Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                        -  -  -
     THE UNITED STATES OF AMERICA,  :  2:19-CR-00350-JD-1
 3               Plaintiff,         :  2:19-CR-00350-JD-2
           vs.                      :  2:19-CR-00350-JD-3
 4                                  :  Philadelphia, PA
     DONNIE SMITH, ABID STEVENS     :
 5   AND MAURICE QUINN              :  January 28, 2020
                 Defendant.    :  10:21 a.m.
 6            TRANSCRIPT OF JURY TRIAL - DAY TWO
            BEFORE THE HONORABLE JAN E. DUBOIS
 7             UNITED STATES DISTRICT JUDGE
 8   APPEARANCES:
 9   For the Plaintiff:  ROBERT E. ECKERT
                         U.S. ATTORNEY'S OFFICE
10                       615 CHESTNUT STREET
                         SUITE 1250
11                       PHILADELPHIA, PA 19106
                         215-851-8630
12                       robert.eckert@usdoj.gov
13                       ASHLEY NICOLE MARTIN, ESQUIRE
                         U.S. ATTORNEY'S OFFICE
14                       615 CHESTNUT ST.
                         SUITE 1250
15                       PHILADELPHIA, PA 19106
                         215-861-8609
16                       ashley.martin2@usdoj.gov
17   For the Defendant:  BARNABY C. WITTELS, ESQUIRE
                         LACHEEN WITTELS & GREENBERG
18                       1429 WALNUT ST.
                         SUITE 1301
19                       PHILADELPHIA, PA  19102
                         215 735-5900
20
                         MARANNA J. MEEHAN, ESQ.
21                       DEFENDER ASSOCIATION OF PHILADELPHIA
                         SUITE 540 W, THE CURTIS CENTER
22                       601 WALNUT STREET
                         PHILADELPHIA, PA  19106
23                       215-928-1100
                         maranna_meehan@fd.org
24
                         ROBERT C. PATTERSON, ESQUIRE
25                       R.C. PATTERSON LAW OFFICES
                         3513 Southwood Drive
```

Page 2

```
 1                          EASTON, PA 18045

                            610-253-7858

 2                          rcplaw434@gmail.com

 3     Also Present:        RAYMOND MCCONNIE, INTERPRETER

 4     AUDIO OPERATOR:      MICHAEL COSGROVE

       TRANSCRIBER:         JANINE THOMAS

 5                          NOTARY PUBLIC

 6         (Proceedings recorded by electronic sound recording,

            transcript produced by transcription service.)

 7

              VERITEXT NATIONAL COURT REPORTING COMPANY

 8                    MID-ATLANTIC REGION

                 1801 Market Street - Suite 1800

 9             Philadelphia, Pennsylvania  19103

                      (888) 777-6690

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                        Page 3
 1                        I N D E X
                                                            Page
 2
     OPENING STATEMENTS:
 3     By Mr. Eckert                          39
       By Ms. Meehan                          45
 4     By Mr. Wittels                         52
       By Mr. Patterson                       56
 5
 6   WITNESS:  Porfiro Joel Ventura (under separate cover)
 7
                      E X H I B I T S
 8
     PLAINTIFF'S
 9   NUMBER      DESCRIPTION           MARKED ADMITTED
10
     N/A
11   N/A
     N/A
12   N/A
13
     DEFENDANT'S
14   NUMBER      DESCRIPTION           MARKED ADMITTED
15
     N/A
16   N/A
     N/A
17   N/A
18
19
20
21
22
23
     (* Marked prior to the start of the proceeding.)
24
25
```

P R O C E E D I N G S

1           THE COURT:  Good morning everybody.

2           MULTIPLE SPEAKERS:  Good morning, Your Honor.

3           THE COURT:  Please be seated.

4           I call the case of United States of America

5    versus Donnie Smith, Abid Stevens and Maurice Quinn.  Criminal

6    number 19-350.  We're beginning day two of the trial.

7           I decided it was necessary to talk to counsel

8    out of the presence of the jury, because there was an issue

9    raised yesterday.  I directed that briefs be submitted.  None

10   were submitted and we're going to have to rule or the

11   government is not be permitted to call the witness until I

12   have enough material to enable them to rule.

13          So I want to know what, if anything, has been

14   done with respect to the issue of the immigration status of

15   one of the government's witnesses.

16          MR. ECKERT:  Well, Your Honor, I think that

17   where we are is this, the defense had a good faith basis to

18   ask them about his immigration status, if there's some kind of

19   issue there, and I think the proffer for that needs to be more

20   than just he's a Hispanic person than certainly, they may be

21   able to inquire about that, but again, we have -- I don't

22   believe the government can ask the victims of crimes just

23   because they are Hispanic about their immigration status.

24   We've received no information whatsoever that the victim in

25   this case is not of legal status, but it's an incredibly

Page 5

 1    showing the fact, and it frankly goes against many things that

 2    this country stands for, for us to say to him, just because

 3    you're Hispanic, we think it might come up, so what's your

 4    immigration status.

 5            Now, again, if there's some information that

 6    they have or if we had discussed any kind of benefits with

 7    him, absolutely, we have an obligation, particularly to turn

 8    that over, but we have not had any discussion with him

 9    whatsoever about his immigration status.  Now, again, if they

10    have some good faith basis under cross-examination to ask him

11    about his immigration status then it's more than just he's

12    Hispanic, and I think they would have a right to do that, but

13    that's where the government stands on the issue.

14            THE COURT:  Your position is that defense

15    counsel can ask the witness about his immigration status?

16    Supposing he says, I'm an illegal immigrant, then what?

17            MR. ECKERT:  Then they could argue whatever --

18    if that's the motive they fabricated in their opinion, I think

19    they would have a right to argue that in closing.  We'd have

20    to think more about what the bounds of that argument is, but

21    I -- again, I say that with the caveat that I think there

22    needs to be more than just this guy works in a store, he's

23    Hispanic, therefore we have a right to ask him.  If there's a

24    reason that they think he's not of status then sure, I think

25    they get to ask him that as it would go to a motive to

Page 6

1    fabricate.

2             THE COURT:  From the government's perspective,

3    is the defense permitted to ask a second question or a second

4    line of questions?  Have you communicated with the government

5    about this?  What about that?

6             MR. ECKERT:  I mean, I haven't thought of that.

7    I haven't really thought about that, Your Honor.  I stand hear

8    saying I've never talked to him -- talked to the victim about

9    his immigration status, and I haven't discussed that with him

10   in the context of, hey, I think this conversation might come

11   up, in fact, I have specifically avoided that for the reasons

12   I've stated.  I don't think it's appropriate for me to ask

13   them about some kind of basis that to believe there's an

14   issue.

15            THE COURT:  What about the privilege about

16   self-incrimination?

17            MR. ECKERT:  So, I mean, if -- I guess if you

18   were to answer yes, there's an issue, then we could certainly

19   get [indiscernible].

20            THE COURT:  Well, that doesn't really work.  Do

21   I have to appoint counsel for him to advise him?  What I'm

22   telling you is that no one in this courtroom, to my knowledge,

23   really thought this out, and to surface the issue as an oral

24   motion in limine, at the beginning of proceedings yesterday, I

25   think that's a mistake.

                                                        Page 7

 1              MR. ECKERT:  May I just offer one point, Your

 2     Honor?

 3              THE COURT:  Yes.

 4              MR. ECKERT:  We have no information whatsoever

 5     to suggest that this man is not of legal status.  If there's

 6     something they know that we don't we can certainly discuss

 7     that, but I don't -- I don't believe that the government

 8     should be instructed to ask all its witnesses just because

 9     they're a defendant, are you legally in the United States.

10              THE COURT:  Well, I asked you to show me

11     something.  There must be some protocol in the office.  This

12     has to come up in Philadelphia prosecutions and the solution

13     that you've come up with, allowing defense counsel to ask him,

14     really puts him in the position of possibly incriminating

15     himself without having been warned he has a right under the

16     Fifth Amendment not to do so.

17              MR. ECKERT:  So I certainly raised this issue

18     with my supervisor in the discovery court -- they were with me

19     as we take the position that if we are aware that a person

20     lacks legal status that would be [indiscernible] that we would

21     turn over, but again, we have no information to suggest that

22     the victim in this matter --

23              THE COURT:  Well, he's a key witness in a case

24     involving three defendants.  Was he an eye witness to all or

25     part of the events that you believe occurred on March 22,

1      2019?

2                   MR. ECKERT:  Yes, Your Honor.

3                   THE COURT:  Was he?

4                   MR. ECKERT:  He was.

5                   THE COURT:  Have you considered or did you

6      consider inquiring and granting him immunity if he ended up

7      telling you that he was an illegal immigrant?

8                   MR. ECKERT:  If he would've told us that -- if

9      he would've told us that he had an issue, we absolutely

10     would've explored some sort of -- all those possibilities, but

11     he's never raised any concerns to us whatsoever about his

12     status.

13                  THE COURT:  Well, what the you're suggesting is

14     we don't instruct him and let him raise any of these concerns,

15     some of which might be very damaging in open court.

16                  MR. ECKERT:  Well, what's the basis?  What's the

17     basis?  Just because he's Hispanic, we get to ask him these

18     questions?  That's what I fail to understand.

19                  MR. WITTELS:  If I may, Your Honor.

20                  THE COURT:  All right.  Yes.

21                  MR. WITTELS:  The basis is, my client tells me

22     that the witness told him that he was here illegally.

23                  THE COURT:  Illegally?

24                  MR. WITTELS:  Yes.

25                  MR. ECKERT:  And that would be a good faith

Page 9

 1   basis.  I would agree that if that's their basis, then they

 2   get to ask him the question, but --

 3               THE COURT:  Wait a minute.  We now have at least

 4   some evidence that witness is here illegally.

 5               MR. ECKERT:  Well --

 6               THE COURT:  And you want me to permit the

 7   defense to ask him on the stand in open court, under oath,

 8   whether he's here legally and you want me to allow him to

 9   possibly, I don't know how he'll answer that question, but

10   possibly incriminate himself or possibly commit perjury in

11   answering that question, without appointing counsel and

12   without advising him -- without anyone advising him of his

13   privilege against self-incrimination under the Fifth

14   Amendment.

15               MR. ECKERT:  Again, I wish I had a better

16   solution, but I don't know what -- if the Court's going to

17   direct us to inquire as to someone's immigration status,

18   because a defendant says in his own interest that, hey, this

19   guy's told me -- it's some evidence, and the standard for

20   cross-examination questions is very low for good reason.

21               THE COURT:  You misunderstand.  Whether there is

22   a basis for cross-examination is an issue, but we'll never

23   know how he will answer that question for sure, and if he

24   incriminates himself, he can be removed from the country.  He

25   can be charged criminally, and that presents problems for me.

Page 10

1    And I asked for briefs and I got nothing.

2              All right, Mr. Eckert, you may be seated.  I

3    gather, I've gotten all I can get from you on his issue.  Ms.

4    Meehan.

5              MS. MEEHAN:  Thank you, Your Honor, I apologize,

6    but I'm in the process of filing a letter brief.  It's my

7    understanding and for with the limited amount of research we

8    did it, it looks like the government doesn't necessarily have

9    to ask a witness if he is -- what his immigration status is,

10   but if they're aware of it, and in fact, he's here illegally

11   that could be Brady material.

12             Your Honor, anecdotally, I know of -- well, let

13   me explain why I think it's relevant in this case.  As Your

14   Honor pointed out, Mr. Ventura is the government -- is a key

15   witness for the government.  He's a victim of a crime.  There

16   may be and I'm not saying that I'm absolutely going to

17   cross-examine him on his immigration status, but if in fact,

18   he deviated from prior statements or he embellishes to the

19   point where what we suggest was a very blown out of proportion

20   argument, and he embellishes that even more than what we have

21   already or deviates or is inconsistent, and this develops into

22   more of the fact that he's a victim, then I will want to

23   cross-examine him, because if he is, in fact, a victim of an

24   I'm that is motive for somebody who is -- whose immigration

25   status here is tenuous.  That is motive for them to curry

1    favor with the government.  There are two different types of

2    visas he could be eligible for, potentially.  One is an S

3    Visa, for cooperation with the government, and I understand

4    that Mr. Eckert is saying we haven't offered that.  There's no

5    discussion, I understand that, but I don't know what is in Mr.

6    Ventura's mind and then there is a U Visa for crime victims.

7    And one of the reasons that I think that the City of

8    Philadelphia has the sanctuary policy that they don't ask

9    victims, is because they want the victims to come forward.

10   This government has the opposite.  They have a zero-tolerance

11   policy for people who are here illegally, so I understand why

12   they wouldn't want to ask the witness that question, because

13   it poses exactly what Your Honor just suggested, is that this

14   individual would be in criminating himself on the witness

15   stand.

16          THE COURT:  But if you asked the question, if I

17   allowed you to ask the question and that appears what the

18   government thinks is appropriate, the witness might very well

19   end up incriminating himself without having any guidance.

20          MS. MEEHAN:  I agree with Your Honor.  It poses

21   a problem, but at the same time, Mr. Quinn and Mr. Stevens and

22   Mr. Smith have a right to confront and cross-examine the

23   witness as to any relative motive or bias and I think if he

24   does tend to be -- if it's our belief as defense counsel that

25   he's exaggerating or embellishing that that might be fertile

1   ground for demonstrating that he has some motive to do so, and

2   Your Honor, I know, I see my colleague in the back of the

3   room, anecdotally, I know there was a case, the U.S. versus

4   Jawan Shaw in front of The Honorable Judge Baylson in which a

5   similar issue came up where the defense was saying that the

6   witnesses had fabricated some or all of a robbery of a pizza

7   delivery man or a pizza store, I'm not quite clear on the

8   evidence, but that -- Judge Baylson allowed cross-examination

9   of the victim witnesses in that case, and they were in fact

10  here, they had no legal status here is my understanding and I

11  could explore that more at the lunch break.

12          THE COURT:  Was there a written opinion?

13          MS. MEEHAN:  I don't know the answers to that,

14  Your Honor.  I don't --

15          UNIDENTIFIED SPEAKER:  No, Judge, there was no

16  written opinion [indiscernible].  Judge Baylson just allowed

17  me to cross-examine one of the witnesses, an eye witness to an

18  alleged robbery [indiscernible].

19          THE COURT:  Well, there might have been

20  circumstances in that case that warranted it.  Here we have a

21  situation where no one in the courtroom knows for sure how the

22  witness will answer a question, are you here legally or

23  illegally, and I'm concerned with allowing a witness to

24  incriminate himself without proper counsel.  Now, the

25  government better come up with a way to resolve that problem

1    or someone better come up with a way to resolve that problem.

2    And the witness is not going to testify until it's resolved,

3    and I know how important it is.

4            MR. ECKERT:  I understand the government's

5    ruling.

6            THE COURT:  What?

7            MR. ECKERT:  I understand the Court's ruling.

8            THE COURT:  How do you intend to proceed?

9            MR. ECKERT:  I would ask for a moment to contact

10   my supervisor, because I don't -- I frankly, don't know and I

11   don't want to bind the office to this position.  I think this

12   is a very significant problem.  It's very likely to come up in

13   the future whether a victim of a crime is of the

14   [indiscernible] that would suggest the people --

15           THE COURT:  I can't believe it hasn't been

16   addressed.

17           MR. ECKERT:  I discussed it with them last night

18   and they directed me -- had a discussion that --

19           THE COURT:  Did anyone raise the Fifth Amendment

20   issue?

21           MR. ECKERT:  May I have one moment, Your Honor?

22   Not directly.  What was told to me was that if we had any

23   knowledge that he was not here legally that would be Giglio

24   [ph] that we would turn over, but we no basis to think that

25   this guy's not here legally.  So how would we ask him that?

Page 14

1    On what -- on what plant would anyone ever come into us and

2    say, yes, I'm a victim of a crime, and if the next question

3    from the government is, are you here legally, and I understand

4    the Court's --

5              THE COURT:  Well, then the answer is, you

6    should've thought it through and ask me to appoint counsel to

7    represent him, and then counsel could handle it.  That would

8    satisfy me completely.

9              MR. ECKERT:  But do we do that with every

10   witness who's Hispanic?  What -- we have no basis to think

11   this guy is not here legally.

12             THE COURT:  Well, maybe a little basis, in

13   your -- Mr. Wittels' client statement, but I don't think

14   that -- that's not the answer, and I guess when you have a key

15   government witness in a case, and I know how important -- I've

16   read your submission, so I don't know how important this

17   witness is to you, but I'm not going to allow the government

18   to sacrifice a witness.  You've got to do something to protect

19   him and you can.  You could have thought of this.  You had to

20   think of this.  I mean, it was the first thing that crossed my

21   mind when the issue was raised yesterday.  It didn't occur to

22   me until Ms. Meehan raised the question.

23             I just don't know what your thinking is, but you

24   can certainly determine from your superior how they want to

25   handle it.  One way to do it is to -- see, I don't know how

Page 15

1    long it takes and I'm sure it takes a while to get proper

2    clearance to grant immunity, you can do that.  There are lots

3    of ways you could have handled it.  I don't know that you can

4    handle it in short notice, and the last thing in the world I

5    want to do is continue the trial, but although the Speedy

6    Trial Act clock has stopped, because we started jury

7    selection, jeopardy, did jeopardy attach when you swore the

8    jury?

9              MR. ECKERT:  It did, Your Honor.

10             THE COURT:  Then you have a real problem.  Talk

11   to your superior and see how they want to handle it, but Mr.

12   Wittels -- why don't we let Mr. Wittels speak first.

13             MR. WITTELS:  Yeah, Judge, additionally, I

14   received a communication, I believe other counsel did from the

15   government last night that they have discussed with Mr.

16   Ventura, the witness, and his -- relocating him and his

17   family, although no money has been spent on relocating him.  I

18   don't think you can relocate someone who's an unlawful,

19   undocumented alien, because they're subject to deportation.

20             THE COURT:  Thank you.

21             MR. ECKERT:  Right.  Under Giglio, we turned

22   over the fact that we provided him with one night of

23   emergency --

24             THE COURT:  I'm sorry, say that again.

25             MR. ECKERT:  Under Giglio, we turned over --

1    last night, we put him up in a hotel, because he's scared.

2    And so we turned that over under Giglio that we gave him -- we

3    provided him with a hotel and he's -- we've discussed

4    potential -- the possibility of relocation, but we have not

5    spent any money as of yet.  Both of those things can be

6    cross-examined, if the defense wants to.  That's why we turned

7    it over.

8              Again, we have no information to suggest he's

9    not here legally.  So to Mr. Wittels' point, I'm just lost as

10   to how -- what we're expected to do when he says, oh, I'm

11   scared, so I would like to go to a hotel, why, are you here

12   legally, we -- we're not in the position to do that.

13             THE COURT:  Did he say why he was afraid?  Why

14   he was "scared" and --

15             MR. ECKERT:  He did, and I'm not at liberty to

16   discuss that in open court, Your Honor.  They're very specific

17   concerns.

18             THE COURT:  Well, I see nothing, absolutely

19   nothing wrong with what you've just said, you put him up in a

20   hotel and told the defense, and also told the defense you're

21   at least potential long-range plans, but that doesn't

22   alleviate the issue of having a witness on the witness stand

23   being asked a question that might incriminate him and might

24   end up either in criminal proceedings or removal.

25             MR. ECKERT:  Sure.  I ask for 10 minutes to run

1   that issue with my superiors.

2           THE COURT:  My suggestion is you do that, and

3   you might want to go all the way.  I remember sitting in this

4   chair and looking at government counsel and seeing as the line

5   AUSA, the current U.S. Attorney, he's got a lot of experience

6   in the courtroom, and see what you come up with.  How much

7   time do you think you need?

8           MR. ECKERT:  Ten to fifteen minutes, Your Honor.

9           THE COURT:  Fine.  I'm going to ask Michael,

10  Michael.

11          DEPUTY CLERK:  Yes.

12          THE COURT:  I want you to advise the jury that

13  we have a legal issue and it will take us, oh, another 10 or

14  15 minutes.

15          DEPUTY CLERK:  [Indiscernible].

16          THE COURT:  What?

17          DEPUTY CLERK:  [Indiscernible].

18          THE COURT:  I'm sorry, I thought you were --

19          UNIDENTIFIED SPEAKER:  I -- it's fine.

20          THE COURT:  I thought you were not here.  All

21  right.  I think what we'll do is recess and Mr. Cosgrove will

22  stay in the courtroom.  Let us know what you decide.  There

23  might very well be a way to resolve this, but I haven't

24  thought of it, and it certainly hasn't been provided by anyone

25  in the courtroom.  So with that, we'll be in recess, 15 or 20

1    minutes, hopefully you can get back to us by then.

2              Is there anything else you have to do first?

3    Nothing?  We're in recess for 15 or 20 minutes.

4              DEPUTY CLERK:  All rise.

5                        -  -  -

6       (Whereupon, there was a recess in the proceeding from

7                 10:41 a.m. to 11:26 a.m.)

8                        -  -  -

9              DEPUTY CLERK:  All rise.

10             THE COURT:  Be seated, everyone.  We have done a

11   little more research, and made some telephone calls, but I

12   want to hear from you first.

13             MR. ECKERT:  May I?

14             THE COURT:  You may, sir.

15             MR. ECKERT:  Your Honor, we -- my supervisor

16   made the call to inquire of the witness what his immigration

17   status was, and we confirmed this through the United States

18   Citizenship and Immigration Services.  The witness -- it has

19   been discussed, Mr. Ventura is a conditional permanent

20   resident with a pending application to remove conditions.

21   Thus, he is currently in lawful status to live and work in the

22   United States and not subject to removal.  His status is

23   derivative through his wife who is a citizen.

24             THE COURT:  Well, that solves the problem.  I

25   think.

1               MR. ECKERT:  We would agree with that, Your

2      Honor.

3               THE COURT:  Does everyone agree it solves the

4      problem?

5               MR. PATTERSON:  Yes, Your Honor.

6               MS. MEEHAN:  Yes, Your Honor.

7               THE COURT:  For the benefit of all of you --

8               MR. WITTELS:  Sorry, Judge.  Is he currently in

9      removal proceedings?

10              MR. ECKERT:  No.  He's not subject to removal

11     proceedings.

12              MR. WITTELS:  He's not subject.  Okay.

13              THE COURT:  For the benefit of all of you, I

14     think were the defendant not a legal -- well, I think this,

15     first of all, there are several crimes relating to immigration

16     status.  Illegal entry and illegal reentry are of course

17     crimes.  Mere presence in the United States unlawfully, I am

18     told, and this would have to be verified, I am told that is

19     not necessarily a crime.  It might not be a crime, unless

20     there was an illegal entry or an illegal reentry, but mere

21     unlawful presence in the United States standing alone, not a

22     crime.  But what happens if a defendant makes that type of

23     statement or admission on the witness stand, he would be

24     subject to removal by ICE.  So there are issues.

25              I quickly called an attorney, a defense attorney

Page 20

```
 1   known to me, he was a clerk for me, and in my judgment he is
 2   just super, and he's very familiar with immigration law and
 3   volunteered to come to the courthouse if necessary and meet
 4   with the witness and his attorney, undertake representation.
 5   And I mention all of this, because I think that's the way the
 6   government should consider proceeding with this type of case
 7   in the future.  Not necessary in this case in view of his
 8   status and I guess so much for the education.
 9            Now, in view of that answer, you're not going to
10   ask the question?
11            MS. MEEHAN:  No, Your Honor.
12            THE COURT:  Fine.  And no one else, Mr. Wittels?
13   Mr. Patterson?
14            MR. PATTERSON:  No, Your Honor.
15            MR. WITTELS:  No, Judge.
16            THE COURT:  Will not ask the question?
17            MR. WITTELS:  No, sir.
18            MR. PATTERSON:  No, Your Honor.
19            THE COURT:  Then it is indeed a moot issue.  And
20   it's only taken an hour and a half, but I'm glad it was
21   resolved.  Is there anything else that needs to be done?
22            MR. ECKERT:  Not from the perspective of the
23   government, Your Honor.
24            THE COURT:  Then where are we in the trial?
25   We're ready to proceed with preliminary jury instructions?
```

```
                                                          Page 21
 1              MR. ECKERT:  We are, Your Honor.

 2              MR. PATTERSON:  Your Honor, we discussed this

 3      previously.  It was the intent, subject to the Court's

 4      approval for openings only and it would be consistent with how

 5      the series of events progressed that Ms. Meehan would go first

 6      for openings.  And then after openings we would go back to the

 7      normal progression of me going first, since Mr. Smith is the

 8      first on the indictment.

 9              THE COURT:  All right.  You want me to give my

10      preliminary jury instructions first, though?

11              MR. PATTERSON:  Yes, Your Honor.

12              THE COURT:  I have two versions.  I have the

13      short version and the long version.  And I'm inclined to think

14      the short version is the one I'm going to give.  It's too --

15      and we've kept the jury waiting too long.

16              So Ms. Hull, and then I want you to call

17      [indiscernible].

18              DEPUTY CLERK:  All rise.

19                            - - -

20              (The jury enters the courtroom.)

21                            - - -

22              THE COURT:  Be seated, everyone.  A very belated

23      good morning, and an apology for two things.  Number one, the

24      breakfast that I promised you, never arrived because by the

25      time we recessed yesterday, it was too late to order anything
```

Page 22

1    for you, but we have remedied that and you have our apology.

2            Number two, you also have my apology for the

3    delay in getting started this morning.  Late last evening,

4    after you were on your way home, one of the attorneys raised a

5    legal issue that no one involved in the case had ever

6    considered, and it was, in my judgment, harkening back to my

7    law school days, one of these exciting legal issues that we

8    had to get decided before we could proceed.

9            And it's not one that comes up regularly, or at

10   all.  We could find absolutely no authority, but we worked

11   through it.  Unfortunately, working through it took about an

12   hour and a half this morning and it should not have.  My goal

13   in trying this case is to have you in the courtroom when

14   you're in the building and not sitting in the jury room.  So

15   we're going to try to avoid any delays such as this one.

16   Again, it was unexpected, and we're going to keep them to a

17   minimum.

18           I'm smiling a little bit, because the legal

19   issue was the kind of stuff that I remembered talking about in

20   law school and for me, that was a heck of a long time ago.

21   Let the record show, there was a chuckle from the jury.

22           I'm now going to give you preliminary jury

23   instructions that will help guide you in your participation in

24   the trial.  It will be your duty to find from the evidence in

25   the case what the facts are.  You will hear all of the

Page 23

1    evidence and you decide what is believable or credible.

2    That's your job.  You're the fact finders and you decide the

3    case.

4              You're the judges of the facts.  You will then

5    have to apply these facts, the facts that you find to be

6    believable to the law as I instruct you on the law, and reach

7    a verdict.  And you must follow the law that I give you,

8    whether you agree with it or not.

9              Nothing I may say or do during the course of the

10   trial is intended to indicate, nor should be taken by you, as

11   indicating what your verdict should be.  You, and you alone,

12   decide this case.

13             Now, the evidence from which you will find the

14   facts, consist of the testimony of witnesses and they'll

15   testify from the witness stand.  On my right, your left,

16   documents and other things received into the record as

17   exhibits.  And any facts the lawyers agree to or stipulate to.

18             I should tell you that a stipulation is fancy

19   legal word for an agreement.  And in cases where the parties

20   agree that something can be proven by witnesses, rather than

21   call the witness into court and take the Court's time and the

22   jury's time, the parties agree or stipulate to certain facts.

23             Now, certain things are not evidence, and must

24   not be considered by you.  And I will tell you what they are.

25   Number one, statements or arguments and questions by lawyers,

1    are not evidence.  The evidence in the case is the question

2    asked of a witness and the witnesses answer taken together.

3    And of course, all of the other exhibits and other things that

4    are offered in evidence, in addition to the testimony of the

5    witnesses.

6              Two, objections to questions are not evidence.

7    Lawyers have an obligation to their clients to object to a

8    question when they believe the question is improper under the

9    rules of evidence.  The rules of evidence set a floor below

10   which the Court is not permitted to receive evidence.

11             You will receive -- we will present to you, or

12   the lawyers will present to you, all the evidence in the case

13   that is relevant and admissible.  If I sustain an objection to

14   evidence, that means that the evidence falls below this floor

15   which is established under the rules of evidence.  Too

16   [indiscernible] both, for some other reason, the evidence is

17   not capable of receipt.

18             Now, when a lawyer objects, you should not hold

19   that against him, if I overrule the objection.  He's just

20   doing what's required under the rules of trials like this one,

21   but the long and the short of it, you should not consider

22   objections, you should consider the evidence that I allow.

23   And if I disallow evidence, you should forget about it.  If a

24   witness starts to answer a question and an objection is made,

25   because he gets into an issue that is improper under the rules

Page 25

1    of evidence, I'll address that issue, that objection, and if I

2    conclude the objection is proper, I'll strike the evidence,

3    which means, I'll remove it from the record and you'll have to

4    ignore it.  I'll instruct you to ignore it, to disregard it.

5    If I do that, you must disregard it.  And it's hard, but it's

6    the fair thing to do and that's really what you're here to do,

7    to be fair in your judgments about the case.

8            Now, testimony that I've excluded or told you to

9    disregard, as I said, is not evidence.  It must not be

10   considered.  Anything you may have seen or heard outside the

11   courtroom is not evidence and must be disregarded.  You are to

12   decide the case solely on the evidence presented here in the

13   courtroom.

14           Now, there are two kinds of evidence, direct and

15   circumstantial.  Direct evidence is direct proof of a fact,

16   such as testimony of an eye witness.  Circumstantial evidence

17   is proof of a fact from which you may infer or conclude that

18   other facts exist.

19           Now, let me give you an example.  If someone

20   walks into the courtroom in a rain coat with an umbrella, and

21   they're dripping wet, it is fair to assume that they were

22   outside and that it is raining outside.  The wet umbrella, the

23   wet raincoat is circumstantial evidence of the fact that it's

24   raining outside, although this courtroom has no windows and

25   you cannot see the rain.

Page 26

1           Direct evidence of rain would be being outside

2      or being at a window and being able to see the rain.  And the

3      long and the short of that difference, you may consider both

4      direct and circumstantial evidence in deciding the case.

5           Now, I told you earlier, you must find from all

6      of the evidence, what evidence is believable.  It will be up

7      to you to decide which witnesses to believe, which witnesses

8      not to believe and how much of any witness' testimony to

9      assessment or reject.  I'll give you a guideline or two about

10     how you should do that now, but at the end of the case, I will

11     give more detailed guideline.

12          One thing you should consider is the extent to

13     which a witness's testimony is backed up or corroborated by

14     other evidence in the case.  Or the extent to which a witness'

15     testimony is contradicted by contrary evidence in the case.

16          Another thing you may consider, and again, I say

17     you may consider, you don't have to, is the way the witness

18     handles questions on cross-examination.  The government will

19     start its case by introducing evidence, witnesses and the

20     defense get to cross-examine those witnesses.  See how the

21     witnesses respond to questions on cross-examination.  Again,

22     just two guidelines for the way in which you assess the

23     contribute or believability of a witness.

24          Now, this is a criminal case, as you know.

25     There are three basic rules about a criminal case that you

```
 1    must keep in mind.  First, the defendants are presumed incent
 2    until proven guilty.  The indictment against the defendants
 3    brought by the government is only an accusation, nothing more.
 4    It is not proof of guilt or anything else.  The defenses start
 5    out with a clean slate.
 6              Second, the burden of proof is on the government
 7    until the very end of the case.  The defendant has no -- are
 8    you okay?
 9              UNIDENTIFIED SPEAKER:  Sorry.
10              THE COURT:  Do you need some water.
11              UNIDENTIFIED SPEAKER:  No.  I put a cough drop
12    in.
13              THE COURT:  Second, the burden is on the
14    government until very end of the case.  The defendant has no
15    burden to prove his innocence or to present any evidence or to
16    testify.  Since the defendant has the right to remain silent,
17    the law prohibits you in arriving at your verdict from
18    considering that the defendants may not have testified.
19              Third, the government must prove the defendant's
20    guilt had beyond a reasonable doubt.  I will give you further
21    instructions on this point later, but bear in mind that in
22    this respect, a criminal case is different from a civil case.
23    The burden of proof in a civil case is much easier to
24    establish.  Again, the burden in a criminal case is to prove
25    every element of the offenses charged beyond a reasonable
```

Page 28

1   doubt.

2             And now, I'm going to tell you about the charges

3   and the elements.  The defendants Donnie Smith, Abid Stevens

4   and Maurice Quinn are charged in the indictment with

5   committing a robbery on or about March 22, 2019, which

6   affected interstate commerce, and aiding and abetting that

7   crime.  That's count one of the indictment.

8             And they're charged in count two with using,

9   carrying and brandishing a firearm in relation to a crime of

10  violence for which they may be prosecuted in a court of the

11  United States.  That is, the crime of robbery which affects

12  interstate commerce, as charged in count one of the

13  indictment.  They're also charged with aiding and abetting

14  that crime.

15            I will now give you the essential elements of

16  each of those crimes.  Interstate robbery, robbery affecting

17  interstate commerce, rather, and aiding and abetting, using,

18  carrying or brandishing a firearm, and aiding, abetting, there

19  are really four sets of the elements that the government will

20  be trying to establish in this case.

21            First, the elements of the crime of robbery

22  affecting interstate commerce as charged in count one of the

23  indictment are as follows, and before I get into them, I'm

24  going to cover this again, in detail, at the end of the case.

25  And I will give you, in addition to my oral instructions on

1    the law at the end of the case, I'll give you written copies

2    of the charge.  So you'll have it in writing.  If you wish to

3    take notes, certainly, you may, and I'll have further

4    instructions on note taking.  What I don't want you to think

5    now, oh, my heavens, this is too complicated for me.  It is

6    not.  And we'll make it as easy as we can.

7             And now, the elements of the crime of robbery

8    affecting interstate commerce.  First, and the government must

9    prove each of these elements beyond a reasonable doubt.

10   First, that defendants, Donnie Smith, Abid Stevens and Maurice

11   Quinn, took from employees of RD Grocery, the property

12   described in count one of the indictment, $100 in United

13   States currency and a firearm, specifically, a Glock 26

14   9-millimeter semi-automatic handgun.  Bearing serial number

15   BCXX649, loaded with eight live rounds of ammunition.

16            Second, that defendants Smith, Stevens and Quinn

17   did so knowingly and willfully, by robbery, and third, and as

18   a result of the actions of Smith, Stevens and Quinn,

19   interstate commerce was affected, delayed or obstructed.

20            Now, count one also charges defendants Smith,

21   Stevens and Quinn with aiding and abetting the crime of

22   interfering with interstate commerce by robbery in violation

23   of a provision of the United States Code.  Under the aiding

24   and abetting statute, it is not necessary for the government

25   to prove that a defendant himself committed the crime with

1    which he is charged, in order for you to find him guilty of

2    that crime.  A person who aids or abets another to commit an

3    offense is just as guilty of that offense as if he committed

4    it himself.

5           In and out elements of the crime of aiding and

6    abetting as charged in count one of the indictment are as

7    follows.  First, that the substantive crime charged was

8    actually committed by another.  That is, that someone

9    including one of the defendants obstructed, delayed and

10   affected interstate commerce by robbery.  So someone must have

11   committed the crime.

12          Second, that Smith, Stevens and Quinn knew that

13   the offense charged was going to be committed or was being

14   committed by someone including one of them.  Third, that

15   Smith, Stevens and Quinn knowingly did some act for the

16   purpose of aiding someone including one of them in committing

17   the specific offense charged with the intent that that someone

18   including one of them commit the specific offense.  And

19   fourth, that Smith, Stevens and Quinn performed an act in

20   furtherance of the crime charged.  That's the burden on the

21   part of the government, the government must prove each of

22   these essential elements for the crime of robbery affecting

23   interstate commerce and aiding and abetting the commission of

24   that crime beyond a reasonable doubt in order to obtain a

25   conviction.  And they can obtain a conviction on count one if

Page 31

1     they prove one set of elements beyond a reasonable doubt or

2     the other set of elements.  There are two ways of committing

3     the crime of robbery affecting interstate commerce.  The

4     second way being aiding and abetting.

5              Now, I turn to count two.  It charges that on or

6     about March 22, 2019, the three defendants knowingly used,

7     carried and brandished and aided and abetted the use, carrying

8     and brandishing of a firearm.  That is two black

9     semi-automatic handguns and a Glock 26 9-millimeter

10    semi-automatic pistol, bearing serial number BCXX649, loaded

11    with eight live rounds of ammunition, during and in relation

12    to a crime of violence for which they may be prosecuted in a

13    court of the United States and that crime is the robbery

14    affecting interstate commerce charged in count one of the

15    indictment.

16             In order for the defendants to be found guilty

17    of the crime of using or carrying or brandishing a firearm

18    during and in relation to a crime of violence, the government

19    must prove each of the following three essential elements

20    beyond a reasonable doubt.

21             First, that defendants committed the crime of

22    interference with interstate commerce by robbery as charged in

23    count one of the indictment.  Second, that during and in

24    relation to the commission of that crime of the defendants,

25    knowingly used or carried a firearm.  And third, that

1    defendants used or carried the firearm during and in relation

2    to the crime of robbery which affected interstate commerce.

3              Now, count two also charges the defendants with

4    aiding and abetting the commission of that crime.  In order

5    for the defendants to be found guilty of aiding and abetting,

6    the crime of using or carrying a firearm during and in

7    relation to a crime of violence, the government must prove

8    each of the following elements beyond a reasonable doubt.

9              First, that the substantive crime charged was

10   actually committed by another.  That is that someone including

11   one of the defendants knowingly used or carried a firearm in

12   relation to a crime of violence.  Second, that the defendants

13   knew that the offense charged was going to be committed or was

14   being committed by someone including one of them.

15             Third, that defendants were active participants

16   in the crime of robbery affecting interstate commerce, and

17   also had advance knowledge that someone, including one of

18   them, would use or carry a firearm during and in relation to

19   the crime of robbery affecting interstate commerce.

20             And fourth, and finally, that defendants

21   performed an act in furtherance of the crime charged.  And

22   finally, and I know this is an awful lot, the government must

23   prove those essential elements beyond a reasonable doubt.  And

24   that you can prove that charged in the second count either by

25   proving that the defendants used or carried a firearm in

1    furtherance of a robbery affecting interstate commerce or that

2    they aided and abetted the commission of that crime by someone

3    else, including one of them.

4         All right.  Now, a few words about your conduct

5    as jurors.  I told you earlier, you must decide the case based

6    solely on the evidence presented in the courtroom.  This

7    means, that during the trial, you must not conduct any

8    independent research about the case, the matters in the case,

9    and the individuals involved in the case.  In other words, you

10   should not consult dictionaries or reference materials, such

11   the Internet, websites, blogs or use any other electronic

12   tools to obtain information about the case or to help you

13   decide the case.  In short, do not try to find out information

14   from any source outside this courtroom.

15        Until you retire to deliberate, you may not

16   discuss the case with anyone, even your fellow jurors.  Now,

17   let me explain the proscription.  The prohibition on your

18   right to discuss the case among yourselves.  You must wait

19   until all of the evidence is received, until you hear the

20   closing arguments of counsel and until you hear my

21   instructions on the law at the end of the case, before you

22   deliberate.  It's unfair to start deliberating before all of

23   that evidence and the arguments of counsel and my instructions

24   are received.  And that's really why you can't start talking

25   about the case in groups of two or three or five or however

1    how many.  In short, you cannot begin your deliberations until

2    all of the evidence is received and until you have the things

3    that come at the end of the case, closing arguments and my

4    instructions on the law.  That's the fair thing to do.

5            Moreover, you cannot discuss the case with

6    anyone else.  You might ask, well, why is that?  Well, the

7    reason is, you've got to decide the case, based solely what

8    you hear in the courtroom, what you read in the way of

9    exhibits and you cannot decide the case based on what someone

10    else might say about the case.  So, if you go home at night

11    and your significant other or child or friend asks you, well,

12    what did you do today, and you say, well, I'm sitting as a

13    juror in a case, well, what's it about, and this person might

14    suggest to you something which did not come from you, that's

15    improper.  And the same prohibition exists with respect to

16    anything that might be written about the case or anything that

17    might be broadcast on radio or television about the case.

18            Courtrooms are open, reporters are welcome.  I

19    don't know whether they will appear in the courtroom, but if

20    anything happens to be broadcast on radio dealing with the

21    case, or broadcast on television dealing with the case, or

22    written about the case in the newspaper, disregard it.  Put it

23    down.  You can read that after you reach a verdict.  And

24    again, the reason, you must decide the case based solely on

25    the evidence presented in the courtroom and my instructions on

Page 35

1   the law, and not on the spin a reporter might put on the case
2   in a radio announcement or a television bit of news or what a
3   reporter might say in the newspaper.
4           You may not communicate with anyone about the
5   case on your cell phone, through e-mail, Blackberry, iPhone,
6   text messaging or on Twitter, through any blog or website,
7   through any Internet chat room or by way of any other social
8   networking websites including, Facebook, Myspace, LinkedIn and
9   YouTube.  Finally, do not form any opinion about the case
10  until all the evidence is received.  You should keep an open
11  mind until you start your deliberations at the end of the
12  case.
13          Now, a word about note taking.  I've given each
14  of you a notebook.  If you put your names on the notebook.
15  The notebooks should not be left in the courtroom.  They
16  should be left in the jury room during recesses and at the end
17  of the day.  My court staff will ensure that no one reads your
18  notes.  They are your personal notes.  They are not for
19  reading or sharing with anyone else.
20          A word of caution about note taking.  Some
21  people are intense note takers.  And they get wrapped up in
22  note taking, and in doing that, they might, I underscore the
23  word might, miss what a witness is saying or what an attorney
24  is saying and that is not good.  I can remedy that myself, if
25  I happen to do that, and I take notes, if I miss something, I

1    just hold up my hand and have my courtroom deputies read back

2    or play back whatever it is that I might have missed.  You do

3    not have that luxury.  So my word of caution, do not in your

4    note taking, get so wrapped up in what you're writing that you

5    miss what a witness is saying or what else is going on in the

6    courtroom.  And one last comment about note taking.  Notes are

7    for your own personal use.  They are not to be shared with

8    anyone else.  And you should not be influenced by someone who

9    is a copious note taker in the event you are not a copious

10   note taker.

11          Now, I'm about to stop talking.  The trial will

12   now begin.  First, the government will make an opening

13   statement.  It is an outline of what the government expecting

14   to be able to prove.  Next, defense counsel may, but need not

15   make opening statements.  I should add, opening statements are

16   neither evidence nor arguments.  They are simply an outline of

17   what the proponent of the opening expects to prove.

18          Of the opening statements, the government

19   presents its witnesses, and counsel for defendant may

20   cross-examine them.  You'll note that when the government

21   presents its witnesses, it may not ask leading questions.  A

22   leading question is one which suggests the answer, like, isn't

23   it correct that after dinner, you went to bed?  And the answer

24   is yes or no.  That's a leading question.  A leading question

25   for the most part is one that can be answered by saying no.

Page 37

1          A non-leading question, same subject matter

2    would be, what did you do after dinner?  The witness then has

3    to speak and say, I went to bed or I did whatever I did, but

4    the witness does the speaking, more of the speaking in a

5    question that is non-leading.  The proponent of a witness may

6    not ask leading questions.

7          After the government presents its evidence, the

8    defendants may, but need not present their evidence.  And if

9    they present witnesses, although they don't have to, but if

10   they do, the government may cross-examine them.  After all the

11   evidence is in, the attorneys present their closing arguments.

12   In their closing arguments, they will argue to you as to why

13   they think you should find in favor of their client.  The

14   government counsel will argue that you should convict.

15   Defense counsel will argue to the contrary.  And after all of

16   that I will give you my instructions on the law.  And I'll

17   deliver them orally.  I'll also give you written instruction

18   with a detailed table of contents, so if you have any

19   questions about anything in the instructions you should be

20   able to go with a chapter and verse without any difficulty at

21   all.

22          And now I'm going to stop talking.  Mr. Eckert,

23   it's a little after 12.  I think we should start the openings

24   now.  We're not going to finish them before lunch.  How long

25   do you expect to be?

Page 38

```
 1              MR. ECKERT:  Not very long, around 10 or 15

 2    minutes.

 3              THE COURT:  All right.  We'll start and before I

 4    let you go for lunch, I'm going to give you an idea of what

 5    our schedule will be today and for the rest of the week.  Mr.

 6    Eckert, you may --

 7              MR. ECKERT:  Thank you, Your Honor.  May I enter

 8    the well?

 9              THE COURT:  You may.

10              MR. ECKERT:  Thank you.

11                            -  -  -

12                      OPENING STATEMENT

13                            -  -  -

14              MR. ECKERT:  On March 22, 2019, Maurice Quinn

15    tried to pull off a scam at a mom and pop store in Northwest

16    Philadelphia, and he got caught.  The store clerk looked at

17    the money, said it was fake.

18              Mr. Quinn wouldn't take no for an answer.  What

19    he did was he left the store and he came back with Mr. Smith

20    and Mr. Stevens and he came back with Smith and Stevens,

21    because they both had guns.  They both had firearms.

22              When Mr. Quinn goes back in the store, he stands

23    in the doorway.  A few seconds later, Mr. Smith comes through

24    the door, takes one step to the right and immediately draws a

25    firearm from his waistband and points it right at the clerk.
```

1          Mr. Stevens, at the same time draws his firearm

2    and he keeps it down at his side.  These three gentleman

3    advance, that is they backed the store clerk, literally into a

4    corner where he has nowhere else to go.

5          You'll hear evidence that the store for a few

6    defendant reasons also keeps a firearm in the store for

7    protection.  The store clerk's firearm is at his side.  It's

8    either in his pocket or at his side the entire time this whole

9    interaction goes on.

10          They forcibly take his firearm, Mr. Smith, with

11   his own hand as Mr. Smith's gun with his hand is pointed at

12   his head and Mr. Stevens' gun is pointed at the clerk's head,

13   Smith takes the firearm from the clerk and puts it in his

14   pocket.

15          At this point, Quinn goes back behind the

16   register and he tries to open up the cash register, but he

17   doesn't know how.  He can't figure it out.  So he comes back

18   out, physically goes up to the store clerk and points him back

19   behind the register and he makes the clerk open up the

20   register where the clerk then takes out $100, hands it over to

21   Mr. Quinn, and they leave the store.

22          Now, the scam that we have in this case is that

23   the defendant, Mr. Quinn, he goes up to the ATM, and he takes

24   out $20 from the ATM.  And he goes up to the counter and he

25   gets a pack of -- he buys a pack of cigarettes.  And he gives

1    the clerk the 20-dollar bill.  And the clerk, he's worked in

2    the store for about three years, he's not fluent in English,

3    but he's worked in the store for three years, so he has the

4    ability to communicate.  And he feels the money, he looks at

5    the money and says, that's not real money.  And Mr. Quinn

6    says, well, I just got $100 from your ATM, but in fact, he had

7    only taken out 20.  And he throws the money on the counter,

8    and the clerk knows that this situation is a little bit beyond

9    what he's going to be able to handle, so his first move is to

10   call his boss, the owner of the store, who's fluent in both

11   Spanish and English, because he hopes that he can put her on

12   the phone and she'll be able to talk to Mr. Quinn and explain

13   the situation.  He tries to do so.  Mr. Quinn takes the phone

14   for 15 to 20 seconds, is not satisfied whatsoever.  He

15   continues to argue and argue with the clerk.  When the clerk

16   is not satisfying him, when he's telling the clerk give me the

17   money, give me the money, give me the money, the clerk is not

18   satisfying him, he's not just going to hand over the money,

19   Mr. Quinn comes back around the counter, physically gets in

20   the face of the clerk, is pushing him -- is pushing

21   merchandise, literally that's falling on top of the clerk, the

22   clerk is getting again, backed into a corner, Mr. Quinn says,

23   give me the Glock.  Give me the Glock, because Mr. Quinn is

24   now about two feet from where the store keeps their firearm

25   for protection.  The store clerk has no other choice at this

Page 41

1    point, he takes the firearm and he holds it as his side.  And
2    he holds it at his side and it never leaves there.  And what
3    that does is it causes Mr. Quinn to back up.
4              Now, Mr. Stevens is also out of the store by
5    this point and he's hearing this argument go back and forth
6    between Mr. Quinn and the store clerk.  Both Mr. Quinn and Mr.
7    Stevens tell the store clerk, I'll be back.  I'll be back.
8    That is, they knew what was about to happen.  They knew what
9    they were going to do.  Stevens argues with the clerk for
10   another 30 seconds, just give my guy the money.  Give my guy
11   the money.  They then both leave.
12             You'll see video evidence of Mr. Smith going up
13   to his car, getting something out of his car and, coming back
14   to the store.  We will prove to you beyond a reasonable doubt
15   that that at the second Mr. Smith enters that store, he knows
16   exactly what is about to happen.  And the reason for that is
17   you'll see on the video, within literally two seconds of Smith
18   going inside of that store, he draws a firearm right out of
19   his waistband and points it right at the clerk.
20             The intent here as to what this was is
21   abundantly clear.  There are three people, two of whom are
22   armed with firearms.  They are forcibly taking property from
23   another person.  That, ladies and gentlemen, is a robbery and
24   that's what the evidence will prove in this case.
25             They are advancing on this person.  They are

Page 42

1    backing him into a corner to take his property.  They are

2    doing that at gunpoint.  You will see a great deal of evidence

3    that everything that happened in this case was at gunpoint.

4    Nothing was handed over, just because there was some kind of

5    misunderstanding or some kind of dispute.  They was handed

6    over because two people pointed firearms at the store clerk's

7    head and he believed that he had no other choice than to hand

8    the money over.

9            There are two charges in this particular case.

10   The first is robbery.  That is, that an item in interstate

11   commerce was obstructed or delayed or affected.  What that

12   means is that this business transacts in interstate commerce.

13   It sells things that are manufactured outside of Pennsylvania.

14   And you'll receive evidence about that.  That the business was

15   disrupted.  You'll see evidence on the video that the business

16   was not able to conduct its business as a store while this was

17   going on.  That this whole thing obstructed their ability to

18   do their business and that proves the interstate commerce

19   nexus or element.

20           We will prove to you that the actions of the

21   defendants are purposeful, that is, that they knew what they

22   were doing.  And that the time they entered the store, they

23   knew what was about to take place.  Nothing happened by

24   accident in this case.

25           The second charge is that they carried and used

Page 43

1    firearms in doing so.  That is, that they were able to commit

2    this crime through the carrying of firearms and there's two

3    separate ways that that applies.  The first, is that Mr.

4    Stevens and Mr. Smith both had their own firearms that were in

5    their possession and that they immediately pulled out as soon

6    as they entered the store, but they also used the victim's

7    firearm to facilitate their crime.  That is that Mr. Smith, in

8    taking the firearm that belonged to the store and putting it

9    in his pocket, that's how he facilitated this crime of

10   robbery.  That also will prove Count 2 in this particular

11   case.

12           For Mr. Quinn, although he never actually

13   possessed a firearm, we will prove to you beyond a reasonable

14   doubt that he had advanced knowledge that firearms would be

15   used.  He had advanced knowledge that before he committed the

16   actual robbery, before he tried to get the money out of the

17   register, before he told the victim, and pointed the victim at

18   the register and sent him back to the register, he knew the

19   firearms had been displayed.  He had had an ample opportunity

20   to know that firearms were involved in this case, they would

21   been displayed and the only reason this robbery was going to

22   be successful was because they were using firearms, that is he

23   had had advanced knowledge of the crime that was about to

24   occur.

25           Now, in case that's not enough to demonstrate

Page 44

1    exactly what happened in this case, the government will also

2    present to you evidence of a high-speed chase that the only

3    reason Mr. Quinn and Mr. Smith left the store is because they

4    heard police sirens.  You'll receive evidence that it's clear

5    that they knew that the police were on the way.  Mr. Quinn,

6    literally pulls Smith out of the store.  He grabs him and

7    physically pulls him out of the store.

8              You'll see evidence that Mr. Smith -- the police

9    officer, a Philadelphia police officer tries to stop him,

10   walks up to his car, tries to open the door, tries to take him

11   out of the car and Mr. Smith drives off.  He drives off for

12   miles, upon miles, because he knows that what he just did is a

13   criminal act and it will demonstrate that he was completely

14   conscious of what he did.  He was conscious that his actions

15   were the commission of a crime.

16             What this case is, ladies and gentlemen, is that

17   three people enter a store, two of them are arm ed with

18   firearms, they point those guns right at a person's head, and

19   they use that to take money out of the cash register.  That is

20   a robbery by any definition and that's what we'll prove to you

21   in this case.  That a robbery occurred, and that they used and

22   carried firearms in the commission of that crime.

23             At the conclusion of this case, my colleague Ms.

24   Martin will stand here and she will ask you to return the only

25   verdict that's consistent with the evidence that we presented

1    to you and that is guilty of both counts.  Thank you.

2              THE COURT:  Thank you.  Ms. Meehan.

3              MS. MEEHAN:  Thank you, Your Honor.

4              Good afternoon, members of the jury.  I

5    represent Maurice Quinn, the gentleman in the gray shirt here

6    and you will become very familiar with Mr. Quinn.  You'll see

7    him on video.  I believe both the government and the defense

8    will be showing a good portion of the video, if not all of it.

9              This was not a robbery.  There was no taking,

10   and you'll hear that word as part of the jury instructions

11   when His Honor instructs you at the end of the case.

12   Something has to be taken.  This was an argument that got

13   ugly, got very ugly, but you will see and hear for yourselves

14   from the most reliable, the most credible witness and that is

15   the store video.

16             You will see that on the RD store video, RD is

17   the name of the grocery store, my client, Maurice Quinn, was

18   in the store trying to give back counterfeit money, $100 in

19   counterfeit money that came from RD Grocery's store ATM, the

20   ATM in their store.  He's just been told -- he's trying to buy

21   cigarettes.  This is on March 22nd, and he's just been told by

22   the store clerk, whose name is Mr. Ventura, he's just been

23   told by the store clerk, I can't take this money.  This is

24   counterfeit money, and Mr. Quinn argues with him, this money

25   came from your machine.  It's not counterfeit.  I got it from

1    your machine, whereupon, Mr. Ventura pulls out a special pen

2    and demonstrates for Mr. Quinn that yes, this pen shows that

3    the money, at least this $20 bill is counterfeit and you will

4    see in several places on the video, Mr. Quinn pushing the

5    money at him, trying to give him the money, say, well, then

6    you owe me $100.  This came from your ATM machine, you owe me

7    $100.  That is not robbery.  He was very insistent and in

8    fact, he was at times physical and he was very foul-mouthed,

9    but he was not there with any intention to rob the store.

10           On March 22nd, Mr. Quinn went into the RD

11   Grocery and you'll hear from the government's own witnesses

12   that he is in the store everyday, everyday, several times a

13   day, in fact.  And he uses the ATM frequently.  He hasn't had

14   a problem with the ATM machine before March 22nd.  He's there

15   everyday as part of the fabric of his life.  The store clerk

16   knows him.  The store owner knows him.  Another individual who

17   was working in the store who you'll hear from, Mr. Sanchez,

18   knows Mr. Quinn.  This is a daily thing for him to be in this

19   store and everyone knows everyone.  He would not rob the

20   store.  It's part of his -- the fabric of his life.

21           So -- and he had never taken anything from RD

22   Grocery that wasn't his.  So you will hear from Mr. Ventura,

23   this interaction with Mr. Quinn, and you will see for

24   yourselves on the video, there are several minutes where Mr.

25   Quinn is trying to push the money and give him the money and

Page 47

1    demanding the money from the register, saying you have to give

2    me -- you have to make good on what the store ATM machine gave

3    me, this counterfeit money.

4              And the store clerk, Mr. Ventura says, it's not

5    my machine.  It's not -- the store doesn't own the machine.

6    It's not my problem.  And Mr. Quinn gets angrier and angrier.

7    Mr. Ventura calls, uses his own cell phone and calls the store

8    owner and you'll see that on the video.  And then, in fact, he

9    puts -- Mr. Quinn -- he hands his phone -- and you'll see

10   this, I think it's at -- the video says, it's military time,

11   I'm not great with, but 16:50 and 30 seconds.  I think it's

12   4:50 and 30 seconds, and Mr. Ventura hands his phone over to

13   Mr. Quinn.  And Mr. Quinn is talking to the store owner,

14   trying to get a resolution to this and still being told, it's

15   not our machine.  I'll have to call someone else.  We're not

16   going to settle this today.  We can't help you.  Was he

17   polite?  No.  Was he a jerk?  Most certainly.  He was very

18   foul-mouthed.  Could he have handled this better?  Most

19   certainly.  Most of you probably would've handled it quite

20   differently.  But if you ask Mr. Quinn today, right now about

21   his conduct, I think he would agree that he was unpleasant and

22   a jerk on that day.  But that does not make him guilty of

23   robbery.

24             Mr. Stevens was also in the store watching Mr.

25   Quinn also argue with the cashier.  You will see on the video,

Page 48

1    customers going into the of the store, standing in line,

2    holding potato chips, because they were watching an argument.

3    That's what this was, this was an argument.  It was a dispute.

4    Mr. Quinn lost his temper.  He wasn't willing to wait for

5    someone to make good on the ATM money at some point in the

6    future.  In his mind, he was never going to see his

7    hard-earned $100 again.  So he keeps on arguing and at one

8    point he goes behind the counter and he's yelling and cursing

9    and he is, in fact in Mr. Ventura's face.

10           And you will see Mr. Ventura grab a gun from the

11   shelf behind the counter.  And he holds it at his side and Mr.

12   Quinn backs off.  He did not have a gun.  He did not have a

13   gun.  He was unarmed.  He was there and trying, repeatedly for

14   several minutes to exchange the money, not take the store 's

15   money, but exchange what was in the register for what came out

16   of that store's ATM machine.  From his own bank account, you

17   will see from records that will be introduced, that he, in

18   fact had a bank account with deposits being made and he -- and

19   they are ATM transactions from the RD Grocery Store.  In fact

20   11 of them, I think between the end of December to the date in

21   question of March 22nd.

22           After Mr. Ventura grabs his gun, Mr. Quinn

23   leaves the store for about a minute.  You'll be able to see

24   for yourselves what the timing is on the video.  Still very

25   upset, he's still very frustrated.  He's unarmed.  He has no

Page 49

1    gun.  And he still believes that he has been cheated by the

2    store.  So at some -- he comes back in, it's 16:55:16, 4:55:16

3    all and you'll -- you'll see that on the video.  He comes in

4    by himself.  Mr. Smith comes in at 16:55:47.  So this is

5    really not quite seconds later.  There's a good period of time

6    between when Mr. Quinn comes back into the store and when Mr.

7    Smith comes in and then Mr. Stevens follows him ten seconds

8    behind that at 4:55:57.

9           Mr. Quinn, goes again, behind the counter to get

10   his $100 bill -- $100, excuse me.  And he's, again, trying to

11   open -- he's trying to open the register, and Mr. Ventura's

12   off to the side.  And she's not having any luck getting the

13   register open.  He's still demanding his money.  I want my

14   $100.  The store, you owe, me $100.

15          Ultimately, Mr. Ventura comes to the register

16   and you will see him on the video, counting out $100, five $20

17   bills.  Exactly the amount of money that Mr. Quinn was trying

18   to hand him earlier.  He's try -- you'll see, at the counter,

19   at the beginning of the video, Mr. Quinn is trying to hand Mr.

20   Ventura five $20 bills that Mr. Ventura is saying, these are

21   counterfeit.  You can't use these to buy cigarettes here.

22   These are counterfeit.

23          And you will see that he counts $100, not a

24   penny more.  Shortly, after that, after Mr. Ventura gives the

25   $100 to Mr. Quinn.  He goes back around the corner.  And he

Page 50

1    leaves.  And in fact, he passes the store owner on his way out

2    and he says, got my $100, he's a little bit more foul-mouthed,

3    and he leaves the store.

4           Mr. Stevens is still in the store and Mr. Smith

5    is still in the store for a little bit more time.  Ultimately,

6    you'll see Mr. Stevens is in the store, there are customers

7    there, and he is talking to the three store employees, the

8    store owner, Mr. Ventura, and Mr. Sanchez, another store

9    employee.  And it isn't until 17:05:07, five minutes after

10   5:00, so long after Mr. Quinn has left, that Mr. Stevens, and

11   you will see this on video, Mr. Stevens shakes Mr. Ventura's

12   hand.  They shook hands after this robbery, they shook hands.

13          Mr. Quinn did not unlawfully take money from the

14   grocery by means of force, threat or fear, and he was unarmed.

15   He did not intend to take anything that did not belong to him.

16   He was simply trying to have the store make good on what they

17   should've made good on in his mind.  The money that came from

18   the store's ATM machine that they make money from, they make a

19   profit from.

20          Should he have handled the situation like this?

21   No.  Did he commit a robbery?  No.  So that's count one of the

22   indictment.  Count two, charges Mr. Quinn with aiding and

23   abetting the use and carry of a gun during and in relation to

24   a robbery.  And you know and you'll see, you'll see Mr.

25   Quinn's hands.  You'll see that he doesn't have a gun.  You'll

1    see he's unarmed.  But the government argues that because Mr.

2    Smith and Mr. Stevens had guns that therefore Mr. Quinn is

3    guilty of aiding and abetting the use and carry of a firearm.

4    But the government cannot establish a taking.  That's really

5    the main focus here.  They can't establish the robbery.  And

6    if they can't establish the robbery in count one, Mr. Quinn is

7    certainly not guilty of count two of aiding and abetting, the

8    use and carry of a gun during a robbery.  There's no robbery.

9    There's no use and carry of a gun in furtherance of a robbery.

10           Apart from that, and this is critical, the

11   government wants you to believe that Mr. Quinn had advanced

12   knowledge of Mr. Smith and Mr. Stevens coming in with guns.

13   There's really no evidence of that and I urge you to look at

14   the video and the timing of the video when Mr. Quinn is

15   standing there, he comes in first and it's 25 or 30 seconds

16   after that.  It's not seconds, it's not they're storming in,

17   the three of them together, into the entrance.  There's only

18   one entrance into the grocery store.  They -- Mr. Quinn comes

19   in and then it's about 25 or 30 seconds later, Mr. Smith comes

20   in and then sometime after that about ten seconds later, Mr.

21   Stevens comes in.

22           Judge DuBois will instruct you at the end of the

23   trial what the law is in order for you to find Mr. Quinn an

24   unarmed man guilty of aiding and abetting the use and carry of

25   a gun.  It is the government's burden, their entire burden to

Page 52

1    prove beyond a reasonable doubt that Mr. Quinn robbed the

2    store, count one, and that Mr. Quinn assisted or facilitated

3    the use and carry of a gun during the robbery.

4             The evidence will show that Mr. Quinn did not

5    commit a robbery.  The evidence will also show he did not

6    assist, facilitate or encourage Mr. Stevens or Mr. Smith to

7    brandish guns.  Mr. Quinn is not guilty.  Thank you.  Thank

8    you, Your Honor.

9             THE COURT:  Thank you.  Mr. Wittels, how are

10   we --

11            MR. PATTERSON:  I think it's going to be Mr.

12   Wittels, Your Honor.

13            THE COURT:  Mr. Wittels.

14            MR. WITTELS:  Your Honor, ladies and gentlemen

15   of the jury, good afternoon.  This will be my first

16   opportunity to speak to you.  I will be brief, although you

17   know when a lawyer says he'll be brief, you better watch out.

18   Whoever -- hardly ever really brief.  And then at the end, I

19   will get to argue to you.

20            The essential question in this case for you is

21   going to be was this a robbery or was it an argument.  You may

22   be in your mind whether you've seen it on TV or you know it

23   from experience of other people what a robbery looks like or

24   you've seen it on the news.  Somebody dashed into a store,

25   maybe he's got a mask on, maybe they don't, they point a gun,

1    give me the money.  And the store owner or the clerk opens the

2    register and takes out all the money and the robber then with

3    money in hand dashes away.

4           You're not going to see that in this case.

5    You're going to see people arguing back and forth.  You're

6    going to see my client staying there, trying to resolve the

7    situation, trying to make peace.  You'll see him there, even

8    as the police cars arrive on scene and go off into the

9    distance chasing Mr. Smith.

10          You'll see him stay in that store for a long

11   period of time.  So the question you're going to -- and it's

12   not like he's a stranger.  He lives on the block.  You'll see

13   from the interaction of the people that they all know each

14   other.  What kind of robbery is this?

15          So what you're going to have to focus on is

16   intent.  Was there an intention to rob?  Was there an

17   intention to have an argument?  Or was there an intention to

18   resolve a dispute?

19          Now, the government is going to March in a lot

20   of witnesses, but you need to focus on not the quantity of

21   witnesses, because there's a saying in opera, they also carry

22   a spear, maybe it's large cast and people, they don't have

23   staying roles, they just come on the stage and off the stage,

24   so they're going to March in a lot of witnesses.  They're

25   going to be on the stand.  We won't have many questions of

Page 54

1    most of them and then they'll March off, because things

2    aren't -- some -- most of this is not in dispute, you'll get

3    to see the videotape.  And in this case, you know that saying,

4    a picture is worth a thousand words, well the videotape is

5    worth more than that.  Unfortunately, there's not sound, but

6    you'll be able to judge by people's body language, by where

7    they stand, about how they interact with each other, about how

8    long they're there, you know, what's going on here.  So the

9    video will tell most of the tale.

10            And you'll also get to decide whether or not the

11   witnesses who were there are testifying in a manner that's

12   consistent with what you see on the tape or not.  Whether

13   they're embellishing or not.  Because credibility is going to

14   be for you to judge, not for us, but for you to decide is this

15   person telling me the truth.  How do you do that?  Common

16   sense and you're life experience.  Time and time again, when

17   someone has been talking to you outside of the courtroom

18   setting, you get to decide whether or not they're telling you

19   the truth, being accurate or whether or not you have some

20   doubt, so that's all you need.  Those are the tools you need.

21   The judge will instruct you as to the law and you'll apply it

22   to the law as the fact -- to the facts, because you are the

23   judges of the facts, nobody else.

24            So focus, really, for my client, who's Abid

25   Stevens, and I don't represent anybody else.  I just represent

1    Abid Stevens.  So focus on what he does and how he acts to

2    decide whether or not he's guilty.  Focus on what his role is,

3    what he seems to be about, whether or not this is an argument

4    that he's facilitating or trying to resolve, and whether or

5    not he's committing the crime of robbery, not some other

6    crime, because what you will see on the videotape and there's

7    no dispute about this, is a good deal of waiving around a gun

8    and pointing of guns, by everybody, including the store clerk.

9    It's like the wild west.  And what the heck is going on here.

10         So what you also have to decide whether or not

11    the weapons were used in furtherance of the crime of robbery

12    or of any crime.  And I think at the end of the day, you'll

13    find -- let me just say this, when the government opens, and

14    tells you their version of the case, it's their version.  It's

15    not necessarily what happened.  If that were so, we wouldn't

16    need a trial.  We'd just have the government say, this is what

17    happened.  We sit down, you go out for a minute and come back

18    with a verdict of guilty.  It's kind of like not having

19    witnesses at the impeachment.  Well, that's a political

20    statement, so, forget that.

21         That's not how cases work.  Not at all.  We

22    wouldn't need you if that's how it worked, but we need you and

23    we need you desperately, to sit in judgment and decide what

24    the truth is.  In the end, what the government told you in

25    their opening are a series of promises.  And I predict to you

Page 56

1    that they will not keep their promises.

2             Be very careful about what is not disputed and

3    what is disputed, because it's what it is in dispute that you

4    will have to focus on.  The evidence will demonstrate to you

5    at the end of the day that my client, Abid Stevens is not

6    guilty.  Thank you.

7             THE COURT:  Thank you, Mr. Wittels.  I think

8    what we'll do now, ladies and gentlemen, is recess for lunch.

9    It's twenty-five minutes of one.  We'll recess for an hour.  I

10   want you to assemble in the jury room, a little bit before

11   twenty-five of two, and we'll -- I hesitate to promise, but

12   I'm going to, I promise we'll get started promptly with the

13   government's evidence.  We've had -- we've heard the -- oh,

14   no, we haven't heard from Mr. Patterson.

15            MR. PATTERSON:  Yes, Your Honor.  And again, I'm

16   going to be brief.  I know probably everyone's hungry, but if

17   we can get it done now, I think that will be more judicious.

18            THE COURT:  I agree, and we'll recess a little

19   later than twenty-five to one, but not much later.  Mr.

20   Patterson.

21            MR. PATTERSON:  Thank you.  May it please the

22   Court, counsel.  Ladies and gentlemen, now, I feel like I'm

23   under pressure here.

24            THE COURT:  No pressure, Mr. Patterson.

25            MR. PATTERSON:  Thank you.  I have notes.  I

Page 57

1    don't use them.  All the highlighters get confused.  So

2    anyway, to be clear, there are three attorneys, there are

3    three defendants.  I am here specific to represent Donnie

4    Smith.  Some questioning during the cross-examine, witnesses

5    may overlap into another defendant, but I just want the jury

6    to be clear, I am here to represent Donnie Smith.

7              So as the judge said, His Honor said in the

8    opening instructions, there's certain things that you have to

9    do in a criminal case.  You've got to decide this case based

10   upon the evidence and based upon the testimony, and based upon

11   the jury instructions.  That is the law that you are to apply

12   to the facts in determining whether or not somebody is guilty.

13   And again, that guilty has got to be beyond a reasonable

14   doubt.

15             The definition of reasonable doubt, His Honor

16   will give you at the conclusion of the case.  It's a criminal

17   case, and the doubt is significant.  They have to prove beyond

18   a reasonable doubt and that definition will be given to you.

19             So one other thing though, the evidence, the

20   testimony, and the jury instructions, you get to use your

21   common sense.  You come here with your life experiences, and

22   you get to use your common sense and use your common-sense

23   relationship to the facts and relationship to the facts of the

24   law.  That's what we all do.

25             This case is going to really call upon your

1    common sense.  And I will tell you in my closing.  See, the

2    opening argument is, as my colleagues have said, the opening

3    statement, rather, not an argument, it's a statement, it's

4    like, it's my opportunity to say, hey, this is what I think

5    the evidence will show, and at the end of the closing

6    argument, then I get up there and say, look, I told you.

7              So I'm at a disadvantage, because whatever I

8    say, what I think they're going to prove in the opening and

9    they don't prove it, then they're going to hold that against

10   me.  So in the next couple minutes, I'm going to tell you what

11   I know that they're going to prove, but what's going -- what

12   the evidence is going to show, rather, and maybe, if I'm not

13   so sure, I'll say what I believe the evidence will show.

14             Video, everyone is going to be talking about

15   this video.  Video is the holy grail in a criminal case.  It's

16   either the good holy grail or the bad holy grail.  As a

17   defense attorney, I'll get some preliminary, you know,

18   discovery, and it said there's a video.  And then I start

19   cringing, I'm like, oh my God, what am I going to do.  They

20   have video.  And this is good video.  This is like real-time,

21   color, crystal clear video.

22             When my son's bike was stolen, I said to the

23   police officer, there's video, it was like Casper The Friendly

24   Ghost took it.  It was like a shadow, a grainy shadow, you

25   couldn't tell anything.  That's not the case in this

1    particular situation.

2         In fact, in the video they're going to show,

3    you're going to see a screen, probably smaller than that, and

4    the screen, whoever walks into the store, and the store is

5    small, but anybody who walks in the store is going to see the

6    screen.  And the screen has six -- I believe it's 16 different

7    separate pictures.  So it's a real-time recording of what

8    you're doing in the store.  Anybody who goes into that store

9    can see this screen with the 16 cameras rolling, and the 16

10   cameras recording.  They're not hiding this in the back.  When

11   you go in that store, you know you're being recorded, period.

12   And that's important.  I'm going to tell you, real quick.

13        What this video is going to show is that my

14   client's wife is in the store.  My client, when this incident

15   occurred, and again, it's not a robbery until you decide it's

16   a robbery based upon the evidence and the testimony at the

17   conclusion of the case.  When you decide it's a robbery beyond

18   a reasonable doubt, then it's a robbery.  Anybody comes up

19   here during the course of this trial and said there's a

20   robbery, it's not until you decide it is.

21        So you'll see two people in Muslim garb --

22   garments, rather, my client, and his wife.  The video is going

23   to show that at a certain time and it's very clear what the

24   time is, my client's wife is in the store waiving around a

25   dollar to the clerk trying to get some -- trying to buy

1    something.

2           The video is going to show that it's my client's

3    wife, the store clerk and a couple of people who work there.

4    I think his name is Emmanuel, maybe somebody else, but again,

5    I believe, I'm not certain, but the video will show.  So --

6    and when my client's wife is in the store, a foot away from

7    her, on the video is the store clerk with a gun, a gun at his

8    side.  My client is not in the store yet, but his wife is,

9    with a store clerk with a gun.  Then you're going to see the

10   video, and it's not pretty, it's not.  Videos don't lie.

11          My client comes in, sees his wife standing

12   there.  Sees the clerk with a gun at his side, takes her,

13   pushes her out the door.  She's safe now, in his mind.  And

14   then he pulls the gun and he points it at the clerk who still

15   has a gun, but now, when he comes in, his friends are in

16   there, Mr. Quinn and Mr. Stevens.  This is what the evidence

17   is going to show.

18          Then, very clear, Donnie Smith points the gun at

19   the clerk, he disarms the clerk.  He takes the gun from the

20   clerk and he puts it in his right pocket.  It's a Muslim garb.

21   It's a long gown that men wear and it's got pockets.  All

22   clear on the videotape.  I'm not making this up.

23          He puts the gun in right pocket.  My client is

24   lefty.  You're going to see two separate situations where he

25   points his gun.  He points his gun with his left hand.  And we

Page 61

```
 1    know that once that gun is in his pocket from the clerk, that

 2    gun stays in his pocket.  That gun never comes out again,

 3    because he's a left and the gun is in his right pocket.  This

 4    is all clear on the videotape.

 5            My client takes off.  The police are coming.  He

 6    gets in his car.  He takes off.  That's on the videotape.

 7    That's not as clear.  That's a pole camera operated by the

 8    Philadelphia Police Department.  That's kind of like a --

 9    that's grainy, what you usually see, not as clear, but he

10    takes off.  And he's engaged in a chase and he crashes the

11    car, and he takes off.

12            Now, I believe when the judge gives you the

13    instructions of the law to apply, that one of the instructions

14    is going to be flight is consciousness of guilt.  That's a

15    jury instruction that you tell the jury, it's like look, this

16    guy took off, so, the mere fact that he took off, he's

17    consciously doing something, because he knows he's guilty.

18    That's a horrible charge for a defense attorney.  It's a

19    horrible charge for a defense attorney, but not in this case,

20    because from the very start to the very end of what my client

21    did in that store, on that day, and that time, it's all on the

22    videotape.

23            The consciousness of guilt, that's a good charge

24    when there's like circumstantial evidence when you really

25    don't know what the guy did, but then, well, he took off, so
```

```
                                                        Page 62
 1    maybe we can fit the pieces together, use our common sense and
 2    come back with a verdict of guilty.  We don't have it here.
 3    It's clear as day as what he did.  He took off because he just
 4    took off.
 5           Now, what they find is when he -- when they come
 6    upon the car, the police, seconds later, they get a search
 7    warrant, they search the car and they find the clerk's gun, in
 8    the car.  My client's not there, and they find his hat.
 9    Donnie Smith was in the store.  I'm not going to say that the
10    DNA swab, the having a gun, it's his hat, it says legend on
11    it, he was wearing it in the store.  It's his hat.  It's the
12    clerk's gun, because they were able to do the -- you'll hear a
13    bunch of evidence about the clerk's gun, but what they do with
14    the clerk's gun is they do a functionality test on it, I
15    believe.  I'm pretty sure they will, the evidence of that.
16           They do a functionality test, because they want
17    to make sure that this gun is functional.  That this gun will
18    propel a projectile.  And I believe the testimony is going to
19    elicit that it was a functional gun, and it was loaded with
20    eight live rounds.  Who had the gun?  Who had the only gun
21    that they can prove that was loaded and was functional with
22    eight live rounds?  The clerk, Joel [ph].
23           The clerk that had the functional eight-round
24    loaded gun, we don't know if one was in the chamber or not.
25    I'll ask that later on.  The guy with the loaded gun that we
```

Page 63

1    will know is a loaded gun and functional, it was two feet from

2    my client's wife, and then was with my client's friends until

3    he was disarmed by my client.

4             There's a lot of words of firearms and weapons

5    and pistols in this case, and you will see something that

6    resembles a firearm in the hands of my client.  I'm pretty

7    sure they can't show that that whatever was in his -- with his

8    hand was a functional firearm and could propel a projectile,

9    that they can prove that the only person that had that gun

10   out, not in their pocket like Donnie Smith did, was the store

11   clerk.

12            So this was where the common sense comes in --

13   and the $100 thing, again, if you're going to rob a store and

14   you got three guns, then rob the store.  Don't just take the

15   $100.  You'll see, when Joel opens up the cash register,

16   there's money in there.  There's a lot of money in there.  You

17   know what he does, he takes 100 bucks.  Thanks, I'm good.  I'm

18   out the door.

19            So I'm almost done.  When I come back on my

20   closing argument, I'm going to ask you these questions.  I'm

21   going to ask you now, and think about these questions.  When I

22   come back, when you know all what the evidence and the

23   testimony is.

24            Number one, who brings your wife to an armed

25   robbery?  Number two, who robs a store when you go in there

1    and you see your face on 16 smaller different screens, in

2    broad daylight?  The store owners, I think Joel and Emmanuel,

3    and I think the store -- the actual store owner, they saw the

4    other two gentleman who are seated here.  They've seen them

5    numerous times.  I mean, that's another -- that's for another

6    attorney -- another colleague to say, why rob the store when

7    you're in there all the time without a mask on, but nobody

8    knows Donnie Smith, he's never been in there, but he goes in

9    there without a mask on, and when he's pointing the gun, he's

10   pointing the gun like this and the screen is there, so he

11   knows he's being recorded.  He's not there to rob the place.

12   He's there, because his wife's in the store, and a probably

13   very dangerous situation, and then he extracts her and now his

14   friends are in the store in a very dangerous situation.

15          Once he takes that gun, puts it in this right

16   pocket, he's cool.  The video is going to show he goes back to

17   where like the cashier is, and it's a small store and he hangs

18   out there with the clerk's gun in his right pocket, and

19   whatever he had, it looks like a gun, whether it is or not, we

20   don't know, in his left pocket.  He never takes it out.  He

21   never says to the store clerk who's standing right there and

22   Emmanuel who's the cook, hey, listen, I'm here loaded for

23   bear, and give me all you got, doesn't do anything.

24          This is an argument over somebody getting fake

25   money, not a robbery.  As it comes to Mr. Smith, he didn't

Page 65

```
 1    take anything.  He didn't get $100.  He didn't take a bag of
 2    potato chips with the two allegedly -- the one gun that we
 3    knew he had in his pocket, and the other gun that we don't
 4    know what it really is.  Doesn't take anything.  And it isn't
 5    like, okay, I don't have time to take anything, because the
 6    police are coming.  He's there for a couple of good minutes,
 7    three, four, five, and that will all be on the video.
 8              So he's hanging out with Mr. Stevens and then he
 9    goes, because the police come and he's like, I might get in
10    trouble here, and he flees.  He's not charged with fleeing and
11    alluding.  That's not a charge.  The government wants to use
12    that as, well, he's fleeing and alluding because he knew he
13    did something wrong.  He left because whatever.  He got
14    nervous, he didn't -- he just took off.  And I got to own
15    that, because he did what he did.
16              So anyway, at the end when I come back here, I
17    will ask you for what I think, and I'm not the jury, the only
18    decision could be on this case, if you answer these questions
19    that I just posed to you, it doesn't make sense.  You can't
20    reconcile what my client did to the charge of a robbery, with
21    a gun [indiscernible] I don't think you can.  That's up to
22    you.
23              I would submit to you, at the appropriate time,
24    that they cannot prove those elements beyond a reasonable
25    doubt.  Thank you very much.
```

1          THE COURT:  Thank you, Mr. Patterson.  And now,

2    we will recess for lunch.  It's not quite ten minutes of one.

3    Let's recess until quarter of one.  It's almost -- that's

4    almost a full hour.  Be sure you leave your jury notebooks in

5    the jury room, and then bring them with you when you come back

6    into court.  We're going to try to get started quarter of two.

7    And as far as the schedule is concerned, for typical days, and

8    today will now be a typical day, we'll recess day end about

9    quarter of five and we'll have a midafternoon break.  I'll

10   have more to say about our schedule at the end of the day, but

11   for today, midafternoon break, recess 4:45.

12          And now Michael.

13          DEPUTY CLERK:  All rise.

14          THE COURT:  I'm sorry, we're minus a court

15   officer.  Someone has to help the jury.  You may now leave the

16   courtroom.

17                     - - -

18          (The jury leaves the courtroom.)

19                     - - -

20          THE COURT:  See you after lunch.

21          Be seated everyone.  Is there anything we have

22   to address before the government begins presenting its

23   witnesses?

24          MR. ECKERT:  Not from the government, Your

25   Honor.

Page 67

1                    MR. PATTERSON:  Not from Mr. Smith, Your Honor.

2                    THE COURT:  All right.  Anything else?  Ms.

3        Meehan.  Mr. Wittels.

4                    MR. WITTELS:  Nothing, Judge.

5                    THE COURT:  All right.  Then we'll --

6                    MS. MEEHAN:  Your Honor, I'm sorry.  I would

7        just move for sequestration of all non-case agent witnesses at

8        the beginning of testimony.

9                    MR. ECKERT:  Certainly, Your Honor.

10                   THE COURT:  Are any of those witnesses in the

11       courtroom?

12                   MR. ECKERT:  I don't believe see, but I'll

13       check.  No, Your Honor.  We would likewise move for mutual

14       sequestration in the event the defense decides to call

15       witnesses.

16                   THE COURT:  Mr. Patterson, Mr. Wittels and Ms.

17       Meehan, the sequestration order will apply equally to the

18       defense --

19                   MS. MEEHAN:  Very well.

20                   THE COURT:  -- as to the government.  And I

21       should add for the benefit of any people in court who wonder

22       what that means, typically, in Federal Court, a within is

23       sequestered, that is the witness is not allowed in the

24       courtroom until after the witness testifies.  That's a general

25       rule.  The exception to that rule is for case agents for the

Page 68

```
 1    government.  I don't believe there are any exceptions in the

 2    rules themselves for the defense.  Of course, the defendants

 3    are in the courtroom, but no other representatives of the

 4    defendants.

 5              On that note, we're in recess until quarter of

 6    two.

 7              MR. ECKERT:  Thank you, Your Honor.

 8              DEPUTY CLERK:  All rise.

 9                        -  -  -

10       (Whereupon, there was a recess in the proceeding from

11                 12:51 p.m. to 2:03 p.m.)

12                        -  -  -

13              DEPUTY CLERK:  All rise.

14              THE COURT:  Be seated, everyone.  Mr. Eckert,

15    you may proceed.

16              MR. ECKERT:  Thank you, Your Honor.  The

17    government will call Joel Ventura.

18                        -  -  -

19                 (PORFIRO JOEL VENTURA - SWORN)

20                        -  -  -

21            (RAYMOND MCCONNIE INTERPRETER - SWORN)

22                        -  -  -

23    (Testimony of Porfiro Joel Ventura taken under separate cover

24                 from 2:06 p.m. to 4:39 p.m.)

25                        -  -  -
```

1           THE COURT:  Thank you.  I think we'll defer the

2     Quinn cross-examination until tomorrow.  It's not quite twenty

3     minutes of five and I don't want you to be watching the clock.

4     With that, I'll give you some brief day end instructions.  I

5     gave you lengthy instructions before lunch, but there are two

6     that are particularly applicable now.  You're going to go

7     home.  It's your first day of testimony.  You're going to be

8     asked, what did you do today, and you're going to have to say,

9     I sat on a jury, but I can't tell you anything about it.

10          If anything happens to be written in a newspaper

11    or broadcast on radio or television dealing with the case,

12    you're not to read it, listen to it or view it.  And I've

13    explained why.  You've got to decide this case based solely on

14    the evidence presented in the courtroom and not on what anyone

15    else writes about it or produces about it on radio or

16    television.

17          With that, have a safe trip home.  We'll start

18    tomorrow, I think at 9:30.  I think that works -- that should

19    work for everyone.  If it does not work for anyone, I want to

20    know about it and we'll change the start time, but tomorrow,

21    we'll start at 9:30.  And I'm looking for Ms. Hull.  I want to

22    be sure that if I promise something it's delivered, but

23    tomorrow, I'm sure that there will be something for you to

24    snack on, coffee and donuts and things of that sort.

25          And so, Michael.

```
 1              DEPUTY CLERK:  All rise.

 2                      - - -

 3           (The jury leaves the courtroom.)

 4                      - - -

 5              THE COURT:  Have a safe trip home, and be sure

 6    you leave your jury notebooks in the jury room.  See you

 7    tomorrow morning.

 8              Be seated, everyone.  And you may step down, Mr.

 9    Ventura.  Mr. McConnie, we'll see you tomorrow.

10              MR. MCCONNIE:  Yes, Your Honor.  Thank you.

11              THE COURT:  Mr. Ventura, good night.

12              I have a very short conference.  It should take

13    about 20 minutes, maybe a little bit longer.  So we'll recess

14    until then.  Then we'll start the charging conference.

15              Is there anything we have to discuss before?

16              MR. ECKERT:  Not from the government, Your

17    Honor.

18              THE COURT:  Mr. Patterson, anything else.

19              MR. PATTERSON:  No.  Your Honor, I think I'll

20    defer to Attorney Wittels.

21              MR. WITTELS:  Nothing, Judge.

22              THE COURT:  Ms. Meehan.

23              MS. MEEHAN:  No, Your Honor.

24              THE COURT:  What is the position of the defense

25    on the need for the defendants to remain during the charging
```

Page 71

1    conference?  I should explain that what we're going to do is

2    review the charge and hear whatever you have to say, comments,

3    objections and I will rule on them.  We might not finish the

4    charging conference tonight.  If so, we'll have to reschedule

5    it.  We'll continue it, and I do that regularly.  It's not

6    unusual.  So I need a response from defense counsel.

7                   MS. MEEHAN:  Your Honor, may I have a moment to

8    consult with my client?

9                   THE COURT:  Yes.

10                                -  -  -

11                              Pause

12                                -  -  -

13                   THE COURT:  You can also talk to co-counsel.

14                   MS. MEEHAN:  Right, Your Honor.

15                   MR. PATTERSON:  Mr. Smith does not need to be

16   here, Your Honor.

17                   MR. WITTELS:  Nor does Mr. Stevens.

18                   MS. MEEHAN:  The same with Mr. Quinn.

19                   THE COURT:  Fine.  Again, for the three

20   defendants, we're going to discuss the charge and after I make

21   my rulings, the final rulings, I'll distribute a revised

22   charge.  And the parties will have the right to object, really

23   up until the time I start giving it.

24                   I have, what I refer to as a floating charging

25   conference.  So as long as I can correct it, if you have a

Page 72

1    valid objection, I want to hear it.  What we do in the

2    charging conference is, we'll not preserve your right to

3    object to the charge.  You must do that before I give the

4    charge.  And after I give the charge, I'll ask you if there's

5    anything that I gave in my charge that you wish me to correct,

6    change or well, modify in any way.  And I'll entertain the

7    comments that you have then, but the way to preserve an

8    objection to the charge is to make it after I give the charge.

9    We'll try to get you a charge that is objection free, but if

10   not, you'll have a right to object after I give the charge.

11            All right.  I'm going to go off the bench.

12   We'll resume, five after or ten after five.

13            DEPUTY CLERK:  All rise.

14            THE COURT:  You may go about your business,

15   everyone.

16                       -  -  -

17       (Whereupon, there was a recess in the proceeding from

18                 4:45 p.m. to 5:30 p.m.)

19                       -  -  -

20            THE COURT:  Sorry it took me a little longer

21   than anticipated, but I want to finish that conference.  Be

22   seated.

23            What we're going to do is go over the charge.

24   With regard to the general instructions, I'm concerned not so

25   much about what I've said, because I've used the Third Circuit

1    standard instructions.  I'm concerned about the need for all

2    of the instructions.  I know a number are unnecessary, and

3    we're going to try to shorten the charge.  A shorter charge is

4    better than a long charge.  It's easier to understand, less

5    chance for the jury to get it wrong, and all-in-all, it's

6    better.

7            So let's go down the general instructions.  You

8    can look at the table of contents.  Should we address the

9    interpreter issue first?  I was going to do that last, but it

10   matters not, maybe we ought to -- well, maybe plans will have

11   to be made for witnesses, but I understand that Mr. McConnie

12   is not available tomorrow, beginning at 9:00.  He has a

13   sentencing, before Judge Robreno.  And although trials trump

14   sentencings, I think maybe we can withdrawal Ventura and put

15   him on the stand in the afternoon or late in the morning.

16           Am I springing something on you?  I thought you

17   discussed it.

18           MR. ECKERT:  No, Your Honor.  No, we're aware.

19   We've been discussing that potential way to solve that issue.

20           MS. MEEHAN:  Your Honor, I think that case is my

21   office's case and I don't want to presume to think for Judge

22   Robreno or anyone, but I don't believe from my colleague that

23   there are contested issues in the sentencing.  So we're hoping

24   that as soon as Mr. McConnie is through interpreting in Judge

25   Robreno's courtroom, he could be here between 9:30 and 10:00.

Page 74

1              THE COURT:  I doubt it.

2              MS. MEEHAN:  Oh, okay.

3              THE COURT:  Well, it's not that I know what Mr.

4    McConnie is going to be doing, but I know Judge Robreno, and I

5    don't think that sentencing will be finished by 9:30.  And I

6    want to start as close to 9:30 as we can.  Is there another

7    witness the government can put on?

8              MR. ECKERT:  We're happy to put on witnesses if

9    it please the Court and counsel.  We can make use of that

10   time, absolutely, with shorter witnesses.

11             THE COURT:  All right.  That's what we'll do.

12   Does anyone have to notify either your office, Ms. Meehan or

13   Judge Robreno?

14             MS. MEEHAN:  About?

15             THE COURT:  Well, has he been told there's a

16   conflict and that we're --

17             MS. MEEHAN:  No.  No.  No. Your Honor, we were

18   just discussing how long we thought the sentencing -- we were

19   discussing order of witnesses, and if we could resume with Mr.

20   Ventura, because he was sort of the in the middle or towards

21   the end of cross-examination, and I thought based on what my

22   colleague had told me that it wasn't going to be a lengthy --

23   there aren't guideline objections and so forth.  But that's

24   fine.  We can start at 9:30 with a different witness.

25             THE COURT:  That's what I'd like to do.  So no

1    one has to notify anyone else.  McConnie was instructed to be

2    here when?

3                MR. ECKERT:  He just -- you and I -- or him --

4    I'm sorry, Your Honor.  Mr. McConnie and I had a conversation

5    where he said he would be here as soon as he could after the

6    proceeding.

7                THE COURT:  All right.  Then we'll leave it that

8    way.

9                MR. ECKERT:  Thank you.

10               THE COURT:  All right.  Let's go down the list

11   and see what we can cut out.  The role of the jury, it's in

12   presumption of innocence, number two.  Do you ever the table

13   of contents in front of you?

14               MR. ECKERT:  I do, Your Honor.

15               THE COURT:  Evidence, yes, in, direct and

16   circumstantial.  Evidence, four, five, credibility of

17   witnesses.  Six, is it necessary?  Not all evidence, not all

18   witnesses needed.  It's a short instruction, but it was

19   requested by the government.  Is it necessary, Mr. Eckert?

20               MR. ECKERT:  We believe it is, Your Honor.

21               THE COURT:  Seven, audio visual recordings,

22   consensual.  To what recordings are you referring?  Not to the

23   one we just seen?  That was a store recording.  The government

24   isn't referring to that, is it?

25               MR. ECKERT:  No, Your Honor.  It would be -- I

Page 76

1    think it would be the pole camera, but -- oh, no, I'm sorry,

2    no, these recordings were made with the consent and agreement

3    of the store owners, exactly.  One of the parties to the video

4    recording.

5              THE COURT:  All right.  So you want us to leave

6    it in and insert the name of the store owner?

7              MR. ECKERT:  It also -- we do, Your Honor.  It

8    also applies to the 911 call, which we haven't heard yet, but

9    if that were to come into evidence, I think that would also be

10   applicable.

11             THE COURT:  Well, it's very short charge.  So

12   we'll add the -- well, do we have to identify, by name, the

13   agreement of one of the parties or can we just say, with the

14   consent and agreement without identifying by name?

15             MR. ECKERT:  I think that's fine, Your Honor.

16             THE COURT:  Of one of the parties.  Can we do it

17   that way?

18             MR. ECKERT:  I would agree with that.  Yes.

19   Counsel, are you in agreement?

20             MR. PATTERSON:  That's fine, Your Honor.

21             THE COURT:  Mr. Wittels.

22             MR. WITTELS:  That's fine.

23             THE COURT:  Ms. Meehan.

24             MS. MEEHAN:  Yes, Your Honor.  I apologize.  Can

25   we go back to the 911 call, the audio visual instruction?  I

Page 77

1   didn't know that the government was planning on introducing

2   the 911 call.

3                   THE COURT:  That's where -- we don't have to go

4   back, we're there.

5                   MS. MEEHAN:  Well, I guess the introduction of

6   the 911 call.  I was unaware of that.  And that would be --

7   I'm not sure what the relevance is of the call itself and what

8   the caller is saying.  I'm assuming that they're trying to

9   introduce Ms. Rodriguez's call to Philadelphia Police and

10  she's making observations on her phone of a video.  She's not

11  in the store.  So her observations on her phone and the

12  description are irrelevant.

13                  Mr. Ventura was in the store, he's the -- the

14  jury saw the video, saw Mr. Ventura, heard from him, heard his

15  impressions of what was going on.  He was in the store as it

16  was happening in real-time, so it seems to me that's very

17  prejudicial, it's hearsay.

18                  THE COURT:  Hearsay.  She's watching it on the

19  store video.  She's not in the store, but she --

20                  MS. MEEHAN:  Well, there's also the response of

21  the call center.  So I just would --

22                  THE COURT:  I haven't seen any of that evidence.

23  And I think what you should do is address this issue with the

24  government --

25                  MS. MEEHAN:  We will.

1            THE COURT:  This is a little bit like, not

2    quite, a little bit like, I'd like to cross-examine the

3    witness on his immigration status, but the time is about the

4    same, but the bottom line, I want to get through the charging

5    conference.

6            MS. MEEHAN:  Very well.

7            THE COURT:  We're talking about the charge for

8    any admissible evidence and we've been told the charge is

9    necessary, because at the very least the video comes in.

10            MS. MEEHAN:  And I don't dispute that, Your

11    Honor.

12            THE COURT:  So what you're doing, you're telling

13    me that you're going to object to the telephone call, the 911

14    call.

15            MS. MEEHAN:  Yes.

16            THE COURT:  Discuss it with Mr. Eckert and be

17    prepared to argue it during a break, but not during the

18    charging conference.

19            MS. MEEHAN:  Certainly.  Thank you, Your Honor.

20            THE COURT:  And now, let me finish writing.  I'm

21    just going to put with the consent and agreement.  And we

22    won't name of one of the parties to the video recording, but

23    you're talking about more than a video recording.

24            MR. ECKERT:  Yes, Your Honor.  It would be

25    potentially a video recording and the audio recording, pending

1    litigation of the 911 calls.

2              THE COURT:  Did you propose a separate charge on

3    audio recordings?  No.

4              MR. ECKERT:  We did not, Your Honor.  It

5    would -- we -- would be just one word we would add to the

6    video, or two words, video and audio recording.

7              THE COURT:  Right now it reads, audio visual.

8    How do you want to head it up?

9              MR. ECKERT:  I think the heading would be fine,

10   Your Honor.  The end of the second sentence, I think we could

11   edit to the audio and the video recording.

12             THE COURT:  All right.  And we'll take it out.

13   And we'll note, Ms. Meehan, that you're probably going to

14   object to the audio recording.

15             MS. MEEHAN:  Thank you, Your Honor.

16             THE COURT:  Opinion evidence of expert

17   witnesses.  Do you plan any?

18             MR. ECKERT:  We'll have a firearms expert, Your

19   Honor, as well as an ATF Nexus expert.

20             THE COURT:  I don't know that it's necessary to

21   identify the experts.  Do you disagree?  Identifying them by

22   name?

23             MR. ECKERT:  No, Your Honor.  I will be

24   certainly be tendering those experts, but in the instruction,

25   no, we don't need to do that.

Page 80

```
 1              THE COURT:  All right.  We'll just note, no need
 2    to I.D. by name.  Chain of custody.  Is there a chain of
 3    custody issue?
 4              MR. ECKERT:  [Indiscernible] but Mr.
 5    Patterson --
 6              THE COURT:  I'm looking, it was Patterson and --
 7    it was you too -- Stevens is objecting to chain of custody.
 8    All right.
 9              MR. PATTERSON:  I'm not -- I was requesting
10    chain of custody.  When the police recovered the store gun
11    from my client's car, the chain of custody then would be
12    bagged and tagged, went to the lab for the functionality
13    report, so I might have a few questions on that, not many.
14              THE COURT:  All right.  We'll leave it in.  And
15    Mr. Wittels, are you planning on addressing chain of custody
16    at all?
17              MR. WITTELS:  No, Judge.  In light of the
18    agreements between counsel, and I don't think this --
19              THE COURT:  Well, it's a short charge and --
20              MR. WITTELS:  Yeah.  No longer needed.
21              THE COURT:  Well, but Mr. Patterson, do you want
22    that charge?
23              MR. PATTERSON:  I do, Your Honor.
24              THE COURT:  All right.  We'll leave it in.
25    Specific investigation techniques not required.  Mr. Eckert.
```

```
                                                      Page 81
1              MR. ECKERT:  Your Honor, I believe there's going
2      to be some effective cross-examination, if you will, about the
3      surveillance video that was recovered, so I believe that this
4      is an appropriate charge, and we would request it on that
5      basis.  I guess I should rephrase that to some of the lack of
6      video that was recovered.
7              THE COURT:  Well, the Third Circuit charge, the
8      model charge, makes mention of the claimed omitted techniques
9      that were addressed in either testimony or argument.  What are
10     the omitted techniques?
11             MR. ECKERT:  I expect that it's going to be
12     that --
13             THE COURT:  It won't be you arguing.
14             MR. ECKERT:  No.  Right.
15             THE COURT:  So why don't we hear from --
16             MR. ECKERT:  That's fair.  Thank you, Your
17     Honor.
18             THE COURT:  -- you, Mr. Patterson.
19             MR. PATTERSON:  If I --
20             THE COURT:  You first.
21             MR. PATTERSON:  If I got this charge right, it
22     would be -- I think that the argument is on point.  That's --
23     there was no capture of the outdoor cameras at the store, even
24     though I believe it was a 16-camera system, which I can elicit
25     through the Philadelphia Police Officers, why there's no
```

Page 82

1    capture of what happened outside the store.

2              THE COURT:  Capture of outdoor cameras at store.

3              MR. PATTERSON:  Right.  I'm pretty sure they

4    were there, they just weren't -- there's no video -- no video

5    captured to present to the jury.

6              THE COURT:  Are there any others, Mr. Wittels?

7              MR. WITTELS:  Judge, I'm not sure if they

8    captured all the cameras inside the store.  There are at least

9    a dozen of them, and we haven't seen all of those.

10             THE COURT:  How long would we be here, were we

11   to see all of those?

12             MR. WITTELS:  Yeah.  I don't know what the

13   government's position is.

14             THE COURT:  About as long as it took him to

15   testify as to the date when he first arrived in this country.

16   I was hanging on every word.  We're going to try to speed this

17   up a little bit.  Capture of outdoor cameras at the store,

18   what else?  I'm hearing nothing.

19             MR. PATTERSON:  No.  That would be my only issue

20   with respect to that, there's people coming in and out of the

21   store all the time when this is going on, but there's no

22   capture of what happens outside the store.

23             THE COURT:  Do you want me to include in this

24   instruction, failure to capture all of the outdoor, is it

25   capture the cameras or is it -- what phrase?

Page 83

1          MR. ECKERT:  Recover the surveillance footage.

2          MR. PATTERSON:  That will be fine.

3          MS. MEEHAN:  Well, no.  We would -- Your Honor,

4     the government wants the specific investigation techniques not

5     required.  Our argument would be that there's a lack of

6     evidence and the jury can consider the lack of evidence.

7          THE COURT:  No, but this charge, it's charge

8     10 --

9          MS. MEEHAN:  Oh, you -- you're giving the charge

10    and you want to know specifically what to reference.  I see.

11         THE COURT:  Yeah.  That's --

12         MS. MEEHAN:  Okay.

13         THE COURT:  -- what we're doing tonight.

14         MS. MEEHAN:  Yeah.  There may be something else,

15    I can't predict that right now with other witnesses, but I

16    would agree with Mr. Patterson that store camera footage that

17    was not obtained by the Philadelphia Police or provided to the

18    Philadelphia Police after the incident.

19         THE COURT:  Capture of all video footage.  Well,

20    video suggests all -- let's do that again.  Patterson, you had

21    it, I think the best.

22         MR. PATTERSON:  Not that I forgot what I said.

23         THE COURT:  Well, it's the defense who are

24    arguing.  The government doesn't have to say.

25         MR. PATTERSON:  That sounds good.  Did I say

Page 84

1    that?

2                    MR. ECKERT:  I said that.

3                    MR. PATTERSON:  Okay.  Recovery of surveillance

4    footage.

5                    THE COURT:  Recovery of all surveillance camera

6    footage at store.  Does that do it?

7                    MR. ECKERT:  It's fine with the government, Your

8    Honor.

9                    MR. PATTERSON:  It is, because I'll be arguing

10   in my closing the outdoor footage was not recovered.

11                   THE COURT:  Okay.  Eye witness identification of

12   defendants.  That's a long charge.

13                   MR. PATTERSON:  I've never made identification

14   of my client at the scene an issue.

15                   THE COURT:  Well, let's see who requested this.

16                   MR. PATTERSON:  I did.

17                   THE COURT:  And so did you Mr. Wittels, and so

18   did the government.  Do you want me to give this charge?

19                   MR. WITTELS:  I see no need for it, Judge, in

20   light of the fact that we've stipulated the identities of the

21   defendants through this -- and with this witness.  It's not a

22   question in the case any longer.

23                   MR. PATTERSON:  Maybe it can all be resolve, by

24   just the stipulation read to the jury that there's been --

25   that the defendants agree that they were on the scene when

1    this happened.  I don't think you have to read that charge

2    since it's not an issue that was brought up during the trial,

3    Your Honor.  That's just my opinion.

4              THE COURT:  Does that satisfy the government?

5              MR. ECKERT:  As long as this means the agreement

6    with that and they're willing to stipulate that there's

7    [indiscernible] that the three gentleman charged were the ones

8    in the video or the ones at the scene, then no, I don't think

9    that's necessary, Your Honor.

10             MR. PATTERSON:  Right, but what I -- I just

11   would add that I think that if we're going to get rid of those

12   charges there would need to be a stipulation that's read to

13   the jury and mention in the stipulation charge.

14             MR. ECKERT:  I would have no objection, Your

15   Honor to that.

16             THE COURT:  Well, agree on a stipulation, we'll

17   remove this charge.  We won't trash it forever, but it seems

18   to me that there was a stipulation.  We started identifying

19   the defendants as they appeared in the video by name --

20             MR. PATTERSON:  Correct.

21             THE COURT:  -- by agreement, each of you, each

22   of the lawyers stood up and said, let's do it that way, so

23   it's done, the jury gets that impression, but a written

24   stipulation is certainly not inappropriate.

25             MR. ECKERT:  Okay.

1              THE COURT:  Let's get one by sometime tomorrow.

2     I'm going to make a note, delete subject to stipulation, as to

3     identity.  All right.  And we will add a very short -- take

4     out three pages and add just two or three lines on

5     stipulations.  The only stipulation in the case now is in the

6     bifurcated trial part count three.  Okay.

7              Next twelve, credibility of witnesses, law

8     enforcement officers.  I think that has to remain.  Three,

9     impeachment, bad character.  It was requested by Smith and

10    Stevens.  I have a question whether that's appropriate.  You

11    first Mr. Patterson.

12             MR. PATTERSON:  Your Honor, before I address

13    that impeachment of 422, impeachment within prior inconsistent

14    statement.

15             THE COURT:  Where is that?

16             MR. PATTERSON:  That's on my request, that's

17    right above where we are right now with the bad character.  I

18    would request that charge.

19             THE COURT:  Wait a minute.  I don't think I've

20    skipped anything.  Unless I did it inadvertently.

21             MR. PATTERSON:  I believe that's 422.

22             THE COURT:  No.  Look at the table of contents.

23             MR. PATTERSON:  Oh, I'm sorry, Your Honor.

24             THE COURT:  We're going -- we're using my

25    charge.

Page 87

1              MR. PATTERSON:  I'm sorry, Judge.  Okay.  The

2     bad character, I don't believe there will be any testimony or

3     at least there has been to this point with respect to that.

4              MR. WITTELS:  I agree, Judge.  At that point, we

5     didn't know if our clients would be testifying or not, so does

6     not look like they're going to do that.

7              THE COURT:  Ms. Meehan, it's going out.

8              MR. PATTERSON:  Okay.

9              THE COURT:  It can always go back in, it's not

10    out, out forever.

11             MS. MEEHAN:  Thank you.

12             THE COURT:  And the next one is prior bad acts

13    608b.  Is that in?

14             MR. PATTERSON:  I don't believe there's been a

15    notice for prior bad acts.  There's been no notice, Your

16    Honor, so I don't think we need that.

17             THE COURT:  No.  They didn't ask for it, you

18    did.

19             MR. PATTERSON:  I know.

20             THE COURT:  And Stevens did.

21             MR. PATTERSON:  So I would withdrawal that on my

22    behalf, on behalf of my client, rather.

23             MR. WITTELS:  As would I.

24             THE COURT:  Okay.  And again, if something

25    happens, it's unexpected, we can always reverse.  Prior

Page 88

 1    convictions, I haven't ruled on that -- those -- well, there

 2    was one motion.  It was filed by Ms. Meehan and no.  No.  The

 3    government, I'm sorry, it was the government and Ms. Meehan

 4    responded.  Am I going to have to rule on that?

 5              MS. MEEHAN:  Your Honor, well, today, as of a

 6    couple hours ago, no.  That's sort of a fluid -- I think, I'm

 7    pretty comfortable indicating he won't be testifying, but I

 8    would alert the Court, if he's pretty insistent, I will alert

 9    Your Honor.

10              THE COURT:  Well, all right.  I'm prepared, I've

11    read your submission about the government's motions and your

12    response, and I'm not unfamiliar with the law, and so that

13    won't come as the kind of surprise last night's motion in

14    limine arrived with.

15              MS. MEEHAN:  Very well.

16              THE COURT:  So we'll take this out.

17              MS. MEEHAN:  Thank you, Your Honor.

18              THE COURT:  Again, if there's a change, you'll

19    get back to me.

20              MS. MEEHAN:  Certainly, Your Honor.

21              THE COURT:  False in one, false in all.  I guess

22    we have to leave that in.

23              MR. PATTERSON:  Please, Your Honor.

24              THE COURT:  Defendant's choice not to testify

25    and to testify, Paragraphs 18 and 19, one of them will go out.

Page 89

1    Next, 404b evidence.  Well, I guess it depends on whether the

2    evidence on the prior convictions comes in, but I suspect that

3    will come out.  I'm talking about the 404b charge which was

4    requested by the government.

5              MR. ECKERT:  We have not provided any 404b

6    notice, we're not presenting any 404b evidence, Your Honor.

7              THE COURT:  Well, you did request a point for a

8    charge.

9              MR. ECKERT:  We did, and I --

10             THE COURT:  But that was at a time where you

11   weren't -- you had no final plans on how you would proceed.

12             MR. ECKERT:  Exactly.

13             THE COURT:  Okay.

14             MR. ECKERT:  Exactly.  Thank you.

15             THE COURT:  Well, this will go out.

16   Consciousness of guilt, flight from the police.  I suspect

17   that's applicable in the Smith case.

18             MR. PATTERSON:  It is, Your Honor, and I brought

19   it up in my opening, so I have no objection, obviously --

20             THE COURT:  No.  I think it has to stay in.  And

21   it's -- it individuates Smith which is appropriate.  Now, if

22   there are any objection Tuesday anything that is going to

23   remain, I want to hear from you, but these are all Third

24   Circuit model instruction, so I suspect they're okay, and

25   again, if you look at this charge tomorrow or Thursday and

1    say, oops, I should've objected, it's not too late to object

2    at that time, so we'll do it that way.

3            Now, I'm on number -- Paragraph 21, prior

4    statement of non-testifying defendant, in multi-defendant

5    trial.  That's a Bruton [ph].  Let me see who requested it.

6    You did Ms. Meehan.

7            MR. PATTERSON:  I also did, Your Honor.

8            MS. MEEHAN:  I did?

9            THE COURT:  No.  I don't think you did.

10            MS. MEEHAN:  No?

11            THE COURT:  But Mr. Wittels did.

12            MR. PATTERSON:  I don't think we need it.

13            MR. WITTELS:  Judge --

14            THE COURT:  It's entitled, prior statement of

15    non-testifying defendant in multi-defendant trial.

16            MR. WITTELS:  Yeah.  That's no longer necessary.

17    We've established that there are no such statements.

18            MS. MARTIN:  Your Honor, I do think it's

19    necessary.  There's the second 911 call that we're talking

20    about.

21            THE COURT:  I'm sorry, the --

22            MS. MARTIN:  There's a 911 call that we believe

23    was placed by defendant, Donnie Smith that we intend to play.

24            THE COURT:  And what about that call?

25            MS. MARTIN:  Well, that would be a prior

1    statement.  It's not really a Bruton issue in any way, shape,

2    or form, but it should probably be only considered against

3    him.

4                 THE COURT:  This has been shared in discovery,

5    of course?

6                 MS. MARTIN:  Of course.

7                 THE COURT:  Do you know what it is, Mr.

8    Patterson?

9                 MR. PATTERSON:  I'm thinking, Judge, and I

10   don't.

11                MS. MARTIN:  Your Honor, there's a 911 call

12   about 50 minutes after the incident where an individual calls

13   and says His Maroon Ford Taurus with New Jersey temp tags was

14   just taken by an assailant.  It's an individual that describes

15   the vehicle that crashed at the site.  He says he's up at

16   Broad and Chew which is a block away or somewhere near where

17   the robbery happened about a block away.  Said he was in the

18   store, so that would be Donnie Smith saying he was in the

19   store when the commotion happened.  He didn't know what was

20   going on and someone stole his car.  So he's providing an

21   alibi for himself about 50 minutes after the incident.

22                MR. PATTERSON:  I'm not saying I don't have

23   that, Judge, I'm just -- I just don't recall it.

24                THE COURT:  All right.  Then let's take a look

25   at that charge, Paragraph 21.  We'll have to insert the name

```
                                                  Page 92
 1   of the Defendant Smith in Paragraphs 1 and 2.  What about
 2   Paragraph 3, it's bracketed?
 3              MS. MARTIN:  I don't see any need for that, Your
 4   Honor.
 5              THE COURT:  Do you agree, Mr. Patterson?
 6              MR. PATTERSON:  I do, Your Honor.
 7              THE COURT:  Okay.  Twenty-two, impeachment of
 8   defendant.  I suspect the defendants won't testify.  We'll
 9   take that out.  If it has to go back in, then we'll do so.
10              Twenty-three, charges.  I don't think there's a
11   problem with twenty-four.  Tell me if there are any problems
12   as we go through these next charges.  On or about is
13   twenty-four.  Impeachment is twenty-three.  Twenty-five,
14   separate consideration, multiple defendants charged with the
15   same offenses.  I don't think there's an issue there.  I think
16   we have to give it.  And then we start with [indiscernible]
17   robbery.  It's Paragraph 27.  I think twenty-seven is okay,
18   you've all request ed -- you all requested it.
19              Paragraph -- no, I'm looking at tabs, but the
20   tabs, do they coincide?  I guess they do.  Twenty-seven, Hobbs
21   Act Element 2, robbery defined.  Any issue there?  Hearing
22   nothing, next, why put Element 2 ahead of -- why Element 2
23   before Element 1?
24              LAW CLERK:  That's exactly [indiscernible] the
25   instructions were ordered [indiscernible].
```

Page 93

1            THE COURT:  Well, that's a strong argument for

2    including it that way.  Does anyone -- someone is on their

3    feet.

4            MS. MEEHAN:  Yes, I am.  Sorry.  Your Honor, I

5    know I'm on thin ice with last minute objections.  I was

6    thinking about this, because of -- and I think it's confusing

7    to us as attorneys, I think it will be crazy confusing to the

8    jurors.  And I'm wondering if the Court would consider -- I

9    think the government's theory of liability as to the

10   defendants Stevens and Smith for Hobbs Act Robbery is through

11   [indiscernible] liability, and they can correct me if I'm

12   wrong, and Mr. Quinn is the principle.  So I'm wondering if

13   the Court could -- if we could instruct, I don't know --

14           MR. ECKERT:  Oh, no.  I was -- that's certainly

15   a theory of liability, but it's not our own theory of

16   liability.  We do believe that there's certainly enough

17   evidence to go to the jury on -- as Mr. Smith and Mr. Stevens

18   as principles, that's not, of course, what we're arguing, what

19   Ms. Meehan suggests, but it's on both.

20           MS. MEEHAN:  So I just -- I still think it's

21   confusing to lump them together.  First Donnie Smith, Abid

22   Stevens and Maurice Quinn took from the employees of RD

23   Grocery the property described.

24           THE COURT:  That's what the indictment charges.

25           MS. MEEHAN:  Very well.

Page 94

```
1               THE COURT:  I'm not -- I don't want to quash any
2     advance thinking, and there's no -- we're not locked into
3     anything, but this is the way the case was presented to me by
4     all of you, and that's why I've said what I said to the jury,
5     but of course, we can undo that by instructions at the end of
6     the trial, they'll be governed by the trial evidence.  But
7     what we've done, we've taken the Hobbs Act charge from the
8     Third Circuit model instructions and it starts with Element 2,
9     taking or obtaining a personal property from the person or in
10    the presence of another against his will by means of actual or
11    threatened force.  It's nothing new.
12              And Count 1 is, unlawful taking by force by
13    unserved [ph] fear, and it's defined.  I want to know whether
14    there's any objection to those charges, Count 1, the first
15    element and the second element.  And then the interstate
16    commerce element, any objection?
17              MS. MEEHAN:  No, Your Honor.
18              MR. ECKERT:  No, Your Honor.
19              MR. WITTELS:  No, sir.
20              THE COURT:  All right.  Now, we get into
21    accomplice liability, which I think is complicating.  Not as
22    complicating as Pinkerton liability, and if you think I was
23    difficult this morning, I'm liable to be even more difficult
24    at seven minutes after six.  Tell me why we need accomplice
25    liability.  I suspect I know the answer, but I want to hear
```

1    it.

2             MR. ECKERT:  Certainly, Your Honor.  It's one of

3    our theories of the case is that Mr. Smith and Mr. Stevens

4    were aiding their friend or their buddy in getting his goal

5    which was to take the property of an institution.  They

6    facilitated the crime by -- they were the ones with the

7    weapons, so they were the ones that controlled the -- both the

8    store employee as well as the clerk.  And that but for their

9    actions is why that the robbery was able to be successful.  So

10   they were accessories before the fact.

11            THE COURT:  And it was Quinn who ended up with

12   $100 and the gun.

13            MR. ECKERT:  Well, he ends up with -- he is --

14   ends up with the gun, so he's the pecuniary beneficiary.  Mr.

15   Smith, we would also argue is both an accomplice -- an

16   accomplice to the robbery of the money, but he actually takes

17   the gun, so he's liable under a principle theory of liability,

18   absolutely.

19            THE COURT:  Well then, we need this charge, and

20   does -- I don't like the -- it doesn't work.  I didn't go back

21   and read this, that another person that's different than the

22   way it was phrased in my preliminary jury instructions, it

23   doesn't make sense that another person or one of them, so

24   we'll have to change that.

25            Do you have -- I have a copy of that.  Let me

Page 96

1    tell you how I think we should change that.  There was no

2    objection to the way we fine-tuned this -- well, these

3    elements, the aiding and abetting elements for Counts 1 and 2.

4             What we have in the statement of the case, and I

5    think in the preliminary jury instructions is this, that

6    Donnie Smith, Stevens and Quinn took from employee of RD

7    Grocery the property described in Count 1 of the indictment,

8    $100 in United States currency, and a firearm, a Glock, with

9    eight live rounds.

10            Two, that Smith, Stevens and Quinn did so

11   knowingly and willfully by robbery.  That's not the -- these

12   are not the elements for aiding and abetting.  And there's no

13   issue there.  The aiding and abetting charge reads -- these

14   are the elements.  First, that the substantive crimes were

15   actually committed by another.  That is, that someone

16   including one of the defendants obstructed, delayed and

17   affected interstate commerce.  And we adopted that approach.

18   Is that agreeable?

19            MR. ECKERT:  It is, Your Honor.

20            THE COURT:  Because what we have in the -- in

21   this charge, it doesn't work.  So we'll charge on accomplice

22   liability for Count 1, essentially, what is set forth, at

23   least as far as the elements are concerned, they will read,

24   first, second, third and fourth, they will read as they do in

25   the statement of the case.

Page 97

1              Now, let's go to Page 2 of that charge.  It's

2      numbered 41.  Is there anything in that part of the charge

3      that's inapplicable?

4              MS. MEEHAN:  Are you on Page 41, the Pinkerton

5      charge, Your Honor?

6              THE COURT:  No, we're not there yet.

7              MS. MEEHAN:  I apologize.

8              THE COURT:  We're still --

9              MS. MEEHAN:  I thought you -- I heard 41.

10             THE COURT:  We're reading -- it's accomplice

11     liability.  It's numbered 31.

12             MS. MEEHAN:  Oh, 31.

13             THE COURT:  And specifically, it's Page 2 of

14     that charge.  The page number that I -- well, the page numbers

15     don't -- yes, they do, it's page 40.

16             MS. MEEHAN:  Okay.

17             THE COURT:  Page 40, it begins on page 40, and

18     we decided that the elements, first, second, third and fourth

19     will be changed to coincide with what is set forth in the

20     preliminary jury instructions.  And now I'm on page 41.  Is

21     there anything on that page that's inapplicable?  We have to

22     make some choices of words.  But first, we have to decide on

23     the language.  And the sentence reads, if the evidence shows

24     that Donnie Smith, well, Smith, Stevens and Quinn knew that

25     the offense was being committed or was about to be committed,

Page 98

1    but does not prove beyond a reasonable doubt that it was

2    Smith, Stevens and Quinn's intent and purpose.  What word do

3    you think we should use, aid, assist, facilitate, encourage?

4    Government.

5                MR. ECKERT:  I'm sorry, Your Honor.  May I just

6    have one moment to confer?  I think aid or assist is what

7    would be most applicable, Your Honor.

8                THE COURT:  All right.  Any objection to that?

9                MS. MEEHAN:  No objection.

10                MR. PATTERSON:  No, Your Honor.

11                MR. WITTELS:  No, sir.

12                THE COURT:  All right.  And a little further

13    down, we're going to change the language, another person or

14    one of them to read as the statement of the case reads.  And

15    the same, a little further down on the last paragraph, another

16    person or one of them, and on the last line, it will be aid or

17    assist.  And the last page, Page 42 of this charge, aid or

18    assist.  About this time I'm going to be very hoarse.  This is

19    a pretty heavy charge.

20                All right.  Anything else that we have to

21    discuss with respect to aiding and abetting?  Now, Mr. Eckert.

22                MR. ECKERT:  Yes, Your Honor.

23                THE COURT:  See, Ms. Martin gets away with not

24    having to argue any of these issues.  She's got --

25                MR. ECKERT:  I'm happy.

1           THE COURT:  She's got the fun part of the trial,

2     the closing.

3           MR. ECKERT:  I'm happy to turn over this

4     argument to her, but I'll [indiscernible] I'll be fair and

5     swift.

6           THE COURT:  Are you serious about going ahead

7     with Pinkerton liability?

8           MR. ECKERT:  After the Court's discussion last

9     night, I did run this by my supervisor, and he directed me --

10    told me that we should seek a Pinkerton charge, because I

11    think a conspiracy can be made out on these facts, Your Honor.

12    And I apologize for any inconvenience that cause to the Court

13    or counsel, but that's --

14          THE COURT:  Well, it's not an inconvenience.  It

15    really, in my judgment, it adds an issue, a significant issue.

16          MR. ECKERT:  Right.

17          THE COURT:  A big chunk of the case that wasn't

18    charged, but you don't have to charge Pinkerton liability, but

19    in my experience, at least I remember one case where I

20    succeeded in convincing the AUSA that it was unnecessary and

21    unduly complicated the case, and I'm telling the story,

22    because he deleted the Pinkerton liability and there was a

23    conviction.

24          MR. ECKERT:  Right.  And I -- I think it's

25    applicable for the simple fact that this is a bit of a -- I

Page 100

1    don't mean to give fodder to the defense, as they've

2    excellently presented their cases, but this is a bit of a

3    unique case.  And given that the amount here is $100, the

4    Pinkerton liability is rather -- in our view, it's persuasive

5    for what this case entails, which is that there's an

6    agreement, one is formed in a few seconds outside.  They then

7    go back into the store, we believe it to be -- it's certainly

8    a theory of liability that the jury could find under these

9    facts.

10            THE COURT:  Have the defendants carefully read

11   the Pinkerton charge?

12            MS. MEEHAN:  Well, not as carefully as I

13   probably should've, Your Honor.  But we strenuously object.

14   There -- I -- we agree with the Court's assertion that the

15   Pinkerton charge can be given without having a conspiracy

16   count in the indictment.  However, there's still has to be

17   some evidence of conspiracy in order for the Court to give the

18   Pinkerton charge.

19            In this case, and I do agree with Mr. Eckert, it

20   is a unique case, but there's no evidence and I think the

21   Court can hold off on making a determination this evening, but

22   I don't think you'll see anymore evidence that these

23   defendants had some agreement or some indication that they had

24   some uniform plan, so that's why the aiding and abetting

25   theory is appropriate and I think it will be completely

Page 101

```
 1    confusing for the jury to have the aiding and abetting
 2    instruction which seems to be less of a burden.  There's no --
 3    for meeting and a pre-conceived plan, and then get a Pinkerton
 4    charge that discusses the conspiracy, and they'll be
 5    scratching their heads say, what -- where's the conspiracy,
 6    and none of us have addressed conspiracy.  Certainly, not in
 7    opening, and I would --
 8                 THE COURT:  Well, you can certainly address it
 9    if it's in the case.  I think the argument is that when Quinn
10    left the store and came back with Smith --
11                 MS. MEEHAN:  I object to Your Honor's
12    characterization of coming back [indiscernible].
13                 THE COURT:  Well, he came back to the store.  He
14    left.
15                 MS. MEEHAN:  He did come back.
16                 THE COURT:  Said, I'll be back, and he was back
17    with Smith and Stevens.
18                 MS. MEEHAN:  Well, that is the essential
19    question.
20                 THE COURT:  Although, I don't want to argue the
21    government's case, because I really, I really think my goal is
22    to make jury instructions understandable.  The library said, I
23    was the only judge who ever read that book, and so they gave
24    it to me.  It's in chambers.  And having charges like this,
25    first of all, I have trouble with the conspiracy charge.  I've
```

Page 102

1   used the Sand charge, I've used the Debit [ph] charge, I've

2   used all the conspiracy charges.  I discussed the conspiracy

3   charge with Leonard Sand, who wrote the charge book.  He has

4   since passed away.  He was a District Judge at SDNY, and he

5   said, you know I don't like it either.  If you can write a

6   better conspiracy charge, send it to me, if I like it, it's in

7   the book, and you'll get credit for it.  Well, I tried.  I

8   did.  I didn't succeed.  So my fallback position is unless

9   conspiracy is really in the case, let's try to keep it out.

10  But the government has a point.  I think you're right.  I only

11  charge on issues that are raised by the evidence.  And I'll

12  hear Mr. Eckert.  I don't want to tap him out now, I want him

13  to -- if you think the evidence is going to tilt us in the

14  opposite direction, away from Pinkerton, we'll wait until we

15  hear it.  Well, Ms. Martin, apparently, has some other ideas.

16          MS. MARTIN:  No, Your Honor, I would just ask

17  that you reserve ruling.  I think that there will be more

18  evidence of a conspiracy when you see a little bit more of the

19  video, and the way certain things line up in the case.  I

20  think that there will be more evidence of what happened

21  outside of the store.

22          THE COURT:  All right.  Well, I'm not going to

23  rule, definitely.  I've told you that with respect to all

24  rulings on the charge, what I do is, we construct the charge

25  as we go.  My goal is to have a charge as to which everyone

 1    agrees.  I very rarely have objections to my charges.  And

 2    I've given lots of charges.  In this case we'll leave

 3    Pinkerton in for now, but I direct the four of you to read

 4    that charge, and the conspiracy charge, and be prepared, we'll

 5    have a Part 2.  And what we'll do at Part 2 of the charging

 6    conference is see if there's anything that is inapplicable in

 7    the Pinkerton charge and the conspiracy charge.  And perhaps

 8    pare it down.

 9            I think on the notice that I gave you and the

10    fact that you're scurrying about trying to get witnesses

11    ready.  This is not the appropriate time to do that.  So I'll

12    come back to Pinkerton, which is, it's Tab 32, and then the

13    conspiracy charge, 33, 34, 35.  And 35 is the key that you

14    raised Ms. Meehan.  The second element in the conspiracy

15    charge, membership and the agreement, the agreement itself.

16    And we'll see.

17            Perhaps, if we invite some supervisors,

18    including the boss, I said you're filing lots of object cases.

19    You can see how one really unfold, that's rather unusual.  I'm

20    sure he's got nothing else to do than to sit on an object

21    case.

22            Mental states, how do we call -- I'm going to

23    call that charge before.  I'm just getting advised while my

24    law clerk that the Third Circuit says, you should charge on

25    all of the model conspiracy charges, all of them.  But in any

Page 104

1    event, I want you to look at the Pinkerton charge.  There's a

2    single charge, and the conspiracy charges.  And we'll pick up

3    on that.  The issue is, if the government won't withdrawal,

4    and I suspect Mr. Eckert is probably not going to withdrawal,

5    whether there's an argument for not including them and I

6    suspect -- well, I won't.  I'll wait and see what happens.

7                MS. MEEHAN:  Thank you, Your Honor.

8                THE COURT:  But there are lots of points.

9    Paragraph 32 to 40, a big chunk of the charge, so we'll come

10   back to that.  Next is Count 2, and we gave Paragraph 21, we

11   gave the model instruction.  I'm on page -- on Paragraph 41.

12   Are there any issues with 41?

13               As I look at it, it looks appropriate.  It's the

14   first instruction on Count 2, 42 is of the firearm defined.

15   We'll change the accomplice liability, but you need paragraph

16   43 to coincide with what we've done with respect to accomplice

17   liability in Count 1.  Motive.

18               MS. MEEHAN:  Your Honor, I object to the Court's

19   accomplice liability.

20               THE COURT:  The accomplice -- the aiding and

21   abetting charge --

22               MS. MEEHAN:  Yes.

23               THE COURT:  -- with respect to Count 2?

24               MS. MEEHAN:  Correct, Your Honor.  I submitted

25   one instruction, and the reason is that through the majority

Page 105

1    of the evidence, the model instructions are sufficient, but

2    there have been problems with the accomplice liability as it

3    pertains to aiding and abetting in 924c and I know the Court

4    is very familiar with the Supreme Court case of Rosemond,

5    R-O-S-E-M-O-N-D versus --

6                  THE COURT:  Yes.  I have that.

7                  MS. MEEHAN:  -- the United States.

8                  THE COURT:  I'm looking at it.

9                  MS. MEEHAN:  So and I -- I want to call the

10   Court's attention, I've submitted one and I think that the

11   sequence is less confusing and very --

12                 THE COURT:  Well, you submitted the -- in

13   essence, the Sixth Circuit charge.

14                 MS. MEEHAN:  With modifications, that's correct,

15   Your Honor.

16                 THE COURT:  But the Third Circuit says, we've

17   taken into consideration Rosemond, and this is what we

18   recommend you do.

19                 MS. MEEHAN:  Right.  However, the Court doesn't

20   have to do that, and I think in this particular case, given

21   the facts and we've ascertained this is a unique set of facts,

22   the -- one of the problems is the Court doesn't define advance

23   knowledge, and I think that the jury needs to have that

24   definition and that is part of the what I submitted in my jury

25   request in the middle of the page, advance knowledge means and

Page 106

1    then there's a definition, knowledge beforehand -- Mr. Quinn

2    had a realistic opportunity to quit the crime after learning

3    that a firearm would be used and carried, and much of this

4    language mirrors the language that is in Rosemond.  And in

5    fact, I'm troubled by what the government opened with.  In

6    their opening argument, Mr. Eckert said, Mr. Quinn had

7    advanced knowledge, because "before he got the money, he knew

8    firearms had been displayed," so he was talking about conduct

9    that was in the store, and that -- it's not as if they were

10   all in there and the guns were already out and Mr. Quinn was

11   there and he went in with them and the guns were already

12   brandished or displayed.  Quite the opposite.  Mr. Quinn had

13   been in there.  He went out.  He came back in before the

14   either two, Mr. Smith came in, did not have a gun, and then

15   pulled a gun out, and this is on the video.  This is the

16   sequence of events and then Mr. Stevens came in 10 seconds

17   later and pulled a gun out pretty quickly.

18            Now, Mr. Quinn had already been in there, in the

19   store for about 40 seconds, so the law does not say that if

20   Mr. -- the law is the opposite and I'm going to quote from the

21   Rosemond case here, Your Honor.  Under these principles and

22   I'm on page 1251 of the cite 134 Supreme Court 1240, under

23   these principles, the District Court erred in instructing the

24   jury, because it did not explain that Rosemond needed advance

25   knowledge of a firearms presence.  They were at a drug deal.

Page 107

```
1    Recall that the Court stated that Rosemond was guilty of

2    aiding and abetting, "If he knew his cohort used a firearm in

3    the drug trafficking crime, and he knowingly and actively

4    participated in the drug trafficking crime."

5           So I think that is very similar to what Mr.

6    Eckert was arguing.  That if Mr. Quinn, he saw the guns, he

7    knew the guns were there, therefore, he's guilty of aiding and

8    abetting, that is contrary to the Rosemond, Holden [ph].

9           THE COURT:  Well, but the -- I'm looking at the

10   instruction on Paragraph 43, and I guess the answer to this

11   issue, at least from the perspective of the Third Circuit is

12   found on Page 59.

13          The element we're talking about is the third

14   element, that the defendants were active participants in the

15   using and carrying of a firearm during a crime of violence.

16   And the key language is, and also had advance knowledge that

17   one of the principles would use a firearm during and in

18   relation to the interference with interstate commerce by

19   robbery.

20          Now, in defining that in deciding whether

21   defendants had the required knowledge and intent to certify

22   the third requirement, you may consider both direct and

23   circumstantial evidence.  However, evidence that defendants

24   merely associated with persons involved in the criminal

25   venture, and we'll have to change the -- this says, or was --
```

Page 108

```
 1    it should be were merely -- present or knowing spectator, not

 2    enough.  If evidence shows that defendants knew that the

 3    offense was being committed or was about to be committed, but

 4    does not also prove beyond a reasonable doubt that it was

 5    defendant's intended purpose to aid and assist or otherwise

 6    associate themselves with the offense.

 7              It isn't as specific as -- and I'm not -- and I

 8    haven't read the whole thing yet.

 9              MS. MEEHAN:  Your Honor, my position is the

10    advance knowledge requires the government have evidence and

11    proof before the guns are displayed.  And the government

12    argued, I think in a sort of misleading way that Mr. Quinn

13    before he got the money, he knew firearms had been displayed

14    and that's not the language of the instruction is that one of

15    the principles would use a firearm, not after the fact that he

16    knew.  That's the opposite of the Rosemond case.  It's too

17    late at that point in time for Mr. Quinn, arguably, to

18    withdrawal.  He's merely present in the store and someone

19    brandishes, pulls out a firearm and there's no -- and he

20    doesn't have advance knowledge.  He's not guilty of aiding and

21    abetting.

22              So I think advance knowledge needs to be further

23    defined, especially in light of what the government argued.

24    And I realize it's not evidence, but I think it would be --

25    it's very confusing to the jury.  They may think that it's
```

Page 109

1    sufficient that because when they came in the store, they

2    pulled out guns and Mr. Quinn saw the guns that that's enough,

3    and it's most definitely under our Supreme Court law not

4    enough.

5              THE COURT:  Well, the proposed instruction, I'm

6    reading from the Third Circuit notes, to find that a defendant

7    had advance knowledge that one of the principles would use or

8    carry a firearm during and in relation to the robbery, you

9    must find that the government prove defendant had knowledge of

10   the firearm at a time when he or she could do something with

11   that knowledge, such as walking away from the criminal

12   venture.  Isn't that -- doesn't that meet your argument?

13             MS. MEEHAN:  Well, I would -- I don't think Mr.

14   Quinn could walk away.  I think --

15             THE COURT:  Well, what you're saying is, in

16   order to convict Quinn under the aiding and abetting statute

17   for Count 2, as applied to Count 2, he's got to be able to

18   have that knowledge.  He's got to have that knowledge at a

19   time when he can walk away.

20             Now, I don't see that in a draft charge, Ryan,

21   is that in there?

22             MR. ECKERT:  [Indiscernible].

23             THE COURT:  I'm looking at the Third Circuit

24   model -- I think it's answered.  Now, I -- it's not exactly a

25   brief explanation, it's rather prolix, but we have said, as

1   the Third Circuit says, to find that defendants had advance

2   knowledge one of the principles would use or carry a firearm

3   during and in relation to -- well, the crime of robbery, you

4   must find that the government proved that they had knowledge

5   of the firearm at a time when they could do something with the

6   knowledge, such as walking away from the criminal venture.

7   You could lean on that language and if, as you say, the only

8   evidence or the first evidence that Quinn had that a gun would

9   be used was after he was back in the store a second time then

10  he could not have walked away or you can argue that he could

11  not have walked away.  But I think I'm going to stick with the

12  Third Circuit charge.  I'm going to read this again.  I'm not

13  entirely --

14          MS. MEEHAN:  Your Honor, I think the problem

15  with the Third Circuit charge is that it was written before

16  2014 and then Rosemond came out, and then they were sort of

17  slapping Band-Aids on to what was already a --

18          THE COURT:  But I'm not in the Sixth Circuit,

19  I'm still here.

20          MS. MEEHAN:  No.  I -- no, the Third Circuit,

21  we --

22          THE COURT:  And I see those guys all the time.

23          MS. MEEHAN:  Well, I -- well, that's why there's

24  this advisory committee, Your Honor and they're tinkering with

25  the instructions and this is one of the instructions, because

Page 111

1    of Rosemond that they were sort of --

2                THE COURT:  Well, the argument that you've made,

3    I must say, I haven't read into this as thoroughly as you

4    apparently have, but I think the instruction that I flagged

5    meets the argument that you made and if the only evidence the

6    government has is evidence that Quinn should've realized a

7    weapon was being used, after he was back in the store the

8    second time, you can argue that he couldn't walk away.

9                MS. MEEHAN:  With the exception of I would still

10   request the advance knowledge definition that I submitted be

11   included.

12               THE COURT:  We'll consider it.

13               MS. MEEHAN:  Very well, thank you.

14               THE COURT:  I'm not ruling on it now.

15               MR. ECKERT:  The only thing I just want to

16   offer, Your Honor, is that absolutely, I think this is a

17   matter that goes to the jury.  We're going to argue that when

18   he's at the threshold of the store, and he walks to the other

19   end of the store, he had the opportunity to walk away.  Ms.

20   Meehan's free to argue that he did not, and that conduct does

21   not meet the element, but I just think it's important.

22               THE COURT:  Well, the question whether the

23   instruction on when he must have the knowledge that someone

24   else in the group was going to use a gun is vague, if she is

25   correct and I don't think she is, we'll take a look at it.

Page 112

```
 1              MR. ECKERT:  Very well.

 2              THE COURT:  Is there anything you wish to add on

 3     the point?

 4              MR. ECKERT:  Just that we would rely on the page

 5     70, I believe it's page 76 of Rosemond which says, "For the

 6     reasons just given, we think that that means advance knowledge

 7     at a time that the accomplice can do something with it, most

 8     notably, opt to walk away," as the Court's indicated.

 9              THE COURT:  Well, that's in the charge.

10              MR. ECKERT:  No, I -- I'm just using that as

11     authority to support what the current charge is, that's my

12     only -- I want to --

13              THE COURT:  Well, Mr. Eckert, you have, in

14     addition to Rosemond, you have the Third Circuit model

15     instructions.  Their certainly consistent with them.  All

16     right.  We'll take a look at that.  Next is --

17              MS. MEEHAN:  And, Your Honor, I'm sorry, I know

18     that -- this is my case, that's why I -- this is central to my

19     case and I'm sorry to belabor this.  I will look for language.

20     I'm pretty sure that the definition of advance -- there's

21     language in Rosemond that speaks to the last sentence of my

22     submission of advance knowledge.  Mr. Quinn's continued

23     participation in a crime of violence once the firearm -- once

24     the firearm is used or displayed is not sufficient to find Mr.

25     Quinn guilty of using and carrying a firearm during and in
```

Page 113

1  relation to a crime of violence.  So it's a little more than

2  the didn't walk away.

3          THE COURT:  I'm not sure I'm going to give that.

4  I think didn't walk away, the argument the government might

5  make is the appropriate language.

6          MS. MEEHAN:  Well, Your Honor, it is in the case

7  and I can submit something or we can at the final charge

8  conference or when I state my objection, because that would

9  be -- if it's language from Rosemond that would be an accurate

10  statement of the law.

11          THE COURT:  Except, it's not binding on it.

12          MS. MEEHAN:  No.

13          THE COURT:  And the Third Circuit really isn't

14  their model instructions, but they cover the issue, the same

15  issue in a slightly different way.  And we're completely

16  consistent with the Third Circuit, but -- well, Ryan noted

17  that Rosemond was decided a few years ago, like six and the

18  Third Circuit charge is still being given, but we'll look at

19  that.

20          We're just about finished.  Motive, necessary to

21  charge motive?  The government requested it.

22          MR. ECKERT:  We believe it is appropriate, Your

23  Honor.

24          THE COURT:  Well, it might be appropriate, we

25  could charge a lot of things.  Is it necessary?

Page 114

1            MR. ECKERT:  We believe so, Your Honor,

2    especially based on, again, the amount of money that was taken

3    in this case, I believe it's important to instruct the jury as

4    to what motive actually is, and whether it's required.

5            THE COURT:  All right.  We'll leave it in for

6    now.  Deliberations, I don't think there's much there that can

7    be pared.  Anything in Paragraph 42?  I don't think so.

8    That's one we've used over and over again.  Verdict perform

9    and special interrogatories though.  Any issues with respect

10   to the verdict form?

11           MR. ECKERT:  No, Your Honor.

12           MS. MEEHAN:  I have an objection, Your Honor.

13           MR. PATTERSON:  No, Your Honor.

14           THE COURT:  Any issue with the way we handle the

15   question of brandishing?  I think it's about time and in the

16   very last question, any issue with additional considerations

17   which really is Count 3?  I'm not going to do Count 3 tonight.

18   It's very simple.  You have it.  And we can have a quick

19   charging conference.

20           MR. PATTERSON:  I understand, Your Honor.

21           THE COURT:  With respect to Count 3.  Yeah, I'm

22   a little --

23           MS. MEEHAN:  Your Honor, can I raise the verdict

24   form as to [indiscernible] at a later date if Your Honor --

25           THE COURT:  What's the -- well, yeah.  Why don't

1    we talk about it very briefly now?  I want to shut down by

2    7:00, at the latest.

3                MS. MEEHAN:  Oh, this is -- Your Honor --

4                THE COURT:  Ryan --

5                MS. MEEHAN:  My position is if the jury finds

6    Mr. Quinn not guilty of robbery on Count 1, because that is a

7    charged offense, robbery, then they can't move to the issue of

8    Count 2, 924c.  Now, if it wasn't charged and there was

9    evidence of a robbery, they could still find the defendant --

10   the jury could find a defendant guilty of 924c, but if they

11   actually -- if it's charged, and they reach a verdict, then

12   they cannot move to Count 2 and that's why I had submitted a

13   verdict form with language saying if you reach a verdict of

14   not guilty or words to that affect, I don't have it in front

15   of me, Your Honor, that they -- that there's no need to move

16   to Count 2.

17               THE COURT:  Mr. Eckert, it seems to me the

18   argument is that if any defendant is found not guilty of Count

19   1, he can't be found guilty of Count 2.

20               MR. ECKERT:  I would like the opportunity to

21   discuss that with my office, Your Honor, before I take a

22   position on that.  That's not completely -- that's the exact

23   way our verdict form is written, but just would ask for --

24               THE COURT:  No, it isn't.  And I'm -- but I'm

25   thinking, a Count 2 charge is using or carrying and I gratin

Page 116

1    that the linking language, whether it's in --

2            MR. ECKERT:  Right.

3            THE COURT:  -- furtherance of or during --

4            MR. ECKERT:  Right.

5            THE COURT:  -- the robbery, charged in Count 1.

6            MR. ECKERT:  If -- I just -- again, I would like

7    to ask the Court permission to address that tomorrow.  I'm not

8    saying anyone's wrong.  I just want to check on that before I

9    take a position.

10           THE COURT:  Okay.  Good.  I think we're through.

11   Anything else, Mr. Eckert?

12           MR. ECKERT:  No, Your Honor.

13           THE COURT:  Ms. Martin.

14           MS. MARTIN:  No, Your Honor.  Thank you.

15           THE COURT:  You're going to work on Mr. Eckert

16   with respect to --

17           MR. ECKERT:  I'm a lost cause in many ways.

18           MS. MARTIN:  I'll do my best.

19           THE COURT:  With respect to Pinkerton?

20           MR. ECKERT:  I believe I'm a lost cause, but

21   we'll do our best.

22           THE COURT:  Mr. Patterson.

23           MR. PATTERSON:  No, Your Honor.  Thank you.

24           THE COURT:  Mr. Wittels.

25           MR. WITTELS:  No, Your Honor.

Page 117

1                THE COURT:  Ms. Meehan.

2                MS. MEEHAN:  No, Your Honor.  Thank you.

3                THE COURT:  Okay.  Thank you.  All right.  We're

4    in recess.

5                DEPUTY CLERK:  All rise.

6                THE COURT:  Tomorrow morning, what time did I

7    say?  9:30?

8                UNIDENTIFIED SPEAKER:  9:30.

9                UNKNOWN SPEAKER:  Yeah.

10                         -  -  -

11               (Whereupon, the proceeding was concluded

12                    at 6:46 p.m.)

13                         -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

Page 118

1                    C E R T I F I C A T E

2

3           I do hereby certify that the aforesaid

4    hearing was transcribed by me from an audio recording to the

5    best of my ability; and that I am neither of counsel nor kin

6    to any party in said action, nor interested in the outcome

7    thereof.

8

9

10

11

              WITNESS my hand and official seal this

12   17th day of November, 2020.

13                   _____

14                        Janine Thomas

                          Notary Public

15

16

17

18

19

20

21

22

23

24

25

[& - abetting]                                                                                  Page 1

| & |
| --- |

**&**   1:17

| 0 |
| --- |

**00350**   1:2,3,3

| 1 |
| --- |

**1**   1:2 92:1,23
  94:12,14 96:3,7,22
  104:17 115:6,19
  116:5
**10**   16:25 17:13
  38:1 83:8 106:16
**100**   29:12 39:20
  40:6 45:18 46:6,7
  48:7 49:10,10,14
  49:14,16,23,25
  50:2 63:13,15,17
  65:1 95:12 96:8
  100:3
**10:00**   73:25
**10:21**   1:5
**10:41**   18:7
**11**   48:20
**11902**   118:13
**11:26**   18:7
**12**   37:23
**1240**   106:22
**1250**   1:10,14
**1251**   106:22
**12:51**   68:11
**1301**   1:18
**134**   106:22
**1429**   1:18
**15**   17:14,25 18:3
  38:1 40:14
**16**   59:6,9,9 64:1
  81:24
**16:50**   47:11
**16:55:16**   49:2
**16:55:47**   49:4

**17:05:07**   50:9
**17th**   118:12
**18**   88:25
**1800**   2:8
**1801**   2:8
**18045**   2:1
**19**   88:25
**19-350**   4:6
**19102**   1:19
**19103**   2:9
**19106**   1:11,15,22

| 2 |
| --- |

**2**   1:3 43:10 92:1
  92:21,22,22 94:8
  96:3 97:1,13
  103:5,5 104:10,14
  104:23 109:17,17
  115:8,12,16,19,25
**20**   17:25 18:3
  39:24 40:1,7,14
  46:3 49:16,20
  70:13
**2014**   110:16
**2019**   8:1 28:5 31:6
  38:14
**2020**   1:5 118:12
**21**   90:3 91:25
  104:10
**215**   1:19
**215-851-8630**   1:11
**215-861-8609**   1:15
**215-928-1100**   1:23
**22**   7:25 28:5 31:6
  38:14
**22nd**   45:21 46:10
  46:14 48:21
**25**   51:15,19
**26**   29:13 31:9
**27**   92:17
**28**   1:5

**2:03**   68:11
**2:06**   68:24
**2:19**   1:2,3,3

| 3 |
| --- |

**3**   1:3 92:2 114:17
  114:17,21
**30**   41:10 47:11,12
  51:15,19
**31**   97:11,12
**32**   103:12 104:9
**33**   103:13
**34**   103:13
**35**   103:13,13
**3513**   1:25
**39**   3:3

| 4 |
| --- |

**40**   97:15,17,17
  104:9 106:19
**404b**   89:1,3,5,6
**41**   97:2,4,9,20
  104:11,12
**42**   98:17 104:14
  114:7
**422**   86:13,21
**43**   104:16 107:10
**45**   3:3
**4:39**   68:24
**4:45**   66:11 72:18
**4:50**   47:12
**4:55:57**   49:8

| 5 |
| --- |

**50**   91:12,21
**52**   3:4
**540**   1:21
**56**   3:4
**59**   107:12
**5:00**   50:10
**5:30**   72:18

| 6 |
| --- |

**601**   1:22
**608b**   87:13
**610-253-7858**   2:1
**615**   1:10,14
**6:46**   117:12

| 7 |
| --- |

**70**   112:5
**735-5900**   1:19
**76**   112:5
**777-6690**   2:9
**7:00**   115:2

| 8 |
| --- |

**888**   2:9

| 9 |
| --- |

**9**   29:14 31:9
**911**   76:8,25 77:2,6
  78:13 79:1 90:19
  90:22 91:11
**924c**   105:3 115:8
  115:10
**9:00**   73:12
**9:30**   69:18,21
  73:25 74:5,6,24
  117:7,8

| a |
| --- |

**a.m.**   1:5 18:7,7
**abets**   30:2
**abetted**   31:7 33:2
**abetting**   28:6,13
  28:17,18 29:21,24
  30:6,23 31:4 32:4
  32:5 50:23 51:3,7
  51:24 96:3,12,13
  98:21 100:24
  101:1 104:21
  105:3 107:2,8
  108:21 109:16

**abid**  1:4 4:5 28:3 29:10 54:24 55:1 56:5 93:21
**ability**  40:4 42:17 118:5
**able**  4:21 26:2 36:14 37:20 40:9 40:12 42:16 43:1 48:23 54:6 62:12 95:9 109:17
**absolutely**  5:7 8:9 10:16 16:18 22:10 74:10 95:18 111:16
**abundantly**  41:21
**accessories**  95:10
**accident**  42:24
**accomplice**  94:21 94:24 95:15,16 96:21 97:10 104:15,16,19,20 105:2 112:7
**account**  48:16,18
**accurate**  54:19 113:9
**accusation**  27:3
**act**  15:6 30:15,19 32:21 44:13 92:21 93:10 94:7
**action**  118:6
**actions**  29:18 42:20 44:14 95:9
**active**  32:15 107:14
**actively**  107:3
**acts**  55:1 87:12,15
**actual**  43:16 64:3 94:10
**add**  36:15 67:21 76:12 79:5 85:11 86:3,4 112:2

**addition**  24:4 28:25 112:14
**additional**  114:16
**additionally**  15:13
**address**  25:1 66:22 73:8 77:23 86:12 101:8 116:7
**addressed**  13:16 81:9 101:6
**addressing**  80:15
**adds**  99:15
**admissible**  24:13 78:8
**admission**  19:23
**admitted**  3:9,14
**adopted**  96:17
**advance**  32:17 39:3 94:2 105:22 105:25 106:24 107:16 108:10,20 108:22 109:7 110:1 111:10 112:6,20,22
**advanced**  43:14 43:15,23 51:11 106:7
**advancing**  41:25
**advise**  6:21 17:12
**advised**  103:23
**advising**  9:12,12
**advisory**  110:24
**affect**  115:14
**aforesaid**  118:3
**afraid**  16:13
**afternoon**  45:4 52:15 73:15
**agent**  67:7
**agents**  67:25
**ago**  22:20 88:6 113:17

**agree**  9:1 11:20 19:1,3 23:8,17,20 23:22 47:21 56:18 76:18 83:16 84:25 85:16 87:4 92:5 100:14,19
**agreeable**  96:18
**agreement**  23:19 76:2,13,14,19 78:21 85:5,21 100:6,23 103:15 103:15
**agreements**  80:18
**agrees**  103:1
**ahead**  92:22 99:6
**aid**  98:3,6,16,17 108:5
**aided**  31:7 33:2
**aiding**  28:6,13,17 28:18 29:21,23 30:5,16,23 31:4 32:4,5 50:22 51:3 51:7,24 95:4 96:3 96:12,13 98:21 100:24 101:1 104:20 105:3 107:2,7 108:20 109:16
**aids**  30:2 110:17
**alert**  88:8,8
**alibi**  91:21
**alien**  15:19
**alleged**  12:18
**allegedly**  65:2
**alleviate**  16:22
**allow**  9:8 14:17 24:22
**allowed**  11:17 12:8,16 67:23
**allowing**  7:13 12:23

**alluding**  65:11,12
**amendment**  7:16 9:14 13:19
**america**  1:2 4:4
**ammunition**  29:15 31:11
**amount**  10:7 49:17 100:3 114:2
**ample**  43:19
**anecdotally**  10:12 12:3
**angrier**  47:6,6
**announcement**  35:2
**answer**  6:18 9:9 9:23 12:22 14:5 14:14 20:9 24:2 24:24 36:22,23 38:18 65:18 94:25 107:10
**answered**  36:25 109:24
**answering**  9:11
**answers**  12:13
**anticipated**  72:21
**anybody**  54:25 59:5,8,18
**anymore**  100:22
**anyone's**  116:8
**anyway**  57:2 65:16
**apart**  51:10
**apologize**  10:5 76:24 97:7 99:12
**apology**  21:23 22:1,2
**apparently**  102:15 111:4
**appear**  34:19
**appearances**  1:8

**appeared** 85:19
**appears** 11:17
**applicable** 69:6
  76:10 89:17 98:7
  99:25
**application** 18:20
**applied** 109:17
**applies** 43:3 76:8
**apply** 23:5 54:21
  57:11 61:13 67:17
**appoint** 6:21 14:6
**appointing** 9:11
**approach** 96:17
**appropriate** 6:12
  11:18 65:23 81:4
  86:10 89:21
  100:25 103:11
  104:13 113:5,22
  113:24
**approval** 21:4
**arguably** 108:17
**argue** 5:17,19
  37:12,14,15 40:15
  40:15 47:25 52:19
  78:17 95:15 98:24
  101:20 110:10
  111:8,17,20
**argued** 108:12,23
**argues** 41:9 45:24
  51:1
**arguing** 48:7 53:5
  81:13 83:24 84:9
  93:18 107:6
**argument** 5:20
  10:20 41:5 45:12
  48:2,3 52:21
  53:17 55:3 58:2,3
  58:6 63:20 64:24
  81:9,22 83:5 93:1
  99:4 101:9 104:5
  106:6 109:12

111:2,5 113:4
  115:18
**arguments** 23:25
  33:20,23 34:3
  36:16 37:11,12
**arm** 44:17
**armed** 41:22
  63:24
**arrive** 53:8
**arrived** 21:24
  82:15 88:14
**arriving** 27:17
**ascertained**
  105:21
**ashley** 1:13
**ashley.martin2**
  1:16
**asked** 7:10 10:1
  11:16 16:23 24:2
  69:8
**asks** 34:11
**assailant** 91:14
**assemble** 56:10
**assertion** 100:14
**assess** 26:22
**assessment** 26:9
**assist** 52:6 98:3,6
  98:17,18 108:5
**assisted** 52:2
**associate** 108:6
**associated** 107:24
**association** 1:21
**assume** 25:21
**assuming** 77:8
**atf** 79:19
**atlantic** 2:8
**atm** 39:23,24 40:6
  45:19,20 46:6,13
  46:14 47:2 48:5
  48:16,19 50:18

**attach** 15:7
**attention** 105:10
**attorney** 17:5
  19:25,25 20:4
  35:23 58:17 61:18
  61:19 64:6 70:20
**attorney's** 1:9,13
**attorneys** 22:4
  37:11 57:2 93:7
**audio** 2:4 75:21
  76:25 78:25 79:3
  79:6,7,11,14 118:4
**ausa** 17:5 99:20
**authority** 22:10
  112:11
**automatic** 29:14
  31:9,10
**available** 73:12
**avoid** 22:15
**avoided** 6:11
**aware** 7:19 10:10
  73:18
**awful** 32:22

**b**

**b** 3:7
**back** 12:2 18:1
  21:6 22:6 36:1,2
  38:19,20,22 39:15
  39:17,18 40:19
  41:3,5,7,7,13
  43:18 45:18 49:2
  49:6,25 53:5
  55:17 59:10 62:2
  63:19,22 64:16
  65:16 66:5 76:25
  77:4 87:9 88:19
  92:9 95:20 100:7
  101:10,12,13,15
  101:16,16 103:12
  104:10 106:13
  110:9 111:7

**backed** 26:13 39:3
  40:22
**backing** 42:1
**backs** 48:12
**bad** 58:16 86:9,17
  87:2,12,15
**bag** 65:1
**bagged** 80:12
**band** 110:17
**bank** 48:16,18
**barnaby** 1:17
**based** 33:5 34:7,9
  34:24 57:9,10,10
  59:16 69:13 74:21
  114:2
**basic** 26:25
**basis** 4:17 5:10
  6:13 8:16,17,21
  9:1,1,22 13:24
  14:10,12 81:5
**baylson** 12:4,8,16
**bcxx649** 29:15
  31:10
**bear** 27:21 64:23
**bearing** 29:14
  31:10
**bed** 36:23 37:3
**beginning** 4:6 6:24
  49:19 67:8 73:12
**begins** 66:22 97:17
**behalf** 87:22,22
**belabor** 112:19
**belated** 21:22
**belief** 11:24
**believability** 26:23
**believable** 23:1,6
  26:6
**believe** 4:22 6:13
  7:7,25 13:15
  15:14 24:8 26:7,8
  45:7 51:11 58:13

59:6 60:5 61:12
62:15,18 67:12
68:1 73:22 75:20
81:1,3,24 86:21
87:2,14 90:22
93:16 100:7 112:5
113:2 114:1,3
116:20
**believed** 42:7
**believes** 49:1
**belong** 50:15
**belonged** 43:8
**bench** 72:11
**beneficiary** 95:14
**benefit** 19:7,13
67:21
**benefits** 5:6
**best** 83:21 116:18
116:21 118:5
**better** 9:15 12:25
13:1 47:18 52:17
73:4,6 102:6
**beyond** 27:20,25
29:9 30:24 31:1
31:20 32:8,23
40:8 41:14 43:13
52:1 57:13,17
59:17 65:24 98:1
108:4
**bias** 11:23
**bifurcated** 86:6
**big** 99:17 104:9
**bike** 58:22
**bill** 40:1 46:3
49:10
**bills** 49:17,20
**bind** 13:11
**binding** 113:11
**bit** 22:18 35:2 40:8
50:2,5 56:10
70:13 78:1,2

82:17 99:25 100:2
102:18
**black** 31:8
**blackberry** 35:5
**block** 53:12 91:16
91:17
**blog** 35:6
**blogs** 33:11
**blown** 10:19
**body** 54:6
**book** 101:23 102:3
102:7
**boss** 40:10 103:18
**bottom** 78:4
**bounds** 5:20
**bracketed** 92:2
**brady** 10:11
**brandish** 52:7
**brandished** 31:7
106:12
**brandishes** 108:19
**brandishing** 28:9
28:18 31:8,17
114:15
**break** 12:11 66:9
66:11 78:17
**breakfast** 21:24
**brief** 10:6 52:16
52:17,18 56:16
69:4 109:25
**briefly** 115:1
**briefs** 4:9 10:1
**bring** 66:5
**brings** 63:24
**broad** 64:2 91:16
**broadcast** 34:17
34:20,21 69:11
**brought** 27:3 85:2
89:18
**bruton** 90:5 91:1

**bucks** 63:17
**buddy** 95:4
**building** 22:14
**bunch** 62:13
**burden** 27:6,13,15
27:23,24 30:20
51:25,25 101:2
**business** 42:12,14
42:15,16,18 72:14
**buy** 45:20 49:21
59:25
**buys** 39:25

## c

**c** 1:17,24 4:1 118:1
118:1
**call** 4:4,11 18:16
21:16 23:21 40:10
47:15 57:25 67:14
68:17 76:8,25
77:2,6,7,9,21
78:13,14 90:19,22
90:24 91:11
103:22,23 105:9
**called** 19:25
**caller** 77:8
**calls** 18:11 47:7,7
79:1 91:12
**camera** 61:7 76:1
81:24 83:16 84:5
**cameras** 59:9,10
81:23 82:2,8,17,25
**capable** 24:17
**capture** 81:23
82:1,2,17,22,24,25
83:19
**captured** 82:5,8
**car** 41:13,13 44:10
44:11 61:6,11
62:6,7,8 80:11
91:20

**careful** 56:2
**carefully** 100:10
100:12
**carried** 31:7,25
32:1,11,25 42:25
44:22 106:3
**carry** 32:18 50:23
51:3,8,9,24 52:3
53:21 109:8 110:2
**carrying** 28:9,18
31:7,17 32:6 43:2
107:15 112:25
115:25
**cars** 53:8
**case** 4:4,25 7:23
10:13 12:3,9,20
14:15 20:6,7 22:5
22:13,25 23:3,12
24:1,12 25:7,12
26:4,10,14,15,19
26:24,25 27:7,14
27:22,22,23,24
28:20,24 29:1
33:5,8,8,9,12,13
33:16,18,21,25
34:3,5,7,9,10,13
34:16,17,21,21,22
34:24 35:1,5,9,12
39:22 41:24 42:3
42:9,24 43:11,20
43:25 44:1,16,21
44:23 45:11 52:20
53:4 54:3 55:14
57:9,9,16,17,25
58:15,25 59:17
61:19 63:5 65:18
67:7,25 69:11,13
73:20,21 84:22
86:5 89:17 94:3
95:3 96:4,25
98:14 99:17,19,21

[case - client]                                                          Page 5

100:3,5,19,20
101:9,21 102:9,19
103:2,21 105:4,20
106:21 108:16
112:18,19 113:6
114:3
**cases** 23:19 55:21
100:2 103:18
**cash** 39:16 44:19
63:15
**cashier** 47:25
64:17
**casper** 58:23
**cast** 53:22
**caught** 38:16
**cause** 99:12
116:17,20
**causes** 41:3
**caution** 35:20 36:3
**caveat** 5:21
**cell** 35:5 47:7
**center** 1:21 77:21
**central** 112:18
**certain** 23:22,23
57:8 59:23 60:5
102:19
**certainly** 4:20
6:18 7:6,17 14:24
17:24 29:3 47:17
47:19 51:7 67:9
78:19 79:24 85:24
88:20 93:14,16
95:2 100:7 101:6
101:8 112:15
**certify** 107:21
118:3
**chain** 80:2,2,7,10
80:11,15
**chair** 17:4
**chamber** 62:24

**chambers** 101:24
**chance** 73:5
**change** 69:20 72:6
88:18 95:24 96:1
98:13 104:15
107:25
**changed** 97:19
**chapter** 37:20
**character** 86:9,17
87:2
**characterization**
101:12
**charge** 29:2 42:25
61:18,19,23 65:11
65:20 71:2,20,22
72:3,4,4,5,8,8,9,10
72:23 73:3,3,4
76:11 78:7,8 79:2
80:19,22 81:4,7,8
81:21 83:7,7,9
84:12,18 85:1,13
85:17 86:18,25
89:3,8,25 91:25
94:7 95:19 96:13
96:21,21 97:1,2,5
97:14 98:17,19
99:10,18 100:11
100:15,18 101:4
101:25 102:1,1,3,3
102:6,11,24,24,25
103:4,4,7,7,13,15
103:23,24 104:1,2
104:9,21 105:13
109:20 110:12,15
112:9,11 113:7,18
113:21,25 115:25
**charged** 9:25
27:25 28:4,8,12,13
28:22 30:1,6,7,13
30:17,20 31:14,22
32:9,13,21,24

65:10 85:7 92:14
99:18 115:7,8,11
116:5
**charges** 28:2
29:20 31:5 32:3
42:9 50:22 85:12
92:10,12 93:24
94:14 101:24
102:2 103:1,2,25
104:2
**charging** 70:14,25
71:4,24 72:2 78:4
78:18 103:5
114:19
**chase** 44:2 61:10
**chasing** 53:9
**chat** 35:7
**cheated** 49:1
**check** 67:13 116:8
**chestnut** 1:10,14
**chew** 91:16
**child** 34:11
**chips** 48:2 65:2
**choice** 40:25 42:7
88:24
**choices** 97:22
**chuckle** 22:21
**chunk** 99:17 104:9
**cigarettes** 39:25
45:21 49:21
**circuit** 72:25 81:7
89:24 94:8 103:24
105:13,16 107:11
109:6,23 110:1,12
110:15,18,20
112:14 113:13,16
113:18
**circumstances**
12:20
**circumstantial**
25:15,16,23 26:4

61:24 75:16
107:23
**cite** 106:22
**citizen** 18:23
**citizenship** 18:18
**city** 11:7
**civil** 27:22,23
**claimed** 81:8
**clean** 27:5
**clear** 12:7 41:21
44:4 57:2,6 58:21
59:23 60:18,22
61:4,7,9 62:3
**clearance** 15:2
**clerk** 17:11,15,17
18:4,9 20:1 21:18
38:16,25 39:3,13
39:18,19,20 40:1,1
40:8,15,15,16,17
40:20,21,22,25
41:6,7,9,19 45:22
45:23 46:15 47:4
53:1 55:8 59:25
60:3,7,9,12,14,19
60:19,20 61:1
62:22,23 63:11
64:21 66:13 68:8
68:13 70:1 72:13
92:24 95:8 103:24
117:5
**clerk's** 39:7,12
42:6 62:7,12,13,14
64:18
**client** 8:21 14:13
37:13 45:17 53:6
54:24 56:5 59:14
59:22 60:8,11,23
61:5,20 63:3,6
65:20 71:8 84:14
87:22

[client's - conviction]

**client's** 59:14,24
  60:2,6 62:8 63:2,2
  80:11
**clients** 24:7 87:5
**clock** 15:6 69:3
**close** 74:6
**closing** 5:19 33:20
  34:3 37:11,12
  58:1,5 63:20
  84:10 99:2
**coat** 25:20
**code** 29:23
**coffee** 69:24
**cohort** 107:2
**coincide** 92:20
  97:19 104:16
**colleague** 12:2
  44:23 64:6 73:22
  74:22
**colleagues** 58:2
**color** 58:21
**come** 5:3 6:10 7:12
  7:13 11:9 12:25
  13:1,12 14:1 17:6
  20:3 34:3,14
  53:23 55:17 57:21
  62:2,5 63:19,22
  65:9,16 66:5 76:9
  88:13 89:3 101:15
  103:12 104:9
**comes** 22:9 38:23
  39:17 40:19 49:2
  49:3,4,6,7,15
  51:15,18,19,21
  59:18 60:11,15
  61:2 63:12 64:25
  78:9 89:2
**comfortable** 88:7
**coming** 41:13
  51:12 61:5 65:6
  82:20 101:12

**comment** 36:6
**comments** 71:2
  72:7
**commerce** 28:6,12
  28:17,22 29:8,19
  29:22 30:10,23
  31:3,14,22 32:2,16
  32:19 33:1 42:11
  42:12,18 94:16
  96:17 107:18
**commission** 30:23
  31:24 32:4 33:2
  44:15,22
**commit** 9:10 30:2
  30:18 43:1 50:21
  52:5
**committed** 29:25
  30:3,8,11,13,14
  31:21 32:10,13,14
  43:15 96:15 97:25
  97:25 108:3,3
**committee** 110:24
**committing** 28:5
  30:16 31:2 55:5
**common** 54:15
  57:21,22,22 58:1
  62:1 63:12
**commotion** 91:19
**communicate** 35:4
  40:4
**communicated** 6:4
**communication**
  15:14
**company** 2:7
**completely** 14:8
  44:13 100:25
  113:15 115:22
**complicated** 29:5
  99:21
**complicating**
  94:21,22

**conceived** 101:3
**concerned** 12:23
  66:7 72:24 73:1
  96:23
**concerns** 8:11,14
  16:17
**conclude** 25:2,17
**concluded** 117:11
**conclusion** 44:23
  57:16 59:17
**conditional** 18:19
**conditions** 18:20
**conduct** 33:4,7
  42:16 47:21 106:8
  111:20
**confer** 98:6
**conference** 70:12
  70:14 71:1,4,25
  72:2,21 78:5,18
  103:6 113:8
  114:19
**confirmed** 18:17
**conflict** 74:16
**confront** 11:22
**confused** 57:1
**confusing** 93:6,7
  93:21 101:1
  105:11 108:25
**conscious** 44:14
  44:14
**consciously** 61:17
**consciousness**
  61:14,23 89:16
**consensual** 75:22
**consent** 76:2,14
  78:21
**consider** 8:6 20:6
  24:21,22 26:3,12
  26:16,17 83:6
  93:8 107:22
  111:12

**consideration**
  92:14 105:17
**considerations**
  114:16
**considered** 8:5
  22:6 23:24 25:10
  91:2
**considering** 27:18
**consist** 23:14
**consistent** 21:4
  44:25 54:12
  112:15 113:16
**conspiracy** 99:11
  100:15,17 101:4,5
  101:6,25 102:2,2,6
  102:9,18 103:4,7
  103:13,14,25
  104:2
**construct** 102:24
**consult** 33:10 71:8
**contact** 13:9
**contents** 37:18
  73:8 75:13 86:22
**contested** 73:23
**context** 6:10
**continue** 15:5 71:5
**continued** 112:22
**continues** 40:15
**contradicted**
  26:15
**contrary** 26:15
  37:15 107:8
**contribute** 26:23
**controlled** 95:7
**conversation** 6:10
  75:4
**convict** 37:14
  109:16
**conviction** 30:25
  30:25 99:23

**convictions** 88:1
  89:2
**convincing** 99:20
**cook** 64:22
**cool** 64:16
**cooperation** 11:3
**copies** 29:1
**copious** 36:9,9
**copy** 95:25
**corner** 39:4 40:22
  42:1 49:25
**correct** 36:23
  71:25 72:5 85:20
  93:11 104:24
  105:14 111:25
**corroborated**
  26:13
**cosgrove** 2:4 17:21
**cough** 27:11
**counsel** 4:7 5:15
  6:21 7:13 9:11
  11:24 12:24 14:6
  14:7 15:14 17:4
  33:20,23 36:14,19
  37:14,15 56:22
  71:6,13 74:9
  76:19 80:18 99:13
  118:5
**count** 28:7,8,12,22
  29:12,20 30:6,25
  31:5,14,23 32:3,24
  43:10 50:21,22
  51:6,7 52:2 86:6
  94:12,14 96:7,22
  100:16 104:10,14
  104:17,23 109:17
  109:17 114:17,17
  114:21 115:6,8,12
  115:16,18,19,25
  116:5

**counter** 39:24
  40:7,19 48:8,11
  49:9,18
**counterfeit** 45:18
  45:19,24,25 46:3
  47:3 49:21,22
**counting** 49:16
**country** 5:2 9:24
  82:15
**counts** 45:1 49:23
  96:3
**couple** 58:10 60:3
  65:6 88:6
**course** 19:16 23:9
  24:3 59:19 68:2
  91:5,6 93:18 94:5
**court** 1:1 2:7 4:1,3
  5:14 6:2,15,20 7:3
  7:10,18,23 8:3,5
  8:13,15,20,23 9:3
  9:6,7,21 11:16
  12:12,19 13:6,8,15
  13:19 14:5,12
  15:10,20,24 16:13
  16:16,18 17:2,9,12
  17:16,18,20 18:10
  18:14,24 19:3,7,13
  20:12,16,19,24
  21:9,12,22 23:21
  24:10 27:10,13
  28:10 31:13 35:17
  38:3,9 45:2 52:9
  52:13 56:7,18,22
  56:24 66:1,6,14,14
  66:20 67:2,5,10,16
  67:20,21,22 68:14
  69:1 70:5,11,18,22
  70:24 71:9,13,19
  72:14,20 74:1,3,9
  74:11,15,25 75:7
  75:10,15,21 76:5

76:11,16,21,23
  77:3,18,22 78:1,7
  78:12,16,20 79:2,7
  79:12,16,20 80:1,6
  80:14,19,21,24
  81:7,13,15,18,20
  82:2,6,10,14,23
  83:7,11,13,19,23
  84:5,11,15,17 85:4
  85:16,21 86:1,15
  86:19,22,24 87:7,9
  87:12,17,20,24
  88:8,10,16,18,21
  88:24 89:7,10,13
  89:15,20 90:9,11
  90:14,21,24 91:4,7
  91:24 92:5,7 93:1
  93:8,13,24 94:1,20
  95:11,19 96:20
  97:6,8,10,13,17
  98:8,12,23 99:1,6
  99:12,14,17
  100:10,17,21
  101:8,13,16,20
  102:22 104:8,20
  104:23 105:3,4,6,8
  105:12,16,19,22
  106:22,23 107:1,9
  109:3,5,15,23
  110:18,22 111:2
  111:12,14,22
  112:2,9,13 113:3
  113:11,13,24
  114:5,14,21,25
  115:4,17,24 116:3
  116:5,7,10,13,15
  116:19,22,24
  117:1,3,6
**court's** 9:16 13:7
  14:4 21:3 23:21
  99:8 100:14

104:18 105:10
  112:8
**courthouse** 20:3
**courtroom** 6:22
  12:21 17:6,22,25
  21:20 22:13 25:11
  25:13,20,24 33:6
  33:14 34:8,19,25
  35:15 36:1,6
  54:17 66:16,18
  67:11,24 68:3
  69:14 70:3 73:25
**courtrooms** 34:18
**cover** 3:6 28:24
  68:23 113:14
**cr** 1:2,3,3
**crashed** 91:15
**crashes** 61:10
**crazy** 93:7
**credibility** 54:13
  75:16 86:7
**credible** 23:1
  45:14
**credit** 102:7
**crime** 10:15 11:6
  13:13 14:2 19:19
  19:19,22 28:7,9,11
  28:14,21 29:7,21
  29:25 30:2,5,7,11
  30:20,22,24 31:3
  31:12,13,17,18,21
  31:24 32:2,4,6,7,9
  32:12,16,19,21
  33:2 43:2,7,9,23
  44:15,22 55:5,6,11
  55:12 95:6 106:2
  107:3,4,15 110:3
  112:23 113:1
**crimes** 4:22 19:15
  19:17 28:16 96:14

**criminal** 4:5 16:24 26:24,25 27:22,24 44:13 57:9,16 58:15 107:24 109:11 110:6
**criminally** 9:25
**criminating** 11:14
**cringing** 58:19
**critical** 51:10
**cross** 5:10 9:20,22 10:17,23 11:22 12:8,17 16:6 26:18,20,21 36:20 37:10 57:4 69:2 74:21 78:2 81:2
**crossed** 14:20
**crystal** 58:21
**currency** 29:13 96:8
**current** 17:5 112:11
**currently** 18:21 19:8
**curry** 10:25
**cursing** 48:8
**curtis** 1:21
**custody** 80:2,3,7 80:10,11,15
**customers** 48:1 50:6
**cut** 75:11

**d**

**d** 3:1 4:1 105:5
**daily** 46:18
**damaging** 8:15
**dangerous** 64:13 64:14
**dashed** 52:24
**dashes** 53:3
**date** 48:20 82:15 114:24

**day** 1:6 4:6 35:17 46:13 47:22 55:12 56:5 61:21 62:3 66:8,8,10 69:4,7 118:12
**daylight** 64:2
**days** 22:7 66:7
**deal** 42:2 55:7 106:25
**dealing** 34:20,21 69:11
**debit** 102:1
**december** 48:20
**decide** 17:22 23:1 23:2,12 25:12 26:7 33:5,13 34:7 34:9,24 54:10,14 54:18 55:2,10,23 57:9 59:15,17,20 69:13 97:22
**decided** 4:7 22:8 97:18 113:17
**decides** 67:14
**deciding** 26:4 107:20
**decision** 65:18
**defendant** 1:5,17 7:9 9:18 19:14,22 27:7,14,16 29:25 36:19 39:6,23 57:5 90:4,4,15,15 90:23 92:1,8 109:6,9 115:9,10 115:18
**defendant's** 3:13 27:19 88:24 108:5
**defendants** 7:24 27:1,2,18 28:3 29:10,16,20 30:9 31:6,16,21,24 32:1 32:3,5,11,12,15,20

32:25 37:8 42:21 57:3 68:2,4 70:25 71:20 84:12,21,25 85:19 92:8,14 93:10 96:16 100:10,23 107:14 107:21,23 108:2 110:1
**defender** 1:21
**defense** 4:17 5:14 6:3 7:13 9:7 11:24 12:5 16:6,20,20 19:25 26:20 36:14 37:15 45:7 58:17 61:18,19 67:14,18 68:2 70:24 71:6 83:23 100:1
**defenses** 27:4
**defer** 69:1 70:20
**define** 105:22
**defined** 92:21 94:13 104:14 108:23
**defining** 107:20
**definitely** 102:23 109:3
**definition** 44:20 57:15,18 105:24 106:1 111:10 112:20
**delay** 22:3
**delayed** 29:19 30:9 42:11 96:16
**delays** 22:15
**delete** 86:2
**deleted** 99:22
**deliberate** 33:15 33:22
**deliberating** 33:22
**deliberations** 34:1 35:11 114:6

**deliver** 37:17
**delivered** 69:22
**delivery** 12:7
**demanding** 47:1 49:13
**demonstrate** 43:25 44:13 56:4
**demonstrates** 46:2
**demonstrating** 12:1
**department** 61:8
**depends** 89:1
**deportation** 15:19
**deposits** 48:18
**deputies** 36:1
**deputy** 17:11,15 17:17 18:4,9 21:18 66:13 68:8 68:13 70:1 72:13 117:5
**derivative** 18:23
**described** 29:12 93:23 96:7
**describes** 91:14
**description** 3:9,14 77:12
**desperately** 55:23
**detail** 28:24
**detailed** 26:11 37:18
**determination** 100:21
**determine** 14:24
**determining** 57:12
**develops** 10:21
**deviated** 10:18
**deviates** 10:21
**dictionaries** 33:10
**difference** 26:3
**different** 11:1 27:22 59:6 64:1

[different - employees]                                                      Page 9

74:24 95:21
113:15
**differently** 47:20
**difficult** 94:23,23
**difficulty** 37:20
**dinner** 36:23 37:2
**direct** 9:17 25:14
25:15,15 26:1,4
75:15 103:3
107:22
**directed** 4:9 13:18
99:9
**direction** 102:14
**directly** 13:22
**disadvantage** 58:7
**disagree** 79:21
**disallow** 24:23
**disarmed** 63:3
**disarms** 60:19
**discovery** 7:18
58:18 91:4
**discuss** 7:6 16:16
33:16,18 34:5
70:15 71:20 78:16
98:21 115:21
**discussed** 5:6 6:9
13:17 15:15 16:3
18:19 21:2 73:17
102:2
**discusses** 101:4
**discussing** 73:19
74:18,19
**discussion** 5:8
11:5 13:18 99:8
**displayed** 43:19
43:21 106:8,12
108:11,13 112:24
**dispute** 42:5 48:3
53:18 54:2 55:7
56:3 78:10

**disputed** 56:2,3
**disregard** 25:4,5,9
34:22
**disregarded** 25:11
**disrupted** 42:15
**distance** 53:9
**distribute** 71:21
**district** 1:1,1,7
102:4 106:23
**dna** 62:10
**documents** 23:16
**doing** 24:20 35:22
42:2,22 43:1 59:8
61:17 74:4 78:12
83:13
**dollar** 40:1 59:25
**donnie** 1:4 4:5
28:3 29:10 57:3,6
60:18 62:9 63:10
64:8 90:23 91:18
93:21 96:6 97:24
**donuts** 69:24
**door** 38:24 44:10
60:13 63:18
**doorway** 38:23
**doubt** 27:20 28:1
29:9 30:24 31:1
31:20 32:8,23
41:14 43:14 52:1
54:20 57:14,15,17
57:18 59:18 65:25
74:1 98:1 108:4
**dozen** 82:9
**draft** 109:20
**draws** 38:24 39:1
41:18
**dripping** 25:21
**drive** 1:25
**drives** 44:11,11
**drop** 27:11

**drug** 106:25 107:3
107:4
**dubois** 1:6 51:22
**duty** 22:24

**e**

**e** 1:6,9 3:1,7 4:1,1
35:5 105:5 118:1
118:1
**earlier** 26:5 33:5
49:18
**earned** 48:7
**easier** 27:23 73:4
**eastern** 1:1
**easton** 2:1
**easy** 29:6
**eckert** 1:9 3:3 4:16
5:17 6:6,17 7:1,4
7:17 8:2,4,8,16,25
9:5,15 10:2 11:4
13:4,7,9,17,21
14:9 15:9,21,25
16:15,25 17:8
18:13,15 19:1,10
20:22 21:1 37:22
38:1,6,7,10,14
66:24 67:9,12
68:7,14,16 70:16
73:18 74:8 75:3,9
75:14,19,20,25
76:7,15,18 78:16
78:24 79:4,9,18,23
80:4,25 81:1,11,14
81:16 83:1 84:2,7
85:5,14,25 89:5,9
89:12,14 93:14
94:18 95:2,13
96:19 98:5,21,22
98:25 99:3,8,16,24
100:19 102:12
104:4 106:6 107:6
109:22 111:15

112:1,4,10,13
113:22 114:1,11
115:17,20 116:2,4
116:6,11,12,15,17
116:20
**ed** 44:17 92:18
**edit** 79:11
**education** 20:8
**effective** 81:2
**eight** 29:15 31:11
62:20,22,23 96:9
**either** 16:24 32:24
39:8 58:16 74:12
81:9 102:5 106:14
**electronic** 2:6
33:11
**element** 27:25
42:19 92:21,22,22
92:23 94:8,15,15
94:16 103:14
107:13,14 111:21
**elements** 28:3,15
28:19,21 29:7,9
30:5,22 31:1,2,19
32:8,23 65:24
96:3,3,12,14,23
97:18
**elicit** 62:19 81:24
**eligible** 11:2
**embellishes** 10:18
10:20
**embellishing**
11:25 54:13
**emergency** 15:23
**emmanuel** 60:4
64:2,22
**employee** 50:9
95:8 96:6
**employees** 29:11
50:7 93:22

enable 4:12
encourage 52:6
  98:3
ended 8:6 95:11
ends 95:13,14
enforcement 86:8
engaged 61:10
english 40:2,11
ensure 35:17
entails 100:5
enter 38:7 44:17
entered 42:22 43:6
enters 21:20 41:15
entertain 72:6
entire 39:8 51:25
entirely 110:13
entitled 90:14
entrance 51:17,18
entry 19:16,20
equally 67:17
erred 106:23
especially 108:23
  114:2
esq 1:20
esquire 1:13,17,24
essence 105:13
essential 28:15
  30:22 31:19 32:23
  52:20 101:18
essentially 96:22
establish 27:24
  28:20 51:4,5,6
established 24:15
  90:17
evening 22:3
  100:21
event 36:9 67:14
  104:1
events 7:25 21:5
  106:16

everybody 4:1
  55:8
everyday 46:12,12
  46:15
everyone's 56:16
evidence 9:4,19
  12:8 22:24 23:1
  23:13,23 24:1,1,4
  24:6,9,9,10,12,14
  24:14,15,16,22,23
  25:1,2,9,11,12,14
  25:15,16,23 26:1,4
  26:6,6,14,15,19
  27:15 33:6,19,23
  34:2,25 35:10
  36:16 37:7,8,11
  39:5 41:12,24
  42:2,14,15 44:2,4
  44:8,25 51:13
  52:4,5 56:4,13
  57:10,19 58:5,12
  58:13 59:16 60:16
  61:24 62:13,15
  63:22 69:14 75:15
  75:16,17 76:9
  77:22 78:8 79:16
  83:6,6 89:1,2,6
  93:17 94:6 97:23
  100:17,20,22
  102:11,13,18,20
  105:1 107:23,23
  108:2,10,24 110:8
  110:8 111:5,6
  115:9
exact 115:22
exactly 11:13
  41:16 44:1 49:17
  76:3 89:12,14
  92:24 109:24
exaggerating
  11:25

examination 5:10
  9:20,22 12:8
  26:18,21 69:2
  74:21 81:2
examine 10:17,23
  11:22 12:17 26:20
  36:20 37:10 57:4
  78:2
examined 16:6
example 25:19
excellently 100:2
exception 67:25
  111:9
exceptions 68:1
exchange 48:14,15
exciting 22:7
excluded 25:8
excuse 49:10
exhibits 23:17
  24:3 34:9
exist 25:18
exists 34:15
expect 37:25 81:11
expected 16:10
expecting 36:13
expects 36:17
experience 17:5
  52:23 54:16 99:19
experiences 57:21
expert 79:16,18,19
experts 79:21,24
explain 10:13
  33:17 40:12 71:1
  106:24
explained 69:13
explanation
  109:25
explore 12:11
explored 8:10
extent 26:12,14

extracts 64:13
eye 7:24 12:17
  25:16 84:11

f

f 118:1
fabric 46:15,20
fabricate 6:1
fabricated 5:18
  12:6
face 40:20 48:9
  64:1
facebook 35:8
facilitate 43:7 52:6
  98:3
facilitated 43:9
  52:2 95:6
facilitating 55:4
fact 5:1 6:11 10:10
  10:17,22,23 12:9
  15:22 23:2 25:15
  25:17,23 40:6
  46:8,13 47:8 48:9
  48:18,19 50:1
  54:22 59:2 61:16
  84:20 95:10 99:25
  103:10 106:5
  108:15
facts 22:25 23:4,5
  23:5,14,17,22
  25:18 54:22,23
  57:12,23,23 99:11
  100:9 105:21,21
fail 8:18
failure 82:24
fair 25:6,7,21 34:4
  81:16 99:4
faith 4:17 5:10
  8:25
fake 38:17 64:24
fallback 102:8

**falling** 40:21
**falls** 24:14
**false** 88:21,21
**familiar** 20:2 45:6
  105:4
**family** 15:17
**fancy** 23:18
**far** 66:7 96:23
**favor** 11:1 37:13
**fd.org** 1:23
**fear** 50:14 94:13
**federal** 67:22
**feel** 56:22
**feels** 40:4
**feet** 40:24 63:1
  93:3
**fellow** 33:16
**fertile** 11:25
**fifteen** 17:8
**fifth** 7:16 9:13
  13:19
**figure** 39:17
**filed** 88:2
**filing** 10:6 103:18
**final** 71:21 89:11
  113:7
**finally** 32:20,22
  35:9
**find** 22:10,24 23:5
  23:13 26:5 30:1
  33:13 37:13 51:23
  55:13 62:5,7,8
  100:8 109:6,9
  110:1,4 112:24
  115:9,10
**finders** 23:2
**finds** 115:5
**fine** 17:9,19 20:12
  71:19 74:24 76:15
  76:20,22 79:9
  83:2 84:7 96:2

**finish** 37:24 71:3
  72:21 78:20
**finished** 74:5
  113:20
**firearm** 28:9,18
  29:13 31:8,17,25
  32:1,6,11,18,25
  38:25 39:1,6,7,10
  39:13 40:24 41:1
  41:18 43:7,8,13
  51:3 63:6,8 96:8
  104:14 106:3
  107:2,15,17
  108:15,19 109:8
  109:10 110:2,5
  112:23,24,25
**firearms** 38:21
  41:22 42:6 43:1,2
  43:4,14,19,20,22
  44:18,22 63:4
  79:18 106:8,25
  108:13
**first** 14:20 15:12
  18:2,12 19:15
  21:5,7,8,10 27:1
  28:21 29:8,10
  30:7 31:21 32:9
  36:12 40:9 42:10
  43:3 51:15 52:15
  69:7 73:9 81:20
  82:15 86:11 93:21
  94:14 96:14,24
  97:18,22 101:25
  104:14 110:8
**fit** 62:1
**five** 33:25 49:16
  49:20 50:9 56:9
  56:11,19 65:7
  66:9 69:3 72:12
  72:12 75:16 92:13

**flagged** 111:4
**fleeing** 65:10,12
**flees** 65:10
**flight** 61:14 89:16
**floating** 71:24
**floor** 24:9,14
**fluent** 40:2,10
**fluid** 88:6
**focus** 51:5 53:15
  53:20 54:24 55:1
  55:2 56:4
**fodder** 100:1
**follow** 23:7
**following** 31:19
  32:8
**follows** 28:23 30:7
  49:7
**foot** 60:6
**footage** 83:1,16,19
  84:4,6,10
**force** 50:14 94:11
  94:12
**forcibly** 39:10
  41:22
**ford** 91:13
**forever** 85:17
  87:10
**forget** 24:23 55:20
**forgot** 83:22
**form** 35:9 91:2
  114:10,24 115:13
  115:23
**formed** 100:6
**forth** 41:5 53:5
  74:23 96:22 97:19
**forward** 11:9
**foul** 46:8 47:18
  50:2
**found** 31:16 32:5
  107:12 115:18,19

**four** 28:19 65:7
  75:16 92:11,13
  103:3
**fourth** 30:19 32:20
  96:24 97:18
**frankly** 5:1 13:10
**free** 72:9 111:20
**frequently** 46:13
**friend** 34:11 95:4
**friendly** 58:23
**friends** 60:15 63:2
  64:14
**front** 12:4 75:13
  115:14
**frustrated** 48:25
**full** 66:4
**fun** 99:1
**functional** 62:17
  62:19,21,23 63:1,8
**functionality**
  62:14,16 80:12
**further** 27:20 29:3
  98:12,15 108:22
**furtherance** 30:20
  32:21 33:1 51:9
  55:11 116:3
**future** 13:13 20:7
  48:6

|  g  |
| --- |

**g** 4:1
**garb** 59:21 60:20
**garments** 59:22
**gather** 10:3
**general** 67:24
  72:24 73:7
**gentleman** 39:2
  45:5 64:4 85:7
**gentlemen** 41:23
  44:16 52:14 56:8
  56:22

**getting** 22:3 40:22
41:13 49:12 64:24
95:4 103:23
**ghost** 58:24
**giglio** 13:23 15:21
15:25 16:2
**give** 21:9,14 22:22
23:7 25:19 26:9
26:11 27:20 28:15
28:25 29:1 37:16
37:17 38:4 40:16
40:17,17,23,23
41:10,10 45:18
46:5,25 47:1 53:1
57:16 64:23 69:4
72:3,4,8,10 84:18
92:16 100:1,17
113:3
**given** 35:13 57:18
100:3,15 103:2
105:20 112:6
113:18
**gives** 39:25 49:24
61:12
**giving** 71:23 83:9
**glad** 20:20
**glock** 29:13 31:9
40:23,23 96:8
**gmail.com** 2:2
**go** 5:25 16:11 17:3
21:5,6 34:10
37:20 38:4 39:4
41:5 53:8 55:17
59:11 63:25 69:6
72:11,14,23 73:7
75:10 76:25 77:3
87:9 88:25 89:15
92:9,12 93:17
95:20 97:1 100:7
102:25

**goal** 22:12 95:4
101:21 102:25
**god** 58:19
**goes** 5:1 38:22
39:9,15,18,23,24
48:8 49:9,25 59:8
64:8,16 65:9
111:17
**going** 4:10 9:16
10:16 13:2 14:17
17:9 20:9 21:7,14
22:15,16,22 28:2
28:24 30:13 32:13
36:5 37:22,24
38:4 40:9,18 41:9
41:12,18 42:17
43:21 47:16 48:1
48:6 52:11,21
53:4,5,6,11,15,19
53:24,25 54:8,13
55:9 56:12,16
57:25 58:8,9,10,11
58:11,12,14,19
59:2,3,5,12,13,22
60:2,9,17,24 61:14
62:9,18 63:13,20
63:21 64:16 66:6
69:6,7,8 71:1,20
72:11,23 73:3,9
74:4,22 77:15
78:13,21 79:13
81:1,11 82:16,21
85:11 86:2,24
87:6,7 88:4 89:22
91:20 98:13,18
99:6 102:13,22
103:22 104:4
106:20 110:11,12
111:17,24 113:3
114:17 116:15

**good** 4:1,2,17 5:10
8:25 9:20 21:23
35:24 45:4,8 47:2
48:5 49:5 50:16
50:17 52:15 55:7
58:16,20 61:23
63:17 65:6 70:11
83:25 116:10
**gotten** 10:3
**governed** 94:6
**government** 4:11
4:22 5:13 6:4 7:7
10:8,14,15 11:1,3
11:10,18 12:25
14:3,15,17 15:15
17:4 20:6,23
26:18 27:3,6,14,19
28:19 29:8,24
30:21,21 31:18
32:7,22 36:12,13
36:18,20 37:7,10
37:14 44:1 45:7
51:1,4,11 53:19
55:13,16,24 65:11
66:22,24 67:20
68:1,17 70:16
74:7 75:19,23
77:1,24 83:4,24
84:7,18 85:4 88:3
88:3 89:4 98:4
102:10 104:3
106:5 108:10,11
108:23 109:9
110:4 111:6 113:4
113:21
**government's** 4:15
6:2 13:4 46:11
51:25 56:13 82:13
88:11 93:9 101:21
**gown** 60:21

**grab** 48:10
**grabs** 44:6 48:22
**grail** 58:15,16,16
**grainy** 58:24 61:9
**grant** 15:2
**granting** 8:6
**gratin** 115:25
**gray** 45:5
**great** 42:2 47:11
**greenberg** 1:17
**grocery** 29:11
45:17 46:11,22
48:19 50:14 51:18
93:23 96:7
**grocery's** 45:19
**ground** 12:1
**group** 111:24
**groups** 33:25
**guess** 6:17 14:14
20:8 77:5 81:5
88:21 89:1 92:20
107:10
**guidance** 11:19
**guide** 22:23
**guideline** 26:9,11
74:23
**guidelines** 26:22
**guilt** 27:4,20 61:14
61:23 89:16
**guilty** 27:2 30:1,3
31:16 32:5 45:1
47:22 51:3,7,24
52:7 55:2,18 56:6
57:12,13 61:17
62:2 107:1,7
108:20 112:25
115:6,10,14,18,19
**gun** 39:11,12
48:10,12,13,22
49:1 50:23,25
51:8,9,25 52:3,25

55:7 60:7,7,9,12
60:14,15,18,19,23
60:25,25 61:1,2,2
61:3 62:7,10,12,13
62:14,17,17,19,20
62:20,24,25 63:1,9
64:9,10,15,18,19
65:2,3,21 80:10
95:12,14,17
106:14,15,17
110:8 111:24
**gunpoint** 42:2,3
**guns** 38:21 44:18
51:2,12 52:7 55:8
63:14 106:10,11
107:6,7 108:11
109:2,2
**guy** 5:22 14:11
41:10,10 61:16,25
62:25
**guy's** 9:19 13:25
**guys** 110:22

**h**

**h** 3:7
**half** 20:20 22:12
**hand** 36:1 39:11
39:11 40:18 42:7
49:18,19 50:12
53:3 60:25 63:8
118:11
**handed** 42:4,5
**handgun** 29:14
**handguns** 31:9
**handle** 14:7,25
15:4,11 40:9
114:14
**handled** 15:3
47:18,19 50:20
**handles** 26:18
**hands** 39:20 47:9
47:12 50:12,12,25

63:6
**hanging** 65:8
82:16
**hangs** 64:17
**happen** 35:25 41:8
41:16
**happened** 42:3,23
44:1 55:15,17
82:1 85:1 91:17
91:19 102:20
**happening** 77:16
**happens** 19:22
34:20 69:10 82:22
87:25 104:6
**happy** 74:8 98:25
99:3
**hard** 25:5 48:7
**harkening** 22:6
**hat** 62:8,10,11
**he'll** 9:9 52:17
**head** 39:12,12
42:7 44:18 79:8
**heading** 79:9
**heads** 101:7
**hear** 6:7 18:12
22:25 33:19,20
34:8 39:5 45:10
45:13 46:11,17,22
62:12 71:2 72:1
81:15 89:23 94:25
102:12,15
**heard** 25:10 44:4
56:13,14 76:8
77:14,14 97:9
**hearing** 41:5
82:18 92:21 118:4
**hearsay** 77:17,18
**heavens** 29:5
**heavy** 98:19
**heck** 22:20 55:9

**help** 22:23 33:12
47:16 66:15
**hesitate** 56:11
**hey** 6:10 9:18 58:4
64:22
**hiding** 59:10
**high** 44:2
**highlighters** 57:1
**hispanic** 4:20,23
5:3,12,23 8:17
14:10
**hoarse** 98:18
**hobbs** 92:20 93:10
94:7
**hold** 24:18 36:1
58:9 100:21
**holden** 107:8
**holding** 48:2
**holds** 41:1,2 48:11
**holy** 58:15,16,16
**home** 22:4 34:10
69:7,17 70:5
**honor** 4:2,16 6:7
7:2 8:2,19 10:5,12
10:14 11:13,20
12:2,14 13:21
15:9 16:16 17:8
18:15 19:2,5,6
20:11,14,18,23
21:1,2,11 38:7
45:3,11 52:8,12,14
56:15 57:7,15
66:25 67:1,6,9,13
68:7,16 70:10,17
70:19,23 71:7,14
71:16 73:18,20
74:17 75:4,14,20
75:25 76:7,15,20
76:24 78:11,19,24
79:4,10,15,19,23
80:23 81:1,17

83:3 84:8 85:3,9
85:15 86:12,23
87:16 88:5,9,17,20
88:23 89:6,18
90:7,18 91:11
92:4,6 93:4 94:17
94:18 95:2 96:19
97:5 98:5,7,10,22
99:11 100:13
102:16 104:7,18
104:24 105:15
106:21 108:9
110:14,24 111:16
112:17 113:6,23
114:1,11,12,13,20
114:23,24 115:3
115:15,21 116:12
116:14,23,25
117:2
**honor's** 101:11
**honorable** 1:6
12:4
**hopefully** 18:1
**hopes** 40:11
**hoping** 73:23
**horrible** 61:18,19
**hotel** 16:1,3,11,20
**hour** 20:20 22:12
56:9 66:4
**hours** 88:6
**hull** 21:16 69:21
**hungry** 56:16

**i**

**i.d.** 80:2
**ice** 19:24 93:5
**idea** 38:4
**ideas** 102:15
**identification**
84:11,13
**identify** 76:12
79:21

**identifying** 76:14
79:21 85:18
**identities** 84:20
**identity** 86:3
**ignore** 25:4,4
**illegal** 5:16 8:7
19:16,16,20,20
**illegally** 8:22,23
9:4 10:10 11:11
12:23
**immediately** 38:24
43:5
**immigrant** 5:16
8:7
**immigration** 4:14
4:18,23 5:4,9,11
5:15 6:9 9:17 10:9
10:17,24 18:16,18
19:15 20:2 78:3
**immunity** 8:6 15:2
**impeachment**
55:19 86:9,13,13
92:7,13
**important** 13:3
14:15,16 59:12
111:21 114:3
**impression** 85:23
**impressions** 77:15
**improper** 24:8,25
34:15
**inadvertently**
86:20
**inapplicable** 97:3
97:21 103:6
**inappropriate**
85:24
**incent** 27:1
**incident** 59:14
83:18 91:12,21
**inclined** 21:13

**include** 82:23
**included** 111:11
**including** 30:9,14
30:16,18 32:10,14
32:17 33:3 35:8
55:8 93:2 96:16
103:18 104:5
**inconsistent** 10:21
86:13
**inconvenience**
99:12,14
**incredibly** 4:25
**incriminate** 9:10
12:24 16:23
**incriminates** 9:24
**incriminating**
7:14 11:19
**incrimination**
6:16 9:13
**independent** 33:8
**indicate** 23:10
**indicated** 112:8
**indicating** 23:11
88:7
**indication** 100:23
**indictment** 21:8
27:2 28:4,7,13,23
29:12 30:6 31:15
31:23 50:22 93:24
96:7 100:16
**indiscernible** 6:19
7:20 12:16,18
13:14 17:15,17
21:17 24:16 65:21
80:4 85:7 92:16
92:24,25 93:11
99:4 101:12
109:22 114:24
**individual** 11:14
46:16 91:12,14

**individuals** 33:9
**individuates** 89:21
**infer** 25:17
**influenced** 36:8
**information** 4:24
5:5 7:4,21 16:8
33:12,13
**innocence** 27:15
75:12
**inquire** 4:21 9:17
18:16
**inquiring** 8:6
**insert** 76:6 91:25
**inside** 41:18 82:8
**insistent** 46:7 88:8
**institution** 95:5
**instruct** 8:14 23:6
25:4 51:22 54:21
93:13 114:3
**instructed** 7:8
75:1
**instructing** 106:23
**instruction** 37:17
61:15 75:18 76:25
79:24 82:24 89:24
101:2 104:11,14
104:25 107:10
108:14 109:5
111:4,23
**instructions** 20:25
21:10 22:23 27:21
28:25 29:4 33:21
33:23 34:4,25
37:16,19 45:10
57:8,11,20 61:13
61:13 69:4,5
72:24 73:1,2,7
92:25 94:5,8
95:22 96:5 97:20
101:22 105:1
110:25,25 112:15

**individuals** 113:14
**instructs** 45:11
**intend** 13:8 50:15
90:23
**intended** 23:10
108:5
**intense** 35:21
**intent** 21:3 30:17
41:20 53:16 98:2
107:21
**intention** 46:9
53:16,17,17
**interact** 54:7
**interaction** 39:9
46:23 53:13
**interest** 9:18
**interested** 118:6
**interference** 31:22
107:18
**interfering** 29:22
**internet** 33:11
35:7
**interpreter** 2:3
68:21 73:9
**interpreting** 73:24
**interrogatories**
114:9
**interstate** 28:6,12
28:16,17,22 29:8
29:19,22 30:10,23
31:3,14,22 32:2,16
32:19 33:1 42:10
42:12,18 94:15
96:17 107:18
**introduce** 77:9
**introduced** 48:17
**introducing** 26:19
77:1
**introduction** 77:5
**investigation**
80:25 83:4

**invite** 103:17
**involved** 22:5 33:9
  43:20 107:24
**involving** 7:24
**iphone** 35:5
**irrelevant** 77:12
**issue** 4:8,14,19
  5:13 6:14,18,23
  7:17 8:9 9:22 10:3
  12:5 13:20 14:21
  16:22 17:1,13
  20:19 22:5,19
  24:25 25:1 73:9
  73:19 77:23 80:3
  82:19 84:14 85:2
  91:1 92:15,21
  96:13 99:15,15
  104:3 107:11
  113:14,15 114:14
  114:16 115:7
**issues** 19:24 22:7
  73:23 98:24
  102:11 104:12
  114:9
**item** 42:10

**j**

**j** 1:20
**jan** 1:6
**janine** 2:4 118:14
**january** 1:5
**jawan** 12:4
**jd** 1:2,3,3
**jeopardy** 15:7,7
**jerk** 47:17,22
**jersey** 91:13
**job** 23:2
**joel** 3:6 62:22
  63:15 64:2 68:17
  68:19,23
**judge** 1:7 12:4,8
  12:15,16 15:13

19:8 20:15 51:22
  54:6,14,21 57:7
  61:12 67:4 70:21
  73:13,21,24 74:4
  74:13 80:17 82:7
  84:19 87:1,4
  90:13 91:9,23
  101:23 102:4
**judges** 23:4 54:23
**judgment** 20:1
  22:6 55:23 99:15
**judgments** 25:7
**judicious** 56:17
**juror** 34:13
**jurors** 33:5,16
  93:8
**jury** 1:6 4:8 15:6,8
  17:12 20:25 21:10
  21:15,20 22:14,21
  22:22 35:16 45:4
  45:10 52:15 56:10
  57:5,11,20 61:15
  61:15 65:17 66:4
  66:5,15,18 69:9
  70:3,6,6 73:5
  75:11 77:14 82:5
  83:6 84:24 85:13
  85:23 93:17 94:4
  95:22 96:5 97:20
  100:8 101:1,22
  105:23,24 106:24
  108:25 111:17
  114:3 115:5,10
**jury's** 23:22

**k**

**keep** 22:16 27:1
  35:10 56:1 102:9
**keeps** 39:2,6 40:24
  48:7
**kept** 21:15

**key** 7:23 10:14
  14:14 103:13
  107:16
**kin** 118:5
**kind** 4:18 5:6 6:13
  22:19 42:4,5
  53:14 55:18 61:8
  88:13
**kinds** 25:14
**knew** 30:12 32:13
  41:8,8 42:21,23
  43:18 44:5 65:3
  65:12 97:24 106:7
  107:2,7 108:2,13
  108:16
**know** 4:13 7:6 9:9
  9:16,23 10:12
  11:5 12:2,3,13
  13:3,10 14:15,16
  14:23,25 15:3
  17:22 26:24 32:22
  34:19 39:17 43:20
  50:24 52:17,22
  53:13 54:3,8
  56:16 58:11,17
  59:11 61:1,25
  62:24 63:1,17,22
  64:20 65:4 69:20
  73:2 74:3,4 77:1
  79:20 82:12 83:10
  87:5,19 91:7,19
  93:5,13 94:13,25
  102:5 105:3
  112:17
**knowing** 108:1
**knowingly** 29:17
  30:15 31:6,25
  32:11 96:11 107:3
**knowledge** 6:22
  13:23 32:17 43:14
  43:15,23 51:12

105:23,25 106:1,7
  106:25 107:16,21
  108:10,20,22
  109:7,9,11,18,18
  110:2,4,6 111:10
  111:23 112:6,22
**known** 20:1
**knows** 12:21 40:8
  41:15 44:12 46:16
  46:16,18,19 61:17
  64:8,11

**l**

**lab** 80:12
**lacheen** 1:17
**lack** 81:5 83:5,6
**lacks** 7:20
**ladies** 41:23 44:16
  52:14 56:8,22
**language** 54:6
  97:23 98:13 106:4
  106:4 107:16
  108:14 110:7
  112:19,21 113:5,9
  115:13 116:1
**large** 53:22
**late** 21:25 22:3
  73:15 90:1 108:17
**latest** 115:2
**law** 1:25 20:2 22:7
  22:20 23:6,6,7
  27:17 29:1 33:21
  34:4 35:1 37:16
  51:23 54:21,22
  57:11,24 61:13
  86:7 88:12 92:24
  103:24 106:19,20
  109:3 113:10
**lawful** 18:21
**lawyer** 24:18
  52:17

**lawyers** 23:17,25
24:7,12 85:22
**leading** 36:21,22
36:24,24 37:1,5,6
**lean** 110:7
**learning** 106:2
**leave** 39:21 41:11
66:4,15 70:6 75:7
76:5 80:14,24
88:22 103:2 114:5
**leaves** 41:2 48:23
50:1,3 66:18 70:3
**left** 23:15 35:15,16
38:19 44:3 50:10
60:25 61:3 64:20
65:13 101:10,14
**lefty** 60:24
**legal** 4:25 7:5,20
12:10 17:13 19:14
22:5,7,18 23:19
**legally** 7:9 9:8
12:22 13:23,25
14:3,11 16:9,12
**legend** 62:10
**lengthy** 69:5 74:22
**leonard** 102:3
**letter** 10:6
**liability** 93:9,11
93:15,16 94:21,22
94:25 95:17 96:22
97:11 99:7,18,22
100:4,8 104:15,17
104:19 105:2
**liable** 94:23 95:17
**liberty** 16:15
**library** 101:22
**lie** 60:10
**life** 46:15,20 54:16
57:21
**light** 80:17 84:20
108:23

**likewise** 67:13
**limine** 6:24 88:14
**limited** 10:7
**line** 6:4 17:4 48:1
78:4 98:16 102:19
**lines** 86:4
**linkedin** 35:8
**linking** 116:1
**list** 75:10
**listen** 64:22 69:12
**literally** 39:3
40:21 41:17 44:6
**litigation** 79:1
**little** 14:12 18:11
22:18 37:23 40:8
50:2,5 56:10,18
70:13 72:20 78:1
78:2 82:17 98:12
98:15 102:18
113:1 114:22
**live** 18:21 29:15
31:11 62:20,22
96:9
**lives** 53:12
**loaded** 29:15
31:10 62:19,21,24
62:25 63:1 64:22
**locked** 94:2
**long** 15:1 16:21
21:13,15 22:20
24:21 26:3 37:24
38:1 50:10 53:10
54:8 60:21 71:25
73:4 74:18 82:10
82:14 84:12 85:5
**longer** 70:13 72:20
80:20 84:22 90:16
**look** 51:13 58:6
61:15 73:8 86:22
87:6 89:25 91:24
104:1,13 111:25

112:16,19 113:18
**looked** 38:16
**looking** 17:4 69:21
80:6 92:19 105:8
107:9 109:23
**looks** 10:8 40:4
52:23 64:19
104:13
**lost** 16:9 48:4
116:17,20
**lot** 17:5 32:22
53:19,24 63:4,16
113:25
**lots** 15:2 103:2,18
104:8
**low** 9:20
**luck** 49:12
**lump** 93:21
**lunch** 12:11 37:24
38:4 56:8 66:2,20
69:5
**luxury** 36:3

## m

**m** 105:5
**machine** 45:25
46:1,6,14 47:2,5,5
47:15 48:16 50:18
**mail** 35:5
**main** 51:5
**majority** 104:25
**making** 60:22
77:10 100:21
**man** 7:5 12:7
51:24
**manner** 54:11
**manufactured**
42:13
**maranna** 1:20,23
**march** 7:25 28:5
31:6 38:14 45:21
46:10,14 48:21

53:19,24 54:1
**marked** 3:9,14,23
**market** 2:8
**maroon** 91:13
**martin** 1:13 44:24
90:18,22,25 91:6
91:11 92:3 98:23
102:15,16 116:13
116:14,18
**mask** 52:25 64:7,9
**material** 4:12
10:11
**materials** 33:10
**matter** 7:22 37:1
111:17
**matters** 33:8
73:10
**maurice** 1:5 4:5
28:4 29:10 38:14
45:5,17 93:22
**mcconnie** 2:3
68:21 70:9,10
73:11,24 74:4
75:1,4
**mean** 6:6,17 14:20
64:5 100:1
**means** 24:14 25:3
33:7 42:12 50:14
67:22 85:5 94:10
105:25 112:6
**meehan** 1:20,23
3:3 10:4,5 11:20
12:13 14:22 19:6
20:11 21:5 45:2,3
67:3,6,17,19 70:22
70:23 71:7,14,18
73:20 74:2,12,14
74:17 76:23,24
77:5,20,25 78:6,10
78:15,19 79:13,15
83:3,9,12,14 87:7

87:11 88:2,3,5,15
88:17,20 90:6,8,10
93:4,19,20,25
94:17 97:4,7,9,12
97:16 98:9 100:12
101:11,15,18
103:14 104:7,18
104:22,24 105:7,9
105:14,19 108:9
109:13 110:14,20
110:23 111:9,13
112:17 113:6,12
114:12,23 115:3,5
117:1,2
**meehan's** 111:20
**meet** 20:3 109:12
111:21
**meeting** 101:3
**meets** 111:5
**members** 45:4
**membership**
103:15
**men** 60:21
**mental** 103:22
**mention** 20:5 81:8
85:13
**merchandise**
40:21
**mere** 19:17,20
61:16
**merely** 107:24
108:1,18
**messaging** 35:6
**michael** 2:4 17:9
17:10 66:12 69:25
**mid** 2:8
**midafternoon**
66:9,11
**middle** 74:20
105:25

**miles** 44:12,12
**military** 47:10
**millimeter** 29:14
31:9
**mind** 11:6 14:21
27:1,21 35:11
48:6 50:17 52:22
60:13
**minimum** 22:17
**minus** 66:14
**minute** 9:3 48:23
55:17 86:19 93:5
**minutes** 16:25
17:8,14 18:1,3
38:2 46:24 48:14
50:9 56:9 58:10
65:6 66:2 69:3
70:13 91:12,21
94:24
**mirrors** 106:4
**misleading** 108:12
**missed** 36:2
**mistake** 6:25
**misunderstand**
9:21
**misunderstanding**
42:5
**model** 81:8 89:24
94:8 103:25
104:11 105:1
109:24 112:14
113:14
**modifications**
105:14
**modify** 72:6
**mom** 38:15
**moment** 13:9,21
71:7 98:6
**money** 15:17 16:5
38:17 40:4,5,5,7
40:17,17,17,18

41:10,11 42:8
43:16 44:19 45:18
45:19,23,24,24
46:3,5,5,25,25
47:1,3 48:5,14,15
49:13,17 50:13,17
50:18 53:1,2,3
63:16,16 64:25
95:16 106:7
108:13 114:2
**moot** 20:19
**morning** 4:1,2
21:23 22:3,12
70:7 73:15 94:23
117:6
**motion** 6:24 88:2
88:13
**motions** 88:11
**motive** 5:18,25
10:24,25 11:23
12:1 104:17
113:20,21 114:4
**mouthed** 46:8
47:18 50:2
**move** 40:9 67:7,13
115:7,12,15
**multi** 90:4,15
**multiple** 4:2 92:14
**muslim** 59:21
60:20
**mutual** 67:13
**myspace** 35:8

**n**

**n** 3:1,10,11,11,12
3:15,16,16,17 4:1
105:5
**name** 45:17,22
60:4 76:6,12,14
78:22 79:22 80:2
85:19 91:25

**names** 35:14
**national** 2:7
**near** 91:16
**necessarily** 10:8
19:19 55:15
**necessary** 4:7 20:3
20:7 29:24 75:17
75:19 78:9 79:20
85:9 90:16,19
113:20,25
**need** 17:7 27:10
36:14 37:8 53:20
54:20,20 55:16,22
55:22,23 70:25
71:6,15 73:1
79:25 80:1 84:19
85:12 87:16 90:12
92:3 94:24 95:19
104:15 115:15
**needed** 75:18
80:20 106:24
**needs** 4:19 5:22
20:21 105:23
108:22
**neither** 36:16
118:5
**nervous** 65:14
**networking** 35:8
**never** 6:8 8:11
9:22 21:24 41:2
43:12 46:21 48:6
61:2 64:8,20,21
84:13
**new** 91:13 94:11
**news** 35:2 52:24
**newspaper** 34:22
35:3 69:10
**nexus** 42:19 79:19
**nicole** 1:13
**night** 13:17 15:15
15:22 16:1 34:10

[night - page]                                                    Page 18

70:11 99:9
**night's** 88:13
**non** 37:1,5 67:7
  90:4,15
**normal** 21:7
**northwest** 38:15
**notably** 112:8
**notary** 2:5 118:14
**note** 29:4 35:13,20
  35:21,22 36:4,6,9
  36:10,20 68:5
  79:13 80:1 86:2
**notebook** 35:14,14
**notebooks** 35:15
  66:4 70:6
**noted** 113:16
**notes** 29:3 35:18
  35:18,25 36:6
  56:25 109:6
**notice** 15:4 87:15
  87:15 89:6 103:9
**notify** 74:12 75:1
**november** 118:12
**number** 3:9,14 4:6
  21:23 22:2 23:25
  29:14 31:10 63:24
  63:25 73:2 75:12
  90:3 97:14
**numbered** 97:2,11
**numbers** 97:14
**numerous** 64:5

**o**

**o** 4:1 105:5,5
**oath** 9:7
**object** 24:7 71:22
  72:3,10 78:13
  79:14 90:1 100:13
  101:11 103:18,20
  104:18
**objected** 90:1

**objecting** 80:7
**objection** 24:13,19
  24:24 25:1,2 72:1
  72:8,9 85:14
  89:19,22 94:14,16
  96:2 98:8,9 113:8
  114:12
**objections** 24:6,22
  71:3 74:23 93:5
  103:1
**objects** 24:18
**obligation** 5:7
  24:7
**observations**
  77:10,11
**obstructed** 29:19
  30:9 42:11,17
  96:16
**obtain** 30:24,25
  33:12
**obtained** 83:17
**obtaining** 94:9
**obviously** 89:19
**occur** 14:21 43:24
**occurred** 7:25
  44:21 59:15
**offense** 30:3,3,13
  30:17,18 32:13
  97:25 108:3,6
  115:7
**offenses** 27:25
  92:15
**offer** 7:1 111:16
**offered** 11:4 24:4
**office** 1:9,13 7:11
  13:11 74:12
  115:21
**office's** 73:21
**officer** 44:9,9
  58:23 66:15

**officers** 81:25 86:8
**offices** 1:25
**official** 118:11
**oh** 16:10 17:13
  29:5 56:13 58:19
  74:2 76:1 83:9
  86:23 93:14 97:12
  115:3
**okay** 19:12 27:8
  65:5 74:2 83:12
  84:3,11 85:25
  86:6 87:1,8,24
  89:13,24 92:7,17
  97:16 116:10
  117:3
**omitted** 81:8,10
**once** 61:1 64:15
  112:23,23
**ones** 85:7,8 95:6,7
**oops** 90:1
**open** 8:15 9:7
  16:16 34:18 35:10
  39:16,19 44:10
  49:11,11,13
**opened** 106:5
**opening** 3:2 36:12
  36:15,15,17,18
  38:12 55:25 57:8
  58:2,2,8 89:19
  101:7 106:6
**openings** 21:4,6,6
  37:23
**opens** 53:1 55:13
  63:15
**opera** 53:21
**operated** 61:7
**operator** 2:4
**opinion** 5:18 12:12
  12:16 35:9 79:16
  85:3

**opportunity** 43:19
  52:16 58:4 106:2
  111:19 115:20
**opposite** 11:10
  102:14 106:12,20
  108:16
**opt** 112:8
**oral** 6:23 28:25
**orally** 37:17
**order** 21:25 30:1
  30:24 31:16 32:4
  51:23 67:17 74:19
  100:17 109:16
**ordered** 92:25
**ought** 73:10
**outcome** 118:6
**outdoor** 81:23
  82:2,17,24 84:10
**outline** 36:13,16
**outside** 25:10,22
  25:22,24 26:1
  33:14 42:13 54:17
  82:1,22 100:6
  102:21
**overlap** 57:5
**overrule** 24:19
**owe** 46:6,6 49:14
**owner** 40:10 46:16
  47:8,13 50:1,8
  53:1 64:3 76:6
**owners** 64:2 76:3

**p**

**p** 4:1
**p.m.** 68:11,11,24
  68:24 72:18,18
  117:12
**pa** 1:4,11,15,19,22
  2:1
**pack** 39:25,25
**page** 3:1 97:1,4,13
  97:14,14,15,17,17

97:20,21 98:17,17
104:11 105:25
106:22 107:12
112:4,5
**pages** 86:4
**paragraph** 90:3
91:25 92:2,17,19
98:15 104:9,10,11
104:15 107:10
114:7
**paragraphs** 88:25
92:1
**pare** 103:8
**pared** 114:7
**part** 7:25 30:21
36:25 45:10 46:15
46:20 86:6 97:2
99:1 103:5,5
105:24
**participants** 32:15
107:14
**participated** 107:4
**participation**
22:23 112:23
**particular** 42:9
43:10 59:1 105:20
**particularly** 5:7
69:6
**parties** 23:19,22
71:22 76:3,13,16
78:22
**party** 118:6
**passed** 102:4
**passes** 50:1
**patterson** 1:24,25
3:4 19:5 20:13,14
20:18 21:2,11
52:11 56:14,15,20
56:21,24,25 66:1
67:1,16 70:18,19
71:15 76:20 80:5

80:6,9,21,23 81:18
81:19,21 82:3,19
83:2,16,20,22,25
84:3,9,13,16,23
85:10,20 86:11,12
86:16,21,23 87:1,8
87:14,19,21 88:23
89:18 90:7,12
91:8,9,22 92:5,6
98:10 114:13,20
116:22,23
**pause** 71:11
**peace** 53:7
**pecuniary** 95:14
**pen** 46:1,2
**pending** 18:20
78:25
**pennsylvania** 1:1
2:9 42:13
**penny** 49:24
**people** 11:11
13:14 35:21 41:21
42:6 44:17 52:23
53:5,13,22 59:21
60:3 67:21 82:20
**people's** 54:6
**perform** 114:8
**performed** 30:19
32:21
**period** 49:5 53:11
59:11
**perjury** 9:10
**permanent** 18:19
**permission** 116:7
**permit** 9:6
**permitted** 4:11 6:3
24:10
**person** 4:20 7:19
30:2 34:13 41:23
41:25 54:15 63:9
94:9 95:21,23

98:13,16
**person's** 44:18
**personal** 35:18
36:7 94:9
**persons** 107:24
**perspective** 6:2
20:22 107:11
**persuasive** 100:4
**pertains** 105:3
**ph** 13:24 62:22
90:5 94:13 102:1
107:8
**philadelphia** 1:4
1:11,15,19,21,22
2:9 7:12 11:8
38:16 44:9 61:8
77:9 81:25 83:17
83:18
**phone** 35:5 40:12
40:13 47:7,9,12
77:10,11
**phrase** 82:25
**phrased** 95:22
**physical** 46:8
**physically** 39:18
40:19 44:7
**pick** 104:2
**picture** 54:4
**pictures** 59:7
**pieces** 62:1
**pinkerton** 94:22
97:4 99:7,10,18,22
100:4,11,15,18
101:3 102:14
103:3,7,12 104:1
116:19
**pistol** 31:10
**pistols** 63:5
**pizza** 12:6,7
**place** 42:23 64:11

**placed** 90:23
**places** 46:4
**plaintiff** 1:3,9
**plaintiff's** 3:8
**plan** 79:17 100:24
101:3
**planning** 77:1
80:15
**plans** 16:21 73:10
89:11
**plant** 14:1
**play** 36:2 90:23
**please** 4:3 56:21
74:9 88:23
**pocket** 39:8,14
43:9 60:20,23
61:1,2,3 63:10
64:16,18,20 65:3
**pockets** 60:21
**point** 7:1 10:19
16:9 27:21 39:15
41:1,5 44:18 48:5
48:8 52:25 81:22
87:3,4 89:7
102:10 108:17
112:3
**pointed** 10:14
39:11,12 42:6
43:17
**pointing** 55:8 64:9
64:10
**points** 38:25 39:18
41:19 60:14,18,25
60:25 104:8
**pole** 61:7 76:1
**police** 44:4,5,8,9
53:8 58:23 61:5,8
62:6 65:6,9 77:9
80:10 81:25 83:17
83:18 89:16

**policy**  11:8,11
**polite**  47:17
**political**  55:19
**pop**  38:15
**porfiro**  3:6 68:19
  68:23
**portion**  45:8
**posed**  65:19
**poses**  11:13,20
**position**  5:14 7:14
  7:19 13:11 16:12
  70:24 82:13 102:8
  108:9 115:5,22
  116:9
**possessed**  43:13
**possession**  43:5
**possibilities**  8:10
**possibility**  16:4
**possibly**  7:14 9:9
  9:10,10
**potato**  48:2 65:2
**potential**  16:4,21
  73:19
**potentially**  11:2
  78:25
**pre**  101:3
**predict**  55:25
  83:15
**prejudicial**  77:17
**preliminary**  20:25
  21:10 22:22 58:17
  95:22 96:5 97:20
**prepared**  78:17
  88:10 103:4
**presence**  4:8 19:17
  19:21 94:10
  106:25
**present**  2:3 24:11
  24:12 27:15 37:8
  37:9,11 44:2 82:5
  108:1,18

**presented**  25:12
  33:6 34:25 44:25
  69:14 94:3 100:2
**presenting**  66:22
  89:6
**presents**  9:25
  36:19,21 37:7
**preserve**  72:2,7
**pressure**  56:23,24
**presume**  73:21
**presumed**  27:1
**presumption**
  75:12
**pretty**  60:10 62:15
  63:6 82:3 88:7,8
  98:19 106:17
  112:20
**previously**  21:3
**principle**  93:12
  95:17
**principles**  93:18
  106:21,23 107:17
  108:15 109:7
  110:2
**prior**  3:23 10:18
  86:13 87:12,15,25
  89:2 90:3,14,25
**privilege**  6:15 9:13
**probably**  47:19
  56:16 59:3 64:12
  79:13 91:2 100:13
  104:4
**problem**  11:21
  12:25 13:1,12
  15:10 18:24 19:4
  46:14 47:6 92:11
  110:14
**problems**  9:25
  92:11 105:2,22
**proceed**  13:8
  20:25 22:8 68:15

89:11
**proceeding**  3:23
  18:6 20:6 68:10
  72:17 75:6 117:11
**proceedings**  2:6
  6:24 16:24 19:9
  19:11
**process**  10:6
**produced**  2:6
**produces**  69:15
**proffer**  4:19
**profit**  50:19
**progressed**  21:5
**progression**  21:7
**prohibition**  33:17
  34:15
**prohibits**  27:17
**projectile**  62:18
  63:8
**prolix**  109:25
**promise**  56:11,12
  69:22
**promised**  21:24
**promises**  55:25
  56:1
**promptly**  56:12
**proof**  25:15,17
  27:4,6,23 108:11
**propel**  62:18 63:8
**proper**  12:24 15:1
  25:2
**property**  29:11
  41:22 42:1 93:23
  94:9 95:5 96:7
**proponent**  36:17
  37:5
**proportion**  10:19
**propose**  79:2
**proposed**  109:5
**proscription**  33:17

**prosecuted**  28:10
  31:12
**prosecutions**  7:12
**protect**  14:18
**protection**  39:7
  40:25
**protocol**  7:11
**prove**  27:15,19,24
  29:9,25 30:21
  31:1,19 32:7,23,24
  36:14,17 41:14,24
  42:20 43:10,13
  44:20 52:1 57:17
  58:8,9,11 62:21
  63:9 65:24 98:1
  108:4 109:9
**proved**  110:4
**proven**  23:20 27:2
**proves**  42:18
**provided**  15:22
  16:3 17:24 83:17
  89:5
**providing**  91:20
**proving**  32:25
**provision**  29:23
**public**  2:5 118:14
**pull**  38:15
**pulled**  43:5 106:15
  106:17 109:2
**pulls**  44:6,7 46:1
  60:14 108:19
**purpose**  30:16
  98:2 108:5
**purposeful**  42:21
**push**  46:25
**pushes**  60:13
**pushing**  40:20,20
  46:4
**put**  16:1,19 27:11
  34:22 35:1,14
  40:11 73:14 74:7

74:8 78:21 92:22
**puts** 7:14 39:13
47:9 60:20,23
64:15
**putting** 43:8

**q**

**quantity** 53:20
**quarter** 66:3,6,9
68:5
**quash** 94:1
**question** 6:3 9:2,9
9:11,23 11:12,16
11:17 12:22 14:2
14:22 16:23 20:10
20:16 24:1,8,8,24
36:22,24,24 37:1,5
48:21 52:20 53:11
84:22 86:10
101:19 111:22
114:15,16
**questioning** 57:4
**questions** 6:4 8:18
9:20 23:25 24:6
26:18,21 36:21
37:6,19 53:25
63:20,21 65:18
80:13
**quick** 59:12
114:18
**quickly** 19:25
106:17
**quinn** 1:5 4:5
11:21 28:4 29:11
29:16,18,21 30:12
30:15,19 38:14,18
38:22 39:15,21,23
40:5,12,13,19,22
40:23 41:3,6,6
43:12 44:3,5 45:5
45:6,17,24 46:2,4
46:10,18,23,25

47:6,9,13,13,20,25
48:4,12,22 49:6,9
49:17,19,25 50:10
50:13,22 51:2,6,11
51:14,18,23 52:1,2
52:4,7 60:16 69:2
71:18 93:12,22
95:11 96:6,10
97:24 101:9 106:1
106:6,10,12,18
107:6 108:12,17
109:2,14,16 110:8
111:6 112:25
115:6
**quinn's** 50:25 98:2
112:22
**quit** 106:2
**quite** 12:7 47:19
49:5 66:2 69:2
78:2 106:12
**quote** 106:20

**r**

**r** 4:1 105:5 118:1
**r.c.** 1:25
**radio** 34:17,20
35:2 69:11,15
**rain** 25:20,25 26:1
26:2
**raincoat** 25:23
**raining** 25:22,24
**raise** 8:14 13:19
114:23
**raised** 4:9 7:17
8:11 14:21,22
22:4 102:11
103:14
**range** 16:21
**rarely** 103:1
**raymond** 2:3
68:21

**rcplaw434** 2:2
**rd** 29:11 45:16,16
45:19 46:10,21
48:19 93:22 96:6
**reach** 23:6 34:23
115:11,13
**read** 14:16 34:8,23
36:1 69:12 84:24
85:1,12 88:11
95:21 96:23,24
98:14 100:10
101:23 103:3
108:8 110:12
111:3
**reading** 35:19
97:10 109:6
**reads** 35:17 79:7
96:13 97:23 98:14
**ready** 20:25
103:11
**real** 15:10 40:5
58:20 59:7,12
77:16
**realistic** 106:2
**realize** 108:24
**realized** 111:6
**really** 6:7,20,23
7:14 25:6 28:19
33:24 49:5 51:4
51:13 52:18 54:24
57:25 61:24 65:4
71:22 91:1 99:15
101:21,21 102:9
103:19 113:13
114:17
**reason** 5:24 9:20
24:16 34:7,24
41:16 43:21 44:3
104:25
**reasonable** 27:20
27:25 29:9 30:24

31:1,20 32:8,23
41:14 43:13 52:1
57:13,15,18 59:18
65:24 98:1 108:4
**reasons** 6:11 11:7
39:6 112:6
**recall** 91:23 107:1
**receipt** 24:17
**receive** 24:10,11
42:14 44:4
**received** 4:24
15:14 23:16 33:19
33:24 34:2 35:10
**recess** 17:21,25
18:3,6 56:8,9,18
66:2,3,8,11 68:5
68:10 70:13 72:17
117:4
**recessed** 21:25
**recesses** 35:16
**recommend**
105:18
**reconcile** 65:20
**record** 22:21
23:16 25:3
**recorded** 2:6
59:11 64:11
**recording** 2:6 59:7
59:10 75:23 76:4
78:22,23,25,25
79:6,11,14 118:4
**recordings** 75:21
75:22 76:2 79:3
**records** 48:17
**recover** 83:1
**recovered** 80:10
81:3,6 84:10
**recovery** 84:3,5
**reentry** 19:16,20
**refer** 71:24

reference 33:10
83:10
referring 75:22,24
regard 72:24
region 2:8
register 39:16,16
39:19,20 43:17,18
43:18 44:19 47:1
48:15 49:11,13,15
53:2 63:15
regularly 22:9
71:5
reject 26:9
relating 19:15
relation 28:9
31:11,18,24 32:1,7
32:12,18 50:23
107:18 109:8
110:3 113:1
relationship 57:23
57:23
relative 11:23
relevance 77:7
relevant 10:13
24:13
reliable 45:14
relocate 15:18
relocating 15:16
15:17
relocation 16:4
rely 112:4
remain 27:16
70:25 86:8 89:23
remedied 22:1
remedy 35:24
remember 17:3
99:19
remembered
22:19
removal 16:24
18:22 19:9,10,24

remove 18:20 25:3
85:17
removed 9:24
repeatedly 48:13
rephrase 81:5
report 80:13
reporter 35:1,3
reporters 34:18
reporting 2:7
represent 14:7
45:5 54:25,25
57:3,6
representation
20:4
representatives
68:3
request 81:4 86:16
86:18 89:7 92:18
105:25 111:10
requested 75:19
84:15 86:9 89:4
90:5 92:18 113:21
requesting 80:9
required 24:20
80:25 83:5 107:21
114:4
requirement
107:22
requires 108:10
reschedule 71:4
research 10:7
18:11 33:8
resembles 63:6
reserve 102:17
resident 18:20
resolution 47:14
resolve 12:25 13:1
17:23 53:6,18
55:4 84:23
resolved 13:2
20:21

respect 4:14 27:22
34:15 82:20 87:3
98:21 102:23
104:16,23 114:9
114:21 116:16,19
respond 26:21
responded 88:4
response 71:6
77:20 88:12
rest 38:5
result 29:18
resume 72:12
74:19
retire 33:15
return 44:24
reverse 87:25
review 71:2
revised 71:21
rid 85:11
right 5:12,19,23
7:15 8:20 10:2
11:22 15:21 17:21
21:9 23:15 27:16
33:4,18 38:3,24,25
41:18,19 44:18
47:20 60:20,23
61:3 64:15,18,21
67:2,5 71:14,22
72:2,10,11 74:11
75:7,10 76:5 79:7
79:12 80:1,8,14,24
81:14,21 82:3
83:15 85:10 86:3
86:17,17 88:10
91:24 94:20 98:8
98:12,20 99:16,24
102:10,22 105:19
112:16 114:5
116:2,4 117:3
rise 18:4,9 21:18
66:13 68:8,13

70:1 72:13 117:5
rob 46:9,19 53:16
63:13,14 64:6,11
robbed 52:1
robber 53:2
robbery 12:6,18
28:5,11,16,16,21
29:7,17,22 30:10
30:22 31:3,13,22
32:2,16,19 33:1
41:23 42:10 43:10
43:16,21 44:20,21
45:9 46:7 47:23
50:12,21,24 51:5,6
51:8,8,9 52:3,5,21
52:23 53:14 55:5
55:11 59:15,16,17
59:18,20 63:25
64:25 65:20 91:17
92:17,21 93:10
95:9,16 96:11
107:19 109:8
110:3 115:6,7,9
116:5
robert 1:9,24
robert.eckert 1:12
robreno 73:13,22
74:4,13
robreno's 73:25
robs 63:25
rodriguez's 77:9
role 55:2 75:11
roles 53:23
rolling 59:9
room 12:3 22:14
35:7,16 56:10
66:5 70:6
rosemond 105:4
105:17 106:4,21
106:24 107:1,8
108:16 110:16

111:1 112:5,14,21
113:9,17
**round**   62:23
**rounds**   29:15
31:11 62:20,22
96:9
**rule**   4:10,12 67:25
67:25 71:3 88:4
102:23
**ruled**   88:1
**rules**   24:9,9,15,20
24:25 26:25 68:2
**ruling**   13:5,7
102:17 111:14
**rulings**   71:21,21
102:24
**run**   16:25 99:9
**ryan**   109:20
113:16 115:4

**s**

**s**   3:7 4:1 11:2
48:14 105:5
**sacrifice**   14:18
**safe**   60:13 69:17
70:5
**sanchez**   46:17
50:8
**sanctuary**   11:8
**sand**   102:1,3
**sat**   69:9
**satisfied**   40:14
**satisfy**   14:8 85:4
**satisfying**   40:16
40:18
**saw**   64:3 77:14,14
107:6 109:2
**saying**   6:8 10:16
11:4 12:5 35:23
35:24 36:5,25
47:1 49:20 53:21
54:3 77:8 91:18

91:22 109:15
115:13 116:8
**says**   5:16 9:18
16:10 40:5,6,22
47:4,10 50:2
52:17 62:10 64:21
91:13,15 103:24
105:16 107:25
110:1 112:5
**scam**   38:15 39:22
**scared**   16:1,11,14
**scene**   53:8 84:14
84:25 85:8
**schedule**   38:5 66:7
66:10
**school**   22:7,20
**scratching**   101:5
**screen**   59:3,4,6,6,9
64:10
**screens**   64:1
**scurrying**   103:10
**sdny**   102:4
**seal**   118:11
**search**   62:6,7
**seated**   4:3 10:2
18:10 21:22 64:4
66:21 68:14 70:8
72:22
**second**   6:3,3 27:6
27:13 29:16 30:12
31:4,23 32:12,24
41:15 42:25 79:10
90:19 94:15 96:24
97:18 103:14
110:9 111:8
**seconds**   38:23
40:14 41:10,17
47:11,12 49:5,7
51:15,16,19,20
62:6 100:6 106:16
106:19

**see**   12:2 14:25
15:11 16:18 17:6
25:25 26:2,20
41:12,17 42:2,15
44:8 45:6,13,16
46:4,23 47:8,9,25
48:6,10,17,23 49:3
49:16,18,23 50:6
50:11,24,24,25
51:1 53:4,5,6,7,10
53:12 54:3,12
55:6 58:1 59:3,5,9
59:21 60:9,24
61:9 63:5,15 64:1
66:20 67:12 70:6
70:9 75:11 82:11
83:10 84:15,19
90:5 92:3 98:23
100:22 102:18
103:6,16,19 104:6
109:20 110:22
**seeing**   17:4
**seek**   99:10
**seen**   25:10 52:22
52:24 64:4 75:23
77:22 82:9
**sees**   60:11,12
**selection**   15:7
**self**   6:16 9:13
**sells**   42:13
**semi**   29:14 31:9,10
**send**   102:6
**sense**   54:16 57:21
57:22,22 58:1
62:1 63:12 65:19
95:23
**sent**   43:18
**sentence**   79:10
97:23 112:21
**sentencing**   73:13
73:23 74:5,18

**sentencings**   73:14
**separate**   3:6 43:3
59:7 60:24 68:23
79:2 92:14
**sequence**   105:11
106:16
**sequestered**   67:23
**sequestration**   67:7
67:14,17
**serial**   29:14 31:10
**series**   21:5 55:25
**serious**   99:6
**service**   2:6
**services**   18:18
**set**   24:9 31:1,2
96:22 97:19
105:21
**sets**   28:19
**setting**   54:18
**settle**   47:16
**seven**   75:21 92:17
92:20 94:24
**shadow**   58:24,24
**shakes**   50:11
**shape**   91:1
**shared**   36:7 91:4
**sharing**   35:19
**shaw**   12:4
**she'll**   40:12
**shelf**   48:11
**shirt**   45:5
**shook**   50:12,12
**short**   15:4 21:13
21:14 24:21 26:3
33:13 34:1 70:12
75:18 76:11 80:19
86:3
**shorten**   73:3
**shorter**   73:3 74:10
**shortly**   49:24

should've  14:6
  50:17 90:1 100:13
  111:6
show  7:10 22:21
  52:4,5 58:5,12,13
  59:2,13,23 60:2,5
  60:17 63:7 64:16
showing  5:1 45:8
shows  46:2 97:23
  108:2
shut  115:1
side  39:2,7,8 41:1
  41:2 48:11 49:12
  60:8,12
signature  118:13
significant  13:12
  34:11 57:17 99:15
silent  27:16
similar  12:5 107:5
simple  99:25
  114:18
simply  36:16
  50:16
single  104:2
sir  18:14 20:17
  94:19 98:11
sirens  44:4
sit  55:17,23 103:20
site  91:15
sitting  17:3 22:14
  34:12
situation  12:21
  40:8,13 50:20
  53:7 59:1 64:13
  64:14
situations  60:24
six  59:6 75:17
  94:24 113:17
sixth  105:13
  110:18

skipped  86:20
slapping  110:17
slate  27:5
slightly  113:15
small  59:5 64:17
smaller  59:3 64:1
smiling  22:18
smith  1:4 4:5
  11:22 21:7 28:3
  29:10,16,18,20
  30:12,15,19 38:19
  38:20,23 39:10,13
  41:12,15,17 43:4,7
  44:3,6,8,11 49:4,7
  50:4 51:2,12,19
  52:6 53:9 57:4,6
  60:18 62:9 63:10
  64:8,25 67:1
  71:15 86:9 89:17
  89:21 90:23 91:18
  92:1 93:10,17,21
  95:3,15 96:6,10
  97:24,24 98:2
  101:10,17 106:14
smith's  39:11
snack  69:24
social  35:7
solely  25:12 33:6
  34:7,24 69:13
solution  7:12 9:16
solve  73:19
solves  18:24 19:3
somebody  10:24
  52:24 57:12 60:4
  64:24
someone's  9:17
son's  58:22
soon  43:5 73:24
  75:5
sorry  15:24 17:18
  19:8 27:9 66:14

67:6 72:20 75:4
  76:1 86:23 87:1
  88:3 90:21 93:4
  98:5 112:17,19
sort  8:10 69:24
  74:20 88:6 108:12
  110:16 111:1
sound  2:6 54:5
sounds  83:25
source  33:14
southwood  1:25
spanish  40:11
speak  15:12 37:3
  52:16
speaker  12:15
  17:19 27:9,11
  117:8,9
speakers  4:2
speaking  37:4,4
speaks  112:21
spear  53:22
special  46:1 114:9
specific  16:16
  30:17,18 57:3
  80:25 83:4 108:7
specifically  6:11
  29:13 83:10 97:13
spectator  108:1
speed  44:2 82:16
speedy  15:5
spent  15:17 16:5
spin  35:1
springing  73:16
st  1:14,18
staff  35:17
stage  53:23,23
stand  6:7 9:7
  11:15 16:22 19:23
  23:15 44:24 53:25
  54:7 73:15

standard  9:19
  73:1
standing  19:21
  48:1 51:15 60:11
  64:21
stands  5:2,13
  38:22
start  3:23 26:19
  27:4 33:22,24
  35:11 37:23 38:3
  58:18 61:20 69:17
  69:20,21 70:14
  71:23 74:6,24
  92:16
started  15:6 22:3
  56:12 66:6 85:18
starts  24:24 94:8
state  113:8
stated  6:12 107:1
statement  14:13
  19:23 36:13 38:12
  55:20 58:3,3
  86:14 90:4,14
  91:1 96:4,25
  98:14 113:10
statements  3:2
  10:18 23:25 36:15
  36:15,18 90:17
states  1:1,2,7 4:4
  7:9 18:17,22
  19:17,21 28:11
  29:13,23 31:13
  96:8 103:22 105:7
status  4:14,18,23
  4:25 5:4,9,11,15
  5:24 6:9 7:5,20
  8:12 9:17 10:9,17
  10:25 12:10 18:17
  18:21,22 19:16
  20:8 78:3

**statute** 29:24
109:16
**stay** 17:22 53:10
89:20
**staying** 53:6,23
**stays** 61:2
**step** 38:24 70:8
**stevens** 1:4 4:5
11:21 28:3 29:10
29:16,18,21 30:12
30:15,19 38:20,20
39:1,12 41:4,7,9
50:4,6,10,11 51:2
51:12,21 52:6
54:25 55:1 56:5
60:16 65:8 71:17
80:7 86:10 87:20
93:10,17,22 95:3
96:6,10 97:24
98:2 101:17
106:16
**stick** 110:11
**stipulate** 23:17,22
85:6
**stipulated** 84:20
**stipulation** 23:18
84:24 85:12,13,16
85:18,24 86:2,5
**stipulations** 86:5
**stole** 91:20
**stolen** 58:22
**stood** 85:22
**stop** 36:11 37:22
44:9
**stopped** 15:6
**store** 5:22 12:7
38:15,16,19,22
39:3,5,6,7,18,21
40:2,3,10,24,25
41:4,6,7,14,15,18

42:6,16,22 43:6,8
44:3,6,7,17 45:15
45:16,17,18,19,20
45:22,23 46:9,12
46:15,16,17,19,20
47:2,4,5,7,13,24
48:1,14,19,23 49:2
49:6,14 50:1,3,4,5
50:6,7,8,8,16
51:18 52:2,24
53:1,10 55:8 59:4
59:4,5,8,8,11,14
59:24 60:3,6,7,8,9
61:21 62:9,11
63:10,13,14,25
64:2,3,3,6,12,14
64:17,21 75:23
76:3,6 77:11,13,15
77:19,19 80:10
81:23 82:1,2,8,17
82:21,22 83:16
84:6 91:18,19
95:8 100:7 101:10
101:13 102:21
106:9,19 108:18
109:1 110:9 111:7
111:18,19
**store's** 48:16
50:18
**storming** 51:16
**story** 99:21
**stranger** 53:12
**street** 1:10,22 2:8
**strenuously**
100:13
**strike** 25:2
**strong** 93:1
**stuff** 22:19
**subject** 15:19
18:22 19:10,12,24
21:3 37:1 86:2

**submission** 14:16
88:11 112:22
**submit** 65:23
113:7
**submitted** 4:9,10
104:24 105:10,12
105:24 111:10
115:12
**substantive** 30:7
32:9 96:14
**succeed** 102:8
**succeeded** 99:20
**successful** 43:22
95:9
**sufficient** 105:1
109:1 112:24
**suggest** 7:5,21
10:19 13:14 16:8
34:14
**suggested** 11:13
**suggesting** 8:13
**suggestion** 17:2
**suggests** 36:22
83:20 93:19
**suite** 1:10,14,18,21
2:8
**super** 20:2
**superior** 14:24
15:11
**superiors** 17:1
**supervisor** 7:18
13:10 18:15 99:9
**supervisors**
103:17
**support** 112:11
**supposing** 5:16
**supreme** 105:4
106:22 109:3
**sure** 5:24 9:23
12:21 15:1 16:25
58:13 62:15,17

63:7 66:4 69:22
69:23 70:5 77:7
82:3,7 103:20
112:20 113:3
**surface** 6:23
**surprise** 88:13
**surveillance** 81:3
83:1 84:3,5
**suspect** 89:2,16,24
92:8 94:25 104:4
104:6
**sustain** 24:13
**swab** 62:10
**swift** 99:5
**swore** 15:7
**sworn** 68:19,21
**system** 81:24

**t**

**t** 3:7 118:1,1
**tab** 103:12
**table** 37:18 73:8
75:12 86:22
**tabs** 92:19,20
**tagged** 80:12
**tags** 91:13
**take** 7:19 17:13
23:21 29:3 35:25
38:18 39:10 42:1
42:23 44:10,19
45:23 48:14 50:13
50:15 63:14 65:1
65:1,4,5 70:12
79:12 86:3 88:16
91:24 92:9 95:5
111:25 112:16
115:21 116:9
**taken** 20:20 23:10
24:2 40:7 45:12
46:21 68:23 91:14
94:7 105:17 114:2

| | | | |
|---|---|---|---|
| **taker** 36:9,10 | **tend** 11:24 | 24:3 34:2 42:13 | **thinking** 14:23 |
| **takers** 35:21 | **tendering** 79:24 | 54:1 57:8 69:24 | 91:9 93:6 94:2 |
| **takes** 15:1,1 38:24 | **tenuous** 10:25 | 102:19 113:25 | 115:25 |
| 39:13,20,23 40:13 | **test** 62:14,16 | **think** 4:16,19 5:3 | **thinks** 11:18 |
| 41:1 53:2 60:12 | **testified** 27:18 | 5:12,18,20,21,24 | **third** 27:19 29:17 |
| 60:19 61:5,6,10,11 | **testifies** 67:24 | 5:24 6:10,12,25 | 30:14 31:25 32:15 |
| 63:17 64:15,20 | **testify** 13:2 23:15 | 10:13 11:7,23 | 72:25 81:7 89:23 |
| 95:16 | 27:16 82:15 88:24 | 13:11,24 14:10,13 | 94:8 96:24 97:18 |
| **tale** 54:9 | 88:25 92:8 | 14:20 15:18 17:7 | 103:24 105:16 |
| **talk** 4:7 15:10 | **testifying** 54:11 | 17:21 18:25 19:14 | 107:11,13,22 |
| 40:12 71:13 115:1 | 87:5 88:7 90:4,15 | 19:14 20:5 21:13 | 109:6,23 110:1,12 |
| **talked** 6:8,8 | **testimony** 23:14 | 29:4 37:13,23 | 110:15,20 112:14 |
| **talking** 22:19 | 24:4 25:8,16 26:8 | 47:10,11,21 48:20 | 113:13,16,18 |
| 33:24 36:11 37:22 | 26:13,15 57:10,20 | 52:11 55:12 56:7 | **thomas** 2:4 118:14 |
| 47:13 50:7 54:17 | 59:16 62:18 63:23 | 56:17 58:4,8 60:4 | **thoroughly** 111:3 |
| 58:14 78:7,23 | 67:8 68:23 69:7 | 63:21 64:2,3 | **thought** 6:6,7,23 |
| 89:3 90:19 106:8 | 81:9 87:2 | 65:17,21 69:1,18 | 14:6,19 17:18,20 |
| 107:13 | **text** 35:6 | 69:18 70:19 73:14 | 17:24 73:16 74:18 |
| **tap** 102:12 | **thank** 10:5 15:20 | 73:20,21 74:5 | 74:21 97:9 |
| **tape** 54:12 | 38:7,10 45:1,2,3 | 76:1,9,15 77:23 | **thousand** 54:4 |
| **taurus** 91:13 | 52:7,7,9 56:6,7,21 | 79:9,10 80:18 | **threat** 50:14 |
| **techniques** 80:25 | 56:25 65:25 66:1 | 81:22 83:21 85:1 | **threatened** 94:11 |
| 81:8,10 83:4 | 68:7,16 69:1 | 85:8,11 86:8,19 | **three** 7:24 26:25 |
| **telephone** 18:11 | 70:10 75:9 78:19 | 87:16 88:6 89:20 | 31:6,19 33:25 |
| 78:13 | 79:15 81:16 87:11 | 90:9,12,18 92:10 | 39:2 40:2,3 41:21 |
| **television** 34:17,21 | 88:17 89:14 104:7 | 92:15,15,17 93:6,7 | 44:17 50:7 51:17 |
| 35:2 69:11,16 | 111:13 116:14,23 | 93:9,20 94:21,22 | 57:2,3 63:14 65:7 |
| **tell** 23:18,24 28:2 | 117:2,3 | 96:1,5 98:3,6 | 71:19 85:7 86:4,4 |
| 41:7 54:9 58:1,10 | **thanks** 63:17 | 99:11,24 100:20 | 86:6,8 92:10,13 |
| 58:25 59:12 61:15 | **theories** 95:3 | 100:22,25 101:9 | **threshold** 111:18 |
| 69:9 92:11 94:24 | **theory** 93:9,15,15 | 101:21 102:10,13 | **throws** 40:7 |
| 96:1 | 95:17 100:8,25 | 102:17,20 103:9 | **thursday** 89:25 |
| **telling** 6:22 8:7 | **thereof** 118:7 | 105:10,20,23 | **tilt** 102:13 |
| 40:16 54:15,18 | **thin** 93:5 | 107:5 108:12,22 | **time** 11:21 17:7 |
| 78:12 99:21 | **thing** 14:20 15:4 | 108:24,25 109:13 | 21:25 22:20 23:21 |
| **tells** 8:21 55:14 | 25:6 26:12,16 | 109:14,24 110:11 | 23:22 39:1,8 |
| **temp** 91:13 | 34:4 42:17 46:18 | 110:14 111:4,16 | 42:22 47:10 49:5 |
| **temper** 48:4 | 57:19 63:13 108:8 | 111:21,25 112:6 | 50:5 53:11 54:16 |
| **ten** 17:8 49:7 | 111:15 | 113:4 114:6,7,15 | 54:16 58:20 59:7 |
| 51:20 66:2 72:12 | **things** 5:1 16:5 | 116:10 | 59:23,24 61:21 |
| | 21:23 23:16,23 | | 64:7 65:5,23 |

69:20 71:23 74:10
77:16 78:3 82:21
89:10 90:2 98:18
103:11 108:17
109:10,19 110:5,9
110:22 111:8
112:7 114:15
117:6
**times**  46:8,12 64:5
**timing**  48:24
51:14
**tinkering**  110:24
**today**  34:12 38:5
47:16,20 66:8,11
69:8 88:5
**told**  8:8,9,22 9:19
13:22 16:20,20
19:18,18 25:8
26:5 33:5 43:17
45:20,21,23 47:14
55:24 58:6 74:15
74:22 78:8 99:10
102:23
**tolerance**  11:10
**tomorrow**  69:2,18
69:20,23 70:7,9
73:12 86:1 89:25
116:7 117:6
**tonight**  71:4 83:13
114:17
**tools**  33:12 54:20
**top**  40:21
**trafficking**  107:3
107:4
**transactions**  48:19
**transacts**  42:12
**transcribed**  118:4
**transcriber**  2:4
**transcript**  1:6 2:6
**transcription**  2:6

**trash**  85:17
**trial**  1:6 4:6 15:5,6
20:24 22:24 23:10
33:7 36:11 51:23
55:16 59:19 85:2
86:6 90:5,15 94:6
94:6 99:1
**trials**  24:20 73:13
**tried**  38:15 43:16
102:7
**tries**  39:16 40:13
44:9,10,10
**trip**  69:17 70:5
**trouble**  65:10
101:25
**troubled**  106:5
**trump**  73:13
**truth**  54:15,19
55:24
**try**  22:15 33:13
49:18 66:6 72:9
73:3 82:16 102:9
**trying**  22:13 28:20
45:18,20 46:5,25
47:14 48:13 49:10
49:11,17,19 50:16
53:6,7 55:4 59:25
59:25 77:8 103:10
**tuesday**  89:22
**tuned**  96:2
**turn**  5:7 7:21
13:24 31:5 99:3
**turned**  15:21,25
16:2,6
**tv**  52:22
**twelve**  86:7
**twenty**  56:9,11,19
69:2 92:7,10,11,13
92:13,13,17,20
**twitter**  35:6

**two**  1:6 4:6 11:1
21:12,23 22:2
24:6 25:14 26:9
26:22 28:8 31:2,5
31:8 32:3 33:25
40:24 41:17,21
42:6,9 43:2 44:17
50:22 51:7 56:11
59:21 60:24 63:1
63:25 64:4 65:2
66:6 68:6 69:5
75:12 79:6 86:4
92:7 96:10 106:14
**type**  19:22 20:6
**types**  11:1
**typical**  66:7,8
**typically**  67:22

**u**

**u**  11:6
**u.s.**  1:9,13 12:3
17:5
**ugly**  45:13,13
**ultimately**  49:15
50:5
**umbrella**  25:20,22
**unarmed**  48:13,25
50:14 51:1,24
**unaware**  77:6
**underscore**  35:22
**understand**  8:18
11:3,5,11 13:4,7
14:3 73:4,11
114:20
**understandable**
101:22
**understanding**
10:7 12:10
**undertake**  20:4
**undo**  94:5
**undocumented**
15:19

**unduly**  99:21
**unexpected**  22:16
87:25
**unfair**  33:22
**unfamiliar**  88:12
**unfold**  103:19
**unfortunately**
22:11 54:5
**unidentified**  12:15
17:19 27:9,11
117:8
**uniform**  100:24
**unique**  100:3,20
105:21
**united**  1:1,2,7 4:4
7:9 18:17,22
19:17,21 28:11
29:12,23 31:13
96:8 105:7
**unknown**  117:9
**unlawful**  15:18
19:21 94:12
**unlawfully**  19:17
50:13
**unnecessary**  73:2
99:20
**unpleasant**  47:21
**unserved**  94:13
**unusual**  71:6
103:19
**upset**  48:25
**urge**  51:13
**usdoj.gov**  1:12,16
**use**  31:7 32:18
33:11 36:7 44:19
49:21 50:23 51:3
51:8,9,24 52:3
57:1,20,22,22 62:1
65:11 74:9 98:3
107:17 108:15
109:7 110:2

**[use - wish]**

111:24

**uses** 46:13 47:7

**usually** 61:9

**v**

**vague** 111:24

**valid** 72:1

**vehicle** 91:15

**ventura** 3:6 10:14
15:16 18:19 45:22
46:1,22 47:4,7,12
48:10,22 49:15,20
49:20,24 50:8
68:17,19,23 70:9
70:11 73:14 74:20
77:13,14

**ventura's** 11:6
48:9 49:11 50:11

**venture** 107:25
109:12 110:6

**verdict** 23:7,11
27:17 34:23 44:25
55:18 62:2 114:8
114:10,23 115:11
115:13,13,23

**verified** 19:18

**veritext** 2:7

**verse** 37:20

**version** 21:13,13
21:14 55:14,14

**versions** 21:12

**versus** 4:5 12:3
105:5

**victim** 4:24 6:8
7:22 10:15,22,23
12:9 13:13 14:2
43:17,17

**victim's** 43:6

**victims** 4:22 11:6
11:9,9

**video** 41:12,17
42:15 45:7,8,15,16

46:4,24 47:8,10,25
48:24 49:3,16,19
50:11 51:14,14
54:9 58:14,15,15
58:18,20,20,21,23
59:2,13,22 60:2,5
60:7,10 64:16
65:7 76:3 77:10
77:14,19 78:9,22
78:23,25 79:6,6,11
81:3,6 82:4,4
83:19,20 85:8,19
102:19 106:15

**videos** 60:10

**videotape** 54:3,4
55:6 60:22 61:4,6
61:22

**view** 20:7,9 69:12
100:4

**violation** 29:22

**violence** 28:10
31:12,18 32:7,12
107:15 112:23
113:1

**visa** 11:3,6

**visas** 11:2

**visual** 75:21 76:25
79:7

**volunteered** 20:3

**vs** 1:3

**w**

**w** 1:21

**waistband** 38:25
41:19

**wait** 9:3 33:18
48:4 86:19 102:14
104:6

**waiting** 21:15

**waiving** 55:7
59:24

**walk** 109:14,19
111:8,19 112:8
113:2,4

**walked** 110:10,11

**walking** 109:11
110:6

**walks** 25:20 44:10
59:4,5 111:18

**walnut** 1:18,22

**want** 4:13 9:6,8
10:22 11:9,12
13:11 14:24 15:5
15:11 17:3,12
18:12 21:9,16
29:4 49:13 56:10
57:5 62:16 69:3
69:19,21 72:1,21
73:21 74:6 76:5
78:4 79:8 80:21
82:23 83:10 84:18
89:23 94:1,13,25
101:20 102:12,12
104:1 105:9
111:15 112:12
115:1 116:8

**wants** 16:6 51:11
65:11 83:4

**warned** 7:15

**warrant** 62:7

**warranted** 12:20

**watch** 52:17

**watching** 47:24
48:2 69:3 77:18

**water** 27:10

**way** 12:25 13:1
14:25 17:3,23
20:5 22:4 26:17
26:22 31:4 34:8
35:7 44:5 50:1
72:6,7 73:19 75:8
76:17 85:22 90:2

91:1 93:2 94:3
95:22 96:2 102:19
108:12 113:15
114:14 115:23

**ways** 15:3 31:2
43:3 116:17

**we've** 4:24 16:3
21:15 56:13,13
73:19 78:8 84:20
90:17 94:7,7
104:16 105:16,21
114:8

**weapon** 111:7

**weapons** 55:11
63:4 95:7

**wear** 60:21

**wearing** 62:11

**website** 35:6

**websites** 33:11
35:8

**week** 38:5

**welcome** 34:18

**went** 36:23 37:3
46:10 80:12
106:11,13

**west** 55:9

**wet** 25:21,22,23

**whatsoever** 4:24
5:9 7:4 8:11 40:14

**wife** 18:23 59:14
59:22,24 60:3,6,8
60:11 63:2,24

**wife's** 64:12

**wild** 55:9

**willfully** 29:17
96:11

**willing** 48:4 85:6

**window** 26:2

**windows** 25:24

**wish** 9:15 29:2
72:5 112:2

**[withdrawal - zero]** Page 29

**withdrawal** 73:14
  87:21 104:3,4
  108:18
**witness** 3:6 4:11
  5:15 7:23,24 8:22
  9:4 10:9,15 11:12
  11:14,18,23 12:17
  12:22,23 13:2
  14:10,15,17,18
  15:16 16:22,22
  18:16,18 19:23
  20:4 23:15,21
  24:2,24 25:16
  26:8,14,17,23
  35:23 36:5 37:2,4
  37:5 45:14 67:23
  67:24 74:7,24
  78:3 84:11,21
  118:11
**witness's** 26:13
**witnesses** 4:15 7:8
  12:6,9,17 23:14,20
  24:2,5 26:7,7,19
  26:20,21 36:19,21
  37:9 46:11 53:20
  53:21,24 54:11
  55:19 57:4 66:23
  67:7,10,15 73:11
  74:8,10,19 75:17
  75:18 79:17 83:15
  86:7 103:10
**wittels** 1:17,17 3:4
  8:19,21,24 14:13
  15:12,12,13 16:9
  19:8,12 20:12,15
  20:17 52:9,12,13
  52:14 56:7 67:3,4
  67:16 70:20,21
  71:17 76:21,22
  80:15,17,20 82:6,7
  82:12 84:17,19

87:4,23 90:11,13
  90:16 94:19 98:11
  116:24,25
**wonder** 67:21
**wondering** 93:8
  93:12
**word** 23:19 35:13
  35:20,23 36:3
  45:10 79:5 82:16
  98:2
**words** 33:4,9 54:4
  63:4 79:6 97:22
  115:14
**work** 6:20 18:21
  55:21 60:3 69:19
  69:19 95:20 96:21
  116:15
**worked** 22:10 40:1
  40:3 55:22
**working** 22:11
  46:17
**works** 5:22 69:18
**world** 15:4
**worth** 54:4,5
**would've** 8:8,9,10
  47:19
**wrapped** 35:21
  36:4
**write** 102:5
**writes** 69:15
**writing** 29:2 36:4
  78:20
**written** 12:12,16
  29:1 34:16,22
  37:17 69:10 85:23
  110:15 115:23
**wrong** 16:19 65:13
  73:5 93:12 116:8
**wrote** 102:3

**x**

**x** 3:1,7

**y**

**yeah** 15:13 80:20
  82:12 83:11,14
  90:16 114:21,25
  117:9
**years** 40:2,3
  113:17
**yelling** 48:8
**yesterday** 4:9 6:24
  14:21 21:25
**youtube** 35:9

**z**

**zero** 11:10