```
                                                          Page 1

 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                          - - -
      THE UNITED STATES OF AMERICA,  :  2:19-CR-00350-JD-1
 3                  Plaintiff,       :  2:19-CR-00350-JD-2
            vs.                      :  2:19-CR-00350-JD-3
 4                                   :  Philadelphia, PA
      DONNIE SMITH, ABID STEVENS     :
 5     AND MAURICE QUINN             :  January 29, 2020
                Defendant.        :  9:53 a.m.
 6            TRANSCRIPT OF JURY TRIAL - DAY THREE
               BEFORE THE HONORABLE JAN E. DUBOIS
 7                 UNITED STATES DISTRICT JUDGE
 8    APPEARANCES:
 9    For the Plaintiff:  ROBERT E. ECKERT
                          U.S. ATTORNEY'S OFFICE
10                        615 CHESTNUT STREET
                          SUITE 1250
11                        PHILADELPHIA, PA 19106
                          215-851-8630
12                        robert.eckert@usdoj.gov
13                        ASHLEY NICOLE MARTIN, ESQUIRE
                          U.S. ATTORNEY'S OFFICE
14                        615 CHESTNUT ST.
                          SUITE 1250
15                        PHILADELPHIA, PA 19106
                          215-861-8609
16                        ashley.martin2@usdoj.gov
17    For the Defendant:  BARNABY C. WITTELS, ESQUIRE
                          LACHEEN WITTELS & GREENBERG
18                        1429 WALNUT ST.
                          SUITE 1301
19                        PHILADELPHIA, PA  19102
                          215 735-5900
20
                          MARANNA J. MEEHAN, ESQ.
21                        DEFENDER ASSOCIATION OF PHILADELPHIA
                          SUITE 540 W, THE CURTIS CENTER
22                        601 WALNUT STREET
                          PHILADELPHIA, PA  19106
23                        215-928-1100
                          maranna_meehan@fd.org
24
                          ROBERT C. PATTERSON, ESQUIRE
25                        R.C. PATTERSON LAW OFFICES
                          3513 Southwood Drive
```

```
 1                      EASTON, PA 18045
                        610-253-7858
 2                      rcplaw434@gmail.com
 3   Also Present:      RAYMOND MCCONNIE, INTERPRETER
                        LOIS WEAVER, INTERPRETER
 4
     AUDIO OPERATOR:    MICHAEL COSGROVE
 5   TRANSCRIBER:       JANINE THOMAS
                        NOTARY PUBLIC
 6
        (Proceedings recorded by electronic sound recording,
 7       transcript produced by transcription service.)
 8         VERITEXT NATIONAL COURT REPORTING COMPANY
                   MID-ATLANTIC REGION
 9           1801 Market Street - Suite 1800
             Philadelphia, Pennsylvania  19103
10                   (888) 777-6690
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                        Page 3
 1                          I N D E X
                                                              Page
 2

     WITNESS:  JESSICA MARTINEZ
 3     Direct Examination by Ms. Martin              8
       Cross-Examination by Ms. Meehan              23
 4     Cross-Examination by Mr. Wittels             27
 5   WITNESS:   PORFIRO VENTURA (By Interpreter Raymond McConnie)
       Cross-Examination by Ms. Meehan             33
 6     Redirect Examination by Mr. Eckert          61
       Cross-Examination by Mr. Patterson          69
 7     Recross-Examination by Ms. Meehan           77
 8   WITNESS:  DETECTIVE COLIN GOSHERT
       Direct Examination by Ms. Martin            80
 9     Cross-Examination by Mr. Wittels            85
10   WITNESS:  ISALIZA RODRIGUEZ
       Direct Examination by Mr. Eckert            87
11     Cross-Examination by Mr. Patterson         128
       Cross-Examination by Mr. Wittels           143
12     Cross-Examination by Ms. Meehan            150
       Re-Redirect Examination by Mr. Eckert      160
13     Recross-Examination by Mr. Wittels         163
       Recross-Examination by Ms. Meehan          163
14
     WITNESS:  EMMANUEL SANCHEZ
15     Direct Examination by Ms. Martin           164
       Cross-Examination by Mr. Patterson         198
16
17                      E X H I B I T S
18   GOVERNMENT'S
     NUMBER      DESCRIPTION            MARKED ADMITTED
19
20   G49         Netspend Records                 12
     3A          Map                              82
21   G5          911 Audio                       102
     G14         Photo Array                     126
22   G37         Photo Array                     126
     G39         Photo Array                     126
23
24

     DEFENDANT'S
25   NUMBER      DESCRIPTION            MARKED ADMITTED
```

Page 4

1

D8              Picture of TV screen              37

2      D9              Photo                            157

D10             Photo                            158

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      (* Marked prior to the start of the proceeding.)

23

24

25

Page 5

P R O C E E D I N G S

1          THE COURT:  Please be seated.  I have several

2     issues to discuss.  First, Mr. McConnie, is he in the

3     courtroom?  Yes, he is.  No, he isn't.

4          MS. MEEHAN:  He was here, Your Honor.

5          THE COURT:  Is he on the floor?

6          MR. ECKERT:  I believe he went to Judge

7     Robreno's courtroom, Your Honor.

8          THE COURT:  Well, let me explain what happened.

9     Judge Robreno called me this morning and told me that he's

10    decided to start the sentencing at 10:00.  He said it's an

11    illegal reentry case, it should take no more than 20 minutes

12    or so, and --

13          UNIDENTIFIED SPEAKER:  I cannot locate him.

14          THE COURT:  Fine.  He offered to stand aside.  I

15    told him I didn't think that was necessary that you were

16    prepared to proceed with a short witness or two until Mr.

17    McConnie was available.  It's difficult for me to understand

18    how this huge courthouse with all of the judges we have didn't

19    have only one Spanish-speaking interpreter available, but I'll

20    look into that.  In any event, that's agreeable to the

21    government?

22          MR. ECKERT:  Of course, Your Honor.  Thank you.

23          THE COURT:  And you, Ms. Meehan.

24          MS. MEEHAN:  Yes, Your Honor.

25          THE COURT:  Fine.  Second issue.  We have a

1    juror issue.  She called Ms. Hull this morning, I guess about

2    6:30 or 7:00.

3              MS. HULL:  Sounds about right.

4              THE COURT:  And Ms. Hull called me about 6:30 or

5    7:00.  Juror number six, grandmother in Maryland is reportedly

6    in ill health and is dying.  Ms. Hull instructed her to come

7    to court and said that we would address the issue and advise

8    her what she should do.  She either did not understand those

9    instructions or ignored them, and in any event, just called

10   Ms. Hull, she is in Maryland now?

11             MS. HULL:  She is in Maryland.

12             THE COURT:  I think what we should do, but I'm

13   going to defer ruling until I hear from each party.  My

14   thought is that we ought to let it go, wish her well, and

15   substitute first alternate for juror number six.  She is

16   seated in the next to last seat in the first row.  I'm

17   pointing to the empty seat.  Do you want to think about or can

18   you tell me now what your position is?

19             MR. ECKERT:  We're fine about it, Your Honor.

20             THE COURT:  Mr. -- why don't you talk to your

21   client and see what they say?

22             MR. PATTERSON:  Your Honor, Mr. Smith is okay

23   with the substitute, alternate, rather.

24             MR. WITTELS:  Judge, my client's fine with

25   the -- substituting the alternate.

Page 7

```
 1              THE COURT:  Ms. Meehan.

 2              MS. MEEHAN:  Mr. Quinn as well.

 3              THE COURT:  All right.  That's what we'll do.  I

 4   think what we should do is bring the jury in, have them seated

 5   in their regular seat.  Have them sit in their regular seats.

 6   I'll then explain what happened and not go into any detail,

 7   but we'll then have the first alternate seat -- actually, just

 8   move over one seat.

 9              Now, is there anything else that we have to do

10   vis-à-vis the jury?

11              MS. MEEHAN:  Not from me.

12              MS. MARTIN:  Your Honor, if I may?

13              THE COURT:  Oh, yes, Ms. Martin.

14              MS. MARTIN:  As a logistical matter, would you

15   like me to request permission to call a witness out of order

16   or we would explain the interpreter issue to the jury?

17              THE COURT:  I'll explain the issue.

18              MS. MARTIN:  Okay.  Thank you.

19              THE COURT:  And you're talking about

20   substituting a witness before the cross-examination is

21   complete?

22              MS. MARTIN:  Correct, Your Honor.

23              THE COURT:  No.  I'll do that.

24              MS. MARTIN:  Thank you.

25              THE COURT:  Are we ready, Ms. Hull?
```

Page 8

1          MS. HULL:  We are.

2          (Audio skips from 9:58 a.m. to 10:03 a.m.)

3                    - - -

4          (JESSICA MARTINEZ - SWORN)

5                    - - -

6          DEPUTY CLERK:  Please state your full name for

7    the record.

8          THE WITNESS:  My name is Jessica Martinez.

9          THE COURT:  Good morning.

10         THE WITNESS:  Good morning.

11         MS. MARTIN:  May I proceed, Your Honor?

12         THE COURT:  You may.

13                   - - -

14                   EXAMINATION

15                   - - -

16   BY MS. MARTIN:

17   Q.    Good morning, Ms. Martinez.

18   A.    Good morning.

19   Q.    Ms. Martinez, how are you currently employed?

20   A.    I am employed with Netspend Corporation.

21   Q.    What is Netspend Corporation?

22   A.    Netspend is a prepaid stored valued system.

23   Essentially, we're a prepaid debit card company.

24   Q.    And what's your title and position with that company?

25   A.    I am the legal compliance manager and records custodian

Page 9

1   for Netspend Corporation.

2   Q.    Can you just explain to the ladies and gentlemen of the

3   jury what that means?

4   A.    Sure.  So I produce records for state and federal

5   investigations and any other civil matters that require

6   records production.

7   Q.    And Netspend, you said it's a prepaid debit card

8   company?

9   A.    That's correct.

10  Q.    So you have customers?

11  A.    Yes.  That's correct.

12  Q.    And is this banking in the same way as, you know, Wells

13  Fargo or Chase?  Are you a physical bank?

14  A.    No.  We're not a physical bank.  Essentially, we have

15  issuing banks.  We -- Netspend will do all of the marketing,

16  customer service, product management, but we're not the bank.

17  We have various issuing banks.

18  Q.    Okay.  Now, in your capacity with Netspend, are you

19  particular with the banking records of individual customers or

20  the records that you keep?

21  A.    Yes.  That's correct.  I am.

22  Q.    And what type of information do you record on those

23  records?

24  A.    We produce various activity logs, everything from

25  records -- transaction records, web log and IVR information

1    like that account correspondence and account ownership

2    information.

3    Q.    So you keep the name of the individual customer?

4    A.    Yes.  That's correct.  We do.

5    Q.    The account number?

6    A.    Yes, ma'am.

7    Q.    Any time that a card is used?

8    A.    Yes, ma'am.

9    Q.    All right.  And how are those records actually created?

10   A.    In our regular course of business, we -- when a

11   transaction or activity occurs, we simply have those logs

12   [indiscernible] and information.

13   Q.    Is that done by a computer or by an individual person

14   when someone swipes a card?

15   A.    It's done by a computer.

16   Q.    Okay.  And are you created contemporaneously at the

17   time of the transaction?

18   A.    Yes, ma'am.

19   Q.    And are those records kept by your company?

20   A.    Yes, ma'am.

21   Q.    In what form?

22   A.    In --

23   Q.    Electronic?

24   A.    Electronic, yes.

25   Q.    All right.  And how long are they kept?

1    A.    For the life of the account.

2    Q.    And in total are these records kept in your normal

3    course of business?

4    A.    Yes, ma'am.

5    Q.    Did you or another records custodian for your

6    organization respond to a request for Netspend records related

7    to this case?

8    A.    Yes, ma'am.

9    Q.    And are those records that we requested kept in the

10   normal course of business as you've explained?

11   A.    Yes, ma'am.  They are.

12   Q.    All right.  Would you recognize those records if I

13   showed them to you?

14   A.    Yes, ma'am.  I would.

15   Q.    Okay.  Can I have the witness shown on the screen

16   exhibit 49?

17              THE COURT:  You may.

18              MS. MARTIN:  And Your Honor, may I approach with

19   a physical copy for ease of the witness?

20              THE COURT:  Yes.

21              MS. MARTIN:  Thank you.

22              THE WITNESS:  Thank you.

23              MS. MARTIN:  For the record and for

24   [indiscernible] marked as exhibit 49.

25              THE WITNESS:  Thank you.

Page 12

```
1    BY MS. MARTIN:

2    Q.    Ms. Martinez, did you recognize these records?

3    A.    Yes.  I do.

4    Q.    Okay.  And are those the records that you or your

5    company provided in response to our subpoena in this case?

6    A.    Yes.  They are.

7              MS. MARTIN:  Your Honor, at this time, I would

8    move to admit Exhibit 49 and publish select portions to the

9    jury.

10             MS. MEEHAN:  No objection.

11             MR. PATTERSON:  No objection.

12             MR. WITTELS:  No objection.

13             THE COURT:  Fine.  G49 is admitted into

14   evidence.

15                            -  -  -

16             (Whereupon, Government's Exhibit Number G49 was

17   admitted into evidence.)

18                            -  -  -

19             MS. MARTIN:  Thank you, Your Honor, and

20   permission to publish.

21             THE COURT:  You have permission to publish.

22             MS. MARTIN:  If you could, please, the first

23   page.

24   BY MS. MARTIN:

25   Q.    All right.  Ms. Martinez, the records in question,
```

1    who's the account holder on those records?

2    A.    Maurice Quinn.

3    Q.    And what are the dates covered by the records that are

4    in front of you?

5    A.    From December 29, 2018 to April 18, 2019.

6    Q.    So the records obviously cover the date of March 22,

7    2019?

8    A.    Yes, ma'am, they do.

9    Q.    I'd like to go ahead and turn directly to that date, if

10   you could.  I believe it's going to be Page 3.  Now, the

11   records that are being shown to the jury, can you just briefly

12   explain what we're looking at in terms of the date, the

13   vendor, what the individual columns mean?

14   A.    Sure.  So this is the transaction history posted

15   account.  In the first column is the transaction date.  These

16   dates and times Are Reflected in central time, which is one

17   hour before eastern time.  The second column is a -- under

18   transaction that's the merchant information.  That information

19   is provided to us by -- when a merchant sets up their merchant

20   processing account and system.  The next column is the credit

21   column that's going to reflect any credits to the account.

22   The next column is the debit column, that's going to reflect

23   any debits from the account.  And the last column is the

24   balance column, and that's going to reflect the balance of the

25   account.

1    Q.    Okay.  And just because it's not shown at the top right

2    now, so it's date, vendor, credit or deposit, withdrawal and

3    then the balance?

4    A.    Yes, that's correct.

5    Q.    That's what we're looking at?

6    A.    Yes, ma'am.  That's correct.

7    Q.    All right.  Now the name associated with the vendor

8    that second column, how is that determined?

9    A.    That information is produced by the merchant processor.

10   Netspend doesn't input that information unless it's a Netspend

11   charge.  That information is set up by the merchant.

12   Q.    Okay.  You also mention the time on these records that

13   the time is in central, is that accurate?

14   A.    Yes.  That's accurate.

15   Q.    Okay.  So if the user of this card were in

16   Philadelphia, we need to address the time on the record by an

17   hour?

18   A.    Yes.  That's correct.

19   Q.    So if it says 3:37 on the records, it would be 4:47 in

20   Philadelphia?

21   A.    Yes.  That's correct.

22   Q.    Okay.  I would like to direct your attention,

23   specifically, to March 22, 2019.  Are there any ATM

24   transactions for this account, Mr. Quinn's account, on March

25   22, 2019?

1   A.     Yes.  There are three ATM withdrawals.

2   Q.     All right.  And are each of these transaction for 152

3   East Sharpnack Street?

4   A.     Yes.  That's correct.

5   Q.     Now, the jury in this case has seen video footage from

6   inside that store that begins at 4:50 p.m. on March 22, 2019.

7   A.     Okay.

8   Q.     Are there any transaction in these records at or around

9   4:50 p.m. eastern standard time?

10  A.     Yes.  So it's reflected as March 22, 2019, our records

11  show 3:47 which would be 4:47 here.  There's an ATM withdrawal

12  for $20.85.  It's shown here as $21.85, the $1.85 is a -- most

13  likely an ATM fee, and then there's a $2.50 ATM fee that

14  Netspend charges.

15  Q.     Okay.  So in terms of what's in front of the jury right

16  now, that second to the last line, that's the $2.50 charged by

17  Netspend?

18  A.     Yes.  That's correct.

19  Q.     All right.  And the line below for $21.85, you

20  mentioned something about an ATM fee?

21  A.     Yes.  A $20 ATM withdrawal and a $1.85 ATM fee.

22  Q.     Correct.  So to be clear, the transaction is for 4:47

23  p.m. Philadelphia time for $20?

24  A.     Yes.  That's correct.

25  Q.     That's how much was withdrawn?

Page 16

1   A.    Yes, ma'am.

2   Q.    And after the $20 was removed at 4:47 p.m. what was the

3   remaining balance on the account?

4   A.    The balance reflected on the same day after that

5   transaction is $42.40.

6   Q.    All right.  And the other transaction earlier in the

7   day, at 152 East Sharpnack Street, can you tell the jury what

8   time those transaction occurred and how much they were for?

9   A.    Sure.  So there was a transaction, it would be 1:04 in

10  Pennsylvania time at the 152 East Sharpnack Street for $100

11  with an ATM fee of $1.85 and a subsequent $2.50 Netspend fee.

12  The next ATM withdrawal would've been at 1:53 p.m. shown here

13  as 12:53 p.m. at the same address for $100 with an ATM fee of

14  $1.85 and a subsequent Netspend fee of 2.50.

15  Q.    Okay.  So in total we have a 1:04, $100 withdrawal;

16  correct?

17  A.    Yes.  That's correct.

18  Q.    A 1:53 p.m. $100 withdrawal?

19  A.    Yes.  That's correct.

20  Q.    And a 4:47 p.m. $20 withdrawal?

21  A.    Yes, ma'am.

22  Q.    All right.  And Ms. Martinez, what was the final

23  balance on the account for that entire day?  Is it still that

24  $42.40?

25  A.    Yes, ma'am.

Page 17

1    Q.    All right.  And what about the next day?  What about --

2                  MS. MEEHAN:  Objection to relevance.

3                  MS. MARTIN:  Your Honor, may we see you at

4    sidebar?

5                  THE COURT:  Yes.

6                            - - -

7                      (SIDEBAR BEGINS)

8                            - - -

9                  MS. MARTIN:  Your Honor, my next question was

10   about what happened with the account the next day.  It goes

11   into overdrawn status.  And there's no further deposits on the

12   account until much later.  It's motive for the robbery.  And

13   the records are now already in evidence.

14                  MS. MEEHAN:  Your Honor, there's actually

15   numerous days where it's in a deficit on the account, so I'm

16   not sure what it's probative of.  Before March 22nd and after

17   March 22nd.

18                  THE COURT:  Yeah.  What is the reason?

19                  MS. MARTIN:  So if the -- then my next series of

20   questions is about the payroll deposits that occurred

21   biweekly, all of them were over about $500 after that date,

22   after the date of the robbery, the only amount that came into

23   the account was a $68 twice.  He was no longer being paid by

24   that organization in any way, shape, or form and there is no

25   other deposits.

Page 18

1              THE COURT:  I know, but what [indiscernible].

2              MS. MARTIN:  Your Honor, he was out of money.

3     He was out of money and he was desperate at that point.

4              MS. MEEHAN:  Thank you argue that from the

5     record that Your Honor has admitted.  They can argue that to

6     the jury in closing, but this witness would have no idea why

7     he's getting less payment from his employer and

8     [indiscernible].

9              MS. MARTIN:  I'm not asking her why.  I'm asking

10    her to read it into the jury, as opposed to me having to

11    explain it.  It's a matter of authority.  She's a bank records

12    custodian.  She's telling them this is what the records say

13    and they --

14             THE COURT:  The objection is overruled.

15                            - - -

16                       (SIDEBAR ENDS)

17                            - - -

18             THE COURT:  Before you continue, there will be

19    times during the trial when counsel have an issue they wish to

20    present to me that they cannot present in open court, and

21    that's what just happened.  We call it a sidebar conference.

22             We try to keep them to a minimum and what

23    happened, an issue was raised.  I ruled on it.  Counsel will

24    proceed.

25    BY MS. MARTIN:

1   Q.    Do you need me to repeat the question, Ms. Martinez?

2   A.    Yes, ma'am.

3   Q.    Okay.  So we were talking about the final balance on

4   March 22, 2019, that was the $42.40?

5   A.    Yes.  That's correct.

6   Q.    All right.  And were there any withdrawals that

7   happened the following day on March 23, 2019?

8   A.    Yes, ma'am.

9   Q.    All right.  And how much was that for?

10  A.    There is an ATM withdrawal at 3:00 p.m. at 1337 West

11  Olney Avenue for $100 with a $2 ATM fee, and a subsequent ATM

12  charge from Netspend for $2.50, and two Uber charges to the

13  account one for $9.74 and one for $5.03.

14  Q.    Okay.  And did those transaction cause the account to

15  become overdrawn?

16  A.    Yes.

17  Q.    Were there any deposits into that account between March

18  22, 2019 and April 4, 2019?

19  A.    No.  Just one on April 4th.

20  Q.    Okay.  I'm going to get to that in just a second.

21  A.    Okay.

22  Q.    I'd like to take a step back.  Let's talk about the

23  records in their entirety.  You said they covered the dates

24  of, I believe, December 29, 2018 to April 18, 2019?

25  A.    Yes, ma'am.

1    Q.    Excluding the transactions on March 22nd that we've

2    already talked about, can you tell the ladies and gentlemen of

3    the jury how many times there were ATM withdrawals from that

4    grocery store at 152 east Sharpnack Street?

5    A.    I believe there were seven.

6    Q.    Okay.  And can we go through the dates, please?

7    A.    Yes.

8    Q.    Starting on January 27, 2019, is there a withdrawal

9    from 152 East Sharpnack Street?

10   A.    On January 27th?

11   Q.    Yes.

12   A.    Let's get to that page here.  Sorry, I'm on February,

13   my apologies.  Yes.  January 27, 2019 at 1:58 p.m. a

14   withdrawal for $100 with a $1.85 fee.

15   Q.    Okay.  And let's just quickly go through the rest of

16   the dates.

17   A.    Sure.

18   Q.    February 22, 2019?

19   A.    Yes, ma'am.  One ATM withdrawal for $200.  I'm just

20   going to say the whole amount, the 1.85 is going to be the

21   fee.

22   Q.    Sure.

23   A.    So that withdrawal was for $201.85.

24   Q.    And on 3-7-2019?

25   A.    I'm sorry, what's the date?

Page 21

1    Q.    3-7, March 7, 2019.

2    A.    Yes.  An ATM withdrawal for $201.85.

3    Q.    And March 8, 2019?

4    A.    Yes, ma'am.  An ATM withdrawal for 201.85, and a --

5    Q.    March 10, 2019?

6    A.    An ATM withdrawal for 26.85.

7    Q.    March 21, 2019?

8    A.    An ATM withdrawal for 201.85.

9    Q.    And then there's the three transaction that we already

10   talked about on March 22nd, is that accurate?

11   A.    Yes, ma'am.

12   Q.    All right.  Now, again, going back to the beginning of

13   the records, as far as credits or deposits to the account, is

14   it fair to say that there's a biweekly deposit from some sort

15   of vendor or organization?

16   A.    Yes, ma'am.

17   Q.    Okay.

18   A.    It appears to be payroll.

19   Q.    What's the title of that in the records?

20   A.    Sure.  It's -- shows as 0170RL43 Scalp P Payroll.

21   Q.    Okay.  And prior to March 22, 2019, can we go through

22   the amount of those payroll deposits, starting at the

23   beginning of the records?

24   A.    Yes, ma'am.  There's a credit to the account on January

25   10th, for $686.55.

Page 22

1    Q.    And two weeks later on January 24th?

2    A.    There's a credit to the account for $410.91.

3    Q.    Two weeks later on February 7th?

4    A.    $762.50.

5    Q.    Two weeks later on February 21st?

6    A.    $1,264.93.

7    Q.    Two weeks later on March 7th?

8    A.    $813.29.

9    Q.    Two weeks later on March 20, 2019?

10   A.    $691.67.

11   Q.    Two weeks later on April 4, 2019?

12   A.    $68.27.

13   Q.    Two weeks after that?

14   A.    $68.27.

15   Q.    So the two deposits after March 22, 2019 are both for

16   $68.27?

17   A.    Yes, ma'am.  That's correct.

18   Q.    We discussed a number of transaction that occurred at

19   152 East Sharpnack Street prior to March 22, 2019.  Are there

20   any transaction at that ATM after March 22, 2019?

21   A.    No, ma'am.

22          MS. MARTIN:  Thank you.  I have no further

23   questions, Your Honor.

24          THE COURT:  Ms. Meehan.

25          MS. MEEHAN:  Thank you, Your Honor.

```
 1                           - - -

 2                   CROSS-EXAMINATION

 3                           - - -

 4    BY MS. MEEHAN:

 5    Q.    Good morning, Ms. Martinez.

 6    A.    Good morning.

 7    Q.    I just have a few questions.

 8    A.    Sure.

 9    Q.    Can you explain --

10            THE COURT:  Keep the microphone --

11            MS. MEEHAN:  Oh, certainly.

12            THE COURT:  -- in front of you.

13            MS. MEEHAN:  Certainly.  Thank you, Your Honor.

14    BY MS. MEEHAN:

15    Q.    You explained to the jurors that Netspend is not a

16    physical bank?

17    A.    Yes.  That's correct.

18    Q.    So the majority of the banking for this account and

19    that belongs to Mr. Quinn, was done through a debit card

20    system?

21    A.    Yes.

22    Q.    And in fact, I think you indicated for the government

23    counsel that there were a number of, what's indicated on

24    government 49 as payroll deposits?

25    A.    Yes, ma'am.
```

1    Q.    Okay.  And in other words, payroll means someone had a

2    job and they're getting paid for work?

3    A.    Most typically, yes.

4    Q.    Okay.  And some people get a physical paycheck, a paper

5    pay check; right?

6    A.    Yes.  Yes, ma'am.

7    Q.    And other people get direct deposit to Wachovia or

8    Citizens or something like that?

9    A.    Yes, ma'am.

10   Q.    And then others, like in this case, would get a payment

11   or their paycheck to a debit card?

12   A.    Yes.  That's correct.

13   Q.    Okay.

14   A.    It's an account.  It has an account and routing number

15   with a debit card attached to it.

16   Q.    And you've seen this with other Netspend customers?

17   A.    Yes.  Very common.

18   Q.    It's very common.  Okay.  And then this is also a debit

19   card that you can use to pay for things in a store?

20   A.    Yes.  You can use the store anywhere Visa or MasterCard

21   is accepted.

22   Q.    It's kind of one-stop shopping.  You get your paycheck

23   and then -- and then you can spend it?

24   A.    Yes.  Just like any other bank.

25   Q.    Okay.

1    A.    Yes, ma'am.

2    Q.    So when you were asked about the providing these

3    records, you were provided with these dates from the

4    government, beginning on December 29th; correct?

5    A.    Yes.  Most likely.

6    Q.    You didn't pick December 29th?

7    A.    No, ma'am.

8    Q.    Okay.  And, in fact, you could've gotten records

9    earlier than December 29th if you had been asked?

10   A.    Yes, ma'am.

11   Q.    Okay.  And then you were asked with the cutoff date of,

12   I think it was April 18th you gave us?

13   A.    Yes, ma'am.

14   Q.    Okay.  And going back to this Government-49, I think

15   the government went through a number of deposits with you and

16   they're clearly marked beginning January 10th; correct?

17   A.    Yes.  That's correct.

18   Q.    And there are how many payroll deposits?

19   A.    I believe we counted seven.

20   Q.    Okay.  And in between those payroll deposits and in

21   addition to the grocery store on Sharpnack Street, there's an

22   indication that there are a number of ATM withdrawals at

23   various different places.  Does G-49 reflect that as well?

24   A.    Yes, ma'am.  It does.

25   Q.    And, in fact, on -- if you could look on the Page 3 of

1   your Netspend record, on March 23rd there's an ATM withdrawal

2   at Wilson's Market of $102.

3   A.    Yes, ma'am.  That's correct.

4   Q.    So it looks like -- do you know what the fee would've

5   been there for Netspend?

6   A.    It's a -- yeah.  It's shown on a different line right

7   under that, same date and time for $2.50.

8   Q.    Okay.

9   A.    That's the Netspend fee.

10  Q.    So and going back to Sharpnack, every time Mr. Quinn

11  took money from the ATM at the store on Sharpnack Street the

12  Netspend charged Mr. Quinn $2.50, you indicated?

13  A.    Yes.  That's correct.

14  Q.    And then it looks like the ATM machine itself charged

15  $1.85?

16  A.    Yes, ma'am.

17  Q.    So he was charged by two different entities; right?

18  And the total, my math here is $4.35?

19  A.    I trust your math.

20  Q.    Okay.  I don't trust my math.  I think the jurors can

21  add.  So every time he took his own money out of an ATM

22  machine, that was the charge?  One from Netspend and I'm not

23  passing judgment --

24  A.    Sure.

25  Q.    -- I'm just saying that was the charge, one from

Page 27

1    Netspend and one from the ATM, they were both charging him

2    different fees?

3    A.    Yes, ma'am.  That's correct.

4    Q.    Okay.  One moment, Your Honor.  Thank you Ms. Martinez.

5    A.    Yes, ma'am.

6              MS. MARTIN:  I have no redirect, Your Honor.

7              THE COURT:  Thank you.  I don't think there's

8    any need for any further examination, other defendants, Mr.

9    Patterson?

10             MR. PATTERSON:  Not on behalf of Mr. Smith.  No.

11             THE COURT:  Mr. Wittels.

12             MR. WITTELS:  I just have two questions, if I

13   may?

14             THE COURT:  May the witness be excused?

15             MR. WITTELS:  Judge, I just want to ask two

16   questions, if I may.

17             THE COURT:  Oh, I'm sorry.  I misunderstood you.

18                        - - -

19                  CROSS-EXAMINATION

20                        - - -

21   BY MR. WITTELS:

22   Q.    Your bank does not own the ATM machine, does it?

23   A.    No, sir.

24   Q.    Do you know who does?

25   A.    I do not.

1   Q.    Or who controls it?

2   A.    No.  I do not.

3   Q.    Thank you.

4              MS. MARTIN:  I have nothing based on that, Your

5   Honor.

6              THE COURT:  Thank you.  So your testimony is

7   concluded.  You may step down.  Thank you very much.

8              THE WITNESS:  Thank you.

9              MS. MARTIN:  Your Honor, may this witness be

10   excused for a flight?

11              THE COURT:  Yes.

12              MS. MARTIN:  Thank you.

13              THE WITNESS:  Thank you.

14              THE COURT:  Have a good day.

15              MS. MARTIN:  Your Honor, I do not see the

16   interpreter in the courtroom.  Would you like me to proceed

17   with an additional witness?

18              THE COURT:  Yes.  I believe he would come to the

19   courtroom.  I haven't seen him this morning, so I didn't

20   instruct him to do that.  My colleague said it would take

21   maybe 30 minutes or so starting at 10:00.  So why don't we

22   proceed with another witness.

23              MS. MARTIN:  Okay.  The government calls

24   Detective Colin Goshert to the stand.

25              MS. MEEHAN:  Your Honor, I think we were -- may

1    we see Your Honor at sidebar?

2                        - - -

3                  (SIDEBAR BEGINS)

4                        - - -

5            MS. MEEHAN:  I do understand taking witnesses

6    out of turn, but I warn against co-counsel yesterday who said,

7    you know, we're in the middle of a cross-examination with a

8    crucial witness, and I felt that the defense was flexible, but

9    now taking a detective out of turn.

10           MS. MARTIN:  He's very short.  If you want me to

11   proffer his testimony, that would change your mind.  He knows

12   Mr. Stevens from the area and from the neighborhood.  He

13   identified him from the video and he knows where he lives, and

14   we'll introduce a Google Map for him.  He's a five to

15   ten-minute witness at the most.  We have no substantive

16   involvement with the exception of [indiscernible] video.  And

17   contesting identification.

18           MS. MEEHAN:  No.

19           MS. MARTIN:  But --

20           MS. MEEHAN:  It seems like he's unnecessary

21   witness, but you know, the further we go away from Mr.

22   Ventura's testimony --

23           THE COURT:  We've talking about minutes.  If

24   we're talking about days, something else.  We might be talking

25   about days if we keep delaying.

1              MS. MEEHAN:  That's true.

2              THE COURT:  Yes.  We might not finish Friday at

3       the rate we're going --

4              MS. MEEHAN:  Right.

5              THE COURT:  -- we're not hitting that target.

6              MS. MEEHAN:  Well, I guess in light of the short

7       amount of time, but I don't want to get too far away from Mr.

8       Ventura's testimony from --

9              THE COURT:  We're certainly not going to have

10      Mr. McConnie sitting in the courtroom.

11             MS. MEEHAN:  Yeah.

12             MR. WITTELS:  Judge, I object to his testimony.

13      We already stipulated to his identity, and there's been

14      testimony that he frequents the store, so I don't know why we

15      need a detective to [indiscernible], quite frankly that he's

16      had police contact.

17             MS. MARTIN:  Your Honor, he hasn't had police

18      contact, that is not what I'm imploring.  He knows him from

19      the area.  He knows that he's regularly on the block.  Here's

20      Mr. McConnie.

21             MS. MEEHAN:  Oh.

22             MS. MARTIN:  That solves the problem, but I do

23      have more to say on elements [ph].

24             THE COURT:  Well, let's finish with that

25      witness.  I also ought to tell you that I do not favor regular

Page 31

```
 1    sidebar conferences.  We don't have to get up and down.  You

 2    ought to know how I rule.  My ruling is [indiscernible].

 3              MS. MEEHAN:  I haven't had a trial before, Your

 4    Honor.

 5              THE COURT:  Oh, I thought you had.  Well, now

 6    you have.  Patterson and Wittels have.  I was a trial lawyer

 7    for many, many years and so be sure you're solid with your

 8    objections.  Do you want to finish your proffer?

 9              MS. MARTIN:  Yes, please, Your Honor.  Your

10    Honor, the fact that counsel has acknowledged in the opening

11    that he frequents the store, he's around there, that's not in

12    evidence in a meaningful way.  I still have the burden to

13    establish that he's in the area, not to mention that the fact

14    that the owner of the store [indiscernible] he's going to

15    testify as to where she lived, and how the defendant knew that

16    he lived in that area, and it relates to the threats he made

17    on that video that he would be back.  It leads to why he

18    stayed in the store, establishing where he lived on that

19    [indiscernible].

20              THE COURT:  Mr. Wittels.

21              MR. WITTELS:  The final witness has already

22    testified that he was frequently in the store.  So I don't

23    know what we gain by having a detective say that he frequents

24    in that [indiscernible] H.

25              THE COURT:  Is the test how much we gain or
```

Page 32

1    lose?

2              MR. WITTELS:  Well, does he gain anything as

3    opposed to the fact there's a detective testifying, there's --

4    he knows him --

5              THE COURT:  Gaining or not gaining is not an

6    issue.

7              MS. MEEHAN:  It's an issue of probative, Your

8    Honor.  It's not probative.

9              THE COURT:  I think it is probative, so the

10   objection is overruled.

11             MS. MARTIN:  Thank you, Your Honor.

12             THE COURT:  Mr. Wittels.

13             MR. WITTELS:  Sorry.

14             THE COURT:  Not dramatic [indiscernible].

15             MS. MARTIN:  I think we'll be short.

16                           - - -

17                       (SIDEBAR ENDS)

18                           - - -

19             THE COURT:  Ladies and gentlemen, our

20   interpreter has appeared in the courtroom and we'll proceed

21   with the cross-examination of Mr. Ventura, the witness who

22   testified yesterday.

23             MR. ECKERT:  May I step outside and retrieve

24   him, Your Honor?

25             THE COURT:  Pardon me?

1           MR. ECKERT:  May I step outside to ask Mr.

2    Ventura to come in the courtroom?

3           THE COURT:  You may.

4           MR. ECKERT:  Thank you.

5           THE COURT:  Mr. Ventura, I remind you that you

6    are under oath.  We will proceed with the cross-examination by

7    counsel for Mr. Quinn.

8           Ms. Meehan.

9           MS. MEEHAN:  Thank you, Your Honor.

10          INTERPRETER:  Yes, Your Honor.

11                          - - -

12                    CROSS-EXAMINATION

13                          - - -

14   BY MS. MEEHAN:

15   Q.    Good morning, Mr. Ventura.

16   A.    Good morning.

17   Q.    I represent Mr. Quinn.

18   A.    Okay.

19   Q.    And you had indicated, I believe yesterday, that you

20   know Mr. Quinn.

21   A.    I had seen him at the store.

22   Q.    Right.  Maybe you don't know him by name, but he's a

23   frequent customer?

24   A.    Exactly.

25   Q.    He's a steady customer?

1  A.    Yeah.  He would come frequently.

2  Q.    So and he would come sometimes to use the store ATM

3  machine?

4  A.    I don't know.  I can only say that I used to see him

5  frequently at the store, but he wouldn't go to the ATM every

6  time he came in.  I can't say that every time I saw him he was

7  going to the ATM.

8  Q.    No.  Understood.  Sometimes he would use the ATM and

9  sometimes he would buy food or groceries?

10  A.    He may have used the ATM before purchasing some

11  articles from the store, but I wouldn't know that.

12  Q.    Okay.  Well, moving on, you go by the name Jay?

13  A.    Yes.  They say that to me.  They call me by that name.

14  Q.    Is that a yes or no, Jay?  Is your name for Joel, Jay?

15  A.    Yes.

16  Q.    And neighbors, customers also call you Papi?

17  A.    Well, Papi is just a, you know, it's a common name for

18  each one of us, you know, that's what we call each other

19  sometimes.

20  Q.    Understood.  So that's a yes or no question.  When

21  people come into the store, do they say, hola, Papi or hi,

22  Papi, or hi, Jay?

23  A.    Yes.

24  Q.    Okay.

25  A.    Papi this, Papi that, Papi the other thing and --

1    Q.    Right.  And on the day in question, you were in the

2    store.  You work long hours.  You were in the store starting

3    at 8:00 a.m.

4    A.    Correct.

5    Q.    On March 22nd, you started at 8:00?

6    A.    Correct.

7    Q.    And that was a Friday?

8    A.    I don't remember the exact day.

9    Q.    Okay.  And in the store, and I'm going to ask you to

10   look at your screen.  Do you see that on your screen?

11   A.    Yes.  I'm looking at it.

12   Q.    And could you explain -- do you recognize that?

13   A.    It's the ATM at the store.

14   Q.    Right, but above that, there looks to be a large TV

15   screen.

16   A.    Yes.  There are screens.  There's a snacks, there's

17   caps.

18   Q.    Okay.  Did the store look pretty much this way on March

19   22, 2019?

20   A.    Well, there said there were some changes made at the

21   store, I don't know if it was normal, the same way.

22   Q.    Well, maybe my question wasn't clear.

23   A.    But the new owner did change some things around.

24   Q.    Okay.  This screen that's -- this TV screen, that was

25   there on March 22nd, the one that says Sylvania at the bottom?

1    A.    Well, the screen has been there ever since.  Yes.

2                MS. MEEHAN:  Your Honor, I would ask to publish

3    Defense Exhibit 8.

4                THE COURT:  Well, first of all, you haven't

5    identified what's on the screen.

6                MS. MEEHAN:  I'm sorry.

7                THE COURT:  Is that what's on the screen?

8                MS. MEEHAN:  Yes.  There's a TV screen that --

9    I'll ask another question.  I'm sorry.

10   BY MS. MEEHAN:

11   Q.    So this reflects, this screen reflects the cameras that

12   are throughout the store and outside the store?

13   A.    Well, that's the screen that's on here.  Yes.

14               MR. ECKERT:  I'm sorry, Your Honor, can I just

15   talk to Ms. Meehan for one second?

16               THE COURT:  Absolutely.

17               MR. ECKERT:  Thank you.

18               MS. MEEHAN:  Your Honor, permission to publish

19   D-8.

20               THE COURT:  Is D-8 on the screen now?

21               MS. MEEHAN:  Well, it's on Mr. Ventura's screen.

22               THE COURT:  And my screen?

23               MR. ECKERT:  I have it.

24               THE COURT:  All right.

25               MR. ECKERT:  No objection, Your Honor.

1          THE COURT:  And are you moving it into evidence?

2          MS. MEEHAN:  I will, yes, Your Honor.

3          THE COURT:  Is there any objection to moving

4   defense exhibits into evidence in the government's case?

5          MR. ECKERT:  No, Your Honor.

6          THE COURT:  Fine.  Then D-8 is received in

7   evidence.  And by the way, this triggers the need for an

8   exhibit list?

9          MS. MEEHAN:  Yes, Your Honor.

10          THE COURT:  Well, not tomorrow or the next day.

11          MS. MEEHAN:  Very well.

12          THE COURT:  Lunch.

13          MS. MEEHAN:  Yes, Your Honor.  Thank you.

14   BY MS. MEEHAN:

15   Q.   So you see --

16                          -  -  -

17          (Whereupon, Defendant's Exhibit Number D-8 was

18   admitted into evidence.)

19                          -  -  -

20          THE COURT:  D-8 is received into evidence.  And

21   may be published.

22          MS. MEEHAN:  Thank you.

23   Q.   So this screen has a number of different squares within

24   it and that --

25   A.   That's right.

Page 38

1    Q.    And it just reflects different parts of the store and

2    it includes the exterior of the store?

3    A.    Yes.  That's correct.

4    Q.    And that's right above the Tastykake stand?

5    A.    That's correct.  The corner.

6    Q.    Okay.  And that's about, would you say, maybe six to

7    eight feet from the counter where people pay?

8    A.    Exactly.  It's like right up in front somewhere, you

9    know, higher.

10   Q.    Okay.  And on March 22nd, Mr. Quinn had been in the

11   store a few times before 5:00 p.m.; do you recall that?

12   A.    I don't remember.

13   Q.    Okay.  But then at 5:00 or around then, it was at

14   quarter of, ten of 5:00 p.m., he comes up to the counter and

15   wants to buy cigarettes?

16   A.    Yet.  That was after he went to the ATM.

17   Q.    Oh, so you saw him go to the ATM?

18   A.    Exactly.  Yes.  I saw him when he went to the ATM.

19   Q.    Okay.  But you didn't see him on two hours earlier use

20   the ATM machine that day?

21   A.    I don't know.

22   Q.    And a couple hours before that, you didn't see him use

23   the ATM machine?

24   A.    No.  I don't know.

25   Q.    Okay.  And then he hands you $20 to pay for the

1   cigarettes?

2   A.    Correct.

3   Q.    And you look at it and you tell Mr. Quinn, I can't take

4   this money?

5   A.    He put the $20 on top of the counter.

6   Q.    To pay for the cigarettes?

7   A.    That's correct.  And that money is false.

8   Q.    Well, you told him it was false?

9   A.    I confirmed that it was false.  I saw it and then I

10  took my pen --

11  Q.    Okay.  Sir --

12  A.    I scratched it and then I told him that it was false.

13  Q.    But you -- that's what I said.  You told him it was

14  false?

15  A.    Yeah.  I --

16  Q.    Okay.

17  A.    I remarked to him that it was false.

18  Q.    Right.  And then he said, no, it's not false, and then

19  you pulled your pen out to demonstrate?

20  A.    I repeat myself again, he passed the bill, I noticed

21  that it was false and then I wanted to make sure, and I

22  confirmed by scratching it with a pen and then I communicated

23  to him that it was fake.  That's when the whole thing started.

24  Q.    Understood.  And so then, he tells you, he's a little

25  bit annoyed at this moment, right?

```
                                                              Page 40
 1   A.    Exactly.  And too -- and it was thereafter, you know,

 2   that he got a rise in his temperament.

 3   Q.    So and then he pulled out money and he spread it onto

 4   the counter.

 5   A.    Exactly.  He had money and he threw it on the counter.

 6   Q.    And can you look on your --

 7              MS. MEEHAN:  Your Honor, this is already in

 8   evidence.  I would ask to publish D-11.  This is part of the

 9   video that the government admitted.

10              MR. ECKERT:  No objection, Your Honor.

11              THE COURT:  You may.  And what is the --

12              MS. MEEHAN:  D-11, Your Honor.

13   BY MS. MEEHAN:

14   Q.    So in this picture, your hand is at the bottom right of

15   the screen, and those are -- this is Mr. Quinn here pointing

16   to the bill?

17   A.    That's correct.  That's what I'm seeing here on the

18   screen.

19   Q.    Okay.  And he's telling you, this money came from the

20   ATM machine.

21   A.    Yes.  That's what he's telling me.  I had to replace

22   that money, because he had pulled it out of the ATM.

23   Q.    Right.  And he's trying to show you, he's telling you

24   the ATM from your store, that's where the money came from?

25   A.    Yes.  Exactly.  It was definitely [indiscernible] that
```

Page 41

1  money from the ATM, that I don't give him the money like right

2  now.

3  Q.    Right.  Because he had -- he wanted to make an

4  exchange.  He wanted his real money for what came from your

5  store; correct?

6  A.    No.  He was just pressuring me to get him money.

7  Q.    And but he had put the bills on the counter for you?

8  A.    He didn't put them there, he just threw them on the

9  counter.

10  Q.    Well, isn't later he's trying to hand it to you?  He

11  goes around and is handing you the money?  He's trying to get

12  you to take the money and give him real money?

13  A.    Well, I'm just clearing this up, because he may put

14  something and throwing it is just two different things, you

15  know.

16  Q.    Well, let's just take a look at what transpired.  And

17  sir, while --

18          THE COURT:  There's an exhibit on the screen,

19  what is it.

20          MS. MEEHAN:  I'm sorry, Your Honor.  If I may

21  have a moment, Your Honor.

22  BY MS. MEEHAN:

23  Q.    So sir, when you're -- when he's --

24          THE COURT:  Pardon me.

25          MS. MEEHAN:  Your Honor, I can't find it on the

1    screen right now.  I'll have to come back to that.

2              THE COURT:  Well, there's something on the

3    screen and it's not going to be on the screen any longer

4    unless you can identify it.

5              MS. MEEHAN:  I'll take it off.  Okay.  Well,

6    that was D-11, Your Honor.  You can take that down.

7              THE COURT:  D-11 is received, it is also part of

8    the government exhibit, Mr. Eckert?

9              MR. ECKERT:  It is, Your Honor.

10             THE COURT:  What government exhibit?

11             MR. ECKERT:  1-A, Your Honor.  Thank you.

12   BY MS. MEEHAN:

13   Q.   So Mr. Ventura, you're telling him at this moment, over

14   and over again, that's not my problem.  The fact that the

15   machine gave fake money to him?

16   A.   That's what I was trying to explain to him to calm

17   down, that what happened to him was separate and apart from

18   the store and we have to call the people that were in charge

19   of the machine.

20   Q.   Right.  So you call Ms. Rodriguez on your phone?

21   A.   Exactly.

22   Q.   Okay.  And you're on the phone with Ms. Rodriguez, and

23   you put her on speakerphone?

24   A.   Yes.  And I passed it onto him.

25   Q.   Right.  You gave your own phone to Mr. Quinn?

1  A.    Exactly.  So she could maybe explain things better than

2  I could.

3  Q.    And Ms. Rodriguez was explaining to him the machine is

4  in the store, but it's not our problem, we have to go to

5  somebody else to fix the fake money?

6  A.    I'm not sure what she talked about.  I just passed my

7  phone to him.  It's Lisa Rodriguez perhaps can answer your

8  question.

9  Q.    Okay.  Well, I'm sorry --

10  A.    They talked with one another.  I don't know what they

11  were saying to each other.

12  Q.    Going back to speakerphone, Ms. Rodriguez, on

13  speakerphone, was talking to you and Mr. Quinn saying that we

14  don't own the machine, I'm going to have to call somebody

15  else.  We can't take care of this right now, essentially;

16  right?

17  A.    Yes.  If I had spoken perfect English or they had been

18  speaking Spanish, I may know what it was that they were saying

19  to each other, but I cannot be sure [indiscernible] what they

20  were talking about.

21  Q.    Okay.

22  A.    Besides there were other customers at the store and I

23  was trying to take care of them.

24  Q.    Sure.  And we've established the other customers at the

25  store are English speaking.  They are all in -- English

1    speaking.  You have no Spanish-speaking customers?

2    A.    Except Emmanuel who is a worker at the store, he speaks

3    Spanish/English.

4    Q.    Right.  But your customers all speak English, you've

5    indicated yesterday?

6    A.    Yes.  The customers did speak English.

7    Q.    And you were the cashier?  Twelve hours a someday?

8    A.    That's right.

9    Q.    So --

10   A.    That is my job.  I'm the cashier.

11   Q.    Right.  And so after this argument that Mr. Quinn is

12   angry and that goes on for several minutes; correct?

13   A.    Exactly.  I don't know how long, but what happened,

14   happened.

15   Q.    So he then, Mr. Quinn, goes -- comes behind the

16   counter?

17   A.    Exactly.

18   Q.    And if I could -- I want you to take a look at D -- if

19   I may have a moment, Your Honor.  This is part of the

20   government exhibit and I'll call it D-3.

21            THE COURT:  Part of what government exhibit?

22            MS. MEEHAN:  This is a still shot of the store.

23            THE COURT:  Of part of --

24            MS. MEEHAN:  Can that be -- it is.  It's part of

25   Government 1-A, Your Honor.  I'm sorry, Your Honor, just a

Page 45

1    moment.  I'll move on.

2    BY MS. MEEHAN:

3    Q.    So Mr. Quinn comes behind the counter, so then he is

4    still arguing and screaming at you, give me my money; correct?

5    A.    Yes.  He was screaming at me.  He was pushing me.

6    Q.    And it's fair to say that he said to you, give me or

7    demanded, give me my money, at least 20 times or more at this

8    point.

9    A.    Yes.  That's what he was saying.  Give me my money.

10   Give me my money.  Right now.  Right now.

11   Q.    Okay.

12   A.    And he was saying a few other things that I couldn't

13   understand.

14   Q.    He was cursing, he was yelling?

15   A.    He was screaming at me, you know, I don't know what

16   else he was saying.

17   Q.    And I want to play for you the exchange where he's

18   behind the counter and he's yelling at you.  And that's in

19   evidence.  That's part of Government T-1A, Your Honor.  So at

20   this point in time, Mr. Quinn, you're -- you've got your phone

21   out; correct?

22   A.    Yes.

23   Q.    You're on speakerphone?  And he's -- this entire time,

24   you can't hear anything, but this entire time he's saying I

25   need my money, give me my money, this came from your store

1    machine.  And there are other customers in the store during

2    this time; correct?

3    A.    Yes.

4    Q.    So this is going on and this entire time you were

5    telling him not my problem, can't help you today.  Well, not

6    that it's not a problem, but it's not my problem.  It's not

7    the store's problem.

8    A.    I was telling him calm down that it was not my problem.

9    That the ATM is separate from the store and that was going to

10   be solved once he calmed down.  That's what I was trying to

11   tell him.

12   Q.    And then when he's behind the counter and we're going

13   to look at that now.  And this is the first time -- there he

14   is and you can see at the bottom of the screen he's trying to

15   give you money; correct?

16   A.    Yes.  I'm looking at it.

17   Q.    And you're still refusing to exchange money from the

18   register?

19   A.    [Indiscernible] take his money, it was fake money.

20   Q.    Well the -- all hundred dollars from your -- the store

21   machine was fake.

22   A.    Not the whole 100.  Four of the five twenty-dollar

23   bills.  Four, well, four were false and one was good.

24   Q.    Well, you only used the pen on one, you said.

25   A.    And one of the false -- I was able to notice that one

1    of the five bills was different from the other.

2    Q.    Okay.  So now, we're going to keep going here.  He

3    comes -- he's trying to hand you the money there and he is

4    screaming at you and pointing.

5    A.    Correct.

6    Q.    And when, sir, after March 2nd was the first time you

7    saw the video?  This video?

8    A.    I saw it the same day of the case when this trouble

9    took place.

10   Q.    Well, what time did you see the video?

11   A.    I can't tell you the exact time.  I can only say what

12   happened there.

13   Q.    Okay.

14   A.    It was [indiscernible] yesterday, it was a few months

15   ago.

16   Q.    Right.  So -- keep playing -- so he's still yelling and

17   you're trying to help a customer and then -- and then you grab

18   your gun from one of the cubbies?

19   A.    Correct.

20   Q.    Okay.  And Mr. Quinn pulls back?

21   A.    He pulled back, and I picked up the gun and I put it

22   next to my leg and I said, calm down, calm down.

23   Q.    Right.  Now, sir, when you went to the police station

24   that same evening, March 22nd, you were interviewed by a

25   detective, Detective Canon [ph].

Page 48

1   A.    I was brought to the precinct on that day.

2   Q.    The question, were you interviewed by a detective?

3   A.    Yes.  I didn't know whether it was police officer or a

4   detective.  I was interviewed on that day.

5   Q.    Right.  And you had a Spanish-speaking interpreter?

6   A.    Yes.  It was an interpreter there.

7   Q.    Right.  And just like Mr. McConnie today, word for

8   word?

9   A.    Correct.

10  Q.    And you told the detective that Mr. Quinn tried to take

11  your gun.

12  A.    That's what he was asking.

13  Q.    You said tried to take my gun.

14  A.    He was coming right on me, that's what he was demanding

15  from me.  What did you want me to do, to let him --

16  Q.    Do you --

17  A.    -- take the weapon?

18  Q.    Well, do you need to see the video?  He didn't get

19  anywhere near the cubby.

20  A.    Well, no, don't try to confuse me, because on this

21  videos and --

22  Q.    Well --

23  A.    We all know what happened that day.

24  Q.    Sir, I'm going to ask you to look at D-23.  And I guess

25  I'll have to ask the assistance of the interpreter.  You read

Page 49

1    English; correct?

2    A.    No.  I don't know English.

3    Q.    Well, you signed this statement, right?

4    A.    My signature is there, because they put it in front of

5    me and told me to sign it.

6    Q.    Well, will you agree with me, you told the detective,

7    he tried to take my gun?  And then, sir, you saw the video,

8    and Mr. Quinn doesn't go anywhere near the cubby where your

9    gun was.

10   A.    He cannot come close to it, because [indiscernible] in

11   order for [indiscernible] cubicle where the weapon was at, he

12   would've had to fly over me, you know.

13   Q.    Of course, he couldn't.

14   A.    Or get under me.

15   Q.    And you didn't tell the detective that night that Mr.

16   Quinn demanded your Glock, that's your word, your Glock.

17   A.    It's not the same thing.  That [indiscernible] than

18   what happened that day, I was there, it was not

19   [indiscernible] I had no idea, then there was -- it was six

20   months ago, however long, you know, it was that all of this

21   happened.

22   Q.    Well, Mr. Quinn had never been behind the counter

23   before, had he?  No.

24   A.    He had never passed behind the counter, no.  The only

25   ones that would go behind the counter --

1    Q.    So --

2    A.    -- was Isaliza and the other coworker.

3    Q.    So, it's after you're confronted with the video

4    evidence that you now say, or you said sometime after March

5    22nd, oh, Mr. Quinn actually demanded the Glock.  You

6    identified the gun as a Glock?

7    A.    It's not that all this time [indiscernible] I hasn't

8    said that.  I've always said that.  Give me the Glock is what

9    he was saying.  I'm not making this up right now.

10   Q.    No.  I'm not saying that, sir, but you didn't say that

11   on the night of incident, March 22nd.

12   A.    The day I was brought over to the precinct, it's not --

13   it's not same thing as being here right now, sitting, I was

14   nervous at the precinct.  There was a lot of questions coming

15   my way, lots of stuff, maybe it was --

16   Q.    Well, that seems to be something important.  You told

17   him about the money he was demanding.  Sir, yesterday you were

18   asked on cross-examination about a moment when you may have

19   cocked or racked the gun.

20   A.    Would you repeat the question for the interpreter

21   [indiscernible], please?

22   Q.    Yes.  I'm sorry.  Yesterday, you were asked a series of

23   questions by defense counsel, about a moment that you may have

24   racked the gun.

25   A.    I don't know what you mean.

Page 51

1    Q.    You were asked yesterday if when you had the gun in

2    your hand -- you took the gun from the cubby, you put it by

3    your side, and --

4    A.    I cleared that up yesterday, I thought.

5    Q.    Well, I'm not sure it's --

6    A.    I don't know why I should repeat that, but I --

7    Q.    Well, let's go look at the video again.  You denied

8    ever racking the gun or cocking the gun, in other words,

9    getting it ready so that it would be able to shoot.  So here

10   you are, and by the way, when you're here in this part of the

11   video.

12   A.    But it's not on my screen.

13   Q.    After you pulled the gun -- I'll fix that.

14         MR. ECKERT:  The video is on the witness'

15   screen.  I apologize for interrupting, Ms. Meehan.  Just know,

16   his screen is not up.

17         MS. MEEHAN:  Okay.  It's not working then.

18         MR. ECKERT:  Right.  Exactly.  I don't mean to

19   interrupt you.

20         MS. MEEHAN:  That's okay.

21         THE COURT:  Is there a problem with the screen?

22   We're having a problem with the screen on the witness stand.

23   It's not showing it.  Do you have stills?

24         MS. MEEHAN:  I don't know if he could come down

25   look at -- I guess he could -- I don't know if --

1    BY MS. MEEHAN:

2    Q.    Mr. Ventura, can you see the large screen here?

3    A.    I mean I -- I can see myself.

4              MR. ECKERT:  Could you just use the TV, it's

5    right here?

6              MR. PATTERSON:  Your Honor, I would request that

7    he have the opportunity to describe what he is seeing rather

8    closely to the monitor.

9              THE COURT:  I agree.  Mr. Eckert, what did you

10   have to suggest?

11             MR. ECKERT:  Your Honor, I just respectfully

12   would suggest that we take a TV -- it's on the [indiscernible]

13   the left-hand side of the jury box and turn that towards Mr.

14   Quinn -- I'm sorry, Mr. Ventura, if we could, and the jurors

15   could be able to see on their personal screens.

16             THE COURT:  I think we should do that.  Well, we

17   don't have to do it -- Mr. Cosgrove, if we could do it in such

18   a way that the jurors can see the big screen if they choose

19   to.  We don't turn it the way it's turned now, and the witness

20   can step down from the witness stand.  You know it can be --

21   we can turn it still more so the jury can see the big screen.

22             MR. ECKERT:  And if Mr. Ventura can get down

23   from the stand.

24             THE COURT:  And Mr. Ventura can step --

25             THE WITNESS:  I can see -- I can see it from the

Page 53

1   witness stand.

2          MS. MEEHAN:  Okay.  Your Honor, and may I

3   approach?

4          THE COURT:  You may.  Can the jurors see the big

5   screen?  It's a little difficult and a little distorted.  Are

6   you able to see on your small screens?  If anything goes wrong

7   where the small screen projection, let me know by raising your

8   hand.  Mr. Ventura, can you see the screen?

9          THE WITNESS:  Yes.

10         THE COURT:  You're looking at the large screen

11  now.

12  BY MS. MEEHAN:

13  Q.   So Mr. Ventura, just so we're clear, this area here,

14  these are these cubbies and your one, this [indiscernible] is

15  somewhere in here.

16         THE COURT:  Are you going to identify what

17  you're pointing to.

18         MS. MEEHAN:  Oh, Your Honor, yes.  I'm looking

19  at the cubbies, there's store products, it looks like a

20  plexiglass cubby.

21         THE COURT:  But the way to identify it for the

22  record is to say I'm pointing to what appears on the lower

23  right, the lower left, the upper middle.

24         MS. MEEHAN:  Thank you.

25         THE COURT:  Whatever.

Page 54

1         MS. MEEHAN:  Very well.

2         THE COURT:  So that when you read the record,

3   you don't get here or there.

4         MS. MEEHAN:  Right.

5         THE COURT:  It doesn't tell us anything.

6         MS. MEEHAN:  I apologize.  I'll correct that,

7   Your Honor.

8   BY MS. MEEHAN:

9   Q.    So Mr. Ventura, I'm point to and I'm on the right side

10  of the screen, and these are the -- you saw this as part of

11  government's exhibit yesterday, these are the cubbies where

12  you have a lot of merchandise.

13  A.    I can't see.

14  Q.    And among that merchandise in one of these cubbies we

15  found [indiscernible] the lower right of the screen, is the

16  store gun or was the store gun?

17  A.    Exactly.  It was in one of those cubicles.

18  Q.    Right.  So and you reached over and pulled it out, the

19  middle cubicle here, cubby.

20  A.    It was in one of those little cubicles, yes.

21  Q.    Okay.  And you put it at your side?

22  A.    Yes.

23  Q.    And Mr. Quinn stepped back and then he left.

24  A.    When I put the gun down by my knees, I said, take it

25  easy, Papi, take it easy.  And he left.

Page 55

1    Q.    Okay.  And Mr. Stevens, and you know Mr. Stevens was

2    the big guy you identified.

3    A.    Yeah, the big one, right.

4    Q.    He was -- he was on the other side of the counter, the

5    counter window?

6    A.    Yes.  He was screaming at me from the other side of the

7    counter.

8    Q.    And he was there after Mr. Quinn left.

9    A.    After Quinn went back with the other side of the

10   counter, on the inside.

11   Q.    After Mr. Quinn left the store?

12   A.    Exactly.  He left.

13   Q.    Okay.  And at some point when you're talking to Mr.

14   Stevens, you pulled your left hand down to the gun, your right

15   hand.

16   A.    No.  I just -- basically, I just crouched and I was

17   holding the gun with both hands.

18   Q.    Okay.  So --

19   A.    And it was between my knees.

20   Q.    Are you saying you never pulled the slider of the gun

21   back?

22   A.    How can you possibly that I cocked it?

23   Q.    Well --

24   A.    I just had my hand on top of it.

25   Q.    Well, Mr. Ventura, let's look at the video.  If we

1    could play -- you could see your -- your left hand and your

2    sort of gesturing.

3    A.    Yes.

4    Q.    And then right -- your left hand, still, you're talking

5    to Mr. Stevens.

6    A.    Yes.

7    Q.    We're going to watch it a little bit slower.  And right

8    there, you put your left hand where the gun was.  Did you see

9    that, Mr. Ventura?

10   A.    I'm looking at it.

11   Q.    And then later, you were in the store well after Mr.

12   Quinn left, and Mr. Stevens is there.  There's Mr. Stevens.

13   Is that Mr. Stevens in the white sweat suit?  Gray sweat suit?

14   A.    Yes.  I'm seeing him.

15   Q.    And Ms. Rodriguez is in the doorway there.  And --

16   A.    Yes.

17   Q.    And you were in the lower right corner here and there's

18   a customer in front of the soda refrigerator.

19   A.    Yes.  That's right.  I'm serving him.

20   Q.    And there's a moment when Ms. Rodriguez comes in and

21   Mr. Stevens starts to talk to her and let's look at that

22   again.  And he is telling her that you packed the gun, when

23   you were talking to him?

24   A.    He's saying that.  I -- I didn't.  Or I don't know what

25   it was that they talked about in there.

Page 57

1   Q.    Well, you just said, he's saying that.  He was telling

2   Ms. Rodriguez that things got really scary when you cocked the

3   gun.

4   A.    I don't know what they talked about.  I don't know what

5   they were saying to each other.

6   Q.    You see that; right?

7   A.    I'm looking at it.

8   Q.    So you're saying that you didn't understand a word what

9   Mr. Stevens was saying when he was [indiscernible]?

10  A.    No.  I didn't understand.

11  Q.    Despite the 12 hours a day you deal with only

12  English-speaking customers.

13  A.    The time that I spend in the store has absolutely

14  nothing to do with what happened here today.  [Indiscernible]

15  what they want, I'm not there to argue with anybody.

16  Q.    So moving on, you -- when Mr. Quinn leaves the store

17  after you have the gun at your side, Mr. Stevens stays a

18  couple more minutes -- take that off the screen, please -- and

19  at some point Mr. Quinn comes back in the store by himself and

20  he's still angry; right?  You told us yesterday --

21  A.    He was -- he was angry.

22  Q.    -- he was still saying give me my money.  Give me my

23  money, over and over again.

24  A.    Exactly.  He's angry, and he's saying that and all

25  kinds of other things that I couldn't understand.

1   Q.    And we saw then that he went behind the counter, the

2   second time -- he went behind the counter a second time where

3   the register is.  Mr. Quinn -- Mr. Quinn, my client.

4   A.    No.  He only came in there once.  I -- when I went out,

5   when I went outside, then when they all tried to take my gun,

6   that's when he approached the cash register, then he went out

7   again and he made me go to the cash register and open it up to

8   him.

9   Q.    Well, Mr. Ventura, let's just be clear, he was in the

10  store, you had the angry conversation about the cigarettes and

11  the $20 and the ATM machine; right?  Yes.  And then Mr. Quinn

12  went behind the counter and you grabbed your gun from the

13  cubby.  That was the first time he was behind the counter.

14  A.    That was the first time that he came around into the

15  space.

16  Q.    And we've established he left after that and came back

17  in --

18  A.    And then --

19  Q.    -- by himself.

20  A.    I was going to the door and I wasn't able to lock the

21  front door and that's when we kind of bumped into each other.

22  Q.    Okay.  He came back and then there was a second time he

23  went behind the counter to the register.

24  A.    Yes, that's when the others came in.

25  Q.    They came in some time after him.

Page 59

1    A.    That's right.  Exactly.

2    Q.    Okay.

3    A.    He came in first.

4    Q.    Correct.  And at that point in time, he tells you to go

5    back.  He can't get the register open; right?  There's only

6    one button that opens it.

7    A.    Exactly.  After we came face to face with each other,

8    when I was trying to lock the front door, that's when he came

9    in behind the counter and he wanted me -- they were pushing me

10   around and he wanted me to open the cash register.

11   Q.    No, sir.  It wasn't they, Mr. Quinn wanted you to open

12   the register.  Mr. Quinn pushed you.

13   A.    Yeah, the [indiscernible].

14   Q.    That's right, Mr. Quinn.

15   A.    [Indiscernible] the names, I can -- I cannot, you know,

16   I cannot --

17   Q.    Okay.  I apologize.

18   A.    -- you know, I cannot remember the names.

19   Q.    The bald one.

20   A.    You say, you know, John, Peter, or Louie, maybe, but --

21   Q.    So then you go to the register after he can't get it

22   open.  And you count out and here you are, you've opened the

23   register now, and this is at 16:58:24.  And you take out five

24   $20 bills and here you are counting, one, two, three, four,

25   five.

```
                                                          Page 60
 1    A.      That's correct.

 2    Q.      And you hand them to Mr. Quinn at 16:58:19.  And we --

 3    you told us yesterday there was more money in the register,

 4    right?

 5    A.      In the cash register, there was more money.  There were

 6    ones, fives, tens and twenties.

 7    Q.      From the whole day of business; correct?

 8    A.      Exactly.  You know, I mean, as the sales went on, you

 9    know, we keep the money there.

10    Q.      And after you gave the five $20 bills to Mr. Quinn, he

11    left the area of the register; correct?  He went out front

12    where the customers are.

13    A.      Yes.  He stepped backwards.  He went around the counter

14    and stayed there.

15    Q.      He didn't take any socks, any Slim Jims, any store

16    merchandise.

17    A.      I don't know.

18    Q.      Well, you would know.  Did you give him any money

19    beyond the five $20 bills from the register?

20    A.      Well, he obliged me into giving him that money.

21    Q.      Right.  You didn't give him any more than $100.

22    A.      Exactly.  Just $100.

23    Q.      And you didn't give him any merchandise from the store.

24    He didn't ask for any.  It's a yes or no.

25    A.      [Indiscernible] he wasn't asking for a soda or a cab,
```

1    he was asking for the money.

2    Q.    Correct.  His $100 --

3    A.    That's what I gave him.

4    Q.    Right.  Thank you.

5              THE COURT:  Is there any redirect?

6              MR. ECKERT:  There will be brief redirect, Your

7    Honor.  Let me go through the 51 Bravo not to the jury, just

8    to the witness -- you know, I'll -- if I may give the witness

9    a copy, Your Honor, the hard copy of the exhibit.

10             THE COURT:  Of what exhibit?

11             MR. ECKERT:  It's his grand jury testimony.  51

12   Bravo.

13             THE COURT:  You may do so.

14             MR. ECKERT:  Thank you.

15                          - - -

16                     CROSS-EXAMINATION

17                          - - -

18   BY MR. ECKERT:

19   Q.    And sir, you testified at the grand jury on April 11,

20   2019?

21   A.    Yes.

22   Q.    And that was 22 days after the robbery; correct?

23   A.    Correct.

24   Q.    Okay.  I want to -- if you could go to Page 10, please,

25   Line 4.  And the question was, so when you say he noticed that

Page 62

1   or he saw it, how did you know that he noticed it?

2              MS. MEEHAN:  Objection, Your Honor.

3              MR. ECKERT:  It's a prior consistent statement

4   under 801d1b2.

5              THE COURT:  Wait a minute.  We don't yet know it

6   is.  Page 10, Line 4.

7              MR. ECKERT:  Right, Your Honor.  I can certainly

8   read Lines 1 through 3 to.

9              THE COURT:  Just a moment.  Is there any part of

10  the testimony that you, Ms. Meehan, thinks should be read

11  first?

12             MS. MEEHAN:  No, that's fine, Your Honor.  I'll

13  withdrawal.

14             THE COURT:  And you're picking up with a

15  question that asks, so when you say when he noticed that or

16  saw it.

17             MR. ECKERT:  Right, Your Honor.  If it's

18  helpful, I can certainly read the three lines.

19             THE COURT:  Not helpful to me.

20             MR. ECKERT:  No.

21             THE COURT:  I want you to present the evidence

22  in a way that makes sense.  Let me explain what this is.  It's

23  the testimony of this witness before a federal grand jury.

24  The grand jury heard evidence in the case, before the case was

25  presented in court.  And this grand jury testimony was given

Page 63

1   by this witness on April 11, 2019, he was under oath.  And Mr.

2   Eckert is calling his attention to questions and answers that

3   were questions that were addressed to him, answers that he

4   gave when testifying before the grand jury.  You may proceed.

5           MR. ECKERT:  Thank you, Your Honor.

6   BY MR. ECKERT:

7   Q.   So I'm going to start with Line 1, "We have a security

8   gun.  He happened to notice it.  We have it in this little

9   cubbyhole and I don't even touch that."  Question --

10          THE COURT:  Well, that was an answer.  Well, I

11  think it would be better if you read a little more so that the

12  jury can understand what --

13          MR. ECKERT:  Okay.

14          THE COURT:  -- what you're asking.

15          MR. ECKERT:  Okay.  I'm going to go to PAGE 9

16  then.

17          THE COURT:  Yes.

18          MR. ECKERT:  Line 22.

19          THE COURT:  Yes.

20  BY MR. ECKERT:

21  Q.   Question:  Okay.  Did he notice something else that was

22  near you at that time?  Answer:  Yes.  Question:  Explain

23  that, please.  Answer:  We have a security gun.  He happen ed

24  to notice it.  We have it in this little cubbyhole and I don't

25  even touch that.  Question:  Okay.  One second.  So when you

1    say he noticed that or he saw that, how do you know that he

2    noticed it?  Answer:  Because he would tell me.  Question:

3    What did he tell you?  Answer:  Can I tell you in my English

4    that he was telling me as I understood it.  Question:  Sure.

5    Sure.  Answer:  The gun is -- the brand of the gun is Glock.

6    Question:  Okay.  Answer:  Give me fucking money.  Give me

7    fucking money.  Give me fucking everything money.  Give me

8    fucking money.  Give me Glock.  Give me Glock.  Give me gun

9    right now.  Right now.

10       Question:  Okay.  Answer:  So that's when I could

11   understand that he was also asking for the gun.

12   A.    Correct.

13   Q.    Sir, did I read your testimony correctly?

14   A.    Correct.

15            MR. ECKERT:  Your Honor, we move Page 9 of 51

16   Bravo starting from Line 22 to Page 10, Line 19.

17            THE COURT:  That would be a matter of record,

18   but you don't move into evidence, the evidence -- well, the

19   evidence is what you read from the grand jury testimony.

20            MR. ECKERT:  Very well, Your Honor.

21   BY MR. ECKERT:

22   Q.    Next, I'm going to go to Page 11, Line 19.  Question:

23   Okay.  And now let me ask you about the two people he came

24   back with.  Was there -- tell me about the clothing of those

25   guys.

1          MS. MEEHAN:  Objection to this line of

2    questioning, Your Honor.

3    BY MR. ECKERT:

4    Q.   He was -- he was --

5          THE COURT:  Wait.

6          MR. ECKERT:  I'm sorry.

7          THE COURT:  Just a moment, let me --

8          MR. ECKERT:  It's really the next page, but it's

9    not going to make any sense if we don't read the first.  He

10   was impeached upon whether he had seen Mr. Smith before.

11         THE COURT:  We're on Page 11 Line 19.

12         MR. ECKERT:  Correct, Your Honor.  Which gives

13   the context to the question on Page 12, about had he ever seen

14   him before.

15         THE COURT:  What's the objection?

16         MS. MEEHAN:  Your Honor, I didn't understand

17   that sentence that he just read made -- that was not proper

18   rebuttal, but I understand the government's introduction of

19   that.

20         THE COURT:  So the objection is withdrawn?

21         MS. MEEHAN:  Yes.

22         THE COURT:  Start at Page 11, Line 19.

23         MR. ECKERT:  Very well, Your Honor.

24   BY MR. ECKERT:

25   Q.   Okay.  And now let me ask you about the two people he

Page 66

1   came back with.  Was there -- tell me about the clothing of

2   those guys.  Answer:  The short one of the three, he had a

3   gown.  The way they use it the way Muslims use.  Question:

4   Okay.  So he was wearing clothing that indicated to you he was

5   of Muslim faith? Answer: Correct.  Okay.  Had you ever seen

6   him before?  Correct.

7            MR. ECKERT:  And I stopped for the record, Your

8   Honor at Line 3 of Page 12.

9            THE COURT:  All right.

10            MR. ECKERT:  Thank you.

11   BY MR. ECKERT:

12   Q.   Now, if we could have --

13            THE COURT:  Well, you didn't ask a question.

14            MR. ECKERT:  Oh, I'm sorry.

15   BY MR. ECKERT:

16   Q.   Sir, did I read your testimony correctly?

17   A.   Yes.

18   Q.   Thank you.

19            MR. ECKERT:  If we could have published to the

20   jury Government's 1 Charlie 6, please?  Oh, I'm sorry.  We

21   either have the same TV screen as we did before, does that

22   work?  We'd ask to publish that to the jury, Your Honor.

23   Since it's previously been in.

24            THE COURT:  Yes, that's received in evidence.

25   What's the exhibit number?

1           MR. ECKERT:  One Charlie 6, Your Honor.

2           THE COURT:  1C?

3           MR. ECKERT:  Yeah, I'm sorry, 1C6.

4           THE COURT:  Michael, do we have 1C in evidence?

5  You may publish to the jury.  Those exhibits 1C1 through 1C --

6  I think 86 --

7           MR. ECKERT:  They've all been admitted, Your

8  Honor.

9           THE COURT:  -- are in evidence.

10          MR. ECKERT:  Thank you.  I'm just attempting to

11 publish C-6 at this time.

12          THE COURT:  And you may.

13 BY MR. ECKERT:

14 Q.   Sir, just to orient you, this is when the bald

15 gentleman, Mr. Quinn first goes behind the counter.  What was

16 his tone like at the time?

17 A.   His tone?

18 Q.   Yes.  No.  No.  Not you.  The gentleman, the bald

19 gentleman, Mr. Quinn.

20 A.   His tone was different.  It was aggressive.  It was --

21 Q.   Did you have any problem understanding what it is this

22 guy was asking you for or demanding?

23          MS. MEEHAN:  Can he identify this guy, Your

24 Honor.

25 BY MR. ECKERT:

1  Q.    I'm sorry, Mr. Quinn.  Do you have any issue

2  understanding what Mr. Quinn, the bald guy, was demanding from

3  you at that time?

4  A.    No.  I was able to understand perfectly well what he

5  was asking me.

6  Q.    Okay.  One final shot, if I could or still shot.  It's

7  going to be 1C43.  Can you look at that screen, please, sir?

8  Did that gun look real to you?

9          MR. PATTERSON:  Your Honor, this was asked and

10  answered on the direct.

11          MR. ECKERT:  He was -- I'm sorry.  I don't mean

12  to talk out of -- over the Judge, but he --

13          THE COURT:  The objection was there was no

14  reference to what is depicted in 1C43 in the cross-examination

15  of Ms. Meehan.

16          MR. ECKERT:  Not Mr. -- of Ms. Meehan who was --

17  and Mr. Patterson, he repeatedly asked questions about whether

18  the firearms were real.

19          THE COURT:  All right.

20          MR. ECKERT:  May I?

21          THE COURT:  Yes, you may.

22          MR. ECKERT:  Thank you.

23  BY MR. ECKERT:

24  Q.    Could you just take a look at that photograph, sir?

25  Does that firearm or did that firearm appear real to you as it

Page 69

1    was pointed at your face on March 22, 2019?

2    A.    Yes.

3    Q.    Thank you.

4          MR. ECKERT:  No further questions from the

5    witness.

6                          - - -

7                     CROSS-EXAMINATION

8                          - - -

9    BY MR. PATTERSON:

10   Q.    Do you remember me from yesterday?

11   A.    Yes.  Correct.

12   Q.    I'd asked you a bunch of questions; correct?

13   A.    Correct.

14   Q.    This gentleman here, Mr. Wittels, he was asking you

15   questions; right?  Right there.

16   A.    Yes.  Correct.

17   Q.    And Ms. Meehan was asking you questions today; correct?

18   A.    Correct.

19   Q.    And through all those questions you don't speak

20   English; correct?

21   A.    About what they were asking me?

22   Q.    Let me just ask you, yes or no, si or no, do you speak

23   English?

24   A.    I don't speak English.

25   Q.    Okay.  I think you said from working in a convenience

1    store for all these years, and interacting with all these

2    patrons whether they're Spanish speaking or English speaking,

3    you were able to learn some question or learn some English.

4    And I believe your testimony was, yeah.  That may be chips or

5    soda or Doritos; right?  Correct?

6    A.    Yes.  A few words.  Yes.

7    Q.    Okay.  Now, when Attorney Eckert just asked you

8    questions about your grand jury testimony, just now, he asked

9    some questions regarding what you testified to at a grand

10   jury; correct?

11   A.    Correct.

12   Q.    And you remember testifying at the grand jury?

13   A.    Yes.

14   Q.    And we established yesterday through my questions it

15   was around April 11th, and you did this [indiscernible].  And

16   you swore in that grand jury testimony to tell the truth?

17   A.    Correct.

18   Q.    I'm going to read back to you the transcript of what

19   Mr. Eckert just read to you that you acknowledge that you

20   said; okay.  So just wait.

21            THE COURT:  What -- identify the pages.

22            MR. PATTERSON:  I'm sorry, it's going to be Page

23   10 of the grand jury testimony.  Starting at Line 4.

24   BY MR. PATTERSON:

25   Q.    This is the same thing that he just read to you five

Page 71

1    minutes ago; okay?  Starting with Line 10.  Oh, I'm sorry.

2    I'm Sorry, Line 4, Page 10.  Question -- and this is attorney

3    Eckert speaking.  Line 4, Question:  Okay.  One second.  So

4    when you say he noticed that or he saw it, how did you know

5    that he noticed it?  Answer:  Because he would tell me.  And

6    you're talking about the gun right here; correct?

7    A.    Correct.

8    Q.    Okay.  So Line 7, question from the government's

9    attorney, what did he tell you?  Your answer, and this is word

10   for word, you just said this five minutes ago.  An answer to

11   the government's question, can I tell you in my English that

12   he was telling me as I understood it.  The response by the

13   government, sure.  Sure.  So now, the government's saying,

14   okay.  You want to use your English, use your English;

15   correct?  Just -- is that -- is that true?

16   A.    With the little English I know, yes.  I beg your

17   pardon, may I speak?

18   Q.    Well, let me ask the next question.  Now, we do know

19   the little English that you know from hours of questioning

20   you, is Doritos potato chips and soda; right?

21   A.    I beg your pardon, I can assure you, sir, I can assure

22   you, with all due respect and with all due respect to the

23   jurors, that if English had served me perfectly well, this

24   interpreter wouldn't be here.  Only an interpreter --

25   Q.    Can you -- I'm sorry, sir, I interrupted you.  Can you

Page 72

1    answer my next question now, please?  You said under

2    questioning in the grand jury in response to the question by

3    the government, that you want to use your English; right?  Yes

4    or no?

5    A.    I don't know.

6    Q.    You don't know or no?

7    A.    I don't know.

8    Q.    Okay.  Well, let me ask you this then, I'm going to

9    reread Line 8, just so we're -- I don't break it up anymore,

10   I'm sorry, Line 7.  Question:  What did he tell you?  Your

11   answer, can I tell you in my English that he was telling me as

12   I understand it.  The government's response to that, sure,

13   sure.  Then you answer, now you're speaking English?

14           MR. ECKERT:  Objection.  The quotation marks are

15   on the next one, starting at line 13.

16           MR. PATTERSON:  Okay.  I'll get to that.

17   BY MR. PATTERSON:

18   Q.    So your answer is, at Line 11, the gun is -- the brand

19   of the gun is Glock.  Question:  Okay, by the government.

20   Now, in quotation marks, right after you ask the government if

21   you can answer in English, give me fucking money.  Give me

22   fucking money.  Give me fucking everything, money, give me

23   fucking money.  Give me Glock.  Give me Glock.  Give me gun.

24   Right now.  Right now.  That's all said in English; correct?

25   Yes or no?  Yes or no?

1    A.    Yes.

2    Q.    Thank you.

3    A.    May I go on?

4            MR. PATTERSON:  Nothing further.

5            THE COURT:  Well, yes.  You can explain your

6    answer.

7            THE WITNESS:  Okay.  That's the English that I

8    live by everyday.  Give me, yes.  Put in my hand.  He's saying

9    when they put groceries in front of me then they say, I live

10   that everyday.  I can tell you today that I'll [indiscernible]

11   tomorrow when I live this every single day of my life.

12   BY MR. PATTERSON:

13   Q.    You speak much more English than you're letting on

14   [indiscernible]; correct?

15   A.    I don't know.

16   Q.    And you decide not to speak English when it suits your

17   purpose; correct?

18   A.    I don't know.

19           MR. PATTERSON:  Nothing further, Your Honor.

20           THE COURT:  Is there anymore examination of this

21   witness?  If there is, we're going to recess.

22           MS. MEEHAN:  Your Honor, I'm sorry.  I do have a

23   little bit of redirect.  I apologize.

24           THE COURT:  Well, we're running a little late,

25   so we're going to recess.  If we don't recess soon, it won't

1    be midmorning.  I wanted to try to finish this witness'

2    testimony.  We'll break for 10 minutes and finish with this

3    witness when we come back.  We'll recess for lunch at around

4    quarter of one or so.  10-minute recess.

5                    DEPUTY CLERK:  All rise.

6                               - - -

7                    (The jury leaves the courtroom.)

8                               - - -

9                    THE COURT:  Be seated everyone.  You may step

10   down Mr. Ventura.  A word about the handling of exhibits on

11   cross-examination.  Not good.  My trial order directed that

12   exhibits for use in cross-examination be premarked.  They need

13   not be exchanged.  They need not have been exchanged if

14   they're to be used for cross-examination purposes only.

15                    If an exhibit is marked as a government exhibit

16   and as a defense exhibit, I think it's best to stay with the

17   single number, so we don't have two numbers identifying a

18   single exhibit.  That wasn't done by you, Ms. Meehan.  The

19   statement the witness gave to the police is a government

20   exhibit.  It's your Exhibit D33, it's Government Exhibit G22.

21   Best to use one number for a single exhibit.

22                    And when something is in evidence as a

23   government exhibit, it's best to use that exhibit number

24   instead of offering a, I don't know, a number of exhibits,

25   they were shown on the screen, no identification.  There's

1    just no way to track what it is the witness was talking about

2    when you read the record.  That's not good.  And that'll

3    change.

4              MS. MEEHAN:  Your Honor, I do have my defense

5    exhibit, but part of the problem with the video clips --

6              THE COURT:  You do have your --

7              MS. MEEHAN:  I will hand it to the Court now.  I

8    do.  And I apologize.

9              THE COURT:  Where are -- well, you have your

10   defense exhibits and that's good, it's good that you have

11   them.  I don't have them.

12             MS. MEEHAN:  I understand.

13             THE COURT:  And you're using them.

14             MS. MEEHAN:  And I apologize.

15             THE COURT:  And that violates court rules.

16             MS. MEEHAN:  I apologize.  Your Honor, the

17   difficulty with the videos is that even though Government 1A

18   is in evidence, there are -- it's a very long video.  It's 15

19   minutes long, so there were portions that we wish to play that

20   we identified as D something that was part of G1A, but it

21   wasn't the entire video which was G1A.

22             THE COURT:  Well, that's fine, but there's a way

23   to identify a specific part of G1A and -- well, I, Mr. Eckert

24   has not done it regularly, he's done it occasionally, you

25   haven't done it at all, until the very end, you started doing

Page 76

1    it, but I want it done all the time --

2                MS. MEEHAN:  Very well.

3                THE COURT:  -- so that we can track what

4    exhibits are on the --

5                MS. MEEHAN:  Yes, Your Honor.

6                THE COURT:  -- on the screen.

7                MS. MEEHAN:  And I'll hand my exhibit book to

8    the Court.

9                THE COURT:  Finally, with regard to

10   cross-examination based on prior testimony, you didn't finish

11   the questioning.  Is that your grand jury testimony was -- is

12   that the grand jury testimony?  I think the proper question is

13   is that the testimony you gave to the grand jury on, a certain

14   date.  And you don't have to offer that into evidence, the

15   evidence is what is brought out in the questioning and the

16   answering.  The entire grand jury transcript not even that

17   part of the transcript that you used comes into evidence as a

18   separate exhibit.  And that rule will -- well, certainly, it's

19   done all the time.  I don't think there's any rule to the

20   contrary, and we'll follow that rule when using prior

21   statements or grand jury testimony to cross-examine a witness

22   to impeach a witness.

23               All right.  Is there anything else we have to

24   do?  Mr. Eckert.

25               MR. ECKERT:  Not at this time, Your Honor.

Page 77

1              MR. PATTERSON:  No, Your Honor.

2              MR. WITTELS:  No, Your Honor.

3              THE COURT:  Mr. Wittels.

4              MR. WITTELS:  No.

5              THE COURT:  Ms. Meehan.

6              MS. MEEHAN:  No, Your Honor.

7              THE COURT:  We're in recess.

8              DEPUTY CLERK:  All rise.

9                        -  -  -

10      (Whereupon, there was a recess in the proceeding from

11              11:47 a.m. to 12:03 p.m.)

12                        -  -  -

13            (The jury enters the courtroom.)

14                        -  -  -

15              DEPUTY CLERK:  All rise.

16              THE COURT:  Be seated, everyone.

17              Ms. Meehan, you may proceed with

18   recross-examination.

19              MS. MEEHAN:  And I'll be brief.  Can we call

20   what's previously been marked G1A?

21   BY MS. MEEHAN:

22   Q.   This is camera 13, starting at 16:59:45 -- 40.

23   16:59:40.  Do you have that on your screen?  Mr. Ventura, this

24   is almost 5:00, and here you are on the bottom right; correct?

25   A.   Yes, ma'am.

Page 78

1    Q.    And the man in the white sort of sweat suit is the big

2    guy, also identified as Mr. Stevens?

3    A.    Yes.

4    Q.    And watched -- and the other individual is a customer

5    on the far left?

6    A.    Yes.

7    Q.    All right.  So watch this for a moment.  That's you

8    talking to Mr. Stevens in English.

9    A.    He's speaking English.

10   Q.    Well, you're talking to him.  Let's play it again.

11   A.    I'm just saying take it easy.  Take it easy.

12   Q.    You're pointing to something and you're talking to him.

13   You're not saying take it easy.

14   A.    Okay.  I can't remember perfectly well what's going on

15   right now.  What I'm telling you it didn't happen yesterday.

16   Q.    Sir, the question was, you were speaking to Mr. Stevens

17   at that moment at 16:59:40 to :50 in English, yes or no?

18   A.    How do you know whether I was speaking English or not?

19   Q.    Well does Mr. Stevens speak Spanish?

20   A.    No.  As far as I knew he didn't know anything.

21   Q.    Right.  Nothing further.

22              MR. ECKERT:  I don't have any additional

23   questions, Your Honor.  Thank you.

24              THE COURT:  That ends the examination of this

25   witness, ladies and gentlemen.  Mr. Ventura, you may step

Page 79

1    down.  Thank you also Mr. McConnie.

2              INTERPRETER:  Your Honor.  It's good seeing you

3    again.

4              THE COURT:  Good to see you.

5              Next government witness.

6              MS. MARTIN:  Yes, Your Honor.  The government

7    calls Detective Colin Goshert to the stand.

8              DEPUTY CLERK:  Please raise your right hand.

9                         - - -

10              (DETECTIVE COLIN GOSHERT - SWORN)

11                         - - -

12              DEPUTY CLERK:  Thank you.  Please be seated.

13              Please state your full name for the record.

14              THE WITNESS:  Detective Colin, C-O-L-I-N,

15    Goshert, G-O-S-H-E-R-T, Badge Number 903, currently assigned

16    in Northwest Detectives.

17              THE COURT:  Good afternoon, sir.

18              THE WITNESS:  Good afternoon, Your Honor.

19              THE COURT:  You may proceed.

20              MS. MARTIN:  May I proceed, Your Honor?

21              THE COURT:  Yes.

22                         - - -

23                     EXAMINATION

24                         - - -

25    BY MS. MARTIN:

1    Q.    Good afternoon, Detective Goshert.

2    A.    Good afternoon.

3    Q.    Detective Goshert, where are you currently employed?

4    A.    With the Philadelphia Police Department.

5    Q.    And you mentioned earlier that you are a detective.  Is

6    that accurate?

7    A.    That is correct.

8    Q.    Okay.  And how long have you been a detective?

9    A.    I've been a detective since November 2018.

10   Q.    And prior to being a detective, how were you employed?

11   A.    I was assigned to the 14th District in the Philadelphia

12   Police Department for approximately nine years and a few

13   months before that I was with the 25th Police District.

14   Q.    Okay.  Let's take a step back.  Can you explain to the

15   ladies and gentlemen of the jury, you mentioned the 14th

16   District and the 25th District, what are police districts?

17   A.    Police districts are just different zones, they break

18   down the city and the numbered districts.  The 14th police

19   district is -- goes from Chestnut Hill to Germantown, Mt.

20   Airy, East Mt. Airy, like a geographical area like that.

21   Q.    The northwest section of the city?

22   A.    That is correct.

23   Q.    All right.  And how long were you an officer in the 14

24   District?

25   A.    I believe it was November 2009 to November 2018.

Page 81

1    Q.    And as a police officer in the 14th District, do you

2    have regular interactions or did you have regular interactions

3    with citizens in the community?

4    A.    Yes.  I was on patrol, so you're driving around the

5    neighborhoods, you're visible.  Most of that time I was spent

6    in uniform, so we were just out in the neighborhood.

7    Q.    And as part of those interactions did you become

8    familiar with the gentleman named Abid Stevens?

9    A.    Yes.  I did.

10   Q.    And did you know where Mr. Stevens lived while you were

11   on those patrols during those years?

12   A.    Yes.  It would be the street known as Sharpnack, the

13   east side of Sharpnack and I believe it was 16 East Sharpnack

14   which is -- it was in Philadelphia, there was Germantown

15   Avenue and Sharpnack and it was just a couple houses off

16   Germantown Avenue.

17   Q.    Would you recognize a map of that area, if I showed it

18   to you?

19   A.    Yes.

20          MS. MARTIN:  If I could please have the witness

21   showed what's marked as Government Exhibit 3A.

22   BY MS. MARTIN:

23   Q.    Detective Goshert, you have 3A on the screen in front

24   of you?

25   A.    Yes.

Page 82

1    Q.    Okay.  And are you familiar with that map?

2    A.    Yes.

3    Q.    Do you recognize the area?

4    A.    Yes.  That's the -- again, the area of Germantown and

5    Sharpnack, Germantown and Hortter, Upsal Street and those

6    streets up there.

7              MS. MARTIN:  Your Honor, permission to publish

8    3A to the jury and admit it into evidence.

9              THE COURT:  You may do so.

10             MR. WITTELS:  No objection.

11             MS. MEEHAN:  No objection.

12             MR. PATTERSON:  No objection.

13                        -  -  -

14             (Whereupon, Government's Exhibit Number 3A was

15    admitted into evidence.)

16                        -  -  -

17             MS. MARTIN:  If it could be placed on the

18    screens.

19             THE COURT:  Yeah may.

20             MS. MARTIN:  Thank you.

21    BY MS. MARTIN:

22    Q.    Detective Goshert, were you also familiar with a corner

23    store bodega at 152 East Sharpnack Street?

24    A.    Yes.  It's right on the corner of Sharpnack and Ross

25    Street.

Page 83

1    Q.    Okay.  And looking at that map in front of you, does
2    that display the location of that corner store?
3    A.    That's correct.
4    Q.    Okay.  Can you tell us, can you identify that location
5    for the jury by icon or area?
6    A.    Right here you'll see there's like the corner of Ross
7    and Sharpnack.  You'll see the -- where it says Sharpnack on
8    like the upper right-hand side.  If you go down to your left a
9    little bit, there's like a little camera icon, a little -- it
10   looks like a shopping cart icon and a little, it looks like a
11   gun icon.
12   Q.    Okay.  And which one is the grocery store?
13   A.    The grocery store is the -- the shopping cart icon, and
14   it's right on the corner of Ross and Sharpnack.
15   Q.    Okay.  And you said you were familiar with Mr. Stevens'
16   residence during those yours that you were on patrol?
17   A.    That's correct.
18   Q.    Is that depicted here on this map?
19   A.    Yes.  If you keep -- where you see the Sharpnack
20   Street, it says East Sharpnack Street, if you keep going down
21   the left towards the bigger words would say the Germantown
22   Church of Brethren, there's a little house icon that would be
23   16 East Sharpnack.
24   Q.    That was where Mr. Stevens lived when you were familiar
25   with him?

Page 84

1    A.    From my knowledge, yes.

2    Q.    Okay.  And there's also a camera icon on the map.  Can

3    you explain that for the jury?

4    A.    Yes.  The camera icon, if you go back up toward like

5    the store icon is, that camera icon is -- the city has cameras

6    throughout the city.  We call them the real-time crime

7    cameras, that's just one of the locations in the 14th

8    District.

9    Q.    It was located right there outside of the store?

10   A.    Yes.  Right on the corner.

11   Q.    All right.  And in terms of involvement in this

12   investigation, at a certain point, were you shown a

13   surveillance video from a robbery inside of 152 East Sharpnack

14   Street?

15   A.    That's correct.

16   Q.    Okay.  And did you recognize anyone that was portrayed

17   in that video?

18   A.    Yes.  I did.

19   Q.    And who was that?

20   A.    Mr. Abid Stevens.

21   Q.    All right.  Nothing further for this witness.  Thank

22   you, Your Honor.

23              MR. PATTERSON:  No questions, Your Honor --

24              THE COURT:  Mr. Patterson, any questions?

25              MR. PATTERSON:  -- on behalf of Mr. Smith.

Page 85

1          THE COURT:  Mr. Wittels.

2          MR. WITTELS:  If I may.

3                    - - -

4               CROSS-EXAMINATION

5                    - - -

6    BY MR. WITTELS:

7    Q.    Good afternoon, Detective.

8    A.    Good afternoon, sir.

9    Q.    I just have a couple questions for you.  You spent nine

10   years in the 14th; correct?

11   A.    Correct.

12   Q.    Did you have a regular sector or did that change?

13   A.    It all depended on assignment.

14   Q.    Okay.  Now, would you explain to the jury what a sector

15   is?

16   A.    A sector, now they're called PSAs, it's just a patrol

17   area.  Right now the 14th District is broken into four patrol

18   areas.  It would just be -- there would be street borders that

19   you would just stay in and patrol.  If there's cause for

20   service in that area, you would just go and answer those calls

21   there.

22   Q.    The Sharpnack Street address, the two addresses, Mr.

23   Stevens' address and the bodega address, were they part of a

24   sector that you regularly patrolled?

25   A.    Yes.  It was in PSA2.

Page 86

```
 1   Q.    And for -- what period of time did you patrol PSA2?
 2   A.    Again, throughout my nine years there.  It was very
 3   often.
 4   Q.    All right.  And in this era of community policing, I
 5   take it that you get to meet a lot of people?
 6   A.    Yes.
 7   Q.    And there's all sorts of people?
 8   A.    Yes.
 9   Q.    All sorts of citizens?
10   A.    Correct.
11   Q.    Business men, students, homeowners --
12   A.    Correct.
13   Q.    -- and the like?
14   A.    Yes, sir.
15   Q.    And as in the course of your contact with regular
16   people that you met Mr. Stevens; correct?
17   A.    Correct.
18   Q.    Thank you.
19             THE COURT:  Ms. Meehan, do you have any
20   questions?
21             MS. MEEHAN:  Oh, no, Your Honor.
22             THE COURT:  Mr. Patterson.
23             MR. PATTERSON:  I don't, Your Honor, thank you.
24             THE COURT:  Fine.  Mr. Eckert, oh, I'm sorry,
25   Ms. Martin.
```

1          MS. MARTIN:  I have no redirect, Your Honor.

2          THE COURT:  Fine.  That concludes your

3    testimony, Detective Goshert.

4          THE WITNESS:  Thank you, Your Honor.  Have a

5    great day, sir.

6          THE COURT:  Say to you.

7          MR. ECKERT:  Your Honor, at this time the

8    government would like to call Isaliza Rodriguez.  Your Honor,

9    the next witness went to the bathroom, so if you give me 30

10   seconds, I'll be right back.

11         THE COURT:  Fine.

12         DEPUTY CLERK:  Please raise your right hand.

13                        - - -

14              (ISALIZA RODRIGUEZ - SWORN)

15                        - - -

16         DEPUTY CLERK:  Please be seated.  Police state

17   your full name for the record, please.

18         THE WITNESS:  Isaliza Rodriguez.

19                      - - -

20                    EXAMINATION

21                      - - -

22   BY MR. ECKERT:

23   Q.   Can you just go ahead and spell your first and last

24   name, please, ma'am?

25   A.   I-S-A-L-I-Z-A.

1    Q.    And your last name, please.

2    A.    R-O-D-R-I-G-U-E-Z.

3    Q.    Okay.  And what city and state do you reside?

4    A.    Philadelphia, PA.

5    Q.    Okay.  And how long have you lived in Philadelphia?

6    A.    19 years.

7    Q.    Okay.  And how far did you go in school?

8    A.    I graduated from high school.

9    Q.    Okay.  And that was here in Philadelphia?

10   A.    Yes.

11   Q.    Okay.  What is that you do for a living?  What type of

12   work?

13   A.    Grocery stores.

14   Q.    When you say grocery store, what do you do in the

15   grocery store?

16   A.    I own the store.

17   Q.    Okay.  How many stores do you currently own?

18   A.    Right now, one.

19   Q.    And back in March 2019 timeframe, how many stores did

20   you own at that time?

21   A.    Two.

22   Q.    Where was the store for which you have been asked to

23   come into court today?  What was the address?

24   A.    152 East Sharpnack Street.

25   Q.    And that's in Philadelphia, Pennsylvania?

Page 89

1   A.    Yes.

2   Q.    Okay.  Now, first, I'm going to start -- if I could

3   just get the -- this exhibit published, just to the witness

4   and not to the jury, please.  You don't have to publish it

5   now, I just want to make sure it's not going to go to the

6   jury.  The store that was at 152 East Sharpnack, ma'am, what

7   was the name of that store?

8   A.    RD Grocery Inc.

9   Q.    And was -- did it go by another name as well?

10  A.    INS Corp.

11  Q.    Now, did you serve hot food at that store?

12  A.    Yes.

13  Q.    What types?

14  A.    It was fries, cheese burgers, cheese steaks, wings, all

15  hot foods.

16  Q.    Okay.  Short-order cook type stuff, whatever

17  made-to-order?

18  A.    Mm-hmm.

19  Q.    I'm sorry?

20          THE COURT:  You have to answer yes or no.

21          THE WITNESS:  Yes.  Sorry.

22  BY MR. ECKERT:

23  Q.    And where did you get the rolls from that store from?

24  A.    Amoroso.

25  Q.    And where was Amoroso located?

Page 90

1    A.    New Jersey.

2    Q.    Okay.  Now, what about some other products such as food

3    products, where did you purchase those from?

4    A.    I get it from the wholesale or Krasdale.

5    Q.    Okay.  And where is Krasdale located?

6    A.    New York.

7    Q.    Okay.  And did you provide receipts and invoices that

8    demonstrated where you purchased those items to Agent Ratulle

9    [ph]?

10   A.    Yes.

11   Q.    Okay.  Now, the final question about the products that

12   that store sells, does that store also sell cigarettes, ma'am?

13   A.    Yes.  And tobacco.

14   Q.    Okay.  All right.  Were you working at 152 East

15   Sharpnack on March 22, 2019?

16   A.    No.

17   Q.    Okay.  Where were you?

18   A.    I was at my other location.

19   Q.    Okay.  And how far of a drive would that be from your

20   other location to the store on Sharpnack Street?

21   A.    About seven minutes.

22   Q.    Okay.  Now, let me ask you about -- how long have you

23   owned that Sharpnack store, the RD Grocery?

24   A.    Ten years.

25   Q.    Okay.  And have you been working -- you owned it for

Page 91

1    ten years, you've actually been a part of running it and

2    making sure everything goes okay?

3    A.    Yes.

4    Q.    Okay.  And what types of customers did you guys have?

5    Do you have a regular customer base?

6    A.    Yes.  The neighbors.

7    Q.    Explain that.  Explain that.

8    A.    The neighbors, they frequently go to the store and they

9    mostly get almost the same thing everyday, like tobacco or

10   sodas.

11   Q.    Okay.

12   A.    Things like that.

13   Q.    Okay.  So people wouldn't necessarily shop for the

14   whole week at the store?

15   A.    No.

16   Q.    But you might see from time -- you would see the same

17   customers on a daily basis?

18   A.    Yes.

19   Q.    Okay.  Did you get to know some of them?

20   A.    Yes.

21   Q.    Now, all right.  I also want to ask you about -- did

22   you keep a firearm at the Sharpnack store?

23   A.    I'm sorry.

24   Q.    Did you keep a firearm or a gun in the Sharpnack store?

25   A.    Oh, yes.

Page 92

1    Q.    Why -- why was that?

2    A.    For protection.

3    Q.    Okay.  And did something specifically happen outside

4    that location?

5    A.    Yes.

6    Q.    What was that?

7    A.    The incident that I'm here now?

8    Q.    No.  No.  No.  Before this incident, did something

9    happen that made you concerned?

10   A.    Oh, yes.  We got shot.

11   Q.    Not -- okay.

12   A.    They were shooting at the store.

13   Q.    But you're not -- you don't mean personally that you

14   were shot; correct?

15   A.    No.  No.

16   Q.    Okay.  But so was there something in the door, in the

17   front door of the store that reflected that?

18   A.    Yes.

19   Q.    Explain that.

20   A.    It's -- they were shooting to the door.  They were

21   shooting at the store and it's like a when you shot

22   something --

23   Q.    A bullet.

24   A.    Yeah.  It's a bullet in the window.

25   Q.    Okay.

Page 93

1   A.    But the bullet is not in the window.

2   Q.    The hole?

3   A.    Yes.

4   Q.    Right.  Okay.  Makes sense.

5   A.    I'm sorry.

6   Q.    No.  It's okay.  All right.  Do you recall what type of

7   firearm you purchased, ma'am?

8   A.    Yes.

9   Q.    What type of firearm was that?

10  A.    A Glock.

11  Q.    And do you recall the serial number as you sit here

12  today?

13  A.    If I know it?

14  Q.    No.  I'm saying as you sit there in that witness stand,

15  do you recall the serial number off the top of your head?  No?

16  That's a no, right?

17  A.    No.

18  Q.    Okay.  What if I showed you the -- the receipt of

19  purchase for that gun, would that refresh your recollection?

20  A.    Yes.

21  Q.    Okay.

22          MR. ECKERT:  If I may have one moment, Your

23  Honor to --

24          THE COURT:  You may.

25          MR. ECKERT:  Thank you.  If I could have 17,

Page 94

1    just to the witness, please.

2              THE COURT:  What is it?

3              MR. ECKERT:  The Government 17, for

4    identification, Your Honor.

5    BY MR. ECKERT:

6    Q.   And while we're on the subject, ma'am, do you remember

7    the purchase price for that firearm?

8    A.   Not exactly price, but close.

9    Q.   What's the ballpark figure?

10   A.   It was about 700.

11   Q.   Okay.  Same thing, same question for you, would the

12   receipt refresh your recollection?

13   A.   Yes.

14   Q.   Okay.  If you could just look through that computer

15   monitor screen that's off to your right shoulder, please.  And

16   don't read it into the record, but when you've looked at it

17   first, the serial number --

18   A.   Yes.  639, yes.

19   Q.   Okay.

20   A.   Oh, I [indiscernible].

21   Q.   It's understandable.  So when you looked at that

22   screen, did that refresh your recollection as to the purchase

23   price of the firearm?

24   A.   Yes.

25   Q.   And what was it?

1    A.    The Glock.

2    Q.    Right.  What was the purchase price?

3    A.    $639.42.

4    Q.    Okay.  And if you could just -- and did it also refresh

5    your recollection as to the serial number right there in the

6    middle of the --

7    A.    Yes.

8    Q.    And what was that?

9    A.    It's BCXX649.

10   Q.    Thank you.  Okay.  Did you receive a phone call on

11   March 22nd from one of your employees?

12   A.    Yes.

13   Q.    Who was that?

14   A.    Joel.

15   Q.    And how do you know Joel?

16   A.    He's the -- oh, he's my brother-in-law.

17   Q.    Okay.  Does he also work for you?

18   A.    Yes.

19   Q.    And how long has he been working for you?

20   A.    About three years.

21   Q.    Okay.  And what does he do?  What's his position?

22   A.    Cashier.

23   Q.    Yeah, what's his position?

24   A.    Cashier.

25   Q.    Okay.  And at that particular store?

Page 96

1   A.    Yes.

2   Q.    And was he working on March 22, 2019?

3   A.    Yes.

4   Q.    All right.  And what happened when he calls you?

5   A.    He said that it was a guy that gave him a $20 fake bill

6   and then that he was complaining that the ATM gave it to him

7   that it was fake.

8   Q.    Okay.  And you said the ATM.  There's an ATM in your

9   store?

10  A.    Yes.

11  Q.    Do you own that?

12  A.    No.

13  Q.    Explain that.  If there's an ATM in your store, but you

14  don't own the ATM?

15  A.    Some Asian by goes and check it, but it's not mine.  He

16  goes there to put the money, if something wrong with the ATM I

17  just call them.  I don't have nothing to do with the ATM.

18  Q.    Okay.  Now, have you ever had anyone else in the time

19  you've had that store, have they ever -- anyone else ever

20  complained about fake money?

21  A.    Never.

22  Q.    Okay.  How long have you had that specific ATM machine

23  in the store?

24  A.    For about three years.

25  Q.    Okay.  Did you have other ATM machines before that?

1    A.    Yes.

2    Q.    Did you ever have any problems with anyone complaining

3    about fake money?

4    A.    No.

5    Q.    Okay.  All right.  Now, just explain to us, what is the

6    arrangement for that ATM in the store that you -- what's the

7    benefit the store gets?

8    A.    Oh, the store gets 85 cents per transaction.

9    Q.    Okay.  And that's from the ATM fee?

10   A.    Yes.

11   Q.    Okay.

12   A.    They charge 1.85, but we just get paid 85 cents per

13   transaction.

14   Q.    And where's -- where's the other dollar go to?

15   A.    To them.

16   Q.    Who's them?

17   A.    The owner of the ATM.

18   Q.    Okay.  All right.  So now, when Joel calls you and

19   tells you there's a situation with the ATM machine and this

20   person, do you talk to him?

21   A.    To Joel?

22   Q.    Well, no, Joel, yes, but the other -- the person --

23   A.    I try.

24   Q.    Explain that.

25   A.    I told him to put him on the phone, because I know who

1    it was and then I told him to put him on the phone, because he

2    always seem like a nice guy, and I told Joel, put him on the

3    phone and then when he put him on the phone, he didn't want to

4    listen to me.

5    Q.    When you say -- who do you mean by he?

6    A.    The bald --

7    Q.    Okay.

8    A.    The bald head guy.

9    Q.    Okay.  Now --

10   A.    I don't know his name.

11   Q.    Oh, okay.  And if I may just instruct the witness that

12   his name is Mr. Quinn, Your Honor.

13               THE COURT:  You may.

14   BY MR. ECKERT:

15   Q.    And so I'll refer to him throughout your testimony as

16   the bald gentleman or Mr. Quinn, is that okay?

17   A.    Mr. Who?

18   Q.    Mr. Quinn.

19   A.    Mr. Quinn.  Okay.

20   Q.    So the bald gentleman, you said you indicated you had

21   known him or you had seen him before?

22   A.    Yes.

23   Q.    Explain that.

24   A.    He goes to the store once in a while sometimes.

25   Q.    Okay.

1   A.    A lot of times.

2   Q.    So that's how you knew him, from him coming into the

3   store?

4   A.    Yes.

5   Q.    Okay.  Had you ever had any problems with him before?

6   A.    No.

7   Q.    Okay.  When you spoke to him or when you tried to speak

8   to him, what did you tell him?

9   A.    I told him that we have nothing to do with the ATM, to

10  wait for me, that I was going over there, because I was at the

11  other location.  So I told him that I'll be there shortly so

12  we could call the company so we can make a complaint, but he

13  didn't want to listen to me.

14  Q.    What did he say to you?

15  A.    He curse at me.

16  Q.    Yes.  I apologize for having to ask you this, ma'am,

17  but if you don't mind, if you could just say exactly what it

18  was he said to you.

19  A.    The bad words he told me?

20  Q.    Yes.

21  A.    Do I have to say it?

22  Q.    It's important for us to understand the context of what

23  was -- what was happening, so yes, please.

24  A.    Well, he said, fuck all that.  I don't hear nothing you

25  -- you told me.  I just want my fucking money.

Page 100

1    Q.    And what did you tell -- what did you tell him in

2    response to that?

3    A.    I just try to talk to him and said, Papi, calm down,

4    I'm on my way there, but he just keep pass the phone to Joel.

5    He didn't want to listen to me.

6    Q.    Okay.  Now, when you were conversing with Joel, what

7    language were you speaking?

8    A.    In Spanish.

9    Q.    Why was that?

10   A.    To Joel?

11   Q.    Yes.

12   A.    He doesn't speak English.

13   Q.    Okay.  Now, let me ask you this, did you ever talk to

14   the bald gentleman, Mr. Quinn again?  Not later in the store,

15   but on the phone.  Did you ever speak to him again on the

16   phone?

17   A.    No.

18   Q.    After you had this conversation, what did you decide to

19   do?

20   A.    I was on my way there.

21   Q.    Okay.  And did you wait a while, did you go right away?

22   Explain that.

23   A.    No.  I went right away.  I have a system.  I have a

24   camera system that I could put it on my phone.  So I look it

25   up to see how every was looking.  And then I saw him forcing

1  to go inside the cash register, so that's when I start getting

2  nervous and I just went to the store.

3  Q.    Okay.  So step back a minute.  So the 152 East

4  Sharpnack that has a security footage system or surveillance

5  video?

6  A.    Yes.

7  Q.    And how are you able to access that not being at the

8  store?

9  A.    On my phone.

10  Q.    Okay.  And Mr. --

11  A.    I have an application.

12  Q.    Okay.

13  A.    That I can see the camera live in my phone.

14  Q.    Okay.  So you can -- is it -- is it a live feed?

15  A.    Yes.

16  Q.    In other words, what's happening in the store you're

17  able to witness on your phone?

18  A.    Right away, yes.

19  Q.    Okay.  And you said you were concerned with what you

20  were viewing?

21  A.    Yes.

22  Q.    Where was -- when you pulled it up where was Mr. Quinn,

23  the bald gentleman?

24  A.    He was in the front -- in the outside of the cash

25  register, but he was like arguing to Joel, so Joel was like

Page 102

1   trying to tell him, you know, I could see the signs that he

2   was telling him to calm down, because I was in the phone, and

3   then when I saw him go around that he trying to go inside the

4   cash register, that's when I called the police.

5   Q.    Okay.

6              MR. ECKERT:  And at this time, Your Honor, I'd

7   like to -- with permission of the Court and counsel, play

8   government's -- the 911 call.  It's Exhibit 5.

9              THE COURT:  What is the number again?

10             MR. ECKERT:  Five, Your Honor.

11                       -  -  -

12                 (Audio recording played)

13                       -  -  -

14             Friday, March 22, 2019, 16:54:49.

15             POLICE DISPATCHER:  Philadelphia Police

16   Dispatcher 181, may I help you?

17             MS. RODRIGUEZ:  [Indiscernible] I need somebody

18   right now [indiscernible].

19             POLICE DISPATCHER:  Listen.  Listen.  Listen.

20   Listen.  Listen.  I want you to calm down and slow down.

21                       -  -  -

22                 (Audio recording ends)

23                       -  -  -

24             MR. ECKERT:  [Indiscernible] I apologize to the

25   Court and the jury.

Page 103

1              THE COURT:  You haven't moved this into

2      evidence, why don't you do it now?

3              MR. ECKERT:  We would move 5 -- Exhibit 5A into

4      evidence, Your Honor.

5              THE COURT:  Any objection?

6              MR. WITTELS:  No objection.

7              MR. PATTERSON:  No objection.

8              THE COURT:  5A is -- G5 is received.

9                              -  -  -

10             (Whereupon, Government's Exhibit Number G5 was

11     admitted into evidence.)

12                             -  -  -

13             MR. ECKERT:  It is G5 and it is multiple -- this

14     is the only -- there's one -- we're only moving one call at

15     this time, so it would be G --

16             MS. MEEHAN:  Judge, may we see you at sidebar?

17             THE COURT:  Yes.

18             MS. MEEHAN:  Thank you.

19             THE COURT:  Your exhibit list only identifies

20     G5.

21             MR. ECKERT:  Okay.  Well, we'll address that,

22     Your Honor.

23             THE COURT:  All right.  We'll do that at

24     sidebar.

25                             -  -  -

```
 1                    (SIDEBAR BEGINS)

 2                         -  -  -

 3              MS. MEEHAN:  Your Honor, we have a

 4    [indiscernible] issue.  Judge --

 5              MR. ECKERT:  [Indiscernible].

 6              MS. MEEHAN:  Right.  I understand that.  I would

 7    like an offer of proof, because -- let me -- let me explain

 8    this for the record.  This witness was not present in the

 9    store.  She watched from her phone and she can say, I called

10    the police and I told the police this, but the fact that

11    they're playing the call isn't relevant and there's --

12    there's -- it's prejudicial.  It's because, she can testify

13    what she says --

14              THE COURT:  Prejudicial?  Tell me why it's

15    prejudicial.

16              MS. MEEHAN:  But I -- why is it relevant to the

17    case [indiscernible] the 911 call?  So she's not an eye

18    witness.  She saw it on her phone.

19              THE COURT:  She's [indiscernible] --

20              MR. ECKERT:  She was so concerned of what she

21    saw that she felt the need to immediately call the police.

22              MS. MEEHAN:  She can testify to that, but

23    you're --

24              MR. ECKERT:  She's on the phone.

25              MS. MEEHAN:  I'll stipulate she called the
```

Page 105

```
 1    police.

 2                MR. ECKERT:  You don't get to pick and choose

 3    what evidence there is.  It's absolutely relevant that she

 4    felt the need to call the police [indiscernible] she saw.

 5                MS. MEEHAN:  And -- and she can say that.

 6    That's testimony.  She can say that.  I felt the need to call

 7    the police.  We don't have to hear the call itself.  That's --

 8    that's hearsay.

 9                MR. ECKERT:  That goes to weight.

10                THE COURT:  [Indiscernible].

11                MS. MEEHAN:  Well, it's hearsay, first of all.

12                THE COURT:  It's what?

13                MS. MEEHAN:  It's hearsay.  [Indiscernible].

14                MR. ECKERT:  [Indiscernible] she's describing

15    what she said.

16                THE COURT:  [Indiscernible] that I can think of,

17    it would be one or two evidence sessions on the hearsay rule.

18    It's prejudicial, you tell me, because she's recording what

19    she's just seen involving your client.

20                MS. MEEHAN:  Well, she's watching it.  She's not

21    recording it, Your Honor.

22                THE COURT:  Well, she saw it on the screen.

23                MS. MEEHAN:  On her phone.

24                THE COURT:  And it was simultaneous.

25                MS. MEEHAN:  I think so.
```

1          THE COURT:  [Indiscernible] no.  I think her

2     tone of voice, among other things is certainly -- it gives an

3     [indiscernible] it's hearsay.  I think there might be other

4     exceptions to the hearsay rule [indiscernible].  Your

5     objection is overruled.

6          MS. MEEHAN:  Okay.

7          THE COURT:  The objection was overruled, counsel

8     may proceed with the audio tape.

9          MR. ECKERT:  Thank you, Your Honor.

10                    -  -  -

11               (Audio recording played)

12                    -  -  -

13          Friday, March 22, 2019, 16:54:49.

14          POLICE DISPATCHER:  Philadelphia Police

15     Dispatcher 181.  May I help you.

16          MS. RODRIGUEZ:  Yes, I need somebody right now

17     on 152 Sharpnack Street.

18          POLICE DISPATCHER:  Listen.  Listen.  Listen.

19     Listen.  Listen.  I want you to calm down and slow down.  Give

20     me the address where you need help.  Give me the address where

21     you need help.

22          MS. RODRIGUEZ:  152 East Sharpnack.

23          POLICE DISPATCHER:  152 East Sharpnack.  Is this

24     a house?

25          MS. RODRIGUEZ:  No.

                                                             Page 107

1                POLICE DISPATCHER:  Ma'am, stop speaking.

2                MS. RODRIGUEZ:  It's a store.

3                POLICE DISPATCHER:  Is this a house or an

4    apartment?

5                MS. RODRIGUEZ:  In the store.  In the store.

6                POLICE DISPATCHER:  What kind of store is it?

7                MS. RODRIGUEZ:  It's a grocery store.  152 East

8    Sharpnack Street.

9                POLICE DISPATCHER:  What's the problem?

10               MS. RODRIGUEZ:  [Indiscernible].

11               POLICE DISPATCHER:  Police what's the problem?

12               MS. RODRIGUEZ:  He went to cash register inside.

13   He's threaten the guy there, because the ATM didn't give

14   him --

15               POLICE DISPATCHER:  Ma'am, you're talking too

16   fast.  Slow down.  What is he doing?

17               MS. RODRIGUEZ:  Can you send somebody?  Can you

18   send somebody?

19               POLICE DISPATCHER:  What happened?  What

20   happened?

21               MS. RODRIGUEZ:  He went to the cash register.

22   He said that the ATM didn't give him the right money.

23               POLICE DISPATCHER:  Okay.  Listen.  Does he have

24   any weapons?

25               MS. RODRIGUEZ:  [Indiscernible].

Page 108

1              POLICE DISPATCHER:  Does he have any weapons?

2              MS. RODRIGUEZ:  Yes.  Please --

3              POLICE DISPATCHER:  What kind of weapon does he

4    have?

5              MS. RODRIGUEZ:  I don't know.  I'm on my way --

6              POLICE DISPATCHER:  Did you see a weapon?

7              MS. RODRIGUEZ:  No.

8              POLICE DISPATCHER:  So you don't know if he has

9    any weapons or not?  Is he white, black or Hispanic?

10             MS. RODRIGUEZ:  He's black.

11             POLICE DISPATCHER:  Black male.  Light

12   complected or dark complected?

13             MS. RODRIGUEZ:  He's dark.  Dark --

14             POLICE DISPATCHER:  He's dark?  Dark complected?

15   Is he tall?  Short?  Heavy or thin?

16             MS. RODRIGUEZ:  Very heavy, please, please.

17             POLICE DISPATCHER:  Heavy -- well, ma'am, you

18   have to answer my questions.  Heavy build.  Is he tall or

19   short?

20             MS. RODRIGUEZ:  [Indiscernible].

21             POLICE DISPATCHER:  Is he tall or short?

22             MS. RODRIGUEZ:  Yes.  Tall.  Tall.

23             POLICE DISPATCHER:  What color -- what color

24   jacket is he wearing?

25             MS. RODRIGUEZ:  Black.  Black.

Page 109

1          POLICE DISPATCHER:  A black jacket.  What color

2     pants?

3          MS. RODRIGUEZ:  Yes.  Black.

4          POLICE DISPATCHER:  Black points is he still

5     inside the store?

6          MS. RODRIGUEZ:  Inside.  Inside.

7          POLICE DISPATCHER:  Police will be out as soon

8     as possible.

9          MS. RODRIGUEZ:  Thank you.

10          POLICE DISPATCHER:  You're welcome.

11                              -  -  -

12                   (Audio recording ends)

13                              -  -  -

14     BY MR. ECKERT:

15     Q.    Ma'am, was that your voice on the phone call?

16     A.    Yes.

17     Q.    Okay.  And you're upset at the time?

18     A.    Yes.

19     Q.    Okay.  Now, when you made that phone call, were you

20     driving over to the other store on Sharpnack Street?

21     A.    Yes.

22     Q.    Okay.  How long did it take you to get over there?

23     A.    It took me about five minutes.

24     Q.    Okay.  Now, if you could, just indicate -- well, let me

25     ask you this, when you arrived on Sharpnack Street, did you

1    park your vehicle?

2    A.    Yes.

3    Q.    And did you go in the store?

4    A.    Yes.

5    Q.    All right.  And what did you observe when you walked

6    into the store?

7    A.    The bald head guy was coming out.

8    Q.    Okay.  We say the -- the bald by, that's the person

9    you've been referring to throughout your testimony here today?

10   A.    Yes.

11   Q.    Okay.  Who else did you see?

12   A.    I saw more guy in there and a woman.

13   Q.    Okay.  And the two gentleman that you saw, had you ever

14   seen any of them before?

15   A.    One of them, yes.

16   Q.    Which one?  You described something about him?

17   A.    I call him the big guy.

18   Q.    Okay.  And you had seen him -- let the record reflect

19   that the witness is referring to Mr. Stevens.  You had seen

20   the big guy, Mr. Stevens.  You had seen him before?

21   A.    Yes.

22   Q.    How often?

23   A.    He used to go to the store.  I'm not going to say

24   everyday, some days.

25   Q.    Okay.  And the third gentleman, had you ever seen him

Page 111

1   before?

2   A.    No.

3   Q.    And that was the first time that day?

4   A.    Excuse me.

5   Q.    That day, March 22nd, that was the first time you had

6   ever seen the third gentleman?

7   A.    Yeah.  I don't remember that I see him before.

8   Q.    Okay.

9          MR. ECKERT:  Now, at this time, I'd ask the

10  Court for permission to bring up Government's 1A which is the

11  video.

12         THE COURT:  Excuse me, you may.

13         MR. ECKERT:  Thank you, Your Honor.  We can go

14  to 16:59 and 30 seconds, 16:59 the time, so 4:59 p.m. and 37

15  seconds.  Okay.  And if we could go ahead and play that.  And

16  pause it right there for me.

17                          -  -  -

18                     (Video played)

19                          -  -  -

20  BY MR. ECKERT:

21  Q.    And, ma'am, that's you in the pink or red sweat suit

22  there?

23  A.    Yes.

24  Q.    Okay.  And now, when you walk in the store, do you have

25  a full understanding of what's taking place?

1    A.    No.  I just went because of the -- of the bald head guy

2    about the money.

3    Q.    Okay.  Now, if we could play that until 5:00 p.m. and

4    three seconds, please.

5                  -  -  -

6              (Video resumes)

7                  -  -  -

8    BY MR. ECKERT:

9    Q.    Okay.  Ma'am, at first, you walked outside the store.

10   Why did you walk -- you walked in and then you walked back

11   out.  Why did you walk back outside?

12   A.    I was trying to talk to him.

13   Q.    Okay.  Talk to who?

14   A.    To the bald head guy.

15   Q.    Okay.  And when you walked outside, did he speak with

16   you?

17   A.    No.

18   Q.    Where'd he go?

19   A.    He went up Ross walking.

20   Q.    Okay.  So he walked away from the store on the street

21   there?

22   A.    Yes.

23   Q.    Okay.  And did you, at that point, you walked back in

24   the store?

25   A.    Yes.

Page 113

1    Q.    Okay.  Why'd you walk back in?

2    A.    To see what was going on.

3    Q.    Sure.  Of course.  Now, when you say you wanted to talk

4    to the bald guy, Mr. Quinn, what did you want to talk to him

5    about?

6    A.    To talk to him about the money that I -- we -- I was

7    going to call the company for him to see why -- because I

8    didn't know at that point what would happen.

9    Q.    Okay.  Okay.  Now, if we could play the video until 17

10   or 5:01 p.m. please, on the dot.

11                           -  -  -

12                      (Video resumes)

13                           -  -  -

14   BY MR. ECKERT:

15   Q.    Okay.  So a few question about that, ma'am,

16   [indiscernible] Mr. Stevens, the bigger gentleman, he was

17   speaking to you when you first had come back into the store.

18   What was he talking to you about?

19   A.    He was telling me that he was trying to fix it.

20   Q.    Okay.  Now, when you -- and that's for the record,

21   that's you on the right-hand side of the screen there, on the

22   video?

23   A.    Yes.

24   Q.    Okay.  When you're there, are you able to witness the

25   security cameras?

1   A.    Yes.

2   Q.    How's that?

3   A.    I have a big screen right there where I'm looking at.

4   Q.    Okay.  And that -- so that screen that you're -- that's

5   close to where you're standing in the video?

6   A.    Yes.

7   Q.    Okay.  And that -- those cameras show both inside and

8   outside?

9   A.    The camera, yeah.  I have cameras outside too.

10  Q.    Okay.  All right.  Now, at the time that -- if you look

11  at your screen there on the left-hand side of the screen there

12  where the bald gentleman, Mr. Quinn had just stepped back in

13  the store, he appears to be conversing with the third

14  gentleman.  Was there something going on at that point?

15  A.    I didn't hear it.

16  Q.    Okay.  Did you see anything on the outdoor cameras?

17  A.    On the out --

18  Q.    At the -- at this point, have you seen anything on the

19  outdoor cameras?

20  A.    No.

21  Q.    Okay.  Now, you called the police previous to this;

22  correct?

23  A.    Yes.

24  Q.    Were you expecting the police to arrive?

25  A.    Yes.  That's why I was watching the video.

Page 115

1    Q.    Okay.  Did they arrive at this point?

2    A.    There.  No, not yet.

3    Q.    Okay.  Now, if we could play it until 5:02 or 17:02 and

4    58 seconds, please.

5                           -   -   -

6                      (Video resumes)

7                           -   -   -

8    BY MR. ECKERT:

9    Q.    And it appears something is -- appeared in the doorway

10   there, what is that, ma'am?

11   A.    Excuse me?

12   Q.    Do you see something in the doorway?

13   A.    Yeah, the police --

14   Q.    When you looked out the front door, did you observe

15   something?

16   A.    The police.

17   Q.    What was that?  Now, did they come inside at this

18   point?

19   A.    No.

20   Q.    Okay.  Can you go ahead and pause it right there for

21   me?  Why did you go outside?

22   A.    Because I saw the cops.

23   Q.    Okay.  What did you expect the cops to do when you saw

24   the cop car or the police car?

25   A.    I was expecting for them to come in.

1    Q.    Okay.  But they didn't do that at that point?

2    A.    No.  One of them was coming, walking toward me, because

3    it was another car, not just that one, it was another one

4    coming one way, and then I was waiting for one, because he was

5    walking towards me, and then he looked back and he was -- that

6    guy in all black, the one that got the Muslim dress, he was

7    getting in his car and then the cops looked back and he

8    just -- they just went after him.  I don't know.

9    Q.    Okay.  And so when you referred to he before, he

10   walking towards the store, you were referring to a police

11   officer?

12   A.    The police officers, yes.

13   Q.    Okay.  Now, if you could play, until --

14         THE COURT:  When you get to a logical breaking

15   point, it's time for our lunch break, you tell me when Mr.

16   Eckert.

17         MR. ECKERT:  Okay.  This will be fine, Your

18   Honor.  I don't mean to hold the Court up if it's time.  We

19   can pick up after lunch.

20         THE COURT:  All right.  That's what we'll do.

21         MR. ECKERT:  Thank you.

22         THE COURT:  Ladies and gentlemen, it's about

23   quarter of one, we'll recess for lunch, for an hour.  I'll

24   give you some instructions and then day-end instructions.  Do

25   not talk to anyone about the case.  If anyone tries to talk to

1    you about the case, say nothing to them, and report that to

2    me, and again, remember you're not to discuss the case among

3    yourselves.  That must await the end of the trial, completion

4    of the evidence, closing arguments and my instructions.  With

5    that, have a good lunch.  Be sure you take your juror

6    notebooks and leave them in the jury room.

7                    DEPUTY CLERK:  All rise.

8                            - - -

9              (The jury leaves the courtroom.)

10                           - - -

11                   THE COURT:  Be seated everyone.

12                   MR. ECKERT:  Your Honor, may the witness step

13   down?

14                   THE COURT:  I'm sorry, yes.  You may step down

15   Ms. Rodriguez.

16                   MR. ECKERT:  Thank you.

17                   THE COURT:  Is there anything we need addressed

18   before we recess for lunch?  Mr. Eckert.

19                   MR. ECKERT:  Not at this time, Your Honor.

20                   THE COURT:  Defense lawyers, anything.

21                   MR. PATTERSON:  No, Your Honor.  Thank you.

22                   THE COURT:  Mr. Wittels.

23                   MR. WITTELS:  Nothing, Judge.

24                   THE COURT:  And Ms. Meehan.

25                   MS. MEEHAN:  No, Your Honor.

Page 118

```
 1              THE COURT:  Fine.  We're in recess until quarter
 2    of two.  Yes, quarter of two.
 3              DEPUTY CLERK:  All rise.
 4                         -  -  -
 5        (Whereupon, there was a recess in the proceeding from
 6                   12:46 p.m. to 1:55 p.m.)
 7                         -  -  -
 8              THE COURT:  Be seated, everyone.  I understand
 9    counsel want to talk to me.
10              MR. ECKERT:  Your Honor, thank you.  We had in
11    light of what had transpired with the previous witness we had
12    ascertained or we attempted to ascertain the immigration
13    status of our last civilian witness, not the witness who's
14    currently on the stand, but the last civilian witness that we
15    would present today, and in light of discussion with counsel,
16    I don't believe there's any desire to cross-examine him on it,
17    but certainly, if that changes, we can put more on the record,
18    but we disclosed what his immigration status was to counsel,
19    and counsel indicated to me that they did not believe there
20    was any need to cross-examine him on it.
21              THE COURT:  You're talking about Mr. Ventura?
22              MR. ECKERT:  Mr. Sanchez.
23              THE COURT:  Pardon me.
24              MR. ECKERT:  Mr. Sanchez.  He has not testified
25    yet, Your Honor.
```

1                THE COURT:  Oh.

2                MR. ECKERT:  But in light of the Court's ruling

3     about what the previous witness, we felt we had an obligation

4     to -- to have that discussion, and we did have him -- we

5     had -- we did not pay for counsel or anything like that, but

6     we ensured that he had the opportunity to meet with an

7     attorney to represent him that's not associated with the

8     government.  And I don't seek to put any specific details on

9     the record in light of the fact that defense counsel has told

10    me they don't believe it's relevant, but we at least want to

11    make the Court aware of the situation.

12               THE COURT:  So that the record is clear, I

13    gather that what we're talking about is a witness who has not

14    yet been called.

15               MR. ECKERT:  Correct, Your Honor.

16               THE COURT:  And his name is?

17               MR. ECKERT:  Mr. Sanchez.  Emmanuel Sanchez.

18               THE COURT:  Emmanuel Sanchez.  And the question

19    was how we should handle any potential immigration issues?

20               MR. ECKERT:  Right.

21               THE COURT:  As a result of what was done with

22    respect to Mr. Ventura, the government asked Mr. Sanchez

23    whether he was a lawful resident --

24               MR. ECKERT:  Correct, Your Honor.

25               THE COURT:  -- and the answer was yes.

Page 120

```
 1              MR. ECKERT:  No.  The answer was that he's
 2   overstayed a visa.  At that point we got him counsel.  I don't
 3   want to say got him counsel, we did not pay for counsel or
 4   anything like that.  We arranged for him to have the
 5   opportunity to meet with an attorney, an immigration attorney,
 6   not a criminal attorney, immigration attorney.  I believe -- I
 7   thought it was the course of action suggested by the Court.
 8              THE COURT:  I think that's the best way to
 9   handle it.  The alternative would be for me to give the
10   witness, the potential witness instructions, and because of
11   the complexity of the immigration law --
12              MR. ECKERT:  Right.
13              THE COURT:  -- I don't choose to, at least with
14   respect to these witnesses, take that course.
15              MR. ECKERT:  Right.  And we don't -- we're not
16   requesting any action of the Court at this time, I just -- I
17   just wanted the Court to be aware of it, based on --
18              THE COURT:  Well, thank for putting it on the
19   record.  Do the defendants all agree to that procedure?  Mr.
20   Patterson.
21              Mr. PATTERSON:  On behalf of Mr. Smith, we --
22   I -- we agree.
23              THE COURT:  Mr. Wittels.
24              MR. WITTELS:  We agree, Your Honor.
25              THE COURT:  Ms. Meehan.
```

Page 121

1          MS. MEEHAN:  Agreed.

2          THE COURT:  I'm sorry, I didn't hear you.

3          MS. MEEHAN:  I'm sorry, agreed, Your Honor.

4   Yes.

5          THE COURT:  Thank you.  All right.  And now,

6   we'll put Ms. Rodriguez back on the stand?

7          MR. ECKERT:  Yes, Your Honor.  May I ask her to

8   step in the courtroom?

9          THE COURT:  Yes.

10          MR. ECKERT:  Thank you.

11          THE COURT:  Ms. Hull, you may bring the jury in.

12   And you may return to what I'll refer to as your seat.  You'll

13   have to stand in a minute, but you may sit down there.

14          MS. HULL:  Oh, okay.  Thank you.

15          DEPUTY CLERK:  All rise.

16                        - - -

17          (The jury enters the courtroom.)

18                        - - -

19          THE COURT:  Be seated, everyone.  You may

20   proceed, Ms. Meehan.

21          MR. ECKERT:  Thank you, Your Honor.

22          THE COURT:  I'm sorry.  Very well.  You have

23   some redirect.

24          MR. ECKERT:  No.  It's -- we're still on direct.

25   We did not finish the direct examination.

Page 122

```
 1              THE COURT:  All right.  We're going on and on.

 2    I remind you, Ms. Rodriguez, you're still under oath.  You'll

 3    continue your testimony.  Mr. Eckert, you may.

 4              MR. ECKERT:  Thank you.

 5                          - - -

 6                   CROSS-EXAMINATION

 7                          - - -

 8              MR. ECKERT:  All right.  If I could just ask for

 9    the screen still up for the jury, please.  Thank you.

10    BY MR. ECKERT:

11    Q.    Okay.  And, ma'am, before we broke for lunch, we were

12    discussing what you observed when you first went outside

13    there; okay?

14    A.    Yes.

15    Q.    And what was it that caused you to want to go outside?

16    A.    I saw the police.

17    Q.    Okay.  And you saw them on the TV screens that you had

18    mentioned a moment ago?

19    A.    Yes.

20    Q.    All right.  And when you went outside, were you

21    expecting it police to come into store?

22    A.    Yes.

23    Q.    Did they at that time?

24    A.    No.

25    Q.    Okay.  And where did -- you had mentioned earlier that
```

1    you saw the bald gentleman, Mr. Quinn, he had walked away.

2    Did you see the shorter gentleman who was dressed in all

3    black?  Did you see him when you were outside?

4    A.    Yes.

5    Q.    Explain that.

6    A.    He was going to his car.

7    Q.    Okay.  Where was his car parked?

8    A.    He was parked on the side of the street.

9    Q.    Okay.  How long were you --

10   A.    On the left.

11   Q.    I didn't mean to cut you off.  How long would it take

12   you to walk from the front door of your store to where his car

13   was parked?

14   A.    Seconds.

15   Q.    Okay.  And did you see him at his car?

16   A.    Yes.

17   Q.    Okay.  And what did you observe with regard to the

18   police at his car?

19   A.    The police just look back and the police saw him

20   getting in his car and then the police just went to him.

21   Q.    Okay.  It appeared to you that the police were more

22   interested in him than coming into the store?

23   A.    Yes.

24   Q.    Okay.  Now, at that time, if we could go ahead and play

25   until 17:04 for 5:04 and 14 seconds, please.

```
 1                        -   -   -

 2                  (Video resumes)

 3                        -   -   -

 4    BY MR. ECKERT:

 5    Q.    Okay.  First question, ma'am, is the lady that's on the

 6    right-hand side of that screen there, wearing black clothing,

 7    who is that?

 8    A.    She said that the guy was her husband.

 9    Q.    Okay.  Now, you and Mr. Stevens, the big guy, you

10    appear to be having a conversation there for some time.  What

11    were you guys talking about?

12    A.    He was telling me that why did I tell the cops that he

13    was two -- that he was two.

14    Q.    When you say he was two, two what?

15    A.    It was two gentleman.

16    Q.    Okay.  And what were you trying -- were you also

17    explaining stuff to him?

18    A.    Yeah.  I was explaining to him that -- because she was

19    saying the -- all of them, because $100 that he was going to

20    give it to him and then I said that I was trying to explain to

21    him that we have nothing to do with the ATM that I was going

22    to call the guy for the ATM.

23    Q.    Okay.  And when you say call the guy, you were going to

24    try and allev iate whatever that situation was?

25    A.    Yes.
```

Page 125

1   Q.   All right.

2            MR. ECKERT:  If we could play to 17 of 5:04 and

3   56 seconds, please.

4                        -  -  -

5                   (Video resumes)

6                        -  -  -

7   BY MR. ECKERT:

8   Q.   Okay.  What's the conversation going on there?

9   A.   He was telling me if I was happy that because of me

10  they was going to -- they was chasing the other -- her

11  husband.

12  Q.   And when you say they was chasing, who was chasing?

13  A.   The police was chasing the guy in black.

14  Q.   Okay.  At one point they were -- there where it

15  stopped, you put your hand up.  Why did you do that, ma'am?

16  A.   Because I was telling him to don't talk to me like

17  that, because he was spitting on me.

18  Q.   Okay.  Did you feel threatened at that time?

19  A.   At that moment.  No.  I was --

20  Q.   Did he feel threatened at any point during your

21  interaction Mr. Stevens, the big guy?

22  A.   Yeah.

23  Q.   Why was that?

24  A.   Because he was loud to me.

25  Q.   Okay.

1   A.    And he was in my face.

2   Q.    Okay.  Anything specific that he said about that that

3   caused you to feel threatened?

4   A.    Well, he said, he told me that that was his

5   neighborhood, that he owned the neighborhood.  This is my

6   neighborhood and that he would close the store at any time he

7   want to.

8   Q.    Okay.

9           MR. ECKERT:  Your Honor, may I ask for one

10  moment to consult with counsel?

11          THE COURT:  Yes.

12          MR. ECKERT:  Thank you.  And, Your Honor, placed

13  on previous agreement with counsel, at this point I would move

14  the photo I raised.  I'm happy to question the witness about

15  them, but I don't believe that it appears to be necessary

16  based on the -- okay.

17          We move Government's 14, which is the photo

18  array containing Donnie Smith, 37, which is the photo array

19  containing Mr. Stevens, and 39 photo array containing Mr.

20  Quinn.

21          THE COURT:  And what are we doing with regard to

22  the three photo arrays?

23          MR. ECKERT:  We were moving them into evidence,

24  Your Honor.  I'm happy to lay the foundation, but I believe

25  based on prior agreements.

Page 127

1             THE COURT:  Is there any objection?

2             MR. PATTERSON:  No objection.

3             THE COURT:  Mr. Patterson.

4             MR. PATTERSON:  No objection.

5             MS. MEEHAN:  No objection, Your Honor.

6             THE COURT:  Fine.

7    BY MR. ECKERT:

8    Q.    Ma'am, thank you very much.  That concludes my

9    examination.

10            THE COURT:  Let me just finish, G14 is received.

11   The other --

12                        -  -  -

13            (Whereupon, Government's Exhibit Number G14 was

14   admitted into evidence.)

15                        -  -  -

16            MR. ECKERT:  The other two, Your Honor, were 37

17   and 39.

18            THE COURT:  G37 is received.

19                        -  -  -

20            (Whereupon, Government's Exhibit Number G37 was

21   admitted into evidence.)

22                        -  -  -

23            THE COURT:  And G39 is received.

24                        -  -  -

25            (Whereupon, Government's Exhibit Number G39 was

Page 128

1   admitted into evidence.)

2                           -  -  -

3              THE COURT:  Your direct examination is --

4              MR. ECKERT:  That is it, Your Honor.  Thank you.

5              THE COURT:  -- completed?  All right.  You may

6   cross-examine.

7              MR. PATTERSON:  Thank you, Your Honor.

8                           -  -  -

9                       CROSS-EXAMINATION

10                          -  -  -

11  BY MR. PATTERSON:

12  Q.    Good afternoon, Ms. Rodriguez.

13  A.    Good afternoon.

14  Q.    This shouldn't take that long.  This is your store;

15  correct?

16  A.    Yes.

17  Q.    You're the owner?

18  A.    Yes.

19  Q.    And you're involved in, obviously, the day-to-day

20  operation during the period of time March 22, 2019; correct?

21  And how many years before were you the owner of the store

22  before March 22nd?

23  A.    If I was there?

24  Q.    Yeah.  How long did you own the store?

25  A.    10 years.

Page 129

1    Q.    Okay.  And you had testified that being the owner,

2    being in the store, you knew a lot of people in the

3    neighborhood; is that correct?

4    A.    Yes.

5    Q.    Because it's a neighborhood store and obviously, you're

6    number one customers would be the neighborhood people;

7    correct?

8    A.    Yes.

9    Q.    In the 10 years that you've owned the store up to the

10   date in question, March 22, 2019, you never saw my client who

11   you described as a Muslim man to the police who is now Donnie

12   Smith, you never saw him at your store, did you?

13   A.    Not that I remember.

14   Q.    If you remembered you would have said so, because it

15   would've been important, because you've seen him before;

16   correct?

17   A.    Yes.

18   Q.    Okay.  I'm going to ask you about the -- the security

19   equipment in your store.  Do you maintain a separate company

20   that sells you the CCTV, the video equipment or did you put

21   that in yourself?

22   A.    A company.

23   Q.    Okay.  And does the company service it or do you know

24   the day-to-day operation of this video recorder?  Do you know

25   how to use it?

1    A.    Yes.

2    Q.    Would you agree with me that it's about the size of a

3    DVD player?

4    A.    Yes.

5    Q.    And it's got a mouse?

6    A.    Yes.

7    Q.    And in the mouse you can move the cursor around and you

8    can click certain pictures of all the cameras that are

9    recording on any given day; correct?

10   A.    Yes.

11   Q.    And if I get -- if I'm getting technical, just tell me

12   you don't know and I'll just stop.  Would you agree with me

13   that there's one -- it's called a -- would you agree with me

14   that this box that looks like a DVD player is called a digital

15   video recorder?  Did you ever hear that terminology in

16   reference to that machine?  No?  Okay.  Let's just say this,

17   let's just refer to it as a video recorder.  You know what I'm

18   talking about; correct?

19   A.    Yes.

20   Q.    Okay.  How many cameras do you have in the store?

21   A.    13.

22   Q.    And these cameras and the DVR, the video recorder was

23   installed by a professional company?

24   A.    Yes.

25   Q.    You didn't go to Wal-Mart, buy it and put it up

1    yourself with all the wires?

2    A.    No.

3    Q.    So once they put it up, since you're paying for it, it

4    was -- it functions very well?

5    A.    Yes.

6    Q.    You had, I'm sorry, 13 cameras?

7    A.    Yes.

8    Q.    So if there's 13 cameras, there's not 13 separate video

9    recordings; correct?

10   A.    No.

11   Q.    It's one video --

12   A.    I video.

13   Q.    -- recorder and it -- inside the box it records

14   everything that it's seeing on any given moment, any given

15   day, any given second; correct?

16   A.    Yes.

17   Q.    And it was functioning on that day; correct?

18   A.    Yes.

19   Q.    And it was functioning before that day, because

20   obviously, if it wasn't functioning, you'd have concerns and

21   you what, call the company up?

22   A.    Yes.

23   Q.    So you didn't have to call the company, because all 13

24   cameras were recording.  And all 13 cameras then were

25   recording right directly into that one box; right?

Page 132

1    A.    Yes.

2              MR. PATTERSON:  Your Honor, if I may put up on

3    the monitors for what's been marked for identification

4    purposes as Defense Exhibit Number 8.

5              THE COURT:  Defense, there's three defendants,

6    this would be Defendant Smith?

7              MR. PATTERSON:  I think it's --

8              MS. MEEHAN:  Defendant Quinn's D8, Your Honor.

9              MR. PATTERSON:  Defendant Quinn, Your Honor.

10   The big one is not on.

11             THE COURT:  And the number again?

12             MR. PATTERSON:  Number 8.  Your Honor, the big

13   screen is not on.

14             UNIDENTIFIED SPEAKER:  [Indiscernible].

15             MR. PATTERSON:  Oh, okay.  I'm sorry.

16   BY MR. PATTERSON:

17   Q.    You've already seen this picture before.  Can you tell

18   the jury what that picture depicts?

19   A.    I haven't seen that picture before.

20   Q.    Oh, I'm sorry.  What -- there's a video screen in that

21   picture; correct?

22   A.    Yes.

23   Q.    And what is on the video screen?

24   A.    This right here?

25   Q.    Yep.

1   A.    Oh, that's the camera, the TV for the -- to see all the

2   cameras.

3   Q.    So when you go back -- is the actual box, the video

4   recorder in a back room where your office somewhere?

5   A.    Yes.  In the top.

6   Q.    Okay.  So you can take a mouse and you can have all

7   your video cameras displayed like that in little tiny boxes so

8   you get more pictures on one -- on that TV; correct?  Or you

9   can hit a button and it'll just be one picture; correct?

10  A.    Yes.

11  Q.    And it's safe to say then that that monitor -- I'm

12  going to reference for the record that the court monitor there

13  it's not as big as that; right?  The actually, the whole --

14  A.    Oh, no.  No.

15  Q.    A little bit smaller?

16  A.    Yes.

17  Q.    Where is that screen in relationship to where people

18  come and go in the store?  Is it prominently displayed so your

19  patients [ph] can see that picture?

20  A.    Yes.

21  Q.    You don't have that screen with the feed from all these

22  cameras in the back room, because you want people to see in

23  your store they're being recorded; right?  That's why you put

24  it there; right?

25  A.    I guess.

1    Q.    Fair?  So if you were in the store and your buying

2    something, and you turn around, you can see yourself if you're

3    in front of one of its cameras; right?

4    A.    Yes.  Some of them, yes.

5    Q.    Right.  And that picture is being recorded; right?

6    A.    Yes.

7    Q.    Okay.  Now, you had already described the incident

8    that's total unrelated to these gentleman seated here about a

9    shooting at your store; correct?

10   A.    Yes.

11   Q.    So you had the interaction with the Philadelphia Police

12   Department in relationship to this other unrelated event;

13   right?  They came into your store and they interviewed you?

14   A.    For the last incident?

15   Q.    Yeah.  For the shooting?

16   A.    Yes.

17   Q.    And they asked you if you had any video?

18   A.    Yes.

19   Q.    And then would show them the video in case there was

20   something important and they can capture from what you've been

21   recording; correct?

22   A.    Yes.

23   Q.    And the jurors have seen a lot of the moving -- the

24   moving videos, it's a pretty good picture; right?

25   A.    Yes.

Page 135

1    Q.   You can see everything clearly; right?  The same thing

2    on this case.  You had a lot of interaction with the

3    Philadelphia Police Department for this incident when they

4    came to investigate; correct?

5    A.   Yes.

6    Q.   And the same thing, they would come and they would ask

7    you to see your digital video recording, the video recorder --

8    A.   Yeah.

9    Q.   -- so they can review everything.  And by the way, do

10   you recall being asked questions and you answering questions

11   by a Detective Funk of the Philadelphia Police Department?

12   A.   When?

13   Q.   I think you met with him at 7:30 p.m. on the same day,

14   March 22nd.  Did you -- were you interviewed by the

15   Philadelphia Police Department with respect to what happened?

16   A.   Oh, in the district?  Yes.

17   Q.   Yes.  Okay.  So you did give a statement and you

18   answered the questions that he gave to you?

19   A.   Yes.

20   Q.   And the answers on the report are the answers to the

21   police officer are the same as what you said here today;

22   correct?

23   A.   Yes.

24   Q.   Okay.

25            MR. PATTERSON:  With the Court's indulgence.

1    Now I am -- can you enlarge that?

2    BY MR. PATTERSON:

3    Q.   Now, the same picture now is enlarged, would you agree?

4    You can see the -- you can see the cameras stills enlarged; is

5    that right?  Right?

6    A.   Yes, but that picture --

7             THE COURT:  What is the exhibit number?

8             THE WITNESS:  Is the new owners now.  That's

9    not -- that's not.

10   BY MR. PATTERSON:

11   Q.   I understand, but I'm just saying for purposes of right

12   now, they just enlarged the picture; right?

13   A.   Oh, yes.  Yes.

14   Q.   Yeah.  Okay.  Now, I'm going to --

15            THE COURT:  The exhibit on the screen is not an

16   enlargement of D8.

17            MR. PATTERSON:  It is, Your Honor.  We just

18   enlarged it so they can see the actual monitor better.

19            UNIDENTIFIED SPEAKER:  I'll do it again.

20            MR. PATTERSON:  Okay.

21            UNIDENTIFIED SPEAKER:  So Your Honor can see.

22            MR. PATTERSON:  So that's the picture where it's

23   in the background and now it's just enlarged.  Same thing.

24   BY MR. PATTERSON:

25   Q.   So if you could please follow along with me --

Page 137

1              THE COURT:  Defendant's Exhibit 8?

2              MR. PATTERSON:  Yeah.

3              THE COURT:  Now, you're talking about defendant

4    Quinn or is this another exhibit I don't have?

5              MR. PATTERSON:  No.  This is the same exhibit.

6    I just ask that the exhibit be enlarged.

7              MR. ECKERT:  Your Honor, can I just find out

8    when this picture was taken?

9              THE COURT:  Pardon me?

10             MR. ECKERT:  Can I find out when this picture

11   was taken, because I think that's causing confusion with the

12   witness.

13             MR. PATTERSON:  Oh, I'm sorry.

14             MS. MEEHAN:  About a month ago, Your Honor.  So,

15   I think there was testimony that it's the same screen, but

16   obviously, what's on the screen from a month ago is not what

17   was on the screen on March 22nd.  I think that's the

18   confusion.

19             MR. PATTERSON:  I'm not asking questions about

20   what's in each little box on the video monitor.  I have

21   other -- very general questions with respect to that.  If I

22   can proceed, I think I can clarify it.

23             THE COURT:  What you have on the screen is an

24   enlargement --

25             MR. PATTERSON:  Yes.

1          THE COURT:  -- of the TV screen that's shown --

2          MR. PATTERSON:  Yes.  Yes.

3          THE COURT:  -- in D8?

4          MR. PATTERSON:  I apologize [indiscernible] just

5    so we can see it better.

6    BY MR. PATTERSON:

7    Q.    It looks like you have 13 cameras; correct?

8    A.    That I remember, yes.

9    Q.    When that snapshot was taken or that capture was taken,

10   it looks like it's displaying one, two, three, four, five,

11   six, it's displaying --

12   A.    Nine.

13   Q.    -- nine separate feeds from nine separate cameras;

14   right?

15   A.    Yes.

16   Q.    And so obviously when you used the mouse, you could've

17   had it display all 13, but that particular day, you just felt

18   displaying nine?

19   A.    We just put nine in there for security, because we

20   don't show the one from the cash register, we hide it.  We

21   don't put it in the screen.

22   Q.    So these are the ones that you display all the time?

23   A.    Yes.

24   Q.    Okay.  Now, if you would look at the -- and again, I

25   don't care what's in the picture, this one asks about your

1   security system.  The lower right-hand corner, what is

2   depicted there?  Is that an outside camera?

3   A.    Yes.

4   Q.    And it looks like from the vantage point of where the

5   camera is pointing to, the camera is actually pointing at your

6   store; correct?

7   A.    Yes.

8   Q.    Mr. I can't see.  It's pointing at the front door of

9   your store; right?

10  A.    Yes.

11  Q.    And that's the door where we've seen in the video

12  people looking out and coming in and out of it; correct?

13  A.    Yes.

14  Q.    So people who are coming into the of your store on any

15  given day while this thing is operating properly and

16  specifically, on March 22nd, you could've captured the comings

17  and goings of people coming into your store and out of your

18  store from that vantage point and that camera; correct?

19  A.    Yes.

20  Q.    Right?  Okay.  Now, the same thing -- do you also have

21  a camera pointing right at the ATM machine?

22  A.    Not right at the ATM.  You can see the ATM machine, but

23  it's not right at the ATM machine.

24  Q.    Okay.  And when this particular picture was taken, your

25  ATM camera was not displayed and it was nine separate videos?

Page 140

1   A.    Yeah.   When I had the store, all the -- the ATM wasn't

2   facing had that way.   It was facing the other way and the case

3   was around.

4   Q.    Okay.

5   A.    So this picture now is with the new owner, so they

6   change everything around.

7   Q.    Okay.   So on March 22, 2019, there wasn't any of your

8   cameras pointed directly at the ATM?

9   A.    Not directly, but you could see it.

10  Q.    Okay.   You could see it?

11  A.    Yes.

12  Q.    So you can see people at it?   You can see people at the

13  ATM machine all when you --

14  A.    Yes.

15  Q.    -- owned the store?

16  A.    Yes.

17  Q.    You can see that they were doing some type of

18  transaction when you owned the store?

19  A.    Yes.

20  Q.    Okay.   Now, you had a lot of interaction with the

21  Philadelphia Police Department because they were the ones who

22  were investigating this incident; correct?

23  A.    Yes.

24  Q.    And they -- they said can we looked at your video?

25  A.    Yes.

Page 141

1  Q.    Okay.  How do you do that?  When they want to -- when

2  they want to review your video, do they take your whole

3  machine with them or how does that work?  Tell the jurors

4  that.

5  A.    No.  They just go there like with a USB and they plug

6  it in the -- in the recorder box and they just take the whole

7  video.

8  Q.    Okay.  So it's a -- USB is a thumb drive?  A little

9  tiny thing, it sticks into a port; correct?

10 A.    Yeah.  The -- they do that.  I don't do that.  I don't

11 know how to do --

12 Q.    And did you ever see -- did you ever see them do it?

13 Did you ever watch him do it?

14 A.    Yeah, because I'm there.

15 Q.    Right.  So they -- it -- would they have something that

16 you described as a USB and they put it in the front; right?

17 And then they down -- they can download -- if you know.

18 A.    They put the time that they want to take that.

19 Q.    Right.  So if this alleged incident happened, you know,

20 on March 22, 2019 over a time span of 20 minutes, they can, in

21 a little tiny drive all copy the entire sequence of all 13

22 cameras, as they were happening, as they were being recorded;

23 correct?

24 A.    Yes.

25 Q.    So obviously, then, if this is what they did and what

1    you saw them do and we'll have police officers here later

2    which we can ask.  They would've had video of the outside of

3    your store when this happened; right?

4    A.    Yes.

5    Q.    Okay.

6    A.    But that camera that -- this one that I have here.

7    Q.    Yeah.

8    A.    I'm not sure if I had that at that moment, because this

9    one I put in not long ago, because I had it in the other

10   neighbors, and she took it down.  So I had to ask permission

11   to the -- to this neighbor right here to put a camera on top

12   of his house, so they could see the store, so I'm not sure if

13   that camera was there at that time or it was the other one

14   that was facing the -- the other way.

15   Q.    On March 22, 2019, was there a camera, maybe a

16   different angle, but was there always a camera outside --

17   A.    Outside.  Yes.

18   Q.    So irrespective of where that camera is showing, on

19   March 22, 2019, when the police came and they put the thumb

20   drive in, there was some operating camera looking at the

21   outside --

22   A.    Outside.  Yes.

23   Q.    -- of your door?  Whether it was on the neighbor's

24   house, the neighbor's porch or the neighbor's telephone pole;

25   right?

Page 143

1    A.    Yes.

2    Q.    So the police, if they wanted to, if they wanted to,

3    they can have a clear picture of the comings and goings of

4    these three individuals on March 22, 2019; correct?

5    A.    Yes.

6    Q.    All right.  Thank you.

7              THE COURT:  Mr. Wittels.

8              MR. WITTELS:  Yes, Judge.  Thank you.

9                      - - -

10                  CROSS-EXAMINATION

11                      - - -

12   BY MR. WITTELS:

13   Q.    Good afternoon.  My name is Barnaby Wittels and I

14   represent Abid Stevens.

15   A.    Good afternoon.

16   Q.    You know Mr. Stevens, don't you?

17   A.    Yes.

18   Q.    In fact, you know him by name, do you not?

19   A.    No.

20   Q.    You know his first name was Abid?

21   A.    No.

22   Q.    He was a frequent customer in the store?

23   A.    Yes.

24   Q.    Has he ever caused you any problems before?

25   A.    Never.

Page 144

1    Q.    Been a good customer?

2    A.    Yes.

3              MR. WITTELS:  Judge, I would like the

4    Government's Exhibit 1A shown from 17:05 to -- I'm sorry, from

5    16:59 to 17:09 without interruption, so that I can then ask

6    this witness questions about it.

7              THE COURT:  16:59 to 17 --

8              MR. WITTELS:  16:59 to 17:09:36.

9              THE COURT:  -- 09.  09?

10             MR. WITTELS:  Yes.

11             MR. ECKERT:  It's just going to take us a second

12   to bring it up, but we'll do that.  Counsel, is that where

13   you'd like to start?

14             MR. WITTELS:  Yes.

15             MR. ECKERT:  Okay.

16                          -  -  -

17                     (Video played)

18                          -  -  -

19             MR. WITTELS:  I think we can stop it here.

20   BY MR. WITTELS:

21   Q.    Ma'am, you came into the store with your cell phone in

22   your hand; correct?

23   A.    Yes.

24   Q.    You didn't have a gun on you or anything, did you?

25   A.    No.

1   Q.    You came into the store because you had seen on your

2   phone this argument with the bald man who was behind the

3   counter and this disturbed you; correct?

4   A.    Yes.

5   Q.    And you came into the store, you weren't afraid of

6   anybody in the store were you?

7   A.    No.

8   Q.    You came into the store, because you wanted to get

9   things straightened out; correct?

10  A.    Yes.

11  Q.    Now, if you looked at the video, you saw a great deal

12  of time when you are talking to Mr. Stevens; correct?

13  A.    Yes.

14  Q.    And you've told us some of what he was saying to you,

15  isn't that correct?

16  A.    Repeat that again.

17  Q.    He hold you -- you told us some of what he was talking

18  to you -- what he said to you; correct?

19  A.    Yes.

20  Q.    And one of the things he said to you was that he's

21  trying to fix it; correct?

22  A.    Yes.  Yes.

23  Q.    And that was the argument about the $100 he was trying

24  to fix that?

25  A.    Yes.

Page 146

1    Q.    Now, during the time that -- that you're in the store,

2    you saw Mr. Stevens talking to Joel; correct?

3    A.    Yes.

4    Q.    You saw him talking to Emmanuel; correct?

5    A.    Yes.

6    Q.    You saw there was at least one customer in the store

7    during this whole period of time; correct?

8    A.    Yes.

9    Q.    And then Mrs. -- Mr. Smith's wife comes in the store;

10   correct?

11   A.    Yes.

12   Q.    Okay.  Now, during this period of time the police --

13   toward the end, the police cars go by; correct?

14   A.    Yes.

15   Q.    And you hear the sirens; correct?

16   A.    Yes.

17   Q.    Does Mr. Stevens react to the sirens from what you

18   could see or what you remember?

19   A.    I don't remember.

20   Q.    Okay.  He didn't leave the store; did he?

21   A.    At that moment, no.

22   Q.    He didn't run away; did he?

23   A.    No.

24   Q.    In fact, at -- toward the end he walks out of the

25   store; correct?

1   A.    Yes.

2   Q.    He walks in a normal way; correct?

3   A.    He was angry.  Yeah.

4   Q.    Well, he was angry, but he didn't seem like he was in a

5   hurry to get away; did he?

6   A.    No.

7   Q.    And, in fact, did you see him out on the -- on the

8   pavement, in the street, walking back and forth a little?

9   A.    No.

10  Q.    Okay.  You didn't see that part.  Now, as you

11  understood it, Mr. Stevens was angry, because you had called

12  the police?

13  A.    I don't know.

14  Q.    Instead of working it out with him and the other

15  people; correct?

16  A.    I don't know.

17  Q.    Did the -- did he tell you why he was angry?

18  A.    He didn't told me.  He was just saying what he feels.

19  Q.    And he told you more than one time that I -- that he

20  was trying to fix it; correct?

21  A.    Yes.

22  Q.    And the words fix it was the argument about the $100;

23  correct?

24  A.    Yes, because he said that he was going to give the guy

25  the $100 that he was going to fix the problem.

1    Q.    He was going to fix the problem?

2    A.    Yes.

3    Q.    Now, did you -- you nor he used the word robbery; did

4    you?

5    A.    No.

6    Q.    Okay.  Now, you wouldn't walk in on an armed robbery,

7    would you?

8    A.    No.

9    Q.    Now, Emmanuel speaks English; correct?

10   A.    Yes.

11   Q.    And Joel speaks nothing, but to get by in terms of

12   dealing with people in the store; correct?

13   A.    Yes.

14   Q.    Mr. I mean after three and a half --

15   A.    He only speaks Spanish.

16   Q.    -- years, you know him pretty well as his

17   sister-in-law.

18   A.    My brother-in-law.

19   Q.    I'm sorry, you're his sister-in-law, I'm sorry.

20   A.    Yes.

21   Q.    I got that mixed up.  But as you're knowing him, he has

22   some ability to speak English, but not -- he's not proficient.

23   A.    He's not fluent.  He just understand words.

24   Q.    Yeah.  And he understands enough to get by.

25   A.    No.

Page 149

1    Q.    Yeah.  And he can speak enough to get by.

2    A.    Not speak well.

3    Q.    He doesn't speak too well.

4              MR. WITTELS:  The Court's indulgence.

5    BY MR. WITTELS:

6    Q.    Would you agree with me that some of what Mr. Stevens

7    said to you was said in anger?

8    A.    Said --

9    Q.    In fact a good deal of it was in anger?

10   A.    Yes.

11   Q.    Would you agree with me sometimes people say things

12   they don't mean when they're really angry?

13   A.    Yes.

14   Q.    And sometimes they make statements that seem like

15   threats when they're really angry, it's just because they're

16   angry?

17   A.    Yes.

18   Q.    Okay.  Thank you.  I have nothing further.

19             THE COURT:  Ms. Meehan.

20             MS. MEEHAN:  Thank you, Your Honor.  May I ask

21   Mr. Cosgrove to switch the [indiscernible]?

22                        - - -

23                   CROSS-EXAMINATION

24                        - - -

25   BY MS. MEEHAN:

1    Q.    Good afternoon.

2    A.    Good afternoon.

3    Q.    I represent Mr. Quinn.  I don't know if you can see him

4    from there.

5    A.    Yes.

6    Q.    He's the bald gentleman.  You can see.  Okay.  And I

7    think you indicated this morning that you know him.

8    A.    Yes.

9    Q.    Not personally know, but you know him from the --

10   A.    The store.

11   Q.    The RD Grocery, also known as the Amaro Grocery.

12   A.    Yes.

13   Q.    Okay.  And the reason that he's familiar to you is

14   because he was in the store everyday.

15   A.    Mostly, yes.

16   Q.    Mostly everyday.  In fact, often times, several times a

17   day.

18   A.    Yes.

19   Q.    And you had at that time another -- a second store on

20   March 22nd?

21   A.    Yes.

22   Q.    And did you split time, your time between R and D

23   Grocery and your other store?

24   A.    Yes.

25   Q.    And you still managed to see Mr. Quinn just about

1    everyday; is that right?

2    A.    Sometimes.

3    Q.    Sometimes.  And on March 22nd -- okay.  In fact, I

4    think today you -- you told the members of the jury that he

5    always seemed like a nice guy.

6    A.    He was -- he -- yeah.  To me, he was.

7    Q.    To you, he was.  And on March 22nd of last year, you

8    got a call from the store cashier Mr. Ventura --

9    A.    Yes.

10   Q.    -- a little before five.

11   A.    Yes.

12   Q.    And he told you about this argument between Mr. Quinn

13   and Mr. Ventura; is that right?

14   A.    Yes.

15   Q.    And how did you know he was talking about Mr. Quinn?

16   A.    Because we call him like that, bald head.

17   Q.    The bald-headed.  So when Mr. Ventura said that bald

18   guy to you, you understood that it was Mr. Quinn?

19   A.    Yes.

20   Q.    Okay.  And because you know him, and because you said

21   he's a nice guy, you said, let me talk to him --

22   A.    Yes.

23   Q.    -- I can -- I can straighten this out.  So when --

24   strike that.  When you said that Mr. Ventura then gave Mr.

25   Quinn the phone to talk to you; is that right?

1    A.    Yes.

2    Q.    And then you were speaking in English to -- of course,

3    to Mr. Quinn.

4    A.    Yes.

5    Q.    Okay.  And understanding Mr. Quinn was not so nice on

6    the phone.

7    A.    No.

8    Q.    No.  And he was loud and he was cursing --

9    A.    Angry.

10    Q.    -- foulmouthed and very angry.

11          THE COURT:  You have to give verbal answers.

12    Say yes or no.

13          THE WITNESS:  I say yes.

14          THE COURT:  You're just shaking your --

15          THE WITNESS:  Yes.

16    BY MS. MEEHAN:

17    Q.    And he was telling you that he had used the ATM machine

18    in your store; right?

19    A.    Yeah.  He didn't tell me that, Joel did.

20    Q.    Okay.  So when you -- when you got on the phone with

21    Mr. Quinn, you already had an understanding of the argument?

22    A.    What was going on.  Yes.

23    Q.    Right.  And you told the -- you testified before the

24    grand jury and you said that Mr. Quinn had said the ATM gave

25    him $100 fake; right?

Page 153

1    A.    In 20s, yes, $100 in 20s fake.

2    Q.    I'm sorry.

3    A.    Yes.  $100 -- not $100 bill, 20s in fake.

4    Q.    Okay.  20s.

5    A.    Yeah.

6    Q.    Fake.

7    A.    Because the ATM don't give out 100s.

8    Q.    Right.  Okay.  So $100 in 20s that were fake from the

9    store ATM?

10   A.    The ATM.

11   Q.    Okay.  And you tried to explain to him that you

12   youthful couldn't fix it; right?  And -- you have to answer.

13   A.    Yes.  Sorry.

14   Q.    And Mr. Ventura couldn't fix it for him by giving

15   him -- exchanging the money?

16   A.    No.

17   Q.    No.  But that you're going to have to call someone

18   else.

19   A.    Yeah.  That I was going to help him --

20   Q.    Okay.

21   A.    -- to call the company to resolve the problem.

22   Q.    Okay.  So it was pretty clear that you couldn't solve

23   the problem that day.

24   A.    No.

25   Q.    No, you couldn't solve --

Page 154

1    A.    Well, not me.  Not myself, no.

2    Q.    No.  And this was a Friday; correct?

3    A.    I don't remember if it was a Friday.

4    Q.    Okay.  But it was -- it might be some time, maybe days,

5    weeks before you would be able to do something about the

6    machine and have it looked at by the owner; is that right?

7    A.    They would be the same day there.  They don't take long

8    to go back to the -- to go by the store.

9    Q.    Okay.  But you just said that you wouldn't be able to

10   fix it that day when you were on the phone with Mr. Quinn;

11   correct?

12   A.    I would call the company and then he would have to talk

13   to them.  I don't know how long they going to take.

14   Q.    Okay.  So you didn't tell Mr. Quinn it'll be a couple

15   minutes, don't -- don't worry?

16   A.    No.  Because he didn't want to talk to me.

17   Q.    Okay.  And you in fact, hung up on him.

18   A.    I didn't hang up on him.

19   Q.    Well, I think you indicated to the police that he was

20   cursing, you didn't understand him and I hung up on him.  Do

21   you remember that?

22   A.    No.

23   Q.    No.  Can I call up -- I'm going to ask you to look at

24   your statement.  And you see it's D25 for Your Honor?

25            THE COURT:  This is D Quinn 25?

 1              MS. MEEHAN:  Yes, I'm sorry, I -- D25.

 2     BY MS. MEEHAN:

 3     Q.    On the third, fourth line down on the right, it says, I

 4     hung up on him.

 5     A.    I don't remember that.

 6     Q.    Okay.

 7     A.    Sorry.

 8     Q.    But it -- regardless, he was really angry --

 9     A.    Yes.

10     Q.    -- and you weren't able to calm him down at all; right?

11     A.    No.

12     Q.    Now, just -- as an aside, the ATM that you have in the

13     store, I understand you don't own it --

14     A.    No.

15     Q.    -- but R and D Grocery makes money from this -- from

16     the ATM; correct?

17     A.    Yes.

18     Q.    And, in fact, you have two different ads in the

19     exterior of RD Grocery that indicate there's an ATM machine

20     inside.  Can we call up D9, please?

21              MS. MEEHAN:  Quinn, D9, Your Honor.

22     BY MS. MEEHAN:

23     Q.    Ma'am, do you recognize that?

24     A.    Yes.

25     Q.    And what is that?

Page 156

1   A.    That's the front of the store.

2   Q.    The front of the store?  Okay.  And did it look like

3   that on March 22nd?

4   A.    Yes.

5             MS. MEEHAN:  Your Honor, can I ask the

6   [indiscernible]?

7             THE COURT:  Sure.

8             MS. MEEHAN:  Okay.

9             MR. ECKERT:  No objection, Your Honor.

10            MS. MEEHAN:  Okay.

11            MR. ECKERT:  She has to switch it over to --

12            MS. MEEHAN:  Can we -- can that be published to

13   the jury, Your Honor?

14            THE COURT:  It's --

15            MR. ECKERT:  That's nine.

16            THE COURT:  -- not in evidence.

17            MS. MEEHAN:  Well, I'm sorry, can I -- can I

18   move to admit D9 and ask that it be published?

19            THE COURT:  That's the way we normally proceed.

20            MS. MEEHAN:  Sorry.  Yes.  I understand, Your

21   Honor.  I got distracted by [indiscernible].

22            THE COURT:  What are you doing with D Quinn 25?

23            MS. MEEHAN:  I'm not moving that in.

24            THE COURT:  You just --

25            MS. MEEHAN:  I was refreshing her recollection.

Page 157

```
 1              THE COURT:  -- made reference to it.  All right.
 2    D Quinn 9, the photo is received.
 3                              -  -  -
 4              (Whereupon, Defendant's Exhibit Number D9 was
 5    admitted into evidence.)
 6                              -  -  -
 7              MS. MEEHAN:  And that could be published.
 8              THE COURT:  Yes.
 9              MS. MEEHAN:  Thank you.
10    BY MS. MEEHAN:
11    Q.    So that you just acknowledge, this is the front and the
12    door sort of at the corner on an angle, and there's the sign
13    on the left and we just enlarged that a little bit -- ATM
14    inside.  And then in fact -- you can take that down -- all
15    on -- there's another side of the store -- I don't know if
16    that's Ross Street -- could you put D10 in front of her, but
17    not publish it?  And do you recognize that, ma'am?
18    A.    Yes.
19    Q.    And that is this -- the other --
20    A.    The side of the store.
21    Q.    -- side of the store.
22    A.    Yes.
23    Q.    Okay.  Did it look like that on March 22nd of last
24    year?
25    A.    If the store looked like that?
```

Page 158

1  Q.    Yes.  With the sign?

2  A.    Mm-hmm.  Yes.

3  Q.    Okay.

4           MS. MEEHAN:  Your Honor, I move to admit D10 and

5  ask that it be published.

6           MR. ECKERT:  No objection, Your Honor.

7           THE COURT:  That's D9?

8           MS. MEEHAN:  Quinn D10.

9           THE COURT:  Pardon me?

10           MS. MEEHAN:  Quinn D10.

11           THE COURT:  I thought it was D9.

12           MS. MEEHAN:  This is a -- this is another angle,

13  Your Honor.

14           THE COURT:  D10 is received.

15                    -  -  -

16           (Whereupon, Defendant's Exhibit Number D10 was

17  admitted into evidence.)

18                    -  -  -

19  BY MS. MEEHAN:

20  Q.    So you have two basic -- essentially two ads on the

21  outside and you want people to use the ATM; right?  Because

22  you have to answer verbally.

23  A.    Yes.

24  Q.    Yes.  Because -- okay.  Because people use it and then

25  spend cash for things; right?

Page 159

1   A.     Yes.

2   Q.     That's probably the primary reason; right?

3   A.     Yes.

4   Q.     And you make some money, I think it was 85 cents per

5   transaction.

6   A.     Yes.

7   Q.     And there may be between -- anywhere between 0 and 25

8   transactions in the machine maybe more a day.

9   A.     I don't really know.

10  Q.     Okay.  So after the phone call ends with Mr. Quinn,

11  he's still upset and he's -- this entire time, he's telling

12  you he doesn't want to hear, and I think you told the grand

13  jury, he didn't want to hear none of that; right?  He didn't

14  want to hear excuses about why he couldn't be helped at that

15  moment by Mr. Ventura; right?

16  A.     Yes.

17  Q.     And while you, yourself couldn't help him as the owner

18  of the store; right?

19  A.     Yeah.

20  Q.     He was pretty mad about that.  So you then drive to the

21  store and when you get there, you actually pass Mr. Quinn on

22  your way into the store, in the doorway there; is that right?

23  A.     Yes.

24  Q.     Okay.  And you ask him what happened, right, because

25  you -- took you just a couple minutes --

1    A.    Yes.

2    Q.    -- to get there, and he's leaving, and you ask him what

3    happens, and he says -- and I -- pardon my language, fuck

4    y'all, I got my money; correct?

5    A.    Yes.

6    Q.    And this was after Mr. Ventura had given Mr. Quinn $100

7    from the register?

8    A.    Yes.

9    Q.    Thank you.  I have nothing further.

10            THE COURT:  Thank you.  Redirect.

11            MR. ECKERT:  Well, brief redirect, Your Honor.

12                        - - -

13                   REDIRECT EXAMINATION

14                        - - -

15   BY MR. ECKERT:

16   Q.    Ma'am, when did you sell the store?

17   A.    When?

18   Q.    When?  What month, not the exact date, but month?

19   A.    October.

20   Q.    October of 2019?

21   A.    Yes.

22   Q.    Okay.  Now, I'm not asking you where you currently

23   reside, where did you reside on March 22, 2019?

24   A.    At my other location.

25   Q.    Where did you reside?  Where did you live?

Page 161

1    A.    Oh, on top of the store on 152 East Sharpnack Street.

2    Q.    Okay.  So you resided right on top of the store?

3    A.    Mm-hmm.

4    Q.    And is that how you were able to have a camera there?

5    Were you -- did you -- you follow my question or --

6    A.    No.

7    Q.    Okay.  Well, you talked before about asking for

8    permission for having the cameras outside of the store.

9    A.    No.  But that's for -- that other neighbor.

10   Q.    Okay.  So you lived directly on top of --

11   A.    The store.

12   Q.    Okay.  And this was in March 22, 2019?

13   A.    Yes.

14   Q.    All right.  When you speak to Joel, what language do

15   you speak?

16   A.    Spanish.

17   Q.    Okay.  So when he said something to you about the bald

18   guy, did he say the bald guy or did he say the word in

19   Spanish, calvo [indiscernible]?

20   A.    Calvo, el calvo.

21   Q.    Okay.

22   A.    That's the -- the bald guy in English.

23   Q.    I'm sorry.  I -- what -- what -- so that calvo --

24   A.    El calvo.

25   Q.    What does that mean in English?

1    A.    The bald head.

2    Q.    Okay.  And so that's what he referred to Mr. Quinn as?

3    A.    Yes.

4    Q.    All right.  You were asked a number of questions about

5    Mr. Stevens, the bigger guy, and whether he was there -- at

6    what points he was there.  Did the police eventually make it

7    to your store, ma'am?

8    A.    After all, yes.

9    Q.    Okay.  So at some point police officers did come inside

10   of the store?

11   A.    Yes.

12   Q.    Was Mr. Stevens still there at that point?

13   A.    No.

14   Q.    When Mr. Stevens told you, "This my neighborhood," did

15   you think he meant it?  Did you think he was serious?

16   A.    He was serious.

17   Q.    Okay.  When you told you -- when you threatened to shut

18   down the store, did you think he was serious then?

19   A.    Yes.

20   Q.    Okay.  Ma'am, thank you very much.  I don't have any

21   further questions.

22              THE COURT:  Any recross?

23              MR. PATTERSON:  No, Your Honor.  Thank you.

24              THE COURT:  Mr. Wittels.

25              MR. WITTELS:  Judge, I have one question.

1                              - - -

2                       RECROSS-EXAMINATION

3                              - - -

4      BY MR. WITTELS:

5      Q.    Do you -- I'm sorry.  Do you remember what time it was

6      that the police came back to your store?

7      A.    No.  No, sir.

8      Q.    Do you know how much time went by from when the police

9      went flying by your store with sirens blazing until they came

10     back to your store?

11     A.    No, sir.

12     Q.    Was it more than 10 minutes?

13     A.    I'm not sure.

14     Q.    Okay.  But it was more than a couple of minutes; yes?

15     A.    Yes.

16     Q.    Thank you.

17              MS. MEEHAN:  Your Honor, I have just one

18     question.

19                              - - -

20                       RECROSS-EXAMINATION

21                              - - -

22     BY MS. MEEHAN:

23     Q.    Ma'am, after March 22, you never saw Mr. Quinn again;

24     is that right?  Until today.

25     A.    The same night.  No.  The -- no.  I haven't seen him.

Page 164

1   Q.    Thank you.

2                MR. ECKERT:  I don't have any -- I do not have

3   any additional questions.  Thank you.

4                THE COURT:  Thank you.  That concludes your

5   testimony, Ms. Rodriguez.  Thank you.

6                THE WITNESS:  I'm done?

7                THE COURT:  You may step down.

8                THE WITNESS:  Thank you.

9                MS. MARTIN:  Your Honor, the government calls

10  Emmanuel Sanchez.

11                          - - -

12                    (LOIS WEAVER - SWORN)

13                          - - -

14                MS. MARTIN:  Your Honor, if I may, I'm sorry,

15  the interpreter is only here as an as-needed basis.  If

16  there's some word that the witness doesn't understand.  Heel

17  will be speaking in English for the majority of his testimony.

18                THE COURT:  Fine.  We'll administer the oath to

19  the -- well, finish the oath to Mr. Sanchez.

20                DEPUTY CLERK:  Please raise your right hand.

21                          - - -

22                  (EMMANUEL SANCHEZ - SWORN)

23                          - - -

24                DEPUTY CLERK:  Please be seated.  Please state

25  your full name for the record.

```
1                 THE WITNESS:  My name is Emmanuel Sanchez.

2                 THE COURT:  Have we administered -- is it done?

3                 UNIDENTIFIED SPEAKER:  [Indiscernible].

4                 THE COURT:  You may proceed.

5                 MS. MARTIN:  Thank you, Your Honor.

6                         -  -  -

7                      EXAMINATION

8                         -  -  -

9     BY MS. MARTIN:

10    Q.    Mr. Sanchez, you're a little bit soft-spoken.  If you

11    could, just pull that chair up a little bit further and make

12    sure you speak into the microphone when you answer my

13    questions; okay?

14    A.    Yes.

15    Q.    If there's ever anything you don't understand that I'm

16    saying, please -- please let me know and I'll rephrase the

17    question; okay?

18    A.    Okay.

19    Q.    All right.  Mr. Sanchez, how old are you as you sit

20    here today?

21    A.    34.

22    Q.    34 years old.

23    A.    Yeah.

24    Q.    And how far did you go in school?

25    A.    10 grades.
```

Page 166

1   Q.    10th grade.

2   A.    At school.

3   Q.    Is that here in Philadelphia?

4   A.    Yeah, in Philly.

5   Q.    And we're obviously speaking in English right now.  Do

6   you speak any other languages?

7   A.    Spanish.  Yes.

8   Q.    Are you fluent in English, and comfort testifying in

9   English right now?

10  A.    Yes.

11  Q.    All right.  What do you do for a living, Mr. Sanchez?

12  A.    I work in a grocery store.

13  Q.    A grocery store?

14  A.    Yes.

15  Q.    A corner store?

16  A.    Yes.

17  Q.    As of March 22, 2019 where were you working on that

18  day?

19  A.    I was working at 152 Chestnut -- chess, I don't know

20  how to spell it.

21  Q.    Sharpnack Street?

22  A.    [Indiscernible] yes.

23  Q.    All right.  And who else was working there that day

24  with you at 152 East Sharpnack Street?

25  A.    Joel.

Page 167

1   Q.   Who's Joel?

2   A.   The cash register, my friend.

3   Q.   Are you related to Joel at all?

4   A.   No.

5   Q.   And the store owner of that corner store or bodega is

6   Isaliza Rodriguez.  Are you related to her?

7   A.   Yes.

8   Q.   How are you related to her?

9   A.   She my baby mama.

10  Q.   Okay.  So you have children together?

11  A.   I have kid with her.  Yes.

12  Q.   All right.  Okay.  As of March 22, 2019, how long had

13  you been working at that store?

14  A.   Three days.

15  Q.   Three days.

16  A.   Yeah.

17  Q.   Did you continue working out of the store for an

18  extended period of time?

19  A.   For a couple day more, yeah.

20  Q.   Were you filling in for someone?

21  A.   Yes.  For Isaliza brother.

22  Q.   What was your job there?

23  A.   Cooking and stacking soda and freezer.

24  Q.   All right.

25           MS. MARTIN:  Your Honor, permission to

1    reposition myself and control the video.

2              THE COURT:  You may.

3              MS. MARTIN:  If I could place government's

4    Exhibit 1A on the screen.  We placed on the screen in front of

5    you there, Mr. Sanchez, I would like to publish it to the jury

6    as well.  For the record, I'm starting Government's Exhibit 1A

7    from the beginning.  All right.

8                          -  -  -

9                      (Video played)

10                         -  -  -

11   BY MS. MARTIN:

12   Q.    Mr. Sanchez, you mentioned that your job was cooking

13   and restocking the shelves; right?

14   A.    Yes.

15   Q.    Do you know where you were located in the store at this

16   particular moment that you see on the screen?

17   A.    Well, at this moment, I'm supposed to be in the back

18   with the freezer that stocking soda.

19   Q.    Okay.  What were you doing?

20   A.    Putting soda inside the freezer.

21   Q.    Did there come a point where there was something going

22   on in the store that caught your attention?

23   A.    Not at all.

24   Q.    Was there ever a moment where there was anything

25   happening at the cash register?

Page 169

1    A.    No.

2    Q.    Did you ever hear anyone speaking in loud voices?

3    A.    No.

4    Q.    And you mean this moment in the video?

5    A.    No.

6    Q.    All right.  I'm going to play a little bit further?

7                            -  -  -

8                       (Video resumes)

9                            -  -  -

10            MS. MARTIN:  For the record, I'm going to stop

11   at 16:50:43.

12   BY MS. MARTIN:

13   Q.    Mr. Sanchez, I didn't have you identify -- who's that

14   behind the counter that we see in the video?

15   A.    Joel.

16   Q.    All right.

17   A.    Yeah.

18   Q.    And did you see him hand his phone to an individual on

19   the other side of the counter?

20   A.    No.  Not his phone.

21   Q.    Not in that video?

22   A.    No.

23   Q.    Okay.

24                            -  -  -

25                       (Video resumes)

1                          -   -   -

2    BY MS. MARTIN:

3    Q.    Mr. Sanchez, I'm stopping the video at 16:52:59.  Do

4    you recognize the man that's standing at the cash register?

5    Did you see him that day?

6    A.    Yes.

7    Q.    All right.  Did you see him right there in that portion

8    of the video where he's speaking to Joel?

9    A.    Yes.  I was behind watching him talking to Joel right

10   now.

11   Q.    Were you able to hear what they were saying?

12   A.    It was something about money, the money.

13   Q.    Can you please explain everything that you heard and

14   tell us who was saying it?

15   A.    Yeah.  This guy right here that's standing in front of

16   Joel, he was telling Joel, your machine give me fake money,

17   and I want my money now.  I want my money now.

18   Q.    You raised your voice a little bit, just now when you

19   were speaking.  Is that the tone he was using?  Was he loud or

20   something?

21   A.    Yeah.  He was loud.  Loud, like I want my money now,

22   like, give me my money now.

23   Q.    Did that get your attention?

24   A.    Yes.  I was watching and [indiscernible].

25   Q.    I'm going to continue playing the video.

1                              -  -  -

2                        (Video resumes)

3                              -  -  -

4    BY MS. MARTIN:

5    Q.    I stopped the video at 16:53:36.  Did you see where the

6    man with the bald head went?

7    A.    Yes.

8    Q.    Where did he go?

9    A.    He went to the side -- to the side of the cash

10   register, that side to the -- toward Joel.

11   Q.    And where were you at this point?  Are you watching

12   what's going on?

13   A.    Yeah.  I'm watching.  I'm behind the cage, where the

14   cage at, watching everything.  I stay behind.

15   Q.    All right.  I'm sorry.  I didn't mean to interrupt is.

16   You were watching what was happening?

17   A.    Yeah.  Watching what happened, yeah.

18   Q.    Could you hear everything that was happening?

19   A.    Yes.

20   Q.    Okay.  I'm going to continue playing the video.  All?

21                              -  -  -

22                        (Video resumes)

23                              -  -  -

24   BY MS. MARTIN:

25   Q.    Do you remember anything that's being said during this

Page 172

1   portion of the video?

2   A.    Yes.

3   Q.    All right.  I'll go ahead and pause it at 16:53:51.  Do

4   you remember anything that he's saying at that point?

5   A.    Yes.  The guy, the bald head guy, he was telling Joel,

6   I want my money now.  You going to give me my money now.  You

7   going to give my money now.  And Joel telling him, easy, easy,

8   not my machine.  That's not my machine, see.

9   Q.    Was it all in that same tone of voice that you just

10  told us?

11  A.    No.  No.  No.  He was still angry, like I want my

12  money.  That's my money.  I want my money now.  And --

13  Q.    And for the record, the witness is shaking his right

14  hand and using index finger and thumb and pounding it in a

15  pounding motion; is that right?

16  A.    Yeah.  I want my money -- my money.

17  Q.    And that's what you saw the bald individual doing?

18  A.    Yes.

19  Q.    Does Joel speak English?

20  A.    No.  Not really.

21  Q.    But the words that you just told us, was he saying

22  those in English or in Spanish?

23  A.    English, yeah.  Okay.  He only speak like little stuff

24  like machine, you know, like not too much English.

25  Q.    You may continue.

1                                - - -

2                          (Video resumes)

3                                - - -

4    BY MS. MARTIN:

5    Q.    Okay.  I'm stopping the video at 16:54:04.  In the back

6    right-hand corner, is that you off to the side?  I'm not sure

7    if it's showing up on the screen.

8    A.    Yeah.  Behind the other guy, that's me.

9    Q.    Okay.  You're leaning on the --

10   A.    On the [indiscernible].  There by the [indiscernible].

11   There's a [indiscernible] right there.

12   Q.    Okay.  Stopping at 16:54:14.  Did you notice this man

13   enter the store?

14   A.    I seen him coming in the store.  I seen him coming in,

15   yeah.

16   Q.    Were you paying attention to him at that point?

17   A.    Not really.  I was paying attention to what's going on

18   in the [indiscernible] I was like --

19   Q.    Okay.  Continue.

20                                - - -

21                          (Video resumes)

22                                - - -

23   BY MS. MARTIN:

24   Q.    Mr. Sanchez, do you remember what was happening in the

25   portion I just played where the bald man is in Joel's face?

1    A.    Yes.

2    Q.    What's he saying?

3    A.    The same thing all over.  I want my money now, pussy.

4    I want my money now.  You going to give me my money now.

5    Q.    Were you concerned at this point?

6    A.    Yes.  Right there, I was concerned.  It was already --

7    he was inside the cash register already.  Yeah.

8                         -  -  -

9                    (Video resumes)

10                        -  -  -

11   BY MS. MARTIN:

12   Q.    I continued playing another five to ten seconds or so.

13   Was there anything -- was it more of the same from the

14   individual?

15   A.    It got worse.

16   Q.    What happened?

17   A.    Me got more close on Joel, and telling him, you going

18   to give me my money now.  You going to give it to me.  He got

19   closer to Joel, like, you know, real close to Joel and

20   touching Joel, give me my money, you going to give me my

21   money.  I'm going to take the money.

22   Q.    Indicating for the record, with an open hand motion, I

23   believe he was saying the individual was doing it towards

24   Joel.

25   A.    Joel.  Yeah.

1    Q.    Is that accurate?

2    A.    Yes.

3    Q.    Okay.  So it escalates?

4    A.    Yeah.  It got worse.

5    Q.    All right.  I'm stopping at 16:54:48.  Do you see

6    anyone you recognize on the screen?

7    A.    Yes.  That's me.

8    Q.    Is that you right there?

9    A.    Yeah.

10   Q.    And that's in the red and black hat?

11   A.    Yes.

12   Q.    Fair to say that you're right there up next to the cash

13   register?

14   A.    Yes.  In front.

15   Q.    Did you notice in the last video, did you notice Joel

16   grab the store gun?

17   A.    I saw in the video, right now.

18   Q.    But when you were standing there across from him, did

19   you notice him with the store gun?

20   A.    No.

21   Q.    Okay.  How far away are you standing from Joel at this

22   point?  Can you give me a distance?

23   A.    I can say, to there.

24   Q.    Okay.  If I approach you, can you tell me when to stop?

25             MS. MARTIN:  Your Honor, if I may.

1          THE COURT:  You may.

2     BY MS. MARTIN:

3     Q.    Okay.

4     A.    Right there.

5     Q.    Indicating two to three feet for the record.

6     A.    Yes.

7     Q.    Is that right?

8     A.    Yes.

9     Q.    As you were standing there across from Joel, where's

10    the gun?  I'm sorry, you never saw the gun; right?

11    A.    No.  No.  I didn't.

12    Q.    So did you ever see him rack the gun or load a bullet

13    into the gun?

14    A.    No.

15    Q.    Did you see him make any motion with a firearm at any

16    point?

17    A.    No.  I don't.  No.

18    Q.    What's happening with the man in all gray to the

19    right-hand side, to your right-hand side?

20    A.    He talking to Joel, like --

21    Q.    How is he talking to Joel?

22    A.    He got loud, well, you know, not so aggressive telling

23    Joel, what's going on?  What's going on?

24    Q.    Is he saying anything about the bald man?

25    A.    No.

1    Q.    What's he saying to Joel during this portion?

2    A.    He telling Joel, you grab the gun?  You grab the gun?

3          MS. MEEHAN:  I'm sorry, who -- who are we

4    talking about?  Who [indiscernible].

5          MS. MARTIN:  I apologize.  Mr. Quinn, I believe

6    has left the store at this point.

7    BY MS. MARTIN:

8    Q.    Mr. Stevens, the guy in all gray?

9    A.    Yes.

10   Q.    He's saying to Joel --

11   A.    Yeah.

12   Q.    -- you grabbed the gun, you grabbed the gun?

13   A.    Yes.

14   Q.    Okay.  Did he ever say anything about the bald man

15   being family?

16   A.    He say my cousin, my family.

17                           -  -  -

18                     (Video resumes)

19                           -  -  -

20   BY MS. MARTIN:

21   Q.    I'm going to take a step back.  For the record, I

22   rewound to 16:54:51.  Mr. Sanchez, directing your attention to

23   the bald man here on the left.

24   A.    Yes.

25   Q.    As he's leaving, do you remember him saying anything?

1    A.    Yeah.  He telling Joel, I be back.  I come back.  I

2    come back, watch.  I be back.

3    Q.    And I'm playing the video.

4    A.    He hit the glass right there.

5    Q.    He hits what glass?

6    A.    Where the candy is at.

7    Q.    Okay.  What kind of glass is that?

8    A.    Plexiglass.

9    Q.    It's like a plastic?

10   A.    Yes.

11   Q.    And he hit that, said, I'll be back.  I'll be back, you

12   watch?

13   A.    I'll be back.  I'll be back.  Yeah.

14   Q.    All right.  I'm continuing the video.

15                            -  -  -

16                      (Video resumes)

17                            -  -  -

18   BY MS. MARTIN:

19   Q.    The man in all gray that we were talking about the, one

20   to your right.

21   A.    Yes.

22   Q.    What tone is he using with you and Joel during that

23   portion of the video that was the 10 seconds preceding

24   16:55:11?

25   A.    No.  He talking real loud.  Loud, like telling Joel,

1    once again, you grab the gun?  You grab the gun, like -- and

2    he talking loud, real loud.

3    Q.    Do you remember him saying before he left the store?

4    A.    No.  No.

5    Q.    Playing 4 to 16:55:14.

6                            -  -  -

7                        (Video resumes)

8                            -  -  -

9    BY MS. MARTIN:

10   Q.    Mr. Sanchez, what are you trying to do in this moment

11   of the video?

12   A.    I try to close the store down.

13   Q.    Why?

14   A.    Lock the door.  Joel told me, close the door, close the

15   door.  Yeah, so I went try to take that guy that's standing

16   there and to go outside then lock the door.

17   Q.    You're indicating the man to your left right now, you

18   were trying to get him to leave the store?

19   A.    Yes.

20   Q.    Were you concerned for your safety at this point?

21   A.    No.  No.

22   Q.    But Joel was telling you to lock the door?

23   A.    Yeah.  Lock the door.  Yeah.

24   Q.    Was Joel speaking to you in English or Spanish?

25   A.    Spanish.

1    Q.    Does Joel ever speak to you in English?

2    A.    No.

3    Q.    Were you able to lock the door?

4    A.    No.  I didn't have no chance.

5    Q.    Playing the video from 16:55:16?

6                         -  -  -

7                    (Video resumes)

8                         -  -  -

9    BY MS. MARTIN:

10   Q.    Mr. Sanchez -- stopping the video at 16:55:32 -- you

11   said you had no chance to actually lock the door.  Why

12   couldn't you lock the door?

13   A.    Because when I went to -- I grabbed the guy who's in

14   the corner, I try to put him out, well, the bald head one --

15   the bald head guy just come inside the store, I couldn't lock.

16   Q.    Do you remember anything that he's saying in this

17   moment or in the preceding 10 seconds of the video when he

18   comes back in the store?

19   A.    Not really.  No.

20   Q.    Do you remember anything about his tone or his

21   volume --

22   A.    No.

23   Q.    -- when he's talking right now?

24   A.    No.  Real loud, like he mad, talking loud, I ain't sure

25   what he's saying.

1    Q.    Was it the same tone and volume that he used

2    [indiscernible]?

3    A.    Yes.

4    Q.    The same as when he was behind the counter with Joel?

5    A.    Yes.  Real loud.

6    Q.    Playing the video.

7                          -  -  -

8                    (Video resumes)

9                          -  -  -

10   BY MS. MARTIN:

11   Q.    Stopping the video at 16:55:48.  Mr. Sanchez, do you

12   remember anything else from that interaction between yourself,

13   Joel and the bald man?

14   A.    No.

15   Q.    Okay.  There's a man that just entered the store, do

16   you recognize him?

17   A.    It was -- I thought it was a customer.

18   Q.    So were you paying attention to him at this point?

19   A.    At all.  At all.

20   Q.    All right.  I'm going to play the video.

21                          -  -  -

22                    (Video resumes)

23                          -  -  -

24   BY MS. MARTIN:

25   Q.    And your back is actually -- I'm stopping the video at

1    16:55:54 --

2    A.     Yes.

3    Q.     Your back is to Joel and the man in all black; correct?

4    A.     Yes.

5    Q.     What are you trying to do right now?

6    A.     I trying to convince the bald head guy, calm down, I

7    said, it's over, you know, calm down.

8    Q.     Do you remember anything that was said during those

9    moment?

10   A.     Joel was telling the guy, no problem.  No problem.

11   Q.     Do you remember anything that any of the men are

12   saying?

13   A.     No.

14   Q.     Okay.  The video just switched angles, and I'm going to

15   ask you a question.  Do you ever go back over to this

16   left-hand side of the store, by the left-hand side of the cash

17   register?

18   A.     No.

19   Q.     Where are you when everything that happens to the left

20   of the cash register, when that's all happening, where are you

21   in the store?

22   A.     I was right there when the guy for the black hat, it

23   was -- when he come in, he took the gun out, I went right

24   there in the corner.

25   Q.     If I showed you a still photo from another angle of the

1    store at that moment, would you recognize it?

2    A.    Yes.

3              MS. MARTIN:  Your Honor, if I may switch to

4    Government's Exhibit 1C24, 25 and 26.  They've already been

5    previously admitted into evidence.

6              THE COURT:  You may.

7    BY MS. MARTIN:

8    Q.    Okay.  Mr. Sanchez, did you see 1C24 on the screen?

9    A.    1C24, yes.

10   Q.    That's the same moment we were just watching in the

11   video?  You have to answer verbally for the record.

12   A.    Yes.

13   Q.    All right.  I'm going to show you 1C25.  Do you see the

14   time marker at the top of 1C25?

15   A.    Time marker?

16   Q.    Yes.  Do you see the date, 3-22-2019?

17   A.    Yes.  In front.

18   Q.    And then 16:56:09?

19   A.    Yes.

20   Q.    And do you see yourself in that video?

21   A.    Yes.  That's me with the hat.

22   Q.    Okay.  And what is the man in all gray doing in that

23   moment?

24   A.    He telling me back up.  Stay inside.  Yeah.  Don't come

25   next to me.  Stay inside.

Page 184

1   Q.    Okay.  Indicating for the record, a waist-level pushing

2   motion.

3   A.    Yeah.  Yeah.

4   Q.    Is that fair to say?

5   A.    Yeah.  Like inside.

6   Q.    Did he do that to you more than once during this

7   interaction?

8   A.    Excuse me.

9   Q.    Did he do that more than once during this interaction?

10  A.    I'm not pretty sure.  No.

11  Q.    Do you understand my question?

12  A.    Yes.

13  Q.    Okay.  I'm going to show you 1W26.  This is a few

14  seconds later.  1C26, do you recognize or do you see yourself

15  in this photograph?

16  A.    Yes.

17  Q.    Where are you?

18  A.    I have my two hand up.

19  Q.    You have both of your hands in the air?

20  A.    Yes.

21  Q.    Okay.  And where is the man in all gray?

22  A.    In front of me.

23  Q.    Is his hand on you, if you remember?

24  A.    No.

25  Q.    You don't remember or it's not on you?

1   A.   No.  I don't remember if it was on me.

2   Q.   But you have both hands in the air?

3   A.   Yes.

4   Q.   Do you know whether or not he had a gun at that point?

5   A.   Yeah.  I saw the gun.  Yeah.  I saw the gun.

6   Q.   Do you see the gun in this photograph?

7   A.   Yes.

8   Q.   Where was it?

9   A.   In front of him.  That's why I got my hand like that.

10   Q.   Okay.  Did you think it was a real gun?

11   A.   Yes.

12   Q.   Why did you think it was a real gun?

13   A.   It's, you know, who come in the store with a fake gun

14   or something?

15   Q.   All right.  I'm going back to the video, Government's

16   Exhibit 1A?

17                          -  -  -

18                     (Video resumes)

19                          -  -  -

20   BY MS. MARTIN:

21   Q.   I'm going to continue playing from 16:56:04.  Mr.

22   Sanchez, do you remember anything that was being said during

23   this interaction to the left of the cash register?

24   A.   I don't remember right now.  No.

25   Q.   Okay.  Playing the video.

```
 1                        -   -   -
 2                   (Video resumes)
 3                        -   -   -
 4    BY MS. MARTIN:
 5    Q.    Stopping the video at 16:57.  Did you see yourself in
 6    that frame?  We switched to the left-hand side of the cash
 7    register.
 8    A.    Yes.
 9    Q.    Where are you right now?
10    A.    I'm the other side at the cash register.
11    Q.    Did you see that man go behind toward the cash
12    register?
13    A.    Yes.
14    Q.    All right.  Where were the other two men?  The man in
15    all black and the man in the gray sweat suit while this man
16    was behind the cash register?
17    A.    The man, all black was in front of the cash register.
18    Q.    Did you hear him saying anything while this man was
19    behind at the cash register?
20    A.    He was telling him -- telling him, take everything,
21    take it.
22    Q.    The man in all black said take everything?
23    A.    Yes.
24    Q.    Take everything?
25    A.    Yes.
```

1    Q.    All right.  I'm playing the video from 16:57.

2                          -  -  -

3                    (Video resumes)

4                          -  -  -

5    BY MS. MARTIN:

6    Q.    Stopping the video, 16:57:32.  Mr. Sanchez, do you see

7    yourself in that screen?

8    A.    Yes.

9    Q.    Do you remember who you were talking to in that moment?

10   A.    The guy with the gray suit.

11   Q.    Do you remember what you were talking about or what he

12   was saying to you?

13   A.    No.  He was -- it was tried pull everything -- he was

14   like calm down, like, calm down.

15   Q.    You were saying calm down?

16   A.    I was saying calm down to him, yeah.

17   Q.    Continuing the video.

18                          -  -  -

19                    (Video resumes)

20                          -  -  -

21   BY MS. MARTIN:

22   Q.    Stop the video at 16:57:58.  Mr. Sanchez, did you see

23   any of this happening to the left of the cash register?

24   A.    No.

25                          -  -  -

Page 188

1              (Video resumes)

2                    -  -  -

3    BY MS. MARTIN:

4    Q.    Stopping the video at 16:58:43.  Mr. Sanchez, do you

5    remember what either the man in gray or the man in black were

6    talking about in this moment?

7    A.    Yeah.  The male -- gray was telling the guy, go, leave,

8    go, leave.

9    Q.    Continuing the video.

10                   -  -  -

11             (Video resumes)

12                   -  -  -

13   BY MS. MARTIN:

14   Q.    Stopping the video at 16:58:43.  Mr. Sanchez, do you

15   remember anything that the bald man is saying to the man in

16   all gray?

17   A.    No.  No one.

18   Q.    Okay.  Playing the video.

19                   -  -  -

20             (Video resumes)

21                   -  -  -

22   BY MS. MARTIN:

23   Q.    Stopping the video at 16:58:58.  Mr. Sanchez, you

24   appear to be speaking in the last five seconds, or so.  Do you

25   remember what you were saying in that moment?

Page 189

1    A.    Yeah.  I was telling they got to call the owner of the

2    machine.  That not belong to us.  That's another business.

3    Got to call him.  Got to call him.  That's why I went like

4    this, got to call him.

5    Q.    Playing the video.

6                          -  -  -

7                     (Video resumes)

8                          -  -  -

9    BY MS. MARTIN:

10   Q.    Stopping at 16:59:26.  Mr. Sanchez, did you hear any

11   conversation between the men in -- or the bald man or the man

12   in gray in the last five seconds before I stopped the video?

13   A.    Yeah.  The guy in the gray telling him -- the guy, go.

14   Just go.  And the bald head told him, give me the gun.  Give

15   me the gun.

16   Q.    The baldheaded guy said give me the gun?

17   A.    Yes.

18   Q.    Playing the video.

19                          -  -  -

20                     (Video resumes)

21                          -  -  -

22   BY MS. MARTIN:

23   Q.    Stopping the video at 16:59:51.  Mr. Sanchez, do you

24   remember any of the conversations happening at this point?

25   A.    Yes.

1    Q.    What's happening?

2    A.    The guy in the gray, he was telling -- saying, all this

3    for $100.  All this for $100.

4    Q.    Did he say anything about the store gun?

5    A.    No.  Not yet.

6    Q.    Not yet?

7    A.    No.

8                          -  -  -

9                    (Video resumes)

10                         -  -  -

11   BY MS. MARTIN:

12   Q.    Stopping the video at 17:00:08.  Mr. Sanchez, do you

13   remember anything that happened in the portion I just played?

14   A.    Yeah.

15   Q.    What happened?

16   A.    That's the owner of the store.  She came inside.  And

17   the guy with the gray, he asked her, who the owner of the

18   machine?  Who the owner?

19   Q.    Playing the video.

20                         -  -  -

21                    (Video resumes)

22                         -  -  -

23   BY MS. MARTIN:

24   Q.    Stopping the video at 17:00:54.  Mr. Sanchez, did you

25   see anybody enter the store just now?

1    A.    Yes.  The bald head open the door again.

2    Q.    Okay.

3    A.    Yeah.

4    Q.    Do you remember whether or not you heard anything

5    outside of the store at this point?

6    A.    I heard the siren and the police.

7    Q.    Was that the first time you heard the sirens?

8    A.    Yeah.

9    Q.    And it's at this same moment that the bald-headed man

10   came in?

11   A.    Yeah.

12   Q.    Playing the video.

13                         -   -   -

14                    (Video resumes)

15                         -   -   -

16   BY MS. MARTIN:

17   Q.    Stopping the video at 17:01:10.  Mr. Sanchez, what are

18   you doing there?  What did you just pick up?

19   A.    Oh, I putting the [indiscernible] back, the potato chip

20   with the [indiscernible].

21   Q.    How did they get there?

22   A.    It was a customer waiting on line to buy the chip.

23   Q.    Did the customer -- was the customer able to pay for

24   the items?

25   A.    No.  No.  When he see what's going on, he just put it

Page 192

1   there.  He left.  Yeah.

2   Q.    So the store didn't make a sale from that individual?

3   A.    No.

4   Q.    Was that during the time that the bald-headed man and

5   the gray man were -- the bald gray suit were in the store?

6   A.    Yes.

7   Q.    Playing the video.

8                          -  -  -

9                   (Video resumes)

10                         -  -  -

11   BY MS. MARTIN:

12   Q.    Mr. Sanchez, did you see that portion where you looked

13   at Joel?

14   A.    Yes.

15   Q.    Do you remember what happened during that moment?

16   A.    Yeah.  The guy with the gray -- with the gray shirt, he

17   was telling him, Joel, did you want your gun back?  I'm going

18   to get your gun back.  When Joel ask me what he said, he

19   didn't understand why he was talking to him, so I told Joel,

20   he's saying that you want your gun back.

21   Q.    So Joel said to you in Spanish, I don't understand?

22   A.    Yeah.  He asking me what he said, so that's when I told

23   him, he asking your if you want the gun back.

24   Q.    The man in gray is saying, do you want the gun back?

25   A.    Yes.

1                          -  -  -

2                      (Video resumes)

3                          -  -  -

4     BY MS. MARTIN:

5     Q.    Stopping the video at 17:02:14.  Do you see anything

6     outside of the store?

7     A.    Yes.

8     Q.    What is it?

9     A.    It's a police car.

10    Q.    Was that the first time you saw or heard a police car?

11    A.    I heard it, but that's the first time that I see it.

12    Q.    You heard it earlier when you [indiscernible]?

13    A.    Yes.

14    Q.    Playing the video.

15                         -  -  -

16                     (Video resumes)

17                         -  -  -

18    BY MS. MARTIN:

19    Q.    Stopping the video at 17:02:44.  Mr. Sanchez, it

20    appears you're looking outside.  Do you remember what was

21    happening outside, if anything?

22    A.    Yes.  I remember.

23    Q.    What was happening?

24    A.    No.  I see police car and the black car in front of the

25    police chase the -- police chasing the black car.

Page 194

1    Q.    The black car?

2    A.    Yeah.  The police chasing the black car.  Yeah.

3    Q.    Playing the video.

4                          -  -  -

5                    (Video resumes)

6                          -  -  -

7    BY MS. MARTIN:

8    Q.    That was another police car that just drove by?

9    A.    Yes.

10                         -  -  -

11                   (Video resumes)

12                         -  -  -

13   BY MS. MARTIN:

14   Q.    Pausing the video at 17:03:07.  Mr. Sanchez, you're

15   standing there with the man in all gray.  Do you remember what

16   he was saying in this moment?

17   A.    Yeah.  He was like, why?  Why?  Like why this happened?

18   Why?

19   Q.    Playing the video.

20                         -  -  -

21                   (Video resumes)

22                         -  -  -

23   BY MS. MARTIN:

24   Q.    That's you in the background, Mr. Sanchez?

25   A.    Yeah.  It's me.

1    Q.    Pausing at 17:03:55.  Were you listening to what was

2    happening?

3    A.    Yes.

4    Q.    Can you tell us what the man in the gray was saying, if

5    you remember?

6    A.    Yeah.  The guy in gray was saying that's your fault.

7    That's your fault.

8    Q.    That's your fault?

9    A.    Yes.

10   Q.    Saying that to who?

11   A.    To the owner of the store.

12   Q.    Is that the woman in pink?

13   A.    Yes.

14   Q.    Did you understand what he meant?

15   A.    Yes.

16   Q.    What do you think he meant?

17   A.    Because they chase him, the other guy.  And she was

18   outside.

19   Q.    The police are chasing?

20   A.    Yeah.

21   Q.    Playing the video.

22                          -  -  -

23                      (Video resumes)

24                          -  -  -

25   BY MS. MARTIN:

Page 196

1    Q.    Pausing the video at 17:04:17.  Mr. Sanchez, what's the

2    tone that the man in gray is using or the level of his volume

3    in the last 10 seconds of the video?

4    A.    He loud.  Yeah.  Loud, but calm though.  Yeah.

5    Q.    Yelling?

6    A.    Yelling, yeah.

7    Q.    Playing the video.

8                         -  -  -

9                    (Video resumes)

10                        -  -  -

11   BY MS. MARTIN:

12   Q.    Pausing the video at 17:04:39.  Mr. Sanchez, you just

13   looked over at the man in gray and the store manager.  Do you

14   remember what they were saying?

15   A.    Yeah.  He was telling Isaliza, the owner, this is my

16   neighborhood.  This is mine.

17   Q.    Was he in -- was that in the same loud tone?

18   A.    No.  No.  He was loud.  Loud.  This is my neighborhood.

19   I own this.

20   Q.    It was louder than what you just --

21   A.    Yeah.  It was loud.  Yeah.

22   Q.    Playing.

23                        -  -  -

24                    (Video resumes)

25                        -  -  -

Page 197

1    BY MS. MARTIN:

2    Q.    Stopping at 17:04:56.  Mr. Sanchez, you seem to have

3    just said something or attempted to interrupt.  Do you

4    remember why?

5    A.    Yeah.  I see him getting more physical with Isaliza,

6    talking real loud like this is my neighborhood.  It's my shit.

7    This is my neighborhood and I try to -- to Isaliza to move out

8    of the way.  Yeah.

9    Q.    Playing the video.

10                            -   -   -

11                        (Video resumes)

12                            -   -   -

13   BY MS. MARTIN:

14   Q.    Stopping the video at 17:05:21.  Mr. Sanchez, do you

15   remember anything that the man in all gray said when he was

16   walking out of the store?

17   A.    No.  It was from Isaliza, he told Isaliza, I close this

18   shit down.  I close this shit down.  And he just went outside.

19   Q.    Mr. Sanchez, did you ever see the plan in gray or the

20   bald man or the bald man in all black, did you ever see them

21   again that night or in the store?

22   A.    No.

23           MS. MARTIN:  May I have a moment to confer with

24   counsel, Your Honor?  I have nothing further for this witness.

25           THE COURT:  We'll take our midafternoon recess.

Page 198

```
 1    It's twenty of four.  We'll take a ten-minute recess.

 2              DEPUTY CLERK:  All rise.

 3                        -  -  -

 4              (The jury leaves the courtroom.)

 5                        -  -  -

 6              THE COURT:  You may go about your business,

 7    everyone.  And you may step down.

 8                        -   -   -

 9       (Whereupon, there was a recess in the proceeding from

10                   3:40 p.m. to 4:05 p.m.)

11                        -   -   -

12              (The jury enters the courtroom.)

13                        -   -   -

14              DEPUTY CLERK:  All rise.

15              THE COURT:  Be seated, everyone.  You may

16    proceed.  Mr. Sanchez, I remind you, you are still under

17    other.  You may proceed.

18              MR. PATTERSON:  Thank you.

19                        -   -   -

20                   CROSS-EXAMINATION

21                        -   -   -

22    BY MR. PATTERSON:

23    Q.    Good afternoon, Mr. Sanchez.

24    A.    [Indiscernible].

25    Q.    Mr. Sanchez, my name is Attorney Bob Patterson.  I
```

1   represent Donnie Smith, who is the individual seated right

2   there in the black and white shirt; okay?

3   A.    Mm-hmm.

4   Q.    And based upon what you answered on what's called

5   direct examination, I'm going to ask you some additional

6   questions; okay.

7   A.    Yes.

8   Q.    And I did note previously that interpreter is here, you

9   do speak English; correct?

10  A.    Yes.

11  Q.    And can you read English?

12  A.    No.  Not [indiscernible].

13  Q.    But you speak English and you understand it; correct?

14  A.    Yes.

15  Q.    The interpreter was provided as a courtesy to you in

16  case there was some things that anybody might say that you

17  don't understand and then you can ask for an interpretation in

18  Spanish; is that correct?

19  A.    Yes.

20  Q.    So once again, sometimes when I get going, I start

21  talking fast, if you don't understand the question, please

22  stop me, and I'll repeat it, if you want or if you don't

23  understand what I'm saying and you want it repeated in

24  Spanish, please tell me and that will be done for you;

25  understand?

Page 200

1    A.    [Indiscernible].

2    Q.    Fair enough?

3    A.    Yes.

4    Q.    Okay.  Now, Mr. Sanchez, the store that we're talking

5    about, you're not a regular -- you're not a regular worker

6    there; correct?  You were filling in for someone?

7    A.    Filling for somebody, yes.

8    Q.    And you are friends with the owner of the store who we

9    already heard from; is that correct?

10   A.    Yes.

11   Q.    So before March 22, 2019 I think you were working in

12   the store around three weeks; right?

13   A.    No.  Three days.

14   Q.    Oh, three days?

15   A.    Yes.

16   Q.    Did you -- you were filling in for --

17   A.    Felice [indiscernible].  Yeah.

18   Q.    Before that, were there periods of time when you worked

19   in the store either to help out the owner or you were filling

20   in for somebody.  You worked at the store before; correct?

21   A.    Not that store.  No.

22   Q.    So just three days at this store?

23   A.    Yes.

24   Q.    Okay.  Well, you kind of took the wind out of my sails.

25   Let's say in the three days that you worked there, did you

1    ever see my client Mr. Smith in the store?

2    A.    No.

3    Q.    You testified on direct examination that you saw him

4    on -- specifically, March 22nd as to what happened; correct?

5    A.    Yes.

6    Q.    And you also answered a lot of questions from the

7    government of what these three individuals were saying during

8    that time; correct?

9    A.    Yes.

10   Q.    Now, we're at January, April, May, June, July, August,

11   September, around ten months of passed by; fair enough?

12   A.    Yes.

13   Q.    Did you read any reports or any notes before your

14   testimony today or are you just remembering what happened back

15   in March?  You just remembered the events as they have

16   occurred; correct?

17   A.    [Indiscernible].

18   Q.    You wouldn't say they're fresh in your mind, but do you

19   have a good memory?

20   A.    I -- mm-hmm.

21   Q.    You have an all right memory or a good memory?

22   A.    A good memory.

23   Q.    How old are you?

24   A.    34.

25   Q.    34.

1   A.    Yes.

2   Q.    Okay.  Now, how long speaking now you can totally and

3   perfectly understand [indiscernible] English; correct?

4   A.    Yes.

5   Q.    The three individuals that were there in the store that

6   day, to what you already testified and apparently what they

7   were saying, was there anything with respect to their speech

8   that would prevent you from understanding?  Could you

9   understand them?

10  A.    Yes.

11  Q.    Was your English as a second language an obstacle and

12  you understanding accurately what they said during that time,

13  10 months ago?

14  A.    Yes.

15  Q.    We -- before you got involved in this part of the

16  trial, we saw this video that you described already, on

17  numerous occasions, so I'm not going to play it again, I'm

18  just going to ask you questions regarding -- again, you

19  already said that you remembered the events as they occurred

20  ten months ago; correct?  You remember?

21  A.    Yes.

22  Q.    Right.  Okay.  There was a period of time that in the

23  video that we just saw on direct examination around 15 minutes

24  ago that there were three people in the store only that would

25  be, you, Joel and a Muslim -- a Muslim lady, a lady that was

1   dressed in Muslim garments, was in the store with you -- with

2   you Joel and the Muslim lady, three people; correct?  We just

3   saw it on the video?

4   A.     Mm-hmm.

5   Q.     And I believe they described the Muslim lady as my

6   client's wife?

7   A.     Yes.

8   Q.     Now, on the video that we just saw 15 minutes ago when

9   the camera had captured you, Joel and my client's wife in the

10  store, Joel had a gun at his side, pointed down; correct?

11  A.     When she was in the store that --

12  Q.     Yeah.

13  A.     -- Muslim lady.

14  Q.     If you don't remember, I'm not going to play the video.

15  I'm just going to ask you.  Do you remember being in the store

16  with you, Joel and my client's wife.  And then Joel had a gun

17  out at his side.  Do you remember?

18  A.     He didn't have the gun at that time.

19  Q.     Okay.  So that's your testimony.  That's what you

20  recall; correct?  Right?

21          THE COURT:  You have to say yes or no.

22          THE WITNESS:  Yes.

23  BY MR. PATTERSON:

24  Q.     And then you answered -- you were asking questions, do

25  you remember answering questions about you were trying to lock

1    the door?

2    A.    Yes.

3    Q.    And this was on the video, but you couldn't, because

4    one of the individuals came -- started coming back in the

5    door; right?

6    A.    Yes.

7    Q.    Would you agree with me that the video depicted and

8    what you acknowledge in the video, 15 minutes ago, that when

9    you were trying to lock the door to the store, again, you were

10   there, Joel was there with his handgun and my client's wife

11   was in the store when you were trying to lock the door.  Do

12   you remember that?  You just saw it 15 minutes ago.

13   A.    Joel didn't have the gun.

14   Q.    No?

15   A.    They took the gun away.

16   Q.    Okay.  Do you remember the Muslim woman and I'm going

17   to just -- I'm going to stop the Muslim woman, my client's

18   wife.  Remember my client's wife coming in waiving a dollar

19   around, wanting to buy something?  Do you remember that?

20   A.    Mm-hmm.

21            THE COURT:  You have to say yes or no.

22            THE WITNESS:  Yes.

23   BY MR. PATTERSON:

24   Q.    Again, I'm not lying, this is all in the video, 15

25   minutes ago.  The government asked you when these guns were

1    pointed when you saw these guns, other than Joel's gun that

2    you said why would you bring a fake gun into a store; right?

3    A.    Yes.

4    Q.    Okay.  But you did know -- or let me ask that a

5    different way.  Did you know that Joel's gun was not a fake

6    gun?

7    A.    I guess so.  Yes.

8    Q.    So the video depicts Joel in possession of a gun that

9    what you testified right now is a real gun; correct?

10   A.    Mm-hmm.

11   Q.    A gun that if you put a bullet in it, you chamber the

12   round, you point it, you pull the trigger, it's going to expel

13   a projectile; correct?

14   A.    Yes.

15   Q.    So we do know that Joel had during the time before the

16   gun was taken from him was armed with a weapon?

17   A.    Yes.

18   Q.    All right.  There were a lot of questions regarding

19   what the one individual was doing with Joel behind the

20   counter.  Do you recall those questions in your answer 15

21   minutes ago?

22   A.    Yes.

23   Q.    Do you remember testifying at a grand jury?  Do you

24   know what a grand jury is?

25   A.    Yes.

1   Q.    It's a room where you're put under oath and the oath is

2   you swear or affirm that you're going to tell the truth, the

3   whole truth and nothing but the truth and, of course, you

4   affirmed, you acknowledged that you would tell the truth;

5   correct?

6   A.    Yes.

7   Q.    And you did tell the truth when you had the -- when you

8   were at the grand jury; right?

9   A.    Yes.

10  Q.    Okay.  And if you remember, if not, I can get the

11  transcript.  Do you recall testifying at the grand jury that

12  when the bald guy was at the ATM, the two guys were not in the

13  store, they didn't see it.  Now, that's your testimony.  Do

14  you recall saying that?

15  A.    Yes.

16  Q.    So what that testimony is and what you said is that

17  when this whole ATM transaction was going down and apparently

18  he was upset about the counterfeit bills, the other two

19  individuals weren't in the store.

20  A.    No.

21  Q.    And as you said in grand jury, they didn't see it.

22  A.    No.

23  Q.    They didn't know what was going on --

24  A.    They didn't know nothing.

25  Q.    -- with respect to this ATM transaction; right?

1    A.    Yes.

2    Q.    In fact, my client doesn't come in until Joel already

3    has the gun; right?

4    A.    Mm-hmm.

5    Q.    Right?  When my client comes in and this is very clear

6    in the video and they say why I never contested that it was

7    him in the video, because it's him, great picture on the video

8    screen, it's easy to [indiscernible].  He comes in, and this

9    is all in front of the register on the customer side of the

10   plexiglass; right?

11   A.    Yes.

12   Q.    Okay.  That's kind of where all this happened.  That's

13   kind of where you were; correct?

14   A.    Yes.

15   Q.    You didn't go around the counter when allegedly, the

16   bald guy was behind the counter --

17   A.    No.

18   Q.    -- and you were not there when there was a depiction of

19   my client taking the weapon from Joel, you didn't see any of

20   that?

21   A.    No.

22   Q.    But what you did see is that when my client came in he

23   walked around you, but before he walks around you, to like

24   towards the back where the deli counter --

25   A.    Yes.

1  Q.    -- he gets his wife, he gets her out of the store;

2  correct?

3  A.     Mm-hmm.

4  Q.    That's the first thing he does is he sees Joel with a

5  gun, and he gets his wife out the store; correct?

6  A.    He came running.  I didn't see that part where he took

7  lady off the store.

8  Q.    But the -- again, just to be clear, the Muslim lady is

9  my client's wife.  There's only one lady in there --

10  A.     Yes.

11  Q.    -- with Muslim garments; correct?

12  A.     Yes.

13  Q.    Correct?  So now the video is not playing and you said

14  you remember all this; right?  That's what you told me before

15  we started questioning.

16  A.     Mm-hmm.

17  Q.    Okay.  So I'm going to ask you again, see if you can

18  give me the answer again.

19  A.     Yes.

20  Q.    Do you remember when Mr. Smith comes into the store

21  that he takes his arm, puts it around his wife and ushers her

22  out of the door?

23  A.    Oh, I [indiscernible] take -- took outside?

24  Q.    Yes.

25  A.    He move her like that.

1    Q.    Right.

2    A.    He move her like -- he go outside.

3    Q.    He moves outside.  All right.  So it seems like to you

4    the first concern in his mind is I'm getting my wife out of

5    the store?

6    A.    It look like that yes.

7    Q.    And you would also agree with me that when he's getting

8    his wife out of the store, this is the -- I know I have to

9    make a record here, but I'm just going to figure out -- Joel

10   is by like the counter where the patrons can look in the

11   little hole back here?

12   A.    Yes.

13   Q.    He's got the gun out by his side; right?

14   A.    Yes.

15   Q.    Okay.  That's when the video depicts, after he has his

16   wife safely out of the store -- now, when his wife is out of

17   the store, Mr. Quinn and Mr. Stevens are still in the store;

18   correct?

19   A.    Yes.

20   Q.    So that's when as the video depicts and you've already

21   described, that's when he points a gun; correct?

22   A.    Yes.

23   Q.    Okay.  Now, again, you said, you were asked whether --

24   you don't know if it was a -- it looked like a real gun;

25   correct?

1    A.    Yes.

2    Q.    A real, real gun; correct?

3    A.    Yes.

4    Q.    It didn't have the fluorescent tip on the barrel that

5    they do for fake guns, so everyone knows it's not a real gun?

6    A.    No.

7    Q.    Okay.  But you didn't know if it was loaded; correct?

8    A.    No.  I didn't know.  No.

9    Q.    You didn't know if it had a firing pin or you don't

10   know if it had a clip or it had anything that could fire a

11   projectile; right?

12   A.    No.

13   Q.    And I'm talking about Mr. Smith's gun and the one

14   allegedly another individual had; correct?

15   A.    [Indiscernible].

16   Q.    You're just assuming --

17   A.    Assuming.  Yeah.

18   Q.    -- it could propel a projectile, but we don't know;

19   right?

20   A.    Yes.

21   Q.    But we do know that Joel's does.

22   A.    Mm-hmm.

23   Q.    So my client gets his wife out of the store, removes

24   his -- just to make this cross-examination go quick, I'm just

25   going to say, the gun, all right, whether it fired or not, or

1    whether he had a real gun, he points a gun at Joel who is

2    holding a gun --

3    A.    Yes.

4    Q.    He doesn't point it at you --

5    A.    Yes.

6    Q.    Right.  So then that's when they start shuffling around

7    out of your vision to kind of like behind the counter before

8    you go back to where the register is; correct?

9    A.    Yeah.  Where he took the gun out, I didn't know -- I

10   thought it was a customer that come inside the store.  I

11   didn't know what's going on behind my back.  I didn't know

12   nothing.  And when he put the gun out and I see it, I jump

13   back.

14   Q.    All right.

15   A.    And he -- and he went to Joel.

16   Q.    I'm sorry to interrupt.  And I believe you said you're

17   not a regular customer; right?  Didn't you say that?

18   A.    Yeah.  And when I see the gun, I was -- I didn't know

19   customer.

20   Q.    Right.  So there comes a time then that you stay in the

21   area that we've already described right inside the front door;

22   correct?

23   A.    Yes.

24   Q.    Oh, real quick, I'm going to -- before I forget this,

25   there's like a video screen, it's a little bit smaller than

Page 212

1    that, it's prominently displayed in the area where the people

2    stand, the customers stand.

3    A.    Yes.  It's camera.

4    Q.    And it has the video capture screens in this TV

5    monitor; right?

6    A.    Yes.

7    Q.    And they're live, they're streaming, they're seeing

8    people moving, you can look at yourself in the -- if you're

9    looking at a camera, you can look at yourself in the video

10   like you're on TV; rights?

11   A.    Yes.

12   Q.    Okay.  And that's displayed, I mean, when you walk in

13   that store, you're going to see that you're on camera; right?

14   A.    Yes.

15   Q.    Because there's a perfect shot, the perfect shot of my

16   client with his gun; right?

17   A.    Yes.

18   Q.    And he could look up and he could see himself on the TV

19   screen; right?  Not hidden in the back; right?

20   A.    Yes.

21   Q.    Okay.  Hey, this is a cash business; right?

22   A.    Yes.

23   Q.    Okay.  The neighborhood demographics, the people use

24   credit cards and debit cards and mostly cash.

25   A.    Both.

1    Q.    Both?

2    A.    Yes.

3    Q.    It would be -- and you worked there three day, so if

4    you know fine, if you don't just tell me.

5    A.    Mm-hmm.

6    Q.    The three days that you worked there, there's a lot of

7    cash going back and forth.  You're selling a lot of

8    merchandise; right?

9          THE COURT:  You have to say yes.

10   BY MR. PATTERSON:

11   Q.    It's actually when this -- when this is all --

12         THE COURT:  Just a minute.  He's nodding.  No

13   record of it.

14         MR. PATTERSON:  Oh, I'm sorry.  I'm sorry.

15   BY MR. PATTERSON:

16   Q.    Sir, I get going and I get ahead of myself.

17         THE COURT:  You have to give affirmative

18   answers, yes or -- well, or a negative answer, yes or no.  You

19   have to give a verbal answer.

20         THE WITNESS:  Yes.

21         THE COURT:  You have to speak.

22         THE WITNESS:  Okay.

23         THE COURT:  Because the reporter will not be

24   able to record a nod.

25         THE WITNESS:  Okay.

Page 214

BY MR. PATTERSON:

Q.    So every that we're saying to you is recorded; okay?

A.    Yes.

Q.    I think that's my fault, I apologize.  So in the three days that you're there, there's -- they're making money, they're selling merchandise.

A.    Yes.

Q.    And there's a lot of merchandise in this store; right?

A.    Some merchandise, yeah.

Q.    There's socks hanging from the ceiling.

A.    Yes.

Q.    There's candy in the plexiglass.

A.    Yes.

Q.    You sell cigarettes?

A.    They sell cigarettes, yes.

Q.    You have carton of cigarettes?

A.    They sell, yeah.

Q.    Do you know how much a carton of cigarettes is in the store, generally?

A.    I don't know.

Q.    It's a high -- it's considered a high-ticket item though; right?  It's a lot of money?

A.    Yes.

Q.    Do you smoke?

A.    No.

1  Q.    Okay.  That's why you don't know how expensive

2  cigarettes are [indiscernible].  I don't smoke either.

3  A.    That's good.

4  Q.    So was there a store safe?

5  A.    A store safe?

6  Q.    Yeah.  A safe where they put the extra cash.

7  A.    Oh, I don't know nothing like that.

8  Q.    Okay.  Is there a back room where the owner would go

9  and look at her receipts and everything?  You know that?

10  A.    No.

11  Q.    Okay.  So you weren't aware of any additional money

12  anywhere within the store?

13  A.    No.

14  Q.    Now, you can't see through the plexiglass, because one,

15  it's plexiglass, it's a little opaque and plus there's little

16  stuff stuffed in the cubbies of the plexiglass; right?

17  A.    Yes.

18  Q.    So from your vantage point outside of where you

19  transact business with the cashier through that little hole in

20  the plexiglass, it's hard for you to see what's going on at

21  the cash register; correct?

22  A.    Yes.

23  Q.    And I believe you did answer that when the one

24  gentleman was allegedly behind the register area with Joel,

25  you couldn't really see what's going on; correct?

1    A.    Yes.

2    Q.    But then on -- responding on a question by the

3    government, they asked you -- and again, I think to make this

4    clear, they were -- you were describing the guy with the hat

5    or the Muslim [indiscernible].  I'm going to refer to him as

6    Donnie Smith.  They asked you did Donnie Smith say anything

7    when the one of these individuals were behind the cash

8    register and your response was that my client says take

9    everything; correct?

10   A.    Yes.

11   Q.    You heard him say take everything?

12   A.    Yes.

13   Q.    And you would hear him say take everything for the mere

14   fact that you were in that --

15   A.    Outside.

16   Q.    You were in -- yeah, you were outside hanging by the

17   front door.

18   A.    Behind him.

19   Q.    Right.

20   A.    Yes.

21   Q.    So when one of the individuals and Joel are behind the

22   cash register where again, you can't really see, who is on the

23   other side with you, other than you and Mr. Smith?

24   A.    The other side with me?

25   Q.    Yeah.

Page 217

1    A.    The other guy, the gentleman.

2    Q.    Okay.  I believe you referred to him as the guy in the

3    gray; correct?

4    A.    Yes.

5    Q.    Okay.  When Donnie Smith came back from that area that

6    they showed where the brief scuffle, did you know that Donnie

7    Smith had Joel's gun?

8    A.    No.

9    Q.    You never saw Donnie Smith take --

10   A.    No.

11   Q.    So when you're saying, you're responding to a question

12   by the government of my client saying take everything, the

13   video shows my client and you in the outside area by the door

14   like this; right?

15   A.    Yes.

16   Q.    He stood like this.

17   A.    Mm-hmm.

18   Q.    He didn't have a gun; right?  In fact, that the gun

19   that he originally pointed at you, that wasn't even out

20   anymore; was it?

21   A.    No.

22   Q.    So he's saying take everything, but he, himself doesn't

23   take anything; right?

24   A.    No.  He don't.

25   Q.    And if we actually knew if that gun that Mr. Smith

Page 218

```
 1    originally had, not Joel's gun, but the gun that he had was
 2    actually a functioning gun, he could've cleaned you out.
 3    A.    Yeah, he could.  Yeah.
 4    Q.    He could've taken your cartons of cigarettes; right?
 5    A.    Everything.
 6    Q.    What about prepaid phone cards, do you have those?
 7    A.    I don't know.  I don't know.
 8    Q.    Okay.  You have those store cards, prepaid store cards,
 9    do you know?
10    A.    I don't know if they sell it.
11    Q.    But he could've taken a lot of stuff.
12    A.    Everything in the store.
13    Q.    You know what he did in the video -- and you -- because
14    you're right there.  He's like this; right?  Doing nothing.
15    Now, I think it was shown to you, did you see Joel giving the
16    other individual the $100?
17    A.    Yes.
18    Q.    Okay.  So you have -- you have the one individual who
19    you describe as a bald guy, he has the $100 which he says was
20    take originally from the MAC machine or ATM.  And we
21    already -- you already testified that you saw what appeared to
22    be a totally operational, functional gun in the hands of
23    Donnie Smith and the other individual, the tall guy; correct?
24    A.    Yes.
25    Q.    And you have a lot of merchandise in your store; right?
```

1    A.    Yes.

2    Q.    And my client is standing there like this.  Doesn't do

3    anything; right?  Right?

4    A.    Yes.

5              THE COURT:  I'm going to interrupt.  I was

6    letting it go, but when you say my client is standing there

7    like this --

8              MR. PATTERSON:  Yeah, I know I'm not describing

9    that.  I'll make it --

10             THE COURT:  Well, not describing, it's not on

11   the record.

12             MR. PATTERSON:  I know that.

13             THE COURT:  The jury heard it, but beyond that,

14   if we ever have to refer to the record, it will say exactly

15   what you said.

16             MR. PATTERSON:  Absolutely, Your Honor.

17             THE COURT:  My client is standing there like

18   this, and no one will know what you're client was doing.

19             MR. PATTERSON:  I understand, Your Honor.

20   BY MR. PATTERSON:

21   Q.    So the for the last few times that I asked -- I asked

22   the witness that my client was standing like this, I would

23   state for the record that I am standing upright with my feet

24   together and my hands clasped before me.  Is that a fair -- is

25   that fair, what I'm doing?

Page 220

1    A.    He had the hand on his pocket, like this, not right in

2    front of him.

3    Q.    Okay.  Did he have hands in his pocket?

4    A.    Yes.

5    Q.    Did he have a gun in his hands out of his pocket?

6    A.    Out of the pocket, no.

7    Q.    You never saw the gun from him other than the first

8    time he came in; correct?

9    A.    Yes.  Yes.

10   Q.    Now, there was a lot of questions that you answered of

11   after -- after, apparently, the bald guy gets his $100 now,

12   everybody goes to the front of the store where the front door

13   is; right?  That's kind of where most of your testimony was,

14   just recently; right?

15   A.    Yes.

16   Q.    Okay.  And again, you speak English, you understand

17   English, so you were able to tell the jury of what you recall

18   10 months ago with respect to what was said during that brief

19   time; correct?

20   A.    Yes.

21   Q.    Okay.  During the time that the guy in the gray, the

22   tall guy was saying something and Donnie is there also, Donnie

23   Smith is there also -- can you play that please?

24             UNIDENTIFIED SPEAKER:  Yeah, sure.  Where would

25   you like --

1                MR. PATTERSON:  Oh --

2                MS. MEEHAN:  Give us a second.

3       BY MR. PATTERSON:

4       Q.    I'm going to be putting up on the monitor Government's

5       Exhibit 1A.  Okay.  Do you see that okay?

6       A.    Yes.

7       Q.    I'm only going to play it for a couple seconds.  Just

8       focus on it.  Now, look at my client Donnie Smith.  Do you see

9       him?

10      A.    Yes.

11                        -  -  -

12                   (Video played)

13                        -  -  -

14      BY MR. PATTERSON:

15      Q.    All right.  You can stop now.  Thank you, very much.

16      Isn't it true when he goes like this, he didn't have a gun.

17      He goes like this, didn't he say, Joel pulled a gun on my

18      friends?  Is that what he said when he was pointing?

19      A.    I don't remember that part.

20      Q.    Okay.

21      A.    No.

22      Q.    I mean you testified on direct examination of a lot of

23      stuff of what the tall gray guy said and -- the guy in the

24      gray clothes said, and everything, and I understand there's a

25      lot going on.

1    A.    Yes.

2    Q.    But you would acknowledge in the video, it depicted my

3    client pointing with his finger; correct?

4    A.    Yeah.  He point a finger.

5    Q.    And you just don't remember if he had said that Joel

6    pulled a gun on my friends.  He could have, you just don't

7    remember?

8    A.    No, remember, no.

9    Q.    Okay.  Thank you.  I appreciate your honesty?

10   A.    Okay.

11   Q.    And again, acknowledging that you've only been there

12   three days, in those three days you were able to look at this

13   TV monitor with all the different feeds from the cameras;

14   right?

15   A.    Yes.

16   Q.    Okay.  Would you agree with me that one of the feeds,

17   when I say feeds, meaning one of the pictures that a camera

18   was recording was of the front of your store, do you remember

19   that being on the screen in the three days that you worked

20   there?

21   A.    The front of the store?

22   Q.    Yeah.

23   A.    Yes.

24   Q.    Like there was a camera --

25   A.    Outside.  Yes.

Page 223

1    Q.    -- of -- so the owner of the store, at least on March

2    22, 2019, and three days before that was recording the comings

3    and goings of people outside the store; right?

4    A.    Yes.

5    Q.    Okay.  And you would agree with me, because you were

6    there for the whole sequence of events; right?

7    A.    Yes.

8    Q.    All right.  You've kind of seen everything.

9    A.    Yes.

10   Q.    You would -- now, I counted and I'm not going to hold

11   you to this, because I'm sure you didn't, but between Mr.

12   Quinn, Mr. Stevens and Mr. Smith, I counted them coming into

13   the of that door at least eight times, but I'm not going to

14   ask you that question.  I'm going to ask you this question,

15   they were coming and going out of this door while all this was

16   going on; right?

17   A.    Yes.

18   Q.    Okay.  So can and you don't know anything about the

19   video capture system, you don't know anything about the

20   digital recorder; right?

21   A.    No.

22   Q.    All right.  But you knew that it was working, because

23   you could see it on the screen; correct?

24   A.    Yes.

25   Q.    So if somebody looked at the whatever camera number

Page 224

1    that is, if somebody looked at that camera feed, you can see

2    what was going on, on the outside of the store based upon that

3    camera across the street.

4    A.    Yes.

5    Q.    And this is based upon your three days of experience;

6    right?

7    A.    Yes.

8    Q.    You could see cop cars zooming by.

9    A.    Yes.

10    Q.    Right?  Because when they played the video, you saw a

11    cop car zooming by, but you saw it from the inside of the

12    store going through the -- looking through the glass am door;

13    correct?

14    A.    It was when he went by into the glass door.

15    Q.    Right.

16    A.    They go outside the street, yeah.

17    Q.    But based upon your experience and being an employee

18    there and I believe specifically, a cook for three days, it

19    was probably a camera that had a much better picture of a cop

20    car zooming by; right?  The one on the outside.

21    A.    It's one camera.

22    Q.    It's one camera on the outside; right?

23    A.    Yeah.

24            MR. PATTERSON:  The Court's indulgence.  One

25    minute, please.

1    BY MR. PATTERSON:

2    Q.    So when all this is done, when Mr. Quinn leaves, Mr.

3    Smith leaves and Mr. Stevens leaves, I believe the video

4    depicts and I don't know if they showed it, I'm just going to

5    ask you respectively, you started selling merchandise right

6    away; right?

7    A.    I was fixing the merchandise, it was a mess.

8    Q.    Right.

9    A.    I was putting everything back.

10   Q.    But, I mean, like, towards the end of the day, the same

11   day, right after this happened, I believe before the police

12   came, the store was open, you were transacting business with

13   customers.

14   A.    I don't think it was business right away, the cop, they

15   came right away, so they close the store down.

16   Q.    The police came right away?

17   A.    Yeah.

18   Q.    Thank you.  I have nothing further?

19   A.    You're welcome.

20            THE COURT:  Mr. Wittels, it's 25 minutes of 5,

21   how long do you expect to be?

22            MR. WITTELS:  I think I'd be a while, Judge.  I

23   anticipate what she was going to ask me, and I think that this

24   would be a good time to break, because I could go a little

25   while and I don't want to impose upon this jury.

Page 226

1              THE COURT:  No.  We want to release the jury no

2      later than quarter of five.  All right.  Then we'll recess for

3      the day.  We'll start tomorrow at 9:30 ladies and gentlemen.

4      You've heard a little bit more about the case, and there might

5      be more temptation to talk about it, but don't.  Don't talk

6      about it among yourselves and don't discuss it with anyone at

7      home.  Also, if anything happens to be broadcast on a radio or

8      television, don't listen to it or watch it.  If anything

9      happens to be broadcast about the case, broadcast, if anything

10     happens to be written in any newspaper about the case, don't

11     read it, and the reason I've told you before, you have to

12     decide the case based solely on the evidence presented in the

13     courtroom.  You can't rely on anything you might have read or

14     heard or discussed with others outside of the courtroom.  On

15     that note, we'll excuse you for the evening.  See you tomorrow

16     morning, 9:30.  Be sure you leave your juror notebooks in the

17     jury room.  Have a good night.

18              DEPUTY CLERK:  All rise.

19                            - - -

20              (The jury leaves the courtroom.)

21                            - - -

22              THE COURT:  Be seated, everyone.  Mr. Sanchez,

23     you may return to government counsel table.

24              THE WITNESS:  Thank you.

25              THE COURT:  We'll continue the cross-examination

Page 227

1    with Mr. Sanchez tomorrow.  I have some questions about

2    scheduling.  It seems to me we are way, way off schedule.  The

3    chances of finishing on Friday are nil if the government

4    intends to call even a small portion of the witnesses

5    remaining.  There are 21 witnesses on your list.  You're

6    working on Witness Number Four.

7              MR. ECKERT:  Right, Your Honor.  This is last

8    lengthy witness I would expect that the other ones will be --

9    are almost all -- are, I believe all law enforcement and one

10   records custodian.  They'll be -- I would expect that we would

11   finish tomorrow, if we have a full day of testimony.

12             THE COURT:  Well, hopefully, we will have a full

13   day, but tomorrow night, we'll have a charging conference, the

14   second part of it.  We're going to have to discuss the things

15   we did not discuss.  We e-mailed a copy of the revised charge

16   to you, this morning.  It covers the changes that we discussed

17   on Tuesday evening.

18             So it's your thought that you might be able to

19   close on Friday?

20             MR. ECKERT:  May I just have one moment, Your

21   Honor?

22             THE COURT:  With the closer?

23             MR. ECKERT:  Yes.  I want to defer to my

24   co-counsel on that.

25             MS. MARTIN:  Your Honor, everything is just

1    taking longer than we expect.  We do absolutely hope that we

2    can get those witnesses up and down, but I don't want to make

3    a promise that we can't keep.  My hope would be to close

4    Friday afternoon, that's all I can offer.

5            THE COURT:  If we close on Friday afternoon, I

6    won't be able to charge until Monday.

7            MS. MARTIN:  So closing Monday morning would be

8    preferable at that point.

9            THE COURT:  And that's fine, except, one of your

10   colleagues has a case that I'm not sure will go away.  It

11   might.  My recollection is that if we don't have a plea, we'll

12   have a continuance.  I might have to break away sometime,

13   unless we do not have a Speedy Trial Act problem in that other

14   case, we might not.  And then I'll just continue it.  I can do

15   that without a Speedy Trial Act issue.  If the Speedy Trial

16   Act doesn't -- if it's not eminent.  So we'll see about that,

17   but your thought is had finishing the evidence on like Friday

18   morning.

19           MS. MARTIN:  That would be my hope.

20           THE COURT:  All right.  Well then we'll maybe --

21   well, we'll see, but that's a little better than I

22   anticipated, I thought we had 17 additional witnesses and

23   looking at the four we've had and realizing that those are

24   longer witnesses, but nevertheless, I was of the view that

25   we're into next week in a major way.  That's incorrect.

Page 229

1              MS. MARTIN:  I absolutely wouldn't expect

2      testimony to go into next week.  At worst-case scenario, I

3      think I'd be closing on Monday.

4              THE COURT:  Fine.  I think I'll say something to

5      the jury tomorrow.  Right now, they're thinking it's a four or

6      five day trial.  That was what we said in the voir dire.  And

7      I'll pick up on that.  All right.  Thank you.

8              Yes, Mr. Wittels.

9              MR. WITTELS:  Judge, knowing what I know about

10     the case, the police witnesses are going to be quick, because

11     there's not much to cross-examine are them about.  The guts of

12     the case is --

13             THE COURT:  I should say, well, I won't.  I'll

14     keep my tongue.  That hasn't cut the cross-examination at all

15     up until this point.

16             MR. WITTELS:  Well, that's, just because these

17     witnesses you've heard up to this point are the guts of the

18     case and --

19             THE COURT:  Well, I think some of the

20     examination has been extensive.

21             MR. WITTELS:  Yeah.

22             THE COURT:  I don't know how many minutes we

23     spent trying to figure out Mr. Ventura date of arrival in this

24     country and but the long and the short of it, I think all of

25     us would be better off if we try to limit examination to that

Page 230

1    which is really significant, relevant, important and not give

2    into a lot of peripheral issues that have little relation to

3    the case.

4              MR. WITTELS:  Judge, I promise you we'll move

5    quickly through the police witnesses, because I share your

6    sentiment.  I plead guilty having done that.

7              MR. PATTERSON:  Your Honor, I understand that I

8    originally said my client may not be testifying.  We've been

9    discussing throughout this -- today's proceedings during

10   breaks that he is considering testifying and I will have a

11   more definitive answer for you hopefully by tomorrow.

12             THE COURT:  Fine.  And then we'll rule on the

13   government's motion in limine.  I won't write, I'll issue an

14   oral order.  I can -- I will be in a position to do that.  I

15   should add that nothing that I am saying now should cause your

16   clients to think the presentation of their case will be

17   limited.  I'm telling each defense lawyer and each defendant

18   now, that they make take as much time as they need to present

19   their case if they decide to present a case.  That's really

20   your call.  You will not be limited unless the government

21   objects and then I'll rule on an objection, but now, not

22   knowing what you intend to do, there will be no limits on time

23   or anything of that sort with respect to presentation of the

24   defense cases.

25             MR. PATTERSON:  Thank you, Your Honor.

 1            THE COURT:  I would like to finish the case

 2   sooner rather than later, however.

 3            MR. PATTERSON:  Understood, Your Honor.

 4            THE COURT:  And I think that's in everyone's

 5   interest, the defense interest as well, if the case "drags

 6   on", that's not good, and my job is to make sure it doesn't.

 7   I use the phrase "drag on" and put it in quotes.

 8            MS. MEEHAN:  Your Honor.

 9            THE COURT:  Well, we'll know more -- I'll hear

10   from you in a minute, Ms. Meehan.  We'll know a little more

11   about the case and the end of the testimony by tomorrow.  And

12   then, remember Mr. Patterson, that we're not finished with the

13   jury reaches a verdict.  We have a bifurcated Count 3.

14            MR. PATTERSON:  I understand, Your Honor.

15            THE COURT:  All right.

16            UNIDENTIFIED SPEAKER:  Judge, I have an issue to

17   add to regarding the schedule.

18            THE COURT:  An issue?

19            UNIDENTIFIED SPEAKER:  The juror issue.

20            THE COURT:  Yes.

21            UNIDENTIFIED SPEAKER:  You want me to say it in

22   open court?  It's nothing -- it's just that there's a juror

23   that has a scheduling conflict out of town for Monday or

24   beginning Monday.  At this time, he's saying he can make

25   arrangements to change it, but he's -- it involves a flight,

Page 232

1   so he's certainly needs to have some information so that he

2   can plan properly.

3                    THE COURT:  Well, I think we can safely say that

4   the entire case including the bifurcated trial will not

5   conclude before Monday.  In other words, we'll be in the

6   courtroom, I am relatively certain, on Monday, perhaps, all

7   day.  The bifurcated case should not take very long to try,

8   but my view is, at best they'll be deliberating and -- on

9   Monday and hopefully we'll be able to end the case on Monday,

10  but the juror should be told the case is going to spill over.

11  And I think we should use the phrase "at least" until Monday.

12  It's possible it will go longer.

13                    UNIDENTIFIED SPEAKER:  Okay.

14                    THE COURT:  All right.  Ms. Meehan.

15                    MS. MEEHAN:  Your Honor, would the Court

16  consider ruling -- and I understand you wouldn't -- you

17  indicated you're not issuing a written ruling on -- for Mr.

18  Smith's 609, but I would ask the same that the Court issue an

19  order on defense -- Defendant Quinn's 609 response and

20  government's 609 motion.

21                    THE COURT:  I will.

22                    MS. MEEHAN:  Thank you.

23                    THE COURT:  What was the government's --

24                    MS. MARTIN:  Your Honor, I do have additional

25  argument based on her motion, if Your Honor is interested in

Page 233

```
 1    hearing it before you rule on the motion.

 2              THE COURT:  On what?

 3              MS. MARTIN:  On her response to our 609 motion.

 4              THE COURT:  Well, we can have oral argument.  I

 5    have nothing on for tonight, do I?  At quarter of five, you've

 6    me scheduled?

 7              MR. PATTERSON:  Your Honor, I would just

 8    formally join Attorney Meehan's motion in limine, since I did

 9    not provide the Court with my own.  It's the same issue, I

10    believe, just for a different defendant.

11              THE COURT:  All right.  Well, I'm thinking about

12    time to argue.  We're going to finish the charging conference

13    tomorrow.  Do you want to -- also looking at my watch -- do

14    you want to do it -- we're now talking about argument on the

15    motions in limine.  Do you want to do it now, or would you

16    prefer to do it tomorrow night.

17              MS. MARTIN:  I would prefer to do it tomorrow

18    night, only because they -- that Mr. Patterson is now orally

19    joined and it seems that there is a likelihood of his client

20    testifying.  My argument in response is specific to the case

21    law cited by Ms. Meehan, so I would just like a chance --

22              THE COURT:  I'm sorry, to the --

23              MS. MARTIN:  The case law cited in Ms. Meehan's

24    motion.  My argument or additional argument to Your Honor is

25    based on that case law, which I believe is specific to some of
```

Page 234

1     the situations and convictions that we seek to admit when it

2     comes to Mr. Quinn.  I would just like a moment to gather my

3     thoughts on Mr. Smith and potentially pull additional case law

4     for Your Honor.

5              THE COURT:  All right.  So we'll do it tomorrow

6     night.

7              MS. MARTIN:  I would appreciate that.

8              THE COURT:  I dislike having to move into your

9     evenings and mine, but we'll -- Ms. Hull, do I have anything

10    on tomorrow?

11             MS. HULL:  No.

12             THE COURT:  Then at day end tomorrow we'll take

13    a short break, not the 45=minute break we took on Tuesday

14    night, and be in probably at 5:00 and I think we should start

15    with the motions in limine.  I read the motion papers, and

16    should come as no surprise, I've ruled on these very same

17    matters before, and I'll consider all of the arguments, the

18    written arguments, and whatever you add orally.  And we'll do

19    it tomorrow starting at 5:00 p.m.

20             All right.  Is there anything else we have to

21    address?

22             MS. MARTIN:  Not from the government, Your

23    Honor.

24             MR. PATTERSON:  No, Your Honor.  Thank you.

25             THE COURT:  You're on your feet, Ms. Martin.

Page 235

1    I'm not sure whether you're up or down.

2              MS. MARTIN:  Your Honor, I'm sorry.  Mr.

3    Patterson and I discussed the 911 call which we mentioned last

4    night during the charging conference.  He did inform me that

5    he plans to object to my omission of that call, and just wants

6    to put his reasoning on the record.  I didn't know if Your

7    Honor wanted to do that outside of the presence of the jury so

8    we don't have to stop in the middle.  I'm assuming Your Honor

9    will want to hear the call, and my reasons for requesting

10   omission of the call and put all of that on the record.  So we

11   can do that tomorrow morning or we can do it tonight, but the

12   government does intend to play that 911 call for the jury

13   tomorrow.

14             THE COURT:  You see, there's a little bit of a

15   tension between having oral arguments during the Court day and

16   trying to get the trial finished sometime this week or maybe

17   next week.  This second call, the first call is in evidence.

18             MS. MARTIN:  Correct.

19             THE COURT:  And again, you're talking about

20   Exhibit 5B.

21             MS. MARTIN:  Yes.  This would be Exhibit 5B.

22             THE COURT:  Tell me about it now.

23             MS. MARTIN:  Your Honor, this is the 911 call

24   that was placed about 50 minutes after the incident inside the

25   store.  It's the government's contention that it's defendant

Page 236

1   Donnie Smith on the call.  I'm happy to play the call for Your

2   Honor.  It might make the argument easier.  It's not a very

3   long call.  Would Your Honor like to hear it or would you like

4   to hear argument?

5              THE COURT:  No.  I'd like to hear the call first

6   and then argument.  We're going to do it now.

7              MS. MARTIN:  Okay.  This is at 5:43 p.m. Your

8   Honor.

9                          -   -   -

10                     (911 call played)

11                         -   -   -

12             THE COURT:  Mr. Patterson.

13             MR. PATTERSON:  Your Honor.  I -- in my opening,

14  I actually told the jury what consciousness of guilt is for

15  the mere fact that it was flight as consciousness of guilt.

16  Originally, when I heard from the government they were going

17  to be requesting that they play this tape, obviously, my first

18  objection was foundation and how are they going to

19  authenticate it.  They can't authenticate it based on my

20  client's voice, because they don't have anybody here that can

21  listen to that and say yes, that's absolutely Donnie Smith,

22  that's him speaking.  So they are attempting to get it in

23  through his phone records.  I've already told the jury he

24  left.  I already told the jury, I don't know why, but he took

25  off and he was involved in a chase and crashed his car.  It's

Page 237

1   just going to confuse the jury.  It's cumulative.  It doesn't

2   really get the government anywhere other than what I've

3   already admitted to in my opening.  I'm going to be admitting

4   to in my closing.  And the evidence, when they start putting

5   in the police officers on about what they saw, my client get

6   in his car and take off with the officer right at his door,

7   this is unnecessary.  And I think for just to get right to the

8   point, I think I'll just make my objection that it's

9   cumulative, and it would just cause confusion, because I'm

10  already saying he took off, Your Honor.

11          MS. MARTIN:  May I respond to that, Your Honor?

12          THE COURT:  Yes.

13          MS. MARTIN:  Your Honor, if you remember Mr.

14  Patterson's opening, he attempts to diminish the flight, and

15  he says, you know what, listen, police got there and my client

16  fled.  Listen, there were cops there.  That is what it is.

17  This call happens 50 minutes after that robbery.  It's the

18  exact amount of time walking distance that he would need to

19  get from the site of the crash to Chew and Sharpnack where

20  this alibi that you hear in the call comes in.  He's had 50

21  minutes to think about this, and place a 911 call to give

22  himself an alibi saying, I don't know what happened in that

23  store.  It was some guy.  And he just keeps talking to the 911

24  dispatcher saying information about what happened with the

25  incident and how he didn't see it.  That shows additional

```
 1   consciousness of guilt.  Just because it's not the flight
 2   consciousness of guilt instruction, doesn't mean I can't argue
 3   it to the jury.
 4            MR. PATTERSON:  If they attempted to
 5   authenticate this phone call, it's coming from my client
 6   through his telephone records, then obviously, I can argue as
 7   to weight it has, how much weigh they should assign that in my
 8   closing as to whether or not those records are sufficient
 9   without a voice recognition to say, yes, in fact, it was my
10   client.  I'm -- one minute, please.
11            And again, without voice recognition, I
12   understand how the government is trying to do this.  I'm just
13   asking permission to make the objection at the appropriate
14   time insofar as to -- just to cross-examine on the record to
15   see if that's sufficient for those phone records to be
16   pointing as my client being the owner of that phone.  The
17   records which I received in discovery said Donte Smith.  Does
18   the government have anything that my clients formal name is
19   Donte Smith?
20            MS. MARTIN:  If I may, Your Honor.  The phone
21   records do come back to a Donte Smith at his -- Mr. Smith's
22   mother's address.  There are numerous phone calls in those
23   records, first between himself and defendant Maurice Quinn on
24   a phone number that we know and Ms. Meehan will stipulate is
25   his phone number, numerous calls before and after the robbery.
```

Page 239

1    And then there are also calls to Mr. Smith's wife, Charlene

2    Webster, who you've seen in the video.  The police that

3    transport her later that day, see a phone number repeatedly

4    popping up on her phone as they're transporting her, that's

5    why they get those records.  Those records come back to Donnie

6    Smith and the 911 dispatcher that called him back, it's right

7    there in his phone records.

8                THE COURT:  How you are going to introduce this

9    evidence?  Are you going to have the record to start.

10               MS. MARTIN:  We do.  We have a T-Mobile records

11   custodian who will be here tomorrow morning.

12               THE COURT:  Well, what I'm going to do.  I'm

13   going to do a little research on the issue.  So I'll take the

14   question under advisement and rule tomorrow morning.  I should

15   tell you now, Mr. Patterson, I'm inclined to agree with the

16   government on this issue right now.  But I'm not ruling now.

17   I just want to be sure about that.  You certainly will be able

18   to cross-examine the telephone record custodian and depending

19   upon -- I won't rule until after that, but after that, if

20   there's an issue that you haven't argued, argue it.  And I'll

21   rule finally at that time.

22               Does the government intend to present any other

23   foundation type evidence?

24               MS. MARTIN:  As to the phone call, Your Honor?

25               THE COURT:  Yes.

Page 240

1              MS. MARTIN:  I believe I've summarized it all,

2       but I'm happy to detail it more extensively.

3              THE COURT:  You don't have to detail it more

4       extensively.  I'm talking about a witness.

5              MS. MARTIN:  No.  We'll have someone who will

6       authenticate in terms of a business record from 911 dispatch

7       and we'll authenticate the phone number that appears in Mr.

8       Smith's records that lines up.  There will be somebody that

9       will authenticate that that's a 911 dispatch number, but I've

10      already presented that to Your Honor.

11             THE COURT:  And you don't have to do that before

12      I rule.  If we do that in front of the jury, the cat's out of

13      the bag before I rule.  So what we'll do, we'll hear from the

14      record custodian and the telephone company and you

15      cross-examine, Mr. Patterson, and I'll rule at that time.

16             MR. PATTERSON:  Just, if the government is --

17      would have to prove then that if they're tying the phone calls

18      to my client's mother, they're going to have to establish that

19      the phone call that's the number he's calling was in fact my

20      client's mother's phone number and it's my client's mother's

21      address.  If they're trying to tie that -- those phone records

22      into my client then they have to establish all the context

23      that he called.

24             THE COURT:  I'm sorry.  They have to establish

25      all the context?

1              MR. PATTERSON:  Well, they're saying that this

2    Donte Smith, the person who owns this number of Donte Smith is

3    calling these people which the government already purported to

4    be Donnie Smith's mother.  They're going to have to establish

5    that connection and Donnie Smith's mother's address which

6    they've already said that that's how they're trying to make

7    this connection, since they don't have voice recognition.

8              MS. MARTIN:  Your Honor, I do just want to

9    clarify.  I have been informed by counsel that I believe I

10   have spoken correctly as to the address on the records, it's

11   Donte Smith and there's an address.  I'm not positive at this

12   moment whether or not it links to his mother, but I plan to

13   establish via voluminous circumstantial evidence in the

14   records the calls to Maurice Quinn, the calls to Charlene

15   Webster's number which is his wife which we do identify, as

16   well as the 911 dispatch.

17             THE COURT:  In other words, this is a number

18   listed for Donte Smith?

19             MS. MARTIN:  Correct Your Honor.

20             THE COURT:  And not his mother?

21             MS. MARTIN:  Correct.

22             MR. PATTERSON:  And then, it's obviously the

23   tried and true, well, just because this person Donte Smith is

24   calling Donte Smith's mother that it's actually my client.

25   Anybody can use the phone, but I understand that's a weight

Page 242

1    argument.  I do understand that.

2           THE COURT:  And I think calling Mr. Quinn would

3    likewise, fall under the category of weight of the evidence.

4           MR. PATTERSON:  Correct.  And they'd have to

5    establish that that's Mr. Quinn's phone number which I'm

6    assuming [indiscernible].  So --

7           MS. MEEHAN:  I would have an objection --

8           THE COURT:  The other Mr. -- well, oh, this Mr.

9    Quinn.  Yes.

10          MS. MEEHAN:  Right, but any evidence that he

11   called Mr. Quinn and then for the jury to speculate that they

12   called to do something with respect to the robbery or

13   something like that, I don't think that they can argue, I just

14   wanted to make sure that that wasn't where the government was

15   going.

16          THE COURT:  Well, it depends on when the calls

17   took place.  Were they before the robbery?

18          MS. MARTIN:  There are numerous calls.  I think

19   there are seven in total, Your Honor, they are before and

20   after.  I don't mean, when I say before and after like

21   immediately preceding and immediately after, I mean in the

22   days before and in the days after and I've assured Ms. Meehan

23   I don't intend to argue to the jury that the contact between

24   the Donte Smith phone number and the Maurice Quinn number

25   shows evidence of advance planning.  That's not my purpose.

Page 243

1    My purpose is to show circumstantial evidence that that phone

2    number does in fact belong to Donnie Smith.

3              MR. PATTERSON:  And I would request either

4    cautionary instruction or stipulation to that affect that

5    they're not being offered to prove that they were speaking on

6    the phone between each other to plan this robbery.  I think

7    either a stipulation or cautionary instruction to address

8    that, rather than the government just saying they're not doing

9    it.

10             MS. MEEHAN:  I join in that, Your Honor, because

11   the phone records, if they got them for months would show that

12   these two are in contact -- I'm sorry -- Mr. Smith and Mr.

13   Quinn are in contact all the time.  So it's not probative that

14   they were in contact just a few days or on the day for several

15   times.  It's meaningless, unless the jury has the full picture

16   and if it was limited to that day that they had all this

17   contact and then there's the episode at the RD Grocery then

18   that might be probative, but the fact that there -- I could

19   assure the Court that they're in contact a lot, that's not

20   probative.  If the jury's left with the false impression,

21   because they are going to be trying to argue that there was

22   some agreement under Pinkerton theory or whatever.  That is

23   really prejudicial.

24             THE COURT:  Not whatever.  Under Pinkerton.

25             MS. MEEHAN:  Well -- or any of the other

Page 244

1    instruction.

2           THE COURT:  And for aiding and abetting, I think

3    they're the two categories of instructions.

4           MS. MEEHAN:  Well, I mean, whatever theory of

5    liability they have, Your Honor, this is really prejudicial

6    unless we have a stipulation.  And frankly, it's kind of

7    cumulative if Mr. Smith has already agreed, I did flee, and

8    the Court's giving the instruction already then it's -- what

9    is it probative by other than to -- under four -- it's

10   prejudicial under 403, so I think we're now opening a can of

11   worms that could have a bad effect on Mr. Quinn.

12          THE COURT:  No, the government has said why they

13   think it's admissible and I'm going to look into it.  It's

14   arguably evidence of guilt, false exculpatory evidence is and

15   you know, the cases, it's evidence -- it's some evidence of

16   guilt.  I've got to decide whether it's enough.  And you've

17   got to decide just how much of this foundation type evidence

18   is necessary.

19          MR. PATTERSON:  And you know, with the vast

20   resources of federal government, why isn't there a voice

21   recognition expert in here?  We can get right to the point

22   then.

23          THE COURT:  Well, there's a point for charge

24   on --

25          MR. PATTERSON:  I understand.

Page 245

1              THE COURT:  -- on scientific techniques.

2     It's -- you wish that, Mr. Patterson?  I don't want it to be

3     like hands crossed in front of your body.  The record will not

4     show anything on that subject.

5              MR. PATTERSON:  I understand, Your Honor.

6              THE COURT:  But, if you want to include that in

7     the point you've just made, voice recognition, as a technique

8     the government should've adopted, you better remind me it's

9     not in the charge.

10             MR. PATTERSON:  I understand.

11             THE COURT:  All right.  So now we'll proceed as

12    the government has said, we'll have the record custodian from

13    the telephone company present.  And I'll rule on the motion

14    thereafter.  As I've told you, well, I've got some things to

15    consider and I'll do that.

16             So we'll resume -- are we finished on this

17    issue?

18             MR. PATTERSON:  I am, Your Honor.  Thank you.

19             THE COURT:  Mr. Wittels, do you have anything to

20    add?

21             MR. WITTELS:  No, Judge.

22             THE COURT:  Thank you.  Well, then, we're

23    leaving early.  It's only ten after five.  We'll convene at 9

24    :30 tomorrow morning and we'll start -- well, I hate to

25    promise to get here earlier, I have a long drive.  I'll try to

Page 246

1    get here earlier.  Let's try to get here -- well, I'm not

2    going to rule until after the first witness, the record

3    custodian from the telephone company testifies.  I'm really

4    determined not to end up in the courtroom with you alone and

5    the jury in the jury room.  That's not what I want to do.  So

6    we'll start -- we have to hear the first witness and then I

7    think I'll be able to rule quickly.

8                 All right.  Anything else we have to discuss

9    tonight or are we finished?

10               MR. ECKERT:  No, Your Honor.

11               THE COURT:  Finished.

12               MR. PATTERSON:  No, Your Honor.  Thank you.

13               THE COURT:  We're in recess until tomorrow

14   morning at 9:30.

15               DEPUTY CLERK:  All rise.

16               THE COURT:  You may go about your business.

17                           -  -  -

18               (Whereupon, the proceeding was concluded

19                    at 5:07 p.m.)

20                           -  -  -

21

22

23

24

25

Page 247

                    C E R T I F I C A T E

        I do hereby certify that the aforesaid

hearing was transcribed by me from an audio recording to the

best of my ability; and that I am neither of counsel nor kin

to any party in said action, nor interested in the outcome

thereof.




            WITNESS my hand and official seal this

17th day of November, 2020.

                    _____

                         Janine Thomas

                         Notary Public

| & |
| --- |
| **&**   1:17 |

| 0 |
| --- |
| **0**   159:7 |
| **00350**   1:2,3,3 |
| **0170rl43**   21:20 |
| **09**   144:9,9 |

| 1 |
| --- |
| **1**   1:2 42:11 44:25 62:8 63:7 66:20 |
| **1,264.93.**   22:6 |
| **1.85**   15:12,21 16:11,14 20:14,20 26:15 97:12 |
| **10**   21:5 61:24 62:6 64:16 70:23 71:1 71:2 74:2,4 128:25 129:9 163:12 165:25 178:23 180:17 196:3 202:13 220:18 |
| **100**   16:10,13,15,18 19:11 20:14 46:22 60:21,22 61:2 124:19 145:23 147:22,25 152:25 153:1,3,3,8 160:6 190:3,3 218:16,19 220:11 |
| **100s**   153:7 |
| **102**   3:21 26:2 |
| **10:00**   5:10 28:21 |
| **10:03**   8:2 |
| **10th**   21:25 25:16 166:1 |
| **11**   40:8,12 42:6,7 61:19 63:1 64:22 65:11,22 72:18 |

**11902**   247:13
**11:47**   77:11
**11th**   70:15
**12**   3:20 57:11 65:13 66:8
**1250**   1:10,14
**126**   3:21,22,22
**128**   3:11
**12:03**   77:11
**12:46**   118:6
**12:53**   16:13
**13**   72:15 77:22 130:21 131:6,8,8 131:23,24 138:7 138:17 141:21
**1301**   1:18
**1337**   19:10
**14**   80:23 123:25 126:17
**1429**   1:18
**143**   3:11
**14th**   80:11,15,18 81:1 84:7 85:10 85:17
**15**   75:18 202:23 203:8 204:8,12,24 205:20
**150**   3:12
**152**   15:2 16:7,10 20:4,9 22:19 82:23 84:13 88:24 89:6 90:14 101:3 106:17,22,23 107:7 161:1 166:19,24
**157**   4:2
**158**   4:2
**16**   81:13 83:23
**160**   3:12
**163**   3:13,13

**164**   3:15
**16:50:43**   169:11
**16:52:59**   170:3
**16:53:36**   171:5
**16:53:51**   172:3
**16:54:04**   173:5
**16:54:14**   173:12
**16:54:48**   175:5
**16:54:49**   102:14 106:13
**16:54:51**   177:22
**16:55:11**   178:24
**16:55:14**   179:5
**16:55:16**   180:5
**16:55:32**   180:10
**16:55:48**   181:11
**16:55:54**   182:1
**16:56:04**   185:21
**16:56:09**   183:18
**16:57**   186:5 187:1
**16:57:32**   187:6
**16:57:58**   187:22
**16:58:19**   60:2
**16:58:24**   59:23
**16:58:43**   188:4,14
**16:58:58**   188:23
**16:59**   111:14,14 144:5,7,8
**16:59:26**   189:10
**16:59:40**   77:23 78:17
**16:59:45**   77:22
**16:59:51**   189:23
**17**   93:25 94:3 113:9 125:2 144:7 228:22
**17:00:08**   190:12
**17:00:54**   190:24
**17:01:10**   191:17
**17:02**   115:3

**17:02:14**   193:5
**17:02:44**   193:19
**17:03:07**   194:14
**17:03:55**   195:1
**17:04**   123:25
**17:04:17**   196:1
**17:04:39**   196:12
**17:04:56**   197:2
**17:05**   144:4
**17:05:21**   197:14
**17:09**   144:5
**17:09:36**   144:8
**17th**   247:12
**18**   13:5 19:24
**1800**   2:9
**1801**   2:9
**18045**   2:1
**181**   102:16 106:15
**18th**   25:12
**19**   64:16,22 65:11 65:22 88:6
**19102**   1:19
**19103**   2:9
**19106**   1:11,15,22
**198**   3:15
**1:04**   16:9,15
**1:53**   16:12,18
**1:55**   118:6
**1:58**   20:13
**1a**   45:19 75:17 111:10 144:4 168:4,6 185:16 221:5
**1c**   67:2,4,5
**1c1**   67:5
**1c24**   183:4,8,9
**1c25**   183:13,14
**1c26**   184:14
**1c43**   68:7,14
**1c6**   67:3

**[1w26 - 6:30]**                                          Page 2

**1w26**   184:13

**2**

**2**   1:3 19:11
**2.50**   15:13,16
  16:11 19:12 26:12
**2.50.**   16:14 26:7
**20**   5:11 15:21,23
  16:2,20 22:9
  38:25 39:5 45:7
  58:11 59:24 60:10
  60:19 96:5 141:20
**20.85.**   15:12
**200**   20:19
**2009**   80:25
**201.85**   21:4
**201.85.**   20:23 21:2
  21:8
**2018**   13:5 19:24
  80:9,25
**2019**   13:5,7 14:23
  14:25 15:6,10
  19:4,7,18,18,24
  20:8,13,18 21:1,3
  21:5,7,21 22:9,11
  22:15,19,20 35:19
  61:20 63:1 69:1
  88:19 90:15 96:2
  102:14 106:13
  128:20 129:10
  140:7 141:20
  142:15,19 143:4
  160:20,23 161:12
  166:17 167:12
  200:11 223:2
**2020**   1:5 247:12
**20s**   153:1,1,3,4,8
**21**   21:7 227:5
**21.85**   15:12,19
**215**   1:19
**215-851-8630**   1:11

**215-861-8609**   1:15
**215-928-1100**   1:23
**21st**   22:5
**22**   13:6 14:23,25
  15:6,10 19:4,18
  20:18 21:21 22:15
  22:19,20 35:19
  61:22 63:18 64:16
  69:1 90:15 96:2
  102:14 106:13
  128:20 129:10
  140:7 141:20
  142:15,19 143:4
  160:23 161:12
  163:23 166:17
  167:12 200:11
  223:2
**22nd**   17:16,17
  20:1 21:10 35:5
  35:25 38:10 47:6
  47:24 50:5,11
  95:11 111:5
  128:22 135:14
  137:17 139:16
  150:20 151:3,7
  156:3 157:23
  201:4
**23**   3:3 19:7 48:24
**23rd**   26:1
**24th**   22:1
**25**   154:25 156:22
  159:7 183:4
  225:20
**25th**   80:13,16
**26**   183:4
**26.85.**   21:6
**27**   3:4 20:8,13
**27th**   20:10
**29**   1:5 13:5 19:24
**29th**   25:4,6,9

**2:19**   1:2,3,3

**3**

**3**   1:3 13:10 25:25
  44:20 62:8 66:8
  231:13
**3-22-2019**   183:16
**3-7**   21:1
**3-7-2019**   20:24
**30**   28:21 87:9
  111:14 245:24
**33**   3:5
**34**   165:21,22
  201:24,25
**3513**   1:25
**37**   4:1 111:14
  126:18 127:16
**39**   126:19 127:17
**3:00**   19:10
**3:37**   14:19
**3:40**   198:10
**3:47**   15:11
**3a**   3:20 81:21,23
  82:8,14

**4**

**4**   19:18 22:11
  61:25 62:6 70:23
  71:2,3 179:5
**4.35**   26:18
**40**   77:22
**403**   244:10
**410.91.**   22:2
**42.40**   16:24 19:4
**42.40.**   16:5
**45**   234:13
**49**   11:16,24 12:8
  23:24 25:14,23
**4:05**   198:10
**4:50**   15:6,9
**4:59**   111:14

**4th**   19:19

**5**

**5**   102:8 103:3
  225:20
**5.03.**   19:13
**50**   78:17 235:24
  237:17,20
**500**   17:21
**51**   61:7,11 64:15
**540**   1:21
**56**   125:3
**58**   115:4
**5:00**   38:11,13,14
  77:24 112:3
  234:14,19
**5:01**   113:10
**5:02**   115:3
**5:04**   123:25 125:2
**5:07**   246:19
**5:43**   236:7
**5a**   103:3,8
**5b**   235:20,21

**6**

**6**   66:20 67:1,11
**601**   1:22
**609**   232:18,19,20
  233:3
**61**   3:6
**610-253-7858**   2:1
**615**   1:10,14
**639**   94:18
**639.42.**   95:3
**68**   17:23
**68.27**   22:16
**68.27.**   22:12,14
**686.55.**   21:25
**69**   3:6
**691.67.**   22:10
**6:30**   6:2,4

**7**

**7**   21:1 71:8 72:10
**700**   94:10
**735-5900**   1:19
**762.50.**   22:4
**77**   3:7
**777-6690**   2:10
**7:00**   6:2,5
**7:30**   135:13
**7th**   22:3,7

**8**

**8**   3:3 21:3 36:3,19
   36:20 37:6,17,20
   72:9 132:4,12
   137:1
**80**   3:8
**801d1b2**   62:4
**813.29.**   22:8
**82**   3:20
**85**   3:9 97:8,12
   159:4
**86**   67:6
**87**   3:10
**888**   2:10
**8:00**   35:3,5

**9**

**9**   63:15 64:15
   157:2 245:23
**9.74**   19:13
**903**   79:15
**911**   3:21 102:8
   104:17 235:3,12
   235:23 236:10
   237:21,23 239:6
   240:6,9 241:16
**9:30**   226:3,16
   246:14
**9:53**   1:5
**9:58**   8:2

**a**

**a.m.**   1:5 8:2,2 35:3
   77:11
**abetting**   244:2
**abid**   1:4 81:8
   84:20 143:14,20
**ability**   148:22
   247:5
**able**   46:25 51:9
   52:15 53:6 58:20
   68:4 70:3 101:7
   101:17 113:24
   154:5,9 155:10
   161:4 170:11
   180:3 191:23
   213:24 220:17
   222:12 227:18
   228:6 232:9
   239:17 246:7
**absolutely**   36:16
   57:13 105:3
   219:16 228:1
   229:1 236:21
**accepted**   24:21
**access**   101:7
**account**   10:1,1,5
   11:1 13:1,15,20,21
   13:23,25 14:24,24
   16:3,23 17:10,12
   17:15,23 19:13,14
   19:17 21:13,24
   22:2 23:18 24:14
   24:14
**accurate**   14:13,14
   21:10 80:6 175:1
**accurately**   202:12
**acknowledge**
   70:19 157:11
   204:8 222:2
**acknowledged**
   31:10 206:4

**acknowledging**
   222:11
**act**   228:13,15,16
**action**   120:7,16
   247:6
**activity**   9:24 10:11
**actual**   133:3
   136:18
**add**   26:21 230:15
   231:17 234:18
   245:20
**addition**   25:21
**additional**   28:17
   78:22 164:3 199:5
   215:11 228:22
   232:24 233:24
   234:3 237:25
**address**   6:7 14:16
   16:13 85:22,23,23
   88:23 103:21
   106:20,20 234:21
   238:22 240:21
   241:5,10,11 243:7
**addressed**   63:3
   117:17
**addresses**   85:22
**administer**   164:18
**administered**
   165:2
**admissible**   244:13
**admit**   12:8 82:8
   156:18 158:4
   234:1
**admitted**   3:18,25
   12:13,17 18:5
   37:18 40:9 67:7
   82:15 103:11
   127:14,21 128:1
   157:5 158:17
   183:5 237:3

**admitting**   237:3
**adopted**   245:8
**ads**   155:18 158:20
**advance**   242:25
**advise**   6:7
**advisement**
   239:14
**affect**   243:4
**affirm**   206:2
**affirmative**   213:17
**affirmed**   206:4
**aforesaid**   247:3
**afraid**   145:5
**afternoon**   79:17
   79:18 80:1,2 85:7
   85:8 128:12,13
   143:13,15 150:1,2
   198:23 228:4,5
**agent**   90:8
**aggressive**   67:20
   176:22
**ago**   47:15 49:20
   71:1,10 122:18
   137:14,16 142:9
   202:13,20,24
   203:8 204:8,12,25
   205:21 220:18
**agree**   49:6 52:9
   120:19,22,24
   130:2,12,13 136:3
   149:6,11 204:7
   209:7 222:16
   223:5 239:15
**agreeable**   5:20
**agreed**   121:1,3
   244:7
**agreement**   126:13
   243:22
**agreements**
   126:25

ahead 13:9 87:23
  111:15 115:20
  123:24 172:3
  213:16
aiding 244:2
ain't 180:24
air 184:19 185:2
airy 80:20,20
alibi 237:20,22
alleged 141:19
allegedly 207:15
  210:14 215:24
allev 124:24
alternate 6:15,23
  6:25 7:7
alternative 120:9
amaro 150:11
america 1:2
amoroso 89:24,25
amount 17:22
  20:20 21:22 30:7
  237:18
anger 149:7,9
angle 142:16
  157:12 158:12
  182:25
angles 182:14
angry 44:12 57:20
  57:21,24 58:10
  147:3,4,11,17
  149:12,15,16
  152:9,10 155:8
  172:11
annoyed 39:25
answer 43:7 63:10
  63:22,23 64:2,3,5
  64:6,10 66:2,5
  71:5,9,10 72:1,11
  72:13,18,21 73:6
  85:20 89:20
  108:18 119:25

120:1 153:12
  158:22 165:12
  183:11 205:20
  208:18 213:18,19
  215:23 230:11
answered 68:10
  135:18 199:4
  201:6 203:24
  220:10
answering 76:16
  135:10 203:25
answers 63:2,3
  135:20,20 152:11
  213:18
anticipate 225:23
anticipated 228:22
anybody 57:15
  145:6 190:25
  199:16 236:20
  241:25
anymore 72:9
  73:20 217:20
apart 42:17
apartment 107:4
apologies 20:13
apologize 51:15
  54:6 59:17 73:23
  75:8,14,16 99:16
  102:24 138:4
  177:5 214:4
apparently 202:6
  206:17 220:11
appear 68:25
  124:10 188:24
appearances 1:8
appeared 32:20
  115:9 123:21
  218:21
appears 21:18
  53:22 114:13
  115:9 126:15

193:20 240:7
application 101:11
appreciate 222:9
  234:7
approach 11:18
  53:3 175:24
approached 58:6
appropriate
  238:13
approximately
  80:12
april 13:5 19:18
  19:19,24 22:11
  25:12 61:19 63:1
  70:15 201:10
area 29:12 30:19
  31:13,16 53:13
  60:11 80:20 81:17
  82:3,4 83:5 85:17
  85:20 211:21
  212:1 215:24
  217:5,13
areas 85:18
arguably 244:14
argue 18:4,5 57:15
  233:12 238:2,6
  239:20 242:13,23
  243:21
argued 239:20
arguing 45:4
  101:25
argument 44:11
  145:2,23 147:22
  151:12 152:21
  232:25 233:4,14
  233:20,24,24
  236:2,4,6 242:1
arguments 117:4
  234:17,18 235:15
arm 208:21

armed 148:6
  205:16
arranged 120:4
arrangement 97:6
arrangements
  231:25
array 3:21,22,22
  126:18,18,19
arrays 126:22
arrival 229:23
arrive 114:24
  115:1
arrived 109:25
articles 34:11
ascertain 118:12
ascertained
  118:12
ashley 1:13
ashley.martin2
  1:16
asian 96:15
aside 5:14 155:12
asked 25:2,9,11
  50:18,22 51:1
  68:9,17 69:12
  70:7,8 88:22
  119:22 134:17
  135:10 162:4
  190:17 204:25
  209:23 216:3,6
  219:21,21
asking 18:9,9
  48:12 60:25 61:1
  63:14 64:11 67:22
  68:5 69:14,17,21
  137:19 160:22
  161:7 192:22,23
  203:24 238:13
asks 62:15 138:25
assign 238:7

**assigned** 79:15
80:11
**assignment** 85:13
**assistance** 48:25
**associated** 14:7
119:7
**association** 1:21
**assuming** 210:16
210:17 235:8
242:6
**assure** 71:21,21
243:19
**assured** 242:22
**atlantic** 2:8
**atm** 14:23 15:1,11
15:13,13,20,21,21
16:11,12,13 19:10
19:11,11 20:3,19
21:2,4,6,8 22:20
25:22 26:1,11,14
26:21 27:1,22
34:2,5,7,8,10
35:13 38:16,17,18
38:20,23 40:20,22
40:24 41:1 46:9
58:11 96:6,8,8,13
96:14,16,17,22,25
97:6,9,17,19 99:9
107:13,22 124:21
124:22 139:21,22
139:22,23,25
140:1,8,13 152:17
152:24 153:7,9,10
155:12,16,19
157:13 158:21
206:12,17,25
218:20
**attached** 24:15
**attempted** 118:12
197:3 238:4

**attempting** 67:10
236:22
**attempts** 237:14
**attention** 14:22
63:2 168:22
170:23 173:16,17
177:22 181:18
**attorney** 70:7 71:2
71:9 119:7 120:5
120:5,6,6 198:25
233:8
**attorney's** 1:9,13
**audio** 2:4 3:21 8:2
102:12,22 106:8
106:11 109:12
247:4
**august** 201:10
**authenticate**
236:19,19 238:5
240:6,7,9
**authority** 18:11
**available** 5:17,19
**avenue** 19:11
81:15,16
**await** 117:3
**aware** 119:11
120:17 215:11

**b**

**b** 3:17
**baby** 167:9
**back** 19:22 21:12
25:14 26:10 31:17
42:1 43:12 47:20
47:21 54:23 55:9
55:21 57:19 58:16
58:22 59:5 64:24
66:1 70:18 74:3
80:14 84:4 87:10
88:19 101:3
112:10,11,23
113:1,17 114:12

116:5,7 121:6
123:19 133:3,4,22
147:8 154:8 163:6
163:10 168:17
173:5 177:21
178:1,1,2,2,11,11
178:13,13 180:18
181:25 182:3,15
183:24 185:15
191:19 192:17,18
192:20,23,24
201:14 204:4
207:24 209:11
211:8,11,13
212:19 213:7
215:8 217:5 225:9
238:21 239:5,6
**background**
136:23 194:24
**backwards** 60:13
**bad** 99:19 244:11
**badge** 79:15
**bag** 240:13
**balance** 13:24,24
14:3 16:3,4,23
19:3
**bald** 59:19 67:14
67:18 68:2 98:6,8
98:16,20 100:14
101:23 110:7,8
112:1,14 113:4
114:12 123:1
145:2 150:6
151:16,17,17
161:17,18,22
162:1 171:6 172:5
172:17 173:25
176:24 177:14,23
180:14,15 181:13
182:6 188:15
189:11,14 191:1,9

192:4,5 197:20,20
206:12 207:16
218:19 220:11
**baldheaded**
189:16
**ballpark** 94:9
**bank** 9:13,14,16
18:11 23:16 24:24
27:22
**banking** 9:12,19
23:18
**banks** 9:15,17
**barnaby** 1:17
143:13
**barrel** 210:4
**base** 91:5
**based** 28:4 76:10
120:17 126:16,25
199:4 224:2,5,17
226:12 232:25
233:25 236:19
**basic** 158:20
**basically** 55:16
**basis** 91:17 164:15
**bathroom** 87:9
**bcxx649** 95:9
**beg** 71:16,21
**beginning** 21:12
21:23 25:4,16
168:7 231:24
**begins** 15:6 17:7
29:3 104:1
**behalf** 27:10 84:25
120:21
**believe** 5:6 13:10
19:24 20:5 25:19
28:18 33:19 70:4
80:25 81:13
118:16,19 119:10
120:6 126:15,24
174:23 177:5

203:5 211:16 215:23 217:2 224:18 225:3,11 227:9 233:10,25 240:1 241:9

**belong**  189:2 243:2

**belongs**  23:19

**benefit**  97:7

**best**  74:16,21,23 120:8 232:8 247:5

**better**  43:1 63:11 136:18 138:5 224:19 228:21 229:25 245:8

**beyond**  60:19 219:13

**bifurcated**  231:13 232:4,7

**big**  52:18,21 53:4 55:2,3 78:1 110:17,20 114:3 124:9 125:21 132:10,12 133:13

**bigger**  83:21 113:16 162:5

**bill**  39:20 40:16 96:5 153:3

**bills**  41:7 46:23 47:1 59:24 60:10 60:19 206:18

**bit**  39:25 56:7 73:23 83:9 133:15 157:13 165:10,11 169:6 170:18 211:25 226:4 235:14

**biweekly**  17:21 21:14

**black**  108:9,10,11 108:25,25 109:1,3

109:4 116:6 123:3 124:6 125:13 175:10 182:3,22 186:15,17,22 188:5 193:24,25 194:1,2 197:20 199:2

**blazing**  163:9

**block**  30:19

**bob**  198:25

**bodega**  82:23 85:23 167:5

**body**  245:3

**book**  76:7

**borders**  85:18

**bottom**  35:25 40:14 46:14 77:24

**box**  52:13 130:14 131:13,25 133:3 137:20 141:6

**boxes**  133:7

**brand**  64:5 72:18

**bravo**  61:7,12 64:16

**break**  72:9 74:2 80:17 116:15 225:24 228:12 234:13,13

**breaking**  116:14

**breaks**  230:10

**brethren**  83:22

**brief**  61:6 77:19 160:11 217:6 220:18

**briefly**  13:11

**bring**  7:4 111:10 121:11 144:12 205:2

**broadcast**  226:7,9 226:9

**broke**  122:11

**broken**  85:17

**brother**  95:16 148:18 167:21

**brought**  48:1 50:12 76:15

**build**  108:18

**bullet**  92:23,24 93:1 176:12 205:11

**bumped**  58:21

**bunch**  69:12

**burden**  31:12

**burgers**  89:14

**business**  10:10 11:3,10 60:7 86:11 189:2 198:6 212:21 215:19 225:12,14 240:6 246:16

**button**  59:6 133:9

**buy**  34:9 38:15 130:25 191:22 204:19

**buying**  134:1

**c**

**c**  1:17,24 5:1 67:11 79:14 247:1,1

**cab**  60:25

**cage**  171:13,14

**call**  7:15 18:21 34:13,16,18 42:18 42:20 43:14 44:20 77:19 84:6 87:8 95:10 96:17 99:12 102:8 103:14 104:11,17,21 105:4,6,7 109:15 109:19 110:17 113:7 124:22,23 131:21,23 151:8

151:16 153:17,21 154:12,23 155:20 159:10 189:1,3,3,4 227:4 230:20 235:3,5,9,10,12,17 235:17,23 236:1,1 236:3,5,10 237:17 237:20,21 238:5 239:24 240:19

**called**  5:9 6:1,4,9 85:16 102:4 104:9 104:25 114:21 119:14 130:13,14 147:11 199:4 239:6 240:23 242:11,12

**calling**  63:2 240:19 241:3,24 242:2

**calls**  28:23 79:7 85:20 96:4 97:18 164:9 238:22,25 239:1 240:17 241:14,14 242:16 242:18

**calm**  42:16 46:8 47:22,22 100:3 102:2,20 106:19 155:10 182:6,7 187:14,14,15,16 196:4

**calmed**  46:10

**calvo**  161:19,20,20 161:23,24

**camera**  77:22 83:9 84:2,4,5 100:24 101:13 114:9 133:1 139:2,5,5,18 139:21,25 142:6 142:11,13,15,16 142:18,20 161:4

203:9 212:3,9,13
222:17,24 223:25
224:1,3,19,21,22
**cameras**  36:11
84:5,7 113:25
114:7,9,16,19
130:8,20,22 131:6
131:8,24,24 133:2
133:7,22 134:3
136:4 138:7,13
140:8 141:22
161:8 222:13
**candy**  178:6
214:12
**canon**  47:25
**capacity**  9:18
**caps**  35:17
**capture**  134:20
138:9 212:4
223:19
**captured**  139:16
203:9
**car**  115:24,24
116:3,7 123:6,7,12
123:15,18,20
193:9,10,24,24,25
194:1,2,8 224:11
224:20 236:25
237:6
**card**  8:23 9:7 10:7
10:14 14:15 23:19
24:11,15,19
**cards**  212:24,24
218:6,8,8
**care**  43:15,23
138:25
**cars**  146:13 224:8
**cart**  83:10,13
**carton**  214:16,18
**cartons**  218:4

**case**  5:11 11:7
12:5 15:5 24:10
37:4 47:8 62:24
62:24 104:17
116:25 117:1,2
134:19 135:2
140:2 199:16
226:4,9,10,12
228:10,14 229:2
229:10,12,18
230:3,16,19,19
231:1,5,11 232:4,7
232:9,10 233:20
233:23,25 234:3
**cases**  230:24
244:15
**cash**  58:6,7 59:10
60:5 101:1,24
102:4 107:12,21
138:20 158:25
167:2 168:25
170:4 171:9 174:7
175:12 182:16,20
185:23 186:6,10
186:11,16,17,19
187:23 212:21,24
213:7 215:6,21
216:7,22
**cashier**  44:7,10
95:22,24 151:8
215:19
**cat's**  240:12
**categories**  244:3
**category**  242:3
**caught**  168:22
**cause**  19:14 85:19
230:15 237:9
**caused**  122:15
126:3 143:24
**causing**  137:11

**cautionary**  243:4
243:7
**cctv**  129:20
**ceiling**  214:10
**cell**  144:21
**center**  1:21
**central**  13:16
14:13
**cents**  97:8,12
159:4
**certain**  76:13
84:12 130:8 232:6
**certainly**  23:11,13
30:9 62:7,18
76:18 106:2
118:17 232:1
239:17
**certify**  247:3
**chair**  165:11
**chamber**  205:11
**chance**  180:4,11
233:21
**chances**  227:3
**change**  29:11
35:23 75:3 85:12
140:6 231:25
**changes**  35:20
118:17 227:16
**charge**  14:11
19:12 26:22,25
42:18 97:12
227:15 228:6
244:23 245:9
**charged**  15:16
26:12,14,17
**charges**  15:14
19:12
**charging**  27:1
227:13 233:12
235:4

**charlene**  239:1
241:14
**charlie**  66:20 67:1
**chase**  9:13 193:25
195:17 236:25
**chasing**  125:10,12
125:12,13 193:25
194:2 195:19
**check**  24:5 96:15
**cheese**  89:14,14
**chess**  166:19
**chestnut**  1:10,14
80:19 166:19
**chew**  237:19
**children**  167:10
**chip**  191:19,22
**chips**  70:4 71:20
**choose**  52:18
105:2 120:13
**church**  83:22
**cigarettes**  38:15
39:1,6 58:10
90:12 214:14,15
214:16,18 215:2
218:4
**circumstantial**
241:13 243:1
**cited**  233:21,23
**citizens**  24:8 81:3
86:9
**city**  80:18,21 84:5
84:6 88:3
**civil**  9:5
**civilian**  118:13,14
**clarify**  137:22
241:9
**clasped**  219:24
**cleaned**  218:2
**clear**  15:22 35:22
53:13 58:9 119:12
143:3 153:22

207:5 208:8 216:4
**cleared** 51:4
**clearing** 41:13
**clearly** 25:16
  135:1
**clerk** 8:6 74:5 77:8
  77:15 79:8,12
  87:12,16 117:7
  118:3 121:15
  164:20,24 198:2
  198:14 226:18
  246:15
**click** 130:8
**client** 6:21 58:3
  105:19 129:10
  201:1 207:2,5,19
  207:22 210:23
  212:16 216:8
  217:12,13 219:2,6
  219:17,18,22
  221:8 222:3 230:8
  233:19 237:5,15
  238:5,10,16
  240:22 241:24
**client's** 6:24 203:6
  203:9,16 204:10
  204:17,18 208:9
  236:20 240:18,20
  240:20
**clients** 230:16
  238:18
**clip** 210:10
**clips** 75:5
**close** 49:10 94:8
  114:5 126:6
  174:17,19 179:12
  179:14,14 197:17
  197:18 225:15
  227:19 228:3,5
**closely** 52:8

**closer** 174:19
  227:22
**closing** 18:6 117:4
  228:7 229:3 237:4
  238:8
**clothes** 221:24
**clothing** 64:24
  66:1,4 124:6
**cocked** 50:19
  55:22 57:2
**cocking** 51:8
**colin** 3:8 28:24
  79:7,10,14
**colleague** 28:20
**colleagues** 228:10
**color** 108:23,23
  109:1
**column** 13:15,17
  13:20,21,22,22,23
  13:24 14:8
**columns** 13:13
**come** 6:6 28:18
  33:2 34:1,2,21
  42:1 49:10 51:24
  74:3 88:23 113:17
  115:17,25 122:21
  133:18 135:6
  162:9 168:21
  178:1,2 180:15
  182:23 183:24
  185:13 207:2
  211:10 234:16
  238:21 239:5
**comes** 38:14 44:15
  45:3 47:3 56:20
  57:19 76:17 146:9
  180:18 207:5,8
  208:20 211:20
  234:2 237:20
**comfort** 166:8

**coming** 48:14
  50:14 99:2 110:7
  116:2,4 123:22
  139:12,14,17
  173:14,14 204:4
  204:18 223:12,15
  238:5
**comings** 139:16
  143:3 223:2
**common** 24:17,18
  34:17
**communicated**
  39:22
**community** 81:3
  86:4
**company** 2:8 8:23
  8:24 9:8 10:19
  12:5 99:12 113:7
  129:19,22,23
  130:23 131:21,23
  153:21 154:12
  240:14 245:13
  246:3
**complained** 96:20
**complaining** 96:6
  97:2
**complaint** 99:12
**complected**
  108:12,12,14
**complete** 7:21
**completed** 128:5
**completion** 117:3
**complexity** 120:11
**compliance** 8:25
**computer** 10:13
  10:15 94:14
**concern** 209:4
**concerned** 92:9
  101:19 104:20
  174:5,6 179:20

**concerns** 131:20
**conclude** 232:5
**concluded** 28:7
  246:18
**concludes** 87:2
  127:8 164:4
**confer** 197:23
**conference** 18:21
  227:13 233:12
  235:4
**conferences** 31:1
**confirmed** 39:9,22
**conflict** 231:23
**confronted** 50:3
**confuse** 48:20
  237:1
**confusion** 137:11
  137:18 237:9
**connection** 241:5
  241:7
**consciousness**
  236:14,15 238:1,2
**consider** 232:16
  234:17 245:15
**considered** 214:21
**considering**
  230:10
**consistent** 62:3
**consult** 126:10
**contact** 30:16,18
  86:15 242:23
  243:12,13,14,17
  243:19
**containing** 126:18
  126:19,19
**contemporaneou...**
  10:16
**contention** 235:25
**contested** 207:6
**contesting** 29:17

**context**   65:13
99:22 240:22,25
**continuance**
228:12
**continue**   18:18
122:3 167:17
170:25 171:20
172:25 173:19
185:21 226:25
228:14
**continued**   174:12
**continuing**   178:14
187:17 188:9
**contrary**   76:20
**control**   168:1
**controls**   28:1
**convene**   245:23
**convenience**   69:25
**conversation**
58:10 100:18
124:10 125:8
189:11
**conversations**
189:24
**conversing**   100:6
114:13
**convictions**   234:1
**convince**   182:6
**cook**   89:16 224:18
**cooking**   167:23
168:12
**cop**   115:24 224:8
224:11,19 225:14
**cops**   115:22,23
116:7 124:12
237:16
**copy**   11:19 61:9,9
141:21 227:15
**corner**   38:5 56:17
82:22,24 83:2,6,14
84:10 139:1

157:12 166:15
167:5 173:6
180:14 182:24
**corp**   89:10
**corporation**   8:20
8:21 9:1
**correct**   7:22 9:9
9:11,21 10:4 14:4
14:6,18,21 15:4,18
15:22,24 16:16,17
16:19 19:5 22:17
23:17 24:12 25:4
25:16,17 26:3,13
27:3 35:4,6 38:3,5
39:2,7 40:17 41:5
44:12 45:4,21
46:2,15 47:5,19
48:9 49:1 54:6
59:4 60:1,7,11
61:2,22,23 64:12
64:14 65:12 66:5
66:6 69:11,12,13
69:16,17,18,20
70:5,10,11,17 71:6
71:7,15 72:24
73:14,17 77:24
80:7,22 83:3,17
84:15 85:10,11
86:10,12,16,17
92:14 114:22
119:15,24 128:15
128:20 129:3,7,16
130:9,18 131:9,15
131:17 132:21
133:8,9 134:9,21
135:4,22 138:7
139:6,12,18
140:22 141:9,23
143:4 144:22
145:3,9,12,15,18
145:21 146:2,4,7

146:10,13,15,25
147:2,15,20,23
148:9,12 154:2,11
155:16 160:4
182:3 199:9,13,18
200:6,9,20 201:4,8
201:16 202:3,20
203:2,10,20 205:9
205:13 206:5
207:13 208:2,5,11
208:13 209:18,21
209:25 210:2,7,14
211:8,22 215:21
215:25 216:9
217:3 218:23
220:8,19 222:3
223:23 224:13
235:18 241:19,21
242:4
**correctly**   64:13
66:16 241:10
**correspondence**
10:1
**cosgrove**   2:4 52:17
149:21
**could've**   25:8
138:16 139:16
218:2,4,11
**counsel**   18:19,23
23:23 29:6 31:10
33:7 50:23 102:7
106:7 118:9,15,18
118:19 119:5,9
120:2,3,3 126:10
126:13 144:12
197:24 226:23
227:24 241:9
247:5
**count**   59:22
231:13

**counted**   25:19
223:10,12
**counter**   38:7,14
39:5 40:4,5 41:7,9
44:16 45:3,18
46:12 49:22,24,25
55:4,5,7,10 58:1,2
58:12,13,23 59:9
60:13 67:15 145:3
169:14,19 181:4
205:20 207:15,16
207:24 209:10
211:7
**counterfeit**   206:18
**counting**   59:24
**country**   229:24
**couple**   38:22
57:18 81:15 85:9
154:14 159:25
163:14 167:19
221:7
**course**   5:22 10:10
11:3,10 49:13
86:15 113:3 120:7
120:14 152:2
206:3
**court**   1:1 2:8 5:1,5
5:8,14,23,25 6:4,7
6:12,20 7:1,3,13
7:17,19,23,25 8:9
8:12 11:17,20
12:13,21 17:5,18
18:1,14,18,20
22:24 23:10,12
27:7,11,14,17 28:6
28:11,14,18 29:23
30:2,5,9,24 31:5
31:20,25 32:5,9,12
32:14,19,25 33:3,5
36:4,7,16,20,22,24
37:1,3,6,10,12,20

40:11 41:18,24
42:2,7,10 44:21,23
51:21 52:9,16,24
53:4,10,16,21,25
54:2,5 61:5,10,13
62:5,9,14,19,21,25
63:10,14,17,19
64:17 65:5,7,11,15
65:20,22 66:9,13
66:24 67:2,4,9,12
68:13,19,21 70:21
73:5,20,24 74:9
75:6,7,9,13,15,15
75:22 76:3,6,8,9
77:3,5,7,16 78:24
79:4,17,19,21 82:9
82:19 84:24 85:1
86:19,22,24 87:2,6
87:11 88:23 89:20
93:24 94:2 98:13
102:7,9,25 103:1,5
103:8,17,19,23
104:14,19 105:10
105:12,16,22,24
106:1,7 111:10,12
116:14,18,20,22
117:11,14,17,20
117:22,24 118:1,8
118:21,23 119:1
119:11,12,16,18
119:21,25 120:7,8
120:13,16,17,18
120:23,25 121:2,5
121:9,11,19,22
122:1 126:11,21
127:1,3,6,10,18,23
128:3,5 132:5,11
133:12 136:7,15
137:1,3,9,23 138:1
138:3 143:7 144:7
144:9 149:19

152:11,14 154:25
156:7,14,16,19,22
156:24 157:1,8
158:7,9,11,14
160:10 162:22,24
164:4,7,18 165:2,4
168:2 176:1 183:6
197:25 198:6,15
203:21 204:21
213:9,12,17,21,23
219:5,10,13,17
225:20 226:1,22
226:25 227:12,22
228:5,9,20 229:4
229:13,19,22
230:12 231:1,4,9
231:15,18,20,22
232:3,14,15,18,21
232:23 233:2,4,9
233:11,22 234:5,8
234:12,25 235:14
235:15,19,22
236:5,12 237:12
239:8,12,25 240:3
240:11,24 241:17
241:20 242:2,8,16
243:19,24 244:2
244:12,23 245:1,6
245:11,19,22
246:11,13,16
**court's** 119:2
135:25 149:4
224:24 244:8
**courtesy** 199:15
**courthouse** 5:18
**courtroom** 5:3,7
28:16,19 30:10
32:20 33:2 74:7
77:13 117:9 121:8
121:17 198:4,12
226:13,14,20

232:6 246:4
**cousin** 177:16
**cover** 13:6
**covered** 13:3
19:23
**covers** 227:16
**coworker** 50:2
**cr** 1:2,3,3
**crash** 237:19
**crashed** 236:25
**created** 10:9,16
**credit** 13:20 14:2
21:24 22:2 212:24
**credits** 13:21
21:13
**crime** 84:6
**criminal** 120:6
**cross** 3:3,4,5,6,9
3:11,11,12,15 7:20
23:2 27:19 29:7
32:21 33:6,12
50:18 61:16 68:14
69:7 74:11,12,14
76:10,21 85:4
118:16,20 122:6
128:6,9 143:10
149:23 198:20
210:24 226:25
229:11,14 238:14
239:18 240:15
**crossed** 245:3
**crouched** 55:16
**crucial** 29:8
**cubbies** 47:18
53:14,19 54:11,14
215:16
**cubby** 48:19 49:8
51:2 53:20 54:19
58:13
**cubbyhole** 63:9,24

**cubicle** 49:11
54:19
**cubicles** 54:17,20
**cumulative** 237:1
237:9 244:7
**currently** 8:19
79:15 80:3 88:17
118:14 160:22
**curse** 99:15
**cursing** 45:14
152:8 154:20
**cursor** 130:7
**curtis** 1:21
**custodian** 8:25
11:5 18:12 227:10
239:11,18 240:14
245:12 246:3
**customer** 9:16
10:3 33:23,25
47:17 56:18 78:4
91:5 143:22 144:1
146:6 181:17
191:22,23,23
207:9 211:10,17
211:19
**customers** 9:10,19
24:16 34:16 43:22
43:24 44:1,4,6
46:1 57:12 60:12
91:4,17 129:6
212:2 225:13
**cut** 123:11 229:14
**cutoff** 25:11

**d**

**d** 3:1 5:1 36:19,20
37:6,17,20 40:8,12
42:6,7 44:18,20
48:24 75:20 88:2
150:22 154:25
155:15 156:22
157:2

**d10** 4:2 157:16
158:4,8,10,14,16
**d25** 154:24 155:1
**d33** 74:20
**d8** 4:1 132:8
136:16 138:3
**d9** 4:2 155:20,21
156:18 157:4
158:7,11
**daily** 91:17
**dark** 108:12,13,13
108:14,14
**date** 13:6,9,12,15
14:2 17:21,22
20:25 25:11 26:7
76:14 129:10
160:18 183:16
229:23
**dates** 13:3,16
19:23 20:6,16
25:3
**day** 1:6 16:4,7,23
17:1,10 19:7
28:14 35:1,8
37:10 38:20 47:8
48:1,4,23 49:18
50:12 57:11 60:7
73:11 87:5 111:3
111:5 116:24
128:19,19 129:24
129:24 130:9
131:15,17,19
135:13 138:17
139:15 150:17
153:23 154:7,10
159:8 166:18,23
167:19 170:5
202:6 213:3
225:10,11 226:3
227:11,13 229:6
232:7 234:12

235:15 239:3
243:14,16 247:12
**days** 17:15 29:24
29:25 61:22
110:24 154:4
167:14,15 200:13
200:14,22,25
213:6 214:5
222:12,12,19
223:2 224:5,18
242:22,22 243:14
**deal** 57:11 145:11
149:9
**dealing** 148:12
**debit** 8:23 9:7
13:22 23:19 24:11
24:15,18 212:24
**debits** 13:23
**december** 13:5
19:24 25:4,6,9
**decide** 73:16
100:18 226:12
230:19 244:16,17
**decided** 5:10
**defendant** 1:5,17
31:15 132:6,8,9
137:3 230:17
232:19 233:10
235:25 238:23
**defendant's** 3:24
37:17 137:1 157:4
158:16
**defendants** 27:8
120:19 132:5
**defender** 1:21
**defense** 29:8 36:3
37:4 50:23 74:16
75:4,10 117:20
119:9 132:4,5
230:17,24 231:5
232:19

**defer** 6:13 227:23
**deficit** 17:15
**definitely** 40:25
**definitive** 230:11
**delaying** 29:25
**deli** 207:24
**deliberating** 232:8
**demanded** 45:7
49:16 50:5
**demanding** 48:14
50:17 67:22 68:2
**demographics**
212:23
**demonstrate**
39:19
**demonstrated**
90:8
**denied** 51:7
**department** 80:4
80:12 134:12
135:3,11,15
140:21
**depended** 85:13
**depending** 239:18
**depends** 242:16
**depicted** 68:14
83:18 139:2 204:7
222:2
**depiction** 207:18
**depicts** 132:18
205:8 209:15,20
225:4
**deposit** 14:2 21:14
24:7
**deposits** 17:11,20
17:25 19:17 21:13
21:22 22:15 23:24
25:15,18,20
**deputy** 8:6 74:5
77:8,15 79:8,12
87:12,16 117:7

118:3 121:15
164:20,24 198:2
198:14 226:18
246:15
**describe** 52:7
218:19
**described** 110:16
129:11 134:7
141:16 202:16
203:5 209:21
211:21
**describing** 105:14
216:4 219:8,10
**description** 3:18
3:25
**desire** 118:16
**desperate** 18:3
**despite** 57:11
**detail** 7:6 240:2,3
**details** 119:8
**detective** 3:8
28:24 29:9 30:15
31:23 32:3 47:25
47:25 48:2,4,10
49:6,15 79:7,10,14
80:1,3,5,8,9,10
81:23 82:22 85:7
87:3 135:11
**detectives** 79:16
**determined** 14:8
246:4
**different** 25:23
26:6,17 27:2
37:23 38:1 41:14
47:1 67:20 80:17
142:16 155:18
205:5 222:13
233:10
**difficult** 5:17 53:5
**difficulty** 75:17

**digital** 130:14
135:7 223:20
**diminish** 237:14
**dire** 229:6
**direct** 3:3,8,10,15
14:22 24:7 68:10
121:24,25 128:3
199:5 201:3
202:23 221:22
**directed** 74:11
**directing** 177:22
**directly** 13:9
131:25 140:8,9
161:10
**disclosed** 118:18
**discovery** 238:17
**discuss** 5:2 117:2
226:6 227:14,15
246:8
**discussed** 22:18
226:14 227:16
235:3
**discussing** 122:12
230:9
**discussion** 118:15
119:4
**dislike** 234:8
**dispatch** 240:6,9
241:16
**dispatcher** 102:15
102:16,19 106:14
106:15,18,23
107:1,3,6,9,11,15
107:19,23 108:1,3
108:6,8,11,14,17
108:21,23 109:1,4
109:7,10 237:24
239:6
**display** 83:2
138:17,22

**displayed** 133:7
133:18 139:25
212:1,12
**displaying** 138:10
138:11,18
**distance** 175:22
237:18
**distorted** 53:5
**distracted** 156:21
**district** 1:1,1,7
80:11,13,16,16,19
80:24 81:1 84:8
85:17 135:16
**districts** 80:16,17
80:18
**disturbed** 145:3
**doing** 75:25
107:16 126:21
140:17 156:22
168:19 172:17
174:23 183:22
191:18 205:19
218:14 219:18,25
243:8
**dollar** 46:22 97:14
204:18
**dollars** 46:20
**donnie** 1:4 126:18
129:11 199:1
216:6,6 217:5,6,9
218:23 220:22,22
221:8 236:1,21
239:5 241:4,5
243:2
**donte** 238:17,19
238:21 241:2,2,11
241:18,23,24
242:24
**door** 58:20,21 59:8
92:16,17,20
115:14 123:12

139:8,11 142:23
157:12 179:14,14
179:15,16,22,23
180:3,11,12 191:1
204:1,5,9,11
208:22 211:21
216:17 217:13
220:12 223:13,15
224:12,14 237:6
**doorway** 56:15
115:9,12 159:22
**doritos** 70:5 71:20
**dot** 113:10
**download** 141:17
**drag** 231:7
**drags** 231:5
**dramatic** 32:14
**dress** 116:6
**dressed** 123:2
203:1
**drive** 1:25 90:19
141:8,21 142:20
159:20 245:25
**driving** 81:4
109:20
**drove** 194:8
**dubois** 1:6
**due** 71:22,22
**dvd** 130:3,14
**dvr** 130:22
**dying** 6:6

**e**

**e** 1:6,9 3:1,17 5:1,1
79:15 88:2 227:15
247:1,1
**earlier** 16:6 25:9
38:19 80:5 122:25
193:12 245:25
246:1
**early** 245:23

**ease** 11:19
**easier** 236:2
**east** 15:3 16:7,10
20:4,9 22:19
80:20 81:13,13
82:23 83:20,23
84:13 88:24 89:6
90:14 101:3
106:22,23 107:7
161:1 166:24
**eastern** 1:1 13:17
15:9
**easton** 2:1
**easy** 54:25,25
78:11,11,13 172:7
172:7 207:8
**eckert** 1:9 3:6,10
3:12 5:6,22 6:19
32:23 33:1,4
36:14,17,23,25
37:5 40:10 42:8,9
42:11 51:14,18
52:4,9,11,22 61:6
61:11,14,18 62:3,7
62:17,20 63:2,5,6
63:13,15,18,20
64:15,20,21 65:3,6
65:8,12,23,24 66:7
66:10,11,14,15,19
67:1,3,7,10,13,25
68:11,16,20,22,23
69:4 70:7,19 71:3
72:14 75:23 76:24
76:25 78:22 86:24
87:7,22 89:22
93:22,25 94:3,5
98:14 102:6,10,24
103:3,13,21 104:5
104:20,24 105:2,9
105:14 106:9
109:14 111:9,13

111:20 112:8
113:14 115:8
116:16,17,21
117:12,16,18,19
118:10,22,24
119:2,15,17,20,24
120:1,12,15 121:7
121:10,21,24
122:3,4,8,10 124:4
125:2,7 126:9,12
126:23 127:7,16
128:4 137:7,10
144:11,15 156:9
156:11,15 158:6
160:11,15 164:2
227:7,20,23
246:10
**ed** 63:23
**effect** 244:11
**eight** 38:7 223:13
**either** 6:8 66:21
188:5 200:19
215:2 243:3,7
**el** 161:20,24
**electronic** 2:6
10:23,24
**elements** 30:23
**eminent** 228:16
**emmanuel** 3:14
44:2 119:17,18
146:4 148:9
164:10,22 165:1
**employed** 8:19,20
80:3,10
**employee** 224:17
**employees** 95:11
**employer** 18:7
**empty** 6:17
**ends** 18:16 32:17
78:24 102:22
109:12 159:10

**enforcement**
227:9
**english** 43:17,25
43:25 44:3,4,6
49:1,2 57:12 64:3
69:20,23,24 70:2,3
71:11,14,14,16,19
71:23 72:3,11,13
72:21,24 73:7,13
73:16 78:8,9,17,18
100:12 148:9,22
152:2 161:22,25
164:17 166:5,8,9
172:19,22,23,24
179:24 180:1
199:9,11,13 202:3
202:11 220:16,17
**enlarge** 136:1
**enlarged** 136:3,4
136:12,18,23
137:6 157:13
**enlargement**
136:16 137:24
**ensured** 119:6
**enter** 173:13
190:25
**entered** 181:15
**enters** 77:13
121:17 198:12
**entire** 16:23 45:23
45:24 46:4 75:21
76:16 141:21
159:11 232:4
**entirety** 19:23
**entities** 26:17
**episode** 243:17
**equipment** 129:19
129:20
**era** 86:4
**escalates** 175:3

**esq** 1:20
**esquire** 1:13,17,24
**essentially** 8:23
9:14 43:15 158:20
**establish** 31:13
240:18,22,24
241:4,13 242:5
**established** 43:24
58:16 70:14
**establishing** 31:18
**evening** 47:24
226:15 227:17
**evenings** 234:9
**event** 5:20 6:9
134:12
**events** 201:15
202:19 223:6
**eventually** 162:6
**everybody** 220:12
**everyday** 73:8,10
91:9 110:24
150:14,16 151:1
**everyone's** 231:4
**evidence** 12:14,17
17:13 31:12 37:1
37:4,7,18,20 40:8
45:19 50:4 62:21
62:24 64:18,18,19
66:24 67:4,9
74:22 75:18 76:14
76:15,17 82:8,15
103:2,4,11 105:3
105:17 117:4
126:23 127:14,21
128:1 156:16
157:5 158:17
183:5 226:12
228:17 235:17
237:4 239:9,23
241:13 242:3,10
242:25 243:1

244:14,14,15,15
244:17
**exact** 35:8 47:11
160:18 237:18
**exactly** 33:24 38:8
38:18 40:1,5,25
42:21 43:1 44:13
44:17 51:18 54:17
55:12 57:24 59:1
59:7 60:8,22 94:8
99:17 219:14
**examination** 3:3,3
3:4,5,6,6,7,8,9,10
3:11,11,12,12,13
3:13,15,15 7:20
8:14 23:2 27:8,19
29:7 32:21 33:6
33:12 50:18 61:16
68:14 69:7 73:20
74:11,12,14 76:10
77:18 78:24 79:23
85:4 87:20 121:25
122:6 127:9 128:3
128:9 143:10
149:23 160:13
163:2,20 165:7
198:20 199:5
201:3 202:23
210:24 221:22
226:25 229:14,20
229:25
**examine** 76:21
118:16,20 128:6
229:11 238:14
239:18 240:15
**exception** 29:16
**exceptions** 106:4
**exchange** 41:4
45:17 46:17
**exchanged** 74:13
74:13

exchanging
  153:15
excluding  20:1
exculpatory
  244:14
excuse  111:4,12
  115:11 184:8
  226:15
excused  27:14
  28:10
excuses  159:14
exhibit  11:16,24
  12:8,16 36:3 37:8
  37:17 41:18 42:8
  42:10 44:20,21
  54:11 61:9,10
  66:25 74:15,15,16
  74:18,20,20,20,21
  74:23,23 75:5
  76:7,18 81:21
  82:14 89:3 102:8
  103:3,10,19
  127:13,20,25
  132:4 136:7,15
  137:1,4,5,6 144:4
  157:4 158:16
  168:4,6 183:4
  185:16 221:5
  235:20,21
exhibits  37:4 67:5
  74:10,12,24 75:10
  76:4
expect  115:23
  225:21 227:8,10
  228:1 229:1
expecting  114:24
  115:25 122:21
expel  205:12
expensive  215:1
experience  224:5
  224:17

expert  244:21
explain  5:8 7:6,16
  7:17 9:2 13:12
  18:11 23:9 35:12
  42:16 43:1 62:22
  63:22 73:5 80:14
  84:3 85:14 91:7,7
  92:19 96:13 97:5
  97:24 98:23
  100:22 104:7
  123:5 124:20
  153:11 170:13
explained  11:10
  23:15
explaining  43:3
  124:17,18
extended  167:18
extensive  229:20
extensively  240:2
  240:4
exterior  38:2
  155:19
extra  215:6
eye  104:17

f

f  247:1
face  59:7,7 69:1
  126:1 173:25
facing  140:2,2
  142:14
fact  23:22 25:8,25
  31:10,13 32:3
  42:14 104:10
  119:9 143:18
  146:24 147:7
  149:9 150:16
  151:3 154:17
  155:18 157:14
  207:2 216:14
  217:18 236:15
  238:9 240:19

243:2,18
fair  21:14 45:6
  134:1 175:12
  184:4 200:2
  201:11 219:24,25
faith  66:5
fake  39:23 42:15
  43:5 46:19,21
  96:5,7,20 97:3
  152:25 153:1,3,6,8
  170:16 185:13
  205:2,5 210:5
fall  242:3
false  39:7,8,9,12
  39:14,17,18,21
  46:23,25 243:20
  244:14
familiar  81:8 82:1
  82:22 83:15,24
  150:13
family  177:15,16
far  21:13 30:7
  78:5,20 88:7
  90:19 165:24
  175:21
fargo  9:13
fast  107:16 199:21
fault  195:6,7,8
  214:4
favor  30:25
fd.org  1:23
february  20:12,18
  22:3,5
federal  9:4 62:23
  244:20
fee  15:13,13,20,21
  16:11,11,13,14
  19:11 20:14,21
  26:4,9 97:9
feed  101:14
  133:21 224:1

feeds  138:13
  222:13,16,17
feel  125:18,20
  126:3
feels  147:18
fees  27:2
feet  38:7 176:5
  219:23 234:25
felice  200:17
felt  29:8 104:21
  105:4,6 119:3
  138:17
figure  94:9 209:9
  229:23
filling  167:20
  200:6,7,16,19
final  16:22 19:3
  31:21 68:6 90:11
finally  76:9 239:21
find  41:25 137:7
  137:10
fine  5:14,25 6:19
  6:24 12:13 37:6
  62:12 75:22 86:24
  87:2,11 116:17
  118:1 127:6
  164:18 213:4
  228:9 229:4
  230:12
finger  172:14
  222:3,4
finish  30:2,24 31:8
  74:1,2 76:10
  121:25 127:10
  164:19 227:11
  231:1 233:12
finished  231:12
  235:16 245:16
  246:9,11
finishing  227:3
  228:17

**fire** 210:10
**firearm** 68:25,25
  91:22,24 93:7,9
  94:7,23 176:15
**firearms** 68:18
**fired** 210:25
**firing** 210:9
**first** 5:2 6:15,16
  7:7 12:22 13:15
  36:4 46:13 47:6
  58:13,14 59:3
  62:11 65:9 67:15
  87:23 89:2 94:17
  105:11 111:3,5
  112:9 113:17
  122:12 124:5
  143:20 191:7
  193:10,11 208:4
  209:4 220:7
  235:17 236:5,17
  238:23 246:2,6
**five** 29:14 46:22
  47:1 59:23,25
  60:10,19 70:25
  71:10 102:10
  109:23 138:10
  151:10 174:12
  188:24 189:12
  226:2 229:6 233:5
  245:23
**fives** 60:6
**fix** 43:5 51:13
  113:19 145:21,24
  147:20,22,25
  148:1 153:12,14
  154:10
**fixing** 225:7
**fled** 237:16
**flee** 244:7
**flexible** 29:8

**flight** 28:10
  231:25 236:15
  237:14 238:1
**floor** 5:5
**fluent** 148:23
  166:8
**fluorescent** 210:4
**fly** 49:12
**flying** 163:9
**focus** 221:8
**follow** 76:20
  136:25 161:5
**following** 19:7
**food** 34:9 89:11
  90:2
**foods** 89:15
**footage** 15:5 101:4
**forcing** 100:25
**forget** 211:24
**form** 10:21 17:24
**formal** 238:18
**formally** 233:8
**forth** 147:8 213:7
**foulmouthed**
  152:10
**found** 54:15
**foundation** 126:24
  236:18 239:23
  244:17
**four** 46:22,23,23
  59:24 85:17
  138:10 198:1
  227:6 228:23
  229:5 244:9
**fourth** 155:3
**frame** 186:6
**frankly** 30:15
  244:6
**freezer** 167:23
  168:18,20

**frequent** 33:23
  143:22
**frequently** 31:22
  34:1,5 91:8
**frequents** 30:14
  31:11,23
**fresh** 201:18
**friday** 30:2 35:7
  102:14 106:13
  154:2,3 227:3,19
  228:4,5,17
**friend** 167:2
**friends** 200:8
  221:18 222:6
**fries** 89:14
**front** 13:4 15:15
  23:12 38:8 49:4
  56:18 58:21 59:8
  60:11 73:9 81:23
  83:1 92:17 101:24
  115:14 123:12
  134:3 139:8
  141:16 156:1,2
  157:11,16 168:4
  170:15 175:14
  183:17 184:22
  185:9 186:17
  193:24 207:9
  211:21 216:17
  220:2,12,12
  222:18,21 240:12
  245:3
**fuck** 99:24 160:3
**fucking** 64:6,7,7,8
  72:21,22,22,23
  99:25
**full** 8:6 79:13
  87:17 111:25
  164:25 227:11,12
  243:15

**functional** 218:22
**functioning**
  131:17,19,20
  218:2
**functions** 131:4
**funk** 135:11
**further** 17:11
  22:22 27:8 29:21
  69:4 73:4,19
  78:21 84:21
  149:18 160:9
  162:21 165:11
  169:6 197:24
  225:18

| g |
| --- |

**g** 5:1 25:23 79:15
  88:2 103:15
**g14** 3:21 127:10,13
**g1a** 75:20,21,23
  77:20
**g22** 74:20
**g37** 3:22 127:18,20
**g39** 3:22 127:23,25
**g49** 3:20 12:13,16
**g5** 3:21 103:8,10
  103:13,20
**gain** 31:23,25 32:2
**gaining** 32:5,5
**garments** 203:1
  208:11
**gather** 119:13
  234:2
**general** 137:21
**generally** 214:19
**gentleman** 67:15
  67:18,19 69:14
  81:8 98:16,20
  100:14 101:23
  110:13,25 111:6
  113:16 114:12,14
  123:1,2 124:15

134:8 150:6
215:24 217:1
**gentlemen** 9:2
20:2 32:19 78:25
80:15 116:22
226:3
**geographical**
80:20
**germantown**
80:19 81:14,16
82:4,5 83:21
**gesturing** 56:2
**getting** 18:7 24:2
51:9 101:1 116:7
123:20 130:11
197:5 209:4,7
**give** 41:1,12 45:4,6
45:7,9,10,25 46:15
50:8 57:22,22
60:18,21,23 61:8
64:6,6,7,7,8,8,8
72:21,21,22,22,23
72:23,23 73:8
87:9 106:19,20
107:13,22 116:24
120:9 124:20
135:17 147:24
152:11 153:7
170:16,22 172:6,7
174:4,18,18,20,20
175:22 189:14,14
189:16 208:18
213:17,19 221:2
230:1 237:21
**given** 62:25 130:9
131:14,14,15
139:15 160:6
**gives** 65:12 106:2
**giving** 60:20
153:14 218:15
244:8

**glass** 178:4,5,7
224:12,14
**glock** 49:16,16
50:5,6,8 64:5,8,8
72:19,23,23 93:10
95:1
**gmail.com** 2:2
**go** 6:14 7:6 13:9
20:6,15 21:21
29:21 34:5,12
38:17 43:4 49:8
49:25 51:7 58:7
59:4,21 61:7,24
63:15 64:22 73:3
83:8 84:4 85:20
87:23 88:7 89:5,9
91:8 97:14 100:21
101:1 102:3,3
110:3,23 111:13
111:15 112:18
115:20,21 122:15
123:24 130:25
133:3,18 141:5
146:13 154:8,8
165:24 171:8
172:3 179:16
182:15 186:11
188:7,8 189:13,14
198:6 207:15
209:2 210:24
211:8 215:8 219:6
224:16 225:24
228:10 229:2
232:12 246:16
**goes** 17:10 41:11
44:12,15 53:6
67:15 80:19 91:2
96:15,16 98:24
105:9 220:12
221:16,17

**going** 6:13 13:10
13:21,22,24 19:20
20:20,20 21:12
25:14 26:10 30:3
30:9 31:14 34:7
35:9 42:3 43:12
43:14 46:4,9,12
47:2,2 48:24
53:16 56:7 58:20
63:7,15 64:22
65:9 68:7 70:18
70:22 72:8 73:21
73:25 78:14 83:20
89:2,5 99:10
110:23 113:2,7
114:14 122:1
123:6 124:19,21
124:23 125:8,10
129:18 133:12
136:14 144:11
147:24,25 148:1
152:22 153:17,19
154:13,23 168:21
169:6,10 170:25
171:12,20 172:6,7
173:17 174:4,17
174:18,20,21
176:23,23 177:21
181:20 182:14
183:13 184:13
185:15,21 191:25
192:17 199:5,20
202:17,18 203:14
203:15 204:16,17
205:12 206:2,17
206:23 208:17
209:9 210:25
211:11,24 212:13
213:7,16 215:20
215:25 216:5
219:5 221:4,7,25

223:10,13,14,15
223:16 224:2,12
225:4,23 227:14
229:10 232:10
233:12 236:6,16
236:18 237:1,3
239:8,9,12,13
240:18 241:4
242:15 243:21
244:13 246:2
**goings** 139:17
143:3 223:3
**good** 8:9,10,17,18
23:5,6 28:14
33:15,16 46:23
74:11 75:2,10,10
79:2,4,17,18 80:1
80:2 85:7,8 117:5
128:12,13 134:24
143:13,15 144:1
149:9 150:1,2
198:23 201:19,21
201:22 215:3
225:24 226:17
231:6
**google** 29:14
**goshert** 3:8 28:24
79:7,10,15 80:1,3
81:23 82:22 87:3
**gotten** 25:8
**government** 5:21
23:22,24 25:4,14
25:15 28:23 40:9
42:8,10 44:20,21
44:25 45:19 71:13
72:3,19,20 74:15
74:19,20,23 75:17
79:5,6 81:21 87:8
94:3 119:8,22
164:9 201:7
204:25 216:3

217:12 226:23
227:3 230:20
234:22 235:12
236:16 237:2
238:12,18 239:16
239:22 240:16
241:3 242:14
243:8 244:12,20
245:8,12
**government's** 3:18
12:16 37:4 54:11
65:18 66:20 71:8
71:11,13 72:12
82:14 102:8
103:10 111:10
126:17 127:13,20
127:25 144:4
168:3,6 183:4
185:15 221:4
230:13 232:20,23
235:25
**gown** 66:3
**grab** 47:17 175:16
177:2,2 179:1,1
**grabbed** 58:12
177:12,12 180:13
**grade** 166:1
**grades** 165:25
**graduated** 88:8
**grand** 61:11,19
62:23,24,25 63:4
64:19 70:8,9,12,16
70:23 72:2 76:11
76:12,13,16,21
152:24 159:12
205:23,24 206:8
206:11,21
**grandmother** 6:5
**gray** 56:13 176:18
177:8 178:19
183:22 184:21

186:15 187:10
188:5,7,16 189:12
189:13 190:2,17
192:5,5,16,16,24
194:15 195:4,6
196:2,13 197:15
197:19 217:3
220:21 221:23,24
**great** 87:5 145:11
207:7
**greenberg** 1:17
**groceries** 34:9
73:9
**grocery** 20:4
25:21 83:12,13
88:13,14,15 89:8
90:23 107:7
150:11,11,23
155:15,19 166:12
166:13 243:17
**guess** 6:1 30:6
48:24 51:25
133:25 205:7
**guilt** 236:14,15
238:1,2 244:14,16
**guilty** 230:6
**gun** 47:18,21
48:11,13 49:7,9
50:6,19,24 51:1,2
51:8,8,13 54:16,16
54:24 55:14,17,20
56:8,22 57:3,17
58:5,12 63:8,23
64:5,5,8,11 68:8
71:6 72:18,19,23
83:11 91:24 93:19
144:24 175:16,19
176:10,10,12,13
177:2,2,12,12
179:1,1 182:23
185:4,5,5,6,10,12

185:13 189:14,15
189:16 190:4
192:17,18,20,23
192:24 203:10,16
203:18 204:13,15
205:1,2,5,6,8,9,11
205:16 207:3
208:5 209:13,21
209:24 210:2,5,13
210:25 211:1,1,2,9
211:12,18 212:16
217:7,18,18,25
218:1,1,2,22 220:5
220:7 221:16,17
222:6
**guns** 204:25 205:1
210:5
**guts** 229:11,17
**guy** 55:2 67:22,23
68:2 78:2 96:5
98:2,8 107:13
110:7,12,17,20
112:1,14 113:4
116:6 124:8,9,22
124:23 125:13,21
147:24 151:5,18
151:21 161:18,18
161:22 162:5
170:15 172:5,5
173:8 177:8
179:15 180:13,15
182:6,10,22
187:10 188:7
189:13,13,16
190:2,17 192:16
195:6,17 206:12
207:16 216:4
217:1,2 218:19,23
220:11,21,22
221:23,23 237:23

**guys** 64:25 66:2
91:4 124:11
206:12

**h**

**h** 3:17 31:24 79:15
**half** 148:14
**hand** 40:14 41:10
47:3 51:2 52:13
53:8 55:14,15,24
56:1,4,8 60:2 73:8
75:7 76:7 79:8
83:8 87:12 113:21
114:11 124:6
125:15 139:1
144:22 164:20
169:18 172:14
173:6 174:22
176:19,19 182:16
182:16 184:18,23
185:9 186:6 220:1
247:11
**handgun** 204:10
**handing** 41:11
**handle** 119:19
120:9
**handling** 74:10
**hands** 38:25 55:17
184:19 185:2
218:22 219:24
220:3,5 245:3
**hang** 154:18
**hanging** 214:10
216:16
**happen** 63:23
78:15 92:3,9
113:8
**happened** 5:8 7:6
17:10 18:21,23
19:7 42:17 44:13
44:14 47:12 48:23
49:18,21 57:14

63:8 96:4 107:19
107:20 135:15
141:19 142:3
159:24 171:17
174:16 190:13,15
192:15 194:17
201:4,14 207:12
225:11 237:22,24
**happening**  99:23
101:16 141:22
168:25 171:16,18
173:24 176:18
182:20 187:23
189:24 190:1
193:21,23 195:2
**happens**  160:3
182:19 226:7,9,10
237:17
**happy**  125:9
126:14,24 236:1
240:2
**hard**  61:9 215:20
**hat**  175:10 182:22
183:21 216:4
**hate**  245:24
**head**  93:15 98:8
110:7 112:1,14
151:16 162:1
171:6 172:5
180:14,15 182:6
189:14 191:1
**headed**  151:17
191:9 192:4
**health**  6:6
**hear**  6:13 45:24
99:24 105:7
114:15 121:2
130:15 146:15
159:12,13,14
169:2 170:11
171:18 186:18

189:10 216:13
231:9 235:9 236:3
236:4,5 237:20
240:13 246:6
**heard**  62:24
170:13 191:4,6,7
193:10,11,12
200:9 216:11
219:13 226:4,14
229:17 236:16
**hearing**  233:1
247:4
**hearsay**  105:8,11
105:13,17 106:3,4
**heavy**  108:15,16
108:17,18
**heel**  164:16
**help**  46:5 47:17
102:16 106:15,20
106:21 153:19
159:17 200:19
**helped**  159:14
**helpful**  62:18,19
**hey**  212:21
**hi**  34:21,22
**hidden**  212:19
**hide**  138:20
**high**  88:8 214:21
214:21
**higher**  38:9
**hill**  80:19
**hispanic**  108:9
**history**  13:14
**hit**  133:9 178:4,11
**hits**  178:5
**hitting**  30:5
**hmm**  89:18 158:2
161:3 199:3
201:20 203:4
204:20 205:10
207:4 208:3,16

210:22 213:5
217:17
**hola**  34:21
**hold**  116:18
145:17 223:10
**holder**  13:1
**holding**  55:17
211:2
**hole**  93:2 209:11
215:19
**home**  226:7
**homeowners**
86:11
**honesty**  222:9
**honor**  5:4,7,22,24
6:19,22 7:12,22
8:11 11:18 12:7
12:19 17:3,9,14
18:2,5 22:23,25
23:13 27:4,6 28:5
28:9,15,25 29:1
30:17 31:4,9,10
32:8,11,24 33:9,10
36:2,14,18,25 37:2
37:5,9,13 40:7,10
40:12 41:20,21,25
42:6,9,11 44:19,25
44:25 45:19 52:6
52:11 53:2,18
54:7 61:7,9 62:2,7
62:12,17 63:5
64:15,20 65:2,12
65:16,23 66:8,22
67:1,8,24 68:9
73:19,22 75:4,16
76:5,25 77:1,2,6
78:23 79:2,6,18,20
82:7 84:22,23
86:21,23 87:1,4,7
87:8 93:23 94:4
98:12 102:6,10

103:4,22 104:3
105:21 106:9
111:13 116:18
117:12,19,21,25
118:10,25 119:15
119:24 120:24
121:3,7,21 126:9
126:12,24 127:5
127:16 128:4,7
132:2,8,9,12
136:17,21 137:7
137:14 149:20
154:24 155:21
156:5,9,13,21
158:4,6,13 160:11
162:23 163:17
164:9,14 165:5
167:25 175:25
183:3 197:24
219:16,19 227:7
227:21,25 230:7
230:25 231:3,8,14
232:15,24,25
233:7,24 234:4,23
234:24 235:2,7,8
235:23 236:2,3,8
236:13 237:10,11
237:13 238:20
239:24 240:10
241:8,19 242:19
243:10 244:5
245:5,18 246:10
246:12
**honorable**  1:6
**hope**  228:1,3,19
**hopefully**  227:12
230:11 232:9
**hortter**  82:5
**hot**  89:11,15
**hour**  13:17 14:17
116:23

**hours** 35:2 38:19
  38:22 44:7 57:11
  71:19
**house** 83:22
  106:24 107:3
  142:12,24
**houses** 81:15
**how's** 114:2
**huge** 5:18
**hull** 6:1,3,4,6,10
  6:11 7:25 8:1
  121:11,14 234:9
  234:11
**hundred** 46:20
**hung** 154:17,20
  155:4
**hurry** 147:5
**husband** 124:8
  125:11

**i**

**iate** 124:24
**icon** 83:5,9,10,11
  83:13,22 84:2,4,5
  84:5
**idea** 18:6 49:19
**identification**
  29:17 74:25 94:4
  132:3
**identified** 29:13
  36:5 50:6 55:2
  75:20 78:2
**identifies** 103:19
**identify** 42:4
  53:16,21 67:23
  70:21 75:23 83:4
  169:13 241:15
**identifying** 74:17
**identity** 30:13
**ignored** 6:9
**illegal** 5:11

**immediately**
  104:21 242:21,21
**immigration**
  118:12,18 119:19
  120:5,6,11
**impeach** 76:22
**impeached** 65:10
**imploring** 30:18
**important** 50:16
  99:22 129:15
  134:20 230:1
**impose** 225:25
**impression** 243:20
**incident** 50:11
  92:7,8 134:7,14
  135:3 140:22
  141:19 235:24
  237:25
**inclined** 239:15
**include** 245:6
**includes** 38:2
**including** 232:4
**incorrect** 228:25
**index** 172:14
**indicate** 109:24
  155:19
**indicated** 23:22,23
  26:12 33:19 44:5
  66:4 98:20 118:19
  150:7 154:19
  232:17
**indicating** 174:22
  176:5 179:17
  184:1
**indication** 25:22
**indiscernible**
  10:12 11:24 18:1
  18:8 29:16 30:15
  31:2,14,19,24
  32:14 40:25 43:19
  46:19 47:14 49:10

49:11,17,19 50:7
50:21 52:12 53:14
54:15 57:9,14
59:13,15 60:25
70:15 73:10,14
94:20 102:17,18
102:24 104:4,5,17
104:19 105:4,10
105:13,14,16
106:1,3,4 107:10
107:25 108:20
113:16 132:14
138:4 149:21
156:6,21 161:19
165:3 166:22
170:24 173:10,10
173:11,18 177:4
181:2 191:19,20
193:12 198:24
199:12 200:1,17
201:17 202:3
207:8 208:23
210:15 215:2
216:5 242:6
**individual** 9:19
  10:3,13 13:13
  78:4 169:18
  172:17 174:14,23
  192:2 199:1
  205:19 210:14
  218:16,18,23
**individuals** 143:4
  201:7 202:5 204:4
  206:19 216:7,21
**indulgence** 135:25
  149:4 224:24
**inform** 235:4
**information** 9:22
  9:25 10:2,12
  13:18,18 14:9,10
  14:11 232:1

237:24
**informed** 241:9
**input** 14:10
**ins** 89:10
**inside** 15:6 55:10
  84:13 101:1 102:3
  107:12 109:5,6,6
  114:7 115:17
  131:13 155:20
  157:14 162:9
  168:20 174:7
  180:15 183:24,25
  184:5 190:16
  211:10,21 224:11
  235:24
**insofar** 238:14
**installed** 130:23
**instruct** 28:20
  98:11
**instructed** 6:6
**instruction** 238:2
  243:4,7 244:1,8
**instructions** 6:9
  116:24,24 117:4
  120:10 244:3
**intend** 230:22
  235:12 239:22
  242:23
**intends** 227:4
**interacting** 70:1
**interaction** 125:21
  134:11 135:2
  140:20 181:12
  184:7,9 185:23
**interactions** 81:2
  81:2,7
**interest** 231:5,5
**interested** 123:22
  232:25 247:6
**interpretation**
  199:17

**interpreter**  2:3,3
  3:5 5:19 7:16
  28:16 32:20 33:10
  48:5,6,25 50:20
  71:24,24 79:2
  164:15 199:8,15
**interrupt**  51:19
  171:15 197:3
  211:16 219:5
**interrupted**  71:25
**interrupting**  51:15
**interruption**  144:5
**interviewed**  47:24
  48:2,4 134:13
  135:14
**introduce**  29:14
  239:8
**introduction**
  65:18
**investigate**  135:4
**investigating**
  140:22
**investigation**
  84:12
**investigations**  9:5
**invoices**  90:7
**involved**  128:19
  202:15 236:25
**involvement**  29:16
  84:11
**involves**  231:25
**involving**  105:19
**irrespective**
  142:18
**isaliza**  3:10 50:2
  87:8,14,18 167:6
  167:21 196:15
  197:5,7,17,17
**issue**  5:25 6:1,7
  7:16,17 18:19,23
  32:6,7 68:1 104:4

228:15 230:13
  231:16,18,19
  232:18 233:9
  239:13,16,20
  245:17
**issues**  5:2 119:19
  230:2
**issuing**  9:15,17
  232:17
**it'll**  133:9 154:14
**item**  214:21
**items**  90:8 191:24
**ivr**  9:25

**j**

**j**  1:20
**jacket**  108:24
  109:1
**jan**  1:6
**janine**  2:5 247:14
**january**  1:5 20:8
  20:10,13 21:24
  22:1 25:16 201:10
**jay**  34:12,14,14,22
**jd**  1:2,3,3
**jersey**  90:1
**jessica**  3:2 8:4,8
**jims**  60:15
**job**  24:2 44:10
  167:22 168:12
  231:6
**joel**  34:14 95:14
  95:15 97:18,21,22
  98:2 100:4,6,10
  101:25,25 146:2
  148:11 152:19
  161:14 166:25
  167:1,3 169:15
  170:8,9,16,16
  171:10 172:5,7,19
  174:17,19,19,20
  174:24,25 175:15

175:21 176:9,20
  176:21,23 177:1,2
  177:10 178:1,22
  178:25 179:14,22
  179:24 180:1
  181:4,13 182:3,10
  192:13,17,18,19
  192:21 202:25
  203:2,9,10,16,16
  204:10,13 205:8
  205:15,19 207:2
  207:19 208:4
  209:9 211:1,15
  215:24 216:21
  218:15 221:17
  222:5
**joel's**  173:25 205:1
  205:5 210:21
  217:7 218:1
**john**  59:20
**join**  233:8 243:10
**joined**  233:19
**judge**  1:7 5:6,9
  6:24 27:15 30:12
  68:12 103:16
  104:4 117:23
  143:8 144:3
  162:25 225:22
  229:9 230:4
  231:16 245:21
**judges**  5:18
**judgment**  26:23
**july**  201:10
**jump**  211:12
**june**  201:10
**juror**  6:1,5,15
  117:5 226:16
  231:19,22 232:10
**jurors**  23:15 26:20
  52:14,18 53:4
  71:23 134:23

141:3
**jury**  1:6 7:4,10,16
  9:3 12:9 13:11
  15:5,15 16:7 18:6
  18:10 20:3 52:13
  52:21 61:7,11,19
  62:23,24,25 63:4
  63:12 64:19 66:20
  66:22 67:5 70:8
  70:10,12,16,23
  72:2 74:7 76:11
  76:12,13,16,21
  77:13 80:15 82:8
  83:5 84:3 85:14
  89:4,6 102:25
  117:6,9 121:11,17
  122:9 132:18
  151:4 152:24
  156:13 159:13
  168:5 198:4,12
  205:23,24 206:8
  206:11,21 219:13
  220:17 225:25
  226:1,17,20 229:5
  231:13 235:7,12
  236:14,23,24
  237:1 238:3
  240:12 242:11,23
  243:15 246:5,5
**jury's**  243:20

**k**

**keep**  9:20 10:3
  18:22 23:10 29:25
  47:2,16 60:9
  83:19,20 91:22,24
  100:4 228:3
  229:14
**keeps**  237:23
**kept**  10:19,25 11:2
  11:9

**kid** 167:11
**kin** 247:5
**kind** 24:22 58:21
  107:6 108:3 178:7
  200:24 207:12,13
  211:7 220:13
  223:8 244:6
**kinds** 57:25
**knees** 54:24 55:19
**knew** 31:15 78:20
  99:2 129:2 217:25
  223:22
**know** 9:12 18:1
  26:4 27:24 29:7
  29:21 30:14 31:2
  31:23 33:20,22
  34:4,11,17,18
  35:21 38:9,21,24
  40:1 41:15 43:10
  43:18 44:13 45:15
  45:15 48:3,23
  49:2,12,20 50:25
  51:6,15,24,25
  52:20 53:7 55:1
  56:24 57:4,4
  59:15,18,20 60:8,9
  60:17,18 61:8
  62:1,5 64:1 71:4
  71:16,18,19 72:5,6
  72:7 73:15,18
  74:24 78:18,20
  81:10 91:19 93:13
  95:15 97:25 98:10
  102:1 108:5,8
  113:8 116:8
  129:23,24 130:12
  130:17 141:11,17
  141:19 143:16,18
  143:20 147:13,16
  148:16 150:3,7,9,9
  151:15,20 154:13

157:15 159:9
  163:8 165:16
  166:19 168:15
  172:24 174:19
  176:22 182:7
  185:4,13 205:4,5
  205:15,24 206:23
  206:24 209:8,24
  210:7,8,9,10,18,21
  211:9,11,11,18
  213:4 214:18,20
  215:1,7,9 217:6
  218:7,7,9,10,13
  219:8,12,18
  223:18,19 225:4
  229:9,22 231:9,10
  235:6 236:24
  237:15,22 238:24
  244:15,19
**knowing** 148:21
  229:9 230:22
**knowledge** 84:1
**known** 81:12
  98:21 150:11
**knows** 29:11,13
  30:18,19 32:4
  210:5
**krasdale** 90:4,5

**l**

**l** 79:14 87:25
**lacheen** 1:17
**ladies** 9:2 20:2
  32:19 78:25 80:15
  116:22 226:3
**lady** 124:5 202:25
  202:25 203:2,5,13
  208:7,8,9
**language** 100:7
  160:3 161:14
  202:11

**languages** 166:6
**large** 35:14 52:2
  53:10
**late** 73:24
**law** 1:25 95:16
  120:11 148:17,18
  148:19 227:9
  233:21,23,25
  234:3
**lawful** 119:23
**lawyer** 31:6
  230:17
**lawyers** 117:20
**lay** 126:24
**leads** 31:17
**leaning** 173:9
**learn** 70:3,3
**leave** 117:6 146:20
  179:18 188:7,8
  226:16
**leaves** 57:16 74:7
  117:9 198:4 225:2
  225:3,3 226:20
**leaving** 160:2
  177:25 245:23
**left** 52:13 53:23
  54:23,25 55:8,11
  55:12,14 56:1,4,8
  56:12 58:16 60:11
  78:5 83:8,21
  114:11 123:10
  157:13 177:6,23
  179:3,17 182:16
  182:16,19 185:23
  186:6 187:23
  192:1 236:24
  243:20
**leg** 47:22
**legal** 8:25
**lengthy** 227:8

**letting** 73:13 219:6
**level** 184:1 196:2
**liability** 244:5
**life** 11:1 73:11
**light** 30:6 108:11
  118:11,15 119:2,9
**likelihood** 233:19
**likewise** 242:3
**limine** 230:13
  233:8,15 234:15
**limit** 229:25
**limited** 230:17,20
  243:16
**limits** 230:22
**line** 15:16,19 26:6
  61:25 62:6 63:7
  63:18 64:16,16,22
  65:1,11,22 66:8
  70:23 71:1,2,3,8
  72:9,10,15,18
  155:3 191:22
**lines** 62:8,18 240:8
**links** 241:12
**lisa** 43:7
**list** 37:8 103:19
  227:5
**listed** 241:18
**listen** 98:4 99:13
  100:5 102:19,19
  102:19,20,20
  106:18,18,18,19
  106:19 107:23
  226:8 236:21
  237:15,16
**listening** 195:1
**little** 39:24 53:5,5
  54:20 56:7 63:8
  63:11,24 71:16,19
  73:23,24 83:9,9,9
  83:10,22 133:7,15
  137:20 141:8,21

147:8 151:10
157:13 165:10,11
169:6 170:18
172:23 209:11
211:25 215:15,15
215:19 225:24
226:4 228:21
230:2 231:10
235:14 239:13
**live** 73:8,9,11
101:13,14 160:25
212:7
**lived** 31:15,16,18
81:11 83:24 88:5
161:10
**lives** 29:13
**living** 88:11
166:11
**load** 176:12
**loaded** 210:7
**locate** 5:13
**located** 84:9 89:25
90:5 168:15
**location** 83:2,4
90:18,20 92:4
99:11 160:24
**locations** 84:7
**lock** 58:20 59:8
179:14,16,22,23
180:3,11,12,15
203:25 204:9,11
**log** 9:25
**logical** 116:14
**logistical** 7:14
**logs** 9:24 10:11
**lois** 2:3 164:12
**long** 10:25 35:2
44:13 49:20 75:18
75:19 80:8,23
88:5 90:22 95:19
96:22 109:22

123:9,11 128:14
128:24 142:9
154:7,13 167:12
202:2 225:21
229:24 232:7
236:3 245:25
**longer** 17:23 42:3
228:1,24 232:12
**look** 5:20 25:25
35:10,18 39:3
40:6 41:16 44:18
46:13 48:24 51:7
51:25 55:25 56:21
68:7,8,24 94:14
100:24 114:10
123:19 138:24
154:23 156:2
157:23 209:6,10
212:8,9,18 215:9
221:8 222:12
244:13
**looked** 94:16,21
115:14 116:5,7
140:24 145:11
154:6 157:25
192:12 196:13
209:24 223:25
224:1
**looking** 13:12 14:5
35:11 46:16 53:10
53:18 56:10 57:7
83:1 100:25 114:3
139:12 142:20
193:20 212:9
224:12 228:23
233:13
**looks** 26:4,14
35:14 53:19 83:10
83:10 130:14
138:7,10 139:4

**lose** 32:1
**lot** 50:14 54:12
86:5 99:1 129:2
134:23 135:2
140:20 201:6
205:18 213:6,7
214:8,22 218:11
218:25 220:10
221:22,25 230:2
243:19
**lots** 50:15
**loud** 125:24 152:8
169:2 170:19,21
170:21 176:22
178:25,25 179:2,2
180:24,24 181:5
196:4,4,17,18,18
196:21 197:6
**louder** 196:20
**louie** 59:20
**lower** 53:22,23
54:15 56:17 139:1
**lunch** 37:12 74:3
116:15,19,23
117:5,18 122:11
**lying** 204:24

| m |
| --- |

**ma'am** 10:6,8,18
10:20 11:4,8,11,14
13:8 14:6 16:1,21
16:25 19:2,8,25
20:19 21:4,11,16
21:24 22:17,21
23:25 24:6,9 25:1
25:7,10,13,24 26:3
26:16 27:3,5
77:25 87:24 89:6
90:12 93:7 94:6
99:16 107:1,15
108:17 109:15
111:21 112:9

113:15 115:10
122:11 124:5
125:15 127:8
144:21 155:23
157:17 160:16
162:7,20 163:23
**mac** 218:20
**machine** 26:14,22
27:22 34:3 38:20
38:23 40:20 42:15
42:19 43:3,14
46:1,21 58:11
96:22 97:19
130:16 139:21,22
139:23 140:13
141:3 152:17
154:6 155:19
159:8 170:16
172:8,8,24 189:2
190:18 218:20
**machines** 96:25
**mad** 159:20
180:24
**mailed** 227:15
**maintain** 129:19
**major** 228:25
**majority** 23:18
164:17
**making** 50:9 91:2
214:5
**male** 108:11 188:7
**mama** 167:9
**man** 78:1 129:11
145:2 170:4 171:6
173:12,25 176:18
176:24 177:14,23
178:19 179:17
181:13,15 182:3
183:22 184:21
186:11,14,15,15
186:17,18,22

188:5,5,15,15
189:11,11 191:9
192:4,5,24 194:15
195:4 196:2,13
197:15,20,20
**managed** 150:25
**management** 9:16
**manager** 8:25
196:13
**map** 3:20 29:14
81:17 82:1 83:1
83:18 84:2
**maranna** 1:20,23
**march** 13:6 14:23
14:24 15:6,10
17:16,17 19:4,7,17
20:1 21:1,3,5,7,10
21:21 22:7,9,15,19
22:20 26:1 35:5
35:18,25 38:10
47:6,24 50:4,11
69:1 88:19 90:15
95:11 96:2 102:14
106:13 111:5
128:20,22 129:10
135:14 137:17
139:16 140:7
141:20 142:15,19
143:4 150:20
151:3,7 156:3
157:23 160:23
161:12 163:23
166:17 167:12
200:11 201:4,15
223:1
**marked** 3:18,25
4:22 11:24 25:16
74:15 77:20 81:21
132:3
**marker** 183:14,15

**market** 2:9 26:2
**marketing** 9:15
**marks** 72:14,20
**mart** 130:25
**martin** 1:13 3:3,8
3:15 7:12,13,14,18
7:22,24 8:11,16
11:18,21,23 12:1,7
12:19,22,24 17:3,9
17:19 18:2,9,25
22:22 27:6 28:4,9
28:12,15,23 29:10
29:19 30:17,22
31:9 32:11,15
79:6,20,25 81:20
81:22 82:7,17,20
82:21 86:25 87:1
164:9,14 165:5,9
167:25 168:3,11
169:10,12 170:2
171:4,24 173:4,23
174:11 175:25
176:2 177:5,7,20
178:18 179:9
180:9 181:10,24
183:3,7 185:20
186:4 187:5,21
188:3,13,22 189:9
189:22 190:11,23
191:16 192:11
193:4,18 194:7,13
194:23 195:25
196:11 197:1,13
197:23 227:25
228:7,19 229:1
232:24 233:3,17
233:23 234:7,22
234:25 235:2,18
235:21,23 236:7
237:11,13 238:20
239:10,24 240:1,5

241:8,19,21
242:18
**martinez** 3:2 8:4,8
8:17,19 12:2,25
16:22 19:1 23:5
27:4
**maryland** 6:5,10
6:11
**mastercard** 24:20
**math** 26:18,19,20
**matter** 7:14 18:11
64:17
**matters** 9:5
234:17
**maurice** 1:5 13:2
238:23 241:14
242:24
**mcconnie** 2:3 3:5
5:2,17 30:10,20
48:7 79:1
**mean** 13:13 50:25
51:18 52:3 60:8
68:11 92:13 98:5
116:18 123:11
148:14 149:12
161:25 169:4
171:15 212:12
221:22 225:10
238:2 242:20,21
244:4
**meaning** 222:17
**meaningful** 31:12
**meaningless**
243:15
**means** 9:3 24:1
**meant** 162:15
195:14,16
**meehan** 1:20,23
3:3,5,7,12,13 5:4
5:23,24 7:1,2,11
12:10 17:2,14

18:4 22:24,25
23:4,11,13,14
28:25 29:5,18,20
30:1,4,6,11,21
31:3 32:7 33:8,9
33:14 36:2,6,8,10
36:15,18,21 37:2,9
37:11,13,14,22
40:7,12,13 41:20
41:22,25 42:5,12
44:22,24 45:2
51:15,17,20,24
52:1 53:2,12,18,24
54:1,4,6,8 62:2,10
62:12 65:1,16,21
67:23 68:15,16
69:17 73:22 74:18
75:4,7,12,14,16
76:2,5,7 77:5,6,17
77:19,21 82:11
86:19,21 103:16
103:18 104:3,6,16
104:22,25 105:5
105:11,13,20,23
105:25 106:6
117:24,25 120:25
121:1,3,20 127:5
132:8 137:14
149:19,20,25
152:16 155:1,2,21
155:22 156:5,8,10
156:12,17,20,23
156:25 157:7,9,10
158:4,8,10,12,19
163:17,22 177:3
221:2 231:8,10
232:14,15,22
233:21 238:24
242:7,10,22
243:10,25 244:4

**meehan's** 233:8,23

**meet** 86:5 119:6
  120:5

**members** 151:4

**memory** 201:19
  201:21,21,22

**men** 86:11 182:11
  186:14 189:11

**mention** 14:12
  31:13

**mentioned** 15:20
  80:5,15 122:18,25
  168:12 235:3

**merchandise**
  54:12,14 60:16,23
  213:8 214:6,8,9
  218:25 225:5,7

**merchant** 13:18
  13:19,19 14:9,11

**mere** 216:13
  236:15

**mess** 225:7

**met** 86:16 135:13

**michael** 2:4 67:4

**microphone** 23:10
  165:12

**mid** 2:8

**midafternoon**
  197:25

**middle** 29:7 53:23
  54:19 95:6 235:8

**midmorning** 74:1

**mind** 29:11 99:17
  201:18 209:4

**mine** 96:15 196:16
  234:9

**minimum** 18:22

**minute** 29:15 62:5
  74:4 101:3 121:13
  198:1 213:12
  224:25 231:10

**minutes** 5:11
  28:21 29:23 44:12
  57:18 71:1,10
  74:2 75:19 90:21
  109:23 141:20
  154:15 159:25
  163:12,14 202:23
  203:8 204:8,12,25
  205:21 225:20
  229:22 235:24
  237:17,21

**misunderstood**
  27:17

**mixed** 148:21

**mm** 89:18 158:2
  161:3 199:3
  201:20 203:4
  204:20 205:10
  207:4 208:3,16
  210:22 213:5
  217:17

**mobile** 239:10

**moment** 27:4
  39:25 41:21 42:13
  44:19 45:1 50:18
  50:23 56:20 62:9
  65:7 78:7,17
  93:22 122:18
  125:19 126:10
  131:14 142:8
  146:21 159:15
  168:16,17,24
  169:4 179:10
  180:17 182:9
  183:1,10,23 187:9
  188:6,25 191:9
  192:15 194:16
  197:23 227:20
  234:2 241:12

**monday** 228:6,7
  229:3 231:23,24
  232:5,6,9,9,11

**money** 18:2,3
  26:11,21 39:4,7
  40:3,5,19,22,24
  41:1,1,4,6,11,12
  41:12 42:15 43:5
  45:4,7,9,10,25,25
  46:15,17,19,19
  47:3 50:17 57:22
  57:23 60:3,5,9,18
  60:20 61:1 64:6,7
  64:7,8 72:21,22,22
  72:23 96:16,20
  97:3 99:25 107:22
  112:2 113:6
  153:15 155:15
  159:4 160:4
  170:12,12,16,17
  170:17,21,22
  172:6,6,7,12,12,12
  172:16,16 174:3,4
  174:4,18,20,21,21
  214:5,22 215:11

**monitor** 52:8
  94:15 133:11,12
  136:18 137:20
  212:5 221:4
  222:13

**monitors** 132:3

**month** 137:14,16
  160:18,18

**months** 47:14
  49:20 80:13
  201:11 202:13,20
  220:18 243:11

**morning** 5:9 6:1
  8:9,10,17,18 23:5
  23:6 28:19 33:15
  33:16 150:7

226:16 227:16
  228:7,18 235:11
  239:11,14 245:24
  246:14

**mother** 240:18
  241:4,12,20,24

**mother's** 238:22
  240:20,20 241:5

**motion** 172:15
  174:22 176:15
  184:2 230:13
  232:20,25 233:1,3
  233:8,24 234:15
  245:13

**motions** 233:15
  234:15

**motive** 17:12

**mouse** 130:5,7
  133:6 138:16

**move** 7:8 12:8
  45:1 64:15,18
  103:3 126:13,17
  130:7 156:18
  158:4 197:7
  208:25 209:2
  230:4 234:8

**moved** 103:1

**moves** 209:3

**moving** 34:12 37:1
  37:3 57:16 103:14
  126:23 134:23,24
  156:23 212:8

**mt** 80:19,20

**multiple** 103:13

**muslim** 66:5 116:6
  129:11 202:25,25
  203:1,2,5,13
  204:16,17 208:8
  208:11 216:5

**muslims** 66:3

| n | | | |
|---|---|---|---|
| **n**  3:1 5:1 79:14 | **neighbors**  34:16 | **northwest**  79:16 | **oath**  33:6 63:1 |
| **name**  8:6,8 10:3 | 91:6,8 142:10 | 80:21 | 122:2 164:18,19 |
| 14:7 33:22 34:12 | **neither**  247:5 | **notary**  2:5 247:14 | 206:1,1 |
| 34:13,14,17 79:13 | **nervous**  50:14 | **note**  199:8 226:15 | **object**  30:12 235:5 |
| 87:17,24 88:1 | 101:2 | **notebooks**  117:6 | **objection**  12:10,11 |
| 89:7,9 98:10,12 | **netspend**  3:20 | 226:16 | 12:12 17:2 18:14 |
| 119:16 143:13,18 | 8:20,21,22 9:1,7 | **notes**  201:13 | 32:10 36:25 37:3 |
| 143:20 164:25 | 9:15,18 11:6 | **notice**  46:25 63:8 | 40:10 62:2 65:1 |
| 165:1 198:25 | 14:10,10 15:14,17 | 63:21,24 173:12 | 65:15,20 68:13 |
| 238:18 | 16:11,14 19:12 | 175:15,15,19 | 72:14 82:10,11,12 |
| **named**  81:8 | 23:15 24:16 26:1 | **noticed**  39:20 | 103:5,6,7 106:5,7 |
| **names**  59:15,18 | 26:5,9,12,22 27:1 | 61:25 62:1,15 | 127:1,2,4,5 156:9 |
| **national**  2:8 | **never**  49:22,24 | 64:1,2 71:4,5 | 158:6 230:21 |
| **near**  48:19 49:8 | 55:20 96:21 | **november**  80:9,25 | 236:18 237:8 |
| 63:22 | 129:10,12 143:25 | 80:25 247:12 | 238:13 242:7 |
| **necessarily**  91:13 | 163:23 176:10 | **number**  3:18,25 | **objections**  31:8 |
| **necessary**  5:15 | 207:6 217:9 220:7 | 6:5,15 10:5 12:16 | **objects**  230:21 |
| 126:15 244:18 | **nevertheless** | 22:18 23:23 24:14 | **obligation**  119:3 |
| **need**  14:16 19:1 | 228:24 | 25:15,22 37:17,23 | **obliged**  60:20 |
| 27:8 30:15 37:7 | **new**  35:23 90:1,6 | 66:25 74:17,21,23 | **observe**  110:5 |
| 45:25 48:18 74:12 | 136:8 140:5 | 74:24 79:15 82:14 | 115:14 123:17 |
| 74:13 102:17 | **newspaper**  226:10 | 93:11,15 94:17 | **observed**  122:12 |
| 104:21 105:4,6 | **nice**  98:2 151:5,21 | 95:5 102:9 103:10 | **obstacle**  202:11 |
| 106:16,20,21 | 152:5 | 127:13,20,25 | **obviously**  13:6 |
| 117:17 118:20 | **nicole**  1:13 | 129:6 132:4,11,12 | 128:19 129:5 |
| 230:18 237:18 | **night**  49:15 50:11 | 136:7 157:4 | 131:20 137:16 |
| **needed**  164:15 | 163:25 197:21 | 158:16 162:4 | 138:16 141:25 |
| **needs**  232:1 | 226:17 227:13 | 223:25 227:6 | 166:5 236:17 |
| **negative**  213:18 | 233:16,18 234:6 | 238:24,25 239:3 | 238:6 241:22 |
| **neighbor**  142:11 | 234:14 235:4 | 240:7,9,19,20 | **occasionally**  75:24 |
| 161:9 | **nil**  227:3 | 241:2,15,17 242:5 | **occasions**  202:17 |
| **neighbor's**  142:23 | **nine**  80:12 85:9 | 242:24,24 243:2 | **occurred**  16:8 |
| 142:24,24 | 86:2 138:12,13,13 | **numbered**  80:18 | 17:20 22:18 |
| **neighborhood** | 138:18,19 139:25 | **numbers**  74:17 | 201:16 202:19 |
| 29:12 81:6 126:5 | 156:15 | **numerous**  17:15 | **occurs**  10:11 |
| 126:5,6 129:3,5,6 | **nod**  213:24 | 202:17 238:22,25 | **october**  160:19,20 |
| 162:14 196:16,18 | **nodding**  213:12 | 242:18 | **offer**  76:14 104:7 |
| 197:6,7 212:23 | **normal**  11:2,10 | | 228:4 |
| **neighborhoods** | 35:21 147:2 | o | **offered**  5:14 243:5 |
| 81:5 | **normally**  156:19 | **o**  5:1 79:14,15 | **offering**  74:24 |
| | | 88:2 | |

| | | | |
|---|---|---|---|
| **office** 1:9,13 133:4 | 63:25 64:6,10,23 | 136:20 138:24 | **old** 165:19,22 |
| **officer** 48:3 80:23 | 65:25 66:4,5 68:6 | 139:20,24 140:4,7 | 201:23 |
| 81:1 116:11 | 69:25 70:7,20 | 140:10,20 141:1,8 | **olney** 19:11 |
| 135:21 237:6 | 71:1,3,8,14 72:8 | 142:5 144:15 | **omission** 235:5,10 |
| **officers** 116:12 | 72:16,19 73:7 | 146:12,20 147:10 | **once** 46:10 58:4 |
| 142:1 162:9 237:5 | 78:14 80:8,14 | 148:6 149:18 | 98:24 131:3 179:1 |
| **offices** 1:25 | 82:1 83:1,4,12,15 | 150:6,13 151:3,20 | 184:6,9 199:20 |
| **official** 247:11 | 84:2,16 85:14 | 152:5,20 153:4,8 | **ones** 49:25 60:6 |
| **oh** 7:13 23:11 | 88:3,5,7,9,11,17 | 153:11,20,22 | 138:22 140:21 |
| 27:17 30:21 31:5 | 89:2,16 90:2,5,7 | 154:4,9,14,17 | 227:8 |
| 38:17 50:5 53:18 | 90:11,14,17,19,22 | 155:6 156:2,8,10 | **opaque** 215:15 |
| 66:14,20 71:1 | 90:25 91:2,4,11,13 | 157:23 158:3,24 | **open** 18:20 58:7 |
| 86:21,24 91:25 | 91:19 92:3,11,16 | 159:10,24 160:22 | 59:5,10,11,22 |
| 92:10 94:20 95:16 | 92:25 93:4,6,18,21 | 161:2,7,10,12,17 | 174:22 191:1 |
| 97:8 98:11 119:1 | 94:11,14,19 95:4 | 161:21 162:2,9,17 | 225:12 231:22 |
| 121:14 132:15,20 | 95:10,17,21,25 | 162:20 163:14 | **opened** 59:22 |
| 133:1,14 135:16 | 96:8,18,22,25 97:5 | 165:13,17,18 | **opening** 31:10 |
| 136:13 137:13 | 97:9,11,18 98:7,9 | 167:10,12 168:19 | 236:13 237:3,14 |
| 161:1 191:19 | 98:11,16,19,25 | 169:23 171:20 | 244:10 |
| 200:14 208:23 | 99:5,7 100:6,13,21 | 172:23 173:5,9,12 | **opens** 59:6 |
| 211:24 213:14 | 101:3,10,12,14,19 | 173:19 175:3,21 | **operating** 139:15 |
| 215:7 221:1 242:8 | 102:5 103:21 | 175:24 176:3 | 142:20 |
| **okay** 6:22 7:18 | 106:6 107:23 | 177:14 178:7 | **operation** 128:20 |
| 9:18 10:16 11:15 | 109:17,19,22,24 | 181:15 182:14 | 129:24 |
| 12:4 14:1,12,15,22 | 110:8,11,13,18,25 | 183:8,22 184:1,13 | **operational** |
| 15:7,15 16:15 | 111:8,15,24 112:3 | 184:21 185:10,25 | 218:22 |
| 19:3,14,20,21 20:6 | 112:9,13,15,20,23 | 188:18 191:2 | **operator** 2:4 |
| 20:15 21:17,21 | 113:1,9,9,15,20,24 | 199:2,6 200:4,24 | **opportunity** 52:7 |
| 24:1,4,13,18,25 | 114:4,7,10,16,21 | 202:2,22 203:19 | 119:6 120:5 |
| 25:8,11,14,20 26:8 | 115:1,3,20,23 | 204:16 205:4 | **opposed** 18:10 |
| 26:20 27:4 28:23 | 116:1,9,13,17 | 206:10 207:12 | 32:3 |
| 33:18 34:12,24 | 121:14 122:11,13 | 208:17 209:15,23 | **oral** 230:14 233:4 |
| 35:9,18,24 38:6,10 | 122:17,25 123:7,9 | 210:7 212:12,21 | 235:15 |
| 38:13,19,25 39:11 | 123:15,17,21,24 | 212:23 213:22,25 | **orally** 233:18 |
| 39:16 40:19 42:5 | 124:5,9,16,23 | 214:2 215:1,8,11 | 234:18 |
| 42:22 43:9,21 | 125:8,14,18,25 | 217:2,5 218:8,18 | **order** 7:15 49:11 |
| 45:11 47:2,13,20 | 126:2,8,16 129:1 | 220:3,16,21 221:5 | 74:11 89:16,17 |
| 51:17,20 53:2 | 129:18,23 130:16 | 221:5,20 222:9,10 | 230:14 232:19 |
| 54:21 55:1,13,18 | 130:20 132:15 | 222:16 223:5,18 | **organization** 11:6 |
| 58:22 59:2,17 | 133:6 134:7 | 232:13 236:7 | 17:24 21:15 |
| 61:24 63:13,15,21 | 135:17,24 136:14 | | |

**orient**  67:14
**originally**  217:19
  218:1,20 230:8
  236:16
**ought**  6:14 30:25
  31:2
**outcome**  247:6
**outdoor**  114:16,19
**outside**  32:23 33:1
  36:12 58:5 84:9
  92:3 101:24 112:9
  112:11,15 114:8,9
  115:21 122:12,15
  122:20 123:3
  139:2 142:2,16,17
  142:21,22 158:21
  161:8 179:16
  191:5 193:6,20,21
  195:18 197:18
  208:23 209:2,3
  215:18 216:15,16
  217:13 222:25
  223:3 224:2,16,20
  224:22 226:14
  235:7
**overdrawn**  17:11
  19:15
**overruled**  18:14
  32:10 106:5,7
**overstayed**  120:2
**owned**  90:23,25
  126:5 129:9
  140:15,18
**owner**  31:14 35:23
  97:17 128:17,21
  129:1 140:5 154:6
  159:17 167:5
  189:1 190:16,17
  190:18 195:11
  196:15 200:8,19
  215:8 223:1

238:16
**owners**  136:8
**ownership**  10:1
**owns**  241:2

**p**

**p**  5:1 21:20
**p.m.**  15:6,9,23
  16:2,12,13,18,20
  19:10 20:13 38:11
  38:14 77:11
  111:14 112:3
  113:10 118:6,6
  135:13 198:10,10
  234:19 236:7
  246:19
**pa**  1:4,11,15,19,22
  2:1 88:4
**packed**  56:22
**page**  3:1 12:23
  13:10 20:12 25:25
  61:24 62:6 63:15
  64:15,16,22 65:8
  65:11,13,22 66:8
  70:22 71:2
**pages**  70:21
**paid**  17:23 24:2
  97:12
**pants**  109:2
**paper**  24:4
**papers**  234:15
**papi**  34:16,17,21
  34:22,25,25,25
  54:25 100:3
**pardon**  32:25
  41:24 71:17,21
  118:23 137:9
  158:9 160:3
**park**  110:1
**parked**  123:7,8,13
**part**  40:8 42:7
  44:19,21,23,24

45:19 51:10 54:10
  62:9 75:5,20,23
  76:17 81:7 85:23
  91:1 147:10
  202:15 208:6
  221:19 227:14
**particular**  9:19
  95:25 138:17
  139:24 168:16
**parts**  38:1
**party**  6:13 247:6
**pass**  100:4 159:21
**passed**  39:20
  42:24 43:6 49:24
  201:11
**passing**  26:23
**patients**  133:19
**patrol**  81:4 83:16
  85:16,17,19 86:1
**patrolled**  85:24
**patrols**  81:11
**patrons**  70:2
  209:10
**patterson**  1:24,25
  3:6,11,15 6:22
  12:11 27:9,10
  31:6 52:6 68:9,17
  69:9 70:22,24
  72:16,17 73:4,12
  73:19 77:1 82:12
  84:23,24,25 86:22
  86:23 103:7
  117:21 120:20,21
  127:2,3,4 128:7,11
  132:2,7,9,12,15,16
  135:25 136:2,10
  136:17,20,22,24
  137:2,5,13,19,25
  138:2,4,6 162:23
  198:18,22,25
  203:23 204:23

213:10,14,15
  214:1 219:8,12,16
  219:19,20 221:1,3
  221:14 224:24
  225:1 230:7,25
  231:3,12,14 233:7
  233:18 234:24
  235:3 236:12,13
  238:4 239:15
  240:15,16 241:1
  241:22 242:4
  243:3 244:19,25
  245:2,5,10,18
  246:12
**patterson's**  237:14
**pause**  111:16
  115:20 172:3
**pausing**  194:14
  195:1 196:1,12
**pavement**  147:8
**pay**  24:5,19 38:7
  38:25 39:6 119:5
  120:3 191:23
**paycheck**  24:4,11
  24:22
**paying**  131:3
  173:16,17 181:18
**payment**  18:7
  24:10
**payroll**  17:20
  21:18,20,22 23:24
  24:1 25:18,20
**pen**  39:10,19,22
  46:24
**pennsylvania**  1:1
  2:9 16:10 88:25
**people**  24:4,7
  34:21 38:7 42:18
  64:23 65:25 86:5
  86:7,16 91:13
  129:2,6 133:17,22

139:12,14,17
140:12,12 147:15
148:12 149:11
158:21,24 202:24
203:2 212:1,8,23
223:3 241:3
**perfect** 43:17
212:15,15
**perfectly** 68:4
71:23 78:14 202:3
**period** 86:1
128:20 146:7,12
167:18 202:22
**periods** 200:18
**peripheral** 230:2
**permission** 7:15
12:20,21 36:18
82:7 102:7 111:10
142:10 161:8
167:25 238:13
**person** 10:13
97:20,22 110:8
241:2,23
**personal** 52:15
**personally** 92:13
150:9
**peter** 59:20
**ph** 30:23 47:25
90:9 133:19
**philadelphia** 1:4
1:11,15,19,21,22
2:9 14:16,20
15:23 80:4,11
81:14 88:4,5,9,25
102:15 106:14
134:11 135:3,11
135:15 140:21
166:3
**philly** 166:4
**phone** 42:20,22,25
43:7 45:20 95:10

97:25 98:1,3,3
100:4,15,16,24
101:9,13,17 102:2
104:9,18,24
105:23 109:15,19
144:21 145:2
151:25 152:6,20
154:10 159:10
169:18,20 218:6
236:23 238:5,15
238:16,20,22,24
238:25 239:3,4,7
239:24 240:7,17
240:19,20,21
241:25 242:5,24
243:1,6,11
**photo** 3:21,22,22
4:2,2 126:14,17,18
126:19,22 157:2
182:25
**photograph** 68:24
184:15 185:6
**phrase** 231:7
232:11
**physical** 9:13,14
11:19 23:16 24:4
197:5
**pick** 25:6 105:2
116:19 191:18
229:7
**picked** 47:21
**picking** 62:14
**picture** 4:1 40:14
132:17,18,19,21
133:9,19 134:5,24
136:3,6,12,22
137:8,10 138:25
139:24 140:5
143:3 207:7
224:19 243:15

**pictures** 130:8
133:8 222:17
**pin** 210:9
**pink** 111:21
195:12
**pinkerton** 243:22
243:24
**place** 47:9 111:25
168:3 237:21
242:17
**placed** 82:17
126:12 168:4
235:24
**places** 25:23
**plaintiff** 1:3,9
**plan** 197:19 232:2
241:12 243:6
**planning** 242:25
**plans** 235:5
**plastic** 178:9
**play** 45:17 56:1
75:19 78:10 102:7
111:15 112:3
113:9 115:3
116:13 123:24
125:2 169:6
181:20 202:17
203:14 220:23
221:7 235:12
236:1,17
**played** 102:12
106:11 111:18
144:17 168:9
173:25 190:13
221:12 224:10
236:10
**player** 130:3,14
**playing** 47:16
104:11 170:25
171:20 174:12
178:3 179:5 180:5

181:6 185:21,25
187:1 188:18
189:5,18 190:19
191:12 192:7
193:14 194:3,19
195:21 196:7,22
197:9 208:13
**plea** 228:11
**plead** 230:6
**please** 5:1 8:6
12:22 20:6 31:9
50:21 57:18 61:24
63:23 66:20 68:7
72:1 79:8,12,13
81:20 87:12,16,17
87:24 88:1 89:4
94:1,15 99:23
108:2,16,16 112:4
113:10 115:4
122:9 123:25
125:3 136:25
155:20 164:20,24
164:24 165:16,16
170:13 199:21,24
220:23 224:25
238:10
**plexiglass** 53:20
178:8 207:10
214:12 215:14,15
215:16,20
**plug** 141:5
**plus** 215:15
**pocket** 220:1,3,5,6
**point** 18:3 45:8,20
54:9 55:13 57:19
59:4 84:12 112:23
113:8 114:14,18
115:1,18 116:1,15
120:2 125:14,20
126:13 139:4,18
162:9,12 168:21

[point - projectile]                                                    Page 29

171:11 172:4
173:16 174:5
175:22 176:16
177:6 179:20
181:18 185:4
189:24 191:5
205:12 211:4
215:18 222:4
228:8 229:15,17
237:8 244:21,23
245:7
**pointed** 69:1 140:8
203:10 205:1
217:19
**pointing** 6:17
40:15 47:4 53:17
53:22 78:12 139:5
139:5,8,21 221:18
222:3 238:16
**points** 109:4 162:6
209:21 211:1
**pole** 142:24
**police** 30:16,17
47:23 48:3 74:19
80:4,12,13,16,17
80:18 81:1 87:16
102:4,15,15,19
104:10,10,21
105:1,4,7 106:14
106:14,18,23
107:1,3,6,9,11,11
107:15,19,23
108:1,3,6,8,11,14
108:17,21,23
109:1,4,7,7,10
114:21,24 115:13
115:16,24 116:10
116:12 122:16,21
123:18,19,19,20
123:21 125:13
129:11 134:11

135:3,11,15,21
140:21 142:1,19
143:2 146:12,13
147:12 154:19
162:6,9 163:6,8
191:6 193:9,10,24
193:25,25 194:2,8
195:19 225:11,16
229:10 230:5
237:5,15 239:2
**policing** 86:4
**popping** 239:4
**porch** 142:24
**porfiro** 3:5
**port** 141:9
**portion** 170:7
172:1 173:25
177:1 178:23
190:13 192:12
227:4
**portions** 12:8
75:19
**portrayed** 84:16
**position** 6:18 8:24
95:21,23 230:14
**positive** 241:11
**possession** 205:8
**possible** 109:8
232:12
**possibly** 55:22
**posted** 13:14
**potato** 71:20
191:19
**potential** 119:19
120:10
**potentially** 234:3
**pounding** 172:14
172:15
**preceding** 178:23
180:17 242:21

**precinct** 48:1
50:12,14
**prefer** 233:16,17
**preferable** 228:8
**prejudicial** 104:12
104:14,15 105:18
243:23 244:5,10
**premarked** 74:12
**prepaid** 8:22,23
9:7 218:6,8
**prepared** 5:16
**presence** 235:7
**present** 2:3 18:20
18:20 62:21 104:8
118:15 230:18,19
239:22 245:13
**presentation**
230:16,23
**presented** 62:25
226:12 240:10
**pressuring** 41:6
**pretty** 35:18
134:24 148:16
153:22 159:20
184:10
**prevent** 202:8
**previous** 114:21
118:11 119:3
126:13
**previously** 66:23
77:20 183:5 199:8
**price** 94:7,8,23
95:2
**primary** 159:2
**prior** 4:22 21:21
22:19 62:3 76:10
76:20 80:10
126:25
**probably** 159:2
224:19 234:14

**probative** 17:16
32:7,8,9 243:13,18
243:20 244:9
**problem** 30:22
42:14 43:4 46:5,6
46:6,7,8 51:21,22
67:21 75:5 107:9
107:11 147:25
148:1 153:21,23
182:10,10 228:13
**problems** 97:2
99:5 143:24
**procedure** 120:19
**proceed** 5:16 8:11
18:24 28:16,22
32:20 33:6 63:4
77:17 79:19,20
106:8 121:20
137:22 156:19
165:4 198:16,17
245:11
**proceeding** 4:22
77:10 118:5 198:9
246:18
**proceedings** 2:6
230:9
**processing** 13:20
**processor** 14:9
**produce** 9:4,24
**produced** 2:7 14:9
**product** 9:16
**production** 9:6
**products** 53:19
90:2,3,11
**professional**
130:23
**proffer** 29:11 31:8
**proficient** 148:22
**projectile** 205:13
210:11,18

projection 53:7

prominently 133:18 212:1

promise 228:3 230:4 245:25

proof 104:7

propel 210:18

proper 65:17 76:12

properly 139:15 232:2

protection 92:2

prove 240:17 243:5

provide 90:7 233:9

provided 12:5 13:19 25:3 199:15

providing 25:2

psa2 85:25 86:1

psas 85:16

public 2:5 247:14

publish 12:8,20,21 36:2,18 40:8 66:22 67:5,11 82:7 89:4 157:17 168:5

published 37:21 66:19 89:3 156:12 156:18 157:7 158:5

pull 165:11 187:13 205:12 234:3

pulled 39:19 40:3 40:22 47:21 51:13 54:18 55:14,20 101:22 221:17 222:6

pulls 47:20

purchase 90:3 93:19 94:7,22

95:2

purchased 90:8 93:7

purchasing 34:10

purported 241:3

purpose 73:17 242:25 243:1

purposes 74:14 132:4 136:11

pushed 59:12

pushing 45:5 59:9 184:1

pussy 174:3

put 39:5 41:7,8,13 42:23 47:21 49:4 51:2 54:21,24 56:8 73:8,9 96:16 97:25 98:1,2,3 100:24 118:17 119:8 121:6 125:15 129:20 130:25 131:3 132:2 133:23 138:19,21 141:16 141:18 142:9,11 142:19 157:16 180:14 191:25 205:11 206:1 211:12 215:6 231:7 235:6,10

puts 208:21

putting 120:18 168:20 191:19 221:4 225:9 237:4

---

**q**

quarter 38:14 74:4 116:23 118:1 118:2 226:2 233:5

question 12:25 17:9 19:1 34:20 35:1,22 36:9 43:8

48:2 50:20 61:25 62:15 63:9,21,22 63:25 64:2,4,6,10 64:22 65:13 66:3 66:13 70:3 71:2,3 71:8,11,18 72:1,2 72:10,19 76:12 78:16 90:11 94:11 113:15 119:18 124:5 126:14 129:10 161:5 162:25 163:18 165:17 182:15 184:11 199:21 216:2 217:11 223:14,14 239:14

questioning 65:2 71:19 72:2 76:11 76:15 208:15

questions 17:20 22:23 23:7 27:12 27:16 50:14,23 63:2,3 68:17 69:4 69:12,15,17,19 70:8,9,14 78:23 84:23,24 85:9 86:20 108:18 135:10,10,18 137:19,21 144:6 162:4,21 164:3 165:13 199:6 201:6 202:18 203:24,25 205:18 205:20 220:10 227:1

quick 210:24 211:24 229:10

quickly 20:15 230:5 246:7

quinn 1:5 7:2 13:2 23:19 26:10,12

33:7,17,20 38:10 39:3 40:15 42:25 43:13 44:11,15 45:3,20 47:20 48:10 49:8,16,22 50:5 52:14 54:23 55:8,9,11 56:12 57:16,19 58:3,3,11 59:11,12,14 60:2 60:10 67:15,19 68:1,2 98:12,16,18 98:19 100:14 101:22 113:4 114:12 123:1 126:20 132:9 137:4 150:3,25 151:12,15,18,25 152:3,5,21,24 154:10,14,25 155:21 156:22 157:2 158:8,10 159:10,21 160:6 162:2 163:23 177:5 209:17 223:12 225:2 234:2 238:23 241:14 242:2,9,11 242:24 243:13 244:11

quinn's 14:24 132:8 232:19 242:5

quite 30:15

quotation 72:14 72:20

quotes 231:7

---

**r**

r 5:1 79:15 88:2,2 150:22 155:15 247:1

**r.c.** 1:25
**rack** 176:12
**racked** 50:19,24
**racking** 51:8
**radio** 226:7
**raise** 79:8 87:12
  164:20
**raised** 18:23
  126:14 170:18
**raising** 53:7
**rate** 30:3
**ratulle** 90:8
**raymond** 2:3 3:5
**rcplaw434** 2:2
**rd** 89:8 90:23
  150:11 155:19
  243:17
**reached** 54:18
**reaches** 231:13
**react** 146:17
**read** 18:10 48:25
  54:2 62:8,10,18
  63:11 64:13,19
  65:9,17 66:16
  70:18,19,25 75:2
  94:16 199:11
  201:13 226:11,13
  234:15
**ready** 7:25 51:9
**real** 41:4,12 68:8
  68:18,25 84:6
  174:19 178:25
  179:2 180:24
  181:5 185:10,12
  197:6 205:9
  209:24 210:2,2,5
  211:1,24
**realizing** 228:23
**really** 57:2 65:8
  149:12,15 155:8
  159:9 172:20

173:17 180:19
  215:25 216:22
  230:1,19 237:2
  243:23 244:5
  246:3
**reason** 17:18
  150:13 159:2
  226:11
**reasoning** 235:6
**reasons** 235:9
**rebuttal** 65:18
**recall** 38:11 93:6
  93:11,15 135:10
  203:20 205:20
  206:11,14 220:17
**receipt** 93:18
  94:12
**receipts** 90:7
  215:9
**receive** 95:10
**received** 37:6,20
  42:7 66:24 103:8
  127:10,18,23
  157:2 158:14
  238:17
**recess** 73:21,25,25
  74:3,4 77:7,10
  116:23 117:18
  118:1,5 197:25
  198:1,9 226:2
  246:13
**recognition** 238:9
  238:11 241:7
  244:21 245:7
**recognize** 11:12
  12:2 35:12 81:17
  82:3 84:16 155:23
  157:17 170:4
  175:6 181:16
  183:1 184:14

**recollection** 93:19
  94:12,22 95:5
  156:25 228:11
**record** 8:7 9:22
  11:23 14:16 18:5
  26:1 53:22 54:2
  64:17 66:7 75:2
  79:13 87:17 94:16
  104:8 110:18
  113:20 118:17
  119:9,12 120:19
  133:12 164:25
  168:6 169:10
  172:13 174:22
  176:5 177:21
  183:11 184:1
  209:9 213:13,24
  219:11,14,23
  235:6,10 238:14
  239:9,18 240:6,14
  245:3,12 246:2
**recorded** 2:6
  133:23 134:5
  141:22 214:2
**recorder** 129:24
  130:15,17,22
  131:13 133:4
  135:7 141:6
  223:20
**recording** 2:6
  102:12,22 105:18
  105:21 106:11
  109:12 130:9
  131:24,25 134:21
  135:7 222:18
  223:2 247:4
**recordings** 131:9
**records** 3:20 8:25
  9:4,6,19,20,23,25
  9:25 10:9,19 11:2
  11:5,6,9,12 12:2,4

12:25 13:1,3,6,11
  14:12,19 15:8,10
  17:13 18:11,12
  19:23 21:13,19,23
  25:3,8 131:13
  227:10 236:23
  238:6,8,15,17,21
  238:23 239:5,5,7
  239:10 240:8,21
  241:10,14 243:11
**recross** 3:7,13,13
  77:18 162:22
  163:2,20
**red** 111:21 175:10
**redirect** 3:6,12
  27:6 61:5,6 73:23
  87:1 121:23
  160:10,11,13
**reentry** 5:11
**refer** 98:15 121:12
  130:17 216:5
  219:14
**reference** 68:14
  130:16 133:12
  157:1
**referred** 116:9
  162:2 217:2
**referring** 110:9,19
  116:10
**reflect** 13:21,22,24
  25:23 110:18
**reflected** 13:16
  15:10 16:4 92:17
**reflects** 36:11,11
  38:1
**refresh** 93:19
  94:12,22 95:4
**refreshing** 156:25
**refrigerator** 56:18
**refusing** 46:17

**regard** 76:9
  123:17 126:21
**regarding** 70:9
  202:18 205:18
  231:17
**regardless** 155:8
**region** 2:8
**register** 46:18
  58:3,6,7,23 59:5
  59:10,12,21,23
  60:3,5,11,19 101:1
  101:25 102:4
  107:12,21 138:20
  160:7 167:2
  168:25 170:4
  171:10 174:7
  175:13 182:17,20
  185:23 186:7,10
  186:12,16,17,19
  187:23 207:9
  211:8 215:21,24
  216:8,22
**regular** 7:5,5
  10:10 30:25 81:2
  81:2 85:12 86:15
  91:5 200:5,5
  211:17
**regularly** 30:19
  75:24 85:24
**related** 11:6 167:3
  167:6,8
**relates** 31:16
**relation** 230:2
**relationship**
  133:17 134:12
**relatively** 232:6
**release** 226:1
**relevance** 17:2
**relevant** 104:11,16
  105:3 119:10
  230:1

**rely** 226:13
**remaining** 16:3
  227:5
**remarked** 39:17
**remember** 35:8
  38:12 59:18 69:10
  70:12 78:14 94:6
  111:7 117:2
  129:13 138:8
  146:18,19 154:3
  154:21 155:5
  163:5 171:25
  172:4 173:24
  177:25 179:3
  180:16,20 181:12
  182:8,11 184:23
  184:25 185:1,22
  185:24 187:9,11
  188:5,15,25
  189:24 190:13
  191:4 192:15
  193:20,22 194:15
  195:5 196:14
  197:4,15 202:20
  203:14,15,17,25
  204:12,16,18,19
  205:23 206:10
  208:14,20 221:19
  222:5,7,8,18
  231:12 237:13
**remembered**
  129:14 201:15
  202:19
**remembering**
  201:14
**remind** 33:5 122:2
  198:16 245:8
**removed** 16:2
**removes** 210:23
**repeat** 19:1 39:20
  50:20 51:6 145:16

199:22
**repeated** 199:23
**repeatedly** 68:17
  239:3
**rephrase** 165:16
**replace** 40:21
**report** 117:1
  135:20
**reportedly** 6:5
**reporter** 213:23
**reporting** 2:8
**reports** 201:13
**reposition** 168:1
**represent** 33:17
  119:7 143:14
  150:3 199:1
**request** 7:15 11:6
  52:6 243:3
**requested** 11:9
**requesting** 120:16
  235:9 236:17
**require** 9:5
**reread** 72:9
**research** 239:13
**reside** 88:3 160:23
  160:23,25
**resided** 161:2
**residence** 83:16
**resident** 119:23
**resolve** 153:21
**resources** 244:20
**respect** 71:22,22
  119:22 120:14
  135:15 137:21
  202:7 206:25
  220:18 230:23
  242:12
**respectfully** 52:11
**respectively** 225:5
**respond** 11:6
  237:11

**responding** 216:2
  217:11
**response** 12:5
  71:12 72:2,12
  100:2 216:8
  232:19 233:3,20
**rest** 20:15
**restocking** 168:13
**result** 119:21
**resume** 245:16
**resumes** 112:6
  113:12 115:6
  124:2 125:5 169:8
  169:25 171:2,22
  173:2,21 174:9
  177:18 178:16
  179:7 180:7 181:8
  181:22 185:18
  186:2 187:3,19
  188:1,11,20 189:7
  189:20 190:9,21
  191:14 192:9
  193:2,16 194:5,11
  194:21 195:23
  196:9,24 197:11
**retrieve** 32:23
**return** 121:12
  226:23
**review** 135:9
  141:2
**revised** 227:15
**rewound** 177:22
**right** 6:3 7:3 10:9
  10:25 11:12 12:25
  14:1,7 15:2,15,19
  16:6,22 17:1 19:6
  19:9 21:12 24:5
  26:6,17 30:4
  33:22 35:1,14
  36:24 37:25 38:4
  38:8 39:18,25

40:14,23 41:1,3
42:1,20,25 43:15
43:16 44:4,8,11
45:10,10 47:16,23
48:5,7,14 49:3
50:9,13 51:18
52:5 53:23 54:4,9
54:15,18 55:3,14
56:4,7,17,19 57:6
57:20 58:11 59:1
59:5,14 60:4,21
61:4 62:7,17 64:9
64:9 66:9 68:19
69:15,15 70:5
71:6,20 72:3,20,24
72:24 76:23 77:24
78:7,15,21 79:8
80:23 82:24 83:6
83:8,14 84:9,10,11
84:21 85:17 86:4
87:10,12 88:18
90:14 91:21 93:4
93:6,16 94:15
95:2,5 96:4 97:5
97:18 100:21,23
101:18 102:18
103:23 104:6
106:16 107:22
110:5 111:16
113:21 114:3,10
115:20 116:20
119:20 120:12,15
121:5 122:1,8,20
124:6 125:1 128:5
131:25,25 132:24
133:13,23,24
134:3,5,5,13,24
135:1 136:5,5,11
136:12 138:14
139:1,9,20,21,22
139:23 141:15,16

141:19 142:3,11
142:25 143:6
151:1,13,25
152:18,23,25
153:8,12 154:6
155:3,10 157:1
158:21,25 159:2
159:13,15,18,22
159:24 161:2,14
162:4 163:24
164:20 165:19
166:5,9,11,23
167:12,24 168:7
168:13 169:6,16
170:7,7,9,15
171:15 172:3,13
172:15 173:6,11
174:6 175:5,8,12
175:17 176:4,7,10
176:19,19 178:4
178:14,20 179:17
180:23 181:20
182:5,22,23
183:13 185:15,24
186:9,14 187:1
199:1 200:12
201:21 202:22
203:20 204:5
205:2,9,18 206:8
206:25 207:3,5,10
208:14 209:1,3,13
210:11,19,25
211:6,14,17,20,21
212:5,13,16,19,19
212:21 213:8
214:8,22 215:16
216:19 217:14,18
217:23 218:4,14
218:14,25 219:3,3
220:1,13,14
221:15 222:14

223:3,6,8,16,20,22
224:6,10,15,20,22
225:5,6,8,11,14,15
225:16 226:2
227:7 228:20
229:5,7 231:15
232:14 233:11
234:5,20 237:6,7
239:6,16 242:10
244:21 245:11
246:8
**rights** 212:10
**rise** 40:2 74:5 77:8
77:15 117:7 118:3
121:15 198:2,14
226:18 246:15
**robbery** 17:12,22
61:22 84:13 148:3
148:6 237:17
238:25 242:12,17
243:6
**robert** 1:9,24
**robert.eckert** 1:12
**robreno** 5:9
**robreno's** 5:7
**rodriguez** 3:10
42:20,22 43:3,7,12
56:15,20 57:2
87:8,14,18 102:17
106:16,22,25
107:2,5,7,10,12,17
107:21,25 108:2,5
108:7,10,13,16,20
108:22,25 109:3,6
109:9 117:15
121:6 122:2
128:12 164:5
167:6
**rolls** 89:23
**room** 117:6 133:4
133:22 206:1

215:8 226:17
246:5
**ross** 82:24 83:6,14
112:19 157:16
**round** 205:12
**routing** 24:14
**row** 6:16
**rule** 31:2 76:18,19
76:20 105:17
106:4 230:12,21
233:1 239:14,19
239:21 240:12,13
240:15 245:13
246:2,7
**ruled** 18:23
234:16
**rules** 75:15
**ruling** 6:13 31:2
119:2 232:16,17
239:16
**run** 146:22
**running** 73:24
91:1 208:6

|  s  |
| --- |

**s** 3:17 5:1 79:15
87:25
**safe** 133:11 215:4
215:5,6
**safely** 209:16
232:3
**safety** 179:20
**sails** 200:24
**sale** 192:2
**sales** 60:8
**sanchez** 3:14
118:22,24 119:17
119:17,18,22
164:10,19,22
165:1,10,19
166:11 168:5,12
169:13 170:3

173:24 177:22
179:10 180:10
181:11 183:8
185:22 187:6,22
188:4,14,23
189:10,23 190:12
190:24 191:17
192:12 193:19
194:14,24 196:1
196:12 197:2,14
197:19 198:16,23
198:25 200:4
226:22 227:1
**saw** 34:6 38:17,18
39:9 47:7,8 49:7
54:10 58:1 62:1
62:16 64:1 71:4
100:25 102:3
104:18,21 105:4
105:22 110:12,13
115:22,23 122:16
122:17 123:1,19
129:10,12 142:1
145:11 146:2,4,6
163:23 172:17
175:17 176:10
185:5,5 193:10
201:3 202:16,23
203:3,8 204:12
205:1 217:9
218:21 220:7
224:10,11 237:5
**saying** 26:25 43:11
43:13,18 45:9,12
45:16,24 50:9,10
55:20 56:24 57:1
57:5,8,9,22,24
71:13 73:8 78:11
78:13 93:14
124:19 136:11
145:14 147:18

165:16 170:11,14
172:4,21 174:2,23
176:24 177:1,10
177:25 179:3
180:16,25 182:12
186:18 187:12,15
187:16 188:15,25
190:2 192:20,24
194:16 195:4,6,10
196:14 199:23
201:7 202:7
206:14 214:2
217:11,12,22
220:22 230:15
231:24 237:10,22
237:24 241:1
243:8
**says** 14:19 35:25
83:7,20 104:13
155:3 160:3 216:8
218:19 237:15
**scalp** 21:20
**scary** 57:2
**scenario** 229:2
**schedule** 227:2
231:17
**scheduled** 233:6
**scheduling** 227:2
231:23
**school** 88:7,8
165:24 166:2
**scientific** 245:1
**scratched** 39:12
**scratching** 39:22
**screaming** 45:4,5
45:15 47:4 55:6
**screen** 4:1 11:15
35:10,10,15,24,24
36:1,5,7,8,11,13
36:20,21,22 37:23
40:15,18 41:18

42:1,3,3 46:14
51:12,15,16,21,22
52:2,18,21 53:5,7
53:8,10 54:10,15
57:18 66:21 68:7
74:25 76:6 77:23
81:23 94:15,22
105:22 113:21
114:3,4,11,11
122:9 124:6
132:13,20,23
133:17,21 136:15
137:15,16,17,23
138:1,21 168:4,4
168:16 173:7
175:6 183:8 187:7
207:8 211:25
212:19 222:19
223:23
**screens** 35:16
52:15 53:6 82:18
122:17 212:4
**scuffle** 217:6
**seal** 247:11
**seat** 6:16,17 7:5,7
7:8 121:12
**seated** 5:1 6:16 7:4
74:9 77:16 79:12
87:16 117:11
118:8 121:19
134:8 164:24
198:15 199:1
226:22
**seats** 7:5
**second** 5:25 13:17
14:8 15:16 19:20
36:15 58:2,2,22
63:25 71:3 131:15
144:11 150:19
202:11 221:2
227:14 235:17

**seconds** 87:10
111:14,15 112:4
115:4 123:14,25
125:3 174:12
178:23 180:17
184:14 188:24
189:12 196:3
221:7
**section** 80:21
**sector** 85:12,14,16
85:24
**security** 63:7,23
101:4 113:25
129:18 138:19
139:1
**see** 6:21 17:3
28:15 29:1 34:4
35:10 37:15 38:19
38:22 46:14 47:10
48:18 52:2,3,15,18
52:21,25,25 53:4,6
53:8 54:13 56:1,8
57:6 79:4 83:6,7
83:19 91:16,16
100:25 101:13
102:1 103:16
108:6 110:11
111:7 113:2,7
114:16 115:12
123:2,3,15 133:1
133:19,22 134:2
135:1,7 136:4,4,18
136:21 138:5
139:8,22 140:9,10
140:12,12,17
141:12,12 142:12
146:18 147:7,10
150:3,6,25 154:24
168:16 169:14,18
170:5,7 171:5
172:8 175:5

176:12,15 183:8
183:13,16,20
184:14 185:6
186:5,11 187:6,22
190:25 191:25
192:12 193:5,11
193:24 197:5,19
197:20 201:1
206:13,21 207:19
207:22 208:6,17
211:12,18 212:13
212:18 215:14,20
215:25 216:22
218:15 221:5,8
223:23 224:1,8
226:15 228:16,21
235:14 237:25
238:15 239:3
**seeing** 40:17 52:7
56:14 79:2 131:14
212:7
**seek** 119:8 234:1
**seen** 15:5 24:16
28:19 33:21 65:10
65:13 66:5 98:21
105:19 110:14,18
110:19,20,25
111:6 114:18
129:15 132:17,19
134:23 139:11
145:1 163:25
173:14,14 223:8
239:2
**sees** 208:4
**select** 12:8
**sell** 90:12 160:16
214:14,15,17
218:10
**selling** 213:7 214:6
225:5

**sells** 90:12 129:20
**send** 107:17,18
**sense** 62:22 65:9
93:4
**sentence** 65:17
**sentencing** 5:10
**sentiment** 230:6
**separate** 42:17
46:9 76:18 129:19
131:8 138:13,13
139:25
**september** 201:11
**sequence** 141:21
223:6
**serial** 93:11,15
94:17 95:5
**series** 17:19 50:22
**serious** 162:15,16
162:18
**serve** 89:11
**served** 71:23
**service** 2:7 9:16
85:20 129:23
**serving** 56:19
**sessions** 105:17
**set** 14:11
**sets** 13:19
**seven** 20:5 25:19
90:21 242:19
**shaking** 152:14
172:13
**shape** 17:24
**share** 230:5
**sharpnack** 15:3
16:7,10 20:4,9
22:19 25:21 26:10
26:11 81:12,13,13
81:15 82:5,23,24
83:7,7,14,19,20,23
84:13 85:22 88:24
89:6 90:15,20,23

91:22,24 101:4
106:17,22,23
107:8 109:20,25
161:1 166:21,24
237:19
**shelves** 168:13
**shirt** 192:16 199:2
**shit** 197:6,18,18
**shoot** 51:9
**shooting** 92:12,20
92:21 134:9,15
**shop** 91:13
**shopping** 24:22
83:10,13
**short** 5:16 29:10
30:6 32:15 66:2
89:16 108:15,19
108:21 229:24
234:13
**shorter** 123:2
**shortly** 99:11
**shot** 44:22 68:6,6
92:10,14,21
212:15,15
**should've** 245:8
**shoulder** 94:15
**show** 15:11 40:23
114:7 134:19
138:20 183:13
184:13 243:1,11
245:4
**showed** 11:13
81:17,21 93:18
182:25 217:6
225:4
**showing** 51:23
142:18 173:7
**shown** 11:15 13:11
14:1 15:12 16:12
26:6 74:25 84:12
138:1 144:4

218:15
**shows** 21:20
217:13 237:25
242:25
**shuffling** 211:6
**shut** 162:17
**si** 69:22
**side** 51:3 52:13
54:9,21 55:4,6,9
57:17 81:13 83:8
113:21 114:11
123:8 124:6
157:15,20,21
169:19 171:9,9,10
173:6 176:19,19
182:16,16 186:6
186:10 203:10,17
207:9 209:13
216:23,24
**sidebar** 17:4,7
18:16,21 29:1,3
31:1 32:17 103:16
103:24 104:1
**sign** 49:5 157:12
158:1
**signature** 49:4
247:13
**signed** 49:3
**significant** 230:1
**signs** 102:1
**simply** 10:11
**simultaneous**
105:24
**single** 73:11 74:17
74:18,21
**sir** 27:23 39:11
41:17,23 47:6,23
48:24 49:7 50:10
50:17 59:11 61:19
64:13 66:16 67:14
68:7,24 71:21,25

78:16 79:17 85:8
86:14 87:5 163:7
163:11 213:16
**siren** 191:6
**sirens** 146:15,17
163:9 191:7
**sister** 148:17,19
**sit** 7:5 93:11,14
121:13 165:19
**site** 237:19
**sitting** 30:10 50:13
**situation** 97:19
119:11 124:24
**situations** 234:1
**six** 6:5,15 38:6
49:19 138:11
**size** 130:2
**skips** 8:2
**slider** 55:20
**slim** 60:15
**slow** 102:20
106:19 107:16
**slower** 56:7
**small** 53:6,7 227:4
**smaller** 133:15
211:25
**smith** 1:4 6:22
27:10 65:10 84:25
120:21 126:18
129:12 132:6
199:1 201:1
208:20 216:6,6,23
217:5,7,9,25
218:23 220:23
221:8 223:12
225:3 234:3 236:1
236:21 238:17,19
238:21 239:6
241:2,2,11,18,23
242:24 243:2,12
244:7

**smith's** 146:9
210:13 232:18
238:21 239:1
240:8 241:4,5,24
**smoke** 214:24
215:2
**snacks** 35:16
**snapshot** 138:9
**socks** 60:15
214:10
**soda** 56:18 60:25
70:5 71:20 167:23
168:18,20
**sodas** 91:10
**soft** 165:10
**solely** 226:12
**solid** 31:7
**solve** 153:22,25
**solved** 46:10
**solves** 30:22
**somebody** 43:5,14
102:17 106:16
107:17,18 200:7
200:20 223:25
224:1 240:8
**someday** 44:7
**soon** 73:25 109:7
**sooner** 231:2
**sorry** 20:12,25
27:17 32:13 36:6
36:9,14 41:20
43:9 44:25 50:22
52:14 65:6 66:14
66:20 67:3 68:1
68:11 70:22 71:1
71:2,25 72:10
73:22 86:24 89:19
89:21 91:23 93:5
117:14 121:2,3,22
131:6 132:15,20
137:13 144:4

148:19,19 153:2
153:13 155:1,7
156:17,20 161:23
163:5 164:14
171:15 176:10
177:3 211:16
213:14,14 233:22
235:2 240:24
243:12
**sort** 21:14 56:2
78:1 157:12
230:23
**sorts** 86:7,9
**sound** 2:6
**sounds** 6:3
**southwood** 1:25
**space** 58:15
**span** 141:20
**spanish** 5:19 43:18
44:1,3 48:5 70:2
78:19 100:8
148:15 161:16,19
166:7 172:22
179:24,25 192:21
199:18,24
**speak** 44:4,6 69:19
69:22,24 71:17
73:13,16 78:19
99:7 100:12,15
112:15 148:22
149:1,2,3 161:14
161:15 165:12
166:6 172:19,23
180:1 199:9,13
213:21 220:16
**speaker** 5:13
132:14 136:19,21
165:3 220:24
231:16,19,21
232:13

**speakerphone**
42:23 43:12,13
45:23
**speaking** 5:19
43:18,25 44:1,1
48:5 57:12 70:2,2
71:3 72:13 78:9
78:16,18 100:7
107:1 113:17
152:2 164:17
166:5 169:2 170:8
170:19 179:24
188:24 202:2
236:22 243:5
**speaks** 44:2 148:9
148:11,15
**specific** 75:23
96:22 119:8 126:2
233:20,25
**specifically** 14:23
92:3 139:16 201:4
224:18
**speculate** 242:11
**speech** 202:7
**speedy** 228:13,15
228:15
**spell** 87:23 166:20
**spend** 24:23 57:13
158:25
**spent** 81:5 85:9
229:23
**spill** 232:10
**spitting** 125:17
**split** 150:22
**spoke** 99:7
**spoken** 43:17
165:10 241:10
**spread** 40:3
**squares** 37:23
**st** 1:14,18

**stacking** 167:23
**stand** 5:14 28:24
  38:4 51:22 52:20
  52:23 53:1 79:7
  93:14 118:14
  121:6,13 212:2,2
**standard** 15:9
**standing** 114:5
  170:4,15 175:18
  175:21 176:9
  179:15 194:15
  219:2,6,17,22,23
**start** 4:22 5:10
  63:7 65:22 89:2
  101:1 144:13
  199:20 211:6
  226:3 234:14
  237:4 239:9
  245:24 246:6
**started** 35:5 39:23
  75:25 204:4
  208:15 225:5
**starting** 20:8
  21:22 28:21 35:2
  64:16 70:23 71:1
  72:15 77:22 168:6
  234:19
**starts** 56:21
**state** 8:6 9:4 79:13
  87:16 88:3 164:24
  219:23
**statement** 49:3
  62:3 74:19 135:17
  154:24
**statements** 76:21
  149:14
**states** 1:1,2,7
**station** 47:23
**status** 17:11
  118:13,18

**stay** 74:16 85:19
  171:14 183:24,25
  211:20
**stayed** 31:18 60:14
**stays** 57:17
**steady** 33:25
**steaks** 89:14
**step** 19:22 28:7
  32:23 33:1 52:20
  52:24 74:9 78:25
  80:14 101:3
  117:12,14 121:8
  164:7 177:21
  198:7
**stepped** 54:23
  60:13 114:12
**stevens** 1:4 29:12
  55:1,1,14 56:5,12
  56:12,13,21 57:9
  57:17 78:2,8,16,19
  81:8,10 83:15,24
  84:20 85:23 86:16
  110:19,20 113:16
  124:9 125:21
  126:19 143:14,16
  145:12 146:2,17
  147:11 149:6
  162:5,12,14 177:8
  209:17 223:12
  225:3
**sticks** 141:9
**stills** 51:23 136:4
**stipulate** 104:25
  238:24
**stipulated** 30:13
**stipulation** 243:4
  243:7 244:6
**stocking** 168:18
**stood** 217:16
**stop** 24:22 107:1
  130:12 144:19

169:10 175:24
  187:22 199:22
  204:17 221:15
  235:8
**stopped** 66:7
  125:15 171:5
  189:12
**stopping** 170:3
  173:5,12 175:5
  180:10 181:11,25
  186:5 187:6 188:4
  188:14,23 189:10
  189:23 190:12,24
  191:17 193:5,19
  197:2,14
**store** 15:6 20:4
  24:19,20 25:21
  26:11 30:14 31:11
  31:14,18,22 33:21
  34:2,5,11,21 35:2
  35:2,9,13,18,21
  36:12,12 38:1,2,11
  40:24 41:5 42:18
  43:4,22,25 44:2,22
  45:25 46:1,9,20
  53:19 54:16,16
  55:11 56:11 57:13
  57:16,19 58:10
  60:15,23 70:1
  82:23 83:2,12,13
  84:5,9 88:14,15,16
  88:22 89:6,7,11,23
  90:12,12,20,23
  91:8,14,22,24
  92:12,17,21 95:25
  96:9,13,19,23 97:6
  97:7,8 98:24 99:3
  100:14 101:2,8,16
  104:9 107:2,5,5,6
  107:7 109:5,20
  110:3,6,23 111:24

112:9,20,24
  113:17 114:13
  116:10 122:21
  123:12,22 126:6
  128:14,21,24
  129:2,5,9,12,19
  130:20 133:18,23
  134:1,9,13 139:6,9
  139:14,17,18
  140:1,15,18 142:3
  142:12 143:22
  144:21 145:1,5,6,8
  146:1,6,9,20,25
  148:12 150:10,14
  150:19,23 151:8
  152:18 153:9
  154:8 155:13
  156:1,2 157:15,20
  157:21,25 159:18
  159:21,22 160:16
  161:1,2,8,11 162:7
  162:10,18 163:6,9
  163:10 166:12,13
  166:15 167:5,5,13
  167:17 168:15,22
  173:13,14 175:16
  175:19 177:6
  179:3,12,18
  180:15,18 181:15
  182:16,21 183:1
  185:13 190:4,16
  190:25 191:5
  192:2,5 193:6
  195:11 196:13
  197:16,21 200:4,8
  200:12,19,20,21
  200:22 201:1
  202:5,24 203:1,10
  203:11,15 204:9
  204:11 205:2
  206:13,19 208:1,5

208:7,20 209:5,8
209:16,17,17
210:23 211:10
212:13 214:8,19
215:4,5,12 218:8,8
218:12,25 220:12
222:18,21 223:1,3
224:2,12 225:12
225:15 235:25
237:23
**store's** 46:7
**stored** 8:22
**stores** 88:13,17,19
**straighten** 151:23
**straightened**
145:9
**streaming** 212:7
**street** 1:10,22 2:9
15:3 16:7,10 20:4
20:9 22:19 25:21
26:11 81:12 82:5
82:23,25 83:20,20
84:14 85:18,22
88:24 90:20
106:17 107:8
109:20,25 112:20
123:8 147:8
157:16 161:1
166:21,24 224:3
224:16
**streets** 82:6
**strike** 151:24
**students** 86:11
**stuff** 50:15 89:16
124:17 172:23
215:16 218:11
221:23
**stuffed** 215:16
**subject** 94:6 245:4
**subpoena** 12:5

**subsequent** 16:11
16:14 19:11
**substantive** 29:15
**substitute** 6:15,23
**substituting** 6:25
7:20
**sufficient** 238:8,15
**suggest** 52:10,12
**suggested** 120:7
**suit** 56:13,13 78:1
111:21 186:15
187:10 192:5
**suite** 1:10,14,18,21
2:9
**suits** 73:16
**summarized** 240:1
**supposed** 168:17
**sure** 9:4 13:14
16:9 17:16 20:17
20:22 21:20 23:8
26:24 31:7 39:21
43:6,19,24 51:5
64:4,5 71:13,13
72:12,13 89:5
91:2 113:3 117:5
142:8,12 156:7
163:13 165:12
173:6 180:24
184:10 220:24
223:11 226:16
228:10 231:6
235:1 239:17
242:14
**surprise** 234:16
**surveillance** 84:13
101:4
**swear** 206:2
**sweat** 56:13,13
78:1 111:21
186:15

**swipes** 10:14
**switch** 149:21
156:11 183:3
**switched** 182:14
186:6
**swore** 70:16
**sworn** 8:4 79:10
87:14 164:12,22
**sylvania** 35:25
**system** 8:22 13:20
23:20 100:23,24
101:4 139:1
223:19

**t**

**t** 3:17 45:19 79:15
239:10 247:1,1
**table** 226:23
**take** 5:11 19:22
28:20 39:3 41:12
41:16 42:5,6
43:15,23 44:18
46:19 48:10,13,17
49:7 52:12 54:24
54:25 57:18 58:5
59:23 60:15 68:24
78:11,11,13 80:14
86:5 109:22 117:5
120:14 123:11
128:14 133:6
141:2,6,18 144:11
154:7,13 157:14
174:21 177:21
179:15 186:20,21
186:22,24 197:25
198:1 208:23
216:8,11,13 217:9
217:12,22,23
218:20 230:18
232:7 234:12
237:6 239:13

**taken** 137:8,11
138:9,9 139:24
205:16 218:4,11
**takes** 208:21
**talk** 6:20 19:22
36:15 56:21 68:12
97:20 100:3,13
112:12,13 113:3,4
113:6 116:25,25
118:9 125:16
151:21,25 154:12
154:16 226:5,5
**talked** 20:2 21:10
43:6,10 56:25
57:4 161:7
**talking** 7:19 19:3
29:23,24,24 43:13
43:20 55:13 56:4
56:23 71:6 75:1
78:8,10,12 107:15
113:18 118:21
119:13 124:11
130:18 137:3
145:12,17 146:2,4
151:15 170:9
176:20,21 177:4
178:19,25 179:2
180:23,24 187:9
187:11 188:6
192:19 197:6
199:21 200:4
210:13 233:14
235:19 237:23
240:4
**tall** 108:15,18,21
108:22,22 218:23
220:22 221:23
**tape** 106:8 236:17
**target** 30:5
**tastykake** 38:4

**technical**   130:11
**technique**   245:7
**techniques**   245:1
**telephone**   142:24
238:6 239:18
240:14 245:13
246:3
**television**   226:8
**tell**   6:18 16:7 20:2
30:25 39:3 46:11
47:11 49:15 54:5
64:2,3,3,24 66:1
70:16 71:5,9,11
72:10,11 73:10
83:4 99:8 100:1,1
102:1 104:14
105:18 116:15
124:12 130:11
132:17 141:3
147:17 152:19
154:14 170:14
175:24 195:4
199:24 206:2,4,7
213:4 220:17
235:22 239:15
**telling**   18:12 40:19
40:21,23 42:13
46:5,8 56:22 57:1
64:4 71:12 72:11
78:15 102:2
113:19 124:12
125:9,16 152:17
159:11 170:16
172:5,7 174:17
176:22 177:2
178:1,25 179:22
182:10 183:24
186:20,20 188:7
189:1,13 190:2
192:17 196:15
230:17

**tells**   39:24 59:4
97:19
**temperament**   40:2
**temptation**   226:5
**ten**   29:15 38:14
90:24 91:1 174:12
198:1 201:11
202:20 245:23
**tens**   60:6
**tension**   235:15
**terminology**
130:15
**terms**   13:12 15:15
84:11 148:11
240:6
**test**   31:25
**testified**   31:22
32:22 61:19 70:9
118:24 129:1
152:23 201:3
202:6 205:9
218:21 221:22
**testifies**   246:3
**testify**   31:15
104:12,22
**testifying**   32:3
63:4 70:12 166:8
205:23 206:11
230:8,10 233:20
**testimony**   28:6
29:11,22 30:8,12
30:14 61:11 62:10
62:23,25 64:13,19
66:16 70:4,8,16,23
74:2 76:10,11,12
76:13,21 87:3
98:15 105:6 110:9
122:3 137:15
164:5,17 201:14
203:19 206:13,16
220:13 227:11

229:2 231:11
**thank**   5:22 7:18,24
11:21,22,25 12:19
18:4 22:22,25
23:13 27:4,7 28:3
28:6,7,8,12,13
32:11 33:4,9
36:17 37:13,22
42:11 53:24 61:4
61:14 63:5 66:10
66:18 67:10 68:22
69:3 73:2 78:23
79:1,12 82:20
84:21 86:18,23
87:4 93:25 95:10
103:18 106:9
109:9 111:13
116:21 117:16,21
118:10 120:18
121:5,10,14,21
122:4,9 126:12
127:8 128:4,7
143:6,8 149:18,20
157:9 160:9,10
162:20,23 163:16
164:1,3,4,5,8
165:5 198:18
221:15 222:9
225:18 226:24
229:7 230:25
232:22 234:24
245:18,22 246:12
**theory**   243:22
244:4
**thereof**   247:7
**thin**   108:15
**thing**   34:25 39:23
49:17 50:13 70:25
91:9 94:11 135:1
135:6 136:23
139:15,20 141:9

174:3 208:4
**things**   24:19 35:23
41:14 43:1 45:12
57:2,25 91:12
106:2 145:9,20
149:11 158:25
199:16 227:14
245:14
**think**   5:15 6:12,17
7:4 23:22 25:12
25:14 26:20 27:7
28:25 32:9,15
52:16 63:11 67:6
69:25 74:16 76:12
76:19 105:16,25
106:1,3 120:8
132:7 135:13
137:11,15,17,22
144:19 150:7
151:4 154:19
159:4,12 162:15
162:15,18 185:10
185:12 195:16
200:11 214:4
216:3 218:15
225:14,22,23
229:3,4,19,24
230:16 231:4
232:3,11 234:14
237:7,8,21 242:2
242:13,18 243:6
244:2,10,13 246:7
**thinking**   229:5
233:11
**thinks**   62:10
**third**   110:25 111:6
114:13 155:3
**thomas**   2:5 247:14
**thought**   6:14 31:5
51:4 120:7 158:11
181:17 211:10

227:18 228:17,22
**thoughts**   234:3
**threaten**   107:13
**threatened**   125:18
125:20 126:3
162:17
**threats**   31:16
149:15
**three**   1:6 15:1 21:9
59:24 62:18 66:2
95:20 96:24 112:4
126:22 132:5
138:10 143:4
148:14 167:14,15
176:5 200:12,13
200:14,22,25
201:7 202:5,24
203:2 213:3,6
214:4 222:12,12
222:19 223:2
224:5,18
**threw**   40:5 41:8
**throwing**   41:14
**thumb**   141:8
142:19 172:14
**ticket**   214:21
**tie**   240:21
**time**   10:7,17 12:7
13:16,17 14:12,13
14:16 15:9,23
16:8,10 26:7,10,21
30:7 34:6,6 45:20
45:23,24 46:2,4,13
47:6,10,11 50:7
57:13 58:2,2,13,14
58:22,25 59:4
63:22 67:11,16
68:3 76:1,19,25
81:5 84:6 86:1
87:7 88:20 91:16
96:18 102:6

103:15 109:17
111:3,5,9,14
114:10 116:15,18
117:19 120:16
122:23 123:24
124:10 125:18
126:6 128:20
138:22 141:18,20
142:13 145:12
146:1,7,12 147:19
150:19,22,22
154:4 159:11
163:5,8 167:18
183:14,15 191:7
192:4 193:10,11
200:18 201:8
202:12,22 203:18
205:15 211:20
220:8,19,21
225:24 230:18,22
231:24 233:12
237:18 238:14
239:21 240:15
243:13
**timeframe**   88:19
**times**   13:16 18:19
20:3 38:11 45:7
99:1 150:16,16
219:21 223:13
243:15
**tiny**   133:7 141:9
141:21
**tip**   210:4
**title**   8:24 21:19
**tobacco**   90:13
91:9
**today**   46:5 48:7
57:14 69:17 73:10
88:23 93:12 110:9
118:15 135:21
151:4 163:24

165:20 201:14
**today's**   230:9
**told**   5:9,15 39:8,12
39:13 48:10 49:5
49:6 50:16 57:20
60:3 97:25 98:1,2
99:9,11,19,25
104:10 119:9
126:4 145:14,17
147:18,19 151:4
151:12 152:23
159:12 162:14,17
172:10,21 179:14
189:14 192:19,22
197:17 208:14
226:11 232:10
236:14,23,24
245:14
**tomorrow**   37:10
73:11 226:3,15
227:1,11,13 229:5
230:11 231:11
233:13,16,17
234:5,10,12,19
235:11,13 239:11
239:14 245:24
246:13
**tone**   67:16,17,20
106:2 170:19
172:9 178:22
180:20 181:1
196:2,17
**tongue**   229:14
**tonight**   233:5
235:11 246:9
**top**   14:1 39:5
55:24 93:15 133:5
142:11 161:1,2,10
183:14
**total**   11:2 16:15
26:18 134:8

242:19
**totally**   202:2
218:22
**touch**   63:9,25
**touching**   174:20
**town**   231:23
**track**   75:1 76:3
**transact**   215:19
**transacting**
225:12
**transaction**   9:25
10:11,17 13:14,15
13:18 15:2,8,22
16:5,6,8,9 19:14
21:9 22:18,20
97:8,13 140:18
159:5 206:17,25
**transactions**   14:24
20:1 159:8
**transcribed**   247:4
**transcriber**   2:5
**transcript**   1:6 2:7
70:18 76:16,17
206:11
**transcription**   2:7
**transpired**   41:16
118:11
**transport**   239:3
**transporting**
239:4
**trial**   1:6 18:19
31:3,6 74:11
117:3 202:16
228:13,15,15
229:6 232:4
235:16
**tried**   48:10,13
49:7 58:5 99:7
153:11 187:13
241:23

**tries** 116:25
**trigger** 205:12
**triggers** 37:7
**trouble** 47:8
**true** 30:1 71:15
   221:16 241:23
**trust** 26:19,20
**truth** 70:16 206:2
   206:3,3,4,7
**try** 18:22 48:20
   74:1 97:23 100:3
   124:24 179:12,15
   180:14 197:7
   229:25 232:7
   245:25 246:1
**trying** 40:23 41:10
   41:11 42:16 43:23
   46:10,14 47:3,17
   59:8 102:1,3
   112:12 113:19
   124:16,20 145:21
   145:23 147:20
   179:10,18 182:5,6
   203:25 204:9,11
   229:23 235:16
   238:12 240:21
   241:6 243:21
**tuesday** 227:17
   234:13
**turn** 13:9 29:6,9
   52:13,19,21 134:2
**turned** 52:19
**tv** 4:1 35:14,24
   36:8 52:4,12
   66:21 122:17
   133:1,8 138:1
   212:4,10,18
   222:13
**twelve** 44:7
**twenties** 60:6

**twenty** 46:22
   198:1
**twice** 17:23
**two** 5:16 19:12
   22:1,3,5,7,9,11,13
   22:15 26:17 27:12
   27:15 38:19 41:14
   59:24 64:23 65:25
   74:17 85:22 88:21
   105:17 110:13
   118:2,2 124:13,13
   124:14,14,15
   127:16 138:10
   155:18 158:20,20
   176:5 184:18
   186:14 206:12,18
   243:12 244:3
**tying** 240:17
**type** 9:22 88:11
   89:16 93:6,9
   140:17 239:23
   244:17
**types** 89:13 91:4
**typically** 24:3

**u**

**u** 88:2
**u.s.** 1:9,13
**uber** 19:12
**understand** 5:17
   6:8 29:5 45:13
   57:8,10,25 63:12
   64:11 65:16,18
   68:4 72:12 75:12
   99:22 104:6 118:8
   136:11 148:23
   154:20 155:13
   156:20 164:16
   165:15 184:11
   192:19,21 195:14
   199:13,17,21,23
   199:25 202:3,9

219:19 220:16
221:24 230:7
231:14 232:16
238:12 241:25
242:1 244:25
245:5,10
**understandable**
   94:21
**understanding**
   67:21 68:2 111:25
   152:5,21 202:8,12
**understands**
   148:24
**understood** 34:8
   34:20 39:24 64:4
   71:12 147:11
   151:18 231:3
**unidentified** 5:13
   132:14 136:19,21
   165:3 220:24
   231:16,19,21
   232:13
**uniform** 81:6
**united** 1:1,2,7
**unnecessary** 29:20
   237:7
**unrelated** 134:8
   134:12
**upper** 53:23 83:8
**upright** 219:23
**upsal** 82:5
**upset** 109:17
   159:11 206:18
**usb** 141:5,8,16
**usdoj.gov** 1:12,16
**use** 24:19,20 34:2
   34:8 38:19,22
   52:4 66:3,3 71:14
   71:14 72:3 74:12
   74:21,23 129:25
   158:21,24 212:23

231:7 232:11
241:25
**user** 14:15
**ushers** 208:21

**v**

**valued** 8:22
**vantage** 139:4,18
   215:18
**various** 9:17,24
   25:23
**vast** 244:19
**vehicle** 110:1
**vendor** 13:13 14:2
   14:7 21:15
**ventura** 3:5 32:21
   33:2,5,15 42:13
   52:2,14,22,24 53:8
   53:13 54:9 55:25
   56:9 58:9 74:10
   77:23 78:25
   118:21 119:22
   151:8,13,17,24
   153:14 159:15
   160:6 229:23
**ventura's** 29:22
   30:8 36:21
**verbal** 152:11
   213:19
**verbally** 158:22
   183:11
**verdict** 231:13
**veritext** 2:8
**video** 15:5 29:13
   29:16 31:17 40:9
   47:7,7,10 48:18
   49:7 50:3 51:7,11
   51:14 55:25 75:5
   75:18,21 84:13,17
   101:5 111:11,18
   112:6 113:9,12,22
   114:5,25 115:6

124:2 125:5
129:20,24 130:15
130:17,22 131:8
131:11,12 132:20
132:23 133:3,7
134:17,19 135:7,7
137:20 139:11
140:24 141:2,7
142:2 144:17
145:11 168:1,9
169:4,8,14,21,25
170:3,8,25 171:2,5
171:20,22 172:1
173:2,5,21 174:9
175:15,17 177:18
178:3,14,16,23
179:7,11 180:5,7
180:10,17 181:6,8
181:11,20,22,25
182:14 183:11,20
185:15,18,25
186:2,5 187:1,3,6
187:17,19,22
188:1,4,9,11,14,18
188:20,23 189:5,7
189:12,18,20,23
190:9,12,19,21,24
191:12,14,17
192:7,9 193:2,5,14
193:16,19 194:3,5
194:11,14,19,21
195:21,23 196:1,3
196:7,9,12,24
197:9,11,14
202:16,23 203:3,8
203:14 204:3,7,8
204:24 205:8
207:6,7,7 208:13
209:15,20 211:25
212:4,9 217:13
218:13 221:12

222:2 223:19
224:10 225:3
239:2
**videos** 48:21 75:17
134:24 139:25
**view** 228:24 232:8
**viewing** 101:20
**violates** 75:15
**vis** 7:10,10
**visa** 24:20 120:2
**visible** 81:5
**vision** 211:7
**voice** 106:2 109:15
170:18 172:9
236:20 238:9,11
241:7 244:20
245:7
**voices** 169:2
**voir** 229:6
**volume** 180:21
181:1 196:2
**voluminous**
241:13
**vs** 1:3

## w

**w** 1:21
**wachovia** 24:7
**waist** 184:1
**wait** 62:5 65:5
70:20 99:10
100:21
**waiting** 116:4
191:22
**waiving** 204:18
**wal** 130:25
**walk** 111:24
112:10,11 113:1
123:12 148:6
212:12
**walked** 110:5
112:9,10,10,15,20

112:23 123:1
207:23
**walking** 112:19
116:2,5,10 147:8
197:16 237:18
**walks** 146:24
147:2 207:23
**walnut** 1:18,22
**want** 6:17 27:15
29:10 30:7 31:8
44:18 45:17 48:15
57:15 61:24 62:21
71:14 72:3 76:1
89:5 91:21 98:3
99:13,25 100:5
102:20 106:19
113:4 118:9
119:10 120:3
122:15 126:7
133:22 141:1,2,18
154:16 158:21
159:12,13,14
170:17,17,21
172:6,11,12,16
174:3,4 192:17,20
192:23,24 199:22
199:23 225:25
226:1 227:23
228:2 231:21
233:13,14,15
235:9 239:17
241:8 245:2,6
246:5
**wanted** 39:21 41:3
41:4 59:9,10,11
74:1 113:3 120:17
143:2,2 145:8
235:7 242:14
**wanting** 204:19
**wants** 38:15 235:5

**warn** 29:6
**watch** 56:7 78:7
141:13 178:2,12
226:8 233:13
**watched** 78:4
104:9
**watching** 105:20
114:25 170:9,24
171:11,13,14,16
171:17 183:10
**way** 9:12 17:24
31:12 35:18,21
37:7 50:15 51:10
52:18,19 53:21
62:22 66:3,3 75:1
75:22 100:4,20
108:5 116:4 120:8
135:9 140:2,2
142:14 147:2
156:19 159:22
197:8 205:5 227:2
227:2 228:25
**we've** 20:1 29:23
43:24 58:16
139:11 211:21
228:23 230:8
**weapon** 48:17
49:11 108:3,6
205:16 207:19
**weapons** 107:24
108:1,9
**wearing** 66:4
108:24 124:6
**weaver** 2:3 164:12
**web** 9:25
**webster** 239:2
**webster's** 241:15
**week** 91:14 228:25
229:2 235:16,17
**weeks** 22:1,3,5,7,9
22:11,13 154:5

200:12
**weigh**   238:7
**weight**   105:9
238:7 241:25
242:3
**welcome**   109:10
225:19
**wells**   9:12
**went**   5:6 25:15
38:16,18 47:23
55:9 58:1,2,4,5,6
58:12,23 60:8,11
60:13 87:9 100:23
101:2 107:12,21
112:1,19 116:8
122:12,20 123:20
163:8,9 171:6,9
179:15 180:13
182:23 189:3
197:18 211:15
224:14
**west**   19:10
**where'd**   112:18
**white**   56:13 78:1
108:9 199:2
**wholesale**   90:4
**why'd**   113:1
**wife**   146:9 203:6,9
203:16 204:10,18
204:18 208:1,5,9
208:21 209:4,8,16
209:16 210:23
239:1 241:15
**wilson's**   26:2
**wind**   200:24
**window**   55:5
92:24 93:1
**wings**   89:14
**wires**   131:1
**wish**   6:14 18:19
75:19 245:2

**withdrawal**   14:2
15:11,21 16:12,15
16:18,20 19:10
20:8,14,19,23 21:2
21:4,6,8 26:1
62:13
**withdrawals**   15:1
19:6 20:3 25:22
**withdrawn**   15:25
65:20
**witness**   3:2,5,8,10
3:14 5:16 7:15,20
8:8,10 11:15,19,22
11:25 18:6 27:14
28:8,9,13,17,22
29:8,15,21 30:25
31:21 32:21 51:14
51:22 52:19,20,25
53:1,9 61:8,8
62:23 63:1 69:5
73:7,21 74:1,3,19
75:1 76:21,22
78:25 79:5,14,18
81:20 84:21 87:4
87:9,18 89:3,21
93:14 94:1 98:11
101:17 104:8,18
110:19 113:24
117:12 118:11,13
118:13,14 119:3
119:13 120:10,10
126:14 136:8
137:12 144:6
152:13,15 164:6,8
164:16 165:1
172:13 197:24
203:22 204:22
213:20,22,25
219:22 226:24
227:6,8 240:4
246:2,6 247:11

**witnesses**   29:5
120:14 227:4,5
228:2,22,24
229:10,17 230:5
**wittels**   1:17,17 3:4
3:9,11,13 6:24
12:12 27:11,12,15
27:21 30:12 31:6
31:20,21 32:2,12
32:13 69:14 77:2
77:3,4 82:10 85:1
85:2,6 103:6
117:22,23 120:23
120:24 143:7,8,12
143:13 144:3,8,10
144:14,19,20
149:4,5 162:24,25
163:4 225:20,22
229:8,9,16,21
230:4 245:19,21
**woman**   110:12
195:12 204:16,17
**word**   48:7,8 49:16
57:8 71:9,10
74:10 148:3
161:18 164:16
**words**   24:1 51:8
70:6 83:21 99:19
101:16 147:22
148:23 172:21
232:5 241:17
**work**   24:2 35:2
66:22 88:12 95:17
141:3 166:12
**worked**   200:18,20
200:25 213:3,6
222:19
**worker**   44:2 200:5
**working**   51:17
69:25 90:14,25
95:19 96:2 147:14

166:17,19,23
167:13,17 200:11
223:22 227:6
**worms**   244:11
**worry**   154:15
**worse**   174:15
175:4
**worst**   229:2
**would've**   16:12
26:4 49:12 129:15
142:2
**write**   230:13
**written**   226:10
232:17 234:18
**wrong**   53:6 96:16

**x**

**x**   3:1,17

**y**

**y'all**   160:4
**yeah**   17:18 26:6
30:11 34:1 39:15
55:3 59:13 67:3
70:4 82:19 92:24
95:23 111:7 114:9
115:13 124:18
125:22 128:24
134:15 135:8
136:14 137:2
140:1 141:10,14
142:7 147:3
148:24 149:1
151:6 152:19
153:5,19 159:19
165:23 166:4
167:16,19 169:17
170:15,21 171:13
171:17,17 172:16
172:23 173:8,15
174:7,25 175:4,9
177:11 178:1,13

**[yeah - à]**                                                      Page 44

| | à |
|---|---|
| 179:15,23,23 | à   7:10 |
| 183:24 184:3,3,5 | |
| 185:5,5 187:16 | |
| 188:7 189:1,13 | |
| 190:14 191:3,8,11 | |
| 192:1,16,22 194:2 | |
| 194:2,17,25 195:6 | |
| 195:20 196:4,4,6 | |
| 196:15,21,21 | |
| 197:5,8 200:17 | |
| 203:12 210:17 | |
| 211:9,18 214:9,17 | |
| 215:6 216:16,25 | |
| 218:3,3 219:8 | |
| 220:24 222:4,22 | |
| 224:16,23 225:17 | |
| 229:21 | |

**year**   151:7 157:24
**years**   31:7 70:1
   80:12 81:11 85:10
   86:2 88:6 90:24
   91:1 95:20 96:24
   128:21,25 129:9
   148:16 165:22
**yelling**   45:14,18
   47:16 196:5,6
**yep**   132:25
**yesterday**   29:6
   32:22 33:19 44:5
   47:14 50:17,22
   51:1,4 54:11
   57:20 60:3 69:10
   70:14 78:15
**york**   90:6
**youthful**   153:12

| z |
|---|

**z**   87:25 88:2
**zones**   80:17
**zooming**   224:8,11
   224:20