Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3    UNITED STATES OF AMERICA  )  2:19-cr-00350-JD-1
             Plaintiff,         )  2:19-cr-00350-JD-2
 4       vs.                    )  2:19-cr-00350-JD-3
                                )  Philadelphia, PA
 5    DONNIE SMITH, ABID        )
      STEVENS AND MAURICE QUINN )  January 30, 2020
 6          Defendant.          )  9:36 a.m.-7:01 p.m.
 7              JURY TRIAL - DAY FOUR
             BEFORE THE HONORABLE JAN E. DUBOIS,
 8              UNITED STATES DISTRICT JUDGE
 9     APPEARANCES:
10    For the Government:       ROBERT E. ECKERT, ESQ.
                                ASHLEY MARTIN, ESQ.
11                              U.S. ATTORNEY'S OFFICE
                                615 Chestnut Street
12                              Suite 1250
                                Philadelphia, PA  19106
13
      For Defendant Smith:      ROBERT C. PATTERSON, ESQ.
14                              R.C. PATTERSON LAW OFFICES
                                3513 Southwood Drive
15                              Easton, PA  18045
16    For Defendant Stevens:    BARNABY C. WITTELS, ESQ.
                                LACHEEN DIXON WITTELS &
17                              GREENBERG LLP
                                1429 Walnut Street
18                              Suite 1301
                                Philadelphia, PA  19102
19
20
21
22
23        Veritext National Court Reporting Company
                    Mid-Atlantic Region
24         1801 Market Street – Suite 1800
                  Philadelphia, PA 19103
25                   1-888-777-6690
```

Page 2

1   For Defendant Quinn:        MARANNA J. MEEHAN, ESQ.
                                DEFENDER ASSOCIATION OF
2                               PHILADELPHIA
                                Suite 540 W.
3                               The Curtis Center
                                601 Walnut Street
4                               Philadelphia, PA  19106

5

6   ESR Operator:              MICHAEL COSGROVE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23           Veritext National Court Reporting Company
                        Mid-Atlantic Region
24              1801 Market Street - Suite 1800
                    Philadelphia, PA 19103
25                       1-888-777-6690

```
 1                      I N D E X
 2     WITNESSES                DIRECT   CROSS   REDIRECT   RECROSS
 3     Emmanuel Sanchez
          By Mr. Wittels               13
 4        By Ms. Martin                                24
          By Mr. Patterson                                         28
 5        By Mr. Wittels                                           29
 6     Ofc. David Ferreira
          By Ms. Martin         32
 7        By Mr. Patterson               57
          By Mr. Wittels                 61
 8
       Ofc. Raheem Williams
 9        By Ms. Martin         65
          By Mr. Patterson               70
10
       Det. William O'Brien
11        By Ms. Martin         75
          By Mr. Wittels                 87
12        By Mr. Patterson               89
          By Ms. Meehan                  99
13
       Joseph Sierra
14        By Ms. Martin        133
          By Ms. Meehan                 195
15        By Mr. Patterson              198
16     Det. Taulant Xhelo
          By Mr. Eckert        208
17        By Mr. Wittels                218
18     Ofc. Alexander Wilson
          By Ms. Martin        220
19        By Mr. Patterson              226
20     Det. Michael Cannon
          By Mr. Eckert        231
21        By Mr. Patterson              242
          By Mr. Eckert                             250
22
       Ofc. Raymond Andrejzak
23        By Ms. Martin        253
          By Mr. Patterson              264
24        By Mr. Wittels                268
25
```

```
                                                     Page 4
1                        I N D E X
2    WITNESSES              DIRECT  CROSS  REDIRECT  RECROSS
3    Ofc. Abigail Fernandez
        By Mr. Eckert       271
4

     SA Shawn Reznik
5       By Mr. Eckert       275
6    SA Michael Orchulli
        By Mr. Eckert       281
7       By Mr. Patterson            284
        By Mr. Wittels             288
8
9
10
11                       E X H I B I T S
12   NO.                                          PAGE
13   Government's 26-A through 26-D (photos)        49
14   Government's 2-B (video footage)              53
15   Government's 2-C (video footage)              55
16   Government's 50 (marriage license)           131
17   Government's 46, 47-A & 47-B (phone records) 149
18   Government's 3-B (map)                        212
19   Government's 27-A through 27-E (photos)       235
20   Government's 29 (handgun)                     238
21   Government's 31 (baseball hat)               241
22   Government's 36 (firearm examiner's report)  263
23
24
25
```

1                    P R O C E E D I N G S

2                    THE COURT:  Good morning, everyone.

3                    MR. ECKERT:  Good morning.

4                    MR. PATTERSON:  Good morning, Your

5      Honor.

6                    MR. WITTELS:  Good morning.

7                    MS. MEEHAN:  Good morning.

8                    THE COURT:  Be seated, please.

9          (Pause)

10                   THE COURT:  Is the Government ready to

11     proceed, Ms. Martin?

12                   MS. MARTIN:  Your Honor, I believe Mr.

13     Sanchez is on cross.  He's here.

14                   THE COURT:  Yes.  You're absolutely

15     right.

16                   Are we ready to proceed on the issue,

17     not immediately, on the issue that we addressed

18     yesterday with regard to Exhibit 5b, the 911 call?

19                   MS. MARTIN:  Would you like additional

20     argument on that, Your Honor?

21                   THE COURT:  No.  I think we'll hear the

22     evidence and then have brief, operative word, brief

23     argument.

24                   MS. MARTIN:  Okay.  I think that there

25     might be an additional, an additional objection by Ms.

Page 6

1  Meehan to the cell phone records custodian, which is

2  the evidence that you wanted to hear first before you

3  decided whether or not the 911 call would come in.

4            THE COURT:  Well, I want to hear all

5  the evidence that you consider to be foundational, and

6  then I'll hear brief argument, including whatever Ms.

7  Meehan has to say.

8            MS. MEEHAN:  Thank you, Your Honor.

9            MS. MARTIN:  Okay.  Your Honor, you're

10  saying right now you would like me to summarize all of

11  it?

12            THE COURT:  No.  I don't want you to do

13  anything except tell me that you're ready to go and is

14  your witness in the --

15            MR. ECKERT:  Yes, Your Honor.  I'll ask

16  him to step in, if I may.

17            THE COURT:  Fine.

18            MR. ECKERT:  Thank you.

19            MS. MARTIN:  Your Honor,  I think that

20  Ms. Meehan has an objection to that testimony coming

21  in at all --

22            MS. MEEHAN:  Uh-huh.

23            MS. MARTIN:  -- with --

24            THE COURT:  Which --

25            MS. MARTIN:  -- regard to --

```
 1                    THE COURT:  Now wait a minute.  Not the
 2      testimony of the witness --
 3                    MS. MEEHAN:  No, not the testimony --
 4                    THE COURT:  -- on the stand.
 5                    MS. MEEHAN:  -- on the stand.
 6                    THE COURT:  We're not going to do
 7      piecemeal arguments, so you don't have to say anything
 8      now.
 9                    MS. MARTIN:  Okay.
10                    THE COURT:  Maybe I didn't make myself
11      clear.  You're going to present the evidence.  If
12      there's an objection, I'll hear it.  If I hear the
13      evidence, I'll hear argument afterwards and I'll rule.
14      That's what I plan to do.
15                    MS. MEEHAN:  Well, Your Honor, I --
16                    MR. PATTERSON:  Your Honor --
17                    MS. MEEHAN:  -- I was mislead by the
18      Government last week on behalf of Mr. Quinn, so I
19      would have a motion right now to preclude any mention
20      of Mr. Quinn's number coming in through the telephone
21      records witness and I would explain that at an
22      appropriate time.  If you wish to hear argument now,
23      that's fine.  If you wish to hear it after Mr. --
24                    THE COURT:  No.  I said three times --
25                    MS. MEEHAN:  -- Sanchez --
```

1                    THE COURT:  -- I want to finish with

2      the witness --

3                    MS. MEEHAN:  Very well.

4                    THE COURT:  -- who is on the witness

5      stand.

6                    MS. MEEHAN:  Okay.  And then we --

7                    THE COURT:  And if you have an argument

8      that you think should precede any testimony --

9                    MS. MEEHAN:  Not of Mr. Sanchez, Your

10     Honor.  This has to do --

11                    THE COURT:  I'm -- no.  I'm not --

12                    MS. MEEHAN:  -- with the phone record.

13                    THE COURT:  No.

14                    MS. MEEHAN:  Sorry.

15                    THE COURT:  I'm not talking about

16     Sanchez.  We're going to finish with Sanchez and then

17     we're going to present whatever witnesses the

18     Government has to present.

19                    If you want to raise an issue, an

20     objection before the testimony --

21                    MS. MEEHAN:  Yes, please.

22                    THE COURT:  -- make it --

23                    MS. MEEHAN:  Yes, please.

24                    THE COURT:  -- and I'll rule.

25     Otherwise --

1      MS. MEEHAN:  Thank you, Your Honor.

2      THE COURT:  -- I'll hear the testimony
3  and then I'll rule on the admissibility of the 911
4  call.

5      MS. MEEHAN:  Very well.  Thank you,
6  Your Honor.

7      MR. PATTERSON:  Your Honor, I have an
8  issue with the -- if the next witness could please
9  step out for a second, I have something to address.

10      (Pause)

11      THE COURT:  Yes.

12      MR. PATTERSON:  Your Honor, if I may --
13  and, again, I am counsel for Donnie Smith.  I am here
14  to represent him.  I am here to address any of the
15  concerns he may have for the record for maybe future
16  review.

17      So in that regard he requested me to
18  ask the Court that he was -- he believes that when
19  witnesses are testifying, that on cross-examination
20  before they answer they are looking at the
21  Government's counsel tables in which he believes might
22  be possible gestures with respect to how they answer.

23      Again, I am addressing this per his
24  request.

25      THE COURT:  I'm looking at Government

1   counsel all the time.  I'm looking at all of the --
2   you attorneys all the time.  I've seen no gestures.  I
3   have seen no suggestion of answers.  Your witness --
4   your client is raising his hand.
5                    MR. SMITH:  Yeah.
6                    THE COURT:  Do you wish -- no.  Wait a
7   minute.  Do you wish him to speak?
8                    MR. PATTERSON:  I just need to speak
9   with him.
10       (Pause)
11                   MR. PATTERSON:  Your Honor, I'm
12  satisfied with the record that I made.
13                   THE COURT:  All right.  Let's put Mr.
14  Sanchez back on the stand.  Where were we?  I did not
15  make a note.  Who was cross-examining, Mr. Wittels?
16                   THE CLERK:  Mr. Wittels.
17                   THE COURT:  Yes.
18                   MR. ECKERT:  Again, may I step out,
19  Your Honor, just to have the witness --
20                   THE COURT:  Yes.
21       (Pause)
22                   THE COURT:  Guys, before we proceed,
23  can we get some paper towels over here?  The cup of
24  water got knocked over when Mr. Smith was gesturing.
25       (Pause)

```
                                               Page 11
 1                    MS. MARTIN:  Your Honor, while there's
 2      a delay may I speak to Ms. Meehan?
 3                    THE COURT:  Yes.
 4                    MS. MARTIN:  Thank you.
 5          (Pause)
 6                    THE CLERK:  Are we prepared for the
 7      jury?
 8                    THE COURT OFFICER:  Yes.
 9                    THE COURT:  Are we cleaned up?
10                    THE CLERK:  No, Your Honor.  Oh, they
11      are?  Sorry.
12                    THE COURT:  Mr. Wittels, have you
13      finished mopping up?
14                    MR. WITTELS:  Yes, Judge.  Thank you.
15          (Pause)
16                    MS. MEEHAN:  Are you waiting for us,
17      Your Honor?  I apologize.
18                    THE COURT:  I'm -- I was just waiting
19      for you to let me know when --
20                    MS. MEEHAN:  I'm sorry.
21                    THE COURT:  -- how long you're going to
22      be?
23                    MS. MEEHAN:  I -- I'm not sure that
24      we're going to be able to reach an agreement on this.
25                    THE COURT:  All right.  Well, then
```

Page 12

```
 1    fine.
 2                    MS. MEEHAN:  Very well.
 3                    THE COURT:  Well, it's not this
 4    witness's testimony.
 5                    MS. MEEHAN:  No.  No, Your Honor.
 6                    THE COURT:  So we'll proceed.
 7                    MS. MEEHAN:  Very well.  Thank you.
 8                    THE COURT:  And I'll be able to rule
 9    quickly, I suspect.
10                    All right.  Let's bring Mr. Sanchez is
11    here.  We ready to proceed with the jury, Mr. Eckert?
12                    MR. ECKERT:  I'm sorry, Your Honor.
13                    THE COURT:  Are you ready to proceed?
14                    MR. ECKERT:  We are.  Thank you.  Yes.
15                    THE COURT:  All right.  Everyone else
16    ready, Mr. Wittels?
17                    MR. WITTELS:  Yes, Judge.
18                    THE COURT:  Someone has to bring the
19    jury in.
20         (Pause)
21                    THE COURT OFFICER:  All rise.
22         (Jury present)
23                    THE COURT:  Thank you.  Any other --
24    thank you.
25                    Good morning, everybody.  Please be
```

Page 13

1    seated.

2          (A chorus of good morning.)

3                    THE COURT:  Mr. Sanchez, I remind you

4    that you are still under oath.

5                    Mr. Wittels, you may begin your cross-

6    examination.

7                    MR. WITTELS:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9    BY MR. WITTELS:

10         Q.  Good morning, Mr. Sanchez.  How are you?

11         A.   Good morning.  Good.  How are you?

12         Q.   Thank you.

13              I represent Abid Stevens, the man in the

14    plaid shirt.

15         A.   Yes.

16         Q.   I don't represent anybody else, just him.

17    Okay.

18         A.   Okay.

19         Q.   So I'm going to ask you some questions.  I

20    know you spent a long time on the stand yesterday and

21    it's a tiring experience, so I'll try and go right to

22    the point if I may.  Okay.

23         A.   Okay.  Thank you.

24         Q.   I think you told us that you went to the

25    tenth grade here in Philadelphia; is that correct?

1        A.    Yes.

2        Q.    That you can read -- can you read English?

3        A.    A little bit.

4        Q.    And can you write English?

5        A.    No.

6        Q.    Okay.  But you speak and understand English

7    just fine?

8        A.    Yes.

9        Q.    Okay.  And I think you told us that Joel

10   understands some English?

11       A.    A little bit.  A --

12       Q.    Yeah.

13       A.    -- little bit.

14       Q.    Enough to get by?

15       A.    Not even that.

16       Q.    Uh-huh.  Okay.  And that Ezaliza (ph) is

17   your baby --

18       A.    Momma.

19       Q.    -- is your momma (sic)?

20       A.    Yes.

21       Q.    Yeah.  Are you guys still together?

22       A.    No.

23       Q.    At the time of this robbery -- of this

24   incident, this argument, were you together?

25       A.    No.

1     Q.   Okay.  But you still care about her?

2     A.   Yes.

3     Q.   Right.  Did you have a cell phone that day?

4     A.   Yes.

5     Q.   And it was working?  You could use it if you

6   needed to?

7     A.   Yes.

8     Q.   Okay.  You wouldn't let your baby momma walk

9   into an armed robbery, would you?

10    A.   No.

11    Q.   No.  You wouldn't want her to get in a

12  situation where she might get hurt, would you?

13    A.   No.

14    Q.   In fact, you would do whatever you could to

15  prevent her walking into that kind of situation,

16  wouldn't you?

17    A.   Yes.

18    Q.   Okay.  Now during the course of this

19  argument, did you ever feel the need to call the

20  police?

21    A.   No.  No.

22    Q.   Why is that?

23    A.   It was an argument.  It got out of hand

24  quick.  I ain't got no chance.

25    Q.   And then it got resolved?

1      A.   And I didn't have my phone with me.  It was

2   in the kitchen --

3      Q.   Uh-huh.

4      A.   -- where I work at.

5      Q.   But you could have gone and gotten your

6   phone, gone to the kitchen and called 911, right?

7      A.   I guess.  I didn't call 911.  I didn't know

8   the exact address of the store.

9      Q.   Okay.  So this argument you said got out of

10   hand?

11      A.   Yes.

12      Q.   And then it got resolved, right?

13      A.   No.

14      Q.   Okay.  The people left?

15      A.   The guy was still there.

16      Q.   Oh, Mr. Stevens was still there?

17      A.   No.  Steven, no.

18      Q.   He stayed there until the -- almost the end,

19   even after the police came by, right?

20      A.   He stayed there.  Yeah.

21      Q.   Yeah.  And he was trying to fix things,

22   right?

23      A.   When he came inside the first time, he asked

24   what's going on.

25      Q.   Uh-huh.

Page 17

```
 1        A.    Yeah.
 2        Q.    But at the end didn't he say, I'll try and
 3   fix this?
 4        A.    And then, yes.  He --
 5        Q.    Yeah.  And I'll try and get you money back?
 6        A.    Not the money, the gun back.
 7        Q.    The gun back.
 8        A.    Yes.
 9        Q.    Okay.  So someone else testified about the
10   money, but you didn't hear that?
11        A.    No.
12        Q.    All right.  As I understand it, in this
13   store you sell mostly soda and chips and things like
14   that, and you make cheesesteaks and hamburgers and
15   cheeseburgers, right?
16        A.    Yes.
17        Q.    You don't have fresh fruits or vegetables,
18   right?
19        A.    Yeah, I do.
20        Q.    You do?
21        A.    Uh-huh.
22        Q.    Okay.  Good.  Now during the course of this
23   argument, did Mr. Stevens ever threaten to hurt you?
24        A.    No.
25        Q.    All right.  Now there's a point at the tape
```

1    where we see you going like this with your hands up --

2        A.   Yes.

3        Q.   -- and it appears maybe you're taking a step

4    back?

5        A.   Yes.

6        Q.   Was -- what was the -- what were you trying

7    to say there or what did you say there?

8        A.   I was like, calm down.  There no need for

9    this.  Calm down.

10       Q.   Okay.

11       A.   Yeah.

12       Q.   So it wasn't, I surrender, don't hurt me.

13   It was --

14       A.   No.  No.  Keep my head up and let him know I

15   ain't going to do nothing or try nothing.  Calm down.

16       Q.   Okay.  You were telling him, and correct me

17   if I'm wrong, that you're trying to deescalate the

18   argument?

19       A.   Uh-huh.  Yes.

20       Q.   You know what I say when I say deescalate?

21       A.   Yeah.  I understand.

22       Q.   You're trying to calm things down.

23       A.   Yes.

24       Q.   And you're telling him to calm down?

25       A.   Yes.

1          Q.    All right.  It's not that there's a threat

2     of physical violence by anyone at that point, is

3     there?

4          A.    No.

5          Q.    All right.  And is that one of the reasons

6     why you didn't call 911 because there wasn't a threat

7     of physical violence?

8          A.    No.  I didn't -- my phone was in the

9     kitchen.

10         Q.    Okay.

11         A.    I got to go in the back of the store to get

12    my phone.

13         Q.    All right.  When Ezaliza came in the store,

14    did you tell her what was going on or did she already

15    know as far as you could tell?

16         A.    I think she already know.

17         Q.    Okay.

18         A.    Yes.

19         Q.    Now from beginning to end, from when Mr.

20    Quinn first approaches Joel to ask for his money back

21    until Mr. Stevens leaves, how much time went by?

22         A.    Like 30 seconds.

23         Q.    No.  The whole incident, did it last ten

24    minutes, 20 minutes, 15 minutes?

25         A.    Oh, the whole incident?  Oh, probably like

Page 20

1    ten minute probably.  Yeah.

2         Q.   Okay.  Now you heard the sirens, the police

3    sirens go by, correct?

4         A.   When it's coming, yeah.

5         Q.   Yeah.  Mr. Stevens is still in the store at

6    that point?

7         A.   Yes.

8         Q.   In fact, at that point he's leaning against

9    the ice cream case, isn't he?

10        A.   Yes, he is.

11        Q.   Did he react to the police sirens in any

12   way?

13        A.   No.

14        Q.   In fact, he continued to talk --

15        A.   Yeah.

16        Q.   -- to you and Joel and Ezaliza, didn't he?

17        A.   Yeah.  He -- yes.  He was talking to Joel.

18        Q.   And what was he saying at that point?

19        A.   He was telling Joel, I'm going to get your

20   gun back.  I'm going to get it back.

21        Q.   Okay.  He was still trying to resolve the

22   problem?

23        A.   Yeah.  Uh-huh.

24        Q.   You have to say yes or no.

25        A.   Yes.

Page 21

1      Q.   Okay.  Now did you see him leave the store?

2      A.   Yeah.

3      Q.   Yes?

4      A.   Yes.

5      Q.   Can you describe to the jury how he left?

6   Did he run out?  Did he walk fast?  Did he walk

7   normal?

8      A.   No.  He walked normal as he got out of the

9   store.  He left.

10      Q.   Okay.  Like there wasn't a problem anymore?

11      A.   Yes.

12      Q.   Did you see where he went?

13      A.   No.

14      Q.   Okay.  Now have you had arguments with

15   people?

16      A.   No.

17      Q.   You don't argue?

18      A.   No.

19      Q.   Okay.  Have you witnessed arguments between

20   people?

21      A.   Yes.

22      Q.   When they get heated do people say things

23   that you clear -- they clearly don't mean?

24      A.   Everybody do, but they -- somebody angry,

25   somebody -- you say something you don't want to say

Page 22

1    right in the moment.

2         Q.   Yeah.  And they can -- it can be a really

3    angry, threatening kind of statement, but you don't

4    necessarily mean it?

5         A.   Right.  Yeah.

6         Q.   Like I'll get you for this?

7         A.   Yeah.

8         Q.   Yeah.  Or we'll settle this later, that kind

9    of thing?

10        A.   Yeah.

11        Q.   So when you heard Mr. Stevens say, I'll

12   close this, I'll shut it down --

13        A.   Uh-huh.

14        Q.   -- did you take him seriously or did you

15   think this is something said in anger or you don't

16   know?

17        A.   I don't know, but he can't do it.  He -- I

18   -- he say I close the store down.  I close this shit

19   down.

20        Q.   How could he do that, right?

21        A.   How?  Who you?

22        Q.   Right.  Who are you to have that kind of

23   power to shut this store down --

24        A.   Yeah.

25        Q.   -- right?

Page 23

1      A.   Uh-huh.

2      Q.   So it's like --

3                THE COURT:  You have to answer yes or

4   no.

5                THE WITNESS:  Yes.

6   BY MR. WITTELS:

7      Q.   So it's like, you know, something said in

8   anger, right?

9      A.   Yes.

10      Q.   All right.  Thanks.

11                MR. WITTELS:  I got nothing else.

12                THE WITNESS:  Thank you.

13                MS. MEEHAN:  No questions, Your Honor.

14                THE COURT:  Thank you.

15                Mr. Eckert, any -- or Ms. Martin, any

16   --

17                MS. MARTIN:  Redirect.

18                THE COURT:  -- redirect?

19                MS. MARTIN:  Thank you, Your Honor.

20   Briefly.  If I could just have a moment.

21      (Pause)

22                     REDIRECT EXAMINATION

23   BY MS. MARTIN:

24      Q.   Good morning, Mr. Sanchez.

25      A.   Good morning.

1      Q.   I want to follow up immediately on what Mr.

2   Wittels was just asking you about.

3      A.   Yes.

4      Q.   He was asking you whether or not you took

5   Mr. Stevens' threat seriously at the end to shut the

6   store down.  Do you remember that question?

7      A.   Yes,

8      Q.   And you had only worked at the store for

9   three days --

10     A.   Three days.

11     Q.   -- at that point?

12     A.   Yes.

13     Q.   Okay.  Did you know Mr. Stevens at all?

14     A.   No.

15     Q.   Had you ever seen him before?

16     A.   No.

17     Q.   All right.  He also asked you whether or not

18   Mr. Stevens ever threatened to hurt you.  Do you

19   remember that question?

20     A.   Yes.

21     Q.   He was talking about that moment where your

22   hands are up in the air?

23     A.   Yes.

24     Q.   If I could please have the witness shown

25   what's been previously marked and admitted as C-125.

Page 25

```
 1                    THE COURT:  Pardon me.  What?
 2                    MS. MARTIN:  1-C-25, I apologize.
 3                    THE COURT:  What is the -- again, the
 4    number?
 5                    MS. MARTIN:  1-C-25.  And if it could
 6    be published.
 7                    THE COURT:  It may be, Michael.
 8                    MS. MARTIN:  Thank you.
 9    BY MS. MARTIN:
10        Q.   Mr. Sanchez --
11                    THE COURT:  Michael --
12        (Pause)
13                    THE COURT:  Go ahead.  You may proceed.
14                    MS. MARTIN:  Thank you.
15    BY MS. MARTIN:
16        Q.   Mr. Sanchez, Mr. Wittels just asked you
17    whether or not Mr. Stevens ever threatened you with
18    words; is that right?
19        A.   Yes.
20                    MR. WITTELS:  Objection.  That
21    mischaracterizes the question and the answer, Judge.
22    I did not ask -- say with words.  I asked did he ever
23    threaten you.
24                    MS. MARTIN:  I'll rephrase, Your Honor.
25                    THE COURT:  All right.
```

Page 26

1    BY MS. MARTIN:

2         Q.   Mr. Sanchez, he asked whether or not he had

3    ever threatened you; is that right?

4         A.   Yes.

5         Q.   Okay.  In this moment, in 1-C-25, do you see

6    the gun in Mr. Stevens' hand?

7         A.   Yes.  I know he got it in his hand.

8         Q.   Did you know it was there in that moment?

9         A.   Yes.

10        Q.   And did you think it was real?

11        A.   Yes.

12             MS. MARTIN:  And can I see 1-C-26,

13    please?

14        (Pause)

15   BY MS. MARTIN:

16        Q.   Is the gun still in his hand in this

17   picture, Mr. Sanchez?

18        A.   Yes.  All the time it was in his hand.

19        Q.   And your hands are up like this?

20        A.   Yes.  I -- yes.

21        Q.   Are you scared?  Are you concerned in that

22   moment?

23        A.   Well, yeah, I'm scared.  He got a gun in his

24   hand.  That's why my hands is up.

25        Q.   Now I want to go back to yesterday.

Page 27

1              MS. MARTIN:  You can take that down,

2       please.  Thank you.

3              If you could please turn to

4       Government's Exhibit 1-A, the video at 16:58:29 and if

5       you could just show it to the witness.

6       BY MS. MARTIN:

7          Q.   Mr. Sanchez, do you remember yesterday when

8       Mr. Patterson, the attorney sitting right here, do you

9       remember when he was asking you questions about Mr.

10      Smith, the man in all black?

11         A.   Yes.

12         Q.   Do you remember when he was asking you about

13      what he was doing by the door?

14         A.   Yes.

15         Q.   Okay.  And whether or not you had ever seen

16      a gun ever again --

17         A.   Yes.

18         Q.   -- from him?  He was asking you, and I

19      believe the motion was he was standing there with both

20      of his hands in his pockets?

21         A.   Yes.

22         Q.   Those hands stayed in his pockets, right?

23         A.   Yes.

24         Q.   Did you know that there was a gun in each of

25      those pockets in that moment?

Page 28

1          A.    No.

2          Q.    And in this moment now that's on the screen,

3     is he standing between you and the exit to the store?

4          A.    Yes.

5                    MS. MARTIN:  I have nothing further,

6     Your Honor.

7                    THE COURT:  Is there any further --

8                    MR. PATTERSON:  One question.

9                    THE COURT:  -- cross-examination?

10                    MR. PATTERSON:  Can you put that

11    picture back up if you may?

12                    THE COURT:  Let me finish.  Any further

13    cross-examination?

14                    MR. PATTERSON:  There is, Judge.  I'm

15    sorry.

16                    THE COURT:  All right.  You may

17    proceed, Mr. Patterson.

18                    RECROSS-EXAMINATION

19    BY MR. PATTERSON:

20          Q.    Mr. Sanchez, you remember me?

21          A.    Yes.

22          Q.    Okay.  Let's just look at that photo again

23    and the very last question before the Government sat

24    down.  You identified my client, Donnie Smith, who is

25    standing between you and the doorway; is that correct?

Page 29

1      A.   Yes.

2      Q.   He never stopped you from leaving, did he?

3      A.   No.

4      Q.   Okay.   Thank you.

5                THE COURT:   Any further --

6                MR. WITTELS:   If I may?   Two questions,

7   maybe three.

8                     RECROSS-EXAMINATION

9   BY MR. WITTELS:

10     Q.   During the course of this argument did Mr.

11   Stevens ever threaten you?

12     A.   No.

13     Q.   During this (sic) course of this argument

14   were you ever physically afraid for your own safety or

15   well being?

16     A.   Yes.

17     Q.   Well, when was that?

18     A.   Well, he got a hand on his gun.

19     Q.   Yeah.

20     A.   He got a gun in his hand.

21     Q.   And that --

22     A.   And so that means to stay back.

23     Q.   And --

24     A.   Anything can happen.

25     Q.   That's right.   Anything can happen.

 1        A.    Right.

 2        Q.    When anybody has a gun, whether it's Joel or

 3    --

 4        A.    Anybody.

 5        Q.    -- or anybody?

 6        A.    Yes.

 7              THE COURT:  Let him answer -- ask the

 8    question, then you answer.

 9              THE WITNESS:  Okay.

10              MR. WITTELS:  Okay.

11    BY MR. WITTELS:

12        Q.    Whether it's Joel or anybody else, right?

13        A.    Yes.

14        Q.    So that's why you're saying calm down?

15        A.    Yes.

16        Q.    Because you don't want this argument to get

17    out of hand?

18        A.    Yes.

19        Q.    Because you know, based on your life

20    experience, that when people have guns and arguments

21    get out of hand, bad things can happen?

22        A.    Yes.

23        Q.    And you didn't want that for anybody?

24        A.    Anybody.

25        Q.    Not for yourself and not for your baby momma

Page 31

```
 1   and not for your friend, Joel?
 2        A.   Nobody.
 3        Q.   Right.  Thank you.
 4        A.   You're welcome.
 5             THE COURT:  There's no redirect, is
 6   there?
 7             MS. MARTIN:  No, Your Honor.
 8             THE COURT:  Fine.  Mr. Sanchez, that
 9   concludes your testimony.
10             THE WITNESS:  Thank you.
11             THE COURT:  You may step down.
12        (Pause)
13             THE COURT:  Thank you, Ms. Weaver.
14             THE INTERPRETER:  Thank you, Your
15   Honor.
16             MR. ECKERT:  Your Honor, may we have
17   one moment to talk?  Court's indulgence for one
18   second.
19             THE COURT:  Yes.
20        (Pause)
21             MS. MARTIN:  Your Honor, the Government
22   would call Officer Ferreira to the stand.
23             THE CLERK:  Raise your right hand.
24      OFFICER DAVID FERREIRA, GOVERNMENT'S WITNESS, SWORN
25             THE CLERK:  Thank you.  Please be
```

Page 32

1    seated.

2                    Please state your full name for the

3    record.

4                    THE WITNESS:  Good morning.  I'm

5    Officer David Ferreira.

6                    THE COURT:  Good morning, Officer.

7                    THE WITNESS:  Good morning, sir.

8                    MS. MARTIN:  May I, Your Honor?

9                    THE COURT:  You may.

10                   MS. MARTIN:  Thank you.

11                   DIRECT EXAMINATION

12   BY MS. MARTIN:

13        Q.   Good morning, Officer.

14        A.   Good morning, ma'am.

15        Q.   Officer Ferreira, how are you currently

16   employed?

17        A.   I'm employed by the Philadelphia Police

18   Department.

19        Q.   And what district do you work in?

20        A.   I work in the 14th District.

21        Q.   And where is that?

22        A.   That's in the northwest section of the city.

23        Q.   All right.  And how long have you been doing

24   that?

25        A.   For about two years now.

1      Q.   And as of March 22nd, 2019, how long had you

2   been on the job?

3      A.   About one year.

4      Q.   Were you working on March 22nd, 2019/

5      A.   Yes, ma'am.

6      Q.   What were your work hours that day?

7      A.   I was working the afternoon shift.

8      Q.   What does that mean?

9      A.   It's --

10      Q.   What time?

11      A.   Four -- 4 p.m. to 12 a.m.

12      Q.   Were you working alone or with a partner?

13      A.   I was working alone.

14      Q.   Do you remember what your assignment was

15   that day?

16      A.   I was on patrol.

17      Q.   Just routine patrol in the 14th District?

18      A.   Correct.

19      Q.   Did you receive a radio call at some point

20   regarding an incident at 152 East Sharpnack Street?

21      A.   Yes, I did.

22      Q.   Do you remember what the radio call was for?

23      A.   Originally it was for a theft in progress.

24      Q.   Do you happen to remember what time that

25   radio call came in or about what time that call came

```
 1   in?

 2         A.    Sometime after my report (indiscernible).

 3         Q.    Okay.  Did you respond to the call?

 4         A.    Yes, I did.

 5         Q.    Do you remember how far away you were when

 6   you started responding to the call?

 7         A.    I couldn't have been farther than two

 8   minutes away.

 9         Q.    All right.  And did you go lights and

10   sirens?

11         A.    Yes, I did.

12         Q.    You were in a marked patrol car?

13         A.    Yes, I was.

14         Q.    And at some point on your way to the scene

15   did you receive additional information about the radio

16   call that came in?

17         A.    Yes, ma'am.

18         Q.    What happened?

19         A.    The theft in progress got upgraded to a

20   robbery --

21                    MR. WITTELS:  Your Honor --

22                    THE WITNESS:  -- in progress.

23                    MR. PATTERSON:  Your Honor, if I may

24   object that if this testimony is offered for the proof

25   of the matter asserted, it's hearsay.  If it's just
```

1   for why the officer responded, then I'm okay with

2   that.

3                    MS. MARTIN:  Your Honor, it's for why

4   the officer responded and the number of officers that

5   responded.

6                    THE COURT:  And that means this is

7   really testimony offered, or this part of the

8   testimony, only offered to show the officer's state of

9   mind, what he was thinking and why he did what he did,

10   not to establish the truth of what was said, only that

11   it was said.

12                    MS. MARTIN:  May I proceed, Your Honor?

13                    THE COURT:  You may.

14                    MS. MARTIN:  Thank you.

15   BY MS. MARTIN:

16        Q.   It just means that the priority of the call

17   was upgraded; is that right?

18        A.   That's correct.

19        Q.   What -- why does that matter?

20        A.   It matters in the amount of officers that's

21   going to respond to the call and the intensity.

22        Q.   Okay.  Do you remember which way you

23   approached the location, from which direction?

24        A.   I was coming off Germantown Avenue.  I came

25   the wrong way on Sharpnack going eastbound.

Page 36

1      Q.   Okay.

2           MS. MARTIN:  If I could please have the

3      witness shown what has been marked and admitted as

4      Government's Exhibit 3-A.  And if it could be

5      published to the jury.

6           THE COURT:  It may.

7      BY MS. MARTIN:

8      Q.   Officer Ferreira, do you recognize the map

9      that's in front of you?

10     A.   Yes, I do.

11     Q.   Do you recognize the location?

12     A.   Yes, I do.

13     Q.   Okay.  And does this depict where 152 East

14     Sharpnack Street is located?

15     A.    It's right at the corner of Sharpnack Street

16     and Ross Street.

17     Q.   Okay.  And if I move over to this screen

18     over here, can you see me?

19     A.   Yes, I can.

20     Q.   And in terms of explaining to the jury which

21     way you ultimately approached, can you tell me where

22     Sharpnack Street is in relation to Ross and which way

23     you drove your car?

24     A.   It's -- I would have to point over here.

25     Q.   Okay.  Go ahead.

Page 37

```
 1                 THE COURT:  That's going to be rather
 2    difficult for the jury to see.
 3                 THE WITNESS:  Oh.
 4                 MS. MARTIN:  Your Honor, I --
 5                 THE COURT:  I suggest that you use this
 6    screen.  We can move the screen as we did before.
 7                 MS. MARTIN:  I just didn't want to
 8    invade the (indiscernible) of the jury.  If it's
 9    alright with Your Honor that I approach?
10                 THE COURT:  It is.
11                 THE WITNESS:  Oh.
12                 THE COURT:  I'm told that you can use
13    your finger to draw on the monitor.
14                 THE WITNESS:  Fair enough.
15                 MS. MARTIN:  You want to try that,
16    Officer Ferreira?
17    BY MS. MARTIN:
18        Q.   Okay.  For the record, you're drawing --
19                 THE COURT:  The -- all right.  The
20    screens are up.
21                 MS. MARTIN:  Okay.
22    BY MS. MARTIN:
23        Q.   Officer Ferreira, can you try again?  Can
24    you draw a line of which way you approached the store?
25                 All right.  Drawing a line and a -- which
```

Page 38

1    way does Sharpnack go?

2         A.   It goes west.

3         Q.   It goes west?  So you were --

4         A.   Westbound.

5         Q.   So you were drawing a line eastbound --

6         A.   Yeah.  I was going eastbound.

7         Q.   -- towards the top of the screen.  And,

8    Officer Ferreira, can you tell us on this map where is

9    the store located?

10        A.   Right.

11        Q.   Can you circle it?  Okay.  Indicating for

12   the record the circle drawn on the corner of Sharpnack

13   --

14        A.   Sharpnack --

15        Q.   -- and Ross?

16        A.   Correct.

17        Q.   All right.  So you drove the wrong way up a

18   one-way street; is that fair?

19        A.   Correct.

20        Q.   And did you park your car in a normal legal

21   parking space?

22        A.   No, I did not.

23        Q.   What did you do?

24        A.   I parked right in the middle of the street.

25        Q.   Again, you were going lights and sirens on

1   the way there?

2        A.   Correct.

3        Q.   At some point did you ever turn off your

4   sirens as you were approaching?

5        A.   I believe so.

6        Q.   Why do you do that?

7        A.   So we don't alert the suspects.

8        Q.   Did you have information at the time that

9   there may be suspects still on scene?  Only if --

10       A.   I'm not positive.

11       Q.   -- you remember.  Okay.

12            So you parked your car in the middle of the

13   street?

14       A.   Correct.

15       Q.   What do you do next?

16       A.   Get out of my patrol car and then go towards

17   the store.

18       Q.   So you're walking towards the store.  Do you

19   go in the store?

20       A.   I do not.

21       Q.   Why not?

22       A.   Because I received further information from

23   radio dispatcher.

24       Q.   How do you receive that information once

25   you're out of your patrol car?

Page 40

1       A.    Through my radio.

2       Q.    And you just indicated for the record a

3    motion on your right-hand shoulder.  Is that where

4    your radio sits?

5       A.    Correct.

6       Q.    Okay.  What information did you receive over

7    the radio?

8       A.    That one male was -- one of the suspects was

9    possibly still on location.  They had fled the store

10   and got into a parked vehicle.

11      Q.    Do you know where that information is coming

12   from over the radio?  Do you know who -- what -- the

13   call sign of the entity that was giving the

14   information?

15      A.    I do.

16      Q.    And what was it?

17      A.    From Real Time Crime Center.

18      Q.    And what -- what's the Real Time Crime

19   Center?

20      A.    Real Time Crime Center is the center where

21   they control all the live cameras that are spread

22   throughout the city.

23      Q.    And do you know whether or not there is a

24   live camera that covers the location or area that you

25   were in?

1        A.    I do.  There is one.

2        Q.    Okay.  And have you seen footage from that

3    pole camera of the incident we're talking about right

4    now?

5        A.    I did saw -- I saw it last week.

6        Q.    Okay.  So you received the information that

7    a suspect is still on location.  Did you receive any

8    details about where that suspect may have been?

9        A.    It was -- the information I received was the

10   vehicle was parked a little bit farther up the block.

11       Q.    Did you get a description of the vehicle?

12       A.    A dark, dark sedan.

13       Q.    All right.  And did you see any vehicles in

14   the area that matched that description?

15       A.    Yes, I did.

16       Q.    What did you do?

17       A.    I approached the vehicle from the passenger

18   side.

19       Q.    All right.  So if you could explain this for

20   us.  Is the car that you're approaching, do you see

21   the rear of the car as you're approaching or do you

22   see the front of the car as you're approaching?

23       A.    I see the rear of the vehicle.

24       Q.    All right.  And you said you approached on

25   the passenger side?

Page 42

1        A.    Correct.

2        Q.    Could you see inside the car?

3        A.    I could not.

4        Q.    What did you do next?

5        A.    I went around to take a look from -- through

6    the windshield and that's where I saw the other

7    vehicle was occupied by someone.

8        Q.    At that point when you're standing by the

9    passenger side looking through the windshield, do you

10   remember whether or not the ignition of the car was

11   running at that time?

12       A.    I do not remember.

13       Q.    So what did you see inside the windshield?

14       A.    I could observe there was someone in the

15   vehicle.  I couldn't really see with great details.

16       Q.    All right.  What did you do next?

17       A.    Sometime between going around, that's where

18   I drew my weapon.

19       Q.    Why did you draw your weapon?

20       A.    Because it was -- based on the radio call it

21   was a robbery, so it -- the male inside could have

22   been armed.

23       Q.    Did you have information specifically that

24   it was an armed robbery?

25       A.    I believe so.

Page 43

1      Q.    Did you give the person inside the car any
2   verbal commands, if you remember?
3      A.    I do not remember.
4      Q.    Did the person roll down the window?
5      A.    No, he did not.
6      Q.    Did the person get out of the car?
7      A.    No.
8      Q.    What did you do next?
9      A.    That's when I went around to the driver's
10   side and I pulled the door open.
11      Q.    Did you see anyone inside?
12      A.    Yeah, I saw.
13      Q.    Do you remember anything about a description
14   of the individual?
15      A.    Only the -- he was dressed with dark colors
16   and he had a hat.
17      Q.    Okay.  Did he say anything to you?
18      A.    I don't remember.
19      Q.    Did you give him any commands at that point
20   to exit the vehicle?
21      A.    No, I did not.
22      Q.    What happens --
23      A.    I don't remember.
24      Q.    Okay.  What happens next?
25      A.    I tried to remove the male from the vehicle.

1      Q.    How did you do that?

2      A.    By pulling, pulling him.

3      Q.    All right.  You just did a motion for the

4   record with both of your hands.  What were you pulling

5   on?

6      A.    I don't remember.

7      Q.    Fair to say this all happened pretty fast?

8      A.    Yeah.  Yeah, it happened really fast.

9      Q.    Do you remember at any point during this

10  interaction the car turning on?

11     A.    I remember hearing it.  I don't know.  It

12  was sometime between -- I don't know if it was before

13  I opened the door or afterwards.

14     Q.    But at some point when you're near the

15  vehicle you heard the ignition turn over?

16     A.    Yes, I did.

17     Q.    Did you ever try to get the keys out of the

18  ignition?

19     A.    I don't remember.

20     Q.    Were you able to successfully pull the

21  individual from the car?

22     A.    No, I was not.

23     Q.    What happens next?

24     A.    Before I tried removing the -- that's when I

25  holstered my weapon.  I see that -- I didn't see a

Page 45

1   weapon inside the car, so I didn't point at -- drew my

2   weapon.  And then he tried to take -- he started to

3   take away.  I believe I walked a few feet and then I

4   let it go.

5        Q.   All right.  Was the male able to take off?

6        A.   Yes, he was.

7        Q.   Were there any other police on scene at that

8   point, any --

9        A.   Yes.

10       Q.   -- other police cars?

11       A.   Yes.  There was a police vehicle

12   approaching.

13       Q.   All right.  And did they follow that

14   vehicle?

15       A.   Yes.  They started to chase it.

16       Q.   Okay.

17            MS. MARTIN:  If I could, please, have

18   the witness shown and only the witness what's been

19   marked as -- I will be marking as Exhibit 2-B, which

20   is Clip Number 1.

21            THE COURT:  G-2-B?

22            MS. MARTIN:  Yes, Your Honor.

23       (Pause)

24   BY MS. MARTIN:

25       Q.   While he's doing that, Officer, I want to

Page 46

1    talk to you about the pole camera footage.  You said

2    you viewed it?

3        A.   Yes, I did.

4        Q.   Can you just explain to the ladies and

5    gentlemen of the jury which way the pole camera faces?

6        A.   It faces pretty much the store and then this

7    section of Sharpnack and Ross.

8        Q.   So does the camera look down the way that

9    you came up the street?

10       A.   I'm not positive.

11       Q.   Okay.  We'll pull it up in just a second.

12       (Pause)

13       Q.   We'll come back to that, Officer.

14            Okay.  So the other officers arrive on

15   location and they follow the car; is that fair?

16       A.   Yes, they did.

17       Q.   Was that lights and sirens?

18       A.   Correct.

19       Q.   What do you do?

20       A.   Then I go back to my patrol vehicle and I

21   started listening to the directions that the other

22   officers, the chasing officers were giving.,

23       Q.   You said you go to your vehicle and listen.

24   You mean to police radio?

25       A.   Correct.

Page 47

1      Q.    And did you try to follow?

2      A.    I could not follow because I could not see

3   them anymore because I was parked the opposite way.

4      Q.    Did you at some point determine the ultimate

5   location of the vehicle involved in the chase?

6      A.    Yes, I did.

7      Q.    How was that?

8      A.    They gave the right directions where -- so I

9   was able to get to the direction -- to that location.

10     Q.    And can you tell me the state of the car

11  when you saw it again?

12     A.    When I saw it, it was already crashed into a

13  rock, something of that nature.

14     Q.    Do you remember the address or the

15  approximate location of where the car crashed?

16     A.    Yes.  I wrote it down.  1021 West Holder,

17  the 2000 black of Holder, West --

18     Q.    How --

19     A.    -- Holder.

20     Q.    Okay.  How far away is that from 152 East

21  Sharpnack, just ballpark?

22     A.    I would say ten, 11 blocks away.

23     Q.    Did you respond to the location of the car

24  crash?

25     A.    Yes, I did.

1      Q.   And was there anyone on scene when you

2   arrived, any civilians on scene?  Was there anyone in

3   the car?

4      A.   Not in the car.

5      Q.   Did you look in the car?

6      A.   I did not.

7      Q.   All right.  Were there other officers on

8   scene?

9      A.   Yes.

10      Q.   Did you ever make any attempts to locate the

11   individual that was in the car, you or other officers?

12      A.   The other officers did.  I had to stay with

13   the vehicle, holding it for a warrant.

14      Q.   Is that a wooded area?

15      A.   Yes, it is.

16      Q.   Were the other officers in the woods while

17   you were holding the car?

18      A.   Correct.

19      Q.   Were you ever able to locate the suspect or

20   individual that day?

21      A.   No. I was not.

22      Q.   If I could please have Exhibit 26-A and 26-D

23   shown to the witness?

24      A.   Officer Ferreira, do you recognize what's

25   just been placed on your screen, Government's Exhibit

Page 49

1    26-A?

2          A.    Yes, I do.

3          Q.    What is it?

4          A.    It was the vehicle that fled from the scene.

5          Q.    And where is that picture taken?

6          A.    That's in the park.

7          Q.    Is that a fair and accurate depiction of the

8    vehicle as you saw it that day?

9          A.    Yes, it is.

10         Q.    Okay.

11               MS. MARTIN:  Your Honor, at this time I

12   would move to admit Exhibits 26-A through 26-D and

13   publish to the jury.

14               MR. PATTERSON:  No objection.

15               THE COURT:  G-26-A, B, C and D, four

16   photographs, are received in evidence.

17         (Government's Exhibit Nos. 26-A through 26-D are

18   received)

19               MS. MARTIN:  And if I could publish for

20   the jury, please.

21   BY MS. MARTIN:

22         Q.    Officer Ferreira, the picture on the screen

23   there, is that the same vehicle that you saw outside

24   of the store at 152 East Sharpnack?

25         A.    Yes, it is.

1      Q.   And is that in the same position that you

2   saw it at the scene of the crash?

3      A.   Yes, it is.

4      Q.   All right.

5           MS. MARTIN:   If I can have the witness

6   shown 26-B.

7   BY MS. MARTIN:

8      Q.   Again, another photograph of the car at that

9   scene?

10     A.   Yes, ma'am.

11     Q.   And 26-C, was that the positioning and

12   damage to the tire that you observed when you got

13   there?

14     A.   Yes.

15     Q.   And 26-D, Officer Ferreira, do you remember

16   seeing this license plate or I believe it's temporary

17   tag on this vehicle?

18     A.   Yes.

19     Q.   And that's a New Jersey temporary tag?

20     A.   That's correct.

21     Q.   Did you complete any paperwork related to

22   that car?

23     A.   I did not.

24     Q.   Why not?

25     A.   Because I didn't put it on a property

Page 51

1    receipt.  Another officer did.

2        Q.   What's a property receipt?  I think that's

3    the first time the jury's heard that term.

4        A.   Oh, every time you have a car that they

5    possibly want fingerprints from the vehicle or DNA

6    samples, they have to get a warrant.  So we treat it

7    as a car for prints, and then they put -- a property

8    receipt is just a paper where it states the vehicle

9    information, the VIN number, tags, and all that.

10       Q.   Did you leave the vehicle in the hands of

11   another officer that completed that paperwork?

12       A.   Yes, I did.

13       Q.   Was that the conclusion of your involvement

14   in this investigation or did you do anything else?

15       A.   No.  I received -- got a call from the

16   officer who went to the store to get the complainant.

17   He asked for another unit or a backup.

18       Q.   Did you return to the 152 East Sharpnack to

19   provide backup to other officers who were on scene?

20       A.   Yes, I did.

21       Q.   And did you come into contact with a female

22   in an all-black outfit while you were there at the

23   scene?

24       A.   Yes, I did.

25       Q.   Did you have any interaction with that woman

Page 52

1    or did you transport her?

2        A.   I don't remember.

3        Q.   Did you ever go to Northwest Detective

4    Division later that night to give a statement?

5        A.   Yes, I did.

6            MS. MARTIN:  Your Honor, if I could

7    just have one moment and see if we can get the

8    technology issue fixed.

9            THE COURT:  Yes.

10       (Pause)

11           MS. MARTIN:

12       Q.   Okay.  Officer Ferreira, I have placed 2-B

13   -- Government's Exhibit 2-B on the screen in front of

14   you.  Do you recognize what you're looking at?

15       A.   Yes, I do.

16       Q.   Okay.  What is it?

17       A.   That's the camera footage from the pole

18   camera.

19       Q.   All right.  And is it a fair and accurate

20   depiction of that location where the pole camera is

21   and what occurred that you've already described for

22   the jury?

23       A.   Yes, it is.

24           MS. MARTIN:  Your Honor, permission to

25   admit Government's Exhibit 2-B and publish to the

Page 53

1    jury.

2                        THE COURT:  Any objection?

3                        MR. PATTERSON:  No, Your Honor.

4                        THE COURT:  G-2-B is received in

5    evidence.

6         (Government's Exhibit No. 2-B was received)

7    BY MS. MARTIN:

8         Q.   All right.  Before we play the video,

9    Officer Ferreira, can you orient the jury as to what

10   we're looking at?  What street is that in the video?

11        A.   That's Sharpnack Street.

12        Q.   All right.  And is the direction of travel

13   east or westbound on that street?

14        A.   That's westbound.

15        Q.   And you told the jury that you came or

16   approached eastbound; is that fair?

17        A.   That's correct.

18        Q.   All right.  And where's the store in

19   location -- in relation to what we're seeing in this

20   video?

21        A.   It's -- the camera is 360, so we wouldn't be

22   able to see it from this angle.

23        Q.   Okay.

24        A.   It would be behind the other way.

25        Q.   So if, for example, in this video we see you

Page 54

1    driving the wrong way up the street, were you driving

2    in the direction directly at the store?

3         A.   Yes, I was.

4         Q.   So it's essentially underneath this camera?

5         A.   Correct.

6         Q.   All right.  And the vehicle in question that

7    you talk -- you told us about that you received

8    information over Real Time Crime, do you see that

9    vehicle in this still image before I play it for you?

10        A.   Yes, I do.

11        Q.   Okay.  And can you go ahead and circle it

12   for the jury using your screen?

13        A.   Yes.

14        Q.   All right.  Indicating for the record on the

15   initial still screen the second vehicle on the left-

16   hand side, parked on the left-hand side.  All right.

17             If we could go ahead and play 2-B for the

18   witness.  What's the time marked there, Officer

19   Ferreira?

20        A.   4:55 p.m.

21        Q.   4:55 and?

22        A.   Eight, eight seconds, ten.

23        Q.   Thank you.

24        (At 10:26 a.m., Exhibit 2-B played)

25        (At 10:27 a.m.)

Page 55

1             MS. MARTIN:  I apologize, Your Honor.

2    That's the -- can we please go to the second clip.

3    We'll mark it as 2-C.

4             THE COURT:  What is on the screen now,

5    2-C?

6             MS. MARTIN:  That was -- we'll mark

7    that as 2-B, Your Honor.  That's the video starting at

8    4:55 p.m.  I would like to show the witness what I'll

9    mark as 2-C which is the second video clip.

10            THE COURT:  And moving that into

11   evidence?

12            MS. MARTIN:  I am going to move that

13   into evidence as well, Your Honor.

14            THE COURT:  Any objection?

15            MR. PATTERSON:  No, Your Honor.

16            THE COURT:  2-C is received in

17   evidence.

18        (Government's Exhibit 2-C was received)

19            MS. MARTIN:  Permission to publish,

20   Your Honor?

21            THE COURT:  Yes, you have it.

22   BY MS. MARTIN:

23       Q.   All right.  Fair to say we're still looking

24   at that same camera angle, just five minutes later

25   than the video we just saw --

Page 56

1       A.   Yes, ma'am.

2       Q.   Officer Ferreira?  Okay.  And we're still

3    looking at the same car on the left-hand side?

4       A.   Yes, ma'am.

5            MS. MARTIN:  And if you could go ahead

6    and play the video for the witness.

7       (At 10:28 a.m. video played)

8       (At 10:28 a.m.)

9    BY MS. MARTIN:

10      Q.   What's the time at the bottom of the screen

11   right now?

12      A.   5:01:20 seconds.

13      Q.   Is that your police car, Officer Ferreira?

14      A.   Yes, it is.

15      (At 10:28, video resumes)

16      (At 10:29 a.m.)

17           MS. MARTIN:  If you could pause,

18   please.  Can you go back just a little bit?

19   BY MS. MARTIN:

20      Q.   Officer Ferreira, just to be clear, the

21   marked police car, is that your car that we see on the

22   screen right now?

23      A.   Yes, ma'am.

24      Q.   Okay.  And the time is 5:02 and 42 seconds.

25   And does this video demonstrate the events that

1    happened that day that you described for the jury?

2        A.   Yes, it does.

3              MS. MARTIN:  If I could just have a

4    moment with Counsel, Your Honor.

5              THE COURT:  You may.

6        (Pause)

7              MS. MARTIN:  Your Honor, I have nothing

8    further for this witness.  Thank you.

9              THE COURT:  Thank you.

10             Mr. Patterson.

11                CROSS-EXAMINATION

12   BY MR. PATTERSON:

13       Q.   Good afternoon, Officer.

14       A.   Good afternoon, sir.

15       Q.   Officer, I'm sorry.  You had told the jury

16   how long you've been a police officer.  How long is

17   that?

18       A.   Close to two years now.

19       Q.   And you're a patrolman, correct?

20       A.   Yes, sir.

21       Q.   So obviously you have quite a bit of

22   experience working for the City of Philadelphia,

23   correct?

24       A.   Yes, sir.

25       Q.   You referenced a walkie talkie that you keep

1    on your right shoulder; is that correct?

2          A.    Yeah.   It's the radio.

3          Q.    And that radio is directly connected to

4    dispatch, correct?

5          A.    Correct.

6          Q.    So when you're in a patrol car on your daily

7    patrol, you have a certain patrol area, correct?

8          A.    Yes, sir.

9          Q.    And so when you're in your car, when you're

10   on foot, or you're anywhere throughout the day when

11   you're on duty you can listen to that -- the speaker

12   on your right shoulder and you're listening directly

13   to dispatch, correct?

14         A.    Yes, sir.

15         Q.    Now you testified on questions from direct

16   examination that you were receiving a lot of

17   dispatches before you responded to Sharpnack Street;

18   is that correct?

19         A.    That's correct.

20         Q.    And when you receive a dispatch, just so

21   we're clear and the jury is clear, the dispatch is

22   from the dispatch center, right?

23         A.    Correct.

24         Q.    Okay.   It's not from the person who's making

25   the phone call?

1      A.    No, it's not.

2      Q.    Okay.  So when you started answering

3  questions based upon what you heard on your radio from

4  dispatch and His Honor instructed the jury that it's

5  not offered for the truth, but just for what you did.

6  So when you receive a dispatch, they try to give you

7  as much information as possible so you are prepared to

8  go and handle whatever they're telling you, correct?

9      A.    Correct.

10     Q.    Because if it's a cat in a tree as opposed

11  to a, you know, a theft or something, you're going to

12  be geared up for whatever you're responding to,

13  correct?

14     A.    Correct.

15     Q.    And that's what's in dispatch.  But dispatch

16  is only relaying to you what they hear from somebody

17  else, right?

18     A.    Yes.

19     Q.    Okay.  Now the -- I believe you said that

20  the dispatch initially was the actors may have been

21  armed; is that -- I forgot.  What did you say was --

22     A.    That's -- that's not what I said.  I said

23  originally it came out as a theft in progress.

24     Q.    Oh, just a theft in progress.

25     A.    Correct.

Page 60

1      Q.   Okay.  But you said when you responded that
2  you got out of the car and you did unholster your
3  weapon; is that correct?
4      A.   No.  That's not what I did.
5      Q.   I'm sorry.
6      A.   That's not what I said.
7      Q.   And, again, if I'm -- please tell us again.
8      A.   I said when I got out of the vehicle, I got
9  further information from radio dispatcher that it was
10  a -- could have been a robbery in progress with a gun.
11      Q.   Okay.  So then you got an additional
12  dispatch that there might be a gun.  That's why you
13  unholstered your weapon; is that correct?
14      A.   No.  I don't remember drawing my weapon at
15  that time.
16      Q.   Well, did you draw your weapon at one point?
17      A.   Yes, I did.
18      Q.   Okay.  And, actually, you wrote in a police
19  report -- and by the way, you were trained as a police
20  officer for the City of Philadelphia Police Department
21  that whenever you're involved in any type of incident
22  you issue a police report, correct?  You type a police
23  report?
24      A.   That's not necessarily true.
25      Q.   Sometimes you do?

Page 61

1        A.   No.  Sometimes we don't have to.

2        Q.   Okay.  But in this case you did, correct?

3        A.   No, I did not.

4        Q.   Just to recount on my cross, you had your

5   weapon drawn, but then you specifically noticed that

6   the occupant of this car didn't have a gun and based

7   upon your observation of the occupant not having a gun

8   you put your gun away; is that correct?

9        A.   That's correct.

10       Q.   Okay.  You would not have put your gun away

11   if you had any indication from this individual that he

12   had a gun or was reaching for a gun, correct?

13       A.   Correct.

14       Q.   Thank you.

15             MR. PATTERSON:  Nothing further.

16             THE COURT:  Any other cross-

17   examination?

18             MR. WITTELS:  Just briefly.

19                  CROSS-EXAMINATION

20   BY MR. WITTELS:

21       Q.   Good morning, Officer Ferreira.

22       A.   Good morning, sir.

23       Q.   I represent Abid Stevens.  You didn't have

24   any contact with him that day, did you?

25       A.   No, I did not.

Page 62

1      Q.   Okay.  When you got to the scene you cut
2   your lights and sirens because you were exiting your
3   radio patrol car, correct?
4      A.   Correct.
5      Q.   Okay.
6      A.   And, also, I didn't want to alert anyone.
7      Q.   But your brother and sister officers also
8   were driving radio patrol cars that came past the
9   scene with their lights and sirens still on, correct?
10      A.   Yes, because at that time they were chasing
11   the vehicle.
12      Q.   All right.  So I would assume that people in
13   the store would still hear lights and sirens, correct?
14      A.   I'm not sure.
15      Q.   But the lights and sirens were on on other
16   vehicles as they went past the scene, correct?
17      A.   I'm not sure.
18      Q.   Okay.  But you cut your lights and sirens
19   when you got to the scene?
20      A.   Sometime --
21      Q.   Or you don't remember --
22              THE COURT:  No.
23              THE WITNESS:  I don't remember.
24              THE COURT:  Let him finish.
25              MR. WITTELS:  Oh, I'm sorry.

Page 63

1                    THE COURT:  You started to say

2     sometime.

3                    THE WITNESS:  Yes.  Sometime between

4     turning into Sharpnack Street and getting to the

5     location that I did.

6                    MR. WITTELS:  All right.

7     BY MR. WITTELS:

8         Q.   But if a witness has said that they heard

9     lights and sirens going by, they wouldn't be

10    incorrect, would they?

11        A.   They wouldn't.

12        Q.   What is -- is there a grading or a call for

13    argument in progress?

14        A.   A rating?

15        Q.   Yeah.  Is there -- you told us about theft

16    in progress, robbery in progress.  Is there one for

17    argument in progress?

18        A.   There are many.

19        Q.   Okay.  But not for that?  It would be more

20    likely a disturbance in progress, something like that?

21        A.   That's correct.

22        Q.   Yeah.  Do you know who upgraded the call?

23        A.   I would say it was the dispatcher.

24        Q.   Okay.  And you don't know on the basis of

25    what information it got upgraded, do you?

Page 64

1         A.    No, I don't.

2         Q.    Thank you.

3                   MS. MEEHAN:  No questions.

4                   MS. MARTIN:  I have no redirect, Your

5    Honor.

6                   THE COURT:  Thank you very much,

7    Officer Ferreira.  That --

8                   THE WITNESS:  Thank you, sir.

9                   THE COURT:  -- concludes your

10   testimony.

11                  MS. MARTIN:  Your Honor, the Government

12   calls Officer Raheem Williams.

13        (Pause)

14                  MS. MARTIN:  My apologies, Your Honor.

15                  Officer, if you would please take the

16   stand.

17                  THE CLERK:  Raise your right hand.

18      OFC. RAHEEM WILLIAMS, GOVERNMENT WITNESS, SWORN

19                  THE CLERK:  Thank you.  Please be

20   seated.

21                  Please state your full name for the

22   record.

23                  THE WITNESS:  Raheem Williams.

24                  Good morning, Your Honor.

25                  THE COURT:  Good morning.

1                    MS. MARTIN:  May I, Your Honor?

2                    THE COURT:  You may.

3                         DIRECT EXAMINATION

4    BY MS. MARTIN:

5         Q.    Good morning, Officer Williams.

6         A.    Good morning.

7         Q.    Officer Williams, how are you currently

8    employed?

9         A.    14th District Police Officer.

10        Q.    A Philadelphia Police Officer?

11        A.    Yes.

12        Q.    And how long have you been a police officer?

13        A.    Two years now.

14        Q.    How long have you been assigned to the 14th

15   District?

16        A.    Both years.

17        Q.    And were you working as a Philadelphia

18   Police Officer on March 15th, 2019?

19        A.    Yes, I was.

20        Q.    And what was your schedule on that day,

21   March 15th?

22        A.    Four to 12.

23        Q.    Were you working alone or with a partner?

24        A.    With a partner.

25        Q.    Who was that?

Page 66

1          A.    Officer Rodriguez.

2          Q.    And at some point -- well, let me back up.

3    Do you remember your schedule that day?

4          A.    Yes.  I was four to 12 that day.

5          Q.    Four to 12.  I apologize if you mentioned

6    that.

7                    MR. PATTERSON:  Your Honor, I'm going

8    to object to relevance on this line of questioning.

9                    MS. MARTIN:  Your Honor, I'm happy to

10   make a proffer at sidebar.

11                   MR. PATTERSON:  I would request that

12   also.

13                   THE COURT:  Yes.  What?

14                   MR. PATTERSON:  I said I would request

15   that also.

16                   THE COURT:  Fine.  We'll go to sidebar.

17        (At sidebar)

18                   MS. MARTIN:  (Indiscernible).

19                   MR. PATTERSON:  (Indiscernible).

20                   MS. MARTIN:  I was only going to say it

21   was a simple (indiscernible).

22                   MR. PATTERSON:  If you can say -- if --

23                   MS. MARTIN:  I specifically told him

24   (indiscernible).  I apologize, Your Honor.  I'm not

25   trying to not speak to you.  I'm trying to explain to

Page 67

1    counsel, I'm --

2                    THE COURT:  Well, I think we would

3    start with an offer of proof.

4                    MS. MARTIN:  Yes.  This is an officer

5    that conducted a car stop of Donnie Smith's vehicle

6    nine -- 12 days before the robbery.  It matches the

7    make, model, tag, VIN number.  And he pulled his

8    identification and filled out a piece of paper that

9    says it was Donnie Smith in that vehicle that day.  So

10   it establishes it's Donnie Smith's car.  It goes to

11   the 911 call.  It goes to the car chase

12   (indiscernible).

13                   MR. PATTERSON:  I'm okay with that.

14   I'm just was concerned about the officer testifying as

15   to the reason for the stop and putting an inference in

16   the jury's mind that my client was up to no good on a

17   prior occasion that has nothing to do with this case.

18                   MS. MARTIN:  And I explained to Mr.

19   Patterson just now and I apologize for not doing it

20   earlier.

21                   THE COURT:  I understand.

22                   MS. MARTIN:  I was simply going to ask,

23   did you conduct a routine traffic stop of this

24   individual.

25                   MR. PATTERSON:  And then I would just

Page 68

1    ask that (indiscernible) --

2                    MS. MARTIN:  (Indiscernible).

3                    THE COURT:  I'm fine with that then.

4                    MS. MARTIN:  Is that okay?

5                    THE COURT:  That's fine.  You'll

6    proceed as agreed.

7         (Sidebar concluded)

8                    THE COURT:  Counsel will proceed as

9    agreed at sidebar.

10                    MS. MARTIN:  Thank you, Your Honor.

11   BY MS. MARTIN:

12        Q.   You said you were working 4 p.m. to 12 a.m.?

13        A.   Yes, I was.

14        Q.   And did you and your partner conduct a

15   routine traffic stop for a 2010 maroon Ford Taurus

16   that evening?

17        A.   Yes, we did.

18        Q.   Did you fill out any paperwork related to

19   that traffic stop?

20        A.   Yes.  I filled out the 48A.

21        Q.   What's a 48A?

22        A.   Just a report of a car stop that you would

23   pull over -- that you would conduct.

24        Q.   Okay.  And do you remember the individual's

25   name who was driving that 2010 Ford maroon Taurus?

1      A.   Yes, I do.

2      Q.   What was the name of the individual?

3      A.   Donnie Smith.

4      Q.   All right.  And what was the VIN number of

5    the vehicle, if you remember it.

6      A.   I don't remember it off the top of my head.

7      Q.   All right.  Would it refresh your

8    recollection if I showed you the paperwork you filled

9    out that evening?

10     A.   Yes.

11     Q.   If I could have on the witness's screen only

12   what's been marked as Government's Exhibit 6.

13     (Pause)

14     Q.   Officer Williams, I've placed the 48A that

15   you filled out on the screen.  Does that document

16   contain the VIN number?

17     A.   Yes, it does.

18     Q.   All right.  And would you have written that

19   down that evening?

20     A.   Yes.

21     Q.   How did you obtain the VIN number?

22     A.   From the vehicle itself.

23     Q.   Okay.  And can you read the VIN number into

24   the record, please?

25     A.   Yes.  It's going to be 1FAHP2EW9EG170167.

Page 70

1          Q.   Okay.  And did you note the make, the model
2     and the year of the vehicle?
3          A.   Yes, I did.
4          Q.   What is it?
5          A.    It's going to be a 2010 Ford Taurus sedan,
6     maroon -- well, red in color, but same shade of red.
7          Q.   Okay.  And did you take down any of the tag
8     or license plate information or do you remember
9     anything about the tag or license plate information?
10         A.   On that night there was a temp tag on the
11    car itself.
12         Q.   What's a temp tag?
13         A.    It's not a real tag, but it's a tag to
14    transport a car from one state to another when you
15    first buy it.
16         Q.   Okay.  There were no traffic citations or
17    anything written as a result of that car stop,
18    correct?
19         A.   No.
20                   MS. MARTIN:  I have nothing further for
21    this witness.
22                   MR. PATTERSON:  Very briefly.
23                        CROSS-EXAMINATION
24    BY MR. PATTERSON:
25         Q.   Good morning, Officer.

Page 71

1        A.    Good morning.

2        Q.    Just briefly, when you fill out these forms,

3   it's required by the Philadelphia Police Department;

4   is that correct?

5        A.    Yes.

6        Q.    And you would put the -- any -- for any stop

7   for whatever reason you would put the owner's name of

8   the vehicle to which you had stopped, correct?

9        A.    Yes.

10       Q.    And when you put the owner's name in this

11  particular traffic stop, where did you get the name

12  from?

13       A.    The owner of the vehicle?

14       Q.    Yeah.

15       A.    From the VIN, when I ran the VIN.

16       Q.    Okay.  So when you ran the VIN it came back

17  as Donnie Smith, correct?

18       A.    I don't recall.  I would have to look at the

19  paperwork.

20       Q.    If it's on the paperwork that I just looked

21  at as D-O-N-N-I-E Smith, you wouldn't have any reason

22  to disbelieve it.  You just don't know because you

23  don't have the form, correct?

24       A.    Yes.  I don't have the form so I can't --

25       (Pause)

Page 72

```
 1        Q.   Oh, you have it up there.  If you can,
 2   that's actually -- is that the form that you typed out
 3   or filled out?
 4        A.   Yes, it was.
 5        Q.   And the owner's --
 6             THE COURT:  Well --
 7   BY MR. PATTERSON:
 8        Q.   -- name is --
 9             THE COURT:  -- before you proceed, the
10   form wasn't offered in evidence.
11             MR. PATTERSON:  It's not and I'm not
12   asking for that.  I'm just asking for --
13             THE COURT:  You're just asking him to
14   testify about the form.
15             MR. PATTERSON:  I can refresh his
16   recollection, Your Honor.  I can do it that way.
17             THE COURT:  You can, but that's not
18   what you started to do.
19             MR. PATTERSON:  I did not and I
20   apologize.
21   BY MR. PATTERSON:
22        Q.   Officer, you originally told me you weren't
23   certain of what my client's name was on the form.  So
24   that form is right next to you.  Can you please take a
25   look at that, that form right there?
```

Page 73

1          A.    Yes.

2          Q.    Now after you looked at that, does it

3    refresh your recollection of what name you put down as

4    the owner of this car?

5          A.    From the form, yes.

6          Q.    What -- what is it?

7          A.    Donnie Smith.

8          Q.    Okay.  It's Donnie, D-O-N-N-I-E Smith,

9    correct?

10         A.    Yes.

11         Q.    It's not Donald Smith, right?

12         A.    No.

13         Q.    And it's -- and it doesn't say Donald Smith

14   and it doesn't say Dontay Smith either, D-O-N-T-E.  It

15   says Donnie Smith, correct?

16         A.    Yes.

17         Q.    Thank you.

18                   MR. PATTERSON:  Nothing further.

19                   THE COURT:  Is there any other cross-

20   examination?

21                   MR. WITTELS:  No.

22                   MS. MEEHAN:  No, Your Honor.

23                   MS. MARTIN:  I have no --

24                   THE COURT:  Any redirect?

25                   MS. MARTIN:  -- redirect, Your Honor.

```
                                                    Page 74

 1                   THE COURT:  Officer Williams, that
 2     concludes your testimony.  Thank you very much.
 3                   THE WITNESS:  Thank you.
 4                   THE COURT:  Oh, I thought you fell.
 5                   THE WITNESS:  No.
 6                   THE COURT:  Is it working, Michael?
 7                   THE CLERK:  Yes.
 8                   THE COURT:  Next witness.
 9                   MR. ECKERT:  Your Honor, the next
10     witness would be something that counsel would need to
11     discuss with the Court.
12                   THE COURT:  There's no other witness?
13     We can't schedule this around our break?
14                   MR. ECKERT:  If I may just have one
15     moment, Your Honor.
16                   THE COURT:  Yes.
17        (Pause)
18                   MR. ECKERT:  Certainly, Your Honor.
19     We'll call someone now.
20                   THE COURT:  Thank you.
21                   MR. ECKERT:  The Government would call
22     Detective William O'Brien.
23        (Pause)
24                   MR. ECKERT:  Your Honor, the witness
25     ran to the restroom, but he's going to be in
```

Page 75

1    momentarily.

2                    THE COURT:  All right.

3                    MR. ECKERT:  Thank you.

4         (Pause)

5                    THE CLERK:  Please raise your right

6    hand.

7         DET. WILLIAM O'BRIEN, GOVERNMENT WITNESS, SWORN

8                    THE CLERK:  Thank you.  Please be

9    seated.

10                   Please state your full name for the

11   record.

12                   THE WITNESS:  Detective William

13   O'Brien, O-B-R-I-E-N.

14                   THE COURT:  Good morning, sir.

15                   THE WITNESS:  Good morning, sir.  How

16   are you?

17                   MS. MARTIN:  May I, Your Honor?

18                   THE COURT:  You may.

19                       DIRECT EXAMINATION

20   BY MS. MARTIN:

21        Q.   Good morning, Detective O'Brien.

22        A.   Good morning.

23        Q.   Detective O'Brien, how are you currently

24   employed?

25        A.   I am a detective currently assigned to

Page 76

1    Northwest Detectives of the Philadelphia Police
2    Department.
3         Q.   What does the Northwest Detectives mean?
4         A.   Northwest Detectives, Philadelphia portion
5    of the city.
6         Q.   Is -- are -- do you encompass a number of
7    police districts in the Northwest section?
8         A.   Yes.  The 14th District, the 35th, the 39th
9    and the 5th District.
10        Q.   Okay.  And before you were a detective were
11   you a police officer?
12        A.   I was.
13        Q.   For how long?
14        A.   Six and a half years in the 12th District
15   which is in Southwest Philadelphia.
16        Q.   All right.  Now were you working as a
17   Northwest Detective on March 22nd, 2019?
18        A.   I was.  That's correct.
19        Q.   And was it Northwest Detectives that was
20   assigned to the investigation, the original
21   Philadelphia police investigation in this case?
22        A.   Yes, it was.
23        Q.   Did you assist in the investigation on March
24   22nd?
25        A.   Yes.  I assisted the assigned detective,

Page 77

1    Detective Cougar (ph).

2         Q.    Okay.  And what was your role?

3         A.    I went out and I recovered video of the

4    incident from inside the store.

5         Q.    What day and time did you recover the video?

6         A.    March 22nd, 2019 -- '18, somewhere that

7    evening.  I don't remember the exact time.

8         Q.    Okay.  But to -- the jury's received

9    evidence that the incident in question happened around

10   4:55 p.m.

11        A.    That's correct.

12        Q.    Did you recover video that same night?

13        A.    Yes, after the incident.

14        Q.    So did you physically go to the scene?

15        A.    I did and I scored the video on their DVR

16   system from the inside cameras.

17        Q.    Okay.  Let's back up for a minute.  As a

18   Philadelphia detective in the age of video

19   surveillance, do you have to or do you have any

20   specialized training in the recovery of video

21   surveillance?

22        A.    Yes.  I had a three-day class in

23   (indiscernible), Pennsylvania with FBI agents,

24   practicals going through different DVR systems and

25   learning how to do a Camtasia program, which was if

1   you ever see news clips and they're asking for help,

2   be able to make compilations to send out to the media

3   for help identifying suspects and other videos and

4   other crimes.

5        Q.   As a practical matter is it difficult to

6   recover video from different kinds of systems?

7        A.   Every system is different.  Some are old and

8   may take a few minutes to learn how, but for the most

9   -- majority you get the video.

10       Q.   That night, March 22nd, the investigation

11  was ongoing; is that fair to say?

12       A.   Yes.

13       Q.   Do you know where the victims were at the

14  time that you were at the store recovering the video?

15       A.   Inside the store.

16       Q.   They were in the store with you?

17       A.   Yes.

18       Q.   At some point were they transported to

19  Northwest Detectives to give statements?

20       A.   They were.

21       Q.   Was that before or after you recovered the

22  video?

23       A.   It was after I recovered the video, I

24  believe.

25       Q.   Did you participate in transporting them?

Page 79

1        A.    I don't recall if I did or not, or if the

2    patrol cars took them.  I don't remember that portion.

3        Q.    Okay.  Did you sit down and watch the video

4    from every single camera angle that the store had

5    while you were in the store recovering the video?

6        A.    No, not in the store, but when we got back

7    to Northwest Detectives after everything was procured,

8    yes.

9        Q.    So tell us about what happened at the store.

10   How do you decide what video you're going to recover

11   and how do you physically recover it?

12       A.    You have to look at the multiple cameras.

13   The complainants told me what time the incident had

14   occurred approximately.  I'm able to go into the DVR

15   system and look for a certain time, search it, bring

16   up the cameras and see how everything played out.  And

17   then at that point once I have the times down and the

18   date, and I have to make sure that there's no offset

19   in the time of recovery of what time it actually

20   happened at and what time it is in real time, and then

21   I just have to place a USB and through the computer

22   mouse I can export the video to the USB and then take

23   it to Northwest Detectives for further viewing.

24       Q.    Do you remember how many video angles or

25   camera angles that you recovered in this case?

1      A.    I believe I took every camera that was

2   inside the store, the interior.

3      Q.    Did you complete a video surveillance

4   recovery form in this case?

5      A.    Yes, I did.

6      Q.    Can you explain for the jury what that is?

7      A.    The video -- excuse me.  The video

8   surveillance recovery form is proprietary form that

9   Philadelphia police fills out when you go to recover a

10  video.  It's basically consent to sign.  It says we

11  didn't force them to take the video.  We took them

12  without their knowledge.  They consent to the form,

13  sign it, and then on the second half of the sheet is

14  -- fill out all the information that's pertinent to

15  the investigation, what time the incident occurred,

16  what time the video was recovered, and offset -- like

17  I explained before, if the time of the videos, the

18  real time to it, time is correct and then there's also

19  a number of cameras.  The information is list in the

20  system.  Sometimes it's not.  Also, how many days the

21  system holds video for if you can find that as well.

22     Q.    Earlier you said you couldn't remember what

23  time you were at the store.  Would it refresh your

24  recollection if I showed you the form you filled out?

25     A.    Yes.

1          MS. MARTIN:  If I could have the witness

2     shown what's been marked as Government Exhibit 24.

3          (Pause)

4     BY MS. MARTIN:

5          Q.    Detective O'Brien, I have placed in front of

6     you Government's Exhibit 24.  Is this the surveillance

7     video recovery document that you filled out?

8          A.    Yes, it is.  That's correct.

9          Q.    Okay.  And after reviewing this document

10    does it refresh your recollection as to the time that

11    you recovered the video in this case?

12         A.    Yes.  So on March 22nd I recovered the

13    video, starting to recover from the USB port at

14    9:45p.m.

15         Q.    You stated started to recover.  How long

16    does it normally take you to recover video in any

17    given case?

18         A.    Everything is fluid.  It depends on how much

19    video is taken, how much -- you know, how long, how

20    many cameras and how old the system is.  If it's an

21    older system it could take longer.  I believe it took

22    me somewhere in the area of 45 minutes that night to

23    recover all the interior cameras.  I think it took 20

24    minutes.

25         Q.    All right.  And on this -- well, let me ask

Page 82

1    you this.  Do you know the retention time of the video

2    system in this case?

3         A.   I do not offhand, but I believe it would be

4    on the second page.

5         Q.   Okay.

6              MS. MARTIN:  If I could have the witness

7    shown the second page.

8    BY MS. MARTIN:

9         Q.   Detective O'Brien, does reviewing the second

10   page of the video recovery form refresh your

11   recollection as to the retention time of the video

12   camera?

13        A.   Yes.  20 days it holds for.

14        Q.   All right.  And 20 days at 12 hours a day

15   for let's say 15 cameras, how long would it take you

16   to download that amount of information?

17        A.   If I had to guess a week, ten days.  It

18   would be a long time to sit there.

19        Q.   And in terms of physical storage capacity,

20   do you have the USBs or the hard drives that would

21   actually have the capacity to recover that kind of

22   video?

23        A.   It would need multiples.  You -- sometimes

24   other systems do not read anything higher than like a

25   16 gigabyte USB drive.  So you have to make sure it's

Page 83

1    a smaller drive when you're pulling the video.

2        Q.   How did you make the decision when you were

3    in the store that evening at 9:45 p.m., how did you

4    make the decision on what camera angles you were going

5    to recover?

6        A.   Based on what was relayed to us about the

7    incident and then reviewing it, the initial review

8    that everything happened in the store at the time.  So

9    I just took the -- all the interior cameras at that

10   time of day.

11       Q.   And do you remember the time offset on the

12   video and -- strike that question.

13            Is it fair to say that on every video

14   there's a time stamp in the corner of the video?

15       A.   Most of the time, yes.  Sometimes not.  But,

16   yes, most of the time there is a stamp there.

17       Q.   As part of your training and recovery do you

18   determine whether or not that time in the video is

19   accurate to Greenwich mean time or the world standard

20   time?

21       A.   Yes.  There's an application that was given

22   to us when we had a training to use to look at the

23   time stamp, put in the current time and then you can

24   figure out calculating by there what the offset is, if

25   there's any at all.

Page 84

1       Q.   Did you determine whether or not there was

2   any sort of offset with the video that was recovered

3   in this case?

4       A.   Yes.  It was small.  It was only -- the

5   video was two seconds ahead of time of Greenwich mean

6   time or (indiscernible) time.  Yes.

7       Q.   So for anything the jury has already seen

8   from that video, real time would be adding two seconds

9   to the video, the time displayed in the video?

10      A.   That's correct.

11      Q.   While you were recovering the video did you

12  receive any calls to assist with additional

13  investigation in this case?

14      A.   No, not while I was recovering the video.

15  No.

16      Q.   Did you assist in the investigation of this

17  case in any additional way?

18      A.   Yes.  I prepared photo lineups back at

19  Northwest Detectives.

20      Q.   Can you just explain for the ladies and

21  gentlemen of the jury what a photo array is and how

22  they're complied?

23      A.   Okay.  For the Philadelphia Police

24  Department, a photo array is conducted with six

25  individual photos.  One is your suspect.  The other

1    five are fillers that have to look similar to the

2    suspect.  The suspect cannot go in to position Number

3    1.  I cannot show the photo array as I prepared it.

4    So I would have to give it to another detective or

5    police officers to administer that photo array.  It's

6    a double blind administer.

7        And that night there was four photo arrays shown,

8    so I placed the suspect in four different spots in the

9    arrays so there would be no possibility of saying,

10   he's Number 2, pick him.  So everybody did not know

11   where the suspect was listed each time he looked at

12   the photo array, just a different victim.

13       Q.   You're saying you placed the suspect for

14   each photo array for each individual civilian you

15   placed the suspect in a different location?

16       A.   Yes.  That's correct.

17       Q.   Okay.  And then you provide the photo array

18   that you've compiled to another detective?

19       A.   Yes.  I believe I gave all four of --

20   Detective Cougar and then they were disseminated in

21   headquarters to the victims to look at.

22       Q.   And does the person showing the photo array

23   know who the prime or the suspect is?

24       A.   No.

25                   MS. MEEHAN:  Judge, I'm not sure where

1    we're going here, but I think all defense counsel have

2    stipulated that identification is not an issue and

3    we're not challenging the photo array where the

4    identification by Ms. -- made by Ms. Rodriguez, by Mr.

5    Ventura or by Mr. Sanchez.

6                    MS. MARTIN:  Your Honor, that was my

7    last question --

8                    MS. MEEHAN:  We can save the jury some

9    time.

10                   THE COURT:  Pardon me?

11                   MS. MARTIN:  That was my last question

12   on the subject.  It's just if he said a term, I would

13   like to define it for the jury.  I'm done on that

14   front, Your Honor.

15                   THE COURT:  Except I -- it sounds like

16   this line of questioning wasn't at all necessary.

17                   MS. MARTIN:  Just explaining what else

18   he did in the investigation, Your Honor.

19                   THE COURT:  Well, we don't have to do

20   everything if it isn't an issue in the case.

21                   Is there anything else you wish to ask

22   this witness?

23                   MS. MARTIN:  There is not, Your Honor.

24   I tender this witness for cross.  Thank you.

25                   THE COURT:  Thank you.

Page 87

```
 1                    Is there any cross-examination?
 2                    MR. WITTELS:  If I may, Judge.
 3                         CROSS-EXAMINATION
 4      BY MR. WITTELS:
 5           Q.   Good morning, Detective.  I'm Barnaby
 6      Wittels and I represent Abid Stevens.
 7           A.   Good morning, Counselor.
 8           Q.   How are you doing today?
 9           A.   I'm doing well.  Yourself?
10           Q.   Thank you.  I'm good.
11           Let me start with the identification process.
12      Photos come from a variety of sources, isn't that
13      correct?
14                    THE COURT:  I'm sorry, Mr. Wittels.
15      The examination on the photo arrays was stopped
16      because --
17                    MR. WITTELS:  Oh, you're right, Judge.
18                    THE COURT:  -- of an agreement --
19                    MR. WITTELS:  Okay.  That's fine, then.
20                    THE COURT:  -- among the three
21      attorneys that identification is not an issue.
22                    MR. WITTELS:  You're right, Judge.
23      Thank you.
24      BY MR. WITTELS:
25           Q.   Who determines how much video from the video
```

Page 88

1    surveillance system gets copied?

2          A.    The assigned investigator.

3          Q.    So was that you?

4          A.    I was not the assigned, no.

5          Q.    Okay.  And how does that work?  Does he give

6    you a parameter, say get from Time X to Time Y?

7          A.    Every case is fluid.  It depends on the

8    situation.  I took -- from what we viewed inside the

9    store at the time we were there.  I took from the

10   beginning of the incident to I think several minutes

11   past the incident when the alleged offenders left.

12         Q.    And how did you determine when the incident

13   began?

14         A.    When I just looked at the video.  I pulled

15   it at the time the call came out which was

16   approximately --

17         Q.    Was the time --

18         A.    -- 4:50 p.m.

19         Q.    Okay.  So you copied from 4:50 p.m. on?

20         A.    Yes.

21         Q.    So if anything occurred in the store between

22   these people before 4:50 it wasn't retrieved, correct?

23         A.    That's fair to say.  Yes.

24         Q.    Thanks.

25                    THE COURT:  Is there any other cross-

Page 89

1    examination?

2                    MR. PATTERSON:  There is, Your Honor.

3    Oh.

4                    MS. MEEHAN:  Go ahead.

5                    MR. PATTERSON:  No.  No.  Go.  Please.

6                    MS. MEEHAN:  Go ahead.

7                        CROSS-EXAMINATION

8    BY MR. PATTERSON:

9         Q.   Good morning --

10        A.   Good morning.

11        Q.   -- Detective.  And I'm sorry.  What's your

12   title within the Philadelphia --

13        A.   Detective.

14        Q.   Detective.

15        A.   Yes.

16        Q.   And do you have any subtitle for that with

17   respect to IT, audio/visual stuff?

18        A.   No.

19        Q.   Okay.  But do you -- you handle -- you've

20   handled this before in other cases where you deal with

21   the digital video recorder, correct?

22        A.   That's correct.

23        Q.   So if I say DVR to you, you would know

24   that's the digital video recorder, correct?

25        A.   Yes.

1      Q.   And you would also agree with me that in

2   your past experiences with a DVR in this case and all

3   the other cases -- and you've dealt with other cases

4   with DVR before; is that correct?

5      A.   That's correct.

6      Q.   You've dealt with DVRs in other cases where

7   there's one camera, four cameras, eight cameras, I

8   think up to 16 cameras, correct?

9      A.   Sure.

10      Q.   And then from there you can stack the DVRs

11   so you can have 32, 64 or 86 cameras, right?

12      A.   Correct.

13      Q.   Okay.  So you're familiar with how they

14   work, what they do and what you need to do to capture

15   a video; is that correct?

16      A.   I have a basic working knowledge of how to

17   export video.  Yes.

18      Q.   All right.  And you would agree with me that

19   since the passage of time there's been an update from

20   the video tapes that they used to use, correct?

21      A.   That's -- are you referring to VHS tapes?

22      Q.   Yeah.

23      A.   Yes.  Yes.

24      Q.   So you would also agree with me then that a

25   DVR would have the appearance of like a DVD player,

1    correct?

2         A.   Yes.

3         Q.   And inside the box there would basically be

4    a hard drive similar to a computer, correct?

5         A.   Correct.   Yes.

6         Q.   So a computer would record data, pictures,

7    movies, everything else.   This is designed and based

8    on the connections in the back with the CCT cable to

9    capture video feeds, correct?

10        A.   Yes.

11        Q.   And did you make a determination if the

12   video system that was used at the store had a 13

13   separate cameras, if you remember?

14        A.   I don't remember.   No.

15        Q.   Okay.   Could you at least testify that when

16   you captured the video and you compiled the video for

17   today's purposes, that they were all functioning

18   appropriate -- they were all functioning, correct?

19        A.   That I know of, yes.

20        Q.   As what you know of all the cameras that

21   were installed in the store on the day in question,

22   March 22nd, were all operating and were all recorded

23   -- were all properly being recorded by the DVR,

24   correct?

25        A.   Yes.

Page 92

1          Q.   Did you compile at a later point and maybe

2     in preparation of today or for whatever legal

3     proceedings a compiled video of everything?

4          A.   A compilation video --

5          Q.   Yes.

6          A.   -- edit it?  No.  I did not edit any video.

7          Q.   Did you see the finished product of anything

8     that you transferred out of the machine?

9          A.   Yes.

10         Q.   So you did?

11         A.   Yes.

12         Q.   Okay.  So you've already -- this -- you

13    already stated that you made a judgment call, and this

14    was your judgment call about what cameras you should

15    actually save for a potential trial like today,

16    correct?

17         A.   Mine and -- yes.  Mine and the assigned,

18    yes.

19         Q.   And it was your judgment call based upon

20    your observations of a preliminary viewing of all the

21    cameras and in discussing with the occupants of the

22    store what might be valuable?

23         A.   Yes.

24         Q.   Okay.  You haven't seen the compiled video

25    that we've seen for the last four days?

Page 93

1        A.    I don't believe I have.

2        Q.    Okay.  Well, let me just ask you this

3    because if we -- I've seen it.  The jury's seen it.

4    Everybody else has seen it.  If the cameras that you

5    preserved for future prosecution on this case depicted

6    the three actors coming and going from the inside of

7    the store to the outside of the store, I said eight

8    times.  Let me be more specific.

9        If I were to tell you that the indoor cameras

10    captured these three individuals coming and going

11    inside the store and outside the store eight times

12    during this alleged incident, you would find that

13    relevant as to what they were doing on the outside,

14    correct?

15        A.    Sure.

16        Q.    Right?  But unfortunately in this situation,

17    and I'm not blaming you.  In this situation you didn't

18    capture the outdoor camera that was pointing across

19    the street to the front door of the store; is that

20    correct?

21        A.    We recovered the Philadelphia police camera

22    that is right outside the store.

23        Q.    Right.  But that --

24        A.    At Wilson --

25        Q.    -- building -- I'm sorry.

Page 94

1        A.    That's all right.

2        Q.    That Philadelphia police camera of what

3    we've played so far points away from the store towards

4    the street.

5        A.    Yes.

6        Q.    Is that correct?

7        A.    That's correct.

8        Q.    Okay.  So, again, there was a camera on this

9    DVR system that was across the street, not at the

10   store, pointing towards the front entrance of where

11   this alleged incident occurred, correct?

12       A.    I do not know that.  No.

13       Q.    We've seen a picture of the screens of that

14   -- what was in the store the day in question.  You

15   didn't see any picture of --

16       A.    No, not that I remember, no.

17       Q.    -- of a front door?

18       A.    I probably took the picture of all the

19   screens, but I don't remember seeing that camera being

20   across the street.  No.

21       Q.    Okay.  Not that you actually physically saw

22   the placement of the camera, but did you see the feed

23   from that -- what that camera was capturing of the

24   front outside entrance of the store?

25       A.    Yes.  Yes.  Yes.

Page 95

1    Q.   You did see that?

2    A.   Yes.

3    Q.   So we do know that when you first initially

4    went there and you made your judgment call that there

5    was a stream, meaning a camera capturing what was

6    going on at the front of the store and outside the

7    front of the store, correct?

8    A.   Yes.

9    Q.   Okay.  And once again, you did not capture

10   that, correct?

11   A.   That's correct.

12   Q.   Okay.  And that was your judgment call based

13   upon your limited observations?

14   A.   Again, I took the relevant video that we

15   thought was necessary at the time.

16   Q.   Okay.  Now going back to the VHS tapes where

17   it had a very limited time to capture, you said that

18   the time to capture on DVR system generally is 20

19   days?

20   A.   Oh, it could vary.  It could be two days.

21   It could be 48 hours.  It depends on how large the

22   hard drive is and how quickly it overturns and re-

23   tapes over --

24   Q.   And, again --

25   A.   -- for lack of a better word.

1      Q.   I'm sorry.

2      A.   Go ahead.  I'm sorry.

3      Q.   It's a continuous loop.  It's not like you

4   pull a tape out and put a new tape --

5      A.   Yes.

6      Q.   -- in?

7      A.   That's correct.

8      Q.   It just keeps going.

9      A.   It just keeps going.

10     Q.   When it reaches its limit where there's no

11  more tape, it will just start re-recording over what

12  was captured --

13     A.   Old footage.

14     Q.   Old footage.  Correct.  And that's how this

15  machine operated, correct?

16     A.   Yes.

17     Q.   And you would also agree with me, sir, that

18  there was no audio on this video tape?

19     A.   I believe so.  Yes.

20     Q.   Right.  Question, since you've done this

21  before, are store surveillance cameras usually video

22  and audio or just it depends?

23     A.   I don't see many -- I don't see much audio.

24  It's usually just the video.

25     Q.   And I'm sorry.  You said -- I'm getting

Page 97

1   ahead of myself.  You said time to recover on this

2   machine was -- oh, I'm sorry.  It took you 45 minutes

3   or 20 minutes to capture what you wanted to capture?

4        A.   It took me 45 minutes of 20 minutes of

5   footage to capture.  Yes.  So it took me 45 minutes to

6   capture 20 minutes of video.

7        Q.   Okay.  Now -- and I believe you said that

8   the retention time on this machine was 20 days,

9   correct?

10       A.   Yes.

11       Q.   So from the day that this happened you would

12   have had 20 days to go back and take whatever you

13   possibly thought might have been relevant?

14       A.   Yes.

15       Q.   Okay.  Now you were asked this specifically

16  by the Government.  And I hope I have the verbiage

17  right.  No.  No.  Strike that.

18       The Government asked you that it could take a

19  long time to capture a lot of feeds from a lot of

20  different cameras; is that correct?

21       A.   That's correct.

22       Q.   Did the amount of time that it may have

23  taken you, was that prohibitive of you actually

24  getting feeds from all the cameras or you -- again, it

25  was just your judgment call as to what you thought --

Page 98

1       A.   Again, I was -- I took the relevant video at

2  the time.  If the assigned would have asked me to go

3  out and grab more video, I would have went out easily

4  and took more video.

5       Q.   Because obviously time -- the amount of time

6  it takes would never factor in in consideration in a

7  crime scene investigation?

8       A.   For something like that, no.  I was onto my

9  own investigations at the time.

10      Q.   I understand.  You were onto other

11 investigations?

12      A.   Well, I was -- I'm also -- I'm an assigned

13 investigator, so I was investigating my jobs.  If he

14 would have asked me to go out and, hey, let's grab

15 more video, I would have went and grabbed more video.

16      Q.   When you say he, who's he?

17      A.   Detective Gugar (ph) who was the assigned

18 detective in this case.

19      Q.   Was he the affiant officer, the one that's

20 responsible for compiling all the discovery in --

21      A.   Yes.

22      Q.   Okay.  So obviously I'm not going to ask you

23 what he did or what he knows, but my question is, do

24 you know if he looked at all the video tape within

25 that 20 days of when you could have went back?

Page 99

1       A.   I don't know if he did or not.

2       Q.   Thanks.

3            MS. MEEHAN:  Judge, I just have one or

4    two questions.

5            THE COURT:  You may proceed.

6                 CROSS-EXAMINATION

7    BY MS. MEEHAN:

8       Q.   Good morning, Detective --

9       A.   Good morning, Counselor.  How --

10       Q.   -- O'Brien.

11       A.   -- are you?

12       Q.   How are you?

13    Just -- I just want to clarify counsel for Mr.

14    Smith used the word capture.  You went to the store

15    that evening and you said you yourself reviewed video,

16    right?

17       A.   The brief several minutes of the incident,

18    yes.

19       Q.   Well, 15 or 20 minutes?

20       A.   Yes.

21       Q.   Okay.  And by review you watched it?

22       A.   I watched one camera and then I took all the

23    cameras from inside.

24       Q.   Okay.

25       A.   Once I realized that the -- an incident had

1   occurred.

2        Q.   Okay.  And you actually had access to the

3   exterior camera footage at that time, same time,

4   correct?

5        A.   I would have.  Yes.

6        Q.   And you reviewed that as well?

7        A.   I did not review the outside camera, no.

8        Q.   But you determined that it wasn't necessary

9   to, we'll use the word capture or take the exterior;

10  is that right?

11       A.   Yes.

12       Q.   Okay.  But did -- you didn't bother

13  reviewing it; is that what you're saying?

14       A.   I did not review it.  No.

15       Q.   You didn't review it.  Okay.  But nothing

16  prevented you from taking it that night?

17       A.   No.

18       Q.   And you said Detective Gugar, did he review

19  what you showed him?

20       A.   Yes, when we got back to Northern

21  Detectives.

22       Q.   Did anyone else review the cameras -- the

23  interior --

24       A.   I'm sure there was multiple people --

25  multiple detectives and police officers that reviewed

Page 101

1  the camera at some point later on that day or the next

2  day.

3          Q.   And so in that 20 -- I'm sorry.  In that 20

4  days that all of these people reviewed it, no one made

5  a determination that any additional evidence was

6  necessary; is that right?

7          A.   That's correct.

8          Q.   Okay.

9          A.   At least for video evidence.

10         Q.   Video evidence.  Correct.

11         A.   Yes.

12         Q.   Thank you.

13                 THE COURT:  Is there any redirect?

14                 MS. MARTIN:  No, Your Honor.

15                 THE COURT:  Thank you very much, sir.

16                 THE WITNESS:  Thank you, Your Honor.

17         (Pause)

18                 MS. MARTIN:  Your Honor, if it's

19  possible to take the morning break at this point?

20                 THE COURT:  Yes.  How long do you

21  anticipate this legal argument will take to present?

22                 MS. MARTIN:  15 to 20 minutes.

23                 THE COURT:  We're not going to allow

24  that much time.  We'll recess until -- we'll make it

25  11:30.  It's now about 12 minutes after 11, a little

```
                                                    Page 102
```

1   bit longer than normal.  We have a legal issue to

2   address and it's going to be presented to me now.

3                    Mr. Cosgrove.

4                    THE CLERK:  All rise.

5        (Jury out)

6                    THE COURT:  Be seated, everyone.

7                    I'll hear from you, Ms. Martin.

8                    MS. MARTIN:  Your Honor, I don't want

9   to speak for Ms. Meehan.  I know it's an objection to

10  the cell phone records that we put into evidence and

11  whether or not there is, I believe, a misunderstanding

12  as to things that were communicated between Ms. Meehan

13  and myself last week.

14                   I reached out to her to ask if she

15  would stipulate to Maurice Quinn's phone number as of

16  the time of the incident because it appears in parole

17  records that we have in our possession and passed in

18  discovery.  Otherwise, I would have to call his parole

19  agent to establish his phone number.

20                   The reason it matters, Your Honor, is

21  it goes to the Dontay Smith cell phone records.  There

22  are, as I mentioned last night, seven contacts between

23  Maurice Quinn's phone number and the Dontay Smith

24  phone number along with calls between Carlene Webster,

25  Mr. Smith's wife, and the Dontay Smith phone number.

1                I -- as I understood Ms. Meehan's

2    objection -- and, again, I don't want to speak for her

3    --

4                MS. MEEHAN:  Then please don't.

5                MS. MARTIN:  I'm happy to let her voice

6    her argument.  I --

7                THE COURT:  The issue is --

8                MS. MARTIN:  I believe she --

9                THE COURT:  -- the telephone number for

10   Mr. Quinn?

11               MS. MARTIN:  Yes.  That was the

12   stipulation, Your Honor, as to the phone number for

13   Mr. Quinn and that was my understanding of the

14   stipulation.  Yes, Your Honor.

15               MS. MEEHAN:  Your Honor, may --

16               THE COURT:  And that was --

17               MS. MEEHAN:  -- I be heard?

18               THE COURT:  -- that stipulation was

19   entered into or the attempt was to stipulate to avoid

20   the need to call the parole agent.

21               MS. MARTIN:  Yes, Your Honor.  That was

22   my intent.

23               THE COURT:  Which would present

24   problems because it would suggest, maybe a little more

25   than suggest that Mr. Quinn was --

1                MS. MARTIN:  It's prejudicial --

2                THE COURT:  Yes.

3                MS. MARTIN:  -- which is why I reached

4     out.

5                THE COURT:  Under state supervision

6     after having committed a crime.

7                MS. MARTIN:  Yes, Your Honor.

8                MS. MEEHAN:  Your Honor, may I be heard

9     on this?  I --

10               THE COURT:  Yes.

11               MS. MEEHAN:  I was mislead by

12    Government counsel last week, and Mr. O'Donnell who is

13    seated next to me was in the room when Ms. Martin was

14    on speaker phone.  Ms. Martin called and said, I

15    provided -- the Government provided parole records of

16    Mr. Quinn.  We don't plan on using those in any -- in

17    our case in chief for any particular purpose.

18               However, we want to show that Mr. Smith

19    had a phone and one of the ways we can show Mr. Smith

20    had a phone is that he contacted Mr. Quinn.

21               Now there's other ways they could show

22    that.  They could show it through his wife, Ms.

23    Webster, and her phone.  But she asked me if I would

24    stipulate to Mr. Quinn's phone number and therefore

25    they wouldn't call the parole agent.  I would have an

1    objection to that, but that's neither here nor there

2    today.

3                    THE COURT:  I'm sorry.  That might be

4    where you end up today.

5                    MS. MEEHAN:  Well, Your Honor, if I

6    could be heard.  Ms. -- I visited --

7                    THE COURT:  You are being heard.

8                    MS. MEEHAN:  -- Mr. Quinn and I

9    discussed the stipulation about this with him, and the

10   secondary reason that she wanted the number for Mr.

11   Quinn was to show that Mr. Quinn and Mr. Smith are

12   friends.  And I said I will agree to that.  There's no

13   issue.  They know each other.  They all know each

14   other.  That is not in dispute.  I would stipulate

15   that they are friends.  And she assured me in the same

16   phone call that she would not be using any records to

17   show any inference or make any argument to the jury

18   that there was phone contact to show anything related

19   to a robbery or they contacted each other and that

20   they -- she would then be able to argue to the jury

21   that they -- between these calls there was something

22   being cooked up.  That's what was represented to me --

23                    THE COURT:  She was not going --

24                    MS. MEEHAN:  -- on last week's --

25                    THE COURT:  -- to do that or she was?

Page 106

1              MS. MEEHAN:  Correct.  That was what
2      was represented to me on the telephone last week.
3      Therefore, I did not raise this issue with the Court
4      in any sort of motion in limine.
5              Today, Your Honor, she wants to present
6      a highlighted, and I'm thumbing through multiple
7      pages.  The yellow highlights are Mr. Quinn's -- I'm
8      sorry -- Mr. Smith's phone and then Mr. Quinn's phone
9      is in blue.  So not only is the stipulation well
10     beyond, yes, this is Mr. Quinn's number.  He and Mr.
11     Smith called each other.  They called each other all
12     the time, Your Honor.  These records go from March
13     20th, and this is one of the reasons I had an issue
14     with this.  If they got all of the records before
15     March 20th it would show that Mr. Quinn and Mr. Smith
16     call each other all the time.  They were sending
17     pictures back and forth.  Mr. Quinn was at Mr. Smith's
18     birthday party.
19              So the probative value of the calls in
20     that limited period of time that the Government
21     obtained from T-Mobile is really prejudicial to Mr.
22     Quinn if she wants to use it for that purpose.  If she
23     wants to say, this is Mr. Smith's phone.  We know that
24     because there were contacts between Mr. Smith and Mr.
25     Quinn over a long period of time that have no relation

Page 107

1    to March 22nd, I'm fine with that.  I'm fine with

2    that.

3              But she went well beyond what we had

4    discussed during the phone conversation and now she

5    wants to highlight in blue all the contacts between

6    Mr. Quinn and Mr. Smith that are not related to the

7    robbery.  There's a call on March 20th that has no

8    bearing on anything, and then there are calls after

9    Mr. Quinn and Mr. Smith leave the store on March 22nd.

10   That also has no relevance or bearing to whether they

11   conspired or aided and abetted each other before or

12   during the robbery.

13             So this is really prejudicial and it

14   puts a seed in the jury's mind that I think really

15   damages Mr. Quinn's fair trial.

16             THE COURT:  And you're -- well, it's --

17   if you had no stipulation it would be admissible.  Do

18   you agree with that or not?

19             MS. MEEHAN:  No.  I would have done a

20   motion in limine, Your Honor, for what purpose does it

21   serve.  I was advised the purpose of this stipulation

22   that it's his number and that they're friends was to

23   show that this --

24             THE COURT:  All right.

25             MS. MEEHAN:  -- is Mr. Quinn's -- Mr.

Page 108

1   Smith's --

2                   THE COURT:  Well, now --

3                   MS. MEEHAN:  -- phone.

4                   THE COURT:  -- apparently the

5   Government wants to extend the --

6                   MS. MEEHAN:  Correct.

7                   THE COURT:  -- offer of proof.

8                   MS. MEEHAN:  Correct, apparently.  Yes.

9                   THE COURT:  And you're moving in limine

10  now --

11                  MS. MEEHAN: Correct.

12                  THE COURT:  -- unless the Government

13  doesn't intend that.

14                  MS. MARTIN:  Your Honor, I would just

15  like to clarify.  And maybe there's a misunderstanding

16  here.  I offered to stipulate to if the Government had

17  obtained phone records from two months prior and two

18  months after the records in front of you, you would

19  see regular communication between Maurice Quinn and

20  Dontay Smith.  That's -- I'm still willing to

21  stipulate to that.

22                  The fact that they call each other

23  after the robbery, though, I believe is relevant.

24  It's, number one, showing the communication between

25  the phones.  But it's the timing of the calls.  When

1   Ms. Meehan and I spoke, I promised her and I stand by

2   this, I will not be arguing to the jury that I believe

3   that this robbery was planned days in advance; that

4   they called each other and planned this robbery.

5   That's not the purpose of these records in any way,

6   shape or form.  And I offered an immediate limiting

7   instruction if she thinks I have even argued that for

8   a second.  I will not argue that.

9           But when it comes to the communication

10  between the phones on the day of the robbery, after

11  the robbery, that's not something that we discussed.

12          MS. MEEHAN:  We did discuss it, Your

13  Honor, and I would ask for an offer of proof.  What is

14  the argument she would put forth to the jury in

15  closing based on these records that I think are

16  irrelevant and prejudicial.

17          THE COURT:  No.  She's -- when did you

18  get the exhibit?

19          MS. MEEHAN:  Today.

20          MS. MARTIN:  Your Honor, if I may --

21          THE COURT:  Problem there.

22          MS. MEEHAN:  Well, the highlighted

23  exhibit.

24          MS. MARTIN:  No.  No.  They -- it's the

25  exact same copy of the records.  It's only the

1    demonstrative with the highlights.  It's the exact

2    same information.  It's the exact same printout that

3    they received in discovery months and months ago.

4                   MS. MEEHAN:  We did.  But the

5    highlights, including the blue highlighted version I

6    received this morning.  That I received this morning.

7    And I was advised --

8                   THE COURT:  But you had the records?

9                   MS. MEEHAN:  Right.  True.

10                   THE COURT:  It sounds like you're --

11   well, it's evidence that does not help Mr. Quinn.  But

12   what are you unable to do today that you could have

13   done two weeks ago?

14                   MS. MEEHAN:  I'm not understanding Your

15   Honor's question.

16                   THE COURT:  Well, you're claiming

17   prejudice and surprise.  You had the exhibit.  If you

18   had looked at the exhibit you would have seen that

19   there were lots of calls between the two of them and

20   you knew that.

21                   MS. MEEHAN:  I did know that, but I was

22   advised that she wouldn't be arguing that.

23                   THE COURT:  She's not --

24                   MS. MEEHAN:  That's what she told me.

25                   THE COURT:  -- arguing that.  She's

Page 111

1    arguing, she wants to argue that there were telephone

2    calls after the robbery.

3                    MS. MEEHAN:  And I was advised that

4    that was not part of her argument.

5                    MS. MARTIN:  Your Honor, I would argued

6    I would never say that there was advance knowledge or

7    preparation.  That's what I said.

8                    THE COURT:  This is not -- from all the

9    evidence, and this is not me speaking as a judge and

10   opining in the case, but this does not sound like the

11   case, the kind of case the Government would argue was

12   planned.  This sounds like something that happened --

13   I'm talking about the evidence I've heard so far and

14   I'm sure the jury is thinking this way.  Whatever

15   happened, seems to have happened spontaneously on the

16   day of the robbery, March 22nd.

17                    But I don't --

18                    MS. MEEHAN:  Well --

19                    THE COURT:  -- get your reasoning for

20   trying to exclude evidence of telephone calls between

21   Mr. Smith and Mr. Quinn after the robbery on --

22                    MS. MEEHAN:  Well --

23                    THE COURT:  -- March 22nd.

24                    MS. MEEHAN:  Well, I'll follow up on

25   Your Honor's words, spontaneous.  If it is, in fact,

```
1    spontaneous, then what is the relevance of showing

2    calls after the robbery other than to -- there's no

3    relevance to them.  They're irrelevant.  They show

4    nothing.  So --

5                    THE COURT:  Ms. Meehan, are you -- do

6    you mean that?

7                    MS. MEEHAN:  Well, I don't -- they're

8    not relevant to show conspiracy.  They're not relevant

9    to show aiding and abetting.  They're not relevant to

10   show Count I robbery.

11                   So -- and, furthermore, I think I would

12   have given this a lot more thought, Your Honor, had

13   the Government advised me that -- they did the

14   opposite.  Ms. Martin did the opposite.  She said, I'm

15   only using it to show that that's Mr. Smith's phone.

16                   THE COURT:  Well, do you want more time

17   to think it through?  We'll withdraw this witness for

18   now and put the witness on later.

19                   MS. MEEHAN:  Here's what I would ask,

20   Your Honor.  I think we can remedy this.  I would ask

21   that Ms. Martin not use the highlighted version of the

22   records and she can highlight on the screen with the

23   witness whatever yellow highlights and not highlight

24   Mr. Quinn's calls.

25                   And I will agree that -- if we could
```

Page 113

1    stipulate that this is a limited -- the Government

2    requested limited phone records and that there was

3    contact between Mr. Smith and Mr. Quinn prior to March

4    20th as she had stated earlier; that she could offer

5    to say that there was frequent -- you know, or

6    whatever --

7                    THE COURT:  She wants to use the

8    records in addition to establish telephone contact

9    after the robbery.

10                    MS. MEEHAN:  Which is -- right.

11                    THE COURT:  Yes.  You see when I'm

12    talking to one attorney, I talk to that attorney.

13                    MR. PATTERSON:  I understand, Your

14    Honor.

15                    THE COURT:  You'll get a chance to

16    speak, but stop standing up, sitting down.

17                    MR. PATTERSON:  Thank you, Your Honor.

18                    THE COURT:  Ms. Meehan, you're not

19    finished.

20                    MS. MEEHAN:  I'm sorry.  So, Your

21    Honor, I -- if you're ruling that you think it is more

22    prejudicial than probative then I would just ask based

23    on the representations that counsel made on the phone

24    last week that that be part of -- that we hammer out a

25    stipulation that these are limited -- this is a

1    limited time period and that there was contact before,

2    you know, well before March 20th between Mr. Quinn and

3    Mr. Smith.

4                I still think that this is very

5    prejudicial and really not necessary.  Mr. Smith's

6    already agreed to the instruction of flight.  So the

7    fact that his phone and the 911 call is coming in, and

8    I know -- I don't know if Your Honor has made a final

9    ruling on that.  But --

10               THE COURT:  I haven't.  If you heard me

11   yesterday and were listening, I said I was going to

12   rule on that after I heard this argument.  But this

13   argument seems to be passing that argument like two

14   ships in the night.

15               MS. MEEHAN:  Well, it's sort of related

16   because if Your Honor ruled that Mr. Smith's 911 call

17   isn't coming in, then they don't need to show any

18   evidence of Mr. Smith's phone and, therefore, it

19   doesn't prejudice Mr. Quinn at all.

20               THE COURT:  I don't understand what you

21   mean by prejudice.  I -- it sounds like from your

22   argument that everything that is adverse to Mr. Quinn

23   is to use your word "prejudicial," and that certainly

24   isn't the law.

25               MS. MEEHAN:  Well, I don't think it's

1   -- my primary objection is the calls afterwards are

2   not relevant.

3                  Thank you.

4                  MS. MARTIN:  Your Honor, I can respond

5   on that point.  I mean, the calls that are immediately

6   after the robbery, they're within an hour of the

7   robbery.  Mr. Quinn is calling Mr. Smith.  And then

8   three minutes later Mr. Smith makes the 911 call that

9   we've been talking about.  And then ten minutes after

10  that 911 calls him back.  And then later that night

11  there's communication between the two phones.

12                 I have a real personal problem with Ms.

13  Meehan calling me disingenuous in this instance.  I

14  think the records speak for what they are.  And I am

15  happy to stipulate to anything on the front end or the

16  back end of these records.  But this is nothing more

17  than a demonstrative --

18                 THE COURT:  I thought this was supposed

19  to be evidence of -- to establish Mr. Quinn's

20  telephone number.

21                 MS. MARTIN:  That's all I was asking --

22                 MS. MEEHAN:  Mr. Smith's phone.

23                 MS. MARTIN:  -- for in the initial

24  stipulation, Your Honor, was stipulating to Mr.

25  Quinn's phone number because I knew she would have an

Page 116

1    issue with me calling a parole agent.  And I agree

2    that that's prejudicial, but I had no other way to

3    establish Mr. Quinn's phone number.

4                    MS. MEEHAN:  But, Your Honor, she

5    represented -- now she's going really far afield and

6    she's trying to insinuate to the jury -- this is well

7    beyond -- first of all, she told me on the phone on

8    speaker phone with Mr. O'Donnell present that she

9    wouldn't use the phone calls in argument to the jury.

10   It was merely to establish that it was Mr. Smith's

11   phone and that --

12                    THE COURT:  Well, how can --

13                    MS. MEEHAN:  -- they were friends.

14                    THE COURT:  -- I cure that prejudice if

15   I --

16                    MS. MEEHAN:  But --

17                    THE COURT:  -- allow it, allow the

18   records.

19                    MS. MEEHAN: Well, here's the problem.

20   If she's going to insinuate to the jury that all these

21   phone calls were part of a plan for Mr. Smith to call

22   911 or to go off in a car.  There's no evidence of

23   that.  But she's insinuating that because he called --

24   he could call him to say, you know, how are you

25   feeling, how are you doing.  I heard -- you know, I

1    heard your car was crashed or whatever.  We don't know

2    and that's the problem with this evidence.  There's no

3    indication -- if it's a text message then that could

4    be relevant depending on what the text message said.

5              But the mere fact that there were phone

6    calls going back and forth is not probative of

7    anything, Your Honor.  It's not relevant.

8              THE COURT:  And are you willing to stip

9    -- well, I thought that's what you were willing to

10   stipulate to.  You keep saying that it's the calls

11   after the robbery that you're objecting to.

12             MS. MEEHAN:  Right.  She has --

13             THE COURT:  And now you're flipping.

14             MS. MEEHAN:  No.  No, Your Honor.

15             THE COURT:  You're all over the place,

16   Ms. Meehan.  I have to --

17             MS. MEEHAN:  No.  You're --

18             THE COURT:  -- tell you --

19             MS. MEEHAN:  I apologize.

20             THE COURT:  Well --

21             MS. MEEHAN:  I'll be clearer.

22             I -- they want Mr. -- evidence that Mr.

23   Smith had a phone and he called 911.  When I spoke to

24   Ms. Martin last week, that was the substance of the

25   call.  They wanted to show Mr. Quinn's phone called

```
 1    Mr. Smith's phone at any point in time, before, after,
 2    whatever; that Mr. Smith's phone was in contact with
 3    Mr. Quinn's.  Therefore, that phone belonged to Mr.
 4    Smith.
 5               They don't really need Mr. Quinn for
 6    that, in all candor, Your Honor, because they have
 7    other evidence of that.
 8               And then she said if you don't
 9    stipulate to the phone number, I'll call the parole
10    agent.  I still would have a relevance argument.  But,
11    anyway, I said, no, no.  That is his phone number and
12    they are friends.  And that was the extent of it.  And
13    she told me that she would not be making argument from
14    that -- the phone records that it had anything to do
15    with the robbery.
16               And now today she wants to insinuate
17    and wants the jury to infer from that phone contact
18    after the robbery that something nefarious was going
19    on after Mr. Smith left RD Grocery and drove off in
20    the car.  And that I think is -- there's no evidence
21    of that.  There's -- it's not relevant that the phone
22    --
23               THE COURT:  Well, there is evidence.
24    There's a police -- the telephone records, the records
25    that they communicated.  There's no evidence as to the
```

1   substance of the call.

2                   MS. MEEHAN:  Correct.

3                   THE COURT:  How are you prejudiced?

4                   MS. MEEHAN:  Well, because that's --

5       that's the problem, Your Honor.  There's nothing there

6       to -- for her to then make this leap for the jury to

7       try to make that Mr. Quinn had anything to do with Mr.

8       Smith and --

9                   THE COURT:  Well --

10                  MS. MEEHAN:  -- getting in his car.

11                  THE COURT:  -- one way to avoid the

12      issue, it seems to me as the issue was presented to me

13      yesterday, is to stipulate to Mr. Quinn's telephone

14      number.  That was the initial reason for these

15      records.

16                  MS. MEEHAN:  Right.  But why does she

17      get to argue that these -- that the calls after the

18      robbery -- that was what we had discussed, and I was

19      unprepared.  I felt sandbagged this morning with this

20      highlighted version.

21                  THE COURT:  Well, that might not come

22      in to evidence.

23                  By the way, the way you're handling

24      exhibits really, if I were to grade it, it's about a

25      C-.  You've got to do better on exhibits.  Different

1    exhibit numbers.  It's very hard to track.

2              But the highlighted exhibit is

3    something that's objected to.  Is the Government

4    willing not to use the highlighted exhibit?

5              MS. MARTIN:  Your Honor, can I use it

6    as a demonstrative and not admit it into evidence in

7    any way?  I mean, otherwise it's very --

8              THE COURT:  The answer is --

9              MS. MARTIN:  -- confusing testimony.

10             THE COURT:  -- if the exhibit is out

11   because it's unduly prejudicial because of all the

12   emphasis and because I don't see its relevance.  You

13   told me yesterday you needed the telephone records to

14   establish Mr. Quinn's telephone number --

15             MS. MARTIN:  I --

16             THE COURT:  -- to link the call that

17   Donnie Smith made, allegedly made, to this case --

18             MS. MARTIN:  Right.

19             THE COURT:  -- to Donnie Smith.

20             MS. MARTIN:  Right.  And that's still

21   true, Your Honor.  I mean, the call that happens one

22   hour after the robbery from Maurice Quinn's phone to

23   the Dontay Smith phone, I mean, they were just

24   together.  We saw it in the video.  That is

25   circumstantial evidence that that is Donnie Smith's

Page 121

1    phone.

2                    THE COURT:  Yes.  That -- and I thought

3    --

4                    MS. MARTIN:  Right.

5                    THE COURT:  -- that was the reason why

6    we're going through this exercise.

7                    MS. MARTIN:  That is the reason, Your

8    Honor.  That is why we're going through it.

9                    THE COURT:  Well, let's try to figure

10   out a way to get there without inflaming a lot of

11   people and presenting a number of issues that really

12   aren't in the case.

13                   MS. MARTIN:  Your Honor, I'm not

14   arguing that there was some sort of conversation about

15   the robbery.  There's communication an hour after the

16   robbery.  That's the facts.  Those are the facts.  And

17   I have to imagine Mr. Patterson is going to get up in

18   front of the jury and say, that was not Donnie Smith

19   on that 911 call.  Well, then why is there a

20   conversation with an alleged co-conspirator three

21   minutes after the 911 call.  That's my response to

22   that.

23                   THE COURT:  Well, I'm -- I want to get

24   this case going and we're not really moving in that

25   direction very quickly.  I'm going to rule that

Page 122

1    exhibit -- does it have a number?

2                    MS. MARTIN:  Your Honor, I would have

3    been marking it as 47-C.

4                    THE COURT:  That exhibit is not to be

5    offered into evidence.

6                    MS. MEEHAN:  Thank you, Your Honor.

7                    THE COURT:  And it's not to be used as

8    a demonstrative --

9                    MS. MARTIN:  I understand, Your Honor.

10                   THE COURT:  -- exhibit.

11                   Are you going to stipulate to Mr.

12   Quinn's telephone number or not?

13                   MS. MEEHAN:  Yes, Your Honor.  His

14   number is --

15                   THE COURT:  Well, wait a minute.

16                   MS. MEEHAN:  I'm sorry.

17                   THE COURT:  You don't have to do it in

18   open court.

19                   MS. MEEHAN:  Very well.

20                   THE COURT:  You just have to agree with

21   the Government.  I don't know how it's going to be

22   used.  Does that answer all of these so-called

23   prejudicial legal issues?

24                   MS. MARTIN:  Your Honor, may I have

25   permission to show the highlighted copies to --

1                    THE COURT:  No.

2                    MS. MARTIN:  -- the witness only below?

3                    THE COURT:  No.

4                    MS. MARTIN:  No?  Okay.

5                    THE COURT:  You didn't answer my

6     question.

7                    MS. MARTIN:  I'm sorry.

8                    THE COURT:  Does the stipulation

9     resolve the issue, the stipulation of Mr. Quinn's

10    telephone number?

11                   MS. MARTIN:  I believe the objection

12    was Ms. Meehan's.  I have no objection.  I'm fine with

13    using the records as is.  With the stipulation I can

14    proceed.  Without the stipulation I can proceed, Your

15    Honor.

16                   THE COURT:  Does the stipulation

17    eliminate the need to call a representative of the

18    telephone company?

19                   MS. MARTIN:  No.  It eliminates the

20    need to call the parole agent.  The phone records

21    still establish the 911 dispatch callback number.

22                   THE COURT:  Okay.  Does that resolve

23    the issue?

24                   MS. MEEHAN:  Your Honor, I had argued

25    that she shouldn't be allowed to argue about phone

Page 124

1   calls after the robbery and I don't know if Your Honor

2   --

3                        THE COURT:   No.   I'm going to --

4                        MS. MEEHAN:   -- ruled on that.

5                        THE COURT:   I overruled that objection

6   on the ground that the Government is going to try to

7   prove that Mr. Smith made the call and that Mr. Quinn

8   and Mr. Smith were talking three minutes, allegedly

9   three minutes after the call.   It's circumstantial

10  evidence.

11                       Is there anything else we have to rule

12  on?

13                       MR. PATTERSON:   If I may, Your Honor.

14                       THE COURT:   Yes.

15                       MR. PATTERSON:   This all kind of

16  started with me objecting to what the Government's --

17  how the Government's going to try to prove that my

18  client made this phone call.

19                       Again, I already had the officer today

20  testify that according to the Pennsylvania Department

21  of Transportation this car is registered under the VIN

22  number under Donnie Smith, not Dontay Smith.   The

23  phone records say Dontay Smith.

24                       So obviously yesterday I argued two

25  things:   One, how are they going to authenticate the

Page 125

1    phone records and how are they going to lay a

2    foundation that the records that are purported to be

3    from my client's phone was, in fact, my client's

4    phone.

5                    Then the Government said, well, that's

6    going to be easy for me because I'm going to have

7    apparently Dontay Smith and these phone records called

8    Donnie Smith's mother.  Why would Dontay Smith call

9    Donnie Smith's mother?

10                   Well, then I objected to, well, how are

11   you going to establish that the phone number that's

12   purported to be Dontay -- Donnie Smith's mother is

13   Donnie Smith's mother's phone number?   And it's just

14   -- it's a can of worms, like I believe Ms. Meehan said

15   yesterday.

16                   And then from there they can prove it

17   by -- again, I hope I'm characterizing the argument

18   yesterday.  He called his mom.  Then you've got to

19   prove that -- I believe he said mother yesterday.

20        (Pause)

21                   MR. SMITH:  I said that's my mother

22   address on the --

23                   MR. PATTERSON:  Oh, mother's address.

24   Okay.  So apparently the Government just told me that

25   they're wrong on that issue.  So we cannot talk about

Page 126

1    that because I do remember his mother's address being

2    mentioned yesterday and I said, how you going to prove

3    that.  So apparently they're wrong on that, so I'll

4    move just to Mr. Quinn.

5              So now to establish that the phone,

6    that the phone records purported to be from Donnie

7    Smith only on the fact that he called Mr. Quinn.

8    That's it.  Why would Dontay Smith be calling Mr.

9    Quinn if it's not, in fact, Donnie Smith's phone?

10             From there it escalated into these

11   calls.  And, again, I don't -- my position is any

12   stipulation or any cautionary instruction that Your

13   Honor decides to give or the stipulation read between

14   Ms. Meehan and the Government, my opinion and my

15   objection is you can't cure that perception in the

16   jurors' mind that these two people are calling each

17   other, whether it's a day before, a day after or a

18   month before; that there's some type of communication

19   between these two for this grand robbery on Sharpnack

20   Street.  I personally think and my objection would be

21   it cannot be cured by a stipulation.

22             I -- again, I think based upon my

23   theory of the case I think it's cumulative.  I think

24   it causes confusion.  And, quite frankly, I think it

25   causes issues relative to the entire case insofar as

1    the perception that there's a conspiracy and they're

2    calling each other about it.

3                    THE COURT:  Well, the Government is

4    going to try to prove a conspiracy.

5                    MR. PATTERSON:  I -- well, I under --

6    we don't --

7                    THE COURT:  I'm charging the jury, at

8    least according to what the Government argued and

9    there's no way to keep it out in my judgment, at least

10   I haven't heard from the defendants on how I can keep

11   the issue of conspiracy out of the case.  But the

12   Pinkerton charge triggers a charge on conspiracy.

13                   MR. PATTERSON:  It does, Your Honor.

14   And I read that last night in preparation of that

15   argument at the appropriate time.  And doubly so if

16   Your Honor gives that Pinkerton with the corresponding

17   conspiracy charge, that's another reason why these --

18                   THE COURT:  No.  But this is evidence

19   that supports that.

20                   MR. PATTERSON:  I understand that.  But

21   the way they're going about trying to get Mr. Quinn's

22   phone number in relationship to my client's --

23                   THE COURT:  No.  They have Mr. Quinn's

24   phone number now.

25                   MR. PATTERSON:  They do have Mr.

Page 128

1    Quinn's phone number now.

2                    I understand.   I can make the

3    appropriate objections at the appropriate time when

4    they have the records custodian.   I am prepared to do

5    that.

6                    I further understand that when I go to

7    the jury, I would be permitted to argue weight,

8    meaning, again, what I believe what I said yesterday

9    is the vast resources of the federal government they

10   don't have a voice recognition expect.   And then I can

11   hopefully punch holes in this whole thing about the

12   telephone call.

13                   Personally, I don't think the telephone

14   call is -- it hurts my case that bad.   Do I want it

15   in, no.   Do I think it should --

16                   THE COURT:   Well --

17                   MR. PATTERSON:   -- be in, no.   But I

18   understand and I will respect Your Honor's ruling on

19   that.   But I believe I sufficiently put forth my

20   objections to the stipulation to Mr. Quinn's phone

21   number now irrespective of the tape insofar as I think

22   it puts the inference in the jurors' minds that

23   there's a conspiracy.

24                   And I understand that Your Honor may be

25   putting conspiracy into the mix, but --

Page 129

1                    THE COURT:  No.  I'm not putting

2      conspiracy --

3                    MR. PATTERSON:  I'm sorry.

4                    THE COURT:  -- into the mix.

5                    MR. PATTERSON:  The law may provide

6      Your Honor to put a conspiracy into --

7                    THE COURT:  It may require me to do so.

8                    MR. PATTERSON:  Right.  Absolutely.

9      And I retract my statement.

10                    THE COURT:  And we can argue that.  We

11     will argue that tonight.  We tabled that --

12                    MR. PATTERSON:  I understand.

13                    THE COURT:  -- on Tuesday night.

14                    MR. PATTERSON:  So that is my objection

15     and I understand and I respect Your Honor's ruling.  I

16     can address it through a weight argument and through

17     cross-examination.

18                    THE COURT:  Well, I haven't ruled

19     except there's a stipulation as to Mr. Quinn's

20     telephone number.  I haven't seen the records, and the

21     idea was we were going to argue the issue of the 911

22     call after I saw the telephone records.

23                    MR. PATTERSON:  So Your Honor is

24     excluding the exhibit with the highlighted phone

25     records is --

Page 130

1             THE COURT:  I am excluding that.  Yes.

2             MR. PATTERSON:  Thank you.  I have

3     nothing further.  Thank you, Your Honor.

4             THE COURT:  I'm not quite sure where we

5     went with your argument, Mr. Patterson.

6             MR. PATTERSON:  I was trying to --

7             THE COURT:  I had --

8             MR. PATTERSON:  -- figure it out

9     myself.

10             THE COURT:  -- a little trouble

11    following how the Government is going to prove that

12    the telephone call which they say was made by Donnie

13    Smith was, in fact, made by Donnie Smith.  But we'll

14    let them proceed with the telephone company records

15    and see where we go.  And you can object certainly if

16    you think any of that evidence is improper.

17             MR. PATTERSON:  Thank you, Your Honor.

18             So I'll make the objection at the

19    appropriate time on the record then, obviously.

20             THE COURT:  Absolutely.  That's what I

21    want you to do.

22             MR. PATTERSON:  Thank you, Your Honor.

23             THE COURT:  Let's take a very short

24    break and try to get back here in five minutes or so.

25             THE CLERK:  All rise.

Page 131

1                    THE COURT:  Go about your business,

2     everyone.

3          (Recess taken at 11:41 a.m.; reconvened at 11:51

4     a.m.)

5          (Jury present)

6                    THE CLERK:  All rise.

7                    THE COURT:  Be seated, everyone.

8                    As with most other things in this case

9     it took a little longer than we anticipated, and for

10    that I apologize.

11                   The Government may proceed.

12                   MR. ECKERT:  Your Honor, at this time I

13    would just move Government Exhibit 50 with the

14    agreement of counsel, which is a self-authenticating

15    (sic)  document.  It's a court record of the

16    defendant, Mr. Smith's marriage to Ms. Carlene Webster

17    and her address in Wilmington, Delaware.

18                   MR. PATTERSON:  No objection.

19                   MR. ECKERT:  I would ask just to

20    publish 50, Government's 50 to the jury --

21                   MR. PATTERSON:  No objection.

22                   MR. ECKERT:  -- and read the address

23    for the record.

24                   MR. PATTERSON:  No objection.

25                   THE COURT:  G-50 is received in

Page 132

1    evidence.

2          (Government's Exhibit No. 50 was received)

3                    THE COURT:  It may be published to the

4    jury.

5                    MR. ECKERT:  Thank you, Your Honor.

6                    And just for the record, that's -- Mr.

7    Smith was married to Ms. Carlene Antoinette Webster at

8    2206 North Monroe Street in Wilmington, Delaware.

9                    Thank you.

10                   THE COURT:  You may proceed.

11                   MS. MARTIN:  Thank you, Your Honor.

12   May I have a moment with counsel?

13                   THE COURT:  Yes.

14                   MS. MEEHAN:  Thank you, Your Honor.

15        (Pause)

16                   MS. MARTIN:  I apologize, Your Honor.

17                   MS. MEEHAN:  Thank you, Your Honor.

18                   MS. MARTIN:  Your Honor, I do have one

19   stipulation before I call my first -- my witness.

20                   There is a stipulation by and between

21   counsel that defendant, Maurice Quinn's, phone number

22   at the time of March 22nd, 2019 was phone number (215)

23   713-5602. again, (215) 713-5602.  So stipulated?

24                   MS. MEEHAN:  So stipulated.

25                   THE COURT:  That --

```
                                                Page 133
 1                    MS. MARTIN:  And with that, Your Honor,
 2     I would call Joseph Sierra.
 3                    THE COURT:  The stipulation, ladies and
 4     gentlemen, is an agreement between the parties.  And
 5     they've agreed on a telephone number and you should
 6     accept that as evidence that or reject that as
 7     evidence.  That's your call.  You're the judges of the
 8     facts.  Treat it as any other piece of evidence in the
 9     case.
10          (Pause)
11                JOSEPH SIERRA, WITNESS, SWORN
12                    THE CLERK:  Thank you.  Please be
13     seated.
14                    Please state your full name for the
15     record.
16                    THE WITNESS:  Joseph, J-O-S-E-P-H
17     Sierra, S-I-E-R-R-A.
18                    THE COURT:  Good morn -- I guess it's
19     afternoon, soon to be afternoon.
20                    MS. MARTIN:  May I proceed, Your Honor?
21                    THE COURT:  You may.
22                         DIRECT EXAMINATION
23     BY MS. MARTIN:
24          Q.   Good morning, Mr. Sierra.
25          A.   Good morning.
```

Page 134

1      Q.   Mr. Sierra, can you tell the ladies and
2    gentlemen of the jury your current occupation?
3      A.   Yes.  I am a custodian of records for T-
4    Mobile USA Incorporated.
5      Q.   So you're employed by T-Mobile?
6      A.   Yes.
7      Q.   Is it T-Mobile and any other entity?
8      A.   T-Mobile is the parent company of Metro PCS.
9      Q.   And how long have you been employed in this
10   position?
11     A.   A little bit over ten years.
12     Q.   What's the nature of your company's
13   business?  I know that seems like a silly question,
14   but if you could explain it for the record.
15     A.   Yes.  We're a telecommunications company.
16   We specialize in cell phones and data devices.
17     Q.   And what kind of work or duties, what are
18   your roles and responsibilities with T-Mobile and
19   Metro PCS?
20     A.   As a custodian of records I travel across
21   the United States to enter in telecommunications in as
22   evidence at trials.
23     Q.   And in that capacity are you familiar with
24   the regularly conducted or normal business practices
25   of T-Mobile and Metro PCS?

Page 135

1    A.    Yes.

2    Q.    Are you familiar with the business practices

3  regarding billing records and subscriber information?

4    A.    Yes.

5    Q.    Can you please explain to the ladies and

6  gentlemen of the jury the record keeping procedures

7  used by T-Mobile and Metro PCS in regard to subscriber

8  and call detail records?

9    A.    So subscriber information is going to be the

10  identifying details that a customer provides at the

11  time that they open their account.  This information

12  is captured when they open the account and is

13  maintained during their time with T-Mobile or any of

14  our subsidiaries and can be modified by the customer

15  at any time as long as their account is active.

16        Call detail records, the other type of

17  record we provide, is going to be captured at or near

18  the time of the occurrence.  Everything is captured

19  electronically, again, at or near the time of that

20  action, and then maintained in our billing system as

21  well as temporarily at the market.

22    Q.    What are call detail records?

23    A.    Call detail records are transactional logs

24  of incoming and outgoing phone calls and text messages

25  for a particular user during a particular date range.

Page 136

1       Q.   And going back to subscriber information for

2    a moment, does T-Mobile and Metro PCS check anybody's

3    ID when they obtain subscriber information?  How do

4    you get that information?

5       A.   So it all depends on the type of account

6    that you have.  If you are a post-paid customer, which

7    was traditionally understood as a contract customer,

8    but contracts for most carriers are now gone, this

9    would require you to pay after usage.  So it would be

10   like a credit.  So your social security number, a

11   credit check would be ran, and an ID as well as proof

12   of address would be collected at the time you open

13   your account.

14           For prepaid accounts, ID is not needed

15   because you're paying for service prior to usage, so

16   there's no need for a credit of any kind.  Because of

17   that, again, you don't have to provide ID, but we do

18   suggest you provide, you know, a name and address for

19   emergency purposes.

20      Q.   Now these subscriber information and call

21   detail records that you've explained, does your

22   company create and maintain both kinds of records?

23      A.   Yes.

24      Q.   And how are these records maintained?

25      A.   Electronically.

Page 137

1          Q.    When are the records created?

2          A.    At or near the time of the occurrence.

3          Q.    And are these records kept by your company?

4          A.    Yes.

5          Q.    You said electronically?

6          A.    Yes.

7          Q.    How long are they kept?

8          A.    It depends on the type of account and the

9     date of the account.  But currently it would be a two-

10    year retention for call detail records, and for

11    subscriber information it would be seven years or the

12    activeness of the account.  So if they were active for

13    eight or nine years, we would still have the

14    subscriber information.

15         Q.    And are these records kept in your normal

16    course of business?

17         A.    Yes.

18              MS. MARTIN:  Your Honor, at this time I

19    would ask that the witness be shown what's been marked

20    as Exhibit 46, 47-A and 47-B.  And if I may approach

21    with paper copies for the witness.

22              THE COURT:  You may.

23              MS. MARTIN:  For the record, in fact,

24    I'm handing the witness what's been marked as Exhibit

25    46, 47-A and 47-B.

1    BY MS. MARTIN:

2         Q.   Mr. Sierra, do you recognize the records

3    I've placed in front of you?

4         A.   Yes, I do.

5         Q.   And did you or another records custodian for

6    T-Mobile respond to a government subpoena or multiple

7    government subpoenas related to this case?

8         A.   Yes.

9         Q.   All right.  And did you return records as a

10   result of those subpoenas?

11        A.   Yes.

12        Q.   And the records in front of you, are those

13   -- is that the information that was provided by T-

14   Mobile records custodian?

15        A.   Yes.

16        Q.   Have you confirmed that that was, in fact,

17   the same information that was provided by a different

18   records custodian?

19        A.   Yes, previously to coming to court today and

20   then reviewed them again this morning.

21                  MS. MARTIN:  Your Honor, at this time I

22   would move for the admission of Exhibit 46, Exhibit

23   47-A and 47-B, and ask permission to publish to the

24   jury.

25                  MR. PATTERSON:  Your Honor, I'm going

Page 139

1      to object at this point.  If the purpose of the

2      exhibit -- I understand the business records custodian

3      is here to testify as to how the records were

4      generated and they were generated within the regular

5      course of business.

6                  If they're offered to prove through

7      this witness that the records are purported records of

8      Donnie Smith, even though the subscriber says Dontay

9      Smith, I would object on two grounds:  One,

10     authentication meaning that there is insufficient

11     authentication of those records to establish that they

12     belong to my client; and

13                 Number Two, insufficient foundation.  Same

14     grounds that there's insufficient foundation to

15     establish that the records to which this witness is

16     going to be testifying to are, in fact, the phone

17     records of my client, Donnie Smith, and not Dontay

18     Smith.

19                 MS. MARTIN:  May I respond, Your Honor?

20                 THE COURT:  I'm wondering whether we

21     should hear the response in open court.  There's an

22     objection to the record on the ground that there's no

23     evidence that the records, and I haven't read them

24     all, but that the records relate to this defendant,

25     Donnie Smith.

```
                                              Page 140

 1                  I think we better get the answer at

 2      sidebar.

 3                  MS. MARTIN:  Okay.

 4          (At sidebar)

 5                  THE COURT:  Yes.

 6                  MS. MARTIN:  May I, Your Honor?

 7                  Your Honor, Exhibit 46 is subscriber

 8      information for Carlene Webster.  She's Donnie Smith's

 9      wife.  Her phone number appears in the secondary set

10      of records more than 50 times over a four-day period

11      that's also the same time period as the robbery.

12                  The phone number in question that --

13      the records we're talking about, they're related to a

14      Dontay Smith, very close to the defendant's name.  And

15      with regard, again, to the actual phone records, there

16      are 50 communications, 50 or more in a four-day period

17      between the two phone numbers, the Dontay Smith phone

18      number and the Carlene Webster phone number.  There

19      are seven --

20                  THE COURT:  And this number is --

21                  MS. MARTIN:  That number, I believe,

22      Your Honor --

23                  THE COURT:  Well, it's a --

24                  MS. MARTIN:  -- if I may --

25                  THE COURT:  Let me finish.  G-46 is a
```

Page 141

1    single page of records for Carlene Webster.

2                    MS. MARTIN:  I didn't hear you.  I'm

3    sorry.

4                    THE COURT:  A single page of records

5    for Carlene Webster.

6                    MS. MARTIN:  That's 46, correct.

7                    THE COURT:  Yes.  That's --

8                    MS. MARTIN:  I believe he's objecting

9    to --

10                    THE COURT:  -- Dontay --

11                    MS. MARTIN:  -- all of them.

12                    THE COURT:  That's Dontay Smith's wife?

13                    MS. MARTIN:  Yes.  It's Donnie Smith's

14   --

15                    MR. PATTERSON:  Correct, Your Honor.

16                    THE COURT:  Well, how do you want to

17   proceed?  I can tell you that records or the phone

18   calls can -- there will be an objection on numerous

19   grounds that I'll hear later or maybe we can

20   anticipate it now.

21                    The records can be self-identify --

22   self-authenticating and they can also be identified or

23   authenticated by circumstantial evidence.  And that's,

24   I think, what the Government is trying to do.

25                    I've read some cases in the -- during

1    the break and in many cases very similar to this

2    courts have admitted the telephone records based on

3    the quality of the self-authentication and the

4    circumstantial evidence.  The self-authentication

5    would be what was said during the call that links the

6    call to -- links the call and caller to Dontay Smith

7    like identifying the car.  And the circumstantial

8    evidence is what we're going through now.

9                     But I think we should hear the

10    evidence.  There's nothing in these records that's

11    prejudicial.  What becomes prejudicial is the

12    telephone call if I conclude there is enough self-

13    authentication, and I'll have to hear the call again,

14    Number One.  And Number Two, enough direct and

15    circumstantial evidence linking the caller to Dontay

16    Smith.  I think that's the way we should proceed.

17                     But the record should come in and we'll

18    see what they're --

19                     MR. PATTERSON:  I understand, Your

20    Honor.

21                     THE COURT:  Okay.  The bottom line --

22    I'm not ruling now on the admissibility of the call,

23    only the records.  Do you have something to say, Mr.

24    Wittels?

25                     MR. WITTELS:  Yes.  Would you tell the

Page 143

1   jury that this has nothing to do with my client, that

2   it pertains only to Quinn and Smith?

3              THE COURT:  Well, I'm going to wait

4   until it's all over rather than do it now.

5              MR. WITTELS:  Okay.

6              THE COURT:  By all over I don't mean

7   the end of the case.  I mean, I'm going to wait until

8   we resolve this issue.

9              MR. WITTELS:  Fine.

10             THE COURT:  You made a big deal of this

11  issue and it's going to -- now it's the tail wagging

12  the dog and it's -- I just want to be sure it doesn't

13  get wagged out of control --

14             MR. WITTELS:  Okay.

15             MS. MEEHAN:  And, Your Honor --

16             THE COURT:  -- which is where I think

17  we're going.

18             MS. MEEHAN:  -- I would agree with Your

19  Honor.  This is going to show flight and consciousness

20  of guilt and I think Mr. Patterson already agreed to

21  that instruction.

22             THE COURT:  What?  I'm sorry.

23             MS. MEEHAN:  This is meant to show

24  flight and consciousness of guilt, the 911 call, and

25  these records.  And that's already been stipulated to

Page 144

 1    by Mr. Patterson.  We've already agreed to --

 2                    THE COURT:  What's been stipulated to,

 3    not consciousness of guilt?

 4                    MS. MEEHAN:  Consciousness of -- I

 5    thought --

 6                    MR. PATTERSON:  Yes.

 7                    MS. MEEHAN:  -- Mr. Patterson agreed.

 8    Yes.

 9                    MS. MARTIN:  Your Honor, if Mr.

10    Patterson wants to stipulate as to the authenticity of

11    the 911 call and that it's Donnie Smith, I don't have

12    to present any of this rec -- any of these --

13                    MS. MEEHAN:  No.  That's cumulative

14    evidence of consciousness of guilt, which is why --

15                    THE COURT:  With you, Ms. Meehan, I'm

16    learning --

17                    MS. MEEHAN:  -- (indiscernible).

18                    THE COURT:  -- that everything that

19    adversely affects a defendant is prejudicial and

20    should be excluded.  And we're not going there,

21    obviously.

22                    What we're talking about becomes

23    relevant to establish foundation for the 911 call.

24                    MR. PATTERSON:  I understand.

25                    THE COURT:  And I'm not -- for example,

Page 145

1   I would not necessarily rule in this case that calls

2   between Smith and Quinn after the robbery were

3   admissible but for the 911 call and it's timing vis-à-

4   vis the robbery and the calls between Smith and Quinn.

5              MR. PATTERSON:  If they're attempting

6   to establish that, yeah, those phone records that are

7   for Dontay Smith are, in fact, Donnie Smith and they

8   can do it two ways.  They can say, one, he's calling

9   Carlene Smith which is Donnie Smith's wife and, two,

10  he's calling Quinn which is apparently Donnie Smith's

11  friend.  That's fine.  They can do that.  I can make

12  my objections and I can argue weight at the

13  appropriate time.

14              When and what time before or after this

15  alleged incident that he calls Quinn is not necessary,

16  just the fact that he calls Quinn and that he calls

17  his wife.  So he's calling -- Dontay Smith is calling

18  two people that Donnie Smith knows well, his wife and

19  his friend, Quinn.  That's all they have to show.

20  They don't have to show that when they're calling

21  them, before or after this alleged incident.

22              THE COURT:  Except the timing of the

23  call supports the Government's position on the 911

24  call.

25              MR. PATTERSON:  And that goes to the

1    inference, that goes to the inference that I was

2    arguing about before the sidebar that any inference

3    that he's calling after the -- after this alleged

4    conspiracy is concluded that shows that there was --

5    that they were in cahoots, for much of a better word,

6    with respect to --

7                    THE COURT:  Well, you have to -- the

8    facts are there.  You have to figure out how best to

9    address them.

10                   MR. PATTERSON:  And I'm trying.

11                   THE COURT:  Well, not -- well, I'm not

12   going to comment.  But there are three defense lawyers

13   and I'm sure between you, you could have come up with

14   a way to resolve this issue --

15                   MR. PATTERSON:  I understand.

16                   THE COURT:  -- and you haven't.  And

17   all I can tell you is that the call can be self-

18   authenticated and I think there's evidence in the call

19   itself that lends support to that argument, and it can

20   be supported by circumstantial evidence such as the

21   telephoning that we're talking about between Quinn and

22   Smith, and that's why -- what the Government proposes

23   is relevant.

24                   Now if you can find a way to agree around

25   that, go ahead and tell me.  But I don't think you

Page 147

```
 1    can, at least you haven't up to this point.
 2                    THE COURT:  And I think since we're all
 3    here I would like to place on the record that all
 4    communications between myself and Mr. Smith has
 5    stopped.  I just want to place that on the record.
 6                    THE COURT:  All communication between
 7    --
 8                    MR. PATTERSON:  My -- me and my client
 9    have ceased.
10                    THE COURT:  Why is that?
11                    MR. PATTERSON:  He's just not happy the
12    way things are going, so --
13                    THE COURT:  Well --
14                    MR. PATTERSON:  -- there's very little
15    input I can get from him with respect to any
16    stipulations or any matters from this day forth.  I
17    just want to state that on the record.
18                    MS. MEEHAN:  Your Honor, without
19    knowing what the calls -- the content of the calls,
20    the fact that Mr. Quinn is being dragged into this 911
21    issue --
22                    THE COURT:  Now wait a minute.  Dragged
23    in because he --
24                    MS. MEEHAN:  -- when he's got nothing
25    to do --
```

```
                                              Page 148

 1                THE COURT:  -- he's -- his --

 2                MS. MEEHAN:  He didn't call 911, Mr.

 3     Quinn.  Who knows what he -- he could have said, well,

 4     you injured me --

 5                THE COURT:  You're running -- now that

 6     argument, you know, has done a complete

 7     (indiscernible).

 8                MS. MEEHAN:  Well, I don't know.

 9                THE COURT:  It won't because it's

10     circumstantial evidence that the caller was Dontay

11     Smith.

12                MS. MEEHAN:  But the --

13                THE COURT:  I'm sorry.  Donnie Smith,

14     my -- Donnie Smith, the defendant.  Well, I don't

15     think we need to spend any more time.  You --

16                MS. MEEHAN:  Very well.

17                THE COURT:  -- know where I'm going.

18                MS. MEEHAN:  Yes.

19                MR. PATTERSON:  I understand, Your

20     Honor.

21                THE COURT:  And you know where you are

22     going to end up --

23                MR. PATTERSON:  Yes.

24                THE COURT:  -- based on everything I

25     know.  Now if it changes by virtue of the evidence,
```

Page 149

1    I'll expect you to argue, object and argue again.  I'm
2    not foreclosing further argument.
3                    MR. PATTERSON:  Thank you, Your Honor.
4                    MS. MARTIN:  Thank you.
5        (Sidebar concluded)
6                    THE COURT:  You may proceed.
7                    MS. MARTIN:  Are the exhibits admitted,
8    Your Honor?
9                    THE COURT:  Yes.  We're talking about
10   Government 46 --
11                   MS. MARTIN:  47-A & --
12                   THE COURT:  -- 47-A --
13                   MS. MARTIN:  -- 47-B.
14                   THE COURT:  Let me just turn there.
15   47-A and 47-B.
16       (Government's Exhibit Nos. 46, 47-A & 47-B were
17   received)
18                   MS. MARTIN:  May I proceed, Your Honor?
19                   THE COURT:  You may.
20                   MS. MARTIN:  Permission to publish to
21   the jury 46.
22                   THE COURT:  You may do so.
23                   MS. MARTIN:  And could you please zoom
24   in?
25   BY MS. MARTIN:

Page 150

1      Q.   Mr. Sierra, what are we looking at in
2   Exhibit 46?
3      A.   This is going to be subscriber information
4   for T-Mobile phone number (267) 742-6641.
5      Q.   Again that was (267) 742-6641?
6      A.   Correct.
7      Q.   And who is the subscriber associated with
8   that account?
9      A.   A Carlene, C-A-R-L-E-N-E, Webster,
10   W-E-B-S-T-E-R.
11      Q.   And what's the address associated with that
12   account?
13      A.   2206 North Monroe Street, Apartment 2,
14   Wilmington, Delaware 19802-4073.
15             MS. MARTIN:  And if I could have the
16   witness shown what's been previously admitted as
17   Exhibit 50?
18   BY MS. MARTIN:
19      Q.   Mr. Sierra, do you see a document in front
20   of you?
21      A.   Yes, I do.
22      Q.   And do you see an address listed for Carlene
23   Webster?
24      A.   Yes, I do.
25      Q.   And is that the same address listed in

Page 151

1    Government's Exhibit 46, the T-Mobile subscriber

2    information?

3            A.   Yes.

4            Q.   All right.  Can we go to Government's

5    Exhibit 46-B, please?  Oh, I'm sorry.  One more on

6    Exhibit 46, Mr. Sierra.  Was this account active as of

7    March 22nd, 2019?

8            A.   Yes.

9            Q.   And can you tell based on what you have in

10   front of you whether or not this was a prepaid account

11   or a post-paid account?

12           A.   This was a prepaid account.

13           Q.   Okay.

14           (Pause)

15                   MS. MARTIN:  Moving to Exhibit 47-A, if

16   that can be placed on the screen and enlarged as well.

17                   Thank you.

18   BY MS. MARTIN:

19           Q.   Mr. Sierra, what are we looking at here in

20   Government's Exhibit 47-A?

21           A.   This is also subscriber information, but for

22   target number (267) 333-9443.

23           Q.   And who is the subscriber associated with

24   this account?

25           A.   A Dontay D-O-N-T-A-Y, last name Smith,

Page 152

1    S-M-I-T-H.

2        Q.   Okay.  And what is -- what are the dates

3    covered or what were the dates that this phone was

4    active?

5        A.   February 16th, 2019 through March 27th,

6    2019.

7        Q.   And can you tell whether or not this is a

8    prepaid or post-paid account based on this document in

9    front of you?

10       A.   This is going to be a prepaid account.

11       Q.   Meaning that there was no verification of

12   the name of the subscriber identification information

13   prior to the phone becoming active?

14       A.   Correct.

15       Q.   Can you use any name when you subscribe

16   using a prepaid?

17       A.   Yes.

18       Q.   And, again, for the record that phone number

19   was (267) 333-9443; is that accurate?

20       A.   Yes.

21       Q.   Okay.  Now were there any call detail

22   records associated with this Dontay Smith phone

23   number?

24       A.   Yes.

25            MS. MARTIN:  And can I have the witness

1   shown what's been marked as Exhibit 47-B and admitted

2   into evidence?

3   BY MS. MARTIN:

4         Q.   All right.  Mr. Sierra, what are we looking

5   at?

6         A.   This is going to be a call detail record for

7   phone number 267-333-9443, covering the dates of March

8   20th, 2019 through April 15th, 2019.

9         Q.   And these are the records associated with

10  the Dontay Smith subscriber information; is that

11  right?

12        A.   That is correct.

13        Q.   Okay.  And as we proceed, I would like to

14  refer to the Dontay Smith phone number or the Dontay

15  Smith phone records and phone number associated with

16  the Dontay Smith number and the same for the Carlene

17  Webster number; is that okay?

18        A.   Okay.

19        Q.   All right.  We're looking at a lot of

20  numbers and a lot of lines.  Can you walk the jury --

21             MS. MARTIN:  And, Agent Orchulli, if

22  you could, just zoom in on the top gray bar there.

23  BY MS. MARTIN:

24        Q.   Can you walk the jury through what we're

25  looking at?

Page 154

1                    THE COURT:  What exhibit is on the

2       screen?

3                    MS. MARTIN:  That's 47-B, Your Honor.

4                    THE COURT:  Thank you.

5                    THE WITNESS:  So this is going to be

6       the column headers for the call detail record.  Again,

7       this is a transactional log of incoming and outgoing

8       phone calls and text messages.

9                    A majority of the information you will

10      see here is what you would see on your cell phone

11      bill:  The date; the time; the number communicated

12      with; the type of transaction; and if a voice

13      transaction, for how long that communication was.

14                   Starting from the left going to the

15      right the first column header is going to be the date.

16      This is the date that the transaction took place.

17                   The next column is going to be the

18      time.  The time is recorded in military, so 2400

19      hours, UTC time.  UTC is universal coordinated time.

20      It is not a time zone in itself like eastern time

21      where Pennsylvania is located, but a standard for

22      understanding time.  So UTC has the same starting

23      point as Greenwich Mean Time, GMT.  And in order to

24      understand the difference or conversion rate from GMT

25      to the eastern time zone, the time zone we're in now,

Page 155

1    you have to count how many time zones apart they are.

2               So between GMT or UTC starting point

3    and eastern time it is five time zones to the left.

4    So it would be minus five.

5               Now the eastern time zone also

6    recognizes daylight savings time.  Because of that,

7    that results in a loss of an hour.  So this record

8    occurred in March of 2019, which would be considered

9    daylight savings time.  So even though normally it is

10   five hours, it would actually be four hours at the

11   time of this record would be the time difference.  So

12   any time stamp you see here, you have to subtract four

13   hours.

14               So, for example, if the time stamp was

15   4 p.m., the time stamp that occurred here in

16   Pennsylvania would be noon because you have to

17   subtract the four hours.

18               The next column is going to be

19   duration.  This is the length of the phone call

20   measured in seconds.  The only caveat for this is that

21   for text messages -- for -- excuse me.  Let me correct

22   that.  Certain types of text messages, they may show a

23   60-second duration.  If it is a text message that has

24   a duration of 60 seconds, that just means that it was

25   one message sent because 60 seconds, one minute, one

1    message.  That's the only duration that would show

2    that doesn't have a measurement of time.

3                    The next column is going to be the call

4    type.  This allows us to understand what type of

5    transaction occurred, whether it be a voice call or a

6    text message.

7                    The next column is going to be

8    direction.  This allows us to know if that call type,

9    the previous column, is an incoming transaction or an

10   outgoing transaction.

11                   The next column is the calling number.

12   This would be the number that placed the transaction,

13   voice or text.

14                   The next three columns, dialed number,

15   called number and destination number, all have to do

16   with the receiving party.  Okay.  On most occasions

17   you will see, if all three columns are populated, the

18   number is the same number in all three columns.  The

19   reason we divide these into separate columns is

20   because we need to identify other types of number

21   communications, such as speed dial or FCC short codes.

22                   So a good example to understand the

23   distinction of the three columns would be is if we

24   image your home or your cell phone number calling your

25   home number using speed dial.  All right.  So we'll

Page 157

1    say your home phone number on your cell phone is speed

2    prompt number 2.  The calling number would be your

3    cell phone number.  The dialed number and the called

4    number would show a 2 or a #2 because that is the

5    function for speed dial.  But in the destination

6    number column it would show your full home phone

7    number because that's the true or translated number

8    that it connected to.  So that's why we have three

9    columns that essentially show the same information.

10                    The next column is the IMSI.  This is

11    the International Mobile Subscriber Identifier.  This

12    is a lot like your social security number on the T-

13    Mobile network because within T-Mobile you can change

14    your phone number, your cell phone, the type of

15    account you have as well as a few other things.  We

16    need a number that identifies you as a customer

17    regardless of changes to make sure we're billing the

18    right person.  So this is what the IMSI is.

19                    The next column is the IMEI, the

20    International Mobile Equipment Identifier.  Think of

21    this like the VIN number of your car, but the serial

22    number for your cell phone.  It's unique to the one

23    device just like this -- the VIN number is unique to

24    that one car.

25                    The next column is completion code.

Page 158

1    This is really more for our engineers.  This just

2    allows us to make sure that the phone call went

3    through the default pathway.  It really has nothing

4    else to do with the call record.

5              Service code, this allows me to know

6    what happened during the call, if anything unique

7    happened.  For example, call waiting, call forwarding,

8    if it was forwarded to voice mail.  There are

9    numerical codes that allow me to know that something

10   in addition to just the connection of the call

11   occurred.

12             And then finally the switch name.  This

13   allows me to know what server routed the call to its

14   destination.

15   BY MS. MARTIN:

16       Q.   All right.  So let's take a look at these

17   records that we have in front of us.

18             MS. MARTIN:  Thank you, Agent Orchulli.

19   BY MS. MARTIN:

20       Q.   Mr. Sierra, did I ask you to look at these

21   records to determine whether there was any

22   communication between the Dontay Smith phone number

23   and the Carlene Webster phone number?

24       A.   Yes.

25       Q.   All right.  And starting on -- were you able

Page 159

1    to do that?

2        A.   Yes, I was.

3        Q.   Okay.  And starting on March 20th, 2019 to

4    March 24th of 2019, can you estimate for the jury how

5    many contacts or communications there were between the

6    Dontay Smith phone number and the Carlene Webster

7    phone number?

8        A.   Back and forth, incoming and outgoing

9    transactions of phone calls and text messages it was

10   over 50 communications.

11       Q.   Over 50 communications in that four-day

12   period?

13       A.   Correct.

14       Q.   Which includes March 22nd of 2019?

15       A.   Yes.

16           MS. MARTIN:  And if we could just place

17   page 6 on the screen as an example?

18           And, Agent Orchulli, if you could

19   please highlight the calling numbers.  That would be

20   the fifth and sixth columns.

21   BY MS. MARTIN:

22       Q.   Mr. Sierra, are you looking at page 6?

23       A.   Yes.

24       Q.   Is it fair to say that 95 percent of the

25   incoming and outgoing calls that exist on this page

Page 160

1     are to or from the Dontay Smith and Carlene Webster

2     phone number?

3          A.    Well, the record is for Dontay Smith.

4          Q.    You're right, Mr. Sierra.  That was a bad

5     question.

6               Is it fair to say that there is contact with

7     the Dontay Smith -- that 95 percent of this page

8     exhibits contact between the Dontay Smith phone number

9     and the Carlene Webster phone number?

10         A.    Yes.  That's correct.

11         Q.    And is there contact between those two phone

12    numbers on March 22nd of 2019?

13         A.    Yes.  There's contacts on March 22nd, 2019

14    between the Dontay Smith and the Carlene Webster.

15         Q.    And that contact continues through the

16    remainder of the records; is that fair to say?

17         (Pause)

18         A.    Yes.  There's communications after the 3/22

19    date.

20         Q.    Did I also ask you to review these records

21    to determine whether or not the phone number of 215-

22    713-5602, a phone number that's been stipulated as

23    Maurice Quinn, did I ask you to review these records

24    to determine whether or not there was any

25    communication between the Maurice Quinn phone number

Page 161

1   and the Dontay Smith phone number?

2          A.   Yes.

3          Q.   All right.  And these dates between March

4   20th of 2019 and the end of the records, did you

5   determine how many contacts, if any, there were

6   between these two phones?

7          A.   I believe there was eight.

8          Q.   Okay.  And now I want to turn your attention

9   directly to -- that was both before and after March

10  22nd?

11         A.   Correct.

12         Q.   I would like to turn your attention to the

13  date of March 22nd in particular in these records.

14         A.   March 22nd spans a few pages.  Do you have a

15  particular page?

16         Q.   The beginning and I will direct you to a

17  time.

18                  THE COURT:  What page?

19  BY MS. MARTIN:

20         Q.   Well, Mr. Sierra, let me ask you this.  The

21  jury has seen video footage of an incident that occurs

22  around 4:55 p.m.  Can you tell me whether or not there

23  are any phone calls, text messages or activity on

24  these cell phone records after 5 p.m. on March 22nd,

25  2019?  And, again, if you could explain for the jury

Page 162

1    how you would convert these records to the actual

2    Eastern Standard Time.

3            A.   Yes.  So if the incident occurred at 5 p.m.

4    in Philadelphia, you would need to add the four hours

5    because we're going from Philly -- from eastern time

6    now to UTC as opposed to UTC to Philadelphia.  So you

7    would add four hours.  So what is that, 1700 is 5

8    p.m., so adding the five is 21, which would be 9 p.m.

9            Q.   Okay.  Is there any activity on this phone

10   just after 5 p.m. on March 22nd of 2019?

11           A.   Yes.  I see 2106, 21 -- so activity,

12   multiple 2106 activity and a couple 2107 activity.

13           Q.   Okay.

14                  MS. MARTIN:  If I could just have a

15   moment, Your Honor.

16                  THE COURT:  You may.

17           (Pause)

18   BY MS. MARTIN:

19           Q.   Mr. Sierra, you mentioned that there is, in

20   fact, a contact at 2106; is that right?

21           A.   Yes.  I have 210621, 210645, 210650 and

22   210652.

23           Q.   Let's start with the 2106.  First of all,

24   what time is that in Philadelphia?

25           A.   That would be 5:06 p.m.

Page 163

1      Q.   All right.  5:06 p.m.  I'm just looking at
2    it.  So what's in front of the jury now?  We have a
3    portion of 47-B --
4              MS. MARTIN:  If I may, Your Honor, just
5    so I can see what's on the screen.
6    BY MS. MARTIN:
7      Q.   I want to direct your attention to the
8    fourth line down.  That's the 210652 call that you're
9    talking about; is that accurate?
10     A.   Yes.
11     Q.   And can you tell us if that is an incoming
12   or outgoing call from the Dontay Smith number?
13     A.   That is going to be an outgoing voice call.
14     Q.   Meaning that the person with the handset
15   dialed a phone number?
16     A.   That is correct.
17     Q.   And how long is that phone call starting at
18   5:06 p.m.?
19     A.   That's 1,219 seconds, a little bit over 20
20   minutes.
21     Q.   Okay.  So that's a 20-minute phone call that
22   starts at 5:06 p.m.; is that right?
23     A.   Yes.
24     Q.   And I want to direct your attention to the
25   lines below that.  Do you recognize any of the

1    numbers, and I'm counting from the -- what's on the

2    screen, one, two, three, the four lines below that 20-

3    minute phone call.  Do you recognize any of those

4    phone numbers as belonging to Carlene Webster?

5         A.   Let's see.  Yes.  One, two, three.  I see

6    four lines of information that reference the 6641

7    number registered to Carlene Webster.

8         Q.   Okay.  And I see multiple lines here of

9    incoming, outgoing, incoming, outgoing, incoming.  Can

10   you explain that for the jury?  Does that mean there

11   was a call from Carlene Webster and then from Dontay

12   Smith back to Carlene Webster?

13        A.   So by the system's information yes, but in

14   reality no.  So what we're seeing here is actually

15   voicemail occurring.  So it's an incoming phone call,

16   followed by an outgoing transaction to that person's

17   voice mail.  The literal example of what voicemail

18   looks like according to our computer system.

19             So, for example, we have --

20        Q.   Mr. Sierra, if I can interrupt you.  You can

21   actually touch that screen and circle what it is

22   you're talking about.

23        A.   That's exactly what I was going to ask.

24        Q.   Okay.

25        (Laughter)

1        A.   So we have here first above, just above the

2    red light at 210705 you see an incoming transaction

3    from 267-742-6641 to the target number ending in 9443.

4    You will notice that approximately 31 seconds after

5    that at 210736 you see the same duration of four

6    seconds an outgoing call from the 6641 number to 805-

7    637-7249.  This number right here is the voicemail

8    platform number for T-Mobile.  So that means you were

9    literally forwarded to voicemail.  And the number that

10   was forwarded would be the number shown here in the

11   calling column, the 6641 number.  The time it takes

12   for voicemail to initiate if it's allowed to ring

13   through is 30 seconds.  That's why you have a 31-

14   second difference between 210705 and 210736.

15       Q.   Okay.  So looking at this -- these records

16   there is an incoming call from Carlene Webster that

17   goes to voicemail at 5:07:05 --

18       A.   Yes.

19       Q.   -- at 5:14:42 --

20       A.   Correct.

21       Q.   -- and at 5:27:56.

22       A.   So the 5:27:56 is actually an incoming phone

23   call --

24       Q.   Okay.

25       A.   -- for 82 seconds.

Page 166

1    Q.   The first two were calls that went to
2    voicemail; is that right?
3    A.   Yes.  The 21 -- oh, the first two?  Yeah.  I
4    apologize.  I was looking at the call before that, the
5    first two calls before that.
6    Q.   So 5:07, 5:14, nobody answers and then at
7    5:27:56 there's some sort of duration associated with
8    the call between Carlene Webster and Dontay Smith?
9    A.   Correct.
10   Q.   Does that means there's some sort of
11   communication?
12   A.   Yes, because since it's not forward to
13   voicemail and there's a duration in the column, that
14   would mean a connection occurred.  I can't say if
15   somebody spoke to somebody, but I see a voice
16   transaction that was open for 82 seconds.
17   Q.   All right.  And looking down the records
18   through to 5:35 p.m., do you see any other
19   communications between the Dontay Smith phone number
20   and the Carlene Webster phone number?
21   A.   I apologize.  Can you repeat that question?
22   Q.   Do you see between what we just discussed,
23   the last one was the 2114, so 5:14, between 5:14 p.m.
24   and 5:35 p.m., so 2135 on what you're seeing, are
25   there any additional communications between the Dontay

Page 167

1    Smith phone number and the Carlene Webster phone
2    number?
3         A.   Yes.  There are a few more communications
4    between 2114 and 2135.
5         Q.   Okay.  I want to direct your attention
6    specifically to 5:43 p.m. and 36 seconds.  So that
7    would be 214336.  Are there any outgoing calls in
8    these phone records for 5:43 p.m. and 36 seconds?
9         A.   No.
10        Q.   Okay.  Mr. Sierra, if an individual calls
11   911 would you expect it to appear in your records?
12        A.   No, I would not.
13        Q.   Why?
14        A.   Well, 911 operates differently than any
15   other kind of transaction.  One, 911 has their own
16   antenna infrastructure so they actually have 911 based
17   antennas deployed throughout the United States.
18             In addition to that, the FCC requires that
19   every handset, so every cellular device, has to be
20   able to dial 911 whether that account is active,
21   whether it has any kind of service connected to it.
22   So I have a cell phone from eight years ago, I can
23   dial 911 on that and it would show up for a 911
24   dispatcher.
25             Because of that you have a situation where

1   you can utilize 911 antennas for Verizon, AT&T,

2   Sprint, so the potential possibility of you utilizing

3   a T-Mobile tower is reduced the more carriers that are

4   available in your area in addition to the 911

5   antennas.

6       Q.   So you wouldn't expect to see it in the

7   records then?

8       A.   Yeah.  It happens very rarely.

9       Q.   Between the times of 5 p.m. and 6 p.m., are

10  there any communications between the Dontay Smith

11  number and the Maurice Quinn number?

12      A.   If I could have the digits for that again.

13      Q.   It would be --

14              MS. MEEHAN:  I'll stipulate that it's

15  215-713-5602.

16              THE WITNESS:  And what was the time

17  frame?

18              MS. MARTIN:  That would be 3/22/19

19  between 2145 and 2200.

20              THE WITNESS:  Yes.  I see 2147 and that

21  is the only communication I see.

22  BY MS. MARTIN:

23      Q.   So that would be at 5:47 p.m. there's an

24  incoming call from the Maurice Quinn number?

25      A.   That is correct.

                                              Page 169

1          Q.   The line directly below that, 2153, is that

2     an outgoing call to the Carlene Webster number?

3          A.   That is correct.

4          Q.   So that would be at 5:53 p.m.?

5          A.   Correct.

6          Q.   The next line, 3/22/2019, 2205 --

7               MS. MARTIN:  And if I could have just a

8     moment, Your Honor?

9          (Pause)

10    BY MS. MARTIN:

11         Q.   Mr. Sierra, the record on the screen right

12    now, 3/22/2019, 220005, first of all, what time is

13    that in Philadelphia?

14         A.   That would be 6 p.m. and five seconds.

15         Q.   Okay.  And is there a duration associated

16    with this call?

17         A.   Yes.

18         Q.   And what is it?

19         A.   136 seconds.

20         Q.   How long is that?

21         A.   Two minutes and 16 seconds.

22         Q.   Very good.

23              And the number that that call is coming in

24    from, can you read that number for the record?

25         A.   Incoming phone call from 215-686-3128.

Page 170

1      Q.   Do you know what that number is?

2      A.   No, I do not.

3      Q.   Okay.  And I just want to move down the

4  records a couple more lines.  At 6:06 and 12 seconds,

5  is there a contact between the Dontay Smith number and

6  the Carlene Webster number?

7      A.   Yes.

8      Q.   And what is it?

9      A.   At 6:06 p.m. and 12 seconds I have an

10 outgoing 136-second phone call from the 9443 number to

11 6641.

12     Q.   Okay.  And skipping one line down to

13 3/22/19, 2116 or 6:16 p.m., is that a contact between

14 the Dontay Smith number and the Maurice Quinn number?

15     A.   Yes.  I have at 2216 an incoming call from

16 the 5602 number to the 9443 number.

17               MS. MARTIN:  If I could have just one

18 moment, Your Honor?

19     (Pause)

20               MS. MARTIN:  I have nothing further for

21 this witness, Your Honor.

22               THE COURT:  Thank you.

23               MS. MEEHAN:  Your Honor, I have a brief

24 number of questions.  I don't know if Your Honor --

25               THE COURT:  Well, it's not quite

Page 171

 1    quarter of one and in order not to limit you, I think

 2    we'll recess for lunch.

 3              Ladies and gentlemen, one hour.  Usual

 4    instructions.  You know still more about the case.

 5    Don't be tempted to discuss it among yourselves.  You

 6    must wait until the case is over, until all the

 7    evidence is in and you've heard my instructions on the

 8    law, then you may begin deliberating.

 9              If anyone tries to talk to you about

10    the case, say nothing to them, and then report that to

11    me.  And, again, don't -- well, I guess you wouldn't

12    have -- well, you might read newspapers over the noon

13    recess.  Don't read anything dealing with the case.

14    Don't listen to anything that might be broadcast on

15    radio or television that deals with the case.

16              And be sure you take your juror

17    notebooks into the jury room and leave them there.

18              We will recess until quarter of two.

19    It's quarter of one now.

20              THE COURT OFFICER:  All rise.

21        (Jury out)

22              THE COURT:  Be seated, everyone.

23              Is there anything we must do before the

24    luncheon recess?

25              MR. PATTERSON:  If I may have one

Page 172

1      minute, Your Honor.

2                    THE COURT:  Yes.

3           (Pause)

4                    THE COURT:  Oh, I forgot about you.

5                    THE WITNESS:  Yeah.

6           (Laughter)

7                    THE COURT:  You're doing a fine job.

8      I'm learning something about telephone records.

9                    THE WITNESS:  Oh, good.

10                   THE COURT:  Yes.  You may step down.

11                   THE WITNESS:  Thank you, Your Honor.

12          (Pause)

13                   THE COURT:  Yes, Mr. Patterson.

14                   MR. PATTERSON:  Can we go to sidebar

15     briefly, Your Honor?

16                   THE COURT:  I'm just wondering why we

17     need to go to sidebar, but if you think it best --

18                   MR. PATTERSON:  I do, Judge.  I --

19                   MS. MEEHAN:  Do you want us there or --

20                   MR. PATTERSON:  Yeah.

21                   MS. MEEHAN:  Okay.

22          (At sidebar)

23                   MR. PATTERSON:  I am at an impasse with

24     my client insofar as him even communicating to me now.

25     I'm going to have to have some serious conversation

1    with him with respect to whether he wishes to exercise

2    his right to remain silent or whether he wishes to

3    testify.  I am hamstrung if there is no communication

4    between us and obviously I can't effectively represent

5    my client.

6              I'm asking the Court for a direction

7    insofar as a possible solution.  Whether Your Honor

8    wants to colloquy him, I -- I really don't know how to

9    proceed to tell you the truth.

10             MR. ECKERT:  I would only suggest, Your

11   Honor, that the issue of whether he testifies you

12   should do a personal colloquy based on the

13   representations that have been made.  I believe it is

14   incumbent upon the Court -- I don't mean to use that

15   word.  But we would request that the Court colloquy

16   the defendant personally as to what his ultimate

17   decision is on whether to testify and whether he can

18   -- I'll just leave it at that.

19             Thank you.

20             THE COURT:  Does he want to proceed pro

21   se?

22             MR. PATTERSON:  I don't think it's that

23   far yet.  He has kind of shut down.  He hasn't

24   expressed that I be removed from the case.  He's just

25   shut down.

```
 1                    THE COURT:  Well, I would address the
 2      issue that you're presenting now before -- there's a
 3      Third Circuit case, US versus I think it's Penny pack
 4      (sic) or Penny back (sic).  Are you familiar with it?
 5                    MR. ECKERT:  Not the case, Your Honor.
 6                    THE COURT:  It was written by a
 7      colleague on the Third Circuit who was my next door
 8      roommate in law school, Judge Greenberg (ph).
 9                    MR. WITTELS:  Oh, Judge Freedberg from
10      Camden County.
11                    THE COURT:  Pardon me?
12                    MR. WITTELS:  Judge Robert Freedberg?
13                    THE COURT:  No.  Judge Greenberg.
14                    MR. WITTELS:  Oh, I thought you said
15      Freedberg.  I know him.
16                    THE COURT:  I'll take a look at the
17      case.  As far as the instructions to the defendant, I
18      don't want to focus on the right to testify until --
19      all of the rights a defendant has, including the right
20      to testify.  It's his choice.  But what I have not had
21      before is a lawyer who reports to me during the trial
22      that the defendant has shut down, shut me out.
23                    MR. PATTERSON:  That's essentially what
24      it is.  There's no communication anymore.  And that's
25      really going to -- it's going to --
```

Page 175

1                    THE COURT:  Do you need to talk to

2    (indiscernible)?

3                    MR. PATTERSON:  I can try.  I mean,

4    I've been in these positions before, unfortunately.

5                    THE COURT:  Well, I think the

6    Government ought to do some homework, too, on this

7    issue.

8                    MR. ECKERT:  Absolutely, Your Honor.

9                    MS. MARTIN:  Yeah.

10                   THE COURT:  And -- because I am.  Yeah.

11   I just haven't had it.

12                   MR. ECKERT:  Okay.

13                   THE COURT:  (Indiscernible).

14                   MR. PATTERSON:  Pardon me?

15                   THE COURT:  (Indiscernible) allow Mr.

16   Patterson some time to see him in the sheriff -- in

17   the marshal's lockup so maybe they can talk to each

18   other at some point today?

19                   MR. PATTERSON:  I would be totally okay

20   with that.  I just want to make this official record

21   for review with respect to me proceeding effectively

22   without my client's input.  I'm not asking to be

23   removed from the case, but I'm just trying to set the

24   record on the perspective of my difficulties right

25   now.

1              THE COURT:  Well, why don't you think

2      about it and chat with your co-counsel, counsel for

3      the co-defendants and advise me after lunch what you

4      propose to do.

5              MR. PATTERSON:  I'll do that.

6              THE COURT:  But for now I have no

7      answer for the shut down in communication.  Your

8      client (indiscernible) -- well, something at the very

9      first hearing that we had.

10             MR. PATTERSON:  I recall.

11             THE COURT:  He was satisfied and then

12     he (indiscernible).  He then wrote me a letter and

13     apologized.  I thought that was very insightful and I

14     think I sent it to you.  But it was just a simple

15     letter apologizing for the outburst.  This came early

16     in the case when you were talking about a separation.

17             MR. PATTERSON:  Right.  He's never

18     expressed a dissatisfaction with how I'm handling his

19     case.  He just essentially shutdown generally, not so

20     much angry at me.

21             THE COURT:  Well, I'm sure he's not

22     going to be overwhelmed by further evidence --

23             MR. PATTERSON:  Right.

24             THE COURT:  -- of the link between

25     Donnie Smith and the 911 call.  But when it's all in,

Page 177

1    I'm going to have to rule whether there's enough self-

2    authenticating evidence and circumstantial evidence

3    for admission of that call.

4                    MR. PATTERSON:  I understand.

5                    THE COURT:  And what we have so far is

6    -- well, a lot of telephone communications, including

7    Dontay Smith and Donnie Smith's wife --

8                    MR. PATTERSON:  I'm aware.

9                    THE COURT:  -- and between Dontay Smith

10   and Mr. Quinn, very, very, very -- at three various

11   close in time to the 911 call.  I'm just preparing you

12   for what you should probably anticipate.  But I'll

13   hear argument and decide.

14                   All right.  Is there anything else for

15   me?

16                    MR. PATTERSON:  No, Your Honor.  Thank

17   you.

18                    MR. ECKERT:  No.

19                    MS. MARTIN:  Thank you.

20        (Sidebar concluded)

21                    THE COURT:  All right.  I think we'll

22   recess for lunch.  See you at quarter of two.

23                    THE COURT OFFICER:  All rise.

24        (Recess taken at 12:51 p.m.; reconvened at 2:01

25   p.m.)

Page 178

1        (Jury not present)

2                    THE COURT OFFICER:  All rise.

3                    THE COURT:  Be seated, everyone.

4                    Another issue has arisen and I'm going

5        to share it with you and we'll decide how to proceed.

6                    A few minutes ago the senior marshal

7        reported to me that Defendant Smith has refused to

8        come back to the courtroom, number one, and he's taken

9        off his civilian clothes and put on his green

10       jumpsuit.

11                   The co-defendants are or soon will be

12       in the cell block.

13                   Government counsel --

14                   MR. ECKERT:  Yes, Your Honor.

15                   THE COURT:  -- how do you recommend we

16       proceed?

17                   MR. ECKERT:  I believe we just place

18       some sort of testimony on the record from the marshal

19       that the defendant, in fact, indicated or if -- or if

20       counsel are satisfied with the Court recounting the

21       conversation, that would be fine.  But there -- as

22       long as there's some representation on the record that

23       the defendant personally himself made a choice to

24       absent himself from the proceedings, we believe that

25       we must proceed given where we are.  Jeopardies

1    attached for the other two defendants.  So we believe

2    that we should proceed as long as the defendant's made

3    an affirmative choice.

4              THE COURT:  What about the need to

5    colloquy the defendant?

6              MR. ECKERT:  So I -- if he refuses to

7    come up, Your Honor, I think that we -- that's an

8    interesting question.  I think we have -- we would

9    accept testimony from the marshal that -- or somebody

10   that spoke to him and say he, in fact, refused to come

11   up.  I don't know that we can make him come up and be

12   colloquied if he's not willing to come up.

13             THE COURT:  We'll certainly get the

14   marshal in to report on his actual conversation with

15   the defendant.

16             Mr. Patterson.

17             MR. PATTERSON:  The senior marshal

18   suggested or would make available the opportunity for

19   me to speak with him downstairs in the holding cell so

20   I can actually -- he said he -- my client told the

21   marshal he wanted to speak with me, then he said he

22   didn't want to speak with me.  I think I should give

23   him one more opportunity, explain to him what will

24   happen if he doesn't come up, and then I'll be at a

25   better position to advise the Court what my next

1    request would be, which would probably be a mistrial

2    on behalf of Mr. Smith.

3                    The issue is how is it explained away

4    to the jury that my client who has been here for four

5    days is no longer here, that's my issue, and what

6    impression that may have on the jury to the detriment

7    of Donnie Smith deciding not to come and finish the

8    trial.

9                    THE COURT:  Well, there's a question

10   whether we should declare a mistrial.

11                   MR. PATTERSON:  Right.  And that's -- I

12   would be moving --

13                   THE COURT:  I haven't articulated the

14   second half of that question, or whether we should

15   proceed against the three defendants if -- assuming he

16   doesn't -- he refuses to appear.

17                   MR. PATTERSON:  I would just be

18   suggesting to the Court that after I do speak with him

19   I will be making a motion for a mistrial if he does

20   not come up.  I just want to advise the Court.

21                   THE COURT:  Well, that raises the

22   question -- again, I just said it --

23                   MR. PATTERSON:  Right.  I understand.

24                   THE COURT:  -- of whether we should

25   proceed with him and with the case against him --

Page 181

1            MR. PATTERSON:  In abstention.

2            THE COURT:  -- in his absence or treat

3    it some other way, such as bifurcating and -- or

4    severing it.

5            MR. PATTERSON:  And then the issue

6    would come -- would arise as to how we or Your Honor

7    would address the jury, whether it be a cautionary

8    instruction or how are they -- what instruction are

9    they given with respect to a trial that continues and

10   there's obviously a person missing.

11           And, again, I would like to place on

12   the record, this isn't a typical scenario where I

13   don't want you as my lawyer anymore at which point the

14   Court can colloquy either standby, pro se or new

15   counsel.  This is just, I am not talking anymore.

16   He's never, again, expressed dissatisfaction with me

17   where he wants new counsel.  That has never been

18   raised between -- in my conversation with Mr. Smith.

19   It's a whole different issue where he just does not

20   wish to communicate at all.  And now that he doesn't

21   want to come to court, that just kind of is the next

22   step.

23           THE COURT:  Does the Government have

24   any authority for its stated position that we should

25   tell Mr. Smith he has a right to participate in the

1    trial and that he's got some other rights as well, and

2    tell him if he doesn't we're going to continue the

3    trial against him in his absence --

4                    MR. ECKERT:  Your Honor --

5                    THE COURT:  -- authority for that?

6                    MR. ECKERT:  -- I was -- I don't mean

7    to interrupt.  I was only made aware of this just

8    before we came.  I guess what we would just put on the

9    record is that if a defendant can cause a mistrial in

10   every victim case where they testified, this could

11   happen in any case.

12           And I think that there's a serious danger

13   here that if we allow the defendant to get a mistrial

14   it just sends a message that if in the middle of trial

15   they don't like the way things are going they can

16   absence themselves.  Clearly, we need to make a record

17   that that's a choice that Mr. Smith is making.  But we

18   would oppose any motion for a mistrial on that basis.

19                    THE COURT:  No.  That wasn't the

20   question --

21                    MR. ECKERT:  Oh, I'm sorry.

22                    THE COURT:  -- I asked of you.  Thank

23   you for that --

24                    MR. ECKERT:  I'm sorry.

25                    THE COURT:  -- those remarks.

Page 183

1              The question I asked of you, do you

2       have any authority for the proposition that we should

3       continue the trial, offer him an opportunity to

4       participate, tell him what other rights he has, and

5       tell him we're going to either participate or declare

6       a mistrial, do whatever the Government recommends.

7              Question, do you have authority for

8       that proposition?

9              MR. ECKERT:  I do not, Your Honor.  But

10      I would be happy -- I would ask for the opportunity to

11      make a call to our appellate folks on that.  I was not

12      aware of the issue just before --

13             THE COURT:  I wasn't aware of it

14      either.  It surfaced, oh, about ten minutes ago.  And

15      it's now ten after two on Thursday, January 30th.  It

16      surfaced about 2:00.

17             All right.  I think -- yes, Mr.

18      Wittels.

19             MR. WITTELS:  May I make a suggestion,

20      Judge?  If Mr. Patterson can go down and talk to him,

21      maybe that will work, maybe it won't.  But it will

22      give us all the time to think this through and to

23      consult appellate authority.

24             THE COURT:  All right.

25             Ms. Hogue, will you ask the marshal who

Page 184

```
 1   reported to me -- we're going to make a record of
 2   this.
 3                 So I would like you to stand at the
 4   lectern and identify yourself.
 5                 DEPUTY DRAKOWSKI:  I don't know if it
 6   makes a difference, Judge, but I -- I didn't speak
 7   directly to the defendant.  My operations deputy did.
 8   And he was the one downstairs with him when he
 9   refused.  I can attest to that -- to what he told me
10   --
11                 THE COURT:  Well, I would like you
12   while you're here, since you reported it to me --
13                 DEPUTY DRAKOWSKI:  Right.  Okay.
14                 THE COURT:  -- put on the record what
15   you know.  We might need to hear from your deputy.
16                 First, your name and then put on the
17   record what you told me in chambers at about 2 p.m. on
18   January 30th.
19                 DEPUTY DRAKOWSKI:  My name is Yohan
20   Drakowski (ph) , Deputy U.S. Marshal.  At around 2:00
21   the defendant --
22                 THE COURT:  Keep your voice up.
23                 DEPUTY DRAKOWSKI:  -- defendant refused
24   to --
25                 THE COURT:  Defendant Smith?
```

Page 185

1                  DEPUTY DRAKOWSKI:  -- Donnie Smith
2    refused to come up to the courtroom for his trial and
3    Judge DuBois was --
4                  THE COURT:  Advised.
5                  DEPUTY DRAKOWSKI:  -- advised.
6                  THE COURT:  All right.  Do you wish to
7    go down and try to talk to him?
8                  MR. PATTERSON:  I do, Your Honor.
9                  Is he down there now?
10                  DEPUTY DRAKOWSKI:  He is.  I can --
11                  MR. PATTERSON:  Okay.  No, I'll meet
12   him in the room down in lockup.
13                  DEPUTY DRAKOWSKI:  Yeah.  Yeah.  Yeah.
14                  MR. PATTERSON:  All right.
15                  THE COURT:  Wait a minute.  Just a
16   minute.
17        (Pause)
18                  THE COURT:  We're talking about the
19   excusing the jury, not for the day, but I don't like
20   them cooped up in the jury room.  We should have
21   gotten that idea before.  Maybe it will take less
22   time.  Why don't we recess -- well, I don't want to
23   recess, but as far as the jury is concerned, tell them
24   that they can get some air and be back at, I would say
25   quarter of three.

```
 1                    THE COURT OFFICER:  Okay.  Will do.
 2                    MR. PATTERSON:  May I be excused, Your
 3      Honor?
 4                    THE COURT:  You may.  And the goal now
 5      is to go down to the cell block and talk to --
 6                    MR. PATTERSON:  Yes.
 7                    THE COURT:  -- talk to the defendant
 8      and then report.  And whenever -- counsel will be
 9      here, and we certainly don't need the jury to resolve
10      this issue.  But when -- as soon as you have any word,
11      I will expect you to come back.
12                    MR. PATTERSON:  I will, Your Honor.
13                    THE COURT:  In the meanwhile, the co-
14      defendants are up here?
15                    THE COURT OFFICER:  Yes, sir.
16                    THE COURT:  Should we send them down or
17      do you --
18                    THE COURT OFFICER:  I'll send them
19      downstairs and I'm going to make contact to -- with
20      his client in the attorney tank.
21                    THE COURT:  Fine.  Anything else we
22      need to do now?
23                    MR. WITTELS:  I'm set.
24                    MR. ECKERT:  No, Your Honor.
25                    THE COURT:  I'm going to go back to the
```

1    (indiscernible) and see what we can come up with.

2                    All right.  We're in recess until a

3    quarter of three.

4                    THE COURT OFFICER:  All rise.

5         (Recess taken at 2:11 p.m.; reconvened at 2:41

6    p.m.)

7         (Jury not present)

8                    THE COURT:  Mr. Patterson, will you

9    report to the Court on your communication with the

10   defendant?

11                   MR. PATTERSON:  Yes, Your Honor.  I met

12   with Mr. Smith down in the visiting area with the U.S.

13   Marshal on the second floor.  And I discussed what his

14   intent was and he wants to proceed with trial.  No

15   further issues, Your Honor.

16                   THE COURT:  Well, that's good because

17   the rules say a defendant who does what Mr. Smith did,

18   who refuses voluntarily to come back to the trial

19   doesn't interrupt the trial at all.  The trial

20   proceeds in his absence and verdicts will be rendered

21   in the same way as if the defendant who abstended

22   himself voluntarily were present in the courtroom.

23                   So we just keep going.  I didn't want

24   to do that.  I wanted to give the defendant an

25   opportunity to be here and to participate in his

Page 188

1    defense, which I think is in his interest.

2                    MR. PATTERSON:  It is in your (sic)

3    interest, Your Honor, and if I could --

4                    THE COURT:  Not my interest.

5                    MR. PATTERSON:  I understand.

6                    THE COURT:  His -- you said it's in my

7    --

8                    MR. PATTERSON:  Oh, I'm sorry.  It is

9    in his interest to proceed with the trial.  But I

10   would just also like to further report that when I

11   initially met with him, it was just a very minor

12   misunderstanding and he told me right away he wants to

13   proceed, he wants to finish this trial.

14                    THE COURT:  Fine.

15                    Well, I want you to thank Ms. Hull --

16   Ms. Hull, thank everyone who participated in the

17   research, the quick research we did without tech

18   people and everyone else.

19                    MS. HULL:  Certainly.

20                    THE COURT:  For their prompt response.

21   Much appreciated.

22        (Pause)

23                    THE COURT:  Now we'll bring the witness

24   back and continue.

25                    THE CLERK:  I can go get him.

Page 189

1              THE COURT:  Well, first we need the

2    jury.

3              MS. MARTIN:  And, Your Honor, the

4    Government does intend to call the 911 custodian after

5    --

6              THE COURT:  I'm sorry.

7              MS. MARTIN:  The Government intends to

8    call the 911 custodian after this witness is finished,

9    if Your Honor is prepared to make a ruling on that

10   once the evidence is in.

11             THE COURT:  What is the position of the

12   two interested parties on how we should proceed with

13   the 911 call?  I've heard it once.  But I don't

14   remember the details.  I know there were certain self-

15   identifying statements in the 911 call.  And as I

16   said, the admissibility of the call depends upon both

17   self-identification and circumstantial evidence.

18             How do you wish to proceed?

19             MR. PATTERSON:  I believe the 911 call,

20   they would have to first identify the speaker on the

21   call as my client that obviously is an exception by --

22   a statement by a defendant.

23             So, again, my original objection is to

24   the -- whether they satisfied their burden through

25   these T-Mobile phone records as to a sufficient

1    foundation on authentication that the speaker is, in

2    fact, Mr. Smith.

3                    THE COURT:  Well, the phone records

4    would establish circumstantial evidence.  The call

5    itself would include the self-identification.  The

6    caller did not say, I don't think he said, my name is

7    Donnie Smith.  If he did we wouldn't be here.

8                    MR. PATTERSON:  No.

9                    THE COURT:  But the caller said some

10   things which helped to identify him as Donnie Smith,

11   like the car description, and there were other things

12   as well.

13                   MR. PATTERSON:  I believe what the

14   caller had said was that he was parked in the area of

15   Scarpack (sic) Street and that somebody jumped in his

16   car and drove off.

17                   THE COURT:  I thought the car was

18   described.

19                   MS. MARTIN:  It was -- I believe it

20   says a 2010 maroon Ford Taurus.

21                   THE COURT:  Well, wait a minute.  I

22   don't -- maybe I don't need -- is there a transcript

23   of the call?  There must be.

24                   MS. MARTIN:  No, there's not, Your

25   Honor.

1           THE COURT:  We don't have an exhibit
2    with -- well --
3           MR. PATTERSON:  I believe that then
4    opens up another issue with respect to the contents of
5    the call that's going to -- if it's allowed in, it's
6    going to be left up to the jury's interpretation
7    obviously.
8           THE COURT:  Absolutely.  Well, what
9    we'll do -- no.  I don't want to spend a lot of time
10   on this.  We've kept the jury waiting and I'm sure
11   this isn't of concern to -- well, I'm not going to go
12   forward with that statement.
13          But what we're going to have to do is
14   excuse the jury again and play the call.  That's what
15   I was addressing, is that necessary, and I suspect
16   that it is.
17          MR. PATTERSON:  I believe so, Your
18   Honor.
19          THE COURT:  I thought there was a
20   transcript, but no.  So we'll put the witness back on
21   the stand, Mr. Sierra, complete his testimony and then
22   it's your -- well, you don't have to put the caller on
23   next.
24          MS. MARTIN:  No, Your Honor.  I don't
25   have to.  I was just indicating that that was our

1    intention and I didn't know if Your Honor was prepared

2    to rule.  I can ask the 911 custodian to come back

3    tomorrow if you would rather rule on it later in the

4    day.

5                    THE COURT:  I want to rule on it out of

6    the presence of the jury.

7                    MS. MARTIN:  Of course.

8                    THE COURT:  I don't want to take any

9    additional time, and it will take additional time to

10   resolve this issue.  And what I'm suggesting is we

11   finish with Mr. Sierra.  We're going to excuse the

12   jury at the rate we're going now.  It's quarter of

13   three.  We have two more hours.  I would like to get

14   two more hours of testimony and not argument.

15                    So my thought is that we ought to keep

16   the 911 operator here and proceed with her.  We've got

17   a lot to accomplish tonight.  But proceed with her

18   first at 5:00.   Hear the call out of the presence of

19   the jury and then decide.  Hear argument again and

20   decide, again, out of the presence of the jury, but

21   they'll be on their way home.

22                    MS. MARTIN:  And just so I'm my -- just

23   to clarify, do you want the 911 custodian here to

24   testify as -- that it's a business record or you just

25   want to hear the phone call again?

Page 193

1                    THE COURT:  Well, I think in -- I would

2       turn to you, Mr. Patterson.

3                    MR. PATTERSON:  If the 911 -- I

4       understand that the 911 center person would testify

5       that it is, in fact, a business record.  Then the

6       other issue obviously is the identification of the

7       caller as my client.  I think that's where I would

8       make the objection --

9                    THE COURT:  I'm primarily interested

10      in, now at least, in hearing the call again.

11                   MR. PATTERSON:  Oh, yes --

12                   THE COURT:  That --

13                   MR. PATTERSON:  -- outside the presence

14      --

15                   THE COURT:  -- will enable me to rule

16      and --

17                   MR. PATTERSON:  I think the Government

18      has other police officer fact witnesses that we can --

19                   THE COURT:  Oh, I'm not concerned about

20      that.  The Government will --

21                   MR. PATTERSON:  I'm just saying --

22                   THE COURT:  -- call other witnesses.

23      But Ms. Martin just asked do we want the 911 operator

24      here at 5:00 to give testimony or is the call alone

25      sufficient.  I'm not talking only about what is

1    necessary in order for me to rule on the admissibility

2    of the 911 call --

3                    MR. PATTERSON:  I would ask for

4    testimony --

5                    THE COURT:  -- Exhibit 5-B.

6                    MR. PATTERSON:  I'm sorry to interrupt.

7    I would ask for testimony from the representative from

8    the 911 center.

9                    THE COURT:  All right.  We'll hear her

10   testimony out of the presence of the jury at or about

11   5:00.

12                   MS. MARTIN:  All right.  Thank you,

13   Your Honor.

14                   THE COURT:  Well, someone's got to do

15   something like get Mr. Sierra back on the stand.

16                   MR. ECKERT:  He's here, Your Honor.

17                   THE COURT:  I'm sorry to have missed

18   you, Mr. Sierra.  My attention was focused on counsel

19   who presented, as you gather --

20                   THE WITNESS:  Yes, sir.

21                   THE COURT:  -- many, many, many legal

22   issues that are not common for presentation in

23   criminal cases.

24                   All right.  You may continue.  Were we

25   on cross-examination?

Page 195

1                    THE COURT OFFICER:  All rise.

2          (Jury present)

3                    THE COURT:  Be seated, everyone.

4                    The legal issue that was presented

5      before lunch has been partially resolved, but not

6      completely resolved.  We're going to finish it

7      tonight.  We'll be here long after you're on your way

8      home.  We're going to send you home at the usual time,

9      and I'll have more to say about scheduling at that

10     time.

11                   And now we will proceed.

12                   Cross-examination.

13                   MR. PATTERSON:  Oh, go ahead.

14                   MS. MEEHAN:  Go ahead.  Go ahead.

15                   MR. PATTERSON:  I'm sorry.  No.  Please

16     go.

17                        CROSS-EXAMINATION

18     BY MS. MEEHAN:

19          Q.   Good afternoon, Mr. Sierra.

20          A.   Good afternoon.

21          Q.   I just have a few quick questions for you.

22                   MS. MEEHAN:  If I could ask the

23     Government to post what's already been marked and

24     admitted as Government 47-B, and that's going to pop

25     up on your screen there.  And can that also be shown

Page 196

1    to the jury as well, Your Honor?  It's already been
2    admitted.
3                 Thank you.
4    BY MS. MEEHAN:
5         Q.   Mr. Sierra, you -- you've got some
6    familiarity with telephone number 215-713-5602 on your
7    direct exam.
8         A.   Yes.
9         Q.   And it was established that that number
10   belongs to my client here, Mr. Quinn.  And the records
11   begin -- the records that you have here of G-47 start
12   on the date of March 20th of 2019, right?
13        A.   Correct.
14        Q.   And they end, and there's 20, 21 pages, and
15   they end April 12th, right?
16        A.   April 15th.
17        Q.   Oh, I'm sorry.  April 15th.  So the very
18   first call either way, with the number 215-713-5602 is
19   on March 20th, correct?
20        A.   Just one moment.
21        (Pause)
22        Q.   Around 3:00 and that's on page 2, sorry, on
23   -- like a quarter of the way down.
24        A.   Yes. I have 3/20/2019 at 0304.
25        Q.   Okay.  And I know this is difficult, but if

1    you could just scan through page 3 and then 4, I think

2    there's another call that day.  It's a quarter of the

3    way -- it's at 171749 on page 4.

4         A.   Yes.

5         Q.   Okay.  All right.  And then that -- page 4

6    continues.  That's still the same date of March 20th

7    and then page 5, if you can just pull up page 5,

8    that's a combination of March 20th and 21, and you

9    don't see any calls on March 21.  And on page 6, if

10   you could scan through that and just see if there's a

11   call from that -- if that number is there on March

12   21st.  And let me know.  Take your time.  I'm sorry.

13        (Pause)

14        A.   I do not see the number on page 6.

15        Q.   Okay.  And page 7 and I'm pretty confident

16   you won't see it on March 21st on page 7.

17        A.   Nothing on page 7.

18        Q.   And again on page 8, same date.  You're

19   still on March 21st.

20        A.   Nothing on page 8.

21        Q.   Same with page 9.  Nothing on page 9.

22        A.   And turning your attention to page -- sorry.

23   Let's jump ahead here.  I don't think there's anything

24   on page 10, but you can go ahead and scan that if you

25   would.

Page 198

1       A.   Nothing on page 10.

2       Q.   And then on page 11, if you can call up page

3  11, we -- it sort of just, almost half, a little more

4  than halfway down the page we get to March 22nd which

5  is the date of the incident that was referenced on

6  direct.  And if you'll go through March 22nd on page

7  11 and 12 and 13, there's no call from the number or

8  to the number 215-713-5602 until, now I'm on page 14,

9  if you can call up 14, until 194213, so that would be

10  -- I think you've already advised us that's 5:42 in

11  the evening, correct?  And take your time.  I don't

12  mean to rush you.  I apologize.

13       A.   So the next transaction I see is on

14  3/22/2019 at 194213.

15       Q.   So there was no call on -- so really before

16  that time the last call was -- with that -- that

17  included that number was on the 20th?

18       A.   That is correct.

19       Q.   Okay.  Thank you.

20            MS. MEEHAN:  I have nothing further.

21            And, Your Honor, I do have a

22  stipulation to add, but I would -- I could ask the

23  Court if I could read that to the jurors after Mr.

24  Patterson's cross-examination, whichever Your Honor

25  prefers.

1           THE COURT:  Fine.

2           MS. MEEHAN:  Thank you.

3               CROSS-EXAMINATION

4   BY MR. PATTERSON:

5      Q.   Good afternoon.  How you doing?

6      A.   Good afternoon, sir.

7      Q.   So before the lunch break you had answered

8   questions by the Government and displayed on the

9   screen both in front of you and in front of the jurors

10  that you explained a lot of data entry; is that

11  correct?

12     A.   Correct, sir.

13     Q.   And that's all they are are data entries,

14  correct?

15     A.   Correct.

16     Q.   You can't testify that those data entries on

17  the day if somebody called and the day that somebody

18  received a call that Donnie Smith made any of those

19  calls, correct?

20     A.   I don't know who that is.

21     Q.   You can't say that -- well, let me ask you.

22  You can't say who made the call, correct?

23     A.   No, only that the handset had the

24  communication.

25     Q.   And so let's get more specific because you

Page 200

1    wouldn't know my client.  Those calls that you were
2    referencing was to a subscriber as Dontay Smith; is
3    that correct?
4         A.   Correct, sir.
5         Q.   Okay.  And I believe you said that Dontay
6    Smith, that particular account was not a contractual
7    account so you could put any name in there; is that
8    right?
9         A.   Correct, sir.
10        Q.   So if you want to conceal your identity you
11   can change the last three letters of your name from
12   Donnie Smith to Dontay Smith, correct?
13        A.   If you wanted to, yes.
14        Q.   You could make it that close.  You could put
15   Santa Claus or Yosemite Sam, right?
16        A.   Correct, sir.
17        Q.   And I bet you've seen that, haven't you?
18        A.   Yes, I have.
19        (Laughter)
20        Q.   So people who would put Santa Claus and Bugs
21   Bunny, obvious they have grave concerns about somebody
22   snooping into their account, correct?
23        A.   People sometimes do it for comedic reasons.
24   I've seen alter egos to super heroes, Bruce Wayne,
25   Bruce Banner.  Whatever makes them happy.

1      (Laughter)

2      Q.   Okay.  And T-Mobile is a vast, large

3    company, correct?

4      A.   Yes.

5      Q.   Millions of subscribers?

6      A.   Yes.

7      Q.   Millions or quadrillions or quadrillions of

8    data, correct?

9      A.   Yes.

10     Q.   And somewhere in some place in some town in

11   the United States there is a room, a very cold air-

12   conditioned room with a big computer in it.  There's

13   probably a lot of those rooms with big computers; is

14   that correct?

15     A.   Yes, sir.

16     Q.   And that computer, one computer or a big, a

17   whole bunch of different computers?

18     A.   Many different servers, but, yes, large air-

19   conditioned rooms.

20     Q.   Right.  T-Mobile obviously has an IT

21   department, correct?

22     A.   Yes, sir.

23     Q.   And I -- to this day I don't know what the

24   IT stands for.  What's IT stand for?

25     A.   Information technology.

Page 202

1       Q.    Okay.  So information technology is
2   obviously somebody who is probably very smart with
3   computers and they are taking care of these very
4   complex machines; is that correct?
5       A.    Yes, sir.
6       Q.    Are you one of the people that are taking
7   care of these very massive, complex machines?
8       A.    No, sir, I am not.
9       Q.    You are actually the person responsible for
10  interpreting what these big massive machines spit out
11  once you put in a request; is that correct?
12      A.    That is correct.
13      Q.    So you would be, at least be familiar with
14  the terminology of garbage in, garbage out?
15      A.    Yes, sir.
16      Q.    You put garbage into a computer, it doesn't
17  matter how smart the computer is, if the garbage in is
18  not -- is garbage, the information out is going to be
19  garbage; is that correct?
20      A.    That is correct, sir.
21      Q.    You can't say with one-hundred percent
22  certainty today that all that information contained in
23  all those documents provided to the jury and that you
24  explained on direct examination by the Government,
25  that that is one hundred percent accurate?

1      A.   Well, that's why there's redundancies.  So

2    as -- I would never say impossible.  But the

3    information being inaccurate is as close to impossible

4    as I feel comfortable saying impossible.

5      Q.   Okay.  So we do at least have close to

6    impossible, correct?

7      A.   Yes.

8      Q.   Okay.  And would you be in the position to

9    testify, would you be -- and the word competent means

10   competent in the scenario of a person testifying at a

11   jury trial, competent meaning would you be competent

12   to say that it's near impossible or would we near an

13   IT guy that's sitting there with these computers every

14   day, making sure that they're working within the

15   established parameters of what that computer is

16   supposed to be operating?

17     A.   Yes.  I would be competent enough to provide

18   that.

19     Q.   Okay.  And I don't know this question.

20   That's why I'm asking.  You generate phone numbers,

21   people who were calling and people who were

22   potentially receiving.  You're not permitted to record

23   the actual voice, the topic of the conversation that's

24   -- that these people are engaged in; is that correct?

25     A.   That's correct.  T-Mobile does not retain

Page 204

1    content of phone calls or text messages.

2         Q.   And how about the -- oh, and text messages,

3    too, correct?

4         A.   Correct, sir.

5         Q.   So those massive computers in the ice cold

6    rooms, they're not calculate -- they're not storing

7    this information, correct?

8         A.   No.  It's just sent and delete, essentially.

9    And then the billing information which is what we have

10   here to confirm, you know, date, time, number, et

11   cetera, that information is what is retained, the

12   transactional logs because obviously we have to

13   provide bills to our customers and our -- are able to

14   be audited by outside agencies.

15        Q.   Okay.

16             MR. PATTERSON:  Nothing further.  Thank

17   you.

18             THE WITNESS:  Thank you.

19             MR. WITTELS:  No questions.

20             THE COURT:  Ms. Meehan?

21             MS. MEEHAN:  No, Your Honor.  Thank

22   you.

23             THE COURT:  That concludes --

24             MS. MEEHAN:  Oh, I'm sorry.  Your

25   Honor, I do --

Page 205

1                    THE COURT:  I'm sorry.

2                    MS. MEEHAN:  I apologize.  I spoke to

3      soon.  I did have a stipulation I wish to enter into

4      the record.  I apologize.

5                    THE COURT:  And do you want to do it --

6      well, first of all, is there any redirect?

7                    MS. MARTIN:  No, Your Honor.

8                    THE COURT:  Do you wish to read the

9      stipulation into the record as part of your cross-

10     examination or can the witness be excused for it?

11                   MS. MEEHAN:  The witness may be

12     excused, Your Honor.

13                   THE WITNESS:  Yay.

14                   MS. MEEHAN:  Thank you.

15                   THE WITNESS:  I'm just waiting on you,

16     Your Honor, for you to say it.

17                   THE COURT:   You've had some experience

18     in court, haven't you?

19                   THE WITNESS:  Yes, sir.

20          (Laughter)

21                   THE COURT:  Good.  You're excused.

22                   THE WITNESS:  Thank you, Your Honor.

23                   THE COURT:  Thank you very much.

24                   MS. MEEHAN:  Thank you, Your Honor.

25                   THE COURT:  This is a stipulation

1   between all counsel?

2                   MS. MEEHAN:  Yes, Your Honor.

3                   Your Honor, there's a stipulation by

4   and between the Government and counsel for Defendant

5   Quinn, Defendant Stevens and Defendant Smith that the

6   Government did not present the entirety of the phone

7   records between -- the entirety of the phone records

8   from February 16th, 2019 through March 27th, 2019.

9   Had the Government presented those records, they would

10  show semi-regular contact between Mr. Quinn and Mr.

11  Smith.  And that is the stipulation.

12                  MS. MARTIN:  So stipulated, Your Honor.

13                  THE COURT:  Thank you.

14                  MR. ECKERT:  May we proceed with our

15  next witness, Your Honor?

16                  THE COURT:  Yes.

17                  MR. ECKERT:  The Government calls

18  Detective Xhelo.

19                  MR. WITTELS:  May we see you just

20  briefly, Judge?

21                  THE COURT:  Pardon me.

22                  MR. WITTELS:  May we see you just

23  briefly, a request to the Court?

24                  THE COURT:  Yes.

25       (At sidebar)

1            MR. WITTELS:  Would you tell the jury

2    now that that -- that this testimony about the phone

3    records has nothing to do with my client, it pertains

4    only to Quinn and Smith.

5            MR. ECKERT:  Why would that come from

6    the Court?  I -- you could have cross-examined him on

7    that.  You can argue that.  That's all fair argument.

8    But why would it need to come from the Court?

9            THE COURT:  Well, it's perfectly

10   obvious it only deals with Quinn and Smith.  I --

11   they're the only two people who were mentioned.

12           MR. WITTELS:  Okay.

13           THE COURT:  Well, I think the

14   Government's position is correct.

15           MR. WITTELS:  All right.

16       (Sidebar concluded)

17           MS. MARTIN:  Your Honor, permission to

18   retrieve the exhibits for the next witness?

19           THE COURT:  You may.

20           MS. MARTIN:  Thank you.

21       (Pause)

22           THE CLERK:  Please raise your right

23   hand.

24     DETECTIVE TAULANT XHELO, GOVERNMENT'S WITNESS, SWORN

25           THE CLERK:  Thank you.  Please be

Page 208

1    seated.

2                    Please state your full name for the

3    record.

4                    THE WITNESS:  Detective Xhelo,

5    X-H-E-L-O.

6                    MR. ECKERT:  And can you state your

7    first name, too, please, sir?

8                    THE WITNESS:  Taulant.  T-A-U-L-A-N-T.

9                    DIRECT EXAMINATION

10   BY MR. ECKERT:

11        Q.   How are you currently employed?

12        A.   I'm a Philadelphia police detective.

13        Q.   Okay.  And how long have you been a

14   detective?

15        A.   Since December 4th, 2019.

16        Q.   Okay.  And what did you do before that?

17   What position did you hold?

18        A.   I was a patrolman, police officer.

19        Q.   Okay.  And how long did you serve in that

20   capacity?

21        A.   For about five years.

22        Q.   Okay.  What district were you assigned to?

23        A.   The 14th.

24        Q.   And that was in the entire five years?

25        A.   I was assigned to the 25th for six months --

Page 209

1        Q.    Okay.

2        A.    -- and then transferred to the 14th.

3        Q.    Okay.  And were you serving in that capacity

4    on March the 22nd of 2019?

5        A.    I was.

6        Q.    And were you working alone that day or with

7    a partner?

8        A.    With a partner.

9        Q.    What type of vehicle were you in?

10       A.    Ford Explorer SUV.

11       Q.    Okay.  Are there lights and sirens affixed

12   to that vehicle?

13       A.    Yes.

14       Q.    Okay.  Were you the driver or the recorder?

15       A.    I was the driver.

16       Q.    Okay.  Did you receive a call for service to

17   152 East Sharpnack Street around 5 p.m.?

18       A.    Yes, I did.

19       Q.    And did you respond to that call?

20       A.    Yes, I did.

21       Q.    What was the nature of that call?

22       A.    It was a robbery in progress.

23       Q.    Okay.  Is that a priority call?

24       A.    Yes.

25       Q.    Explain to the ladies and gentlemen of the

Page 210

1    jury what a priority call is.

2        A.    A priority call is an emergency call where

3    we have to respond right away with lights and sirens.

4        Q.    Okay.  Now what street did you ride down

5    when you were responding to that call for service?

6        A.    Sharpnack Street.

7        Q.    Are you familiar with this area, sir?

8        A.    Yes, I am.

9        Q.    Okay.  And that's through your time as a

10   patrolman or patrol officer in the 14th?

11       A.    Yes.

12       Q.    All right.  What do you observe as you

13   proceed down Sharpnack to the location?

14       A.    I observe a maroon car parked on Sharpnack

15   and also other vehicles that were already parked on

16   the street that had responded to the location before I

17   got there.

18       Q.    Okay.  And were -- did you later receive a

19   report of a vehicle you should be on the lookout for?

20       A.    Yes, through police radio.  Real Time Crime

21   notified us via police radio that a male possibly

22   involved in a robbery walked into a dark color vehicle

23   parked on Sharpnack.

24       Q.    Okay.  And when you drove down Sharpnack to

25   the intersection of -- or where 152 Sharpnack is

Page 211

1     located, what did you observe?

2           A.    That was the intersection of Sharpnack and

3     Rolls and I observed the vehicle and I also observed

4     Officer Ferreira go up to the vehicle, to the driver's

5     side of the vehicle.

6           Q.    And what did you observe happen with Officer

7     Ferreira at the driver's side of the vehicle?

8           A.    I observed him open the door and try to take

9     the male out of the car and it appeared that a

10    struggle was going on between Officer Ferreira and

11    whoever was in the car.

12          Q.    Okay.  Did you get out of the car at that

13    point?

14          A.    No, I didn't.  I didn't get a chance to get

15    out of the car because the car pulled -- drove off.

16          Q.    Okay.  And after the car drove off what did

17    you do?

18          A.    I followed the car.

19          Q.    Okay.  Where did you follow the car to?

20          A.    The car drove westbound on Sharpnack so I

21    started following westbound on Sharpnack after the

22    car.

23          Q.    Okay.  If you look at your screen there,

24    there should be a map that's marked as Government's 3-

25    A.  Okay.  Does that map fairly and accurately

Page 212

1    represent that area as you've come to know it through

2    your service in the 14th district?

3         A.   Yes.

4         Q.   Okay.  Okay.

5              MR. ECKERT:  Officer, if you could go

6    to 3-B, please.

7    BY MR. ECKERT:

8         Q.   Just hang on for one second, sir.

9         A.   Sure.

10        Q.   All right.  Now, also, what should be up on

11   the screen is 3 Bravo or 3-B, and that's just a zoomed

12   out map of that same area.  Does that fairly and

13   accurately represent the area as you've come to know

14   it through your service as a police officer?

15        A.   Yes.

16        Q.   Okay.

17             MR. ECKERT:  Your Honor, at this time

18   we move 3-B.  3-A has been previously admitted.

19             THE COURT:  Yeah.  Is there any

20   objection?

21             MR. PATTERSON:  No, Your Honor.

22             THE COURT:  3-B is received.

23        (Government's Exhibit No. 3-B is received)

24             MR. ECKERT:  Okay.  Free to publish it

25   to the jury, please.

Page 213

1    BY MR. ECKERT:

2         Q.   Okay.  Sir, if you would, take us through

3    the -- your route of travel after you follow the car

4    that you were on the lookout for.  Where did it go?

5         A.   So from Sharpnack -- could you show us the

6    other --

7         Q.   Oh, I'm sorry.

8              MR. ECKERT:  Go back to 3-A.

9              THE WITNESS:  All right.  So from

10   Sharpnack we were driving towards Germantown Ave.  The

11   vehicle made a right-hand turn on Germantown Ave. and

12   then a quick turn on West Hoarder and went all the way

13   down to Hoarder and I would say Hagan.  That's where

14   we lose sight of the car.

15             MR. ECKERT:  Okay.

16   BY MR. ECKERT:

17        Q.   Now how long did it take -- would it take

18   you to drive from Ross and Sharpnack to the crash

19   site.

20        A.   That day or usually when --

21        Q.   No, usually.  Generally first.

22        A.   Five minutes.

23        Q.   Okay.  And how long would it have taken on

24   that day?

25        A.   Two or three minutes.

Page 214

1      Q.    Okay.  Now when you were following after

2    this car, were you trying to be right behind it?

3      A.    I was trying to have visual on the vehicle.

4    I was trying to see where it would go so I could give

5    information on -- through a radio, police radio --

6      Q.    Okay.

7      A.    -- and follow the car at a safe distance.

8      Q.    And were you able to observe that vehicle?

9      A.    I was after the vehicle for a good maybe two

10   minutes until he went towards Hagan Avenue.  That's

11   where I lose sight of the vehicle.

12     Q.    Okay.  And what happened after you lost

13   sight of the vehicle?

14     A.    We made a left turn on West Hagan, and then

15   we made a right turn on Upsal Street and that's where

16   we were flagged down by other drivers who let us know

17   that a crash just occurred on Park Line Ave.

18     Q.    Okay.  And did you respond to the crash?

19     A.    Yes, I did.

20     Q.    And what did you see at the crash site?

21     A.    I saw the same vehicle that I was following

22   crashed near the woods.

23     Q.    Okay.

24           MR. ECKERT:  If I could have 26-A just

25   to the witness, please.  Thank you.

Page 215

1    BY MR. ECKERT:

2         Q.   All right.  You see that, what photograph

3    has been marked as 26-A, sir?

4         A.   Yes, I do.

5         Q.   Does that fairly and accurately represent

6    the condition of the vehicle?

7         A.   Yes, sir.

8         Q.   Okay.

9              MR. ECKERT:  Publish it, please.

10             THE COURT:  You may publish.

11             MR. ECKERT:  Thank you.  That's

12   previously been admitted.

13             Thank you.

14   BY MR. ECKERT:

15        Q.   Now did you and your partner actually

16   physically get out of your car and approach that

17   vehicle?

18        A.   Yes, we did.

19        Q.   Okay.  What happened at that point?

20        A.   My partner opened the door to see if anybody

21   was inside the car and there was no one in the car.

22        Q.   Okay.  Now what did you and your partner do

23   once you confirmed there was no one inside the car?

24        A.   We called for a backup unit to stay with the

25   car and -- so we could go into the wooded area and

Page 216

1    check to see if there was anybody in there.

2         Q.   Okay.  And did backup eventually arrive?

3         A.   Yes.

4         Q.   How long did that take?

5         A.   About ten minutes.

6         Q.   Okay.  And what happened once backup

7    arrived?  What did you and your partner do?

8         A.   We started to walk through the trails to see

9    if we could find the driver.

10        Q.   Describe for the ladies and gentlemen of the

11   jury what is that, when you say the wooded area, what

12   does that mean?

13        A.   It was like a park.  It's a park where

14   people walk their dogs and run, go for a jog.

15        Q.   Okay.  And you and your partner -- who was

16   your partner, by the way?

17        A.   Officer Fernandez.

18        Q.   Okay.  You and Officer Fernandez, you

19   canvassed the area?

20        A.   Yes.

21        Q.   Okay.  How long did you do that for?

22        A.   For about 30 minutes, 35 minutes.

23        Q.   Okay.  Were you ever able to locate anyone

24   matching the description of the suspect?

25        A.   No.

1      Q.   Okay.  All right.  Did you later respond to

2    the store at 152 East Sharpnack?

3      A.   Yes.  After we surveyed the area, we went

4    back to our vehicle which was where the car was

5    crashed, and then we drove back to Ross and Sharpnack.

6      Q.   Okay.

7              MR. ECKERT:  Your Honor, may I have one

8    moment to consult with counsel?

9              THE COURT:  Yes.

10              MR. ECKERT:  Thank you.

11              At this time I would just like to play

12    Exhibit 2-C to the jury if that's fine.

13    BY MR. ECKERT:

14      Q.   Would you just observe that video, please,

15    on your screen, sir?

16      (Pause)

17              MR. ECKERT:  You can go ahead and stop

18    it right there.

19              Thank you.

20    BY MR. ECKERT:

21      Q.   Sir, that SUV, that marked SUV police

22    vehicle that pulled up, was that your vehicle?

23      A.   That's the vehicle I was driving, yes.

24      Q.   Thank you.

25              MR. ECKERT:  No further questions for

```
                                                      Page 218
 1    the witness.
 2                   THE COURT:  You may cross-examine.
 3                   MR. PATTERSON:  No questions for this
 4    witness, Your Honor.
 5                   Mr. Wittels.
 6                   THE COURT:  Briefly.
 7                   CROSS-EXAMINATION
 8    BY MR. WITTELS:
 9         Q.   Office -- Detective, I'm sorry, when you got
10    a call, robbery in progress, who does that come from?
11         A.   Police radio.
12         Q.   Police radio, which they would have gotten
13    information from the 911 call center, correct?
14         A.   Yes.
15         Q.   So it would have gotten information from
16    someone at some location about some problem?
17         A.   Yes, from complainant, from whoever called.
18         Q.   And that's usually a civilian?
19         A.   Yes.
20         Q.   Okay.  So a civilian to the 911 operator to
21    the police radio to you?
22         A.   Yes, sir.
23         Q.   Doesn't mean -- the term robbery in progress
24    doesn't mean that a robbery actually occurred.  That
25    means that's what's transmitted to you, correct?
```

Page 219

1    A.   Robbery in progress means that there is a
2  robbery occurring.  That's what we get it as.  I'm not
3  --
4    Q.   That doesn't mean that there's actually a
5  robbery in progress, does it?
6    A.   That -- I can't answer that.  I do not --
7  when we get a call, we get a call for a robbery in
8  progress, that -- to me that means it's a priority
9  which means that I have to turn my lights and sirens
10  on.
11    Q.   And that's based on what police radio tells
12  you --
13    A.   Yes.
14    Q.   -- which they got from the 911 call
15  operator, correct?
16    A.   Yes.
17    Q.   Thank you.
18                THE COURT:  Ms. Meehan?
19                MS. MEEHAN:  No questions, Your Honor.
20                THE COURT:  There's no redirect?
21                MR. ECKERT:  No, Your Honor.  Thank
22  you.
23                THE COURT:  That concludes your
24  testimony.  Thank you --
25                THE WITNESS:  Thank you, Your Honor.

Page 220

```
 1                    THE COURT:  -- very much.
 2                    MS. MARTIN:  May I, Your Honor?
 3                    THE COURT:  You may.
 4                    MS. MARTIN:  The Government calls
 5    Officer Alexander Wilson.
 6         (Pause)
 7                    THE CLERK:  Please raise your right
 8    hand.
 9     OFFICER ALEXANDER WILSON, GOVERNMENT'S WITNESS, SWORN
10                    THE CLERK:  Thank you. Please be
11    seated.
12                    Please state your full name for the
13    record.
14                    THE WITNESS:  Alexander Wilson.
15                    THE COURT:  Good afternoon, sir.
16                    THE WITNESS:  How you doing, sir?
17                    THE COURT:  Fine.
18                    MS. MARTIN:  May I proceed, Your Honor?
19                    THE COURT:  Yes.
20                       DIRECT EXAMINATION
21    BY MS. MARTIN:
22         Q.   Good afternoon, Officer Wilson.
23         A.   Good afternoon.
24         Q.   Officer Wilson, how are you currently
25    employed?
```

Page 221

1          A.    Philadelphia Police Department.

2          Q.    How long have you been a Philadelphia police

3     officer?

4          A.    24 years.

5          Q.    And during those 24 year where have you been

6     assigned?

7          A.    The 14th District.

8          Q.    Okay.  And were you working on March 22nd,

9     2019 as a Philadelphia police officer?

10          A.    Yes.

11          Q.    All right.  And what were your work hours

12     that day?

13          A.    2:30 in the afternoon to 10:30 at night.

14          Q.    Were you working alone or with a partner?

15          A.    No.  I was working by myself.

16          Q.    At a certain point that day did you receive

17     a radio call for a robbery in progress?

18          A.    Yes.  I responded to a radio call for a

19     robbery in progress.

20          Q.    Was that at 152 East Sharpnack Street?

21          A.    Yes.  That's correct.

22          Q.    Did you respond to that call?

23          A.    Yes, I did.

24          Q.    Did you make it to the location?

25          A.    I didn't make it to the location.  At the

Page 222

1   time, as I was on my way to the location two other

2   officers through police radio came on air that what --

3   that had responded also, stated that they was pursuing

4   a vehicle that was in reference to the robbery that

5   happened at 152 West -- East Sharpnack and they was

6   traveling westbound on Hoarder.  At that time prior to

7   going there I directed my attention to go after the --

8   well, not go after the officer, but go follow -- catch

9   up with the officers as they was in pursuit of a

10  vehicle.

11       Q.   Okay.  Did you participate in the pursuit in

12  any way?

13       A.   Yes, I participated into it, but I was

14  trying to catch up to them as far as the pursuit.

15       Q.   Did you ultimately respond to the crash

16  site?

17       A.   Yes, I did.

18       Q.   Okay.  And would you recognize a photo of

19  that car if I showed it to you?

20       A.   Yes.

21            MS. MARTIN:  If I could please have the

22  witness shown 26-A and published.

23       (Pause)

24            THE WITNESS:  Yes.  That's the vehicle.

25            MS. MARTIN:  Thank you, Officer Wilson.

Page 223

1    BY MS. MARTIN:

2         Q.   Officer Wilson, what was your role at this

3    scene?

4         A.   At that scene I held the vehicle as far as

5    part of the robbery that happened --

6                    MS. MEEHAN:  Objection.

7                    THE COURT:  I'm sorry.

8                    MS. MEEHAN:  Objection.

9                    MS. MARTIN:  Your Honor, I -- we can

10   strike that from the testimony.  I -- he's simply

11   responding as to why he was holding the vehicle.  It

12   was related to an investigation that was in progress.

13   It's a robbery investigation.

14                   MS. MEEHAN:  Well, he said the robbery

15   in progress and that is a central issue in the case,

16   Your Honor.  I thought the Court earlier cautioned the

17   jury that it's not for the truth of the matter

18   asserted, but -- so I objected to hearsay.

19                   THE COURT:  Well, it was reported to

20   him as a robbery in progress.  Whether it was a

21   robbery in progress is up to you to decide, ladies and

22   gentlemen.

23                   Is that the instruction you were

24   requesting?

25                   MS. MEEHAN:  Yes, Your Honor.  Thank

Page 224

1    you.

2    BY MS. MARTIN:

3        Q.   Officer Wilson, you said that you held the

4    vehicle.  What does that mean?

5        A.   Holding the vehicle as part of an

6    investigation of anything that happened or any

7    information that's given out.  Hold the scene till the

8    detectives come and detectives will determine as far

9    as where we go from there, what's going to happen from

10   there.

11       Q.   All right.  And did you search the vehicle

12   or anything like that?

13       A.   No, I didn't search the vehicle.

14       Q.   Did you wait for detectives to arrive?

15       A.   Yes.  Our job is to wait till detectives get

16   on location.

17       Q.   Did you fill out any paperwork related to

18   this vehicle?

19       A.   Yes, I did.

20       Q.   Okay.  And did that paperwork include the

21   tag information and VIN number?

22       A.   Yes, it does.

23       Q.   Officer Wilson, do you know the VIN number

24   off the top of your head?

25       A.   No.  I can't remember the VIN number off the

Page 225

1    top of my head.

2         Q.   Would it refresh your recollection if I

3    showed you some paperwork that you filled out?

4         A.   Yes.

5              MS. MARTIN:  If I could please on the

6    witness's screen only have Government's Exhibit 12

7    displayed.

8              THE WITNESS:  Yes.  That's my paperwork

9    that I filled out for the vehicle.

10   BY MS. MARTIN:

11        Q.   Let's start with the basics, Officer Wilson.

12   Do -- what was the make, model and year of the

13   vehicle?

14        A.   2010 Ford Taurus, burgundy in color.

15        Q.   And did you note the VIN number?

16        A.   Yeah.  I wrote the VIN number on the

17   property receipt.

18        Q.   And can you read the VIN number into the

19   record, please?

20        A.   Okay.  It's 1FAHP2EW9AG170167.

21        Q.   And how did you determine the VIN number?

22        A.   Prior to getting the VIN number the tag that

23   was on the vehicle, which was a New Jersey temporary

24   tag, my job was to run the vehicle to try to get the

25   owner's information.  As I ran the New Jersey, it was

1    a paper tag, temporary tag on there and I could get

2    nothing from Pennsylvania BMV or New Jersey BMV.  At

3    that time I walked to the vehicle, which is a -- the

4    VIN number plate which is on the left side front of

5    the window shield, the vehicle where you can see it

6    right there, took that down, wrote it down, went back

7    to my vehicle.  At that time I entered that VIN number

8    that I just read into the system, checked both

9    Pennsylvania and New Jersey, also, and at that time

10   the tag that came up was from Pennsylvania.  At that

11   time that's what I wrote on the property receipt.  The

12   tag that was originally assigned to the vehicle and

13   the owner that the tag came to the vehicle.  So the

14   tag and the VIN number had matched through

15   Pennsylvania BMV, Board of Motor Vehicle code --

16   system.

17        Q.    Okay.  And did you or brother or sister

18   officers arrange for this vehicle to be towed to a

19   Philadelphia police lot?

20        A.    Yes.  I made arrangements to be towed to

21   the, what we call McAllister and Whitaker, to there.

22        Q.    And did you stay with the vehicle until it

23   was towed?

24        A.    Yes.  I stayed until it was towed.

25        Q.    Thank you.

Page 227

1          MS. MARTIN:  Nothing further, Your

2    Honor.

3          THE COURT:  Any cross-examine?

4              CROSS-EXAMINATION

5    BY MR. PATTERSON:

6      Q.   Good afternoon, Officer.

7      A.   Good afternoon.

8      Q.   That document that was up for your direct

9    and it's up again, could you please look at that

10   report and tell us who you noted as the owner of the

11   car?

12     A.   Christina D. Tarziene (ph), I believe.  I

13   don't have my glasses.

14     Q.   That's fine.  You want my dollar ones?

15     (Laughter)

16     A.   That would probably work.

17     Q.   So it's not Donnie Smith, though, correct?

18     A.   No, it's not Donnie Smith.

19     Q.   Now were you first on scene to this

20   accident?

21     A.   No.  I wasn't the first one on scene, but I

22   was down there also.

23     Q.   Okay.  And you testified that I believe it

24   was your job to secure the scene?

25     A.   Yes.  I secured the vehicle.

1          Q.    And, Officer, you've been on the force for

2     quite a number of years, 24, correct?

3          A.    Yes.

4          Q.    This isn't your first rodeo.  You've been to

5     a crash scene and you know what to do, correct?

6          A.    Yes.

7          Q.    And you did it in this case, correct?

8          A.    That's correct.

9          Q.    And by doing what you did in this case, what

10    you -- the purpose of this is to make sure that

11    whatever evidence they find inside the car or outside

12    the car is not disturbed, correct?

13         A.    That's correct.

14         Q.    Because, actually, what you do as the first

15    responder or somebody, you know, the first, second,

16    third, fourth person and you have to make sure nobody

17    goes around the car, that's essentially the start of

18    the chain of custody, correct?

19         A.    Yes.

20         Q.    Because any potential evidence that they

21    would find in that car, and if I'm wrong just tell me,

22    it's typically -- first of all, it would be initially

23    observed by an officer, by their (indiscernible),

24    correct?

25         A.    That's correct.

Page 229

1        Q.    And then they would maybe do it themselves

2    or they would call in a special unit depending on the

3    -- what you're investigating, and then the potential

4    evidence inside or outside the car would be

5    photographed, correct?

6        A.    That's correct.

7        Q.    And after it's photographed -- and it would

8    be photographed in the position as they found it when

9    they came on scene, correct?

10       A.    That's correct.

11       Q.    They wouldn't manipulate it at all because

12   that would then effect the chain of custody, correct?

13       A.    That's correct.

14       Q.    You want the evidence that they find in the

15   car -- and let's say -- instead of me talking about

16   generalizations, let's talk about this case.

17             You want it preserved so whatever's in there

18   can potentially be tested, correct?

19       A.    That's correct.

20       Q.    If it's controlled substance that would then

21   be observed by somebody initially and would then be

22   photographed, then it would be-- I believe the

23   verbiage is bagged and tagged, right?

24       A.    Yes.

25       Q.    Bagged and tagged means when they would take

1    the object that might be a part of a crime, they would

2    use gloves so they don't put their own fingerprints on

3    it, correct?

4         A.   That's correct.

5         Q.   And they would not transfer their own DNA on

6    it, correct?

7         A.   Right.

8         Q.   And they would put it in a bag and they

9    would seal that bag, and the only person who could

10   open that bag once it's sealed is a lab, right?

11        A.   I believe so.

12        Q.   Okay.  And were you involved -- the scope of

13   your involvement in this case was what you just

14   testified to, correct?

15        A.   That's correct.

16        Q.   Were you responsible for any bagging and

17   tagging of any items found within the car?

18        A.   No.

19        Q.   Okay.  Thank you.

20             MR. PATTERSON:  Thank you.

21             THE COURT:  Any further cross-

22   examination?

23             MR. WITTELS:  No questions.

24             MS. MEEHAN:  No questions, Your Honor.

25             THE COURT:  That concludes your

Page 231

1    testimony, Officer Wilson.  Thank you.

2                    THE WITNESS:  All right.  Thank you.

3                    MR. ECKERT:  Your Honor, at this time

4    the Government would call Detective Michael Cannon.

5         (Pause)

6                    THE CLERK:  Please raise your right

7    hand.

8     DETECTIVE MICHAEL CANNON, GOVERNMENT'S WITNESS, SWORN

9                    THE CLERK:  Thank you.  Please be

10   seated.  Please state your full name for the record.

11                   THE WITNESS:  Detective Michael Cannon,

12   CANNON, Badge 9167, assigned to Northwest Detective

13   Division.

14                   THE COURT:  Good afternoon, Detective

15   Cannon.

16                   THE WITNESS:  Good afternoon, Your

17   Honor.

18                     DIRECT EXAMINATION

19   BY MR. ECKERT:

20        Q.   Sir, how long have you been a police

21   officer?

22        A.   Twenty years.

23        Q.   Okay.  And how long have you served as a

24   Philadelphia detective?

25        A.   13 years.

Page 232

1          Q.    Okay.  And how long have you served with

2    Northwest detectives?

3          A.    13 years.

4          Q.    Okay.  Are you -- were you asked to assist

5    the investigation of a robbery that occurred at 152

6    East Sharpnack Street on March the 22nd of 2019?

7          A.    Yes.

8          Q.    Okay.  Where did you respond to?

9          A.    I responded to 1021 Hoarder Street.  It's

10   right on the edge of Fairmount Park area.

11         Q.    Okay.  And why did you respond to that

12   location?

13         A.    There was a car involved in an accident

14   there, a Ford Taurus.

15         Q.    Okay.  And was this in relation to that --

16   into the robbery investigation?

17         A.    Yes, it was.

18         Q.    All right.  And what did you observe when

19   you arrived at the crash site?

20         A.    The car hit a log.  It was unattended.  When

21   I looked inside the car I could see a handgun.

22         Q.    Okay.  Now did you search the car right at

23   that location?

24         A.    No.

25         Q.    Why not?

1        A.    I needed to get a search warrant for the

2   car.  I made arrangements for the car to be towed by

3   police tow to our police garage.

4        Q.    And when you say police garage, explain what

5   that is.

6        A.    It's where we examine cars and for different

7   investigations.

8        Q.    Okay.  So in other words, it's -- the custom

9   of the Philadelphia Police Department is not to search

10  the vehicle on location, correct?

11       A.    Most times, yes.  Correct.

12       Q.    Okay.  So you have the vehicle towed to a

13  secure facility?

14       A.    Yes.

15       Q.    Okay.  And where's the location of that

16  facility?

17       A.    4928 McAllister Avenue.

18       Q.    Okay.  And it's what police officers often

19  refer to as Whitaker and McAllister, correct?

20       A.    Yes.

21       Q.    So did you then -- did you obtain a search

22  warrant for the vehicle?

23       A.    I did.

24       Q.    Okay.  And did you, in fact, search it?

25       A.    Yes.

Page 234

1          Q.   All right.

2                    MR. ECKERT:   If we can show 27-A just

3     to the witness, please.

4     BY MR. ECKERT:

5          Q.   All right.  Do you see that photograph, sir?

6          A.   Yes.

7          Q.   And what does that photograph depict?

8          A.   It's the car I searched that night.

9          Q.   Okay.  And you've reviewed five photographs

10    in this case?

11         A.   Yes.

12         Q.   -- and they've been marked as 27 --

13    Government 27-A through E.  We can go through them

14    now.

15                    MR. ECKERT:   If you could go to B,

16    please.

17    BY MR. ECKERT:

18         Q.   Now what's that photograph depict, sir?

19         A.   It's the back of the car.

20         Q.   Okay.  And that's the car you obtained a

21    search warrant on?

22         A.   Correct.

23         Q.   Okay.

24                    MR. ECKERT:   And we'll go to C, please.

25    BY MR. ECKERT:

Page 235

1      Q.    And what does that photograph depict, sir?

2      A.    It's a photograph of the interior of the

3   car.

4      Q.    Okay.  Do all these photographs, 27-A

5   through E, do they fairly and accurately represent the

6   vehicle as you searched it on March 23rd of 2019?

7      A.    Yes.

8             MR. ECKERT:  Your Honor, at this time

9   we would move 27 Alpha through Echo or A through E.

10            THE COURT:  Is there any objection?

11            MR. PATTERSON:  No objection, Your

12   Honor.

13            MR. ECKERT:  All right.  If you could -

14   -

15            THE COURT:  27 --

16            MR. ECKERT:  A through E, Your Honor.

17            THE COURT:  -- A through E are received

18   in evidence.

19            MR. ECKERT:  Thank you.

20      (Government's Exhibit Nos. 27-A through 27-E are

21   received)

22            MR. ECKERT:  May we publish that to the

23   jury, please?

24            THE COURT:  You may.

25   BY MR. ECKERT:

Page 236

1       Q.   Okay.  And that's the interior of the
2    vehicle, sir?
3       A.   Yes.
4       Q.   Okay.  What of note did you recover in the
5    vehicle?
6       A.   I recovered a handgun and also a knit cap.
7       Q.   A knit cap, like a baseball hat?
8       A.   Yes, like a baseball cap, hat.
9       Q.   Okay.  All right.  At this --
10              MR. ECKERT:  May I have permission to
11   approach the witness, Your Honor?
12              THE COURT:  You may.
13              MR. ECKERT:  Thank you.
14   BY MR. ECKERT:
15      Q.   Sir, I've handed you for the record what's
16   been marked as Government's 29 for identification.
17   What is it that I just handed you, sir?
18      A.   A Glock handgun.
19      Q.   Okay.  And what is the serial number on that
20   weapon?
21      A.   Serial number is BCXX649.
22      Q.   Okay.  And is that the firearm that you
23   recovered on -- first of all, let me back up a step.
24   On what date did you actually search this vehicle, was
25   it March 22nd or March 23rd?

Page 237

1          A.    I believe it was the 22nd.

2          Q.    Okay.  And the firearm that you're handing

3     -- that you're holding there, is that the firearm that

4     you recovered on that date?

5          A.    Yes.

6          Q.    Okay.  And how do you know that?

7          A.    From the serial number.

8          Q.    Okay.  And is there somewhere where you

9     would have recorded the serial number at the time of

10    the search?

11         A.    Yes, the property receipt.

12         Q.    Okay.

13                    MR. ECKERT:  And can we have the

14    property receipt just to the witness?  Just to the

15    witness.  Thank you.

16    BY MR. ECKERT:

17         Q.    All right.  Is that the -- looking at your

18    screen there, sir, just off your right shoulder, is

19    that the property receipt that you filled out in

20    relation to that firearm?

21         A.    Yes.

22         Q.    Okay.  And did you record the serial number

23    on that property receipt?

24         A.    Yes.

25         Q.    All right.  Is that the same serial number

Page 238

1    you just read a moment ago?

2        A.   It is.  Yes.

3        Q.   All right.

4             MR. ECKERT:  At this time, Your Honor,

5    we would move Government's 29.

6             THE COURT:  Any objection?

7             MR. PATTERSON:  No, Your Honor.

8             THE COURT:  G-29 is received.

9        (Government's Exhibit No. 29 is received)

10   BY MR. ECKERT:

11       Q.   All right.  Now after you -- while you were

12   searching that vehicle and you located that firearm,

13   what did you do with it?

14       A.   We -- I brought it back to the Northwest

15   Detective Division.  There's other paperwork we had to

16   -- I had to prepared and then it was taken to the

17   firearms identification unit at 8th and Poplar.

18       Q.   Okay.  And what is the firearms

19   identification unit?

20       A.   That's where we take all of our ballistic

21   evidence and handguns and firearms.

22       Q.   Anytime a weapon is seized in Philadelphia

23   it gets taken to FIU?

24       A.   Correct.

25       Q.   Okay.  Now when you would have actually

Page 239

1    recovered the firearm during the search of the

2    vehicle, would you -- what would you have done with it

3    prior to transporting it anywhere?

4         A.   I clear the weapon to make it safe, that

5    there were no bullets in the weapon.

6         Q.   Okay.  When you say make it safe, just

7    explain what you mean by that.

8         A.   For this type of weapon, I would release the

9    magazine which holds the bullets and also there might

10   be a bullet already in the chamber and then you just

11   -- you rack the slide back and forth to make sure that

12   it's safe and there's no bullets in it anywhere.

13        Q.   Okay.  And what is the purpose of doing that

14   prior to transport?

15        A.   So there's no accidents.

16        Q.   Okay.  You mean accidents with the firearm?

17        A.   The gun doesn't discharge.

18        Q.   Okay.  Now you said -- you also mentioned a

19   moment ago that you recovered a hat from the vehicle,

20   correct?

21        A.   Yes.

22        Q.   Okay.  I'm going to show you what's been

23   marked as Government's 32.

24        (Pause)

25        Q.   Sir, what did I just hand you?

Page 240

```
 1        A.    The baseball cap with the black -- black cap
 2   with the word, Legend, on the front.
 3        Q.    Okay.  And for the record that's been marked
 4   as Government's 32.  Have you -- are you able to
 5   determine whether that's the same hat that you
 6   recovered from the -- from that vehicle?
 7        A.    Yes, it is.
 8        Q.    And how do you know that?
 9        A.    It was placed on a property receipt.
10        Q.    Okay.
11              MR. ECKERT:  At this time, Your Honor,
12   we would move Government's 32.
13              THE COURT:  Any objection?
14              MR. PATTERSON:  No objection, Your
15   Honor.
16              THE COURT:  G-32 is received.
17              MR. ECKERT:  I'm sorry.  It was -- I
18   misspoke, Your Honor.  It was 31.  I had the wrong
19   number.  I apologize.  We would move 31 into
20   evidence, which is the hat.
21              THE COURT:  30 -- yes.  It's 31.
22   There's also reference to the hat in 30.
23              MR. ECKERT:  Now I'm moving --
24              THE COURT:  That's the property --
25              MR. ECKERT:  I'm sorry --
```

```
                                              Page 241

 1                  THE COURT:  That's the property

 2   receipt.

 3                  MR. ECKERT:  Exactly.  Exactly.

 4                  THE COURT:  Have you offered that into

 5   evidence?  Are --

 6                  MR. ECKERT:  No, Your Honor, just --

 7                  THE COURT:  -- you offering --

 8                  MR. ECKERT:  -- just the physical

 9   evidence itself.

10                  THE COURT:  Fine.  G-31 is received.

11                  MR. ECKERT:  Thank you.

12        (Government's Exhibit No. 31 is received)

13          MR. ECKERT:  Now if you could -- if we could

14   go to 27-D, please, and that's to the jury as well.

15   We can go -- thank you.

16   BY MR. ECKERT:

17        Q.   If you could just indicate where it was that

18   you recovered the firearm in the vehicle, sir.

19        A.   The driver's side on the floor underneath

20   the pedals.

21        Q.   Okay.  Thank you.

22                  MR. ECKERT:  Your Honor, may I have one

23   moment to consult with counsel?

24                  THE COURT:  You may.

25        (Pause)
```

Page 242

1            MR. ECKERT:  I'm sorry.  If we could go

2    to 27-E.

3    BY MR. ECKERT:

4        Q.    Same question with regards to the hat, where

5    in the vehicle was the hat?

6        A.    The driver's seat.

7        Q.    Okay.  Thank you.

8            MR. ECKERT:  No further questions.

9            THE COURT:  You may cross-examine.

10            MR. PATTERSON:  Thank you.

11                CROSS-EXAMINATION

12    BY MR. PATTERSON:

13        Q.    Officer, good afternoon.

14        A.    Good afternoon.

15        Q.    I was writing some notes so I might have

16    missed a few things, so if I have to ask you to

17    repeat, please -- I apologize.

18            When did you get the search warrant?

19        A.    That night.

20        Q.    The 22nd?

21        A.    The 22nd, yes.

22        Q.    If I tell you that this alleged incident

23    occurred on the 22nd, would that refresh your memory

24    that you got the search warrant on the same day, on

25    the 22nd?

Page 243

1      A.   Yes.

2      Q.   So you didn't -- I believe -- did you just

3  testify that you got the warrant on the 23rd?

4      A.   When I looked at the property receipt it

5  said the 23rd.  By the time it was recovered, it was

6  -- it turned into the 23rd date.

7      Q.   Okay.  So just for purposes of today and

8  your testimony, did you search the car before or after

9  you got the search warrant?

10      A.   After.

11      Q.   Okay.  And you also described -- they had

12  shown you a picture of a -- what's purported to be a

13  firearm, a weapon, a handgun.  That was under -- kind

14  of by the gas pedal and brake pedal, correct?

15      A.   Yes.

16      Q.   And that -- was that -- before you got the

17  search warrant was that in plain view?

18      A.   Yes.

19      Q.   Okay.  And plain view is when a police

20  officer is legally where he is -- can be and he

21  observes something in plain view, right?

22      A.   Yes.

23      Q.   Okay.   Now -- and this is where I kind of

24  may not have heard you.  Is it standard police

25  procedure to un-chamber a round?

Page 244

1          A.    When you're going to handle a weapon?

2          Q.    Yeah.

3          A.    Yes, make it safe.

4          Q.    If you could tell me so the jury can hear,

5     what is chambering a round?  Let me lay a foundation

6     first.  How long have you been a police officer,

7     Detective Cannon?

8          A.    13 years.

9          Q.    And so you've had probably extensive

10    training with the use of firearms, correct?

11         A.    Yes.

12         Q.    And when you chamber a round, chambering a

13    round is specific for what I believe is called a semi-

14    automatic weapon; is that correct?

15         A.    Yes.

16         Q.    As opposed to a revolver?

17         A.    Yes.

18         Q.    Okay.  Because a revolver, it's -- it

19    revolves.  It's got a round thing and you have to

20    manually put all the bullets in, correct?

21         A.    Correct.

22         Q.    And then you don't actually chamber it

23    because there's always a bullet, and then once you

24    fire it kind of advances to the next round in the

25    round part, correct?

Page 245

1      A.   Yes.

2      Q.   I'm not a gun guy so I'm --

3      A.   And I'm not an expert either --

4      Q.   Okay.

5      A.   -- but I know the basics.

6      Q.   And I'm not asking for your opinion.  I'm

7  just asking for, within your degree of knowledge as

8  being a detective for 13 years you know at least the

9  functionings of a gun, correct?

10     A.   Yes.

11     Q.   Okay.  And I'm going to ask you specifically

12 the functioning of a semi-automatic just so we're

13 clear.

14          Now you were the first officer to manipulate

15 this firearm that you found in this Taurus; is that

16 correct?

17     A.   Yes.

18     Q.   Okay.  And, again, I asked the other

19 officer.  Obviously you weren't here because of

20 sequestration, but you were trained and what you did

21 in this case is you used latex gloves so you don't

22 transfer your own DNA or fingerprints on this weapon;

23 is that correct?

24     A.   Yes.

25     Q.   Because obviously you want the weapon to be

1    in the condition and location as you found it before

2    it's actually placed into an evidence bag; is that

3    correct?

4         A.   Yes.

5         Q.   And the evidence bag is then sealed

6    (indiscernible).  Did you do this?  Did you put it in

7    an evidence bag and then seal it?

8         A.   Yes.

9         Q.   Okay.  And when is that seal broken, in the

10   lab?

11        A.   Yes, after -- when we submit it down at 8th

12   and Poplar.

13        Q.   And when you -- you took the -- you grabbed

14   the gun with your hand with latex gloves on; is that

15   correct?

16        A.   Yes.

17        Q.   And did you un-chamber a round?

18        A.   I don't remember whether there was a round

19   in the handgun or not.

20        Q.   Okay.  There could have been.  There could

21   have not been.  You just don't remember?

22        A.   I don't remember.

23        Q.   Okay.  Would it be -- if I can ask you if it

24   was loaded, do you remember?

25        A.   Yes, it was loaded.

Page 247

1      Q.   And if I told you eight rounds, would that

2   be a fair statement if you remember?

3      A.   Yes.  It was eight rounds.

4      Q.   When they say live round, what's a live

5   round as opposed to a non-live round?

6      A.   A round that can be fired.

7      Q.   So this gun was able to be fired at least

8   eight times because there was eight live rounds,

9   correct?

10      A.   Yes.

11      Q.   All right.  Did you -- were you responsible

12   to then transfer this gun to either the Philadelphia

13   crime lab or the Pennsylvania state police crime lab?

14   Did you do that or somebody else do that within the

15   police department?

16      A.   Someone else did it.

17      Q.   Okay.  Do you know if this gun that you --

18   so when you bagged and tagged it, was that the end of

19   it -- of your involvement with this gun?

20      A.   Yes.

21      Q.   All right.  So you wouldn't have any -- it

22   wasn't you, then, that would send it off -- strike

23   that.

24           Did you know if this gun was sent off for a

25   functionality test?

Page 248

```
 1        A.    All the guns are, but I don't know

 2   personally that it was.

 3        Q.    And tell me or tell the jury what a

 4   functionality test is.

 5        A.    To determine whether the gun will, in fact,

 6   fire a bullet, a projectile.

 7        Q.    Now you just said that in every situation

 8   where a gun is found that it might be involved in some

 9   type of incident it is always tested for

10   functionality, correct?

11        A.    That's my understanding.

12        Q.    And is that because -- for -- it's going to

13   be used as evidence or in testimony at a later

14   proceeding since it's a criminal trial that you might

15   want to prove that the gun in question could actually

16   fire a firearm, correct?

17        A.    Correct.

18        Q.    Do you have any information with the

19   functionality of this -- the results of the

20   functionality test of this gun?

21        A.    I don't.

22        Q.    Okay.  Again, I'm not asking your -- I'm not

23   asking for an expert opinion, but I'm going to try to

24   describe this for the record.  My right hand is

25   clenched like I'm holding the gun; is that a fair
```

Page 249

1    statement, like this, like I'm holding a gun?

2         A.   Yes.

3         Q.   And is -- and, again, I'm going to try to do

4    this so everyone can know this for the record.

5              When you chamber a round, you would -- if

6    you're a righty you would hold a gun in your right

7    hand.  Then you would take your left hand like this,

8    and I'm levitating my left hand over my right hand and

9    then it's a quick jerking motion back and forth; is

10   that correct?

11        A.   Yes, on the slide.

12        Q.   Right.  So if you're holding the gun down

13   here, gun in your hand -- again, my hand is in the

14   position of a, like I'm holding a weapon, and then my

15   left hand is over my right hand and I'm moving my left

16   hand towards me and then away from me.  So it's quick

17   action like that, correct?

18        A.   Well, you could let your hand go.  It has to

19   come back.

20        Q.   It's like spring-loaded, right?

21        A.   Yes.

22        Q.   You can chamber rounds in a real quick

23   motion like that, right?

24        A.   Pretty quick.

25        Q.   Yeah.

Page 250

1              MR. PATTERSON:  Thanks.

2              THE WITNESS:  You're welcome.

3              MR. WITTELS:  No questions.

4              MS. MEEHAN:  No questions.

5              THE COURT:  Thank you very much.

6              MR. ECKERT:  Your Honor, I just have

7    two brief --

8              THE COURT:  I'm sorry.

9              MR. ECKERT:  -- redirect questions.  I

10   apologize for interrupting.

11             THE COURT:  Go ahead.

12             MR. ECKERT:  Thank you.

13             Your Honor, may I approach the witness?

14             THE COURT:  You may.

15             MR. ECKERT:  Thank you.

16                  REDIRECT EXAMINATION

17   BY MR. ECKERT:

18        Q.   Sir, I'm going to show you what's been

19   previously marked as Government's 25 and 30 for

20   identification purposes only.  Would the middle of

21   that search warrant there, would that refresh your

22   recollection as to the exact time you applied for it?

23        A.   Yes.

24        Q.   So I'm going to retrieve Government's 25

25   from the witness.  What time was it that you applied

1    for the search warrant, sir?

2        A.   10:47 p.m.

3        Q.   On what date?

4        A.   3/22/19.

5        Q.   Thank you so much.

6            And --

7                MR. PATTERSON:  Your Honor, I'm sorry.

8    I would just like to see the document.

9                MR. ECKERT:  Oh, it's Government's 25.

10   It's been provided.

11               MR. PATTERSON:  Oh, 25.  Can I see

12   yours, please?

13               MR. ECKERT:  Yeah.  Of course.

14   BY MR. ECKERT:

15       Q.   Sir, a similar line of questioning for

16   Government's 30.  Would Government's 30 refresh your

17   recollection as to the exact time that it was that the

18   items were recovered at the top of the property

19   receipt there?

20       A.   Yes.  3/23/19, 1:05.

21       Q.   Thank you.

22               MR. ECKERT:  No further questions.

23               THE COURT:  Thank you.

24               MR. ECKERT:  And that was Government's

25   30.  Neither of them are being offered.

Page 252

1                    That concludes my redirect.  Thank you.

2                    THE COURT:  You may step down,

3      Detective Cannon.

4                    THE WITNESS:  Yes, Your Honor.

5                    THE COURT:  Thank you.

6                    MR. ECKERT:  Your Honor, may I retrieve

7      the pistol evidence from the witness stand?

8                    THE COURT:  You may.

9                    MR. ECKERT:  Thank you.

10          (Pause)

11                   MS. MARTIN:  May I, Your Honor?

12                   THE COURT:  Yes, you may.

13                   MS. MARTIN:  The Government calls

14     Firearms Examiner Andrejzak.

15          (Pause)

16                   THE CLERK:  Please raise your right

17     hand.

18      OFFICER RAYMOND ANDREJZAK, GOVERNMENT'S WITNESS, SWORN

19                   THE CLERK:  Thank you.  Please be

20     seated.

21                   Please state your full name for the

22     record.

23                   THE WITNESS:  Police Officer Raymond

24     Andrejzak, Badge Number 1935.

25                   THE COURT:  Good afternoon, sir.

Page 253

1                    THE WITNESS:  Good afternoon.

2                    MS. MARTIN:  May I proceed, Your Honor?

3                    THE COURT:  You may.

4                         DIRECT EXAMINATION

5     BY MS. MARTIN:

6          Q.   Good afternoon, Officer.

7          A.   Good afternoon.

8          Q.   Could you please tell the ladies and

9     gentlemen of the jury how you're currently employed?

10         A.   I am a Philadelphia police officer currently

11    assigned to the Firearms Identification Unit.

12         Q.   And what is the Firearms Identification

13    Unit?

14         A.   That is a special unit within the

15    Philadelphia Police Department that's responsible for

16    examining and processing all firearms related evidence

17    in the City of Philadelphia.

18         Q.   How long have you been with FIU?

19         A.   13 years.

20         Q.   And prior to joining the firearms unit?

21         A.   I was a patrol officer for 13 and a half

22    years.

23         Q.   And when you joined the Firearms

24    Identification Unit, did you complete any additional

25    training or education?

Page 254

1        A.   Yes, I did.

2        Q.   Can you please tell the ladies and gentlemen

3    of the jury about that?

4        A.   I received 18 months of academic and

5    apprenticeship type training.  During that time I

6    completed a 50-gun practical test, 250 practical

7    microscopy tests with over 1,000 microscopic

8    comparisons.  I've completed armors courses and Glock

9    pistols, Colt M-16 rifles, Benelli shotguns, Mossberg

10   shotguns.  I've completed a serial number restoration

11   course given by the Bureau of Alcohol, Tobacco,

12   Firearms and Explosives.  I've toured U.S. military

13   installations that specialize in the firearms and

14   ammunition development and testing.  I've also toured

15   several firearms manufacturers and ammunition

16   facilities such as Colt, Smith & Wesson, Ruger,

17   Savage, U.S. Firearms, Drillmaster Eldorado, LeHigh

18   Defense.  I have attended autopsies with the

19   Philadelphia Medical Examiner's Office dealing with

20   recovery and preservation of ballistic evidence.  I

21   receive training annually to keep my training updated.

22   So it's always ongoing.  My continuing education is

23   always ongoing.

24        Q.   As a Firearms Identification Unit officer

25   what are your roles and responsibilities?

Page 255

1          A.   Well, as the name would imply we identify

2     firearms first off and we do that by make, model,

3     caliber, country of origin and serial number.  We test

4     fire firearms for operability and to retrieve

5     evidence.  We do various other firearms testing on an

6     as needed basis including serial number restoration.

7     And one of the most important things that we do is the

8     examination and microscopic comparison of ballistic

9     evidence.

10         Q.   Can you explain how it is that you receive a

11    firearm and the procedure that you go through when

12    you're examining a firearm?

13         A.   Well, I receive a firearm through a chain of

14    custody where it has the assigned police officer or

15    detective, investigator will submit evidence into our

16    building.  It comes through the intake process where

17    it comes down to the Firearms Identification Unit and

18    ultimately it is assigned to a firearms examiner.

19              Once I retrieve my evidence, I am going to

20    maintain the chain of custody either for scanning the

21    bar code on the evidence to myself and checking the

22    evidence against the property receipt for accuracy.

23              After that I can start with a bench

24    examination in the case of a firearm.  And what that

25    basically means is I am going to visually examine it,

Page 256

1    check it for any unsafe conditions or modifications or

2    anything that might make it unsafe to test fire.  I'm

3    going to check barrel conditions.  I'm going to note

4    all of this in my report.

5          Once I determine I'm able to test fire it

6    safely, then I will proceed with the test firing

7    process.  During that time I create test samples of

8    bullet specimens and fire cartridge cases which are

9    marked with the identifying FIU case number and placed

10   in envelopes.  They are filed and/or used for

11   microscopic comparison of any other submitted

12   ballistic evidence.

13        Q.   You mentioned that you create a report.  Do

14   you detail all of your findings in that report?

15        A.   Yes, I do.

16        Q.   And are those findings reviewed by anyone

17   else?

18        A.   Yes.  I have a co-examiner on all

19   examinations I conduct.

20        Q.   And during the course of your career could

21   you estimate how many firearms you've examined?

22        A.   Tens and tens of thousands.

23        Q.   And have you ever testified in court about

24   your reports or the results of those examinations?

25        A.   Yes, I have.

Page 257

1      Q.    How many times?

2      A.    I believe this is Number 135 or 136.

3      Q.    And have you ever been qualified as an

4   expert in the field of firearms identification and

5   analysis?

6      A.    Yes, I have.

7      Q.    How many times?

8      A.    Every time.

9      Q.    And in what jurisdictions?

10      A.    Here in Federal Court, Common Pleas, and

11   Municipal.

12            MS. MARTIN:  Your Honor, at this time I

13   move to qualify Officer Andrejzak as an expert in the

14   field of firearms identification and analysis.

15            THE COURT:  Thank you.

16            Ladies and gentlemen, this witness is

17   an expert witness.  He's going to testify based on

18   evidence presented at other times during the trial.

19   So we start with brief examination of his

20   qualifications, and the defense is given an

21   opportunity to cross-examine the witness based on his

22   qualifications.  That's what we'll here next.

23            Mr. Patterson.

24            VOIR DIRE EXAMINATION

25   BY MR. PATTERSON:

1    Q.   Officer, you did a function -- is it a

2    functionality test or is it -- did you use another

3    word for it?

4    A.   It's -- well, it is a functionality test

5    basically, but we just refer to it as a bench

6    examination.

7    Q.   Okay.  And you were asked to perform one on

8    this --

9              THE COURT:  Wait.  We're on

10   qualification.

11             MR. PATTERSON:  Oh, I'm sorry.  No,

12   Judge.  I don't have any objections.

13             THE COURT:  That's --

14             MR. PATTERSON:  I was -- I

15   misunderstood.  I apologize.

16             THE COURT:  No.  That's the way we

17   start things in Federal Court with expert witnesses.

18             MR. PATTERSON:  Yeah.  I'm sorry,

19   Judge.  No.  Absolutely --

20             THE COURT:  Mr. Wittels, any --

21             MR. PATTERSON:  No objection at all.

22             THE COURT:  -- cross on qualifications?

23             MR. WITTELS:  Oh, no.  He's known to me

24   as an expert and if he was in private play I would use

25   him.

Page 259

1          (Laughter)

2                    THE COURT:  Ms. Meehan.

3                    MS. MEEHAN:  No questions.

4                    THE COURT:  You may proceed.

5                    MS. MARTIN:  Thank you, Your Honor.

6     BY MS. MARTIN:

7          Q.   Officer, did you conduct an examination of

8     the firearm recovered in this case?

9          A.   Yes, I did.

10         Q.   And did you write a report that detailed

11    your findings regarding that firearm?

12         A.   Correct.

13         Q.   Would you recognize the firearm in question

14    and the report that you created if I showed them to

15    you?

16         A.   Yes, I would.

17                   MS. MARTIN:  If I could please have on

18    the screen the witness shown what's been marked as

19    Government's Exhibit 36.

20                   And, Your Honor, if I may approach with

21    Exhibit 29 that's been previously admitted into

22    evidence.

23                   THE COURT:  You may.

24                   MS. MARTIN:  For the record I'm

25    approaching the witness with what's been marked as

Page 260

1    Government's Exhibit 29.

2                    THE WITNESS:  thank you.

3    BY MS. MARTIN:

4         Q.   Officer, do you recognize the report that's

5    on the screen?

6         A.   Yes, I do.

7         Q.   Is that the report you created in relation

8    to the firearm in this case?

9         A.   Yes, it is.

10        Q.   And can you identify what's in front of you

11   there, Government Exhibit 29?

12        A.   This is the firearm I examined in reference

13   to this case and I'm going to identify it by Serial

14   Number BCXX649.  It's a Glock model 26 semi-automatic

15   five millimeter.

16        Q.   You said it's a Glock?

17        A.   A Glock, yes.

18        Q.   And did you note the serial number, the same

19   serial number in your report there listed as 36?

20        A.   Yes.

21        Q.   Exhibit 36?

22        A.   Correct.

23        Q.   Did you examine this firearm in accordance

24   with the same procedure that you outlined for the

25   ladies and gentlemen of the jury earlier in your

Page 261

1   testimony?

2         A.   Yes, I did.

3         Q.   And you testified it was a Glock.  What is

4   the capacity of the gun?

5         A.   The capacity of this firearm is ten in the

6   magazine and one in the chamber for a total of 11

7   cartridges.

8         Q.   When you received this firearm were there

9   any rounds in the gun, in the chamber?  Was there any

10  ammunition in the gun?

11        A.   No.  Firearms are not submitted to us

12  loaded.  They are unloaded before being brought into

13  the building.  Ammunition is separately -- put

14  separately into an envelope.

15        Q.   Did you test fire this weapon?

16        A.   Yes, I did.

17        Q.   Did you determine whether the firearm was

18  operable?

19        A.   It was operable.

20        Q.   Meaning capable of firing a projectile?

21        A.   Meaning it will function as it was supposed

22  to and it will -- it is capable of firing a

23  projectile.

24        Q.   And did you note these findings in your

25  report detailed as Exhibit 36?

1      A.   Yes, I did.

2      Q.   Did you make all of these determinations to

3   a reasonable degree of scientific certainty?

4      A.   Yes.

5              MS. MARTIN:  Your Honor, I would move

6   to admit Government's Exhibit 36.

7              MR. PATTERSON:  No objection, Your

8   Honor.

9              THE COURT:  Should we go to sidebar?

10  Yes.  Sidebar.

11     (At sidebar)

12             THE COURT:  Well, the report is

13  hearsay.  It doesn't normally come into evidence.  The

14  witness testifies regarding the findings in the

15  report.  Is this an agreement?  Are you agreeing that

16  the report comes into evidence?  I'm looking at the

17  Government.  I'm looking really at --

18             MR. PATTERSON:  I don't care.  I'm okay

19  with it.

20             THE COURT:  Sure.  (Indiscernible).

21             MR. PATTERSON:  That's the theory of my

22  case anyway, so, yes, I would not oppose that coming

23  into evidence.

24             THE COURT:  Oh (indiscernible).

25             MS. MEEHAN:  I don't have any problem

Page 263

1    with it.

2                      THE COURT:  You look surprised?

3                      MS. MARTIN:  Your Honor, I was a State

4    Court prosecutor.  I -- we always admit it.  I didn't

5    know.

6                      THE COURT:  No.  Here he can use the

7    report when he testifies, but it's not received in

8    evidence.

9                      MS. MARTIN:  I understand.

10                     THE COURT:  But it is in this case.

11   It's admitted --

12                     MS. MARTIN:  Okay.

13                     THE COURT:  -- without objection.  And

14   I will -- so --

15                     MS. MARTIN:  Duly noted.

16                     THE COURT:  -- put on the record.

17   Thank you.

18        (Sidebar concluded)

19                     THE COURT:  The parties have agreed

20   that the officer's report should come into evidence.

21   There's no objection to it.  And so that exhibit,

22   Exhibit, I think it's 36, is received in evidence.

23        (Government's Exhibit No. 36 is received)

24                     MS. MARTIN:  Your Honor, with that I

25   have nothing further for the witness.

Page 264

1          THE COURT:  Well, I'm not precluding
2    his testifying regarding what's in the report.  You
3    can handle that as you see fit.
4          MS. MARTIN:  I was planning to admit
5    the exhibit and sit down, Your Honor.
6          THE COURT:  Then you may do so.
7          MS. MARTIN:  Thank you.
8          THE COURT:  Exhibit is received into
9    evidence.
10          Cross-examine, anyone?
11          MR. PATTERSON:  Very briefly.
12               CROSS-EXAMINATION
13   BY MR. PATTERSON:
14        Q.   Good afternoon.
15        A.   Good afternoon.
16        Q.   Detective, thousands of guns, right, you've
17   examined?
18        A.   Tens and tens of thousands.
19        Q.   And when you hear the expression chambering
20   a round, what does that mean?
21        A.   It means that a cartridge is being loaded
22   into the chamber and making the gun ready to fire.
23        Q.   When you hear the action of a gun, what is
24   that, on a semi-automatic specifically?
25        A.   Well, if you hear anything it's the sound of

Page 265

1    the slide and the barrel cycling -- well, being pulled

2    rearward under spring tension and then returning

3    forward under spring tension.  If you pull it to the

4    rear and let it go forward, it's going to go fast and

5    slap forward under that spring tension.  So if you're

6    going to hear anything it's usually the metal on metal

7    of the slide and the barrel or slide barrel and frame

8    making that noise.

9          Q.   And specifically this Glock is a semi-

10   automatic as you described, correct?

11         A.   Correct.

12         Q.   And, again, to chamber the round you -- the

13   slide is what you actually grab with the other hand

14   that you're holding the gun with and move it back; is

15   that correct?

16         A.   Well, you can -- there's two ways.  You can

17   do either.  And the condition that it's in right now,

18   if I were to insert a loaded magazine and just simply

19   pulling back on the slide and letting it go forward

20   under spring tension would chamber a cartridge, or if

21   the slide were in the forward position and I inserted

22   a loaded magazine, I would have to pull back on the

23   slide and let it go forward under spring tension.  So

24   either way would load the firearm.

25         Q.   Okay.  And you already described this gun as

Page 266

1    functional, right?

2         A.    That's correct.

3         Q.    So whenever was holding this gun before you

4    got to it, they could fire a round, correct?

5         A.    It could have been fired, yes.

6         Q.    They could have fired eight rounds?

7         A.    Yes.    There were eight cartridges with this

8    firearm.

9         Q.    Okay.  And you actually noted that in your

10   report, I believe, a full metal jacket.  What is that,

11   full metal jacket?

12        A.    Full metal jacket is a bullet design which

13   basically means that -- well, there's two -- well, let

14   me explain.  The two most common types of bullet

15   designs are full metal jacketed rounds and jacketed

16   hollow points.  And with a full metal jacket around it

17   just basically means that the -- I'll use this for

18   just a quick demonstration.  Although this isn't

19   perfectly round, the nose of the bullet is rounding

20   giving it the full metal jacket design.  With a

21   jacketed hollow point there would be a open cavity in

22   the nose of the bullet creating a hollow point.

23             So full metal jacketed round is a very

24   common type of ammunition bullet design.  So you're

25   going to see it -- we see it a lot.

Page 267

1      Q.   And since you said you did tens of

2   thousands, is every gun recovered in a police

3   investigation always tested or bench tested for

4   functionality?

5      A.   Every firearm that we get is examined in

6   that same exact way.  It does not mean that every

7   firearm that we receive is operable as received.

8      Q.   But this gun was operable as received?

9      A.   Yes. That's correct.

10     Q.   You could fire a round?

11     A.   Yes.  Correct.

12     Q.   Okay.  Now -- and I've got to describe this

13  for the record, so if you would please follow along.

14         I have my right hand in a downward position

15  pointing towards the floor and my right hand is

16  approximating holding a gun.  Would you agree with

17  that?

18     A.   Sure.

19     Q.   Okay.  Now with my left hand, I'm putting my

20  left hand over my right hand as if I'm grabbing the

21  slide.  Is that consistent with what you would see

22  when chambering a round?

23     a.   Sure.

24     Q.   And then to chamber a round you would move

25  your left hand up towards you and then back, correct?

Page 268

1      A.   You could -- well, that's what we refer to

2   as riding the slide which you don't really want to do

3   because it can cause the firearm to jam.  It's better

4   to just let it go forward under the spring tension.

5      Q.   Okay.  But if you saw this motion, again,

6   I'll be moving my left hand up towards my body and

7   back down in a quick motion like this, is that

8   consistent with somebody chambering a round?

9      A.   Yes.

10     Q.   Thank you.

11             MR. PATTERSON:  Nothing further.

12             MR. WITTELS:  Just a couple of

13  questions if I may.

14                     CROSS-EXAMINATION

15  BY MR. WITTELS:

16     Q.   Officer, did you test the trigger pull on

17  this weapon?

18     A.   The trigger pull, no, sir, it was not

19  conducted on that.  We only generally do that with

20  homicides and police shootings.

21     Q.   Okay.  Thank you.

22             THE COURT:  Ms. Meehan.

23             MS. MEEHAN:  No question, Your Honor.

24             THE COURT:  Any redirect?

25             MS. MARTIN:  No redirect, Your Honor.

Page 269

1                THE COURT:  That concludes your

2     testimony, sir.  Thank you very much.

3                THE WITNESS:  Thank you, Your Honor.

4                MR. ECKERT:  Your Honor, at this time

5     the Government would call Officer Fernandez.

6                May I retrieve the exhibit from the --

7                THE COURT:  You may.

8                MR. ECKERT:  Thank you.

9                THE COURT:  Before we continue with the

10    next witness, ladies and gentlemen, because of the

11    long break around lunch time, the fact that we didn't

12    resume until three something, it's now 4:00, I had not

13    planned on an afternoon break unless anyone on the

14    jury feels they need a break.

15               Now I don't normally ask juries to

16    respond for questions in open court, but if anyone

17    needs a break, raise your hand and we'll recess for

18    ten minutes.  Any one of you needs a break, don't be

19    embarrassed.  If you need a break, we'll break for ten

20    minutes.

21               Let the record show no hands.

22               MR. WITTELS:  Can I step out for two

23    minutes?  One minute?

24               THE COURT:  Are you raising your hand?

25               MR. WITTELS:  I am.

Page 270

1          (Laughter)

2                    MR. WITTELS:  I am, Judge.  But I don't

3     need ten minutes.

4                    THE COURT:  We'll wait for you, Mr. --

5                    MR. WITTELS:  I'll be right back.

6                    THE COURT:  -- Wittels.  I thought I

7     had the lawyers under control.

8          (Laughter)

9                    THE COURT:  You can proceed.  We don't

10    have to -- we're not going to proceed with the

11    witness, but you can bring the next witness into

12    court.

13                   MR. ECKERT:  She's here, Your Honor.

14    Officer Fernandez is waiting in the first row.

15                   THE COURT:  Fine.  All right.

16                   MR. ECKERT:  Thank you.

17                   THE COURT:  We'll proceed in just a few

18    minutes.

19         (Pause)

20                   THE COURT:

21                   THE CLERK:  Please raise your right

22    hand.

23    OFFICER FERNANDEZ, GOVERNMENT'S WITNESS, SWORN

24                   THE CLERK:  Thank you.  Please be

25    seated.

```
                                                   Page 271

 1                  Please state your full name for the

 2      record.

 3                  THE WITNESS:  Abigail Fernandez.

 4                  THE COURT:  Good afternoon.

 5                      DIRECT EXAMINATION

 6      BY MR. ECKERT:

 7           Q.   Ma'am, good afternoon.

 8           A.   Good afternoon.

 9           Q.   How are you currently employed?

10           A.   Police officer. Philadelphia Police

11      Department, 14th District.

12           Q.   Okay.  And how long have you served in that

13      capacity?

14           A.   Say that again.

15           Q.   How long have you been a police officer?

16           A.   Five years.

17           Q.   Okay.  Were you working on March the 22nd of

18      2019?

19           A.   That's correct.

20           Q.   Who was your partner that day?

21           A.   Officer Xhelo.

22           Q.   Okay.  And he's since been promoted to

23      detective?

24           A.   That's correct.

25           Q.   Okay.  Did you respond to a call for service
```

Page 272

1    at 152 East Sharpnack around 5 p.m.?

2         A.   Yes.

3         Q.   All right.  Now there's previously been

4    testimony about the crash site and the pursuit, but

5    we're going to fast-forward past all that.  I want to

6    go to the point upon which you were finishing the

7    wooded area looking for a suspect.  Did you and your

8    partner respond back to 152 East Sharpnack after that?

9         A.   Yes.

10        Q.   Why did you go back to the store?

11        A.   I wanted to look at the surveillance

12   footage.

13        Q.   Okay.  And did you go inside the store?

14        A.   Yes.

15        Q.   Who did you observe present inside?

16        A.   A few officers, employees and a female.

17        Q.   Okay.  Was that female Ms. Carlene Webster?

18        A.   Yes.

19        Q.   All right.  Were you asked to transport Ms.

20   Webster to Northwest Detectives?

21        A.   Yes.

22        Q.   Okay.  And did you take possession of her

23   cell phone prior to that drive?

24        A.   Yes.

25        Q.   All right.  What happened on the car ride?

Page 273

1       A.   That phone that I had possession of rang

2    multiple times.  After that second time that it rang,

3    it was the same phone number.  I jotted down that

4    phone number --

5       Q.   okay.

6       A.   -- in my notepad.

7       Q.   And do you recall the phone number as you

8    sit here today?

9       A.   Most of it.

10      Q.   Well, what do you recall?

11      A.   267-333.  I don't remember the last four.

12      Q.   Okay.  And would the report of investigation

13   from your interview with the U.S. Attorney's Office on

14   June 11th, 2019, would that refresh your recollection?

15      A.   Yeah.

16           MR. ECKERT:  Your Honor, I'm going to

17   mark that ROI, report of investigation, as

18   Government's 53 for ID only.

19           THE COURT:  All right.

20      (Pause)

21           MR. ECKERT:  May I approach the

22   witness, Your Honor?

23           THE COURT:  Is there a copy for the

24   Court?

25           MR. ECKERT:  I'm sorry.  Yes, sir.

1              May I approach the witness, Your Honor?

2              THE COURT:  You may.

3              MR. ECKERT:  Thank you.

4    BY MR. ECKERT:

5        Q.   Ma'am, I'm going to turn your attention to

6    Government's 53 for identification purposes only.  If

7    you could review paragraph 9 there and when you're

8    finished look up at me.

9              Okay.  Has your recollection been refreshed?

10       A.   Yes.

11             MR. ECKERT:  Let the record reflect I

12   retrieved the exhibit from the witness.

13   BY MR. ECKERT:

14       Q.   What was the last four digits?

15       A.   9443.

16       Q.   Thank you.

17             MR. ECKERT:  I have no further

18   questions for the witness.

19             THE COURT:  Any cross?

20             MR. PATTERSON:  I don't, Your Honor.

21   Thanks.

22             THE COURT:  Mr. Wittels?

23             MR. WITTELS:  No, Judge.

24             MS. MEEHAN:  No, Your Honor.

25             THE COURT:  Fine.  That concludes your

Page 275

1   testimony, Officer.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  Thank you.

4                    MR. ECKERT:  Your Honor, at this time

5   the Government would call ATF Special Agent Sean

6   Reznik.

7        (Pause)

8                    THE CLERK:  Please raise your right

9   hand.

10      SPECIAL AGENT SHAWN REZNIK, GOVERNMENT'S WITNESS,

11                         SWORN

12                   THE CLERK:  Thank you.  Please be

13   seated.

14                   Please state your name for the record.

15                   THE WITNESS:  Shawn Reznik.

16                      DIRECT EXAMINATION

17   BY MR. ECKERT:

18        Q.   Sir, if you could just start off by telling

19   the ladies and gentlemen of the jury how are you

20   employed?

21        A.   I'm employed as a Special Agent with the

22   Bureau of Alcohol, Tobacco, Firearms and Explosives.

23        Q.   Okay.  And is that here in Philadelphia?

24        A.   Yes.

25        Q.   Okay.  And how long have you been an ATF

Page 276

1    agent?

2         A.    Since May of 2015.

3         Q.    Okay.  And what are your current duties and

4    responsibilities?

5         A.    Currently, we work investigatively for

6    federal firearms violations in a violent crimes group

7    and a HIDTA group which is a High Intensity Drug

8    Trafficking area.  My other duties include interstate

9    nexus expert.

10        Q.    Okay.  And have you received any specialized

11   training regarding firearms?

12        A.    Yes.

13        Q.    Explain that.

14        A.    I attended a basic criminal investigator's

15   school down at the Federal Law Enforcement Training

16   Center down in Glencoe, Georgia as well as a special

17   agent basic training for the ATF.  And I also went

18   back down there in 2019 for the firearms nexus school.

19        Q.    Okay.  And how long was that firearms nexus

20   school?

21        A.    It was a week.

22        Q.    Okay.  And what's the goal of that course?

23   What are you trying to learn?

24        A.    More about firearms in general, specifically

25   identification of the firearm, different models,

Page 277

1    different types as well as where they're manufactured,

2    whether or not they're manufactured outside of certain

3    states to determine whether or not firearms have

4    traveled through interstate or foreign commerce.

5         Q.   Okay.  And have you previously testified in

6    federal or state court as an expert witness regarding

7    the place of firearms manufacturing?

8         A.   Yes.

9         Q.   How many times?

10        A.   Once.

11        Q.   And where was that?

12        A.   In the Eastern District of Pennsylvania.

13        Q.   So same building you're in right now?

14        A.   Correct.

15             MR. ECKERT:  Your Honor, at this time

16   we would move Agent Reznik as an expert in the place

17   of firearms manufacturing.

18             MR. PATTERSON:  No objection.

19             MR. WITTELS:  No objection.

20             MS. MEEHAN:  No objection.

21             MR. ECKERT:  No objection?

22             MS. MEEHAN:  I said no objection.

23             MR. ECKERT:  Oh, I'm sorry.  I'm sorry.

24             MS. MEEHAN:  Yeah.  No objection.

25             THE COURT:  Then we will hear ATF Agent

Page 278

1   Reznik's testimony.

2                   MR. ECKERT:  Thank you, Your Honor.

3   BY MR. ECKERT:

4        Q.   Now if you could just indicate to the ladies

5   and gentlemen of the jury, what are the procedures you

6   follow to determine where it is that firearms are

7   manufactured?

8        A.   Typically an agent or state or local law

9   enforcement will provide the firearm to me at which

10  point I Look at the different identification marks on

11  the firearm to include proof marks and stuff like

12  that.  We are given numerous books and reference

13  materials as well as documents that go back years that

14  the ATF has collected to determine where firearms are

15  manufactured.

16       Q.   Okay.  And have you had the opportunity to

17  examine what's been previously admitted as

18  Government's 29 which is the firearm in this case?

19       A.   Yes.

20                  MR. ECKERT:  Your Honor, may I approach

21  the witness?

22                  THE COURT:  You may.

23                  MR. ECKERT:  Thank you.

24  BY MR. ECKERT:

25       Q.   Sir, I've handed you what's been admitted,

Page 279

1    previously admitted as Government's 29.  Can you

2    examine that, please, sir?

3              Okay.  Are you familiar with that firearm,

4    sir?

5         A.   Yes.

6         Q.   Okay.  And that's the firearm that you

7    examined for -- in preparation for your testimony

8    here?

9         A.   Correct.

10        Q.   All right.  And based on your examination

11   and research do you have an opinion regarding where

12   that firearm was manufactured?

13        A.   Yes.

14        Q.   And what is that opinion?

15        A.   It was manufactured in Austria and then it

16   was imported into the United States at the Glock

17   factory in Smyrna, Georgia.

18        Q.   Okay.  And therefore by virtue of its

19   recovery in Philadelphia, Pennsylvania, do you believe

20   that firearm would have traveled in interstate

21   commerce?

22        A.   Yes.

23        Q.   Thank you.

24              MR. ECKERT:  I have no further

25   questions of the witness, Your Honor.

Page 280

1                    THE COURT:  Any cross-examination?

2                    MR. PATTERSON:  No cross, Your Honor.

3     Thank you.

4                    MR. WITTELS:  No cross.

5                    THE COURT:  Mr. Wittels.

6                    MS. MEEHAN:  No questions.

7                    THE COURT:  Thank you.

8                    That concludes your testimony, Agent.

9                    THE WITNESS:  Thank you.

10                    THE COURT:  Thank you.

11         (Pause)

12                    MR. ECKERT:  May I, Your Honor?

13                    THE COURT:  Yes, you may.

14                    MR. ECKERT:  Your Honor, at this time

15     the Government will call Special Agent Mike Orchulli.

16                    MS. MEEHAN:  Your Honor, may I speak to

17     counsel for an offer of proof?

18                    MR. ECKERT:  Sure.

19                    MS. MEEHAN:  May we speak to counsel?

20     Sorry.

21         (Pause)

22                    MS. MEEHAN:  Thank you, Your Honor.

23                    MR. ECKERT:  Can I just have one

24     moment, Your Honor, to speak with counsel?

25                    THE COURT:  Yes.

Page 281

1        (Pause)

2                    MR. ECKERT:  I'm sorry for the delay to

3     everyone.

4                    Please, Mr. Orchulli, Agent Orchulli.

5      SPECIAL AGENT MICHAEL ORCHULLI, GOVERNMENT'S WITNESS,

6                             SWORN

7                    THE CLERK:  Thank you.  Please be

8     seated.

9                    Please state your name for the record.

10                   THE WITNESS:  Special Agent Michael

11    Orchulli, O-R-C-H-U-L-L-I.

12                        DIRECT EXAMINATION

13    BY MR. ECKERT:

14        Q.   Sir, how are you currently employed?

15        A.   Special Agent with the ATF, Alcohol, Tobacco

16    Firearms and Explosives.

17        Q.   Is that here in Philadelphia?

18        A.   Yes.

19        Q.   Okay.  And what are your duties with the

20    ATF?

21        A.   I'm in a group that we're considered a

22    violent crime task force, also considered HITDA, which

23    is High Intensity Drug Trafficking Area.

24        Q.   Okay.  And do you have any law enforcement

25    experience prior to your service with ATF?

Page 282

1       A.   Yes.  I was a federal air marshal for five

2   years in Washington, D.C.

3       Q.   Okay.  And I apologize if I already asked

4   you, but how long have you been with the ATF?

5       A.   In May it will be five years.

6       Q.   Thank you.

7            Okay.  Now did you obtain real time crime

8   camera footage that's been discussed here during this

9   trial?

10      A.   Yes, sir.

11      Q.   Okay.  And what was the location of that

12  camera footage?

13      A.   It was right in the area of 152 East

14  Sharpnack Street.

15      Q.   Okay.  And is there a time offset of that

16  camera?

17      A.   There's no time offset.

18      Q.   Okay.  So explain what that means.

19      A.   There's no time offset.

20      Q.   Okay.  So explain what that means.

21      A.   Sometimes with cameras in the city or in

22  general, security cameras, you'll have the real time

23  that is the current time right now in eastern time

24  zone, and then the camera will also have a time.  That

25  time may or may not be accurate to the current time in

Page 283

1    its time zone.

2         Q.   Okay.  But through -- you've learned that

3    with the real time crime cameras and real time crime

4    camera footage you obtained in this case, that is the

5    accurate time?

6         A.   It is the accurate time.  There is no

7    offset.  They are both the same.

8         Q.   Okay.  Just one final line of questioning,

9    sir.  Have you met with Mr. Ventura, the gentleman who

10   testified earlier during this case?

11        A.   Yes, several times.

12        Q.   Okay.  And all the times that you met with

13   him, what language did he speak?

14        A.   Spanish.

15        Q.   How is it that you were able to communicate

16   with him?

17        A.   Through an interpreter.

18        Q.   Thank you.

19             MR. ECKERT:  No further questions for

20   the witness.

21             THE COURT:  Are there any questions on

22   cross?

23             MR. PATTERSON:  Please, Your Honor.

24                  CROSS-EXAMINATION

25   BY MR. PATTERSON:

Page 284

1      Q.   Good afternoon, Agent.

2      A.   Good afternoon.  How are you?

3      Q.   I'm doing well.  Thank you.

4           You are the case agent in this case,

5   correct?

6      A.   Yes, sir.

7      Q.   That's why you had to sit here for the last

8   couple of days, right?

9      A.   Yes, sir.

10     Q.   However, as part of your responsibilities as

11   case agent you accumulate all of the evidence, all of

12   the police reports, any observations in written form

13   from any investigating officer; is that correct?

14     A.   Yes.

15     Q.   And most of the reports in the investigation

16   were actually completed by the Philadelphia Police

17   Department; is that correct?

18     A.   That's correct.

19     Q.   Even though we're in a federal courthouse in

20   a federal trial all of the observations and the

21   investigation was done by the Philadelphia Police

22   Department; is that correct?

23     A.   Not all, but a majority.

24     Q.   Majority.  Correct.  You -- I -- you were

25   responsible for the last four days of operating the

Page 285

1    camera for the Government to put on the real time
2    capture video from the day in question; is that
3    correct?
4         A.   Yes.
5         Q.   So you're obviously acutely -- you're aware
6    and you have familiarity with all of the video feeds,
7    correct?  You've been looking at them probably for a
8    while, right?
9         A.   Yes.
10        Q.   And you would agree with me that based upon
11   what -- and you reviewed all the video capture feeds
12   in preparation for today's trial, correct?
13        A.   Yes.
14        Q.   So not just what you -- we saw today.
15   You've been doing this as -- before the trial even
16   started, correct, reviewing all the videos?
17        A.   Yes.  That's correct.
18        Q.   And, again, you're familiar -- you are very
19   familiar with what was depicted and what was captured
20   on March 22nd, 2019, correct?
21        A.   Yes, sir.
22        Q.   And we had also put up a photograph which
23   was actually a picture of the monitor that was in the
24   store.  There was a monitor kind of smaller than that
25   that was in the store; is that correct?

1      A.   The picture that you showed of --

2      Q.   The screen with all the separate video feeds

3  in it from the store.  Do you remember that?  We

4  played it a couple of days ago.

5      A.   Yeah.

6      Q.   Okay.  You would agree with me that there

7  was an outdoor pole camera -- strike that, not a pole

8  camera.

9           There was a camera associated with the store

10  itself pointing at the front of the store from across

11  the street, correct?

12      A.   Yes.  But that photo was taken just a month

13  ago, I think.

14      Q.   You're right.  But were you aware based upon

15  what you did see that there was a feed from an outdoor

16  source pointing at the front of the store?

17      A.   Whenever that picture was taken, I could see

18  it in that picture that there was a camera.

19      Q.   Okay.  But you were aware based upon -- and

20  you talked to the police officers who prepared the

21  reports, correct?

22      A.   Yes.

23      Q.   And you are aware that there was a camera

24  capturing the outside of the store?

25      A.   I've never seen footage from it.  That was

1    -- I'm not -- I wasn't sure until we started the

2    investigation probably a month after the robbery.

3         Q.   And that's my -- yeah.  That's my next

4    question because obviously -- not obviously.  What was

5    retrieved from the DVR, the digital video recorder,

6    that was all done by the police department.  You had

7    no involvement in that, though, correct?

8         A.   That's correct.

9         Q.   Okay.  And I'm sorry.  That was -- you would

10   agree with me that what we've seen today and what you

11   saw in preparation of today, that these three

12   individuals were coming and going out of the store

13   while these events were occurring, correct?

14        A.   Yes.

15        Q.   Would you agree with me for purposes of

16   today and the testimony and what the jury has seen, it

17   would have been helpful if there was a video of what

18   was going on outside of the store because most of the

19   defendants were in and out of the store during this

20   time, correct?

21        A.   Could have been.

22        Q.   Right.  Thank you.

23             MR. PATTERSON:  Nothing further.

24             MR. WITTELS:  Just a couple of

25   questions if I may.

1                    CROSS-EXAMINATION

2    BY MR. WITTELS:

3         Q.   Agent Orchulli, did you help prepare the

4    video that we saw several times here in court?

5         A.   Yes.

6         Q.   And that's an amalgamation of various

7    cameras, correct?

8         A.   Yes, sir.

9         Q.   And did you help make the decisions about

10   what was included and what was not included?

11        A.   Yes.

12        Q.   And you did that together with the

13   prosecutors?

14        A.   Yes, sir.

15        Q.   Thank you.

16                 MR. ECKERT:  Nothing further, Your

17   Honor.

18                 MS. MEEHAN:  Excuse me, Your Honor.  If

19   we may have a moment to confer.

20                 THE COURT:  Are you finished with this

21   witness or don't you know?

22                 MS. MEEHAN:  Not yet, Your Honor.

23                 THE COURT:  All right.  Go ahead.

24        (Pause)

25                 MS. MEEHAN:  No questions, Your Honor.

Page 289

1                    THE COURT:  Any redirect?  I don't
2      think so.  We haven't heard any cross.
3                    MR. ECKERT:  No, Your Honor.
4                    THE COURT:  Yeah.  Well, there was some
5      cross.
6                    MR. ECKERT:  No.  I don't have any
7      redirect, Your Honor.  Thank you.  I just need to
8      consult with Ms. Meehan for one second, if I may.
9                    THE COURT:  Well, should we excuse the
10     witness or have --
11                    MR. ECKERT:  No.  Yes.  Absolutely.
12                    THE COURT:  -- let him sit there.
13                    THE WITNESS:  It's up to you, Your
14     Honor.
15          (Laughter)
16                    THE WITNESS:  It's up to you.
17                    THE COURT:  Well, it's not necessary
18     for you to remain here.  You can step down.
19                    THE WITNESS:  All right.  Thank you,
20     Your Honor.
21                    THE COURT:  Your testimony is
22     completed.  Thank you.
23          (Pause)
24                    MS. MEEHAN:  Thank you, Your Honor.
25                    MR. ECKERT:  Is that okay?

Page 290

```
 1                   MS. MEEHAN:  Yes.
 2                   MR. ECKERT:  May I?
 3                   Your Honor, there's one final
 4     stipulation to read, if I may, to the jury.
 5                   THE COURT:  You may.
 6                   MR. ECKERT:  Thank you.
 7                   Ladies and gentlemen of the jury, the
 8     Government and the Defendant, Mr. Quinn, agree and
 9     stipulate that the Government determined Mr. Quinn's
10     identity when they received his bank records through a
11     grand jury subpoena.
12                   Thank you.
13                   MS. MEEHAN:  So stipulated.
14                   THE COURT:  Thank you.
15                   MR. ECKERT:  May I just have one
16     moment?  I believe we're finished.
17          (Pause)
18                   MR. ECKERT:  Right.  We're not -- the
19     Government's not prepared to rest at this time based
20     on the discussions that have previously been had with
21     the Court and counsel.  But we -- that is the last
22     witness.
23                   THE COURT:  And what you're saying is
24     the last witness is the next witness we will hear out
25     of the presence of the jury.
```

Page 291

1                MR. ECKERT:  Exactly, Your Honor.
2     Exactly.
3                THE COURT:  Fine.  Is there anything
4     else that we need to do today in the presence of the
5     jury?
6                MR. PATTERSON:  I don't believe so from
7     Mr. Smith.
8                MR. WITTELS:  No, sir.
9                MS. MEEHAN:  No, Your Honor.
10               THE COURT:  Well, what we must do is
11    give the jury some guidance as to when we're going to
12    finish.  So I think we'll go to sidebar and talk about
13    it.  We don't want to do it in open court.
14         (At sidebar)
15               THE COURT:  The Government is finished.
16    What about the defense?
17               MS. MEEHAN:  Well, Your Honor, I do
18    need to let the Court know I do have a written Rule 29
19    motion as to Count II and I would make an oral motion
20    under Rule 29, and I could file that as soon as we
21    return to the office.
22               THE COURT:  All right.
23               MS. MEEHAN:  After they rest, but they
24    haven't rested yet, so.
25               MR. PATTERSON:  To address future

Page 292

1    scheduling, I need some -- I need like at least an

2    hour and a half to two hours with my client on him

3    testifying or not.  I'm trying to figure out when we

4    can fit that in.  I mean, I leave my house at 6 a.m.

5    and get back at 8:00, so I'm just trying to --

6                   THE COURT:  I do, too.

7                   MR. PATTERSON:  Okay.

8                   THE COURT:  A little difference in our

9    ages, though.

10        (Laughter)

11                  MR. PATTERSON:  I know.  I'm just

12   trying to figure out how I can -- I need some time,

13   definitely need some time with my client about this

14   testifying thing.  I need to go over some stuff with

15   him.

16                  THE COURT:  It's going to be a late

17   night for you.

18                  MR. PATTERSON:  It's going to be I

19   think, or in the --

20                  MS. MEEHAN:  They won't let him in the

21   prison now, Your Honor.

22                  MR. WITTELS:  No.  He -- they close it

23   down at seven.  So he'll never get there.

24                  THE COURT:  Well, I understood that.

25   But the Court wasn't officially notified that the

Page 293

1    prison was shut down.  Does anyone know the reason?

2                    MR. WITTELS:  No.  No.  Every -- visits

3    end at seven.

4                    THE COURT:  No.  I -- I understand the

5    prison is shut down during the day.

6                    MS. MEEHAN:  Restoring (indiscernible).

7                    MR. WITTELS:  Oh.

8                    MS. MEEHAN:  I don't know the reason,

9    Your Honor.  I --

10                    THE COURT:  Yeah.  I don't know if it's

11   open either.

12                    MR. PATTERSON:  I've been getting to

13   Philly every morning around 8:00 if I leave at six.

14   So if I see him from eight to ten, that would be

15   enough time for me, eight to 9:30, 10:00 to play it

16   safe.

17                    THE COURT:  All right.  So we start

18   tomorrow at ten, maybe with this last Government

19   witness, maybe not.

20                    What else do we have in the way of

21   evidence?

22                    MR. WITTELS:  Nothing from me.

23                    THE COURT:  And from you, Ms. Meehan?

24                    MS. MEEHAN:  I'm not certain.  I don't

25   believe so.

Page 294

1                    THE COURT:  Pardon me.

2                    MS. MEEHAN:  I don't believe that Mr.

3      Quinn will be testifying.  I don't believe he will be

4      testifying.  But --

5                    THE COURT:  Are you going to present

6      any other evidence?

7                    MS. MEEHAN:  No.

8                    THE COURT:  Then what you're saying, we

9      can proceed to closings tomorrow?

10                    MR. WITTELS:  Yes.

11                    MR. ECKERT:  It appears that way, Your

12     Honor.

13                    THE COURT:  What about the charge?

14                    MS. MEEHAN:  Well --

15                    THE COURT:  And deliberations.

16                    MS. MEEHAN:  When should we do that?

17     If we have time tomorrow, I guess.

18                    THE COURT:  I don't know if we'll have

19     time.  That's what I'm trying to figure out.  If we

20     start at ten --

21                    MR. ECKERT:  Our last witness will be

22     very brief, right, ten minutes, including the call.

23     If the Court were to rule -- obviously I know the

24     Court hasn't ruled.  But if the Court were to rule, I

25     believe the Government's presentation would even be

Page 295

1   done at 10:00 if it was, if the objection was

2   sustained, or we would be done at 10:10 if the

3   objection was overruled.

4                    MR. PATTERSON:  If we start at ten and

5   if my client testifies and then the 56 pages of jury

6   instructions and then the closings, I mean, that's

7   almost an entire day I would think.  That's just --

8                    THE COURT:  Well, the question is

9   whether -- we can tell the jury we're likely to finish

10  tomorrow or tell them we're going to spill over until

11  Monday?  I think we should tell them based on what

12  you're telling me --

13                   MR. ECKERT:  Yes.

14                   THE COURT:  -- that there's a

15  possibility we're spilling over --

16                   MS. MEEHAN:  Possibility.

17                   MR. ECKERT:  Possibly.

18                   MS. MEEHAN:  We can try not to, though.

19                   MR. ECKERT:  Right.

20                   MR. WITTELS:  We'll try not to, but it

21  may happen.  It wouldn't be the worst thing to give

22  them an early afternoon if we have to.  They would

23  probably appreciate it.

24                   THE COURT:  As opposed to coming back

25  on a Monday?

Page 296

1        (Laughter)

2                    MR. WITTELS:  No.  No.  I just mean if

3    we can't do it all on Friday.

4                    THE COURT:  Oh, you're absolutely

5    right.

6                    All right.  I'll give them that advise.

7    We'll start tomorrow, everyone at ten.  If I think

8    there's any need to gather sooner, I'll keep it --

9    well, we'll talk about it out of the presence of the

10   jury.

11                   MR. PATTERSON:  Thank you.

12                   THE COURT:  All right.

13                   MR. ECKERT:  Thank you, Your Honor.

14                   MS. MEEHAN:  Thank you, Your Honor.

15       (Sidebar concluded)

16                   THE COURT:  I have good news, I think.

17   I'll share it with you.  The Government might have one

18   additional witness.  I'm going to rule on the

19   admissibility of that witness's testimony tonight.

20   And so we'll know a little later tonight whether that

21   witness will testify.  If the witness testifies, it

22   will be very brief and that will end the Government's

23   case.

24                   Then the defendants have an opportunity

25   to present evidence.  They don't have to, remember,

1    and you can't hold that against them because that is

2    their constitutional right.  We'll know more about

3    that tomorrow.

4              But what I'm telling you is there is a

5    possibility that we will not finish tomorrow.  There's

6    also a possibility, a little slim, that we will.  We

7    have to finish the testimony, however much testimony

8    there is, then we have to have closing arguments and

9    my charge and your deliberations.

10             Right now there's a possibility that

11   we'll spill over, the trial will continue until

12   Monday.  At most on Monday, based on what I've been

13   told today, you will have my charge and you will begin

14   deliberations.  And I'll certainly have much more

15   definite advice on scheduling tomorrow.  But for now

16   it's possible, underscore the word possible, that

17   we'll have to gather again on Monday.

18             I'm sure all of us had other plans.  I

19   did.  Those plans might have to be changed.  And I'm

20   sure you understand.  We've had a lot of problems

21   scheduling.  You've been very understanding.  I've

22   heard no complaints.  I hope our breakfast finally got

23   to you.  And one thing I can tell you, you're probably

24   eating better than the rest of us because we--

25        (Laughter)

Page 298

1              THE COURT:  -- there's not much time
2     left for us to grab anything to eat.
3              I'm going to let you go tonight.
4     Something has to be done by several of the attorneys
5     tomorrow morning, so we're going to start a little
6     later, 10:00 tomorrow.  So you can sleep in a little
7     bit and you can get home a little earlier.
8              I'm not going to repeat all of the
9     instructions I've given you over and over again.  But
10    just remember you must decide the case based solely on
11    the evidence received in the courtroom.  You cannot
12    refer to anything that deals with the case that comes
13    from outside the courtroom.
14             Don't discuss the case among yourselves
15    and when that person or persons at home asks you what
16    you did today, where did you go out, what did you do,
17    nothing.  And that's what you've got to tell them.
18             On that note, Mr. Cosgrove will excuse
19    you for the night.  Leave your juror notebooks in the
20    jury room.  We'll see you tomorrow morning, 10:00.
21             THE COURT OFFICER:  All rise.
22        (Jury out)
23             THE COURT:  Be seated, everybody.
24             Let's talk about who should be present
25    during these proceedings.  We're going to start with

Page 299

1    the -- we'll probably have some introduction, but

2    we're going to address issues related to the 911 call

3    and specifically the tape of the call.  I believe it's

4    exhibit, Government Exhibit 5-B.  So we'll hear the

5    testimony out of the presence of the jury and then

6    I'll hear argument and decide whether that call comes

7    in to evidence.

8                 Then we're going to address -- well,

9    there's one question with respect to the charge that

10   was raised by Ms. Meehan that we'll address.  But

11   we'll address all charge related issues.

12                Are there any issue, other issues you

13   anticipate presenting this afternoon or what's left of

14   the afternoon?

15                Government first.

16                MR. ECKERT:  I don't know of any, Your

17   Honor.

18                THE COURT:  Mr. Patterson.

19                MR. PATTERSON:  One minute, Your Honor.

20        (Pause)

21                MR. PATTERSON:  Since I'm not certain

22   whether my client will be testifying, I'm assuming he

23   will be, but if he does testify then I would, with the

24   permission of Ms. Meehan, utilize her motion in limine

25   for impeachment with prior conviction pursuant to Rule

Page 300

1    609.

2                    THE COURT:  I'm sorry.

3                    MR. PATTERSON:  I would be arguing that

4    my client's prior conviction not come in based upon --

5                    THE COURT:  Oh, we're going to address

6    the motions in limine.

7                    MR. PATTERSON:  Okay.

8                    THE COURT:  Ms. Meehan asked that that

9    be done.  I --

10                   MR. PATTERSON:  Oh, I'm sorry.

11                   THE COURT:  -- I forgot that.  And I

12   will.  I'll -- while I'm at it I'll rule on -- the

13   motion applies to all defendants.

14                   MR. PATTERSON:  Yes.

15                   THE COURT:  And I'll rule with respect

16   to all defendants.

17                   MR. PATTERSON:  Thank you, Your Honor.

18                   THE COURT:  All right.  Now the

19   question is, is the presence of the defendants

20   necessary?  And if it's not necessary, they still have

21   a right to participate, but discuss that with the

22   defendants and let me know what you want to do.  We'll

23   have to advise the marshals.

24                   MR. PATTERSON:  We're doing the 911

25   stuff today, correct?

```
 1                    THE COURT:  We're doing the out of the
 2      presence of the jury presentation --
 3                    MR. PATTERSON:  Right.
 4                    THE COURT:  -- on that issue tonight --
 5                    MR. PATTERSON:  Okay.
 6                    THE COURT:  -- first.
 7                    MR. PATTERSON:  It would be my
 8      intention, then, to assist the Court in determining
 9      whether that 911 call should come in to be -- to have
10      my client be permitted to read something to Your Honor
11      so Your Honor can get the cadence and the tone of his
12      voice to help determine whether or not the call, what
13      you're going to hear that's purported to be Donnie
14      Smith as opposed to what Your Honor is going to hear
15      with respect to, again, the tone and timber of his
16      voice.
17                    THE COURT:  I guess we can do that.  We
18      can have that part of the trial out of the presence of
19      the jury.  And if I decide the 911 call is admissible,
20      you could present him tomorrow as a witness in your
21      case.  Is that what you contemplate?
22                    MR. PATTERSON:  If he doesn't --
23                    THE COURT:  Well, he doesn't have to.
24                    MR. PATTERSON:  I understand.  I
25      understand, Your Honor.  If Your Honor permits the 911
```

Page 302

1    tape to play, and if my client does not testify, I

2    would still -- I've got to think about this.  But I

3    believe that the jury should be allowed to hear his

4    voice before they hear the tape and then they can make

5    their own call with respect to whether it's him or

6    not.

7                So I would have him stand up for the

8    limited purpose of reading something to the jury to

9    help them assist to whether or not that tape --

10   because there's no voice recognition expert.  And,

11   again, I'll address that in my closing for the weight

12   argument.

13               But, again, I think the juror should be

14   able to hear my client when they hear the video -- the

15   911 tape, if the 911 tape comes in.  And, again, it

16   would be for the limited purpose of my client

17   providing a voice sample to the jury.

18               THE COURT:  So what you're saying is

19   your client would not testify.  He would just stand up

20   and --

21               MR. PATTERSON:  Right.  If he does not

22   testify, then that's how I wish to handle that if the

23   911 tape comes in.

24               THE COURT:  All right.  Does the

25   Government have a position with respect to that

```
 1   procedure?
 2              MS. MARTIN:  Your Honor, all I can say
 3   is I've never heard of that procedure.  I don't think
 4   a voice recognition expert would even be admissible in
 5   court.  And this evidence then can't be cross-examined
 6   in any way.  Can I then use jail calls that I have of
 7   the defendant to say that it's closer to his voice.  I
 8   don't know how I could cross-examine that evidence if
 9   I can't -- I would like more time to think about it,
10   Your Honor.
11              MR. PATTERSON:  And, of course, I -- at
12   the appropriate time I would object because we're --
13   this entire jury up until trial I've been trying to
14   keep from the jury that my client, one, is a convicted
15   felon and, two, that he's in jail, ergo the street
16   clothes.
17              I believe just a voice sample of him
18   talking, why would they need to cross-examine that?
19              THE COURT:  Do you have any authority
20   for that proposition --
21              MR. PATTERSON:  I don't.
22              THE COURT:  -- in a case where
23   someone's voice is at issue?
24              MR. PATTERSON:  Right.  I don't -- I do
25   not.  I hopefully could get authority for you
```

1    tomorrow.

2                    THE COURT:  Well, is there any

3    objection -- see, we don't -- we're not before the

4    jury right now.  Is there any objection to my hearing

5    his voice?

6                    MS. MARTIN:  No, Your Honor.  I think

7    the circumstantial evidence speaks for itself and I

8    would argue there's limited weight to the defendant

9    standing up and talking for Your Honor.  In the same

10   way that I can change my handwriting, I can change my

11   voice right now.  I'm not sure how that's relevant.

12                   THE COURT:  I'm not going to ask you to

13   do that.

14                   MS. MARTIN:  Okay.

15                   THE COURT:  Well --

16                   MS. MARTIN:  I'm happy to make argument

17   on it, Your Honor.

18                   THE COURT:  But you're right.  And --

19   but I'm just trying to think how Mr. Patterson can

20   present me with any authority for his position that --

21   in a case like this it's relevant for the defendant to

22   say something in open court so the fact finders can

23   use that as additional evidence that the voice on a

24   tape is not --

25                   MS. MARTIN:  Right.

Page 305

1                    THE COURT:  -- the voice of the
2       defendant.
3                    MS. MARTIN:  I think there is a remedy.
4       I think he needs to testify and say that's not my
5       voice.  And then I get to cross-examine him on that.
6                    THE COURT:  Mr. Patterson, that might
7       be my ruling.  I'm not sure.
8                    MR. PATTERSON:  I think --
9                    THE COURT:  I can tell you that I've
10      been on the bench for quite some time.  I haven't had
11      this issue before.  And I've had voice related issues
12      before, but never anything like this.
13                    MR. PATTERSON:  I believe if they want
14      to cross-examine him, would the scope of the -- if he
15      decides not to testify in the case in chief with
16      respect to what happened on March 22nd of 2019, what's
17      the scope of the cross-examination:  Are you
18      disguising your voice right now?  Is that your real
19      voice?
20                    I -- if it -- if the 911 call is
21      admissible and there is a distinct difference between
22      the sound of the person on the tape as opposed to my
23      client's voice, then I think it's relevant for that
24      limited purpose.
25                    THE COURT:  Well, there is -- again,

1    the rule on the 911 call is set forth in two cases.

2    And I think what we'll do is get into this later.  You

3    see, as has happened frequently during the trial, my

4    question was deflected.  I had a simple question for

5    you, Mr. Patterson, and it relates to whether -- we're

6    talking about whether it's appropriate or necessary,

7    either one, for your client to remain now after --

8                      MR. PATTERSON:  Oh.

9                      THE COURT:  -- we've excused the jury.

10   That was the question.  We'll decide the procedure and

11   what's going to be done after we hear the call all

12   tonight.

13                     MR. PATTERSON:  Oh, I misunderstood.

14   He --

15                     THE COURT:  Do you want --

16                     MR. PATTERSON:  He does not need to be

17   present.  He does not need to be present.

18                     THE COURT:  Well, if I'm going to --

19                     MR. WITTELS:  My client does not need

20   to be present.

21                     THE COURT:  Well, I'm sure Mr. Wittels

22   -- go ahead, Mr. Wittels.

23                     MR. WITTELS:  He doesn't have to -- my

24   client does not need to be present.

25                     THE COURT:  And Ms. Meehan?

1           MS. MEEHAN:  No, Your Honor.

2           THE COURT:  No, wait a minute.  No,

3     your client does not --

4           MS. MEEHAN:  No, he does not need to be

5     present.

6           THE COURT:  -- need to be present.

7     Well, if you're going to have your client speak, read

8     something, he certainly has to be present.  I'm not

9     going to be able to hear him from the detention

10    center.

11          MR. PATTERSON:  I know.  I just thought

12    maybe after if Your Honor is going to -- you're right.

13    I thought we were going to address some preliminary

14    issues and then get to my client.  But I understand,

15    Your Honor.

16          THE COURT:  What, you mean tonight?

17          MR. PATTERSON:  Yes.  Yes.

18          THE COURT:  No.  We're going to do this

19    -- the preliminary issue is what we're talking about

20    now.  The first issue on the agenda is the 911 call.

21          MR. PATTERSON:  I understand.  So, yes,

22    if -- yes.  For the voice sample then I would think he

23    would have to remain.

24          THE COURT:  Although I'm not certain

25    that's admissible.

Page 308

1                    MR. PATTERSON:  Correct.

2                    THE COURT:  Now how are we going to get

3      authority on that?

4                    MR. PATTERSON:  I'm a one man show, so

5      I would have to try to get some case law for Your

6      Honor or something.

7                    THE COURT:  All right.  And we'll

8      research it as well.

9                    Right now I'm going off the bench for

10     15 minutes.  I think we'll excuse -- who is the senior

11     marshal?  You moved and I couldn't find you.

12                    We'll recess for 15 minutes.

13     Defendants Stevens and Quinn are not going to remain

14     in the courtroom.  Defendant Smith will, but not for

15     the entire evening proceeding.  He'll be here only for

16     the first part of the proceeding dealing with the 911

17     call.  Can you handle that?

18                    THE DEPUTY:  Yes, sir.

19                    THE COURT:  All right.  I'm going to

20     recess then for 15 minutes.  Again, Stevens and Quinn

21     need not remain.  Smith must remain.

22                    THE COURT OFFICER:  All rise.

23          (Recess taken at 4:47 p.m.; reconvened at 5:11

24     p.m.)

25                    THE COURT:  Be seated, everyone.

Page 309

1                        We've done some research --
2                        MR. WITTELS:  Judge, if --
3                        THE COURT:  -- on the issues raised in
4      Mr. Patterson --
5                        MR. WITTELS:  -- may I step out and see
6      Mr. -- get Ms. Meehan?
7                        THE COURT:  Yes, Mr. Wittels.
8                        MR. WITTELS:  Ms. Meehan's not here.
9      I'll --
10                       THE COURT OFFICER:  I think he's --
11                       MR. WITTELS:  Okay.  The marshal's
12     getting her.
13                       MR. PATTERSON:  While we're waiting for
14     Ms. Meehan, I think we can streamline this.  I am
15     curious about what Your Honor came up with, but I
16     don't think it's going to be necessary with what we're
17     going to do.
18                       THE COURT:  That's been true of most of
19     what has happened vis-à-vis your client today.
20                       MR. PATTERSON:  I understand, Your
21     Honor.
22                       THE COURT:  All right.  We're all here.
23                       Tell me what you wanted to report.
24                       MR. PATTERSON:  Thank you.
25                       I -- the marshals provided me the

Page 310

1    opportunity to speak with my client in the holding

2    cell back off the courtroom.  I explained to him what

3    we would be doing.  I explained to him the

4    significance or insignificance of this 911 call should

5    it come in.  I told him that if the 911 call does come

6    in, that I would still be able to argue weight to the

7    jury.  However, I can argue or I would intend to argue

8    to the jury in the alternative that assuming it is

9    him, it still fits into his -- my theory of this case

10   as it pertains to him at Sharpnack on the day in

11   question.  It will not impact, this 911 call will not

12   impact my theory of the case.

13               Based upon that conversation with my

14   client, and after having total understanding of

15   whether it comes in or it doesn't come in, he told me

16   that he would be okay.  He would not object to me

17   withdrawing my objection to the 911 tape coming in.

18   And, again, not stipulating that it is his voice, but

19   I still would retain the right to argue to the jury as

20   to weight.

21               So, in short -- shorthand, we're going

22   to withdraw the objection on admissibility of the 911

23   tape.

24               MS. MARTIN:  Your Honor, if I just may

25   place one thing on the record.  Just while we were

 1    taking this short break I also played the additional

 2    dispatch conversation that happens after the 911 call

 3    for both Mr. Patterson and Mr. Smith.  It is my

 4    understanding at that time -- at this time that

 5    there's no objection to those communications either.

 6                   MR. PATTERSON:  There -- there's -- no.

 7    Right.  There would come in with all the 911

 8    recordings.  And if I could just colloquy my client

 9    very quickly, Your Honor.  He kind of wants to get

10    back.

11                   Mr. --

12                   THE COURT:  Yes, you may.

13                   MR. PATTERSON:  I'm sorry.

14                   THE COURT:  You asked a question and

15    then you proceeded without --

16                   MR. PATTERSON:  Oh, I'm sorry.

17                   THE COURT:  -- getting an answer.

18                   MR. PATTERSON:  If I may colloquy him.

19                   THE COURT:  You may colloquy your

20    client.

21                   MR. PATTERSON:  Thank you.

22                   If you could stand up, Mr. Smith.

23                   Now, Mr. Smith, you were here when I

24    told His Honor with respect that it was my intent to

25    withdraw the objection on the admissibility of the 911

Page 312

1    tape; is that correct?

2                    DEFENDANT SMITH:  Yes.

3                    MR. PATTERSON:  And you had ample

4    opportunity to discuss this issue with me back in the

5    holding cell; is that correct?

6                    DEFENDANT SMITH:  Yes.

7                    MR. PATTERSON:  And I told you that

8    it's my opinion, even though you -- your decision

9    rules, that I don't believe if it does come in it

10   would hurt your theory of the case insofar as what

11   transpired on the day in question; is that correct?

12                   DEFENDANT SMITH:  Yes.

13                   MR. PATTERSON:  And you would agree

14   with me in the withdrawal of my objection for the

15   admissibility of the 911 tapes, correct?

16                   DEFENDANT SMITH:  Yeah.

17                   MR. PATTERSON:  And also that I reserve

18   -- I would reserve and would still have the

19   opportunity to argue weight, meaning to argue to the

20   jury that it may or may not be you.  Do you understand

21   that?

22                   DEFENDANT SMITH:  Yeah.

23                   MR. PATTERSON:  Are you okay with that?

24                   DEFENDANT SMITH:  Yes.

25                   MR. PATTERSON:  Any questions of me or

Page 313

1    His Honor?

2                    DEFENDANT SMITH:  No, sir.

3                    THE COURT:  Thank you.

4                    Do you have any questions for the

5    Court, Mr. Smith?

6                    DEFENDANT SMITH:  No, sir.

7                    THE COURT:  There's really no need for

8    me to rule, but I am going to point out that under the

9    case law and the cases that we found, Fitzpatrick

10   versus United States, 178 -- I'm sorry.  Wrong case.

11   United States versus Murdock, 699 Fed. 3d. 665, a 2012

12   decision from the First Circuit in Boston and a Third

13   Circuit case, United States versus Console and others

14   (phonetic), 13 F.3d 641., a 1993 case, the tape would

15   come in if there were sufficient circumstantial

16   evidence and direct recognition of the person alleged

17   to have made the call.

18                    I believe there was sufficient

19   evidence, circumstantial evidence among other things,

20   and I'm not detailing it all, the exchange of

21   telephone calls between the challenged number and your

22   wife, Mr. Smith, number one, and self-identification

23   because of some of the things that were said in the

24   call that link the caller to you.  There was

25   sufficient evidence for me to rule.  I'm not having to

Page 314

1    rule now, but there was sufficient evidence for me to

2    rule that it was your call and it was your voice.

3              So I don't think anything has been

4    conceded that would not have been the subject of my

5    ruling.

6              MR. PATTERSON:  Thank you, Your Honor.

7              THE COURT:  Is there anything else that

8    needs to be put on the record at this time?

9              MS. MARTIN:  Not from the Government,

10   Your Honor.

11             THE COURT:  And not from your

12   perspective?

13             MR. PATTERSON:  No, Your Honor.  I

14   would just request that my client be permitted to go

15   back to FDC.

16             THE COURT:  Yes.  Mr. Smith will be

17   permitted to return to the FDC.  We're going to resume

18   tomorrow at 10:00, Mr. Smith.

19        (Pause)

20             THE COURT:  I should also tell you we

21   found another case, an older case, the case I started

22   to cite, Fitzpatrick versus the United States, it's a

23   Supreme Court case, 178 U.S. 304.  I haven't cited a

24   case that old in a while.  It was decided in 1900.

25   But it is authority for the proposition that Mr. Smith

Page 315

1    would not have been permitted to stand up and give a

2    sample of his voice.  He would have been permitted to

3    take the witness stand, of course, and testify in

4    whatever manner he deemed appropriate under the rules,

5    but no stand up sample of voice.

6                    Okay.  On that note, have you excused

7    the 911 operator?

8                    MS. MARTIN:  I just did, Your Honor.

9    She'll be back tomorrow morning first thing.

10                   THE COURT:  All right.  We certainly

11   don't need her out of the presence of the jury.

12                   All right.  Now I would rather start

13   with the charge and end with the motions in limine.

14        (Pause)

15                   THE COURT:  All right.  You've all

16   received the revised charge.  We covered everything

17   through -- well, we -- there were a lot of things we

18   were coming back to.  But essentially one of the -- I

19   guess where we have to address issues begins with --

20        (Pause)

21                   THE COURT:  Okay.  It's Section 27, and

22   that's the Pinkerton charge.

23                   Now I know one objection to the charge

24   that we haven't completely discussed that comes before

25   that, and that's -- hmm -- oh, yes, it's Count 2,

Page 316

1    using or carrying.  It's after the Pinkerton charge

2    and it's the aiding and abetting charge there.  So

3    we'll address those in whatever order you deem

4    appropriate.

5                    And, Ms. Meehan, it's your objection to

6    the aiding and abetting charge with respect to Count

7    II.

8                    MS. MEEHAN:  Yes.  Your Honor, I think

9    Your Honor surmised from numerous arguments throughout

10   the case that this instruction in particular is

11   critical to Mr. Quinn's defense and it's critical that

12   the jury understand aiding and abetting, and that it's

13   clear to them what actions and what evidence the

14   Government must prove in order for the jurors to find

15   Mr. Quinn, who was unarmed, was an accomplice or had

16   accomplice liability and aided and abetted the using

17   and carrying and brandishing, of significance

18   brandishing a gun --

19                    THE COURT:  Well, brandishing --

20                    MS. MEEHAN:  -- in connection with a

21   crime of violence.

22                    THE COURT:  Brandishing is not part of

23   the -- is not an element of the charge.  It will be on

24   the verdict sheet, but brandishing is a sentencing

25   issue.

Page 317

1                    MS. MEEHAN:  Well --

2                    THE COURT:  The only thing the

3        defendant has to be concerned about is using or

4        carrying.

5                    MS. MEEHAN:  Well, I respectfully

6        disagree with the Court and I would add, Your Honor,

7        just to clarify things.  And I mean no disrespect to

8        the Court, but because the -- this instruction is

9        confusing, and I understand what the Court said the

10       other day about the Bozeman (phonetic) case having

11       been decided six years ago, although for many, many

12       years, Your Honor, we treated the guidelines as

13       mandatory before 2005.

14                   The Chief of Appeals for the U.S.

15       Attorney's Office, Mr. Zalsner (ph), I don't want to

16       speak for Mr. Zalsner, but he spoke to the Appellate

17       Chief of the Defend -- the Federal Defender Officer,

18       Mr. Swietzer (ph) and they were both on the advisory

19       committee for the Third Circuit model -- jury

20       instructions.  And they -- we're trying to propose a

21       joint instruction for the Court.

22                   And I would hand it up.  I just -- I

23       want to apologize to the Court in advance because when

24       I was rushing this morning I mislabeled what the

25       Government -- we're not 90 percent of the way -- 90

1    percent of the instructions we agree on.  There's one

2    paragraph which I highlighted that appears in the

3    Government's proposal.  And the only reason that I did

4    not want that paragraph in for Mr. Quinn, and it

5    pertains to if the defendant continues to participate

6    in a crime after a gun was displayed or used by

7    confederate:

8                    "You may permissibly infer from the

9    defendant's failure to object or withdraw from the

10   crime at that time that he had advance knowledge of

11   the confederate's plan.  You're not required to draw

12   this inference, however.  It is entirely up to you to

13   determine the facts."

14                    And I just think this unduly singles

15   out or over-emphasizes --

16                    THE COURT:  Now where is that in my --

17                    MS. MEEHAN:  -- certain evidence.

18                    THE COURT:  -- charge?

19                    MS. MEEHAN:  Well, that -- I'm going to

20   hand this up to the Court.  And, again, I --

21                    THE COURT:  That's -- I don't think

22   that is in my charge.

23                    MS. MEEHAN:   No, it's not.  And I

24   think --

25                    THE COURT:  And do you think that's

1   helpful to Mr. Quinn?  You may -- well, I guess you

2   do.

3               MS. MEEHAN:  No.  I don't think it's

4   helpful, Your Honor.  And -- but as I was mentioning,

5   I think that our proposed -- the jointly proposed

6   instructions, either way, I think are clear or more

7   helpful to the jury than the current Third Circuit

8   instruction.  So I'm -- and I gave a copy to

9   Government counsel and I'll hand this up to the Court.

10  And I --

11              THE COURT:  And this is in place of

12  what charge?

13              MS. MEEHAN:  The accomplice liability,

14  aiding and abetting.

15              THE COURT:  Yeah.  But there's a lot of

16  that.  Which one?

17              MS. MEEHAN:  As it pertains to the

18  924(C), Count II.  So that would be the Court's -- if

19  I could just have a moment.  Sorry.  That would be a

20  proposal to replace the Court's instruction which is

21  -- sorry, Your Honor -- Number -- it would be Number

22  38, page 47.

23              THE COURT:  That's where I am.  My

24  instruction reads first that someone -- we didn't --

25  this hasn't been changed as I directed that it be

1    changed, including one of them.  It has to be one of

2    the defendants.  That someone, including one of them,

3    one of the defendants -- we would insert that, and

4    we've been identifying them by name -- committed each

5    of the elements of the offense charged as I explained

6    those elements to you.

7                    Now we're going to make that more

8    clear.  The offense charged there would be using or

9    carrying a firearm during a crime of violence.  So

10   that will read if I it -- if I sign off on this,

11   first, that one of the defendants, including the --

12   that -- first, that it would be consistent with

13   everything else.  Smith, Stevens and Quinn, or one of

14   them committed the offense charged, and the offense

15   charged then would be explained, using and carrying a

16   firearm during a crime of violence by committing each

17   of the elements charged as I have explained those

18   elements to you.

19                   Second, that Smith, Stevens and Quinn

20   knew that the offense charged was going to be

21   committed or was being committed by someone, including

22   one of them, and there the one of them works because

23   we've identified Smith, Stevens and Quinn in the -- at

24   the beginning of the element.

25                   MS. MEEHAN:  Your Honor, I'm sorry to

1    interrupt.  Are -- is Your Honor rejecting the joint

2    proposal from --

3                    THE COURT:  I'm reading what I -- what

4    is in there now.

5                    MS. MEEHAN:  Okay.  I --

6                    THE COURT:  Yes.  It would have been

7    good, not required, but it would have been good to --

8    for you to have given me these.  I think this is

9    essentially what you have in your points, but I'm not

10   sure.

11                   MS. MEEHAN:  Well, it's actually

12   slightly different.  But this would be -- and for now

13   I'll just -- I'll agree with the Government proposal

14   and that paragraph can stay in --

15                   THE COURT:  I don't know what paragraph

16   --

17                   MS. MEEHAN:  -- on the second page.

18                   THE COURT:  -- you're talking about

19   now.

20                   MS. MEEHAN:  Your Honor, I handed up,

21   and I apologize to the Court.

22                   THE COURT:  You interrupted.

23                   MS. MEEHAN:  I did.

24                   THE COURT:  I'm now reviewing my charge

25   now.  Why you thought that was an appropriate time to

Page 322

1    interrupt escapes me.

2                   MS. MEEHAN:  Because I think Your

3    Honor's charge is really confusing with this set of

4    facts because there is money and a gun charge, but

5    it's the store gun in Count I.  And Mr. Quinn doesn't

6    have the gun, but Mr. Quinn touches money and then --

7    I mean, it's a -- the fact pattern is a quick fact

8    pattern, but it's very confusing under the law with

9    who the principles are and who the aider and abettors

10   are and what the jury can --

11                  THE COURT:  Well, the jury has -- if

12   the Government --

13                  MS. MEEHAN:  -- can reasonably find.

14                  THE COURT:  -- is going to proceed on

15   this charge, and they certainly can, they've got to

16   argue this and make it clear to the jury.  Yes, it's a

17   very unusual fact pattern.

18                  MS. MEEHAN:  It is and that's why I

19   think because the Third Circuit model instruction

20   remains confusing and is flawed, and I think the

21   Government agreed -- agrees with that, which is why

22   I'm submitting a joint proposal --

23                  THE COURT:  Oh, a joint proposal?

24                  MS. MEEHAN:  Yes, it's a joint

25   proposal.

                                                    Page 323

 1                  MR. ECKERT:  Yes, Your Honor.

 2                  MS. MARTIN:  Yes, Your Honor.  It's a

 3     joint proposal and the -- I believe what was just

 4     handed up --

 5                  MS. MEEHAN:  Yes.  It's -- I'm just

 6     going to agree with yours.

 7                  MS. MARTIN:  Okay.  Your Honor, it

 8     sounds like there is an agreement between counsel that

 9     the instruction as written with the highlighted

10     paragraph that's just been handed up to you is a joint

11     request from the two of us.

12                  MS. MEEHAN:   And I had to hand --

13                  THE COURT:  Well, first of all --

14                  MS. MEEHAN:  -- correct it.

15                  THE COURT:  -- my -- I've got two

16     typewritten pages.  One is titled, Defendant's

17     proposed jury instructions and then Defendant is

18     crossed out and Government is written in.  The other

19     one is entitled, Government's proposed jury

20     instructions and Defendant is written in over the term

21     Government which is crossed out.

22                  There was no suggestion that it was a

23     joint proposal.  And you interrupted my reading of the

24     current charge.  I want to start where we are now --

25                  MS. MEEHAN:  I apologize --

Page 324

1          THE COURT:  -- which is the current
2   charge, which is the Third Circuit charge.  Your
3   interruption isn't getting you anywhere.
4          MS. MEEHAN:  I apologize, Your Honor.
5   I just -- I --
6          THE COURT:  Then it's down.
7          MS. MEEHAN:  -- thought I made it clear
8   that we had a joint proposal for that.  So I --
9          THE COURT:  You didn't tell me --
10         MS. MEEHAN:  -- apologize.
11         THE COURT:  -- that.  You were on your
12  feet for a good bit of time and neglected to tell me
13  something that was rather important, that we have an
14  agreement with the Government.
15         You're right.  This is the first time
16  you've tried before me, Ms. Meehan.
17         The third element that either Smith,
18  Stevens or Quinn was an active participant in the
19  using and carrying of a firearm during a crime of
20  violence and also had advance notice that one of the
21  principals would use a firearm during and in relation
22  to the crime of interference with interstate commerce
23  by a robbery, and they then performed some act in
24  furtherance of the crime.
25         Now what is the joint proposal?

Page 325

1    There's a fourth element, by the way.  Well, we don't

2    have to go into it.  It's not being challenged.  What

3    is the joint proposal?

4                   MS. MEEHAN:  Your Honor, I made the

5    mistake when I -- Mr. Zalsner and our Chief of Appeals

6    were 95 percent in agreement with the exception of the

7    highlighted paragraph which is now hand-corrected to

8    say Government.  I did not want that paragraph in

9    there for Mr. Quinn.  But at this point I am happy to

10   have this instruction if Your Honor would agree to it,

11   which would be -- and I've hand-corrected.

12                   It says typed, Defendant's proposed

13   jury instruction for accomplice liability aiding and

14   abetting.  But I crossed that off and said,

15   Government, and it's got first, second and third

16   element, and then there's a paragraph about continued

17   participation, and then the second to last paragraph

18   says, the Government, on page 2, need not prove that

19   the defendant desired that Mr. Stevens or Mr. Smith

20   used, carry or brandished.

21                   And the reason brandishing is

22   important, Your Honor, is because there is a Seventh

23   Circuit case, United States versus Armour, A-R-M-O-U-

24   R, 2016, so it's post-Roseman, 840 F.3d. 904.  So that

25   Mr. Quinn must know that -- must have advance

1  knowledge of brandishing, not just use and carry.

2  That was what that case stood for.

3              So this would be a joint proposal, and

4  at this juncture I'll agree to include all three

5  paragraphs on page 2.

6              THE COURT:  Well, the advance knowledge

7  issue is covered in the charge that I've proposed.

8  It's covered -- well, I won't read the whole

9  paragraph.  It's on page 51 and it reads, to find that

10 Donnie Smith, Stevens and Quinn had advance knowledge

11 that one of the principals would use or carry a

12 firearm during and in relation to the interference

13 with interstate commerce by robbery.  You must find

14 that the Government proved that Smith, Stevens and I'm

15 -- I think maybe we should use the disjunctive, or

16 Quinn, had knowledge of the firearm at a time when

17 they could do something with that knowledge such as

18 walking away from the criminal venture.

19              That's the issue that you seem to be

20 talking about and it's in there, and it was in the

21 Roseman --

22              MS. MEEHAN:  No, Your Honor.  This was

23 actually continued participation I had an issue with.

24 But the reason --

25              THE COURT:  I'm sorry.  What are you

Page 327

1   talking about now?

2              MS. MEEHAN:   The continued

3   participation.   There is a paragraph that addresses

4   advance knowledge here.   Your Honor, the reason that

5   this was jointly submitted was both the Government and

6   the defense both chiefs of appeals of our two offices

7   have been working and re-evaluating the accomplice

8   liability instruction as it pertains to the 924(C)

9   statute.   And because it's very confusing, and I

10  think it's already confusing in a case that it might

11  not be as factually complex as this one in terms of

12  who is responsible for what.

13             And with the facts of this case being,

14  I would suggest to the Court extraordinarily

15  confusing, that this proposal, joint proposal would be

16  very helpful and is a very clear instruction for the

17  jurors.

18             THE COURT:   Some of -- I haven't read

19  the whole thing because you didn't think it was

20  important enough to give me a copy in time to read

21  before the hearing.   But I'm reading on the last page,

22  next to last paragraph.   The Government need not prove

23  that the defendant desired that Stevens or Smith use,

24  carry -- and you're not -- this is a charge for three

25  defendants, or brandish a firearm.   And the

Page 328

1    brandishing is not -- again, it's not a part of the

2    using or carrying.  The brandishing reference is only

3    in the charge for sentencing purposes.  It's not part

4    of 924(C).

5                 By why isn't the Third Circuit

6    instruction, which has been in place for, let's see,

7    2014, for six years, five and a half years, why isn't

8    that sufficient?  Why isn't the language that I use --

9                 MS. MEEHAN:  Because it's very --

10                THE COURT:  -- giving the defendant an

11   opportunity to withdraw?

12                MS. MEEHAN:  Because, Your Honor, the

13   instruction was written prior to the Roseman case, and

14   since that time there have been suggestions and

15   additions, and it's only made the jury instruction

16   more confusing.

17                So it's being worked on currently as we

18   speak by the committee, by this advisory committee,

19   and Mr. Zalsner and Mr. Swietzer of my office are part

20   of this advisory committee.  And I don't know who else

21   is on it.  It's apparently on the website, the list of

22   individuals.  But Mr. Swietzer and Mr. Zalsner spoke

23   at length yesterday and went back and forth in writing

24   as to a proposed instruction and a jointly proposed

25   instruction.  And, again, I'll just agree with the

Page 329

1    Government's version for purposes of this case; that

2    we can agree that this instruction from both of the --

3    from both of our offices have crafted is a clearer

4    instruction on accomplice liability than the current

5    Third Circuit instruction.

6                    THE COURT:  Well, it's nice the lawyers

7    agree.  It's certainly not binding on me and I'm not

8    going to --

9                    MS. MEEHAN:  Of course not, Your Honor.

10   I understand.

11                   THE COURT:  With the major changes.

12   First of all, I need to read it.  I can't believe

13   you're presenting this in the way you're presenting

14   it, Ms. Meehan.  I mean --

15                   MS. MEEHAN:  Your Honor, I wanted to

16   change the -- I did not realize that the caption was

17   wrong, that I had it in the reverse.

18                   THE COURT:  Well, Ms. Meehan, the last

19   thing I'm complaining about is the caption.  You gave

20   me a rather detailed charge.  We're supposed to close

21   the case tomorrow.  We probably won't.  And you want

22   us to digest this charge.  I don't know how long

23   you've held onto it. If you hung onto it for an hour,

24   it was too long.

25                   MS. MEEHAN:  Well, I certainly had it

Page 330

1    since mid-morning, Your Honor.  Yes.

2                    THE COURT:  Well, you should have --

3    well, I gather this is an ongoing process.  But I'm

4    not really prepared tonight to rule on this charge.  I

5    find this issue as applied, the issue of aiding and

6    abetting as applied to this case rather, well, I'll

7    say difficult.  It's not an easy fit.  But I know the

8    elements of the crime and I'll charge the jury in a

9    way that I think communicates to them the essence of

10   the law and the elements as they're -- as they need to

11   be presented.  But I can't do that tonight.  You

12   waited too long.

13                   Does the Government want to say

14   anything on this issue?

15                   MS. MARTIN:  No, Your Honor.  I agree

16   it is a joint proposal and I understand the Court's

17   ruling.

18                   THE COURT:  And have you checked this

19   language?  I mean, there's a lot of -- there are a lot

20   of words the courts don't use very often.  For

21   example, you must establish -- and it's written for

22   Quinn.  It's not written for the Court.  We're talking

23   about points for charge for the three defendants.

24                   MS. MARTIN:  Your Honor, I will note I

25   did just notice that.  It was written by Mr. --

Page 331

```
 1              THE COURT:  Quinn's attorney.  Well,
 2     someone wrote it for Quinn's attorney.  But it -- what
 3     that sentence reads is, how it reads is what it must
 4     prove beyond a reasonable doubt is that Mr. Quinn knew
 5     beforehand at a time when he had a realistic
 6     opportunity to quit the robbery that the principal
 7     would use, carry or brandish the firearm.  And Mr.
 8     Quinn elected thereafter to continue to participate in
 9     it.
10              MS. MEEHAN:  But he's the only one
11     unarmed, Your Honor.  So the accomplice liability on
12     the 924(C) would have to apply to him and not to Mr.
13     Stevens and Mr. Smith.
14              MS. MARTIN:  Your Honor, I disagree
15     with that insofar as it would apply to the store gun
16     in terms of aiding and abetting, the robbery of the
17     store gun.
18              THE COURT:  Well, did --
19              MS. MEEHAN:  That's Count I.
20              THE COURT:  -- did Quinn -- I'm trying
21     to refresh my recollection.  Did he touch any of the
22     other guns?
23              MS. MARTIN:  He took the gun from Mr.
24     Stevens at the end, Your Honor.
25              THE COURT:  That was when Stevens was
```

                                           Page 332

1    leaving?

2                  MS. MEEHAN:  Well, that -- Your Honor,

3    we have a stipulation that -- because Government, I

4    thought, was a little bit tricky with exhibits there.

5    This was the issue that came up when Ms. Martin asked

6    Mr. Ventura, did you ever see the gun again, and then

7    there was a video of Mr. Quinn -- Mr. Stevens handing

8    his gun to Mr. Quinn.  That was Mr. Stevens' gun and

9    we have a stipulation before this jury that that was

10   not the store gun.

11                  MR. ECKERT:  Right.  And we're --

12                  MS. MEEHAN:  Right.  So --

13                  MR. ECKERT:  A hundred percent.

14                  MS. MEEHAN:  So the accomplice

15   liability for Mr. Quinn is on the guns -- I'm assuming

16   it's the Government theory -- is on the guns that Mr.

17   Stevens and Mr. Smith had.  The store gun and this

18   theft or robbery of the store gun is Count I and there

19   is an instruction in Your Honor's instructions.  I

20   haven't objected to that.  That -- I don't know what

21   number offhand, but there's already an instruction for

22   that for Count I.  We're talking about Count II.

23        (Pause)

24                  THE COURT:  Well, the question I asked

25   was did Quinn ever touch -- what weapons -- well,

```
 1    maybe I ought to put it this way.  What weapons did
 2    Quinn have his hands on?
 3                    MR. ECKERT:  The only weapon that he
 4    touched is the store gun.  That's absolutely factually
 5    correct.
 6                    MS. MEEHAN:  What?  The store gun?
 7                    MR. ECKERT:  I'm sorry.  I meant -- I'm
 8    sorry.
 9                    MS. MEEHAN:  Oh, sorry.
10                    MR. ECKERT:  I'm sorry.
11                    MR. WITTELS:  Stevens.
12                    MR. ECKERT:  I'm sorry.  Stevens gun.
13    What Ms. Meehan said is absolutely factually correct.
14    The only gun he touches is the gun that's provided by
15    Mr. Stevens before Mr. Quinn leaves the store.
16                    What is charged in the indictment is
17    two separate theories under 924(C).  There's the store
18    gun that Mr. Smith takes.  That also facilitates the
19    robbery because the robbery doesn't happen until after
20    Mr. Smith takes the gun from the store clerk.  I don't
21    see why accomplice liability would not -- under the
22    same theory, the accomplice liability would apply for
23    that gun as well.  Certainly, it's a different -- it's
24    a little bit of a different argument, but it's the
25    same exact instruction, would be the same exact --
```

Page 334

1           THE COURT:  Well, the store gun was

2    charged as having been stolen.  It was --

3           MR. ECKERT:  It's charged in both

4    counts.  Yes, Your Honor.  It was a 924(C) based on

5    the store gun, and the store gun is a proceed of the

6    robbery.  Yes.  That's correct.

7           MS. MEEHAN:  Well, I'm -- I -- you're

8    charging that the store gun is a 924(C).

9           MR. ECKERT:  It's in the indictment as

10   a 924(C).

11       (Pause)

12           THE COURT:  Is there anything else you

13   want to say about this charge?

14           MR. ECKERT:  No, Your Honor.

15           THE COURT:  Have you thought of

16   tailoring a charge that I can use instead of a charge

17   that relates to only one defendant?

18           MR. ECKERT:  Your Honor, I believe the

19   parties could tailor this to --

20           MS. MEEHAN:  This is tailored with Mr.

21   -- between Mr. Zalsner and Mr. Swietzer because Mr.

22   Quinn is the person who doesn't have a gun.  He's the

23   only one in the store who doesn't physically touch the

24   gun and take the store gun or brandish, use and carry

25   like we've seen on the video with Mr. Smith and Mr.

Page 335

1    Stevens.

2            Therefore, the only way the jurors

3    could find that he is guilty of Count II is through

4    accomplice liability.

5            THE COURT:  This charge is a charge

6    that would, at least from your perspective, be

7    applicable in a single defendant case in which Quinn

8    is the defendant.

9            MS. MEEHAN:  No, Your Honor.  They

10   can't -- he's the only one in the case, Your Honor,

11   who is unarmed.  So the only way to show that he has

12   some liability for using, carrying and brandishing or

13   brandishing --

14           THE COURT:  This is a charge for aiding

15   and abetting the applicable of the three defendants.

16           MS. MEEHAN:  The 924(C) count.

17           THE COURT:  That's what we're talking

18   about.

19           MS. MEEHAN:  Right.

20           THE COURT:  Count II, they argue aiding

21   and abetting with respect to the three defendants.

22   The three defendants must be subject to the

23   instruction.  The instruction you've asked me to

24   insert in place of the -- my instruction 38 on

25   accomplice liability says the elements are these:

Page 336

1    First, that Mr. Quinn was an active participant, but

2    not that Stevens or Smith were active.

3               MS. MEEHAN:  Right.  Because, Your

4    Honor, they're not liable as accomplices because they

5    possessed the guns.  I mean, that part -- I'm not sure

6    how they would not -- how they would contest that.

7    It's on video.  Mr. Quinn is unarmed so the gun -- his

8    liability is through being an accomplice if he meets

9    these things, if the Government's proven these things

10   to the jury or:  That he was an active participant;

11   that the principals, Smith and Stevens, committed the

12   offense of using, carrying or brandishing a gun in

13   relation to a crime of violence; and that he had

14   advance knowledge, new and advanced of the robbery

15   that the principal would use, carry or brandish a

16   firearm, the principals being Smith and Stevens.

17              THE COURT:  But under your instructions

18   I would not have to instruct the jury that they must

19   find that Stevens and Smith were active participants.

20   I don't think you've drafted jury instructions in

21   multiple defendant cases before.  I'll look at this,

22   but I must say that you've presented more that is

23   confusing than hallucinating (sic), even though it's

24   an agreed upon charge.  I just don't see this

25   instruction.

1              I think what you're trying to do, and

2       maybe you're coming to grips with the fact, that

3       aiding and abetting is very difficult to articulate in

4       the context of the charges in Count II.  I found that

5       to be so.  And that might mean that all of the

6       defendants ought to be subject to the aiding and

7       abetting -- to the charges in Count II.

8                   MS. MEEHAN:  Your Honor, that's -- they

9       can -- if Mr. Quinn didn't exist and Mr. Stevens and

10      Mr. Smith went into the store and they have guns and

11      they're on video, Your Honor would just have the plain

12      old, straight old 924(C) instruction.  But because Mr.

13      Quinn is also in there and he's unarmed, which I don't

14      think is contested, the Government's theory is that he

15      aided and abetted the 924(C).  So if you took Mr.

16      Quinn out of the equation, you would have a straight

17      up 924(C) that the Court's given a million times in

18      other cases.

19                  But -- and they don't -- so they don't

20      need an aiding and abetting instruction, but Mr. Quinn

21      does.

22                  THE COURT:  Do you want to limit the

23      aiding and abetting charge in Count II to Mr. Quinn?

24                  MR. ECKERT:  No, Your Honor.  No.

25                  MS. MEEHAN:  This was agreed upon

1    between Mr. Zalsner and Mr. Swietzer.

2                    MR. ECKERT:  We believe that's accurate

3    with regard to your client, absolutely, but I don't --

4    the indictment lists two guns.  It lists the store gun

5    and two black semi-automatic firearms.  So either of

6    the -- for Mr. Smith, perhaps, he would have to be a

7    principal.  But certainly for Mr. Stevens and Mr.

8    Quinn, I'm not following how they're not also -- for

9    Mr. Quinn, it's the same exact legal theory.  It's

10   under an aiding and abetting theory.  But Mr. Stevens

11   can aid and abet the 924(C) of the store gun.

12                   So we believe that to be an appropriate

13   instruction based on the facts as --

14                   THE COURT:  The fact that he had a gun,

15   you're relying on the store gun to convict Stevens?

16                   MR. ECKERT:  It's either possibility,

17   Your Honor.  Either possibility would be sufficient.

18   Yes.  It can be his own gun that he provided or he can

19   aid and abet the store gun if they find that -- if the

20   jury were to find that he had advance knowledge that

21   the robbery would occur after the store gun was taken

22   from the complainant and provided to Mr. Smith.

23                   THE COURT:  All right.  Well, we'll

24   take this under advisement.  This is the only

25   objection to the charges on the -- to my charge on the

Page 339

1    three -- well, actually four separate charges, the

2    underlying crimes and the two aiding and abetting

3    charges; is that correct?  Is that where we are?

4    Government first.

5                     MR. ECKERT:  I believe so, Your Honor.

6    Yes.

7                     THE COURT:  Mr. Patterson, I don't

8    think you're -- well, you have a horse in this race,

9    this race, the aiding and abetting race.

10                     MR. PATTERSON:  Correct, Your Honor.

11                     THE COURT:  Mr. Wittels.

12                     MR. WITTELS:  No objection.

13                     THE COURT:  Well, I'll look into it.

14   We'll have to decide this.  It certainly is a charge

15   that applies to Mr. Quinn.

16                     One last question is your charge, Ms.

17   Meehan, patterned on the Sixth Circuit charge?

18                     MS. MEEHAN:  Well the original

19   submission was a modified -- was patterned, yes, on

20   the Sixth Circuit.  And I didn't have an opportunity

21   to talk to Mr. Swietzer about how he and Mr. Zalsner

22   modeled this one or came up with this particular joint

23   proposal.

24                     THE COURT:  And so you've changed --

25   this is a dramatic change.

Page 340

1              MS. MEEHAN:  This is not what I
2      submitted.  I only submitted one jury instruction,
3      Your Honor, and that was on the accomplice liability
4      which was modeled on the Sixth Circuit pattern after
5      the Sixth Circuit instruction.  But this one I'm not
6      sure what Mr. Swietzer and Mr. Zalsner discussed.  So
7      I don't know what they -- I'm assuming some of it may
8      have been patterned after the Sixth Circuit.
9              THE COURT:  Well, this charge, again,
10     going back to it, it seems to -- not seems to, it does
11     focus on Quinn as the aider and abettor.  You can't
12     have it both ways.  The Government argument is
13     summarized in the agreed charge.  The Government
14     alleges that Quinn aided and abetted Stevens and Smith
15     in committing the offense by using, carrying or
16     brandishing.
17              In the charge, you've -- in this agreed
18     charge, I think you've agreed to limit and it makes a
19     little more sense then, but I'm not sure that I agree
20     with all of the language.  But it makes a little more
21     sense to give it if that's the way you're proceeding.
22              MR. ECKERT:  I'm not sure I follow.
23              THE COURT:  What I'm telling you is
24     your agreed charge doesn't fit the case as you just
25     articulated it.  It fits the case that is being

Page 341

1    presented now by Ms. Meehan, and that is that Quinn is
2    charged with aiding and abetting the using or carrying
3    -- and it's not brandishing -- using or carrying of a
4    weapon in furtherance of a robbery committed by or --
5    in furtherance of a robbery, I guess we have to say by
6    the other two defendants.  It's just what you've read.
7    Government alleges that Quinn aided and abetted
8    Stevens and Smith in committing the offense of using
9    or carrying during and in relation to a crime of
10   violence.
11              But you're not willing to agree to
12   that?  So you've got every one of them as a potential
13   aider and abettor and every one of them as a potential
14   principal?  That's the way you're presenting the case.
15              MR. ECKERT:  I think for Count II, for
16   Count II only Mr. Smith is a principal because he has
17   both the store gun and his own gun.  But Mr. Stevens,
18   we would argue to the Court that he can aid and abet
19   Count II of the store gun.
20              THE COURT:  He -- but he's got his own
21   gun.
22              MR. ECKERT:  Right.  But there's been
23   evidence -- there's been a lot of cross-examination
24   and argument made that somehow that's not a real
25   firearm.  Obviously, that's not our theory of the

Page 342

1    case, but if the defense -- if Mr. Stevens is going to

2    offer the defense that the guns aren't real, we

3    believe that we have a right to argue that he also

4    aided and abetted the crime after the store gun was

5    taken by Mr. Smith.

6                THE COURT:  Well, let's ask Stevens'

7    lawyer, Mr. Wittels.

8                MR. WITTELS:  I don't have any position

9    on this, Judge.

10               THE COURT:  Are you planning on arguing

11   that Stevens' gun was not real or that the Government

12   has not proven that it was real?

13               MR. WITTELS:  I will argue to the jury

14   that they have to decide whether or not it was real.

15               MR. PATTERSON:  That was my argument,

16   Your Honor, with respect to the Government's proof

17   that other than the store gun, which we know is real

18   based upon the functionality test of what was being

19   pointed before Mr. Smith got Joel's gun, whether they

20   were real.  And I'm reading the jury charge right now

21   on a firearm offense defined.  The term firearm means

22   any weapon which will expel or designed to or may

23   readily be converted to expel a projectile by the

24   action or explosive.  How did they prove that?

25               MS. MEEHAN:  Your Honor, to further

 1    confuse things, in keeping with the statute, my client
 2    would have to know in advance per the law that Mr.
 3    Smith was going to use and carry the store gun.  How
 4    is that possible under any theory, under any of this
 5    evidence?  That would -- I guarantee, Your Honor, that
 6    the jurors will be back 15 times at least with
 7    questions about the aiding and abetting, where we are
 8    right now because it's completely confusing and the
 9    Government's theory is bonkers, really.
10              And I having -- if I had known that I
11    would have moved to sever because Mr. Quinn in terms
12    of the actual gun possession and brandishing is the
13    least culpable defendant here.
14              MR. ECKERT:  The robbery happens after
15    the store gun is taken by Mr. Smith.  That's advance
16    notice.  It's literally exactly what's in -- it's a
17    much harder argument than the other two guns, which
18    are brandished before that, but I -- there's less time
19    clearly.  But I fail to see how that's not a case that
20    would go to the jury on whether that's an advance
21    knowledge of the -- that the robbery is going to
22    happen after the store gun is taken by Mr. Smith.
23              MR. PATTERSON:  The videotape also is
24    very clear that the only functioning gun, which would
25    be the store owner's gun, was put in my client's right

Page 344

1    pocket and never removed.  That's clear.

2                    THE COURT:  Well, I don't see how you

3    can say the video evidence is very clear that the only

4    operable gun is the store gun.  I don't think the

5    video is clear on that at all.  The video shows other

6    guns.

7                    MR. PATTERSON:  Correct.  And my

8    argument would be that they couldn't -- they can't

9    prove that whatever they were carrying could propel a

10   projectile.  Just because it looked real doesn't make

11   it a firearm.  I understand for intent to cause -- put

12   somebody in fear of --

13                   THE COURT:  But you just said this is

14   clear from the video.  It isn't clear from the video.

15   It might be an argument you can make based on the

16   evidence, but it sure as heck isn't clear from the

17   video.

18                   Well, I don't think we're getting

19   anywhere on this tonight.  But I can tell you that

20   looking at this proposed charge, it is not consistent

21   with what you, Mr. Eckert, have articulated as the

22   Government's theory the case.  It seems to focus on

23   Quinn as the aider and abettor, and Stevens or Smith

24   as the principals, but not as the aiders or abettors.

25   We've got to make this a little more clear in

Page 345

1    presenting it to the jury.

2                    Have you read this?  Let me read the

3    second paragraph out loud.

4                    "In this case the Government alleges

5    that Maurice Quinn aided and abetted Abid Stevens and

6    Donnie Smith in committing the offense of using,

7    carrying or brandishing a firearm during and in

8    relation to a crime of violence as charged in the

9    indictment.

10                   "In order to find Mr. Quinn guilty of

11   this offense" -- because he aided Stevens and Smith in

12   committing this offense -- "you must find that the

13   Government proved beyond a reasonable doubt that each

14   -- each of the following three requirements."

15                   That clearly shows -- articulates the

16   theory that Quinn is being charged as the aider and

17   abettor and not Stevens or Smith.

18                   And then it goes on to say, first, the

19   first element, Quinn was an active participant in the

20   Hobbs Act robbery as charged in the indictment.  I

21   thought you told me -- argued yesterday that he was

22   not an active participant and that there was a

23   question whether -- well, this requires that the jury

24   find that Quinn was an active participant.  And what

25   happens if they find in Count I that he is not guilty

Page 346

1    of Hobbs Act robbery?  What does this do to the

2    Government's theory?

3                    MR. ECKERT:  Right.  I mean, is the

4    Court asking about the verdict slip or the

5    inconsistent verdict or just -- I think that that's

6    accurately stated that in order to get to -- he has to

7    be an active participant in the Hobbs Act robbery to

8    be found guilty of Count II.  But I still -- as I

9    stated yesterday --

10                    THE COURT:  Well, if -- they've got to

11   prove that to find him guilty, then Ms. Meehan argues

12   that these -- if he's found not guilty on Count I,

13   Hobbs Act robbery, then the jury should not proceed

14   further with the interrogatory on Count II.

15                    MR. ECKERT:  I don't believe that to be

16   an accurate statement of law based on my -- the

17   converse -- the email I received from Mr. Zalsner last

18   night.

19                    THE COURT:  You believe it -- you

20   believe what to be inaccurate?

21                    MR. ECKERT:  I don't believe that to be

22   an accurate statement of the law, that the jury should

23   not reach Count II by virtue of an acquittal on Count

24   I.  I believe that the -- that charge is proposed by

25   Ms. Meehan and agreed to by the Government first that

Page 347

1    Mr. Quinn was an active participant in the Hobbs Act

2    robbery.  I believe that's an accurate statement of

3    the law, just to the element of aiding and abetting

4    absolutely.  But I do not believe that by virtue of an

5    acquittal on Count I that they do not deliberate on

6    Count II.

7                 THE COURT:  Well, to acquit on Count I

8    they have to find that he was not an active

9    participant.

10                MR. ECKERT:  Right.  I understand what

11   the Court's saying.  I'm not trying to be difficult or

12   disrespectful.  I just -- that's what -- I sent Mr.

13   Zalsner both verdict slips and I said, this issue has

14   been raised.  He said per the Powell case inconsistent

15   verdicts are permitted and the jury should still

16   deliberate on Count II.  That's not to say there's any

17   issue with this as a statement of the law, the

18   elements as stated in the proposed accomplice

19   liability charge.

20                MS. MEEHAN:  Judge, that has to be

21   wrong.  I'm not disputing the holding of the Powell

22   case, but as it applies to this, if Mr. Quinn is found

23   not guilty of robbery, the crime of violence, he can't

24   be guilty of using and carry -- as aiding and abetting

25   or using and carrying or brandishing a firearm in

1    connection with robbery, a crime of violence.

2                    THE COURT:  Well, the way to handle

3    that is to submit -- I have two choices, to submit it

4    to the jury or not.  If I don't submit it to the jury,

5    the Government is out of the box.  If I do and it's

6    wrong, we can set aside the conviction.  Of course

7    Quinn doesn't want that to happen, but that would be

8    better than leaving the conviction stand.

9                    But that's what I would be inclined to

10   do if I conclude their might be an inconsistency.

11                   All right.  We've spent a lot of time

12   on this.  Are there any other issues with respect to

13   accomplice liability?

14                   MR. ECKERT:  Not from the Government,

15   Your Honor.

16                   THE COURT:  Anyone else?

17                   MR. PATTERSON:  No, Your Honor.

18                   THE COURT:  All right.  Then let's go

19   back to Pinkerton liability.  I think it's, is it 28?

20   Yes.

21       (Pause)

22                   THE COURT:  I think it might be 27.

23   Any issue with respect to the Pinkerton liability

24   charge?

25                   MR. ECKERT:  Not from us, Your Honor.

Page 349

1                    MS. MEEHAN:  Yes, Your Honor.

2                    THE COURT:  What?

3                    MS. MEEHAN:  Okay.  Well, again, under

4       the facts of this case I'm looking at the second

5       paragraph, crimes and acts were committed to help

6       further or achieve the objective of the conspiracy.

7       First of all, there's already two problems with that.

8       It's unclear what the objective is of this so-called

9       conspiracy.  There's no evidence of a conspiracy

10      because there's absolutely -- and Your Honor used the

11      best word of all this morning.  Your Honor said, well,

12      it seems somewhat spontaneous because it was

13      spontaneous.

14                    And then finally --

15                    THE COURT:  Well, spontaneous can spill

16      out over a period of however long that -- the incident

17      was videotaped.  How long did it go from start to

18      finish, 20 minutes --

19                    MS. MEEHAN:  Ten -- no ten --

20                    THE COURT:  -- 30?

21                    MS. MEEHAN:  I would say ten or 15,

22      Your Honor.  Between 4:50 and I think Mr. Stevens --

23      I'm sorry -- yeah, Mr. Stevens left at 5:05.  But

24      really the other individuals had left around 5:00.

25                    But then we have -- come to the

Page 350

1    language of were reasonably foreseeable to Donnie

2    Smith, Abid Stevens and Maurice Quinn.

3                    THE COURT:  Where are you reading?

4                    MS. MEEHAN:  I'm sorry.  I'm in the

5    second paragraph --

6                    THE COURT:  I see.  Yeah.

7                    MS. MEEHAN:  And it's hard to fathom

8    what would be reasonably foreseeable to them under

9    this set of facts.

10                   THE COURT:  How do you answer that?

11                   MR. ECKERT:  The object would be to

12   take the money.  I mean, it -- a conspiracy could be

13   formed in an instant.  They were outside.  They were

14   inside.  They could absolutely form a conspiracy in

15   the instance that the three of them are outside which

16   is granted only a few seconds.  When they come back in

17   and they advance upon the complainant into the back of

18   the room they can form the conspiracy then.

19                   I don't -- and I think the object is

20   clear from the evidence that the object it to take the

21   money on behalf of Quinn, whether that's a taking or

22   not is obviously going to be heavily discussed.  But

23   the object is -- of everyone's actions is quite clear.

24                   THE COURT:  And you think there was an

25   opportunity to form the required conspiracy when they

1    were all three -- when Quinn left the store and then

2    came back and -- or the three of them then came back?

3                    MR. ECKERT:  Yes.

4                    MS. MEEHAN:  But there's no evidence

5    that that happened, Your Honor, zero.  In fact, they

6    could have had evidence, but they chose not to save

7    the evidence if there was any such evidence.

8                    THE COURT:  Well, there's evidence that

9    the three of them were out together and they went

10   back.

11                   MS. MEEHAN:  No, there is no evidence

12   that they were out together.  That's the problem.

13   They may have been outside of the store.

14                   THE COURT:  They came back in rapid

15   succession.  Well, I -- I'm not so sure I agree with

16   you on that subject.  The evidence is not -- certainly

17   not clear.  There were no meetings of record.  But

18   Quinn left and in short order he came back, and

19   followed by the other two.  And my recollection is

20   they followed very soon after one another.

21                   MR. ECKERT:  Right.  So Quinn stands in

22   the door, which is why the store is not closed.  It is

23   at that -- but they are -- Quinn is outside before

24   that.  First of all, Quinn and Stevens when they're in

25   the store it's quite clear based on the way they're

Page 352

1    talking to the complainant that they could have then

2    reached an agreement.

3                    Second, just by the way the fact that

4    Mr. Smith and Mr. Stevens enter the store and

5    immediately draw their weapons, it's clear that they

6    know exactly what's going to happen when they go into

7    the store.

8                    MS. MEEHAN:  Your Honor, I -- that's a

9    stretch.  That really is.  And I think -- first of

10   all, Mr. Stevens and Mr. Quinn, sorry, are outside of

11   the store.  And, again, we don't know if they're

12   together.  They're outside of the store for a period

13   of two seconds.  That's it.  Two seconds.  We know

14   from the witnesses, we don't hear any conversations

15   about anything but take -- give me my money, give me

16   my money, give me my money, and Mr. Smith is alleged

17   to have made this -- take all the money, which we know

18   doesn't happen.

19                    So if that's the objective --

20                    THE COURT:  Well, is there any evidence

21   --

22                    MS. MEEHAN:   -- is to take all the

23   money, that didn't happen.

24                    THE COURT:  Is there any evidence, did

25   Mr. Ventura testify as to what Stevens said when he

Page 353

1    was --

2                  MR. ECKERT:  He --

3                  THE COURT:  -- in the store?

4                  MR. ECKERT:  I'm sorry.  I don't -- may

5    I?

6                  THE COURT:  Yes.

7                  MR. ECKERT:  There's evidence in the

8    record that Mr. Stevens said to Mr. Ventura, I'll be

9    back.

10                 Also, in response to the point that's

11   been raised, the only reason that all the money wasn't

12   taken is because Mr. Quinn couldn't open the register.

13   There's a plethora of evidence there that Mr. Quinn

14   was trying to open the register and he was

15   unsuccessful and that's why the complainant then goes

16   back and gives him the $100.  But the --

17                 THE COURT:  Boy, if you think that was

18   clear from the video.

19                 MR. ECKERT:  I'm not saying it's clear.

20   I'm saying it's an inference that can be argued based

21   on the evidence in the record.

22                 MS. MEEHAN:  Your Honor, there was cash

23   on top of the register and there was more money in the

24   register.  That is in the record.  That's crystal

25   clear.  None of that went to Mr. Quinn.  $100 in five

Page 354

1   $20 bills went to Mr. Quinn.

2                   MR. ECKERT:  Because he --

3                   MS. MEEHAN:  That's it.

4                   MR. ECKERT:  -- couldn't open --

5                   THE COURT:  That's all the money that

6   was taken.

7                   MR. ECKERT:  Right.

8                   MS. MEEHAN:  Correct.  Correct.

9                   MR. ECKERT:  But he goes back there and

10  he tries to open the register and he can't figure out

11  how to do it.  Yes, there's a dollar laying on top of

12  the register.  There's a dollar or $2.  That's

13  absolutely correct.  But we can argue to the jury that

14  had Mr. Quinn opened the register, he would have had

15  access to all the money.  He can't do it.  That's the

16  only reason he sends the complainant back there.

17                  MS. MEEHAN:  Your Honor --

18                  THE COURT:  That happens after.

19                  MS. MEEHAN:  But, Your Honor, if I may,

20  he -- Mr. Ventura could have been forced -- he used

21  the word forced -- to give all of the money in the

22  register.  That's what normally happens in a robbery.

23  That's what normally happens.  And that would have

24  been the objective is to take merchandise and money,

25  as much money as possible.  That's ordinarily what the

1    common objective is in a conspiratorial robbery.

2    That's not what happened here.  And -- but the most

3    important thing is there's absolutely no evidence that

4    there was forseeability (sic) in this case because

5    there's no evidence that they did anything outside of

6    the store, that there was enough time to do anything

7    out of the store to form this agreement.  That's the

8    main problem with the Government's evidence.

9              And I think this instruction is really

10   confusing and I object to the -- for a variety of

11   reasons, for achieving the objective.  It's not clear

12   what the objective is.  Mr. Quinn's objective is $100

13   that was given -- that came out of the ATM machine.

14   And reasonably foreseeable, it's hard to discern what

15   would be reasonably foreseeable under this set of

16   facts to any of these defendants.

17             And then for the conspiracy there's

18   just insufficient evidence of what, if anything,

19   transpired outside of the store.  If they had a text

20   message -- there's no -- not even a phone call.  We

21   heard phone evidence today, Your Honor.  There's no

22   phone contact between Mr. Smith and Mr. Quinn before

23   the alleged robbery.  There's a phone call 20 -- 40

24   minutes after, but if there was some indication that

25   there was communication between the three of them,

1    that would be a little bit different.  I would still

2    argue that there's issues with the objective and

3    what's foreseeable.  But I think there are a lot of

4    problems with this instruction.

5                    MR. WITTELS:  Judge, if I may, this is

6    where had -- if they had gotten the video from the

7    outside camera we would have more information.  But

8    they didn't.  We have no idea what Quinn said, if

9    anything, when he went outside.

10                   THE COURT:  We would never know what

11   Quinn said, if anything.

12                   MR. WITTELS:  We will never -- he could

13   have said, Jay drew his gun, and they went in to see

14   what was going on.

15                   THE COURT:  Well -- and he could have

16   said that they took $100 of Quinn's money.  Let's go

17   get it.

18                   MR. WITTELS:  Could they, Judge, but

19   then we're engaging in speculation.

20                   THE COURT:  Both sides.  But --

21                   MR. WITTELS:  I understand.

22                   THE COURT:  -- I wonder if there's

23   enough circumstantial evidence by the fact that they

24   were -- Quinn was in the store, left the store after

25   saying I'll be back, and came back very shortly

1     thereafter followed almost immediately by Smith and
2     Stevens who had guns drawn.
3                     MS. MEEHAN:  But they didn't have their
4     guns drawn when they went in.
5                     THE COURT:  Are they --
6                     MS. MEEHAN:  Mr. Smith did not.  It
7     wasn't until he went to the very back of the store and
8     then pulled out his --
9                     THE COURT:  All right.  Well, in any
10    event, the question is whether I submit this to the
11    jury and I don't think I'm going to take it away from
12    the jury at this stage.  So --
13                    MR. PATTERSON:  Your Honor, I just have
14    a very brief statement.  I might be very far afield on
15    this statement, but I have had cases in federal court,
16    not a lot of trials, but it's -- conspiracies are
17    usually charged in the indictment.  It goes to the
18    grand jury.  The grand jury --
19                    THE COURT:  Mr. Patterson, I am well
20    aware of that.
21                    MR. PATTERSON:  I understand.
22                    THE COURT:  I'm also aware of Pinkerton
23    liability.  Are you aware of Pinkerton liability?
24                    MR. PATTERSON:  I believe -- I read it
25    last night so I'm -- I have a working knowledge of it.

1              THE COURT:  And what it says is a

2     member of a conspiracy who commits a crime poses a

3     real problem for co-defendants who are also members of

4     the conspiracy who can be found guilty of the crime by

5     virtue of the fact that there is a conspiracy and one

6     member of the conspiracy ahs committed a crime.

7     That's Pinkerton.

8              And Pinkerton liability is still the

9     law.  I think it unnecessarily complicates cases.  And

10    as I know you heard me, I inquired whether the

11    Government would consider removing that charge which

12    would remove God knows how many pages from the charge

13    and make it a little easier for the jury to comprehend

14    the issues in this case.

15              I think the problem in the case is that

16    we've taken a simple set of facts and we made it very,

17    very complicated for the jury.  And I think that

18    reduces the chance that they'll get it right or get it

19    consistent.  And I know inconsistent verdicts are not

20    a problem in federal court.  But I'm not happy with

21    the way the case is being presented.

22              Now making me happy is not a goal of

23    the lawyers in the case.  But I just want to make it

24    as clear as possible to the jury.  And I can tell Mr.

25    Eckert and I'll tell him again that this proposed

1   instruction, proposed as a joint instruction, is

2   inconsistent with what you've argued to me tonight as

3   your theory of liability, criminal liability.

4                So we'll decide what to do.  We might

5   make it a little more generic than this charge.

6                Is there anything you want to fall back

7   on taking a look at my instructions, and I'm talking

8   about Pinkerton liability and aiding and abetting with

9   respect to Count II?  Anything that you think needs

10  clarification?

11               MR. ECKERT:  Not about those two, Your

12  Honor.  I did have perhaps one other issue, but it's

13  unrelated.  I'm happy to address that later.

14               THE COURT:  Well, I -- we're not going

15  anywhere here tonight.  You've dropped too much on me

16  at the last minute.  I don't know what you were

17  thinking we would do.

18               Is there anything else on the charge

19  that needs to be addressed tonight?

20               MR. ECKERT:  Your Honor, the unlawful

21  taking charge for Hobbs Act, element one, I just need

22  to look at --

23               THE COURT:  And what page is that?

24               MR. ECKERT:  I have the old -- I might

25  have the old copy.  It was page 35, so I just need to

Page 360

1    -- yes.  Page 27, right?

2                    MS. MEEHAN:  Oh, I'm -- you're right.

3    27.

4                    MR. ECKERT:  I was just --

5                    THE COURT:  It's instruction -- I'm

6    sorry.

7         (Pause)

8                    THE COURT:  Yes.

9                    MR. ECKERT:  Right.  And just that the

10   second line, I believe, should refer to the store that

11   was charged, the RD Grocery rather than naming of the

12   complaining witness.

13                   MS. MEEHAN:  I -- no objection, Your

14   Honor.

15                   MR. PATTERSON:  No objection.

16                   MR. WITTELS:  I agree.

17                   MR. ECKERT:  I just think it's

18   confusing if it has the victim's name rather than the

19   entity given that it's a commercial -- alleges a

20   commercial robbery.

21                   THE COURT:  And we're looking at page?

22                   MR. ECKERT:  27, Your Honor.

23                   THE COURT:  Not page 27.

24                   MS. MEEHAN:  Yes, page 27.  Number 23,

25   page 27.

1          THE COURT:  What page is it?  It's not

2   23.

3        (Pause)

4          THE COURT:  Yeah.  We'll certainly do

5   that.  I missed that.

6        (Pause)

7          THE COURT:  Does the indictment charge

8   against its will?

9          MR. ECKERT:  I believe so.  I don't --

10  my copy, I believe, is in the cart if I just may get

11  it, Your Honor.

12          THE COURT:  We can get it.

13          MR. ECKERT:  Thank you.

14        (Pause)

15          THE COURT:  It says from employees.

16  That's the way they handled it.  So we'll change it to

17  took property of employees of R&D Grocery -- RD

18  Grocery against their will.

19          All right.  That takes care of that.

20          Any other objections?

21          MR. ECKERT:  No, Your Honor.  Thank

22  you.

23          THE COURT:  Mr. Patterson.

24          MR. PATTERSON:  No, Your Honor.  Thank

25  you.

Page 362

1                    MR. WITTELS:  Nothing, Judge.

2                    MS. MEEHAN:  Nothing more, Your Honor.

3                    THE COURT:  All right.  Are there any

4    blanks that need to be filled in?

5                    MR. ECKERT:  I don't know that, Your

6    Honor.

7                    THE COURT:  Pardon me.  Well, there are

8    lots of blanks.  Let's go back.  Page -- well, it's

9    point number 8, expert witnesses.  I don't think we

10   need to include the names of the experts.  Does anyone

11   disagree?

12                   MR. ECKERT:  I have no issue with that,

13   Your Honor.

14                   MR. PATTERSON:  I have no issue, Your

15   Honor.

16                   THE COURT:  Mr. Wittels, any --

17                   MR. WITTELS:  No issue.

18                   THE COURT:  Ms. Meehan?

19                   MS. MEEHAN:  No.  No, Your Honor.

20                   THE COURT:  All right.  We'll revise 8

21   to eliminate the experts by name.

22                   Who does the Government believe were

23   the experts, the ATF -- the police identification

24   expert on the gun.

25                   MR. ECKERT:  Right, Your Honor, the FIU

Page 363

1    expert and the ATF expert, both which testified today.

2                   THE COURT:  By the way, the ATF expert,

3    did you discuss agreeing?  I've tried I don't know how

4    many --

5                   MR. ECKERT:  We --

6                   THE COURT:  -- 924(C) counts.  And I've

7    never had a nexus expert testify.

8                   MR. ECKERT:  We proposed stipulations,

9    yes, Your Honor.

10                  THE COURT:  And that was rejected?

11                  MR. ECKERT:  I don't -- I think some of

12   the -- we absolutely proposed stipulations.  The --

13   what was -- yeah.  I'm not sure.  I believe it was Mr.

14   Smith who didn't want to stipulate, but I don't want

15   to speak for you guys.

16                  THE COURT:  All right.

17                  MR. ECKERT:  Not today.  It may have

18   been different.  But when we proposed them weeks ago

19   it was reported to me that the only stipulation that

20   was willing to be entered into was the prior

21   conviction.

22                  MR. PATTERSON:  Correct.  And the nexus

23   for the interstate --

24                  MR. ECKERT:  Right.

25                  MR. PATTERSON:  -- with the firearm.

Page 364

1                    MR. ECKERT:  Right.

2                    MR. PATTERSON:  Yes.

3                    THE COURT:  He would not agree to that?

4                    MR. ECKERT:  Correct, Your Honor.

5                    MR. PATTERSON:  No, he would agree to

6     that.

7                    MR. ECKERT:  Today.

8                    MR. PATTERSON:  Right.

9                    MR. ECKERT:  Today it was reported to

10    me that potentially he may have changed his mind, but

11    we didn't have the written stipulation.

12                    THE COURT:  Right.  Well, we'll -- the

13    evidence is in.

14                    MR. ECKERT:  Thank you.

15                    THE COURT:  We'll change the charge on

16    -- well, it's Charge Number 8 without identifying the

17    experts.  And we'll talk about any experts.  You will

18    argue which experts were covered.

19                    Page 17 of the charge is Charge Number

20    11, stipulations.  In that proposed Third Circuit

21    charge the stipulations are set forth.  The way you've

22    handled stipulations is as bad as the way you've

23    handled exhibits.  Many of them were not reduced to

24    writing.  I don't have them.  I have one.  I have Mr.

25    Patterson's stipulation on the prior conviction.

```
 1                    How do you want to handle stipulations?
 2                    MR. ECKERT:  I'm not sure, Your Honor.
 3    I just would ask for a moment to think about that.
 4    I'm not sure if you want to reiterate topics now or in
 5    the instructions.
 6                    THE COURT:  Well, I don't -- we don't
 7    have to.  What we can say is, there were a number of
 8    stipulations.  How are they going -- how are they
 9    embodied?  I haven't seen any written -- well, I've
10    seen one written stipulation.
11                    MR. PATTERSON:  And that stipulation
12    would be for the second part, the bifurcated --
13                    THE COURT:  Yes.
14                    MR. PATTERSON:  -- that we read to the
15    jury.
16                    THE COURT:  Yes.  Well, how do you want
17    to --
18                    MR. ECKERT:  We can make a list of the
19    topics if the Court wanted, I'm fine, which the
20    Government and the defendants had agreed to that
21    certain facts are true.  You should therefore treat
22    these facts as having been proved and the parties
23    would be free to argue them in their closing.
24                    But if -- I'm happy to also -- we can
25    -- I'm sure counsel can get together and list out the
```

Page 366

1    topics that were --

2                   THE COURT:  Well, I don't -- we sort of

3    had -- are running out of time.

4                   MR. ECKERT:  Right.

5                   THE COURT:  And you've had this charge

6    since Tuesday.  And I know you're busy, but we've got

7    to do something.  So to say there's nothing else that

8    needs to be done in the charge is a misstatement.

9                   MR. ECKERT:  I'm sure I would know some

10   of them, but I wouldn't want to say three of them and

11   miss the fourth one and that's not fair to --

12                  THE COURT:  Is it agreed then that we

13   should just refer generically to stipulations?

14                  MR. WITTELS:  I think that would be

15   best, Judge, as far as --

16                  THE COURT:  All right.

17                  MR. WITTELS:  -- as the testimony.

18                  THE COURT:  Have agreed that --

19                  MR. PATTERSON:  I was thinking out loud

20   maybe they should hear rather than generalized

21   stipulations, stipulation that the -- we all agree

22   that the people depicted on the video are our clients.

23   I think that's important that we're --

24                  THE COURT:  Are what?

25                  MR. PATTERSON:  That they're -- our

```
1    clients stipulated that it's them, that they didn't

2    have to present any evidence with respect to the photo

3    identification or lineups.  We have stipulated that

4    the people in the video are, in fact, our clients.

5               MR. ECKERT:  I would have no issue with

6    them saying -- with the Court saying exactly that;

7    that the defendants have stipulated that the people in

8    the video are their clients.  But the second part of

9    that we would --

10              THE COURT:  The way I would describe

11   the handling of stipulations in the case is

12   diaphanous.  That means very filmy.

13              MR. PATTERSON:  I was going to have to

14   look that up, but thanks for telling me.

15              THE COURT:  My God.  I know that

16   identification is not an issue.  I had to remind Mr.

17   Wittels when he started cross-examining a witness on

18   identification right after there was a statement on

19   the record that we stipulated to identification.

20              I think what we ought to have is a list

21   of the stipulations or they ought to be reduced to

22   writing and we ought to have the -- we ought to have a

23   record and there is none.  So this is a comeback to

24   point.  And if this were the beginning of the trial or

25   some date prior to the trial that would be great.  But
```

Page 368

1    it's not.  It should have been done before.  So we

2    need stips in writing and then we'll decide how to

3    handle them.  We can handle them by subject without

4    going into the details, but I want the stipulations in

5    writing.

6         (Pause)

7                   THE COURT:  Next, we've got to come

8    back to defendant's choice not to testify and to

9    testify.  We'll wait and see what happens.

10                   Smith and Stevens submitted a point per

11   charge on prior statement of non-testifying defendant

12   in multi-defendant trial.  Is that in the case?

13                   MR. PATTERSON:  It's not, Your Honor.

14                   MR. WITTELS:  It's no longer pertinent.

15        (Pause)

16                   THE COURT:  And unlawful taking by

17   force defined, we'll change that as I stated.

18        (Pause)

19                   THE COURT:  By the way, I didn't mean

20   to cut off the defense argument on the Pinkerton

21   liability.  But if you can find one case that says the

22   Court should not charge the jury where the evidence of

23   conspiracy is thin, but there's some evidence that the

24   Government can argue is a basis for Pinkerton

25   liability, that -- where there is a certain level of

                                        Page 369

1    evidence the Court should not so charge, I would be

2    delighted to agree with you.  Right now you've shown

3    me nothing.

4                    MS. MEEHAN:  Very well.

5                    THE COURT:  And aiding and abetting, I

6    think you've -- we've done enough.  I have to go -- I

7    have to do some homework.

8         (Pause)

9                    THE COURT:  Take a look at the charges,

10   Point 24.  It's page 30, the second paragraph.  It

11   involves Ventura.  And it says, your decision whether

12   Smith, Stevens and Quinn used or threatened fear of

13   injury, and this is the object charge, involves a

14   decision about Joel Ventura's state of mind at the

15   time of Smith, Stevens and Quinn's actions.

16                    I think that -- I'm just calling it to

17   your attention.  I think it's appropriate.

18                    Government have any comment about it?

19                    MR. ECKERT:  Whether it's appropriate

20   to use his name there, Your Honor?

21                    THE COURT:  Well, we have to -- well,

22   we have to use someone's state of mind.  I don't want

23   to go back to the beginning.

24                    MR. ECKERT:  No.  I think it makes

25   sense the way the Court had drafted it.

Page 370

1                  THE COURT:  Is there any issue with
2      respect to that second paragraph of the Hobbs Act
3      charge on Element 1, clear injury?  I think it's okay.
4           (Pause)
5                  THE COURT:  Maybe we have to add
6      Sanchez or the store owner.  There is evidence --
7      Sanchez said he was -- well, he felt threatened.  I
8      think that was his word.
9                  MR. ECKERT:  Your Honor, I guess it
10     would meet the element if it was either Mr. Sanchez or
11     Mr. Ventura, but I wouldn't -- I do not think Ms.
12     Rodriguez would apply because she was not in the store
13     at the time of the robbery.
14                 MR. PATTERSON:  I would agree with
15     that.
16                 THE COURT:  So we'll change that to a
17     decision about the state of mind of Joel Ventura and
18     Emanuel Sanchez.  I don't think we need any more but
19     -- description than that, at the time Smith -- at the
20     time of Smith, Stevens and Quinn's actions.  And in
21     the last sentence of that paragraph whether Joel
22     Ventura or Emanuel Sanchez was in fear and whether the
23     fear was reasonable.
24                 All right.  Is there anything else,
25     Ryan?

Page 371

1          (Pause)

2                    THE COURT:  Well, what all this is

3     telling me is that you're not really prepared for the

4     charging conference tonight.  There are lots of blanks

5     that need to be filled in that we were supposed to

6     fill in at the second part of the charging conference.

7     And we didn't -- we're not doing it.

8                    Let me go to -- it's page one of the

9     Pinkerton charge, 35.  On page 2 of that charge, page

10    36, there's some bracketed portions.  We forgot to

11    include in that Pinkerton charge one or more of the

12    other members of the conspiracy.  I think we should

13    still -- we should say including one of them.

14                   MS. MEEHAN:  What line in the charge

15    are you referring --

16                   THE COURT:  I'm on page 35, the second

17    element of the Pinkerton charge, second line from the

18    bottom of that page.

19                   MS. MEEHAN:  Oh, I see.  I apologize.

20    Thank you.

21                   THE COURT:  What this tells me is we're

22    probably not going to end up charging tomorrow.

23          (Pause)

24                   THE COURT:  I wonder why -- the word

25    other doesn't work there.

Page 372

1            Mr. Eckert --

2            MR. ECKERT:  Yes, Your Honor.

3            THE COURT:  You're not on vacation.

4    This Pinkerton charge doesn't work and you were

5    responsible for presenting a Pinkerton charge because

6    you're really the motivating factor behind including

7    it.  It doesn't work, so it's going to have to be

8    carefully analyzed.  We're going to have to have

9    another conference tomorrow.  I don't want to do it,

10   but we're going to have to.

11            Right now it reads, page 35, second,

12   that while Smith, Stevens and Quinn were still members

13   of the conspiracy, one or more of the other members of

14   the conspiracy.  Well, there were no other members of

15   the conspiracy.  And adding the words, including one

16   of them makes no sense because we've used the word,

17   other.   So we have to take out the word other, it's a

18   very critical word, and then it works.

19            I think we're going to have to re-visit

20   tomorrow the Pinkerton charge, the conspiracy charge

21   to make sure it all works, and the -- again, the

22   aiding and abetting charge with respect to Count II.

23   I don't know that we can get anything else

24   accomplished tonight.

25            Does everyone in the courtroom have the

Page 373

1    revised charge, the Tuesday charge?

2                    MR. ECKERT:  I do, Your Honor.

3                    THE COURT:  Well, we'll make extra

4    copies if you don't.  We're not going to do it

5    tonight.  We'll make extra copies for use tomorrow.

6                    Do you have one, Mr. Patterson?

7                    MR. PATTERSON:  No, Your Honor.  I have

8    the -- apparently I'm a page off of what we've been

9    discussing.

10                   THE COURT:  No.  But there were

11   changes.

12                   MR. PATTERSON:  I understand.  I don't

13   have those.

14                   THE COURT:  Mr. Wittels?

15                   MR. WITTELS:  Do I have a charge -- a

16   copy of your revised charge?

17                   THE COURT:  Yes.

18                   MR. WITTELS:  Yes, I do.

19                   THE COURT:  Okay.

20                   MR. WITTELS:  Right here on my phone.

21                   THE COURT:  Ms. Meehan, do you have the

22   revised charge?

23                   MS. MEEHAN:  I think so, Your Honor,

24   but I managed to somehow --

25                   THE COURT:  Well, they're dated.

Page 374

```
 1                    MS. MEEHAN:  -- mix it up.
 2                    THE COURT:  Oh, that's --
 3                    THE CLERK:  January 28th is the most
 4    recent.
 5                    MS. MEEHAN:  Was that emailed to us?
 6                    THE CLERK:  Yes.
 7                    MR. WITTELS:  Yeah, it was.
 8                    MS. MEEHAN:  Okay.
 9                    THE CLERK:  It was emailed Wednesday
10    morning.
11                    THE COURT:  Hold on.  We know you got
12    it.
13                    MS. MEEHAN:  Yes.  Oh, I certainly did,
14    Your Honor.  Yes.
15                    THE COURT:  I'm talking about whether
16    it's here in court.
17                    MS. MEEHAN:  No.  I'm -- I -- well, it
18    is, but I've been sort of shuffling between mine and
19    yours and --
20                    THE COURT:  All right.  Well, before we
21    leave the charge, what remains to be done tomorrow?
22    We're going to decide -- I guess we still have to
23    decide on whether Smith will testify.
24                    MR. PATTERSON:  Correct.  And I'll have
25    that answer as soon as possible.  As I understand it,
```

Page 375

1    the Government's last witness is going to be five

2    minutes and then if my client doesn't testify I won't

3    be putting anything on my side of the case.  I don't

4    know what the other -- my other colleagues are going

5    to do.

6                    THE COURT:  Well, if that happens, and

7    Mr. Wittels has already said his client is not going

8    to testify.  And, Ms. Meehan, you don't know yet.

9    I'll -- we'll go over the motions in limine.  The

10   testimony might finish mid-morning, maybe a little

11   later.  We're starting at ten.

12                   MR. PATTERSON:  And that's another

13   issue.  I was informed that my client would be

14   available in the marshal's office hopefully by 9:00

15   tomorrow.  I'm hoping an hour should be fine for me to

16   discuss his right to testify.  I will attempt to get

17   that done in an hour.

18                   THE COURT:  All right.  Well, we'll get

19   to work on the charge tonight.

20                   All right.  I think maybe we're ready

21   to turn to the motions in limine.  And I think we can

22   be brief.

23        (Pause)

24                   THE COURT:  All right.  I don't really

25   need argument.  I'm going to confirm what convictions

Page 376

1    are extant and I think I can rule on that in that way.

2                    There are three motions in limine,

3    Documents 84, 85, 86.  Ms. Meehan responded, Document

4    90.  In ruling on a motion in limine, we're talking

5    about a motion in limine to exclude evidence of prior

6    convictions in order to impeach -- well, the reason

7    for the evidence would be to impeach the defendants

8    should they testify in trial.

9                    Federal Rule of Evidence 609(a)(1)

10   provides that evidence of a prior conviction must be

11   admitted in a criminal case in which the witness is a

12   defendant if the probative value of the evidence

13   outweighs its prejudicial effect to that defendant.

14   In deciding that issue, the Court must determine the

15   following: One, the nature of the prior crime.

16                    And in deciding that, the courts

17   consider the impeachment value of the prior conviction

18   as well as its similarity to the charged crime.  If it

19   is similar to the charged crime, the -- well, that

20   weighs substantially against admissibility.

21                    The Court must consider also the age of

22   the prior conviction, the importance of the

23   defendant's testimony, and the importance of the

24   defendant's credibility.

25                    Cases have held and I have held that

Page 377

1    where the past conviction was basically the same, or

2    was substantially the same crime as the crimes

3    charged, the prior conviction would be excluded.  I

4    ruled that way at least twice.  I don't know that you

5    need the cites.  United States versus Camacho was one,

6    Westlaw 5069866 at *3, EDPA, December 6th, 2010.  The

7    second case, United States versus Cherry, 210 Westlaw

8    3156529 at *6, my case again, August 10th, 2010.  That

9    must have been a big year for government efforts in

10   impeachment.

11              All right.  I don't think the law is in

12   dispute, but I want to know with respect to each

13   defendant the crimes of conviction and I'll rule.

14              MS. MARTIN:  If I may, Your Honor.

15              THE COURT:  You may.

16              MS. MARTIN:  In the motion -- and I

17   apologize.  I realize they are not numbered.  Section

18   3 for Mr. Quinn is --

19              THE COURT:  Let me turn to my summary

20   of that.  Yes.  He was -- he pled guilty.  My notes

21   tell me he pled guilty to four counts of robbery and

22   one count of possessing a firearm during a crime of

23   violence --

24              MS. MARTIN:  Yes, Your Honor.

25              THE COURT:  -- in 2006.

Page 378

1                    MS. MARTIN:  Yes.  And he was -- he

2     served -- well, he received I believe a sentence --

3                    THE COURT:  Two to five.

4                    MS. MARTIN:  Yes.

5                    THE COURT:  Two to five years.

6                    MS. MARTIN:  And then there's another

7     --

8                    THE COURT:  Yes.  He pled guilty to

9     possession of a firearm --

10                   MS. MARTIN:  Uh-huh.

11                   THE COURT:  -- by a prohibited

12    individual.

13                   MS. MARTIN:  Yes, Your Honor.

14                   THE COURT:  And possession of a firearm

15    with a manufacture number altered, and was sentenced

16    to 11 and a half to 23 months.

17                   Applying my rule, I would exclude that

18    evidence unless you think there's compelling argument

19    in favor of receiving that evidence.

20                   MS. MARTIN:  Your Honor, with regard to

21    the robbery I understand its similarity to the crime

22    charged here obviously.  But the firearms violation, I

23    mean, this entire case comes down to weighing the

24    credibility of the victims that testified, and if Mr.

25    Quinn chooses to testify, his credibility.  I mean,

Page 379

```
 1    the immigration status of our witnesses have been
 2    questioned, their credibility has been questioned.
 3                  THE COURT:  Well, the immigration
 4    status was questioned out of the presence of the jury.
 5                  MS. MARTIN:  Right.  I thought that Mr.
 6    Wittels and Mr. Patterson made issues of his ability
 7    to speak English, when he came to the country, how he
 8    came to --
 9                  THE COURT:  I think --
10                  MS. MARTIN:  -- the country.
11                  THE COURT:  Not how, but when.  I'm
12    still puzzled as to the 20 minutes Mr. Wittels spent
13    trying to get the defendant to admit the date on which
14    he came to the country.  I suspected it was because he
15    was testing his fluency with English, but I don't have
16    an answer to that question.
17                  But I don't think what you're arguing
18    to me now withstands the 403 test.
19                  MS. MARTIN:  I understand, Your Honor.
20                  THE COURT:  I -- so with respect to
21    Defendant Quinn, I find that the probative value of
22    the evidence is exceeded by the prejudice to Mr.
23    Quinn.  And so those two convictions for Mr. Quinn
24    will be excluded.  The Government's motion in limine
25    with respect to Mr. Quinn is denied.
```

Page 380

1                    MS. MEEHAN:  Thank you, Your Honor.

2                    THE COURT:  The other defendants, we'll

3       take Stevens next.  In 2001 he was arrested and

4       charged with multiple firearms violations, found

5       guilty and sentenced to 11 months, 15 days to 23

6       months confinement and five years probation.  And he

7       violated his probation numerous times so he was in

8       custody for a lot longer than the initial sentence.

9                    That conviction is similar to the prior

10      crime.  It's similar to the crime charged and that

11      certainly weighs against admission.

12                   I think with all of them, the factors

13      are going to be the same.  The evidence of the prior

14      crime argues against admission, the similarity to the

15      prior crime is what I'm focused on.  The fact that the

16      convictions are old argues against admission.  The

17      importance of the defendant's testimony and

18      credibility favor admission.

19                   But with nothing more and with those

20      multiple firearms violations in 2001, I conclude

21      weighing the four factors that those firearm -- that

22      firearm conviction should not be received.

23                   Now Stevens was arrested and charged

24      with multiple firearm violations in 2007, found

25      guilty, sentenced to a longer term.  And for the same

1    reasons I'm going to exclude those convictions.

2               Finally, Smith, he -- I didn't realize

3    this was his second conviction.  This is his second

4    charge.

5               MS. MARTIN:  Yes, Your Honor.

6               THE COURT:  Only one prior conviction.

7    He was convicted of possession of a firearm by a

8    convicted felon in 2012.  And in 2013 was sentenced to

9    imprisonment for 46 months and three years of

10   supervised probation.  Was that in this court, by the

11   way, do we know?

12              MR. ECKERT:  It was, Your Honor.  That

13   -- he has other offenses, but that was the only one

14   that we submitted for potential impeachment.

15              THE COURT:  That was not my case, was

16   it?

17              MR. ECKERT:  No.  It was Chief Judge

18   Sanchez, I believe, Your Honor.

19              THE COURT:  All right.  I think in this

20   case as with the others the four factors weigh as I've

21   stated.  The nature of the prior crime and the --

22   well, not so much the age, but the nature of the prior

23   crime is the touchstone of my decision.  I think that

24   argues against admission.  The crime is not so old as

25   to warrant exclusion on that ground.  And the

Page 382

1    defendant's testimony and his credibility are

2    certainly important in this case.

3                    So with respect to all of the motions,

4    the three motions, it's the similarity between the

5    crimes of conviction and the crimes charged in this

6    case that lead me to conclude that the motions in

7    limine should be denied.

8                    I rule that the probative value -- let

9    me get Rule 403 out.  I want to make sure I use the

10   exact language.  I think it's the probative value is

11   exceeded by the danger of unfair prejudice.

12                   Ms. Meehan, don't leave when --

13                   MS. MEEHAN:  I'm sorry.  I'm not.

14                   THE COURT:  -- I'm giving a mini-

15   lecture on unfair prejudice because you've argued that

16   what the Government is trying to do is prejudicial.

17   As far as I can determine, prejudice alone is not

18   enough in a criminal case.  Everything offered against

19   a defendant is prejudicial.

20                   MS. MEEHAN:  True, but it has to be

21   relevant.

22                   THE COURT:  It's unfair prejudice.  And

23   in connection with Rule 403 -- I'm told that it's Rule

24   609 and not 403.  Rule 609 which is the rule governing

25   the admission of these convictions provides that

```
                                              Page 383
 1    evidence of the conviction is admissible only if its
 2    probative values supported by specific facts and
 3    circumstances substantially outweighs its prejudicial
 4    effect.
 5              And I find that the probative value of
 6    the convictions offered as evidence, the credibility
 7    of the defendants should they take the witness stand,
 8    the probative value is not substantial -- does not
 9    substantially outweigh its prejudicial effect.  I
10    think that if the jury finds that these three
11    defendants have been convicted of drug -- of gun-
12    related crimes, the prejudice far exceeds any
13    probative value.
14              MS. MARTIN:  Understood.  Thank you,
15    Your Honor.
16              THE COURT:  All right.  Is there
17    anything else we have to do tonight?
18              MR. ECKERT:  No, Your Honor.
19              MR. PATTERSON:  I would just inquire if
20    my client doesn't testify, does Your Honor think we'll
21    be closing tomorrow or --
22              THE COURT:  We might close tomorrow.  I
23    think I have to, before you close I've got to finalize
24    issues with respect to the charge.
25              MR. PATTERSON:  Right.
```

1          THE COURT:  Not necessarily the

2    language of the charge.  And if I can do that, the

3    answer is yes because the charge is long with the

4    number of charges against the defendant.  The issues

5    that need to be presented is long.  It will take at

6    least two hours, I think, and maybe more.  And I want

7    to try to end the case on Monday.

8          So the answer is, yes.  I would give --

9    there would be a break after -- well, we'll have a

10   little testimony tomorrow.  But there would be a break

11   after that if your client does not testify.  So we

12   would start the closings either late in the morning or

13   early in the afternoon.

14          MR. PATTERSON:  Thank you, Judge.

15          MR. ECKERT:  Your Honor, may I provide

16   two documents?  We received a waiver, the

17   determination of forfeiture by the jury from two of

18   the defendants and we expect the third one tomorrow.

19   I would just ask to provide that to your staff.

20          THE COURT:  Fine.

21          MR. ECKERT:  May I, Your Honor?

22          THE COURT:  Yes.

23          MR. ECKERT:  Thank you.

24          THE COURT:  Now must these -- how

25   should these be addressed?

Page 385

1                    MR. ECKERT:  So it's just a -- I

2      believe it would allow the Court to make the

3      determination if a guilty verdict is reached that

4      forfeiture -- the Court could determine forfeiture.

5      It just deals with the forfeiture of the firearm.  And

6      I believe the $100 is also charged in the forfeiture,

7      but that's really an issue of if there's -- if there's

8      a guilty verdict there would be restitution.  If not,

9      there wouldn't be.

10                   THE COURT:  Do I have to approve these

11     waivers?

12                   MR. ECKERT:  I don't know that the

13     Court specifically needs to do anything.  It's just I

14     -- they have a right to a jury trial on the forfeiture

15     itself if there's a guilty -- it would be after the

16     guilty verdict.  There would be a forfeiture

17     proceeding that would have to go to the jury unless

18     they waive it.  But I believe they're okay with the

19     Court doing it.

20                   THE COURT:  All right.  Remind me again

21     and we'll have to address this if there's a guilty

22     verdict.

23                   MR. ECKERT:  I will, Your Honor.

24                   THE COURT:  And we'll await Mr. Smith's

25     waiver.  Do you have that form?  Is he going to agree

Page 386

1    to that?

2                    MR. PATTERSON:  I didn't broach the

3    subject with him based upon what happened.  I will do

4    that first thing in the morning, Your Honor.

5                    THE COURT:  All right.  Is there

6    anything else we can do tonight?

7                    MR. ECKERT:  No, Your Honor.  Thank

8    you.

9                    MR. PATTERSON:  Thank you, Your Honor.

10                   MS. MEEHAN:  No, Your Honor.

11                   THE COURT:  We're adjourned.

12                   MR. WITTELS:  No, Judge.

13                   THE COURT OFFICER:  All rise.

14        (Proceedings concluded at 7:01 p.m.)

15                    *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

Page 387

1                        CERTIFICATION

2

3            I, Sherri L. Breach, certify that the

4        foregoing is a correct transcript from the official

5        electronic sound recording of the proceedings in the

6        above-entitled matter.

7

8        _____

9        SHERRI L. BREACH, APPROVED TRANSCRIPTIONIST

10

11       Dated:  November 19th, 2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**[& - 210]**                                                                                   Page 1

| & |
| --- |

**&**   1:16 4:17
    149:11,16 254:16

| 0 |
| --- |

**00350**   1:3,3,4
**0304**   196:24

| 1 |
| --- |

**1**   1:3 25:2,5 26:5
    26:12 27:4 45:20
    85:3 370:3 376:9
**1,000**   254:7
**1,219**   163:19
**1-888-777-6690**
    1:25 2:25
**10**   197:24 198:1
**100**   353:16,25
    355:12 356:16
    385:6
**1021**   47:16 232:9
**10:00**   293:15
    295:1 298:6,20
    314:18
**10:10**   295:2
**10:26**   54:24
**10:27**   54:25
**10:28**   56:7,8,15
**10:29**   56:16
**10:30**   221:13
**10:47**   251:2
**10th**   377:8
**11**   47:22 101:25
    198:2,3,7 261:6
    364:20 378:16
    380:5
**11:30**   101:25
**11:41**   131:3
**11th**   273:14
**12**   33:11 65:22
    66:4,5 67:6 68:12
    82:14 101:25

170:4,9 198:7
    225:6
**125**   24:25
**1250**   1:12
**12:51**   177:24
**12th**   76:14 196:15
**13**   3:3 91:12 198:7
    231:25 232:3
    244:8 245:8
    253:19,21 313:14
**1301**   1:18
**131**   4:16
**133**   3:14
**135**   257:2
**136**   169:19 170:10
    257:2
**14**   198:8,9
**1429**   1:17
**149**   4:17
**14th**   32:20 33:17
    65:9,14 76:8
    208:23 209:2
    210:10 212:2
    221:7 271:11
**15**   19:24 82:15
    99:19 101:22
    308:10,12,20
    343:6 349:21
    380:5
**152**   33:20 36:13
    47:20 49:24 51:18
    209:17 210:25
    217:2 221:20
    222:5 232:5 272:1
    272:8 282:13
**15th**   65:18,21
    153:8 196:16,17
**16**   82:25 90:8
    169:21 254:9
**16:58:29**   27:4

**16th**   152:5 206:8
**17**   364:19
**1700**   162:7
**171749**   197:3
**178**   313:10 314:23
**18**   77:6 254:4
**1800**   1:24 2:24
**1801**   1:24 2:24
**18045**   1:15
**1900**   314:24
**19102**   1:18
**19103**   1:24 2:24
**19106**   1:12 2:4
**1935**   252:24
**194213**   198:9,14
**195**   3:14
**198**   3:15
**19802-4073**
    150:14
**1993**   313:14
**19th**   387:11
**1:05**   251:20
**1fahp2ew9ag17...**
    225:20
**1fahp2ew9eg17...**
    69:25

| 2 |
| --- |

**2**   1:3 4:14,15
    45:19,21 52:12,13
    52:25 53:4,6
    54:17,24 55:3,5,7
    55:9,16,18 85:10
    150:13 157:2,4,4
    184:17 196:22
    217:12 315:25
    325:18 326:5
    354:12 371:9
**20**   19:24 81:23
    82:13,14 95:18
    97:3,4,6,8,12
    98:25 99:19 101:3

101:3,22 163:19
    163:21 164:2
    196:14 349:18
    354:1 355:23
    379:12
**2000**   47:17
**2001**   380:3,20
**2005**   317:13
**2006**   377:25
**2007**   380:24
**2010**   68:15,25 70:5
    190:20 225:14
    377:6,8
**2012**   313:11 381:8
**2013**   381:8
**2014**   328:7
**2015**   276:2
**2016**   325:24
**2019**   33:1,4 65:18
    76:17 77:6 132:22
    151:7 152:5,6
    153:8,8 155:8
    159:3,4,14 160:12
    160:13 161:4,25
    162:10 196:12
    206:8,8 208:15
    209:4 221:9 232:6
    235:6 271:18
    273:14 276:18
    285:20 305:16
**2020**   1:5 387:11
**208**   3:16
**20th**   106:13,15
    107:7 113:4 114:2
    153:8 159:3 161:4
    196:12,19 197:6,8
    198:17
**21**   162:8,11 166:3
    196:14 197:8,9
**210**   377:7

**2106** 162:11,12,20
162:23
**210621** 162:21
**210645** 162:21
**210650** 162:21
**210652** 162:22
163:8
**2107** 162:12
**210705** 165:2,14
**210736** 165:5,14
**2114** 166:23 167:4
**2116** 170:13
**212** 4:18
**2135** 166:24 167:4
**214336** 167:7
**2145** 168:19
**2147** 168:20
**215** 132:22,23
160:21
**215-686-3128**
169:25
**215-713-5602**
168:15 196:6,18
198:8
**2153** 169:1
**218** 3:17
**21st** 197:12,16,19
**220** 3:18
**2200** 168:19
**220005** 169:12
**2205** 169:6
**2206** 132:8 150:13
**2216** 170:15
**226** 3:19
**22nd** 33:1,4 76:17
76:24 77:6 78:10
81:12 91:22 107:1
107:9 111:16,23
132:22 151:7
159:14 160:12,13
161:10,13,14,24

162:10 198:4,6
209:4 221:8 232:6
236:25 237:1
242:20,21,23,25
271:17 285:20
305:16
**23** 360:24 361:2
378:16 380:5
**231** 3:20
**235** 4:19
**238** 4:20
**23rd** 235:6 236:25
243:3,5,6
**24** 3:4 81:2,6
221:4,5 228:2
369:10
**2400** 154:18
**241** 4:21
**242** 3:21
**24th** 159:4
**25** 25:2,5 26:5
250:19,24 251:9
251:11
**250** 3:21 254:6
**253** 3:23
**25th** 208:25
**26** 4:13,13 26:12
48:22,22 49:1,12
49:12,15,17,17
50:6,11,15 214:24
215:3 222:22
260:14
**263** 4:22
**264** 3:23
**267** 150:4,5 151:22
152:19
**267-333** 273:11
**267-333-9443**
153:7
**267-742-6641**
165:3

**268** 3:24
**27** 4:19,19 234:2
234:12,13 235:4,9
235:15,20,20
241:14 242:2
315:21 348:22
360:1,3,22,23,24
360:25
**271** 4:3
**275** 4:5
**27th** 152:5 206:8
**28** 3:4 348:19
**281** 4:6
**284** 4:7
**288** 4:7
**28th** 374:3
**29** 3:5 4:20 236:16
238:5,8,9 259:21
260:1,11 278:18
279:1 291:18,20
**2:11** 187:5
**2:19** 1:3,3,4
**2:30** 221:13

**3**

**3** 1:4 4:18 36:4
197:1 211:24
212:6,11,11,18,18
212:22,23 213:8
377:6,18
**3/20/2019** 196:24
**3/22** 160:18
**3/22/19** 168:18
170:13 251:4
**3/22/2019** 169:6
169:12 198:14
**3/23/19** 251:20
**30** 1:5 19:22
165:13 216:22
240:21,22 250:19
251:16,16,25
349:20 369:10

**304** 314:23
**30th** 183:15
184:18
**31** 4:21 165:4,13
240:18,19,21
241:10,12
**3156529** 377:8
**32** 3:6 90:11
239:23 240:4,12
240:16
**333-9443** 151:22
152:19
**35** 216:22 359:25
371:9,16 372:11
**3513** 1:14
**35th** 76:8
**36** 4:22 167:6,8
259:19 260:19,21
261:25 262:6
263:22,23 371:10
**360** 53:21
**38** 319:22 335:24
**39th** 76:8
**3:00** 196:22
**3d** 313:11

**4**

**4** 33:11 68:12
155:15 197:1,3,5
**40** 355:23
**403** 379:18 382:9
382:23,24
**42** 56:24
**45** 81:22 97:2,4,5
**46** 4:17 137:20,25
138:22 140:7,25
141:6 149:10,16
149:21 150:2
151:1,5,6 381:9
**47** 4:17,17 122:3
137:20,20,25,25
138:23,23 149:11

149:12,13,15,15
149:16,16 151:15
151:20 153:1
154:3 163:3
195:24 196:11
319:22
**48**  95:21
**48a**  68:20,21 69:14
**49**  4:13
**4928**  233:17
**4:00**  269:12
**4:47**  308:23
**4:50**  88:18,19,22
349:22
**4:55**  54:20,21 55:8
77:10 161:22
**4th**  208:15

**5**

**5**  161:24 162:3,7
162:10 168:9
194:5 197:7,7
209:17 272:1
299:4
**50**  4:16 131:13,20
131:20,25 132:2
140:10,16,16
150:17 159:10,11
254:6
**5069866**  377:6
**51**  326:9
**53**  4:14 273:18
274:6
**540**  2:2
**55**  4:15
**56**  295:5
**5602**  170:16
**57**  3:7
**5:00**  192:18
193:24 194:11
349:24

**5:01:20**  56:12
**5:02**  56:24
**5:05**  349:23
**5:06**  162:25 163:1
163:18,22
**5:07**  166:6
**5:07:05**  165:17
**5:14**  166:6,23,23
**5:14:42**  165:19
**5:27:56**  165:21,22
166:7
**5:35**  166:18,24
**5:42**  198:10
**5:43**  167:6,8
**5:47**  168:23
**5:53**  169:4
**5b**  5:18
**5th**  76:9

**6**

**6**  69:12 159:17,22
168:9 169:14
197:9,14 292:4
377:8
**60**  155:23,24,25
**601**  2:3
**609**  300:1 376:9
382:24,24
**61**  3:7
**615**  1:11
**637-7249**  165:7
**64**  90:11
**641**  313:14
**65**  3:9
**6641**  164:6 165:6
165:11 170:11
**665**  313:11
**699**  313:11
**6:06**  170:4,9
**6:16**  170:13
**6th**  377:6

**7**

**7**  197:15,16,17
**70**  3:9
**713-5602**  132:23
132:23 160:22
**742-6641**  150:4,5
**75**  3:11
**7:01**  1:6 386:14

**8**

**8**  197:18,20 362:9
362:20 364:16
**805**  165:6
**82**  165:25 166:16
**84**  376:3
**840**  325:24
**85**  376:3
**86**  90:11 376:3
**87**  3:11
**89**  3:12
**8:00**  292:5 293:13
**8th**  238:17 246:11

**9**

**9**  162:8 197:21,21
274:7
**90**  317:25,25 376:4
**904**  325:24
**911**  5:18 6:3 9:3
16:6,7 19:6 67:11
114:7,16 115:8,10
116:22 117:23
121:19,21 123:21
129:21 143:24
144:11,23 145:3
145:23 147:20
148:2 167:11,14
167:15,16,20,23
167:23 168:1,4
176:25 177:11
189:4,8,13,15,19
192:2,16,23 193:3

193:4,23 194:2,8
218:13,20 219:14
299:2 300:24
301:9,19,25
302:15,15,23
305:20 306:1
307:20 308:16
310:4,5,11,17,22
311:2,7,25 312:15
315:7
**9167**  231:12
**924**  319:18 327:8
328:4 331:12
333:17 334:4,8,10
335:16 337:12,15
337:17 338:11
363:6
**9443**  165:3 170:10
170:16 274:15
**95**  159:24 160:7
325:6
**99**  3:12
**9:30**  293:15
**9:36**  1:6
**9:45**  83:3
**9:45p.m.**  81:14

**a**

**a.m.**  1:6 33:11
54:24,25 56:7,8,16
68:12 131:3,4
292:4
**abet**  338:11,19
341:18
**abetted**  107:11
316:16 337:15
340:14 341:7
342:4 345:5
**abetting**  112:9
316:2,6,12 319:14
325:14 330:6
331:16 335:15,21

**[abetting - admitted]**                                                    Page 4

337:3,7,20,23
338:10 339:2,9
341:2 343:7 347:3
347:24 359:8
369:5 372:22
**abettor**  340:11
341:13 344:23
345:17
**abettors**  322:9
344:24
**abid**  1:5 13:13
61:23 87:6 345:5
350:2
**abigail**  4:3 271:3
**ability**  379:6
**able**  11:24 12:8
44:20 45:5 47:9
48:19 53:22 78:2
79:14 105:20
158:25 167:20
204:13 214:8
216:23 240:4
247:7 256:5
283:15 302:14
307:9 310:6
**absence**  181:2
182:3,16 187:20
**absent**  178:24
**absolutely**  5:14
129:8 130:20
175:8 191:8
258:19 289:11
296:4 333:4,13
338:3 347:4
349:10 350:14
354:13 355:3
363:12
**abstended**  187:21
**abstention**  181:1
**academic**  254:4

**accept**  133:6 179:9
**access**  100:2
354:15
**accident**  227:20
232:13
**accidents**  239:15
239:16
**accomplice**  316:15
316:16 319:13
325:13 327:7
329:4 331:11
332:14 333:21,22
335:4,25 336:8
340:3 347:18
348:13
**accomplices**  336:4
**accomplish**  192:17
**accomplished**
372:24
**account**  135:11,12
135:15 136:5,13
137:8,9,12 150:8
150:12 151:6,10
151:11,12,24
152:8,10 157:15
167:20 200:6,7,22
**accounts**  136:14
**accumulate**
284:11
**accuracy**  255:22
**accurate**  49:7
52:19 83:19
152:19 163:9
202:25 282:25
283:5,6 338:2
346:16,22 347:2
**accurately**  211:25
212:13 215:5
235:5 346:6
**achieve**  349:6

**achieving**  355:11
**acquit**  347:7
**acquittal**  346:23
347:5
**act**  324:23 345:20
346:1,7,13 347:1
359:21 370:2
**action**  135:20
249:17 264:23
342:24
**actions**  316:13
350:23 369:15
370:20
**active**  135:15
137:12 151:6
152:4,13 167:20
324:18 336:1,2,10
336:19 345:19,22
345:24 346:7
347:1,8
**activeness**  137:12
**activity**  161:23
162:9,11,12,12
**actors**  59:20 93:6
**acts**  349:5
**actual**  140:15
162:1 179:14
203:23 343:12
**acutely**  285:5
**add**  162:4,7
198:22 317:6
370:5
**adding**  84:8 162:8
372:15
**addition**  113:8
158:10 167:18
168:4
**additional**  5:19,25
5:25 34:15 60:11
84:12,17 101:5
166:25 192:9,9

253:24 296:18
304:23 311:1
**additions**  328:15
**address**  9:9,14
16:8 47:14 102:2
125:22,23 126:1
129:16 131:17,22
136:12,18 146:9
150:11,22,25
174:1 181:7
291:25 299:2,8,10
299:11 300:5
302:11 307:13
315:19 316:3
359:13 385:21
**addressed**  5:17
359:19 384:25
**addresses**  327:3
**addressing**  9:23
191:15
**adjourned**  386:11
**administer**  85:5,6
**admissibility**  9:3
142:22 189:16
194:1 296:19
310:22 311:25
312:15 376:20
**admissible**  107:17
145:3 301:19
303:4 305:21
307:25 383:1
**admission**  138:22
177:3 380:11,14
380:16,18 381:24
382:25
**admit**  49:12 52:25
120:6 262:6 263:4
264:4 379:13
**admitted**  24:25
36:3 142:2 149:7
150:16 153:1

195:24 196:2
212:18 215:12
259:21 263:11
278:17,25 279:1
376:11
**advance** 109:3
111:6 317:23
318:10 324:20
325:25 326:6,10
327:4 336:14
338:20 343:2,15
343:20 350:17
**advanced** 336:14
**advances** 244:24
**adverse** 114:22
**adversely** 144:19
**advice** 297:15
**advise** 176:3
179:25 180:20
296:6 300:23
**advised** 107:21
110:7,22 111:3
112:13 185:4,5
198:10
**advisement**
338:24
**advisory** 317:18
328:18,20
**affiant** 98:19
**affirmative** 179:3
**affixed** 209:11
**afield** 116:5
357:14
**afraid** 29:14
**afternoon** 33:7
57:13,14 133:19
133:19 195:19,20
199:5,6 220:15,22
220:23 221:13
227:6,7 231:14,16
242:13,14 252:25

253:1,6,7 264:14
264:15 269:13
271:4,7,8 284:1,2
295:22 299:13,14
384:13
**age** 77:18 376:21
381:22
**agencies** 204:14
**agenda** 307:20
**agent** 102:19
103:20 104:25
116:1 118:10
123:20 153:21
158:18 159:18
275:5,10,21 276:1
276:17 277:16,25
278:8 280:8,15
281:4,5,10,15
284:1,4,11 288:3
**agents** 77:23
**ages** 292:9
**ago** 110:3,13
167:22 178:6
183:14 238:1
239:19 286:4,13
317:11 363:18
**agree** 90:1,18,24
96:17 105:12
107:18 112:25
116:1 122:20
143:18 146:24
267:16 285:10
286:6 287:10,15
290:8 312:13
318:1 321:13
323:6 325:10
326:4 328:25
329:2,7 330:15
340:19 341:11
351:15 360:16
364:3,5 366:21

369:2 370:14
385:25
**agreed** 68:6,9
114:6 133:5
143:20 144:1,7
263:19 322:21
336:24 337:25
340:13,17,18,24
346:25 365:20
366:12,18
**agreeing** 262:15
363:3
**agreement** 11:24
87:18 131:14
133:4 262:15
323:8 324:14
325:6 352:2 355:7
**agrees** 322:21
**ahead** 25:13 36:25
54:11,17 56:5
84:5 89:4,6 96:2
97:1 146:25
195:13,14,14
197:23,24 217:17
250:11 288:23
306:22
**ahs** 358:6
**aid** 338:11,19
341:18
**aided** 107:11
316:16 337:15
340:14 341:7
342:4 345:5,11
**aider** 322:9 340:11
341:13 344:23
345:16
**aiders** 344:24
**aiding** 112:9 316:2
316:6,12 319:14
325:13 330:5
331:16 335:14,20

337:3,6,20,23
338:10 339:2,9
341:2 343:7 347:3
347:24 359:8
369:5 372:22
**ain't** 15:24 18:15
**air** 24:22 185:24
201:11,18 222:2
282:1
**alcohol** 254:11
275:22 281:15
**alert** 39:7 62:6
**alexander** 3:18
220:5,9,14
**alleged** 88:11
93:12 94:11
121:20 145:15,21
146:3 242:22
313:16 352:16
355:23
**allegedly** 120:17
124:8
**alleges** 340:14
341:7 345:4
360:19
**allow** 101:23
116:17,17 158:9
175:15 182:13
385:2
**allowed** 123:25
165:12 191:5
302:3
**allows** 156:4,8
158:2,5,13
**alpha** 235:9
**alright** 37:9
**alter** 200:24
**altered** 378:15
**alternative** 310:8
**amalgamation**
288:6

**america** 1:3
**ammunition**
254:14,15 261:10
261:13 266:24
**amount** 35:20
82:16 97:22 98:5
**ample** 312:3
**analysis** 257:5,14
**analyzed** 372:8
**andrejzak** 3:22
252:14,18,24
257:13
**anger** 22:15 23:8
**angle** 53:22 55:24
79:4
**angles** 79:24,25
83:4
**angry** 21:24 22:3
176:20
**annually** 254:21
**answer** 9:20,22
23:3 25:21 30:7,8
120:8 122:22
123:5 140:1 176:7
219:6 311:17
350:10 374:25
379:16 384:3,8
**answered** 199:7
**answering** 59:2
**answers** 10:3
166:6
**antenna** 167:16
**antennas** 167:17
168:1,5
**anticipate** 101:21
141:20 177:12
299:13
**anticipated** 131:9
**antoinette** 132:7
**anybody** 13:16
30:2,4,5,12,23,24

215:20 216:1
**anybody's** 136:2
**anymore** 21:10
47:3 174:24
181:13,15
**anytime** 238:22
**anyway** 118:11
262:22
**apart** 155:1
**apartment** 150:13
**apologies** 64:14
**apologize** 11:17
25:2 55:1 66:5,24
67:19 72:20
117:19 131:10
132:16 166:4,21
198:12 205:2,4
240:19 242:17
250:10 258:15
282:3 317:23
321:21 323:25
324:4,10 371:19
377:17
**apologized** 176:13
**apologizing**
176:15
**apparently** 108:4
108:8 125:7,24
126:3 145:10
328:21 373:8
**appeals** 317:14
325:5 327:6
**appear** 167:11
180:16
**appearance** 90:25
**appearances** 1:9
**appeared** 211:9
**appears** 18:3
102:16 140:9
294:11 318:2

**appellate** 183:11
183:23 317:16
**applicable** 335:7
335:15
**application** 83:21
**applied** 250:22,25
330:5,6
**applies** 300:13
339:15 347:22
**apply** 331:12,15
333:22 370:12
**applying** 378:17
**appreciate** 295:23
**appreciated**
188:21
**apprenticeship**
254:5
**approach** 37:9
137:20 215:16
236:11 250:13
259:20 273:21
274:1 278:20
**approached** 35:23
36:21 37:24 41:17
41:24 53:16
**approaches** 19:20
**approaching** 39:4
41:20,21,22 45:12
259:25
**appropriate** 7:22
91:18 127:15
128:3,3 130:19
145:13 303:12
306:6 315:4 316:4
321:25 338:12
369:17,19
**approve** 385:10
**approved** 387:9
**approximate**
47:15

**approximately**
79:14 88:16 165:4
**approximating**
267:16
**april** 153:8 196:15
196:16,17
**area** 40:24 41:14
48:14 58:7 81:22
168:4 187:12
190:14 210:7
212:1,12,13
215:25 216:11,19
217:3 232:10
272:7 276:8
281:23 282:13
**argue** 21:17
105:20 109:8
111:1,11 119:17
123:25 128:7
129:10,11,21
145:12 149:1,1
207:7 304:8 310:6
310:7,7,19 312:19
312:19 322:16
335:20 341:18
342:3,13 354:13
356:2 364:18
365:23 368:24
**argued** 109:7
111:5 123:24
124:24 127:8
345:21 353:20
359:2 382:15
**argues** 346:11
380:14,16 381:24
**arguing** 109:2
110:22,25 111:1
121:14 146:2
300:3 342:10
379:17

**argument** 5:20,23
6:6 7:13,22 8:7
14:24 15:19,23
16:9 17:23 18:18
29:10,13 30:16
63:13,17 101:21
103:6 105:17
109:14 111:4
114:12,13,13,22
116:9 118:10,13
125:17 127:15
129:16 130:5
146:19 148:6
149:2 177:13
192:14,19 207:7
299:6 302:12
304:16 333:24
340:12 341:24
342:15 343:17
344:8,15 368:20
375:25 378:18
**arguments** 7:7
21:14,19 30:20
297:8 316:9
**arisen** 178:4
**armed** 15:9 42:22
42:24 59:21
**armors** 254:8
**armour** 325:23
**arrange** 226:18
**arrangements**
226:20 233:2
**array** 84:21,24
85:3,5,12,14,17,22
86:3
**arrays** 85:7,9
87:15
**arrested** 380:3,23
**arrive** 46:14 216:2
224:14

**arrived** 48:2 216:7
232:19
**articulate** 337:3
**articulated** 180:13
340:25 344:21
**articulates** 345:15
**ashley** 1:10
**aside** 348:6
**asked** 16:23 24:17
25:16,22 26:2
51:17 97:15,18
98:2,14 104:23
182:22 183:1
193:23 232:4
245:18 258:7
272:19 282:3
300:8 311:14
332:5,24 335:23
**asking** 24:2,4 27:9
27:12,18 72:12,12
72:13 78:1 115:21
173:6 175:22
203:20 245:6,7
248:22,23 346:4
**asks** 298:15
**asserted** 34:25
223:18
**assigned** 65:14
75:25 76:20,25
88:2,4 92:17 98:2
98:12,17 208:22
208:25 221:6
226:12 231:12
253:11 255:14,18
**assignment** 33:14
**assist** 76:23 84:12
84:16 232:4 301:8
302:9
**assisted** 76:25
**associated** 150:7
150:11 151:23

152:22 153:9,15
166:7 169:15
286:9
**association** 2:1
**assume** 62:12
**assuming** 180:15
299:22 310:8
332:15 340:7
**assured** 105:15
**at&t** 168:1
**atf** 275:5,25
276:17 277:25
278:14 281:15,20
281:25 282:4
362:23 363:1,2
**atlantic** 1:23 2:23
**atm** 355:13
**attached** 179:1
**attempt** 103:19
375:16
**attempting** 145:5
**attempts** 48:10
**attended** 254:18
276:14
**attention** 161:8,12
163:7,24 167:5
194:18 197:22
222:7 274:5
369:17
**attest** 184:9
**attorney** 27:8
113:12,12 186:20
331:1,2
**attorney's** 1:11
273:13 317:15
**attorneys** 10:2
87:21 298:4
**audio** 89:17 96:18
96:22,23
**audited** 204:14

**august** 377:8
**austria** 279:15
**authenticate**
124:25
**authenticated**
141:23 146:18
**authenticating**
131:14 141:22
177:2
**authentication**
139:10,11 142:3,4
142:13 190:1
**authenticity**
144:10
**authority** 181:24
182:5 183:2,7,23
303:19,25 304:20
308:3 314:25
**automatic** 244:14
245:12 260:14
264:24 265:10
338:5
**autopsies** 254:18
**available** 168:4
179:18 375:14
**ave** 213:10,11
214:17
**avenue** 35:24
214:10 233:17
**avoid** 103:19
119:11
**await** 385:24
**aware** 177:8 182:7
183:12,13 285:5
286:14,19,23
357:20,22,23

**b**

**b** 4:11,14,17,18
45:19,21 49:15
50:6 52:12,13,25
53:4,6 54:17,24

55:7 75:13 137:20
137:25 138:23
149:13,15,16
150:10 151:5
153:1 154:3 163:3
194:5 195:24
212:6,11,18,22,23
234:15 299:4
**baby** 14:17 15:8
30:25
**back** 10:14 17:5,6
17:7 18:4 19:11
19:20 20:20,20
26:25 28:11 29:22
46:13,20 56:18
66:2 71:16 77:17
79:6 84:18 91:8
95:16 97:12 98:25
100:20 106:17
115:10,16 117:6
130:24 136:1
159:8 164:12
174:4 178:8
185:24 186:11,25
187:18 188:24
191:20 192:2
194:15 213:8
217:4,5 226:6
234:19 236:23
238:14 239:11
249:9,19 265:14
265:19,22 267:25
268:7 270:5 272:8
272:10 276:18
278:13 292:5
295:24 310:2
311:10 312:4
314:15 315:9,18
328:23 340:10
343:6 348:19
350:16,17 351:2,2

351:10,14,18
353:9,16 354:9,16
356:25,25 357:7
359:6 362:8 368:8
369:23
**backup** 51:17,19
215:24 216:2,6
**bad** 30:21 128:14
160:4 364:22
**badge** 231:12
252:24
**bag** 230:8,9,10
246:2,5,7
**bagged** 229:23,25
247:18
**bagging** 230:16
**ballistic** 238:20
254:20 255:8
256:12
**ballpark** 47:21
**bank** 290:10
**banner** 200:25
**bar** 153:22 255:21
**barnaby** 1:16 87:5
**barrel** 256:3 265:1
265:7,7
**baseball** 4:21
236:7,8 240:1
**based** 30:19 42:20
59:3 61:6 83:6
91:7 92:19 95:12
109:15 113:22
126:22 142:2
148:24 151:9
152:8 167:16
173:12 219:11
257:17,21 279:10
285:10 286:14,19
290:19 295:11
297:12 298:10
300:4 310:13

334:4 338:13
342:18 344:15
346:16 351:25
353:20 386:3
**basic** 90:16 276:14
276:17
**basically** 80:10
91:3 255:25 258:5
266:13,17 377:1
**basics** 225:11
245:5
**basis** 63:24 182:18
255:6 368:24
**bcxx649** 236:21
260:14
**bearing** 107:8,10
**becoming** 152:13
**began** 88:13
**beginning** 19:19
88:10 161:16
320:24 367:24
369:23
**begins** 315:19
**behalf** 7:18 180:2
350:21
**believe** 5:12 27:19
39:5 42:25 45:3
50:16 59:19 78:24
80:1 81:21 82:3
85:19 93:1 96:19
97:7 102:11 103:8
108:23 109:2
123:11 125:14,19
128:8,19 140:21
141:8 161:7
173:13 178:17,24
179:1 189:19
190:13,19 191:3
191:17 200:5
227:12,23 229:22
230:11 237:1

243:2 244:13
257:2 266:10
279:19 290:16
291:6 293:25
294:2,3,25 299:3
302:3 303:17
305:13 312:9
313:18 323:3
329:12 334:18
338:2,12 339:5
342:3 346:15,19
346:20,21,24
347:2,4 357:24
360:10 361:9,10
362:22 363:13
378:2 381:18
385:2,6,18
**believes** 9:18,21
**belong** 139:12
**belonged** 118:3
**belonging** 164:4
**belongs** 196:10
**bench** 255:23
258:5 267:3
305:10 308:9
**benelli** 254:9
**best** 146:8 172:17
349:11 366:15
**bet** 200:17
**better** 95:25
119:25 140:1
146:5 179:25
268:3 297:24
348:8
**beyond** 106:10
107:3 116:7 331:4
345:13
**bifurcated** 365:12
**bifurcating** 181:3
**big** 143:10 201:12
201:13,16 202:10

377:9
**bill** 154:11
**billing** 135:3,20
  157:17 204:9
**bills** 204:13 354:1
**binding** 329:7
**birthday** 106:18
**bit** 14:3,11,13
  41:10 56:18 57:21
  102:1 134:11
  163:19 298:7
  324:12 332:4
  333:24 356:1
**black** 27:10 47:17
  51:22 240:1,1
  338:5
**blaming** 93:17
**blanks** 362:4,8
  371:4
**blind** 85:6
**block** 41:10
  178:12 186:5
**blocks** 47:22
**blue** 106:9 107:5
  110:5
**bmv** 226:2,2,15
**board** 226:15
**body** 268:6
**bonkers** 343:9
**books** 278:12
**boston** 313:12
**bother** 100:12
**bottom** 56:10
  142:21 371:18
**box** 91:3 348:5
**boy** 353:17
**bozeman** 317:10
**bracketed** 371:10
**brake** 243:14
**brandish** 327:25
  331:7 334:24

336:15
**brandished**
  325:20 343:18
**brandishing**
  316:17,18,19,22
  316:24 325:21
  326:1 328:1,2
  335:12,13 336:12
  340:16 341:3
  343:12 345:7
  347:25
**bravo** 212:11
**breach** 387:3,9
**break** 74:13
  101:19 130:24
  142:1 199:7
  269:11,13,14,17
  269:18,19,19
  311:1 384:9,10
**breakfast** 297:22
**brief** 5:22,22 6:6
  99:17 170:23
  250:7 257:19
  294:22 296:22
  357:14 375:22
**briefly** 23:20
  61:18 70:22 71:2
  172:15 206:20,23
  218:6 264:11
**bring** 12:10,18
  79:15 188:23
  270:11
**broach** 386:2
**broadcast** 171:14
**broken** 246:9
**brother** 62:7
  226:17
**brought** 238:14
  261:12
**bruce** 200:24,25

**bugs** 200:20
**building** 93:25
  255:16 261:13
  277:13
**bullet** 239:10
  244:23 248:6
  256:8 266:12,14
  266:19,22,24
**bullets** 239:5,9,12
  244:20
**bunch** 201:17
**bunny** 200:21
**burden** 189:24
**bureau** 254:11
  275:22
**burgundy** 225:14
**business** 131:1
  134:13,24 135:2
  137:16 139:2,5
  192:24 193:5
**busy** 366:6
**buy** 70:15

**c**

**c** 1:13,16 4:15 5:1
  24:25 25:2,5 26:5
  26:12 49:15 50:11
  55:3,5,9,16,18
  119:25 122:3
  150:9 217:12
  234:24 281:11
  319:18 327:8
  328:4 331:12
  333:17 334:4,8,10
  335:16 337:12,15
  337:17 338:11
  363:6
**cable** 91:8
**cadence** 301:11
**cahoots** 146:5
**calculate** 204:6

**calculating** 83:24
**caliber** 255:3
**call** 5:18 6:3 9:4
  15:19 16:7 19:6
  31:22 33:19,22,25
  33:25 34:3,6,16
  35:16,21 40:13
  42:20 51:15 58:25
  63:12,22 67:11
  74:19,21 88:15
  92:13,14,19 95:4
  95:12 97:25
  102:18 103:20
  104:25 105:16
  106:16 107:7
  108:22 114:7,16
  115:8 116:21,24
  117:25 118:9
  119:1 120:16,21
  121:19,21 123:17
  123:20 124:7,9,18
  125:8 128:12,14
  129:22 130:12
  132:19 133:2,7
  135:8,16,22,23
  136:20 137:10
  142:5,6,6,12,13,22
  143:24 144:11,23
  145:3,23,24
  146:17,18 148:2
  152:21 153:6
  154:6 155:19
  156:3,5,8 158:2,4
  158:6,7,7,10,13
  163:8,12,13,17,21
  164:3,11,15 165:6
  165:16,23 166:4,8
  168:24 169:2,16
  169:23,25 170:10
  170:15 176:25
  177:3,11 183:11

189:4,8,13,15,16
189:19,21 190:4
190:23 191:5,14
192:18,25 193:10
193:22,24 194:2
196:18 197:2,11
198:2,7,9,15,16
199:18,22 209:16
209:19,21,23
210:1,2,2,5 218:10
218:13 219:7,7,14
221:17,18,22
226:21 229:2
231:4 269:5
271:25 275:5
280:15 294:22
299:2,3,6 301:9,12
301:19 302:5
305:20 306:1,11
307:20 308:17
310:4,5,11 311:2
313:17,24 314:2
355:20,23
**callback**   123:21
**called**   16:6 104:14
  106:11,11 109:4
  116:23 117:23,25
  122:22 125:7,18
  126:7 156:15
  157:3 199:17
  215:24 218:17
  244:13 349:8
**caller**   142:6,15
  148:10 190:6,9,14
  191:22 193:7
  313:24
**calling**   115:7,13
  116:1 126:8,16
  127:2 145:8,10,17
  145:17,20 146:3
  156:11,24 157:2

159:19 165:11
203:21 369:16
**calls**   64:12 84:12
  102:24 105:21
  106:19 107:8
  108:25 110:19
  111:2,20 112:2,24
  115:1,5,10 116:9
  116:21 117:6,10
  119:17 124:1
  126:11 135:24
  141:18 145:1,4,15
  145:16,16 147:19
  147:19 154:8
  159:9,25 161:23
  166:1,5 167:7,10
  197:9 199:19
  200:1 204:1
  206:17 220:4
  252:13 303:6
  313:21
**calm**   18:8,9,15,22
  18:24 30:14
**camacho**   377:5
**camden**   174:10
**camera**   40:24 41:3
  46:1,5,8 52:17,18
  52:20 53:21 54:4
  55:24 79:4,25
  80:1 82:12 83:4
  90:7 93:18,21
  94:2,8,19,22,23
  95:5 99:22 100:3
  100:7 101:1 282:8
  282:12,16,24
  283:4 285:1 286:7
  286:8,9,18,23
  356:7
**cameras**   40:21
  77:16 79:12,16
  80:19 81:20,23

82:15 83:9 90:7,7
90:8,11 91:13,20
92:14,21 93:4,9
96:21 97:20,24
99:23 100:22
282:21,22 283:3
288:7
**camtasia**   77:25
**candor**   118:6
**cannon**   3:20 231:4
  231:8,11,12,15
  244:7 252:3
**canvassed**   216:19
**cap**   236:6,7,8
  240:1,1
**capable**   261:20,22
**capacity**   82:19,21
  134:23 208:20
  209:3 261:4,5
  271:13
**caption**   329:16,19
**capture**   90:14
  91:9 93:18 95:9
  95:17,18 97:3,3,5
  97:6,19 99:14
  100:9 285:2,11
**captured**   91:16
  93:10 96:12
  135:12,17,18
  285:19
**capturing**   94:23
  95:5 286:24
**car**   34:12 36:23
  38:20 39:12,16,25
  41:20,21,22 42:2
  42:10 43:1,6
  44:10,21 45:1
  46:15 47:10,15,23
  48:3,4,5,11,17
  50:8,22 51:4,7
  56:3,13,21,21 58:6

58:9 60:2 61:6
62:3 67:5,10,11
68:22 70:11,14,17
73:4 116:22 117:1
118:20 119:10
124:21 142:7
157:21,24 190:11
190:16,17 210:14
211:9,11,12,15,15
211:16,18,19,20
211:22 213:3,14
214:2,7 215:16,21
215:21,23,25
217:4 222:19
227:11 228:11,12
228:17,21 229:4
229:15 230:17
232:13,20,21,22
233:2,2 234:8,19
234:20 235:3
243:8 272:25
**care**   15:1 202:3,7
  262:18 361:19
**career**   256:20
**carefully**   372:8
**carlene**   102:24
  131:16 132:7
  140:8,18 141:1,5
  145:9 150:9,22
  153:16 158:23
  159:6 160:1,9,14
  164:4,7,11,12
  165:16 166:8,20
  167:1 169:2 170:6
  272:17
**carriers**   136:8
  168:3
**carry**   325:20
  326:1,11 327:24
  331:7 334:24
  336:15 343:3

347:24
**carrying** 316:1,17
  317:4 320:9,15
  324:19 328:2
  335:12 336:12
  340:15 341:2,3,9
  344:9 345:7
  347:25
**cars** 45:10 62:8
  79:2 233:6
**cart** 361:10
**cartridge** 256:8
  264:21 265:20
**cartridges** 261:7
  266:7
**case** 20:9 61:2
  67:17 76:21 79:25
  80:4 81:11,17
  82:2 84:3,13,17
  86:20 88:7 90:2
  93:5 98:18 104:17
  111:10,11,11
  120:17 121:12,24
  126:23,25 127:11
  128:14 131:8
  133:9 138:7 143:7
  145:1 171:4,6,10
  171:13,15 173:24
  174:3,5,17 175:23
  176:16,19 180:25
  182:10,11 223:15
  228:7,9 229:16
  230:13 234:10
  245:21 255:24
  256:9 259:8 260:8
  260:13 262:22
  263:10 278:18
  283:4,10 284:4,4
  284:11 296:23
  298:10,12,14
  301:21 303:22

304:21 305:15
  308:5 310:9,12
  312:10 313:9,10
  313:13,14 314:21
  314:21,21,23,24
  316:10 317:10
  325:23 326:2
  327:10,13 328:13
  329:1,21 330:6
  335:7,10 340:24
  340:25 341:14
  342:1 343:19
  344:22 345:4
  347:14,22 349:4
  355:4 358:14,15
  358:21,23 367:11
  368:12,21 375:3
  376:11 377:7,8
  378:23 381:15,20
  382:2,6,18 384:7
**cases** 89:20 90:3,3
  90:6 141:25 142:1
  194:23 256:8
  306:1 313:9
  336:21 337:18
  357:15 358:9
  376:25
**cash** 353:22
**cat** 59:10
**catch** 222:8,14
**cause** 182:9 268:3
  344:11
**causes** 126:24,25
**cautionary** 126:12
  181:7
**cautioned** 223:16
**caveat** 155:20
**cavity** 266:21
**cct** 91:8
**ceased** 147:9

**cell** 6:1 15:3
  102:10,21 134:16
  154:10 156:24
  157:1,3,14,22
  161:24 167:22
  178:12 179:19
  186:5 272:23
  310:2 312:5
**cellular** 167:19
**center** 2:3 40:17
  40:19,20,20 58:22
  193:4 194:8
  218:13 276:16
  307:10
**central** 223:15
**certain** 58:7 72:23
  79:15 155:22
  189:14 221:16
  277:2 293:24
  299:21 307:24
  318:17 365:21
  368:25
**certainly** 74:18
  114:23 130:15
  179:13 186:9
  188:19 297:14
  307:8 315:10
  322:15 329:7,25
  333:23 338:7
  339:14 351:16
  361:4 374:13
  380:11 382:2
**certainty** 202:22
  262:3
**certification** 387:1
**certify** 387:3
**cetera** 204:11
**chain** 228:18
  229:12 255:13,20
**challenged** 313:21
  325:2

**challenging** 86:3
**chamber** 239:10
  243:25 244:12,22
  246:17 249:5,22
  261:6,9 264:22
  265:12,20 267:24
**chambering** 244:5
  244:12 264:19
  267:22 268:8
**chambers** 184:17
**chance** 15:24
  113:15 211:14
  358:18
**change** 157:13
  200:11 304:10,10
  329:16 339:25
  361:16 364:15
  368:17 370:16
**changed** 297:19
  319:25 320:1
  339:24 364:10
**changes** 148:25
  157:17 329:11
  373:11
**characterizing**
  125:17
**charge** 127:12,12
  127:17 294:13
  297:9,13 299:9,11
  315:13,16,22,23
  316:1,2,6,23
  318:18,22 319:12
  321:24 322:3,4,15
  323:24 324:2,2
  326:7 327:24
  328:3 329:20,22
  330:4,8,23 334:13
  334:16,16 335:5,5
  335:14 336:24
  337:23 338:25
  339:14,16,17

340:9,13,17,18,24
342:20 344:20
346:24 347:19
348:24 358:11,12
359:5,18,21 361:7
364:15,16,19,19
364:21 366:5,8
368:11,22 369:1
369:13 370:3
371:9,9,11,14,17
372:4,5,20,20,22
373:1,1,15,16,22
374:21 375:19
381:4 383:24
384:2,3
**charged** 320:5,8
320:14,15,17,20
333:16 334:2,3
341:2 345:8,16,20
357:17 360:11
376:18,19 377:3
378:22 380:4,10
380:23 382:5
385:6
**charges** 337:4,7
338:25 339:1,3
369:9 384:4
**charging** 127:7
334:8 371:4,6,22
**chase** 45:15 47:5
67:11
**chasing** 46:22
62:10
**chat** 176:2
**check** 136:2,11
216:1 256:1,3
**checked** 226:8
330:18
**checking** 255:21
**cheeseburgers**
17:15

**cheesesteaks**
17:14
**cherry** 377:7
**chestnut** 1:11
**chief** 104:17
305:15 317:14,17
325:5 381:17
**chiefs** 327:6
**chips** 17:13
**choice** 174:20
178:23 179:3
182:17 368:8
**choices** 348:3
**chooses** 378:25
**chorus** 13:2
**chose** 351:6
**christina** 227:12
**circle** 38:11,12
54:11 164:21
**circuit** 174:3,7
313:12,13 317:19
319:7 322:19
324:2 325:23
328:5 329:5
339:17,20 340:4,5
340:8 364:20
**circumstances**
383:3
**circumstantial**
120:25 124:9
141:23 142:4,7,15
146:20 148:10
177:2 189:17
190:4 304:7
313:15,19 356:23
**citations** 70:16
**cite** 314:22
**cited** 314:23
**cites** 377:5
**city** 32:22 40:22
57:22 60:20 76:5

253:17 282:21
**civilian** 85:14
178:9 218:18,20
**civilians** 48:2
**claiming** 110:16
**clarification**
359:10
**clarify** 99:13
108:15 192:23
317:7
**class** 77:22
**claus** 200:15,20
**cleaned** 11:9
**clear** 7:11 21:23
56:20 58:21,21
239:4 245:13
316:13 319:6
320:8 322:16
324:7 327:16
343:24 344:1,3,5
344:14,14,16,25
350:20,23 351:17
351:25 352:5
353:18,19,25
355:11 358:24
370:3
**clearer** 117:21
329:3
**clearly** 21:23
182:16 343:19
345:15
**clenched** 248:25
**clerk** 10:16 11:6
11:10 31:23,25
64:17,19 74:7
75:5,8 102:4
130:25 131:6
133:12 188:25
207:22,25 220:7
220:10 231:6,9
252:16,19 270:21

270:24 275:8,12
281:7 333:20
374:3,6,9
**client** 10:4 28:24
67:16 124:18
139:12,17 143:1
147:8 172:24
173:5 176:8
179:20 180:4
186:20 189:21
193:7 196:10
200:1 207:3 292:2
292:13 295:5
299:22 301:10
302:1,14,16,19
303:14 306:7,19
306:24 307:3,7,14
309:19 310:1,14
311:8,20 314:14
338:3 343:1 375:2
375:7,13 383:20
384:11
**client's** 72:23
125:3,3 127:22
175:22 300:4
305:23 343:25
**clients** 366:22
367:1,4,8
**clip** 45:20 55:2,9
**clips** 78:1
**close** 22:12,18,18
57:18 140:14
177:11 200:14
203:3,5 292:22
329:20 383:22,23
**closed** 351:22
**closer** 303:7
**closing** 109:15
297:8 302:11
365:23 383:21

**closings** 294:9 295:6 384:12
**clothes** 178:9 303:16
**code** 157:25 158:5 226:15 255:21
**codes** 156:21 158:9
**cold** 201:11 204:5
**colleague** 174:7
**colleagues** 375:4
**collected** 136:12 278:14
**colloquied** 179:12
**colloquy** 173:8,12 173:15 179:5 181:14 311:8,18 311:19
**color** 70:6 210:22 225:14
**colors** 43:15
**colt** 254:9,16
**column** 154:6,15 154:17 155:18 156:3,7,9,11 157:6 157:10,19,25 165:11 166:13
**columns** 156:14 156:17,18,19,23 157:9 159:20
**combination** 197:8
**come** 6:3 46:13 51:21 87:12 119:21 142:17 146:13 178:8 179:7,10,11,12,24 180:7,20 181:6,21 185:2 186:11 187:1,18 192:2 207:5,8 212:1,13

218:10 224:8 249:19 262:13 263:20 300:4 301:9 310:5,5,15 311:7 312:9 313:15 349:25 350:16 368:7
**comeback** 367:23
**comedic** 200:23
**comes** 109:9 255:16,17 262:16 298:12 299:6 302:15,23 310:15 315:24 378:23
**comfortable** 203:4
**coming** 6:20 7:20 20:4 35:24 40:11 93:6,10 114:7,17 138:19 169:23 262:22 287:12 295:24 310:17 315:18 337:2
**commands** 43:2 43:19
**comment** 146:12 369:18
**commerce** 277:4 279:21 324:22 326:13
**commercial** 360:19,20
**commits** 358:2
**committed** 104:6 320:4,14,21,21 336:11 341:4 349:5 358:6
**committee** 317:19 328:18,18,20
**committing** 320:16 340:15 341:8 345:6,12

**common** 194:22 257:10 266:14,24 355:1
**communicate** 181:20 283:15
**communicated** 102:12 118:25 154:11
**communicates** 330:9
**communicating** 172:24
**communication** 108:19,24 109:9 115:11 121:15 126:18 147:6 154:13 158:22 160:25 166:11 168:21 173:3 174:24 176:7 187:9 199:24 355:25
**communications** 140:16 147:4 156:21 159:5,10 159:11 160:18 166:19,25 167:3 168:10 177:6 311:5
**company** 1:23 2:23 123:18 130:14 134:8,15 136:22 137:3 201:3
**company's** 134:12
**comparison** 255:8 256:11
**comparisons** 254:8
**compelling** 378:18

**competent** 203:9 203:10,11,11,17
**compilation** 92:4
**compilations** 78:2
**compile** 92:1
**compiled** 85:18 91:16 92:3,24
**compiling** 98:20
**complainant** 51:16 218:17 338:22 350:17 352:1 353:15 354:16
**complainants** 79:13
**complaining** 329:19 360:12
**complaints** 297:22
**complete** 50:21 80:3 148:6 191:21 253:24
**completed** 51:11 254:6,8,10 284:16 289:22
**completely** 195:6 315:24 343:8
**completion** 157:25
**complex** 202:4,7 327:11
**complicated** 358:17
**complicates** 358:9
**complied** 84:22
**comprehend** 358:13
**computer** 79:21 91:4,6 164:18 201:12,16,16 202:16,17 203:15
**computers** 201:13 201:17 202:3

203:13 204:5
**conceal** 200:10
**conceded** 314:4
**concern** 191:11
**concerned** 26:21
67:14 185:23
193:19 317:3
**concerns** 9:15
200:21
**conclude** 142:12
348:10 380:20
382:6
**concluded** 68:7
146:4 149:5
177:20 207:16
263:18 296:15
386:14
**concludes** 31:9
64:9 74:2 204:23
219:23 230:25
252:1 269:1
274:25 280:8
**conclusion** 51:13
**condition** 215:6
246:1 265:17
**conditioned**
201:12,19
**conditions** 256:1,3
**conduct** 67:23
68:14,23 256:19
259:7
**conducted** 67:5
84:24 134:24
268:19
**confederate** 318:7
**confederate's**
318:11
**confer** 288:19
**conference** 371:4
371:6 372:9

**confident** 197:15
**confinement** 380:6
**confirm** 204:10
375:25
**confirmed** 138:16
215:23
**confuse** 343:1
**confusing** 120:9
317:9 322:3,8,20
327:9,10,15
328:16 336:23
343:8 355:10
360:18
**confusion** 126:24
**connected** 58:3
157:8 167:21
**connection** 158:10
166:14 316:20
348:1 382:23
**connections** 91:8
**consciousness**
143:19,24 144:3,4
144:14
**consent** 80:10,12
**consider** 6:5
358:11 376:17,21
**consideration** 98:6
**considered** 155:8
281:21,22
**consistent** 267:21
268:8 320:12
344:20 358:19
**console** 313:13
**conspiracies**
357:16
**conspiracy** 112:8
127:1,4,11,12,17
128:23,25 129:2,6
146:4 349:6,9,9
350:12,14,18,25
355:17 358:2,4,5,6

368:23 371:12
372:13,14,15,20
**conspirator**
121:20
**conspiratorial**
355:1
**conspired** 107:11
**constitutional**
297:2
**consult** 183:23
217:8 241:23
289:8
**contact** 51:21
61:24 105:18
113:3,8 114:1
118:2,17 160:6,8
160:11,15 162:20
170:5,13 186:19
206:10 355:22
**contacted** 104:20
105:19
**contacts** 102:22
106:24 107:5
159:5 160:13
161:5
**contain** 69:16
**contained** 202:22
**contemplate**
301:21
**content** 147:19
204:1
**contents** 191:4
**contest** 336:6
**contested** 337:14
**context** 337:4
**continue** 182:2
183:3 188:24
194:24 269:9
297:11 331:8
**continued** 20:14
325:16 326:23

327:2
**continues** 160:15
181:9 197:6 318:5
**continuing** 254:22
**continuous** 96:3
**contract** 136:7
**contracts** 136:8
**contractual** 200:6
**control** 40:21
143:13 270:7
**controlled** 229:20
**conversation**
107:4 121:14,20
172:25 178:21
179:14 181:18
203:23 310:13
311:2
**conversations**
352:14
**converse** 346:17
**conversion** 154:24
**convert** 162:1
**converted** 342:23
**convict** 338:15
**convicted** 303:14
381:7,8 383:11
**conviction** 299:25
300:4 348:6,8
363:21 364:25
376:10,17,22
377:1,3,13 380:9
380:22 381:3,6
382:5 383:1
**convictions** 375:25
376:6 379:23
380:16 381:1
382:25 383:6
**cooked** 105:22
**cooped** 185:20
**coordinated**
154:19

**copied**  88:1,19
**copies**  122:25
    137:21 373:4,5
**copy**  109:25
    273:23 319:8
    327:20 359:25
    361:10 373:16
**corner**  36:15
    38:12 83:14
**correct**  13:25
    18:16 20:3 28:25
    33:18 35:18 38:16
    38:19 39:2,14
    40:5 42:1 46:18
    46:25 48:18 50:20
    53:17 54:5 57:19
    57:23 58:1,4,5,7
    58:13,18,19,23
    59:8,9,13,14,25
    60:3,13,22 61:2,8
    61:9,12,13 62:3,4
    62:9,13,16 63:21
    70:18 71:4,8,17,23
    73:9,15 76:18
    77:11 80:18 81:8
    84:10 85:16 87:13
    88:22 89:21,22,24
    90:4,5,8,12,15,20
    91:1,4,5,9,18,24
    92:16 93:14,20
    94:6,7,11 95:7,10
    95:11 96:7,14,15
    97:9,20,21 100:4
    101:7,10 106:1
    108:6,8,11 119:2
    141:6,15 150:6
    152:14 153:12
    155:21 159:13
    160:10 161:11
    163:16 165:20
    166:9 168:25

169:3,5 196:13,19
198:11,18 199:11
199:12,14,15,19
199:22 200:3,4,9
200:12,16,22
201:3,8,14,21
202:4,11,12,19,20
203:6,24,25 204:3
204:4,7 207:14
218:13,25 219:15
221:21 227:17
228:2,5,7,8,12,13
228:18,24,25
229:5,6,9,10,12,13
229:18,19 230:3,4
230:6,14,15
233:10,11,19
234:22 238:24
239:20 243:14
244:10,14,20,21
244:25 245:9,16
245:23 246:3,15
247:9 248:10,16
248:17 249:10,17
259:12 260:22
265:10,11,15
266:2,4 267:9,11
267:25 271:19,24
277:14 279:9
284:5,13,17,18,22
284:24 285:3,7,12
285:16,17,20,25
286:11,21 287:7,8
287:13,20 288:7
300:25 308:1
312:1,5,11,15
323:14 333:5,13
334:6 339:3,10
344:7 354:8,8,13
363:22 364:4
374:24 387:4

**corrected**  325:7
    325:11
**corresponding**
    127:16
**cosgrove**  2:6 102:3
    298:18
**cougar**  77:1 85:20
**counsel**  9:13,21
    10:1 57:4 67:1
    68:8 74:10 86:1
    99:13 104:12
    113:23 131:14
    132:12,21 176:2,2
    178:13,20 181:15
    181:17 186:8
    194:18 206:1,4
    217:8 241:23
    280:17,19,24
    290:21 319:9
    323:8 365:25
**counselor**  87:7
    99:9
**count**  112:10
    155:1 291:19
    315:25 316:6
    319:18 322:5
    331:19 332:18,22
    332:22 335:3,16
    335:20 337:4,7,23
    341:15,16,19
    345:25 346:8,12
    346:14,23,23
    347:5,6,7,16 359:9
    372:22 377:22
**counting**  164:1
**country**  255:3
    379:7,10,14
**counts**  334:4
    363:6 377:21
**county**  174:10

**couple**  162:12
    170:4 268:12
    284:8 286:4
    287:24
**course**  15:18
    17:22 29:10,13
    137:16 139:5
    192:7 251:13
    254:11 256:20
    276:22 303:11
    315:3 329:9 348:6
**courses**  254:8
**court**  1:1,23 2:23
    5:2,8,10,14,21 6:4
    6:12,17,24 7:1,4,6
    7:10,24 8:1,4,7,11
    8:13,15,22,24 9:2
    9:11,18,25 10:6,13
    10:17,20,22 11:3,8
    11:9,12,18,21,25
    12:3,6,8,13,15,18
    12:21,23 13:3
    23:3,14,18 25:1,3
    25:7,11,13,25 28:7
    28:9,12,16 29:5
    30:7 31:5,8,11,13
    31:19 32:6,9 35:6
    35:13 36:6 37:1,5
    37:10,12,19 45:21
    49:15 52:9 53:2,4
    55:4,10,14,16,21
    57:5,9 61:16
    62:22,24 63:1
    64:6,9,25 65:2
    66:13,16 67:2,21
    68:3,5,8 72:6,9,13
    72:17 73:19,24
    74:1,4,6,8,11,12
    74:16,20 75:2,14
    75:18 86:10,15,19
    86:25 87:14,18,20

88:25 99:5 101:13
101:15,20,23
102:6 103:7,9,16
103:18,23 104:2,5
104:10 105:3,7,23
105:25 106:3
107:16,24 108:2,4
108:7,9,12 109:17
109:21 110:8,10
110:16,23,25
111:8,19,23 112:5
112:16 113:7,11
113:15,18 114:10
114:20 115:18
116:12,14,17
117:8,13,15,18,20
118:23 119:3,9,11
119:21 120:8,10
120:16,19 121:2,5
121:9,23 122:4,7
122:10,15,17,18
122:20 123:1,3,5,8
123:16,22 124:3,5
124:14 127:3,7,18
127:23 128:16
129:1,4,7,10,13,18
130:1,4,7,10,20,23
131:1,7,15,25
132:3,10,13,25
133:3,18,21
137:22 138:19
139:20,21 140:5
140:20,23,25
141:4,7,10,12,16
142:21 143:3,6,10
143:16,22 144:2
144:15,18,25
145:22 146:7,11
146:16 147:2,6,10
147:13,22 148:1,5
148:9,13,17,21,24

149:6,9,12,14,19
149:22 154:1,4
161:18 162:16
170:22,25 171:20
171:22 172:2,4,7
172:10,13,16
173:6,14,15,20
174:1,6,11,13,16
175:1,5,10,13,15
176:1,6,11,21,24
177:5,9,21,23
178:2,3,15,20
179:4,13,25 180:9
180:13,18,20,21
180:24 181:2,14
181:21,23 182:5
182:19,22,25
183:13,24 184:11
184:14,22,25
185:4,6,15,18
186:1,4,7,13,15,16
186:18,21,25
187:4,8,9,16 188:4
188:6,14,20,23
189:1,6,11 190:3,9
190:17,21 191:1,8
191:19 192:5,8
193:1,9,12,15,19
193:22 194:5,9,14
194:17,21 195:1,3
198:23 199:1
204:20,23 205:1,5
205:8,17,18,21,23
205:25 206:13,16
206:21,23,24
207:6,8,9,13,19
212:19,22 215:10
217:9 218:2,6
219:18,20,23
220:1,3,15,17,19
223:7,16,19 227:3

230:21,25 231:14
235:10,15,17,24
236:12 238:6,8
240:13,16,21,24
241:1,4,7,10,24
242:9 250:5,8,11
250:14 251:23
252:2,5,8,12,25
253:3 256:23
257:10,15 258:9
258:13,16,17,20
258:22 259:2,4,23
262:9,12,20,24
263:2,4,6,10,13,16
263:19 264:1,6,8
268:22,24 269:1,7
269:9,16,24 270:4
270:6,9,12,15,17
270:20 271:4
273:19,23,24
274:2,19,22,25
275:3 277:6,25
278:22 280:1,5,7
280:10,13,25
283:21 288:4,20
288:23 289:1,4,9
289:12,17,21
290:5,14,21,23
291:3,10,13,15,18
291:22 292:6,8,16
292:24,25 293:4
293:10,17,23
294:1,5,8,13,15,18
294:23,24,24
295:8,14,24 296:4
296:12,16 298:1
298:21,23 299:18
300:2,5,8,11,15,18
301:1,4,6,8,17,23
302:18,24 303:5
303:19,22 304:2

304:12,15,18,22
305:1,6,9,25 306:9
306:15,18,21,25
307:2,6,16,18,24
308:2,7,19,22,25
309:3,7,10,18,22
311:12,14,17,19
313:3,5,7 314:7,11
314:16,20,23
315:10,15,21
316:19,22 317:2,6
317:8,9,21,23
318:16,18,20,21
318:25 319:9,11
319:15,23 321:3,6
321:15,18,21,22
321:24 322:11,14
322:23 323:13,15
324:1,6,9,11 326:6
326:25 327:14,18
328:10 329:6,11
329:18 330:2,18
330:22 331:1,18
331:20,25 332:24
334:1,12,15 335:5
335:14,17,20
336:17 337:22
338:14,23 339:7
339:11,13,24
340:9,23 341:18
341:20 342:6,10
344:2,13 346:4,10
346:19 347:7
348:2,16,18,22
349:2,15,20 350:3
350:6,10,24 351:8
351:14 352:20,24
353:3,6,17 354:5
354:18 356:10,15
356:20,22 357:5,9
357:15,19,22

358:1,20 359:14
359:23 360:5,8,21
360:23 361:1,4,7
361:12,15,23
362:3,7,16,18,20
363:2,6,10,16
364:3,12,15 365:6
365:13,16,19
366:2,5,12,16,18
366:24 367:6,10
367:15 368:7,16
368:19,22 369:1,5
369:9,21,25 370:1
370:5,16 371:2,16
371:21,24 372:3
373:3,10,14,17,19
373:21,25 374:2
374:11,15,16,20
375:6,18,24
376:14,21 377:15
377:19,25 378:3,5
378:8,11,14 379:3
379:9,11,20 380:2
381:6,10,15,19
382:14,22 383:16
383:22 384:1,20
384:22,24 385:2,4
385:10,13,19,20
385:24 386:5,11
386:13
**court's** 31:17
319:18,20 330:16
337:17 347:11
**courthouse** 284:19
**courtroom** 178:8
185:2 187:22
298:11,13 308:14
310:2 372:25
**courts** 142:2
330:20 376:16

**covered** 152:3
315:16 326:7,8
364:18
**covering** 153:7
**covers** 40:24
**cr** 1:3,3,4
**crafted** 329:3
**crash** 47:24 50:2
213:18 214:17,18
214:20 222:15
228:5 232:19
272:4
**crashed** 47:12,15
117:1 214:22
217:5
**cream** 20:9
**create** 136:22
256:7,13
**created** 137:1
259:14 260:7
**creating** 266:22
**credibility** 376:24
378:24,25 379:2
380:18 382:1
383:6
**credit** 136:10,11
136:16
**crime** 40:17,18,20
54:8 98:7 104:6
210:20 230:1
247:13,13 281:22
282:7 283:3,3
316:21 318:6,10
320:9,16 324:19
324:22,24 330:8
336:13 341:9
342:4 345:8
347:23 348:1
358:2,4,6 376:15
376:18,19 377:2
377:22 378:21

380:10,10,14,15
381:21,23,24
**crimes** 78:4 276:6
339:2 349:5 377:2
377:13 382:5,5
383:12
**criminal** 194:23
248:14 276:14
326:18 359:3
376:11 382:18
**critical** 316:11,11
372:18
**cross** 3:2 4:2 5:13
9:19 10:15 13:5,8
28:9,13 57:11
61:4,16,19 70:23
73:19 86:24 87:1
87:3 88:25 89:7
99:6 129:17
194:25 195:12,17
198:24 199:3
205:9 207:6 218:2
218:7 227:3,4
230:21 242:9,11
257:21 258:22
264:10,12 268:14
274:19 280:1,2,4
283:22,24 288:1
289:2,5 303:5,8,18
305:5,14,17
341:23 367:17
**crossed** 323:18,21
325:14
**crystal** 353:24
**culpable** 343:13
**cumulative** 126:23
144:13
**cup** 10:23
**cure** 116:14
126:15

**cured** 126:21
**curious** 309:15
**current** 83:23
134:2 276:3
282:23,25 319:7
323:24 324:1
329:4
**currently** 32:15
65:7 75:23,25
137:9 208:11
220:24 253:9,10
271:9 276:5
281:14 328:17
**curtis** 2:3
**custodian** 6:1
128:4 134:3,20
138:5,14,18 139:2
189:4,8 192:2,23
**custody** 228:18
229:12 255:14,20
380:8
**custom** 233:8
**customer** 135:10
135:14 136:6,7
157:16
**customers** 204:13
**cut** 62:1,18 368:20
**cycling** 265:1

**d**

**d** 3:1 4:1,13 5:1
48:22 49:12,15,17
50:15 71:21 73:8
73:14 151:25
227:12 241:14
**d.c.** 282:2
**daily** 58:6
**damage** 50:12
**damages** 107:15
**danger** 182:12
382:11

**dark**  41:12,12
43:15 210:22
**data**  91:6 134:16
199:10,13,16
201:8
**date**  79:18 135:25
137:9 154:11,15
154:16 160:19
161:13 196:12
197:6,18 198:5
204:10 236:24
237:4 243:6 251:3
367:25 379:13
**dated**  373:25
387:11
**dates**  152:2,3
153:7 161:3
**david**  3:6 31:24
32:5
**day**  1:7 15:3 33:6
33:15 48:20 49:8
57:1 58:10 61:24
65:20 66:3,4 67:9
77:5,22 82:14
83:10 91:21 94:14
97:11 101:1,2
109:10 111:16
126:17,17 140:10
140:16 147:16
159:11 185:19
192:4 197:2
199:17,17 201:23
203:14 209:6
213:20,24 221:12
221:16 242:24
271:20 285:2
293:5 295:7
310:10 312:11
317:10
**daylight**  155:6,9

**days**  24:9,10 67:6
80:20 82:13,14,17
92:25 95:19,20
97:8,12 98:25
101:4 109:3 180:5
284:8,25 286:4
380:5
**deal**  89:20 143:10
**dealing**  171:13
254:19 308:16
**deals**  171:15
207:10 298:12
385:5
**dealt**  90:3,6
**december**  208:15
377:6
**decide**  79:10
177:13 178:5
192:19,20 223:21
298:10 299:6
301:19 306:10
339:14 342:14
359:4 368:2
374:22,23
**decided**  6:3
314:24 317:11
**decides**  126:13
305:15
**deciding**  180:7
376:14,16
**decision**  83:2,4
173:17 312:8
313:12 369:11,14
370:17 381:23
**decisions**  288:9
**declare**  180:10
183:5
**deem**  316:3
**deemed**  315:4
**deescalate**  18:17
18:20

**default**  158:3
**defend**  317:17
**defendant**  1:6,13
1:16 2:1 131:16
132:21 139:24
144:19 148:14
173:16 174:17,19
174:22 178:7,19
178:23 179:5,15
182:9,13 184:7,21
184:23,25 186:7
187:10,17,21,24
189:22 206:4,5,5
290:8 303:7 304:8
304:21 305:2
308:14 312:2,6,12
312:16,22,24
313:2,6 317:3
318:5 323:17,20
325:19 327:23
328:10 334:17
335:7,8 336:21
343:13 368:11,12
376:12,13 377:13
379:13,21 382:19
384:4
**defendant's**
140:14 179:2
318:9 323:16
325:12 368:8
376:23,24 380:17
382:1
**defendants**  127:10
176:3 178:11
179:1 180:15
186:14 287:19
296:24 300:13,16
300:19,22 308:13
320:2,3,11 327:25
330:23 335:15,21
335:22 337:6

**default**  341:6 355:16
358:3 365:20
367:7 376:7 380:2
383:7,11 384:18
**defender**  2:1
317:17
**defense**  86:1
146:12 188:1
254:18 257:20
291:16 316:11
327:6 342:1,2
368:20
**define**  86:13
**defined**  342:21
368:17
**definite**  297:15
**definitely**  292:13
**deflected**  306:4
**degree**  245:7
262:3
**delaware**  131:17
132:8 150:14
**delay**  11:2 281:2
**delete**  204:8
**deliberate**  347:5
347:16
**deliberating**  171:8
**deliberations**
294:15 297:9,14
**delighted**  369:2
**demonstrate**
56:25
**demonstration**
266:18
**demonstrative**
110:1 115:17
120:6 122:8
**denied**  379:25
382:7
**department**  32:18
60:20 71:3 76:2

84:24 124:20
201:21 221:1
233:9 247:15
253:15 271:11
284:17,22 287:6
**depending**  117:4
229:2
**depends**  81:18
88:7 95:21 96:22
136:5 137:8
189:16
**depict**  36:13 234:7
234:18 235:1
**depicted**  93:5
285:19 366:22
**depiction**  49:7
52:20
**deployed**  167:17
**deputy**  184:5,7,13
184:15,19,20,23
185:1,5,10,13
308:18
**describe**  21:5
216:10 248:24
267:12 367:10
**described**  52:21
57:1 190:18
243:11 265:10,25
**description**  41:11
41:14 43:13
190:11 216:24
370:19
**design**  266:12,20
266:24
**designed**  91:7
342:22
**designs**  266:15
**desired**  325:19
327:23
**destination**  156:15
157:5 158:14

**det**  3:10,16,20
75:7
**detail**  135:8,16,22
135:23 136:21
137:10 152:21
153:6 154:6
256:14
**detailed**  259:10
261:25 329:20
**detailing**  313:20
**details**  41:8 42:15
135:10 189:14
368:4
**detective**  52:3
74:22 75:12,21,23
75:25 76:10,17,25
77:1,18 81:5 82:9
85:4,18,20 87:5
89:11,13,14 98:17
98:18 99:8 100:18
206:18 207:24
208:4,12,14 218:9
231:4,8,11,12,14
231:24 238:15
244:7 245:8 252:3
255:15 264:16
271:23
**detectives**  76:1,3,4
76:19 78:19 79:7
79:23 84:19
100:21,25 224:8,8
224:14,15 232:2
272:20
**detention**  307:9
**determination**
91:11 101:5
384:17 385:3
**determinations**
262:2
**determine**  47:4
83:18 84:1 88:12

158:21 160:21,24
161:5 224:8
225:21 240:5
248:5 256:5
261:17 277:3
278:6,14 301:12
318:13 376:14
382:17 385:4
**determined**  100:8
290:9
**determines**  87:25
**determining**  301:8
**detriment**  180:6
**development**
254:14
**device**  157:23
167:19
**devices**  134:16
**dial**  156:21,25
157:5 167:20,23
**dialed**  156:14
157:3 163:15
**diaphanous**
367:12
**didn't**  61:23 93:17
100:12,15 179:22
**difference**  154:24
155:11 165:14
184:6 292:8
305:21
**different**  77:24
78:6,7 85:8,12,15
97:20 119:25
138:17 181:19
201:17,18 233:6
276:25 277:1
278:10 321:12
333:23,24 356:1
363:18
**differently**  167:14

**difficult**  37:2 78:5
196:25 330:7
337:3 347:11
**difficulties**  175:24
**digest**  329:22
**digital**  89:21,24
287:5
**digits**  168:12
274:14
**dire**  257:24
**direct**  3:2 4:2
32:11 58:15 65:3
75:19 133:22
142:14 161:16
163:7,24 167:5
196:7 198:6
202:24 208:9
220:20 227:8
231:18 253:4
271:5 275:16
281:12 313:16
**directed**  222:7
319:25
**direction**  35:23
47:9 53:12 54:2
121:25 156:8
173:6
**directions**  46:21
47:8
**directly**  54:2 58:3
58:12 161:9 169:1
184:7
**disagree**  317:6
331:14 362:11
**disbelieve**  71:22
**discern**  355:14
**discharge**  239:17
**discovery**  98:20
102:18 110:3
**discuss**  74:11
109:12 171:5

discuss 298:14 300:21
312:4 363:3
375:16
**discussed** 105:9
107:4 109:11
119:18 166:22
187:13 282:8
315:24 340:6
350:22
**discussing** 92:21
373:9
**discussions** 290:20
**disguising** 305:18
**disingenuous**
115:13
**disjunctive** 326:15
**dispatch** 58:4,13
58:20,21,22 59:4,6
59:15,15,20 60:12
123:21 311:2
**dispatcher** 39:23
60:9 63:23 167:24
**dispatches** 58:17
**displayed** 84:9
199:8 225:7 318:6
**dispute** 105:14
377:12
**disputing** 347:21
**disrespect** 317:7
**disrespectful**
347:12
**dissatisfaction**
176:18 181:16
**disseminated**
85:20
**distance** 214:7
**distinct** 305:21
**distinction** 156:23
**district** 1:1,1,8
32:19,20 33:17
65:9,15 76:8,9,14

208:22 212:2
221:7 271:11
277:12
**districts** 76:7
**disturbance** 63:20
**disturbed** 228:12
**divide** 156:19
**division** 52:4
231:13 238:15
**dixon** 1:16
**dna** 51:5 230:5
245:22
**document** 69:15
81:7,9 131:15
150:19 152:8
227:8 251:8 376:3
**documents** 202:23
278:13 376:3
384:16
**doesn't** 202:16
301:23
**dog** 143:12
**dogs** 216:14
**doing** 27:13 32:23
45:25 67:19 87:8
87:9 93:13 116:25
172:7 199:5
220:16 228:9
239:13 284:3
285:15 300:24
301:1 310:3 371:7
385:19
**dollar** 227:14
354:11,12
**donald** 73:11,13
**donnie** 1:5 9:13
28:24 67:5,9,10
69:3 71:17 73:7,8
73:15 120:17,19
120:25 121:18
124:22 125:8,9,12

125:13 126:6,9
130:12,13 139:8
139:17,25 140:8
141:13 144:11
145:7,9,10,18
148:13,14 176:25
177:7 180:7 185:1
190:7,10 199:18
200:12 227:17,18
301:13 326:10
345:6 350:1
**dontay** 73:14
102:21,23,25
108:20 120:23
124:22,23 125:7,8
125:12 126:8
139:8,17 140:14
140:17 141:10,12
142:6,15 145:7,17
148:10 151:25
152:22 153:10,14
153:14,16 158:22
159:6 160:1,3,7,8
160:14 161:1
163:12 164:11
166:8,19,25
168:10 170:5,14
177:7,9 200:2,5,12
**don't** 146:25
298:14
**door** 27:13 43:10
44:13 93:19 94:17
174:7 211:8
215:20 351:22
**doorway** 28:25
**double** 85:6
**doubly** 127:15
**doubt** 331:4
345:13
**download** 82:16

**downstairs** 179:19
184:8 186:19
**downward** 267:14
**drafted** 336:20
369:25
**dragged** 147:20,22
**drakowski** 184:5
184:13,19,20,23
185:1,5,10,13
**dramatic** 339:25
**draw** 37:13,24
42:19 60:16
318:11 352:5
**drawing** 37:18,25
38:5 60:14
**drawn** 38:12 61:5
357:2,4
**dressed** 43:15
**drew** 42:18 45:1
356:13
**drillmaster** 254:17
**drive** 1:14 82:25
83:1 91:4 95:22
213:18 272:23
**driver** 209:14,15
216:9
**driver's** 43:9
211:4,7 241:19
242:6
**drivers** 214:16
**drives** 82:20
**driving** 54:1,1
62:8 68:25 213:10
217:23
**dropped** 359:15
**drove** 36:23 38:17
118:19 190:16
210:24 211:15,16
211:20 217:5
**drug** 276:7 281:23
383:11

**dubois** 1:7 185:3
**duly** 263:15
**duration** 155:19
  155:23,24 156:1
  165:5 166:7,13
  169:15
**duties** 134:17
  276:3,8 281:19
**duty** 58:11
**dvd** 90:25
**dvr** 77:15,24 79:14
  89:23 90:2,4,25
  91:23 94:9 95:18
  287:5
**dvrs** 90:6,10

**e**

**e** 1:7,10 3:1 4:1,11
  4:19 5:1,1 71:21
  73:8,14 75:13
  133:16,17 150:9,9
  150:10,10 208:5
  234:13 235:5,9,16
  235:17,20 242:2
**earlier** 67:20
  80:22 113:4
  223:16 260:25
  283:10 298:7
**early** 176:15
  295:22 384:13
**easier** 358:13
**easily** 98:3
**east** 33:20 36:13
  47:20 49:24 51:18
  53:13 209:17
  217:2 221:20
  222:5 232:6 272:1
  272:8 282:13
**eastbound** 35:25
  38:5,6 53:16
**eastern** 1:1 154:20
  154:25 155:3,5

162:2,5 277:12
  282:23
**easton** 1:15
**easy** 125:6 330:7
**eat** 298:2
**eating** 297:24
**echo** 235:9
**eckert** 1:10 3:16
  3:20,21 4:3,5,6
  5:3 6:15,18 10:18
  12:11,12,14 23:15
  31:16 74:9,14,18
  74:21,24 75:3
  131:12,19,22
  132:5 173:10
  174:5 175:8,12
  177:18 178:14,17
  179:6 182:4,6,21
  182:24 183:9
  186:24 194:16
  206:14,17 207:5
  208:6,10 212:5,7
  212:17,24 213:1,8
  213:15,16 214:24
  215:1,9,11,14
  217:7,10,13,17,20
  217:25 219:21
  231:3,19 234:2,4
  234:15,17,24,25
  235:8,13,16,19,22
  235:25 236:10,13
  236:14 237:13,16
  238:4,10 240:11
  240:17,23,25
  241:3,6,8,11,13,16
  241:22 242:1,3,8
  250:6,9,12,15,17
  251:9,13,14,22,24
  252:6,9 269:4,8
  270:13,16 271:6
  273:16,21,25

274:3,4,11,13,17
  275:4,17 277:15
  277:21,23 278:2,3
  278:20,23,24
  279:24 280:12,14
  280:18,23 281:2
  281:13 283:19
  288:16 289:3,6,11
  289:25 290:2,6,15
  290:18 291:1
  294:11,21 295:13
  295:17,19 296:13
  299:16 323:1
  332:11,13 333:3,7
  333:10,12 334:3,9
  334:14,18 337:24
  338:2,16 339:5
  340:22 341:15,22
  343:14 344:21
  346:3,15,21
  347:10 348:14,25
  350:11 351:3,21
  353:2,4,7,19 354:2
  354:4,7,9 358:25
  359:11,20,24
  360:4,9,17,22
  361:9,13,21 362:5
  362:12,25 363:5,8
  363:11,17,24
  364:1,4,7,9,14
  365:2,18 366:4,9
  367:5 369:19,24
  370:9 372:1,2
  373:2 381:12,17
  383:18 384:15,21
  384:23 385:1,12
  385:23 386:7
**edge** 232:10
**edit** 92:6,6
**edpa** 377:6

**education** 253:25
  254:22
**effect** 229:12
  376:13 383:4,9
**effectively** 173:4
  175:21
**efforts** 377:9
**egos** 200:24
**eight** 54:22,22
  90:7 93:7,11
  137:13 161:7
  167:22 247:1,3,8,8
  266:6,7 293:14,15
**either** 73:14
  181:14 183:5,14
  196:18 245:3
  247:12 255:20
  265:17,24 293:11
  306:7 311:5 319:6
  324:17 338:5,16
  338:17 370:10
  384:12
**eldorado** 254:17
**elected** 331:8
**electronic** 387:5
**electronically**
  135:19 136:25
  137:5
**element** 316:23
  320:24 324:17
  325:1,16 345:19
  347:3 359:21
  370:3,10 371:17
**elements** 320:5,6
  320:17,18 330:8
  330:10 335:25
  347:18
**eliminate** 123:17
  362:21
**eliminates** 123:19

email  346:17
emailed  374:5,9
emanuel  370:18
  370:22
embarrassed
  269:19
embodied  365:9
emergency  136:19
  210:2
emmanuel  3:3
emphasis  120:12
emphasizes
  318:15
employed  32:16
  32:17 65:8 75:24
  134:5,9 208:11
  220:25 253:9
  271:9 275:20,21
  281:14
employees  272:16
  361:15,17
enable  193:15
encompass  76:6
enforcement
  276:15 278:9
  281:24
engaged  203:24
engaging  356:19
engineers  158:1
english  14:2,4,6,10
  379:7,15
enlarged  151:16
enter  134:21 205:3
  352:4
entered  103:19
  226:7 363:20
entire  126:25
  208:24 295:7
  303:13 308:15
  378:23

entirely  318:12
entirety  206:6,7
entitled  323:19
  387:6
entity  40:13 134:7
  360:19
entrance  94:10,24
entries  199:13,16
entry  199:10
envelope  261:14
envelopes  256:10
equation  337:16
equipment  157:20
ergo  303:15
escalated  126:10
escapes  322:1
esq  1:10,10,13,16
  2:1
esr  2:6
essence  330:9
essentially  54:4
  157:9 174:23
  176:19 204:8
  228:17 315:18
  321:9
establish  35:10
  102:19 113:8
  115:19 116:3,10
  120:14 123:21
  125:11 126:5
  139:11,15 144:23
  145:6 190:4
  330:21
established  196:9
  203:15
establishes  67:10
estimate  159:4
  256:21
et  204:10
evaluating  327:7

evening  68:16
  69:9,19 77:7 83:3
  99:15 198:11
  308:15
event  357:10
events  56:25
  287:13
eventually  216:2
everybody  12:25
  21:24 85:10 93:4
  298:23
everyone's  350:23
evidence  5:22 6:2
  6:5 7:11,13 49:16
  53:5 55:11,13,17
  72:10 77:9 101:5
  101:9,10 102:10
  110:11 111:9,13
  111:20 114:18
  115:19 116:22
  117:2,22 118:7,20
  118:23,25 119:22
  120:6,25 122:5
  124:10 127:18
  130:16 132:1
  133:6,7,8 134:22
  139:23 141:23
  142:4,8,10,15
  144:14 146:18,20
  148:10,25 153:2
  171:7 176:22
  177:2,2 189:10,17
  190:4 228:11,20
  229:4,14 235:18
  238:21 240:20
  241:5,9 246:2,5,7
  248:13 252:7
  253:16 254:20
  255:5,9,15,19,21
  255:22 256:12
  257:18 259:22

  262:13,16,23
  263:8,20,22 264:9
  284:11 293:21
  294:6 296:25
  298:11 299:7
  303:5,8 304:7,23
  313:16,19,19,25
  314:1 316:13
  318:17 341:23
  343:5 344:3,16
  349:9 350:20
  351:4,6,7,7,8,11
  351:16 352:20,24
  353:7,13,21 355:3
  355:5,8,18,21
  356:23 364:13
  367:2 368:22,23
  369:1 370:6 376:5
  376:7,9,10,12
  378:18,19 379:22
  380:13 383:1,6
exact  16:8 77:7
  109:25 110:1,2
  250:22 251:17
  267:6 333:25,25
  338:9 382:10
exactly  164:23
  241:3,3 291:1,2
  343:16 352:6
  367:6
exam  196:7
examination  9:19
  13:6,8 23:22 28:9
  28:13,18 29:8
  32:11 57:11 58:16
  61:17,19 65:3
  70:23 73:20 75:19
  87:1,3,15 89:1,7
  99:6 129:17
  133:22 194:25
  195:12,17 198:24

199:3 202:24
205:10 208:9
218:7 220:20
227:4 230:22
231:18 242:11
250:16 253:4
255:8,24 257:19
257:24 258:6
259:7 264:12
268:14 271:5
275:16 279:10
280:1 281:12
283:24 288:1
305:17 341:23
**examinations**
256:19,24
**examine** 218:2
227:3 233:6 242:9
255:25 257:21
260:23 264:10
278:17 279:2
303:8,18 305:5,14
**examined** 207:6
256:21 260:12
264:17 267:5
279:7 303:5
**examiner** 252:14
255:18 256:18
**examiner's** 4:22
254:19
**examining** 10:15
253:16 255:12
367:17
**example** 53:25
144:25 155:14
156:22 158:7
159:17 164:17,19
330:21
**exceeded** 379:22
382:11

**exceeds** 383:12
**exception** 189:21
325:6
**exchange** 313:20
**exclude** 111:20
376:5 378:17
381:1
**excluded** 144:20
377:3 379:24
**excluding** 129:24
130:1
**exclusion** 381:25
**excuse** 80:7
155:21 191:14
192:11 288:18
289:9 298:18
308:10
**excused** 186:2
205:10,12,21
306:9 315:6
**excusing** 185:19
**exercise** 121:6
173:1
**exhibit** 5:18 27:4
36:4 45:19 48:22
48:25 49:17 52:13
52:25 53:6 54:24
55:18 69:12 81:2
81:6 109:18,23
110:17,18 120:1,2
120:4,10 122:1,4
122:10 129:24
131:13 132:2
137:20,24 138:22
138:22 139:2
140:7 149:16
150:2,17 151:1,5,6
151:15,20 153:1
154:1 191:1 194:5
212:23 217:12
225:6 235:20

238:9 241:12
259:19,21 260:1
260:11,21 261:25
262:6 263:21,22
263:23 264:5,8
269:6 274:12
299:4,4
**exhibits** 49:12
119:24,25 149:7
160:8 207:18
332:4 364:23
**exist** 159:25 337:9
**exit** 28:3 43:20
**exiting** 62:2
**expect** 128:10
149:1 167:11
168:6 186:11
384:18
**expel** 342:22,23
**experience** 13:21
30:20 57:22
205:17 281:25
**experiences** 90:2
**expert** 245:3
248:23 257:4,13
257:17 258:17,24
276:9 277:6,16
302:10 303:4
362:9,24 363:1,1,2
363:7
**experts** 362:10,21
362:23 364:17,17
364:18
**explain** 7:21 41:19
46:4 66:25 80:6
84:20 134:14
135:5 161:25
164:10 179:23
209:25 233:4
239:7 255:10
266:14 276:13

282:18,20
**explained** 67:18
80:17 136:21
180:3 199:10
202:24 310:2,3
320:5,15,17
**explaining** 36:20
86:17
**explorer** 209:10
**explosive** 342:24
**explosives** 254:12
275:22 281:16
**export** 79:22
90:17
**expressed** 173:24
176:18 181:16
**expression** 264:19
**extant** 376:1
**extend** 108:5
**extensive** 244:9
**extent** 118:12
**exterior** 100:3,9
**extra** 373:3,5
**extraordinarily**
327:14
**ezaliza** 14:16
19:13 20:16

**f**

**f.3d** 313:14
**f.3d.** 325:24
**faces** 46:5,6
**facilitates** 333:18
**facilities** 254:16
**facility** 233:13,16
**fact** 15:14 20:8,14
108:22 111:25
114:7 117:5 125:3
126:7,9 130:13
137:23 138:16
139:16 145:7,16
147:20 162:20

178:19 179:10
190:2 193:5,18
233:24 248:5
269:11 304:22
322:7,7,17 337:2
338:14 351:5
352:3 356:23
358:5 367:4
380:15
**factor** 98:6 372:6
**factors** 380:12,21
 381:20
**factory** 279:17
**facts** 121:16,16
 133:8 146:8
 318:13 322:4
 327:13 338:13
 349:4 350:9
 355:16 358:16
 365:21,22 383:2
**factually** 327:11
 333:4,13
**fail** 343:19
**failure** 318:9
**fair** 37:14 38:18
 44:7 46:15 49:7
 52:19 53:16 55:23
 78:11 83:13 88:23
 107:15 159:24
 160:6,16 207:7
 247:2 248:25
 366:11
**fairly** 211:25
 212:12 215:5
 235:5
**fairmount** 232:10
**fall** 359:6
**familiar** 90:13
 134:23 135:2
 174:4 202:13
 210:7 279:3

285:18,19
**familiarity** 196:6
 285:6
**far** 19:15 34:5
 47:20 94:3 111:13
 116:5 173:23
 174:17 177:5
 185:23 222:14
 223:4 224:8
 357:14 366:15
 382:17 383:12
**farther** 34:7 41:10
**fast** 21:6 44:7,8
 265:4 272:5
**fathom** 350:7
**favor** 378:19
 380:18
**fbi** 77:23
**fcc** 156:21 167:18
**fdc** 314:15,17
**fear** 344:12 369:12
 370:22,23
**february** 152:5
 206:8
**fed** 313:11
**federal** 128:9
 257:10 258:17
 276:6,15 277:6
 282:1 284:19,20
 317:17 357:15
 358:20 376:9
**feed** 94:22 286:15
**feeds** 91:9 97:19
 97:24 285:6,11
 286:2
**feel** 15:19 203:4
**feeling** 116:25
**feels** 269:14
**feet** 45:3 324:12
**fell** 74:4

**felon** 303:15 381:8
**felt** 119:19 370:7
**female** 51:21
 272:16,17
**fernandez** 4:3
 216:17,18 269:5
 270:14,23 271:3
**ferreira** 3:6 31:22
 31:24 32:5,15
 36:8 37:16,23
 38:8 48:24 49:22
 50:15 52:12 53:9
 54:19 56:2,13,20
 61:21 64:7 211:4
 211:7,10
**field** 257:4,14
**fifth** 159:20
**figure** 83:24 121:9
 130:8 146:8 292:3
 292:12 294:19
 354:10
**file** 291:20
**filed** 256:10
**fill** 68:18 71:2
 80:14 224:17
 371:6
**filled** 67:8 68:20
 69:8,15 72:3
 80:24 81:7 225:3
 225:9 237:19
 362:4 371:5
**fillers** 85:1
**fills** 80:9
**filmy** 367:12
**final** 114:8 283:8
 290:3
**finalize** 383:23
**finally** 158:12
 297:22 349:14
 381:2

**find** 80:21 93:12
 146:24 216:9
 228:11,21 229:14
 308:11 316:14
 322:13 326:9,13
 330:5 335:3
 336:19 338:19,20
 345:10,12,24,25
 346:11 347:8
 368:21 379:21
 383:5
**finders** 304:22
**findings** 256:14,16
 259:11 261:24
 262:14
**finds** 383:10
**fine** 6:17 7:23 12:1
 14:7 31:8 66:16
 68:3,5 87:19
 107:1,1 123:12
 143:9 145:11
 172:7 178:21
 186:21 188:14
 199:1 217:12
 220:17 227:14
 241:10 270:15
 274:25 291:3
 365:19 375:15
 384:20
**finger** 37:13
**fingerprints** 51:5
 230:2 245:22
**finish** 8:1,16 28:12
 62:24 140:25
 180:7 188:13
 192:11 195:6
 291:12 295:9
 297:5,7 349:18
 375:10
**finished** 11:13
 92:7 113:19 189:8

274:8 288:20
290:16 291:15
**finishing** 272:6
**fire** 244:24 248:6
248:16 255:4
256:2,5,8 261:15
264:22 266:4
267:10
**firearm** 4:22
236:22 237:2,3,20
238:12 239:1,16
241:18 243:13
245:15 248:16
255:11,12,13,24
259:8,11,13 260:8
260:12,23 261:5,8
261:17 265:24
266:8 267:5,7
268:3 276:25
278:9,11,18 279:3
279:6,12,20 320:9
320:16 324:19,21
326:12,16 327:25
331:7 336:16
341:25 342:21,21
344:11 345:7
347:25 363:25
377:22 378:9,14
380:21,22,24
381:7 385:5
**firearms** 238:17
238:18,21 244:10
252:14 253:11,12
253:16,20,23
254:12,13,15,17
254:24 255:2,4,5
255:17,18 256:21
257:4,14 261:11
275:22 276:6,11
276:18,19,24
277:3,7,17 278:6

278:14 281:16
338:5 378:22
380:4,20
**fired** 247:6,7
266:5,6
**firing** 256:6
261:20,22
**first** 6:2 16:23
19:20 51:3 70:15
95:3 116:7 132:19
154:15 162:23
165:1 166:1,3,5
169:12 176:9
184:16 189:1,20
192:18 196:18
205:6 208:7
213:21 227:19,21
228:4,14,15,22
236:23 244:6
245:14 255:2
270:14 299:15
301:6 307:20
308:16 313:12
315:9 319:24
320:11,12 323:13
324:15 325:15
329:12 336:1
339:4 345:18,19
346:25 349:7
351:24 352:9
386:4
**fit** 264:3 292:4
330:7 340:24
**fits** 310:9 340:25
**fitzpatrick** 313:9
314:22
**fiu** 238:23 253:18
256:9 362:25
**five** 55:24 85:1
130:24 155:3,4,10
162:8 169:14

208:21,24 213:22
234:9 260:15
271:16 282:1,5
328:7 353:25
375:1 378:3,5
380:6
**fix** 16:21 17:3
**fixed** 52:8
**flagged** 214:16
**flawed** 322:20
**fled** 40:9 49:4
**flight** 114:6
143:19,24
**flipping** 117:13
**floor** 187:13
241:19 267:15
**fluency** 379:15
**fluid** 81:18 88:7
**focus** 174:18
340:11 344:22
**focused** 194:18
380:15
**folks** 183:11
**follow** 24:1 45:13
46:15 47:1,2
111:24 211:19
213:3 214:7 222:8
267:13 278:6
340:22
**followed** 164:16
211:18 351:19,20
357:1
**following** 130:11
211:21 214:1,21
338:8 345:14
376:15
**foot** 58:10
**footage** 4:14,15
41:2 46:1 52:17
96:13,14 97:5
100:3 161:21

272:12 282:8,12
283:4 286:25
**force** 80:11 228:1
281:22 368:17
**forced** 354:20,21
**ford** 68:15,25 70:5
190:20 209:10
225:14 232:14
**foreclosing** 149:2
**foregoing** 387:4
**foreign** 277:4
**foreseeable** 350:1
350:8 355:14,15
356:3
**forfeiture** 384:17
385:4,4,5,6,14,16
**forgot** 59:21 172:4
300:11 371:10
**form** 71:23,24
72:2,10,14,23,24
72:25 73:5 80:4,8
80:8,12,24 82:10
109:6 284:12
350:14,18,25
355:7 385:25
**formed** 350:13
**forms** 71:2
**forseeability**
355:4
**forth** 106:17
109:14 117:6
128:19 147:16
159:8 239:11
249:9 306:1
328:23 364:21
**forward** 166:12
191:12 265:3,4,5
265:19,21,23
268:4 272:5
**forwarded** 158:8
165:9,10

**forwarding** 158:7
**found** 229:8
  230:17 245:15
  246:1 248:8 313:9
  314:21 337:4
  346:8,12 347:22
  358:4 380:4,24
**foundation** 125:2
  139:13,14 144:23
  190:1 244:5
**foundational** 6:5
**four** 1:7 33:11
  49:15 65:22 66:4
  66:5 85:7,8,19
  90:7 92:25 140:10
  140:16 155:10,12
  155:17 159:11
  162:4,7 164:2,6
  165:5 180:4
  273:11 274:14
  284:25 339:1
  377:21 380:21
  381:20
**fourth** 163:8
  228:16 325:1
  366:11
**frame** 168:17
  265:7
**frankly** 126:24
**free** 212:24 365:23
**freedberg** 174:9
  174:12,15
**frequent** 113:5
**frequently** 306:3
**fresh** 17:17
**friday** 296:3
**friend** 31:1 145:11
  145:19
**friends** 105:12,15
  107:22 116:13
  118:12

**front** 36:9 41:22
  52:13 81:5 86:14
  93:19 94:10,17,24
  95:6,7 108:18
  115:15 121:18
  138:3,12 150:19
  151:10 152:9
  158:17 163:2
  199:9,9 226:4
  240:2 260:10
  286:10,16
**fruits** 17:17
**full** 32:2 64:21
  75:10 133:14
  157:6 208:2
  220:12 231:10
  252:21 266:10,11
  266:12,15,16,20
  266:23 271:1
**function** 157:5
  258:1 261:21
**functional** 266:1
**functionality**
  247:25 248:4,10
  248:19,20 258:2,4
  267:4 342:18
**functioning** 91:17
  91:18 245:12
  343:24
**functionings** 245:9
**further** 28:5,7,12
  29:5 39:22 57:8
  60:9 61:15 70:20
  73:18 79:23 128:6
  130:3 149:2
  170:20 176:22
  187:15 188:10
  198:20 204:16
  217:25 227:1
  230:21 242:8
  251:22 263:25

  268:11 274:17
  279:24 283:19
  287:23 288:16
  342:25 346:14
  349:6
**furtherance**
  324:24 341:4,5
**furthermore**
  112:11
**future** 9:15 93:5
  291:25

**g**

**g** 5:1 45:21 49:15
  53:4 131:25
  140:25 196:11
  238:8 240:16
  241:10
**garage** 233:3,4
**garbage** 202:14,14
  202:16,17,18,19
**gas** 243:14
**gather** 194:19
  296:8 297:17
  330:3
**geared** 59:12
**general** 276:24
  282:22
**generalizations**
  229:16
**generalized**
  366:20
**generally** 95:18
  176:19 213:21
  268:19
**generate** 203:20
**generated** 139:4,4
**generic** 359:5
**generically** 366:13
**gentleman** 283:9
**gentlemen** 46:5
  84:21 133:4 134:2

  135:6 171:3
  209:25 216:10
  223:22 253:9
  254:2 257:16
  260:25 269:10
  275:19 278:5
  290:7
**georgia** 276:16
  279:17
**germantown**
  35:24 213:10,11
**gestures** 9:22 10:2
**gesturing** 10:24
**getting** 63:4 96:25
  97:24 119:10
  225:22 293:12
  309:12 311:17
  324:3 344:18
**gigabyte** 82:25
**give** 43:1,19 52:4
  59:6 78:19 85:4
  88:5 126:13
  179:22 183:22
  187:24 193:24
  214:4 291:11
  295:21 296:6
  315:1 327:20
  340:21 352:15,15
  352:16 354:21
  384:8
**given** 81:17 83:21
  112:12 178:25
  181:9 224:7
  254:11 257:20
  278:12 298:9
  321:8 337:17
  355:13 360:19
**gives** 127:16
  353:16
**giving** 40:13 46:22
  266:20 328:10

382:14
**glasses** 227:13
**glencoe** 276:16
**glock** 236:18
254:8 260:14,16
260:17 261:3
265:9 279:16
**gloves** 230:2
245:21 246:14
**gmt** 154:23,24
155:2
**go** 6:13 13:21
19:11 20:3 25:13
26:25 34:9 36:25
38:1 39:16,19
45:4 46:20,23
52:3 54:11,17
55:2 56:5,18 59:8
66:16 77:14 79:14
80:9 85:2 89:4,5,6
96:2 97:12 98:2
98:14 106:12
116:22 128:6
130:15 131:1
146:25 151:4
172:14,17 183:20
185:7 186:5,25
188:25 191:11
195:13,14,14,16
197:24 198:6
211:4 212:5 213:4
213:8 214:4
215:25 216:14
217:17 222:7,8,8
224:9 234:13,15
234:24 241:14,15
242:1 249:18
250:11 255:11
262:9 265:4,4,19
265:23 268:4
272:6,10,13

278:13 288:23
291:12 292:14
298:3,16 306:22
314:14 325:2
343:20 348:18
349:17 352:6
356:16 362:8
369:6,23 371:8
375:9 385:17
**goal** 186:4 276:22
358:22
**god** 358:12 367:15
**goes** 38:2,3 67:10
67:11 102:21
145:25 146:1
165:17 228:17
345:18 353:15
354:9 357:17
**going** 7:6,11 8:16
8:17 11:21,24
13:19 16:24 18:1
18:15 19:14 20:19
20:20 35:21,25
37:1 38:6,25
42:17 55:12 59:11
63:9 66:7,20
67:22 69:25 70:5
74:25 77:24 79:10
83:4 86:1 93:6,10
95:6,16 96:8,9
98:22 101:23
102:2 105:23
114:11 116:5,20
117:6 118:18
121:6,8,17,24,25
122:11,21 124:3,6
124:17,25 125:1,6
125:6,11 126:2
127:4,21 129:21
130:11 135:9,17
136:1 138:25

139:16 142:8
143:3,7,11,17,19
144:20 146:12
147:12 148:17,22
150:3 152:10
153:6 154:5,14,15
154:17 155:18
156:3,7 162:5
163:13 164:23
172:25 174:25,25
176:22 177:1
178:4 182:2,15
183:5 184:1
186:19,25 187:23
191:5,6,11,13
192:11,12 195:6,8
195:24 202:18
211:10 222:7
224:9 239:22
244:1 245:11
248:12,23 249:3
250:18,24 255:19
255:25 256:3,3
257:17 260:13
265:4,6 266:25
270:10 272:5
273:16 274:5
287:12,18 291:11
292:16,18 294:5
295:10 296:18
298:3,5,8,25 299:2
299:8 300:5
301:13,14 304:12
306:11,18 307:7,9
307:12,13,18
308:2,9,13,19
309:16,17 310:21
313:8 314:17
318:19 320:7,20
322:14 323:6
329:8 340:10

342:1 343:3,21
350:22 352:6
356:14 357:11
359:14 365:8
367:13 368:4
371:22 372:7,8,10
372:19 373:4
374:22 375:1,4,7
375:25 380:13
381:1 385:25
**good** 5:2,3,4,6,7
12:25 13:2,10,11
13:11 17:22 23:24
23:25 32:4,6,7,13
32:14 57:13,14
61:21,22 64:24,25
65:5,6 67:16
70:25 71:1 75:14
75:15,21,22 87:5,7
87:10 89:9,10
99:8,9 133:18,24
133:25 156:22
169:22 172:9
187:16 195:19,20
199:5,6 205:21
214:9 220:15,22
220:23 227:6,7
231:14,16 242:13
242:14 252:25
253:1,6,7 264:14
264:15 271:4,7,8
284:1,2 296:16
321:7,7 324:12
**gotten** 16:5 185:21
218:12,15 356:6
**governing** 382:24
**government** 1:10
5:10 7:18 8:18
9:25 28:23 31:21
64:11,18 74:21
75:7 81:2 97:16

97:18 104:12,15
106:20 108:5,12
108:16 111:11
112:13 113:1
120:3 122:21
124:6 125:5,24
126:14 127:3,8
128:9 130:11
131:11,13 138:6,7
141:24 146:22
149:10 175:6
178:13 181:23
183:6 189:4,7
193:17,20 195:23
195:24 199:8
202:24 206:4,6,9
206:17 220:4
231:4 234:13
252:13 260:11
262:17 269:5
275:5 280:15
285:1 290:8,9
291:15 293:18
296:17 299:4,15
302:25 314:9
316:14 317:25
319:9 321:13
322:12,21 323:18
323:21 324:14
325:8,15,18
326:14 327:5,22
330:13 332:3,16
339:4 340:12,13
341:7 342:11
345:4,13 346:25
348:5,14 358:11
362:22 365:20
368:24 369:18
377:9 382:16
**government's** 4:13
4:14,15,16,17,18

4:19,20,21,22 9:21
27:4 31:24 36:4
48:25 49:17 52:13
52:25 53:6 55:18
69:12 81:6 124:16
124:17 131:20
132:2 145:23
149:16 151:1,4,20
207:14,24 211:24
212:23 220:9
225:6 231:8
235:20 236:16
238:5,9 239:23
240:4,12 241:12
250:19,24 251:9
251:16,16,24
252:18 259:19
260:1 262:6
263:23 270:23
273:18 274:6
275:10 278:18
279:1 281:5
290:19 294:25
296:22 318:3
323:19 329:1
336:9 337:14
342:16 343:9
344:22 346:2
355:8 375:1
379:24
**grab** 98:3,14
265:13 298:2
**grabbed** 98:15
246:13
**grabbing** 267:20
**grade** 13:25
119:24
**grading** 63:12
**grand** 126:19
290:11 357:18,18

**granted** 350:16
**grave** 200:21
**gray** 153:22
**great** 42:15 367:25
**green** 178:9
**greenberg** 1:17
174:8,13
**greenwich** 83:19
84:5 154:23
**grips** 337:2
**grocery** 118:19
360:11 361:17,18
**ground** 124:6
139:22 381:25
**grounds** 139:9,14
141:19
**group** 276:6,7
281:21
**guarantee** 343:5
**guess** 16:7 82:17
133:18 171:11
182:8 294:17
301:17 315:19
319:1 341:5 370:9
374:22
**gugar** 98:17
100:18
**guidance** 291:11
**guidelines** 317:12
**guilt** 143:20,24
144:3,14
**guilty** 335:3
345:10,25 346:8
346:11,12 347:23
347:24 358:4
377:20,21 378:8
380:5,25 385:3,8
385:15,16,21
**gun** 17:6,7 20:20
26:6,16,23 27:16
27:24 29:18,20

30:2 60:10,12
61:6,7,8,10,12,12
239:17 245:2,9
246:14 247:7,12
247:17,19,24
248:5,8,15,20,25
249:1,6,12,13
254:6 261:4,9,10
264:22,23 265:14
265:25 266:3
267:2,8,16 316:18
318:6 322:4,5,6
331:15,17,23
332:6,8,8,10,17,18
333:4,6,12,14,14
333:18,20,23
334:1,5,5,8,22,24
334:24 336:7,12
338:4,11,14,15,18
338:19,21 341:17
341:17,19,21
342:4,11,17,19
343:3,12,15,22,24
343:25 344:4,4
356:13 362:24
383:11
**guns** 30:20 248:1
264:16 331:22
332:15,16 336:5
337:10 338:4
342:2 343:17
344:6 357:2,4
**guy** 16:15 203:13
245:2
**guys** 10:22 14:21
363:15

|  h  |
| --- |
| **h** 4:11 133:16
152:1 208:5
281:11 |

**hagan** 213:13
214:10,14
**half** 76:14 80:13
180:14 198:3
253:21 292:2
328:7 378:16
**halfway** 198:4
**hallucinating**
336:23
**hamburgers** 17:14
**hammer** 113:24
**hamstrung** 173:3
**hand** 10:4 15:23
16:10 26:6,7,16,18
26:24 29:18,20
30:17,21 31:23
40:3 54:16,16
56:3 64:17 75:6
207:23 213:11
220:8 231:7
239:25 246:14
248:24 249:7,7,8,8
249:13,13,15,15
249:16,18 252:17
265:13 267:14,15
267:19,20,20,25
268:6 269:17,24
270:22 275:9
317:22 318:20
319:9 323:12
325:7,11
**handed** 236:15,17
278:25 321:20
323:4,10
**handgun** 4:20
232:21 236:6,18
243:13 246:19
**handguns** 238:21
**handing** 137:24
237:2 332:7

**handle** 59:8 89:19
244:1 264:3
302:22 308:17
348:2 365:1 368:3
368:3
**handled** 89:20
361:16 364:22,23
**handling** 119:23
176:18 367:11
**hands** 18:1 24:22
26:19,24 27:20,22
44:4 51:10 269:21
333:2
**handset** 163:14
167:19 199:23
**handwriting**
304:10
**hang** 212:8
**happen** 29:24,25
30:21 33:24
179:24 182:11
211:6 224:9
295:21 333:19
343:22 348:7
352:6,18,23
**happened** 34:18
44:7,8 57:1 77:9
79:9,20 83:8
97:11 111:12,15
111:15 158:6,7
214:12 215:19
216:6 222:5 223:5
224:6 272:25
305:16 306:3
309:19 351:5
355:2 386:3
**happens** 43:22,24
44:23 120:21
168:8 311:2
343:14 345:25
354:18,22,23

368:9 375:6
**happy** 66:9 103:5
115:15 147:11
183:10 200:25
304:16 325:9
358:20,22 359:13
365:24
**hard** 82:20 91:4
95:22 120:1 350:7
355:14
**harder** 343:17
**hasn't** 294:24
**hat** 4:21 43:16
236:7,8 239:19
240:5,20,22 242:4
242:5
**he'll** 292:23
308:15
**head** 18:14 69:6
224:24 225:1
**header** 154:15
**headers** 154:6
**headquarters**
85:21
**hear** 5:21 6:2,4,6
7:12,12,13,22,23
9:2 17:10 59:16
62:13 102:7
139:21 141:2,19
142:9,13 177:13
184:15 192:18,19
192:25 194:9
244:4 264:19,23
264:25 265:6
277:25 290:24
299:4,6 301:13,14
302:3,4,14,14
306:11 307:9
352:14 366:20
**heard** 20:2 22:11
44:15 51:3 59:3

63:8 103:17 104:8
105:6,7 111:13
114:10,12 116:25
117:1 127:10
171:7 189:13
243:24 289:2
297:22 303:13
355:21 358:10
**hearing** 44:11
176:9 193:10
304:4 327:21
**hearsay** 34:25
223:18 262:13
**heated** 21:22
**heavily** 350:22
**heck** 344:16
**held** 223:4 224:3
329:23 376:25,25
**help** 78:1,3 110:11
288:3,9 301:12
302:9 349:5
**helped** 190:10
**helpful** 287:17
319:1,4,7 327:16
**heroes** 200:24
**hey** 98:14
**hidta** 276:7
**high** 276:7 281:23
**higher** 82:24
**highlight** 107:5
112:22,23 159:19
**highlighted** 106:6
109:22 110:5
112:21 119:20
120:2,4 122:25
129:24 318:2
323:9 325:7
**highlights** 106:7
110:1,5 112:23
**hit** 232:20

**hitda**  281:22
**hmm**  315:25
**hoarder**  213:12,13
  222:6 232:9
**hobbs**  345:20
  346:1,7,13 347:1
  359:21 370:2
**hogue**  183:25
**hold**  208:17 224:7
  249:6 297:1
  374:11
**holder**  47:16,17,19
**holding**  48:13,17
  179:19 223:11
  224:5 237:3
  248:25 249:1,12
  249:14 265:14
  266:3 267:16
  310:1 312:5
  347:21
**holds**  80:21 82:13
  239:9
**holes**  128:11
**hollow**  266:16,21
  266:22
**holstered**  44:25
**home**  156:24,25
  157:1,6 192:21
  195:8,8 298:7,15
**homework**  175:6
  369:7
**homicides**  268:20
**honor**  5:5,12,20
  6:8,9,15,19 7:15
  7:16 8:10 9:1,6,7
  9:12 10:11,19
  11:1,10,17 12:5,12
  13:7 23:13,19
  25:24 28:6 31:7
  31:15,16,21 32:8
  34:21,23 35:3,12

37:4,9 45:22
49:11 52:6,24
53:3 55:1,7,13,15
55:20 57:4,7 59:4
64:5,11,14,24 65:1
66:7,9,24 68:10
72:16 73:22,25
74:9,15,18,24
75:17 86:6,14,18
86:23 89:2 101:14
101:16,18 102:8
102:20 103:12,14
103:15,21 104:7,8
105:5 106:5,12
107:20 108:14
109:13,20 111:5
112:12,20 113:14
113:17,21 114:8
114:16 115:4,24
116:4 117:7,14
118:6 119:5 120:5
120:21 121:8,13
122:2,6,9,13,24
123:15,24 124:1
124:13 126:13
127:13,16 128:24
129:6,23 130:3,17
130:22 131:12
132:5,11,14,16,17
132:18 133:1,20
137:18 138:21,25
139:19 140:6,7,22
141:15 142:20
143:15,19 144:9
147:18 148:20
149:3,8,18 154:3
162:15 163:4
169:8 170:18,21
170:23,24 172:1
172:11,15 173:7
173:11 174:5

175:8 177:16
178:14 179:7
181:6 182:4 183:9
185:8 186:3,12,24
187:11,15 188:3
189:3,9 190:25
191:18,24 192:1
194:13,16 196:1
198:21,24 204:21
204:25 205:7,12
205:16,22,24
206:2,3,12,15
207:17 212:17,21
217:7 218:4
219:19,21,25
220:2,18 223:9,16
223:25 227:2
230:24 231:3,17
235:8,12,16
236:11 238:4,7
240:11,15,18
241:6,22 250:6,13
251:7 252:4,6,11
253:2 257:12
259:5,20 262:5,8
263:3,24 264:5
268:23,25 269:3,4
270:13 273:16,22
274:1,20,24 275:4
277:15 278:2,20
279:25 280:2,12
280:14,16,22,24
283:23 288:17,18
288:22,25 289:3,7
289:14,20,24
290:3 291:1,9,17
292:21 293:9
294:12 296:13,14
299:17,19 300:17
301:10,11,14,25
301:25 303:2,10

304:6,9,17 307:1
307:12,15 308:6
309:15,21 310:24
311:9,24 313:1
314:6,10,13 315:8
316:8,9 317:6,12
319:4,21 320:25
321:1,20 323:1,2,7
324:4 325:4,10,22
326:22 327:4
328:12 329:9,15
330:1,15,24
331:11,14,24
332:2 334:4,14,18
335:9,10 336:4
337:8,11,24
338:17 339:5,10
340:3 342:16,25
343:5 348:15,17
348:25 349:1,10
349:11,22 351:5
352:8 353:22
354:17,19 355:21
357:13 359:12,20
360:14,22 361:11
361:21,24 362:2,6
362:13,15,19,25
363:9 364:4 365:2
368:13 369:20
370:9 372:2 373:2
373:7,23 374:14
377:14,24 378:13
378:20 379:19
380:1 381:5,12,18
383:15,18,20
384:15,21 385:23
386:4,7,9,10
**honor's**  110:15
111:25 128:18
129:15 322:3
332:19

**honorable** 1:7
**hope** 97:16 125:17
  297:22
**hopefully** 128:11
  303:25 375:14
**hoping** 375:15
**horse** 339:8
**hour** 115:6 120:22
  121:15 155:7
  171:3 292:2
  329:23 375:15,17
**hours** 33:6 82:14
  95:21 154:19
  155:10,13,17
  162:4,7 192:13,14
  221:11 292:2
  384:6
**house** 292:4
**huh** 6:22 14:16
  16:3,25 17:21
  18:19 20:23 22:13
  23:1 378:10
**hull** 188:15,16,19
**hundred** 202:21
  202:25 332:13
**hung** 329:23
**hurt** 15:12 17:23
  18:12 24:18
  312:10
**hurts** 128:14

**i**

**ice** 20:9 204:5
**idea** 129:21
  185:21 356:8
**identification** 67:8
  86:2,4 87:11,21
  152:12 189:17
  190:5 193:6
  236:16 238:17,19
  250:20 253:11,12
  253:24 254:24

255:17 257:4,14
274:6 276:25
278:10 313:22
362:23 367:3,16
367:18,19
**identified** 28:24
  141:22 320:23
**identifier** 157:11
  157:20
**identifies** 157:16
**identify** 141:21
  156:20 184:4
  189:20 190:10
  255:1 260:10,13
**identifying** 78:3
  135:10 142:7
  189:15 256:9
  320:4 364:16
**identity** 200:10
  290:10
**ignition** 42:10
  44:15,18
**ii** 291:19 316:7
  319:18 332:22
  335:3,20 337:4,7
  337:23 341:15,16
  341:19 346:8,14
  346:23 347:6,16
  359:9 372:22
**image** 54:9 156:24
**imagine** 121:17
**imei** 157:19
**immediate** 109:6
**immediately** 5:17
  24:1 115:5 352:5
  357:1
**immigration**
  379:1,3
**impact** 310:11,12
**impasse** 172:23

**impeach** 376:6,7
**impeachment**
  299:25 376:17
  377:10 381:14
**imply** 255:1
**importance**
  376:22,23 380:17
**important** 255:7
  324:13 325:22
  327:20 355:3
  366:23 382:2
**imported** 279:16
**impossible** 203:2,3
  203:4,6,12
**impression** 180:6
**imprisonment**
  381:9
**improper** 130:16
**imsi** 157:10,18
**inaccurate** 203:3
  346:20
**incident** 14:24
  19:23,25 33:20
  41:3 60:21 77:4,9
  77:13 79:13 80:15
  83:7 88:10,11,12
  93:12 94:11 99:17
  99:25 102:16
  145:15,21 161:21
  162:3 198:5
  242:22 248:9
  349:16
**inclined** 348:9
**include** 190:5
  224:20 276:8
  278:11 326:4
  362:10 371:11
**included** 198:17
  288:10,10
**includes** 159:14

**including** 6:6
  110:5 174:19
  177:6 255:6
  294:22 320:1,2,11
  320:21 371:13
  372:6,15
**incoming** 135:24
  154:7 156:9 159:8
  159:25 163:11
  164:9,9,9,15 165:2
  165:16,22 168:24
  169:25 170:15
**inconsistency**
  348:10
**inconsistent** 346:5
  347:14 358:19
  359:2
**incorporated**
  134:4
**incorrect** 63:10
**incumbent** 173:14
**indicate** 241:17
  278:4
**indicated** 40:2
  178:19
**indicating** 38:11
  54:14 191:25
**indication** 61:11
  117:3 355:24
**indictment** 333:16
  334:9 338:4 345:9
  345:20 357:17
  361:7
**indiscernible** 34:2
  37:8 66:18,19,21
  66:24 67:12 68:1
  68:2 77:23 84:6
  144:17 148:7
  175:2,13,15 176:8
  176:12 187:1
  228:23 246:6

262:20,24 293:6
**individual** 43:14
44:21 48:11,20
61:11 67:24 69:2
84:25 85:14
167:10 378:12
**individual's** 68:24
**individuals** 93:10
287:12 328:22
349:24
**indoor** 93:9
**indulgence** 31:17
**infer** 118:17 318:8
**inference** 67:15
105:17 128:22
146:1,1,2 318:12
353:20
**inflaming** 121:10
**information** 34:15
39:8,22,24 40:6,11
40:14 41:6,9
42:23 51:9 54:8
59:7 60:9 63:25
70:8,9 80:14,19
82:16 110:2 135:3
135:9,11 136:1,3,4
136:20 137:11,14
138:13,17 140:8
150:3 151:2,21
152:12 153:10
154:9 157:9 164:6
164:13 201:25
202:1,18,22 203:3
204:7,9,11 214:5
218:13,15 224:7
224:21 225:25
248:18 356:7
**informed** 375:13
**infrastructure**
167:16

**initial** 54:15 83:7
115:23 119:14
380:8
**initially** 59:20
95:3 188:11
228:22 229:21
**initiate** 165:12
**injured** 148:4
**injury** 369:13
370:3
**input** 147:15
175:22
**inquire** 383:19
**inquired** 358:10
**insert** 265:18
320:3 335:24
**inserted** 265:21
**inside** 16:23 42:2
42:13,21 43:1,11
45:1 77:4,16
78:15 80:2 88:8
91:3 93:6,11
99:23 215:21,23
228:11 229:4
232:21 272:13,15
350:14
**insightful** 176:13
**insignificance**
310:4
**insinuate** 116:6,20
118:16
**insinuating** 116:23
**insofar** 126:25
128:21 172:24
173:7 312:10
331:15
**installations**
254:13
**installed** 91:21
**instance** 115:13
350:15

**instant** 350:13
**instruct** 336:18
**instructed** 59:4
**instruction** 109:7
114:6 126:12
143:21 181:8,8
223:23 316:10
317:8,21 319:8,20
319:24 322:19
323:9 325:10,13
327:8,16 328:6,13
328:15,24,25
329:2,4,5 332:19
332:21 333:25
335:23,23,24
336:25 337:12,20
338:13 340:2,5
355:9 356:4 359:1
359:1 360:5
**instructions** 171:4
171:7 174:17
295:6 298:9
317:20 318:1
319:6 323:17,20
332:19 336:17,20
359:7 365:5
**insufficient** 139:10
139:13,14 355:18
**intake** 255:16
**intend** 108:13
189:4 310:7
**intends** 189:7
**intensity** 35:21
276:7 281:23
**intent** 103:22
187:14 311:24
344:11
**intention** 192:1
301:8
**interaction** 44:10
51:25

**interest** 188:1,3,4
188:9
**interested** 189:12
193:9
**interesting** 179:8
**interference**
324:22 326:12
**interior** 80:2
81:23 83:9 100:23
235:2 236:1
**international**
157:11,20
**interpretation**
191:6
**interpreter** 31:14
283:17
**interpreting**
202:10
**interrogatory**
346:14
**interrupt** 164:20
182:7 187:19
194:6 321:1 322:1
**interrupted**
321:22 323:23
**interrupting**
250:10
**interruption** 324:3
**intersection**
210:25 211:2
**interstate** 276:8
277:4 279:20
324:22 326:13
363:23
**interview** 273:13
**introduction**
299:1
**invade** 37:8
**investigating**
98:13 229:3
284:13

**investigation**
51:14 76:20,21,23
78:10 80:15 84:13
84:16 86:18 98:7
223:12,13 224:6
232:5,16 267:3
273:12,17 284:15
284:21 287:2
**investigations**
98:9,11 233:7
**investigatively**
276:5
**investigator** 88:2
98:13 255:15
**investigator's**
276:14
**involved** 47:5
60:21 210:22
230:12 232:13
248:8
**involvement** 51:13
230:13 247:19
287:7
**involves** 369:11,13
**irrelevant** 109:16
112:3
**irrespective**
128:21
**issue** 5:16,17 8:19
9:8 52:8 60:22
86:2,20 87:21
102:1 103:7
105:13 106:3,13
116:1 119:12,12
123:9,23 125:25
127:11 129:21
143:8,11 146:14
147:21 173:11
174:2 175:7 178:4
180:3,5 181:5,19
183:12 186:10

191:4 192:10
193:6 195:4
223:15 299:12
301:4 303:23
305:11 307:19,20
312:4 316:25
326:7,19,23 330:5
330:5,14 332:5
347:13,17 348:23
359:12 362:12,14
362:17 367:5,16
370:1 375:13
376:14 385:7
**issues** 121:11
122:23 126:25
187:15 194:22
299:2,11,12
305:11 307:14
309:3 315:19
348:12 356:2
358:14 379:6
383:24 384:4
**items** 230:17
251:18
**i'm** 20:19 175:23
178:4 298:8

**j**

**j** 2:1 133:16
**jacket** 266:10,11
266:12,16,20
**jacketed** 266:15
266:15,21,23
**jail** 303:6,15
**jam** 268:3
**jan** 1:7
**january** 1:5
183:15 184:18
374:3
**jay** 356:13
**jd** 1:3,3,4

**jeopardies** 178:25
**jerking** 249:9
**jersey** 50:19
225:23,25 226:2,9
**job** 33:2 172:7
224:15 225:24
227:24
**jobs** 98:13
**joel** 14:9 19:20
20:16,17,19 30:2
30:12 31:1 369:14
370:17,21
**joel's** 342:19
**jog** 216:14
**joined** 253:23
**joining** 253:20
**joint** 317:21 321:1
322:22,23,24
323:3,10,23 324:8
324:25 325:3
326:3 327:15
330:16 339:22
359:1
**jointly** 319:5
327:5 328:24
**joseph** 3:13 133:2
133:11,16
**jotted** 273:3
**judge** 1:8 11:14
12:17 25:21 28:14
85:25 87:2,17,22
99:3 111:9 172:18
174:8,9,12,13
183:20 184:6
185:3 206:20
258:12,19 270:2
274:23 309:2
342:9 347:20
356:5,18 362:1
366:15 381:17
384:14 386:12

**judges** 133:7
**judgment** 92:13
92:14,19 95:4,12
97:25 127:9
**jump** 197:23
**jumped** 190:15
**jumpsuit** 178:10
**juncture** 326:4
**june** 273:14
**juries** 269:15
**jurisdictions**
257:9
**juror** 171:16
298:19 302:13
**jurors** 126:16
128:22 198:23
199:9 316:14
327:17 335:2
343:6
**jury** 1:7 11:7
12:11,19,22 21:5
36:5,20 37:2,8
46:5 49:13,20
52:22 53:1,9,15
54:12 57:1,15
58:21 59:4 80:6
84:7,21 86:8,13
102:5 105:17,20
109:2,14 111:14
116:6,9,20 118:17
119:6 121:18
127:7 128:7 131:5
131:20 132:4
134:2 135:6
138:24 143:1
149:21 153:20,24
159:4 161:21,25
163:2 164:10
171:17,21 178:1
180:4,6 181:7
185:19,20,23

186:9 187:7 189:2
191:10,14 192:6
192:12,19,20
194:10 195:2
196:1 202:23
203:11 207:1
210:1 212:25
216:11 217:12
223:17 235:23
241:14 244:4
248:3 253:9 254:3
260:25 269:14
275:19 278:5
287:16 290:4,7,11
290:25 291:5,11
295:5,9 296:10
298:20,22 299:5
301:2,19 302:3,8
302:17 303:13,14
304:4 306:9 310:7
310:8,19 312:20
315:11 316:12
317:19 319:7
322:10,11,16
323:17,19 325:13
328:15 330:8
332:9 336:10,18
336:20 338:20
340:2 342:13,20
343:20 345:1,23
346:13,22 347:15
348:4,4 354:13
357:11,12,18,18
358:13,17,24
365:15 368:22
379:4 383:10
384:17 385:14,17
**jury's**  51:3 67:16
77:8 93:3 107:14
191:6

**k**

**keep**  18:14 57:25
117:10 127:9,10
184:22 187:23
192:15 254:21
296:8 303:14
**keeping**  135:6
343:1
**keeps**  96:8,9
**kept**  137:3,7,15
191:10
**keys**  44:17
**kind**  15:15 22:3,8
22:22 82:21
111:11 124:15
134:17 136:16
167:15,21 173:23
181:21 243:13,23
244:24 285:24
311:9
**kinds**  78:6 136:22
**kitchen**  16:2,6
19:9
**knew**  110:20
115:25 320:20
331:4
**knit**  236:6,7
**knocked**  10:24
**know**  11:19 13:20
16:7 18:14,20
19:15,16 22:16,17
23:7 24:13 26:7,8
27:24 30:19 40:11
40:12,23 44:11,12
59:11 63:22,24
71:22 78:13 81:19
82:1 85:10,23
89:23 91:19,20
94:12 95:3 98:24
99:1 102:9 105:13
105:13 106:23

110:21 113:5
114:2,8,8 116:24
116:25 117:1
122:21 124:1
134:13 136:18
148:6,8,17,21,25
156:8 158:5,9,13
170:1,24 171:4
173:8 174:15
179:11 184:5,15
189:14 192:1
196:25 197:12
199:20 200:1
201:23 203:19
204:10 212:1,13
214:16 224:23
228:5,15 237:6
240:8 245:5,8
247:17,24 248:1
249:4 263:5
288:21 291:18
292:11 293:1,8,10
294:18,23 296:20
297:2 299:16
300:22 303:8
307:11 315:23
321:15 325:25
328:20 329:22
330:7 332:20
340:7 342:17
343:2 352:6,11,13
352:17 356:10
358:10,19 359:16
362:5 363:3 366:6
366:9 367:15
372:23 374:11
375:4,8 377:4,12
381:11 385:12
**knowing**  147:19
**knowledge**  80:12
90:16 111:6 245:7

318:10 326:1,6,10
326:16,17 327:4
336:14 338:20
343:21 357:25
**known**  258:23
343:10
**knows**  98:23
145:18 148:3
358:12

**l**

**l**  150:9 208:5,8
281:11,11 387:3,9
**lab**  230:10 246:10
247:13,13
**lacheen**  1:16
**lack**  95:25
**ladies**  46:4 84:20
133:3 134:1 135:5
171:3 209:25
216:10 223:21
253:8 254:2
257:16 260:25
269:10 275:19
278:4 290:7
**language**  283:13
328:8 330:19
340:20 350:1
382:10 384:2
**large**  95:21 201:2
201:18
**late**  292:16 384:12
**latex**  245:21
246:14
**laughter**  164:25
172:6 200:19
201:1 205:20
227:15 259:1
270:1,8 289:15
292:10 296:1
297:25

**law** 1:14 114:24
129:5 171:8 174:8
276:15 278:8
281:24 308:5
313:9 322:8
330:10 343:2
346:16,22 347:3
347:17 358:9
377:11
**lawyer** 174:21
181:13 342:7
**lawyers** 146:12
270:7 329:6
358:23
**lay** 125:1 244:5
**laying** 354:11
**lead** 382:6
**leaning** 20:8
**leap** 119:6
**learn** 78:8 276:23
**learned** 283:2
**learning** 77:25
144:16 172:8
**leave** 21:1 51:10
107:9 171:17
173:18 292:4
293:13 298:19
374:21 382:12
**leaves** 19:21
333:15
**leaving** 29:2 332:1
348:8
**lectern** 184:4
**lecture** 382:15
**left** 16:14 21:5,9
54:15,16 56:3
88:11 118:19
154:14 155:3
191:6 214:14
226:4 249:7,8,15
249:15 267:19,20

267:25 268:6
298:2 299:13
349:23,24 351:1
351:18 356:24
**legal** 38:20 92:2
101:21 102:1
122:23 194:21
195:4 338:9
**legally** 243:20
**legend** 240:2
**lehigh** 254:17
**lends** 146:19
**length** 155:19
283:23
**letter** 176:12,15
**letters** 200:11
**letting** 265:19
**level** 368:25
**levitating** 249:8
**liability** 316:16
319:13 325:13
327:8 329:4
331:11 332:15
333:21,22 335:4
335:12,25 336:8
340:3 347:19
348:13,19,23
357:23,23 358:8
359:3,3,8 368:21
368:25
**liable** 336:4
**license** 4:16 50:16
70:8,9
**life** 30:19
**light** 165:2
**lights** 34:9 38:25
46:17 62:2,9,13,15
62:18 63:9 209:11
210:3 219:9
**limine** 106:4
107:20 108:9

299:24 300:6
315:13 375:9,21
376:2,4,5 379:24
382:7
**limit** 96:10 171:1
337:22 340:18
**limited** 95:13,17
106:20 113:1,2,25
114:1 302:8,16
304:8 305:24
**limiting** 109:6
**line** 37:24,25 38:5
66:8 86:16 142:21
163:8 169:1,6
170:12 214:17
251:15 283:8
360:10 371:14,17
**lines** 153:20
163:25 164:2,6,8
170:4
**lineups** 84:18
367:3
**link** 120:16 176:24
313:24
**linking** 142:15
**links** 142:5,6
**list** 80:19 328:21
365:18,25 367:20
**listed** 85:11
150:22,25 260:19
**listen** 46:23 58:11
171:14
**listening** 46:21
58:12 114:11
**lists** 338:4,4
**literal** 164:17
**literally** 165:9
343:16
**little** 14:3,11,13
41:10 56:18
101:25 103:24

130:10 131:9
134:11 147:14
163:19 198:3
292:8 296:20
297:6 298:5,6,7
332:4 333:24
340:19,20 344:25
356:1 358:13
359:5 375:10
384:10
**live** 40:21,24 247:4
247:4,5,8
**llp** 1:17
**load** 265:24
**loaded** 246:24,25
249:20 261:12
264:21 265:18,22
**local** 278:8
**locate** 48:10,19
216:23
**located** 36:14 38:9
154:21 211:1
238:12
**location** 35:23
36:11 40:9,24
41:7 46:15 47:5,9
47:15,23 52:20
53:19 63:5 85:15
210:13,16 218:16
221:24,25 222:1
224:16 232:12,23
233:10,15 246:1
282:11
**lockup** 175:17
185:12
**log** 154:7 232:20
**logs** 135:23 204:12
**long** 11:21 13:20
32:23 33:1 57:16
57:16 65:12,14
76:13 81:15,19

82:15,18 97:19
101:20 106:25
134:9 135:15
137:7 154:13
163:17 169:20
178:22 179:2
195:7 208:13,19
213:17,23 216:4
216:21 221:2
231:20,23 232:1
244:6 253:18
269:11 271:12,15
275:25 276:19
282:4 329:22,24
330:12 349:16,17
384:3,5
**longer**   81:21 102:1
131:9 180:5
368:14 380:8,25
**look**   28:22 42:5
46:8 48:5 71:18
72:25 79:12,15
83:22 85:1,21
158:16,20 174:16
211:23 227:9
263:2 272:11
274:8 278:10
336:21 339:13
359:7,22 367:14
369:9
**looked**   71:20 73:2
85:11 88:14 98:24
110:18 232:21
243:4 344:10
**looking**   9:20,25
10:1 42:9 52:14
53:10 55:23 56:3
150:1 151:19
153:4,19,25
159:22 163:1
165:15 166:4,17

237:17 262:16,17
272:7 285:7
344:20 349:4
360:21
**lookout**   210:19
213:4
**looks**   164:18
**loop**   96:3
**lose**   213:14 214:11
**loss**   155:7
**lost**   214:12
**lot**   58:16 97:19,19
112:12 121:10
153:19,20 157:12
177:6 191:9
192:17 199:10
201:13 226:19
266:25 297:20
315:17 319:15
330:19,19 341:23
348:11 356:3
357:16 380:8
**lots**   110:19 362:8
371:4
**loud**   345:3 366:19
**lunch**   171:2 176:3
177:22 195:5
199:7 269:11
**luncheon**   171:24

**m**

**m**   152:1 254:9
325:23
**ma'am**   32:14 33:5
34:17 50:10 56:1
56:4,23 271:7
274:5
**machine**   92:8
96:15 97:2,8
355:13
**machines**   202:4,7
202:10

**magazine**   239:9
261:6 265:18,22
**mail**   158:8 164:17
**main**   355:8
**maintain**   136:22
255:20
**maintained**
135:13,20 136:24
**major**   329:11
**majority**   78:9
154:9 284:23,24
**making**   58:24
118:13 180:19
182:17 203:14
264:22 265:8
358:22
**male**   40:8 42:21
43:25 45:5 210:21
211:9
**man**   13:13 27:10
308:4
**managed**   373:24
**mandatory**   317:13
**manipulate**
229:11 245:14
**manner**   315:4
**manually**   244:20
**manufacture**
378:15
**manufactured**
277:1,2 278:7,15
279:12,15
**manufacturers**
254:15
**manufacturing**
277:7,17
**map**   4:18 36:8
38:8 211:24,25
212:12
**maranna**   2:1

**march**   33:1,4
65:18,21 76:17,23
77:6 78:10 81:12
91:22 106:12,15
107:1,7,9 111:16
111:23 113:3
114:2 132:22
151:7 152:5 153:7
155:8 159:3,4,14
160:12,13 161:3,9
161:13,14,24
162:10 196:12,19
197:6,8,9,11,16,19
198:4,6 206:8
209:4 221:8 232:6
235:6 236:25,25
271:17 285:20
305:16
**mark**   55:3,6,9
273:17
**marked**   24:25
34:12 36:3 45:19
54:18 56:21 69:12
81:2 137:19,24
153:1 195:23
211:24 215:3
217:21 234:12
236:16 239:23
240:3 250:19
256:9 259:18,25
**market**   1:24 2:24
135:21
**marking**   45:19
122:3
**marks**   278:10,11
**maroon**   68:15,25
70:6 190:20
210:14
**marriage**   4:16
131:16

**married** 132:7
**marshal** 178:6,18
  179:9,14,17,21
  183:25 184:20
  187:13 282:1
  308:11
**marshal's** 175:17
  309:11 375:14
**marshals** 300:23
  309:25
**martin** 1:10 3:4,6
  3:9,11,14,18,23
  5:11,12,19,24 6:9
  6:19,23,25 7:9
  11:1,4 23:15,17,19
  23:23 25:2,5,8,9
  25:14,15,24 26:1
  26:12,15 27:1,6
  28:5 31:7,21 32:8
  32:10,12 35:3,12
  35:14,15 36:2,7
  37:4,7,15,17,21,22
  45:17,22,24 49:11
  49:19,21 50:5,7
  52:6,11,24 53:7
  55:1,6,12,19,22
  56:5,9,17,19 57:3
  57:7 64:4,11,14
  65:1,4 66:9,18,20
  66:23 67:4,18,22
  68:2,4,10,11 70:20
  73:23,25 75:17,20
  81:1,4 82:6,8 86:6
  86:11,17,23
  101:14,18,22
  102:7,8 103:5,8,11
  103:21 104:1,3,7
  104:13,14 108:14
  109:20,24 111:5
  112:14,21 115:4
  115:21,23 117:24

120:5,9,15,18,20
121:4,7,13 122:2,9
122:24 123:2,4,7
123:11,19 132:11
132:16,18 133:1
133:20,23 137:18
137:23 138:1,21
139:19 140:3,6,21
140:24 141:2,6,8
141:11,13 144:9
149:4,7,11,13,18
149:20,23,25
150:15,18 151:15
151:18 152:25
153:3,21,23 154:3
158:15,18,19
159:16,21 161:19
162:14,18 163:4,6
168:18,22 169:7
169:10 170:17,20
175:9 177:19
189:3,7 190:19,24
191:24 192:7,22
193:23 194:12
205:7 206:12
207:17,20 220:2,4
220:18,21 222:21
222:25 223:1,9
224:2 225:5,10
227:1 252:11,13
253:2,5 257:12
259:5,6,17,24
260:3 262:5 263:3
263:9,12,15,24
264:4,7 268:25
303:2 304:6,14,16
304:25 305:3
310:24 314:9
315:8 323:2,7
330:15,24 331:14
331:23 332:5

377:14,16,24
378:1,4,6,10,13,20
379:5,10,19 381:5
383:14
**massive** 202:7,10
  204:5
**matched** 41:14
  226:14
**matches** 67:6
**matching** 216:24
**materials** 278:13
**matter** 34:25
  35:19 78:5 202:17
  223:17 387:6
**matters** 35:20
  102:20 147:16
**maurice** 1:5
  102:15,23 108:19
  120:22 132:21
  160:23,25 168:11
  168:24 170:14
  345:5 350:2
**mcallister** 226:21
  233:17,19
**mean** 21:23 22:4
  33:8 46:24 76:3
  83:19 84:5 112:6
  114:21 115:5
  120:7,21,23 143:6
  143:7 154:23
  164:10 166:14
  173:14 175:3
  182:6 198:12
  216:12 218:23,24
  219:4 224:4 239:7
  239:16 264:20
  267:6 292:4 295:6
  296:2 307:16
  317:7 322:7
  329:14 330:19
  336:5 337:5 346:3

350:12 368:19
378:23,25
**meaning** 95:5
  128:8 139:10
  152:11 163:14
  203:11 261:20,21
  312:19
**means** 29:22 35:6
  35:16 155:24
  165:8 166:10
  203:9 218:25
  219:1,8,9 229:25
  255:25 264:21
  266:13,17 282:18
  282:20 342:21
  367:12
**meant** 143:23
  333:7
**measured** 155:20
**measurement**
  156:2
**media** 78:2
**medical** 254:19
**meehan** 2:1 3:12
  3:14 5:7 6:1,7,8
  6:20,22 7:3,5,15
  7:17,25 8:3,6,9,12
  8:14,21,23 9:1,5
  11:2,16,20,23 12:2
  12:5,7 23:13 64:3
  73:22 85:25 86:8
  89:4,6 99:3,7
  102:9,12 103:4,15
  103:17 104:8,11
  105:5,8,24 106:1
  107:19,25 108:3,6
  108:8,11 109:1,12
  109:19,22 110:4,9
  110:14,21,24
  111:3,18,22,24
  112:5,7,19 113:10

113:18,20 114:15
114:25 115:13,22
116:4,13,16,19
117:12,14,16,17
117:19,21 119:2,4
119:10,16 122:6
122:13,16,19
123:24 124:4
125:14 126:14
132:14,17,24
143:15,18,23
144:4,7,13,15,17
147:18,24 148:2,8
148:12,16,18
168:14 170:23
172:19,21 195:14
195:18,22 196:4
198:20 199:2
204:20,21,24
205:2,11,14,24
206:2 219:18,19
223:6,8,14,25
230:24 250:4
259:2,3 262:25
268:22,23 274:24
277:20,22,24
280:6,16,19,22
288:18,22,25
289:8,24 290:1,13
291:9,17,23
292:20 293:6,8,23
293:24 294:2,7,14
294:16 295:16,18
296:14 299:10,24
300:8 306:25
307:1,4 309:6,14
316:5,8,20 317:1,5
318:17,19,23
319:3,13,17
320:25 321:5,11
321:17,20,23

322:2,13,18,24
323:5,12,14,25
324:4,7,10,16
325:4 326:22
327:2 328:9,12
329:9,14,15,18,25
331:10,19 332:2
332:12,14 333:6,9
333:13 334:7,20
335:9,16,19 336:3
337:8,25 339:17
339:18 340:1
341:1 342:25
346:11,25 347:20
349:1,3,19,21
350:4,7 351:4,11
352:8,22 353:22
354:3,8,17,19
357:3,6 360:2,13
360:24 362:2,18
362:19 369:4
371:14,19 373:21
373:23 374:1,5,8
374:13,17 375:8
376:3 380:1
382:12,13,20
386:10
**meehan's** 103:1
123:12 309:8
**meet** 185:11
370:10
**meetings** 351:17
**meets** 336:8
**member** 358:2,6
**members** 358:3
371:12 372:12,13
372:14
**memory** 242:23
**mention** 7:19
**mentioned** 66:5
102:22 126:2

162:19 207:11
239:18 256:13
**mentioning** 319:4
**merchandise**
354:24
**mere** 117:5
**merely** 116:10
**message** 117:3,4
155:23,25 156:1,6
182:14 355:20
**messages** 135:24
154:8 155:21,22
159:9 161:23
204:1,2
**met** 187:11 188:11
283:9,12
**metal** 265:6,6
266:10,11,12,15
266:16,20,23
**metro** 134:8,19,25
135:7 136:2
**michael** 2:6 3:20
4:6 25:7,11 74:6
231:4,8,11 281:5
281:10
**microscopic** 254:7
255:8 256:11
**microscopy** 254:7
**mid** 1:23 2:23
330:1 375:10
**middle** 38:24
39:12 182:14
250:20
**mike** 280:15
**military** 154:18
254:12
**millimeter** 260:15
**million** 337:17
**millions** 201:5,7
**mind** 35:9 67:16
107:14 126:16

364:10 369:14,22
370:17
**minds** 128:22
**mine** 92:17,17
374:18
**mini** 382:14
**minor** 188:11
**minus** 155:4
**minute** 7:1 10:7
20:1 77:17 122:15
147:22 155:25
163:21 164:3
172:1 185:15,16
190:21 269:23
299:19 307:2
359:16
**minutes** 19:24,24
19:24 34:8 55:24
78:8 81:22,24
88:10 97:2,3,4,4,5
97:6 99:17,19
101:22,25 115:8,9
121:21 124:8,9
130:24 163:20
169:21 178:6
183:14 213:22,25
214:10 216:5,22
216:22 269:18,20
269:23 270:3,18
294:22 308:10,12
308:20 349:18
355:24 375:2
379:12
**mischaracterizes**
25:21
**mislabeled** 317:24
**mislead** 7:17
104:11
**missed** 194:17
242:16 361:5

missing   181:10
misspoke   240:18
misstatement
   366:8
mistake   325:5
mistrial   180:1,10
   180:19 182:9,13
   182:18 183:6
misunderstanding
   102:11 108:15
   188:12
misunderstood
   258:15 306:13
mix   128:25 129:4
   374:1
mobile   106:21
   134:4,5,7,8,18,25
   135:7,13 136:2
   138:6,14 150:4
   151:1 157:11,13
   157:13,20 165:8
   168:3 189:25
   201:2,20 203:25
model   67:7 70:1
   225:12 255:2
   260:14 317:19
   322:19
modeled   339:22
   340:4
models   276:25
modifications
   256:1
modified   135:14
   339:19
mom   125:18
moment   22:1
   23:20 24:21 26:5
   26:8,22 27:25
   28:2 31:17 52:7
   57:4 74:15 132:12
   136:2 162:15

169:8 170:18
196:20 217:8
238:1 239:19
241:23 280:24
288:19 290:16
319:19 365:3
momentarily   75:1
momma   14:18,19
   15:8 30:25
monday   295:11,25
   297:12,12,17
   384:7
money   17:5,6,10
   19:20 322:4,6
   350:12,21 352:15
   352:16,16,17,23
   353:11,23 354:5
   354:15,21,24,25
   356:16
monitor   37:13
   285:23,24
monroe   132:8
   150:13
month   126:18
   286:12 287:2
months   108:17,18
   110:3,3 208:25
   254:4 378:16
   380:5,6 381:9
mopping   11:13
morn   133:18
morning   5:2,3,4,6
   5:7 12:25 13:2,10
   13:11 23:24,25
   32:4,6,7,13,14
   61:21,22 64:24,25
   65:5,6 70:25 71:1
   75:14,15,21,22
   87:5,7 89:9,10
   99:8,9 101:19
   110:6,6 119:19

133:24,25 138:20
293:13 298:5,20
315:9 317:24
330:1 349:11
374:10 375:10
384:12 386:4
mossberg   254:9
mother   125:8,9,12
   125:19,21
mother's   125:13
   125:23 126:1
motion   7:19 27:19
   40:3 44:3 106:4
   107:20 180:19
   182:18 249:9,23
   268:5,7 291:19,19
   299:24 300:13
   376:4,5 377:16
   379:24
motions   300:6
   315:13 375:9,21
   376:2 382:3,4,6
motivating   372:6
motor   226:15
mouse   79:22
move   36:17 37:6
   49:12 55:12 126:4
   131:13 138:22
   170:3 212:18
   235:9 238:5
   240:12,19 257:13
   262:5 265:14
   267:24 277:16
moved   308:11
   343:11
movies   91:7
moving   55:10
   108:9 121:24
   151:15 180:12
   240:23 249:15
   268:6

multi   368:12
multiple   79:12
   100:24,25 106:6
   138:6 162:12
   164:8 273:2
   336:21 380:4,20
   380:24
multiples   82:23
municipal   257:11
murdock   313:11

**n**

n   3:1 4:1 5:1 71:21
   71:21 73:8,8,14
   75:13 150:9
   151:25 208:8
name   32:2 64:21
   68:25 69:2 71:7
   71:10,11 72:8,23
   73:3 75:10 133:14
   136:18 140:14
   151:25 152:12,15
   158:12 184:16,19
   190:6 200:7,11
   208:2,7 220:12
   231:10 252:21
   255:1 271:1
   275:14 281:9
   320:4 360:18
   362:21 369:20
names   362:10
naming   360:11
national   1:23 2:23
nature   47:13
   134:12 209:21
   376:15 381:21,22
near   44:14 135:17
   135:19 137:2
   203:12,12 214:22
necessarily   22:4
   60:24 145:1 384:1

**necessary**  86:16
  95:15 100:8 101:6
  114:5 145:15
  191:15 194:1
  289:17 300:20,20
  306:6 309:16
**need**  10:8 15:19
  18:8 74:10 82:23
  90:14 103:20
  114:17 118:5
  123:17,20 136:16
  148:15 156:20
  157:16 162:4
  172:17 175:1
  179:4 182:16
  184:15 186:9,22
  189:1 190:22
  207:8 269:14,19
  270:3 289:7 291:4
  291:18 292:1,1,12
  292:13,14 296:8
  303:18 306:16,17
  306:19,24 307:4,6
  308:21 313:7
  315:11 325:18
  327:22 329:12
  330:10 337:20
  359:21,25 362:4
  362:10 368:2
  370:18 371:5
  375:25 377:5
  384:5
**needed**  15:6
  120:13 136:14
  233:1 255:6
**needs**  269:17,18
  305:4 314:8 359:9
  359:19 366:8
  385:13
**nefarious**  118:18

**neglected**  324:12
**neither**  105:1
  251:25
**network**  157:13
**never**  29:2 98:6
  111:6 176:17
  181:16,17 203:2
  286:25 292:23
  303:3 305:12
  344:1 356:10,12
  363:7
**new**  50:19 96:4
  181:14,17 225:23
  225:25 226:2,9
  336:14
**news**  78:1 296:16
**newspapers**
  171:12
**nexus**  276:9,18,19
  363:7,22
**nice**  329:6
**night**  52:4 70:10
  77:12 78:10 81:22
  85:7 100:16
  102:22 114:14
  115:10 127:14
  129:13 221:13
  234:8 242:19
  292:17 298:19
  346:18 357:25
**nine**  67:6 137:13
**noise**  265:8
**non**  247:5 368:11
**noon**  155:16
  171:12
**normal**  21:7,8
  38:20 102:1
  134:24 137:15
**normally**  81:16
  155:9 262:13
  269:15 354:22,23

**north**  132:8
  150:13
**northern**  100:20
**northwest**  32:22
  52:3 76:1,3,4,7,17
  76:19 78:19 79:7
  79:23 84:19
  231:12 232:2
  238:14 272:20
**nos**  49:17 149:16
  235:20
**nose**  266:19,22
**note**  10:15 70:1
  225:15 236:4
  256:3 260:18
  261:24 298:18
  315:6 330:24
**notebooks**  171:17
  298:19
**noted**  227:10
  263:15 266:9
**notepad**  273:6
**notes**  242:15
  377:20
**notice**  165:4
  324:20 330:25
  343:16
**noticed**  61:5
**notified**  210:21
  292:25
**november**  387:11
**number**  7:20 25:4
  35:4 45:20 51:9
  67:7 69:4,16,21,23
  76:6 80:19 85:2
  85:10 102:15,19
  102:23,24,25
  103:9,12 104:24
  105:10 106:10
  107:22 108:24
  115:20,25 116:3

118:9,11 119:14
  120:14 121:11
  122:1,12,14
  123:10,21 124:22
  125:11,13 127:22
  127:24 128:1,21
  129:20 132:21,22
  133:5 136:10
  139:13 140:9,12
  140:18,18,20,21
  142:14,14 150:4
  151:22 152:18,23
  153:7,14,15,16,17
  154:11 156:11,12
  156:14,15,15,18
  156:18,20,24,25
  157:1,2,2,3,3,4,6,7
  157:7,12,14,16,21
  157:22,23 158:22
  158:23 159:6,7
  160:2,8,9,21,22,25
  161:1 163:12,15
  164:7 165:3,6,7,8
  165:9,10,11
  166:19,20 167:1,2
  168:11,11,24
  169:2,23,24 170:1
  170:5,6,10,14,14
  170:16,16,24
  178:8 196:6,9,18
  197:11,14 198:7,8
  198:17 204:10
  224:21,23,25
  225:15,16,18,21
  225:22 226:4,7,14
  228:2 236:19,21
  237:7,9,22,25
  240:19 252:24
  254:10 255:3,6
  256:9 257:2
  260:14,18,19

273:3,4,7 313:21
313:22 319:21,21
332:21 360:24
362:9 364:16,19
365:7 378:15
384:4
**numbered** 377:17
**numbers** 120:1
140:17 153:20
159:19 160:12
164:1,4 203:20
**numerical** 158:9
**numerous** 141:18
278:12 316:9
380:7

**o**

**o** 5:1 71:21 73:8
73:14 75:13
133:16 151:25
208:5 281:11
325:23
**o'brien** 3:10 74:22
75:7,13,21,23 81:5
82:9 99:10
**o'donnell** 104:12
116:8
**oath** 13:4
**object** 34:24 66:8
130:15 139:1,9
149:1 230:1
303:12 310:16
318:9 350:11,19
350:20,23 355:10
369:13
**objected** 120:3
125:10 223:18
332:20
**objecting** 117:11
124:16 141:8
**objection** 5:25
6:20 7:12 8:20

25:20 49:14 53:2
55:14 102:9 103:2
105:1 115:1
123:11,12 124:5
126:15,20 129:14
130:18 131:18,21
131:24 139:22
141:18 189:23
193:8 212:20
223:6,8 235:10,11
238:6 240:13,14
258:21 262:7
263:13,21 277:18
277:19,20,21,22
277:24 295:1,3
304:3,4 310:17,22
311:5,25 312:14
315:23 316:5
338:25 339:12
360:13,15
**objections** 128:3
128:20 145:12
258:12 361:20
**objective** 349:6,8
352:19 354:24
355:1,11,12,12
356:2
**observation** 61:7
**observations**
92:20 95:13
284:12,20
**observe** 42:14
210:12,14 211:1,6
214:8 217:14
232:18 272:15
**observed** 50:12
211:3,3,8 228:23
229:21
**observes** 243:21
**obtain** 69:21 136:3
233:21 282:7

**obtained** 106:21
108:17 234:20
283:4
**obvious** 200:21
207:10
**obviously** 57:21
98:5,22 124:24
130:19 144:21
173:4 181:10
189:21 191:7
193:6 201:20
202:2 204:12
245:19,25 285:5
287:4,4 294:23
341:25 350:22
378:22
**occasion** 67:17
**occasions** 156:16
**occupant** 61:6,7
**occupants** 92:21
**occupation** 134:2
**occupied** 42:7
**occur** 338:21
**occurred** 52:21
79:14 80:15 88:21
94:11 100:1 155:8
155:15 156:5
158:11 162:3
166:14 214:17
218:24 232:5
242:23
**occurrence** 135:18
137:2
**occurring** 164:15
219:2 287:13
**occurs** 161:21
**ofc** 3:6,8,18,22 4:3
64:18
**offenders** 88:11
**offense** 320:5,8,14
320:14,20 336:12

340:15 341:8
342:21 345:6,11
345:12
**offenses** 381:13
**offer** 67:3 108:7
109:13 113:4
183:3 280:17
342:2
**offered** 34:24 35:7
35:8 59:5 72:10
108:16 109:6
122:5 139:6 241:4
251:25 382:18
383:6
**offering** 241:7
**offhand** 82:3
332:21
**office** 1:11 218:9
254:19 273:13
291:21 317:15
328:19 375:14
**officer** 11:8 12:21
31:22,24 32:5,6,13
32:15 35:1,4 36:8
37:16,23 38:8
45:25 46:13 48:24
49:22 50:15 51:1
51:11,16 52:12
53:9 54:18 56:2
56:13,20 57:13,15
57:16 60:20 61:21
64:7,12,15 65:5,7
65:9,10,12,18 66:1
67:4,14 69:14
70:25 72:22 74:1
76:11 98:19
124:19 171:20
177:23 178:2
186:1,15,18 187:4
193:18 195:1
208:18 210:10

211:4,6,10 212:5
212:14 216:17,18
220:5,9,22,24
221:3,9 222:8,25
223:2 224:3,23
225:11 227:6
228:1,23 231:1,21
242:13 243:20
244:6 245:14,19
252:18,23 253:6
253:10,21 254:24
255:14 257:13
258:1 259:7 260:4
268:16 269:5
270:14,23 271:10
271:15,21 275:1
284:13 298:21
308:22 309:10
317:17 386:13
**officer's** 35:8
263:20
**officers** 35:4,20
46:14,22,22 48:7
48:11,12,16 51:19
62:7 85:5 100:25
222:2,9 226:18
233:18 272:16
286:20
**offices** 1:14 327:6
329:3
**official** 175:20
387:4
**officially** 292:25
**offset** 79:18 80:16
83:11,24 84:2
282:15,17,19
283:7
**oh** 11:10 16:16
19:25,25 37:3,11
51:4 59:24 62:25
72:1 74:4 87:17

89:3 95:20 97:2
125:23 151:5
166:3 172:4,9
174:9,14 182:21
183:14 188:8
193:11,19 195:13
196:17 204:2,24
213:7 251:9,11
258:11,23 262:24
277:23 293:7
296:4 300:5,10
306:8,13 311:16
315:25 322:23
333:9 360:2
371:19 374:2,13
**okay** 5:24 6:9 7:9
8:6 13:17,18,22,23
14:6,9,16 15:1,8
15:18 16:9,14
17:9,22 18:10,16
19:10,17 20:2,21
21:1,10,14,19
24:13 26:5 27:15
28:22 29:4 30:9
30:10 34:3 35:1
35:22 36:1,13,17
36:25 37:18,21
38:11 39:11 40:6
41:2,6 43:17,24
45:16 46:11,14
47:20 49:10 52:12
52:16 53:23 54:11
56:2,24 58:24
59:2,19 60:1,11,18
61:2,10 62:1,5,18
63:19,24 67:13
68:4,24 69:23
70:1,7,16 71:16
73:8 76:10 77:2,8
77:17 79:3 81:9
82:5 84:23 85:17

87:19 88:5,19
89:19 90:13 91:15
92:12,24 93:2
94:8,21 95:9,12,16
97:7,15 98:22
99:21,24 100:2,12
100:15 101:8
123:4,22 125:24
140:3 142:21
143:5,14 151:13
152:2,21 153:13
153:17,18 156:16
159:3 161:8 162:9
162:13 163:21
164:8,24 165:15
165:24 167:5,10
169:15 170:3,12
172:21 175:12,19
184:13 185:11
186:1 196:25
197:5,15 198:19
200:5 201:2 202:1
203:5,8,19 204:15
207:12 208:13,16
208:19,22 209:1,3
209:11,14,16,23
210:4,9,18,24
211:12,16,19,23
211:25 212:4,4,16
212:24 213:2,15
213:23 214:1,6,12
214:18,23 215:8
215:19,22 216:2,6
216:15,18,21,23
217:1,6 218:20
221:8 222:11,18
224:20 225:20
226:17 227:23
230:12,19 231:23
232:1,4,8,11,15,22
233:8,12,15,18,24

234:9,20,23 235:4
236:1,4,9,19,22
237:2,6,8,12,22
238:18,25 239:6
239:13,16,18,22
240:3,10 241:21
242:7 243:7,11,19
243:23 244:18
245:4,11,18 246:9
246:20,23 247:17
248:22 258:7
262:18 263:12
265:25 266:9
267:12,19 268:5
268:21 271:12,17
271:22,25 272:13
272:17,22 273:5
273:12 274:9
275:23,25 276:3
276:10,19,22
277:5 278:16
279:3,6,18 281:19
281:24 282:3,7,11
282:15,18,20
283:2,8,12 286:6
286:19 287:9
289:25 292:7
300:7 301:5
304:14 309:11
310:16 312:23
315:6,21 321:5
323:7 349:3 370:3
373:19 374:8
385:18
**old** 78:7 81:20
96:13,14 314:24
337:12,12 359:24
359:25 380:16
381:24
**older** 81:21 314:21

**once** 39:24 79:17
95:9 99:25 189:10
189:13 202:11
215:23 216:6
230:10 244:23
255:19 256:5
277:10
**ones** 227:14
**ongoing** 78:11
254:22,23 330:3
**open** 43:10 122:18
135:11,12 136:12
139:21 166:16
211:8 230:10
266:21 269:16
291:13 293:11
304:22 353:12,14
354:4,10
**opened** 44:13
215:20 354:14
**opens** 191:4
**operability** 255:4
**operable** 261:18
261:19 267:7,8
344:4
**operated** 96:15
**operates** 167:14
**operating** 91:22
203:16 284:25
**operations** 184:7
**operative** 5:22
**operator** 2:6
192:16 193:23
218:20 219:15
315:7
**opining** 111:10
**opinion** 126:14
245:6 248:23
279:11,14 312:8
**opportunity**
179:18,23 183:3

183:10 187:25
257:21 278:16
296:24 310:1
312:4,19 328:11
331:6 339:20
350:25
**oppose** 182:18
262:22
**opposed** 59:10
162:6 244:16
247:5 295:24
301:14 305:22
**opposite** 47:3
112:14,14
**oral** 291:19
**orchulli** 4:6
153:21 158:18
159:18 280:15
281:4,4,5,11 288:3
**order** 154:23
171:1 194:1 316:3
316:14 345:10
346:6 351:18
376:6
**ordinarily** 354:25
**orient** 53:9
**origin** 255:3
**original** 76:20
189:23 339:18
**originally** 33:23
59:23 72:22
226:12
**ought** 175:6
192:15 333:1
337:6 367:20,21
367:22,22
**outburst** 176:15
**outdoor** 93:18
286:7,15
**outfit** 51:22

**outgoing** 135:24
154:7 156:10
159:8,25 163:12
163:13 164:9,9,16
165:6 167:7 169:2
170:10
**outlined** 260:24
**outside** 49:23 93:7
93:11,13,22 94:24
95:6 100:7 193:13
204:14 228:11
229:4 277:2
286:24 287:18
298:13 350:13,15
351:13,23 352:10
352:12 355:5,19
356:7,9
**outweigh** 383:9
**outweighs** 376:13
383:3
**overruled** 124:5
295:3
**overturns** 95:22
**overwhelmed**
176:22
**owner** 71:13 73:4
226:13 227:10
370:6
**owner's** 71:7,10
72:5 225:25
343:25

**p**

**p** 5:1 133:16
**p.m.** 1:6 33:11
54:20 55:8 68:12
77:10 83:3 88:18
88:19 155:15
161:22,24 162:3,8
162:8,10,25 163:1
163:18,22 166:18
166:23,24 167:6,8

168:9,9,23 169:4
169:14 170:9,13
177:24,25 184:17
187:5,6 209:17
251:2 272:1
308:23,24 386:14
**pa** 1:4,12,15,18,24
2:4,24
**pack** 174:3
**page** 4:12 82:4,7
82:10 141:1,4
159:17,22,25
160:7 161:15,18
196:22 197:1,3,5,7
197:7,9,14,15,16
197:17,18,20,21
197:21,22,24
198:1,2,2,4,6,8
319:22 321:17
325:18 326:5,9
327:21 359:23,25
360:1,21,23,24,25
361:1 362:8
364:19 369:10
371:8,9,9,16,18
372:11 373:8
**pages** 106:7
161:14 196:14
295:5 323:16
358:12
**paid** 136:6 151:11
152:8
**paper** 10:23 51:8
67:8 137:21 226:1
**paperwork** 50:21
51:11 68:18 69:8
71:19,20 224:17
224:20 225:3,8
238:15
**paragraph** 274:7
318:2,4 321:14,15

323:10 325:7,8,16
325:17 326:9
327:3,22 345:3
349:5 350:5
369:10 370:2,21
**paragraphs** 326:5
**parameter** 88:6
**parameters**
203:15
**pardon** 25:1 86:10
174:11 175:14
206:21 294:1
362:7
**parent** 134:8
**park** 38:20 49:6
214:17 216:13,13
232:10
**parked** 38:24
39:12 40:10 41:10
47:3 54:16 190:14
210:14,15,23
**parking** 38:21
**parole** 102:16,18
103:20 104:15,25
116:1 118:9
123:20
**part** 35:7 83:17
111:4 113:24
116:21 205:9
223:5 224:5 230:1
244:25 284:10
301:18 308:16
316:22 328:1,3,19
336:5 365:12
367:8 371:6
**partially** 195:5
**participant** 324:18
336:1,10 345:19
345:22,24 346:7
347:1,9

**participants**
336:19
**participate** 78:25
181:25 183:4,5
187:25 222:11
300:21 318:5
331:8
**participated**
188:16 222:13
**participation**
325:17 326:23
327:3
**particular** 71:11
104:17 135:25,25
161:13,15 200:6
316:10 339:22
**parties** 133:4
189:12 263:19
334:19 365:22
**partner** 33:12
65:23,24 68:14
209:7,8 215:15,20
215:22 216:7,15
216:16 221:14
271:20 272:8
**party** 106:18
156:16
**passage** 90:19
**passed** 102:17
**passenger** 41:17
41:25 42:9
**passing** 114:13
**pathway** 158:3
**patrol** 33:16,17
34:12 39:16,25
46:20 58:6,7,7
62:3,8 79:2
210:10 253:21
**patrolman** 57:19
208:18 210:10

**pattern** 322:7,8,17
340:4
**patterned** 339:17
339:19 340:8
**patterson** 1:13,14
3:4,7,9,12,15,19
3:21,23 4:7 5:4
7:16 9:7,12 10:8
10:11 27:8 28:8
28:10,14,17,19
34:23 49:14 53:3
55:15 57:10,12
61:15 66:7,11,14
66:19,22 67:13,19
67:25 70:22,24
72:7,11,15,19,21
73:18 89:2,5,8
113:13,17 121:17
124:13,15 125:23
127:5,13,20,25
128:17 129:3,5,8
129:12,14,23
130:2,5,6,8,17,22
131:18,21,24
138:25 141:15
142:19 143:20
144:1,6,7,10,24
145:5,25 146:10
146:15 147:8,11
147:14 148:19,23
149:3 171:25
172:13,14,18,20
172:23 173:22
174:23 175:3,14
175:16,19 176:5
176:10,17,23
177:4,8,16 179:16
179:17 180:11,17
180:23 181:1,5
183:20 185:8,11
185:14 186:2,6,12

187:8,11 188:2,5,8
189:19 190:8,13
191:3,17 193:2,3
193:11,13,17,21
194:3,6 195:13,15
199:4 204:16
212:21 218:3
227:5 230:20
235:11 238:7
240:14 242:10,12
250:1 251:7,11
257:23,25 258:11
258:14,18,21
262:7,18,21
264:11,13 268:11
274:20 277:18
280:2 283:23,25
287:23 291:6,25
292:7,11,18
293:12 295:4
296:11 299:18,19
299:21 300:3,7,10
300:14,17,24
301:3,5,7,22,24
302:21 303:11,21
303:24 304:19
305:6,8,13 306:5,8
306:13,16 307:11
307:17,21 308:1,4
309:4,13,20,24
311:3,6,13,16,18
311:21 312:3,7,13
312:17,23,25
314:6,13 339:7,10
342:15 343:23
344:7 348:17
357:13,19,21,24
360:15 361:23,24
362:14 363:22,25
364:2,5,8 365:11
365:14 366:19,25

367:13 368:13 370:14 373:6,7,12 374:24 375:12 379:6 383:19,25 384:14 386:2,9

**patterson's** 198:24 364:25

**pause** 5:9 9:10 10:10,21,25 11:5 11:15 12:20 23:21 25:12 26:14 31:12 31:20 45:23 46:12 52:10 56:17 57:6 64:13 69:13 71:25 74:17,23 75:4 81:3 101:17 125:20 132:15 133:10 151:14 160:17 162:17 169:9 170:19 172:3,12 185:17 188:22 196:21 197:13 207:21 217:16 220:6 222:23 231:5 239:24 241:25 252:10,15 270:19 273:20 275:7 280:11,21 281:1 288:24 289:23 290:17 299:20 314:19 315:14,20 332:23 334:11 348:21 360:7 361:3,6,14 368:6 368:15,18 369:8 370:4 371:1,23 375:23

**pay** 136:9

**paying** 136:15

**pcs** 134:8,19,25 135:7 136:2

**pedal** 243:14,14

**pedals** 241:20

**pennsylvania** 1:1 77:23 124:20 154:21 155:16 226:2,9,10,15 247:13 277:12 279:19

**penny** 174:3,4

**people** 16:14 21:15,20,22 30:20 62:12 88:22 100:24 101:4 121:11 126:16 145:18 188:18 200:20,23 202:6 203:21,21,24 207:11 216:14 366:22 367:4,7

**percent** 159:24 160:7 202:21,25 317:25 318:1 325:6 332:13

**perception** 126:15 127:1

**perfectly** 207:9 266:19

**perform** 258:7

**performed** 324:23

**period** 106:20,25 114:1 140:10,11 140:16 159:12 349:16 352:12

**permissibly** 318:8

**permission** 52:24 55:19 122:25 138:23 149:20 207:17 236:10 299:24

**permits** 301:25

**permitted** 128:7 203:22 301:10 314:14,17 315:1,2 347:15

**person** 43:1,4,6 58:24 85:22 157:18 163:14 181:10 193:4 202:9 203:10 228:16 230:9 298:15 305:22 313:16 334:22

**person's** 164:16

**personal** 115:12 173:12

**personally** 126:20 128:13 173:16 178:23 248:2

**persons** 298:15

**perspective** 175:24 314:12 335:6

**pertains** 143:2 207:3 310:10 318:5 319:17 327:8

**pertinent** 80:14 368:14

**ph** 14:16 77:1 98:17 174:8 184:20 227:12 317:15,18

**philadelphia** 1:4 1:12,18,24 2:2,4 2:24 13:25 32:17 57:22 60:20 65:10 65:17 71:3 76:1,4 76:15,21 77:18 80:9 84:23 89:12 93:21 94:2 162:4

162:6,24 169:13 208:12 221:1,2,9 226:19 231:24 233:9 238:22 247:12 253:10,15 253:17 254:19 271:10 275:23 279:19 281:17 284:16,21

**philly** 162:5 293:13

**phone** 4:17 6:1 8:12 15:3 16:1,6 19:8,12 58:25 102:10,15,19,21 102:23,24,25 103:12 104:14,19 104:20,23,24 105:16,18 106:8,8 106:23 107:4 108:3,17 112:15 113:2,23 114:7,18 115:22,25 116:3,7 116:8,9,11,21 117:5,23,25 118:1 118:2,3,9,11,14,17 118:21 120:22,23 121:1 123:20,25 124:18,23 125:1,3 125:4,7,11,13 126:5,6,9 127:22 127:24 128:1,20 129:24 132:21,22 135:24 139:16 140:9,12,15,17,17 140:18 141:17 145:6 150:4 152:3 152:13,18,22 153:7,14,15,15 154:8,10 155:19 156:24 157:1,1,3,6

[phone - police]                                                   Page 46

157:14,14,22
158:2,22,23 159:6
159:7,9 160:2,8,9
160:11,21,22,25
161:1,23,24 162:9
163:15,17,21
164:3,4,15 165:22
166:19,20 167:1,1
167:8,22 169:25
170:10 189:25
190:3 192:25
203:20 204:1
206:6,7 207:2
272:23 273:1,3,4,7
355:20,21,22,23
373:20
**phones**  108:25
109:10 115:11
134:16 161:6
**phonetic**  313:14
317:10
**photo**  28:22 84:18
84:21,24 85:3,5,7
85:12,14,17,22
86:3 87:15 222:18
286:12 367:2
**photograph**  50:8
215:2 234:5,7,18
235:1,2 285:22
**photographed**
229:5,7,8,22
**photographs**
49:16 234:9 235:4
**photos**  4:13,19
84:25 87:12
**physical**  19:2,7
82:19 241:8
**physically**  29:14
77:14 79:11 94:21
215:16 334:23

**pick**  85:10
**picture**  26:17
28:11 49:5,22
94:13,15,18
243:12 285:23
286:1,17,18
**pictures**  91:6
106:17
**piece**  67:8 133:8
**piecemeal**  7:7
**pinkerton**  127:12
127:16 315:22
316:1 348:19,23
357:22,23 358:7,8
359:8 368:20,24
371:9,11,17 372:4
372:5,20
**pistol**  252:7
**pistols**  254:9
**place**  79:21 117:15
147:3,5 154:16
159:16 178:17
181:11 201:10
277:7,16 310:25
319:11 328:6
335:24
**placed**  48:25
52:12 69:14 81:5
85:8,13,15 138:3
151:16 156:12
240:9 246:2 256:9
**placement**  94:22
**plaid**  13:14
**plain**  243:17,19,21
337:11
**plaintiff**  1:3
**plan**  7:14 104:16
116:21 318:11
**planned**  109:3,4
111:12 269:13

**planning**  264:4
342:10
**plans**  297:18,19
**plate**  50:16 70:8,9
226:4
**platform**  165:8
**play**  53:8 54:9,17
56:6 191:14
217:11 258:24
293:15 302:1
**played**  54:24 56:7
79:16 94:3 286:4
311:1
**player**  90:25
**pleas**  257:10
**please**  5:8 8:21,23
9:8 12:25 24:24
26:13 27:2,3
31:25 32:2 36:2
45:17 48:22 49:20
55:2 56:18 60:7
64:15,19,21 69:24
72:24 75:5,8,10
89:5 103:4 133:12
133:14 135:5
149:23 151:5
159:19 195:15
207:22,25 208:2,7
212:6,25 214:25
215:9 217:14
220:7,10,12
222:21 225:5,19
227:9 231:6,9,10
234:3,16,24
235:23 241:14
242:17 251:12
252:16,19,21
253:8 254:2
259:17 267:13
270:21,24 271:1
275:8,12,14 279:2

281:4,7,9 283:23
**pled**  377:20,21
378:8
**plethora**  353:13
**pocket**  344:1
**pockets**  27:20,22
27:25
**point**  13:22 17:25
19:2 20:6,8,18
24:11 33:19 34:14
36:24 39:3 42:8
43:19 44:9,14
45:1,8 47:4 60:16
66:2 78:18 79:17
92:1 101:1,19
115:5 118:1 139:1
147:1 154:23
155:2 175:18
181:13 211:13
215:19 221:16
266:21,22 272:6
278:10 313:8
325:9 353:10
362:9 367:24
368:10 369:10
**pointed**  342:19
**pointing**  93:18
94:10 267:15
286:10,16
**points**  94:3 266:16
321:9 330:23
**pole**  41:3 46:1,5
52:17,20 286:7,7
**police**  15:20 16:19
20:2,11 32:17
45:7,10,11 46:24
56:13,21 57:16
60:18,19,20,22,22
65:9,10,12,18 71:3
76:1,7,11,21 80:9
84:23 85:5 93:21

94:2 100:25
118:24 193:18
208:12,18 210:20
210:21 212:14
214:5 217:21
218:11,12,21
219:11 221:1,2,9
222:2 226:19
231:20 233:3,4,9
233:18 243:19,24
244:6 247:13,15
252:23 253:10,15
255:14 267:2
268:20 271:10,10
271:15 284:12,16
284:21 286:20
287:6 362:23
**pop** 195:24
**poplar** 238:17
246:12
**populated** 156:17
**port** 81:13
**portion** 76:4 79:2
163:3
**portions** 371:10
**poses** 358:2
**position** 50:1 85:2
126:11 134:10
145:23 179:25
181:24 189:11
203:8 207:14
208:17 229:8
249:14 265:21
267:14 302:25
304:20 342:8
**positioning** 50:11
**positions** 175:4
**positive** 39:10
46:10
**possessed** 336:5

**possessing** 377:22
**possession** 102:17
272:22 273:1
343:12 378:9,14
381:7
**possibility** 85:9
168:2 295:15,16
297:5,6,10 338:16
338:17
**possible** 9:22 59:7
101:19 173:7
297:16,16 343:4
354:25 358:24
374:25
**possibly** 40:9 51:5
97:13 210:21
295:17
**post** 136:6 151:11
152:8 195:23
325:24
**potential** 92:15
168:2 228:20
229:3 341:12,13
381:14
**potentially** 203:22
229:18 364:10
**powell** 347:14,21
**power** 22:23
**practical** 78:5
254:6,6
**practicals** 77:24
**practices** 134:24
135:2
**precede** 8:8
**preclude** 7:19
**precluding** 264:1
**prefers** 198:25
**prejudice** 110:17
114:19,21 116:14
379:22 382:11,15
382:17,22 383:12

**prejudiced** 119:3
**prejudicial** 104:1
106:21 107:13
109:16 113:22
114:5,23 116:2
120:11 122:23
142:11,11 144:19
376:13 382:16,19
383:3,9
**preliminary** 92:20
307:13,19
**prepaid** 136:14
151:10,12 152:8
152:10,16
**preparation** 92:2
111:7 127:14
279:7 285:12
287:11
**prepare** 288:3
**prepared** 11:6
59:7 84:18 85:3
128:4 189:9 192:1
238:16 286:20
290:19 330:4
371:3
**preparing** 177:11
**presence** 192:6,18
192:20 193:13
194:10 290:25
291:4 296:9 299:5
300:19 301:2,18
315:11 379:4
**present** 7:11 8:17
8:18 12:22 101:21
103:23 106:5
116:8 131:5
144:12 178:1
187:7,22 195:2
206:6 272:15
294:5 296:25
298:24 301:20

304:20 306:17,17
306:20,24 307:5,6
307:8 367:2
**presentation**
194:22 294:25
301:2
**presented** 102:2
119:12 194:19
195:4 206:9
257:18 330:11
336:22 341:1
358:21 384:5
**presenting** 121:11
174:2 299:13
329:13,13 341:14
345:1 372:5
**preservation**
254:20
**preserved** 93:5
229:17
**pretty** 44:7 46:6
197:15 249:24
**prevent** 15:15
**prevented** 100:16
**previous** 156:9
**previously** 24:25
138:19 150:16
212:18 215:12
250:19 259:21
272:3 277:5
278:17 279:1
290:20
**primarily** 193:9
**primary** 115:1
**prime** 85:23
**principal** 331:6
336:15 338:7
341:14,16
**principals** 324:21
326:11 336:11,16
344:24

**principles** 322:9
**printout** 110:2
**prints** 51:7
**prior** 67:17 108:17
    113:3 136:15
    152:13 222:6
    225:22 239:3,14
    253:20 272:23
    281:25 299:25
    300:4 328:13
    363:20 364:25
    367:25 368:11
    376:5,10,15,17,22
    377:3 380:9,13,15
    381:6,21,22
**priority** 35:16
    209:23 210:1,2
    219:8
**prison** 292:21
    293:1,5
**private** 258:24
**pro** 173:20 181:14
**probably** 19:25
    20:1 94:18 177:12
    180:1 201:13
    202:2 227:16
    244:9 285:7 287:2
    295:23 297:23
    299:1 329:21
    371:22
**probation** 380:6,7
    381:10
**probative** 106:19
    113:22 117:6
    376:12 379:21
    382:8,10 383:2,5,8
    383:13
**problem** 20:22
    21:10 109:21
    115:12 116:19
    117:2 119:5

218:16 262:25
    351:12 355:8
    358:3,15,20
**problems** 103:24
    297:20 349:7
    356:4
**procedure** 243:25
    255:11 260:24
    303:1,3 306:10
**procedures** 135:6
    278:5
**proceed** 5:11,16
    10:22 12:6,11,13
    25:13 28:17 35:12
    68:6,8 72:9 99:5
    123:14,14 130:14
    131:11 132:10
    133:20 141:17
    142:16 149:6,18
    153:13 173:9,20
    178:5,16,25 179:2
    180:15,25 187:14
    188:9,13 189:12
    189:18 192:16,17
    195:11 206:14
    210:13 220:18
    253:2 256:6 259:4
    270:9,10,17 294:9
    322:14 334:5
    346:13
**proceeded** 311:15
**proceeding** 175:21
    248:14 308:15,16
    340:21 385:17
**proceedings** 92:3
    178:24 298:25
    386:14 387:5
**proceeds** 187:20
**process** 87:11
    255:16 256:7
    330:3

**processing** 253:16
**procured** 79:7
**product** 92:7
**proffer** 66:10
**program** 77:25
**progress** 33:23
    34:19,22 59:23,24
    60:10 63:13,16,16
    63:17,20 209:22
    218:10,23 219:1,5
    219:8 221:17,19
    223:12,15,20,21
**prohibited** 378:11
**prohibitive** 97:23
**projectile** 248:6
    261:20,23 342:23
    344:10
**promised** 109:1
**promoted** 271:22
**prompt** 157:2
    188:20
**proof** 34:24 67:3
    108:7 109:13
    136:11 278:11
    280:17 342:16
**propel** 344:9
**properly** 91:23
**property** 50:25
    51:2,7 225:17
    226:11 237:11,14
    237:19,23 240:9
    240:24 241:1
    243:4 251:18
    255:22 361:17
**proposal** 318:3
    319:20 321:2,13
    322:22,23,25
    323:3,23 324:8,25
    325:3 326:3
    327:15,15 330:16
    339:23

**propose** 176:4
    317:20
**proposed** 319:5,5
    323:17,19 325:12
    326:7 328:24,24
    344:20 346:24
    347:18 358:25
    359:1 363:8,12,18
    364:20
**proposes** 146:22
**proposition** 183:2
    183:8 303:20
    314:25
**proprietary** 80:8
**prosecution** 93:5
**prosecutor** 263:4
**prosecutors**
    288:13
**prove** 124:7,17
    125:16,19 126:2
    127:4 130:11
    139:6 248:15
    316:14 325:18
    327:22 331:4
    342:24 344:9
    346:11
**proved** 326:14
    345:13 365:22
**proven** 336:9
    342:12
**provide** 51:19
    85:17 129:5
    135:17 136:17,18
    203:17 204:13
    278:9 384:15,19
**provided** 104:15
    104:15 138:13,17
    202:23 251:10
    309:25 333:14
    338:18,22

**provides** 135:10
  376:10 382:25
**providing** 302:17
**publish** 49:13,19
  52:25 55:19
  131:20 138:23
  149:20 212:24
  215:9,10 235:22
**published** 25:6
  36:5 132:3 222:22
**pull** 44:20 46:11
  68:23 96:4 197:7
  265:3,22 268:16
  268:18
**pulled** 43:10 67:7
  88:14 211:15
  217:22 265:1
  357:8
**pulling** 44:2,2,4
  83:1 265:19
**punch** 128:11
**purported** 125:2
  125:12 126:6
  139:7 243:12
  301:13
**purpose** 104:17
  106:22 107:20,21
  109:5 139:1
  228:10 239:13
  302:8,16 305:24
**purposes** 91:17
  136:19 243:7
  250:20 274:6
  287:15 328:3
  329:1
**pursuant** 299:25
**pursuing** 222:3
**pursuit** 222:9,11
  222:14 272:4
**put** 10:13 28:10
  50:25 51:7 61:8

61:10 71:6,7,10
  73:3 83:23 96:4
  102:10 109:14
  112:18 128:19
  129:6 178:9 182:8
  184:14,16 191:20
  191:22 200:7,14
  200:20 202:11,16
  230:2,8 244:20
  246:6 261:13
  263:16 285:1,22
  314:8 333:1
  343:25 344:11
**puts** 107:14
  128:22
**putting** 67:15
  128:25 129:1
  267:19 375:3
**puzzled** 379:12

**q**

**quadrillions** 201:7
  201:7
**qualification**
  258:10
**qualifications**
  257:20,22 258:22
**qualified** 257:3
**qualify** 257:13
**quality** 142:3
**quarter** 171:1,18
  171:19 177:22
  185:25 187:3
  192:12 196:23
  197:2
**question** 24:6,19
  25:21 28:8,23
  30:8 54:6 77:9
  83:12 86:7,11
  91:21 94:14 96:20
  98:23 110:15
  123:6 134:13

140:12 160:5
  166:21 179:8
  180:9,14,22
  182:20 183:1,7
  203:19 242:4
  248:15 259:13
  268:23 285:2
  287:4 295:8 299:9
  300:19 306:4,4,10
  310:11 311:14
  312:11 332:24
  339:16 345:23
  357:10 379:16
**questioned** 379:2
  379:2,4
**questioning** 66:8
  86:16 251:15
  283:8
**questions** 13:19
  23:13 27:9 29:6
  58:15 59:3 64:3
  99:4 170:24
  195:21 199:8
  204:19 217:25
  218:3 219:19
  230:23,24 242:8
  250:3,4,9 251:22
  259:3 268:13
  269:16 274:18
  279:25 280:6
  283:19,21 287:25
  288:25 312:25
  313:4 343:7
**quick** 15:24
  188:17 195:21
  213:12 249:9,16
  249:22,24 266:18
  268:7 322:7
**quickly** 12:9 95:22
  121:25 311:9

**quinn** 1:5 2:1 7:18
  19:20 103:10,13
  103:25 104:16,20
  105:8,11,11
  106:15,17,22,25
  107:6,9 108:19
  110:11 111:21
  113:3 114:2,19,22
  115:7 118:5 119:7
  124:7 126:4,7,9
  143:2 145:2,4,10
  145:15,16,19
  146:21 147:20
  148:3 160:23,25
  168:11,24 170:14
  177:10 196:10
  206:5,10 207:4,10
  290:8 294:3
  308:13,20 316:15
  318:4 319:1
  320:13,19,23
  322:5,6 324:18
  325:9,25 326:10
  326:16 330:22
  331:4,8,20 332:7,8
  332:15,25 333:2
  333:15 334:22
  335:7 336:1,7
  337:9,13,16,20,23
  338:8,9 339:15
  340:11,14 341:1,7
  343:11 344:23
  345:5,10,16,19,24
  347:1,22 348:7
  350:2,21 351:1,18
  351:21,23,24
  352:10 353:12,13
  353:25 354:1,14
  355:22 356:8,11
  356:24 369:12
  372:12 377:18

378:25 379:21,23
379:23,25
**quinn's**  7:20
102:15,23 104:24
106:7,8,10 107:15
107:25 112:24
115:19,25 116:3
117:25 118:3
119:13 120:14,22
122:12 123:9
127:21,23 128:1
128:20 129:19
132:21 290:9
316:11 331:1,2
355:12 356:16
369:15 370:20
**quit**  331:6
**quite**  57:21 126:24
130:4 170:25
228:2 305:10
350:23 351:25

**r**

**r**  5:1 75:13 133:17
133:17 150:9,10
281:11 325:23,24
**r&d**  361:17
**r.c.**  1:14
**race**  339:8,9,9
**rack**  239:11
**radio**  33:19,22,25
34:15 39:23 40:1
40:4,7,12 42:20
46:24 58:2,3 59:3
60:9 62:3,8
171:15 210:20,21
214:5,5 218:11,12
218:21 219:11
221:17,18 222:2
**raheem**  3:8 64:12
64:18,23

**raise**  8:19 31:23
64:17 75:5 106:3
207:22 220:7
231:6 252:16
269:17 270:21
275:8
**raised**  181:18
299:10 309:3
347:14 353:11
**raises**  180:21
**raising**  10:4
269:24
**ran**  71:15,16 74:25
136:11 225:25
**rang**  273:1,2
**range**  135:25
**rapid**  351:14
**rarely**  168:8
**rate**  154:24 192:12
**rating**  63:14
**raymond**  3:22
252:18,23
**rd**  118:19 360:11
361:17
**reach**  11:24
346:23
**reached**  102:14
104:3 352:2 385:3
**reaches**  96:10
**reaching**  61:12
**react**  20:11
**read**  14:2,2 69:23
82:24 126:13
127:14 131:22
139:23 141:25
169:24 171:12,13
198:23 205:8
225:18 226:8
238:1 290:4
301:10 307:7
320:10 326:8

327:18,20 329:12
341:6 345:2,2
357:24 365:14
**readily**  342:23
**reading**  302:8
321:3 323:23
327:21 342:20
350:3
**reads**  319:24
326:9 331:3,3
372:11
**ready**  5:10,16 6:13
12:11,13,16
264:22 375:20
**real**  26:10 40:17
40:18,20 54:8
70:13 79:20 80:18
84:8 115:12
210:20 249:22
282:7,22 283:3,3
285:1 305:18
341:24 342:2,11
342:12,14,17,20
344:10 358:3
**realistic**  331:5
**reality**  164:14
**realize**  329:16
377:17 381:2
**realized**  99:25
**really**  22:2 35:7
42:15 44:8 106:21
107:13,14 114:5
116:5 118:5
119:24 121:11,24
158:1,3 173:8
174:25 198:15
262:17 268:2
313:7 322:3 330:4
343:9 349:24
352:9 355:9 371:3
372:6 375:24

385:7
**rear**  41:21,23
265:4
**rearward**  265:2
**reason**  67:15 71:7
71:21 102:20
105:10 119:14
121:5,7 127:17
156:19 293:1,8
318:3 325:21
326:24 327:4
353:11 354:16
376:6
**reasonable**  262:3
331:4 345:13
370:23
**reasonably**  322:13
350:1,8 355:14,15
**reasoning**  111:19
**reasons**  19:5
106:13 200:23
355:11 381:1
**rec**  144:12
**recall**  71:18 79:1
176:10 273:7,10
**receipt**  51:1,2,8
225:17 226:11
237:11,14,19,23
240:9 241:2 243:4
251:19 255:22
**receive**  33:19
34:15 39:24 40:6
41:7 58:20 59:6
84:12 209:16
210:18 221:16
254:21 255:10,13
267:7
**received**  39:22
41:6,9 49:16,18
51:15 53:4,6 54:7
55:16,18 77:8

110:3,6,6 131:25
132:2 149:17
199:18 212:22,23
235:17,21 238:8,9
240:16 241:10,12
254:4 261:8 263:7
263:22,23 264:8
267:7,8 276:10
290:10 298:11
315:16 346:17
378:2 380:22
384:16
**receiving** 58:16
156:16 203:22
378:19
**recess** 101:24
131:3 171:2,13,18
171:24 177:22,24
185:22,23 187:2,5
269:17 308:12,20
308:23
**recognition**
128:10 302:10
303:4 313:16
**recognize** 36:8,11
48:24 52:14 138:2
163:25 164:3
222:18 259:13
260:4
**recognizes** 155:6
**recollection** 69:8
72:16 73:3 80:24
81:10 82:11 225:2
250:22 251:17
273:14 274:9
331:21 351:19
**recommend**
178:15
**recommends**
183:6

**reconvened** 131:3
177:24 187:5
308:23
**record** 8:12 9:15
10:12 32:3 37:18
38:12 40:2 44:4
54:14 64:22 69:24
75:11 91:6 130:19
131:15,23 132:6
133:15 134:14
135:6,17 137:23
139:22 142:17
147:3,5,17 152:18
153:6 154:6 155:7
155:11 158:4
160:3 169:11,24
175:20,24 178:18
178:22 181:12
182:9,16 184:1,14
184:17 192:24
193:5 203:22
205:4,9 208:3
220:13 225:19
231:10 236:15
237:22 240:3
248:24 249:4
252:22 259:24
263:16 267:13
269:21 271:2
274:11 275:14
281:9 310:25
314:8 351:17
353:8,21,24
367:19,23
**recorded** 91:22,23
154:18 237:9
**recorder** 89:21,24
209:14 287:5
**recording** 96:11
387:5

**recordings** 311:8
**records** 4:17 6:1
7:21 102:10,17,21
104:15 105:16
106:12,14 108:17
108:18 109:5,15
109:25 110:8
112:22 113:2,8
115:14,16 116:18
118:14,24,24
119:15 120:13
123:13,20 124:23
125:1,2,7 126:6
128:4 129:20,22
129:25 130:14
134:3,20 135:3,8
135:16,22,23
136:21,22,24
137:1,3,10,15
138:2,5,9,12,14,18
139:2,3,7,7,11,15
139:17,23,24
140:10,13,15
141:1,4,17,21
142:2,10,23
143:25 145:6
152:22 153:9,15
158:17,21 160:16
160:20,23 161:4
161:13,24 162:1
165:15 166:17
167:8,11 168:7
170:4 172:8
189:25 190:3
196:10,11 206:7,7
206:9 207:3
290:10
**recount** 61:4
**recounting** 178:20
**recover** 77:5,12
78:6 79:10,11

80:9 81:13,15,16
81:23 82:21 83:5
97:1 236:4
**recovered** 77:3
78:21,23 79:25
80:16 81:11,12
84:2 93:21 236:6
236:23 237:4
239:1,19 240:6
241:18 243:5
251:18 259:8
267:2
**recovering** 78:14
79:5 84:11,14
**recovery** 77:20
79:19 80:4,8 81:7
82:10 83:17
254:20 279:19
**recross** 3:2 4:2
28:18 29:8
**red** 70:6,6 165:2
**redirect** 3:2 4:2
23:17,18,22 31:5
64:4 73:24,25
101:13 205:6
219:20 250:9,16
252:1 268:24,25
289:1,7
**reduced** 168:3
364:23 367:21
**reduces** 358:18
**redundancies**
203:1
**refer** 153:14
233:19 258:5
268:1 298:12
360:10 366:13
**reference** 164:6
222:4 240:22
260:12 278:12
328:2

**referenced** 57:25 198:5
**referencing** 200:2
**referring** 90:21 371:15
**reflect** 274:11
**refresh** 69:7 72:15 73:3 80:23 81:10 82:10 225:2 242:23 250:21 251:16 273:14 331:21
**refreshed** 274:9
**refused** 178:7 179:10 184:9,23 185:2
**refuses** 179:6 180:16 187:18
**regard** 5:18 6:25 9:17 135:7 140:15 338:3 378:20
**regarding** 33:20 135:3 259:11 262:14 264:2 276:11 277:6 279:11
**regardless** 157:17
**regards** 242:4
**region** 1:23 2:23
**register** 353:12,14 353:23,24 354:10 354:12,14,22
**registered** 124:21 164:7
**regular** 108:19 139:4 206:10
**regularly** 134:24
**reiterate** 365:4
**reject** 133:6
**rejected** 363:10

**rejecting** 321:1
**relate** 139:24
**related** 50:21 68:18 105:18 107:6 114:15 138:7 140:13 223:12 224:17 253:16 299:2,11 305:11 383:12
**relates** 306:5 334:17
**relation** 36:22 53:19 106:25 232:15 237:20 260:7 324:21 326:12 336:13 341:9 345:8
**relationship** 127:22
**relative** 126:25
**relayed** 83:6
**relaying** 59:16
**release** 239:8
**relevance** 66:8 107:10 112:1,3 118:10 120:12
**relevant** 93:13 95:14 97:13 98:1 108:23 112:8,8,9 115:2 117:4,7 118:21 144:23 146:23 304:11,21 305:23 382:21
**relying** 338:15
**remain** 173:2 289:18 306:7 307:23 308:13,21 308:21
**remainder** 160:16
**remains** 322:20 374:21

**remarks** 182:25
**remedy** 112:20 305:3
**remember** 24:6,19 27:7,9,12 28:20 33:14,22,24 34:5 35:22 39:11 42:10 42:12 43:2,3,13,18 43:23 44:6,9,11,19 47:14 50:15 52:2 60:14 62:21,23 66:3 68:24 69:5,6 70:8 77:7 79:2,24 80:22 83:11 91:13 91:14 94:16,19 126:1 189:14 224:25 246:18,21 246:22,24 247:2 273:11 286:3 296:25 298:10
**remind** 13:3 367:16 385:20
**remove** 43:25 358:12
**removed** 173:24 175:23 344:1
**removing** 44:24 358:11
**rendered** 187:20
**repeat** 166:21 242:17 298:8
**rephrase** 25:24
**replace** 319:20
**report** 4:22 34:2 60:19,22,23 68:22 171:10 179:14 186:8 187:9 188:10 210:19 227:10 256:4,13 256:14 259:10,14 260:4,7,19 261:25

262:12,15,16 263:7,20 264:2 266:10 273:12,17 309:23
**reported** 178:7 184:1,12 223:19 363:19 364:9
**reporting** 1:23 2:23
**reports** 174:21 256:24 284:12,15 286:21
**represent** 9:14 13:13,16 61:23 87:6 173:4 212:1 212:13 215:5 235:5
**representation** 178:22
**representations** 113:23 173:13
**representative** 123:17 194:7
**represented** 105:22 106:2 116:5
**request** 9:24 66:11 66:14 173:15 180:1 202:11 206:23 314:14 323:11
**requested** 9:17 113:2
**requesting** 223:24
**require** 129:7 136:9
**required** 71:3 318:11 321:7 350:25
**requirements** 345:14

**requires** 167:18
345:23
**research** 188:17
188:17 279:11
308:8 309:1
**reserve** 312:17,18
**resolve** 20:21
123:9,22 143:8
146:14 186:9
192:10
**resolved** 15:25
16:12 195:5,6
**resources** 128:9
**respect** 9:22 89:17
128:18 129:15
146:6 147:15
173:1 175:21
181:9 191:4 299:9
300:15 301:15
302:5,25 305:16
311:24 316:6
335:21 342:16
348:12,23 359:9
367:2 370:2
372:22 377:12
379:20,25 382:3
383:24
**respectfully** 317:5
**respond** 34:3
35:21 47:23 115:4
138:6 139:19
209:19 210:3
214:18 217:1
221:22 222:15
232:8,11 269:16
271:25 272:8
**responded** 35:1,4
35:5 58:17 60:1
210:16 221:18
222:3 232:9 376:3

**responder** 228:15
**responding** 34:6
59:12 210:5
223:11
**response** 121:21
139:21 188:20
353:10
**responsibilities**
134:18 254:25
276:4 284:10
**responsible** 98:20
202:9 230:16
247:11 253:15
284:25 327:12
372:5
**rest** 290:19 291:23
297:24
**rested** 291:24
**restitution** 385:8
**restoration** 254:10
255:6
**restoring** 293:6
**restroom** 74:25
**result** 70:17
138:10
**results** 155:7
248:19 256:24
**resume** 269:12
314:17
**resumes** 56:15
**retain** 203:25
310:19
**retained** 204:11
**retention** 82:1,11
97:8 137:10
**retract** 129:9
**retrieve** 207:18
250:24 252:6
255:4,19 269:6
**retrieved** 88:22
274:12 287:5

**return** 51:18
138:9 291:21
314:17
**returning** 265:2
**reverse** 329:17
**review** 9:16 83:7
99:21 100:7,14,15
100:18,22 160:20
160:23 175:21
274:7
**reviewed** 99:15
100:6,25 101:4
138:20 234:9
256:16 285:11
**reviewing** 81:9
82:9 83:7 100:13
285:16 321:24
**revise** 362:20
**revised** 315:16
373:1,16,22
**revolver** 244:16
244:18
**revolves** 244:19
**reznik** 4:4 275:6
275:10,15 277:16
**reznik's** 278:1
**ride** 210:4 272:25
**riding** 268:2
**rifles** 254:9
**right** 5:15 6:10
7:19 10:13 11:25
12:10,15 13:21
15:3 16:6,12,19,22
17:12,15,18,25
19:1,5,13 22:1,5
22:20,22,25 23:8
23:10 24:17 25:18
25:25 26:3 27:8
27:22 28:16 29:25
30:1,12 31:3,23
32:23 34:9 35:17

36:15 37:19,25
38:10,17,24 40:3
41:3,13,19,24
42:16 44:3 45:5
45:13 47:8 48:7
50:4 52:19 53:8
53:12,18 54:6,14
54:16 55:23 56:11
56:22 58:1,12,22
59:17 62:12 63:6
64:17 69:4,7,18
72:24,25 73:11
75:2,5 76:16
81:25 82:14 87:17
87:22 90:11,18
93:16,22,23 94:1
96:20 97:17 99:16
100:10 101:6
107:24 110:9
113:10 117:12
119:16 120:18,20
121:4 129:8 138:9
151:4 153:4,11,19
154:15 156:25
157:18 158:16,25
160:4 161:3
162:20 163:1,22
165:7 166:2,17
169:11 173:2
174:18,19 175:24
176:17,23 177:14
177:21 180:11,23
181:25 183:17,24
184:13 185:6,14
187:2 188:12
194:9,12,24
196:12,15 197:5
200:8,15 201:20
207:15,22 210:3
210:12 212:10
213:9,11 214:2,15

215:2 217:1,18
220:7 221:11
224:11 226:6
229:23 230:7,10
231:2,6 232:10,18
232:22 234:1,5
235:13 236:9
237:17,18,25
238:3,11 243:21
247:11,21 248:24
249:6,8,12,15,20
249:23 252:16
264:16 265:17
266:1 267:14,15
267:20 270:5,15
270:21 272:3,19
272:25 273:19
275:8 277:13
279:10 282:13,23
284:8 285:8
286:14 287:22
288:23 289:19
290:18 291:22
293:17 294:22
295:19 296:5,6,12
297:2,10 300:18
300:21 301:3
302:21,24 303:24
304:4,11,18,25
305:18 307:12
308:7,9,19 309:22
310:19 311:7
315:10,12,15
324:15 332:11,12
335:19 336:3
338:23 341:22
342:3,20 343:8,25
346:3 347:10
348:11,18 351:21
354:7 357:9
358:18 360:1,2,9

361:19 362:3,20
362:25 363:16,24
364:1,8,12 366:4
366:16 367:18
369:2 370:24
372:11 373:20
374:20 375:16,18
375:20,24 377:11
379:5 381:19
383:16,25 385:14
385:20 386:5
**rights**  174:19
182:1 183:4
**righty**  249:6
**ring**  165:12
**rise**  12:21 102:4
130:25 131:6
171:20 177:23
178:2 187:4 195:1
298:21 308:22
386:13
**robbery**  14:23
15:9 34:20 42:21
42:24 60:10 63:16
67:6 105:19 107:7
107:12 108:23
109:3,4,10,11
111:2,16,21 112:2
112:10 113:9
115:6,7 117:11
118:15,18 119:18
120:22 121:15,16
124:1 126:19
140:11 145:2,4
209:22 210:22
218:10,23,24
219:1,2,5,7 221:17
221:19 222:4
223:5,13,14,20,21
232:5,16 287:2
324:23 326:13

331:6,16 332:18
333:19,19 334:6
336:14 338:21
341:4,5 343:14,21
345:20 346:1,7,13
347:2,23 348:1
354:22 355:1,23
360:20 370:13
377:21 378:21
**robert**  1:10,13
174:12
**rock**  47:13
**rodeo**  228:4
**rodriguez**  66:1
86:4 370:12
**roi**  273:17
**role**  77:2 223:2
**roles**  134:18
254:25
**roll**  43:4
**rolls**  211:3
**room**  104:13
171:17 185:12,20
201:11,12 298:20
350:18
**roommate**  174:8
**rooms**  201:13,19
204:6
**roseman**  325:24
326:21 328:13
**ross**  36:16,22
38:15 46:7 213:18
217:5
**round**  243:25
244:5,12,13,19,24
244:25 246:17,18
247:4,5,5,6 249:5
264:20 265:12
266:4,19,23
267:10,22,24
268:8

**rounding**  266:19
**rounds**  247:1,3,8
249:22 261:9
266:6,15
**route**  213:3
**routed**  158:13
**routine**  33:17
67:23 68:15
**row**  270:14
**ruger**  254:16
**rule**  7:13 8:24 9:3
12:8 114:12
121:25 124:11
145:1 177:1 192:2
192:3,5 193:15
194:1 291:18,20
294:23,24 296:18
299:25 300:12,15
306:1 313:8,25
314:1,2 330:4
376:1,9 377:13
378:17 382:8,9,23
382:23,24,24
**ruled**  114:16
124:4 129:18
294:24 377:4
**rules**  187:17 312:9
315:4
**ruling**  113:21
114:9 128:18
129:15 142:22
189:9 305:7 314:5
330:17 376:4
**run**  21:6 216:14
225:24
**running**  42:11
148:5 366:3
**rush**  198:12
**rushing**  317:24
**ryan**  370:25

**s**

**s**  4:11 5:1 133:16
   133:17 150:10
   152:1
**sa**  4:4,6
**safe**  214:7 239:4,6
   239:12 244:3
   293:16
**safely**  256:6
**safety**  29:14
**sam**  200:15
**sample**  302:17
   303:17 307:22
   315:2,5
**samples**  51:6
   256:7
**sanchez**  3:3 5:13
   7:25 8:9,16,16
   10:14 12:10 13:3
   13:10 23:24 25:10
   25:16 26:2,17
   27:7 28:20 31:8
   86:5 370:6,7,10,18
   370:22 381:18
**sandbagged**
   119:19
**santa**  200:15,20
**sat**  28:23
**satisfied**  10:12
   176:11 178:20
   189:24
**savage**  254:17
**save**  86:8 92:15
   351:6
**savings**  155:6,9
**saw**  41:5,5 42:6
   43:12 47:11,12
   49:8,23 50:2
   55:25 94:21
   120:24 129:22
   214:21 268:5

285:14 287:11
   288:4
**saying**  6:10 20:18
   30:14 85:9,13
   100:13 117:10
   193:21 203:4
   290:23 294:8
   302:18 347:11
   353:19,20 356:25
   367:6,6
**says**  67:9 73:15
   80:10 139:8
   190:20 325:12,18
   335:25 358:1
   361:15 368:21
   369:11
**scan**  197:1,10,24
**scanning**  255:20
**scared**  26:21,23
**scarpack**  190:15
**scenario**  181:12
   203:10
**scene**  34:14 39:9
   45:7 48:1,2,8 49:4
   50:2,9 51:19,23
   62:1,9,16,19 77:14
   98:7 223:3,4
   224:7 227:19,21
   227:24 228:5
   229:9
**schedule**  65:20
   66:3 74:13
**scheduling**  195:9
   292:1 297:15,21
**school**  174:8
   276:15,18,20
**scientific**  262:3
**scope**  230:12
   305:14,17
**scored**  77:15

**screen**  28:2 36:17
   37:6,6 38:7 48:25
   49:22 52:13 54:12
   54:15 55:4 56:10
   56:22 69:11,15
   112:22 151:16
   154:2 159:17
   163:5 164:2,21
   169:11 195:25
   199:9 211:23
   212:11 217:15
   225:6 237:18
   259:18 260:5
   286:2
**screens**  37:20
   94:13,19
**se**  173:21 181:14
**seal**  230:9 246:7,9
**sealed**  230:10
   246:5
**sean**  275:5
**search**  79:15
   224:11,13 232:22
   233:1,9,21,24
   234:21 236:24
   237:10 239:1
   242:18,24 243:8,9
   243:17 250:21
   251:1
**searched**  234:8
   235:6
**searching**  238:12
**seat**  242:6
**seated**  5:8 13:1
   32:1 64:20 75:9
   102:6 104:13
   131:7 133:13
   171:22 178:3
   195:3 208:1
   220:11 231:10
   252:20 270:25

275:13 281:8
   298:23 308:25
**second**  9:9 31:18
   46:11 54:15 55:2
   55:9 80:13 82:4,7
   82:9 109:8 155:23
   165:14 170:10
   180:14 187:13
   212:8 228:15
   273:2 289:8
   320:19 321:17
   325:15,17 345:3
   349:4 350:5 352:3
   360:10 365:12
   367:8 369:10
   370:2 371:6,16,17
   372:11 377:7
   381:3,3
**secondary**  105:10
   140:9
**seconds**  19:22
   54:22 56:12,24
   84:5,8 155:20,24
   155:25 163:19
   165:4,6,13,25
   166:16 167:6,8
   169:14,19,21
   170:4,9 350:16
   352:13,13
**section**  32:22 46:7
   76:7 315:21
   377:17
**secure**  227:24
   233:13
**secured**  227:25
**security**  136:10
   157:12 282:22
**sedan**  41:12 70:5
**see**  18:1 21:1,12
   26:5,12 36:18
   37:2 41:13,20,22

41:23 42:2,13,15
43:11 44:25,25
47:2 52:7 53:22
53:25 54:8 56:21
78:1 79:16 92:7
94:15,22 95:1
96:23,23 108:19
113:11 120:12
130:15 142:18
150:19,22 154:10
154:10 155:12
156:17 162:11
163:5 164:5,5,8
165:2,5 166:15,18
166:22 168:6,20
168:21 175:16
177:22 187:1
197:9,10,14,16
198:13 206:19,22
214:4,20 215:2,20
216:1,8 226:5
232:21 234:5
251:8,11 264:3
266:25,25 267:21
286:15,17 293:14
298:20 304:3
306:3 309:5 328:6
332:6 333:21
336:24 343:19
344:2 350:6
356:13 368:9
371:19
**seed** 107:14
**seeing** 50:16 53:19
94:19 164:14
166:24
**seen** 10:2,3 24:15
27:15 41:2 84:7
92:24,25 93:3,3,4
94:13 110:18
129:20 161:21

200:17,24 286:25
287:10,16 334:25
365:9,10
**seized** 238:22
**self** 131:14 141:21
141:22 142:3,4,12
146:17 177:1
189:14,17 190:5
313:22
**sell** 17:13
**semi** 206:10
244:13 245:12
260:14 264:24
265:9 338:5
**send** 78:2 186:16
186:18 195:8
247:22
**sending** 106:16
**sends** 182:14
354:16
**senior** 178:6
179:17 308:10
**sense** 340:19,21
369:25 372:16
**sent** 155:25 176:14
204:8 247:24
347:12
**sentence** 331:3
370:21 378:2
380:8
**sentenced** 378:15
380:5,25 381:8
**sentencing** 316:24
328:3
**separate** 91:13
156:19 286:2
333:17 339:1
**separately** 261:13
261:14
**separation** 176:16

**sequestration**
245:20
**serial** 157:21
236:19,21 237:7,9
237:22,25 254:10
255:3,6 260:13,18
260:19
**serious** 172:25
182:12
**seriously** 22:14
24:5
**serve** 107:21
208:19
**served** 231:23
232:1 271:12
378:2
**server** 158:13
**servers** 201:18
**service** 136:15
158:5 167:21
209:16 210:5
212:2,14 271:25
281:25
**serving** 209:3
**set** 140:9 175:23
186:23 306:1
322:3 348:6 350:9
355:15 358:16
364:21
**settle** 22:8
**seven** 102:22
137:11 140:19
292:23 293:3
**seventh** 325:22
**sever** 343:11
**severing** 181:4
**shade** 70:6
**shape** 109:6
**share** 178:5
296:17

**sharpnack** 33:20
35:25 36:14,15,22
38:1,12,14 46:7
47:21 49:24 51:18
53:11 58:17 63:4
126:19 209:17
210:6,13,14,23,24
210:25 211:2,20
211:21 213:5,10
213:18 217:2,5
221:20 222:5
232:6 272:1,8
282:14 310:10
**shawn** 4:4 275:10
275:15
**she'll** 315:9
**sheet** 80:13 316:24
**sheriff** 175:16
**sherri** 387:3,9
**shield** 226:5
**shift** 33:7
**ships** 114:14
**shirt** 13:14
**shit** 22:18
**shootings** 268:20
**short** 130:23
156:21 310:21
311:1 351:18
**shorthand** 310:21
**shortly** 356:25
**shotguns** 254:9,10
**shoulder** 40:3 58:1
58:12 237:18
**shouldn't** 123:25
**show** 27:5 35:8
55:8 85:3 104:18
104:19,21,22
105:11,17,18
106:15 107:23
112:3,8,9,10,15
114:17 117:25

122:25 143:19,23
145:19,20 155:22
156:1 157:4,6,9
167:23 206:10
213:5 234:2
239:22 250:18
269:21 308:4
335:11
**showed** 69:8 80:24
100:19 222:19
225:3 259:14
286:1
**showing** 85:22
108:24 112:1
**shown** 24:24 36:3
45:18 48:23 50:6
81:2 82:7 85:7
137:19 150:16
153:1 165:10
195:25 222:22
243:12 259:18
369:2
**shows** 146:4 344:5
345:15
**shuffling** 374:18
**shut** 22:12,23 24:5
173:23,25 174:22
174:22 176:7
293:1,5
**shutdown** 176:19
**sic** 14:19 29:13
131:15 174:4,4
188:2 190:15
336:23 355:4
**side** 41:18,25 42:9
43:10 54:16,16
56:3 211:5,7
226:4 241:19
375:3
**sidebar** 66:10,16
66:17 68:7,9

140:2,4 146:2
149:5 172:14,17
172:22 177:20
206:25 207:16
262:9,10,11
263:18 291:12,14
296:15
**sides** 356:20
**sierra** 3:13 133:2
133:11,17,24
134:1 138:2 150:1
150:19 151:6,19
153:4 158:20
159:22 160:4
161:20 162:19
164:20 167:10
169:11 191:21
192:11 194:15,18
195:19 196:5
**sight** 213:14
214:11,13
**sign** 40:13 80:10
80:13 320:10
**significance** 310:4
316:17
**silent** 173:2
**silly** 134:13
**similar** 85:1 91:4
142:1 251:15
376:19 380:9,10
**similarity** 376:18
378:21 380:14
382:4
**simple** 66:21
176:14 306:4
358:16
**simply** 67:22
223:10 265:18
**single** 79:4 141:1,4
335:7

**singles** 318:14
**sir** 32:7 57:14,20
57:24 58:8,14
61:22 64:8 75:14
75:15 96:17
101:15 186:15
194:20 199:6,12
200:4,9,16 201:15
201:22 202:5,8,15
202:20 204:4
205:19 208:7
210:7 212:8 213:2
215:3,7 217:15,21
218:22 220:15,16
231:20 234:5,18
235:1 236:2,15,17
237:18 239:25
241:18 250:18
251:1,15 252:25
268:18 269:2
273:25 275:18
278:25 279:2,4
281:14 282:10
283:9 284:6,9
285:21 288:8,14
291:8 308:18
313:2,6
**sirens** 20:2,3,11
34:10 38:25 39:4
46:17 62:2,9,13,15
62:18 63:9 209:11
210:3 219:9
**sister** 62:7 226:17
**sit** 79:3 82:18
264:5 273:8 284:7
289:12
**site** 213:19 214:20
222:16 232:19
272:4
**sits** 40:4

**sitting** 27:8 113:16
203:13
**situation** 15:12,15
88:8 93:16,17
167:25 248:7
**six** 76:14 84:24
208:25 293:13
317:11 328:7
**sixth** 159:20
339:17,20 340:4,5
340:8
**skipping** 170:12
**slap** 265:5
**sleep** 298:6
**slide** 239:11
249:11 265:1,7,7
265:13,19,21,23
267:21 268:2
**slightly** 321:12
**slim** 297:6
**slip** 346:4
**slips** 347:13
**small** 84:4
**smaller** 83:1
285:24
**smart** 202:2,17
**smith** 1:5,13 9:13
10:5,24 27:10
28:24 67:9 69:3
71:17,21 73:7,8,11
73:13,14,15 99:14
102:21,23,25
104:18,19 105:11
106:11,15,24
107:6,9 108:20
111:21 113:3
114:3 115:7,8
116:21 117:23
118:4,19 119:8
120:17,19,23
121:18 124:7,8,22

124:22,23 125:7,8
125:21 126:7,8
130:13,13 132:7
139:8,9,17,18,25
140:14,17 142:6
142:16 143:2
144:11 145:2,4,7,7
145:9,17,18
146:22 147:4
148:11,13,14
151:25 152:22
153:10,14,15,16
158:22 159:6
160:1,3,7,8,14
161:1 163:12
164:12 166:8,19
167:1 168:10
170:5,14 176:25
177:7,9 178:7
180:2,7 181:18,25
182:17 184:25
185:1 187:12,17
190:2,7,10 199:18
200:2,6,12,12
206:5,11 207:4,10
227:17,18 254:16
291:7 301:14
308:14,21 311:3
311:22,23 312:2,6
312:12,16,22,24
313:2,5,6,22
314:16,18,25
320:13,19,23
324:17 325:19
326:10,14 327:23
331:13 332:17
333:18,20 334:25
336:2,11,16,19
337:10 338:6,22
340:14 341:8,16
342:5,19 343:3,15

343:22 344:23
345:6,11,17 350:2
352:4,16 355:22
357:1,6 363:14
368:10 369:12,15
370:19,20 372:12
374:23 381:2
**smith's** 67:5,10
102:25 106:8,17
106:23 108:1
112:15 114:5,16
114:18 115:22
116:10 118:1,2
120:25 125:8,9,12
125:13 126:9
131:16 140:8
141:12,13 145:9
145:10 177:7
385:24
**smyrna** 279:17
**snooping** 200:22
**social** 136:10
157:12
**soda** 17:13
**solely** 298:10
**solution** 173:7
**somebody** 21:24
21:25 59:16
166:15,15 179:9
190:15 199:17,17
200:21 202:2
228:15 229:21
247:14 268:8
344:12
**someone's** 194:14
303:23 369:22
**somewhat** 349:12
**soon** 133:19
178:11 186:10
205:3 291:20
351:20 374:25

**sooner** 296:8
**sorry** 8:14 11:11
11:20 12:12 28:15
57:15 60:5 62:25
87:14 89:11 93:25
96:1,2,25 97:2
101:3 105:3 106:8
113:20 122:16
123:7 129:3 141:3
143:22 148:13
151:5 182:21,24
188:8 189:6 194:6
194:17 195:15
196:17,22 197:12
197:22 204:24
205:1 213:7 218:9
223:7 240:17,25
242:1 250:8 251:7
258:11,18 273:25
277:23,23 280:20
281:2 287:9 300:2
300:10 311:13,16
313:10 319:19,21
320:25 326:25
333:7,8,9,10,12
349:23 350:4
352:10 353:4
360:6 382:13
**sort** 84:2 106:4
114:15 121:14
166:7,10 178:18
198:3 366:2
374:18
**sound** 111:10
264:25 305:22
387:5
**sounds** 86:15
110:10 111:12
114:21 323:8
**source** 286:16

**sources** 87:12
**southwest** 76:15
**southwood** 1:14
**space** 38:21
**spanish** 283:14
**spans** 161:14
**speak** 10:7,8 11:2
14:6 66:25 102:9
103:2 113:16
115:14 179:19,21
179:22 180:18
184:6 280:16,19
280:24 283:13
307:7 310:1
317:16 328:18
363:15 379:7
**speaker** 58:11
104:14 116:8
189:20 190:1
**speaking** 111:9
**speaks** 304:7
**special** 229:2
253:14 275:5,10
275:21 276:16
280:15 281:5,10
281:15
**specialize** 134:16
254:13
**specialized** 77:20
276:10
**specific** 93:8
199:25 244:13
383:2
**specifically** 42:23
61:5 66:23 97:15
167:6 245:11
264:24 265:9
276:24 299:3
385:13
**specimens** 256:8

speculation
 356:19
speed 156:21,25
 157:1,5
spend 148:15
 191:9
spent 13:20
 348:11 379:12
spill 295:10
 297:11 349:15
spilling 295:15
spit 202:10
spoke 109:1
 117:23 166:15
 179:10 205:2
 317:16 328:22
spontaneous
 111:25 112:1
 349:12,13,15
spontaneously
 111:15
spots 85:8
spread 40:21
spring 249:20
 265:2,3,5,20,23
 268:4
sprint 168:2
stack 90:10
staff 384:19
stage 357:12
stamp 83:14,16,23
 155:12,14,15
stand 7:4,5 8:5
 10:14 13:20 31:22
 64:16 109:1 184:3
 191:21 194:15
 201:24 252:7
 302:7,19 311:22
 315:1,3,5 348:8
 383:7

standard 83:19
 154:21 162:2
 243:24
standby 181:14
standing 27:19
 28:3,25 42:8
 113:16 304:9
stands 201:24
 351:21
start 67:3 87:11
 96:11 162:23
 196:11 225:11
 228:17 255:23
 257:19 258:17
 275:18 293:17
 294:20 295:4
 296:7 298:5,25
 315:12 323:24
 349:17 384:12
started 34:6 45:2
 45:15 46:21 59:2
 63:1 72:18 81:15
 124:16 211:21
 216:8 285:16
 287:1 314:21
 367:17
starting 55:7
 81:13 154:14,22
 155:2 158:25
 159:3 163:17
 375:11
starts 163:22
state 32:2 35:8
 47:10 64:21 70:14
 75:10 104:5
 133:14 147:17
 208:2,6 220:12
 231:10 247:13
 252:21 263:3
 271:1 275:14
 277:6 278:8 281:9

369:14,22 370:17
stated 81:15 92:13
 113:4 181:24
 222:3 346:6,9
 347:18 368:17
 381:21
statement 22:3
 52:4 129:9 189:22
 191:12 247:2
 249:1 346:16,22
 347:2,17 357:14
 357:15 367:18
 368:11
statements 78:19
 189:15
states 1:1,3,8 51:8
 134:21 167:17
 201:11 277:3
 279:16 313:10,11
 313:13 314:22
 325:23 377:5,7
status 379:1,4
statute 327:9
 343:1
stay 29:22 48:12
 215:24 226:22
 321:14
stayed 16:18,20
 27:22 226:24
step 6:16 9:9 10:18
 18:3 31:11 172:10
 181:22 236:23
 252:2 269:22
 289:18 309:5
steven 16:17
stevens 1:5,16
 13:13 16:16 17:23
 19:21 20:5 22:11
 24:5,13,18 25:17
 26:6 29:11 61:23
 87:6 206:5 308:13

308:20 320:13,19
 320:23 324:18
 325:19 326:10,14
 327:23 331:13,24
 331:25 332:7,8,17
 333:11,12,15
 335:1 336:2,11,16
 336:19 337:9
 338:7,10,15
 340:14 341:8,17
 342:1,6,11 344:23
 345:5,11,17
 349:22,23 350:2
 351:24 352:4,10
 352:25 353:8
 357:2 368:10
 369:12,15 370:20
 372:12 380:3,23
stip 117:8
stips 368:2
stipulate 102:15
 103:19 104:24
 105:14 108:16,21
 113:1 115:15
 117:10 118:9
 119:13 122:11
 144:10 168:14
 290:9 363:14
stipulated 86:2
 132:23,24 143:25
 144:2 160:22
 206:12 290:13
 367:1,3,7,19
stipulating 115:24
 310:18
stipulation 103:12
 103:14,18 105:9
 106:9 107:17,21
 113:25 115:24
 123:8,9,13,14,16
 126:12,13,21

128:20 129:19
132:19,20 133:3
198:22 205:3,9,25
206:3,11 290:4
332:3,9 363:19
364:11,25 365:10
365:11 366:21
**stipulations**
147:16 363:8,12
364:20,21,22
365:1,8 366:13,21
367:11,21 368:4
**stolen** 334:2
**stood** 326:2
**stop** 67:5,15,23
68:15,19,22 70:17
71:6,11 113:16
217:17
**stopped** 29:2 71:8
87:15 147:5
**storage** 82:19
**store** 16:8 17:13
19:11,13 20:5
21:1,9 22:18,23
24:6,8 28:3 37:24
38:9 39:17,18,19
40:9 46:6 49:24
51:16 53:18 54:2
62:13 77:4 78:14
78:15,16 79:4,5,6
79:9 80:2,23 83:3
83:8 88:9,21
91:12,21 92:22
93:7,7,11,11,19,22
94:3,10,14,24 95:6
95:7 96:21 99:14
107:9 217:2
272:10,13 285:24
285:25 286:3,9,10
286:16,24 287:12
287:18,19 322:5

331:15,17 332:10
332:17,18 333:4,6
333:15,17,20
334:1,5,5,8,23,24
337:10 338:4,11
338:15,19,21
341:17,19 342:4
342:17 343:3,15
343:22,25 344:4
351:1,13,22,25
352:4,7,11,12
353:3 355:6,7,19
356:24,24 357:7
360:10 370:6,12
**storing** 204:6
**straight** 337:12,16
**stream** 95:5
**streamline** 309:14
**street** 1:11,17,24
2:3,24 33:20
36:14,15,16,22
38:18,24 39:13
46:9 53:10,11,13
54:1 58:17 63:4
93:19 94:4,9,20
126:20 132:8
150:13 190:15
209:17 210:4,6,16
214:15 221:20
232:6,9 282:14
286:11 303:15
**stretch** 352:9
**strike** 83:12 97:17
223:10 247:22
286:7
**struggle** 211:10
**stuff** 89:17 278:11
292:14 300:25
**subject** 86:12
314:4 335:22
337:6 351:16

368:3 386:3
**submission** 339:19
**submit** 246:11
255:15 348:3,3,4
357:10
**submitted** 256:11
261:11 327:5
340:2,2 368:10
381:14
**submitting** 322:22
**subpoena** 138:6
290:11
**subpoenas** 138:7
138:10
**subscribe** 152:15
**subscriber** 135:3,7
135:9 136:1,3,20
137:11,14 139:8
140:7 150:3,7
151:1,21,23
152:12 153:10
157:11 200:2
**subscribers** 201:5
**subsidiaries**
135:14
**substance** 117:24
119:1 229:20
**substantial** 383:8
**substantially**
376:20 377:2
383:3,9
**subtitle** 89:16
**subtract** 155:12
155:17
**successfully** 44:20
**succession** 351:15
**sufficient** 189:25
193:25 313:15,18
313:25 314:1
328:8 338:17

**sufficiently** 128:19
**suggest** 37:5
103:24,25 136:18
173:10 327:14
**suggested** 179:18
**suggesting** 180:18
192:10
**suggestion** 10:3
183:19 323:22
**suggestions**
328:14
**suite** 1:12,18,24
2:2,24
**summarize** 6:10
**summarized**
340:13
**summary** 377:19
**super** 200:24
**supervised** 381:10
**supervision** 104:5
**support** 146:19
**supported** 146:20
383:2
**supports** 127:19
145:23
**supposed** 115:18
203:16 261:21
329:20 371:5
**supreme** 314:23
**sure** 11:23 62:14
62:17 79:18 82:25
85:25 90:9 93:15
100:24 111:14
130:4 143:12
146:13 157:17
158:2 171:16
176:21 191:10
203:14 212:9
228:10,16 239:11
262:20 267:18,23
280:18 287:1

297:18,20 304:11
305:7 306:21
321:10 336:5
340:6,19,22
344:16 351:15
363:13 365:2,4,25
366:9 372:21
382:9
**surfaced** 183:14
183:16
**surmised** 316:9
**surprise** 110:17
**surprised** 263:2
**surrender** 18:12
**surveillance** 77:19
77:21 80:3,8 81:6
88:1 96:21 272:11
**surveyed** 217:3
**suspect** 12:9 41:7
41:8 48:19 84:25
85:2,2,8,11,13,15
85:23 191:15
216:24 272:7
**suspected** 379:14
**suspects** 39:7,9
40:8 78:3
**sustained** 295:2
**suv** 209:10 217:21
217:21
**swietzer** 317:18
328:19,22 334:21
338:1 339:21
340:6
**switch** 158:12
**sworn** 31:24 64:18
75:7 133:11
207:24 220:9
231:8 252:18
270:23 275:11
281:6

**system** 77:16 78:7
79:15 80:20,21
81:20,21 82:2
88:1 91:12 94:9
95:18 135:20
164:18 226:8,16
**system's** 164:13
**systems** 77:24
78:6 82:24

**t**

**t** 4:11 73:14
106:21 134:3,5,7,8
134:18,25 135:7
135:13 136:2
138:6,13 150:4,10
151:1,25 152:1
157:12,13 165:8
168:3 189:25
201:2,20 203:25
208:8,8
**tabled** 129:11
**tables** 9:21
**tag** 50:17,19 67:7
70:7,9,10,12,13,13
224:21 225:22,24
226:1,1,10,12,13
226:14
**tagged** 229:23,25
247:18
**tagging** 230:17
**tags** 51:9
**tail** 143:11
**tailor** 334:19
**tailored** 334:20
**tailoring** 334:16
**take** 22:14 27:1
42:5 45:2,3,5
64:15 70:7 72:24
78:8 79:22 80:11
81:16,21 82:15
97:12,18 100:9

101:19,21 130:23
158:16 171:16
174:16 185:21
192:8,9 197:12
198:11 211:8
213:2,17,17 216:4
229:25 238:20
249:7 272:22
315:3 334:24
338:24 350:12,20
352:15,17,22
354:24 357:11
369:9 372:17
380:3 383:7 384:5
**taken** 49:5 81:19
97:23 131:3
177:24 178:8
187:5 213:23
238:16,23 286:12
286:17 308:23
338:21 342:5
343:15,22 353:12
354:6 358:16
**takes** 98:6 165:11
333:18,20 361:19
**talk** 20:14 31:17
46:1 54:7 113:12
125:25 171:9
175:1,17 183:20
185:7 186:5,7
229:16 291:12
296:9 298:24
339:21 364:17
**talked** 286:20
**talkie** 57:25
**talking** 8:15 20:17
24:21 41:3 111:13
113:12 115:9
124:8 140:13
144:22 146:21
149:9 163:9

164:22 176:16
181:15 185:18
193:25 229:15
303:18 304:9
306:6 307:19
321:18 326:20
327:1 330:22
332:22 335:17
352:1 359:7
374:15 376:4
**tank** 186:20
**tape** 17:25 96:4,4
96:11,18 98:24
128:21 299:3
302:1,4,9,15,15,23
304:24 305:22
310:17,23 312:1
313:14
**tapes** 90:20,21
95:16,23 312:15
**target** 151:22
165:3
**tarziene** 227:12
**task** 281:22
**taulant** 3:16
207:24 208:8
**taurus** 68:15,25
70:5 190:20
225:14 232:14
245:15
**tech** 188:17
**technology** 52:8
201:25 202:1
**telecommunicati...**
134:15,21
**telephone** 7:20
103:9 106:2 111:1
111:20 113:8
115:20 118:24
119:13 120:13,14
122:12 123:10,18

128:12,13 129:20
129:22 130:12,14
133:5 142:2,12
172:8 177:6 196:6
313:21
**telephoning**
146:21
**television** 171:15
**tell** 6:13 19:14,15
36:21 38:8 47:10
60:7 79:9 93:9
117:18 134:1
141:17 142:25
146:17,25 151:9
152:7 161:22
163:11 173:9
181:25 182:2
183:4,5 185:23
207:1 227:10
228:21 242:22
244:4 248:3,3
253:8 254:2 295:9
295:10,11 297:23
298:17 305:9
309:23 314:20
324:9,12 344:19
358:24,25 377:21
**telling** 18:16,24
20:19 59:8 275:18
295:12 297:4
340:23 367:14
371:3
**tells** 219:11 371:21
**temp** 70:10,12
**temporarily**
135:21
**temporary** 50:16
50:19 225:23
226:1
**tempted** 171:5

**ten** 19:23 20:1
47:22 54:22 82:17
115:9 134:11
183:14,15 216:5
261:5 269:18,19
270:3 293:14,18
294:20,22 295:4
296:7 349:19,19
349:21 375:11
**tender** 86:24
**tens** 256:22,22
264:18,18 267:1
**tension** 265:2,3,5
265:20,23 268:4
**tenth** 13:25
**term** 51:3 86:12
218:23 323:20
342:21 380:25
**terminology**
202:14
**terms** 36:20 82:19
327:11 331:16
343:11
**test** 247:25 248:4
248:20 254:6
255:3 256:2,5,6,7
258:2,4 261:15
268:16 342:18
379:18
**tested** 229:18
248:9 267:3,3
**testified** 17:9
58:15 182:10
227:23 230:14
256:23 261:3
277:5 283:10
363:1 378:24
**testifies** 173:11
262:14 263:7
295:5 296:21

**testify** 72:14 91:15
124:20 139:3
173:3,17 174:18
174:20 192:24
193:4 199:16
203:9 243:3
257:17 296:21
299:23 302:1,19
302:22 305:4,15
315:3 352:25
363:7 368:8,9
374:23 375:2,8,16
376:8 378:25
383:20 384:11
**testifying** 9:19
67:14 139:16
203:10 264:2
292:3,14 294:3,4
299:22 368:11
**testimony** 6:20 7:2
7:3 8:8,20 9:2
12:4 31:9 34:24
35:7,8 64:10 74:2
120:9 178:18
179:9 191:21
192:14 193:24
194:4,7,10 207:2
219:24 223:10
231:1 243:8
248:13 261:1
269:2 272:4 275:1
278:1 279:7 280:8
287:16 289:21
296:19 297:7,7
299:5 366:17
375:10 376:23
380:17 382:1
384:10
**testing** 254:14
255:5 379:15

**tests** 254:7
**text** 117:3,4
135:24 154:8
155:21,22,23
156:6,13 159:9
161:23 204:1,2
355:19
**thank** 6:8,18 9:1,5
11:4,14 12:7,14,23
12:24 13:7,12,23
23:12,14,19 25:8
25:14 27:2 29:4
31:3,10,13,14,25
32:10 35:14 54:23
57:8,9 61:14 64:2
64:6,8,19 68:10
73:17 74:2,3,20
75:3,8 86:24,25
87:10,23 101:12
101:15,16 113:17
115:3 122:6 130:2
130:3,17,22 132:5
132:9,11,14,17
133:12 149:3,4
151:17 154:4
158:18 170:22
172:11 173:19
177:16,19 182:22
188:15,16 194:12
196:3 198:19
199:2 204:16,18
204:21 205:14,22
205:23,24 206:13
207:20,25 214:25
215:11,13 217:10
217:19,24 219:17
219:21,24,25
220:10 222:25
223:25 226:25
230:19,20 231:1,2
231:9 235:19

236:13 237:15
241:11,15,21
242:7,10 250:5,12
250:15 251:5,21
251:23 252:1,5,9
252:19 257:15
259:5 260:2
263:17 264:7
268:10,21 269:2,3
269:8 270:16,24
274:3,16 275:2,3
275:12 278:2,23
279:23 280:3,7,9
280:10,22 281:7
282:6 283:18
284:3 287:22
288:15 289:7,19
289:22,24 290:6
290:12,14 296:11
296:13,14 300:17
309:24 311:21
313:3 314:6
361:13,21,24
364:14 371:20
380:1 383:14
384:14,23 386:7,9
**thanks** 23:10
88:24 99:2 250:1
274:21 367:14
**theft** 33:23 34:19
59:11,23,24 63:15
332:18
**theories** 333:17
**theory** 126:23
262:21 310:9,12
312:10 332:16
333:22 337:14
338:9,10 341:25
343:4,9 344:22
345:16 346:2
359:3

**thin** 368:23
**thing** 22:9 128:11
244:19 292:14
295:21 297:23
310:25 315:9
317:2 327:19
329:19 355:3
386:4
**things** 16:21 17:13
18:22 21:22 30:21
102:12 124:25
131:8 147:12
157:15 182:15
190:10,11 242:16
255:7 258:17
313:19,23 315:17
317:7 336:9,9
343:1
**think** 5:21,24 6:19
8:8 13:24 14:9
19:16 22:15 26:10
51:2 67:2 81:23
86:1 88:10 90:8
107:14 109:15
112:11,17,20
113:21 114:4,25
115:14 118:20
126:20,22,23,23
126:24 128:13,15
128:21 130:16
140:1 141:24
142:9,16 143:16
143:20 146:18,25
147:2 148:15
157:20 171:1
172:17 173:22
174:3 175:5 176:1
176:14 177:21
179:7,8,22 182:12
183:17,22 188:1
190:6 193:1,7,17

197:1,23 198:10
207:13 263:22
286:13 289:2
291:12 292:19
295:7,11 296:7,16
302:2,13 303:3,9
304:6,19 305:3,4,8
305:23 306:2
307:22 308:10
309:10,14,16
314:3 316:8
318:14,21,24,25
319:3,5,6 321:8
322:2,19,20
326:15 327:10,19
330:9 336:20
337:1,14 339:8
340:18 341:15
344:4,18 346:5
348:19,22 349:22
350:19,24 352:9
353:17 355:9
356:3 357:11
358:9,15,17 359:9
360:17 362:9
363:11 365:3
366:14,23 367:20
369:6,16,17,24
370:3,8,11,18
371:12 372:19
373:23 375:20,21
376:1 377:11
378:18 379:9,17
380:12 381:19,23
382:10 383:10,20
383:23 384:6
**thinking** 35:9
111:14 359:17
366:19
**thinks** 109:7

**third** 174:3,7
228:16 313:12
317:19 319:7
322:19 324:2,17
325:15 328:5
329:5 364:20
384:18
**thought** 74:4
95:15 97:13,25
112:12 115:18
117:9 121:2 144:5
174:14 176:13
190:17 191:19
192:15 223:16
270:6 307:11,13
321:25 324:7
332:4 334:15
345:21 379:5
**thousands** 256:22
264:16,18 267:2
**threat** 19:1,6 24:5
**threaten** 17:23
25:23 29:11
**threatened** 24:18
25:17 26:3 369:12
370:7
**threatening** 22:3
**three** 7:24 24:9,10
29:7 77:22 87:20
93:6,10 115:8
121:20 124:8,9
146:12 156:14,17
156:18,23 157:8
164:2,5 177:10
180:15 185:25
187:3 192:13
200:11 213:25
269:12 287:11
326:4 327:24
330:23 335:15,21
335:22 339:1

345:14 350:15
351:1,2,9 355:25
366:10 376:2
381:9 382:4
383:10
**thumbing** 106:6
**thursday** 183:15
**till** 224:7,15
**timber** 301:15
**time** 7:22 10:1,2
13:20 14:23 16:23
19:21 26:18 33:10
33:24,25 39:8
40:17,18,20 42:11
49:11 51:3,4 54:8
54:18 56:10,24
60:15 62:10 77:5
77:7 78:14 79:13
79:15,19,19,20,20
80:15,16,17,18,18
80:23 81:10 82:1
82:11,18 83:8,10
83:11,14,15,16,18
83:19,20,23,23
84:5,6,6,8,9 85:11
86:9 88:6,6,9,15
88:17 90:19 95:15
95:17,18 97:1,8,19
97:22 98:2,5,5,9
100:3,3 101:24
102:16 106:12,16
106:20,25 112:16
114:1 118:1
127:15 128:3
130:19 131:12
132:22 135:11,13
135:15,18,19
136:12 137:2,18
138:21 140:11
145:13,14 148:15
154:11,18,18,19

154:19,20,20,22
154:23,25,25
155:1,3,3,5,6,9,11
155:11,12,14,15
156:2 161:17
162:2,5,24 165:11
168:16 169:12
175:16 177:11
183:22 185:22
191:9 192:9,9
195:8,10 197:12
198:11,16 204:10
210:9,20 212:17
217:11 222:1,6
226:3,7,9,11 231:3
235:8 237:9 238:4
240:11 243:5
250:22,25 251:17
254:5 256:7 257:8
257:12 269:4,11
273:2 275:4
277:15 280:14
282:7,15,17,19,22
282:23,23,24,25
282:25 283:1,3,3,5
283:6 285:1
287:20 290:19
292:12,13 293:15
294:17,19 298:1
303:9,12 305:10
311:4,4 314:8
318:10 321:25
324:12,15 326:16
327:20 328:14
331:5 343:18
348:11 355:6
366:3 369:15
370:13,19,20
**times** 7:24 79:17
93:8,11 140:10
168:9 233:11

247:8 257:1,7,18
273:2 277:9
283:11,12 288:4
337:17 343:6
380:7
**timing** 108:25
145:3,22
**tire** 50:12
**tiring** 13:21
**title** 89:12
**titled** 323:16
**tobacco** 254:11
275:22 281:15
**today** 87:8 92:2,15
105:2,4 106:5
109:19 110:12
118:16 124:19
138:19 175:18
202:22 243:7
273:8 285:14
287:10,11,16
291:4 297:13
298:16 300:25
309:19 355:21
363:1,17 364:7,9
**today's** 91:17
285:12
**told** 13:24 14:9
37:12 53:15 54:7
57:15 63:15 66:23
72:22 79:13
110:24 116:7
118:13 120:13
125:24 179:20
184:9,17 188:12
247:1 297:13
310:5,15 311:24
312:7 345:21
382:23
**tomorrow** 192:3
293:18 294:9,17

295:10 296:7
297:3,5,15 298:5,6
298:20 301:20
304:1 314:18
315:9 329:21
371:22 372:9,20
373:5 374:21
375:15 383:21,22
384:10,18
**tone** 301:11,15
**tonight** 129:11
192:17 195:7
296:19,20 298:3
301:4 306:12
307:16 330:4,11
344:19 359:2,15
359:19 371:4
372:24 373:5
375:19 383:17
386:6
**top** 38:7 69:6
153:22 224:24
225:1 251:18
353:23 354:11
**topic** 203:23
**topics** 365:4,19
366:1
**total** 261:6 310:14
**totally** 175:19
**touch** 164:21
331:21 332:25
334:23
**touched** 333:4
**touches** 322:6
333:14
**touchstone** 381:23
**toured** 254:12,14
**tow** 233:3
**towed** 226:18,20
226:23,24 233:2
233:12

**towels** 10:23
**tower** 168:3
**town** 201:10
**track** 120:1
**traditionally**
  136:7
**traffic** 67:23 68:15
  68:19 70:16 71:11
**trafficking** 276:8
  281:23
**trails** 216:8
**trained** 60:19
  245:20
**training** 77:20
  83:17,22 244:10
  253:25 254:5,21
  254:21 276:11,15
  276:17
**transaction**
  154:12,13,16
  156:5,9,10,12
  164:16 165:2
  166:16 167:15
  198:13
**transactional**
  135:23 154:7
  204:12
**transactions** 159:9
**transcript** 190:22
  191:20 387:4
**transcriptionist**
  387:9
**transfer** 230:5
  245:22 247:12
**transferred** 92:8
  209:2
**translated** 157:7
**transmitted**
  218:25
**transpired** 312:11
  355:19

**transport** 52:1
  70:14 239:14
  272:19
**transportation**
  124:21
**transported** 78:18
**transporting**
  78:25 239:3
**travel** 53:12
  134:20 213:3
**traveled** 277:4
  279:20
**traveling** 222:6
**treat** 51:6 133:8
  181:2 365:21
**treated** 317:12
**tree** 59:10
**trial** 1:7 92:15
  107:15 174:21
  180:8 181:9 182:1
  182:3,14 183:3
  185:2 187:14,18
  187:19,19 188:9
  188:13 203:11
  248:14 257:18
  282:9 284:20
  285:12,15 297:11
  301:18 303:13
  306:3 367:24,25
  368:12 376:8
  385:14
**trials** 134:22
  357:16
**tricky** 332:4
**tried** 43:25 44:24
  45:2 324:16 363:3
**tries** 171:9 354:10
**trigger** 268:16,18
**triggers** 127:12
**trouble** 130:10

**true** 60:24 110:9
  120:21 157:7
  309:18 365:21
  382:20
**truth** 35:10 59:5
  173:9 223:17
**try** 13:21 17:2,5
  18:15 37:15,23
  44:17 47:1 59:6
  119:7 121:9 124:6
  124:17 127:4
  130:24 175:3
  185:7 211:8
  225:24 248:23
  249:3 295:18,20
  308:5 384:7
**trying** 16:21 18:6
  18:17,22 20:21
  66:25,25 111:20
  116:6 127:21
  130:6 141:24
  146:10 175:23
  214:2,3,4 222:14
  276:23 292:3,5,12
  294:19 303:13
  304:19 317:20
  331:20 337:1
  347:11 353:14
  379:13 382:16
**tuesday** 129:13
  366:6 373:1
**turn** 27:3 39:3
  44:15 149:14
  161:8,12 193:2
  213:11,12 214:14
  214:15 219:9
  274:5 375:21
  377:19
**turned** 243:6
**turning** 44:10 63:4
  197:22

**twenty** 231:22
**twice** 377:4
**two** 29:6 32:25
  34:7 57:18 65:13
  84:5,8 95:20 99:4
  108:17,17 110:13
  110:19 114:13
  115:11 124:24
  126:16,19 137:9
  139:9,13 140:17
  142:14 145:8,9,18
  160:11 161:6
  164:2,5 166:1,3,5
  169:21 171:18
  177:22 179:1
  183:15 189:12
  192:13,14 207:11
  213:25 214:9
  222:1 250:7
  265:16 266:13,14
  269:22 292:2
  303:15 306:1
  323:11,15 327:6
  333:17 338:4,5
  339:2 341:6
  343:17 348:3
  349:7 351:19
  352:13,13 359:11
  378:3,5 379:23
  384:6,16,17
**type** 60:21,22
  126:18 135:16
  136:5 137:8
  154:12 156:4,4,8
  157:14 209:9
  239:8 248:9 254:5
  266:24
**typed** 72:2 325:12
**types** 155:22
  156:20 266:14
  277:1

**typewritten**
  323:16
**typical**  181:12
**typically**  228:22
  278:8

**u**

**u**  208:8 281:11
  325:23
**u.s.**  1:11 184:20
  187:12 254:12,17
  273:13 314:23
  317:14
**uh**  6:22 14:16 16:3
  16:25 17:21 18:19
  20:23 22:13 23:1
  378:10
**ultimate**  47:4
  173:16
**ultimately**  36:21
  222:15 255:18
**un**  243:25 246:17
**unable**  110:12
**unarmed**  316:15
  331:11 335:11
  336:7 337:13
**unattended**
  232:20
**unclear**  349:8
**underlying**  339:2
**underneath**  54:4
  241:19
**underscore**  297:16
**understand**  14:6
  17:12 18:21 67:21
  98:10 113:13
  114:20 122:9
  127:20 128:2,6,18
  128:24 129:12,15
  139:2 142:19
  144:24 146:15
  148:19 154:24

156:4,22 177:4
180:23 188:5
193:4 263:9 293:4
297:20 301:24,25
307:14,21 309:20
312:20 316:12
317:9 329:10
330:16 344:11
347:10 356:21
357:21 373:12
374:25 378:21
379:19
**understanding**
  103:13 110:14
  154:22 248:11
  297:21 310:14
  311:4
**understands**  14:10
**understood**  103:1
  136:7 292:24
  383:14
**unduly**  120:11
  318:14
**unfair**  382:11,15
  382:22
**unfortunately**
  93:16 175:4
**unholster**  60:2
**unholstered**  60:13
**unique**  157:22,23
  158:6
**unit**  51:17 215:24
  229:2 238:17,19
  253:11,13,14,20
  253:24 254:24
  255:17
**united**  1:1,3,8
  134:21 167:17
  201:11 279:16
  313:10,11,13
  314:22 325:23

377:5,7
**universal**  154:19
**unlawful**  359:20
  368:16
**unloaded**  261:12
**unnecessarily**
  358:9
**unprepared**
  119:19
**unrelated**  359:13
**unsafe**  256:1,2
**unsuccessful**
  353:15
**unusual**  322:17
**update**  90:19
**updated**  254:21
**upgraded**  34:19
  35:17 63:22,25
**upsal**  214:15
**usa**  134:4
**usage**  136:9,15
**usb**  79:21,22 81:13
  82:25
**usbs**  82:20
**use**  15:5 37:5,12
  83:22 90:20 100:9
  106:22 112:21
  113:7 114:23
  116:9 120:4,5
  152:15 173:14
  230:2 244:10
  258:2,24 263:6
  266:17 303:6
  304:23 324:21
  326:1,11,15
  327:23 328:8
  330:20 331:7
  334:16,24 336:15
  343:3 369:20,22
  373:5 382:9

**user**  135:25
**usual**  171:3 195:8
**usually**  96:21,24
  213:20,21 218:18
  265:6 357:17
**utc**  154:19,19,22
  155:2 162:6,6
**utilize**  168:1
  299:24
**utilizing**  168:2

**v**

**vacation**  372:3
**valuable**  92:22
**value**  106:19
  376:12,17 379:21
  382:8,10 383:5,8
  383:13
**values**  383:2
**variety**  87:12
  355:10
**various**  177:10
  255:5 288:6
**vary**  95:20
**vast**  128:9 201:2
**vegetables**  17:17
**vehicle**  40:10
  41:10,11,17,23
  42:7,15 43:20,25
  44:15 45:11,14
  46:20,23 47:5
  48:13 49:4,8,23
  50:17 51:5,8,10
  54:6,9,15 60:8
  62:11 67:5,9 69:5
  69:22 70:2 71:8
  71:13 209:9,12
  210:19,22 211:3,4
  211:5,7 213:11
  214:3,8,9,11,13,21
  215:6,17 217:4,22
  217:22,23 222:4

222:10,24 223:4
223:11 224:4,5,11
224:13,18 225:9
225:13,23,24
226:3,5,7,12,13,15
226:18,22 227:25
233:10,12,22
235:6 236:2,5,24
238:12 239:2,19
240:6 241:18
242:5
**vehicles**  41:13
62:16 210:15
**ventura**  86:5
283:9 332:6
352:25 353:8
354:20 369:11
370:11,17,22
**ventura's**  369:14
**venture**  326:18
**verbal**  43:2
**verbiage**  97:16
229:23
**verdict**  316:24
346:4,5 347:13
385:3,8,16,22
**verdicts**  187:20
347:15 358:19
**verification**
152:11
**veritext**  1:23 2:23
**verizon**  168:1
**version**  110:5
112:21 119:20
329:1
**versus**  174:3
313:10,11,13
314:22 325:23
377:5,7
**vhs**  90:21 95:16

**victim**  85:12
182:10
**victim's**  360:18
**victims**  78:13
85:21 378:24
**video**  4:14,15 27:4
53:8,10,20,25 55:7
55:9,25 56:6,7,15
56:25 77:3,5,12,15
77:18,20 78:6,9,14
78:22,23 79:3,5,10
79:22,24 80:3,7,7
80:10,11,16,21
81:7,11,13,16,19
82:1,10,11,22 83:1
83:12,13,14,18
84:2,5,8,9,9,11,14
87:25,25 88:14
89:21,24 90:15,17
90:20 91:9,12,16
91:16 92:3,4,6,24
95:14 96:18,21,24
97:6 98:1,3,4,15
98:15,24 99:15
101:9,10 120:24
161:21 217:14
285:2,6,11 286:2
287:5,17 288:4
302:14 332:7
334:25 336:7
337:11 344:3,5,5
344:14,14,17
353:18 356:6
366:22 367:4,8
**videos**  78:3 80:17
285:16
**videotape**  343:23
**videotaped**  349:17
**view**  243:17,19,21
**viewed**  46:2 88:8

**viewing**  79:23
92:20
**vin**  51:9 67:7 69:4
69:16,21,23 71:15
71:15,16 124:21
157:21,23 224:21
224:23,25 225:15
225:16,18,21,22
226:4,7,14
**violated**  380:7
**violation**  378:22
**violations**  276:6
380:4,20,24
**violence**  19:2,7
316:21 320:9,16
324:20 336:13
341:10 345:8
347:23 348:1
377:23
**violent**  276:6
281:22
**virtue**  148:25
279:18 346:23
347:4 358:5
**vis**  145:3,4 309:19
309:19
**visit**  372:19
**visited**  105:6
**visiting**  187:12
**visits**  293:2
**visual**  89:17 214:3
**visually**  255:25
**voice**  103:5 128:10
154:12 156:5,13
158:8 163:13
164:17 166:15
184:22 203:23
301:12,16 302:4
302:10,17 303:4,7
303:17,23 304:5
304:11,23 305:1,5

305:11,18,19,23
307:22 310:18
314:2 315:2,5
**voicemail**  164:15
164:17 165:7,9,12
165:17 166:2,13
**voir**  257:24
**voluntarily**  187:18
187:22
**vs**  1:4

**w**

**w**  2:2 150:10
**wagged**  143:13
**wagging**  143:11
**wait**  7:1 10:6
122:15 143:3,7
147:22 171:6
185:15 190:21
224:14,15 258:9
270:4 307:2 368:9
**waited**  330:12
**waiting**  11:16,18
158:7 191:10
205:15 270:14
309:13
**waive**  385:18
**waiver**  384:16
385:25
**waivers**  385:11
**walk**  15:8 21:6,6
153:20,24 216:8
216:14
**walked**  21:8 45:3
210:22 226:3
**walkie**  57:25
**walking**  15:15
39:18 326:18
**walnut**  1:17 2:3
**want**  6:4,12 8:1,19
15:11 21:25 24:1
26:25 30:16,23

37:7,15 45:25
51:5 62:6 99:13
102:8 103:2
104:18 112:16
117:22 121:23
128:14 130:21
141:16 143:12
147:5,17 161:8
163:7,24 167:5
170:3 172:19
173:20 174:18
175:20 179:22
180:21 181:13,21
185:22 187:23
188:15 191:9
192:5,8,23,25
193:23 200:10
205:5 227:14
229:14,17 245:25
248:15 268:2
272:5 291:13
300:22 305:13
306:15 317:15,23
318:4 323:24
325:8 329:21
330:13 334:13
337:22 348:7
358:23 359:6
363:14,14 365:1,4
365:16 366:10
368:4 369:22
372:9 377:12
382:9 384:6
**wanted**   6:2 97:3
105:10 117:25
179:21 187:24
200:13 272:11
309:23 329:15
365:19
**wants**   106:5,22,23
107:5 108:5 111:1

113:7 118:16,17
144:10 173:8
181:17 187:14
188:12,13 311:9
**warrant**   48:13
51:6 233:1,22
234:21 242:18,24
243:3,9,17 250:21
251:1 381:25
**washington**   282:2
**watch**   79:3
**watched**   99:21,22
**water**   10:24
**way**   20:12 34:14
35:22,25 36:21,22
37:24 38:1,17,18
39:1 46:5,8 47:3
53:24 54:1 60:19
72:16 84:17 109:5
111:14 116:2
119:11,23,23
120:7 121:10
127:9,21 142:16
146:14,24 147:12
181:3 182:15
187:21 192:21
195:7 196:18,23
197:3 213:12
216:16 222:1,12
258:16 265:24
267:6 293:20
294:11 303:6
304:10 317:25
319:6 325:1
329:13 330:9
333:1 335:2,11
340:21 341:14
348:2 351:25
352:3 358:21
361:16 363:2
364:21,22 367:10

368:19 369:25
376:1 377:4
381:11
**wayne**   200:24
**ways**   104:19,21
145:8 265:16
340:12
**we've**   92:25 94:3
94:13 115:9 144:1
191:10 192:16
287:10 297:20
306:9 309:1 320:4
320:23 334:25
344:25 348:11
358:16 366:6
368:7 369:6
372:16 373:8
**weapon**   42:18,19
44:25 45:1,2 60:3
60:13,14,16 61:5
236:20 238:22
239:4,5,8 243:13
244:1,14 245:22
245:25 249:14
261:15 268:17
333:3 341:4
342:22
**weapons**   332:25
333:1 352:5
**weaver**   31:13
**website**   328:21
**webster**   102:24
104:23 131:16
132:7 140:8,18
141:1,5 150:9,23
153:17 158:23
159:6 160:1,9,14
164:4,7,11,12
165:16 166:8,20
167:1 169:2 170:6
272:17,20

**wednesday**   374:9
**week**   7:18 41:5
82:17 102:13
104:12 106:2
113:24 117:24
276:21
**week's**   105:24
**weeks**   110:13
363:18
**weigh**   381:20
**weighing**   378:23
380:21
**weighs**   376:20
380:11
**weight**   128:7
129:16 145:12
302:11 304:8
310:6,20 312:19
**welcome**   31:4
250:2
**went**   13:24 19:21
21:12 42:5 43:9
51:16 62:16 77:3
95:4 98:3,15,25
99:14 107:3 130:5
158:2 166:1
213:12 214:10
217:3 226:6
276:17 328:23
337:10 351:9
353:25 354:1
356:9,13 357:4,7
**wesson**   254:16
**west**   38:2,3 47:16
47:17 213:12
214:14 222:5
**westbound**   38:4
53:13,14 211:20
211:21 222:6
**westlaw**   377:6,7

**whatever's** 229:17
**whichever** 198:24
**whitaker** 226:21
233:19
**wife** 102:25
104:22 140:9
141:12 145:9,17
145:18 177:7
313:22
**william** 3:10 74:22
75:7,12
**williams** 3:8 64:12
64:18,23 65:5,7
69:14 74:1
**willing** 108:20
117:8,9 120:4
179:12 341:11
363:20
**wilmington**
131:17 132:8
150:14
**wilson** 3:18 93:24
220:5,9,14,22,24
222:25 223:2
224:3,23 225:11
231:1
**window** 43:4
226:5
**windshield** 42:6,9
42:13
**wish** 7:22,23 10:6
10:7 86:21 181:20
185:6 189:18
205:3,8 302:22
**wishes** 173:1,2
**withdraw** 112:17
310:22 311:25
318:9 328:11
**withdrawal**
312:14

**withdrawing**
310:17
**withstands** 379:18
**witness** 6:14 7:2
7:21 8:2,4 9:8
10:3,19 23:5,12
24:24 27:5 30:9
31:10,24 32:4,7
34:22 36:3 37:3
37:11,14 45:18,18
48:23 50:5 54:18
55:8 56:6 57:8
62:23 63:3,8 64:8
64:18,23 70:21
74:3,5,8,10,12,24
75:7,12,15 81:1
82:6 86:22,24
101:16 112:17,18
112:23 123:2
132:19 133:11,16
137:19,21,24
139:7,15 150:16
152:25 154:5
168:16,20 170:21
172:5,9,11 188:23
189:8 191:20
194:20 204:18
205:10,11,13,15
205:19,22 206:15
207:18,24 208:4,8
213:9 214:25
218:1,4 219:25
220:9,14,16
222:22,24 225:8
231:2,8,11,16
234:3 236:11
237:14,15 250:2
250:13,25 252:4,7
252:18,23 253:1
257:16,17,21
259:18,25 260:2

262:14 263:25
269:3,10 270:11
270:11,23 271:3
273:22 274:1,12
274:18 275:2,10
275:15 277:6
278:21 279:25
280:9 281:5,10
283:20 288:21
289:10,13,16,19
290:22,24,24
293:19 294:21
296:18,21,21
301:20 315:3
360:12 367:17
375:1 376:11
383:7
**witness's** 12:4
69:11 225:6
296:19
**witnessed** 21:19
**witnesses** 3:2 4:2
8:17 9:19 193:18
193:22 258:17
352:14 362:9
379:1
**wittels** 1:16,16 3:3
3:5,7,11,17,24 4:7
5:6 10:15,16
11:12,14 12:16,17
13:5,7,9 23:6,11
24:2 25:16,20
29:6,9 30:10,11
34:21 61:18,20
62:25 63:6,7
73:21 87:2,4,6,14
87:17,19,22,24
142:24,25 143:5,9
143:14 174:9,12
174:14 183:18,19
186:23 204:19

206:19,22 207:1
207:12,15 218:5,8
230:23 250:3
258:20,23 268:12
268:15 269:22,25
270:2,5,6 274:22
274:23 277:19
280:4,5 287:24
288:2 291:8
292:22 293:2,7,22
294:10 295:20
296:2 306:19,21
306:22,23 309:2,5
309:7,8,11 333:11
339:11,12 342:7,8
342:13 356:5,12
356:18,21 360:16
362:1,16,17
366:14,17 367:17
368:14 373:14,15
373:18,20 374:7
375:7 379:6,12
386:12
**woman** 51:25
**wonder** 356:22
371:24
**wondering** 139:20
172:16
**wooded** 48:14
215:25 216:11
272:7
**woods** 48:16
214:22
**word** 5:22 95:25
99:14 100:9
114:23 146:5
173:15 186:10
203:9 240:2 258:3
297:16 349:11
354:21 370:8
371:24 372:16,17

372:18
**words**   25:18,22
111:25 233:8
330:20 372:15
**work**   16:4 32:19
32:20 33:6 88:5
90:14 134:17
183:21 221:11
227:16 276:5
371:25 372:4,7
375:19
**worked**   24:8
328:17
**working**   15:5 33:4
33:7,12,13 57:22
65:17,23 68:12
74:6 76:16 90:16
203:14 209:6
221:8,14,15
271:17 327:7
357:25
**works**   320:22
372:18,21
**world**   83:19
**worms**   125:14
**worst**   295:21
**wouldn't**   15:16
63:9 229:11
**write**   14:4 259:10
**writing**   242:15
328:23 364:24
367:22 368:2,5
**written**   69:18
70:17 174:6
284:12 291:18
323:9,18,20
328:13 330:21,22
330:25 364:11
365:9,10
**wrong**   18:17 35:25
38:17 54:1 125:25

126:3 228:21
240:18 313:10
329:17 347:21
348:6
**wrote**   47:16 60:18
176:12 225:16
226:6,11 331:2

**x**

**x**   3:1 4:1,11 88:6
208:5
**xhelo**   3:16 206:18
207:24 208:4
271:21

**y**

**y**   88:6 151:25
**yay**   205:13
**yeah**   10:5 14:12
14:21 16:20,21
17:1,5,19 18:11,21
20:1,4,5,15,17,23
21:2 22:2,5,7,8,10
22:24 26:23 29:19
38:6 43:12 44:8,8
58:2 63:15,22
71:14 90:22 145:6
166:3 168:8 172:5
172:20 175:9,10
185:13,13,13
212:19 225:16
244:2 249:25
251:13 258:18
273:15 277:24
286:5 287:3 289:4
293:10 312:16,22
319:15 349:23
350:6 361:4
363:13 374:7
**year**   33:3 70:2
137:10 221:5
225:12 377:9

**years**   32:25 57:18
65:13,16 76:14
134:11 137:11,13
167:22 208:21,24
221:4 228:2
231:22,25 232:3
244:8 245:8
253:19,22 271:16
278:13 282:2,5
317:11,12 328:7,7
378:5 380:6 381:9
**yellow**   106:7
112:23
**yesterday**   5:18
13:20 26:25 27:7
114:11 119:13
120:13 124:24
125:15,18,19
126:2 128:8
328:23 345:21
346:9
**yohan**   184:19
**yosemite**   200:15

**z**

**zalsner**   317:15,16
325:5 328:19,22
334:21 338:1
339:21 340:6
346:17 347:13
**zero**   351:5
**zone**   154:20,25,25
155:5 282:24
283:1
**zones**   155:1,3
**zoom**   149:23
153:22
**zoomed**   212:11

**à**

**à**   145:3 309:19