```
                                                      Page 1

 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
     UNITED STATES OF AMERICA  )  2:19-cr-00350-JD-1
 3            Plaintiff,        )  2:19-cr-00350-JD-2
       vs.                     )  2:19-cr-00350-JD-3
 4                             )  Philadelphia, PA
     DONNIE SMITH, ABID        )
 5   STEVENS AND MAURICE QUINN,)  February 3, 2020
              Defendants.      )  9:49 a.m. - 5:05 p.m.
 6
                    JURY TRIAL - DAY SIX
 7            BEFORE THE HONORABLE JAN E. DUBOIS
                UNITED STATES DISTRICT JUDGE
 8
 9   APPEARANCES:
10   For the Government:      ROBERT E. ECKERT, ESQ.
                             ASHLEY NICOLE MARTIN, ESQ.
11                           U.S. ATTORNEY'S OFFICE
                             615 Chestnut Street
12                           Suite 1250
                             Philadelphia, PA  19106
13
     For Defendant Smith:     ROBERT C. PATTERSON, ESQ.
14                           R.C. PATTERSON LAW OFFICES
                             3513 Southwood Drive
15                           Easton, PA  18045
16   For Defendant Stevens:   BARNABY C. WITTELS, ESQ.
                             LACHEEN DIXON WITTELS &
17                            GREENBERG LLP
                             1429 Walnut Street
18                           Suite 1301
                             Philadelphia, PA  19102
19
20
21
22
23        Veritext National Court Reporting Company
                    Mid-Atlantic Region
24          1801 Market Street – Suite 1800
                  Philadelphia, PA 19103
25                    1-888-777-6690
```

Page 2

1   APPEARANCES, CONTD.:

2   For Defendant Quinn:      MARANNA J. MEEHAN, ESQ.
                              DEFENDER ASSOCIATION OF
3                              PHILADELPHIA
                              Suite 540 W.
4                             The Curtis Center
                              601 Walnut Street
5                             Philadelphia, PA  19106

6   ESR Operator:            MICHAEL COSGROVE

7   TRANSCRIBERS:            KATHERINE PETERSON AND SHARON
    WOODWARD

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Veritext National Court Reporting Company
                    Mid-Atlantic Region
24            1801 Market Street – Suite 1800
                   Philadelphia, PA 191
25                  1-888-777-6690

Page 3

1

I N D E X

2                                                          Page

3    CLOSING ARGUMENTS

       By Ms. Martin                              8

4      By Mr. Patterson                           45

       By Mr. Wittels                             80

5      By Ms. Meehan                              98

       By Mr. Eckert                              117

6

7    JURY INSTRUCTIONS                            126

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 4

 1                 P R O C E E D I N G S
 2                 THE COURT:  Good morning everyone.
 3   Please be seated.
 4       (Chorus of good morning)
 5                 THE COURT:  First, we were held up a
 6   bit this morning because of difficulty in transporting
 7   the Defendants, but we're ready to start now.
 8                 I made minor changes in the verdict
 9   forms to clarify the instructions regarding the
10   finding of "brandishing," and I decided one other
11   change was necessary.  In the verdict forms that we
12   gave to counsel last week, we referred to "the"
13   firearm, and I decided better to use the term "a"
14   firearm, because there were different firearms.  And
15   that's true with respect to the three verdict forms.
16                 Next, I saw your stipulations.  A
17   little unusual that they're not signed, but we'll
18   certainly receive them.  One of them, it doesn't make
19   sense.  I refer to the Maurice Quinn verdict format.
20   I think it's the punctuation, quoting Stipulation No.
21   2, "There's a stipulation bind between the Government
22   and counsel for Defendant Maurice Quinn that had the
23   Government presented the entirety of the available
24   phone records between February 16th and March 27th,
25   2019," period.  And it's obvious that what needed to
```

Page 5

1   be changed -- what needs to be changed, there needs to

2   be a comma after 2019, because what follows is, "Those

3   records would show semi-regular contact between Mr.

4   Smith and Mr. Quinn."  I think I should return -- I

5   don't want to do the changing of the stipulations, but

6   I think that should be done, and then we'll file the

7   three stipulations.

8                  Ms. Meehan, is that what was intended?

9                  MS. MEEHAN:  Yes, Your Honor.  I'll --

10                  THE COURT:  Fine.

11                  MS. MEEHAN:  -- fix it over the lunch

12   break, Your Honor.

13                  THE COURT:  Thank you.  Well, we don't

14   need it now.

15                  We're going to proceed with closing

16   arguments.  I assume you're ready, and there are no

17   other issues?

18                  MS. MARTIN:  I am, Your Honor.

19                  THE COURT:  And you looked at the

20   charge, and we'll get comments from all four of you,

21   or however many of you there are.

22                  Government, the revised charge.  Any

23   issues?

24                  MR. ECKERT:  No, Your Honor.

25                  THE COURT:  Mr. Patterson?

```
                                                Page 6
 1                    MR. PATTERSON:  No objection, Your
 2      Honor, thank you.
 3                    MR. WITTELS:  No objection.
 4                    MS. MEEHAN:  No objection.
 5                    THE COURT:  All right.
 6                    MR. WITTELS:  Judge, I do have one
 7      issue.  The Government has the gun in a box on the
 8      edge of their table.  I understand they want to use it
 9      in their closing.  That's not a problem as long as
10      they do it properly, but I would ask that it be moved
11      away from the jury box, because having it there is
12      distracting to the jury and provocative.
13                    THE COURT:  Say no more.  I agree with
14      you.  Where should we put the gun?
15                    MS. MARTIN:  Your Honor, I just don't
16      want it to be distracting when I reach for it.  Is it
17      okay if I put it on this side of my table?
18                    THE COURT:  Well, Mr. Wittels is
19      correct, it's inappropriate to have something that
20      would cause the jury to focus on an object and not on
21      the presentation.  Close the box.
22                    MS. MARTIN:  Would it be all right if I
23      closed the box?
24                    THE COURT:  Yes.  I think that's fine.
25      Mr. Wittels?
```

```
                                               Page 7
 1                MR. WITTELS:  That's fine, Judge.
 2                THE COURT:  Good.  Ms. Hull, do you
 3   want to bring the jury in?
 4        (Pause)
 5                CLERK:  All rise.
 6        (Jury in)
 7                THE COURT:  Good morning everyone.
 8   Please be seated.
 9        (Chorus of good morning)
10                THE COURT:  On Friday, the evidence was
11   concluded.  After you left, we had arguments on the
12   legal issues that are typically presented at the end
13   of the evidentiary portion of the trial.  I ruled on
14   them, and now we will begin the closing arguments.
15                As I told you before, closing arguments
16   are not evidence, but I've been told by many, many
17   jurors that they find them very helpful, for among
18   other things, they might cause you to focus on issues
19   that would otherwise escape your attention.
20                The Government goes first, followed by
21   -- are we back to usual order, Mr. Patterson?
22                MR. PATTERSON:  We are, Your Honor,
23   yes.
24                THE COURT:  Patterson first?
25                MR. PATTERSON:  Yes.
```

Page 8

1                    THE COURT:  Wittels?

2                    MR. WITTELS:  Yes.

3                    THE COURT:  Meehan?

4                    MS. MEEHAN:  Yes, Your Honor.

5                    THE COURT:  And then, because the

6    Government has the burden of proof, the Government has

7    an opportunity for a brief rebuttal.

8                    We hope to finish the closing arguments

9    before lunch, might not, and we'll talk about that at

10   lunch, and I will instruct you on the law, hopefully,

11   right after lunch, but if not, immediately following

12   the end of the closing arguments.  I'll have more to

13   say about the schedule just before lunch.

14                   All right.  Is the Government ready to

15   proceed?

16                   MS. MARTIN:  We are, Your Honor.

17                   THE COURT:  You may --

18                   MS. MARTIN:  Thank you.

19                   THE COURT:  You may proceed, Ms.

20   Martin.

21                       CLOSING ARGUMENTS

22                   MS. MARTIN:  This was not a

23   misunderstanding.  This was a robbery.  Donnie Smith,

24   Abid Stevens, and Maurice Quinn went into that store,

25   they cornered the store clerk, Joel (phonetic), in the

1    back corner of that store.  They put two guns up to

2    Joel's head.  One, Donnie Smith, into his chest, as he

3    reaches and takes the gun from Joel Ventura, and he

4    leaves with that gun.  We know that Maurice Smith

5    (sic) took the money in this case.  This is not a

6    misunderstanding; this is a robbery, and you have

7    enough evidence to convict these individuals based on

8    the video alone.  But there's so much more in this

9    case.

10                   Actions speak louder than words,

11   (indiscernible - 10:05:22) it's tried and true.  And

12   the Judge, he instructed you on the law in this case

13   that embodies that principle.  He told you about

14   direct and circumstantial evidence.

15                   Do you remember that example he gave

16   you, the example about the rain?  If you walked

17   outside right now, and you see that it's raining, you

18   know that it rained.  But if you're here in this

19   windowless courtroom, somebody comes in sopping wet,

20   rain jacket, shaking off their umbrella, you have

21   circumstantial evidence that it rained.  You have

22   facts that allow you to conclude that something else

23   happened.  You know it rained without seeing it rain.

24                   Why does that matter?  Here -- first of

25   all, you can never prove somebody's intent.  You can't

1    look inside their mind and know what their intent is,
2    but it's their actions, it's their words, and it's
3    their choices that allow you to infer their intent.
4    And that's what's happening in this case.  And the
5    Judge is also going to tell you that you can use that
6    concept, circumstantial evidence, equally valid as
7    direct evidence, to conclude that those guns in that
8    picture right there are real.
9              But let's take a step back.  This all
10   starts with the scam.  Maurice Quinn walks up to that
11   ATM at 4:47 p.m., and he takes out $20, puts it in his
12   wallet, walks up to the store clerk, here, puts out a
13   fake $20 bill, and tries to buy cigarettes.  Joel
14   Ventura, the store clerk, he tells him, "That's fake."
15   And actually, when he was on this stand, what he told
16   you was that he knew that money was fake the second it
17   was put on the counter.
18             He tells Maurice Quinn, "That's fake
19   money.  It's not good."
20             How does Maurice Quinn react?  Is the
21   reaction, "Oh, wow.  It's fake money.  I had no idea"?
22   No, he gets angry.  He gets angry, and he throws $100
23   down on the counter, and he tells Joel Ventura,
24   "You're going to give me that money from that
25   register."

Page 11

1            He doesn't ask him to check the other
2    bills.  Are they fake?  Common sense and life
3    experience tells ya that Maurice Quinn knew that
4    money was fake when he walked up to that counter.
5    Common sense and life experience tells you, and these
6    ATM records tell you, that Maurice Quinn took $20 out
7    at 4:47 p.m., three minutes before the surveillance
8    video starts.

9            You know also from those bank records,
10   a $42 balance remaining in Maurice Quinn's account.
11   He couldn't have taken $100 out if he wanted to.  And
12   you also saw those payroll deposits, those bi-weekly
13   payroll deposits that averaged $700 prior to this day
14   -- prior to March 22nd, 2019.  You know that next
15   payroll check is not coming for another 10 days, and
16   those next two payroll checks averaged $68.  The bank
17   account balance goes into the negative and stays
18   there.  Maurice Quinn is out of money.

19           So what does Joel Ventura do?  He calls
20   the store manager, Isalisa (phonetic) Rodriguez, and
21   you heard from her.  And she explains to Quinn in
22   perfect English, no possibility of a misunderstanding
23   here, and you saw him hand over the cell phone.
24   Isalisa Rodriguez explains in perfect English to
25   Maurice Quinn that the ATM is not owned by them, that

1  it's separate, that she's going to deal with the
2  problem.  She'll call the ATM manager, and she's on
3  her way over.
4           But Maurice Quinn doesn't accept that.
5  And why he doesn't accept that makes perfect sense,
6  because the jig is up.  Isalisa Rodriguez is on her
7  way to the store, and he knows that the second that
8  someone checks those ATM records, they're going to
9  find out he took out $20, not $100.
10          So he goes around to the other side of
11  the counter.  He thinks he can pull a fast one on Joel
12  Ventura, a guy that doesn't speak great English.  He's
13  a little timid, a little mild-mannered.  And on the
14  other guy in the store, Emmanuel Sanchez, the new guy,
15  the cook, he's only been there three day.  He thinks
16  if he yells loud enough, if he bangs his fist hard
17  enough, that he can get that $100 from Joel Ventura.
18  That's when he escalates.  Isalisa is on her way.
19          Putting that money in his face, putting
20  that money in his face, demanding the money.  And
21  we'll talk about what he said, you know what he was
22  saying.  He's saying, "Give me the fucking money."
23          And what happens next?  Abid Stevens
24  walks in the door.  And why does that matter?  Because
25  it's Abid Stevens on the other side of that counter --

1   on the other side of that counter, the moment that

2   Maurice Quinn escalates again.  And you saw me when I

3   was talking to Emmanuel Sanchez, I walked up to the

4   stand right here, and I said, "How far away are you

5   when you were across the counter?"

6           He says, "Two feet."  So you have Abid

7   Stevens yelling from one side of the counter.  You

8   have Maurice Quinn physically cornering Joel Ventura

9   on the other side of the counter.  He's advancing on

10  him.  He's cornering him.  He's in his face.  He's

11  screaming at him -- screaming at him, and we know what

12  he said.  You heard that quote, and you heard it

13  twice.  "Give me fucking money.  Give me fucking

14  money.  Give me fucking everything, money.  Give me

15  fucking money, Glock.  Give me Glock.  Give me Glock.

16  Give me gun right now.  Right now."

17          Joel Ventura knows, in that moment,

18  with that quote, he knows that Maurice Quinn sees the

19  gun on the other side of the register.  He's

20  terrified.  Quinn has physically advanced on him to a

21  point where Joel Ventura has nowhere to go, and he

22  does the only thing that makes sense, the only thing

23  he can do to prevent Maurice Quinn from getting that

24  gun, Joel Ventura grabs the store gun, and he puts it

25  down by his side.

1            He never lifts that gun.  He never

2      points that gun at anybody.  He puts it down at his

3      side.  And that's when Quinn backs up.  But it's not

4      over.  Quinn walks around the corner, he walks toward

5      the exit, and we all know what happens in this moment.

6      You know what happens in this moment.  That's the

7      moment that he bangs on the Plexiglas, bangs on the

8      Plexiglas, and what does he say?  One last threat.

9      "I'll be back."

10            So you have Abid Stevens in the store,

11      standing there across the counter from Joel, again,

12      two feet away, and you see Abid Stevens on the video.

13      He's still screaming at Joel.  And we know what's

14      happening in that moment, because Emmanuel Sanchez is

15      standing right there next to him.  We know that Abid

16      Stevens is saying, "Oh, you got a gun?  You got a gun?

17      You going to pull a gun on my family?"

18            And then what does Abid Stevens say

19      right before he leaves?  He says the exact same thing.

20      "I'll be back."

21            Let's think about this moment, and

22      Emmanuel Sanchez and Joel Ventura told you about this

23      moment.  All they needed was five more seconds to get

24      that door shut.  Joel Ventura is frantically telling

25      Emmanuel, in Spanish, to close that door, to lock that

1   door.  Joel Ventura told you he knew something

2   terrible was going to happen.  They needed five more

3   seconds.

4                    But why else is this moment important?

5   Every single one of the Defendants in this case is

6   outside of the store.  Stop and think about that.

7   Think about the choices that all three of them had to

8   make to go back into that store.  Think about what

9   would have happened if they could have locked the

10  door.

11                   Think about where they went, too.  How

12  do you know what's happening outside of the store?

13  Maurice Quinn, when he leaves, that threat, "I'll be

14  back."  He goes out the store, and he goes to the

15  right.  Twenty seconds later, Abid Stevens, where does

16  he go, out the door to the right.  Donnie Smith hasn't

17  even been in the store yet.  But there, in that same

18  moment, in that same moment where they only needed

19  five more seconds, who do you see in the background of

20  that video?  Who do you see coming from the right-hand

21  side, over to the left-hand side?  You see Donnie

22  Smith.

23                   Twenty seconds after Quinn leaves, two

24  seconds after Abid Stevens leaves, they're all over on

25  the right-hand side.  And Donnie Smith, he goes

1    running to the left-hand side.  And you saw this

2    video.  He goes running from that right-hand side over

3    to the left-hand side.  And what are you going to see?

4    You're going to see him come up on the left side to

5    the car that we know is his.  He's going to be

6    running, running to that car.

7                   He's at the car one, two, three, four,

8    five, six, seven seconds, out the door with his gun,

9    running back to the store.  He hasn't even been in the

10   store yet, but he runs to his car, six seconds, gets a

11   gun, and comes back.  Three seconds after Donnie runs

12   from that screen, from the right to the left, that's

13   when Maurice Quinn goes back into the store.  And

14   what's Maurice Quinn doing when he goes back into that

15   store?  It's the same thing all over again, screaming,

16   screaming at Joel, screaming at Emmanuel Sanchez.

17                   But what's different?  We know the

18   moment that Quinn backs off originally, it's because

19   Joel had the store gun at his side.  We know Maurice

20   Quinn doesn't have a gun in the moment.

21                   So what changed?  What changed is that

22   he got backup.  He knows his friends are on the way.

23   And how do you know that?  He spends 20 seconds

24   holding the door open while he's screaming at Joel and

25   Emmanuel.

```
 1              Why is he holding the door open?  He's
 2    holding the door open, because he knows he just sent
 3    his buddy, Donnie Smith, to get a gun and to bring it
 4    back.  And what happens?  Donnie Smith comes blazing
 5    in the door, blazing in the door right behind him.  He
 6    leans in, he tells his wife to leave -- and we'll go
 7    back to her in a minute.  He tells his wife to leave,
 8    and you know exactly what's going to happen next.  In
 9    that moment, tells her to leave, he's going to walk
10    into the middle of the store, he's going to take up,
11    almost, a position, and then he's going to pull out
12    that gun, and he's going to point it at Joel Ventura.
13              Donnie Smith was on a mission in that
14    moment.  So let's talk about what Donnie Smith knew or
15    didn't know when he walked into that store.  No
16    possible way he could have seen Joel Ventura with a
17    gun.  We've heard all this about his wife being in the
18    store, how she was going to get locked in this store,
19    and he needed to protect her.  Well, Emmanuel and Joel
20    are talking in Spanish when they're talking about
21    locking the door, first of all.  Second of all, no way
22    he could have known that Joel had a gun, but for
23    Maurice Quinn telling him outside.
24              But how do you know that this isn't
25    about Donnie's wife?  How do you know he didn't see
```

1    Joel with a gun?  Look at where Joel's hands are when
2    Donnie Smith walks into the door.  Both hands are up
3    in the air.  That store gun is in Joel Ventura's
4    pocket.  Donnie Smith makes the decision to pull out a
5    gun before he ever sees Joel Ventura with a gun.
6              And, again, right here, the moment that
7    you see Donnie Smith pull the gun, where is Joel
8    Ventura's gun?  It's in his pocket.  The store gun is
9    in his pocket.  And, by the way, where's Donnie
10   Smith's wife?  Out the door.  At the moment he pulls
11   the gun, his wife's gone.  There it is again, the
12   gun's even higher, raised at his chest.  Joel can't
13   even get the store gun out of his pocket.
14             And who's coming in hot 10 seconds
15   later?  Abid Stevens in the background, right as
16   Donnie Smith's wife's walking out.  Ten seconds after
17   Donnie Smith goes in and lines up a position on Joel
18   Ventura.
19             And what do we know?  What do we know
20   about Abid Stevens?  What do you know about Abid
21   Stevens?  He's got that gun in his hand already.  He's
22   out of the store for 44 seconds after he says, "I'll
23   be back."  He says, "I'll be back," and he comes back
24   with a gun, 10 seconds after Donnie Smith comes in
25   with a gun.

1              In this moment, you know that Donnie

2     Smith and Maurice Quinn have started physically

3     advancing on Joel Ventura yet again, physically

4     advancing on him into that corner.  But I want to

5     focus on what you see Mr. Stevens doing at this point.

6     Stevens is acting as crowd control.  He's got his hand

7     out.  He's making sure that Emmanuel Sanchez can't get

8     involved in this situation.  He makes sure that it

9     stays outnumbered 3 to 2.  There he is, Emmanuel

10    Sanchez, arms up, with Abid Stevens' arm out.  And

11    what in Abid Stevens' hand?  It's that gun.  A gun

12    that Emmanuel Sanchez told you he absolutely thought

13    was real.

14             But then Stevens gets involved.  He

15    starts pushing him into the corner, pushing him into

16    the corner with the other two.  And that's the moment

17    both guns are up, trained on Joel Ventura's face,

18    chest.  And all three of the Defendants are standing

19    there in that moment.  They're about to go for the

20    gun.  Is Donnie Smith going for the gun?  Look at

21    where Donnie Smith's gun is in relation to Joel

22    Ventura.  It's in his chest.  It's physically in his

23    chest with his left hand as he's reaching for the gun.

24    This is the moment the gun's stolen, reaching for the

25    gun with his right hand.

1            And where's Maurice Quinn?  Hot on his

2    tail.  Maurice Quinn is right there, acting as backup,

3    at the moment that Donnie Smith goes for the gun.

4            And what's Abid Stevens doing?  Abid

5    Stevens has his gun trained on Joel Ventura's chest

6    the entire time.

7                There is the moment they get the gun.

8    And how do you know they've got the gun?  It's right

9    there in Donnie's hands.  Right there in Donnie

10   Smith's hands, both hands, he's got the gun.  He's got

11   his gun in his left hand, he's got the store gun in

12   his right hand.

13               It's not over yet, though.  Maurice

14   Quinn, it's about the money.  He goes after Joel

15   Ventura again.  Now, they have all of the guns, and

16   they've got the manpower.  He starts screaming at Joel

17   Ventura again.  He strangles Joel Ventura at one

18   point.  They have all the guns at this point.  And

19   here comes Donnie Smith again, gun out, trained on

20   Joel Ventura as Maurice Quinn strangles him.

21               That's when Maurice Quinn goes behind

22   the counter.  He's behind the counter for 47 seconds,

23   47 seconds, and what does he do?  He takes the sleeves

24   of his sweatshirt, and for 47 seconds, he's pushing

25   buttons on that register.  47 seconds, but he can't

```
 1    get it open.
 2                    So what does he do?  Flying back in
 3    Joel Ventura's face.  And then he's going to order
 4    him, he's going to force him, he's going to tell him
 5    that you're getting behind that register, and you're
 6    giving me the money.  And that's exactly what he does.
 7    What else can Joel Ventura do in that moment when
 8    there's three men, three guns, and we know where
 9    Donnie Smith's standing this entire time, as well.
10                    Donnie Smith's in the middle of that
11    store, hands in both pockets.  And you know there's
12    two guns in those pockets.  He's standing between the
13    exit -- he's standing between Joel Ventura, Emmanuel
14    Sanchez, and the exit the entire time.  And you know
15    what he's been saying to Maurice Quinn when he's on
16    the other side of that counter.  "Take it all.  Take
17    it all."
18                    You know that he hands the gun off to
19    Abid Stevens, that Abid Stevens hands the gun off to
20    Maurice as they're leaving, before they're leaving
21    when Abid Stevens is telling him to get out of there.
22    Abid Stevens is going to stay behind, and we'll talk
23    about why in a minute.  But they take the gun, and
24    Abid Stevens does the only things he can do in this
25    moment, try to convince Isalisa Rodriguez not to make
```

1   this a police matter.

2                    There, the moment that Emmanuel Sanchez

3   told you police sirens are going.  They hear the

4   police sirens, and Maurice Quinn is physically

5   removing Donnie Smith from the scene, pulling him

6   along.  And you know what happens when Abid Stevens

7   can't convince Isalisa Rodriquez not to make it a

8   police matter.  He gets in her face.  He starts

9   screaming at her.  He starts threatening her.  He

10  tells her, "This is my neighborhood.  This is my

11  block, and I will shut your store down."

12                   This is not a misunderstanding.  This

13  is not a misunderstanding.  This is a robbery.  And at

14  the end of these closings, the Judge is going to

15  instruct you on the law, but I want to take a minute,

16  and I want to go through each of the charges.

17                   The first is Hobbs Act robbery.  Hobbs

18  Act robbery in its most simple form, most simple

19  terms, is a violent taking.  It's a violent taking

20  from an individual who works in a business that

21  interacts in interstate commerce.  That means they buy

22  and sell goods that travel across state lines.  And

23  we'll get to "interstate commerce" in a second, but a

24  violent taking.  Violence, it means violence.  It's

25  actual or threatened force.  And a taking.  Here, we

1    have the taking of the gun, and we have the taking of

2    the money.

3              How do we know there's violence here?

4    Well, you heard the threats.  "I'll be back.  I'll be

5    back," the threats that Stevens makes at the end of

6    it, but there's obviously guns in Joel Ventura's face

7    at the moment that the gun is taken from him.  There

8    are three men in the store outnumbering them at the

9    moment that the money is taken.  He's choked,

10    strangled before the money's taken.  And then, of

11    course, you know that there is an actual taking.

12              Another element that you need to find

13    as a jury is that both Joel Ventura, or one or the

14    other, Joel Ventura and Emmanuel Sanchez had a

15    reasonable fear of injury.  They told you that they

16    thought those guns were real.  Those guns were pointed

17    at them, and they were scared for their life.  Joel

18    Ventura told you he thought his life was one finger-

19    pull away from being over.  Emmanuel Sanchez told you

20    that he was afraid in this moment.  These men had guns

21    on them.  This man had a gun in his chest.  Reasonable

22    fear of injury.

23              Interstate commerce.  This is an

24    element that's established when something's taken from

25    a business that transacts across state lines.  They

1    buy and sell goods from people in other places.  You

2    heard Isalisa Rodriguez testify that she buys her

3    hoagie rolls from New Jersey, and she buys bulk foods

4    from Krasdale (phonetic) in New York.  That's enough

5    for interstate commerce, buying things that cross

6    state lines.

7              But there's a little bit more in this

8    case.  And there's a couple of other nuances the Judge

9    is going to tell you about.  He's going to tell you

10   that, one, the Defendants don't have to intend to

11   affect interstate commerce, don't have to prove that.

12   He's going to tell you that it's something that

13   affected or could have affected interstate commerce,

14   meaning the flow of goods.  And he's going to tell you

15   that it doesn't have to be a lot, minimal is

16   acceptable.

17             And here, we have actual interference with

18   interstate commerce.  This is earlier in the

19   surveillance video when Maurice Quinn is physically

20   encroaching upon Joel Ventura behind the counter.

21   He's backing him into the counter.  You have this

22   gentleman here in the middle.  He's got a lemonade,

23   and he's got money out.  Essentially, at the exact

24   moment that Maurice Quinn knocks those Slim Jims over,

25   this man sets his soda down -- his lemonade, and he

Page 25

1    walks out of the store.  So he walks out on a sale.

2                    Same thing with this gentleman in the

3    background, here, in the blue with the little girl.

4    He's going -- he's got six bags of chips in his hand.

5    At the moment that Abid Stevens comes in and is

6    screaming at Joel from the other side of the counter,

7    that's when this man puts his stuff down on the

8    counter, and he leaves.  And you see that same stuff

9    sitting on the counter during the robbery.  It's the

10   same stuff that Emmanuel Sanchez is putting away.

11   Commerce was actually disrupted here, because they

12   missed out on business.  That's interstate commerce,

13   in and of itself.

14                    So I told you what Hobbs Act robbery

15   is, but I'd like to also explain conflict liability.

16   It's also known as aiding and abetting.  The law is

17   based on common sense.  The law makes sure that there

18   -- that people who participate in a crime, such as a

19   robbery, are held accountable, even if they are not

20   the ones who physically took the item from an

21   individual.

22                    Everyone's heard of an accomplice.  You

23   hear about it on TV, you hear about it in the movies.

24   It's your partner in crime.  It's the person who helps

25   you out.  It's the person who helps you accomplish

1    your goals.  And that's essentially what the law says.

2    The law says that we need to establish that somebody

3    actually committed the robbery, so, meaning, Maurice

4    Quinn with the money, or Donnie Smith with the gun,

5    that the accomplice knew it was happening, intended to

6    help, and actually helped.  It's as simple as that.

7              Take a classic bank robbery example.

8    You've got three guys who go to rob a bank.  You've

9    got the getaway driver.  You've got the guy that goes

10   into the bank.  He's going to disarm the security

11   guard.  And then you've got the guy that actually

12   steals the money.  Well, we don't actually just -- we

13   don't hold the guy who stole the money responsible, we

14   hold all three responsible.  All three are guilty of

15   the robbery, because they agreed to participate in the

16   crime, they intended to help, and they did help.

17   That's what we have here.

18             Let's talk about it with regard to the

19   store gun.  You know, first of all, robbery was

20   committed.  You know that Donnie Smith stole the gun.

21   We've gone over it now a couple of times.  You saw the

22   moment on the video where Donnie Smith took the store

23   gun.  You saw the moment on the video when Donnie

24   Smith has both of the guns.  Joel Ventura testified

25   that Donnie Smith stole the store gun from him.  And

1   then you know that the store gun ends up in Donnie

2   Smith's car at the site of the car crash after the

3   high-speed chase.  So you have the robbery.

4                  Now, how did Abid Stevens help, and did

5   Abid Stevens intend to help?  You know that moment

6   after Maurice Quinn leaves the store.  You know what

7   Emmanuel Sanchez said.  Abid Stevens is screaming at

8   Joel Ventura, "Oh, you're going to pull a gun?  You're

9   going to pull a gun?  You're going to pull a gun on my

10  family?"  44 seconds later, after going out of the

11  store and coming back, he comes back with a gun.  He's

12  acting as crowd control with Emmanuel, and then he's

13  physically advancing on him in the corner, training

14  his gun on Joel Ventura's chest to make sure that

15  Donnie Smith can get that gun.  That's knowing what

16  was going on, intending to help, and then actually

17  helping, making sure that the gun was taken.  There he

18  is helping Donnie Smith with that gun.  But for him

19  trained on Joel Ventura in that moment, Donnie Smith

20  can't take the gun.

21           Same thing for Maurice Quinn.  You heard

22  what happened.  You heard the quote it's -- that was

23  being said that he said to Joel Ventura on the other

24  side before he goes around the counter.  You heard the

25  threat, "I'll be back."  And he does come back.  He

1    comes back, and he comes back with his two buddies,
2    and he's right there, again, same thing.  He's making
3    sure that Donnie Smith can achieve his goal.  They're
4    outnumbering three to one, three to two, if you count
5    Emmanuel Sanchez.  But look at where Maurice Quinn is
6    the moment that Donnie takes the gun.  He knew what
7    was happening, he intended to help, and he did help.

8            With regard to the money -- we haven't even
9    talked about the money yet.  For Quinn, it's all about
10   the money, right?  How do you know it was all about
11   the money for Maurice Quinn?  It all starts with that
12   scam.  It starts with walking up to the counter with
13   your fake $20 bill and trying to buy cigarettes.

14           Look at those early escalation points.  When
15   Isalisa Rodriguez is on the phone saying, "We can fix
16   this.  I'm on my way over," he knows that the jig is
17   up, so he's got to go around the counter.  He's got to
18   try to physically force Joel Ventura to give him the
19   money.  "Give me fucking money.  Give me fucking
20   money.  Give me fucking everything, money.  Give me
21   fucking money.  Give me Glock.  Give me Glock.  Give
22   me gun.  Right now.  Right now."  And remember, this
23   is 22 days after the incident during Joel Ventura's
24   Grand Jury testimony that he gave this quote.  That's
25   what Maurice Quinn wants.  You know Maurice Quinn's

Page 29

1   intent.  You know his intent when he says, "I'll be
2   back," and when he comes back.
3              Is it violent?  Absolutely.  Does
4   Maurice Quinn ultimately get what he wants?  Is the
5   money taken?  Yes.
6              Let's take a step back, though.  Let's
7   throw the entire scam out the window.  We've heard --
8   or there have been questions about -- I'm sorry, I
9   think it was in opening statement, Ms. Meehan told you
10  that this wasn't a taking, because he was entitled to
11  the money.  So let's throw the scam out for just a
12  second.
13             Let me give you an example.  Let's say
14  I go to the PNC later today, PNC Bank down the street,
15  I use the ATM in the vestibule, I take out $100, and I
16  only get $80.  I can't get two buddies, bum rush the
17  store, strangle the teller, put guns to their head,
18  and take $20 out of the cash register.  It's my money,
19  I'm entitled to it, but I can't do that.  The law
20  doesn't permit it.
21             Regardless of whether or not the scam
22  was real or fake, or whether or not he got fake money,
23  although, again, I ask you to use your common sense
24  when you look at those bank records, that's not what's
25  happening.  You can't do that.  You can't run into a

1  bank and take money from the cash register.

2           How do we know that Abid Stevens is

3  helping?  How do we know that he knows about the

4  money?  Again, he's standing on the other side of the

5  counter at the moment that that quote happens.  He's

6  originally there, he comes in, Quinn's behind the

7  counter.  "Give me fucking money.  Give me fucking

8  money."  That's what's happening right in that moment.

9  You know that he knows about the money, and you know

10  that he's going to help his friend.  You know that he

11  goes and says, "All right, you're going to pull a gun

12  on my friend?  You're going to pull a gun on my

13  friend, my family?"  Goes, gets the gun, comes back,

14  he's there to help Maurice Quinn.

15           It doesn't matter that he isn't getting

16  any of the money, and it doesn't matter that he stays

17  later on, given that that's his only choice when he

18  knows that they have made a very bad decision.  What

19  matters is what he was thinking in this moment.  What

20  matters is when -- what he was thinking the moment

21  that he came back into this store with a gun.  He's

22  there to help his friend.  He does help his friend,

23  and Maurice Quinn walks out of the store with the

24  money.  Again, crowd control, he's helping.  He is

25  acting as an accomplice in this moment.

Page 31

1            How do we know that Donnie Smith
2     intended to help Maurice Quinn?  Not only does he --
3     the timing of the outside cameras, the running to the
4     right, two seconds later, Donnie Smith's running to
5     get a gun, and then he's immediately inside the store,
6     but he helps Quinn get that money by taking the gun
7     from Joel Ventura.  Once the store gun is out of the
8     equation, it allows Maurice Quinn to go behind the
9     counter and attempt to get that money.  But you also
10    know from Donnie Smith's own words, when he's on the
11    other side of that counter, when Maurice is back there
12    with his hands over his -- with his sweatshirt over
13    his hands, so he won't leave fingerprints or DNA
14    behind, we know what Donnie Smith is saying on the
15    other side of the cash register.  Donnie Smith is
16    saying, "Take it all.  Take it all."  His intent is
17    clear from his own words, and he obviously helped by
18    taking the gun.
19            Count II that you're going to see in
20    the indictment -- well, actually, let me take a step
21    back.  What I just explained to you are a bunch of
22    different theories of liability.  What you're actually
23    going to see on your verdict form is: are each of
24    these individuals guilty of Hobbs Act Robbery as
25    either an abettor or guilty of Hobbs Act Robbery?  You

1    can find any one of the ways that I just explained to

2    you.  As a principal, Donnie Smith taking the gun,

3    Maurice Quinn taking the money, or as an aider and

4    abettor.  They're equally guilty.  You'll see one for

5    each of the Defendants, and you are supposed to check

6    yes.

7                 Count II, using or carrying a firearm

8    in connection to a crime of violence.  It is what it

9    sounds like.  It's having a gun out, and it's using it

10   in connection to the robbery.

11                The Judge is going to instruct you on

12   the definition of a firearm.  He's going to tell you

13   that a firearm is anything that's readily capable of

14   firing a projectile.  What he's not going to tell you

15   is that you need some sort of functionality test or

16   results of a functionality test to know whether or not

17   these were firearms.

18                He's going to tell you that the same

19   set of principles, direct and circumstantial evidence,

20   apply the element of a firearm in this case, that you

21   can use circumstantial evidence to determine that

22   these guns are real.  You can use the video in this

23   case.  You can use pictures of the gun.  You can use

24   the real gun.  We know for sure this gun was test

25   fired, what this looks like in comparison to those

1    guns.

2              You can used the testimony of Joel

3    Ventura, who was too inches away from that gun, two

4    inches away when Donnie Smith had it pointed in his

5    face, a foot away when Abid Stevens has that gun

6    pointed in his face, and Joel Ventura testified, he

7    told you that he's familiar with guns, and that he

8    absolutely thought those guns were real.  Same with

9    Emmanuel.  You can look at these photos for yourself,

10   and again, you can compare them to the real gun.

11             You know what you can also consider?

12   Think about how they're using them.  Think about how

13   these individuals held and handled these guns.  Were

14   they handled like fake guns, or were they handled like

15   real guns.  Look at the way that Abid Stevens, earlier

16   on when he first comes in.  Do you remember when he's

17   got that gun pointed down at the ground?  He's being

18   cautious with it.  Is there a reason to be cautious

19   with a fake gun?  There's no reason to put your finger

20   on the trigger of a fake gun.

21             And when Donnie Smith gets that store

22   gun, the gun that I just showed you, the gun that we

23   are absolutely certain, functionality test this, one's

24   real, when Donnie Smith gets this gun, he puts it in

25   his right pocket, and then he continues to use that

1    gun in his left hand.  If you're using a fake gun and
2    you just picked up a real gun, why keep using the fake
3    gun?  And we know in this moment, that's when he came
4    back at him.  That's when he came back at Joel
5    Ventura.  We know that that other gun's in his pocket.
6              Look at these pictures.  Compare the
7    guns, consider the testimony, consider the video,
8    consider how it was handled and held.
9              And one more thing.  Why pass off a
10   fake gun?  Abid Stevens hands off his gun to Maurice
11   Quinn before police arrive.  If it's a fake gun, why
12   are you handing it off to your friend?  And then
13   Donnie Smith, he leaves a real gun in his car after he
14   bails out after the high speed chase.  That's a $700
15   gun.  You heard from Isalisa Rodriguez.  It's a $685
16   gun.  You don't accidentally leave behind a real gun
17   and take a fake gun.  Those guns are real.
18             You're also going to be asked whether
19   or not they were brandished, and you'll see a
20   definition in the jury instructions.  What that means
21   is were the guns used in a way to intimidate someone.
22   I'm not going to show you the picture again, but come
23   on, the guns are, two of them, in Joel Ventura's face,
24   being used to intimidate him in that moment.  The gun
25   is being held at Abid Stevens' side to hold Emmanuel

Page 35

1   back, being used to intimidate him.

2                You haven't heard me talk about Maurice
3   Quinn with regard to this element yet.  We know that
4   Maurice Quinn isn't carrying the gun until the moment
5   that he takes the gun from Abid Stevens.  But the law
6   is smart.  The law is based on common sense.  The law
7   recognizes if you join up with a bunch of people to go
8   commit a crime and they're carrying guns, you don't
9   get off the hook just because you didn't have one, as
10  long as you knew that the guns were going to be used.

11               So with Maurice Quinn, what you have to
12  consider is whether or not he had advanced knowledge
13  of the guns.  I want to explain what "advanced
14  knowledge" means.  Advanced knowledge doesn't mean
15  before he walked back into the store that second time.
16  Advanced knowledge means at the moment or at a moment
17  that he had the opportunity to do something about it,
18  that he had the opportunity to walk away from the
19  criminal venture.

20               If you look at the video, if you look
21  at the video at the moment that Donnie Smith comes in
22  and pulls out his gun, Maurice Quinn is the one that
23  is the closest to the exit.  He's the closest to the
24  exit, and he can leave at any time.  When Abid Stevens
25  comes in and pulls out his gun, Maurice Quinn actually

1    goes for it.  If you look at the video closely enough,

2    it looks like he wants to control the gun, not in a

3    way, like, "I didn't know you were using a gun," like

4    in the way that he wants the gun for himself in that

5    moment.  But he's the one that's closest to the door.

6              And then they advance on Joel Ventura.

7    They advance on him, they advance on him, they advance

8    on him, and those guns are out the entire time.

9    Maurice Quinn never leaves, never makes a move to

10   leave.

11             And think about when that money is

12   actually taken.  We're talking about minutes later.

13   We're talking about minutes, and every single second

14   of one of those minutes was an opportunity where

15   Maurice Quinn knew guns were being used, and he had

16   the opportunity to leave.  Nobody's holding a gun to

17   his head.  Nobody's preventing him from leaving.  He

18   had advance knowledge that those guns were going to be

19   used.

20             I know we've talked about a lot of

21   theories of liability, but there's just one more.  The

22   Judge is going to charge you on conspiratorial

23   liability, a conspiracy.  Everyone's heard of

24   conspiracy.  And at the end of the day, what it really

25   means is if you find that these three individuals had

1    an agreement, and I'm not talking about a written

2    contract, I'm not talking about blueprints or

3    schematics in "Ocean 11," I'm talking about whether or

4    not they had an agreement, a mutual understanding,

5    spoken or unspoken, at the moment that they walked

6    into the store, at the moment that they're cornering

7    Joel Ventura, to accomplish a common objective, to

8    take that gun from Joel Ventura.  You can find them

9    guilty of all of these crimes on the basis of

10   conspiracy.

11              Again, remember, these are a menu of

12   options.  These are all of the different ways that the

13   law holds individuals responsible.

14              I want to talk about one more

15   instruction that you're going to hear before I sit

16   down, consciousness of guilt.  The Judge is going to

17   give you an instruction that you can consider the fact

18   that Donnie Smith fled from police as consciousness of

19   his own guilt.  But there is more than just the flight

20   from police, with regard to all three of the

21   Defendants, evidence that you can consider that they

22   knew what they were doing was wrong.

23              With Donnie Smith, it starts out with

24   the moment that the sirens happened.  This is equally

25   applicable to Maurice Quinn.  That's the moment that

1    he's dragging him out of the store, because they hear

2    the police are coming.  But then we all know what

3    happens next.  We all know what happens when Donnie

4    Smith starts to go to his car.  Officer Ferreira is on

5    his way at this point, and he told you he had lights

6    and sirens going, but that he turns them off.  You're

7    going to see Donnie Smith start to jog.  There he is.

8    He's running to his car, because Officer Ferreira is

9    zooming up Sharpnack Street the wrong way.

10                   Donnie Smith doesn't make a move to

11    leave.  He doesn't take off in that moment.  He's

12    sitting there.  He's got to be watching Officer

13    Ferreira, who gets out of his police car now, and he

14    starts heading toward R.D. Grocery, and but for the

15    operators at the Real Time Crime Center, who have this

16    video pulled up, we'd never know that Maurice -- or

17    that Donnie Smith's in that car.

18                   But remember Police Officer Ferreira

19    testified he gets that radio alert from Real Time

20    Crime that there possibly a suspect still on location

21    in that dark-colored vehicle.  Donnie Smith has to

22    have been watching him this whole time, sees him come

23    up on the passenger side, or if not, he's certainly

24    seen him by now, through the front windshield, that's

25    when Officer Ferreira sees Mr. Smith in the car.  He

 1    goes around to the side.  Donnie Smith doesn't open

 2    the door, he doesn't roll down the window, so Officer

 3    Ferreira tries to get him out of the car.  And that's

 4    the moment that Donnie Smith chooses to take off,

 5    dragging Officer Ferreira a few feet along the way.

 6    But for that officer behind him, who knows if it

 7    actually would have turned into a high speed chase.

 8                But we all know how that chase ended.

 9    It ends not too far away.  Donnie Smith has crashed

10    the car, and we heard a lot about this car.  We know

11    it's Donnie Smith's car, he's stopped in it seven days

12    before, a 2010 Ford Taurus with New Jersey temp tags.

13    And if that's not enough, you know that the

14    Complainant -- the store gun is in the car, and you

15    know that that Legend hat -- the black Legend hat that

16    you see in the video, that that's in the car.

17                Why does the car matter?  Why do the

18    details of the car matter?  Because Donnie Smith calls

19    911 at 5:43 p.m. and attempts to put a recorded alibi

20    on the record for himself.  He attempts to say that an

21    unknown assailant stole his car, took off from police.

22    So this isn't just he made a bad decision in the

23    moment to flee from police.  He has 50 minutes after

24    the robbery, 50 minutes, probably 40 minutes after he

25    crashed the car to think about how he's going to get

Page 40

1    himself out of this.

2                   How do you know that it's Donnie Smith

3    on that 911 call?  You saw the Dante Smith cell phone

4    records.  First of all, Dante Smith, we know they're

5    prepaid records.  We know that you can use any name.

6    Mr. Sierra from T-Mobile testified to that.  But you

7    also have the contacts on those phone records.

8                   Remember 50 calls between Dante Smith

9    number and the Carlene Webster number, Donnie Smith's

10   wife.  And that's in the four days on either side of

11   the robbery, 50 contacts.  Seven calls between them

12   the night of the robbery, just after the robbery,

13   between 5:07 and 5:29 p.m.  That's Carlene Webster and

14   Donnie Smith -- Dante Smith having communication.

15                   We know that there are seven contacts

16   in those four days with the Maurice Quinn phone

17   number, that phone number that was stipulated to.  And

18   then we know, at the moment right before and after the

19   911 call, we have multiple calls between the Dante

20   Smith number and Charlene Webster, Donnie Smith's

21   wife.  And then just five minutes after the 911 call,

22   we have an incoming call from Maurice Quinn.  The

23   Dante Smith phone number, those phone records, they

24   belong to Donnie Smith.

25                   And if that's not enough, look at the

Page 41

1    time line of the 911 call, 5:43 p.m.  And then all

2    those dispatch calls I played for you.  5:57 p.m., the

3    dispatch officer, the police on the scene say, "Hey,

4    we went out there, no Complainant on scene about that

5    car."  5:58 p.m., supervisor tells the officers on the

6    street, "All right.  I'll call that caller back."  And

7    it's at 6:00 p.m. in those Dante Smith cell phone

8    records that there is a two-minute incoming call from

9    (215) 686-3128, which Miss Cordallis (phonetic)

10   testified is 911 dispatch, a two-minute call where 911

11   dispatch calls back the Dante Smith phone number.

12   Says he'll return to the location, and then we know no

13   caller on scene.

14              Listen to the details that he gives

15   about that car.

16      (Audio plays)

17              DISPATCHER:  Friday -- 2019, 1743 and

18   36 seconds.

19              MR. SMITH:  What?

20              DISPATCHER:  Philadelphia Police Radio

21   Dispatch.  (Indiscernible - 10:49:54.)

22              MR. SMITH:  How you doing, ma'am?

23   Somebody just jumped in my 2010 maroon car.  Some kind

24   of commotion was going on on Sharpnack and Ross, and

25   whoever the assailant was, I'm not even sure what

1   happened.

2                DISPATCHER:  Where are you at?

3                MR. SMITH:  Where am I at?

4                DISPATCHER:  Yes.

5                MR. SMITH:  I'm on Chew and Sharpnack.

6   I had to walk --

7                DISPATCHER:  Chew and Sharpneck?

8                MR. SMITH:  Yeah.  I walked down the

9   block to get a pack of cigarettes.

10               DISPATCHER:  All right.  Somebody went

11  in your vehicle and took it?

12               MR. SMITH:  No, they took off.

13               DISPATCHER:  In your vehicle, right?

14               MR. SMITH:  Yeah.

15               DISPATCHER:  All right.  What type --

16  what -- do you know your license plate?

17               MR. SMITH:  It was -- I just got temp

18  tags on it.  I just bought the car.  It's got New

19  Jersey temp tags on it.

20               DISPATCHER:  Okay.  All right.  Listen,

21  I'm going to get the police out there as soon as

22  possible.  Did you see the person that went in the

23  vehicle?

24               MR. SMITH:  No.  Actually, I was in a

25  store.

1                 DISPATCHER:  All right.  And let me ask

2       you a question.  Are the keys with the vehicle?

3                 MR. SMITH:  Yes, they were.

4                 DISPATCHER:  All right.  No problem.

5                 MR. SMITH:  I stopped to get a pack of

6       cigarettes there.  But I didn't -- I seen some

7       commotion, but I didn't pay no attention to it.

8                 DISPATCHER:  No problem.

9          (Audio stopped)

10                MS. MARTIN:  Donnie Smith was the

11      commotion.  And then he spent 50 minutes after

12      crashing his car thinking about how he can call 911

13      and try to come up with an alibi for himself, try to

14      come up with an unknown assailant that took his car

15      and crashed it.

16                There's consciousness of guilt with

17      regard to Maurice Quinn, as well.  Again, it's --

18      putting his sweatshirt over the hands.  Those aren't

19      the actions of a man that thinks that he's entitled to

20      the money in that register.  He wants to make sure

21      he's not leaving behind fingerprints or DNA when he is

22      pushing the buttons on that register.

23                You don't take your buddy's gun.  You

24      don't take a gun that's not real, first of all, but

25      you don't take a gun from somebody if you don't think

Page 44

1    that there was a problem with what you've done in this

2    store.  And you don't drag your other friend out of

3    the store the second you hear police sirens.

4                There's consciousness of guilt with

5    regard to Abid Stevens, as well, again, handing off

6    that gun.  No reason to hand off that gun unless

7    you're concerned about what's going to happen when the

8    police come.

9                And then you have the threats to

10   Isalisa Rodriguez.  The need to scream at a five foot

11   two woman that you are going to shut down her store,

12   that you own this block, that this is your

13   neighborhood.  Think about that.  Isalisa Rodriguez

14   lives above the store.  You heard that.  She's got two

15   kids.  He's threatening her livelihood in this moment,

16   and she takes it seriously.  What's more, not a single

17   one of those individuals ever come back in the store

18   ever again.

19               This was not a misunderstanding.  This

20   was a robbery.  And at the end of closing, during the

21   rebuttal closing, my co-counsel, Mr. Eckert is going

22   to address you again, and he is going to ask you to

23   return the only verdict that's supported by the

24   evidence in this case, a verdict of guilty on all

25   counts.

Page 45

```
 1              THE COURT:  Thank you.  Mr. Patterson.
 2              MR. PATTERSON:  Thank you, Your Honor.
 3         (Pause)
 4              MR. PATTERSON:  May it please the
 5    Court, counsel, ladies and gentlemen of the jury, with
 6    the jury's indulgence, I just want to get set up here.
 7         (Pause)
 8              MR. PATTERSON:  I promise you this is
 9    the level of technology I'll be using today, if it
10    works.
11         (Pause)
12              MR. PATTERSON:  Okay.  Now, when you
13    heard from me five and a half days ago on Monday, a
14    week from today, obviously, it was an opening
15    statement.  I told you what an opening statement was.
16    I'm not going to go through the whole thing again, but
17    I was clear with an opening statement is what I think
18    that the testimony and evidence is going to show, and
19    what I think that the evidence and testimony is going
20    to show, because obviously, I have some discovery that
21    the Government gives me, so I have the knowledge of
22    what's there.  But then I haven't heard any of the
23    testimony, nor have you, has the jury heard it.
24              The closing is much more important,
25    though, opening statement versus a closing argument.
```

Page 46

1    Closing argument is now I get to get up and say, "Yes.
2    See, I told you six days ago -- a week ago that I was
3    right what the evidence showed, what the evidence
4    didn't show."

5              And as I said in my opening, I am here
6    for one person and one person only.  I am here for
7    Donnie Smith.  I am Donnie Smith's attorney.  My
8    opening statement is related to Donnie Smith, and my
9    closing argument is going to relate to Donnie Smith.
10   Now, there are two other actors present in the
11   courtroom.  They have their own attorneys.  So I,
12   typically, will tend to not use their names.  I'll
13   focus on my client unless, obviously, there will come
14   appoint in my closing where I may have to mention
15   somebody.

16             The other thing about a closing
17   argument that's important is that what I say now --
18   what I say in the next 40 minutes, and what the
19   Government just said for the last hour, is that -- I'm
20   starting my timer right now, so excuse me.  What I say
21   is not evidence.  You've heard the evidence.  You've
22   heard the testimony.  And you heard -- you will hear
23   the Judge's instructions.  And it's my interpretation
24   of the evidence.

25             If my notes -- and this is important.

Page 47

1    If my notes and what I say now is different than what
2    you remember and what's in your notes, your memory and
3    your notes rule.  Doing that -- doing these type of
4    trials, very fluid, a lot of stuff going on.  I've got
5    to listen to what the Government is asking.  I have to
6    listen to what the witness is responding to.  I've got
7    to think of what I'm going to say on a cross or a
8    recross.  I might miss something or I might misstate
9    something, or it might not comport with what you have
10   or what you remember and what you've written down.
11   Your facts, your memories, your notes rule.  This is
12   not my job to mislead you.  This is my job to recount
13   the evidence as I remember it and as I heard it.
14              Now, I do this a little differently.  I
15   have notes I prepared.  There is a lot of things that
16   I want to point out, so I will reference my notes
17   every once in a while.
18              Burden of proof, His Honor, we have
19   some instruction -- preliminary instructions before
20   this started regarding the burden of proof.  The
21   burden of proof in a criminal case is the highest
22   burden that there is in the -- in a criminal trial in
23   Federal Court.  It is beyond a reasonable doubt.  Now,
24   again, His Honor will give you the jury instructions
25   when we're all done with this closing stuff.

1            Now, I do know that there is one word
2    that you're going to hear from me right now, and
3    you're going to hear from His Honor again, what His
4    Honor reads you with respect to the definition of a
5    "reasonable doubt," that's what rules for your
6    deliberations.
7            There's one common word, and that is
8    "hesitate."  In State court, they define the type of
9    doubt as the type of doubt that you would make a
10   reasonable, prudent person hesitate before acting on a
11   matter of importance in their own affairs.  Federal is
12   a little bit different, and again, His Honor will read
13   you exactly what it is.  The word is "hesitate."
14           When you are deliberating this case --
15   when you're looking back at the evidence and the
16   testimony, and you're comparing that and trying to fit
17   that into the jury instructions, the law to apply, to
18   determine whether they satisfied the burden beyond a
19   reasonable doubt, the question is will you hesitate.
20   Now, when I get done with my closing, I'm going to
21   suggest that you'll be hesitating a lot.
22           There's other instructions, and we
23   focus this on voir dire.  Voir dire, again, is just to
24   get a jury that's going to decide this case on three
25   things: evidence, testimony, and judge's instructions.

1   There's also other things that were in your -- that we

2   asked questions, a lot questions with respect: does

3   anybody have any issue with the Defendant's right to

4   remain silent.  That is a right in our Constitution

5   that a defendant does not have to testify.  And the

6   Judge will read you a jury instruction at the end, and

7   he will tell you specifically you may not -- you may

8   not draw a negative inference for the mere fact that

9   somebody decided to exercise their Constitutional

10  right to remain silent.  So please take that into

11  consideration, and please follow that instruction.

12  It's very important in a case such as this.

13            Now, there's also going to be a jury

14  instruction that's called justification.  Now, this

15  jury instruction only pertains to Donnie Smith.  The

16  jury instruction is justification.  There's a lot of

17  jury instructions, so it's down towards the bottom,

18  but just wait for it, and you'll hear it.

19            The Government has to prove beyond a

20  reasonable doubt that everything that they just said

21  in the closing actually happened, that the robbery

22  happened, that there was a conspiracy, that they

23  brandished the firearm.  They have to prove all of

24  those elements beyond a reasonable doubt, again, the

25  type of doubt to make a reasonable, prudent person

1    hesitate before acting on an important matter.

2              Justification -- now, I'm going out of

3    order with respect to this -- my closing, because I

4    think it's -- sequentially, it kind of leads to where

5    I want to get to the end.  Justification also has a

6    burden of proof.  If, and only if, the Government

7    proves each and every element beyond a reasonable

8    doubt, then the burden -- it's very unusual that a

9    burden would shift to a Defendant -- to Mr. Smith --

10   but that burden is by preponderance of the evidence.

11   That's the lowest standard in the law, reasonable

12   doubt, highest standard, preponderance, lowest burden.

13   And the Judge will describe -- His Honor will describe

14   what that burden is and how to visualize it, look past

15   the words, and he'll tell you how and what it is.

16             But preponderance of the evidence is a

17   scale, you know, the lady justice with the -- not a

18   digital scale, a regular, old-fashioned scale.  You

19   put two pennies on it, they stay even, and they don't

20   go anywhere.  That means that we did not prove a

21   preponderance that my client was justified in doing

22   what he did.  Now, you throw a dime on there.  We

23   throw a dime on there.  It sinks down a little bit.

24   That's a preponderance of the evidence.  If you think

25   that that scale sunk down a little bit on our behalf,

1   then you can find Mr. Smith not guilty.  And this is

2   in your jury instructions.  I'm not making it up.  It

3   stays even, we don't satisfy our burden.  You put that

4   dime on the other side, the Government's side, it

5   weighs down there.  Again, we didn't satisfy our

6   burden.  Now, obviously, I am going to tell you here

7   that it's my belief, when I get towards the end of

8   this, that he did satisfy our burden beyond a --

9   preponderance of the evidence.

10              And before I start talking about

11  justification, again, I'm out of order on this, but

12  I'm going to tell you where I'm going to end up in a

13  few minutes.  You do not even get to the justification

14  instruction, only if the Government proves beyond a

15  reasonable doubt each and every element that they're -

16  - that my client, Donnie Smith, is charged with.

17              Now, of course, I would submit that

18  they'll never do that based upon the evidence as you

19  heard it, based upon the testimony, based upon the

20  videos, and particularly the videos, when you compare

21  that to the Judge's instructions.

22              Now, there are four elements for a

23  justification.  To cut this down, I'm just going to

24  talk about the first one, and then the Judge will read

25  the other three elements, and you can -- they kind of

1    flow from the first one, which is the most important.

2                    Donnie Smith was under an immediate

3    unlawful threat of death or serious bodily injury to

4    himself or others.  Now, "others" is a biggie here, to

5    himself or others, meaning him and his wife.  It was

6    uncontroverted and unequivocal that she was in the

7    store when this happened.

8                    And the other thing that we do know for

9    our burden to tip the scales no matter how slightly,

10   we do know some things.  We know that the store owner

11   -- I'm going to refer to him as Joel.  He had -- his

12   first -- his formal name is a little bit different,

13   but Joel Ventura.  He had a loaded gun.  Mr. Quinn

14   didn't have a loaded gun.  Mr. Quinn didn't have

15   anything.  The only two people in the store before

16   this all happened -- this is in the video, was Mr.

17   Quinn and Joel.  Joel pulled a loaded gun.

18                    So knowing -- and that's a loaded,

19   functional gun, and I'll get to what my client had in

20   his hands a little bit later on, but we know that that

21   was a loaded, functional gun that can fire a

22   projectile and kill somebody.  And the expert said it

23   was loaded -- not loaded, strike that -- that there

24   was eight rounds when he got it from the Philadelphia

25   Police Department.

1           A lot of hay was made about this semi-

2    automatic weapon with Mr. Ventura, he's the -- he was

3    the store owner.  And then you had Mr. Sanchez.  He

4    was there for three days, and he's the cook, I think.

5    A lot of stuff was said -- was there a round chamber

6    or wasn't there a round chamber?  I asked questions,

7    my colleagues asked questions, and do you know why

8    that's important?  Because the only game in town that

9    day with a loaded gun who could kill somebody was Joel

10   Ventura.

11           "I took it out of the cubby, and I just

12   kept it down at my side."  And I asked and everybody

13   else did, "Did you chamber a round?"  "No, I didn't

14   chamber a round."

15           Okay.  So we played the video.  We kept

16   playing it over and over and over again, and I think

17   you can see it.  Again, your recollection rules in

18   this -- in my closing argument.  He had the gun here,

19   and you see the video.  And I'll do it from the

20   standpoint that you saw it.  The video is, like,

21   behind him, and you can see something here, and you

22   see this, real quick.  I played it a lot.  You see

23   that and you see this.

24           Now, when we had two people, one a gun

25   expert, who's tested functionality on tens of

1    thousands of firearms, and the other officer, who is

2    not trained -- he said he's not trained, and he didn't

3    have any expertise in the function of guns, but he's a

4    detective.  He's dealt with guns.  Each one of those

5    confirmed that that movement that I described to them,

6    and to you, and for the record of my left hand going

7    real fast over my right hand is consistent with

8    somebody chambering a round.

9              Now, Mr. Ventura says, "No.  I didn't

10   do that."  But what does the evidence show?  I will

11   submit for the jury's consideration, Mr. Ventura

12   locked and loaded that functional gun, and he was

13   ready.  He was loaded for bear.  And it's important

14   for the defense of justification.

15             I also was the only attorney that just,

16   kind of, asked a few questions of the one patrolman

17   about chain of custody.  You know, when you see a

18   piece of evidence, you don't disturb it, you leave it

19   where it lies.  Somebody will then come in and take a

20   picture of it.  Once they take a picture of it, an

21   officer will then handle the gun with latex gloves.

22   He will make sure that it's not -- does not have a

23   chambered round, because it's going to bagged and

24   tagged, put into an evidence bag, and sent off to a

25   crime lab somewhere.

1          Unfortunately, in this case, the
2   officer -- and I am totally cool with that, he
3   probably -- he just -- he was honest, "I don't
4   remember if there was a round chambered," not that
5   there wasn't, he doesn't remember.  So again, look
6   back to the evidence of what you saw Joel Ventura do,
7   and what the two officers said is consistent with
8   somebody chambering a round.
9          That gun was loaded.  That gun could
10  have killed Donnie Smith, and that gun -- not the gun.
11  What am I saying?  Joel Ventura could have killed
12  Donnie Smith.  And Joel Ventura could have killed his
13  wife.  You can speculate all you want about these
14  other "guns," quotation marks, that my client had.
15  Can you get there to the same level as you can get
16  there, that Joel Ventura had a functioning gun that
17  was locked and loaded?
18          It's an element of the offense.  A
19  firearm is defined in the jury instructions.  You've
20  got to read that definition and apply it to the facts.
21  It's an element of the charge that is -- that the
22  crime that's charged here.
23          Now, what I forgot to say in my
24  opening, in my closing, rather, is that you can use
25  the evidence and the testimony in relation to the

Page 56

1    Judge's instructions, but you can also use your common
2    sense, your life's experiences.  I think when we were
3    doing voir dire, when we were asking you questions,
4    there was quite a few of you -- I don't know if any of
5    you ended up on our jury, that you have a firearm, so
6    you know how it's used.  And again, you can draw upon
7    your life's experience and your common sense with
8    respect to that.  But what you can't do in a criminal
9    case, you can't guess, and you can't speculate.
10              You say, "Well, what's the difference?
11   My common sense or guessing and speculating."  I think
12   there's a big difference.  Your common sense, knowing
13   how a gun is functioning, knowing that you go like
14   this, and it was tested on a bench test by an expert,
15   and it could fire, you don't need common sense.
16   That's direct evidence.  But can you get to what my
17   client was holding?  Can you jump across that chasm
18   without guessing and speculating that that was a gun?
19              And the Government kept bringing up
20   that it was fake gun.  I'm not suggesting it was a
21   fake gun.  I'm not suggesting it was a real gun.  I
22   don't know what it is, because they didn't prove it.
23   But even a gun -- a real gun, if you read the
24   definition, it's got to be designed or easily
25   converted to eject the projectile under the gun powder

Page 57

1    or something.  Even if it was a real gun, was it a
2    functional real gun?  Well, he may -- they could use
3    circumstantial evidence to get to that point.
4              My position is -- and, again, it's up
5    to you, you can't get to that point without guessing
6    or speculating.  Yeah, you can use circumstantial
7    evidence on a lot of things.  Again, you come in here,
8    no windows, somebody's wet, it's raining out, they
9    have an umbrella.  Common sense.  There's a lot of
10   steps you've got to jump through, a lot of hoops
11   you've got to jump through to use your common sense to
12   say that that gun, whether real or not real, was
13   functional, or it could be readily made functional, to
14   eject a projectile.  We're not there.
15             Oh, and brandishing a firearm?  I'll
16   get to this later.  Brandishing, wave a gun around,
17   point it, wave it -- not carrying it, wave it,
18   carrying around.  So then you can say, "Well, okay.
19   Well, they didn't prove -- or I don't think they
20   proved beyond a reasonable doubt" -- hesitate -- that
21   what my client had was a functional gun, whether real
22   or unreal, or whether it was plug in the barrel, or no
23   firing pin, whatever.
24             The Glock that my client did take, I'm
25   not going to come up here and spin a yarn.  He took

Page 58

1   the gun, because he was afraid for himself and his
2   wife.  He took the loaded, functional, operational,
3   bench-tested Glock gun from the store owner, and he
4   put it in his right pocket, and my client's a lefty.
5   All over the video tape, my client's a lefty.  The
6   only gun that we proved beyond a reasonable doubt
7   stayed in his right pocket and never left his right
8   pocket.  That gun was not brandished.  Your
9   determination, beyond a reasonable doubt, so you don't
10  hesitate, is that the other one in his left hand he
11  brandished, and it was a gun, as defined in the law to
12  be applied to this case.
13               Now, the threat of death or serious
14  bodily injury to Donnie Smith and his wife.  This is
15  my other technology exhibit here.  Now, this is,
16  unfortunately, not going to flash up on the screen
17  anywhere.  This is it.  Can everybody see it?  Okay.
18               Again, like I said before, this is my
19  interpretation of the video evidence that we've all
20  seen.  This is the time, and this is not the time on
21  the bottom scroll of the computer, this is the
22  embedded time stamp from the video that we can all
23  see.  And this is me looking at the video last night
24  and writing down times, and who -- what's happening.
25  Who's coming and going.  So again, the time, beginning

1    at 16:52:50 and ending 16:55:56.  And again, I am the

2    attorney of Donnie Smith.  I am not Mr. Quinn's and

3    Mr. Stevens' attorneys.  I didn't put their names in

4    here.  I put "Person A" and "Person B."  You can

5    determine who's who, but I am attorney -- Donnie

6    Smith's attorney.  I put his wife's name and his name

7    in.

8                  Now, look at this.  There's a lot of

9    comings and goings.  The front door should have been a

10   revolving door to keep the heat in, because people

11   were coming and going so many times.  And look at the

12   sequence of events.  16:54:53, Smith's wife is in the

13   store.  She's the lady dressed in the Muslim garments.

14   And during the stills that you just saw in the

15   Government's opening, she's all over the place,

16   uncontroverted that she's in the store without her

17   husband.

18                  So what happens?  Almost a full minute

19   -- 16:54:53 to 16:55:47, she's there alone.  And if

20   you remember the video -- again, this is my exhibit.

21   I'm not going to flash up the video.  We've seen it a

22   hundred times.  There's a point where Joel comes out

23   around the cubicle with the Plexiglas, and he's got

24   the gun here.  Now, the gun is out.  At one point, he

25   puts it in his pocket, but the gun -- the loaded

1    functional Glock, eight-round gun is there.

2              She's right there waving around with

3    some type of currency to buy something.  She's there

4    to buy something.  He kept -- look, she's getting

5    frustrated.  She's like, "Here, I want to buy

6    something."  And he's right by where you stand -- Mr.

7    Ventura, Joel, where you stand when you want to

8    transact business through that cubicle, with a gun.

9    Donnie Smith comes in.  He does what any husband's

10   going to do, takes his wife, takes his hand by her

11   waist, and ushers her out.

12             Now, the Government had said, "Well,

13   okay, now his wife is gone.  So where is the threat of

14   death or serious bodily injury?"  He's still there

15   with a guy with a gun.  What does he do?  He removes

16   what appears to be a gun, and I'm just -- I'm just

17   going to say "gun" in quotation marks, because it's

18   just too much to say "object."  Again, it's my

19   submission; it's not proven.  He removes his wife.  He

20   removes the threat of death or serious bodily injury

21   to his wife, and then he pulls what the Government

22   wants you to believe is an operational, functional

23   gun.

24             What did Donnie Smith do then?  I can't

25   unmake the facts of this case.  You know, if there's

Page 61

1    not a nine -- eight, nine cameras trained on my client

2    throughout the entire course here, I could put a spin

3    on it and maybe say, "Well, you know, it didn't happen

4    that way," but we know exactly what happened.  We know

5    exactly what my client did.  There's a video of it.

6              You just saw it on the stills, he pulls

7    what they purport to be a gun.  But Mr. Ventura

8    doesn't get his gun out.  Then they start backing away

9    from one camera angle to the next camera angle, and

10   you'll see him in the camera again -- I'm sorry,

11   (indiscernible - 11:17:54).  Goes like this to try to

12   get the gun to disarm him.  He doesn't get the gun

13   out.  So then my client puts his gun around, points it

14   at the floor, and this is on the video.  I'm not

15   making it up.

16             Then they all start walking over to a

17   little area where you can actually go back to where

18   the cash register is.  And again, he keeps going,

19   like, with his right hand with the gun pointed down,

20   he keeps reaching over, reaching over, reaching over.

21   Still not getting the gun out.  Then he gets his gun,

22   and he points it, just like we've seen, that's when he

23   points the gun to get the gun.  I think like this, and

24   he's reaching.  But before that, the gun's down

25   pointing at the floor.  Takes the gun and disarms him.

1  That threat is over to his life.

2             Where does that Glock go?  It goes in

3  his right pocket, and that Glock is never seen again.

4  Puts it in his pocket, walks out to where the patrons

5  sit, and he stands there.  Now, there's a question of

6  whether he stood like this, as I asked three times of

7  Mr. Ventura, or whether his hands were in his pocket,

8  but either way, your recollection rules on that one.

9  He never drew that Glock.  He never drew the other

10 gun, that was purportedly a functional, operational

11 gun.

12            Mr. Sanchez -- again, this is when he

13 disarms Joel Ventura of a loaded gun, and he's

14 standing there.  And I asked Mr. Sanchez about the

15 cigarettes and, you know, all the stuff in the store,

16 and transacting cash business.  There's a lot of cash.

17 He didn't know if there was store safe.  And then I

18 asked him about -- "Did my client take anything?"

19 "No, he didn't.  He didn't."

20            He could have taken -- "he could have

21 cleaned you out."  That was my words exactly.  "He

22 could have cleaned you out.  Did he?"  "No."  He

23 didn't do anything

24            So this is where the part of my closing

25 with respect to justification ends, then I'll get into

Page 63

1    the other stuff.

2              So once again, only if they prove their

3    case beyond a reasonable doubt, which I submit that

4    they cannot, that you reach the justification

5    instruction.  And it's my submission, my request, that

6    based upon the evidence as you've seen, this is not

7    secondhand account of a biased witness or an unbiased

8    witness or a patron who just kind of happened to be

9    there.  This is on video.

10             Now, the elements of the offense, the

11   Government already went through those.  I'm not going

12   to bore you with me doing it again.  If you don't

13   remember exactly what each element is, I'm sure my

14   colleagues may mention it again in their closing, but

15   you will have the elements to apply to the law when

16   the Judge gives you the instructions.

17             There are two things that were

18   allegedly taken that day, the $100 and the Glock.

19   I've already discussed the Glock.  I already discussed

20   my interpretation of the facts and the evidence and

21   the video tape of why that gun was taken.  The $100,

22   once that -- once Mr. Ventura's disarmed, the Glock

23   goes in my client's right pocket, never to be seen

24   again.  He doesn't partake in anything with respect to

25   stealing anything from that store.

Page 64

1               Now, video evidence.  Sure, you have a
2    lot of video evidence, I just said that, but there's
3    no audio.  So what the police did was they relied on
4    what Mr. Ventura said to them.  And the only really
5    fact witnesses are, other than the store owner, for
6    what happened, what transpired when this occurred was
7    Mr. Ventura and Mr. Sanchez.
8               Now, there is also a jury instruction
9    called credibility that you can judge the credibility
10   of the witnesses.  I was a little harsh with Mr.
11   Ventura, because he wasn't answering my questions.  I
12   admit it.  But Mr. Sanchez, he was great.  You asked
13   him a question, he answered it.
14               "Mr. Ventura, Hello.  How's your day?"
15               "Oh, your client robbed me at
16   gunpoint."
17               It almost -- it wasn't that bad, but it
18   kind of got to that point.  But you have to judge
19   their credibility, and that's in the jury
20   instructions.
21               But there are only two witnesses and a
22   video tape with no audio.  And those two witnesses
23   work there.  But did you notice the video, even in the
24   stills that we've just seen in the Government's
25   closing?  There were -- and I counted this when I was

Page 65

1  doing this -- there were three adult male men in that
2  store.  They were the ones that dropped the potato
3  chips before they left.  Where are their statements?
4  It's a neighborhood store.  I don't know.  Does the
5  Government know?  If the Government knew what their
6  statements are, they would have presented them today
7  as corroborating evidence of the two witnesses who
8  work in the store to say, "Yeah.  That's what these
9  guys said."
10            And the big one is the guy with the
11  gray hoodie.  If you look at the video, he is there
12  from start to finish.  He is there for a whole --
13  almost the whole 23 minutes.  Now, I think we can
14  infer, based on what he's doing, he does not work
15  there.  He's seeing everything.  He allegedly -- since
16  he's standing right there when it looks like my
17  client's saying something after this whole incident is
18  done, when they're all just kind of hanging out with
19  the store owner, he's right there.  When Mr. Stevens
20  is saying something to, you know, about what happened
21  or whatever, I don't know.  There's no witnesses to
22  that effect.  What did the police do?
23            Now, police work is -- what you do is
24  you canvas the neighborhood.  I didn't ask any
25  questions about did you canvass the neighborhood,

Page 66

1   because it's not my job.  It's the Government's job to

2   prove each and every element beyond a reasonable

3   doubt.  I don't have to prove my client didn't do it.

4   I've got to prove -- I've got to show that they didn't

5   prove it.

6              This is the Philadelphia Police

7   Department.  No canvassing?  Did you try to get the

8   identity of the three adult males that were in the

9   store about what happened, who said what?  What about

10  the guy with the gray hoodie?  What would he have

11  possibly said that might help their case out?  It

12  isn't like we looked and we couldn't find him.

13  Crickets.  Silence, as to what the police did and did

14  not do in this case.

15             And it's not just the Philadelphia

16  Police Department, it's the Federal Government.  We're

17  in a Federal Government courthouse: the ATF, DEA, the

18  FBI, the Secret Service, vast, vast resources to get

19  you through the hump, to get you through your

20  reasonable doubt, to get you through your "I might

21  hesitate to say yes, this was a robbery, this was a

22  conspiracy, this was an aiding and abetting, and my

23  client had a real functional gun that he brandished."

24  Nothing.

25             Now, one more thing.  Nobody called

1  911.  The three adult males that were there trying to

2  buy something, they don't -- they're hear -- I'm

3  assuming they're hearing this -- one of the

4  individuals yelling and screaming about something,

5  nobody calls 911.  The guy in the hoodie who's seeing

6  everything, based upon the evidence -- the video,

7  rather, he doesn't call 911.  Everybody's got a phone,

8  and even if your phone -- as the one expert said, even

9  if you didn't pay your bill that day, you could always

10  call 911 on a phone as long as it's powered up.

11            And I made a big deal about this, and I

12  think it's extremely important.  Look at my exhibit.

13  Look at everybody coming and going.  You saw it on the

14  video.  I believe the Government said in their closing

15  that, "You know they're outside talking."  I think

16  they said that.  I hope they did.  You know they're

17  outside.  Well, how do you know they're outside

18  talking?

19            What if you got the video capture, or

20  the camera that the owner asked her next door neighbor

21  across the street that's directly pointing at the

22  outside door of the entrance to the store, why didn't

23  you get that?  You know, it seems like, "Oh, he's

24  just" -- "you know, he's talking in circles.  He's

25  making things up, you know, he's distracting me."  No,

1    I'm not.  I'm asking you is what the Government did to

2    prove their case beyond a reasonable doubt so you

3    don't have to guess and speculate.

4              Were they talking outside as the

5    Government said in her closing?  We don't know.  Could

6    we have known if they were talking outside or if they

7    were even outside when Person A leaves, Person B comes

8    in, Person A comes back, Person B leaves and then

9    comes back later on?  They're asking you to guess.

10   They're asking you to speculate as to what happened

11   outside.

12             Can you use your common sense to say,

13   "Oh, well, it's common sense that they were outside,

14   and they were all talking."  That's a leap.  That's a

15   big leap.  That's not the person coming in in a

16   windowless room soaking wet.  The camera was there.

17   The store owner said she paid a company to put these

18   cameras in.  They were all functional, they were all

19   operational, and the digital video recorder was

20   recording every single thing for the entire time

21   sequence that's relevant in this case.  Nothing.  No

22   canvassing the area for potential witnesses, no

23   finding out who the guy with the gray hoodie is, and

24   not getting the camera that shows if anybody was doing

25   anything outside, because -- nine times, comings and

Page 69

1    goings out the front door, nine times.

2              Now the one officer said it was his job

3    to put the thumb drive in, and the thumb drive that he

4    put in the slot, and -- I'd like to take the whole

5    machine with you, you put it under your arm and out

6    the door you go.  You don't do that.  You put a thumb

7    drive in, and they look, and say, "Okay.  Well, he

8    said, well I looked, and I saw what was relevant, and

9    I took just those cameras."

10             But then he doesn't stop there.  I

11   think it was either him or somebody else.  They go

12   back to the precinct, now, and other people review the

13   video.  Now, if other people are reviewing the video

14   in a controlled setting, not right at the store when

15   -- right when this happened, now they're in a

16   controlled setting, they all have the opportunity to

17   sit down, have a cup of coffee, and look at it, and

18   say, "Okay, what's relevant?  How can we use this

19   evidence to charge these people with a crime?"

20             Nobody in the Philadelphia Police

21   Department notices that their coming and going out of

22   the store nine times, and think, "Well, let's go back

23   and get the camera for the outdoors?"  This is --

24   they're trying to prove a conspiracy, the Government.

25   You know, one person takes money, then everybody takes

1    money.  One person got a gun, everybody's got a gun.

2    One person does something, they're all responsible

3    based upon a law of conspiracy.  Where is the evidence

4    of that?  I think there could have been a whole bunch

5    of evidence, but we don't have it.

6                    What if Person A goes outside, and

7    nobody else is there.  He walks up the other way, and

8    down the other way, Person B comes into the store.

9    These are scenarios that could have happened,

10   absolutely could have happened, but they want you to

11   guess, and they want you to speculate, and they want

12   you to come back beyond a reasonable doubt, without

13   hesitating, that there was a conspiracy here of an

14   armed robbery.  No evidence.

15                   They had 20 days.  They had 20 days

16   before that DVR recorded the events of that day, and

17   based upon the number of bytes it was recording, it

18   started, then, rerecording.  So they had 20 days of

19   that evidence still being in that DVR that they could

20   have went back, did their job, and got what you need

21   to jump the bridge from hesitate to no hesitate.  Not

22   here.

23                   And look, I'm not blaming the police.

24   It's a hard job.  But when you have a crime, do what

25   you're supposed to do.  Don't come in here later on, a

Page 71

1   week, a month, a year, five years later, and ask a
2   jury to make a leap of faith that this was a
3   conspiracy when they didn't provide you everything
4   that was in their control or could have been within
5   their control had they have done their jobs.
6            This is real quick now.  The robbery,
7   unlawful taking by force, fear, again, I'm not going
8   to beat a dead horse.  I already said why my client
9   has a gun.  Whether you believe it or not, that's up
10  to you, and that's for your determination.  But that's
11  my interpretation of the evidence.  When, apparently,
12  the money, the $100 is exchanging hands, my client is
13  on the other side where the patrons stand.  He's not
14  behind the counter when this interaction is happening
15  between one of the individuals here and the store
16  clerk.  He's got his hands at his side or in his
17  pocket.
18            Now, the Commonwealth -- or the
19  Government said, well, he said, "Take everything."
20  That's from the witnesses.  If he said it, he said it.
21  I don't know if he said it.  That's for your
22  determination.  But if he's the only person in this
23  store, uncontroverted, proved beyond a reasonable
24  doubt, that had a loaded, functioning, operational
25  hand gun, he didn't take anything when he could have

1   cleaned the store out, according to Mr. Sanchez.

2                   I said the video is the Holy Grail.  It

3   could be the Holy Grail for the Government, it could

4   be the Holy Grail for the defense, because, I mean,

5   it's pretty much clear.  You've got angles of

6   everything, and it's bright, and it's fluid, and you

7   can see everything.  Look at it.  Look at the people

8   in the video.  Look at Mr. Sanchez, look at Mr.

9   Ventura, look at the store owner, I think Ms.

10  Rodriguez.  Do they look scared?  What is their

11  demeanor?  Judge their demeanor when you look at that

12  video tape?  If this is a robbery, a strong-armed

13  robbery -- look at everything.  Look at the facts.

14  Look at the totality of circumstances.  Do they look

15  like they just got robbed?  They're just kind of

16  hanging out.  I think Mr. Stevens shook the hand of

17  Mr. Ventura.

18                  Mr. Ventura had a cell phone the entire

19  time.  Remember, he actually -- he's on the phone with

20  the store owner, and he gives it to the other

21  individual, and the other individual has a

22  conversation, (indiscernible - 11:33:29) hear any of

23  this, and he gives it back to him.  He's got the phone

24  the entire time, doesn't call 911.  They didn't take

25  his phone.  Any of these people behind me, they didn't

1  stop anybody from leaving, to escape an armed robbery,

2  fear of death, fear of injury.  Just -- I'm asking you

3  when you go back, just to look at everything.  That is

4  common sense.  That fact is common sense.

5          Real quick, this is what I remember Mr.

6  Sanchez testifying to.  He confirmed there was an

7  outdoor camera.  He corroborated what the store owner

8  said.  Now, this is important, because they're trying

9  to prove a conspiracy that these three people

10  conspired to do this robbery, to steal stuff.  I wrote

11  down, and I put it in quotes -- again, this is the

12  pitfalls in closing.  I'm not trying to mislead you,

13  but I remember that Mr. Sanchez testified that Mr.

14  Stevens said, "Why, why, why?  Why is this all

15  happening?"  If you're in a conspiracy to steal stuff,

16  would you be asking "why" three or four times?  Like

17  what is going on here?

18          And again, I have another -- somebody

19  saying it to Mr. Sanchez, and Mr. Sanchez testified to

20  this, hopefully, if my notes are right, "All this for

21  $100," like you're pulling guns, and you're doing all

22  this for $100.  Are those statements alone the

23  statements of a conspirator in an armed robbery, if

24  they were said?  It's just another piece, another

25  piece to help you prove, or not prove, or reach a

Page 74

1   conclusion that the Government didn't prove each and
2   every element beyond a reasonable doubt.
3                   Again, I recall the testimony of Mr.
4   Sanchez stating, specifically, he testified this -- it
5   was -- he did not think it was a robbery.  And again,
6   if my notes are correct, again, I defer to what your
7   notes say, I believe Ms. Rodriguez testified that, no,
8   this was not a robbery.  They did not think it was a
9   robbery.  And that fits into what you see in the video
10  tape of their demeanor afterwards.
11                  Now, one other thing, for a robbery, it
12  could be the use of force or the threat of force.
13  Nobody threatened anybody.  Nobody threatened anybody.
14  I'm almost done.  No threats.
15                  Okay.  Now, I had brought up flight as
16  consciousness of guilt in my opening.  I said that,
17  which I usually don't do, because you don't want to
18  give too much, because they're going to have that in
19  their minds, like, "Oh, God, flight is consciousness
20  of guilt."  Why would you ever say that before the
21  jury started?  Because it doesn't matter in this case,
22  and I'm going to tell you why real quick.
23                  This is a quick aside.  I had a case in
24  State court where my client, he was probably, like 81,
25  82, years old.  The police responded to his home.  He

1    was -- he and his wife were estranged.  He was living

2    someplace else, and they go into the home on a welfare

3    check, and she's now deceased.  They run a check on

4    the plate number of my client and his credit cards and

5    where he could possibly be, because he wasn't at his

6    place, which is -- he was, like -- he lived close by.

7              Do you know where he was the next day?

8    In Utah.  And I believe I said he was 82 years old.

9    He didn't happen to know anybody in Utah.  He went

10   from Pennsylvania to Utah in 24 hours.  That is flight

11   for consciousness of guilt.

12             And why I bring that story up is

13   because who cares?  It's all in the video tape.  You

14   know why my client was there.  Do you need flight as

15   consciousness of guilt when everything -- this whole -

16   - every action that he did is on video tape in nine

17   cameras and shown to you for this jury trial?  It

18   sounds good for the Government, but does it matter?

19   When you go to a store to rob it -- and by the way, I

20   think the store owner said he's been there ten years,

21   she doesn't remember the Muslim man.  She'd never seen

22   the Muslim man.  I know Mr. Ventura said he did, but

23   the store owner said no, never been there before.  But

24   the Government wants you to believe that, "I'm going

25   to go a store where nobody knows me, where maybe I can

Page 76

1  rob them, because I'm not known," but he robs it with
2  the two people that are at the store every day.  One
3  lives right up the street.  Again, does this -- any of
4  this make sense for a robbery?  No attempt to conceal
5  his identity.  He's already with two people that --
6  one lives right up the street.
7                    And again, I stress that, because when
8  you -- when an attorney stresses something during
9  their cross-examination or direct examination, it's
10  because they want to bring home a point at closing,
11  which I'm going to do right now.  This screen, which
12  is -- it's much -- this is much larger than what was
13  there at the store.  That screen -- that monitor that
14  shows the real-time capture, real-time live feeds, is
15  prominently and proudly displayed in the area where
16  all the patrons are.
17                    Assuming that when my client is robbing
18  the store at gunpoint, he's on video tape without a
19  mask, with a black hat that has silver letters that
20  says "Legend" on it, does any of this make sense?
21  Does it make sense that somebody's got a loaded gun,
22  my wife's in the store, now I'm in the store, and I'm
23  going to disarm them?  That makes sense, irrespective
24  that I'm being recorded, irrespective that the two
25  people that I'm with and I'm allegedly conspiring

Page 77

1   with, have been in the store every day and live up the

2   street.

3            The same thing -- and I see the word

4   "conclusion."  I'm going to get there real quick.  The

5   same thing with alibi.  You've heard that the tape.

6   Whether it's him or it's not him, my point is it does

7   not matter when you look at all the evidence.  So my

8   argument for him fleeing and eluding, flight as a

9   consciousness of guilt, same thing with the alibi,

10   same thing.  Who cares?  You have all the evidence in

11   the world you need for this.  You have all the

12   evidence in the world you need for this to come back

13   with, I hope, a not guilty, but that's up to you.

14            So what he does afterwards, you already

15   know what he did.  You don't have to fill in the gaps.

16   That instruction is a horrible instruction for a

17   defense attorney when you have to fill in the gaps,

18   like why my 82-year old client was in Utah the night

19   after his wife was found deceased in her home.

20            In conclusion, I want to thank you very

21   much for your time, and I can tell you're all paying

22   attention.  This was a relatively long case, and a lot

23   of stuff you have to consider.  I would ask you again,

24   please, the Judge is going to tell you, and I'm going

25   to implore you, decide this case based upon the

1   testimony, the evidence as it relates to the jury
2   instructions, and your common sense, and your life's
3   experience.  Do not decide this case, as I believe the
4   Government wants you to do, on guessing and
5   speculating.  I think there's way too many holes in
6   this case that you have to -- and it goes well beyond
7   common sense, and you have to guess and you have to
8   speculate, and you cannot do that in a criminal case
9   to see if they met their burden of beyond a reasonable
10   doubt of whether you will or you will not hesitate.
11           My suggestion is when you get it all --
12   the Judge gives you the case to go back and
13   deliberate, you will hesitate, and if you hesitate,
14   then I would submit for the jury's consideration that
15   there's only verdict, and that would be not guilty to
16   all the charges.
17           And I've got to do this as an aside,
18   if, which I don't believe you can, you find beyond a
19   reasonable doubt, then you go to the justification
20   instruction for my client, Donnie Smith.  And again,
21   it's not that burden, it's a burden of preponderance,
22   does the scales tip to one side or the other.
23           I would submit based on what I think
24   the evidence showed, that's uncontroverted, where you
25   don't have to guess and speculate, just based on what

Page 79

1    the video is, and what they did and didn't do, and

2    what the witnesses said and didn't say, that the

3    scales would tip in the favor of my client.  And if

4    that is the case, then you'll come back with a "not

5    guilty."

6                    One more thing and I am done.  I asked

7    you this in my opening.  I'm going to say it in my

8    closing.  Who brings their wife to a robbery?

9                    Thank you.

10                   THE COURT:  Thank you.  It's 22 minutes

11   of 12:00, a little late for a mid-morning break, but

12   we'll break now for 10 minutes, and then we'll hear

13   from Mr. Wittels and Ms. Meehan.  Michael.

14                   THE CLERK:  All rise.

15        (Jury out)

16                   THE COURT:  We're in recess for 10

17   minutes, everyone.

18        (Recessed at 11:43 a.m.; reconvened at 12:04

19   p.m.)

20        (Jury in)

21                   THE CLERK:  All rise.

22                   THE COURT:  Be seated everyone.  Mr.

23   Wittels, are you ready to proceed?

24                   MR. WITTELS:  I am.  Good afternoon.

25                   (Chorus of good afternoon.)

Page 80

```
 1              MR. WITTELS:  I am Barnaby Wittels.  I
 2   represent Abid Stevens.  He's the gentleman in the
 3   plaid shirt right over there.  You'll remember him
 4   from the video as the gentleman in the gray or white
 5   track suit -- sweats.
 6              As I look at you, and I've paid
 7   attention to you over the three days you've heard
 8   testimony, I am reassured to have my client's fate in
 9   your hands.  You've been attentive, you've taken
10   notes, you've listened to both sides.  I've noticed in
11   the closings, you listened carefully to the Government
12   and to Mr. Patterson, and I know you will accord me
13   that same respect and attention, and I appreciate it.
14   Mr. Stevens appreciates it.
15              One often wonders how it is that you --
16   a jury can sit in judgment of another human being, but
17   you should be reassured that people in this country,
18   citizens, have been sitting where you sit since the
19   founding of this country, not necessarily in this
20   courthouse.  And there have been changes over time.
21   In the beginning, it was all white male property
22   owners who sat on juries.  Now we have women, people
23   of color, people who rent as opposed to own, and
24   they've been able to do this.
25              One of the remarkable systems -- things
```

1    about our system of justice is that jurors, everyday

2    citizens, decide on questions of guilt and innocence.

3    They sit as the judges of the fact, and they do it

4    confidently, and they have done that, as I said, for

5    centuries.  So I know you'll be able to do this.

6                      Excuse me while I get some water.

7                      Now, I don't think I'll go as long as

8    the Government did or Mr. Patterson.  I'm old school.

9    You can tell by my gray hair that I've been doing this

10   for a while.  I don't do audio-visual.  I don't know

11   how to do it.  I can't do what Ms. Martin did.  I was

12   impressed by it.  It was a nice show.  But I have

13   always just stood here and talked to juries, one

14   person to a group of 12.  So let me do that with you.

15                     I've been doing this a long time, as I

16   said, and I had never, ever seen a case like this.

17   It's the darndest -- if this was a robbery, it's the

18   darndest robbery I ever saw.  And you can use your

19   common sense and life experience to watch that tape

20   and come to the same conclusion.

21                     You know, it's funny.  The only people

22   who called this a robbery were the police and the

23   Government.  In the beginning, the radio call is

24   "theft in progress."  That's then upgraded by the

25   police radio.  Remember we had that testimony about

1    how the police operator receives the information from

2    the caller, types something that goes over to the

3    Dispatch Center, then goes out over police radio?

4    This somehow gets upgraded to "robbery in progress."

5                Nobody who was there uses the term

6    "robbery."  Mr. Ventura didn't.  Mr. Sanchez and Ms.

7    Rodriguez, when I asked them the question, they said

8    -- agreed that it was an argument.  Now, who's right?

9                It's a funny thing, there's an old

10   saying, "To a hammer, everything's a nail."  I suggest

11   to you that in this case, the Government perceives a

12   nail, they perceive a robbery, and they proceeded

13   along that theory.  But that's a theory, not a fact.

14   You're the ones who decide the facts.

15                You know, I was watching the Super Bowl

16   last night with my wife, and I noticed a couple of

17   things, that while they showed the game, every now and

18   then, they'd stop it, and the commentators would

19   argue, "Was that a touchdown," "Was that pass

20   interference?"  I'm sorry if some of you don't watch

21   football, but bear with me.  And what would happen?

22   They'd go to the tape.

23                Now, here today and during the case,

24   the Government has gone to selected portions of the

25   tape, not the whole tape.  You have to ask yourself

Page 83

1   why they'd do that, because we also saw some ads on TV

2   last night, and I think I might like the ads better

3   than the game sometimes, and I noticed that in ads,

4   when they're advocating a position, you get little

5   snippets of tape, especially in the political ads, and

6   we had some on both sides.  These didn't show you a

7   stretch of reality, they showed you what they wanted

8   you to see.

9                   So I was listening to the Government on

10  their -- during the presentation of their case and

11  during Ms. Martin's excellent closing argument, and

12  I'm thinking, "Why not just show the whole tape?"  Why

13  not show all the tapes, because we -- you're going to

14  take back with you, as Government Exhibit 1 A and B,

15  are what the Government compiled as a tape of the

16  event.  And Mr. Cowen's (phonetic) right, Mr.

17  Patterson's right.  It's what the Government, the

18  police selected, but that didn't show you everything.

19  It shows you a good deal of it, and the Defense has

20  submitted video of its own.  So I ask you, look at the

21  tape and decide.  Look at all the tape and decide,

22  because if it was me, I'd play the tape, the whole

23  tape.  And I'd play -- I asked that they play a good

24  portion of the tape when I was going to cross-examine

25  Ms. Rodriguez.

Page 84

1            I want you to ask yourself some

2    questions.  You know that Ms. Rodriguez, for example,

3    was watching this all unfold on her phone.  She has an

4    app for that.  She then goes to the store.  She

5    doesn't seem like she's crazy to you nor to me.  Who,

6    in their right mind, walks into an armed robbery?

7    Nobody.  Who walks into an argument to try and resolve

8    it?  Well, the store owner.  Right?  Who in their

9    right mind acts like Mr. Sanchez when he's trying to

10    resolve things?  Nobody.  Who in their right mind lets

11    the mother of their child walk in to an armed robbery?

12    Nobody.

13            Now, as you watch the tape, ask

14    yourself if what Mr. Ventura told you is true, that he

15    doesn't speak English, just enough to make a

16    transaction.  Watch the tape, and you'll see him

17    gesturing and talking to Mr. Stevens and other people.

18    Well, we know he's not talking to Mr. Stevens in

19    Spanish, because he also told you that the customers

20    don't speak Spanish.  He might be talking to Mr.

21    Sanchez at times in Spanish.  We don't know.  I sure

22    wish there was sound, but there's not.

23            So the evidence is for you to judge,

24    but what I saw on the tape and what I heard from the

25    witnesses was there was a dispute about money, about

Page 85

1    what did or didn't come out of the ATM.  And it's for

2    you to decide whether or not Mr. Quinn is trying to

3    pull a fast one or not.  That really doesn't concern

4    Mr. Stevens, because he doesn't come into the picture

5    until after that.  He would have no knowledge of what

6    Mr. Quinn is up to with regard to the money.

7              What we do know is that Mr. Quinn is

8    being aggressive, and that then Mr. Ventura, for

9    reasons we don't know, decides to pull out the store

10   gun, puts it down by his side, and later you saw, when

11   Mr. Stevens is trying to explain to Ms. Rodriguez what

12   happens, that he does this (indicating).  Even in the

13   time of silent movies, you know, people made gestures,

14   and you know what they meant.  It was him trying to

15   tell Ms. Rodriguez, he cocked the gun.

16             So what happens?  Well, not their

17   proudest moment, I'll tell you that.  Not something I

18   would do, not something I would convict him over,

19   either, but that's for you to decide.  They come back

20   in, and there's a lot of waving of guns.  And then the

21   guns get put away, the store clerk gives Mr. Quinn the

22   money, they take the gun away from Mr. Ventura, which

23   is probably a sensible thing to do, after all, he's

24   the guy that pulled the gun and he cocks it.  What

25   would you do?  Say, "Okay.  Yeah.  Hold on to your

Page 86

1    gun.  Keep it in your pocket.  No problem."  You would

2    disarm him.  Why?  You don't know what he's going to

3    do.  He seems, both on the stand and in the -- on the

4    tape, to be a rather excitable guy who can overreact

5    to things.  Now, again, he's put in a pressured

6    situation, no doubt about it.  Mr. Quinn is being

7    aggressive; they're being aggressive.  It's scary, but

8    it's not a robbery.

9               And now I want to focus mostly on Mr.

10   Stevens.  He lives on the block, he's well known.

11   They all identify him, even if they don't know his

12   name.  Identity is not a question in this case for

13   anybody, but for Mr. Quinn -- Mr. Stevens, you know,

14   that's his store.  That's his neighborhood store, down

15   the block from his house.

16               Now, he's got to know that there are

17   cameras all over the place so that whatever you do

18   gets recorded.  And in fact, everybody knows that,

19   because the screen is right out there in front of the

20   cashier's desk.  And it's a good thing, because it

21   tells people, "You're on camera," you know, "We're

22   going to know what you're doing."

23               So you see him -- and by the way, who

24   stays at a robbery that long?  He stays until the end

25   and then some.  The police cars go flying by, and we

 1    know from the testimony of the officers they had

 2    lights and sirens on.  The first officer said he cut

 3    his lights and sirens when he got there, but the other

 4    officer who you see going back, you know, along the

 5    street, they've got lights and sirens on.  He sort of

 6    turns his head and keeps on talking.  Now, if you've

 7    just been part of a robbery, don't you beat feet?

 8    Don't you leave?  Don't you run?  Don't you go and

 9    hide somewhere?  What kind of event is this?

10                It was very interesting that Ms. Martin

11    would say, "Oh, it's not a dispute."  You're right.

12    It's not a dispute, it's a full-blown argument, a lot

13    of anger, a lot of people somewhat out of control, but

14    you know, when Ms. Rodriquez comes in, you see Mr.

15    Stevens trying to explain it to her.  And you watch

16    the tape, he stayed there.  He leans on the ice cream

17    stand.  You've just committed a robbery, is that how

18    you behave?  You lean on the ice cream stand, you

19    relax?  You're somewhat animated and relaxed at the

20    same time?

21                And what did he say?  Well, we know

22    some of it, but we don't have the sound.  From the

23    witnesses, we know he says, "I'll fix it.  I'll get

24    the gun back."

25                When he goes to Mr. Sanchez, like --

1    Mr. Sanchez goes like this, his hands up, and it's

2    because, "Hey, take it easy."  That's what he said.

3    He's trying to indicate to Mr. Stevens, take it easy,

4    tempers are hot, blood's running hot, take it easy.

5    That's what Mr. Sanchez is trying to say.

6              Mr. Ventura says, "Yeah.  I shook his

7    hand.  I wanted to calm him down."  If you've just

8    been robbed, do you shake the robber's hand?  Does

9    that make any sense at all?  Of course not, but if

10   you've had an argument with somebody, what do you

11   often do?  You've had arguments, sometimes loud

12   arguments, maybe with the spouse, a neighbor, or

13   friend, a family member.  At the end, what do you

14   often do?  Well, guys more often than the women, you

15   shake hands.  Okay.  It's resolved.

16             The Government has made a great deal

17   out of Mr. Stevens saying, "I'll be back," like Arnold

18   Schwarzenegger in "The Terminator."  "I'll be back."

19   And "This is my block.  I'm going to shut you down."

20   Well, I asked on cross-examination, and I'll suggest

21   to you now, that we often say things in anger that we

22   don't mean, only half mean.  And Mr. Stevens was very

23   angry.  You can see that from the tape.  There's no

24   disputing that.  And he could have behaved better.

25   They all could have.  But some of those things that

1    are said in anger are not true.  Threats issued in

2    anger are not true.  They're talk.  You can't convict

3    somebody on talk.

4              Now, the Government said, "Oh, were

5    they ever back?" like that means something.  Well,

6    hell, they all got arrested.  That's why they're here.

7    We all know they got arrested.  Are they going to be

8    back after that?  Of course not.

9              If you had an argument in a store,

10   whether you're right or wrong, and they called the

11   cops, and the cops then arrest you, are you going to

12   go back to that store?  No.  Why is the Government

13   trying to say that sort of thing?  Well, they want you

14   to make an inference, an inference that they had some

15   guilty conscious, when that's not the case at all.

16   That's not why they don't go back.

17             And you can see the weakness of the

18   Government case -- of the Government's case when they

19   try and make that kind of inference to you.  You can

20   see the weakness of the Government's case when they

21   only show you snippets of the tape.  You can see the

22   Government's case when they tiptoe to the edge of

23   making inferences they shouldn't and then back away.

24   Like I said, nobody called this a robbery but the cops

25   and the Government, because it wasn't.

1              In the end, it's going to be up to you

2    to make a decision.  I'm not going to talk to you

3    about the law.  I'm not going to define reasonable

4    doubt for you, because that's the Judge's job.  I'm

5    not going to talk to you about burden of proof.  Our

6    proof is the tape.  It was introduced by the

7    Government and some by the Defense, by Ms. Meehan.

8    It's there for you, there for you to examine and

9    decide.  The Judge will give you the rules of how you

10   proceed and how you weigh evidence, but use your

11   common sense.

12             You know, you can't make a camel and

13   call it a horse.  A camel is not a horse.  They all --

14   both are on four legs, but one is a radically

15   different animal than the other.  You can't call

16   something it's not.  You just can't, and you

17   shouldn't.  And you shouldn't fall for it.

18             I'm going to ask you to come back with

19   the only reasonable verdict in this case for Mr.

20   Stevens, the man who stayed, the man who tried to

21   explain things, the man who said, "I'll get your gun

22   back.  I'm trying to fix it."

23             Now, one thought, if Mr. Stevens is so

24   clever, so Machiavellian that in an instant, he

25   switches from a robber to a guy who's trying to work

1    it out as a way of covering it up.  No.  Maybe you see

2    that in the movies.  Maybe that's some thought of a

3    Hollywood script writer, but this is real life, and in

4    real life, people don't act like that.  They don't

5    flip the switch like that.  What you see on that tape,

6    plus what we showed you and when you see the whole

7    tape, even from the snippets that the Government

8    showed you, is a man who's not involved in a robbery.

9            Now the Government makes a great deal

10   about what might have happened outside, and Mr.

11   Patterson makes an excellent point, where is the tape?

12   Wouldn't it be nice to have the tape from that camera?

13   We don't.  And if you watch the tape, the whole tape,

14   you're going to see customers in the store.  Some

15   people were there for the whole -- what kind of

16   robbery is it where the customers stay?  What kind of

17   robbery is it where people go up to pay for goods?

18   You can make an inference yourselves, if you want, as

19   to why those people aren't here.  And I'll be honest

20   with you, sometimes it's because they don't want to

21   get involved.  That's normal.  Sometimes it's because

22   what they have to say won't be in the favor of the

23   Government, and you can make that conclusion.

24            Mr. Patterson said, "Wouldn't you like

25   to have that guy in the gray sweatshirt who stays for

Page 92

1    the whole thing?"  He's not a part of any argument.

2    He's just standing there, right?  People come and go.

3    The Defendants come and go.

4                    This is so far from a robbery, and it's

5    so much like an argument.  A robbery, you run in,

6    "Give me the money," get all the cash you can, and you

7    split.  By the way, did you notice that all the money

8    that was in the register?  Mr. Ventura said, "I don't

9    really know.  There were 10s, there were 5s, there

10   were 20s, there were 1s."  All that was given back is

11   the $100 that Mr. Quinn claims he's owed from the ATM.

12                   Did people handle this the right way?

13   No.  Was this a crime?  Was this a robbery?  No.

14                   Now, I suggest to you if you find not

15   guilty on the Hobbs Act robbery, you have to find not

16   guilty on the gun, because the way it works is the gun

17   has to be used in a crime of violence.  And if there's

18   no crime of violence, then it's got to be not guilty

19   on the gun, too.

20                   So in the end, deliberate as long as

21   you need to.  Deliberate well and wisely, but I ask on

22   behalf of my client, Abid Stevens, return a verdict of

23   not guilty on both counts.

24                   Thank you.

25                   THE COURT:  Thank you, Mr. Wittels.

Page 93

1    It's almost 12:30, ladies and gentlemen.  I think

2    we'll recess for lunch now rather than having Ms.

3    Meehan have to, "Fight the clock."  We won't do that.

4              But let's try to get back just a little

5    early, and I'll tell you what we're going to do this

6    afternoon.  We'll hear closing argument from Ms.

7    Meehan, and then the Government will have a short

8    rebuttal, and then I will instruct you on the law.

9    And we'll get all of that done this afternoon.

10             You will begin deliberating this

11   afternoon, and normally, we recess for the evening at

12   quarter of 5:00 or so.  Today is a different day.  We

13   may recess at a quarter of 5:00, but if you've started

14   deliberations and want to continue deliberations,

15   you'll ask me whether you can do that, and I'll talk

16   to counsel.  In all probability, we would say "yes,"

17   and you can remain for a time.  If you choose to have

18   dinner sent in, we can arrange to have dinner sent in.

19   You won't be required to stay any particular length of

20   time.  When you choose to leave, you'll send us a note

21   and tell us that "We're tired, we want to go home,

22   we'll start again tomorrow," and we would permit that.

23             I'm telling you this now so that you

24   can let folks at home know that tonight might be a

25   slightly different evening with respect to your

Page 94

1    schedule, but you will be the ones to call the shots.
2    In other words, we won't keep you here if you decide
3    at the end of the charge, for example, that you want
4    to go home.  You'll go home.
5                  But again, if you wish to stay, we can
6    work that out.  And if you stay and miss a ride, or a
7    train, or a bus and have an unreasonable delay, we
8    would arrange to send you home.  I'd better describe
9    this carefully.  I don't want you thinking that
10   individual stretch limousines to go home.  No, but
11   we'll arrange to send you home if you miss a ride, or
12   a bus, or a train and have an unreasonable wait.  We
13   don't want you hanging around the city late at night.
14                  I tell you this just so you can --
15   well, first of all so you will know what the schedule
16   will be, and number two, so that you can let folks at
17   home that you might be a little late.
18                  And again, I want to end on the note if
19   you wish to go home at the end of the charge or any
20   other time, you'll send us a note, and you'll go home.
21                  All right.  Is there anything else we
22   have to say before we excuse the jury?  Government?
23        (Chorus of no)
24                  THE COURT:  Okay.  Let's try to get
25   back around quarter after 1:00.  It's 12:30 now.

Page 95

1              THE CLERK:  All rise.

2        (Jury out)

3              THE COURT:  Be seated everyone.  There

4    are some things that we have to attend to.  The

5    stipulations, Ms. Meehan, you're going to get me a

6    corrected stipulation?

7              MS. MEEHAN:  Yes, Your Honor.

8              THE COURT:  And then I will file the

9    three stipulations.  We need to talk briefly about a

10   procedure for viewing the video.  Have you agreed on a

11   procedure?

12             MR. ECKERT:  I believe that we have,

13   Your Honor, and that would be that the jurors would

14   have their own laptop, so they wouldn't have to come

15   back and forth.  We've provided them with the CD.  And

16   I believe one of the folks from the IT Department in

17   the courthouse would go back there at the beginning of

18   the deliberations and just show them how it worked.

19   And then, of course, the part -- they'd be free to --

20   the jury would be free to view it as much or as little

21   as they need.

22             THE COURT:  Is that agreeable to

23   everyone?  Mr. Patterson?

24             MR. PATTERSON:  It is, yes, Judge.

25             THE COURT:  Mr. Wittels?

1                    MS. MEEHAN:  Yes, Your Honor.

2                    MR. WITTELS:  Yes.

3                    THE COURT:  Ms. Meehan?  Fine.  I'll

4     take care of that.

5                    Exhibits.  Has the Government compiled

6     a book of the exhibits that were received in evidence?

7                    MR. ECKERT:  We have, Your Honor.

8                    THE COURT:  And there's an exhibit

9     list?

10                   MR. ECKERT:  We will get that up -- we

11    will get that up.

12                   THE COURT:  Fine.  And we'll give that

13    to the jury.  And, Ms. Meehan, you're the only other -

14    - well, the only other party who's offering any

15    exhibits.

16                   MS. MEEHAN:  Yes, Your Honor.

17                   THE COURT:  And what do you have?

18                   MS. MEEHAN:  I think what -- I have

19    what we reviewed the other day, Your Honor, which was

20    D 1-A, which consisted of D 1 through 6, which was the

21    entire video.  Your Honor, if you'd bear with me for a

22    moment.  I'm sorry.  D9, 10, and 11.

23                   THE COURT:  Do you have an exhibit list

24    for those exhibits?

25                   MS. MEEHAN:  8, 9, and 10.  I'm sorry.

1    I thought that the Court had that, but I can --

2                    THE COURT:  No.

3                    MS. MEEHAN:  I can get that together.

4                    THE COURT:  I have what you gave me for

5    trial purposes, but that's not an exhibit list that

6    I'm going to give to the jury.

7                    MS. MEEHAN:  Very well.

8                    THE COURT:  I need an exhibit list that

9    will go out with the jury.  For example, they'll get a

10   disk -- they won't know what it is.

11                   MS. MEEHAN:  Right.

12                   THE COURT:  You need an exhibit list

13   covering the, I think, the three photos that were

14   received in evidence and the two disks.  I need those

15   five exhibits and an exhibit list.

16                   MS. MEEHAN:  Very well.  Thank you.

17                   THE COURT:  All right.  Then we're in

18   recess until quarter after 1:00.  You may go about

19   your business.

20                   THE CLERK:  All rise.

21                   (At 12:33 p.m., proceedings recessed

22   for lunch.)

23

24                        *  *  *  *  *  *

25

Page 98

1                A F T E R N O O N   S E S S I O N

2                        (1:24 p.m.)

3                THE CLERK:  All rise.

4                THE COURT:  Be seated, everyone.

5                All right.  Ms. Meehan, are you ready

6    to proceed with your closing?

7                MS. MEEHAN:  Yes, I am, Your Honor.

8                THE COURT:  We will hear your closing.

9                MS. MEEHAN:  Good afternoon.  Welcome

10   back.  I represent Mr. Quinn.

11               The Government is trying to prove

12   something here that just didn't happen.  They're

13   offering you a buffet of versions and theories,

14   plural, you heard that in the Government's closing.

15               But we all know what a robbery looks

16   like.  Somebody or more than one person goes in,

17   they're wearing a mask, maybe a hoodie, glasses,

18   hiding their identity, they're in and out as fast as

19   possible, they take as much money as possible -- take

20   -- they take as much money, anything and everything.

21               You know that's not what happened on

22   March 22nd.  Mr. Quinn is at this store every day,

23   sometimes multiple times a day.  You know that from

24   Ms. Rodriguez, and sort of, kind of, you know that

25   from Mr. Ventura.  And but for what happened on March

1   22nd, he would've been back the following day, and the

2   day after that, and the day after that, using the ATM,

3   buying cigarettes, doing what he's done every single

4   day.

5           And you'll recall Ms. Rodriguez said,

6   "Always seemed like a nice guy."  She told you that.

7   "He always seemed like a nice guy." So this was out of

8   character for Mr. Quinn this day.

9           So on March 22nd, after using the ATM

10  in the store several times that day, and you'll have

11  G20 -- G49, excuse me -- you can look at that, and you

12  heard from the bank witness, that Mr. Quinn had

13  actually taken out $220, not 20, 200: 100, 100, and

14  then 20; and, of course, that doesn't include the bank

15  fees on both sides, Mr. Quinn's bank and the store

16  that makes some money from that.

17          So he took out $220, and he tries to

18  buy cigarettes, and Mr. Ventura tells him -- Mr.

19  Ventura says, "This isn't real money.  This is fake."

20  He won't take Mr. Quinn's money in order to sell the

21  cigarettes to him.  And Mr. Quinn says, "But this

22  money came from your machine," and he spreads it out,

23  and you'll see this on -- this is actually on camera 8

24  at 4:51:51.  So he did throw it down, and then he

25  spreads it out for him, "Look, this is from your

1    machine."

2                     I don't know if that obviously looks

3    like counterfeit, but how would Mr. Quinn know that?

4    So, he's -- they're arguing back and forth, and back

5    and forth, and Mr. Quinn is trying is trying to get

6    reimbursed.  He's trying to get reimbursed for the

7    money that came from his account from that store ATM.

8    And every store witness told you that this was about

9    the money from the ATM machine, every store witness:

10   Mr. Ventura, Ms. Rodriguez, Mr. Sanchez.  "I want my

11   money, I want my money."  So Mr. Quinn wants his

12   money, he wants to be reimbursed.

13                    And don't let the Government argue that

14   this was a scam.  First, they said, "Oh, well, this is

15   a scam."  There's absolutely no evidence of that.  You

16   just saw him trying to show Mr. Ventura, "This is from

17   your machine."  And then Government counsel said,

18   "Well, if it's not a scam, then picture this."  So,

19   you can't have it both ways.

20                    This was not a scam, and why would Mr.

21   -- think about this, he's there every day, this is his

22   store, this is his habitat.  Why would he try to scam

23   a store that he's in every single day?  He seemed --

24   always seemed like a nice guy.  This is not the guy

25   who's trying to scam the store.

Page 101

1           If you're going to do that, you go to a

2     store you've never been to before, and you never

3     intend to go back to, and you know that.

4           So, Mr. Quinn is really upset, and he

5     gets more upset, and Mr. Ventura puts Ms. Rodriguez on

6     the store -- on his phone.  I assume it's his personal

7     phone.  So, and, again, what robbery -- in what

8     robbery does that happen?  So Mr. Quinn gets on the

9     phone, and Ms. Rodriguez is trying to explain to him,

10    "I can't take care of this now, I have to call the ATM

11    guy, and then do this and that."  And he's getting

12    more upset, because he can see that he's not getting

13    his hundred dollars back that day.

14           And make no mistake about it, if in

15    fact the Government thought for one minute that this

16    was a scam, they would've been able to investigate the

17    ATM machine.  And they had ample time to do that, and

18    there's no evidence of that.

19           So, Ms. Rodriguez is on her way, she's

20    driving there, and Mr. Quinn is still yelling over and

21    over again, "Give me my money.  Give me my money."  He

22    goes behind the counter, and this is of some

23    significance, because Mr. Ventura tried to convince

24    you that Mr. Quinn not only was saying, "I want my

25    money, I want my money," but he's also saying, "Give

Page 102

1   me the Glock.  I want the Glock."

2            But I want you to take a look at this,

3   and you'll have this, this is D-1A, and it's got all

4   the cameras.  This is -- you'll see camera 7 in the

5   corner here, and the time up there (indicating).  Look

6   at Mr. Quinn.  He is aggressive and obnoxious, but he

7   is in Mr. Ventura's face.  There is no way he is

8   looking over here (indicating).  He never looks over

9   there (indicating).  And you've seen the exterior of

10  this cubby.  You've seen it.  There's all kinds of

11  clutter.  You can't possibly see what's in those

12  cubbies as a customer.  And we know he'd never been

13  behind the counter before March 22nd.

14            So, and then he backs up.  So there is

15  just absolutely no way -- how would you possibly know

16  where the gun is, and that it's a Glock?  So that is

17  just not very credible.

18            And you'll remember Mr. Sanchez was on

19  the witness stand, and he was asked, I believe, on

20  direct, "Did you hear everything?" and he said, "Yes,

21  I could hear everything."  And he told you, Mr. Quinn,

22  over, and over, and over again, "I want my money.  I

23  want my money."  You never heard from Mr. Sanchez that

24  Mr. Quinn said, "Give me the Glock."  And that's

25  really significant.  And you should be questioning

1    that about Mr. Ventura's testimony.

2                     So, and you'll recall, just as an

3    aside, you saw Mr. Ventura as a witness, and I

4    understand, and I'm not disrespecting him.  I'm sure

5    he doesn't -- maybe he doesn't speak good English, but

6    he had an interpreter on both days of his testimony.

7    And I asked him, "Do the customers call you Jay, or

8    Papi?"  And that was a 10-minute answer.  So think

9    about his demeanor on the witness stand when he was

10   testifying.  That exchange, "I want the Glock," just

11   simply never happened.  That is fiction.

12                     So, Mr. Quinn goes behind the counter,

13   and Mr. Stevens comes in the store, and Mr. Stevens,

14   as you know, is another frequent customer, and he is

15   trying to figure out what's going on, why is his

16   friend, Mr. Quinn, yelling, what's going on.  He

17   wasn't there for the ATM discussion.  He wasn't there

18   when Mr. Quinn was on the phone, on speaker phone,

19   with Ms. Rodriguez.  He doesn't know what's going on.

20                     But there are other customers in the

21   store.  Everybody's milling about, and you'll recall

22   not a single customer, not a single customer called

23   the police.  No one called 911.  Because what they

24   were watching was a very upset and angry Mr. Quinn in

25   an argument, in -- engaged in an argument with Mr.

1    Ventura, trying to get his money back that was from

2    his bank account from the store's ATM.

3                    And then things escalate, and Mr.

4    Ventura pulls the gun out from the cubby.  You saw Mr.

5    Quinn step back, remember you saw that, and then

6    you'll see on the same video, that Mr. Quinn is on the

7    side trying to exchange -- you'll see him on the side

8    of the counter, if you watch the whole video, he's

9    still trying to pass the money to Mr. Ventura, the

10   hundred dollars in exchange for the money from the

11   register.  And he's still very frustrated.

12                   And then he leaves when -- after Mr.

13   Ventura pulls out the gun, he says, "I'll be back."

14   So what?  He's still angry, as you know.  You saw him,

15   and he comes back into the store -- well, he leaves

16   the store at 16:54:54.  Mr. Stevens is still in the

17   store, still trying to figure out what's going on.

18                   And then it's at some point after Mr.

19   Quinn leaves, he's no longer in the store, that Mr.

20   Ventura cocks the gun.  And we're going to look at

21   camera 7, at 16:54:55, when you see this, this motion

22   (demonstrating), and you heard co-counsel, Mr.

23   Patterson, ask the police about how you would ready

24   the gun to be fired.  Mr. Stevens reacts to that, and

25   he leaves the store at 16:55:14.

Page 105

1            And now as Mr. Stevens is leaving --

2    and this timing is really important, and that's why

3    you saw a chart from Mr. Patterson, and that's why the

4    sequence on the video, which is really the best

5    witness, the video.  Not stills, because that doesn't

6    really show the whole story, but what was going on

7    real-time, second by second, minute by minute.

8            You'll see here at 16:55, Mr. Stevens

9    leaves -- there he is, 13, this is on camera 13,

10   16:55:13, he's walking out of the store, and then just

11   one second later, one second later, Mr. Quinn, there

12   he is (indicating), you can see the corner of his

13   sweatshirt there on the left side of the monitor, on

14   the shoulder of Mr. Sanchez.  Mr. Sanchez is in the

15   doorway there.  Here comes Mr. Quinn, after Mr.

16   Stevens has just stormed out.

17           Mr. Quinn comes in, and he's back in

18   the store, and here he is (indicating) still yelling

19   at Mr. Ventura, still yelling at him, and he's still

20   mad.  Now, watch this part.  He's still yelling.

21   We're at 16:55:29, and, again, you can see the

22   Plexiglas how much stuff there is, remember I had

23   mentioned, you couldn't possibly know where a gun is

24   on the other side of that.

25           Now, here we are, and it is, I think,

Page 106

1    31 seconds later that Mr. Smith will come into the

2    door.  Here he is (indicating), here comes Mr. Smith,

3    16:55:48, and he, sort of, goes right by Mr. Quinn

4    who, sort of, gives him a passing glance.  And right

5    -- look at this, and this is actually also G --

6    Government 1-C23.

7                   Look at Mr. Sanchez's face in the left

8    corner of the monitor, look at Mr. Quinn.  Look at

9    him.  He's surprised.  He's just as surprised as Mr.

10   Sanchez.  This is right at the moment where Mr. Smith

11   has pulled out a gun, or whatever it is.  You're to

12   determine that.  But he has pulled something out, and

13   look at Mr. Quinn's face.  He is just as surprised as

14   the store employee.

15                   This was not a plan.  There was no

16   advance knowledge here.  There's no evidence.  In

17   fact, there's an opposite of advanced knowledge here.

18                   So, then right after -- now, look at

19   Mr. Stevens' face.  He's looking over, too.  And I'll

20   leave it for you, ladies and gentlemen, to determine

21   what you see on Mr. Stevens' face as well.

22                   So Mr. Stevens comes in, and that's at

23   16:55:57, and this is all on camera 13, and this is

24   all part of D-1A, and the Government's G-1 as well.

25   And Mr. Quinn looks down, and you'll see when Mr.

1    Stevens comes in -- and if we could play that -- he

2    practically pushes Mr. Quinn into the Plexiglas, and

3    then Mr. Quinn, sort of, swats at his hand, or tries

4    to push his hand down.

5                    Can we play that again (indiscernible -

6    1:37:01)?  Watch this.  And he's trying to, "Hey,

7    don't -- what are you doing?  Come on."  Remember, Mr.

8    Stevens doesn't know about the ATM machine, and

9    there's no evidence that Mr. Smith knew about what

10   this yelling was all about from -- by Mr. Quinn.

11                   So, Mr. Stevens -- so you see Mr. Quinn

12   go into the Plexiglas and then at some point -- so

13   this right here (indicating), this is evidence of

14   spontaneity.  That's what that was.  That was

15   spontaneous.  There's no advance plan, there's no

16   advance knowledge.

17                   And the Government is trying to argue

18   that these three must've concocted this somehow

19   outside.  But this is why the timing is so important,

20   because you saw Mr. Stevens and Mr. Quinn, like, cross

21   each other in a second or two.  I think the Government

22   said two.  It's over a second or two.  And then Mr.

23   Smith isn't in the store at any moment, but, oh,

24   something must've happened outside.

25                   Well, that's just absurd, because you

1    heard from Detective O'Brien (phonetic), and his exact

2    words were -- but it's your recollection that

3    controls, "Everything happened on the interior.

4    Everything happened on the interior.  I made a

5    judgment call."

6              So he made a judgment call to get all

7    of the interior cameras, and we know they were

8    exterior cameras, and then he and his fellow police

9    had 20 days, 20 days, to review this evidence, and

10   say, "Oh, there must've been something going on

11   outside, let's get that evidence."  There is no

12   evidence.  That's why it's not before you, that's not

13   -- that's why you haven't seen any of that.  This was

14   entirely spontaneous.

15             So then Mr. Smith, and it's Mr. Smith

16   alone who advances on Mr. Ventura, for whatever

17   reason, and it's for you to determine whether it was

18   his wife's safety and so forth.  But it's Mr. Smith

19   who goes over to Mr. Ventura, and he takes the store

20   gun from Mr. Ventura, and Mr. Quinn wants no parts of

21   this.  And this is important.

22             I want you to take a look at -- this is

23   camera 6, at 16:56:31, take a look at what Mr. Quinn

24   does.  He physically lifts Mr. Smith up, physically.

25   Lifts him up, lifts him up, and puts him, sort of,

Page 109

1   away from Mr. Ventura.  And then he's, sort of,

2   pushing him, "Get out of here."  And he's pushing,

3   he's telling Mr. Stevens and Mr. Smith, "Just go.  I'm

4   just -- this is my issue.  Just go."

5                   This is the opposite of aiding and

6   abetting.  This is the opposite of accomplice

7   liability, and the opposite of a conspiracy.

8                   So Mr. Quinn then goes to the register,

9   and he's acting like an idiot.  He puts his sleeve

10  over his hand, and he tries to get into the register,

11  and he's unable to.  And then you hear Mr. Ventura

12  when he testified -- and Government counsel asked him,

13  "Why did you open the register?"  And I believe he

14  twice said, "Because he was asking me to do it."

15  Asking.  That was his word.  "He was asking me to do

16  that."  "He was asking for his money."  I believe that

17  was a direct quote.  "He was asking for his money."

18                   And then I think Government counsel

19  asked him -- and then he said -- I'm sorry -- "the

20  problem had to do with the hundred dollars."  The

21  problem.  Problems are not robberies.  Robbery is not

22  a problem, and a problem is not a robbery.  "I gave

23  him his money."  "The problem had to do with the ATM,

24  with the hundred dollars."

25                   So then Mr. Ventura gives him exactly

Page 110

1   $100, and you'll see, this is on camera 4, and I --

2   you've seen this before where Mr. Ventura -- and you

3   know there's more money in the register.  There's a

4   dollar bill at the top of the register that remains

5   there the whole time.  Mr. Ventura counts out exactly

6   five $20 bills.  And the point is, that Mr. Quinn did

7   not rob, he didn't take.  He was being reimbursed for

8   the money that came from the store's ATM machine.

9           Was he aggressive?  Yes.  Was he

10  obnoxious?  Yes.  Was he -- did he maybe do a simple

11  assault when he was overly aggressive, physical, with

12  Mr. Ventura?  Maybe.  But he's charged with armed

13  robbery.  This was no robbery.

14          And then as he's leaving, he leaves --

15  right after this, he leaves.  Doesn't take another

16  thing.  He has his hundred dollars, the hundred

17  dollars that he was asking for, as Mr. Ventura told

18  you, and as he's leaving, he passes Ms. Rodriguez on

19  the way out of the door, and I think Ms. Rodriguez

20  said something to him, and he was very crude, and

21  said, you'll recall, "Fuck you all, I got my money."

22          And then he walked, walked, up Ross

23  Street.  He didn't go to Sharpneck, he walked up Ross

24  Street, because this was not a robbery.

25          And then remember Mr. Sanchez saying --

1   and this is, again, very odd -- something odd to say

2   if you're in the middle of a robbery.  Mr. Sanchez

3   testified that he was saying, "Calm down.  There's no

4   need for this.  There's no need for this.  There's no

5   need for all this drama over the money from the ATM

6   machine."  And he also said, "I didn't want the

7   argument."  He called it an argument.  The Government

8   witness called it an argument.  I believe Ms.

9   Rodriguez called it an argument as well.  "I didn't

10  want the argument to get out of hand."

11              So as to Count I, robbery, the

12  Government -- the Court, pardon me, the Court will

13  instruct you on the fact that there must be unlawful

14  taking.  Mr. Quinn did not unlawfully take anything.

15  We know he could've taken everything in the store, we

16  know that.  He was reimbursed the money that he was

17  owed.

18              And they want you to find that Mr.

19  Quinn aided and abetted Mr. Smith in the taking of the

20  store gun.  Again, there's no evidence that.  How

21  would he have known that Mr. Smith was going to take

22  Mr. Ventura's gun?  There's simply no evidence of

23  that, and you saw the opposite where he physically

24  picks up Mr. Ventura -- Mr. Smith, rather, and moves

25  him away from Mr. Ventura.  We just saw that.

```
                                            Page 112
```

1           So how do you reconcile the facts with

2    the law?  You are the factfinders, you can determined

3    what -- determine what happened here based on what you

4    see on the video, what you determine is credible on

5    the witness stand, and what you believe really

6    happened.

7               And the Government spent hours and

8    hours on Thursday with various witnesses that had very

9    little to do with what happened on the interior of the

10   store.  And they'll argue, or they may argue in

11   rebuttal, that because Mr. Quinn -- there was a lot of

12   telephone testimony, remember, from the T-Mobile

13   witness, Mr. Sierra, that Mr. Quinn had called Mr.

14   Smith, I think, six or seven times at sometime after

15   5:30, I think it was 5:46.

16              That is no evidence of a plan, and you

17   can imagine what the conversation was between the two,

18   Mr. Quinn saying, "What were you doing?"  Mr. Smith

19   saying, "I was trying to help my wife," and back and

20   forth.  But we know that Mr. Quinn and Mr. Smith did

21   not speak on March 21st, and they did not speak on

22   March 22nd until well after Mr. Quinn and all of this

23   incident was over.

24              So if there's no taking, which is the

25   essence of robbery, there's no robbery, then Mr. Quinn

Page 113

1    is guilty.

2                Do not be persuaded by the false

3    argument that the Government made on their closing

4    that Mr. Quinn was desperate.  You'll see -- you can

5    have -- you can take a look at the bank records, that

6    was G49, you will see that Mr. Quinn's bank account

7    fluctuated.  There were many times where he was in a

8    negative balance.  March 22nd was nothing unusual.  It

9    would fluctuate, he would get a paycheck, he was

10   working, and his bank account would be recovered.

11               And again, we know that he was a

12   regular customer.  Ms. Rodriguez said, "He always

13   seemed like a nice guy."  This was not -- he was not

14   there to take anything from the store that was not

15   his.  So don't let that be -- that's just not a

16   credible argument from the Government.

17               So if he's not guilty of robbery, you

18   should find him not guilty of Count II, because

19   there's no crime of violence if there's no robbery.

20               In Count II, Mr. Quinn is charged with

21   aiding and abetting Mr. Smith and Mr. Stevens using or

22   carrying a firearm in relation to a crime of violence,

23   and we already talked about whether this was a crime

24   of violence or not.  And the key question is did Mr.

25   Quinn have advanced knowledge that Mr. Smith or Mr.

1    Stevens would come into the store with a gun.

2                    Advanced knowledge means before they
3    entered the store.  They must prove that beyond a
4    reasonable doubt.  So what would you want to see to
5    show evidence of advanced knowledge?  Well, if they
6    spoke inside the store before guns were used, if there
7    was some evidence that there was a conversation, or
8    some commands, or orders, that would be some evidence
9    of advanced knowledge maybe.  There's no evidence of
10   that.

11                   In fact, Mr. Quinn, you just saw,
12   appears very surprised when Mr. Smith goes across the
13   store and pulls out a gun.  And then he pushes Mr.
14   Stevens' hand away after Mr. Stevens come in, and
15   literally pushes him.

16                   If they spoke outside the store,
17   there's no evidence of that.  And you know all about
18   that, you've heard all three of us argue that you
19   would've seen something from the outdoor cameras if
20   there had been evidence of advanced knowledge.

21                   The Government can't simply claim that
22   something must've gone outside -- gone on outside,
23   therefore there was advanced knowledge.  They need to
24   show you evidence.  They need to convince you beyond a
25   reasonable doubt.  There has to be evidence.

1            So, and you know these three Defendants

2    were at cross purposes.  No one knew what anything --

3    what happened with Mr. Quinn, with the ATM, Mr. Quinn

4    may not have realized that Mr. Smith's wife was in the

5    store, there were all sorts of things going on, and

6    you can see this on the video, and I urge you to watch

7    the entire video, just, in one sitting, and not in

8    clips.

9            So, Mr. Stevens comes into the store

10   for his own reasons, perhaps.  Perhaps because Mr.

11   Ventura cocked the gun, and not because of Mr. Quinn's

12   argument.  You saw Mr. Stevens on the video -- and we

13   can watch that again, explaining to Ms. Rodriguez --

14   now, here we are on camera 13 (indicating), this is at

15   16:59, here comes Ms. Rodriguez in the door, and he's

16   trying to explain.  Look at him, look at this motion

17   (indicating).  Why would he do that?  Why would he do

18   that, if he wasn't trying to explain to her that

19   something had happened?  So he was mimicking exactly

20   what you saw Mr. Ventura doing behind the counter.

21            And then on camera 12, at 17:04:33, he

22   makes that same -- run it back again.  Sorry.  He

23   makes that same motion again, there it is, same

24   motion.  Trying to explain to her why things

25   escalated, why did they get to where they were.  And

1  again, you heard Mr. Sanchez say that Mr. Stevens was

2  saying, "What happened?  How did it get here?  Why --

3  why is -- why did this happen this way?"

4             Mr. Quinn is then turning to leave the

5  store -- another thing about advance knowledge, Mr.

6  Quinn is turning to leave the store just before Mr.

7  Smith pulls out a gun, and I -- this is really

8  important, because this really cuts against any, any

9  planning or advance knowledge.  This is 16:55:51,

10 again, on camera 13, look at this (indicating).  He's

11 backing up, he's about to leave, the doors open.

12            Can we show that again?

13            Backing up, backing up, and then all of

14 a sudden, this (indicating).  Surprise.  And then you

15 know, you saw Mr. Quinn try to physically move Mr.

16 Smith out of the way.

17            There is evidence that Mr. Quinn did

18 not want firearms involved in this argument.  He did

19 not have advance knowledge that guns would be involved

20 in this.

21            And finally, the Judge -- part of the

22 instruction on accomplice liability on Count II for

23 Mr. Quinn would be if the Defendant -- and this is

24 only a portion of the instruction, and of course, the

25 Court's instructions control -- if the Defendant

1    continues to participate in a crime, and in this case

2    the crime would be robbery.  And I've already gone

3    through all the reasons this is not a robbery -- after

4    a gun is displayed or used.

5              This conduct isn't right.  Mr. Quinn

6    was out of line, he was obnoxious, he was aggressive.

7    But he's charged with armed robbery, and you know that

8    this is not an armed robbery, and I ask you to find

9    him not guilty on Counts I and II.  Thank you.

10              Thank you, Your Honor.

11              THE COURT:  Thank you, Ms. Meehan.

12              Yes.  The Government is now given an

13   opportunity to rebut the arguments made by defense

14   counsel.

15              Mr. Eckert?

16              MR. ECKERT:  Thank you, Your Honor.

17              So the theory of this case is that if

18   tonight, you go into Acme, or you go into ShopRite,

19   you go into CVS, you go into Walgreens, any business

20   in the world with an ATM, and that ATM gives you $80

21   instead of $100, or it gives you a $20 bill that is

22   fake, you have the right to go to the cash register,

23   try to get her money, when the person at the cash

24   register says, not, "Go away.  I'll see you in six

25   weeks," says, "Let me call my boss.  Let me call my

Page 118

1    manager so that they can come down here, and try to
2    work out the situation."
3                    Because what is the clerk supposed to
4    do?  "Oh, you were just at my ATM, and you told me you
5    gave me fake money, so here's $100 hundred bucks."
6    They would be fired in 15 seconds.  He called his boss
7    and said, "Can you come down here, because there's a
8    situation."  And his boss said, "Okay, great."  And
9    tells him, "I'm going to come down there."  Not, "See
10   you later.  Goodbye.  No way."  "Sure, okay.  I'll
11   come down there, and I'll try to work it out."  And he
12   says, "No, absolutely not."
13                   What he does is he goes and gets two
14   other people, whether -- however they got in the
15   store, it really doesn't matter.  The fact of the
16   matter is that two other people are then in the store,
17   both of whom have guns, both of whom put the guns in
18   the face of Joel, and that's why he gets the money.
19                   How do you know this is aiding and
20   abetting?  The most important reason for that is
21   because Mr. Quinn tries to get his money first, and he
22   was not successful.  He tries to get the money, and
23   Joel says, "No.  I need to call my boss.  I need to
24   look into this," right?  And then he enlists the help
25   of two other people, aiding and abetting.

Page 119

1             Aiding is a legal word for help.
2      That's all it means.  It means that he's getting two
3      other people to help him.  And that's why he's
4      successful, because Mr. Stevens and Mr. Smith come
5      back with the guns, and that's how they get the
6      register.  That's how they get the store gun, and
7      that's how they get the register opened.
8             Oh, another thing.  The $100.  You've
9      heard a lot of arguments about, "Well, this was about
10     $100.  This was at $100."  The only reason he doesn't
11     empty that register is because he can't figure out how
12     to get it open.  Donnie Smith, right next to him, two
13     feet away, "Take everything.  Take it all.  Take
14     everything."  And Quinn's trying to get the register
15     opened, but he doesn't know how, because he doesn't
16     work there.  He doesn't know.  There's 30 buttons on
17     the register, and he's not going to know which one it
18     is that opens it up.  That's the only reason he
19     doesn't clean out the register.  And that's why it's
20     about $100, because he then has to back out, and Joel
21     has to go back in again, being forced to give the
22     money.
23             There was a lot of discussion about
24     justification, and when it's -- the concept of
25     justification has not really been discussed yet.  You

Page 120

1    heard the phrase from counsel for Mr. Smith, that he
2    ushered his wife out of the store.  And the Government
3    would ask that you remember that.  Because when he
4    ushered his wife out of the store, he ushered any
5    justification defense right out of this case.  The
6    second the wife leaves the store, there's no more
7    justification.
8                   What justification means is that you're
9    taking actions to alleviate the threat, to eliminate
10   the threat.  If you believe there's a threat to his
11   wife, so be it.  But once she leaves the store, there
12   goes any justification defense.
13                  The question is not is he justified in
14   going in the store.  The question is not is he even
15   maybe justified in taking his gun out.  That's
16   ludicrous, for a number of reasons, but assume for the
17   sake of argument that that would be okay.  It's 30
18   seconds later that they take the gun.  It's even more
19   time after that they take the money out of the
20   register.
21                  Remember that Donnie Smith puts his gun
22   in the face of Joel Ventura multiple times.  Not once,
23   not twice, distinct, separate times.  After they get
24   the store gun, after Donnie Smith gets the store gun
25   and puts it in his pocket, even after that, he again

Page 121

1    puts his gun in Joel's face to facilitate the robbery,

2    to aid and assist in helping the robbery happen.

3    There is no way, absolutely no way, that that action

4    is at all in any way, shape, or form related to his

5    wife.  His wife's been out of the store for plenty of

6    time at that point.

7                    If you actually look at the elements of

8    justification, there are four elements of

9    justification, and he fails each one.  The immediate,

10   unlawful threat of death, or seriously serious bodily

11   injury.  That's gone when she leaves the store.

12                   Second, had a well-rounded reasonable

13   belief that the threat would be carried out if he did

14   not commit the offenses.  Even if you believe he has

15   to go in the store, the offense of robbery has nothing

16   to do with that.

17                   Third, that Mr. Smith's criminal action

18   was directly caused by the need to avoid the

19   threatened harm, and that Donnie Smith had no

20   reasonable lawful opportunity to avoid the threatened

21   harm without committing the offenses.  He could've

22   walked out of the store.  If it's all about his wife,

23   the second he comes in the store and pulls the

24   firearm, he walks out with his wife.  Everything that

25   happens after that has nothing to do with

Page 122

1    justification, and we'd ask you to reject that

2    defense.

3                    The 911 call.  So someone did call 911

4    -- 911 in this case.  Isalisa Rodriguez, she called

5    911, because she talked to Joel, and Joel told her a

6    little bit of what's going on.  She talks to Mr.

7    Quinn, and then she is able to briefly watch a little

8    bit of that video on her phone.  She called 911.  So,

9    the idea that all these people in the store didn't

10   call 911 doesn't have to do with anything.

11                   Speaking of things that don't have to

12   do with anything.  You've heard all kinds of argument

13   about racking the charging handle, about whether --

14   first of all, it's not in the video.  But even if you

15   believe that happened, when you look at the elements

16   of the offenses, and the elements of the offenses are

17   the most important thing, that's what the Judge will

18   tell you.  To find a person guilty, you have to find

19   the Government's proven each and every element beyond

20   a reasonable doubt.

21                   Racking the charging handle, or

22   chambering a round, has nothing to do with any of the

23   elements of the offenses.  Why?  First, because that

24   happened when one person was in the store, when Mr.

25   Stevens was in the store.  There is no evidence before

Page 123

1   you whatsoever that Mr. Quinn or Mr. Smith would've
2   even known about that.
3              Second, it doesn't negate anything.  It
4   doesn't negate whether this was a taking.  It wasn't -
5   - whether that -- whether there was a round in the
6   chamber or not has nothing to do with anything, but
7   it's a great way to distract you, and to make you --
8   to somehow try to dirty Joel up, that somehow he's the
9   bad guy.  That when you watch that video, you should
10  be mad at his conduct.
11             But remember that Joel never raised
12  that gun, not one time.  His gun never left his side.
13  At one point, he puts it in his pocket.  When Donnie
14  Smith goes in the store, his hands are literally like
15  this (indicating), up in the air, because the gun's in
16  his pocket.
17             The quote was that Joel is a rather
18  excitable guy, who overreacts to things.  That's what
19  you're told.
20             Pull up 1C 43, please.
21       (Asides)
22             MR. ECKERT:  All right, we'll get back
23  to that in a second -- we'll get back to -- for that.
24  I apologize for that about the photo.  But some of the
25  things that were discussed, "He's asking me for

1    money."  That Mr. Quinn's counsel argues to you that

2    somehow because he said the term, "Well, he's asking

3    me for money."  The reason he's asking me for money is

4    because he's failed two times before.  He went back

5    there himself, wasn't successful.  He went back there

6    the second time after -- by himself, without Mr.

7    Ventura, the clerk, after the other two people are in

8    the store with guns, and he was unsuccessful.

9                So yes, the third time when he's back

10   there, he's demanding his $100.  Asking, demanding, it

11   makes no difference.  The fact of the matter is that

12   the only reason that was successful is because guns

13   were introduced by Smith and Stevens in this case.

14               You can use the term "asking,"

15   "demanding," "taking," whatever you want in common

16   English, but the only reason that that happened was

17   because the guns were brought to that store by Stevens

18   and Smith.

19               The advance knowledge.  A lot of

20   discussion about advance knowledge.  The quote that

21   the Government would submit to you, you're going to

22   hear from the Court is, "Advanced knowledge means

23   knowledge beforehand, such that the Defendant had a

24   realistic opportunity to leave the scene of the

25   robbery after learning that a firearm would be used or

Page 125

1    carried."

2                    He had a realistic opportunity to leave

3    the scene.  How many times did Mr. Quinn have a chance

4    to walk away when he sees the guns, when Donnie first

5    pulled -- when Smith first pulls out his gun, when

6    Stevens pulls out a gun?  There's ample time for him

7    to say, "Oh, I didn't know they were coming out.  I'm

8    going to leave the scene."  That doesn't happen.  He

9    absolutely had advanced knowledge before the robbery

10   actually happens.

11                   One final thing for each of the

12   Defendants.  For Mr. Stevens, they would have you

13   believe that he's the peacemaker here, that he's

14   coming in there, and he's just going to work

15   everything out.  He was holding the peacemaker in his

16   right hand, and that was the firearm that he put in

17   Joel's face.  That's the peacemaker that Mr. Stevens

18   was.  How do you know that?  Because what happens

19   afterwards?  "I'll shut you down.  This is my

20   neighborhood."  He's telling Mr. Rodriguez, "Don't

21   talk to the police, don't make this a police matter,

22   because I own the neighborhood."

23                   Second, Donnie Smith.  This has nothing

24   to do with his wife.  How do you know that?  Because

25   you were told -- the argument was made to you, "Who

Page 126

1   brings their wife into an armed robbery?"  The
2   Government has no idea.  But you know who leaves their
3   wife at an armed robbery?  You know who -- even though
4   this was all about his wife, the second Officer
5   Ferrero (phonetic) walks in front of the car, he pulls
6   away.
7                   This has nothing to do with his wife.
8   Absolutely nothing whatsoever.  The wife is a
9   smokescreen to distract you from the real issues in
10  the case.
11                  Finally, Mr. Quinn.  It all starts with
12  Mr. Quinn and the cash register.  And the only reason
13  the only way he's able to get anything out of that
14  cash register is because two people come back and help
15  him out with guns.  That's it.  It's really that
16  simple.
17                  Thank you for your time.
18                  THE COURT:  Thank you, Mr. Eckert.
19                  MR. ECKERT:  Thank you.
20                  THE COURT:  Ladies and gentlemen, now
21  that you've heard all of the arguments, you've heard
22  and seen all of the evidence, it's my opportunity to
23  instruct you on the law.
24                  You have two duties as a jury.  Your
25  first duty is to decide the facts from the evidence

1    that you've heard and seen in the courtroom.  That is

2    your job and yours alone.  I play no part in finding

3    the facts.  You should not take anything I may have

4    said or done during the trial as indicating what I

5    think of the evidence, or what I think about what your

6    verdict should be.

7              Your second duty is to apply the law

8    that I give you to the facts.  You must apply my

9    instructions carefully.  Each of the instructions is

10   important, and you must apply all of them.  You must

11   not substitute or follow your own notion, or opinion

12   about what the law is, or ought to be.  You must apply

13   the law that I give you, whether you agree with it or

14   not.

15             Whatever your verdict, it will have to

16   be unanimous.  All of you will have to agree on it, or

17   there will be no verdict.  In the jury room, you will

18   discuss the case among yourselves, but ultimately each

19   of you will have to make up his or her own mind.  This

20   is a responsibility that each of you has, and that you

21   cannot avoid.

22             During your deliberations, you must not

23   communicate with, or provide any information to anyone

24   by any means about the case.  You may not use any

25   electronic device or media such as the telephone, a

Page 128

1    cell phone, smart phone, iPhone, blackberry, or a
2    computer, the Internet, any Internet service, any text
3    or instant messaging service, any Internet chat room,
4    blog, or website such as Facebook, MySpace, or Linked
5    In, YouTube, or Twitter to communicate to anyone any
6    information about the case, or to conduct any research
7    about the case until I accept your verdict at the end
8    of your deliberations.
9              In other words, you cannot talk to
10   anyone on the phone, correspond with anyone, or
11   electronically communicate with anyone about the case.
12   You can only discuss the case in the jury room with
13   your fellow jurors during deliberations.
14             You may not use these electronic means
15   to investigate or communicate about the case, because
16   it is important that you decide the case based solely
17   on the evidence presented in the courtroom.  You're
18   only permitted to discuss the case with your fellow
19   jurors during deliberations, because they have seen
20   and heard the same evidence you have.
21             In our judicial system, it is important
22   that you are not influenced by anything or anyone
23   outside of this courtroom.
24             Perform these duties fairly and
25   impartially.  Do not allow sympathy, prejudice, fear,

Page 129

 1    or public opinion to influence you.  You should also

 2    not be influenced by any person's race, or color,

 3    religion, national ancestry, gender, sexual

 4    orientation, profession, occupation, celebrity status,

 5    economic circumstances, or position in life or the

 6    community.

 7                    The Defendants pled not guilty to the

 8    offenses charged.  They are presumed to be innocent.

 9    They started the trial with a clean slate with no

10    evidence against them.  The presumption of innocence

11    stays with them unless and until the Government has

12    presented evidence that overcomes that presumption by

13    convincing you that they are guilty of the offenses

14    charged beyond a reasonable doubt.

15                    The presumption of innocence requires

16    that you find the Defendants not guilty unless you are

17    satisfied that the Government has proved guilty beyond

18    a reasonable doubt.

19                    The presumption of innocence means that

20    the Defendants have no burden, or obligation, to

21    present any evidence at all, or to prove that they are

22    not guilty.  The burden, or obligation, of proof is on

23    the Government to prove that the Defendants are

24    guilty, and this burden stays with the Government

25    throughout the trial.

Page 130

1            In order for you to find the Defendants

2    guilty of the offenses charged, the Government must

3    convince you that the Defendants are guilty beyond a

4    reasonable doubt.  That means that the Government must

5    prove each and every element of the offenses charged

6    beyond a reasonable doubt.

7            A definition may not be -- a Defendant

8    -- pardon me, a Defendant may not be convicted based

9    on suspicion or conjecture, but only on evidence

10   proving guilt beyond a reasonable doubt.

11           Proof beyond a reasonable doubt does

12   not mean proof beyond all possible doubt, or to a

13   mathematical certainty.  Possible doubts or doubts

14   based on conjecture, speculation, or hunch are not

15   reasonable doubts.

16           A reasonable doubt is a fair doubt

17   based on reason, logic, common sense, or experience.

18   It is a doubt that an ordinary, reasonable person has

19   after carefully weighing all of the evidence, and is a

20   doubt of the sort that would cause him, or her, to

21   hesitate in matters of importance in his or her own

22   life.  It may arise from the evidence, or from the

23   lack of evidence, or from the nature of the evidence.

24           If having now heard all of the evidence

25   you are convinced that the Government proved each and

Page 131

1   every element of the offenses charged beyond a

2   reasonable doubt, you should return a verdict of

3   guilty for that offense.

4           However, if you have a reasonable doubt

5   about one or more of the elements of the offense

6   charged, then you must return a verdict of not guilty

7   of that offense.

8           Now, what is the evidence from which

9   you will decide the case?  First of all, it is only

10  the evidence that you saw and heard in the courtroom.

11  Do not let rumors, suspicions, or anything else that

12  you may have seen or heard outside of court influence

13  your decision in any way.

14          The evidence from which you are to find

15  the facts consists of the following: first, one, the

16  testimony of the witnesses; two, documents and other

17  things received in received in -- received as

18  exhibits; and three, any fact or testimony that was

19  stipulated.  That is, formally agreed to by the

20  parties.

21          The following are not evidence: one,

22  the indictment; two, statements and arguments of the

23  lawyers for the parties; three, questions by the

24  lawyers, and questions that I may have asked.  The

25  evidence is the question and the answer taken

Page 132

1    together.  Four, objections by lawyers, including

2    objections in which the lawyers stated facts; five,

3    any testimony that I struck, or told you to disregard;

4    and finally, anything you may have seen or heard

5    outside of the courtroom.

6              You should use your common sense in

7    weighing the evidence.  Consider it in light of your

8    everyday experience with people and events, and give

9    it whatever weight you believe it deserves.  If your

10   experience and common sense tell you that certain

11   evidence reasonably leads to a conclusion, you may

12   reach that conclusion.

13             As I told you in my preliminary

14   instruction, the rules of evidence control what can be

15   received into evidence.  During the trial, lawyers

16   objected when they thought that evidence was offered

17   that was not permitted by the rules of evidence.

18   These objections simply meant that the lawyers were

19   asking me to decide whether the evidence should be

20   allowed under the applicable rules.

21             You should not be influenced by the

22   fact that an objection was made.  You should also not

23   be influenced by my rulings on objections, or any

24   sidebar conferences that you may have overheard.

25             When I overruled an objection, the

1   question was answered, or the exhibit was received as

2   evidence, and you should treat that testimony or

3   exhibit like any other.  When I allowed the evidence,

4   the testimony, or the exhibits for a limited purpose

5   only, I instructed you to consider that evidence only

6   for that limited purpose, and you must do that.

7               When I sustained an objection to a

8   question, the question was not answered, or the

9   exhibit was not received as evidence, you must

10   disregard the question or the exhibit entirely when

11   that occurred.  Do not think about or guess what the

12   witness might have said in answer to the question, and

13   do not think about or guess what the exhibit might

14   have shown.

15               Sometimes a witness may have already

16   answered before a lawyer objected, or before I ruled

17   on the objection.  If that happened, and if I

18   sustained the objection, you must disregard the answer

19   that was given.

20               Also, if I ordered that some testimony

21   or other evidence be stricken, or removed from the

22   record, you must disregard the evidence.  When you are

23   deciding the case, you must not consider or be

24   influenced in any way by the testimony or other

25   evidence that I told you to disregard.

Page 134

1          There was a little of that in the case,

2    ladies and gentlemen, and you'll remember when I gave

3    you that instruction.

4          Now, although the lawyers may have

5    called your attention to certain facts or factual

6    conclusions that they thought were important, what the

7    lawyers said is not evidence, and is not binding on

8    you.  It is your own recollection and interpretation

9    of the evidence that controls your decision in this

10   case.

11          Also, do not assume from anything I may

12   have done, or said, during the trial that I have any

13   opinion about any of the issues in the case, or about

14   what your verdict should be.

15          Now, I told you in my preliminary jury

16   instructions that there were two types of evidence,

17   direct evidence and circumstantial, or indirect,

18   evidence.  You may use both types of evidence in

19   reaching your verdict.

20          Direct evidence is simply evidence

21   which, if believed, directly proves a fact.  An

22   example of direct evidence occurred when a witness

23   testifies about something a witness knows from his or

24   her own senses something the witness has seen,

25   touched, heard, or smelled.

Page 135

1             Circumstantial evidence is evidence

2    which, if believed, indirectly proves a fact.  It is

3    evidence that proves one or more facts from which you

4    could reasonably find, or infer, the existence of some

5    other fact, or facts.  A reasonable inference is

6    simply a deduction or conclusion that reason,

7    experience, and common sense lead you to make from the

8    evidence.

9             A reasonable inference is not a

10   suspicion or a guess.  It is a reasoned, logical

11   decision to find that a disputed fact exists on the

12   basis of another fact.

13             For example, and you've heard this

14   several times, but I'll repeat it, if someone walked

15   into the courtroom wearing a wet rain coat and

16   carrying a wet umbrella, that would be circumstantial

17   or indirect evidence from which you could reasonably

18   find, or conclude, that it was raining outside.  You

19   would not have to find that it was raining, but you

20   could.

21             Sometimes, different inferences may be

22   drawn from the same set of facts.  The Government may

23   ask you to draw one inference, and the Defense may ask

24   you to draw another.  You, and you alone, must decide

25   what reasonable inferences you will draw based on all

1    the evidence, and your reason, experience, and common

2    sense.

3                    You should consider all of the evidence

4    that is presented in the trial, direct and

5    circumstantial.  The law makes no distinction between

6    the weight you should give to either direct or

7    circumstantial evidence.  It is for you to decide how

8    much weight to give to the evidence.

9                    Also, as I said in my preliminary

10   instructions at the beginning of the trial, in

11   deciding what the facts are, you must decide what

12   testimony you believe, and what testimony you do not

13   believe.  You are the sole judges of the credibility

14   or believability of the witnesses.  Credibility refers

15   to whether a witness is worthy of belief.  Was the

16   witness truthful?  Was the witness's testimony

17   accurate?  You may believe everything a witness says,

18   or only part of it, or none of it.

19                   You may decide whether to believe a

20   witness based on his or her behavior and manner of

21   testifying, the explanations the witness gave, and all

22   of the other evidence in the case, just as you would

23   in any important matter where you are trying to decide

24   if a person is truthful, straightforward, and accurate

25   in his or her recollection.  In deciding the question

1    of credibility, remember to use your common sense,

2    your good judgment, and your experience.

3                    Now, in deciding what to believe, you

4    may consider a number of factors, and I'll mention

5    some of them.  One, the opportunity and ability of the

6    witness to see, or hear, or know the things about

7    which the witness testified.  Two, the quality of the

8    witness's knowledge, understanding, and memory.

9    Three, the witness's appearance, behavior, and manner

10   while testifying.  Four, whether the witness has an

11   interest in the outcome of the case, or any motive,

12   bias, or prejudice.  Five, any relation the witness

13   may with a party in the case, and any effect the

14   verdict may have on the witness.  And six, whether the

15   witness said or wrote anything before trial that was

16   different from the witness's testimony in court.

17   Seven, whether the witness's testimony was consistent

18   or inconsistent with other evidence that you believe.

19   And eight, any other factors that bear on whether the

20   witness should be believed.

21                    Inconsistencies, or discrepancies in a

22   witness's testimony, or between the testimony of

23   different witnesses, may or may not cause you to

24   disbelieve a witness's testimony.  Two or more persons

25   witnessing an event may simply see or hear it

1  differently.  Mistaken recollection, like failure to

2  recall, is a common human experience.  In weighing the

3  effect of an inconsistency, you should also consider

4  whether it was about a matter of importance or an

5  insignificant detail.  You should also consider

6  whether the inconsistency was innocent or intentional.

7            You are not required to accept

8  testimony, even if the testimony was not contradicted,

9  and the witness was not impeached.  You may decide

10  that the witness is not worthy of belief because of

11  the witness's bearing and demeanor, or because of the

12  inherent improbability of the testimony, or for other

13  reasons that are sufficient to you.  After you make

14  your own judgment about the believability of a

15  witness, you can then attach to that witness's

16  testimony the importance or weight that you think it

17  deserves.

18            The weight of the evidence to prove a

19  fact does not necessarily depend on the number of

20  witnesses who testified, or the quantity of the

21  evidence that was presented.  What is more important

22  than numbers or quantity is how believable the

23  witnesses were, and how much weight you think their

24  testimony deserves.

25            Now, while the Government is required

Page 139

1   to prove the Defendant's guilt -- guilty beyond a

2   reasonable doubt, the Government is not required to

3   present all possible evidence related to the case, or

4   to produce all possible witnesses who may have some

5   knowledge about the facts of the case.  In addition,

6   as I've explained, the Defendants are not required to

7   present any evidence or produce any witnesses.

8                    In this case, the Defendants, or one

9   Defendant presented evidence, and one Defendant

10  presented a witness.  The Defendants are not required

11  to present all possible evidence related to the case,

12  or to produce all possible witnesses who might have

13  some knowledge about the facts of the case.

14                   During the trial, you saw and heard

15  audio and video recordings of the Defendants and

16  others made without their knowledge.  These recordings

17  were made with the consent and agreement of one of the

18  parties to the audio and visual recordings.  The use

19  of this procedure to gather evidence is lawful, and

20  the recordings may be used by either party.

21                   Now, the rules of evidence ordinarily

22  do not permit witnesses to state their own opinions

23  about important questions in a trial, but there are

24  exceptions to those rules.  In this case, you heard

25  testimony from several witnesses who offered an

Page 140

1  opinion.  Because of their knowledge, skill,

2  experience, training, or education, they were

3  permitted to offer an opinion, and the reasons for

4  that opinion.  These witnesses are called expert

5  witnesses.

6              The opinion these witnesses stated

7  should receive whatever weight you think appropriate,

8  given all the other evidence in the case.  In weighing

9  this opinion testimony, you may consider the witness's

10 qualifications, the reasons for the witness's

11 opinions, and the reliability of the information

12 supporting the witness's opinions, as well as the

13 other factors discussed in these instructions for

14 weighing the testimony of witnesses.

15             You may disregard the opinions entirely

16 if you decide that their opinions are not based on

17 sufficient knowledge, or skill, or experience, or

18 training, or education.  You may also disregard the

19 opinions if you include that the reasons given in

20 support of the opinions are not sound, or if you

21 conclude that the opinions are not supported by the

22 facts shown by the evidence, or if you think that the

23 opinions are outweighed by other evidence.

24             During the trial, you heard testimony

25 of witnesses and arguments by counsel that the

Page 141

```
 1   Government did not use specific investigative
 2   techniques regarding the recovery of surveillance
 3   footage at the store.  You may consider these facts in
 4   deciding whether the Government has met its burden of
 5   proof, because as I told you, you should look to all
 6   of the evidence, or lack of evidence, in deciding
 7   whether the Defendants are guilty.  However, there is
 8   no legal requirement that the Government use any of
 9   these specific investigative techniques, or all
10   possible techniques to prove the case.  There is no
11   requirement to use specific investigative techniques
12   regarding the recovery of surveillance camera footage
13   at the store.  Your concern, as I have said, is to
14   determine whether or not the evidence admitted in the
15   case proves the Defendants' guilt beyond a reasonable
16   doubt.
17                  Now, the Government and the Defendants
18   have agreed that certain stipulated facts are true.
19   You should -- and you've heard those stipulations,
20   they've been presented.  You should, therefore, treat
21   these stipulations -- stipulated facts as having been
22   true.  You are not required to do so, however, since
23   you are the sole judges of the facts.
24                  You heard the testimony of a number of
25   law enforcement officers.  The fact that a witness is
```

Page 142

1   employed by a law -- as a law enforcement officer does

2   not mean that his or her testimony necessarily

3   deserves more or less consideration, or greater or

4   lesser weight than that of any other witness.  At the

5   same time, it is quite legitimate for defense counsel

6   to try to attack the believability of a law

7   enforcement witness on the ground that his or her

8   testimony may be colored by a personal or professional

9   interest in the outcome of the case.  You must decide,

10   after reviewing all of the evidence, whether you

11   believe the testimony of the law enforcement witness,

12   and how much weight, if any, it deserves.

13              Also with respect to the believability

14   of a witness's testimony, if you believe that a

15   witness knowingly testified falsely concerning any

16   important matter, you may distrust the witness's

17   testimony concerning other matters.  You may reject

18   all of the testimony, or you may disregard -- no, let

19   me start that again.  You may reject all of the

20   testimony, or you may accept such parts of the

21   testimony that you believe are true, and give it such

22   weight as you think it deserves.

23              The Defendants did not testify in this

24   case.  A Defendant has an absolute constitutional

25   right not to testify.  The burden of proof remains

Page 143

1    with the prosecution, the Government, throughout the

2    entire trial, and it never shifts to the Defendant.  A

3    Defendant is never required to prove that he is

4    innocent.  You must not attach any significance to the

5    fact that the Defendants did not testify.  You must

6    not draw any adverse inference against them because

7    they did not take the witness stand.  Do not consider

8    for any reason at all the fact that the Defendants did

9    not testimony (sic), and do not discuss that fact

10   during your deliberations, or let it influence your

11   decision in any way.

12              Now, you have heard testimony that

13   after the crime was supposed to have been committed,

14   Donnie Smith ran from the police officers.  If you

15   believe that Donnie Smith ran from the police

16   officers, then you must consider this conduct, along

17   with all of the other conduct, in deciding whether the

18   Government has proved beyond a reasonable doubt that

19   he committed the crimes charged.

20              This conduct may indicate that he

21   thought he was guilty of the crimes charged, and was

22   trying to avoid punishment.  On the other hand,

23   sometimes an innocent person may run from the police

24   for some other reason.  Whether or not this evidence

25   causes you to find that Donnie Smith was conscious of

1   his guilt of the crimes charged, and whether that

2   indicates he committed the crimes charged, is entirely

3   up to you as the sole judges of the facts.

4           Those are my general instructions, and

5   now I will instruct you on the charges against the

6   Defendants in the two counts of the indictment.  And

7   before I do, I'll remind you that although I'm reading

8   these instructions to you, I will give you copies of

9   my instructions, and the instructions will have a

10  table of contents that should enable you to, if you

11  have any questions, to check the table of contents,

12  re-read what I said on the issue, and hopefully that

13  will answer your question.  But if it doesn't, you can

14  send me a note asking a question that you are unable

15  to answer yourselves.  I will then present it to

16  counsel, and we'll decide how to handle it, call you

17  back into the courtroom, and give you an answer.

18          So I don't want you to be concerned now

19  and think, "Oh, this is an awful lot for me to

20  remember, my heavens."  You'll get a lot of

21  assistance, including copies of the charge.

22          The Defendants are charged in an

23  indictment with violating the law, violating federal

24  law.  Count I of the indictment charges Donnie Smith,

25  Abid Stevens, and Maurice Quinn with robbery, which

Page 145

1    interferes with interstate commerce, and aiding and

2    abetting in violation of a provision -- two provisions

3    of the United States Code, 18 United States Code,

4    Sections 1951 and 2.

5                 The robbery will be referred to in

6    these instructions as robbery, which interferes with

7    interstate commerce, or Hobbs Act robbery.  Hobbs Act,

8    because that's the name of the statute under which the

9    indictment was brought.

10                 Count II of the indictment charges the

11   three Defendants with using, carrying, and brandishing

12   a firearm during, and in relation to, a crime of

13   violence, and aiding and abetting in violation of 18

14   United States Code, Sections 924(c) and 2.

15                 The crime of violence to which

16   reference is made in Count II of the indictment is the

17   Hobbs Act robbery that was charged in Count I of the

18   indictment.

19                 As I explained at the beginning of the

20   trial, an indictment is just the formal way of

21   specifying the exact crime the Defendants are accused

22   of committing.  An indictment is simply a description

23   of the charge against a Defendant.  It is an

24   accusation only.  An indictment is not evidence of

25   anything, and you should not give any weight to the

Page 146

1   fact that the Defendants have been indicted in making

2   your decision in this case.

3              The indictment charges that the

4   offenses were committed on or about a certain date,

5   that date is March 22nd, 2019.  The Government does

6   not have to prove with certainty the exact date of the

7   alleged offense.  It is sufficient if the Government

8   proves beyond a reasonable doubt that the offense, or

9   offenses, were committed on a date reasonably near the

10  date alleged.

11             Now, in this case, there are multiple

12  Defendants charged with the same offenses.  The

13  Defendants, Donnie Smith, Abid Stevens, and Maurice

14  Quinn are all charged with more than one offense.

15  Each offense is charged in a separate count of the

16  indictment.

17             The number of offenses charged is not

18  evidence of guilt, and this should not influence your

19  decision in any way.  Also, in our system of justice,

20  guilt or innocence is personal and individual.  You

21  must separately consider the evidence against each

22  Defendant on each offense charged, and you must return

23  a separate verdict for each Defendant on each offense.

24             For each Defendant and offense, you

25  must decide whether the Government has proved beyond a

Page 147

1    reasonable doubt that the particular Defendant is
2    guilty of the particular offense.  And this will be
3    individuated for you by three separate verdict sheets.
4    I'll explain that at the end of these instructions.
5                    Your decision or on any one Defendant,
6    or any one offense, whether guilty or not guilty,
7    should not influence your decision on any of the other
8    Defendants or offenses.  Each offense and each
9    Defendant should be considered separately.
10                   Now, I will instruct you on Hobbs Act
11   robbery.  In order to sustain its burden of proof for
12   the crime of interstate commerce -- of -- let me start
13   that again.  In order to sustain its burden of proof
14   for the crime of interfering with interstate commerce
15   by robbery, which I will also refer to as Hobbs Act
16   robbery, as charged in Count I of the indictment, the
17   Government must prove the following three essential
18   elements beyond a reasonable doubt:  first, that
19   Donnie Smith, Abid Stevens, and Maurice Quinn took
20   from employees of RD Grocery the property described in
21   Count I of the indictment.  And I -- that property was
22   $100, and a gun described as a Glock, and described in
23   more detail in the indictment.
24                   Second, that Donnie Smith, Abid
25   Stevens, and Maurice Quinn did so knowingly and

Page 148

1   willfully by robbery.

2                    And third, that as a result of Donnie

3   Smith, Abid Stevens, and Maurice Quinn's actions,

4   interstate commerce, specifically an item moving in

5   interstate commerce, was obstructed, delayed, or

6   affected.

7                    Now, in connection with the description

8   of Hobbs Act robbery, and specifically the definition

9   of the term robbery, which is the second element of

10  the crime.  Robbery is the unlawful taking of personal

11  property from the person, or in the presence of

12  another against his will, by means of actual or

13  threatened force or violence, or fear of injury,

14  whether immediately or in the future, to his person or

15  property, or property in his custody or possession, or

16  the person or property of a relative, or member of his

17  family, or of anyone in his company at the time of the

18  taking or obtaining.

19                   Now, with respect to the first element

20  of the crime of Hobbs Act robbery, unlawful taking by

21  force, violence, or fear, I'll give you some guidance,

22  I'll define that term.

23                   The Government must prove beyond a

24  reasonable doubt that Donnie Smith, Abid Stevens, and

25  Maurice Quinn unlawfully took property from employees

Page 149

1    of the RD Grocery against their will by actual or
2    threatened force, violence, or fear of injury, whether
3    immediately or in the future.  You must determine
4    whether Donnie Smith, Abid Stevens, and Maurice Quinn
5    obtained the property by using any of these unlawful
6    means as set forth in the indictment.
7              The Government need not prove that
8    force, violence, and fear were all used or threatened.
9    The Government satisfies its burden of proving an
10   unlawful taking if you unanimously agree that Donnie
11   Smith, Abid Stevens, and Maurice Quinn employed any of
12   these methods.  That is, the Government satisfies its
13   burden only if you all agree concerning the particular
14   method used by Donnie Smith, Abid Stevens, and Maurice
15   Quinn.
16             In considering whether Donnie Smith,
17   Abid Stevens, and Maurice Quinn used or threatened to
18   use force, violence, or fear, you should give these
19   words their common and ordinary meaning in
20   understanding -- and understand them as normally -- as
21   you normally would.
22             A threat may be made verbally, or by
23   physical gesture.  Whether a statement or physical
24   gesture by Donnie Smith, Abid Stevens, and Maurice
25   Quinn actually was a threat depends upon the

Page 150

1    surrounding facts.

2              And I'm going to define for you the

3    term "fear of injury," part of the first element of

4    the crime of Hobbs Act robbery.

5              Fear exists if a victim experiences

6    anxiety, concerns, or worry over expected personal,

7    physical harm.  The fear must be reasonable under the

8    circumstances, existing at the time of the Defendants'

9    actions.  Your decision whether Donnie Smith, Abid

10   Stevens, and Maurice Quinn used or threatened fear of

11   injury involves a decision about the state of mind of

12   Joel Ventura and Emmanuel Sanchez at the time of

13   Donnie Smith, Abid Stevens, and Maurice Quinn's

14   actions.

15             It is obviously impossible to prove

16   directly a person's subjective feeling.  You cannot

17   look into a person's mind to see what his state of

18   mind is or was, but a careful consideration of the

19   circumstances and evidence should enable you to decide

20   whether Joel Ventura or Emmanuel Sanchez were in fear,

21   and whether this fear was reasonable.

22             Looking at the situation and the

23   actions of the person, or persons, in question may

24   help you determine what his state of mind was.  You

25   can consider this kind of evidence, which is called

Page 151

1   circumstantial evidence, in deciding whether Donnie

2   Smith, Abid Stevens, and Maurice Quinn obtained

3   property through the use of, or threat -- the use of

4   threat or fear -- let me repeat that last sentence.

5               You can consider this kind of evidence,

6   which is called circumstantial evidence, in deciding

7   whether Donnie Smith, Abid Stevens, and Maurice Quinn

8   obtained property through the use of threat or fear.

9               You've also heard the testimony of Joel

10  Ventura and Emmanuel Sanchez describing their state of

11  mind, that is, how they felt about giving up the

12  property.  This testimony was allowed to help you

13  decide whether the property was obtained by fear.  You

14  should consider this testimony for that purpose only.

15  You may also consider the relationship between Donnie

16  Smith, Abid Stevens, and Maurice Quinn on the one

17  hand, and Joel Venture and Emmanuel Sanchez on the

18  other in deciding whether the element of fear exists.

19  However, even a friendly relationship between the

20  parties does not preclude you from finding that fear

21  exists.

22              Now, the final element of the crime of

23  Hobbs Act robbery is interstate commerce.  The third

24  element that the Government must prove beyond a

25  reasonable doubt in order to obtain a conviction for

Page 152

1    Hobbs Act robbery is that the conduct of the

2    Defendants must affect, or could have affected,

3    interstate commerce.

4              Conduct affects interstate commerce if

5    it in any way interferes with, changes, or alters the

6    movement, or transportation, or flow of goods,

7    merchandise, money, or other property in commerce

8    between, or among, the states.  The effect can be

9    minimal.  It is not necessary to prove that Defendants

10   intended to obstruct, delay, or interfere with

11   interstate commerce, or that the purpose of the

12   alleged crime was to affect interstate commerce.

13             Further, you do not have to decide

14   whether the effect on interstate commerce was to be

15   harmful or beneficial to a particular business, or to

16   commerce in general.  You do not even have to find

17   that there was an actual effect on interstate

18   commerce.  All that is required to prove this element

19   is that the natural consequences of the offense

20   potentially caused an effect on interstate commerce to

21   any degree, however minimal, or slight.

22             And now, because I've been talking for

23   45 minutes, we're going to do what I traditionally do

24   in the case where the instructions on the law, my

25   charge, are long.  We're going to have a standup.

1    We're going to stop, we're going to stand up, shake

2    the kinks out, and hopefully refresh yourselves.  And

3    we'll do that now.  Everybody.  Besides I'm getting a

4    little tired.

5                    MR. WITTELS:  Judge, do you mind if I

6    run out for second?  I'll be right back.  One minute.

7                    THE COURT:  Not exactly.  But I guess

8    I'll have to say yes.

9                    Maybe we should do this.  Does anyone

10   need a break?  I don't get votes in open court from

11   jurors, but if anyone needs a break, one hand is

12   enough, and we'll recess for 10 minutes.

13                   I see no hands.  We'll give you a break

14   a little later, around midafternoon.

15       (Asides)

16                   THE COURT:  I might add, while we're

17   waiting, that I got the idea of the standups from the

18   movie Crocodile Dundee.  I don't know whether anyone

19   saw this movie.  He didn't do standups, he did what he

20   referred to as a walkabout, and this is my equivalent

21   of a walkabout, shake the kinks out and clear the head

22   a little bit.

23                   MR. WITTELS:  Thank you, Your Honor.

24                   THE COURT:  Oh, you're welcome.  And

25   now we can return to the charge.

Page 154

1                  You've heard argument regarding

2       accomplice liability, it's also referred to as aiding

3       and abetting.  A person may be guilty of an offense

4       because he personally committed the offense himself,

5       or because he aided and abetted another person in

6       committing the offense.  A person who has aided and

7       abetted another person in committing an offense is

8       often called an accomplice.  The person whom the

9       accomplice aids and abets is known as the principal.

10                  In this case, the Government alleges

11      that Donnie Smith, Abid Stevens, and Maurice Quinn

12      aided and abetted someone, including a co-Defendant,

13      in committing the crime of Hobbs Act robbery as

14      charged in the indictment.  In order to find a

15      Defendant guilty of Hobbs Act robbery, because they

16      aided and abetted someone in committing this offense,

17      you must find that the Government proved beyond a

18      reasonable doubt each of the following four

19      requirements.

20                  One, that someone, including one of the

21      Defendants, committed the offense charged by

22      committing each of the elements of the offense charged

23      as I've explained those elements to you in these

24      instructions, and those would be all of the elements

25      of Hobbs Act robbery.

1            Second, that the Defendant knew that

2   the offence charged was going to be committed, or was

3   being committed by someone, including a co-Defendant.

4            Third, that the Defendant knowingly did

5   some act for the purpose of aiding, or assisting

6   someone, including a co-Defendant, in committing the

7   specific offense charged, and with the intent that

8   someone, including a co-Defendant, commit that

9   specific offense.

10           And forth and finally, that the

11  Defendant performed an act in furtherance of the

12  offense charged.

13           In deciding whether the Defendant had

14  the required knowledge and intent to satisfy the third

15  requirement for aiding and abetting, and that is the

16  requirement of proving that aider and abettor aided or

17  assisted someone else in committing the offense, you

18  may consider both direct and circumstantial evidence,

19  including the Defendant's words and actions, and the

20  other facts and circumstances.

21           However, evidence that the Defendant

22  merely associated with persons involved in a criminal

23  venture, or was merely present, or was merely a

24  knowing spectator during the commission of the offense

25  is not enough for you to define -- for you to find

1  that the Defendant was guilty as an aider and abettor.

2  If the evidence shows that the Defendant knew the

3  offense was being committed, or was about to be

4  committed, but does not also prove beyond a reasonable

5  doubt that it was that Defendant's intent and purpose

6  to aid or assist, or otherwise associate themselves

7  with the offense, you may not find that Defendant

8  guilty of the offense as an aider and abettor.

9            The Government must prove beyond a

10  reasonable doubt that the Defendant in some way

11  participated in the offense committed by someone,

12  including a co-Defendant, as something that Defendant

13  wished to bring about, and to make succeed in order

14  for that Defendant to be an aider and abettor.

15            To show that the Defendant performed an

16  act in furtherance of the offense charged in order to

17  satisfy the fourth requirement, the Government needs

18  to show some affirmative participation by the

19  Defendant, which at least encouraged someone,

20  including a co-Defendant, to commit the offense

21  charged.  That is, you must find that Defendant's act

22  did in some way aid or assist someone, including a co-

23  Defendant, to commit the offense.

24            The Defendant's act need not further

25  aid or assist every part of the offense charged.  It

Page 157

1   is enough if the Defendant's act further aids or

2   assists only one or some part, or phase of the events.

3   Also, the Defendant's acts need not themselves be

4   against the law.

5                    And that's a second way of establishing

6   guilt.  The Government can establish guilt if it

7   proves beyond a reasonable doubt all of the elements

8   of Hobbs Act robbery, and all of the elements that I

9   have just instructed you on with respect to accomplice

10  liability, or liability as an aider and abettor.

11                   There is in this case a third way a

12  Government can prove guilt beyond a reasonable doubt,

13  and it's referred to -- well, it's involved in

14  offenses committed by co-conspirators.

15                   Count I of the indictment charges that

16  on or about March 22nd, 2019, in this district,

17  Defendants Donnie Smith, Abid Stevens, and Maurice

18  Quinn committed a robbery, which interferes, or

19  interfered, with interstate commerce.  The Government

20  may prove Defendants Abid Smith -- I'm sorry Donnie

21  Smith, Abid Stevens, and Maurice Quinn guilty of the

22  offense by proving that Donnie Smith, Abid Stevens,

23  and Maurice Quinn personally committed the crime of

24  Hobbs act robbery.

25                   The Government may also prove

Page 158

1    Defendants Smith, Stevens, and Quinn guilty of the

2    offense based on the legal rule that each member of a

3    conspiracy is responsible for crimes and other acts

4    committed by the other members, as long as those

5    crimes and acts were committed to help further, or

6    achieve, the objective of the conspiracy, and were

7    reasonably foreseeable to the Defendants Donnie Smith,

8    Abid Stevens, and Maurice Quinn as a necessary, or

9    natural consequence of the agreement.

10                   In other words, under certain

11   circumstances, the act of one conspirator may be

12   treated as the act of all.  This means that all the

13   conspirators may be convicted of a crime committed by

14   any one or more of them, even though they did not all

15   personally participate in that crime themselves.

16                   In order for you to find Donnie Smith,

17   Abid Stevens, and Maurice Quinn guilty of Hobbs Act

18   robbery as charged in Count I, based on this legal

19   rule, the legal rule regarding the liability as a

20   conspirator, you must find that the Government proved

21   beyond a reasonable doubt each of the four

22   requirements that follow.

23                   First, that a conspiracy existed

24   between Donnie Smith, Abid Stevens, and Maurice Quinn,

25   and that Donnie Stevens (sic), Maurice Quinn, -- I'm

Page 159

1   sorry, and that Donnie Stevens, Abid Stevens, and

2   Maurice Quinn were members of that conspiracy.

3              So the first element is the Government

4   must prove the conspiracy existed, and that Defendants

5   Smith, Stevens, and Quinn were members of that

6   conspiracy.

7              Second, that while Donnie Smith, Abid

8   Stevens, and Maurice Quinn were still members of the

9   conspiracy, one of them committed the offense charged

10  in Count I by committing each of the elements of that

11  offense as I've explained those elements to you.

12             Third, that Donnie Smith, Abid Stevens,

13  or Maurice Quinn committed this offense within the

14  scope of the unlawful agreement between them, and to

15  further or -- and to help further or achieve the

16  objective of the conspiracy.

17             And fourth, that this offense was

18  reasonably foreseeable to, or reasonably anticipated

19  by Defendants Donnie Smith, Abid Stevens, and Maurice

20  Quinn as a necessary or natural consequence of the

21  unlawful agreement.  The Government does not have to

22  prove that Donnie Smith, Abid Stevens, and Maurice

23  Quinn specifically agreed, or knew that this offense

24  would be committed.  However, the Government must

25  prove that the offense was reasonably foreseeable to

Page 160

1    Donnie Smith, Abid Stevens, and Maurice Quinn as a

2    member of the conspiracy, and within the scope -- and

3    within the scope of the agreement, as Donnie Smith,

4    Abid Stevens, and Maurice Quinn understood it.

5                    It is a federal crime for two or more

6    persons to agree or conspire to commit any offense

7    against the United States, even if they never actually

8    achieve their objective.

9                    A conspiracy is a kind of criminal

10   partnership.  In order for you to find Donnie Smith,

11   Abid Stevens, and Maurice Quinn guilty of conspiracy

12   to commit an offense against the United States, you

13   must find that the Government proved beyond a

14   reasonable doubt each of the following four elements:

15                   First, that two or more persons agreed

16   to commit an offense against the United States as

17   charged in Count I of the indictment.  That is the

18   Hobbs Act robbery.  I've explained the elements of

19   that offense in these instructions.

20                   Second, the Government must prove

21   beyond a reasonable doubt that Donnie Smith, Abid

22   Stevens, and Maurice Quinn were parties to, or members

23   of, that agreement.

24                   Third, the Government must prove that

25   Donnie Smith, Abid Stevens, and Maurice Quinn joined

Page 161

1    the agreement, or conspiracy, knowing of its objective

2    to commit an offense against the United States, and

3    intending to join together to achieve that objective.

4    That is, that Donnie Smith, Abid Stevens, or Maurice

5    Quinn shared a unity of purpose, and the intent to

6    achieve a common goal, or objective, to commit an

7    offense against the United States.

8              And fourth and finally, that at some

9    point during the existence of the agreement, or

10   conspiracy, at least one of its members performed an

11   overt act in order to further the objectives of the

12   agreement.

13             Now, I will explain each of these

14   elements in more detail.

15             The first element of the crime of

16   conspiracy is the existence of an agreement.  The

17   Government must prove beyond a reasonable doubt that

18   two or more persons knowingly, and intentionally,

19   arrived at a mutual understanding, or agreement,

20   either spoken or unspoken, to work together to achieve

21   the overall objective of the conspiracy to commit the

22   offense of interfering with interstate commerce by

23   robbery.

24             The Government does not have to prove

25   the existence of a formal or written agreement, or an

Page 162

1    expressed oral agreement, spelling out the details of

2    the understanding.  The Government also does not have

3    to prove that all of the members of the conspiracy

4    directly met, or discussed between themselves their

5    unlawful objective, or agreed to all of the details,

6    or agreed to what the means were by which the

7    objective would be accomplished.

8              The Government is not even required to

9    prove that all the people named in the indictment were

10   in fact parties to the agreement, or that all members

11   of the alleged conspiracy were named, or that all

12   members of the conspiracy are even known.  What the

13   Government must prove beyond a reasonable doubt is

14   that two or more persons in some way or manner arrived

15   at some type of agreement, mutual understanding, or

16   meeting of the minds to accomplish a common and

17   unlawful purpose.

18              You may consider both direct and

19   circumstantial evidence in deciding whether the

20   Government has proved beyond a reasonable doubt that

21   an agreement or mutual understanding existed.

22              You may find that the existence of a

23   conspiracy based on reason -- you may find the

24   existence of a conspiracy based on reasonable

25   inferences drawn from the actions and statements of

                                              Page 163

1   the alleged members of the conspiracy, from the
2   circumstances surrounding the scheme, and from
3   evidence of related facts and circumstances, which
4   prove that the activities of the participants in the
5   criminal venture could not have been carried out,
6   except as the result of a preconceived agreement,
7   scheme, or understanding.
8               Now, if you find that a criminal
9   agreement or conspiracy existed, then in order to find
10  Donnie Smith, Abid Stevens, and Maurice Quinn guilty
11  of conspiracy, you must also find that the Government
12  proved beyond a reasonable doubt that Defendants
13  Smith, Stevens, and Quinn knowingly and intentionally
14  joined that agreement, or conspiracy, during its
15  existence.
16              The Government must prove that
17  Defendants Smith, Stevens, and Quinn knew the goal or
18  objective of the agreement, or conspiracy, and
19  voluntarily joined it during its existence, intending
20  to achieve the common goal or objective, and to work
21  together with the other alleged conspirators toward
22  that goal or objective.
23              The Government need not prove that
24  Donnie Smith, Abid Stevens, and Maurice Quinn knew
25  everything about the conspiracy, or that they knew

Page 164

1    everyone involved in it, or that they were a member

2    from the beginning.  The Government also does not have

3    to prove that Donnie Smith, Abid Stevens, and Maurice

4    Quinn played a major or substantial role in the

5    conspiracy.

6              You may consider both direct and

7    circumstantial evidence in deciding whether Defendants

8    Smith, Stevens, and Quinn joined the conspiracy, knew

9    of its criminal objective, and intended to further

10   that objective.  Evidence which shows that Defendants

11   Smith, Stevens, and Quinn only knew about the

12   conspiracy, or only kept bad company by associating

13   with members of the conspiracy, or was only present

14   when it was discussed, or when a crime was committed

15   is not sufficient to prove that Defendants Smith,

16   Stevens, and Quinn were members of the conspiracy,

17   even if they approved of what was happening, or did

18   not object to it.

19              Likewise, evidence showing that

20   Defendants Smith, Stevens, and Quinn may have done

21   something that happened to help a conspiracy does not

22   necessarily prove that they joined the conspiracy.

23              You may, however, consider this

24   evidence with all of the other evidence in deciding

25   whether the Government proved beyond a reasonable

Page 165

1   doubt that Donnie Smith, Abid Stevens, and Maurice

2   Quinn joined the conspiracy.

3           The third element of the conspiracy is

4   the mental state or states of the Defendants.  In

5   order to find Donnie Smith, Abid Stevens, and Maurice

6   Quinn guilty of conspiracy, you must find that the

7   Government proved beyond a reasonable doubt that

8   Defendants Smith, Stevens, and Quinn joined the

9   conspiracy knowing of its objective, and intending to

10  help further, or achieve, that objective.

11          That is, the Government must prove:

12  one, that Donnie Smith, Abid Stevens, and Maurice

13  Quinn knew of the objective, or goal, of the

14  conspiracy; two, that Donnie Smith, Abid Stevens, and

15  Maurice Quinn joined the conspiracy, intending to help

16  further, or achieve, that goal, or objective; and

17  three, that Defendants Smith, Stevens, and Quinn, and

18  at least one -- no.  That Defendants Smith, Stevens,

19  and Quinn shared a unity of purpose toward the

20  objective of that goal.

21              Let me --

22      (Pause)

23          THE COURT:  There was a phrase that was

24  supposed to have been deleted.  It's applicable only

25  when there is only a single Defendant, and we'll

Page 166

1   delete it in the copy that is presented to the jury.

2   We'll talk about that at sidebar when I finish.

3            You may consider both direct and

4   circumstantial evidence, including Donnie Smith, Abid

5   Stevens, and Maurice Quinn's words or conduct, and

6   other facts and circumstances in deciding whether

7   Donnie Smith, Abid Stevens, and Maurice Quinn had the

8   required knowledge and intent.

9            With regard to the fourth element of

10  conspiracy, overt acts, the Government must prove

11  beyond a reasonable doubt that during the existence of

12  the conspiracy, at least one member of the conspiracy

13  performed at least one of the overt acts described in

14  the indictment for the purposes of furthering, or

15  helping to achieve, the objective of the conspiracy.

16           Take a look at the paragraph of the

17  charge that follows.  It does not seem to me that that

18  is applicable, and that was to have been deleted, but

19  we can go to sidebar and give the jury another

20  standup.

21           I'm on page 36, and it's the second

22  paragraph.  Take a look at it, if there's agreement

23  that it should not be read, I won't read it.  If

24  there's disagreement, we go to sidebar.

25           Does anyone disagree that paragraph

Page 167

1    two, the second paragraph on page 36 should not be

2    read because it's inapplicable?

3         (Pause)

4              MR. ECKERT:  I think we're in agreement

5    that it should not be read, Your Honor.

6              THE COURT:  Everyone?  Does anyone

7    disagree with that?

8         (Chorus of no)

9              THE COURT:  All right.  And it just

10   slipped into the charge.  It was supposed to have been

11   removed.  It applies when there's a single -- well, it

12   applies when there's a different set of circumstances.

13   It doesn't apply here.

14              Next, with respect to conspiracy, the

15   Government is not required to prove that any of the

16   members of the conspiracy were successful in achieving

17   any or all of the objectives of a conspiracy.

18              You may find Donnie Smith, Abid

19   Stevens, and Maurice Quinn guilty of conspiracy if you

20   find that the Government proved beyond a reasonable

21   doubt the elements I've explained, even if you find

22   that the Government did not prove that any of the

23   conspirators actually committed any other offense

24   against the United States.

25              Conspiracy is a criminal offense

Page 168

1    separate from the offense that was the objective of

2    the conspiracy.  Conspiracy is complete without the

3    commission of that offense.

4              Next, with respect to conspiracy.

5    Evidence has been admitted in this case that certain

6    persons who were -- who are alleged to be co-

7    conspirators --

8         (Pause)

9              THE COURT:  No, I'm going to modify

10   that charge as well.  I'm deleting the first sentence

11   of that charge.

12             The acts or statements of any member of

13   a conspiracy are treated as the acts or statements of

14   all the members of a conspiracy if these acts or

15   statements were performed or spoken during the

16   existence of the conspiracy, and to further the

17   objectives of the conspiracy.

18             Therefore, you may consider as evidence

19   against Donnie Smith, Abid Stevens, and Maurice Quinn

20   any acts done or statements made by any members of the

21   conspiracy during the existence of, and to further the

22   objectives of the conspiracy.  You may consider these

23   acts and statements even if they were done and made in

24   Donnie Smith, Abid Stevens, and Maurice Quinn's

25   absence and without their knowledge.

Page 169

1            As with all the evidence presented in
2    the case, it is for you to decide whether you believe
3    this evidence and how much weight to give it.
4            That concludes the charge on Count I,
5    Hobbs Act robbery, including aiding and abetting Hobbs
6    Act robbery and conspiracy.  I'm now going to turn to
7    Count II, which charges a separate crime against the
8    three Defendants, using or carrying a firearm during
9    any crime of violence.  And I think we'll take another
10   break.  Let's stand up.
11           You know what I think we'll do, we'll
12   take more than a standup.  Let's recess for 10
13   minutes.
14               THE BAILIFF:  All rise.
15       (Jury out)
16               THE COURT:  Be seated, everyone.  One
17   of those deletions was required, because the
18   Government did not charge conspiracy in the
19   indictment, and the other involved the statement of a
20   co-conspirator other than the Defendants.  It's really
21   designed for a single Defendant charge.  And we'll
22   delete what I said we'd delete.  When we go to
23   sidebar, I'll go over it so that you know what it was
24   we deleted.
25               And now we'll move into Count II.  And

Page 170

1    on that note, we are in recess.

2                     THE BAILIFF:  All rise.

3                     THE COURT:  Ten minutes.

4          (Recessed at 3:18 p.m.; reconvened at 3:40 p.m.)

5                     THE CLERK:  Please be seated.

6          (Pause)

7                     THE CLERK:  All rise.

8                     THE COURT:  Be seated, everyone.

9                     All right.  We will continue with the

10   charge.

11                    I'm now going to charge you on Count II

12   of the indictment.  Count II of the indictment charges

13   the Defendants Donnie Smith, Abid Stevens, and Maurice

14   Quinn with using and carrying a firearm during a crime

15   of violence, which is in violation of federal law.

16                    The offense charged in Count I of the

17   indictment, the Hobbs Act robbery, is a crime of

18   violence.  In order to find that Donnie Smith, Abid

19   Stevens, and Maurice Quinn guilty of the offense

20   charged in Count II of the indictment, you must find

21   that the Government has proved each of the following

22   three elements beyond a reasonable doubt:

23                    First, that Donnie Smith, Abid Stevens,

24   or Maurice Quinn committed the crime of Hobbs Act

25   robbery as charged in Count I of the indictment.

Page 171

1              And second, that during and in relation

2     to the commission of the crime, an individual

3     Defendant knowingly used or carried a firearm.

4              The term "uses or carries a firearm"

5     means having a firearm or firearms available to assist

6     or aid in the commission of the crime of interference

7     with interstate commerce by robbery.  "Use" means more

8     than mere possession of a firearm by a person who

9     commits a crime.  To establish use, the Government

10    must show active employment of the firearm.

11             If the Defendant did not either

12    disclose or mention the firearm, or actively employ

13    it, the Defendant did not use the firearm.

14             "Carry" means that the Defendant had

15    the firearm on his person.

16             Third, the Government must prove beyond

17    a reasonable doubt -- this is the third element, that

18    an individual Defendant used or carried the firearm

19    during and in relation to the crime of interference

20    with interstate commerce by robbery, that is Hobbs Act

21    robbery.

22             "During and in relation to" means that

23    the firearm must have had some purpose or effect with

24    respect to interference with interstate commerce by

25    robbery.  The firearm must have at least facilitated,

Page 172

1    or had the potential of facilitating interference with

2    interstate commerce by robbery.

3              In determining whether an individual

4    Defendant used or carried a firearm in relation to the

5    interference with interstate commerce by robbery

6    crime, you may consider all of the factors received in

7    evidence in the case, including the nature of the

8    underlying crime, interference with interstate

9    commerce by robbery, how close that Defendant was to

10   the firearm in question, the usefulness of the firearm

11   to interference with interstate commerce by robbery,

12   and the circumstances surrounding the presence of the

13   firearm.

14             If -- the Government is not required to

15   show that an individual Defendant actually displayed

16   or fired the weapon, however the Government must prove

17   beyond a reasonable doubt that the firearm was in that

18   Defendant's possession, or under their control at the

19   time of the Hobbs Act -- at the time the crime of

20   Hobbs Act robbery was committed, and that the firearm

21   facilitated, or at least had the potential in

22   facilitating the interference with interstate commerce

23   by robbery.

24             Now, the term "firearm" means any

25   weapon which will expel, or is designed to, or may

Page 173

1    readily be converted to expel a projectile by the

2    action of an explosive.  The term includes the frame

3    or receiver of any such weapon.

4              Now, I charged you with respect to

5    accomplice liability, or aiding and abetting with

6    respect to Count I, the Hobbs Act robbery Count.  I'm

7    now going to charge you on accomplice liability with

8    respect to Count II, the using or carrying a firearm

9    during and in relation to a crime of violence count.

10             A person may be guilty of an offense

11   because he personally committed the offense himself,

12   or because he aided and abetted another person in

13   committing the offense.  A person who has aided and

14   abetted another person in committing an offense is

15   often called an accomplice, and the person whom the

16   accomplice aids and abets is known as the principal.

17   Same instructions that I gave you with respect to

18   Hobbs Act robbery, it gets a little different as we

19   proceed.

20             In this case, the Government alleges

21   that Donnie Smith, Abid Stevens, and Maurice Quinn

22   aided and abetted someone, including a co-defendant,

23   in committing the crime of using or carrying a firearm

24   during and in relation to a crime of violence as

25   charged in the indictment in Count II.

1             In order to find the Defendant guilty

2    of using and carrying a firearm during a crime of

3    violence, because they aided and abetted someone in

4    committing this offense, you must find that the

5    Government proved beyond a reasonable doubt each of

6    the following four requirements.

7             First, that someone, including one of

8    the Defendants, committed the offense charged by

9    committing each of the elements of the offense charged

10   as I've explained those elements to you, and those

11   elements would be the Hobbs Act robbery elements, the

12   crime of violence.

13            Second, that the Defendant knew that

14   the offense charged was going to be committed, or was

15   being committed by someone, including a co-defendant.

16            Third, that the Defendant was an active

17   participant in using or carrying a firearm during and

18   in relation to a robbery that interfered with

19   interstate commerce, and also had advanced knowledge

20   that one of the principles would use a firearm during

21   and in relation to that robbery.

22            And fourth, that the Defendant

23   performed an act in furtherance of the offenses

24   charged.

25            To find that the Defendant was an

1   active participant in using or carrying a firearm

2   during and in relation to a crime of violence, you

3   must find that the Government proved that the

4   Defendant knowingly did some act for the purpose of

5   aiding or assisting someone, including a co-Defendant,

6   in committing the Hobbs Act robbery, and with the

7   intent that someone, including a co-Defendant, commit

8   that offense.

9               To find that the Defendant had advanced

10  knowledge that one of the principals would use or

11  carry a firearm during and in relation to the

12  interference with interstate commerce by robbery, you

13  must find that the Government proved that the

14  Defendant had knowledge of the firearm at a time when

15  they could do something with that knowledge, such as

16  walking away from the criminal venture.

17              "Advanced knowledge" means knowledge

18  beforehand such that the Defendant had a realistic

19  opportunity to leave the scene of the robbery after

20  learning that a firearm would be used or carried.

21              In deciding whether the Defendant had

22  the required knowledge and intent to satisfy the third

23  requirement for aiding and abetting, you may consider

24  both direct and circumstantial evidence, including the

25  Defendant's words and actions, and the other facts and

1    circumstances.  However, evidence that the Defendant

2    merely associated with persons involved in a criminal

3    venture, or was merely present, or was merely a

4    knowing spectator during the commission of the offense

5    is not enough for you to find that the Defendant was

6    guilty as an aider or a better.

7                    If the evidence shows that the

8    Defendant knew that the offense was being committed,

9    or was about to be committed, but does not also prove

10   beyond a reasonable doubt that it was that Defendant's

11   intent and purpose to aid or assist, or otherwise

12   associate themselves with the offense, you may not

13   find that Defendant guilty of the offense as an aider

14   and abettor.

15                    The Government must prove beyond a

16   reasonable doubt that the Defendant in some way

17   participated in the offense committed by someone,

18   including a co-Defendant, as something that Defendant

19   wished to bring about, and to make succeed in order

20   for that Defendant to be an aider and abettor.

21                    To show that the Defendant performed an

22   act in furtherance of the offense charged to satisfy

23   the fourth requirement, the Government needs to show

24   some affirmative participation by the Defendant, which

25   at least encouraged someone, including a co-Defendant,

1    to commit the offense.  That is, you must find that

2    the Defendant's act did in some way aid or assist

3    someone, including a co-Defendant, to commit the

4    offense.

5              The Defendant's act need not further

6    aid or assist every part of the offense charged, it is

7    enough if the Defendant's act further aid or assist

8    only one or some part, or phase of the offense.

9              Also, the Defendant's acts need not

10   themselves be against the law, thus the Defendant's

11   act -- acts need not further aid or assist the use or

12   carrying of a firearm.  It is enough if the

13   Defendant's acts further aid or assist the underlying

14   crime of using or carrying a firearm during and in

15   relation to a crime of violence.

16             Now, I'm going to charge you on motive.

17   Motive is not an element of the offenses with which

18   the Defendants are charged.  Proof of bad motive is

19   not required to convict.  Further, proof of bad motive

20   alone does not establish that the Defendants are

21   guilty, and proof of good motive alone does not

22   establish that the Defendants are not guilty.

23   Evidence of the Defendant's motive may however help

24   you find the Defendant's intent.

25             Intent and motive are different

Page 178

1    concepts.  Motive is what prompts a person to act.

2    Intent refers only to the state of mind with which the

3    particular act is done.  Personal advancement and

4    financial gain, for example, our motives for much of

5    human conduct.  However, these motives may prompt one

6    person to intentionally do something perfectly

7    acceptable, while prompting another person to

8    intentionally do an act that is a crime.

9              Now, I will instruct you on the defense

10   of justification.  It's applicable only to one

11   Defendant, Donnie Smith.

12             Donnie Smith has raised the defense

13   that he was justified by necessity in committing the

14   offenses charged in Counts I and II of the indictment.

15             If you find that the Government proved

16   beyond a reasonable doubt that Donnie Smith committed

17   the offenses charged, then you must consider whether

18   Donnie Smith's actions were justified by necessity as

19   I will define that for you.

20             If you find that the Government proved

21   that Donnie Smith committed the offenses charged, and

22   you also find that Donnie Smith proved that he was

23   justified by necessity in committing the offenses,

24   then you must find Donnie Smith not guilty of the

25   charges.

Page 179

1            To find that Donnie Smith's actions

2    were justified by necessity, and therefore that he is

3    not guilty of the offenses charged in Counts I and II

4    of the indictment, you must find that Donnie Smith

5    proved by a preponderance of the evidence each of the

6    following.

7            First, that Donnie Smith was under an

8    immediate unlawful threat of death or serious bodily

9    injury to himself or to others.

10            Second, that Donnie Smith had a well-

11    rounded reasonable belief that the threat would be

12    carried out if he did not commit the offenses.

13            Third, that Donnie Smith's criminal

14    action was directly caused by the need to avoid the

15    threatened harm, and that Donnie Smith had no

16    reasonable lawful opportunity to avoid the threatened

17    harm without committing the offenses.  That is, that

18    Donnie Smith had no reasonable lawful opportunity both

19    to refuse to do the criminal act, and also to avoid

20    the threatened harm.

21            And fourth, that Donnie Smith had

22    recklessly placed himself in a situation -- I'm sorry.

23    Wrong.  Fourth, strike that, disregard it.

24            Fourth, that Donnie Smith had not

25    recklessly placed himself in a situation in which it

Page 180

1  was probable that he would be put in a position of

2  having to choose whether to engage in criminal act.

3                  Now, Donnie Smith has the burden of

4  proving the defense of justification necessity by a

5  preponderance of the evidence.

6                  Preponderance of the evidence is a

7  lower standard than proof beyond a reasonable doubt.

8  To prove something by a preponderance of the evidence,

9  means to prove that it is more likely true than not

10  true.  If you put all of the credible or believable

11  evidence that is favorable to Donnie Smith, and the

12  credible evidence that is favorable to the Government

13  on opposite sides of a scale, the scale would have to

14  tip somewhat in Donnie Smith's favor in order for you

15  to find that Donnie Smith is not guilty because of

16  justification necessity.

17                  However, if the scale tips in favor of

18  the Government, or if the credible evidence appears to

19  be equally balanced, or if you cannot say on which

20  side the credible evidence is heavier, then you must

21  decide that Donnie Smith has not proved the defense of

22  justification necessity by a preponderance of the

23  evidence.

24                  In making this determination, you

25  should consider all of the evidence presented during

1    the trial regardless of who offered it.  You should

2    evaluate the evidence and its credibility in

3    accordance to the instructions I gave you earlier.

4    You should also remember that the fact that Donnie

5    Smith asserts this defense does not relieve the

6    Government of the burden of proving all of the

7    offenses charged beyond a reasonable doubt.

8                    Now, we're just about at the end of my

9    charge.  I'm going to instruct you now on

10   deliberations.

11                   That concludes my charge explaining the

12   law regarding the testimony and other evidence in the

13   two offenses charged.  Now, let me explain some things

14   about your deliberations in the jury room, and your

15   possible verdicts.

16                   First, the first thing you should do in

17   the jury room is to choose someone to be your

18   foreperson.  This person will speak for you here in

19   court.  He or she will also preside over your

20   discussions.  However, the views and vote of the

21   foreperson are entitled to no greater weight than

22   those of any other juror.

23                   Second, I want to remind you that your

24   verdict, whether it is guilty or not guilty, must be

25   unanimous.  All of you must agree.  To find that

Page 182

1    Donnie Smith, Abid Stevens, and Maurice Quinn are

2    guilty of an offense, every one of you must agree that

3    the Government has overcome the presumption of

4    innocence with evidence that proves each element of

5    that offense beyond a reasonable doubt.

6               To find Donnie Smith, Abid Stevens, and

7    Maurice Quinn not guilty, every one of you must agree

8    that the Government has failed to convince you beyond

9    a reasonable doubt.

10              Third, if you decide that the

11   Government has proved Donnie Smith, Abid Stevens, and

12   Maurice Quinn guilty, then it will be my

13   responsibility to decide what the appropriate

14   punishment should be.  You should never consider the

15   possible punishment in reaching your verdict.

16              Fourth, as I have said before, your

17   verdict must be based only on the evidence received in

18   this case and the law as I am giving it to you.  You

19   should not take anything I may have said or done

20   during the trial as indicating what I think of the

21   evidence, or what I think your verdict should be.

22   What the verdict should be is the exclusive

23   responsibility of you, the jurors.

24              Fifth, now that all the evidence is in,

25   the arguments are completed, and once I have finished

Page 183

1   these instructions, you're free to talk about the case

2   in the jury room.  In fact, it is your duty to talk

3   with each other about the evidence, and to make every

4   reasonable effort you can to reach unanimous

5   agreement.  Talk with each other.  Listen carefully

6   and respectfully to each other's views, and keep an

7   open mind as you listen to what your fellow jurors

8   have to say.

9             Do not hesitate to change your mind if

10  you are convinced that other jurors are right and that

11  your original position was wrong.  But, do not ever

12  change your mind just because other jurors see things

13  differently, or just to get the case over with.

14            In the end, your vote must be exactly

15  that, your own vote.  It is important for you to reach

16  a unanimous agreement, but only if you can do so

17  honestly and in good conscience.

18            Listen carefully to what other jurors

19  have to say, and then decide for yourself if the

20  Government has proven the Defendants guilty beyond a

21  reasonable doubt.

22            No one will be allowed to hear your

23  discussions in the jury room, and no record will be

24  made of what you say.  You should all feel free to

25  speak your minds.

Page 184

1          Remember, if you elected to take notes

2    during the trial, your notes should only be used as

3    memory aids.  You should not give your notes greater

4    weight than your independent recollection of the

5    evidence.  You should rely upon your own independent

6    recollection of the evidence, or lack of evidence, and

7    you should not be unduly influenced by the notes of

8    other jurors.  Notes are not entitled to any more

9    weight than the memory or impression of each juror.

10         Six, once you start deliberating, do

11   not talk, communicate with, or provide any information

12   about the case, by any means, to the court officials,

13   or to me, or to anyone else except each other.

14         During your deliberations, you may not

15   use any electronic device or media such as telephones,

16   cell phones, smart phone, iPhone, blackberry, or

17   computer, the Internet, any Internet service, or any

18   text or instant messaging service, or any Internet

19   chat room, blog, or website, such as Facebook,

20   MySpace, LinkedIn, YouTube, or Twitter to communicate

21   to anyone any information about the case, or to

22   conduct any research about the case.

23         Seventh, if you have any questions or

24   messages, your foreperson should write them down on a

25   piece of paper, sign them, and then give them to the

Page 185

1    court official, who will give them to me.  I will
2    first talk to the lawyers about what you have asked,
3    and I will respond as soon as I can.  In the
4    meanwhile, if possible, you should continue your
5    deliberations.
6                    If you want to see any of the exhibits
7    that are admitted in evidence and not provided to you,
8    you may send me a message, and if I can legally do so,
9    I will have those exhibits provided to you.
10                   One more thing about messages, do not
11   ever write down, or tell me, or tell anyone how you or
12   anyone else voted.  That should stay secret until you
13   have finished your deliberations.  If you have
14   occasion to communicate with me while you are
15   deliberating, do not disclose the number of jurors who
16   have voted to convict or acquit on any offense.
17                   And now, the verdict forms.  There are
18   three verdict forms and they have an interrogatory,
19   which is a question.  You should take these forms to
20   the jury room.  When you've reached your unanimous
21   verdicts, the foreperson should write the verdicts on
22   the forms, date and sign them, and return them to the
23   courtroom.  And you do this by notifying the court
24   officer, who will be in attendance just outside the
25   jury room.

Page 186

1                    If you decide the Government has proved

2      the Defendants' guilty of any or all of the offenses

3      charged beyond a reasonable doubt, say so by having

4      your foreperson mark the appropriate place on the

5      forms.

6                    If you decide that the Government has

7      not proven the Defendant guilty of some or all of the

8      offenses charged beyond a reasonable doubt, say so by

9      having the foreperson mark the appropriate place on

10     the forms.

11                   Now, the forms are not very

12     complicated. There's a form for each Defendant, so

13     you'll have a separate verdict form for each

14     Defendant.  And these verdict forms will -- well, they

15     do provide, and I'm quoting, "The jury unanimously

16     agrees to the following verdict for Counts I and II of

17     the indictment, as to Defendant," and there's one for

18     Dante (sic) Smith, Abid Stevens, and Maurice Quinn.

19                   And then there's a description of Count

20     I, and it's in the block to the left of the form, and

21     it reads, "On Count I of the indictment, charging

22     robbery which interferes with interstate commerce by"

23     -- "which interferes with interstate commerce, and

24     aiding and abetting, on or about March 22nd, 2019, we,

25     the Jury, unanimously find the Defendant" -- and,

Page 187

1    again, it's each one, Dante Smith, Abid Stevens,

2    Maurice Quinn, there's one for each of them -- "guilty

3    or not guilty."  There are two columns, guilty or not

4    guilty, and two lines, in whichever line you find

5    applicable.

6                    And then there's a description of Count

7    II.  "On Count II of the indictment, charging using

8    and carrying a firearm during and in relation to a

9    crime of violence, and aiding and abetting, on or

10   about March 22nd, 2019, we, the Jury, unanimously find

11   the Defendant," and again, Dante Stevens -- I'm sorry

12   Dante Smith, Abid Stevens, and Maurice Quinn, there's

13   a separate verdict form for each of them, and, again,

14   the same two columns, guilty and not guilty.

15                   When you answer those two questions,

16   you'll find an instruction at the bottom of the first

17   page.  And it reads, "If you find," and again, it's

18   each of the Defendants, "not guilty of Count II,"

19   that's the count that charges using or carrying a

20   firearm in connection with a crime of violence, "your

21   deliberations are concluded," and it says, "you should

22   sign the verdict form."  That's wrong.  The foreperson

23   should sign the verdict form, and we'll correct these

24   verdict forms.

25                   If you find the Defendants guilty -- if

1    you find any of the Defendants guilty of the crime

2    charged in Count II, you must answer an additional

3    question called an interrogatory, and that

4    interrogatory, again, it's applicable just to Count

5    II, and it reads, "Do you unanimously find that the

6    Government proved beyond a reasonable doubt that

7    Defendants," and again, there's one for each of them,

8    "brandished a firearm when committing this offense?"

9    And this offense refers to the offense charged in

10   Count II, using or carrying a firearm during and in

11   relation to a crime of violence.  And in order to

12   answer this interrogatory, there are two columns, yes

13   or no, and you check the applicable place.

14           After you have completed, and if after

15   the foreperson has completed this jury verdict form in

16   accordance with my instructions, the foreperson should

17   sign and date the form, and the jury should notify the

18   court official, who will be outside the jury room

19   door, that you're ready to return to the courtroom.

20           I should add that in answering this

21   interrogatory, this question, about brandishing, as in

22   deciding your verdict, you must be unanimous, and in

23   order to find that offense involves certain conduct,

24   you must all be satisfied that the Government proved

25   that conduct beyond a reasonable doubt.

1          And I'll go over this question, or the

2    interrogatory, in just a little more detail.  The jury

3    interrogatory asks whether if Defendant is guilty of

4    using or carrying a firearm during and in relation to

5    a crime of violence, whether he brandished the firearm

6    in a course of committing this offense.

7          To "brandish" means to display all or

8    part of the firearm, or otherwise make the presence of

9    the firearm known to another person in order to

10   intimidate that person, regardless of whether the

11   firearm is directly visible to that person.  You

12   should answer "yes" or "no" to this question.

13         And now I have -- I'm just about at the

14   end.

15         You should also be aware that after you

16   complete your deliberations as I have instructed you,

17   there may be some additional evidence presented very,

18   very brief, and, I mean, measured in minutes rather

19   than hours, an additional matter which you -- on which

20   you will have to deliberate.

21         All right.  That concludes my

22   instructions.  I now must go to sidebar to find

23   whether the attorneys have any other instructions they

24   wish me to give you.

25         In the meanwhile, why don't you take

Page 190

1    another stretch, standup, if you care to.

2         (Sidebar on the record)

3              THE COURT:  First of all, we've

4    substituted pages -- for the pages on which I told

5    you, on which you agreed, that there were problems.

6    On page 35, conspiracy element three, mental state,

7    the end of the first paragraph, we deleted "and at

8    least one other alleged conspirator."

9              Second, page 36, fourth element of the

10   conspiracy charge, overt acts.  We deleted the second

11   paragraph.

12             And third, page 38, acts and statements

13   of co-conspirators.  I deleted the first sentence

14   because it was inapplicable.  And those pages will be

15   substituted.  There's no objection to any of that, no?

16   Am I correct, Mr. Eckert?

17             MR. ECKERT:  No.

18             THE COURT:  Mr. Patterson?

19             MR. PATTERSON:  No.

20             MS. MEEHAN:  Not to the changes, but to

21   the overall Pinkerton charge.

22             THE COURT:  Yeah.

23             MS. MEEHAN:  (Indiscernible - 4:15:42)

24   to that, yes, (indiscernible - 4:15:43).

25             THE COURT:  There was an issue on page

Page 191

1   39, something didn't work.  I have some (indiscernible

2   - 4:16:02).  Ryan, anything?

3               MR. ECKERT:  I have.

4               THE COURT:  I made one other

5   correction.

6               MR. ECKERT:  I don't have an objection.

7               THE COURT:  Well, I thought -- I think

8   it's -- I think it's this, the second paragraph,

9   guilty of the offense charged, it should be Count II

10  of the indictment.  I think that better explains.

11              All right.  Now, let's talk about any

12  other issues with respect to the indictment.

13              Mr. Eckert, do you have any objections

14  -- I'm sorry.  I said, "the indictment," I meant the

15  charge.  Do you have any other issues with respect to

16  the charge?

17              MR. ECKERT:  Your Honor, I think the

18  Counsel (indiscernible - 4:17:18) the flight

19  instruction.  The Court read "must" instead of "may,"

20  so (indiscernible - 4:17:22) -- we'd defer to Mr.

21  Patterson, but I believe we would ask that

22  (indiscernible - 4:17:26).

23              MR. PATTERSON:  That's correct, Your

24  Honor, jury instruction number 14, first paragraph.

25              THE COURT:  What page?

1                    MS. MEEHAN:  18.

2                    MR. PATTERSON:  Page 18.

3                    THE COURT:  All right.

4                    MR. PATTERSON:  Second paragraph, the

5      first line.   Your Honor said, "must," rather than,

6      "may."

7                    THE COURT:  Oh, it's "may."

8                    MR. PATTERSON:  Right.  And I would --

9      I'd be okay with just rereading that first line if

10     Your Honor doesn't want to reread the whole charge.

11                   THE COURT:  I'll redo that.

12                   MR. PATTERSON:  And one other minor

13     thing, on page 51, just when Your Honor was -- when

14     Your Honor was reviewing the verdict form with the

15     jury, at one time you referred to Donnie Smith as

16     Dante Smith.  I would just ask that that be clarified.

17     That's all.

18                   THE COURT:  Okay.  I can do that.

19     Yeah.  Okay.

20                   MR. ECKERT:  And of course there'd be

21     no objection to that, Your Honor.

22                   MR. PATTERSON:  And I have nothing

23     further.

24                   THE COURT:  And you're okay on

25     everything else except for this (indiscernible

Page 193

1    4:18:57).

2                    MR. PATTERSON:  Yes, Your Honor.

3                    THE COURT:  All right.

4                    MR. WITTELS:  Well, I think we renew

5    our challenge to the Pinkerton charge, Judge, which we

6    have to do at this point.

7                    THE COURT:  Yes.

8                    MR. WITTELS:  We believe that there was

9    no evidence against of a conspiracy upon which to base

10   the Pinkerton charge, and even if there was some

11   scintilla of evidence, that giving a Pinkerton charge

12   is unduly confusing a burden to the jury, and

13   therefore should not have been given.

14                   THE COURT:  All right.

15                   MS. MEEHAN:  I join in that.

16                   MR. PATTERSON:  And I would join in

17   also, Your Honor.

18                   THE COURT:  Right.  I won't tell you

19   where I stand.

20                   Any other objections?

21                   MR. PATTERSON:  No.

22                   MR. WITTELS:  No.

23                   MS. MEEHAN:  Yes, Your Honor.

24   Accomplice liability as to that 924(c), on behalf of

25   Maurice Quinn, I would renew my objection for the

1    reasons we stated on the record -- well, during

2    several charge conferences, and the only thing I would

3    note, Your Honor, when we submitted the joint

4    instruction, the Government and Mr. Quinn, as to one

5    of the elements, it says, "You must unanimously agree

6    on the identity of the principal or principals," which

7    is not part of the current charge that Your Honor --

8                    THE COURT:  That's not part of the law

9    either.

10                   MS. MEEHAN:  Well, I'm not --

11                   THE COURT:  At least as the Third

12   Circuit (indiscernible - 4:20:20).

13                   MS. MEEHAN:  So, well, I'll just add

14   that for my objection to that, and that I think that

15   the aiding and abetting as the 924(c) in its current

16   forms is a little bit --

17                   THE COURT:  It's what?

18                   MS. MEEHAN:  -- confusing.  It's

19   confusing.

20                   THE COURT:  Well, I added -- I tailored

21   it to your objection.  Your objection was based

22   primarily on the opportunity to withdraw, whether he

23   was a knowing participant in conduct involving guns,

24   and I took from your proposed charge the paragraph

25   that I thought was most important.

1            I found that the rest of that charge
2  was inapplicable to the case in view of the
3  Government's position that they were not saying that
4  Quinn was the only aider and abettor, and that others
5  could be other aiders and abettors.
6            In any event, I'll address that.
7            MS. MEEHAN:  Very well.  And then the
8  verdict slip, Your Honor, we went through this before
9  that our position -- my position is that if Mr. Quinn
10 -- if the jury finds unanimously Mr. Quinn not guilty
11 of Count I, that they should be instructed that they
12 cannot move to Count II, and Your Honor addressed that
13 earlier.
14            THE COURT:  Well, in thinking about
15 that, it seems to me that if no one is convicted of
16 Count II, there's no crime of violence and no one can
17 be convicted -- I'm sorry.
18            MS. MEEHAN:  Of Count I.
19            MR. ECKERT:  Count I.
20            THE COURT:  If no one is convicted of
21 Hobbs Act robbery in Count I --
22            MS. MEEHAN:  Right.
23            THE COURT:  -- then there is no crime
24 of violence, and I don't think the Government can
25 prevail.  But that's not where we are now.

Page 196

1              While I'm on that issue, do you agree
2      with that, Mr. Eckert?
3              MR. ECKERT:  I would just ask for a set
4      -- or, an hour to look it over.  I think it make sense
5      what the Court's saying (indiscernible - 4:22:06) --
6              THE COURT:  Well, it's not really in
7      the case, yet.
8              MR. ECKERT:  Right, right.
9              THE COURT:  Now, it might be.  And then
10     I'll have to come to grips with it.  It's a very
11     interesting point, but as I read the law, I don't
12     think the Government has to find, and this is
13     hypothetically, Maurice Quinn guilty of Count I in
14     order to be able to consider his guilt or innocence of
15     the crime charged in Count II.
16             Someone, in my judgment, must be found
17     guilty of Hobbs Act robbery in order to find anyone
18     guilty of the crime of using or carrying a firearm
19     during and in relation to the Hobbs Act robbery.
20             MS. MEEHAN:  That's the problem with
21     that issue of who is the principal to what?
22             THE COURT:  I'm sorry?
23             MS. MEEHAN:  That is the problem with
24     the jury being confused about which Defendant is which
25     principal in which offense.

Page 197

```
 1                 THE COURT:  Well, it doesn't matter.
 2    It seems to me that if anyone is convicted of Hobbs
 3    Act robbery, they can all be convicted of using or
 4    carrying a firearm during and in relation of that
 5    robbery.
 6                 But it's an issue presented by the way
 7    the Government tried the case.  I have made my
 8    position clear --
 9                 MS. MEEHAN:  Very well.
10                 THE COURT:  -- on that, and your
11    objection is noted.
12                 MS. MEEHAN:  Thank you, Your Honor.
13                 THE COURT:  Now, those two forms that
14    you handed out didn't get anywhere except into my file
15    there.  They're not filed.
16                 In other words, you handed out two
17    forms with inked corrections regarding your charge.
18    At one point for charge it was the -- well, it was the
19    point on aiding and abetting Count II, using or
20    carrying a firearm.  Do you -- have you filed
21    (indiscernible - 4:23:59)?
22                 MS. MEEHAN:  I can file those, Your
23    Honor.
24                 THE COURT:  File them.  You have them.
25                 MS. MEEHAN:  The problem was that I was
```

1   going to file it as a joint -- a joint recommendation

2   to the Court as to the aiding and abetting accomplice

3   liability on 924(c), and then when we got to court and

4   the Government said, "Oh, no, we're not agreeing," I

5   didn't know how to file that, but I'll just file it as

6   Defendant's proposed --

7                   THE COURT:  Okay. That's fine.

8                   MS. MEEHAN:  Okay.  Thank you.

9                   THE COURT:  I have one other thing.  As

10  I read this, the instruction at the bottom of page 1

11  of the verdict form, and this is for all.  First of

12  all, it says, "You should sign the verdict form."  It

13  should read, "Your foreperson should sign the verdict

14  form."

15                  And then it should read, "After your

16  foreperson has completed this jury verdict form, the

17  foreperson should sign and date." I'm going to change

18  it to reflect that.

19                  Any objection to that?  I'm sorry.

20     (Chorus of no)

21                  THE COURT:  All right.  And what we'll

22  do, we'll make arrangements.  I don't know whether

23  they're going to want -- they're not going to want to

24  stay tonight.

25                  MR. ECKERT:  No.

```
                                              Page 199
```

1            THE COURT:  We'll make arrangements
2     tomorrow morning to have that (indiscernible -
3     4:25:53), the IT person, instruct them on how to use
4     the laptop in the (indiscernible - 4:26:00).  And I'll
5     let them go, after we administer the oath to the court
6     officer, and then we'll chat about some follow-up.
7                 MR. ECKERT:  Okay.
8                 THE COURT:  Anything else we have to
9     discuss now?
10                MR. ECKERT:  No, Your Honor.
11                MR. WITTELS:  No.
12                MR. PATTERSON:  No.
13                THE CLERK:  Yes, yes.  We -- just one
14    quick thing to think about in the middle of your
15    (indiscernible - 4:26:20).  Your Alternate, our
16    Alternate that's remaining has expressed a wish to
17    kind of be released from the building.  She does live
18    in Philadelphia and she can be on call where she would
19    not be permitted to go to work, but will be available,
20    and therefore, she would get paid.  So I just wanted
21    to throw that out there to see how you wanted to
22    handle the Alternate.  It's actually since I don't
23    expect the jury to even stay tonight.
24                THE COURT:  It's okay with me.
25                MR. ECKERT:  I don't have any

Page 200

```
1   objections.
2                   MS. MEEHAN:  That's fine.
3                   THE COURT:  I've done it this way in
4   the past.  It's not the conservative way to handle it.
5   Oh, I don't mean -- I'm not talking politics at all,
6   but, if that's agreeable to everyone, we'll instruct
7   her that she can't read or do anything dealing with
8   the case, and she has to be available in the event
9   another juror has a good reason for abstaining himself
10  or herself.
11                  THE CLERK:  And she --
12                  MR. ECKERT:  Sorry.
13                  THE CLERK:  -- and she has to
14  specifically be instructed that she cannot report to
15  work.
16                  THE COURT:  Yes.
17                  MR. ECKERT:  (Indiscernible - 4:27:34)
18  all the defendants bring no objection to that
19  procedure.
20                  MR. WITTELS:  No objection.
21                  MR. PATTERSON:  No objection.
22                  THE COURT:  I didn't hear you.
23                  MS. MEEHAN:  No objection.  I'm sorry.
24                  THE COURT:  I should tell you, when you
25  speak at the lectern, your habit is to move the mic
```

Page 201

1    up, which is great.  It might give you some feeling of

2    comfort, or what have you, but it makes it very hard

3    to hear.

4                    MS. MEEHAN:  Oh, sorry.  I always hit

5    the mic with my gestures, so it's always just --

6                    THE COURT:  All right. I'll instruct

7    the jury as (indiscernible - 4:28:06).

8                    MR. ECKERT:  Okay.

9         (Sidebar concluded)

10                   THE COURT:  Counsel has suggested one

11   minor correction and they're right.  I misread

12   something, and it concerns --

13        (Asides)

14                   THE COURT:  -- two minor corrections.

15   The first, it concerns consciousness of guilt, and

16   it's page 18.  I read that if you believe that Donnie

17   Smith ran from police officers, then you must consider

18   this conduct along with all the other evidence in

19   deciding whether the Government has proved beyond a

20   reasonable doubt that he committed the crime charged.

21   My use of the word "must" was wrong.

22                   It should read, "If you believe that

23   Donnie Smith ran from the police officers, then you

24   may," not must, "then you may consider this evidence,

25   or this conduct, along with all the other evidence in

Page 202

1   deciding whether the Government has proved beyond a

2   reasonable doubt that he committed the crime charged."

3   That's the first correction.

4               The second correction, I've been told

5   that in repeating Donnie Smith's name as many times as

6   I repeated it, on one occasion I identified him as

7   Dante Smith.  That was a mistake.  The Defendant is

8   Donnie Smith, not Dante Smith.  So that should be

9   corrected.

10              Other than that, the charge as I read

11  it is going to be presented to you as soon as we make

12  the one or two minor changes that need to be made.

13  All of the exhibits received in evidence will be given

14  to you.  There will be a court officer -- is there a

15  court officer who will be sworn, Ms. Hall?

16              THE CLERK:  Yes, sir.

17              THE COURT:  Where is --

18              THE CLERK:  He's in the back of the

19  courtroom.

20              THE COURT:  Oh, he's here.  Let's

21  administer the oath to the court officer while the

22  jury is here.

23      (Court officer sworn)

24              THE CLERK:  Please state your full

25  name, and spell your last name for the record.

```
1                OFFICER JORDAN:  CSO Michael Jordan, J-
2      O-R-D-A-N.
3                THE CLERK:  Thank you.
4                THE COURT:  Thank you.  Court Security
5      Officer Jordan will be in attendance outside the jury
6      room door.  He might be succeeded by other court
7      officers, but there will always be a court officer in
8      attendance.
9                And now, you have a decision to make.
10     It's 4:30, and I told you that at the end of the day
11     we would decide whether you wanted to stay and begin
12     deliberations, or wait until tomorrow morning.  And
13     what I'm going to ask you to do, this will not be a
14     vote in open court.  We don't do that very often.  I
15     think we've had the last of those votes in open court.
16     But I want you to go to -- go back to the jury room
17     and decide among yourselves, quickly, so that we can
18     decide what to do, decide quickly whether you wish to
19     remain tonight or come back tomorrow morning and
20     resume deliberations as soon as all of you are
21     together.
22               Is there anything else that needs to be
23     done at this stage of the proceedings?
24               MR. ECKERT:  No, Your Honor.
25               MR. PATTERSON:  No, Your Honor.  Thank
```

```
                                                Page 204
 1   you.
 2                   MR. WITTELS:  No, Your Honor.
 3                   MS. MEEHAN:  No, Your Honor.
 4                   THE COURT:  All right.  Let's usher the
 5   jury into the jury room.
 6                   THE CLERK:  All rise.
 7                   THE COURT:  You'll get back to me right
 8   away.
 9        (Jury out)
10                   THE COURT:  Be seated everyone.  We'll
11   wait for the jury.
12        (Pause)
13                   THE COURT:  I'll read the note.  "The
14   juror team has elected a foreperson, and has decided
15   as a group to begin deliberations tomorrow morning."
16                   Let's call them back.  I want to tell
17   them what they should do.  And there's no objection to
18   that, I'm going to let them do that, which is what I
19   expected.
20        (Pause)
21                   THE CLERK:  All rise.
22        (Jury in)
23                   THE COURT:  Be seated, everyone.
24                   First, we got your note.  You wish to
25   go home and start deliberations tomorrow morning, and
```

1   that's fine, and that's what we're going to do.  I

2   want you all here at 9:30, by 9:30 tomorrow morning.

3   You cannot begin your deliberations, however, until

4   all 12 of you, there will be 12 of you deliberating.

5                I'm going to excuse the Alternate

6   juror, I'll explain that to her, but she'll be on

7   standby in case one of you gets ill, or is otherwise

8   unable to participate.

9                We have arranged with the IT people

10  here in the courthouse to bring to the jury room a

11  laptop and a television set, and that person will

12  explain to you how to work it.  I'm sure some of you

13  know how, but we want to be sure you know how to work

14  this equipment so that if you choose to, you can play

15  all or part of the videos that are in evidence, and

16  those will be provided to you.  But that will happen

17  early tomorrow morning.

18               Also, we're going to have to make some

19  minor changes in the verdict forms in the charge, and

20  they will be provided to you early tomorrow morning as

21  will the exhibits.

22               Now, you know all the evidence.  You've

23  heard all the evidence, you've heard the closing

24  arguments, you've heard my charge.  Now, it's your

25  time to begin the oh so important task of jury

Page 206

1    deliberations.

2                    Keep in mind that you cannot deliberate

3    until all 12 of you are there, and that if, for

4    example, during deliberations someone wants to leave

5    to use the restroom or whatever, you've got to stop.

6    You cannot deliberate in groups.  You've got to

7    deliberate as a jury of 12 people.

8                    I'm going to repeat very briefly,

9    anyone asks you about what you did today at home, tell

10   them nothing.  Don't listen to anything that might be

11   broadcast over the radio dealing with the case, and

12   don't view anything that might be broadcast on

13   television, don't read anything that might be printed

14   in any newspaper dealing with the case, and just don't

15   discuss the case with anyone other than your fellow

16   jurors.

17                   The reason I've told you over and over

18   again you could probably give this instruction

19   yourselves now, but the reason is you've got to decide

20   the case based solely on the evidence presented in the

21   courtroom and not on anything else.

22                   Be sure you leave your juror notebooks

23   in the jury room, and we will not call you back into

24   the courtroom tomorrow morning.  We'll check on you to

25   make sure all is well.  As soon as all 12 of you are

Page 207

1    there, you may begin deliberations.  Okay.

2                   Now, Alternate juror has to retrieve

3    her belongings.  We have to do that first, yes?

4                   You're looking at me with that face.

5    And she really knows what she's doing.  She's telling

6    me I'm doing something.  And I'll talk --

7        (Asides)

8                   THE COURT:  On the question whether you

9    can all go back into the jury room including the

10   alternate, and the alternate can bring her belongings

11   out, Melan Hall and Deputy Wince (phonetic), you can

12   all go back into the jury room, we don't have to send

13   her back first, but don't discuss the case at all.

14   And I'll have some instructions for the alternate

15   juror, and I want her to come back into the courtroom.

16                  The rest of you may go home, and I'll

17   see you tomorrow morning at 9:30.

18                  THE CLERK:  All rise.

19       (Jury out)

20                  THE COURT:  Be seated everyone.  I want

21   to give the alternate juror the alternate juror

22   instructions just in case we have a need to call her.

23       (Pause)

24                  THE CLERK:  Are you ready for the

25   alternate?

Page 208

1                    THE COURT:  I am.

2                    THE CLERK:  All rise.

3          (Alternate Juror in)

4                    THE COURT:  Ms. Hall, will you show her

5     to the first --

6                    Be seated, everyone.

7                    I'm not going to refer to you by name.

8     I haven't done that throughout the trial, but that's

9     not to be impersonal.  That's because I don't think

10    it's necessary to broadcast your name throughout the

11    court -- courtroom.

12                   I understand you have requested to be

13    released from having to return to the courthouse

14    tomorrow morning.  Is that correct?

15                   ALTERNATE JUROR:  Yes.

16                   THE COURT:  I have no objection to

17    that, but it still is possible for a juror to call in

18    sick tomorrow, or for something else to happen to a

19    juror.  So your services might still be needed.

20                   Now, it's appropriate to release a

21    juror, an alternate juror, subject to call, and that's

22    what I'm doing to you.  You may --

23                   ALTERNATE JUROR:  But it means I can't

24    go to work tomorrow.

25                   THE COURT:  I don't know whether that

1    pleases you are not.  The smile on your face tells me

2    that that might not be so bad.

3                    ALTERNATE JUROR:  No, I kind of want to

4    go back.  I'm a teacher, so I want to go back to my

5    students.

6                    THE COURT:  I'm sure you do.

7                    ALTERNATE JUROR:  Yeah.

8                    THE COURT:  But we've got to keep you

9    so that you can substitute quickly.  If a juror isn't

10   here at the appropriate time at 9:30, we'll want to

11   call you, and have you substitute.  So you'll have to

12   get back to the courthouse.

13                   ALTERNATE JUROR:  Okay.

14                   THE COURT:  And we'll keep you advised.

15   If the jury reaches a verdict, we'll certainly let you

16   know.  Number one.

17                   Number two, it's very important for you

18   not to read anything that might be written about the

19   case, or to listen to anything broadcast on radio, or

20   view anything broadcast on television.  It's as though

21   you're subject to the same restrictions as the rest of

22   the jury until the jury reaches the verdict.  And then

23   we'll call you, and if you want to come back -- I

24   don't know how far away you are, but if you want to

25   come back and join in what happens at the end of the

Page 210

1    trial, you'd certainly be welcome to do that.

2                    But for now, I'm releasing you subject

3    to call, if a juror calls in and is unable to

4    participate in jury deliberations.  And it's very

5    important, that role is a very important one, because

6    the rules provide that in a criminal case, the jury

7    must include 12 members, have 12 members, in order to

8    return a true verdict.

9                    So, do you think there's anything else

10   that needs to be said, Mr. Eckert?

11                   MR. ECKERT:  No, Your Honor, thank you.

12                   THE COURT:  Patterson?

13                   MR. PATTERSON:  No, Your Honor. Thank

14   you.

15                   MR. WITTELS:  No, Your Honor.

16                   THE COURT:  Wittels?

17                   MS. MEEHAN:  No, Your Honor.

18                   THE COURT:  No.  So, I'm going to

19   excuse you for the evening.  Ms. Hall?

20                   THE CLERK:  All rise.

21                   THE COURT:  Do we have jurors, Ms.

22   Hall?

23                   THE CLERK:  Yeah.  Yes.

24                   THE COURT:  Contact information?

25                   THE CLERK:  Yes.

Page 211

```
 1              THE COURT:  Good.  Thank you.
 2        (Alternate juror out)
 3              THE COURT:  All right.  Be seated
 4    everyone.
 5              Something that has to be done that
 6    doesn't require all of you, I must go over the charge
 7    for Count III very briefly with the Government and Mr.
 8    Patterson.  Same is true of the verdict form.
 9              I don't think there's anything else.  I
10    have the stipulations.  We've talked about the
11    procedure for instructing the jury on the use of the
12    laptop and television set to view the video.
13              Oh, yes.  I've issued a formal order
14    bifurcating Counts I and II from Count III.  I issued
15    an oral order at the beginning of the trial, but I
16    decided it was necessary to issue a formal order.
17    It's dated today.  I decided not to file it for
18    reasons that I'll not go into in open court.  I don't
19    think it's necessary to file it, and I think it's in
20    Mr. Smith's interest that that not be filed.
21              We'll file it after the jury reaches a
22    verdict on Count III, but not until.
23              All right.  Is there anything else?
24              The Government exhibits, where are
25    those books -- where is the book?
```

Page 212

1          MR. ECKERT:  They're right here, Your
2   Honor.
3          THE COURT:  Give the exhibit book and
4   the exhibit list to Mr. Cosgrove (phonetic), and he'll
5   give it to the jury tomorrow morning.
6          MR. ECKERT:  Very well, Your Honor.
7          THE COURT:  Ms. Meehan, where are your
8   exhibits and the exhibit list?
9          You do?  All right.  Well, that needs
10  to be done.  Then the only other thing that I can
11  think of, I want to go over the charge and the verdict
12  form for Count III.  Is there anything else the
13  Government believes needs to be done?
14         MR. ECKERT:  No, Your Honor.
15         THE COURT:  Well, Patterson is here and
16  Mr. Smith can remain or not.  We're going to talk
17  about the charge on Count III, and the verdict sheet
18  on Count III.
19         MR. WITTELS:  Judge, I assume you want
20  us in attendance while the jury is deliberating?  Or
21  not?
22         THE COURT:  How far away are you, Mr.
23  Wittels?
24         MR. WITTELS:  My office is at 1429
25  Walnut Street.

```
                                            Page 213

 1                THE COURT:  I don't know how long

 2     they'll be, and as long as we have contact

 3     information.

 4                MR. WITTELS:  Yeah.  I'll give that to

 5     Ms. Hall.

 6                THE COURT:  I don't think -- I don't

 7     think it's necessary for you to be here at 10 o'clock.

 8                MR. WITTELS:  All right.  You'll call

 9     me if they have a question, and I'll be here in 20

10     minutes.

11                THE COURT:  We'll call you if the jury

12     has a question.  We've eliminated one issue, and that

13     is the laptop and the --

14                MR. WITTELS:  Yeah.

15                THE COURT:  -- television set.  Ms.

16     Hall?

17                THE CLERK:  Are there any other

18     exhibits that need to be -- need to go back to the

19     jury?  I just want that agreed to if you're not going

20     to be here in the morning, so that I know.

21                THE COURT:  Well, we have the

22     Government exhibits.

23                MR. ECKERT:  I'm happy to let Mr.

24     Wittels look at the binder.

25                MR. WITTELS:  No, I trust you.
```

Page 214

```
 1              THE COURT:  Mr. Patterson?
 2              MR. PATTERSON:  I'm 65 miles away.  So
 3    I'll be here.
 4              THE COURT:  Yes.  Good idea.  I was
 5    thinking more about the exhibits.
 6              MR. PATTERSON:  Oh, I'm sorry, Judge.  I
 7    thought you meant --
 8              THE COURT:  Is there any issue with
 9    regard to the Government exhibits in the binder?  Only
10    the exhibits that were received in evidence should be
11    included, along with an exhibit list.  And counsel
12    should satisfy themselves before they leave tonight
13    that that is so.  All right.  Any other issues Mr.
14    Wittels?  You've signed off on the exhibits?
15              MR. WITTELS:  No.  Mr. Eckert looks
16    like a trustworthy guy.
17              MR. PATTERSON:  I'm okay with them, for
18    the record, Your Honor.
19              MS. MEEHAN:  We're fine, Your Honor.
20              THE COURT:  All right.  I don't think
21    there's anything else.  Anyone have anything else to
22    present to the Court, other than Patterson and Eckert,
23    and they'll stay, and Ms. Martin will stay.
24              MR. PATTERSON:  No, Your Honor.
25              MR. ECKERT:  No, Your Honor.
```

```
1                    THE COURT:  All right.  Then I'm going
2       to excuse everyone other than Mr. Patterson, Mr.
3       Eckert, and Ms. Martin, and --
4                    MR. PATTERSON:  And, Your Honor, Mr.
5       Smith can go back.  He does not wish to be here for --
6                    THE COURT:  Fine.
7                    MR. PATTERSON:  -- these --
8                    THE COURT:  That's all right.  That's
9       fine.  All right.  Why don't we recess for just a few
10      minutes, Michael?  I'll sit -- stay on the bench.
11                   Michael?  We're in recess to let them
12      go.
13                   THE CLERK:  All rise.
14          (Recessed at 4:56 p.m., reconvened at 4:57 p.m.)
15                   THE COURT:  These are the three
16      stipulations.  I don't think I have any copies.
17      They're not signed, but I think they're all right.
18                   All right.  We have a very short
19      verdict form, and a very short charge.  After that
20      very long charge.
21                   Any objections to the jury charge on
22      Count III?
23                   MR. ECKERT:  We do not have any, Your
24      Honor.
25                   MR. PATTERSON:  None on behalf of Mr.
```

Page 216

1    Smith, Your Honor.

2                    THE COURT:  I thought there was an

3    issue on justification.  I don't know that it works,

4    but I thought you were raising one.

5                    MR. PATTERSON:  I was going to raise

6    it, but I think if we get to charge III, that would

7    assume that they would discount my justification on

8    Counts I and II.  For purposes of --

9                    THE COURT:  I'm sorry, what's

10   happening, Michael?

11       (Pause)

12                   THE COURT:  What do you think that was?

13                   THE CLERK:  We're getting feedback from

14   one of the microphones.  It's been resolved.

15                   THE COURT:  Okay.  Go ahead, Mr.

16   Patterson.

17                   MR. PATTERSON:  I originally advised

18   your clerk, Your Honor, that it may have been my

19   intent to ask for another justification charge on the

20   persons not to possess, however, since -- if we get to

21   Count III, I would assume that -- well, we're going to

22   get to Count III no matter what, but if my client is

23   convicted on Count I and II, that I would assume the

24   jury has discounted my justification defense in the

25   first case the chief.

1               So with that being said, I will not be

2     asking for justification charge.  I think I made my

3     reasons clear on the record for future review.

4               THE COURT:  All right.  Let's look at

5     the verdict form.

6               MR. PATTERSON:  And I do have a minor

7     objection to that, Your Honor.

8               THE COURT:  All right.

9               MR. PATTERSON:  I believe -- and I left

10    mine at home, but I believe it says that my client

11    possessed a gun.  I think that the Glock was charged

12    in the indictment.  I think it should say, "the store

13    gun," or, "the Glock," either one.  I believe, "the

14    store gun," would be easier for the jury to make that

15    --

16              THE COURT:  I think what we'll do is

17    identify it as it's charged, and then put in parens,

18    "the store gun."

19              MR. PATTERSON:  And that'll be fine

20    then.  That would be acceptable.

21              THE COURT:  Do you agree to that, Mr.

22    Eckert?

23              MR. ECKERT:  Of course, Your Honor.

24    Thank you.

25              THE COURT:  That's not a problem.  And

Page 218

1   I'm going to change the instruction at the bottom of

2   the form to read, "After the foreperson has completed

3   this jury verdict form in accordance with the

4   instructions, the foreperson should sign and date the

5   form below, and the jury should return to the

6   courtroom."  We'll do it that way.

7              All right.  I don't think we have

8   anything, and I see no issue with you, Mr. Wittels,

9   and -- where's Ms. Meehan?  Is she -- she's going?

10             MR. WITTELS:  She left, Your Honor.

11             THE COURT:  Being available by

12  telephone.  We have contact information.  Well, I know

13  we have it for Ms. Meehan.  Mr. Wittels, do we have

14  your contact information?

15             MR. WITTELS:  I'll make sure Ms. Hall

16  has it.

17             THE COURT:  Good.

18             MR. WITTELS:  I think she has my main

19  number, and I'll give her my cell.

20             MR. PATTERSON:  Your Honor, and I think

21  I believe I misspoke. I'm not getting my thoughts

22  clear on the record.

23             If my client is acquitted of Counts I

24  and II, and then we go to Count III, then yes, I would

25  request the justification charge.  So, if I can argue

Page 219

1  that now for the reasons why I believe it should be
2  included.
3              THE COURT:  Does the Government object?
4              MR. ECKERT:  We don't, Your Honor.
5              THE COURT:  Pardon me?
6              MR. ECKERT:  I don't think so.  I mean,
7  I hadn't really thought about, because I just --
8              THE COURT:  It's a little different.
9              MR. ECKERT:  Yeah.  Actually, may I
10  just have a second, Your Honor, on that?
11              THE COURT:  Because -- he has it.
12              MR. ECKERT:  He's in use.  Right.
13  Right.
14              THE COURT:  He has a gun.
15              MR. ECKERT:  Right.  Yeah, actually, I
16  --
17              THE COURT:  Although he's challenging
18  the -- well, the fact that it's a real gun.  And
19  you've argued that why would you leave the real gun in
20  the car, and take the toy gun?  But --
21              MR. ECKERT:  I need to be able to
22  present argument on that tomorrow morning, Your Honor.
23  I just want to think about that for second, because I
24  think it works slightly different with the position of
25  his wife as to whether the justification argument's

Page 220

1    been made in relation to this case.  I think for Count

2    III it works slightly different, given that it's

3    continuing defense to the time he leaves the store, up

4    until the time he crashes the car, which is a good

5    distance away.

6              So, I hadn't really thought of it in

7    this context, so I just act if the Court will permit

8    it, if --

9              THE COURT:  Well, that raises an

10    interesting issue.  Like, why didn't he leave the gun

11    behind, or throw it away --

12              MR. ECKERT:  Right.

13              THE COURT:  -- or do something like

14    that.

15              MR. ECKERT:  Right.

16              MR. PATTERSON:  I mean --

17              MR. ECKERT:  I didn't meant to talk

18    over you.  I just -- I think that I -- right, I think

19    there is with the -- I haven't read this case law in

20    some time, but the felon in possession of

21    justification case law deals with -- there are certain

22    requirements that have to be met, such as you can only

23    possess the gun for the limited purpose of whatever

24    the offense -- or whatever the other issue is.  Once

25    he leaves the area, I think it wouldn't apply, but I

1    would just ask for --

2                   THE COURT:  I am not familiar with that

3    law at all.  I've never had it.  So, I know I'm

4    looking out for hard work tonight, but I'm going to

5    need something, cases.

6                   MR. ECKERT:  Sure.

7                   THE COURT:  I don't need a law review

8    article.  But I need some case authority if there's

9    going to be an objection.

10                  MR. PATTERSON:  I would be --

11                  MR. ECKERT:  Understood, Your Honor.

12                  MR. PATTERSON:  -- I would be referring

13   to the case that's cited in the comments to the

14   standard jury instructions for the third charge.

15   That's -- that would be United States v. Dodd, United

16   States v. Plo (phonetic), P-L-O, and I believe --

17   yeah, those two cases.  And those are right in the

18   comments.

19                  MR. ECKERT:  Okay.  Yeah, I have your

20   file.

21                  MR. PATTERSON:  Okay.

22                  THE COURT:  All right.

23                  MR. ECKERT:  Thank you, Your Honor.

24                  THE COURT:  I don't think there's

25   anything else we have to do, unless you just want to

Page 222

1  hang out until --
2            MR. PATTERSON:  I've got a long drive,
3  Judge.  I would appreciate that.
4            THE COURT:  Ms. Martin has registered
5  by her smile the fact that she doesn't want to hang
6  out.
7            MR. WITTELS:  Judge, I've offered Mr.
8  Patterson --
9            THE COURT:  All right.  Then we're in
10  recess.  No one has to appear tomorrow at 9:30.  You
11  can, or you do if you --
12            MR. PATTERSON:  Yeah, I've got to --
13  I've got to drive.
14            MR. WIITELS:  Judge, I've offered him
15  the use of my conference room.
16            MR. PATTERSON:  And I might take him up
17  on that.
18            MR. WITTELS:  Yeah.
19            THE COURT:  You can do that.
20            MR. WITTELS:  We only -- we charge
21  premier rates.  We charge CJN rates.
22            MR. PATTERSON:  Get a discount.
23            THE COURT:  Or you can use the witness
24  room if you want to come down here.  I don't want --
25            MR. PATTERSON:  Okay.  I have some work

Page 223

1    to catch up on.  So I'll keep myself busy.

2                    THE COURT:  But you don't have to sit

3    in the courtroom.

4                    MR. PATTERSON:  Okay.  That'll be good.

5         (Asides)

6         (Proceedings recessed at 5:06 p.m., February 3,

7    2020, to reconvene at 9:30 a.m., February 4, 2020.)

8

9

10                        *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 224

1                           CERTIFICATION

2

3            We, Katherine A. Peterson and Sharon

4    Woodward, certify that the foregoing is a correct

5    transcript from the official electronic sound

6    recording of the proceedings in the above-entitled

7    matter.

8

9    _____

10   KATHERINE A. PETERSON, APPROVED TRANSCRIPTIONIST

11

12

13   _____

14   SHARON WOODWARD, APPROVED TRANSCRIPTIONIST

15

16   Dated:  November 19, 2020

17

18

19

20

21

22

23

24

25

| & | | | |
|---|---|---|---|

**&** 1:16

**0**

**00350** 1:2,3,3

**1**

**1** 1:2 83:14 96:20
  96:20 106:6,24
  198:10
**1-888-777-6690**
  1:25 2:25
**10** 11:15 18:14,24
  79:12,16 96:22,25
  103:8 153:12
  169:12 213:7
**100** 10:22 11:11
  12:9,17 29:15
  63:18,21 71:12
  73:21,22 92:11
  99:13,13 110:1
  117:21 118:5
  119:8,10,10,20
  124:10 147:22
**10:05:22** 9:11
**10:49:54** 41:21
**10s** 92:9
**11** 37:3 96:22
**117** 3:5
**11:17:54** 61:11
**11:33:29** 72:22
**11:43** 79:18
**12** 81:14 115:21
  205:4,4 206:3,7,25
  210:7,7
**1250** 1:12
**126** 3:7
**12:00** 79:11
**12:30** 93:1 94:25
**12:33** 97:21
**13** 105:9,9 106:23
  115:14 116:10

**1301** 1:18
**14** 191:24
**1429** 1:17 212:24
**15** 118:6
**16:52:50** 59:1
**16:54:53** 59:12,19
**16:54:54** 104:16
**16:54:55** 104:21
**16:55** 105:8
**16:55:13** 105:10
**16:55:14** 104:25
**16:55:29** 105:21
**16:55:47** 59:19
**16:55:48** 106:3
**16:55:51** 116:9
**16:55:56** 59:1
**16:55:57** 106:23
**16:56:31** 108:23
**16:59** 115:15
**16th** 4:24
**1743** 41:17
**17:04:33** 115:21
**18** 145:3,13 192:1
  192:2 201:16
**1800** 1:24 2:24
**1801** 1:24 2:24
**18045** 1:15
**19** 224:16
**191** 2:24
**19102** 1:18
**19103** 1:24
**19106** 1:12 2:5
**1951** 145:4
**1:00** 94:25 97:18
**1:24** 98:2
**1:37:01** 107:6
**1a** 102:3 106:24
**1c** 123:20
**1s** 92:10

| 2 | | | |
|---|---|---|---|

**2** 1:3 4:21 19:9
  145:4,14
**20** 10:11,13 11:6
  12:9 16:23 28:13
  29:18 70:15,15,18
  99:13,14 108:9,9
  110:6 117:21
  213:9
**200** 99:13
**2010** 39:12 41:23
**2019** 4:25 5:2
  11:14 41:17 146:5
  157:16 186:24
  187:10
**2020** 1:5 223:7,7
  224:16
**20s** 92:10
**215** 41:9
**21st** 112:21
**22** 28:23 79:10
**220** 99:13,17
**22nd** 11:14 98:22
  99:1,9 102:13
  112:22 113:8
  146:5 157:16
  186:24 187:10
**23** 65:13
**24** 75:10
**27th** 4:24
**2:19** 1:2,3,3

| 3 | | | |
|---|---|---|---|

**3** 1:3,5 19:9 223:6
**30** 119:16 120:17
**31** 106:1
**35** 190:6
**3513** 1:14
**36** 41:18 166:21
  167:1 190:9

**38** 190:12
**39** 191:1
**3:18** 170:4
**3:40** 170:4

| 4 | | | |
|---|---|---|---|

**4** 110:1 223:7
**40** 39:24 46:18
**42** 11:10
**43** 123:20
**44** 18:22 27:10
**45** 3:4 152:23
**47** 20:22,23,24,25
**4:15:42** 190:23
**4:15:43** 190:24
**4:16:02** 191:2
**4:17:18** 191:18
**4:17:22** 191:20
**4:17:26** 191:22
**4:18:57** 193:1
**4:20:20** 194:12
**4:22:06** 196:5
**4:23:59** 197:21
**4:25:53** 199:3
**4:26:00** 199:4
**4:26:20** 199:15
**4:27:34** 200:17
**4:28:06** 201:7
**4:30** 203:10
**4:47** 10:11 11:7
**4:51:51** 99:24
**4:56** 215:14
**4:57** 215:14

| 5 | | | |
|---|---|---|---|

**50** 39:23,24 40:8
  40:11 43:11
**51** 192:13
**540** 2:3
**5:00** 93:12,13
**5:05** 1:5

**5:06**  223:6
**5:07**  40:13
**5:29**  40:13
**5:30**  112:15
**5:43**  39:19 41:1
**5:46**  112:15
**5:57**  41:2
**5:58**  41:5
**5s**  92:9

**6**

**6**  96:20 108:23
**601**  2:4
**615**  1:11
**65**  214:2
**68**  11:16
**685**  34:15
**686-3128**  41:9
**6:00**  41:7

**7**

**7**  102:4 104:21
**700**  11:13 34:14

**8**

**8**  3:3 96:25 99:23
**80**  3:4 29:16
  117:20
**81**  74:24
**82**  74:25 75:8
  77:18

**9**

**9**  96:25
**911**  39:19 40:3,19
  40:21 41:1,10,10
  43:12 67:1,5,7,10
  72:24 103:23
  122:3,3,4,5,8,10
**924**  145:14 193:24
  194:15 198:3
**98**  3:5

**9:30**  205:2,2
  207:17 209:10
  222:10 223:7
**9:49**  1:5

**a**

**a.m.**  1:5 79:18
  223:7
**abets**  154:9 173:16
**abetted**  111:19
  154:5,7,12,16
  173:12,14,22
  174:3
**abetting**  25:16
  66:22 109:6
  113:21 118:20,25
  145:2,13 154:3
  155:15 169:5
  173:5 175:23
  186:24 187:9
  194:15 197:19
  198:2
**abettor**  31:25 32:4
  155:16 156:1,8,14
  157:10 176:14,20
  195:4
**abettors**  195:5
**abid**  1:4 8:24
  12:23,25 13:6
  14:10,12,15,18
  18:20 19:10,11
  20:4,4 21:19,19,21
  21:22,24 22:6
  25:5 27:4,5,7 30:2
  33:5,15 34:10,25
  35:5,24 44:5 80:2
  92:22 144:25
  146:13 147:19,24
  148:3,24 149:4,11
  149:14,17,24
  150:9,13 151:2,7

151:16 154:11
157:17,20,21,22
158:8,17,24 159:1
159:7,12,19,22
160:1,4,11,21,25
161:4 163:10,24
164:3 165:1,5,12
165:14 166:4,7
167:18 168:19,24
170:13,18,23
173:21 182:1,6,11
186:18 187:1,12
**ability**  137:5
**able**  80:24 81:5
  101:16 122:7
  126:13 196:14
  219:21
**absence**  168:25
**absolute**  142:24
**absolutely**  19:12
  29:3 33:8,23
  70:10 100:15
  102:15 118:12
  121:3 125:9 126:8
**abstaining**  200:9
**absurd**  107:25
**accept**  12:4,5
  128:7 138:7
  142:20
**acceptable**  24:16
  178:7 217:20
**accidentally**  34:16
**accomplice**  25:22
  26:5 30:25 109:6
  116:22 154:2,8,9
  157:9 173:5,7,15
  173:16 193:24
  198:2
**accomplish**  25:25
  37:7 162:16

**accomplished**
  162:7
**accord**  80:12
**account**  11:10,17
  63:7 100:7 104:2
  113:6,10
**accountable**  25:19
**accurate**  136:17
  136:24
**accusation**  145:24
**accused**  145:21
**achieve**  28:3 158:6
  159:15 160:8
  161:3,6,20 163:20
  165:10,16 166:15
**achieving**  167:16
**acme**  117:18
**acquit**  185:16
**acquitted**  218:23
**act**  22:17,18 25:14
  31:24,25 91:4
  92:15 145:7,7,17
  147:10,15 148:8
  148:20 150:4
  151:23 152:1
  154:13,15,25
  155:5,11 156:16
  156:21,24 157:1,8
  157:24 158:11,12
  158:17 160:18
  161:11 169:5,6
  170:17,24 171:20
  172:19,20 173:6
  173:18 174:11,23
  175:4,6 176:22
  177:2,5,7,11 178:1
  178:3,8 179:19
  180:2 195:21
  196:17,19 197:3
  220:7

acting   19:6 20:2
  27:12 30:25 48:10
  50:1 109:9
action   75:16 121:3
  121:17 173:2
  179:14
actions   9:10 10:2
  43:19 120:9 148:3
  150:9,14,23
  155:19 162:25
  175:25 178:18
  179:1
active   171:10
  174:16 175:1
actively   171:12
activities   163:4
actors   46:10
acts   84:9 157:3
  158:3,5 166:10,13
  168:12,13,14,20
  168:23 177:9,11
  177:13 190:10,12
actual   22:25 23:11
  24:17 148:12
  149:1 152:17
add   153:16 188:20
  194:13
added   194:20
addition   139:5
additional   188:2
  189:17,19
address   44:22
  195:6
addressed   195:12
administer   199:5
  202:21
admit   64:12
admitted   141:14
  168:5 185:7
ads   83:1,2,3,5

adult   65:1 66:8
  67:1
advance   36:6,7,7,7
  36:18 106:16
  107:15,16 116:5,9
  116:19 124:19,20
advanced   13:20
  35:12,13,14,16
  106:17 113:25
  114:2,5,9,20,23
  124:22 125:9
  174:19 175:9,17
advancement
  178:3
advances   108:16
advancing   13:9
  19:3,4 27:13
adverse   143:6
advised   209:14
  216:17
advocating   83:4
affairs   48:11
affect   24:11 152:2
  152:12
affirmative   156:18
  176:24
afraid   23:20 58:1
afternoon   79:24
  79:25 93:6,9,11
  98:9
aggressive   85:8
  86:7,7 102:6
  110:9,11 117:6
ago   45:13 46:2,2
agree   6:13 127:13
  127:16 149:10,13
  160:6 181:25
  182:2,7 194:5
  196:1 217:21
agreeable   95:22
  200:6

agreed   26:15 82:8
  95:10 131:19
  141:18 159:23
  160:15 162:5,6
  190:5 213:19
agreeing   198:4
agreement   37:1,4
  139:17 158:9
  159:14,21 160:3
  160:23 161:1,9,12
  161:16,19,25
  162:1,10,15,21
  163:6,9,14,18
  166:22 167:4
  183:5,16
agrees   186:16
ahead   216:15
aid   121:2 156:6,22
  156:25 171:6
  176:11 177:2,6,7
  177:11,13
aided   111:19
  154:5,6,12,16
  155:16 173:12,13
  173:22 174:3
aider   32:3 155:16
  156:1,8,14 157:10
  176:6,13,20 195:4
aiders   195:5
aiding   25:16 66:22
  109:5 113:21
  118:19,25 119:1
  145:1,13 154:2
  155:5,15 169:5
  173:5 175:5,23
  186:24 187:9
  194:15 197:19
  198:2
aids   154:9 157:1
  173:16 184:3

air   18:3 123:15
alert   38:19
alibi   39:19 43:13
  77:5,9
alleged   146:7,10
  152:12 162:11
  163:1,21 168:6
  190:8
allegedly   63:18
  65:15 76:25
alleges   154:10
  173:20
alleviate   120:9
allow   9:22 10:3
  128:25
allowed   132:20
  133:3 151:12
  183:22
allows   31:8
alternate   199:15
  199:16,22 205:5
  207:2,10,10,14,21
  207:21,25 208:3
  208:15,21,23
  209:3,7,13 211:2
alters   152:5
america   1:2
ample   101:17
  125:6
ancestry   129:3
anger   87:13 88:21
  89:1,2
angle   61:9,9
angles   72:5
angry   10:22,22
  88:23 103:24
  104:14
animal   90:15
animated   87:19
answer   103:8
  131:25 133:12,18

144:13,15,17
187:15 188:2,12
189:12
**answered** 64:13
133:1,8,16
**answering** 64:11
188:20
**anticipated** 159:18
**anxiety** 150:6
**anybody** 14:2 49:3
68:24 73:1 74:13
74:13 75:9 86:13
**apologize** 123:24
**app** 84:4
**apparently** 71:11
**appear** 222:10
**appearance** 137:9
**appearances** 1:9
2:1
**appears** 60:16
114:12 180:18
**applicable** 37:25
132:20 165:24
166:18 178:10
187:5 188:4,13
**applied** 58:12
**applies** 167:11,12
**apply** 32:20 48:17
55:20 63:15 127:7
127:8,10,12
167:13 220:25
**appoint** 46:14
**appreciate** 80:13
222:3
**appreciates** 80:14
**appropriate** 140:7
182:13 186:4,9
208:20 209:10
**approved** 164:17
224:10,14

**area** 61:17 68:22
76:15 220:25
**argue** 82:19
100:13 107:17
112:10,10 114:18
218:25
**argued** 219:19
**argues** 124:1
**arguing** 100:4
**argument** 45:25
46:1,9,17 53:18
77:8 82:8 83:11
84:7 87:12 88:10
89:9 92:1,5 93:6
103:25,25 111:7,7
111:8,9,10 113:3
113:16 115:12
116:18 120:17
122:12 125:25
154:1 219:22
**argument's**
219:25
**arguments** 3:3
5:16 7:11,14,15
8:8,12,21 88:11,12
117:13 119:9
126:21 131:22
140:25 182:25
205:24
**arm** 19:10 69:5
**armed** 70:14
72:12 73:1,23
84:6,11 110:12
117:7,8 126:1,3
**arms** 19:10
**arnold** 88:17
**arrange** 93:18
94:8,11
**arranged** 205:9
**arrangements**
198:22 199:1

**arrest** 89:11
**arrested** 89:6,7
**arrive** 34:11
**arrived** 161:19
162:14
**article** 221:8
**ashley** 1:10
**aside** 74:23 78:17
103:3
**asides** 123:21
153:15 201:13
207:7 223:5
**asked** 34:18 49:2
53:6,7,12 54:16
62:6,14,18 64:12
67:20 79:6 82:7
83:23 88:20
102:19 103:7
109:12,19 131:24
185:2
**asking** 47:5 56:3
68:1,9,10 73:2,16
109:14,15,15,16
109:17 110:17
123:25 124:2,3,10
124:14 132:19
144:14 217:2
**asks** 189:3 206:9
**assailant** 39:21
41:25 43:14
**assault** 110:11
**asserts** 181:5
**assist** 121:2 156:6
156:22,25 171:5
176:11 177:2,6,7
177:11,13
**assistance** 144:21
**assisted** 155:17
**assisting** 155:5
175:5

**assists** 157:2
**associate** 156:6
176:12
**associated** 155:22
176:2
**associating** 164:12
**association** 2:2
**assume** 5:16 101:6
120:16 134:11
212:19 216:7,21
216:23
**assuming** 67:3
76:17
**atf** 66:17
**atlantic** 1:23 2:23
**atm** 10:11 11:6,25
12:2,8 29:15 85:1
92:11 99:2,9
100:7,9 101:10,17
103:17 104:2
107:8 109:23
110:8 111:5 115:3
117:20,20 118:4
**attach** 138:15
143:4
**attack** 142:6
**attempt** 31:9 76:4
**attempts** 39:19,20
**attend** 95:4
**attendance** 185:24
203:5,8 212:20
**attention** 7:19
43:7 77:22 80:7
80:13 134:5
**attentive** 80:9
**attorney** 46:7
54:15 59:2,5,6
76:8 77:17
**attorney's** 1:11
**attorneys** 46:11
59:3 189:23

**audio**  41:16 43:9
  64:3,22 81:10
  139:15,18
**authority**  221:8
**automatic**  53:2
**available**  4:23
  171:5 199:19
  200:8 218:11
**averaged**  11:13,16
**avoid**  121:18,20
  127:21 143:22
  179:14,16,19
**aware**  189:15
**awful**  144:19

**b**

**b**  59:4 68:7,8 70:8
  83:14
**back**  7:21 9:1 10:9
  14:9,20 15:8,14
  16:9,11,13,14 17:4
  17:7 18:23,23,23
  21:2 23:4,5 27:11
  27:11,25,25 28:1,1
  29:2,2,6 30:13,21
  31:11,21 34:4,4
  35:1,15 41:6,11
  44:17 48:15 55:6
  61:17 68:8,9
  69:12,22 70:12,20
  72:23 73:3 77:12
  78:12 79:4 83:14
  85:19 87:4,24
  88:17,18 89:5,8,12
  89:16,23 90:18,22
  92:10 93:4 94:25
  95:15,17 98:10
  99:1 100:4,4
  101:3,13 104:1,5
  104:13,15 105:17
  112:19 115:22
  119:5,20,21

123:22,23 124:4,5
  124:9 126:14
  144:17 153:6
  202:18 203:16,19
  204:7,16 206:23
  207:9,12,13,15
  209:4,4,12,23,25
  213:18 215:5
**background**  15:19
  18:15 25:3
**backing**  24:21
  61:8 116:11,13,13
**backs**  14:3 16:18
  102:14
**backup**  16:22 20:2
**bad**  30:18 39:22
  64:17 123:9
  164:12 177:18,19
  209:2
**bag**  54:24
**bagged**  54:23
**bags**  25:4
**bailiff**  169:14
  170:2
**bails**  34:14
**balance**  11:10,17
  113:8
**balanced**  180:19
**bangs**  12:16 14:7,7
**bank**  11:9,16 26:7
  26:8,10 29:14,24
  30:1 99:12,14,15
  104:2 113:5,6,10
**barnaby**  1:16 80:1
**barrel**  57:22
**base**  193:9
**based**  9:7 25:17
  35:6 51:18,19,19
  63:6 65:14 67:6
  70:3,17 77:25
  78:23,25 112:3

128:16 130:8,14
  130:17 135:25
  136:20 140:16
  158:2,18 162:23
  162:24 182:17
  194:21 206:20
**basis**  37:9 135:12
**bear**  54:13 82:21
  96:21 137:19
**bearing**  138:11
**beat**  71:8 87:7
**beginning**  58:25
  80:21 81:23 95:17
  136:10 145:19
  164:2 211:15
**behalf**  50:25 92:22
  193:24 215:25
**behave**  87:18
**behaved**  88:24
**behavior**  136:20
  137:9
**belief**  51:7 121:13
  136:15 138:10
  179:11
**believability**
  136:14 138:14
  142:6,13
**believable**  138:22
  180:10
**believe**  60:22
  67:14 71:9 74:7
  75:8,24 78:3,18
  95:12,16 102:19
  109:13,16 111:8
  112:5 120:10
  121:14 122:15
  125:13 132:9
  136:12,13,17,19
  137:3,18 142:11
  142:14,21 143:15
  169:2 191:21

193:8 201:16,22
  217:9,10,13
  218:21 219:1
  221:16
**believed**  134:21
  135:2 137:20
**believes**  212:13
**belong**  40:24
**belongings**  207:3
  207:10
**bench**  56:14 58:3
  215:10
**beneficial**  152:15
**best**  105:4
**better**  4:13 83:2
  88:24 94:8 176:6
  191:10
**beyond**  47:23
  48:18 49:19,24
  50:7 51:8,14
  57:20 58:6,9 63:3
  66:2 68:2 70:12
  71:23 74:2 78:6,9
  78:18 114:3,24
  122:19 129:14,17
  130:3,6,10,11,12
  131:1 139:1
  141:15 143:18
  146:8,25 147:18
  148:23 151:24
  154:17 156:4,9
  157:7,12 158:21
  160:13,21 161:17
  162:13,20 163:12
  164:25 165:7
  166:11 167:20
  170:22 171:16
  172:17 174:5
  176:10,15 178:16
  180:7 181:7 182:5
  182:8 183:20

186:3,8 188:6,25
201:19 202:1
**bi** 11:12
**bias** 137:12
**biased** 63:7
**bifurcating** 211:14
**big** 56:12 65:10
67:11 68:15
**biggie** 52:4
**bill** 10:13 28:13
67:9 110:4 117:21
**bills** 11:2 110:6
**bind** 4:21
**binder** 213:24
214:9
**binding** 134:7
**bit** 4:6 24:7 48:12
50:23,25 52:12,20
122:6,8 153:22
194:16
**black** 39:15 76:19
**blackberry** 128:1
184:16
**blaming** 70:23
**blazing** 17:4,5
**block** 22:11 42:9
44:12 86:10,15
88:19 186:20
**blog** 128:4 184:19
**blood's** 88:4
**blown** 87:12
**blue** 25:3
**blueprints** 37:2
**bodily** 52:3 58:14
60:14,20 121:10
179:8
**book** 96:6 211:25
212:3
**books** 211:25
**bore** 63:12

**boss** 117:25 118:6
118:8,23
**bottom** 49:17
58:21 187:16
198:10 218:1
**bought** 42:18
**bowl** 82:15
**box** 6:7,11,21,23
**brandish** 189:7
**brandished** 34:19
49:23 58:8,11
66:23 188:8 189:5
**brandishing** 4:10
57:15,16 145:11
188:21
**break** 5:12 79:11
79:12 153:10,11
153:13 169:10
**bridge** 70:21
**brief** 8:7 189:18
**briefly** 95:9 122:7
206:8 211:7
**bright** 72:6
**bring** 7:3 17:3
75:12 76:10
156:13 176:19
200:18 205:10
207:10
**bringing** 56:19
**brings** 79:8 126:1
**broadcast** 206:11
206:12 208:10
209:19,20
**brought** 74:15
124:17 145:9
**bucks** 118:5
**buddies** 28:1
29:16
**buddy** 17:3
**buddy's** 43:23

**buffet** 98:13
**building** 199:17
**bulk** 24:3
**bum** 29:16
**bunch** 31:21 35:7
70:4
**burden** 8:6 47:18
47:20,21,22 48:18
50:6,8,9,10,12,14
51:3,6,8 52:9 78:9
78:21,21 90:5
129:20,22,24
141:4 142:25
147:11,13 149:9
149:13 180:3
181:6 193:12
**bus** 94:7,12
**business** 22:20
23:25 25:12 60:8
62:16 97:19
117:19 152:15
**busy** 223:1
**buttons** 20:25
43:22 119:16
**buy** 10:13 22:21
24:1 28:13 60:3,4
60:5 67:2 99:18
**buying** 24:5 99:3
**buys** 24:2,3
**bytes** 70:17

**c**

**c** 1:13,16 4:1
145:14 193:24
194:15 198:3
**c23** 106:6
**call** 12:2 40:3,19
40:21,22 41:1,6,8
41:10 43:12 67:7
67:10 72:24 81:23
90:13,15 94:1
101:10 103:7

108:5,6 117:25,25
118:23 122:3,3,10
144:16 199:18
204:16 206:23
207:22 208:17,21
209:11,23 210:3
213:8,11
**called** 49:14 64:9
66:25 81:22 89:10
89:24 103:22,23
111:7,8,9 112:13
118:6 122:4,8
134:5 140:4
150:25 151:6
154:8 173:15
188:3
**caller** 41:6,13 82:2
**calls** 11:19 39:18
40:8,11,19 41:2,11
67:5 210:3
**calm** 88:7 111:3
**camel** 90:12,13
**camera** 61:9,9,10
67:20 68:16,24
69:23 73:7 86:21
91:12 99:23 102:4
104:21 105:9
106:23 108:23
110:1 115:14,21
116:10 141:12
**cameras** 31:3 61:1
68:18 69:9 75:17
86:17 102:4 108:7
108:8 114:19
**canvas** 65:24
**canvass** 65:25
**canvassing** 66:7
68:22
**capable** 32:13
**capture** 67:19
76:14

car   16:5,6,7,10
  27:2,2 34:13 38:4
  38:8,13,17,25 39:3
  39:10,10,11,14,16
  39:17,18,21,25
  41:5,15,23 42:18
  43:12,14 126:5
  219:20 220:4
cards   75:4
care   96:4 101:10
  190:1
careful   150:18
carefully   80:11
  94:9 127:9 130:19
  183:5,18
cares   75:13 77:10
carlene   40:9,13
carried   121:13
  125:1 163:5 171:3
  171:18 172:4
  175:20 179:12
carries   171:4
carry   171:14
  175:11
carrying   32:7 35:4
  35:8 57:17,18
  113:22 135:16
  145:11 169:8
  170:14 173:8,23
  174:2,17 175:1
  177:12,14 187:8
  187:19 188:10
  189:4 196:18
  197:4,20
cars   86:25
case   9:5,9,12 10:4
  15:5 24:8 32:20
  32:23 44:24 47:21
  48:14,24 49:12
  55:1 56:9 58:12
  60:25 63:3 66:11

66:14 68:2,21
  74:21,23 77:22,25
  78:3,6,8,12 79:4
  81:16 82:11,23
  83:10 86:12 89:15
  89:18,18,20,22
  90:19 117:1,17
  120:5 122:4
  124:13 126:10
  127:18,24 128:6,7
  128:11,12,15,16
  128:18 131:9
  133:23 134:1,10
  134:13 136:22
  137:11,13 139:3,5
  139:8,11,13,24
  140:8 141:10,15
  142:9,24 146:2,11
  152:24 154:10
  157:11 168:5
  169:2 172:7
  173:20 182:18
  183:1,13 184:12
  184:21,22 195:2
  196:7 197:7 200:8
  205:7 206:11,14
  206:15,20 207:13
  207:22 209:19
  210:6 216:25
  220:1,19,21 221:8
  221:13
cases   221:5,17
cash   29:18 30:1
  31:15 61:18 62:16
  62:16 92:6 117:22
  117:23 126:12,14
cashier's   86:20
catch   223:1
cause   6:20 7:18
  130:20 137:23

caused   121:18
  152:20 179:14
causes   143:25
cautious   33:18,18
cd   95:15
celebrity   129:4
cell   11:23 40:3
  41:7 72:18 128:1
  184:16 218:19
center   2:4 38:15
  82:3
centuries   81:5
certain   33:23
  132:10 134:5
  141:18 146:4
  158:10 168:5
  188:23 220:21
certainly   4:18
  38:23 209:15
  210:1
certainty   130:13
  146:6
certification   224:1
certify   224:4
chain   54:17
challenge   193:5
challenging
  219:17
chamber   53:5,6,13
  53:14 123:6
chambered   54:23
  55:4
chambering   54:8
  55:8 122:22
chance   125:3
change   4:11 183:9
  183:12 198:17
  218:1
changed   5:1,1
  16:21,21

changes   4:8 80:20
  152:5 190:20
  202:12 205:19
changing   5:5
character   99:8
charge   5:20,22
  36:22 55:21 69:19
  94:3,19 144:21
  145:23 152:25
  153:25 166:17
  167:10 168:10,11
  169:4,18,21
  170:10,11 173:7
  177:16 181:9,11
  190:10,21 191:15
  191:16 192:10
  193:5,10,11 194:2
  194:7,24 195:1
  197:17,18 202:10
  205:19,24 211:6
  212:11,17 215:19
  215:20,21 216:6
  216:19 217:2
  218:25 221:14
  222:20,21
charged   51:16
  55:22 110:12
  113:20 117:7
  129:8,14 130:2,5
  131:1,6 143:19,21
  144:1,2,22 145:17
  146:12,14,15,17
  146:22 147:16
  154:14,21,22
  155:2,7,12 156:16
  156:21,25 158:18
  159:9 160:17
  170:16,20,25
  173:4,25 174:8,9
  174:14,24 176:22
  177:6,18 178:14

[charged - comes]                                                    Page 8

178:17,21 179:3
181:7,13 186:3,8
188:2,9 191:9
196:15 201:20
202:2 217:11,17
**charges**   22:16
78:16 144:5,24
145:10 146:3
157:15 169:7
170:12 178:25
187:19
**charging**   122:13
122:21 186:21
187:7
**charlene**   40:20
**chart**   105:3
**chase**   27:3 34:14
39:7,8
**chasm**   56:17
**chat**   128:3 184:19
199:6
**check**   11:1,15 32:5
75:3,3 144:11
188:13 206:24
**checks**   11:16 12:8
**chest**   9:2 18:12
19:18,22,23 20:5
23:21 27:14
**chestnut**   1:11
**chew**   42:5,7
**chief**   216:25
**child**   84:11
**chips**   25:4 65:3
**choice**   30:17
**choices**   10:3 15:7
**choked**   23:9
**choose**   93:17,20
180:2 181:17
205:14
**chooses**   39:4

**chorus**   4:4 7:9
79:25 94:23 167:8
198:20
**cigarettes**   10:13
28:13 42:9 43:6
62:15 99:3,18,21
**circles**   67:24
**circuit**   194:12
**circumstances**
72:14 129:5 150:8
150:19 155:20
158:11 163:2,3
166:6 167:12
172:12 176:1
**circumstantial**
9:14,21 10:6
32:19,21 57:3,6
134:17 135:1,16
136:5,7 151:1,6
155:18 162:19
164:7 166:4
175:24
**cited**   221:13
**citizens**   80:18 81:2
**city**   94:13
**cjn**   222:21
**claim**   114:21
**claims**   92:11
**clarified**   192:16
**clarify**   4:9
**classic**   26:7
**clean**   119:19 129:9
**cleaned**   62:21,22
72:1
**clear**   31:17 45:17
72:5 153:21 197:8
217:3 218:22
**clerk**   7:5 8:25
10:12,14 71:16
79:14,21 85:21
95:1 97:20 98:3

118:3 124:7 170:5
170:7 199:13
200:11,13 202:16
202:18,24 203:3
204:6,21 207:18
207:24 208:2
210:20,23,25
213:17 215:13
216:13,18
**clever**   90:24
**client**   46:13 50:21
51:16 52:19 55:14
56:17 57:21,24
61:1,5,13 62:18
64:15 66:3,23
71:8,12 74:24
75:4,14 76:17
77:18 78:20 79:3
92:22 216:22
217:10 218:23
**client's**   58:4,5
63:23 65:17 80:8
**clips**   115:8
**clock**   93:3
**close**   6:21 14:25
75:6 172:9
**closed**   6:23
**closely**   36:1
**closest**   35:23,23
36:5
**closing**   3:3 5:15
6:9 7:14,15 8:8,12
8:21 44:20,21
45:24,25 46:1,9,14
46:16 47:25 48:20
49:21 50:3 53:18
55:24 62:24 63:14
64:25 67:14 68:5
73:12 76:10 79:8
83:11 93:6 98:6,8
98:14 113:3

205:23
**closings**   22:14
80:11
**clutter**   102:11
**coat**   135:15
**cocked**   85:15
115:11
**cocks**   85:24
104:20
**code**   145:3,3,14
**coffee**   69:17
**colleagues**   53:7
63:14
**color**   80:23 129:2
**colored**   38:21
142:8
**columns**   187:3,14
188:12
**come**   16:4 27:25
34:22 38:22 43:13
43:14 44:8,17
46:13 54:19 57:7
57:25 70:12,25
77:12 79:4 81:20
85:1,4,19 90:18
92:2,3 95:14
106:1 107:7 114:1
114:14 118:1,7,9
118:11 119:4
126:14 196:10
203:19 207:15
209:23,25 222:24
**comes**   9:19 16:11
17:4 18:23,24
20:19 25:5 27:11
28:1,1 29:2 30:6
30:13 33:16 35:21
35:25 59:22 60:9
68:7,8,9 70:8
87:14 103:13
104:15 105:15,17

106:2,22 107:1
115:9,15 121:23
**comfort** 201:2
**coming** 11:15
15:20 18:14 27:11
38:2 58:25 59:11
67:13 68:15 69:21
125:7,14
**comings** 59:9
68:25
**comma** 5:2
**commands** 114:8
**commentators**
82:18
**comments** 5:20
221:13,18
**commerce** 22:21
22:23 23:23 24:5
24:11,13,18 25:11
25:12 145:1,7
147:12,14 148:4,5
151:23 152:3,4,7
152:11,12,14,16
152:18,20 157:19
161:22 171:7,20
171:24 172:2,5,9
172:11,22 174:19
175:12 186:22,23
**commission**
155:24 168:3
171:2,6 176:4
**commit** 35:8
121:14 155:8
156:20,23 160:6
160:12,16 161:2,6
161:21 175:7
177:1,3 179:12
**commits** 171:9
**committed** 26:3
26:20 87:17
143:13,19 144:2

146:4,9 154:4,21
155:2,3 156:3,4,11
157:14,18,23
158:4,5,13 159:9
159:13,24 164:14
167:23 170:24
172:20 173:11
174:8,14,15 176:8
176:9,17 178:16
178:21 201:20
202:2
**committing**
121:21 145:22
154:6,7,13,16,22
155:6,17 159:10
173:13,14,23
174:4,9 175:6
178:13,23 179:17
188:8 189:6
**common** 11:2,5
25:17 29:23 35:6
37:7 48:7 56:1,7
56:11,12,15 57:9
57:11 68:12,13
73:4,4 78:2,7
81:19 90:11
124:15 130:17
132:6,10 135:7
136:1 137:1 138:2
149:19 161:6
162:16 163:20
**commonwealth**
71:18
**commotion** 41:24
43:7,11
**communicate**
127:23 128:5,11
128:15 184:11,20
185:14
**communication**
40:14

**community** 129:6
**company** 1:23
2:23 68:17 148:17
164:12
**compare** 33:10
34:6 51:20
**comparing** 48:16
**comparison** 32:25
**compiled** 83:15
96:5
**complainant**
39:14 41:4
**complete** 168:2
189:16
**completed** 182:25
188:14,15 198:16
218:2
**complicated**
186:12
**comport** 47:9
**computer** 58:21
128:2 184:17
**conceal** 76:4
**concept** 10:6
119:24
**concepts** 178:1
**concern** 85:3
141:13
**concerned** 44:7
144:18
**concerning** 142:15
142:17 149:13
**concerns** 150:6
201:12,15
**conclude** 9:22
10:7 135:18
140:21
**concluded** 7:11
187:21 201:9
**concludes** 169:4
181:11 189:21

**conclusion** 74:1
77:4,20 81:20
91:23 132:11,12
135:6
**conclusions** 134:6
**concocted** 107:18
**conduct** 117:5
123:10 128:6
143:16,17,20
152:1,4 166:5
178:5 184:22
188:23,25 194:23
201:18,25
**conference** 222:15
**conferences**
132:24 194:2
**confidently** 81:4
**confirmed** 54:5
73:6
**conflict** 25:15
**confused** 196:24
**confusing** 193:12
194:18,19
**conjecture** 130:9
130:14
**connection** 32:8
32:10 148:7
187:20
**conscience** 183:17
**conscious** 89:15
143:25
**consciousness**
37:16,18 43:16
44:4 74:16,19
75:11,15 77:9
201:15
**consent** 139:17
**consequence**
158:9 159:20
**consequences**
152:19

conservative
   200:4
consider   33:11
   34:7,7,8 35:12
   37:17,21 77:23
   132:7 133:5,23
   136:3 137:4 138:3
   138:5 140:9 141:3
   143:7,16 146:21
   150:25 151:5,14
   151:15 155:18
   162:18 164:6,23
   166:3 168:18,22
   172:6 175:23
   178:17 180:25
   182:14 196:14
   201:17,24
consideration
   49:11 54:11 78:14
   142:3 150:18
considered   147:9
considering
   149:16
consisted   96:20
consistent   54:7
   55:7 137:17
consists   131:15
conspiracy   36:23
   36:24 37:10 49:22
   66:22 69:24 70:3
   70:13 71:3 73:9
   73:15 109:7 158:3
   158:6,23 159:2,4,6
   159:9,16 160:2,9
   160:11 161:1,10
   161:16,21 162:3
   162:11,12,23,24
   163:1,9,11,14,18
   163:25 164:5,8,12
   164:13,16,21,22
   165:2,3,6,9,14,15

166:10,12,12,15
167:14,16,17,19
167:25 168:2,2,4
168:13,14,16,17
168:21,22 169:6
169:18 190:6,10
193:9
conspirator   73:23
   158:11,20 169:20
   190:8
conspiratorial
   36:22
conspirators
   157:14 158:13
   163:21 167:23
   168:7 190:13
conspire   160:6
conspired   73:10
conspiring   76:25
constitution   49:4
constitutional
   49:9 142:24
contact   5:3 210:24
   213:2 218:12,14
contacts   40:7,11
   40:15
contd   2:1
contents   144:10
   144:11
context   220:7
continue   93:14
   170:9 185:4
continues   33:25
   117:1
continuing   220:3
contract   37:2
contradicted
   138:8
control   19:6 27:12
   30:24 36:2 71:4,5
   87:13 116:25

132:14 172:18
controlled   69:14
   69:16
controls   108:3
   134:9
conversation
   72:22 112:17
   114:7
converted   56:25
   173:1
convict   9:7 85:18
   89:2 177:19
   185:16
convicted   130:8
   158:13 195:15,17
   195:20 197:2,3
   216:23
conviction   151:25
convince   21:25
   22:7 101:23
   114:24 130:3
   182:8
convinced   130:25
   183:10
convincing   129:13
cook   12:15 53:4
cool   55:2
copies   144:8,21
   215:16
cops   89:11,11,24
copy   166:1
cordallis   41:9
corner   9:1 14:4
   19:4,15,16 27:13
   102:5 105:12
   106:8
cornered   8:25
cornering   13:8,10
   37:6
correct   6:19 74:6
   187:23 190:16

191:23 208:14
   224:4
corrected   95:6
   202:9
correction   191:5
   201:11 202:3,4
corrections   197:17
   201:14
correspond
   128:10
corroborated   73:7
corroborating
   65:7
cosgrove   2:6 212:4
could've   111:15
   121:21
counsel   4:12,22
   44:21 45:5 93:16
   100:17 104:22
   109:12,18 117:14
   120:1 124:1
   140:25 142:5
   144:16 191:18
   201:10 214:11
count   28:4 31:19
   32:7 111:11
   113:18,20 116:22
   144:24 145:10,16
   145:17 146:15
   147:16,21 157:15
   158:18 159:10
   160:17 169:4,7,25
   170:11,12,16,20
   170:25 173:6,6,8,9
   173:25 186:19,21
   187:6,7,18,19
   188:2,4,10 191:9
   195:11,12,16,18
   195:19,21 196:13
   196:15 197:19
   211:7,14,22

212:12,17,18
215:22 216:21,22
216:23 218:24
220:1
**counted**  64:25
**counter**  10:17,23
11:4 12:11,25
13:1,5,7,9 14:11
20:22,22 21:16
24:20,21 25:6,8,9
27:24 28:12,17
30:5,7 31:9,11
71:14 101:22
102:13 103:12
104:8 115:20
**counterfeit**  100:3
**country**  80:17,19
**counts**  44:25
92:23 110:5 117:9
144:6 178:14
179:3 186:16
211:14 216:8
218:23
**couple**  24:8 26:21
82:16
**course**  23:11
51:17 61:2 88:9
89:8 95:19 99:14
116:24 189:6
192:20 217:23
**court**  1:1,23 2:23
4:2,5 5:10,13,19
5:25 6:5,13,18,24
7:2,7,10,24 8:1,3,5
8:17,19 45:1,5
47:23 48:8 74:24
79:10,16,22 92:25
94:24 95:3,8,22,25
96:3,8,12,17,23
97:1,2,4,8,12,17
98:4,8 111:12,12

117:11 124:22
126:18,20 131:12
137:16 153:7,10
153:16,24 165:23
167:6,9 168:9
169:16 170:3,8
181:19 184:12
185:1,23 188:18
190:3,18,22,25
191:4,7,19,25
192:3,7,11,18,24
193:3,7,14,18
194:8,11,17,20
195:14,20,23
196:6,9,22 197:1
197:10,13,24
198:2,3,7,9,21
199:1,5,8,24 200:3
200:16,22,24
201:6,10,14
202:14,15,17,20
202:21,23 203:4,4
203:6,7,14,15
204:4,7,10,13,23
207:8,20 208:1,4
208:11,16,25
209:6,8,14 210:12
210:16,18,21,24
211:1,3,18 212:3,7
212:15,22 213:1,6
213:11,15,21
214:1,4,8,20,22
215:1,6,8,15 216:2
216:9,12,15 217:4
217:8,16,21,25
218:11,17 219:3,5
219:8,11,14,17
220:7,9,13 221:2,7
221:22,24 222:4,9
222:19,23 223:2

**court's**  116:25
196:5
**courthouse**  66:17
80:20 95:17
205:10 208:13
209:12
**courtroom**  9:19
46:11 127:1
128:17,23 131:10
132:5 135:15
144:17 185:23
188:19 202:19
206:21,24 207:15
208:11 218:6
223:3
**covering**  91:1
97:13
**cowen's**  83:16
**cr**  1:2,3,3
**crash**  27:2
**crashed**  39:9,25
43:15
**crashes**  220:4
**crashing**  43:12
**crazy**  84:5
**cream**  87:16,18
**credibility**  64:9,9
64:19 136:13,14
137:1 181:2
**credible**  102:17
112:4 113:16
180:10,12,18,20
**credit**  75:4
**crickets**  66:13
**crime**  25:18,24
26:16 32:8 35:8
38:15,20 54:25
55:22 69:19 70:24
92:13,17,18
113:19,22,23
117:1,2 143:13

145:12,15,21
147:12,14 148:10
148:20 150:4
151:22 152:12
154:13 157:23
158:13,15 160:5
161:15 164:14
169:7,9 170:14,17
170:24 171:2,6,9
171:19 172:6,8,19
173:9,23,24 174:2
174:12 175:2
177:14,15 178:8
187:9,20 188:1,11
189:5 195:16,23
196:15,18 201:20
202:2
**crimes**  37:9
143:19,21 144:1,2
158:3,5
**criminal**  35:19
47:21,22 56:8
78:8 121:17
155:22 160:9
163:5,8 164:9
167:25 175:16
176:2 179:13,19
180:2 210:6
**crocodile**  153:18
**cross**  24:5 47:7
76:9 83:24 88:20
107:20 115:2
**crowd**  19:6 27:12
30:24
**crude**  110:20
**cso**  203:1
**cubbies**  102:12
**cubby**  53:11
102:10 104:4
**cubicle**  59:23 60:8

cup 69:17
currency 60:3
current 194:7,15
curtis 2:4
custody 54:17
  148:15
customer 102:12
  103:14,22,22
  113:12
customers 84:19
  91:14,16 103:7,20
cut 51:23 87:2
cuts 116:8
cvs 117:19

**d**

d 3:1 4:1 96:20,20
  102:3 106:24
  203:2
d9 96:22
dante 40:3,4,8,14
  40:19,23 41:7,11
  186:18 187:1,11
  187:12 192:16
  202:7,8
dark 38:21
darndest 81:17,18
date 146:4,5,6,9
  146:10 185:22
  188:17 198:17
  218:4
dated 211:17
  224:16
day 1:6 11:13
  12:15 36:24 53:9
  63:18 64:14 67:9
  70:16 75:7 76:2
  77:1 93:12 96:19
  98:22,23 99:1,2,2
  99:4,8,10 100:21
  100:23 101:13
  203:10

days 11:15 28:23
  39:11 40:10,16
  45:13 46:2 53:4
  70:15,15,18 80:7
  103:6 108:9,9
dea 66:17
dead 71:8
deal 12:1 67:11
  83:19 88:16 91:9
dealing 200:7
  206:11,14
deals 220:21
dealt 54:4
death 52:3 58:13
  60:14,20 73:2
  121:10 179:8
deceased 75:3
  77:19
decide 48:24 77:25
  78:3 81:2 82:14
  83:21,21 85:2,19
  90:9 94:2 126:25
  128:16 131:9
  132:19 135:24
  136:7,11,19,23
  138:9 140:16
  142:9 144:16
  146:25 150:19
  151:13 152:13
  169:2 180:21
  182:10,13 183:19
  186:1,6 203:11,17
  203:18,18 206:19
decided 4:10,13
  49:9 204:14
  211:16,17
decides 85:9
deciding 133:23
  136:11,25 137:3
  141:4,6 143:17
  151:1,6,18 155:13

162:19 164:7,24
  166:6 175:21
  188:22 201:19
  202:1
decision 18:4
  30:18 39:22 90:2
  131:13 134:9
  135:11 143:11
  146:2,19 147:5,7
  150:9,11 203:9
deduction 135:6
defendant 1:13,16
  2:2 4:22 49:5 50:9
  116:23,25 124:23
  130:7,8 139:9,9
  142:24 143:2,3
  145:23 146:22,23
  146:24 147:1,5,9
  154:12,15 155:1,3
  155:4,6,8,11,13,21
  156:1,2,7,10,12,12
  156:14,15,19,20
  156:23 165:25
  169:21 171:3,11
  171:13,14,18
  172:4,9,15 173:22
  174:1,13,15,16,22
  174:25 175:4,5,7,9
  175:14,18,21
  176:1,5,8,13,16,18
  176:18,20,21,24
  176:25 177:3
  178:11 186:7,12
  186:14,17,25
  187:11 189:3
  196:24 202:7
defendant's 49:3
  139:1 155:19
  156:5,21,24 157:1
  157:3 172:18
  175:25 176:10

177:2,5,7,9,10,13
  177:23,24 198:6
defendants 1:5 4:7
  15:5 19:18 24:10
  32:5 37:21 92:3
  115:1 125:12
  129:7,16,20,23
  130:1,3 139:6,8,10
  139:15 141:7,15
  141:17 142:23
  143:5,8 144:6,22
  145:11,21 146:1
  146:12,13 147:8
  150:8 152:2,9
  154:21 157:17,20
  158:1,7 159:4,19
  163:12,17 164:7
  164:10,15,20
  165:4,8,17,18
  169:8,20 170:13
  174:8 177:18,20
  177:22 183:20
  186:2 187:18,25
  188:1,7 200:18
defender 2:2
defense 54:14 72:4
  77:17 83:19 90:7
  117:13 120:5,12
  122:2 135:23
  142:5 178:9,12
  180:4,21 181:5
  216:24 220:3
defer 74:6 191:20
define 48:8 90:3
  148:22 150:2
  155:25 178:19
defined 55:19
  58:11
definition 32:12
  34:20 48:4 55:20
  56:24 130:7 148:8

**degree** 152:21
**delay** 94:7 152:10
**delayed** 148:5
**delete** 166:1
  169:22,22
**deleted** 165:24
  166:18 169:24
  190:7,10,13
**deleting** 168:10
**deletions** 169:17
**deliberate** 78:13
  92:20,21 189:20
  206:2,6,7
**deliberating** 48:14
  93:10 184:10
  185:15 205:4
  212:20
**deliberations** 48:6
  93:14,14 95:18
  127:22 128:8,13
  128:19 143:10
  181:10,14 184:14
  185:5,13 187:21
  189:16 203:12,20
  204:15,25 205:3
  206:1,4 207:1
  210:4
**demanding** 12:20
  124:10,10,15
**demeanor** 72:11
  72:11 74:10 103:9
  138:11
**demonstrating**
  104:22
**department** 52:25
  66:7,16 69:21
  95:16
**depend** 138:19
**depends** 149:25
**deposits** 11:12,13

**deputy** 207:11
**describe** 50:13,13
  94:8
**described** 54:5
  147:20,22,22
  166:13
**describing** 151:10
**description** 145:22
  148:7 186:19
  187:6
**deserves** 132:9
  138:17,24 142:3
  142:12,22
**designed** 56:24
  169:21 172:25
**desk** 86:20
**desperate** 113:4
**detail** 138:5
  147:23 161:14
  189:2
**details** 39:18
  41:14 162:1,5
**detective** 54:4
  108:1
**determination**
  58:9 71:10,22
  180:24
**determine** 32:21
  48:18 59:5 106:12
  106:20 108:17
  112:3,4 141:14
  149:3 150:24
**determined** 112:2
**determining** 172:3
**device** 127:25
  184:15
**difference** 56:10
  56:12 124:11
**different** 4:14
  16:17 31:22 37:12
  47:1 48:12 52:12

90:15 93:12,25
  135:21 137:16,23
  167:12 173:18
  177:25 219:8,24
  220:2
**differently** 47:14
  138:1 183:13
**difficulty** 4:6
**digital** 50:18 68:19
**dime** 50:22,23
  51:4
**dinner** 93:18,18
**dire** 48:23,23 56:3
**direct** 9:14 10:7
  32:19 56:16 76:9
  102:20 109:17
  134:17,20,22
  136:4,6 155:18
  162:18 164:6
  166:3 175:24
**directly** 67:21
  121:18 134:21
  150:16 162:4
  179:14 189:11
**dirty** 123:8
**disagree** 166:25
  167:7
**disagreement**
  166:24
**disarm** 26:10
  61:12 76:23 86:2
**disarmed** 63:22
**disarms** 61:25
  62:13
**disbelieve** 137:24
**disclose** 171:12
  185:15
**discount** 216:7
  222:22
**discounted** 216:24

**discovery** 45:20
**discrepancies**
  137:21
**discuss** 127:18
  128:12,18 143:9
  199:9 206:15
  207:13
**discussed** 63:19,19
  119:25 123:25
  140:13 162:4
  164:14
**discussion** 103:17
  119:23 124:20
**discussions** 181:20
  183:23
**disk** 97:10
**disks** 97:14
**dispatch** 41:2,3,10
  41:11,21 82:3
**dispatcher** 41:17
  41:20 42:2,4,7,10
  42:13,15,20 43:1,4
  43:8
**display** 189:7
**displayed** 76:15
  117:4 172:15
**dispute** 84:25
  87:11,12
**disputed** 135:11
**disputing** 88:24
**disregard** 132:3
  133:10,18,22,25
  140:15,18 142:18
  179:23
**disrespecting**
  103:4
**disrupted** 25:11
**distance** 220:5
**distinct** 120:23
**distinction** 136:5

**distract** 123:7
  126:9
**distracting** 6:12
  6:16 67:25
**district** 1:1,1,7
  157:16
**distrust** 142:16
**disturb** 54:18
**dixon** 1:16
**dna** 31:13 43:21
**documents** 131:16
**dodd** 221:15
**doing** 16:14 19:5
  20:4 37:22 41:22
  47:3,3 50:21 56:3
  63:12 65:1,14
  68:24 73:21 81:9
  81:15 86:22 99:3
  107:7 112:18
  115:20 207:5,6
  208:22
**dollar** 110:4
**dollars** 101:13
  104:10 109:20,24
  110:16,17
**donnie** 1:4 8:23
  9:2 15:16,21,25
  16:11 17:3,4,13,14
  18:2,4,7,9,16,17
  18:24 19:1,20,21
  20:3,9,19 21:9,10
  22:5 26:4,20,22,23
  26:25 27:1,15,18
  27:19 28:3,6 31:1
  31:4,10,14,15 32:2
  33:4,21,24 34:13
  35:21 37:18,23
  38:3,7,10,17,21
  39:1,4,9,11,18
  40:2,9,14,20,24
  43:10 46:7,7,8,9

49:15 51:16 52:2
55:10,12 58:14
59:2,5 60:9,24
78:20 119:12
120:21,24 121:19
123:13 125:4,23
143:14,15,25
144:24 146:13
147:19,24 148:2
148:24 149:4,10
149:14,16,24
150:9,13 151:1,7
151:15 154:11
157:17,20,22
158:7,16,24,25
159:1,7,12,19,22
160:1,3,10,21,25
161:4 163:10,24
164:3 165:1,5,12
165:14 166:4,7
167:18 168:19,24
170:13,18,23
173:21 178:11,12
178:16,18,21,22
178:24 179:1,4,7
179:10,13,15,18
179:21,24 180:3
180:11,14,15,21
181:4 182:1,6,11
192:15 201:16,23
202:5,8
**donnie's** 17:25
  20:9
**door** 12:24 14:24
  14:25 15:1,10,16
  16:8,24 17:1,2,5,5
  17:21 18:2,10
  36:5 39:2 59:9,10
  67:20,22 69:1,6
  106:2 110:19
  115:15 188:19

203:6
**doors** 116:11
**doorway** 105:15
**doubt** 47:23 48:5,9
  48:9,19 49:20,24
  49:25 50:8,12
  51:15 57:20 58:6
  58:9 63:3 66:3,20
  68:2 70:12 71:24
  74:2 78:10,19
  86:6 90:4 114:4
  114:25 122:20
  129:14,18 130:4,6
  130:10,11,12,16
  130:16,18,20
  131:2,4 139:2
  141:16 143:18
  146:8 147:1,18
  148:24 151:25
  154:18 156:5,10
  157:7,12 158:21
  160:14,21 161:17
  162:13,20 163:12
  165:1,7 166:11
  167:21 170:22
  171:17 172:17
  174:5 176:10,16
  178:16 180:7
  181:7 182:5,9
  183:21 186:3,8
  188:6,25 201:20
  202:2
**doubts** 130:13,13
  130:15
**drag** 44:2
**dragging** 38:1
  39:5
**drama** 111:5
**draw** 49:8 56:6
  135:23,24,25
  143:6

**drawn** 135:22
  162:25
**dressed** 59:13
**drew** 62:9,9
**drive** 1:14 69:3,3,7
  222:2,13
**driver** 26:9
**driving** 101:20
**dropped** 65:2
**dubois** 1:7
**dundee** 153:18
**duties** 126:24
  128:24
**duty** 126:25 127:7
  183:2
**dvr** 70:16,19

**e**

**e** 1:7,10 3:1 4:1,1
  98:1,1
**earlier** 24:18
  33:15 181:3
  195:13
**early** 28:14 93:5
  205:17,20
**easier** 217:14
**easily** 56:24
**eastern** 1:1
**easton** 1:15
**easy** 88:2,3,4
**eckert** 1:10 3:5
  5:24 44:21 95:12
  96:7,10 117:15,16
  123:22 126:18,19
  167:4 190:16,17
  191:3,6,13,17
  192:20 195:19
  196:2,3,8 198:25
  199:7,10,25
  200:12,17 201:8
  203:24 210:10,11
  212:1,6,14 213:23

214:15,22,25
215:3,23 217:22
217:23 219:4,6,9
219:12,15,21
220:12,15,17
221:6,11,19,23
**economic** 129:5
**edge** 6:8 89:22
**education** 140:2
140:18
**effect** 65:22
137:13 138:3
152:8,14,17,20
171:23
**effort** 183:4
**eight** 52:24 60:1
61:1 137:19
**either** 31:25 40:10
62:8 69:11 85:19
136:6 139:20
161:20 171:11
194:9 217:13
**eject** 56:25 57:14
**elected** 184:1
204:14
**electronic** 127:25
128:14 184:15
224:5
**electronically**
128:11
**element** 23:12,24
32:20 35:3 50:7
51:15 55:18,21
63:13 66:2 74:2
122:19 130:5
131:1 148:9,19
150:3 151:18,22
151:24 152:18
159:3 161:15
165:3 166:9
171:17 177:17

182:4 190:6,9
**elements** 49:24
51:22,25 63:10,15
121:7,8 122:15,16
122:23 131:5
147:18 154:22,23
154:24 157:7,8
159:10,11 160:14
160:18 161:14
167:21 170:22
174:9,10,11,11
194:5
**eliminate** 120:9
**eliminated** 213:12
**eluding** 77:8
**embedded** 58:22
**embodies** 9:13
**emmanuel** 12:14
13:3 14:14,22,25
16:16,25 17:19
19:7,9,12 21:13
22:2 23:14,19
25:10 27:7,12
28:5 33:9 34:25
150:12,20 151:10
151:17
**employ** 171:12
**employed** 142:1
149:11
**employee** 106:14
**employees** 147:20
148:25
**employment**
171:10
**empty** 119:11
**enable** 144:10
150:19
**encouraged**
156:19 176:25
**encroaching** 24:20

**ended** 39:8 56:5
**ends** 27:1 39:9
62:25
**enforcement**
141:25 142:1,7,11
**engage** 180:2
**engaged** 103:25
**english** 11:22,24
12:12 84:15 103:5
124:16
**enlists** 118:24
**entered** 114:3
**entire** 20:6 21:9,14
29:7 36:8 61:2
68:20 72:18,24
96:21 115:7 143:2
**entirely** 108:14
133:10 140:15
144:2
**entirety** 4:23
**entitled** 29:10,19
43:19 181:21
184:8 224:6
**entrance** 67:22
**equally** 10:6 32:4
37:24 180:19
**equation** 31:8
**equipment** 205:14
**equivalent** 153:20
**escalate** 104:3
**escalated** 115:25
**escalates** 12:18
13:2
**escalation** 28:14
**escape** 7:19 73:1
**especially** 83:5
**esq** 1:10,10,13,16
2:2
**esr** 2:6
**essence** 112:25

**essential** 147:17
**essentially** 24:23
26:1
**establish** 26:2
157:6 171:9
177:20,22
**established** 23:24
**establishing** 157:5
**estranged** 75:1
**evaluate** 181:2
**evening** 93:11,25
210:19
**event** 83:16 87:9
137:25 195:6
200:8
**events** 59:12 70:16
132:8 157:2
**everybody** 53:12
58:17 67:13 69:25
86:18 153:3
**everybody's** 67:7
70:1 103:21
**everyday** 81:1
132:8
**everyone's** 25:22
36:23
**everything's** 82:10
**evidence** 7:10,16
9:7,14,21 10:6,7
32:19,21 37:21
44:24 45:18,19
46:3,3,21,21,24
47:13 48:15,25
50:10,16,24 51:9
51:18 54:10,18,24
55:6,25 56:16
57:3,7 58:19 63:6
63:20 64:1,2 65:7
67:6 69:19 70:3,5
70:14,19 71:11
77:7,10,12 78:1,24

84:23 90:10 96:6
97:14 100:15
101:18 106:16
107:9,13 108:9,11
108:12 111:20,22
112:16 114:5,7,8,9
114:17,20,24,25
116:17 122:25
126:22,25 127:5
128:17,20 129:10
129:12,21 130:9
130:19,22,23,23
130:24 131:8,10
131:14,21,25
132:7,11,14,15,16
132:17,19 133:2,3
133:5,9,21,22,25
134:7,9,16,17,18
134:18,20,20,22
135:1,1,3,8,17
136:1,3,7,8,22
137:18 138:18,21
139:3,7,9,11,19,21
140:8,22,23 141:6
141:6,14 142:10
143:24 145:24
146:18,21 150:19
150:25 151:1,5,6
155:18,21 156:2
162:19 163:3
164:7,10,19,24,24
166:4 168:5,18
169:1,3 172:7
175:24 176:1,7
177:23 179:5
180:5,6,8,11,12,18
180:20,23,25
181:2,12 182:4,17
182:21,24 183:3
184:5,6,6 185:7
189:17 193:9,11

201:18,24,25
202:13 205:15,22
205:23 206:20
214:10
**evidentiary**   7:13
**exact**   14:19 24:23
108:1 145:21
146:6
**exactly**   17:8 21:6
48:13 61:4,5
62:21 63:13
109:25 110:5
115:19 153:7
183:14
**examination**   76:9
76:9 88:20
**examine**   83:24
90:8
**example**   9:15,16
26:7 29:13 84:2
94:3 97:9 134:22
135:13 178:4
206:4
**excellent**   83:11
91:11
**exceptions**   139:24
**exchange**   103:10
104:7,10
**exchanging**   71:12
**excitable**   86:4
123:18
**exclusive**   182:22
**excuse**   46:20 81:6
94:22 99:11 205:5
210:19 215:2
**exercise**   49:9
**exhibit**   58:15
59:20 67:12 83:14
96:8,23 97:5,8,12
97:15 133:1,3,9,10
133:13 212:3,4,8

214:11
**exhibits**   96:5,6,15
96:24 97:15
131:18 133:4
185:6,9 202:13
205:21 211:24
212:8 213:18,22
214:5,9,10,14
**existed**   158:23
159:4 162:21
163:9
**existence**   135:4
161:9,16,25
162:22,24 163:15
163:19 166:11
168:16,21
**existing**   150:8
**exists**   135:11
150:5 151:18,21
**exit**   14:5 21:13,14
35:23,24
**expect**   199:23
**expected**   150:6
204:19
**expel**   172:25 173:1
**experience**   11:3,5
56:7 78:3 81:19
130:17 132:8,10
135:7 136:1 137:2
138:2 140:2,17
**experiences**   56:2
150:5
**expert**   52:22 53:25
56:14 67:8 140:4
**expertise**   54:3
**explain**   25:15
35:13 85:11 87:15
90:21 101:9
115:16,18,24
147:4 161:13
181:13 205:6,12

**explained**   31:21
32:1 139:6 145:19
154:23 159:11
160:18 167:21
174:10
**explaining**   115:13
181:11
**explains**   11:21,24
191:10
**explanations**
136:21
**explosive**   173:2
**expressed**   162:1
199:16
**exterior**   102:9
108:8
**extremely**   67:12

**f**

**f**   98:1
**face**   12:19,20
13:10 19:17 21:3
22:8 23:6 33:5,6
34:23 102:7 106:7
106:13,19,21
118:18 120:22
121:1 125:17
207:4 209:1
**facebook**   128:4
184:19
**facilitate**   121:1
**facilitated**   171:25
172:21
**facilitating**   172:1
172:22
**fact**   37:17 49:8
64:5 73:4 81:3
82:13 86:18
101:15 106:17
111:13 114:11
118:15 124:11
131:18 132:22

134:21 135:2,5,11
135:12 138:19
141:25 143:5,8,9
146:1 162:10
181:4 183:2
219:18 222:5
**factfinders** 112:2
**factors** 137:4,19
140:13 172:6
**facts** 9:22 47:11
55:20 60:25 63:20
72:13 82:14 112:1
126:25 127:3,8
131:15 132:2
134:5 135:3,5,22
136:11 139:5,13
140:22 141:3,18
141:21,23 144:3
150:1 155:20
163:3 166:6
175:25
**factual** 134:5
**failed** 124:4 182:8
**fails** 121:9
**failure** 138:1
**fair** 130:16
**fairly** 128:24
**faith** 71:2
**fake** 10:13,14,16
10:18,21 11:2,4
28:13 29:22,22
33:14,19,20 34:1,2
34:10,11,17 56:20
56:21 99:19
117:22 118:5
**fall** 90:17
**false** 113:2
**falsely** 142:15
**familiar** 33:7
221:2

**family** 14:17 27:10
30:13 88:13
148:17
**far** 13:4 39:9 92:4
209:24 212:22
**fashioned** 50:18
**fast** 12:11 54:7
85:3 98:18
**fate** 80:8
**favor** 79:3 91:22
180:14,17
**favorable** 180:11
180:12
**fbi** 66:18
**fear** 23:15,22 71:7
73:2,2 128:25
148:13,21 149:2,8
149:18 150:3,5,7
150:10,20,21
151:4,8,13,18,20
**february** 1:5 4:24
223:6,7
**federal** 47:23
48:11 66:16,17
144:23 160:5
170:15
**feedback** 216:13
**feeds** 76:14
**feel** 183:24
**feeling** 150:16
201:1
**fees** 99:15
**feet** 13:6 14:12
39:5 87:7 119:13
**fellow** 108:8
128:13,18 183:7
206:15
**felon** 220:20
**felt** 151:11
**ferreira** 38:4,8,13
38:18,25 39:3,5

**ferrero** 126:5
**fiction** 103:11
**fifth** 182:24
**fight** 93:3
**figure** 103:15
104:17 119:11
**file** 5:6 95:8
197:14,22,24
198:1,5,5 211:17
211:19,21 221:20
**filed** 197:15,20
211:20
**fill** 77:15,17
**final** 125:11
151:22
**finally** 116:21
126:11 132:4
155:10 161:8
**financial** 178:4
**find** 7:17 12:9
23:12 32:1 36:25
37:8 51:1 66:12
78:18 92:14,15
111:18 113:18
117:8 122:18,18
129:16 130:1
131:14 135:4,11
135:18,19 143:25
152:16 154:14,17
155:25 156:7,21
158:16,20 160:10
160:13 162:22,23
163:8,9,11 165:5,6
167:18,20,21
170:18,20 174:1,4
174:25 175:3,9,13
176:5,13 177:1,24
178:15,20,22,24
179:1,4 180:15
181:25 182:6
186:25 187:4,10

187:16,17,25
188:1,5,23 189:22
196:12,17
**finding** 4:10 68:23
127:2 151:20
**finds** 195:10
**fine** 5:10 6:24 7:1
96:3,12 198:7
200:2 205:1
214:19 215:6,9
217:19
**finger** 23:18 33:19
**fingerprints** 31:13
43:21
**finish** 8:8 65:12
166:2
**finished** 182:25
185:13
**fire** 52:21 56:15
**firearm** 4:13,14
32:7,12,13,20
49:23 55:19 56:5
57:15 113:22
121:24 124:25
125:16 145:12
169:8 170:14
171:3,4,5,8,10,12
171:13,15,18,23
171:25 172:4,10
172:10,13,17,20
172:24 173:8,23
174:2,17,20 175:1
175:11,14,20
177:12,14 187:8
187:20 188:8,10
189:4,5,8,9,11
196:18 197:4,20
**firearms** 4:14
32:17 54:1 116:18
171:5

**[fired - further]**

**fired**  32:25 104:24
  118:6 172:16
**firing**  32:14 57:23
**first**  4:5 7:20,24
  9:24 17:21 22:17
  26:19 33:16 40:4
  43:24 51:24 52:1
  52:12 87:2 94:15
  100:14 118:21
  122:14,23 125:4,5
  126:25 131:9,15
  147:18 148:19
  150:3 158:23
  159:3 160:15
  161:15 168:10
  170:23 174:7
  179:7 181:16,16
  185:2 187:16
  190:3,7,13 191:24
  192:5,9 198:11
  201:15 202:3
  204:24 207:3,13
  208:5 216:25
**fist**  12:16
**fit**  48:16
**fits**  74:9
**five**  14:23 15:2,19
  16:8 40:21 44:10
  45:13 71:1 97:15
  110:6 132:2
  137:12
**fix**  5:11 28:15
  87:23 90:22
**flash**  58:16 59:21
**fled**  37:18
**flee**  39:23
**fleeing**  77:8
**flight**  37:19 74:15
  74:19 75:10,14
  77:8 191:18

**flip**  91:5
**floor**  61:14,25
**flow**  24:14 52:1
  152:6
**fluctuate**  113:9
**fluctuated**  113:7
**fluid**  47:4 72:6
**flying**  21:2 86:25
**focus**  6:20 7:18
  19:5 46:13 48:23
  86:9
**folks**  93:24 94:16
  95:16
**follow**  49:11
  127:11 158:22
  199:6
**followed**  7:20
**following**  8:11
  99:1 131:15,21
  147:17 154:18
  160:14 170:21
  174:6 179:6
  186:16
**follows**  5:2 166:17
**foods**  24:3
**foot**  33:5 44:10
**footage**  141:3,12
**football**  82:21
**force**  21:4 22:25
  28:18 71:7 74:12
  74:12 148:13,21
  149:2,8,18
**forced**  119:21
**ford**  39:12
**foregoing**  224:4
**foreperson**  181:18
  181:21 184:24
  185:21 186:4,9
  187:22 188:15,16
  198:13,16,17
  204:14 218:2,4

**foreseeable**  158:7
  159:18,25
**forgot**  55:23
**form**  22:18 31:23
  121:4 186:12,13
  186:20 187:13,22
  187:23 188:15,17
  192:14 198:11,12
  198:14,16 211:8
  212:12 215:19
  217:5 218:2,3,5
**formal**  52:12
  145:20 161:25
  211:13,16
**formally**  131:19
**format**  4:19
**forms**  4:9,11,15
  185:17,18,19,22
  186:5,10,11,14
  187:24 194:16
  197:13,17 205:19
**forth**  95:15 100:4
  100:5 108:18
  112:20 149:6
  155:10
**found**  77:19 195:1
  196:16
**founding**  80:19
**four**  5:20 16:7
  40:10,16 51:22
  73:16 90:14 121:8
  132:1 137:10
  154:18 158:21
  160:14 174:6
**fourth**  156:17
  159:17 161:8
  166:9 174:22
  176:23 179:21,23
  179:24 182:16
  190:9

**frame**  173:2
**frantically**  14:24
**free**  95:19,20
  183:1,24
**frequent**  103:14
**friday**  7:10 41:17
**friend**  30:10,12,13
  30:22,22 34:12
  44:2 88:13 103:16
**friendly**  151:19
**friends**  16:22
**front**  38:24 59:9
  69:1 86:19 126:5
**frustrated**  60:5
  104:11
**fuck**  110:21
**fucking**  12:22
  13:13,13,14,15
  28:19,19,20,21
  30:7,7
**full**  59:18 87:12
  202:24
**function**  54:3
**functional**  52:19
  52:21 54:12 57:2
  57:13,13,21 58:2
  60:1,22 62:10
  66:23 68:18
**functionality**
  32:15,16 33:23
  53:25
**functioning**  55:16
  56:13 71:24
**funny**  81:21 82:9
**further**  152:13
  156:24 157:1
  158:5 159:15,15
  161:11 164:9
  165:10,16 168:16
  168:21 177:5,7,11
  177:13,19 192:23

**furtherance**
155:11 156:16
174:23 176:22
**furthering** 166:14
**future** 148:14
149:3 217:3

**g**

**g** 4:1 106:5,24
**g20** 99:11
**g49** 99:11 113:6
**gain** 178:4
**game** 53:8 82:17
83:3
**gaps** 77:15,17
**garments** 59:13
**gather** 139:19
**gender** 129:3
**general** 144:4
152:16
**gentleman** 24:22
25:2 80:2,4
**gentlemen** 45:5
93:1 106:20
126:20 134:2
**gesture** 149:23,24
**gestures** 85:13
201:5
**gesturing** 84:17
**getaway** 26:9
**getting** 13:23 21:5
30:15 60:4 61:21
68:24 101:11,12
119:2 153:3
216:13 218:21
**girl** 25:3
**give** 10:24 12:22
13:13,13,14,14,15
13:15,16 28:18,19
28:19,20,20,21,21
28:21 29:13 30:7
30:7 37:17 47:24

74:18 90:9 92:6
96:12 97:6 101:21
101:21,25 102:24
119:21 127:8,13
132:8 136:6,8
142:21 144:8,17
145:25 148:21
149:18 153:13
166:19 169:3
184:3,25 185:1
189:24 201:1
206:18 207:21
212:3,5 213:4
218:19
**given** 30:17 92:10
117:12 133:19
140:8,19 193:13
202:13 220:2
**gives** 41:14 45:21
63:16 72:20,23
78:12 85:21 106:4
109:25 117:20,21
**giving** 21:6 151:11
182:18 193:11
**glance** 106:4
**glasses** 98:17
**glock** 13:15,15,15
28:21,21 57:24
58:3 60:1 62:2,3,9
63:18,19,22 102:1
102:1,16,24
103:10 147:22
217:11,13
**gloves** 54:21
**go** 13:21 15:8,16
17:6 19:19 22:16
26:8 28:17 29:14
31:8 35:7 38:4
45:16 50:20 56:13
61:17 62:2 69:6
69:11,22 73:3

75:2,19,25 78:12
78:19 81:7 82:22
86:25 87:8 89:12
89:16 91:17 92:2
92:3 93:21 94:4,4
94:10,19,20 95:17
97:9,18 101:1,3
107:12 109:3,4
110:23 117:18,18
117:19,19,22,24
119:21 121:15
166:19,24 169:22
169:23 189:1,22
199:5,19 203:16
203:16 204:25
207:9,12,16
208:24 209:4,4
211:6,18 212:11
213:18 215:5,12
216:15 218:24
**goal** 28:3 161:6
163:17,20,22
165:13,16,20
**goals** 26:1
**god** 74:19
**goes** 7:20 11:17
12:10 15:14,14,25
16:2,13,14 18:17
20:3,14,21 26:9
27:24 30:11,13
36:1 39:1 61:11
62:2 63:23 70:6
78:6 82:2,3 84:4
87:25 88:1 98:16
101:22 103:12
106:3 108:19
109:8 114:12
118:13 120:12
123:14
**going** 5:15 10:5,24
12:1,8 14:17 15:2

16:3,4,5 17:8,9,10
17:11,12,18 19:20
21:3,4,4,22 22:3
22:14 24:9,9,12,14
25:4 26:10 27:8,9
27:9,10,16 30:10
30:11,12 31:19,23
32:11,12,14,18
34:18,22 35:10
36:18,22 37:15,16
38:6,7 39:25
41:24 42:21 44:7
44:11,21,22 45:16
45:18,19 46:9
47:4,7 48:2,3,20
48:24 49:13 50:2
51:6,12,12,23
52:11 54:6,23
57:25 58:16,25
59:11,21 60:10,17
61:18 63:11 67:13
69:21 71:7 73:17
74:18,22 75:24
76:11,23 77:4,24
77:24 79:7 83:13
83:24 86:2,22
87:4 88:19 89:7
89:11 90:1,2,3,5
90:18 91:14 93:5
95:5 97:6 101:1
103:15,16,19
104:17,20 105:6
108:10 111:21
115:5 118:9
119:17 120:14
122:6 124:21
125:8,14 150:2
152:23,25 153:1,1
155:2 168:9 169:6
170:11 173:7
174:14 177:16

**[going - gun]**                                        Page 20

181:9 198:1,17,23
198:23 202:11
203:13 204:18
205:1,5,18 206:8
208:7 210:18
212:16 213:19
215:1 216:5,21
218:1,9 221:4,9
**goings** 59:9 69:1
**good** 4:2,4 7:2,7,9
10:19 75:18 79:24
79:25 83:19,23
86:20 98:9 103:5
137:2 177:21
183:17 200:9
211:1 214:4
218:17 220:4
223:4
**goodbye** 118:10
**goods** 22:22 24:1
24:14 91:17 152:6
**government** 1:10
4:21,23 5:22 6:7
7:20 8:6,6,14
45:21 46:19 47:5
49:19 50:6 51:14
56:19 60:12,21
63:11 65:5,5
66:16,17 67:14
68:1,5 69:24
71:19 72:3 74:1
75:18,24 78:4
80:11 81:8,23
82:11,24 83:9,14
83:15,17 88:16
89:4,12,18,25 90:7
91:7,9,23 93:7
94:22 96:5 98:11
100:13,17 101:15
106:6 107:17,21
109:12,18 111:7

111:12 112:7
113:3,16 114:21
117:12 120:2
124:21 126:2
129:11,17,23,24
130:2,4,25 135:22
138:25 139:2
141:1,4,8,17 143:1
143:18 146:5,7,25
147:17 148:23
149:7,9,12 151:24
154:10,17 156:9
156:17 157:6,12
157:19,25 158:20
159:3,21,24
160:13,20,24
161:17,24 162:2,8
162:13,20 163:11
163:16,23 164:2
164:25 165:7,11
166:10 167:15,20
167:22 169:18
170:21 171:9,16
172:14,16 173:20
174:5 175:3,13
176:15,23 178:15
178:20 180:12,18
181:6 182:3,8,11
183:20 186:1,6
188:6,24 194:4
195:24 196:12
197:7 198:4
201:19 202:1
211:7,24 212:13
213:22 214:9
219:3
**government's** 51:4
59:15 64:24 66:1
89:18,20,22 98:14
106:24 122:19
195:3

**grabs** 13:24
**grail** 72:2,3,4
**grand** 28:24
**gray** 65:11 66:10
68:23 80:4 81:9
91:25
**great** 12:12 64:12
88:16 91:9 118:8
123:7 201:1
**greater** 142:3
181:21 184:3
**greenberg** 1:17
**grips** 196:10
**grocery** 38:14
147:20 149:1
**ground** 33:17
142:7
**group** 81:14
204:15
**groups** 206:6
**guard** 26:11
**guess** 56:9 68:3,9
70:11 78:7,25
133:11,13 135:10
153:7
**guessing** 56:11,18
57:5 78:4
**guidance** 148:21
**guilt** 37:16,19
43:16 44:4 74:16
74:20 75:11,15
77:9 81:2 130:10
139:1 141:15
144:1 146:18,20
157:6,6,12 196:14
201:15
**guilty** 26:14 31:24
31:25 32:4 37:9
44:24 51:1 77:13
78:15 79:5 89:15
92:15,16,18,23

113:1,17,18 117:9
122:18 129:7,13
129:16,17,22,24
130:2,3 131:3,6
139:1 141:7
143:21 147:2,6,6
154:3,15 156:1,8
157:21 158:1,17
160:11 163:10
165:6 167:19
170:19 173:10
174:1 176:6,13
177:21,22 178:24
179:3 180:15
181:24,24 182:2,7
182:12 183:20
186:2,7 187:2,3,3
187:4,14,14,18,25
188:1 189:3 191:9
195:10 196:13,17
196:18
**gun** 6:7,14 9:3,4
13:16,19,24,24
14:1,2,16,16,17
16:8,11,19,20 17:3
17:12,17,22 18:1,3
18:5,5,7,8,8,11,13
18:21,24,25 19:11
19:11,20,20,21,23
19:25 20:3,5,7,8
20:10,11,11,19
21:18,19,23 23:1,7
23:21 26:4,19,20
26:23,25 27:1,8,9
27:9,11,14,15,17
27:18,20 28:6,22
30:11,12,13,21
31:5,6,7,18 32:2,9
32:23,24,24 33:3,5
33:10,17,19,20,22
33:22,22,24 34:1,1

34:2,3,10,10,11,13
34:15,16,16,17,24
35:4,5,22,25 36:2
36:3,4,16 37:8
39:14 43:23,24,25
44:6,6 52:13,14,17
52:19,21 53:9,18
53:24 54:12,21
55:9,9,10,10,16
56:13,18,20,21,21
56:23,23,25 57:1,2
57:12,16,21 58:1,3
58:6,8,11 59:24,24
59:25 60:1,8,15,16
60:17,23 61:7,8,12
61:12,13,19,21,21
61:23,23,25 62:10
62:11,13 63:21
66:23 70:1,1 71:9
71:25 76:21 85:10
85:15,22,24 86:1
87:24 90:21 92:16
92:16,19 102:16
104:4,13,20,24
105:23 106:11
108:20 111:20,22
114:1,13 115:11
116:7 117:4 119:6
120:15,18,21,24
120:24 121:1
123:12,12 125:5,6
147:22 217:11,13
217:14,18 219:14
219:18,19,20
220:10,23
**gun's** 18:12 19:24
34:5 61:24 123:15
**gunpoint** 64:16
76:18
**guns** 9:1 10:7
19:17 20:15,18

21:8,12 23:6,16,16
23:20 26:24 29:17
32:22 33:1,7,8,13
33:14,15 34:7,17
34:21,23 35:8,10
35:13 36:8,15,18
54:3,4 55:14
73:21 85:20,21
114:6 116:19
118:17,17 119:5
124:8,12,17 125:4
126:15 194:23
**guy** 12:12,14,14
26:9,11,13 60:15
65:10 66:10 67:5
68:23 85:24 86:4
90:25 91:25 99:6
99:7 100:24,24
101:11 113:13
123:9,18 214:16
**guys** 26:8 65:9
88:14

# h

**habit** 200:25
**habitat** 100:22
**hair** 81:9
**half** 45:13 88:22
**hall** 202:15 207:11
208:4 210:19,22
213:5,16 218:15
**hammer** 82:10
**hand** 11:23 15:20
15:21,25 16:1,2,3
18:21 19:6,11,23
19:25 20:11,12
25:4 34:1 44:6
54:6,7 58:10
60:10 61:19 71:25
72:16 88:7,8
107:3,4 109:10
111:10 114:14

125:16 143:22
151:17 153:11
**handed** 197:14,16
**handing** 34:12
44:5
**handle** 54:21
92:12 122:13,21
144:16 199:22
200:4
**handled** 33:13,14
33:14 34:8
**hands** 18:1,2 20:9
20:10,10 21:11,18
21:19 31:12,13
34:10 43:18 52:20
62:7 71:12,16
80:9 88:1,15
123:14 153:13
**hang** 222:1,5
**hanging** 65:18
72:16 94:13
**happen** 15:2 17:8
44:7 61:3 75:9
82:21 98:12 101:8
116:3 121:2 125:8
205:16 208:18
**happened** 9:23
15:9 27:22 37:24
42:1 49:21,22
52:7,16 61:4 63:8
64:6 65:20 66:9
68:10 69:15 70:9
70:10 91:10 98:21
98:25 103:11
107:24 108:3,4
112:3,6,9 115:3,19
116:2 122:15,24
124:16 133:17
164:21
**happening** 10:4
14:14 15:12 26:5

28:7 29:25 30:8
58:24 71:14 73:15
164:17 216:10
**happens** 12:23
14:5,6 17:4 22:6
30:5 38:3,3 59:18
85:12,16 121:25
125:10,18 209:25
**happy** 213:23
**hard** 12:16 70:24
201:2 221:4
**harm** 121:19,21
150:7 179:15,17
179:20
**harmful** 152:15
**harsh** 64:10
**hat** 39:15,15 76:19
**hay** 53:1
**he'll** 41:12 50:15
212:4
**head** 9:2 29:17
36:17 87:6 153:21
**heading** 38:14
**hear** 22:3 25:23,23
37:15 38:1 44:3
46:22 48:2,3
49:18 67:2 72:22
79:12 93:6 98:8
102:20,21 109:11
124:22 137:6,25
183:22 200:22
201:3
**heard** 11:21 13:12
13:12 17:17 23:4
24:2 25:22 27:21
27:22,24 29:7
34:15 35:2 36:23
39:10 44:14 45:13
45:22,23 46:21,22
46:22 47:13 51:19
77:5 80:7 84:24

98:14 99:12
102:23 104:22
108:1 114:18
116:1 119:9 120:1
122:12 126:21,21
127:1 128:20
130:24 131:10,12
132:4 134:25
135:13 139:14,24
140:24 141:19,24
143:12 151:9
154:1 205:23,23
205:24
**hearing** 67:3
**heat** 59:10
**heavens** 144:20
**heavier** 180:20
**held** 4:5 25:19
33:13 34:8,25
**hell** 89:6
**hello** 64:14
**help** 26:6,16,16
27:4,5,16 28:7,7
30:10,14,22,22
31:2 66:11 73:25
112:19 118:24
119:1,3 126:14
150:24 151:12
158:5 159:15
164:21 165:10,15
177:23
**helped** 26:6 31:17
**helpful** 7:17
**helping** 27:17,18
30:3,24 121:2
166:15
**helps** 25:24,25
31:6
**hesitate** 48:8,10,13
48:19 50:1 57:20
58:10 66:21 70:21

70:21 78:10,13,13
130:21 183:9
**hesitating** 48:21
70:13
**hey** 41:3 88:2
107:6
**hide** 87:9
**hiding** 98:18
**high** 27:3 34:14
39:7
**higher** 18:12
**highest** 47:21
50:12
**hit** 201:4
**hoagie** 24:3
**hobbs** 22:17,17
25:14 31:24,25
92:15 145:7,7,17
147:10,15 148:8
148:20 150:4
151:23 152:1
154:13,15,25
157:8,24 158:17
160:18 169:5,5
170:17,24 171:20
172:19,20 173:6
173:18 174:11
175:6 195:21
196:17,19 197:2
**hold** 26:13,14
34:25 85:25
**holding** 16:24 17:1
17:2 36:16 56:17
125:15
**holds** 37:13
**holes** 78:5
**hollywood** 91:3
**holy** 72:2,3,4
**home** 74:25 75:2
76:10 77:19 93:21
93:24 94:4,4,8,10

94:11,17,19,20
204:25 206:9
207:16 217:10
**honest** 55:3 91:19
**honestly** 183:17
**honor** 5:9,12,18
5:24 6:2,15 7:22
8:4,16 45:2 47:18
47:24 48:3,4,12
50:13 95:7,13
96:1,7,16,19,21
98:7 117:10,16
153:23 167:5
191:17,24 192:5
192:10,13,14,21
193:2,17,23 194:3
194:7 195:8,12
197:12,23 199:10
203:24,25 204:2,3
210:11,13,15,17
212:2,6,14 214:18
214:19,24,25
215:4,24 216:1,18
217:7,23 218:10
218:20 219:4,10
219:22 221:11,23
**honorable** 1:7
**hoodie** 65:11
66:10 67:5 68:23
98:17
**hook** 35:9
**hoops** 57:10
**hope** 8:8 67:16
77:13
**hopefully** 8:10
73:20 144:12
153:2
**horrible** 77:16
**horse** 71:8 90:13
90:13

**hot** 18:14 20:1
88:4,4
**hour** 46:19 196:4
**hours** 75:10 112:7
112:8 189:19
**house** 86:15
**how's** 64:14
**hull** 7:2
**human** 80:16
138:2 178:5
**hump** 66:19
**hunch** 130:14
**hundred** 59:22
101:13 104:10
109:20,24 110:16
110:16 118:5
**husband** 59:17
**husband's** 60:9
**hypothetically**
196:13

**i**

**ice** 87:16,18
**idea** 10:21 122:9
126:2 153:17
214:4
**identified** 202:6
**identify** 86:11
217:17
**identity** 66:8 76:5
86:12 98:18 194:6
**idiot** 109:9
**ii** 31:19 32:7
113:18,20 116:22
117:9 145:10,16
169:7,25 170:11
170:12,20 173:8
173:25 178:14
179:3 186:16
187:7,7,18 188:2,5
188:10 191:9
195:12,16 196:15

197:19 211:14
216:8,23 218:24
**iii** 211:7,14,22
212:12,17,18
215:22 216:6,21
216:22 218:24
220:2
**imagine** 112:17
**immediate** 52:2
121:9 179:8
**immediately** 8:11
31:5 148:14 149:3
**impartially** 128:25
**impeached** 138:9
**impersonal** 208:9
**implore** 77:25
**importance** 48:11
130:21 138:4,16
**important** 15:4
45:24 46:17,25
49:12 50:1 52:1
53:8 54:13 67:12
73:8 105:2 107:19
108:21 116:8
118:20 122:17
127:10 128:16,21
134:6 136:23
138:21 139:23
142:16 183:15
194:25 205:25
209:17 210:5,5
**impossible** 150:15
**impressed** 81:12
**impression** 184:9
**improbability**
138:12
**inapplicable** 167:2
190:14 195:2
**inappropriate**
6:19

**inches** 33:3,4
**incident** 28:23
65:17 112:23
**include** 99:14
140:19 210:7
**included** 214:11
219:2
**includes** 173:2
**including** 132:1
144:21 154:12,20
155:3,6,8,19
156:12,20,22
166:4 169:5 172:7
173:22 174:7,15
175:5,7,24 176:18
176:25 177:3
207:9
**incoming** 40:22
41:8
**inconsistencies**
137:21
**inconsistency**
138:3,6
**inconsistent**
137:18
**independent** 184:4
184:5
**indicate** 88:3
143:20
**indicates** 144:2
**indicating** 85:12
102:5,8,9 105:12
105:18 106:2
107:13 115:14,17
116:10,14 123:15
127:4 182:20
**indicted** 146:1
**indictment** 31:20
131:22 144:6,23
144:24 145:9,10
145:16,18,20,22

145:24 146:3,16
147:16,21,23
149:6 154:14
157:15 160:17
162:9 166:14
169:19 170:12,12
170:17,20,25
173:25 178:14
179:4 186:17,21
187:7 191:10,12
191:14 217:12
**indirect** 134:17
135:17
**indirectly** 135:2
**indiscernible** 9:11
41:21 61:11 72:22
107:5 190:23,24
191:1,18,20,22
192:25 194:12
196:5 197:21
199:2,4,15 200:17
201:7
**individual** 22:20
25:21 72:21,21
94:10 146:20
171:2,18 172:3,15
**individuals** 9:7
31:24 33:13 36:25
37:13 44:17 67:4
71:15
**individuated**
147:3
**indulgence** 45:6
**infer** 10:3 65:14
135:4
**inference** 49:8
89:14,14,19 91:18
135:5,9,23 143:6
**inferences** 89:23
135:21,25 162:25

**influence** 129:1
131:12 143:10
146:18 147:7
**influenced** 128:22
129:2 132:21,23
133:24 184:7
**information** 82:1
127:23 128:6
140:11 184:11,21
210:24 213:3
218:12,14
**inherent** 138:12
**injury** 23:15,22
52:3 58:14 60:14
60:20 73:2 121:11
148:13 149:2
150:3,11 179:9
**inked** 197:17
**innocence** 81:2
129:10,15,19
146:20 182:4
196:14
**innocent** 129:8
138:6 143:4,23
**inside** 10:1 31:5
114:6
**insignificant** 138:5
**instant** 90:24
128:3 184:18
**instruct** 8:10
22:15 32:11 93:8
111:13 126:23
144:5 147:10
178:9 181:9 199:3
200:6 201:6
**instructed** 9:12
133:5 157:9
189:16 195:11
200:14
**instructing** 211:11

**instruction**  37:15
  37:17 47:19 49:6
  49:11,14,15,16
  51:14 63:5 64:8
  77:16,16 78:20
  116:22,24 132:14
  134:3 187:16
  191:19,24 194:4
  198:10 206:18
  218:1
**instructions**  3:7
  4:9 34:20 46:23
  47:19,24 48:17,22
  48:25 49:17 51:2
  51:21 55:19 56:1
  63:16 64:20 78:2
  116:25 127:9,9
  134:16 136:10
  140:13 144:4,8,9,9
  145:6 147:4
  152:24 154:24
  160:19 173:17
  181:3 183:1
  188:16 189:22,23
  207:14,22 218:4
  221:14
**intend**  24:10 27:5
  101:3
**intended**  5:8 26:5
  26:16 28:7 31:2
  152:10 164:9
**intending**  27:16
  161:3 163:19
  165:9,15
**intent**  9:25 10:1,3
  29:1,1 31:16
  155:7,14 156:5
  161:5 166:8 175:7
  175:22 176:11
  177:24,25 178:2
  216:19

**intentional**  138:6
**intentionally**
  161:18 163:13
  178:6,8
**interaction**  71:14
**interacts**  22:21
**interest**  137:11
  142:9 211:20
**interesting**  87:10
  196:11 220:10
**interfere**  152:10
**interfered**  157:19
  174:18
**interference**  24:17
  82:20 171:6,19,24
  172:1,5,8,11,22
  175:12
**interferes**  145:1,6
  152:5 157:18
  186:22,23
**interfering**  147:14
  161:22
**interior**  108:3,4,7
  112:9
**internet**  128:2,2,3
  184:17,17,18
**interpretation**
  46:23 58:19 63:20
  71:11 134:8
**interpreter**  103:6
**interrogatory**
  185:18 188:3,4,12
  188:21 189:2,3
**interstate**  22:21
  22:23 23:23 24:5
  24:11,13,18 25:12
  145:1,7 147:12,14
  148:4,5 151:23
  152:3,4,11,12,14
  152:17,20 157:19
  161:22 171:7,20

171:24 172:2,5,8
  172:11,22 174:19
  175:12 186:22,23
**intimidate**  34:21
  34:24 35:1 189:10
**introduced**  90:6
  124:13
**investigate**  101:16
  128:15
**investigative**
  141:1,9,11
**involved**  19:8,14
  91:8,21 116:18,19
  155:22 157:13
  164:1 169:19
  176:2
**involves**  150:11
  188:23
**involving**  194:23
**iphone**  128:1
  184:16
**irrespective**  76:23
  76:24
**isalisa**  11:20,24
  12:6,18 21:25
  22:7 24:2 28:15
  34:15 44:10,13
  122:4
**issue**  6:7 49:3
  109:4 144:12
  190:25 196:1,21
  197:6 211:16
  213:12 214:8
  216:3 218:8
  220:10,24
**issued**  89:1 211:13
  211:14
**issues**  5:17,23 7:12
  7:18 126:9 134:13
  191:12,15 214:13

**item**  25:20 148:4

**j**

**j**  2:2 203:1
**jacket**  9:20
**jan**  1:7
**jay**  103:7
**jd**  1:2,3,3
**jersey**  24:3 39:12
  42:19
**jig**  12:6 28:16
**jims**  24:24
**job**  47:12,12 66:1
  66:1 69:2 70:20
  70:24 90:4 127:2
**jobs**  71:5
**joel**  8:25 9:3 10:13
  10:23 11:19 12:11
  12:17 13:8,17,21
  13:24 14:11,13,22
  14:24 15:1 16:16
  16:19,24 17:12,16
  17:19,22 18:1,3,5
  18:7,12,17 19:3,17
  19:21 20:5,14,16
  20:17,20 21:3,7,13
  23:6,13,14,17
  24:20 25:6 26:24
  27:8,14,19,23
  28:18,23 31:7
  33:2,6 34:4,23
  36:6 37:7,8 52:11
  52:13,17,17 53:9
  55:6,11,12,16
  59:22 60:7 62:13
  118:18,23 119:20
  120:22 122:5,5
  123:8,11,17
  150:12,20 151:9
  151:17
**joel's**  9:2 18:1
  121:1 125:17

jog 38:7
join 35:7 161:3
  193:15,16 209:25
joined 160:25
  163:14,19 164:8
  164:22 165:2,8,15
joint 194:3 198:1,1
jordan 203:1,1,5
judge 1:7 6:6 7:1
  9:12 10:5 22:14
  24:8 32:11 36:22
  37:16 49:6 50:13
  51:24 63:16 64:9
  64:18 72:11 77:24
  78:12 84:23 90:9
  95:24 116:21
  122:17 153:5
  193:5 212:19
  214:6 222:3,7,14
judge's 46:23
  48:25 51:21 56:1
  90:4
judges 81:3
  136:13 141:23
  144:3
judgment 80:16
  108:5,6 137:2
  138:14 196:16
judicial 128:21
jump 56:17 57:10
  57:11 70:21
jumped 41:23
juries 80:22 81:13
juror 181:22
  184:9 200:9
  204:14 205:6
  206:22 207:2,15
  207:21,21 208:3
  208:15,17,19,21
  208:21,23 209:3,7
  209:9,13 210:3

211:2
jurors 7:17 81:1
  95:13 128:13,19
  153:11 182:23
  183:7,10,12,18
  184:8 185:15
  206:16 210:21
jury 1:6 3:7 6:11
  6:12,20 7:3,6
  23:13 28:24 34:20
  45:5,23 47:24
  48:17,24 49:6,13
  49:15,16,17 51:2
  55:19 56:5 64:8
  64:19 71:2 74:21
  75:17 78:1 79:15
  79:20 80:16 94:22
  95:2,20 96:13
  97:6,9 126:24
  127:17 128:12
  134:15 166:1,19
  169:15 181:14,17
  183:2,23 185:20
  185:25 186:15,25
  187:10 188:15,17
  188:18 189:2
  191:24 192:15
  193:12 195:10
  196:24 198:16
  199:23 201:7
  202:22 203:5,16
  204:5,5,9,11,22
  205:10,25 206:7
  206:23 207:9,12
  207:19 209:15,22
  209:22 210:4,6
  211:11,21 212:5
  212:20 213:11,19
  215:21 216:24
  217:14 218:3,5
  221:14

jury's 45:6 54:11
  78:14
justice 50:17 81:1
  146:19
justification 49:14
  49:16 50:2,5
  51:11,13,23 54:14
  62:25 63:4 78:19
  119:24,25 120:5,7
  120:8,12 121:8,9
  122:1 178:10
  180:4,16,22 216:3
  216:7,19,24 217:2
  218:25 219:25
  220:21
justified 50:21
  120:13,15 178:13
  178:18,23 179:2

### k

katherine 2:7
  224:3,10
keep 34:2 59:10
  86:1 94:2 183:6
  206:2 209:8,14
  223:1
keeps 61:18,20
  87:6
kept 53:12,15
  56:19 60:4 164:12
key 113:24
keys 43:2
kids 44:15
kill 52:22 53:9
killed 55:10,11,12
kind 41:23 50:4
  51:25 54:16 63:8
  64:18 65:18 72:15
  87:9 89:19 91:15
  91:16 98:24
  150:25 151:5
  160:9 199:17

209:3
kinds 102:10
  122:12
kinks 153:2,21
knew 10:16 11:3
  15:1 17:14 26:5
  28:6 35:10 36:15
  37:22 65:5 107:9
  115:2 155:1 156:2
  159:23 163:17,24
  163:25 164:8,11
  165:13 174:13
  176:8
knocks 24:24
know 9:4,18,23
  10:1 11:9,14
  12:21 13:11 14:5
  14:6,13,15 15:12
  16:5,17,19,23 17:8
  17:15,24,25 18:19
  18:19,20 19:1
  20:8 21:8,11,14,18
  22:6 23:3,11
  26:19,20 27:1,5,6
  28:10,25 29:1
  30:2,3,9,9,10 31:1
  31:10,14 32:16,24
  33:11 34:3,5 35:3
  36:3,20 38:2,3,16
  39:8,10,13,15 40:2
  40:4,5,15,18 41:12
  42:16 48:1 50:17
  52:8,10,10,20 53:7
  54:17 56:4,6,22
  60:25 61:3,4,4
  62:15,17 65:4,5,20
  65:21 67:15,16,17
  67:23,24,25 68:5
  69:25 71:21 75:7
  75:9,14,22 77:15
  80:12 81:5,10,21

82:15 84:2,18,21
85:7,9,13,14 86:2
86:11,13,16,21,22
87:1,4,14,21,23
89:7 90:12 92:9
93:24 94:15 97:10
98:15,21,23,24
100:2,3 101:3
102:12,15 103:14
103:19 104:14
105:23 107:8
108:7 110:3
111:15,16 112:20
113:11 114:17
115:1 116:15
117:7 118:19
119:15,16,17
125:7,18,24 126:2
126:3 137:6
153:18 169:11,23
198:5,22 205:13
205:13,22 208:25
209:16,24 213:1
213:20 216:3
218:12 221:3
**knowing** 27:15
52:18 56:12,13
155:24 161:1
165:9 176:4
194:23
**knowingly** 142:15
147:25 155:4
161:18 163:13
171:3 175:4
**knowledge** 35:12
35:14,14,16 36:18
45:21 85:5 106:16
106:17 107:16
113:25 114:2,5,9
114:20,23 116:5,9
116:19 124:19,20

124:22,23 125:9
137:8 139:5,13,16
140:1,17 155:14
166:8 168:25
174:19 175:10,14
175:15,17,17,22
**known** 17:22
25:16 68:6 76:1
86:10 111:21
123:2 154:9
162:12 173:16
189:9
**knows** 12:7 13:17
13:18 16:22 17:2
28:16 30:3,9,18
39:6 75:25 86:18
134:23 207:5
**krasdale** 24:4

## l

**l** 221:16
**lab** 54:25
**lacheen** 1:16
**lack** 130:23 141:6
184:6
**ladies** 45:5 93:1
106:20 126:20
134:2
**lady** 50:17 59:13
**laptop** 95:14 199:4
205:11 211:12
213:13
**larger** 76:12
**late** 79:11 94:13
94:17
**latex** 54:21
**law** 1:14 8:10 9:12
22:15 25:16,17
26:1,2 29:19 35:5
35:6,6 37:13
48:17 50:11 58:11
63:15 70:3 90:3

93:8 112:2 126:23
127:7,12,13 136:5
141:25 142:1,1,6
142:11 144:23,24
152:24 157:4
170:15 177:10
181:12 182:18
194:8 196:11
220:19,21 221:3,7
**lawful** 121:20
139:19 179:16,18
**lawyer** 133:16
**lawyers** 131:23,24
132:1,2,15,18
134:4,7 185:2
**lead** 135:7
**leads** 50:4 132:11
**lean** 87:18
**leans** 17:6 87:16
**leap** 68:14,15 71:2
**learning** 124:25
175:20
**leave** 17:6,7,9
31:13 34:16 35:24
36:10,16 38:11
54:18 87:8 93:20
106:20 116:4,6,11
124:24 125:2,8
175:19 206:4,22
214:12 219:19
220:10
**leaves** 9:4 14:19
15:13,23,24 25:8
27:6 34:13 36:9
68:7,8 104:12,15
104:19,25 105:9
110:14,15 120:6
120:11 121:11
126:2 220:3,25
**leaving** 21:20,20
36:17 43:21 73:1

105:1 110:14,18
**lectern** 200:25
**left** 7:11 15:21
16:1,3,4,12 19:23
20:11 34:1 54:6
58:7,10 65:3
105:13 106:7
123:12 186:20
217:9 218:10
**lefty** 58:4,5
**legal** 7:12 119:1
141:8 158:2,18,19
**legally** 185:8
**legend** 39:15,15
76:20
**legitimate** 142:5
**legs** 90:14
**lemonade** 24:22
24:25
**length** 93:19
**lesser** 142:4
**letters** 76:19
**level** 45:9 55:15
**liability** 25:15
31:22 36:21,23
109:7 116:22
154:2 157:10,10
158:19 173:5,7
193:24 198:3
**license** 42:16
**lies** 54:19
**life** 11:2,5 23:17
23:18 62:1 81:19
91:3,4 129:5
130:22
**life's** 56:2,7 78:2
**lifts** 14:1 108:24
108:25,25
**light** 132:7
**lights** 38:5 87:2,3
87:5

**likewise** 164:19
**limited** 133:4,6
　220:23
**limousines** 94:10
**line** 41:1 117:6
　187:4 192:5,9
**lines** 18:17 22:22
　23:25 24:6 187:4
**linked** 128:4
**linkedin** 184:20
**list** 96:9,23 97:5,8
　97:12,15 212:4,8
　214:11
**listen** 41:14 42:20
　47:5,6 183:5,7,18
　206:10 209:19
**listened** 80:10,11
**listening** 83:9
**literally** 114:15
　123:14
**little** 4:17 12:13,13
　24:7 25:3 47:14
　48:12 50:23,25
　52:12,20 61:17
　64:10 79:11 83:4
　93:4 94:17 95:20
　112:9 122:6,7
　134:1 153:4,14,22
　173:18 189:2
　194:16 219:8
**live** 76:14 77:1
　199:17
**lived** 75:6
**livelihood** 44:15
**lives** 44:14 76:3,6
　86:10
**living** 75:1
**llp** 1:17
**loaded** 52:13,14
　52:17,18,21,23,23
　53:9 54:12,13

55:9,17 58:2
　59:25 62:13 71:24
　76:21
**location** 38:20
　41:12
**lock** 14:25
**locked** 15:9 17:18
　54:12 55:17
**locking** 17:21
**logic** 130:17
**logical** 135:10
**long** 6:9 35:10
　67:10 77:22 81:7
　81:15 86:24 92:20
　152:25 158:4
　213:1,2 215:20
　222:2
**longer** 104:19
**look** 10:1 18:1
　19:20 28:5,14
　29:24 33:9,15
　34:6 35:20,20
　36:1 40:25 50:14
　55:5 59:8,11 60:4
　65:11 67:12,13
　69:7,17 70:23
　72:7,7,8,8,9,10,11
　72:13,13,14,14
　73:3 77:7 80:6
　83:20,21 99:11,25
　102:2,5 104:20
　106:5,7,8,8,13,18
　108:22,23 113:5
　115:16,16 116:10
　118:24 121:7
　122:15 141:5
　150:17 166:16,22
　196:4 213:24
　217:4
**looked** 5:19 66:12
　69:8

**looking** 48:15
　58:23 102:8
　106:19 150:22
　207:4 221:4
**looks** 32:25 36:2
　65:16 98:15 100:2
　102:8 106:25
　214:15
**lot** 24:15 36:20
　39:10 47:4,15
　48:21 49:2,16
　53:1,5,22 57:7,9
　57:10 59:8 62:16
　64:2 77:22 85:20
　87:12,13 112:11
　119:9,23 124:19
　144:19,20
**loud** 12:16 88:11
**louder** 9:10
**lower** 180:7
**lowest** 50:11,12
**ludicrous** 120:16
**lunch** 5:11 8:9,10
　8:11,13 93:2
　97:22

## m

**ma'am** 41:22
**machiavellian**
　90:24
**machine** 69:5
　99:22 100:1,9,17
　101:17 107:8
　110:8 111:6
**mad** 105:20
　123:10
**main** 218:18
**major** 164:4
**making** 19:7 27:17
　28:2 51:2 61:15
　67:25 89:23 146:1
　180:24

**male** 65:1 80:21
**males** 66:8 67:1
**man** 23:21 24:25
　25:7 43:19 75:21
　75:22 90:20,20,21
　91:8
**manager** 11:20
　12:2 118:1
**manner** 136:20
　137:9 162:14
**mannered** 12:13
**manpower** 20:16
**maranna** 2:2
**march** 4:24 11:14
　98:22,25 99:9
　102:13 112:21,22
　113:8 146:5
　157:16 186:24
　187:10
**mark** 186:4,9
**market** 1:24 2:24
**marks** 55:14 60:17
**maroon** 41:23
**martin** 1:10 3:3
　5:18 6:15,22 8:16
　8:18,20,22 43:10
　81:11 87:10
　214:23 215:3
　222:4
**martin's** 83:11
**mask** 76:19 98:17
**mathematical**
　130:13
**matter** 9:24 12:24
　22:1,8 30:15,16
　39:17,18 48:11
　50:1 52:9 74:21
　75:18 77:7 118:15
　118:16 124:11
　125:21 136:23
　138:4 142:16

189:19 197:1
216:22 224:7
**matters**  30:19,20
130:21 142:17
**maurice**  1:5 4:19
4:22 8:24 9:4
10:10,18,20 11:3,6
11:10,18,25 12:4
13:2,8,18,23 15:13
16:13,14,19 17:23
19:2 20:1,2,13,20
20:21 21:15,20
22:4 24:19,24
26:3 27:6,21 28:5
28:11,25,25 29:4
30:14,23 31:2,8,11
32:3 34:10 35:2,4
35:11,22,25 36:9
36:15 37:25 38:16
40:16,22 43:17
144:25 146:13
147:19,25 148:3
148:25 149:4,11
149:14,17,24
150:10,13 151:2,7
151:16 154:11
157:17,21,23
158:8,17,24,25
159:2,8,13,19,22
160:1,4,11,22,25
161:4 163:10,24
164:3 165:1,5,12
165:15 166:5,7
167:19 168:19,24
170:13,19,24
173:21 182:1,7,12
186:18 187:2,12
193:25 196:13
**mean**  35:14 72:4
88:22,22 130:12
142:2 189:18

200:5 219:6
220:16
**meaning**  24:14
26:3 52:5 149:19
**means**  22:21,24
34:20 35:14,16
36:25 50:20 89:5
114:2 119:2,2
120:8 124:22
127:24 128:14
129:19 130:4
148:12 149:6
158:12 162:6
171:5,7,14,22
172:24 175:17
180:9 184:12
189:7 208:23
**meant**  85:14
132:18 191:14
214:7 220:17
**measured**  189:18
**media**  127:25
184:15
**meehan**  2:2 3:5
5:8,9,11 6:4 8:3,4
29:9 79:13 90:7
93:3,7 95:5,7 96:1
96:3,13,16,18,25
97:3,7,11,16 98:5
98:7,9 117:11
190:20,23 192:1
193:15,23 194:10
194:13,18 195:7
195:18,22 196:20
196:23 197:9,12
197:22,25 198:8
200:2,23 201:4
204:3 210:17
212:7 214:19
218:9,13

**meeting**  162:16
**melan**  207:11
**member**  88:13
148:16 158:2
160:2 164:1
166:12 168:12
**members**  158:4
159:2,5,8 160:22
161:10 162:3,10
162:12 163:1
164:13,16 167:16
168:14,20 210:7,7
**memories**  47:11
**memory**  47:2
137:8 184:3,9
**men**  21:8 23:8,20
65:1
**mental**  165:4
190:6
**mention**  46:14
63:14 137:4
171:12
**mentioned**  105:23
**menu**  37:11
**merchandise**
152:7
**mere**  49:8 171:8
**merely**  155:22,23
155:23 176:2,3,3
**message**  185:8
**messages**  184:24
185:10
**messaging**  128:3
184:18
**met**  78:9 141:4
162:4 220:22
**method**  149:14
**methods**  149:12
**mic**  200:25 201:5
**michael**  2:6 79:13
203:1 215:10,11

216:10
**microphones**
216:14
**mid**  1:23 2:23
79:11
**midafternoon**
153:14
**middle**  17:10
21:10 24:22 111:2
199:14
**mild**  12:13
**miles**  214:2
**milling**  103:21
**mimicking**  115:19
**mind**  10:1 84:6,9
84:10 127:19
150:11,17,18,24
151:11 153:5
178:2 183:7,9,12
206:2
**minds**  74:19
162:16 183:25
**mine**  217:10
**minimal**  24:15
152:9,21
**minor**  4:8 192:12
201:11,14 202:12
205:19 217:6
**minute**  17:7 21:23
22:15 41:8,10
59:18 101:15
103:8 105:7,7
153:6
**minutes**  11:7
36:12,13,14 39:23
39:24,24 40:21
43:11 46:18 51:13
65:13 79:10,12,17
152:23 153:12
169:13 170:3
189:18 213:10

215:10
**mislead** 47:12
73:12
**misread** 201:11
**missed** 25:12
**mission** 17:13
**misspoke** 218:21
**misstate** 47:8
**mistake** 101:14
202:7
**mistaken** 138:1
**misunderstanding**
8:23 9:6 11:22
22:12,13 44:19
**mobile** 40:6
112:12
**modify** 168:9
**moment** 13:1,17
14:5,6,7,14,21,23
15:4,18,18 16:18
16:20 17:9,14
18:6,10 19:1,16,19
19:24 20:3,7 21:7
21:25 22:2 23:7,9
23:20 24:24 25:5
26:22,23 27:5,19
28:6 30:5,8,19,20
30:25 34:3,24
35:4,16,16,21 36:5
37:5,6,24,25 38:11
39:4,23 40:18
44:15 85:17 96:22
106:10 107:23
**monday** 45:13
**money** 9:5 10:16
10:19,21,24 11:4
11:18 12:19,20,20
12:22 13:13,14,14
13:15 20:14 21:6
23:2,9 24:23 26:4
26:12,13 28:8,9,10

28:11,19,19,20,20
28:21 29:5,11,18
29:22 30:1,4,7,8,9
30:16,24 31:6,9
32:3 36:11 43:20
69:25 70:1 71:12
84:25 85:6,22
92:6,7 98:19,20
99:16,19,20,22
100:7,9,11,11,12
101:21,21,25,25
102:22,23 104:1,9
104:10 109:16,17
109:23 110:3,8,21
111:5,16 117:23
118:5,18,21,22
119:22 120:19
124:1,3,3 152:7
**money's** 23:10
**monitor** 76:13
105:13 106:8
**month** 71:1
**morning** 4:2,4,6
7:7,9 79:11 199:2
203:12,19 204:15
204:25 205:2,17
205:20 206:24
207:17 208:14
212:5 213:20
219:22
**mother** 84:11
**motion** 104:21
115:16,23,24
**motive** 137:11
177:16,17,18,19
177:21,23,25
178:1
**motives** 178:4,5
**move** 36:9 38:10
116:15 169:25
195:12 200:25

**moved** 6:10
**movement** 54:5
152:6
**moves** 111:24
**movie** 153:18,19
**movies** 25:23
85:13 91:2
**moving** 148:4
**multiple** 40:19
98:23 120:22
146:11
**muslim** 59:13
75:21,22
**must've** 107:18,24
108:10 114:22
**mutual** 37:4
161:19 162:15,21
**myspace** 128:4
184:20

**n**

**n** 3:1 4:1 98:1,1,1
203:2
**nail** 82:10,12
**name** 40:5 52:12
59:6,6 86:12
145:8 202:5,25,25
208:7,10
**named** 162:9,11
**names** 46:12 59:3
**national** 1:23 2:23
129:3
**natural** 152:19
158:9 159:20
**nature** 130:23
172:7
**near** 146:9
**necessarily** 80:19
138:19 142:2
164:22
**necessary** 4:11
152:9 158:8

159:20 208:10
211:16,19 213:7
**necessity** 178:13
178:18,23 179:2
180:4,16,22
**need** 5:14 23:12
26:2 32:15 44:10
56:15 70:20 75:14
77:11,12 92:21
95:9,21 97:8,12,14
111:4,4,5 114:23
114:24 118:23,23
121:18 149:7
153:10 156:24
157:3 163:23
177:5,9,11 179:14
202:12 207:22
213:18,18 219:21
221:5,7,8
**needed** 4:25 14:23
15:2,18 17:19
208:19
**needs** 5:1,1 153:11
156:17 176:23
203:22 210:10
212:9,13
**negate** 123:3,4
**negative** 11:17
49:8 113:8
**neighbor** 67:20
88:12
**neighborhood**
22:10 44:13 65:4
65:24,25 86:14
125:20,22
**never** 9:25 14:1,1
36:9,9 38:16
51:18 58:7 62:3,9
62:9 63:23 75:21
75:23 81:16 101:2
101:2 102:8,12,23

103:11 123:11,12
143:2,3 160:7
182:14 221:3
**new**   12:14 24:3,4
39:12 42:18
**newspaper**   206:14
**nice**   81:12 91:12
99:6,7 100:24
113:13
**nicole**   1:10
**night**   40:12 58:23
77:18 82:16 83:2
94:13
**nine**   61:1,1 68:25
69:1,22 75:16
**nobody's**   36:16,17
**normal**   91:21
**normally**   93:11
149:20,21
**note**   93:20 94:18
94:20 144:14
170:1 194:3
204:13,24
**notebooks**   206:22
**noted**   197:11
**notes**   46:25 47:1,2
47:3,11,15,16
73:20 74:6,7
80:10 184:1,2,3,7
184:8
**notice**   64:23 92:7
**noticed**   80:10
82:16 83:3
**notices**   69:21
**notify**   188:17
**notifying**   185:23
**notion**   127:11
**november**   224:16
**nuances**   24:8
**number**   40:9,9,17
40:17,20,23 41:11

70:17 75:4 94:16
120:16 137:4
138:19 141:24
146:17 185:15
191:24 209:16,17
218:19
**numbers**   138:22

**o**

**o**   4:1 98:1,1,1
203:2 221:16
**o'brien**   108:1
**o'clock**   213:7
**oath**   199:5 202:21
**object**   6:20 60:18
164:18 219:3
**objected**   132:16
133:16
**objection**   6:1,3,4
132:22,25 133:7
133:17,18 190:15
191:6 192:21
193:25 194:14,21
194:21 197:11
198:19 200:18,20
200:21,23 204:17
208:16 217:7
221:9
**objections**   132:1,2
132:18,23 191:13
193:20 200:1
215:21
**objective**   37:7
158:6 159:16
160:8 161:1,3,6,21
162:5,7 163:18,20
163:22 164:9,10
165:9,10,13,16,20
166:15 168:1
**objectives**   161:11
167:17 168:17,22

**obligation**   129:20
129:22
**obnoxious**   102:6
110:10 117:6
**obstruct**   152:10
**obstructed**   148:5
**obtain**   151:25
**obtained**   149:5
151:2,8,13
**obtaining**   148:18
**obvious**   4:25
**obviously**   23:6
31:17 45:14,20
46:13 51:6 100:2
150:15
**occasion**   185:14
202:6
**occupation**   129:4
**occurred**   64:6
133:11 134:22
**ocean**   37:3
**odd**   111:1,1
**offence**   155:2
**offense**   55:18
63:10 121:15
131:3,5,7 146:7,8
146:14,15,22,23
146:24 147:2,6,8
152:19 154:3,4,6,7
154:16,21,22
155:7,9,12,17,24
156:3,7,8,11,16,20
156:23,25 157:22
158:2 159:9,11,13
159:17,23,25
160:6,12,16,19
161:2,7,22 167:23
167:25 168:1,3
170:16,19 173:10
173:11,13,14
174:4,8,9,14 175:8

176:4,8,12,13,17
176:22 177:1,4,6,8
182:2,5 185:16
188:8,9,9,23 189:6
191:9 196:25
220:24
**offenses**   121:14,21
122:16,16,23
129:8,13 130:2,5
131:1 146:4,9,12
146:17 147:8
157:14 174:23
177:17 178:14,17
178:21,23 179:3
179:12,17 181:7
181:13 186:2,8
**offer**   140:3
**offered**   132:16
139:25 181:1
222:7,14
**offering**   96:14
98:13
**office**   1:11 212:24
**officer**   38:4,8,12
38:18,25 39:2,5,6
41:3 54:1,21 55:2
69:2 87:2,4 126:4
142:1 185:24
199:6 202:14,15
202:21,23 203:1,5
203:7
**officers**   41:5 55:7
87:1 141:25
143:14,16 201:17
201:23 203:7
**offices**   1:14
**official**   185:1
188:18 224:5
**officials**   184:12
**oh**   10:21 14:16
27:8 57:15 64:15

[oh - part]                                                                 Page 31

67:23 68:13 74:19
87:11 89:4 100:14
107:23 108:10
118:4 119:8 125:7
144:19 153:24
192:7 198:4 200:5
201:4 202:20
205:25 211:13
214:6
**okay** 6:17 42:20
45:12 53:15 57:18
58:17 60:13 69:7
69:18 74:15 85:25
88:15 94:24 118:8
118:10 120:17
192:9,18,19,24
198:7,8 199:7,24
201:8 207:1
209:13 214:17
216:15 221:19,21
222:25 223:4
**old** 50:18 74:25
75:8 77:18 81:8
82:9
**once** 31:7 47:17
54:20 63:2,22,22
120:11,22 182:25
184:10 220:24
**one's** 33:23
**ones** 25:20 65:2
82:14 94:1
**open** 16:24 17:1,2
21:1 39:1 109:13
116:11 119:12
153:10 183:7
203:14,15 211:18
**opened** 119:7,15
**opening** 29:9
45:14,15,17,25
46:5,8 55:24
59:15 74:16 79:7

**opens** 119:18
**operational** 58:2
60:22 62:10 68:19
71:24
**operator** 2:6 82:1
**operators** 38:15
**opinion** 127:11
129:1 134:13
140:1,3,4,6,9
**opinions** 139:22
140:11,12,15,16
140:19,20,21,23
**opportunity** 8:7
35:17,18 36:14,16
69:16 117:13
121:20 124:24
125:2 126:22
137:5 175:19
179:16,18 194:22
**opposed** 80:23
**opposite** 106:17
109:5,6,7 111:23
180:13
**options** 37:12
**oral** 162:1 211:15
**order** 7:21 21:3
50:3 51:11 99:20
130:1 147:11,13
151:25 154:14
156:13,16 158:16
160:10 161:11
163:9 165:5
170:18 174:1
176:19 180:14
188:11,23 189:9
196:14,17 210:7
211:13,15,16
**ordered** 133:20
**orders** 114:8
**ordinarily** 139:21

**ordinary** 130:18
149:19
**orientation** 129:4
**original** 183:11
**originally** 16:18
30:6 216:17
**ought** 127:12
**outcome** 137:11
142:9
**outdoor** 73:7
114:19
**outdoors** 69:23
**outnumbered** 19:9
**outnumbering**
23:8 28:4
**outside** 9:17 15:6
15:12 17:23 31:3
67:15,17,17,22
68:4,6,7,11,13,25
70:6 91:10 107:19
107:24 108:11
114:16,22,22
128:23 131:12
132:5 135:18
185:24 188:18
203:5
**outweighed**
140:23
**overall** 161:21
190:21
**overcome** 182:3
**overcomes** 129:12
**overheard** 132:24
**overly** 110:11
**overreact** 86:4
**overreacts** 123:18
**overruled** 132:25
**overt** 161:11
166:10,13 190:10
**owed** 92:11 111:17

**owned** 11:25
**owner** 52:10 53:3
58:3 64:5 65:19
67:20 68:17 72:9
72:20 73:7 75:20
75:23 84:8
**owners** 80:22

**p**

**p** 4:1 221:16
**p.m.** 1:5 10:11
11:7 39:19 40:13
41:1,2,5,7 79:19
97:21 98:2 170:4
170:4 215:14,14
223:6
**pa** 1:4,12,15,18,24
2:5,24
**pack** 42:9 43:5
**page** 3:2 166:21
167:1 187:17
190:6,9,12,25
191:25 192:2,13
198:10 201:16
**pages** 190:4,4,14
**paid** 68:17 80:6
199:20
**paper** 184:25
**papi** 103:8
**paragraph** 166:16
166:22,25 167:1
190:7,11 191:8,24
192:4 194:24
**pardon** 111:12
130:8 219:5
**parens** 217:17
**part** 62:24 87:7
92:1 95:19 105:20
106:24 116:21
127:2 136:18
150:3 156:25
157:2 177:6,8

[part - phrase]                                                                    Page 32

189:8 194:7,8
  205:15
**partake**  63:24
**participant**  174:17
  175:1 194:23
**participants**  163:4
**participate**  25:18
  26:15 117:1
  158:15 205:8
  210:4
**participated**
  156:11 176:17
**participation**
  156:18 176:24
**particular**  93:19
  147:1,2 149:13
  152:15 178:3
**particularly**  51:20
**parties**  131:20,23
  139:18 151:20
  160:22 162:10
**partner**  25:24
**partnership**
  160:10
**parts**  108:20
  142:20
**party**  96:14
  137:13 139:20
**pass**  34:9 82:19
  104:9
**passenger**  38:23
**passes**  110:18
**passing**  106:4
**patrolman**  54:16
**patron**  63:8
**patrons**  62:4
  71:13 76:16
**patterson**  1:13,14
  3:4 5:25 6:1 7:21
  7:22,24,25 45:1,2
  45:4,8,12 80:12

81:8 91:11,24
  95:23,24 104:23
  105:3 190:18,19
  191:21,23 192:2,4
  192:8,12,22 193:2
  193:16,21 199:12
  200:21 203:25
  210:12,13 211:8
  212:15 214:1,2,6
  214:17,22,24
  215:2,4,7,25 216:5
  216:16,17 217:6,9
  217:19 218:20
  220:16 221:10,12
  221:21 222:2,8,12
  222:16,22,25
  223:4
**patterson's**  83:17
**pause**  7:4 45:3,7
  45:11 165:22
  167:3 168:8 170:6
  204:12,20 207:23
  216:11
**pay**  43:7 67:9
  91:17
**paycheck**  113:9
**paying**  77:21
**payroll**  11:12,13
  11:15,16
**peacemaker**
  125:13,15,17
**pennies**  50:19
**pennsylvania**  1:1
  75:10
**people**  24:1 25:18
  35:7 52:15 53:24
  59:10 69:12,13,19
  72:7,25 73:9 76:2
  76:5,25 80:17,22
  80:23 81:21 84:17
  85:13 86:21 87:13

91:4,15,17,19 92:2
  92:12 118:14,16
  118:25 119:3
  122:9 124:7
  126:14 132:8
  162:9 205:9 206:7
**perceive**  82:12
**perceives**  82:11
**perfect**  11:22,24
  12:5
**perfectly**  178:6
**perform**  128:24
**performed**  155:11
  156:15 161:10
  166:13 168:15
  174:23 176:21
**period**  4:25
**permit**  29:20
  93:22 139:22
  220:7
**permitted**  128:18
  132:17 140:3
  199:19
**person**  25:24,25
  42:22 46:6,6
  48:10 49:25 59:4
  59:4 68:7,7,8,8,15
  69:25 70:1,2,6,8
  71:22 81:14 98:16
  117:23 122:18,24
  130:18 136:24
  143:23 148:11,14
  148:16 150:23
  154:3,5,6,7,8
  171:8,15 173:10
  173:12,13,14,15
  178:1,6,7 181:18
  189:9,10,11 199:3
  205:11
**person's**  129:2
  150:16,17

**personal**  101:6
  142:8 146:20
  148:10 150:6
  178:3
**personally**  154:4
  157:23 158:15
  173:11
**persons**  137:24
  150:23 155:22
  160:6,15 161:18
  162:14 168:6
  176:2 216:20
**persuaded**  113:2
**pertains**  49:15
**peterson**  2:7 224:3
  224:10
**phase**  157:2 177:8
**philadelphia**  1:4
  1:12,18,24 2:3,5
  2:24 41:20 52:24
  66:6,15 69:20
  199:18
**phone**  4:24 11:23
  28:15 40:3,7,16,17
  40:23,23 41:7,11
  67:7,8,10 72:18,19
  72:23,25 84:3
  101:6,7,9 103:18
  103:18 122:8
  128:1,1,10 184:16
**phones**  184:16
**phonetic**  8:25
  11:20 24:4 41:9
  83:16 108:1 126:5
  207:11 212:4
  221:16
**photo**  123:24
**photos**  33:9 97:13
**phrase**  120:1
  165:23

**physical**  110:11
  149:23,23 150:7
**physically**  13:8,20
  19:2,3,22 22:4
  24:19 25:20 27:13
  28:18 108:24,24
  111:23 116:15
**picked**  34:2
**picks**  111:24
**picture**  10:8 34:22
  54:20,20 85:4
  100:18
**pictures**  32:23
  34:6
**piece**  54:18 73:24
  73:25 184:25
**pin**  57:23
**pinkerton**  190:21
  193:5,10,11
**pitfalls**  73:12
**place**  59:15 75:6
  86:17 186:4,9
  188:13
**placed**  179:22,25
**places**  24:1
**plaid**  80:3
**plaintiff**  1:3
**plan**  106:15
  107:15 112:16
**planning**  116:9
**plate**  42:16 75:4
**play**  83:22,23,23
  107:1,5 127:2
  205:14
**played**  41:2 53:15
  53:22 164:4
**playing**  53:16
**plays**  41:16
**please**  4:3 7:8 45:4
  49:10,11 77:24
  123:20 170:5

**pleases**  209:1
**pled**  129:7
**plenty**  121:5
**plexiglas**  14:7,8
  59:23 105:22
  107:2,12
**plo**  221:16
**plug**  57:22
**plural**  98:14
**plus**  91:6
**pnc**  29:14,14
**pocket**  18:4,8,9,13
  33:25 34:5 58:4,7
  58:8 59:25 62:3,4
  62:7 63:23 71:17
  86:1 120:25
  123:13,16
**pockets**  21:11,12
**point**  13:21 17:12
  19:5 20:18,18
  38:5 47:16 57:3,5
  57:17 59:22,24
  64:18 76:10 77:6
  91:11 104:18
  107:12 110:6
  121:6 123:13
  161:9 193:6
  196:11 197:18,19
**pointed**  23:16 33:4
  33:6,17 61:19
**pointing**  61:25
  67:21
**points**  14:2 28:14
  61:13,22,23
**police**  22:1,3,4,8
  34:11 37:18,20
  38:2,13,18 39:21
  39:23 41:3,20
  42:21 44:3,8
  52:25 64:3 65:22

65:23 66:6,13,16
  69:20 70:23 74:25
  81:22,25 82:1,3
  83:18 86:25
  103:23 104:23
  108:8 125:21,21
  143:14,15,23
  201:17,23
**political**  83:5
**politics**  200:5
**portion**  7:13 83:24
  116:24
**portions**  82:24
**position**  17:11
  18:17 57:4 83:4
  129:5 180:1
  183:11 195:3,9,9
  197:8 219:24
**possess**  216:20
  220:23
**possessed**  217:11
**possession**  148:15
  171:8 172:18
  220:20
**possibility**  11:22
**possible**  17:16
  42:22 98:19,19
  130:12,13 139:3,4
  139:11,12 141:10
  181:15 182:15
  185:4 208:17
**possibly**  38:20
  66:11 75:5 102:11
  102:15 105:23
**potato**  65:2
**potential**  68:22
  172:1,21
**potentially**  152:20
**powder**  56:25
**powered**  67:10

**practically**  107:2
**precinct**  69:12
**preclude**  151:20
**preconceived**
  163:6
**prejudice**  128:25
  137:12
**preliminary**  47:19
  132:13 134:15
  136:9
**premier**  222:21
**prepaid**  40:5
**prepared**  47:15
**preponderance**
  50:10,12,16,21,24
  51:9 78:21 179:5
  180:5,6,8,22
**presence**  148:11
  172:12 189:8
**present**  46:10
  129:21 139:3,7,11
  144:15 155:23
  164:13 176:3
  214:22 219:22
**presentation**  6:21
  83:10
**presented**  4:23
  7:12 65:6 128:17
  129:12 136:4
  138:21 139:9,10
  141:20 166:1
  169:1 180:25
  189:17 197:6
  202:11 206:20
**preside**  181:19
**pressured**  86:5
**presumed**  129:8
**presumption**
  129:10,12,15,19
  182:3

**pretty**  72:5
**prevail**  195:25
**prevent**  13:23
**preventing**  36:17
**primarily**  194:22
**principal**  32:2
  154:9 173:16
  194:6 196:21,25
**principals**  175:10
  194:6
**principle**  9:13
**principles**  32:19
  174:20
**printed**  206:13
**prior**  11:13,14
**probability**  93:16
**probable**  180:1
**probably**  39:24
  55:3 74:24 85:23
  206:18
**problem**  6:9 12:2
  43:4,8 44:1 86:1
  109:20,21,22,22
  109:23 196:20,23
  197:25 217:25
**problems**  109:21
  190:5
**procedure**  95:10
  95:11 139:19
  200:19 211:11
**proceed**  5:15 8:15
  8:19 79:23 90:10
  98:6 173:19
**proceeded**  82:12
**proceedings**  97:21
  203:23 223:6
  224:6
**produce**  139:4,7
  139:12
**profession**  129:4

**professional**  142:8
**progress**  81:24
  82:4
**projectile**  32:14
  52:22 56:25 57:14
  173:1
**prominently**  76:15
**promise**  45:8
**prompt**  178:5
**prompting**  178:7
**prompts**  178:1
**proof**  8:6 47:18,20
  47:21 50:6 90:5,6
  129:22 130:11,12
  141:5 142:25
  147:11,13 177:18
  177:19,21 180:7
**properly**  6:10
**property**  80:21
  147:20,21 148:11
  148:15,15,16,25
  149:5 151:3,8,12
  151:13 152:7
**proposed**  194:24
  198:6
**prosecution**  143:1
**protect**  17:19
**proudest**  85:17
**proudly**  76:15
**prove**  9:25 24:11
  49:19,23 50:20
  56:22 57:19 63:2
  66:2,3,4,5 68:2
  69:24 73:9,25,25
  74:1 98:11 114:3
  129:21,23 130:5
  138:18 139:1
  141:10 143:3
  146:6 147:17
  148:23 149:7
  150:15 151:24

152:9,18 156:4,9
157:12,20,25
159:4,22,25
160:20,24 161:17
161:24 162:3,9,13
163:4,16,23 164:3
164:15,22 165:11
166:10 167:15,22
171:16 172:16
176:9,15 180:8,9
**proved**  57:20 58:6
  71:23 129:17
  130:25 143:18
  146:25 154:17
  158:20 160:13
  162:20 163:12
  164:25 165:7
  167:20 170:21
  174:5 175:3,13
  178:15,20,22
  179:5 180:21
  182:11 186:1
  188:6,24 201:19
  202:1
**proven**  60:19
  122:19 183:20
  186:7
**proves**  50:7 51:14
  134:21 135:2,3
  141:15 146:8
  157:7 182:4
**provide**  71:3
  127:23 184:11
  186:15 210:6
**provided**  95:15
  185:7,9 205:16,20
**proving**  130:10
  149:9 155:16
  157:22 180:4
  181:6

**provision**  145:2
**provisions**  145:2
**provocative**  6:12
**prudent**  48:10
  49:25
**public**  129:1
**pull**  12:11 14:17
  17:11 18:4,7
  23:19 27:8,9,9
  30:11,12 85:3,9
  123:20
**pulled**  38:16 52:17
  85:24 106:11,12
  125:5
**pulling**  22:5 73:21
**pulls**  18:10 35:22
  35:25 60:21 61:6
  104:4,13 114:13
  116:7 121:23
  125:5,6 126:5
**punctuation**  4:20
**punishment**
  143:22 182:14,15
**purport**  61:7
**purportedly**  62:10
**purpose**  133:4,6
  151:14 152:11
  155:5 156:5 161:5
  162:17 165:19
  171:23 175:4
  176:11 220:23
**purposes**  97:5
  115:2 166:14
  216:8
**push**  107:4
**pushes**  107:2
  114:13,15
**pushing**  19:15,15
  20:24 43:22 109:2
  109:2

**put**  6:14,17 9:1
  10:17 29:17 33:19
  39:19 50:19 51:3
  54:24 58:4 59:3,4
  59:6 61:2 68:17
  69:3,4,5,6 73:11
  85:21 86:5 118:17
  125:16 180:1,10
  217:17
**puts**  10:11,12
  13:24 14:2 25:7
  33:24 59:25 61:13
  62:4 85:10 101:5
  108:25 109:9
  120:21,25 121:1
  123:13
**putting**  12:19,19
  25:10 43:18

**q**

**qualifications**
  140:10
**quality**  137:7
**quantity**  138:20
  138:22
**quarter**  93:12,13
  94:25 97:18
**question**  43:2
  48:19 62:5 64:13
  82:7 86:12 113:24
  120:13,14 131:25
  133:1,8,8,10,12
  136:25 144:13,14
  150:23 172:10
  185:19 188:3,21
  189:1,12 207:8
  213:9,12
**questioning**
  102:25
**questions**  29:8
  49:2,2 53:6,7
  54:16 56:3 64:11

  65:25 81:2 84:2
  131:23,24 139:23
  144:11 184:23
  187:15
**quick**  53:22 71:6
  73:5 74:22,23
  77:4 199:14
**quickly**  203:17,18
  209:9
**quinn**  1:5 2:2 4:19
  4:22 5:4 8:24
  10:10,18,20 11:3,6
  11:18,21,25 12:4
  13:2,8,18,20,23
  14:3,4 15:13,23
  16:13,14,18,20
  17:23 19:2 20:1,2
  20:14,20,21 21:15
  22:4 24:19,24
  26:4 27:6,21 28:5
  28:9,11,25 29:4
  30:14,23 31:2,6,8
  32:3 34:11 35:3,4
  35:11,22,25 36:9
  36:15 37:25 40:16
  40:22 43:17 52:13
  52:14,17 85:2,6,7
  85:21 86:6,13
  92:11 98:10,22
  99:8,12,21 100:3,5
  100:11 101:4,8,20
  101:24 102:6,21
  102:24 103:12,16
  103:18,24 104:5,6
  104:19 105:11,15
  105:17 106:3,8,25
  107:2,3,10,11,20
  108:20,23 109:8
  110:6 111:14,19
  112:11,13,18,20
  112:22,25 113:4

  113:20,25 114:11
  115:3,3 116:4,6,15
  116:17,23 117:5
  118:21 122:7
  123:1 125:3
  126:11,12 144:25
  146:14 147:19,25
  148:25 149:4,11
  149:15,17,25
  150:10 151:2,7,16
  154:11 157:18,21
  157:23 158:1,8,17
  158:24,25 159:2,5
  159:8,13,20,23
  160:1,4,11,22,25
  161:5 163:10,13
  163:17,24 164:4,8
  164:11,16,20
  165:2,6,8,13,15,17
  165:19 166:7
  167:19 168:19
  170:14,19,24
  173:21 182:1,7,12
  186:18 187:2,12
  193:25 194:4
  195:4,9,10 196:13
**quinn's**  11:10
  28:25 30:6 59:2
  99:15,20 106:13
  113:6 115:11
  119:14 124:1
  148:3 150:13
  166:5 168:24
**quite**  56:4 142:5
**quotation**  55:14
  60:17
**quote**  13:12,18
  27:22 28:24 30:5
  109:17 123:17
  124:20

**quotes**  73:11
**quoting**  4:20
  186:15

**r**

**r**  4:1 98:1 203:2
**r.c.**  1:14
**r.d.**  38:14
**race**  129:2
**racking**  122:13,21
**radically**  90:14
**radio**  38:19 41:20
  81:23,25 82:3
  206:11 209:19
**rain**  9:16,20,23
  135:15
**rained**  9:18,21,23
**raining**  9:17 57:8
  135:18,19
**raise**  216:5
**raised**  18:12
  123:11 178:12
**raises**  220:9
**raising**  216:4
**ran**  143:14,15
  201:17,23
**rates**  222:21,21
**rd**  147:20 149:1
**reach**  6:16 63:4
  73:25 132:12
  183:4,15
**reached**  185:20
**reaches**  9:3 209:15
  209:22 211:21
**reaching**  19:23,24
  61:20,20,20,24
  134:19 182:15
**react**  10:20
**reaction**  10:21
**reacts**  104:24
**read**  48:12 49:6
  51:24 55:20 56:23

144:12 166:23,23
167:2,5 191:19
196:11 198:10,13
198:15 200:7
201:16,22 202:10
204:13 206:13
209:18 218:2
220:19
**readily** 32:13
57:13 173:1
**reading** 144:7
**reads** 48:4 186:21
187:17 188:5
**ready** 4:7 5:16
8:14 54:13 79:23
98:5 104:23
188:19 207:24
**real** 10:8 19:13
23:16 29:22 32:22
32:24 33:8,10,15
33:24 34:2,13,16
34:17 38:15,19
43:24 53:22 54:7
56:21,23 57:1,2,12
57:12,21 66:23
71:6 73:5 74:22
76:14,14 77:4
91:3,4 99:19
105:7 126:9
219:18,19
**realistic** 124:24
125:2 175:18
**reality** 83:7
**realized** 115:4
**really** 36:24 64:4
85:3 92:9 101:4
102:25 105:2,4,6
112:5 116:7,8
118:15 119:25
126:15 169:20
196:6 207:5 219:7

220:6
**reason** 33:18,19
44:6 108:17
118:20 119:10,18
124:3,12,16
126:12 130:17
135:6 136:1 143:8
143:24 162:23
200:9 206:17,19
**reasonable** 23:15
23:21 47:23 48:5
48:10,19 49:20,24
49:25 50:7,11
51:15 57:20 58:6
58:9 63:3 66:2,20
68:2 70:12 71:23
74:2 78:9,19 90:3
90:19 114:4,25
121:12,20 122:20
129:14,18 130:4,6
130:10,11,15,16
130:18 131:2,4
135:5,9,25 139:2
141:15 143:18
146:8 147:1,18
148:24 150:7,21
151:25 154:18
156:4,10 157:7,12
158:21 160:14,21
161:17 162:13,20
162:24 163:12
164:25 165:7
166:11 167:20
170:22 171:17
172:17 174:5
176:10,16 178:16
179:11,16,18
180:7 181:7 182:5
182:9 183:4,21
186:3,8 188:6,25
201:20 202:2

**reasonably** 132:11
135:4,17 146:9
158:7 159:18,18
159:25
**reasoned** 135:10
**reasons** 85:9
115:10 117:3
120:16 138:13
140:3,10,19 194:1
211:18 217:3
219:1
**reassured** 80:8,17
**rebut** 117:13
**rebuttal** 8:7 44:21
93:8 112:11
**recall** 74:3 99:5
103:2,21 110:21
138:2
**receive** 4:18 140:7
**received** 96:6
97:14 131:17,17
131:17 132:15
133:1,9 172:6
182:17 202:13
214:10
**receiver** 173:3
**receives** 82:1
**recess** 79:16 93:2
93:11,13 97:18
153:12 169:12
170:1 215:9,11
222:10
**recessed** 79:18
97:21 170:4
215:14 223:6
**recklessly** 179:22
179:25
**recognizes** 35:7
**recollection** 53:17
62:8 108:2 134:8
136:25 138:1

184:4,6
**recommendation**
198:1
**reconcile** 112:1
**reconvene** 223:7
**reconvened** 79:18
170:4 215:14
**record** 39:20 54:6
133:22 183:23
190:2 194:1
202:25 214:18
217:3 218:22
**recorded** 39:19
70:16 76:24 86:18
**recorder** 68:19
**recording** 68:20
70:17 224:6
**recordings** 139:15
139:16,18,20
**records** 4:24 5:3
11:6,9 12:8 29:24
40:4,5,7,23 41:8
113:5
**recount** 47:12
**recovered** 113:10
**recovery** 141:2,12
**recross** 47:8
**redo** 192:11
**refer** 4:19 52:11
147:15 208:7
**reference** 47:16
145:16
**referred** 4:12
145:5 153:20
154:2 157:13
192:15
**referring** 221:12
**refers** 136:14
178:2 188:9
**reflect** 198:18

refresh 153:2
refuse 179:19
regard 26:18 28:8
  35:3 37:20 43:17
  44:5 85:6 166:9
  214:9
regarding 4:9
  47:20 141:2,12
  154:1 158:19
  181:12 197:17
regardless 29:21
  181:1 189:10
region 1:23 2:23
register 10:25
  13:19 20:25 21:5
  29:18 30:1 31:15
  43:20,22 61:18
  92:8 104:11 109:8
  109:10,13 110:3,4
  117:22,24 119:6,7
  119:11,14,17,19
  120:20 126:12,14
registered 222:4
regular 5:3 50:18
  113:12
reimbursed 100:6
  100:6,12 110:7
  111:16
reject 122:1
  142:17,19
relate 46:9
related 46:8 121:4
  139:3,11 163:3
relates 78:1
relation 19:21
  55:25 113:22
  137:12 145:12
  171:1,19,22 172:4
  173:9,24 174:18
  174:21 175:2,11
  177:15 187:8

188:11 189:4
  196:19 197:4
  220:1
relationship
  151:15,19
relative 148:16
relatively 77:22
relax 87:19
relaxed 87:19
release 208:20
released 199:17
  208:13
releasing 210:2
relevant 68:21
  69:8,18
reliability 140:11
relied 64:3
relieve 181:5
religion 129:3
rely 184:5
remain 49:4,10
  93:17 203:19
  212:16
remaining 11:10
  199:16
remains 110:4
  142:25
remarkable 80:25
remember 9:15
  28:22 33:16 37:11
  38:18 40:8 47:2
  47:10,13 55:4,5
  59:20 63:13 72:19
  73:5,13 75:21
  80:3 81:25 102:18
  104:5 105:22
  107:7 110:25
  112:12 120:3,21
  123:11 134:2
  137:1 144:20
  181:4 184:1

remind 144:7
  181:23
removed 133:21
  167:11
removes 60:15,19
  60:20
removing 22:5
renew 193:4,25
rent 80:23
repeat 135:14
  151:4 206:8
repeated 202:6
repeating 202:5
report 200:14
reporting 1:23
  2:23
represent 80:2
  98:10
request 63:5
  218:25
requested 208:12
require 211:6
required 93:19
  138:7,25 139:2,6
  139:10 141:22
  143:3 152:18
  155:14 162:8
  166:8 167:15
  169:17 172:14
  175:22 177:19
requirement
  141:8,11 155:15
  155:16 156:17
  175:23 176:23
requirements
  154:19 158:22
  174:6 220:22
requires 129:15
reread 192:10
rereading 192:9

rerecording 70:18
research 128:6
  184:22
resolve 84:7,10
resolved 88:15
  216:14
resources 66:18
respect 4:15 48:4
  49:2 50:3 56:8
  62:25 63:24 80:13
  93:25 142:13
  148:19 157:9
  167:14 168:4
  171:24 173:4,6,8
  173:17 191:12,15
respectfully 183:6
respond 185:3
responded 74:25
responding 47:6
responsibility
  127:20 182:13,23
responsible 26:13
  26:14 37:13 70:2
  158:3
rest 195:1 207:16
  209:21
restrictions
  209:21
restroom 206:5
result 148:2 163:6
results 32:16
resume 203:20
retrieve 207:2
return 5:4 41:12
  44:23 92:22 131:2
  131:6 146:22
  153:25 185:22
  188:19 208:13
  210:8 218:5
review 69:12
  108:9 217:3 221:7

**reviewed** 96:19
**reviewing** 69:13
  142:10 192:14
**revised** 5:22
**revolving** 59:10
**ride** 94:6,11
**right** 6:5,22 8:11
  8:14 9:17 10:8
  13:4,16,16 14:15
  14:19 15:15,16,20
  15:25 16:2,12
  17:5 18:6,15
  19:25 20:2,8,9,12
  28:2,10,22,22 30:8
  30:11 31:4 33:25
  40:18 41:6 42:10
  42:13,15,20 43:1,4
  46:3,20 48:2 49:3
  49:4,10 54:7 58:4
  58:7,7 60:2,6
  61:19 62:3 63:23
  65:16,19 69:14,15
  73:20 76:3,6,11
  80:3 82:8 83:16
  83:17 84:6,8,9,10
  86:19 87:11 89:10
  92:2,12 94:21
  97:11,17 98:5
  106:3,4,10,18
  107:13 110:15
  117:5,22 118:24
  119:12 120:5
  123:22 125:16
  142:25 153:6
  167:9 170:9
  183:10 189:21
  191:11 192:3,8
  193:3,14,18
  195:22 196:8,8
  198:21 201:6,11
  204:4,7 211:3,23

212:1,9 213:8
214:13,20 215:1,8
215:9,17,18 217:4
217:8 218:7
219:12,13,15
220:12,15,18
221:17,22 222:9
**rise** 7:5 79:14,21
  95:1 97:20 98:3
  169:14 170:2,7
  204:6,21 207:18
  208:2 210:20
  215:13
**rob** 26:8 75:19
  76:1 110:7
**robbed** 64:15
  72:15 88:8
**robber** 90:25
**robber's** 88:8
**robberies** 109:21
**robbery** 8:23 9:6
  22:13,17,18 25:9
  25:14,19 26:3,7,15
  26:19 27:3 31:24
  31:25 32:10 39:24
  40:11,12,12 44:20
  49:21 66:21 70:14
  71:6 72:12,13
  73:1,10,23 74:5,8
  74:9,11 76:4 79:8
  81:17,18,22 82:4,6
  82:12 84:6,11
  86:8,24 87:7,17
  89:24 91:8,16,17
  92:4,5,13,15 98:15
  101:7,8 109:21,22
  110:13,13,24
  111:2,11 112:25
  112:25 113:17,19
  117:2,3,7,8 121:1
  121:2,15 124:25

125:9 126:1,3
144:25 145:5,6,7
145:17 147:11,15
147:16 148:1,8,9
148:10,20 150:4
151:23 152:1
154:13,15,25
157:8,18,24
158:18 160:18
161:23 169:5,6
170:17,25 171:7
171:20,21,25
172:2,5,9,11,20,23
173:6,18 174:11
174:18,21 175:6
175:12,19 186:22
195:21 196:17,19
197:3,5
**robbing** 76:17
**robert** 1:10,13
**robs** 76:1
**rodriguez** 11:20
  11:24 12:6 21:25
  24:2 28:15 34:15
  44:10,13 72:10
  74:7 82:7 83:25
  84:2 85:11,15
  98:24 99:5 100:10
  101:5,9,19 103:19
  110:18,19 111:9
  113:12 115:13,15
  122:4 125:20
**rodriquez** 22:7
  87:14
**role** 164:4 210:5
**roll** 39:2
**rolls** 24:3
**room** 68:16
  127:17 128:3,12
  181:14,17 183:2
  183:23 184:19

185:20,25 188:18
203:6,16 204:5
205:10 206:23
207:9,12 222:15
222:24
**ross** 41:24 110:22
  110:23
**round** 53:5,6,13
  53:14 54:8,23
  55:4,8 60:1
  122:22 123:5
**rounded** 121:12
  179:11
**rounds** 52:24
**rule** 47:3,11 158:2
  158:19,19
**ruled** 7:13 133:16
**rules** 48:5 53:17
  62:8 90:9 132:14
  132:17,20 139:21
  139:24 210:6
**rulings** 132:23
**rumors** 131:11
**run** 29:25 75:3
  87:8 92:5 115:22
  143:23 153:6
**running** 16:1,2,6,6
  16:9 31:3,4 38:8
  88:4
**runs** 16:10,11
**rush** 29:16
**ryan** 191:2

|  s  |
| --- |

**s** 4:1 98:1,1,1
**safe** 62:17
**safety** 108:18
**sake** 120:17
**sale** 25:1
**sanchez** 12:14
  13:3 14:14,22
  16:16 19:7,10,12

21:14 22:2 23:14
23:19 25:10 27:7
28:5 53:3 62:12
62:14 64:7,12
72:1,8 73:6,13,19
73:19 74:4 82:6
84:9,21 87:25
88:1,5 100:10
102:18,23 105:14
105:14 106:10
110:25 111:2
116:1 150:12,20
151:10,17
**sanchez's**  106:7
**sat**  80:22
**satisfied**  48:18
129:17 188:24
**satisfies**  149:9,12
**satisfy**  51:3,5,8
155:14 156:17
175:22 176:22
214:12
**saw**  4:16 11:12,23
13:2 16:1 26:21
26:23 40:3 53:20
55:6 59:14 61:6
67:13 69:8 81:18
83:1 84:24 85:10
100:16 103:3
104:4,5,14 105:3
107:20 111:23,25
114:11 115:12,20
116:15 131:10
139:14 153:19
**saying**  12:22,22
14:16 21:15 28:15
31:14,16 55:11
65:17,20 73:19
82:10 88:17
101:24,25 110:25
111:3 112:18,19

116:2 195:3 196:5
**says**  13:6 14:19
18:22,23 26:1,2
29:1 30:11 41:12
54:9 76:20 87:23
88:6 99:19,21
104:13 117:24,25
118:12,23 136:17
187:21 194:5
198:12 217:10
**scale**  50:17,18,18
50:25 180:13,13
180:17
**scales**  52:9 78:22
79:3
**scam**  10:10 28:12
29:7,11,21 100:14
100:15,18,20,22
100:25 101:16
**scared**  23:17
72:10
**scary**  86:7
**scenarios**  70:9
**scene**  22:5 41:3,4
41:13 124:24
125:3,8 175:19
**schedule**  8:13 94:1
94:15
**schematics**  37:3
**scheme**  163:2,7
**school**  81:8
**schwarzenegger**
88:18
**scintilla**  193:11
**scope**  159:14
160:2,3
**scream**  44:10
**screaming**  13:11
13:11 14:13 16:15
16:16,16,24 20:16
22:9 25:6 27:7

67:4
**screen**  16:12 58:16
76:11,13 86:19
**script**  91:3
**scroll**  58:21
**seated**  4:3 7:8
79:22 95:3 98:4
169:16 170:5,8
204:10,23 207:20
208:6 211:3
**second**  10:16 12:7
17:21 22:23 29:12
35:15 36:13 44:3
105:7,7,11,11
107:21,22 120:6
121:12,23 123:3
123:23 124:6
125:23 126:4
127:7 147:24
148:9 153:6 155:1
157:5 159:7
160:20 166:21
167:1 171:1
174:13 179:10
181:23 190:9,10
191:8 192:4 202:4
219:10,23
**secondhand**  63:7
**seconds**  14:23
15:3,15,19,23,24
16:8,10,11,23
18:14,16,22,24
20:22,23,24,25
27:10 31:4 41:18
106:1 118:6
120:18
**secret**  66:18
185:12
**sections**  145:4,14
**security**  26:10
203:4

**see**  9:17 14:12
15:19,20,21 16:3,4
17:25 18:7 19:5
25:8 31:19,23
32:4 34:19 38:7
39:16 42:22 46:2
53:17,19,21,22,22
53:23 54:17 58:17
58:23 61:10 72:7
74:9 77:3 78:9
83:8 84:16 86:23
87:4,14 88:23
89:17,20,21 91:1,5
91:6,14 99:23
101:12 102:4,11
104:6,7,21 105:8
105:12,21 106:21
106:25 107:11
110:1 112:4 113:4
113:6 114:4 115:6
117:24 118:9
137:6,25 150:17
153:13 183:12
185:6 199:21
207:17 218:8
**seeing**  9:23 65:15
67:5
**seen**  17:16 38:24
43:6 58:20 59:21
61:22 62:3 63:6
63:23 64:24 75:21
81:16 102:9,10
108:13 110:2
114:19 126:22
127:1 128:19
131:12 132:4
134:24
**sees**  13:18 18:5
38:22,25 125:4
**selected**  82:24
83:18

**sell**  22:22 24:1
  99:20
**semi**  5:3 53:1
**send**  93:20 94:8,11
  94:20 144:14
  185:8 207:12
**sense**  4:19 11:2,5
  12:5 13:22 25:17
  29:23 35:6 56:2,7
  56:11,12,15 57:9
  57:11 68:12,13
  73:4,4 76:4,20,21
  76:23 78:2,7
  81:19 88:9 90:11
  130:17 132:6,10
  135:7 136:2 137:1
  196:4
**senses**  134:24
**sensible**  85:23
**sent**  17:2 54:24
  93:18,18
**sentence**  151:4
  168:10 190:13
**separate**  12:1
  120:23 146:15,23
  147:3 168:1 169:7
  186:13 187:13
**separately**  146:21
  147:9
**sequence**  59:12
  68:21 105:4
**sequentially**  50:4
**serious**  52:3 58:13
  60:14,20 121:10
  179:8
**seriously**  44:16
  121:10
**service**  66:18
  128:2,3 184:17,18
**services**  208:19

**set**  32:19 45:6
  135:22 149:6
  167:12 196:3
  205:11 211:12
  213:15
**sets**  24:25
**setting**  69:14,16
**seven**  16:8 39:11
  40:11,15 112:14
  137:17
**seventh**  184:23
**sexual**  129:3
**shake**  88:8,15
  153:1,21
**shaking**  9:20
**shape**  121:4
**shared**  161:5
  165:19
**sharon**  2:7 224:3
  224:14
**sharpnack**  38:9
  41:24 42:5
**sharpneck**  42:7
  110:23
**she'd**  75:21
**she'll**  12:2 205:6
**sheet**  212:17
**sheets**  147:3
**shift**  50:9
**shifts**  143:2
**shirt**  80:3
**shook**  72:16 88:6
**shoprite**  117:18
**short**  93:7 215:18
  215:19
**shots**  94:1
**shoulder**  105:14
**show**  5:3 34:22
  45:18,20 46:4
  54:10 66:4 81:12
  83:6,12,13,18

**showed**  33:22 46:3
  78:24 82:17 83:7
  91:6,8
**showing**  164:19
**shown**  75:17
  133:14 140:22
**shows**  68:24 76:14
  83:19 156:2
  164:10 176:7
**shut**  14:24 22:11
  44:11 88:19
  125:19
**sic**  9:5 143:9
  158:25 186:18
**sick**  208:18
**side**  6:17 12:10,25
  13:1,7,9,19,25
  14:3 15:21,21,25
  16:1,2,3,4,19
  21:16 25:6 27:24
  30:4 31:11,15
  34:25 38:23 39:1
  40:10 51:4,4
  53:12 71:13,16
  78:22 85:10 104:7
  104:7 105:13,24
  123:12 180:20
**sidebar**  132:24
  166:2,19,24
  169:23 189:22
  190:2 201:9
**sides**  80:10 83:6
  99:15 180:13
**sierra**  40:6 112:13

**sign**  184:25 185:22
  187:22,23 188:17
  198:12,13,17
  218:4
**signed**  4:17 214:14
  215:17
**significance**
  101:23 143:4
**significant**  102:25
**silence**  66:13
**silent**  49:4,10
  85:13
**silver**  76:19
**simple**  22:18,18
  26:6 110:10
  126:16
**simply**  103:11
  111:22 114:21
  132:18 134:20
  135:6 137:25
  145:22
**single**  15:5 36:13
  44:16 68:20 99:3
  100:23 103:22,22
  165:25 167:11
  169:21
**sinks**  50:23
**sir**  202:16
**sirens**  22:3,4 37:24
  38:6 44:3 87:2,3,5
**sit**  37:15 62:5
  69:17 80:16,18
  81:3 215:10 223:2
**site**  27:2
**sitting**  25:9 38:12
  80:18 115:7
**situation**  19:8 86:6
  118:2,8 150:22
  179:22,25
**six**  1:6 16:8,10
  25:4 46:2 112:14

117:24 137:14
184:10
**skill**   140:1,17
**slate**   129:9
**sleeve**   109:9
**sleeves**   20:23
**slight**   152:21
**slightly**   52:9 93:25
219:24 220:2
**slim**   24:24
**slip**   195:8
**slipped**   167:10
**slot**   69:4
**smart**   35:6 128:1
184:16
**smelled**   134:25
**smile**   209:1 222:5
**smith**   1:4,13 5:4
8:23 9:2,4 15:16
15:22,25 17:3,4,13
17:14 18:2,4,7,17
18:24 19:2,20
20:3,19 22:5 26:4
26:20,22,24,25
27:15,18,19 28:3
31:1,14,15 32:2
33:4,21,24 34:13
35:21 37:18,23
38:4,7,10,21,25
39:1,4,9,18 40:2,3
40:4,8,14,14,20,23
40:24 41:7,11,19
41:22 42:3,5,8,12
42:14,17,24 43:3,5
43:10 46:7,8,9
49:15 50:9 51:1
51:16 52:2 55:10
55:12 58:14 59:2
60:9,24 78:20
106:1,2,10 107:9
107:23 108:15,15

108:18,24 109:3
111:19,21,24
112:14,18,20
113:21,25 114:12
116:7,16 119:4,12
120:1,21,24
121:19 123:1,14
124:13,18 125:5
125:23 143:14,15
143:25 144:24
146:13 147:19,24
148:3,24 149:4,11
149:14,16,24
150:9,13 151:2,7
151:16 154:11
157:17,20,21,22
158:1,7,16,24
159:5,7,12,19,22
160:1,3,10,21,25
161:4 163:10,13
163:17,24 164:3,8
164:11,15,20
165:1,5,8,12,14,17
165:18 166:4,7
167:18 168:19,24
170:13,18,23
173:21 178:11,12
178:16,21,22,24
179:4,7,10,15,18
179:21,24 180:3
180:11,15,21
181:5 182:1,6,11
186:18 187:1,12
192:15,16 201:17
201:23 202:7,8,8
212:16 215:5
216:1
**smith's**   18:10,16
19:21 20:10 21:9
21:10 27:2 31:4
31:10 38:17 39:11

40:9,20 46:7 59:6
59:12 115:4
121:17 178:18
179:1,13 180:14
202:5 211:20
**smokescreen**
126:9
**snippets**   83:5
89:21 91:7
**soaking**   68:16
**soda**   24:25
**sole**   136:13 141:23
144:3
**solely**   128:16
206:20
**somebody**   9:19
26:2 41:23 42:10
43:25 46:15 49:9
52:22 53:9 54:8
54:19 55:8 69:11
73:18 88:10 89:3
98:16
**somebody's**   9:25
57:8 76:21
**someplace**   75:2
**something's**   23:24
**somewhat**   87:13
87:19 180:14
**soon**   42:21 185:3
202:11 203:20
206:25
**sopping**   9:19
**sorry**   29:8 61:10
82:20 96:22,25
109:19 115:22
157:20 159:1
179:22 187:11
191:14 195:17
196:22 198:19
200:12,23 201:4
214:6 216:9

**sort**   32:15 87:5
89:13 98:24 106:3
106:4 107:3
108:25 109:1
130:20
**sorts**   115:5
**sound**   84:22 87:22
140:20 224:5
**sounds**   32:9 75:18
**southwood**   1:14
**spanish**   14:25
17:20 84:19,20,21
**speak**   9:10 12:12
84:15,20 103:5
112:21,21 181:18
183:25 200:25
**speaker**   103:18
**speaking**   122:11
**specific**   141:1,9,11
155:7,9
**specifically**   49:7
74:4 148:4,8
159:23 200:14
**specifying**   145:21
**spectator**   155:24
176:4
**speculate**   55:13
56:9 68:3,10
70:11 78:8,25
**speculating**   56:11
56:18 57:6 78:5
**speculation**
130:14
**speed**   27:3 34:14
39:7
**spell**   202:25
**spelling**   162:1
**spends**   16:23
**spent**   43:11 112:7
**spin**   57:25 61:2

split  92:7
spoke  114:6,16
spoken  37:5
   161:20 168:15
spontaneity
   107:14
spontaneous
   107:15 108:14
spouse  88:12
spreads  99:22,25
stage  203:23
stamp  58:22
stand  10:15 13:4
   60:6,7 71:13 86:3
   87:17,18 102:19
   103:9 112:5 143:7
   153:1 169:10
   193:19
standard  50:11,12
   180:7 221:14
standby  205:7
standing  14:11,15
   19:18 21:9,12,13
   30:4 62:14 65:16
   92:2
standpoint  53:20
stands  62:5
standup  152:25
   166:20 169:12
   190:1
standups  153:17
   153:19
start  4:7 38:7
   51:10 61:8,16
   65:12 93:22
   142:19 147:12
   184:10 204:25
started  19:2 47:20
   70:18 74:21 93:13
   129:9

starting  46:20
starts  10:10 11:8
   19:15 20:16 22:8
   22:9 28:11,12
   37:23 38:4,14
   126:11
state  22:22 23:25
   24:6 48:8 74:24
   139:22 150:11,17
   150:24 151:10
   165:4 178:2 190:6
   202:24
stated  132:2 140:6
   194:1
statement  29:9
   45:15,15,17,25
   46:8 149:23
   169:19
statements  65:3,6
   73:22,23 131:22
   162:25 168:12,13
   168:15,20,23
   190:12
states  1:1,2,7
   145:3,3,14 152:8
   160:7,12,16 161:2
   161:7 165:4
   167:24 221:15,16
stating  74:4
status  129:4
statute  145:8
stay  21:22 50:19
   91:16 93:19 94:5
   94:6 185:12
   198:24 199:23
   203:11 214:23,23
   215:10
stayed  58:7 87:16
   90:20
stays  11:17 19:9
   30:16 51:3 86:24

86:24 91:25
   129:11,24
steal  73:10,15
stealing  63:25
steals  26:12
step  10:9 29:6
   31:20 104:5
steps  57:10
stevens  1:5,16
   8:24 12:23,25
   13:7 14:10,12,16
   14:18 15:15,24
   18:15,20,21 19:5,6
   19:10,11,14 20:4,5
   21:19,19,21,22,24
   22:6 23:5 25:5
   27:4,5,7 30:2 33:5
   33:15 34:10,25
   35:5,24 44:5 59:3
   65:19 72:16 73:14
   80:2,14 84:17,18
   85:4,11 86:10,13
   87:15 88:3,17,22
   90:20,23 92:22
   103:13,13 104:16
   104:24 105:1,8,16
   106:19,21,22
   107:1,8,11,20
   109:3 113:21
   114:1,14,14 115:9
   115:12 116:1
   119:4 122:25
   124:13,17 125:6
   125:12,17 144:25
   146:13 147:19,25
   148:3,24 149:4,11
   149:14,17,24
   150:10,13 151:2,7
   151:16 154:11
   157:17,21,22
   158:1,8,17,24,25

159:1,1,5,8,12,19
   159:22 160:1,4,11
   160:22,25 161:4
   163:10,13,17,24
   164:3,8,11,16,20
   165:1,5,8,12,14,17
   165:18 166:5,7
   167:19 168:19,24
   170:13,19,23
   173:21 182:1,6,11
   186:18 187:1,11
   187:12
stills  59:14 61:6
   64:24 105:5
stipulated  40:17
   131:19 141:18,21
stipulation  4:20
   4:21 95:6
stipulations  4:16
   5:5,7 95:5,9
   141:19,21 211:10
   215:16
stole  26:13,20,25
   39:21
stolen  19:24
stood  62:6 81:13
stop  15:6 69:10
   73:1 82:18 153:1
   206:5
stopped  39:11
   43:5,9
store  8:24,25 9:1
   10:12,14 11:20
   12:7,14 13:24
   14:10 15:6,8,12,14
   15:17 16:9,10,13
   16:15,19 17:10,15
   17:18,18 18:3,8,13
   18:22 20:11 21:1
   22:11 23:8 25:1
   26:19,22,25 27:1,6

27:11 29:17 30:21
30:23 31:5,7
33:21 35:15 37:6
38:1 39:14 42:25
44:2,3,11,14,17
52:7,10,15 53:3
58:3 59:13,16
62:15,17 63:25
64:5 65:2,4,8,19
66:9 67:22 68:17
69:14,22 70:8
71:15,23 72:1,9,20
73:7 75:19,20,23
75:25 76:2,13,18
76:22,22 77:1
84:4,8 85:9,21
86:14,14 89:9,12
91:14 98:22 99:10
99:15 100:7,8,9,22
100:23,25 101:2,6
103:13,21 104:15
104:16,17,19,25
105:10,18 106:14
107:23 108:19
111:15,20 112:10
113:14 114:1,3,6
114:13,16 115:5,9
116:5,6 118:15,16
119:6 120:2,4,6,11
120:14,24,24
121:5,11,15,22,23
122:9,24,25
123:14 124:8,17
141:3,13 217:12
217:14,18 220:3
**store's**  104:2
  110:8
**stormed**  105:16
**story**  75:12 105:6
**straightforward**
  136:24

**strangle**  29:17
**strangled**  23:10
**strangles**  20:17,20
**street**  1:11,17,24
  2:4,24 29:14 38:9
  41:6 67:21 76:3,6
  77:2 87:5 110:23
  110:24 212:25
**stress**  76:7
**stresses**  76:8
**stretch**  83:7 94:10
  190:1
**stricken**  133:21
**strike**  52:23
  179:23
**strong**  72:12
**struck**  132:3
**students**  209:5
**stuff**  25:7,8,10
  47:4,25 53:5
  62:15 63:1 73:10
  73:15 77:23
  105:22
**subject**  208:21
  209:21 210:2
**subjective**  150:16
**submission**  60:19
  63:5
**submit**  51:17
  54:11 63:3 78:14
  78:23 124:21
**submitted**  83:20
  194:3
**substantial**  164:4
**substitute**  127:11
  209:9,11
**substituted**  190:4
  190:15
**succeed**  156:13
  176:19

**succeeded**  203:6
**successful**  118:22
  119:4 124:5,12
  167:16
**sudden**  116:14
**sufficient**  138:13
  140:17 146:7
  164:15
**suggest**  48:21
  82:10 88:20 92:14
**suggested**  201:10
**suggesting**  56:20
  56:21
**suggestion**  78:11
**suit**  80:5
**suite**  1:12,18,24
  2:3,24
**sunk**  50:25
**super**  82:15
**supervisor**  41:5
**support**  140:20
**supported**  44:23
  140:21
**supporting**  140:12
**supposed**  32:5
  70:25 118:3
  143:13 165:24
  167:10
**sure**  19:7,8 25:17
  27:14,17 28:3
  32:24 41:25 43:20
  54:22 63:13 64:1
  84:21 103:4
  118:10 205:12,13
  206:22,25 209:6
  218:15 221:6
**surprise**  116:14
**surprised**  106:9,9
  106:13 114:12
**surrounding**
  150:1 163:2

172:12
**surveillance**  11:7
  24:19 141:2,12
**suspect**  38:20
**suspicion**  130:9
  135:10
**suspicions**  131:11
**sustain**  147:11,13
**sustained**  133:7,18
**swats**  107:3
**sweats**  80:5
**sweatshirt**  20:24
  31:12 43:18 91:25
  105:13
**switch**  91:5
**switches**  90:25
**sworn**  202:15,23
**sympathy**  128:25
**system**  81:1
  128:21 146:19
**systems**  80:25

                    **t**

**t**  40:6 98:1 112:12
**table**  6:8,17
  144:10,11
**tagged**  54:24
**tags**  39:12 42:18
  42:19
**tail**  20:2
**tailored**  194:20
**take**  10:9 17:10
  21:16,16,23 22:15
  26:7 27:20 29:6
  29:15,18 30:1
  31:16,16,20 34:17
  37:8 38:11 39:4
  43:23,24,25 49:10
  54:19,20 57:24
  62:18 69:4 71:19
  71:25 72:24 83:14
  85:22 88:2,3,4

96:4 98:19,19,20
99:20 101:10
102:2 108:22,23
110:7,15 111:14
111:21 113:5,14
119:13,13,13
120:18,19 127:3
143:7 166:16,22
169:9,12 182:19
184:1 185:19
189:25 219:20
222:16
**taken** 11:11 23:7,9
23:10,24 27:17
29:5 36:12 62:20
63:18,21 80:9
99:13 111:15
131:25
**takes** 9:3 10:11
20:23 28:6 35:5
44:16 60:10,10
61:25 69:25,25
108:19
**talk** 8:9 12:21
17:14 21:22 26:18
35:2 37:14 51:24
89:2,3 90:2,5
93:15 95:9 125:21
128:9 166:2 183:1
183:2,5 184:11
185:2 191:11
207:6 212:16
220:17
**talked** 28:9 36:20
81:13 113:23
122:5 211:10
**talking** 13:3 17:20
17:20 36:12,13
37:1,2,3 51:10
67:15,18,24 68:4,6
68:14 84:17,18,20

87:6 152:22 200:5
**talks** 122:6
**tape** 58:5 63:21
64:22 72:12 74:10
75:13,16 76:18
77:5 81:19 82:22
82:25,25 83:5,12
83:15,21,21,22,23
83:24 84:13,16,24
86:4 87:16 88:23
89:21 90:6 91:5,7
91:11,12,13,13
**tapes** 83:13
**task** 205:25
**taurus** 39:12
**teacher** 209:4
**team** 204:14
**techniques** 141:2
141:9,10,11
**technology** 45:9
58:15
**telephone** 112:12
127:25 218:12
**telephones** 184:15
**television** 205:11
206:13 209:20
211:12 213:15
**tell** 10:5 11:6 21:4
24:9,9,12,14 32:12
32:14,18 49:7
50:15 51:6,12
74:22 77:21,24
81:9 85:15,17
93:5,21 94:14
122:18 132:10
185:11,11 193:18
200:24 204:16
206:9
**teller** 29:17
**telling** 14:24 17:23
21:21 93:23 109:3

125:20 207:5
**tells** 10:14,18,23
11:3,5 17:6,7,9
22:10 41:5 86:21
99:18 118:9 209:1
**temp** 39:12 42:17
42:19
**tempers** 88:4
**ten** 18:16 75:20
170:3
**tend** 46:12
**tens** 53:25
**term** 4:13 82:5
124:2,14 148:9,22
150:3 171:4
172:24 173:2
**terminator** 88:18
**terms** 22:19
**terrible** 15:2
**terrified** 13:20
**test** 32:15,16,24
33:23 56:14
**tested** 53:25 56:14
58:3
**testified** 26:24
33:6 38:19 40:6
41:10 73:13,19
74:4,7 109:12
111:3 137:7
138:20 142:15
**testifies** 134:23
**testify** 24:2 49:5
142:23,25 143:5
**testifying** 73:6
103:10 136:21
137:10
**testimony** 28:24
33:2 34:7 45:18
45:19,23 46:22
48:16,25 51:19
55:25 74:3 78:1

80:8 81:25 87:1
103:1,6 112:12
131:16,18 132:3
133:2,4,20,24
136:12,12,16
137:16,17,22,22
137:24 138:8,8,12
138:16,24 139:25
140:9,14,24
141:24 142:2,8,11
142:14,17,18,20
142:21 143:9,12
151:9,12,14
181:12
**text** 128:2 184:18
**thank** 5:13 6:2
8:18 45:1,2 77:20
79:9,10 92:24,25
97:16 117:9,10,11
117:16 126:17,18
126:19 153:23
197:12 198:8
203:3,4,25 210:11
210:13 211:1
217:24 221:23
**theft** 81:24
**theories** 31:22
36:21 98:13
**theory** 82:13,13
117:17
**thing** 13:22,22
14:19 16:15 25:2
27:21 28:2 34:9
45:16 46:16 52:8
66:25 68:20 74:11
77:3,5,9,10 79:6
82:9 85:23 86:20
89:13 92:1 110:16
116:5 119:8
122:17 125:11
181:16 185:10

192:13 194:2
198:9 199:14
212:10
**things**   7:18 21:24
24:5 47:15 48:25
49:1 52:10 57:7
63:17 67:25 80:25
82:17 84:10 86:5
88:21,25 90:21
95:4 104:3 115:5
115:24 122:11
123:18,25 131:17
137:6 181:13
183:12
**think**   4:20 5:4,6
6:24 14:21 15:6,7
15:8,11 29:9
33:12,12 36:11
39:25 43:25 44:13
45:17,19 47:7
50:4,24 53:4,16
56:2,11 57:19
61:23 65:13 67:12
67:15 69:11,22
70:4 72:9,16 74:5
74:8 75:20 78:5
78:23 81:7 83:2
93:1 96:18 97:13
100:21 103:8
105:25 107:21
109:18 110:19
112:14,15 127:5,5
133:11,13 138:16
138:23 140:7,22
142:22 144:19
167:4 169:9,11
182:20,21 191:7,8
191:10,17 193:4
194:14 195:24
196:4,12 199:14
203:15 208:9

210:9 211:9,19,19
212:11 213:6,7
214:20 215:16,17
216:6,12 217:2,11
217:12,16 218:7
218:18,20 219:6
219:23,24 220:1
220:18,18,25
221:24
**thinking**   30:19,20
43:12 83:12 94:9
195:14 214:5
**thinks**   12:11,15
43:19
**third**   121:17 124:9
148:2 151:23
155:4,14 157:11
159:12 160:24
165:3 171:16,17
174:16 175:22
179:13 182:10
190:12 194:11
221:14
**thought**   19:12
23:16,18 33:8
90:23 91:2 97:1
101:15 132:16
134:6 143:21
191:7 194:25
214:7 216:2,4
219:7 220:6
**thoughts**   218:21
**thousands**   54:1
**threat**   14:8 15:13
27:25 52:3 58:13
60:13,20 62:1
74:12 120:9,10,10
121:10,13 149:22
149:25 151:3,4,8
179:8,11

**threatened**   22:25
74:13,13 121:19
121:20 148:13
149:2,8,17 150:10
179:15,16,20
**threatening**   22:9
44:15
**threats**   23:4,5 44:9
74:14 89:1
**three**   4:15 5:7 11:7
12:15 15:7 16:7
16:11 19:18 21:8
21:8 23:8 26:8,14
26:14 28:4,4
36:25 37:20 48:24
51:25 53:4 62:6
65:1 66:8 67:1
73:9,16 80:7 95:9
97:13 107:18
114:18 115:1
131:18,23 137:9
145:11 147:3,17
165:17 169:8
170:22 185:18
190:6 215:15
**throw**   29:7,11
50:22,23 99:24
199:21 220:11
**throws**   10:22
**thumb**   69:3,3,6
**thursday**   112:8
**time**   20:6 21:9,14
35:15,24 36:8
38:15,19,22 41:1
58:20,20,22,25
68:20 72:19,24
76:14,14 77:21
80:20 81:15 85:13
87:20 93:17,20
94:20 101:17
102:5 105:7 110:5

120:19 121:6
123:12 124:6,9
125:6 126:17
142:5 148:17
150:8,12 172:19
172:19 175:14
192:15 205:25
209:10 220:3,4,20
**timer**   46:20
**times**   26:21 58:24
59:11,22 62:6
68:25 69:1,22
73:16 84:21 98:23
99:10 112:14
113:7 120:22,23
124:4 125:3
135:14 202:5
**timid**   12:13
**timing**   31:3 105:2
107:19
**tip**   52:9 78:22 79:3
180:14
**tips**   180:17
**tiptoe**   89:22
**tired**   93:21 153:4
**today**   29:14 45:9
45:14 65:6 82:23
93:12 206:9
211:17
**told**   7:15,16 9:13
10:15 14:22 15:1
19:12 22:3 23:15
23:18,19 25:14
29:9 33:7 38:5
45:15 46:2 84:14
84:19 99:6 100:8
102:21 110:17
118:4 122:5
123:19 125:25
132:3,13 133:25
134:15 141:5

190:4 202:4
203:10 206:17
**tomorrow** 93:22
199:2 203:12,19
204:15,25 205:2
205:17,20 206:24
207:17 208:14,18
208:24 212:5
219:22 222:10
**tonight** 93:24
117:18 198:24
199:23 203:19
214:12 221:4
**top** 110:4
**totality** 72:14
**totally** 55:2
**touchdown** 82:19
**touched** 134:25
**town** 53:8
**toy** 219:20
**track** 80:5
**traditionally**
152:23
**train** 94:7,12
**trained** 19:17 20:5
20:19 27:19 54:2
54:2 61:1
**training** 27:13
140:2,18
**transact** 60:8
**transacting** 62:16
**transaction** 84:16
**transacts** 23:25
**transcribers** 2:7
**transcript** 224:5
**transcriptionist**
224:10,14
**transpired** 64:6
**transportation**
152:6

**transporting** 4:6
**travel** 22:22
**treat** 133:2 141:20
**treated** 158:12
168:13
**trial** 1:6 7:13
47:22 75:17 97:5
127:4 129:9,25
132:15 134:12
136:4,10 137:15
139:14,23 140:24
143:2 145:20
181:1 182:20
184:2 208:8 210:1
211:15
**trials** 47:4
**tried** 9:11 90:20
101:23 197:7
**tries** 10:13 39:3
99:17 107:3
109:10 118:21,22
**trigger** 33:20
**true** 4:15 9:11
84:14 89:1,2
141:18,22 142:21
180:9,10 210:8
211:8
**trust** 213:25
**trustworthy**
214:16
**truthful** 136:16,24
**try** 21:25 28:18
43:13,13 61:11
66:7 84:7 89:19
93:4 94:24 100:22
116:15 117:23
118:1,11 123:8
142:6
**trying** 28:13 48:16
67:1 69:24 73:8
73:12 84:9 85:2

85:11,14 87:15
88:3,5 89:13
90:22,25 98:11
100:5,5,6,16,25
101:9 103:15
104:1,7,9,17 107:6
107:17 112:19
115:16,18,24
119:14 136:23
143:22
**turn** 169:6
**turned** 39:7
**turning** 116:4,6
**turns** 38:6 87:6
**tv** 25:23 83:1
**twenty** 15:15,23
**twice** 13:13 109:14
120:23
**twitter** 128:5
184:20
**two** 9:1 11:16 13:6
14:12 15:23 16:7
19:16 21:12 28:1
28:4 29:16 31:4
33:3 34:23 41:8
41:10 44:11,14
46:10 50:19 52:15
53:24 55:7 63:17
64:21,22 65:7
76:2,5,24 94:16
97:14 107:21,22
107:22 112:17
118:13,16,25
119:2,12 124:4,7
126:14,24 131:16
131:22 134:16
137:7,24 144:6
145:2 160:5,15
161:18 162:14
165:14 167:1
181:13 187:3,4,14

187:15 188:12
197:13,16 201:14
202:12 209:17
221:17
**type** 42:15 47:3
48:8,9 49:25 60:3
162:15
**types** 82:2 134:16
134:18
**typically** 7:12
46:12

## u

**u.s.** 1:11
**ultimately** 29:4
127:18
**umbrella** 9:20
57:9 135:16
**unable** 109:11
144:14 205:8
210:3
**unanimous** 127:16
181:25 183:4,16
185:20 188:22
**unanimously**
149:10 186:15,25
187:10 188:5
194:5 195:10
**unbiased** 63:7
**uncontroverted**
52:6 59:16 71:23
78:24
**underlying** 172:8
177:13
**understand** 6:8
103:4 149:20
208:12
**understanding**
37:4 137:8 149:20
161:19 162:2,15
162:21 163:7

**understood**  160:4
  221:11
**unduly**  184:7
  193:12
**unequivocal**  52:6
**unfold**  84:3
**unfortunately**
  55:1 58:16
**united**  1:1,2,7
  145:3,3,14 160:7
  160:12,16 161:2,7
  167:24 221:15,15
**unity**  161:5 165:19
**unknown**  39:21
  43:14
**unlawful**  52:3
  71:7 111:13
  121:10 148:10,20
  149:5,10 159:14
  159:21 162:5,17
  179:8
**unlawfully**  111:14
  148:25
**unmake**  60:25
**unreal**  57:22
**unreasonable**  94:7
  94:12
**unspoken**  37:5
  161:20
**unsuccessful**
  124:8
**unusual**  4:17 50:8
  113:8
**upgraded**  81:24
  82:4
**upset**  101:4,5,12
  103:24
**urge**  115:6
**use**  4:13 6:8 10:5
  29:15,23 32:21,22
  32:23,23 33:25

40:5 46:12 55:24
  56:1 57:2,6,11
  68:12 69:18 74:12
  81:18 90:10
  124:14 127:24
  128:14 132:6
  134:18 137:1
  139:18 141:1,8,11
  149:18 151:3,3,8
  171:7,9,13 174:20
  175:10 177:11
  184:15 199:3
  201:21 206:5
  211:11 219:12
  222:15,23
**usefulness**  172:10
**uses**  82:5 171:4
**usher**  204:4
**ushered**  120:2,4,4
**ushers**  60:11
**usual**  7:21
**usually**  74:17
**utah**  75:8,9,10
  77:18

**v**

**v**  221:15,16
**valid**  10:6
**various**  112:8
**vast**  66:18,18
**vehicle**  38:21
  42:11,13,23 43:2
**ventura**  9:3 10:14
  10:23 11:19 12:12
  12:17 13:8,17,21
  13:24 14:22,24
  15:1 17:12,16
  18:5,18 19:3,22
  20:15,17,17,20
  21:7,13 23:13,14
  23:18 24:20 26:24
  27:8,19,23 28:18

31:7 33:3,6 34:5
  36:6 37:7,8 52:13
  53:2,10 54:9,11
  55:6,11,12,16 60:7
  61:7 62:7,13 64:4
  64:7,11,14 72:9,17
  72:18 75:22 82:6
  84:14 85:8,22
  88:6 92:8 98:25
  99:18,19 100:10
  100:16 101:5,23
  103:3 104:1,4,9,13
  104:20 105:19
  108:16,19,20
  109:1,11,25 110:2
  110:5,12,17
  111:24,25 115:11
  115:20 120:22
  124:7 150:12,20
  151:10
**ventura's**  18:3,8
  19:17 20:5 21:3
  23:6 27:14 28:23
  34:23 63:22 102:7
  103:1 111:22
**venture**  35:19
  151:17 155:23
  163:5 175:16
  176:3
**verbally**  149:22
**verdict**  4:8,11,15
  4:19 31:23 44:23
  44:24 78:15 90:19
  92:22 127:6,15,17
  128:7 131:2,6
  134:14,19 137:14
  146:23 147:3
  181:24 182:15,17
  182:21,22 185:17
  185:18 186:13,14
  186:16 187:13,22

187:23,24 188:15
  188:22 192:14
  195:8 198:11,12
  198:13,16 205:19
  209:15,22 210:8
  211:8,22 212:11
  212:17 215:19
  217:5 218:3
**verdicts**  181:15
  185:21,21
**veritext**  1:23 2:23
**versions**  98:13
**versus**  45:25
**vestibule**  29:15
**victim**  150:5
**video**  9:8 11:8
  14:12 15:20 16:2
  24:19 26:22,23
  32:22 34:7 35:20
  35:21 36:1 38:16
  39:16 52:16 53:15
  53:19,20 58:5,19
  58:22,23 59:20,21
  61:5,14 63:9,21
  64:1,2,22,23 65:11
  67:6,14,19 68:19
  69:13,13 72:2,8,12
  74:9 75:13,16
  76:18 79:1 80:4
  83:20 95:10 96:21
  104:6,8 105:4,5
  112:4 115:6,7,12
  122:8,14 123:9
  139:15 211:12
**videos**  51:20,20
  205:15
**view**  95:20 195:2
  206:12 209:20
  211:12
**viewing**  95:10

**views** 181:20
183:6

**violating** 144:23
144:23

**violation** 145:2,13
170:15

**violence** 22:24,24
23:3 32:8 92:17
92:18 113:19,22
113:24 145:13,15
148:13,21 149:2,8
149:18 169:9
170:15,18 173:9
173:24 174:3,12
175:2 177:15
187:9,20 188:11
189:5 195:16,24

**violent** 22:19,19
22:24 29:3

**visible** 189:11

**visual** 81:10
139:18

**visualize** 50:14

**voir** 48:23,23 56:3

**voluntarily** 163:19

**vote** 181:20
183:14,15 203:14

**voted** 185:12,16

**votes** 153:10
203:15

**vs** 1:3

**W**

**w** 2:3

**waist** 60:11

**wait** 49:18 94:12
203:12 204:11

**waiting** 153:17

**walgreens** 117:19

**walk** 17:9 35:18
42:6 84:11 125:4

**walkabout** 153:20
153:21

**walked** 9:16 11:4
13:3 17:15 35:15
37:5 42:8 110:22
110:22,23 121:22
135:14

**walking** 18:16
28:12 61:16
105:10 175:16

**walks** 10:10,12
12:24 14:4,4 18:2
25:1,1 30:23 62:4
70:7 84:6,7
121:24 126:5

**wallet** 10:12

**walnut** 1:17 2:4
212:25

**want** 5:5 6:8,16
7:3 19:4 22:15,16
35:13 37:14 45:6
47:16 50:5 55:13
60:5,7 70:10,11,11
74:17 76:10 77:20
84:1 86:9 89:13
91:18,20 93:14,21
94:3,9,13,18
100:10,11 101:24
101:25 102:1,2,22
102:23 103:10
108:22 111:6,10
111:18 114:4
116:18 124:15
144:18 181:23
185:6 192:10
198:23,23 203:16
204:16 205:2,13
207:15,20 209:3,4
209:10,23,24
212:11,19 213:19
219:23 221:25

222:5,24,24

**wanted** 11:11 83:7
88:7 199:20,21
203:11

**wants** 28:25 29:4
36:2,4 43:20
60:22 75:24 78:4
100:11,12 108:20
206:4

**watch** 81:19 82:20
84:13,16 87:15
91:13 104:8
105:20 107:6
115:6,13 122:7
123:9

**watching** 38:12,22
82:15 84:3 103:24

**water** 81:6

**wave** 57:16,17,17

**waving** 60:2 85:20

**way** 12:3,7,18
16:22 17:16,21
18:9 28:16 33:15
34:21 36:3,4 38:5
38:9 39:5 61:4
62:8 70:7,8 75:19
78:5 86:23 91:1
92:7,12,16 101:19
102:7,15 110:19
116:3,16 118:10
121:3,3,4 123:7
126:13 131:13
133:24 143:11
145:20 146:19
152:5 156:10,22
157:5,11 162:14
176:16 177:2
197:6 200:3,4
218:6

**ways** 32:1 37:12
100:19

**we've** 17:17 26:21
29:7 36:20 58:19
59:21 61:22 64:24
95:15 190:3
203:15 209:8
211:10 213:12

**weakness** 89:17,20

**weapon** 53:2
172:16,25 173:3

**wearing** 98:17
135:15

**website** 128:4
184:19

**webster** 40:9,13
40:20

**week** 4:12 45:14
46:2 71:1

**weekly** 11:12

**weeks** 117:25

**weigh** 90:10

**weighing** 130:19
132:7 138:2 140:8
140:14

**weighs** 51:5

**weight** 132:9
136:6,8 138:16,18
138:23 140:7
142:4,12,22
145:25 169:3
181:21 184:4,9

**welcome** 98:9
153:24 210:1

**welfare** 75:2

**went** 8:24 15:11
41:4 42:10,22
63:11 70:20 75:9
124:4,5 195:8

**wet** 9:19 57:8
68:16 135:15,16

**whatsoever** 123:1
126:8

**whichever** 187:4
**white** 80:4,21
**wife** 17:6,7,17,25
  18:10 40:10,21
  52:5 55:13 58:2
  58:14 59:12 60:10
  60:13,19,21 75:1
  77:19 79:8 82:16
  112:19 115:4
  120:2,4,6,11 121:5
  121:22,24 125:24
  126:1,3,4,7,8
  219:25
**wife's** 18:11,16
  59:6 76:22 108:18
  121:5
**wiitels** 222:14
**willfully** 148:1
**wince** 207:11
**window** 29:7 39:2
**windowless** 9:19
  68:16
**windows** 57:8
**windshield** 38:24
**wisely** 92:21
**wish** 84:22 94:5,19
  189:24 199:16
  203:18 204:24
  215:5
**wished** 156:13
  176:19
**withdraw** 194:22
**witness** 47:6 63:7
  63:8 99:12 100:8
  100:9 102:19
  103:3,9 105:5
  111:8 112:5,13
  133:12,15 134:22
  134:23,24 136:15
  136:16,17,20,21
  137:6,7,10,12,14

137:15,20 138:9
138:10,15 139:10
141:25 142:4,7,11
142:15 143:7
222:23
**witness's** 136:16
137:8,9,16,17,22
137:24 138:11,15
140:9,10,12
142:14,16
**witnesses** 64:5,10
64:21,22 65:7,21
68:22 71:20 79:2
84:25 87:23 112:8
131:16 136:14
137:23 138:20,23
139:4,7,12,22,25
140:4,5,6,14,25
**witnessing** 137:25
**wittels** 1:16,16 3:4
6:3,6,18,25 7:1
8:1,2 79:13,23,24
80:1,1 92:25
95:25 96:2 153:5
153:23 193:4,8,22
199:11 200:20
204:2 210:15,16
212:19,23,24
213:4,8,14,24,25
214:14,15 218:8
218:10,13,15,18
222:7,18,20
**woman** 44:11
**women** 80:22
88:14
**wonders** 80:15
**woodward** 2:7
224:4,14
**word** 48:1,7,13
77:3 109:15 119:1
201:21

**words** 9:10 10:2
31:10,17 50:15
62:21 94:2 108:2
128:9 149:19
155:19 158:10
166:5 175:25
197:16
**work** 64:23 65:8
65:14,23 90:25
94:6 118:2,11
119:16 125:14
161:20 163:20
191:1 199:19
200:15 205:12,13
208:24 221:4
222:25
**worked** 95:18
**working** 113:10
**works** 22:20 45:10
92:16 216:3
219:24 220:2
**world** 77:11,12
117:20
**worry** 150:6
**worthy** 136:15
138:10
**would've** 99:1
101:16 114:19
123:1
**wow** 10:21
**write** 184:24
185:11,21
**writer** 91:3
**writing** 58:24
**written** 37:1 47:10
161:25 209:18
**wrong** 37:22 38:9
89:10 179:23
183:11 187:22
201:21

**wrote** 73:10
137:15

### x

**x** 3:1

### y

**yarn** 57:25
**yeah** 42:8,14 57:6
65:8 85:25 88:6
190:22 192:19
209:7 210:23
213:4,14 219:9,15
221:17,19 222:12
222:18
**year** 71:1 77:18
**years** 71:1 74:25
75:8,20
**yelling** 13:7 67:4
101:20 103:16
105:18,19,20
107:10
**yells** 12:16
**york** 24:4
**youtube** 128:5
184:20

### z

**zooming** 38:9